IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| CARLOS E. SALA and | ) | |
| TINA ZANOLINI SALA, | ) | |
| | ) | 05-cv-00636-LTB-OES |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

UNITED STATES' REPLY TO PLAINTIFFS' RESPONSE TO
MOTION FOR RELIEF UNDER FED. R. CIV. P. 56(f) WITH RESPECT TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

_____

Defendant, the United States of America ("United States") hereby replies to plaintiffs'

response to the United States' motion for Rule 56(f) relief.

**INTRODUCTION**

The United States is entitled to Rule 56(f) relief.  The plaintiffs' arguments that (1) the

Government is somehow precluded from raising a statutory defense to plaintiffs' claim for

abatement of interest and (2) the United States has not met its burden under Rule 56(f) are,

especially at this nascent stage of the litigation, without justification.

Plaintiffs' argument that the United States is barred or precluded from asserting the

statutory defense that this is "a case involving fraud" lacks merit.  First, the United States'

argument is not predicated upon the assertion of a 26 U.S.C. § 6663 fraud penalty.  No such

penalty has been asserted here, nor is one necessary to assert that this is a case involving fraud.

Second, the assertion of an accuracy related penalty does not bar the Government from asserting

the statutory defense that this is a case involving fraud.  Third, the argument that fraud was not asserted in response to the plaintiffs' claim for refund is specious, given that this lawsuit was filed in advance of any determination by the IRS on that issue.   Fourth, it is immaterial whether or not the IRS administratively asserted that this is a case involving fraud, because this Court reviews the liability <u>de novo</u>.  Fifth, the Sala SOS tax shelter is one of the SOS transactions encompassed by the charges in the <u>Stein</u> Superseding Indictment.  Sixth, the evidence adduced so far indicates that this may be a case involving fraud.

The United States' Rule 56(f) motion is predicated on the belief that if permitted to conduct the necessary discovery, the United States will be able to establish that this is a case involving fraud.  KPMG recently disclosed to the United States a number of documents.  The newly-disclosed documents strongly indicate that plaintiffs' motivation was to enter into this shelter transaction solely for the tax benefits.

Plaintiff Carlos Sala, a financial expert who includes in his accomplishments experience as Mergers and Acquisitions manager at Ernst & Young's New York office and over 13 years as a Chief Financial Officer for major manufacturing and communications businesses, reported earning $60 million in income in 2000.  With KPMG as his agent, Sala spent part of 1999 and most of 2000 considering at least seven separate transactions to shelter this income; six of the seven were later invalidated as abusive tax shelters, including the transaction ultimately selected. After a failed effort to enter a BLIPS transaction, Sala eventually entered into the SOS shelter transaction at issue here.  Within two months of funding that shelter transaction, Sala liquidated his holdings and claimed a $60 million artificial tax loss, which he used to offset his $60 million in income.  When the income and loss were matched against each other, the transaction sheltered

all but $26,000 of Sala's income.  When his personal deductions were added in, Sala paid no income taxes.

These documents further indicate that at least 41 persons and nearly as many entities (including KPMG which has admitted that these SOS transactions were "fraudulent" and "bogus") were involved in locating, developing, and implementing Sala's entry into this abusive tax shelter.  Included among these persons are five who have been indicted for criminally defrauding the United States through the use of bogus tax shelters, including the SOS shelter at issue in this case, and who had direct connection to the Salas involvement with tax shelters: Raymond J. Ruble, Jeffrey Eischeid, Steven Gremminger, David Amir Makov, and Carol Warley.  The United States v. Stein Superseding Indictment charges these five persons, among others, with tax fraud for devising, marketing, and implementing fraudulent tax shelters, including SOS transactions such as the one at issue, with the knowledge that they were fraudulent and bogus.  A grand jury indictment is probable cause that the fraud occurred.  These individuals, among others, should be able to provide admissible evidence as to Sala's true motivation in entering into this transaction.

This is no fishing expedition.  Plaintiff Carlos Sala, a financially savvy executive, had reason to be concerned, and was well aware of the risks he had undertaken, when entering into this abusive tax shelter.  The fact that this shelter transaction created $60 million in artificial losses over a two month period, sufficient to offset virtually all of his taxable income that year, should have given Sala pause.  Tellingly, a notation in KPMG's 2001 Sala files indicates that Sala did not want to "risk" bringing the shelter transaction to the attention of the IRS.

1458267.11458267.1.1

The United States has already averred that it lacks personal knowledge as to the facts and circumstances surrounding plaintiffs' entry into this transaction.  However, the United States has identified some of the promoters, the accounting firms, the law firms, the trading firms, and the financial advisors which located, developed, implemented, and/or assisted in carrying out the abusive tax shelter.  The additional step of discovery upon those persons and entities will enable the United States to uncover evidence in the form of facts, testimony, and documents, which will enable it to conclusively determine whether this is a case involving fraud, such that the United States will then be able to rebut plaintiffs' allegations that no genuine issue of fact remains as to the interest refund issue.

## ARGUMENT

### I.      THE UNITED STATES IS NOT BARRED FROM ASSERTING THAT THIS IS A CASE INVOLVING FRAUD.

Much of plaintiffs' brief argues that the United States is barred from asserting that this may be a case involving fraud,[1] and thus must refund the interest at issue, because the IRS did not assert a fraud penalty, the imposition of a Section 6662(a) accuracy-related penalty bars the assertion of a fraud penalty, and the United States has waived the right to assert fraud.  Plaintiffs' Opposition to Defendant's Motion for Relief Under FED. R. CIV. P. 56(f) With Respect to Plaintiffs' Motion for Partial Summary Judgment ("Response") at 13, 23.

---

[1]      At page 25 of their Response, plaintiffs complain—in their demand for a $60 million tax deduction—that they will suffer an unspecified harm in the community should the United States now be permitted to assert fraud as a defense to refunding the interest at issue.  Even if these unsupported arguments of counsel were shown to be accurate, they do not operate to bar the United States, or any party, from asserting a valid defense.  Moreover, when "a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."  Neonatology Associates, P.A., et al. v. Comm'r, 299 F.3d 221, 234 (3d Cir. 2002)

The evidence adduced so far points to the conclusion that it is likely that fraud occurred. If this is a case involving fraud, plaintiffs cannot receive a refund of interest accrued after 18 months and one day from the filing of their original return.  26 U.S.C. § 6404(g)(2)(B).  As set out more fully below, there is evidence that plaintiffs sought out and knowingly invested in an abusive tax shelter with the express intent of creating sufficient losses to fully offset the $60 million of income earned in tax year 2000.  Furthermore, there is evidence that plaintiffs thereafter took steps to conceal the transaction from the IRS.

The legal standard applicable to deciding whether a case is "a case involving fraud" under Section 6404 has not been addressed by a court.  Ordinarily, for determinations of fraud, the Government must show that a taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of a tax.  Recklitis v. C.I.R., 91 T.C. 874, 909 (1977).  Fraud is often proved by circumstantial evidence and reasonable inferences from the facts.  Petzodt v. Commission, 92 T.C. 661, 669 (1989).  Fraud may also be inferred "from any conduct, the likely effect of which would be to mislead or conceal."  Spies v. United States, 317 U.S. 492, 499 (1943).  Importantly, the Section 6404 exception for a "case involving fraud" does not require, on its face, that the fraud at issue be committed by the taxpayer.  But even if the statutory exception contained such a requirement, there is evidence that the taxpayer in this case may have committed fraud.

**A.	The United States Has Not Asserted a Fraud Penalty.**

Plaintiffs oppose an argument the Government is not asserting in this case, namely, the propriety of asserting a fraud penalty under 26 U.S.C. § 6663(a).  Response at 5, 23.  The United States' opposition to plaintiffs' motion for partial summary judgment is not premised upon the

Section 6663 fraud penalty.  Rather, it is premised upon the fact that there is evidence that this is "a case involving fraud," a statutory defense provided under Section 6404(g)(2)(B).  Section 6404 is a provision falling under the Internal Revenue Code's (26 U.S.C.) refund procedures. Section 6663 falls under the Internal Revenue Code's penalty provisions (Chapter 68).

Plaintiffs' confuse the statutory exception barring the abatement of interest ("in a case involving fraud,") which is being asserted, with the civil fraud penalty (imposed on "75 percent of the portion of the underpayment which is attributable to fraud") which is not being asserted. These two provisions are separate and distinct as are their consequences.  More plainly, the former involves a concession otherwise granted to taxpayers providing for the cessation of the accrual of interest on a tax deficiency after the expiration of a certain period of time, while the latter is a penalty for underpayments attributable to fraud.

**B.**	**The Imposition of the Accuracy-Related Penalty Does Not Bar the Assertion of Fraud in this Case.**

Plaintiffs argue that the Section 6662(a) accuracy-related penalty bars imposition of a Section 6663 fraud penalty.  Response at 23.  As explained above, this argument fails to recognize that the fraud penalty is not at issue.  The United States does not dispute, as plaintiffs allege, that Section 6662(b) provides that the accuracy-related penalty "shall not apply to any portion of an underpayment on which a penalty is imposed under section 6663 [fraud penalty]." However, if what plaintiffs meant to argue is that this statutory language should be expanded to include Section 6404(g)(2)(B) (a non-penalty provision) in addition to IRC § 6663, and that therefore the United States may not argue that this is "a case involving fraud,"  such a contention not only rewrites Section 6662(b), but it is a position not supported by any identifiable case law. Furthermore, the plaintiffs' deficient legal argument is inapplicable to these facts.

A $4,440.80 accuracy-related penalty was imposed upon only the additional $56,071.00 in income that the IRS determined that plaintiffs' wholly owned corporation, Solid Currencies, Inc. had for tax year 2000.  See Notice of Deficiency, Exhibit A to Complaint.  The Section 6662(a) accuracy-related penalty was not assessed on the tax attributable to the $60,449,984 loss deduction taken by plaintiffs, a loss created by plaintiffs' use of the abusive tax shelter.  Id.

Because the accuracy-related penalty was assessed only on the additional $56,071 in income, but not the tax attributable to the $60,449,984 artificial loss, and assuming arguendo that plaintiffs' interpretation of the Section 6662(b) clause is found to be sound, it would not bar the United States from asserting that this is "a case involving fraud," with respect to that improper $60 million deduction.[2]

## C.    Because Plaintiffs Filed this Refund Suit Before the IRS Issued a Determination as to their Refund Claim, Plaintiffs Argument that Fraud was Waived is Incorrect.

Plaintiffs argue that the IRS did not determine that the "fraud" exception to interest abatement applied.  Indeed, that is the case.  Plaintiffs filed this suit before the IRS issued a determination on their refund claim.  Because the IRS did not issue a determination, plaintiffs do not know what the IRS' position was with regard to their request for a refund of that interest.  Because plaintiffs failed to wait for the IRS' actual determination as to whether plaintiffs were owed a refund of that interest amount, plaintiffs cannot argue that the IRS has waived such ability.

---

[2]      Moreover, as explained in the United States' motion to amend its Answer, if KPMG is found to have promoted the transaction in question, the United States does not need to show fraud to setoff and keep the interest at issue.  Lewis v. Reynolds, 284 U.S. 281, 283 (1932) ("Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.").

As to plaintiffs' assertion that the United States is barred from asserting fraud because its Answer did not allege fraud, the United States has concurrently filed a timely motion to amend,[3] and an amended Answer setting forth the Section 6404(g)(2)(B) "case involving fraud" exception as an affirmative defense to plaintiffs' request for refund of tax, penalties, and interest.

**D.      The Facts Available to the IRS During the Underlying Audit Indicated that, at Minimum, the Imposition of an Accuracy-Related penalty was Appropriate.  The Facts Now Available Indicate that this is "a Case Involving Fraud."**

The IRS assessed an accuracy-related penalty against plaintiffs based upon the facts available to the IRS at the time of the audit.  Since the date of the parties' Rule 26(f) conference, Skadden Arps Slate Meagher and Flom LLP, KPMG's counsel, disclosed to the undersigned attorneys for the United States a large number of documents that were not previously disclosed.[4] Those documents make it clear that, contrary to the representations in Mr. Sala's declaration, KPMG played a significant role as plaintiffs' agent in the illegal tax shelter at issue here.  The documents do not appear to have been included in the "1800 pages of documents" plaintiffs claim to have provided to the IRS during the underlying audit.  Declaration of Carlos E. Sala Regarding Plaintiffs' Opposition to United States' Motion for Relief ("Sala Declaration") at ¶7. As discussed in infra Section II(D), these newly-obtained documents outline in detail KPMG's significant and material role in connection with the SOS shelter at issue here.

Furthermore, those documents set forth the involvement of five of the persons indicted in the United States v. Stein, et al. case as identified and discussed below.  United States v. Stein, et

---

[3]      The Court's October 24, 2005 Scheduling Order provides that such amendments must be made by December 12, 2005.  Scheduling Order, Docket Entry 27, at 7.

[4]      The United States has produced these documents to plaintiffs.

al., Indictment No. S1 05 Cr. 888 (LAK) (SDNY 2005) ("Superseding Indictment").  See Exhibit

A.  The Court may take judicial notice of this public document.  The five persons are Raymond

J. Ruble, Jeffrey Eischeid, David Amir Makov, Steven Gremminger, and Carol Warley.  The

Superseding Indictment charges these five persons with tax fraud for devising, marketing, and

implementing fraudulent tax shelters, including SOS transactions such as the one at issue, with

the knowledge that they were fraudulent and bogus.[5]  The grand jury indictment is probable

cause that those five criminal defendants committed fraud.  United States v. Stricklin, 932 F.2d

1353, 1355 (10th Cir. 1991).  The Sala SOS tax shelter at issue here is one of the SOS shelter

transactions encompassed by the charges in the Indictment.  Declaration of Shirah Neiman,

Exhibit B at ¶2.  These five persons may be able to establish that plaintiffs' motive in entering

into this transaction was only to create a tax loss sufficient to shelter a particular, defined amount

of income.

    The United States' assertion that this is a case involving fraud does not arise out of whole

cloth.  The IRS assessed plaintiffs with an accuracy-related penalty and specifically reserved the

right to assert fraud.  Notice of Deficiency, Exhibit A to Complaint, at 10.  KPMG's counsel has

provided the United States with a set of KPMG's own documents, whose contents (discussed in

detail at infra Section II(D)) reflect that this is a case involving fraud, not just a case involving

inaccuracy.  The United States is seeking the full discovery period in which to further develop

this outline of facts into facts presentable by affidavit, in order to oppose plaintiffs' motion for

---

[5]    KPMG's Washington National Tax office considered whether KPMG could issue "more
likely than not" opinions regarding SOS transactions, and they concluded that the phony losses
generated by those transactions were not more likely than not to withstand IRS challenge.  That
office also reviewed "more likely than not" SOS opinion letters prepared by Stein defendant
Raymond J. Ruble and determined that the transactions described therein were not more likely
than not to withstand IRS challenge.  Exhibit A at ¶47.

partial summary judgment by rebutting their contention that no material facts exist on this issue. This is clearly not a fishing expedition.

**E.      It is Immaterial to a Fraud Determination Whether or Not the IRS Assessed a Fraud Penalty at the Administrative Level.**

A refund case proceeds by de novo review.  Lewis v. Reynolds, 284 U.S. 281, 283 (1932) ("the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax," and that "involves a redetermination of the entire tax liability.").  It is immaterial whether or not the IRS assessed fraud at the administrative level.  R.E. Dietz Corp. v. United States, 939 F.2d 1, 5 (2d Cir. 1991) ("The factual and legal analysis employed by the [IRS] is of no consequence to the district court." "'[T]he court does not sit in judgment of the [IRS]; the court places itself in the shoes of the [IRS].'" (quoting National Right to Work Legal Def. & Educ. Found. v. United States, 487 F.Supp. 801, 805 (E.D.N.C. 1979)).

Since this Court must reach its own conclusion on whether plaintiffs are entitled to a refund, anything the IRS did or did not consider is inadmissible.  Associated Wholesale Grocers, Inc. v. United States, 1989 U.S.Dist. LEXIS 14047 at *4,5 (D. Kan. June 7, 1989) (a copy is attached as Exhibit C).  The particulars of the contents of the IRS' administrative record are irrelevant because the government is not bound in this lawsuit by the IRS' findings and conclusions, or lack thereof, at the administrative level.  Blansett v. United States, 283 F.2d 474, 477 (8th Cir. 1960); see also Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974) (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").  The United States may defend this tax refund suit upon any legal ground, even if that legal ground was not considered or

relied upon by the IRS at the time it reviewed the underlying returns and made its assessments.

Blansett, 283 F.2d at 477.

If plaintiffs' refund request can be denied on any theory, that refund request must be denied.[6] Id.  In light of the foregoing, evidence as to the IRS' deliberations, considerations, findings, determinations and assessments, or lack thereof, are irrelevant and inadmissible.  Any such evidence may not be relied upon to support plaintiffs' Response.

## II.    PLAINTIFFS' ASSERTIONS, AND CARLOS SALA'S DECLARATION, BELIE THE TRUE FACTS – THAT THERE IS EVIDENCE OF FRAUD

### A.    Overview.

Plaintiffs filed this action requesting that the Court award them a refund of over $27 million in federal taxes for tax year 2000 on the basis of a claimed loss of $60,449,984 created by their participation in this abusive tax shelter used to offset their $60,476,365 in income.  See 2000 Form 1040, Exhibit D at 1.  Those deductions erased all of plaintiffs' DoubleClick income and, but for $26,000, eliminated plaintiffs' entire gross income.  Id.  Once plaintiffs' personal deductions were figured in, plaintiffs paid no tax at all.  Id. at 2.  That neat matching of income with deduction is revealing, and by itself, raises serious questions about Mr. Sala's motivation in entering the SOS deal.

Additionally, the documents KPMG provided show the direct involvement of at least five persons currently indicted in the United States v. Stein, et al. case: Raymond J. Ruble ("R.J. Ruble") (former tax partner at Brown & Wood LLP), Jeffrey Eischeid (former head of KPMG's

---

[6]    Moreover, as explained in the United States' concurrently-filed motion to amend its Answer, the right of setoff permits the United States to collect any unassessed deficiency from held funds.  Lewis, 284 U.S. at 283.

Innovative Strategies group[7] and Partner-in-Charge of KPMG's Personal Financial Planning group), Steven Gremminger (former KPMG partner and associate general counsel in KPMG's Office of General Counsel), David Amir Makov (of Presidio Advisory Services, LLC), and Carol Warley (former KPMG Director, Washington National Tax). See Superseding Indictment, United States v. Stein, et al., Exhibit A at 1. KPMG has admitted that the SOS tax shelters were "fraudulent" and "bogus." See Exhibit E at 2.

In the Stein indictment, those five persons are charged with having known that SOS transactions were fraudulent and bogus, and thus they may be able to establish that plaintiffs' motive in entering into this transaction was only to create a tax loss sufficient to shelter a particular, defined amount of income. The documents made available to the United States as identified and described infra, provide ample support that discovery needs to be taken as to the knowledge of these persons, as well as the persons and entities identified and described therein, which should establish whether any actions in this transaction were taken with the intent of defrauding the United States.

Furthermore, on December 6, 2001, Tracey Angelisa Napier ("Angie Napier") (KPMG employee in the "Innovative Strategies" group) wrote a memorandum listing the professional fees plaintiffs paid for the transaction at issue. Those fees totaled $113,000. Exhibit F[8]. Angie Napier then wrote that "He [Sala] doesn't want to lose [the 2001 deductions] but not worth risk of linking it to last year." The clear meaning is that Sala does not want to lose these tax

---

[7]      Innovative Strategies was the name of the KPMG group which focused on designing, marketing, and implementing of tax shelters for individual clients. See Superseding Indictment, Exhibit A at ¶2.

[8]      Documents containing the bates-range commencing "KPMG" were made available by counsel for KPMG in connection with this case. Exhibit OO.

deductions, but he is aware that asserting them <u>risks</u> alerting the IRS to the lack of <u>bona fides</u> of the underlying SOS shelter transaction.

Plaintiffs cleverly, but wrongly, argue that the illegal conduct asserted in the SDNY case is limited to the fact that KPMG failed to register several tax shelters, that KPMG advised using grantor trusts to hide the shelters on a participants tax return, that KPMG made false statements that the transaction had a reasonable opportunity for profit, and that KPMG improperly withheld documents subject to government discovery requests.  Response at 18.  Plaintiffs base this incorrect argument upon a speech an IRS representative made to the press.  <u>Id</u>.  The actual superseding indictment states that the illegal conduct consisted of:

> a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters, by preparing and causing to be prepared, and filing and causing to be filed with the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent tax shelter losses, and by fraudulently concealing from the IRS those shelters.

> In order to conceal the true nature of the tax shelter from the IRS, to attempt to evade the wealthy client's U.S. individual income taxes, and to shield the clients from IRS penalties for underpayment of income taxes, KPMG and/or a law firm provided the clients with opinion letters containing false and fraudulent representations and statements and claiming that the tax shelter losses were "more likely than not" to survive IRS challenge.

> [T]he conspirators issued false and fraudulent opinion letters with the intent that the clients would claim the fraudulent tax shelter losses on tax returns and provide the opinion letter and other false and fraudulent transactional documents and/or the false and fraudulent representations and statements contained therein to the IRS if and when the client was audited.

> Superseding Indictment, Exhibit A at ¶¶25-27.

The conduct and activity underlying the transaction at issue in this case appears, based upon the facts currently known, and as reflected in the documents which KPMG presented to the United States, and discussed below, falls squarely within the scope of the Superseding Indictment.

Moreover, the Sala SOS tax shelter at issue here is one of the SOS shelter transactions encompassed by the charges in the Indictment.  Declaration of Shirah Neiman, Exhibit B at ¶2. Further discovery is warranted to verify these probable facts.

**B.  KPMG Acted as Plaintiffs' Agent in Locating, Developing, and Implementing the Desired Loss-Generating Tax Shelter.**

Sala's initial contact with KPMG came through Tim Gillis, an old friend of Carlos Sala. See Exhibit G.  In the months leading up to Sala's participation in the SOS transaction, Sala worked with KPMG partner and Personal Relationship Manager Tracie Henderson, on a number of potential shelter options.  Several of the Stein criminal defendants also participated in these efforts.

The informal discovery that the United States has performed to date shows that plaintiff Carlos E. Sala ("Sala") used KPMG as his agent to locate and present to him loss-generating tax shelters, and to develop and implement his entry into the loss-generating transaction.  In that role, KPMG, through Tracie Henderson, presented to Sala at least seven separate tax shelters, both before and after the failed BLIPS2000 deal, and as discussed in subsection D below, spent a great deal of effort on selecting and placing Sala into the SOS transaction at issue in this case.

The first known transaction KPMG presented to Sala is called the Tax Relief Act Charitable Trust (TRACT) tax shelter.  KPMG presented that tax shelter to Sala on October 1, 1999.  See TRACT Presentation, Exhibit H.  On October 18, 1999, TRACT was invalidated by Treas. Reg. 1.643(a)-8.

The second known transaction KPMG presented to Sala was the BLIPS2000 variant of the Son of BOSS tax shelter.  KPMG's promotion and implementation of the BLIPS shelter is also the subject of the Stein criminal indictment and KPMG has conceded that the "losses"

generated by BLIPS are "bogus," and the transaction was premised on false and fraudulent representations. See Composite Exhibit Transcript of Hearing and accompanying Statement of Facts Exhibit E, p.5 at ¶20.  The record indicates that Sala agreed to enter into the BLIPS2000 transaction on or about June 6, 2000.  Exhibit I.  Prior to reaching an agreement on BLIPS, Sala directed Tracie Henderson to contact criminal defendant David Amir Makov to inquire about the economics of the transaction. February 10, 2000 email from Henderson to Makov, Exhibit J.  A June 2000 memorandum to another criminal defendant, Larry Delap (with a copy to criminal defendant Eischeid) reported on communications between the Salas' counsel and KPMG about the Salas' request to change the terms of their shelter engagement letter with KPMG to delete any reference to the IRS challenging "the program."  June 30, 2000 Delap Memorandum, Exhibit K.  The BLIPS tax shelter was invalidated as an abusive tax shelter by IRS Notice 2000-44, released August 13, 2000.  Sala backed out of that transaction in late August or early September 2000.

The third known transaction KPMG presented to Sala is known as the Common Trust Fund Straddle (CTF) tax shelter.  KPMG began discussing offering this loss-generating transaction to Sala as early as May 23, 2000.  See Exhibit L.  On October 6, 2000, while assisting Sala in finding a replacement for BLIPS2000, Tracie Henderson sent an email to Jeffrey Eischeid stating that Sala "doesn't seem inclined to [do] CTF.  He must decide about this other transaction by Friday."[9]  Exhibit M.  The CTF transaction was invalidated as an abusive tax shelter by IRS Notice 2003-54.  It appears from the record that the "other transaction" referenced in the email was an options transaction promoted by R.J. Ruble or Brown & Wood LLP;

---

[9]       The CTF transaction was invalidated as an abusive tax shelter by IRS Notice 2003-54.

however, while discovery has not yet been taken as to this matter, it may well be that this "other transaction" is the SOS transaction at hand.  Id.

The fourth known transaction KPMG presented to Sala is called the Offshore Portfolio Investment Strategy (OPIS).[10]  OPIS is yet another of the shelters encompassed by the Stein criminal indictment, and KPMG has conceded that the "losses" generated by OPIS are "bogus" as well.  See Composite Exhibit Transcript of Hearing and accompanying Statement of Facts at p. 3, ¶6, Exhibit E.  On October 3, 2000 Jeffrey Eischeid, indicted KPMG partner, emailed Tracie Henderson "scripts for [her] conversations with clients on the following [OPIS] deals." Exhibit N.  Sala and his friend Martin White[11] were identified as part of the sixth presentation group.  Id.; see also Exhibit G.

The fifth known transaction KPMG presented to Sala was the transaction at issue, the SOS variant of the Son of BOSS tax shelter; a transaction also invalidated as an abusive tax shelter by IRS Notice 2000-44.  Sala entered into that transaction on October 23, 2000, two months after the Notice invalidating the tax shelter was released on August 13, 2000.  As with BLIPS and OPIS, the SOS transaction is encompassed by the Stein criminal indictment and KPMG has admitted its invalidity. See Composite Exhibit Transcript of Hearing and accompanying Statement of Facts at ¶20, Exhibit E.  In connection with SOS shelter transactions, the indictment brings criminal charges against numerous defendants, including

---

[10]      The OPIS tax shelter was invalidated as an abusive tax shelter by IRS Notice 2001-45.

[11]      The documents provided by KPMG indicate that Martin "Tony" White, president of DoubleClick, also sought to shelter his tax year 2000 DoubleClick income.  Those documents show that KPMG also placed him into the BLIPS2000 transaction (which ultimately failed).  See Exhibit I.

several believed by counsel to be specifically involved with Sala, including Jeffrey Eischeid, Carol Warley, David Amir Makov and R.J. Ruble.

The sixth known transaction KPMG presented to Sala (via his Colorado tax counsel Lawrence Nemirow of Davis Graham & Stubbs LLP) is referenced as "involv[ing] options on a mutual fund pool held in a Rabbi Trust." On October 10, 2000 this "alternative" was discussed in a meeting between Gary Powell (KPMG employee) and Lawrence Nemirow. See Exhibit O.

The seventh known transaction KPMG presented to Sala is known as the Partnership Option Portfolio Strategy (POPS).[12]  KPMG was discussing this loss-generating transaction with Sala at least as early as November 3, 2000.  Exhibit P.

The eighth known transaction is referenced as a "Jones Day transaction."  On September 6, 2000 Tracie Henderson emailed Tim Gillis (a KPMG partner) stating that she had just spoken with Sala, and that "we are hoping to do a Jones Day transaction for Sala.  However, it appears that Jones Day may be getting cold feet; they are having second thoughts about writing the opinion letter."  Exhibit Q.  It is unclear whether the Jones Day transaction is different from the seven other loss-generating tax shelters offered to Sala, and whether Jones Day was getting "cold feet" in response to Notice 2000-44.

**C.**     **Plaintiffs Paid KPMG $6,225 for Preparing Their 2000 Tax Returns, and an $18,775 "Advisors" Fee for Locating, Developing, and Implementing their Entry Into this Particular Loss-Generating Tax Shelter.**

Sala admits that he used KPMG to find and set up the BLIPS2000 shelter, which he backed out of when Notice 2000-44 was released.  Response at 15.  When Sala backed out of BLIPS2000, KPMG lost out on its $700,000 fee.  Exhibit R at 3.  What Sala has failed to

---

[12]     The POPS tax shelter was invalidated as an abusive tax shelter by Notice 2002-50.

1458267.11458267.1.1

disclose was that after that BLIPS2000 deal fell through, he told Tracie Henderson, KPMG partner, that he would do a transaction with KPMG if KPMG was able to find one, "but if not, he would use KPMG as his advisor on another deal." September 6, 2000 Email from Tracie Henderson to Tim Gillis, Exhibit Q.

Sala's declaration states that he paid KPMG only for its preparation of his 2000 tax returns. Sala Declaration at ¶8(f),(g). However, of the $25,000 KPMG charged Sala, only $6,225 was for preparation of Sala's tax returns and the rest was to cover KPMG's tax advisor's fee. Exhibits S, T and U. The drafts of this bill show that the "tax advice" was in regard to Sala's DoubleClick Form W-2, which indicated $51,748,681 in income from salary and the exercise of his stock options and involved KPMG's discussions regarding lowering that stock option gain. Exhibit U.

**D.      KPMG Took a Significant, Material Role in Locating, Developing, and Implementing this Abusive Tax Shelter.**

At pages 15-16 of their response, plaintiffs insist that "KPMG played no role in the transactions at issue in this case, other than as a return preparer, compensated on an hourly basis." Response at 15-16. The Sala Declaration states that KPMG had no dealings with Deerhurst, and that he did not invest in, or claim a loss with respect to, any KPMG-promoted investments. Sala Declaration, at ¶¶8(d), 8(f), 9. The limited informal discovery the United States has conducted up to this date belie these statements. As discussed below, KPMG's own documents show that it, as Sala's agent, took a significant, material role in locating, developing, and implementing Sala's entry into this abusive tax shelter, and that plaintiffs paid KPMG an advisor's fee for that material assistance. The United States' information on this subject comes from KPMG's own records produced by KPMG's counsel, Skadden Arps. There is no indication

that any of this information was available or provided in the "over 1800 pages of documents [plaintiffs] provided to the IRS."  Sala Declaration at ¶7; Response at 11.

The below facts, as they are now known, detail the extensive work KPMG (which has admitted that these SOS transactions were fraudulent and bogus) did to locate, develop, and implement Sala's entry into this abusive tax shelter, and show that KPMG, as Sala's agent and advisor in this transaction, "worked with" Deerhurst Management and MultiNational Strategies, in addition to several outside attorneys from several firms, when locating, developing, and implementing Sala's entry.

- On August 13, 2000 IRS Notice 2000-44 was released, invalidating the BLIPS2000 transaction.  Five days later, Tracie Henderson emailed Sala a chronology titled "Timing of the Transaction" which set forth the dates on which each step of the BLIPS2000 transaction would occur.  See Exhibit V.  It is clear that at this point, Sala and KPMG were still preparing to go forward with the BLIPS2000 transaction.

- On August 31, 2000 Tim Gillis emailed Tracie Henderson regarding a conversation he had with Sala, stating that "they are rethinking what if anything they should do."  See Exhibit W.  This email indicates that by this time, Sala was aware that the IRS had invalidated the BLIPS2000 transaction he had been planning to enter.  Six days later, Tracie Henderson emailed Tim Gillis stating that she had just gotten off the telephone with Sala and that "**he said he would do a transaction with [KPMG] if we are able to do one.  Otherwise, he will use us as an advisor on another transaction**.  We are hoping to do a Jones Day transaction for Carlos Sala."  See Exhibit Q (emphasis added).  This conversation makes clear that Sala asked KPMG to play a continuing role as his

1458267.11458267.1.1

agent to find him a transaction, that he would pay KPMG for its effort, and that in its role as agent, KPMG was already searching for new loss-generating transactions.

- On September 14, 2000 Tracie Henderson met with Bruce Amman (the Morgan Stanley investment advisor to Sala and Martin White[13]) at Benny's (a Denver restaurant) to "discuss investment."  (Sala was billed for the cost of the meal.)  See Exhibit P.  Without having had the opportunity to take discovery as to the particulars, it can only be surmised that this meeting was part of KPMG's active attempts to locate a new transaction.

- On October 3, 2000 Jeffrey Eischeid (indicted former head of KPMG's "Innovative Strategies" group and Partner-in-Charge of KPMG's Personal Financial Planning group) emailed Tracie Henderson the script for her conversation with Sala on the Offshore Portfolio Investment Strategy (OPIS) tax shelter.  See Exhibit N.  The Innovative Strategies group was KPMG's name for the KPMG division that designed, marketed, and implemented tax shelters.  Superseding Indictment, Exhibit B at ¶2.  The Superseding Indictment charges, and KPMG admits, that OPIS is a fraudulent transaction.  Exhibit A at ¶¶ 34-37; Exhibit E at pp 1-4.

- Jeffrey Eischeid's email was copied to Steven Gremminger (indicted KPMG partner and associate general counsel in KPMG's Office of General Counsel) and indicated that Carlos Sala and Martin White trading had not commenced.  See Exhibit N.  It is unclear why there was confusion as to whether any trading had commenced; regardless, this email indicates that two of the indicted KPMG persons were involved in marketing

---

[13]    The documents provided by KPMG indicate that Martin "Tony" White was also placed into this SOS variant of the Son of BOSS transaction.  See Exhibit X.

shelters to Sala, and monitoring, at minimum, the transactional activity necessary to carry out the shelters.

- On October 6, 2000 Sala sent Tracie Henderson a September 15th draft Brown & Wood LLP opinion letter titled "Re: Investments in Foreign Currency." Exhibit Y (full attachment not included). This opinion letter appears to be a template for the SOS transaction eventually entered into by Sala. That same day, Tracie Henderson billed Sala $450 for a one-hour discussion of the "new strategy." See Exhibit P. Three days later, Tracie Henderson's billing records show that she read the opinion letter, called R.J. Ruble (believed to be the author of this draft opinion), and discussed the contents of that call with Sala. See Exhibit P. Those records show that Tracie Henderson billed Sala $2500 for those 5 hours of work.

- On October 9, 2000 Gary Powell (KPMG employee) scheduled a meeting with Lawrence Nemirow for the purpose of presenting two alternative tax shelter transactions. The persons scheduled to attend were R.J. Ruble, Mary Heath (KPMG Tax Partner, D.C. Office), Carol Warley (KPMG partner, Washington National Tax and a Stein criminal defendant), Tracy Stone (KPMG partner, Washington National Tax), and Pamela Weems (KPMG partner). See Exhibit Z. That meeting took place the following day, but at that meeting only one transaction alternative was presented. KPMG did not present the second transaction because Lawrence Nemirow refused to sign a non-disclosure agreement. See Exhibit AA. It was at this meeting that the tax shelter involving "options on a mutual fund pool held in a Rabbi Trust" was discussed. Id.

1458267.11458267.1.1

- Also on October 9, 2000 Tracie Henderson emailed Jeffrey Eischeid stating that "Sala talked to Beckett Cantley [a tax attorney then practicing with Rachelson & White] about R.J. Ruble's option strategy and he likes it.  He has seven clients doing the transaction. Carlos [Sala] wants me to talk to him tomorrow at 1:00.  Hopefully, I can talk to R.J. Ruble first.  Carlos doesn't seem inclined to [enter into the] CTF [Common Trust Fund Shetler].  He must decide about this other transaction by Friday."  <u>See</u> Exhibit BB.  The following day, Tracie Henderson made that telephone call to Beckett Cantley, and billed Sala $900 for the two-hour call.  <u>See</u> Exhibit P.  As discussed above, KPMG began discussing the CTF[14] transaction with Sala as early as May 23, 2000.

- Two days later, on October 11, 2000, it appears that KPMG stepped up its efforts to locate a new transaction.  On that date, Tracie Henderson found Sala an "attorney" in Bruce N. Lemmons (then practicing with Holland & Hart) and "investment help" in David Amir Makov (a <u>Stein</u> criminal defendant and co-owner of Presidio).  <u>See</u> Exhibit P.  Sala was billed $450 for Tracie Henderson's effort.  <u>Id</u>.  The next day, Tracie Henderson had a one-hour telephone call with Makov, billing Sala $450 for that discussion.  <u>See</u> Exhibit P.  This call took place well after Sala backed out of the BLIPS2000 transaction, which was set up using Presidio as a promoter.  The reason Tracie Henderson was using Makov for "investment help" at this point in time is unknown, but this evidence nevertheless points to KPMG's role as Sala's agent in locating, developing, and implementing his entry into a loss-generating transaction.

---

[14]    CTF was invalidated as an abusive tax shelter by Notice 2003-54.

- On October 13, 2000 Tracie Henderson had a 1.5 hour telephone call with Bruce Lemmons, and billed Sala $675 for that discussion.  <u>See</u> Exhibit P.  At this time, the United States has no knowledge of the substance of this telephone call, and without discovery cannot determine why KPMG sought another attorney's help during the period in which it was charged with finding Sala a loss-generating transaction.  The probable fact may be that Lemmons and Makov jointly developed, marketed, and implemented these or similar tax shelters.[15]  The documentary evidence indicates that Sala paid Holland & Hart, Lemmon's firm, $4,200 in professional fees for its role in this transaction.  <u>See</u> Exhibit CC.

- On November 3, 2000 Tracie Henderson presented Sala with another tax shelter transaction, the POPs shelter.  <u>See</u> Exhibit P.  As discussed above, POPs was another tax shelter transaction later invalidated by IRS Notice 2002-50.  Sala was billed $450 for this discussion.  <u>See</u> Exhibit P.  One month later, on December 6, 2000 Tracie Henderson, Sala, and Kevin Brady (KPMG Senior Manager) met in Atlanta[16] for lunch at Nona's Italian Kitchen to discuss personal financial planning.  Sala was billed for the cost of the meal.  <u>See</u> Exhibit P.

- On December 23, 2000 Bruce Amman sent Tracie Henderson updated income projections for Sala's 2000 tax year, along with a spreadsheet showing Sala's interest gains and

---

[15]      It appears that Makov actively developed BLIPS with KPMG and others, as charged in the Superseding Indictment, and acted as investment adviser while Lemmons wrote shelter opinion letters.  <u>See</u> Exhibits KK and NN (reflecting that Lemmons met with Tracie Henderson and <u>Stein</u> criminal defendants Eischeid, John Larson, Amir Makov, R.J. Ruble and Mark Watson in connection with OPIS, BLIPS and possibly other shelter transactions),

[16]      KPMG's Innovative Strategies group was headquartered in Atlanta, and it is believed that Tracie Henderson worked out of this office.

1458267.11458267.1.1

losses.  See Exhibit DD.  It was at this point that KPMG knew exactly how much of a loss would be required to offset Sala's income.  On or about December 29, 2000, Sala liquidated Solid Currencies LLC (creating the $60,449,984 in artificial tax losses) and contributed the remaining assets to Deerfield Trading Strategies LLC. See Exhibit EE. On or about December 31, 2000, at least in a letter dated that date, Brown & Wood LLP issued its tax opinion letter blessing the SOS transaction.  See Exhibit EE.

- On March 20, 2001 Tracie Henderson spent two hours discussing "strategy issues" with Lawrence Nemirow, billing Sala $900.  See Exhibit P.  On April 9, 2001, Lawrence Nemirow forwarded to Tracie Henderson an email he sent to R.J. Ruble with changes he wanted to make to the Brown & Wood representation letters.  Exhibit FF. Mr. Nemirow requested that R.J. Ruble change the language of one paragraph from "Investor actively participates in management" to read "Investor invests directly in marketable securities." Id.  This change was likely made to bolster the plaintiffs' position that there was a business purpose to the transaction.

- On April 12, 2001 Tracie Henderson emailed R.J. Ruble asking him to re-send the Sala opinion letter to her, as she hadn't received it.  She also stated that Lawrence Nemirow "would like an email from you [R.J. Ruble] stating that you considered any developments from December 31 (the date of the Opinion Letter) through the issue date."  See Exhibit GG.  On April 9, 2001 Lawrence Nemirow had emailed Tracie Henderson, stating that he had received a final opinion letter from R.J. Ruble, but was waiting for Sala to execute his representation letter before he would release the opinion letter.  See Exhibit HH.  It is

clear that even when Sala's Colorado attorney was independently working on matters related to this transaction, he kept KPMG closely informed as to his activities.

- Finally, on August 21, 2003 Tracie Henderson emailed Jeffrey Eischeid and stated that Deerhurst Management and MultiNational Strategies LLC[17] are firms that KPMG has "worked with" to provide tax advantaged transactions to their clients.  See Exhibit II. While Sala declared that KPMG had no relationship with Deerhurst, KPMG, by its own admission, used those firms to provide tax-advantaged transactions to its clients.

## E.    Sala's Declaration Omits Material and Significant Facts

The Sala Declaration is notable more for the facts it omits, than those it admits. Certainly, the most glaring omission is that KPMG took a significant, material role as Sala's agent in locating, developing, and implementing Sala's entry into the tax shelter at issue in this case.

While the Sala Declaration states that Sala disclosed a purported "1800 pages of documents" to the IRS in support of his position, the IRS was not provided emails and documents which clearly showed the significant and material role KPMG took in this case. Some of these documents and emails were, at some time, in Sala's possession – his own email address appears on them.[18]

---

[17]    In plaintiffs' Rule 26(a) disclosures, they identify Michael N. Schwartz, owner of MultiNational Strategies, as having information regarding "the investment program offered to Plaintiff Carlos E. Sala by Deerhurst, including the formation, the nature and structure of the specific assets bought and/or sold, the history of the investment opportunity and the future profit projections."  Plaintiffs' Initial Disclosures Pursuant to FED. R. CIV. P. 26(a)(1), at 4.

[18]    That email address is "Salaini@aol.com."

1458267.11458267.1.1

Additionally, Sala himself admits that he did <u>not</u> turn over all of the transactionally-related documents he has in his possession.  Sala Declaration at ¶5.  The emails sent to Sala, as described above, fell within the purview of the IRS' document requests to Sala:

> Related to your investments in Deerhurst Investors and/or Deerhurst Management and/or any other entity and Solid Currencies, Inc., (sometimes collectively referred to as the "partnership") provide the following:
> 
>                         \*\*\*
> 
> 4.     All correspondence and memoranda, including but not limited to engagement letters, representation letters, confidentiality agreements, correspondence, instructions, authorizations, and withdrawal requests.

Sala Declaration at Exhibit E, p.9.

Furthermore, although Sala claims that he entered into a "five-year program," the $60 million in tax losses Sala sought on his $8.9 million investment were achieved within two months of funding the transaction.  Sala Declaration at ¶8(a).

## III.     THE UNITED STATES IS NOT CONDUCTING A FISHING EXPEDITION

This is no fishing expedition.[19]  The documents the United States has received to date refute Sala's declaration and indicate KPMG had a much greater degree of involvement in this transaction than the Response or Sala's declaration admits to.  Furthermore, those documents identify five involved persons who are now under indictment in <u>Stein</u>, and are believed to have knowledge that the SOS transaction was fraudulent and bogus, and who may establish that Sala's sole motive in entering into this transaction was to purchase a tax loss.  As a practical matter, the

---

[19]     Plaintiffs' citation to the <u>Ezekwo</u> case does not support their argument that the United States is engaged in a fishing expedition.  Response at 15.  In <u>Ezekwo</u>, a private party availed themselves of extensive discovery in the administrative process below, and was unable to show what additional discovery was needed to defeat summary judgment.  <u>Ezekwo v. Amer. Bd. of Internal Med.</u>, 18 F.Supp.2d 271, 273-75 (S.D.N.Y. 1998).  That court wasn't foreclosing discovery; it only stated that the plaintiff needed to show what more needed to be discovered.  <u>Id</u>.

United States cannot be expected to accept plaintiffs' version of the events without further discovery.  At a bare minimum, the United States is entitled to depose the individuals identified above,[20] and to issue subpoenas <u>duces</u> <u>tecum</u> upon the above-identified entities.  However, logic, FED. R. CIV. P. 26(b)(1), and FED. R. EVID. 401 contemplate much wider discovery:

> Parties may obtain discovery regarding any matter … that is relevant to the claim or defense of any party….  [FED. R. CIV. P. 26(b)(1)]

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  [FED. R. EVID. 401]

> Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  [FED. R. CIV. P. 26(b)(1)]

Evidence as to the involvement of the persons and entities identified above is clearly relevant to the United States defense to plaintiffs' motion for summary judgment on the interest refund issue on the grounds that this is a "case involving fraud."  Indeed, the information already known indicates that substantial discovery upon the plaintiffs, the promoters, the accounting firms, the law firms, the trading firms, and the financial advisors, which developed, promoted, and/or assisted in carrying out the abusive tax shelter are likely to be fruitful.  The facts of this case are so intertwined with the discovery necessary to determine whether this is a case

---

[20]     However, the United States is already meeting resistance.  Justin Thornton, Tracie Henderson's counsel, sent a December 5, 2005 letter to the undersigned counsel stating that Tracie Henderson will, upon advice of counsel, assert her 5th Amendment privilege against self-incrimination should she be required to give deposition testimony as to this transaction.  Exhibit JJ.

1458267.11458267.1.1

involving fraud, that the United States should be afforded the full discovery period to discover this relevant evidence.[21]

Finally, it should be pointed out that plaintiffs agreed, in the joint Scheduling Statement, that a year of discovery was necessary and appropriate to preparing this case for trial. Scheduling Statement at 7.  It is incongruous for plaintiffs to state that one year of discovery is warranted to determine whether the underlying transaction had any economic purpose other than the creation of tax benefits, but at the same time say that no discovery is warranted as to whether the underlying transaction involved fraud.

## IV.    THE UNITED STATES RULE 56(f) MOTION MEETS THE <u>CAMPBELL</u> TEST.

As a predicate matter, the appropriate test for granting and denying a Rule 56(f) motion is that set forth in <u>Campbell</u>.  The Rule 56(f) motion must: (1) be authoritative and timely; (2) explain why facts precluding summary judgment cannot be presented; (3) identify the probable facts not available and what steps have been taken to obtain these facts; and (4) explain how additional steps will enable the United States to rebut plaintiffs' allegations that no genuine issue

---

[21]        Furthermore, plaintiffs' counsel's published writings show that they understand that the KPMG fraud investigation went farther than simply an investigation into the entity itself, and would result in investigations of the intent and actions of individual clients:

> It appears likely that similar investigations [like the Southern District of New York's investigation in KPMG] involving high profile tax specialists involved in the creation of tax shelters will not be uncommon in the future.  … Thus, it appears that the KPMG and E&Y investigations will not be isolated incidents, but part of a larger group of tax fraud cases against highly respected tax advisors **and their large corporate and individual clients**.

D. Hallett & J. Colvin, "It Seemed Like Such a Good Idea at the Time" Tax Shelters, The Morning [sic] After, Exhibit ** at 1-2 (emphasis added).

1458267.11458267.1.1

of fact exists on the interest refund issue.  <u>Committee for the First Amendment v. Campbell</u>, 962

F.2d 1517, 1522 (10th Cir. 1992).

**A.      The United States' 56(f) Motion is Authoritative and Timely.**

In their brief, plaintiffs spend a great deal of time arguing that the United States was

dilatory in its allegation that this may be a "case involving fraud."  Response at 5,6,11-14.  On

September 22, 2005, counsel for the United States called John Colvin, counsel for plaintiffs, and

discussed the fact that the United States intended to assert fraud in this case.  One month later,

the United States re-affirmed its intention to argue fraud in this case when it conferred with

plaintiffs' counsel and filed the joint proposed Scheduling Order, noting that the United States

was exploring whether this is a case involving fraud.  Scheduling Order at 2.

Plaintiffs took care to explain the several extensions of time that it took for the United

States to obtain documents and records from its client, and to explore a disposition of the matter

at hand in this motion.  <u>Id</u>.  It is regrettable that while both counsel agreed to several unopposed

extensions of time for each side, plaintiffs are now using those agreements as a sword in an

attempt to show that the United States was dilatory in asserting its claim.  It is further regrettable

that in support of its claim that the United States has been dilatory, the content of the parties

confidential settlement negotiations have been improperly placed into the briefing.  Response at

6,7; FED. R. EVID. 408.

Plaintiffs make the argument that the Janik Declaration is faulty because it was not based

upon first-hand knowledge.  Response at 7.  At this early stage of discovery, the United States

cannot offer the required Rule 56(e) affidavits based upon first-hand knowledge, as the United

States was not a party to these events.  Once discovery is complete, if the United States responds

to the motion for partial summary judgment with an argument that this is a case involving fraud, at that time the United States will be in a position to offer affidavits, deposition transcripts, and documentary evidence showing that this case involves fraud.

As to plaintiffs' final point, while the limited documentary evidence at hand was not attached to the [first] Janik Declaration, all of the documents relied upon were provided to opposing counsel on October 28, 2005.  Plaintiffs' Response to the United States' motion was made more than two weeks after that disclosure.  At the time plaintiffs responded to the United States' motion, they already had a full two weeks to review the documents underlying the [first] Janik Declaration.  It is disingenuous to suggest that the declaration's contentions were unsupportable.  Response at 7.

Since the time in which that declaration was made, KPMG's counsel has provided to the undersigned counsel a number of previously-undisclosed documents.  The United States is therefore supplementing the declaration filed by Mr. Janik by filing an additional declaration of David N. Geier.  Exhibit PP.  The newly obtained information further establishes that the United States is acting well within the parameters of <u>Campbell</u> and FED. R. CIV. P. 11 when alleging that this may be a case involving fraud which requires further discovery.

**B.      The United States has Not had the Opportunity to Conduct Discovery to Obtain Admissible Information to Establish that this is a Case Involving Fraud.**

Rule 56(f) exists to permit a party to conduct discovery sufficient to rebut a summary judgment proponent's statement that no dispute of material fact exists.  FED. R. CIV. P. 56(e),(f). The United States has filed its intervening Rule 56(f) motion on the basis that the interest at issue may not be refunded in a "case involving fraud," that there is a clear question as to whether the parties and entities involved in this transaction engaged in it with the intent of defrauding the

1458267.11458267.1.1

United States, and therefore, that the United States should be afforded time in which to perform thorough discovery on this issue.  Using the admissions, statements, and other documents of various third parties as recently provided to the IRS by KPMG's counsel Skadden, Arps, the United States, in supra Section II(D) and in its amended Rule 26(a)(1) disclosures, has identified at least 41 persons and nearly as many entities all taking a role in the marketing, promotion, and implementation of this transaction.[22]  Several of these persons, and the entity KPMG, have been charged with defrauding the United States in these same SOS transactions.  Exhibits A and B and E.

Furthermore, due to the complexity of this abusive tax shelter, and the large number of persons and entities involved, the United States believes that in order to adequately and appropriately respond to plaintiffs' motion for partial summary judgment, written discovery in this matter needs to be served upon the plaintiffs, subpoenas duces tecum served upon the several third parties, and the depositions taken of the plaintiffs, the promoters, the accounting firms, the law firms, the trading firms, the banks, and the financial advisors which designed, marketed, and implemented this abusive tax shelter.  The United States has taken no discovery from those persons and entities, other than to obtain a set of documents which KPMG provided to the IRS.[23]  The persons' and entities' knowledge of the circumstances, facts, and events surrounding

---

[22]     The United States has concurrently sent plaintiffs the United States' amended Rule 26(a)(1) disclosures.

[23]     The plaintiffs attempt to confuse the IRS civil tax audit with the discovery process in litigation.  They claim that because IRS audited the Sala return, the lawyers for the United States who are defending this civil lawsuit do not require (or deserve) discovery to develop evidence for trial and to oppose their motion for partial summary judgment.  To state their position in its simplest terms exposes its basic flaw – an IRS audit is not a substitute for the discovery that the Federal Rules of Civil Procedure allow to all attorneys and litigants in civil lawsuits.

1458267.11458267.1.1

plaintiffs' entry into this abusive tax shelter has not been discovered.  Only the existence of their

material involvement is known.

**C.**     **The United States Has Identified The Probable Facts Not Available, and has Stated What Steps Have Been Taken to Obtain Those Facts.**

As discussed above and in the United States' Rule 56(f) motion, the United States neither

possesses all of the knowledge, nor does it have all of the facts, pertaining to plaintiffs

transaction.  Based upon documents KPMG provided, in <u>supra</u> Section II(D) and its Rule 26(a)

and amended Rule 26(a) pleadings, the United States set forth further evidence of probable fact,

and has indicated those currently-known persons and entities, including the five <u>Stein</u> criminal

defendants, whom it believes know or possess information material to a determination as to

whether this is a case involving fraud.

**D.**     **The United States has Clearly Shown How the Additional Step of Discovery Upon the Involved Persons and Entities Will Enable It to Determine Whether a Triable Issue Exists as to Whether this is a Case Involving Fraud**

The United States has already averred that it lacks personal knowledge as to the facts and

circumstances surrounding plaintiffs' entry into this transaction.  However, the United States has

identified some of the promoters, the accounting firms, the law firms, the trading firms, and the

financial advisors which located, developed, implemented, and/or assisted in carrying out the

abusive tax shelter.  The additional step of discovery upon those persons and entities will enable

the United States to uncover evidence in the form of facts, testimony, and documents, which will

enable it to conclusively determine whether this is a case involving fraud, such that the United

States will then be able to rebut plaintiffs' allegations that no genuine issue of fact remains as to

the interest refund issue.

1458267.11458267.1.1

**V.    BECAUSE A RULE 56(F) MOTION IS SEPARATE AND DISTINCT FROM A RULE 56(E) RESPONSE, AND BECAUSE THE UNITED STATES IS ONLY REQUIRED TO MEET THE TENTH CIRCUIT'S <u>CAMPBELL</u> TEST, THE UNITED STATES IS NOT REQUIRED IN ITS RULE 56(f) MOTION TO SHOW THAT "MATERIAL FACTS ARE IN DISPUTE," TO PROVE FRAUD BY "CLEAR AND CONVINCING EVIDENCE," OR TO "STATE WITH PRECISION" THE UNKNOWN FACTS AND HOW THOSE FACTS WILL ENABLE THE UNITED STATES TO SHOW THIS IS A CASE INVOLVING FRAUD.**

A Rule 56(f) motion is an independent motion, not a response to a Rule 56 motion for summary judgment.  The United States will respond to plaintiffs' motion for partial summary judgment, and if the facts support it, will provide the requisite affidavits to show that "material facts are in issue."  In order to support its Rule 56(f) motion, the United States is not required to state that "material facts are in issue."  Nor is there a "clear and convincing evidence" requirement when showing that material facts exist as to whether this is a case involving fraud. FED. R. CIV. P. 56(e).  The United States is only required to make a showing that it meets the four <u>Campbell</u> elements that the Tenth Circuit requires before granting a Rule 56(f) motion. Only when the United States actually responds to the motion for partial summary judgment, is it required to state that material triable facts are in issue.

Plaintiffs cite a Fifth Circuit case for the proposition that the United States must "state with precision the material [it] hopes to obtain with further discovery and exactly how [it] expects those materials would help [it] resist summary judgment."  Response at 18-19; <u>Krim v. BancTexas Group, Inc</u>., 989 F.2d 1435, 1443 (5th Cir. 1993).  Plaintiffs parallel cite to two Tenth Circuit Court of Appeals cases in an attempt to bolster that argument.  Response at 19. However, there is no requirement in the Tenth Circuit that the United States "set forth with precision" what the unknown facts are and how those facts will enable the United States to show

that this is a case involving fraud.  The Tenth Circuit's test explicitly states that the United States need only show that the motion "(3) **identifies** the probable facts not available and what steps have been taken to obtain these facts; and (4) explains **how additional steps** will enable the United States to rebut plaintiffs' allegations that no genuine issue of fact exists as to the interest refund issue.  Campbell, 962 F.2d at 1522 (emphasis added)."[24]

The first Tenth Circuit case plaintiffs point to affirms the Campbell test and states that "the party must demonstrate precisely **how additional discovery** will lead to a genuine issue of material fact."  Ben Ezra, Weinstein, & Co. v. America Online, Inc., 206 F.3d 980, 987 (10th Cir. 2000) (emphasis added).  The second case plaintiffs parallel cite to also affirms the Campbell test, stating that "[t]here was not even an attempt to show **how such facts**, if discovered, **would have been useful** in opposing the motions for summary judgment.  Plaintiffs made no showing that additional discovery time would have established facts sufficient to create a genuine issue of fact."  Jensen v. Redevelopment Agency, 998 F.2d 1550, 1555 (10th Cir. 1993) (emphasis added).

The United States has identified at least 41 persons, and nearly as many entities, who were involved in the marketing, developing and implementing of this abusive tax shelter.  As plaintiffs and the third parties, not the United States, have personal knowledge as to the facts underlying whether this is a case involving fraud, the United States cannot now explicitly identify just what those probable facts are.  However, there is ample evidence indicating that a

---

[24]    It appears that plaintiffs may be confusing the requirements of a Rule 56(e) response to a motion for summary judgment with the Campbell requirements necessary to granting a Rule 56(f) motion.  Under Campbell, the proponent needs only to identify probable facts and why they will enable a 56(e) response.  Campbell, 962 F.2d at 1522.  In a Rule 56(e) response to a motion for summary judgment, the respondent must "set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e) (emphasis added).

1458267.11458267.1.1

closer look needs to be given to the actions and knowledge of the persons and entities identified

and described in <u>supra</u> Section II(D), including the five persons indicted in <u>United States v.</u>

<u>Stein</u>, as to whether their actions were taken with the intent to defraud the United States.  Taking

the steps of obtaining that documentary and testimonial evidence will enable the United States to

rebut plaintiffs allegation that no issue of material facts exist as to their claim for a refund of

interest.

     Finally, when responding to plaintiff's motion for partial summary judgment, there is no

requirement that the United States present "clear and convincing evidence" of fraud.  Rather, the

United States need only show that the question of whether such fraud existed is a fact in material

dispute, and is thus a genuine issue for trial.  See FED. R. CIV. P. 56(e).

## CONCLUSION

Accordingly, based upon the arguments herein, this Court should GRANT the United

States' motion for Rule 56(f) relief.

Dated this 13th day of December, 2005.             WILLIAM J. LEONE

                                                   Acting United States Attorney
                                                   MARK S. PESTAL
                                                   Assistant United States Attorney

                                                   s/ David N. Geier
                                                   DAVID N. GEIER
                                                   ANTON L. JANIK, JR.  CO#35164
                                                   PHILIP E. BLONDIN
                                                   Trial Attorneys, Tax Division
                                                   U.S. Department of Justice
                                                   P.O. Box 683
                                                   Ben Franklin Station
                                                   Washington, D.C. 20044-0683
                                                   Telephone:      (202) 616-3448
                                                   Facsimile:      (202) 307-0054
                                                   Email:David.N.Geier@usdoj.gov

                         Street Address:           Judiciary Center Building
                                                   555 Fourth Street, N.W.
                                                   Washington, D.C. 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on December 13, 2005, I electronically filed the foregoing UNITED STATES' REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR RELIEF UNDER FED. R. CIV. P. 56(f) WITH RESPECT TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT  with the Clerk of Court using the EFC system which will send notification of such filing to the following e-mail addresses:

dhallett@chicoine-hallett.com

jcolvin@chicoine-hallett.com

s/ David N. Geier_____
DAVID N. GEIER
Trial Attorney, Tax Division
U.S. Department of Justice

1458267.11458267.1.1