# EXHIBIT

## A

**2 of 3**

meeting, in substance and in part, that the tax position taken in BLIPS was "close to frivolous." During that meeting, the participants also discussed the risks of proceeding with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil penalties, civil liability for fraud, action by the IRS's Director of Professional Practice, and action by state Boards of Accountancy. Nevertheless, and despite the obviously fraudulent nature of BLIPS and the warnings conveyed, the defendants JEFFREY STEIN and JOHN LANNING, and others, decided not to refund BLIPS fees and to proceed (i) with the issuance of "more likely than not" opinion letters on all of the 1999 transactions with the intent that BLIPS clients would claim the phony BLIPS losses on 1999 tax returns, and (ii) continued to implement more BLIPS tax shelter transactions in 2000 and, in 2001, to issue opinions to support those transactions and the claiming of those BLIPS losses.

46.    In addition, in or about March 2000, the defendant STEVEN GREMMINGER telephoned KPMG's relationship partner at Law Firm 2 about the Law Firm 2 Memo and stated that Law Firm 2 was interfering with a KPMG tax transaction and that senior tax partners at KPMG were irate.

The Fraudulent SOS Shelters

47.    These shelters were designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the clients entering into virtually offsetting foreign currency option positions with a bank, including

26

but not limited to Bank A, sometimes transferring the offsetting positions to a partnership or other entity, and then withdrawing from the transaction, claiming a loss in the desired amount. These shelters were referred to by various names, including Short Option Strategy, Spread Option Strategy, Split Option Strategy, SOS, Binary Option, Digital Option, Gain Mitigator, Loss Generator, COINS, BEST, FX Transaction (hereinafter "SOS"). KPMG's Washington National Tax office and the defendant RICHARD SMITH considered whether KPMG could issue "more likely than not" opinions regarding SOS transactions, and they concluded that the phony losses generated by those transactions were *not* more likely than not to withstand IRS challenge. Moreover, KPMG's Washington National Tax office and the defendant RICHARD SMITH reviewed draft "more likely than not" SOS opinion letters prepared by the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," and other firms, and determined that the transactions described therein were not more likely than not to withstand IRS challenge. Nevertheless, between 1998 and 2002, the defendants JEFFREY STEIN, RICHARD SMITH, JEFFREY EISCHEID, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," RANDY BICKHAM, CAROL WARLEY, CARL HASTING, and RICHARD ROSENTHAL, and their co-conspirators, assisted in marketing and implementing SOS transactions for KPMG clients for a fee to KPMG generally not less than 1% of the tax losses to be generated, and prepared and caused to be prepared tax returns based on the phony SOS

tax losses. For many of these SOS transactions, KPMG did not issue an opinion letter, but instead certain lawyers, including RUBLE, issued "more likely than not" opinion letters with respect to those transactions so that clients would claim the fraudulent SOS losses and evade taxes.

48.   In addition, from at least in or about 1999 through at least in or about 2002, the defendant DAVID GREENBERG, with the approval of members of KPMG's tax leadership, including the defendants JEFFREY STEIN, RICHARD SMITH, and RICHARD ROSENTHAL, marketed and implemented dozens of SOS transactions to KPMG clients, often charging fees well in excess of 1% of the phony tax loss to be generated. GREENBERG also arranged SOS transactions for at least 14 KPMG partners, including for the defendant RICHARD ROSENTHAL. In connection with the SOS transactions arranged by GREENBERG, GREENBERG issued KPMG opinion letters or caused others to issue opinion letters that falsely claimed that the tax losses purportedly generated by SOS were more likely than not to withstand IRS challenge, so that KPMG partners and GREENBERG's other clients would claim the fraudulent SOS losses and evade taxes.

49.   SOS opinion letters, and other associated documents, were false and fraudulent in a number of ways well known to the conspirators, including the following:

a.   They falsely and misleadingly describe SOS as an investment, when in truth and in fact, it was a tax shelter designed and marketed to generate tax

losses in order to eliminate income taxes for wealthy clients and garner substantial fees and income for KPMG, the RUBLE Law Firm, certain co-conspirators, and others.

      b.     They falsely claimed that the client would have entered into the option positions independent of the other steps that made up SOS, when in truth and in fact, the clients would not have entered into those positions absent the anticipated tax loss to be generated.

      c.     They falsely claim that the option positions were contributed to a partnership or other entity to "diversify" the client's "investment" when in truth and in fact, the contribution was simply a necessary step in the tax shelter, was executed for the purpose of generating the tax loss, and was not executed to "diversify" any "investment."

      d.     They falsely claim that the offsetting option positions were entered into for "substantial non-tax business reasons," and were contributed to the partnership or other entity for "substantial non-tax business reasons," when in truth and in fact, the transactions were undertaken in order to generate the phony tax losses SOS purported to generate and not for any "substantial non-tax business reason."

      50.     The defendants created and caused to be created this false and fraudulent documentation in order to assist clients in claiming the phony tax shelter

29

losses on tax returns and in evading taxes.

51.  Many of the SOS transactions marketed by the defendants CAROL WARLEY, CARL HASTING, DAVID GREENBERG and others at KPMG to KPMG clients were arranged and implemented by a tax shelter firm located in New York, New York (the "Shelter Boutique"). In addition, the defendant RICHARD ROSENTHAL's SOS transaction was arranged with the Shelter Boutique. The principal of the Shelter Boutique is a co-conspirator not named as a defendant herein ("CC 10").

## Side Payments to RUBLE

52.  In addition to the fees collected by the RUBLE Law Firm for the issuance of opinion letters on SOS and other tax shelter transactions, RUBLE accepted side payments for his benefit from the Shelter Boutique and other entities controlled by CC 10. The CC-10-related side payments to RUBLE totalled over $3 million. The CC-10-related side payments were not reported to the IRS by CC 10 or any entity controlled by CC 10, and RUBLE failed to report to the IRS over $700,000 of these side payments. In addition, the defendants JOHN LARSON and ROBERT PFAFF caused nominee entities to make side payments to RUBLE for his participation in tax shelter transactions. The LARSON and PFAFF side payments to RUBLE totalled approximately $500,000, and they were not reported to the IRS by LARSON, PFAFF, or RUBLE, or by any entities controlled by LARSON, PFAFF, or RUBLE.

53.  Although, during the period 2001 through 2003, RUBLE received

30

millions of dollars in side payments relating to his participation in devising, marketing, and implementing tax shelters, RUBLE falsely stated to the RUBLE Law Firm that he had no outside income.

## Fraudulent Concealment of Tax Shelters

54.    In addition to preparing and causing to be prepared false and fraudulent documentation relating to and implementing the shelter transactions, and in addition to preparing and causing to be prepared tax returns that fraudulently incorporated the phony tax shelter losses, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG and their co-conspirators employed various means fraudulently to conceal from the IRS the fraudulent tax shelters they designed, marketed and implemented, including but not limited to the following: (i) not registering the tax shelters with the IRS as required by law; (ii) preparing and causing to be prepared tax returns that fraudulently concealed the phony losses from the IRS; (iii) attempting to conceal from the IRS the tax shelter losses and transactions with sham attorney-client privilege claims; and (iv) obstructing IRS and Senate investigations into their tax shelter activities.

31

### Failing to Register Tax Shelters

55.     Under the law in effect at all times relevant to this Indictment, an organizer of a tax shelter was required to "register" the shelter by filing a form with the IRS describing the transaction. The IRS in turn would issue a number to the shelter, and all individuals or entities claiming a benefit from the shelter were required to include with their income tax returns a form disclosing that they had participated in a registered tax shelter, and disclosing the assigned registration number. Notwithstanding these legal requirements, the defendants JEFFREY STEIN, JOHN LANNING, JEFFREY EISCHEID, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, and DAVID GREENBERG and their co-conspirators caused the entities with which they were associated not to register as required any of the tax shelters they devised, marketed and implemented, and thereby ensured that registration numbers would not be included on returns relating to unregistered shelters.

56.     The defendants JOHN LANNING and JEFFREY STEIN and their co-conspirators decided not to register FLIP, OPIS, or BLIPS based on a "business decision" that to register the shelters would hamper KPMG's ability to sell them, and that the IRS penalties applicable to a failure to register would be dwarfed by the lucrative fees KPMG stood to collect from selling unregistered tax shelters. Indeed, the defendant

32

GREGG RITCHIE, the head of the CaTS practice, wrote a memorandum to the defendant JEFFREY STEIN arguing that, assuming OPIS was required to be registered, KPMG should make a "business decision" not to register OPIS because (i) registering the shelters would put KPMG at a competitive disadvantage as compared to other accounting firms, law firms, and other firms that were promoting tax shelters; and (ii) selling unregistered shelters would be so lucrative that the benefits outweighed the risk of civil penalties that might be imposed.  Moreover, the defendant STEVEN GREMMINGER, among others, advised that by deciding not to register tax shelters, KPMG risked criminal prosecution, but advised that KPMG's tax leadership could nevertheless "make a business decision to not register the activity as a tax shelter."  The defendant LARRY DELAP concurred in this advice.

### Fraudulently Concealing Shelter Losses and Income on Tax Returns

57.    The conspirators would and did prepare and cause to be prepared tax returns that were false and misleading and were intended fraudulently to conceal the fraudulent tax shelters from the IRS in a number of ways, including but not limited to the following:

a.    Although the law requires that an individual's items of income, gain, and loss be reported on an individual income tax return, the defendants JEFFREY EISCHEID, JOHN LARSON, DAVID AMIR MAKOV, GREGG RITCHIE, and CARL HASTING, and their co-conspirators advised certain clients that the phony

33

tax shelter losses and the income or gains that were to be sheltered should not be reported on the client's individual income tax return, and instead only the net of those two figures should be reported on the return. One method of "netting" pursued by the conspirators in order fraudulently to hide the tax shelter transactions from the IRS involved using a "grantor trust." A grantor trust is a trust that, because of certain features enumerated in the tax code, is disregarded as an entity for federal income tax purposes. RITCHIE and his co-conspirators devised a scheme to insert a grantor trust into a tax shelter transaction, and then, rather than disregarding the grantor trust as required by the tax code, reporting the large phony tax shelter loss and the taxable gain or income those losses were used to offset only on the grantor trust information return, while reporting only the small net of those numbers on the client's individual income tax return. Although the defendant MARK WATSON notified other members of the Innovative Strategies group, including the defendants JEFFREY EISCHEID, RANDY BICKHAM, DAVID RIVKIN, and CARL HASTING, as well as the defendant LARRY DELAP, that to pursue this "grantor trust netting" scheme was *not* a proper reporting position, and in fact would result in the filing of false income tax returns, EISCHEID instructed KPMG partners that each could decide for himself or herself whether to engage in grantor trust netting. As a result, dozens of tax returns for FLIP, OPIS, and BLIPS clients used grantor trusts fraudulently to hide

34

the tax shelter losses (and the gains they were designed to shelter) on the clients' individual income tax returns.

  b.  In order to conceal tax shelter losses from the IRS, the defendants CAROL WARLEY, DAVID AMIR MAKOV and others, advised at least one client that phony tax shelter losses could be concealed and made to look like losses from the sale of a number of publicly traded stocks. In order to so conceal the losses, the Larson/Pfaff Entities purchased publicly traded stock on behalf of the shelter client, and then distributed those stocks to the client upon the client's withdrawal from the transaction. WARLEY and others then advised that the shelter could be concealed on the client's tax return and instead reported as losses resulting from the sale of the stock so distributed. In order to further conceal the phony tax shelter losses from the IRS, in some instances WARLEY, the defendant GREGG RITCHIE and others selected stocks that had already suffered large losses during the year as the stocks to which the shelter losses would be attached, in order to mislead the IRS into believing that the losses resulted from those stocks' poor performance, rather than from the fraudulent tax shelters.

Concealing Shelters with Sham Attorney-Client Privilege Claims

  58.  The conspirators also attempted to conceal their fraudulent tax shelter activities by attempting to cloak communications regarding those activities and certain of the activities themselves with the attorney-client privilege, although the

35

communications in question were not privileged. For example, the defendant DAVID GREENBERG, with the knowledge and approval of the defendant RICHARD ROSENTHAL, attempted to conceal his activities in this manner by purporting to have KPMG clients engage a law firm (the "Orange County Law Firm") to provide legal advice, which law firm would then purport to engage KPMG to work under the direction of the Orange County Law Firm. Under *United States v. Kovel*, communications by non-lawyer professionals such as accountants are protected under the attorney-client privilege when the accountant is in fact working under the direction of an attorney. Numerous *Kovel* arrangements purportedly established by GREENBERG and the Orange County Law Firm were sham arrangements because the clients did not directly engage the law firm, in many instances never even spoke to anyone at the Orange County Law Firm, and GREENBERG's work was done outside of the purported lawyer-client privilege. The purpose of this fraudulent conduct was to enable the client, with the assistance of GREENBERG and the Orange County Law Firm, to conceal the fraudulent tax shelter from the IRS by attempting to cloak all of the work for the shelter in the attorney-client privilege. The defendants GREENBERG and ROSENTHAL set up such a phony *Kovel* relationship with the Orange County Law Firm in an attempt to hide ROSENTHAL's fraudulent tax shelter transaction from the IRS.

## Obstruction of IRS and Senate Investigations

59.    In or about October 2001 the IRS initiated an examination of KPMG

36

for its failure to register the transactions with the IRS. As part of this examination, in early 2002 the IRS issued 25 summonses to KPMG calling for information relating to numerous tax shelters with which KPMG may have been involved. In addition, the IRS summonses required KPMG to designate a knowledgeable person to testify under oath at the IRS. KPMG designated the defendant JEFFREY EISCHEID, who at the time was the Partner-in-Charge of KPMG's Personal Financial Planning group, to testify. EISCHEID's testimony was false, misleading, and evasive. Among other things, EISCHEID falsely denied that KPMG's fees were based on anticipated tax benefits and misrepresented KPMG's role in devising, marketing, and implementing tax shelters. Indeed, after one day of testimony, another KPMG partner who attended the testimony reported in an email to the defendant RICHARD ROSENTHAL that KPMG's Office of General Counsel and outside counsel "determined that the best strategy was 'the less said the better,'" and that EISCHEID "felt that he had no choice but to be 'forgetful.' And so the record will reflect repeated 'I don't knows', 'I don't recalls,' and 'I was out of the loops' — the rope-a-dope/Enron defense."

60. IRS summonses called for production of documents relating to SOS tax shelters, among other things. The defendants RICHARD SMITH and STEVEN GREMMINGER were among the KPMG personnel directing KPMG's response to the IRS summonses and SMITH and GREMMINGER were aware of KPMG's involvement in marketing and implementing SOS transactions. Nevertheless, none of the SOS tax

37

shelters marketed or implemented by KPMG, or in which KPMG personnel participated, were disclosed to the IRS and on a number of occasions, SMITH, GREMMINGER and others caused KPMG falsely to claim to the IRS that the production of documents and information relating to the summonses was substantially complete.

61.    In addition, when the IRS in May 2003 specifically inquired about KPMG's failure to produce SOS information, the defendants JEFFREY EISCHEID and STEVEN GREMMINGER intentionally caused KPMG's representatives to falsely respond that KPMG was not involved in SOS, but may have prepared a couple of tax returns containing SOS losses.

62.    In January 2003, a Subcommittee of the United States Senate issued a subpoena to KPMG calling for documents and information relating to its tax shelter activities, including a specific request for documents relating to tax shelters used by KPMG partners to evade their own taxes. The subpoena specifically named the defendant DAVID GREENBERG as well as certain KPMG partners who, in fact, had used SOS transactions to evade their own taxes, including the defendant RICHARD ROSENTHAL. The defendants RICHARD SMITH and STEVEN GREMMINGER were among the KPMG personnel supervising and directing KPMG's response to the Senate investigation. In addition, SMITH and GREMMINGER were aware of ROSENTHAL's and other KPMG partners' use of GREENBERG shelters to offset those partners' own income or gain, and were aware of related documents responsive to the

38

Senate subpoena. However, the defendants SMITH and GREMMINGER and their co-conspirators caused KPMG's representatives falsely to respond to the subpoena as follows: "to the best of its knowledge and belief, after reasonable inquiry to date, the firm has not yet identified any documents that are responsive to this request."

    63. In or about November 2003, the defendants RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, LARRY DELAP, and MARK WATSON, certain co-conspirators, and others testified before the Senate Subcommittee investigating tax shelter activities of KPMG and others. The defendants EISCHEID, WIESNER, and DELAP testified together in panel format. During this testimony, among other things, EISCHEID falsely denied that KPMG's fee was a percentage of the tax loss to be generated by the shelters. In addition, when asked by a Senator whether FLIP, OPIS and BLIPS were "designed and marketed primarily as tax reduction strategies," EISCHEID falsely stated "Senator, I would not agree with that characterization." In addition, among other false and misleading testimony presented at the hearing, SMITH gave evasive testimony regarding KPMG's involvement in designing, marketing, and implementing tax shelters. LARSON also provided false and misleading testimony by, among other things, falsely denying that BLIPS was designed so that investors would exit on day 60 of the transaction regardless of the purported 7-year structure of the purported loan, and falsely denying that FLIP was designed primarily for tax deductions.

RITCHIE's Obstruction of IRS Audit of the Beverly Hills Businessman

64.    In 1999, the Beverly Hills Businessman participated in a BLIPS transaction that generated $300 million of phony tax losses, a portion of which was attached to various publicly-traded stocks. The Beverly Hills Businessman sold these stocks to trigger the losses. The Beverly Hills Businessman triggered and claimed a $225 million BLIPS-related loss on 1999 tax returns, and claimed the remaining BLIPS loss on 2000 tax returns. In or about early 2002, the IRS's Los Angeles Office commenced a civil audit of the Beverly Hills Businessman and certain entities controlled by him with respect to the 1999 tax year.

65.    During the course of, and in connection with, the IRS audit, defendant GREGG RITCHIE, who represented the Beverly Hills Businessman and the entities in connection with the audit, made a number of false and misleading statements to the IRS Revenue Agent conducting the audit in order to avoid disclosing to the IRS that the $225 million loss claimed by the Beverly Hills Businessman and related entities for 1999 was attributable to a BLIPS tax shelter transaction sold to the Beverly Hills Businessman by KPMG. Those false and misleading statements included that the alleged $225 million "loss" incurred by the Beverly Hills Businessman and ultimately claimed on tax returns was attributable to regular business activities of the Beverly Hills Businessman's companies. In addition to making false and misleading statements, RITCHIE (a) provided the IRS Revenue Agent with a false and misleading document

40

that purported to represent the organizational structure of the Beverly Hills Businessman's companies but which, in truth and fact, omitted a description of or reference to the entities through which the Beverly Hills Businessman participated in BLIPS and created the phony $225 million loss for the 1999 tax year, and (b) failed to provide the IRS Agent with the BLIPS power point, notwithstanding the fact that RITCHIE had been provided the power point by KPMG and used it to provide the Beverly Hills Businessman with an understanding of BLIPS.

66.     After realizing during the audit that the IRS Agent conducting the audit had not uncovered the true nature of the $225 million loss, GREGG RITCHIE sought to expand the audit to cover the year 2000, and sought to have the IRS enter into a settlement, or "closing", agreement, which agreement would finally determine the Beverly Hills Businessman's tax liabilities for the 1999 and 2000 tax years. In order to create a false sense of urgency with respect to the execution of that agreement, GREGG RITCHIE falsely represented to the IRS that the closing agreement had to be finalized by April 15, 2002 because the Beverly Hills Businessman had to comply with certain IRS return filing deadlines.

67.     On or about April 23, 2002, GREGG RITCHIE realized that the closing agreement relating to the IRS's audit of the Beverly Hills Businessman would not be completed prior to the expiration of the April 23, 2002 deadline set by the IRS for taxpayers to disclose to the IRS's Office of Tax Shelter Analysis in Washington, D.C.

41

their participation in tax shelters likes BLIPS, which disclosures would allow tax shelter participants to avoid certain civil (but not criminal) penalties. In order to comply with the disclosure filing deadline without alerting the Los Angeles IRS Revenue Agent about the filing, GREGG RITCHIE prepared and caused to be sent to the Office of Tax Shelter Analysis, in Washington, D.C., a disclosure form with respect to the Beverly Hills Businessman's 1999 BLIPS transaction. In that disclosure, RITCHIE falsely represented that he had provided a copy of the disclosure form to the Los Angeles IRS Revenue Agent who was conducting the audit of the Beverly Hills Businessman. In truth and fact, as RITCHIE well knew, he never provided the disclosure form to the Los Angeles IRS Revenue Agent the Los Angeles IRS Revenue Agent did not learn of the disclosure filing until after the execution of the closing agreement in or about May 2002.

## Evasion of Defendants' Taxes

68.    As noted above, the Larson/Pfaff entities collected at least $140 million in fees relating to FLIP, OPIS, and BLIPS. Between July and September 1999, the defendants JOHN LARSON and ROBERT PFAFF engaged in a BLIPS transaction through Bank E and claimed on tax returns approximately $24 million in purported losses as a result. LARSON and PFAFF used these fraudulent losses to evade their own taxes and taxes relating to an entity they owned and controlled ("Larson/Pfaff entity 1"). The defendants LARSON, PFAFF, and DAVID AMIR MAKOV engaged in a set of two BLIPS transactions from March through May 2000 through Bank C that purported to

42

generate a total of $75 million of losses. LARSON, PFAFF, and MAKOV generated
these losses using a variety of entities and trusts controlled by them, and used them to
evade individual income taxes and taxes relating to entities they owned and controlled
("Larson/Pfaff entity 2" and "Larson/Pfaff entity 3"). The defendants LARSON,
PFAFF, and MAKOV exited the BLIPS transactions approximately 67 days after
commencing the transaction; they did not remain in for later stages or seven years, and
did not exit the transaction based on the performance of the nominal investment
component of BLIPS.

           69.    In 1999, the defendant GREGG RITCHIE engaged in a BLIPS
transaction that purported to generate tax losses of approximately $10 million. RITCHIE
exited BLIPS at the earliest opportunity and before year-end 1999. RITCHIE's BLIPS
transaction was conducted concurrent with the $300 million BLIPS transaction
conducted by the Beverly Hills Businessman. The Beverly Hills Businessman also exited
BLIPS at the earliest opportunity. However, the Beverly Hills Businessman triggered
approximately $225 million in tax losses in 1999, attaching a substantial portion of the
remaining losses to stocks and triggering them in 2000. Both RITCHIE and the Beverly
Hills Businessman attached a portion of the phony BLIPS losses to a number of publicly
traded stocks that had already suffered large losses during the year, in order to mislead
the IRS into believing that the losses resulted from those stocks' poor performance,
rather than from the fraudulent tax shelters. RITCHIE prepared and caused to be

43

prepared tax returns for himself and the Beverly Hills Businessman that reported the

BLIPS losses as if they had resulted from the sale of these various stocks.   In addition,

although the Larson/Pfaff entities purchased these stocks on behalf of RITCHIE and the

Beverly Hills Businessman on or about December 6, 1999, RITCHIE falsely reported

that these stocks had been purchased on "various" dates to further conceal the BLIPS

shelter and to mislead the IRS into thinking that the losses resulted from the poor

performance of these stocks during the year.

       70.    The defendant RICHARD ROSENTHAL conducted an SOS

transaction in 1999.  ROSENTHAL used approximately $248,000 in tax losses from this

transaction to evade 1999 taxes, and approximately $248,000 in tax losses from this

transaction to evade 2000 taxes.

       71.    The defendant DAVID GREENBERG received approximately $1.6

million in income from KPMG in 1999, 2000, and 2001.  On his tax returns for those

years, he claimed losses of approximately $1.6 million with the notation "nominee," and

therefore fraudulently understated his taxable income and paid virtually no tax on the

money he received from KPMG.  GREENBERG reported this money as income on the

tax returns for an entity controlled by GREENBERG and a co-conspirator not named as a

defendant herein ("CC 11"), but that entity conducted tax shelter transactions to generate

phony losses that offset virtually all of that income.  GREENBERG only reported on his

individual income tax returns a total of $185,000 in income from this entity.

44

## Statutory Allegations

72.    From at least in or about 1996 through at least in or about 2005, JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, 7206(1), and 7206(2).

## Objects of the Conspiracy

73.    It was a part and an object of the conspiracy that JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY,

45

DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID

GREENBERG, the defendants, and their co-conspirators, including co-conspirators not

named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, willfully and

knowingly would and did defraud the United States of America and the IRS by

impeding, impairing, defeating and obstructing the lawful governmental functions of the

IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

74.   It was further a part and an object of the conspiracy that JEFFREY

STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP

WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY

DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J.

Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL

WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and

DAVID GREENBERG, the defendants, and their co-conspirators, including co-

conspirators not named as defendants herein KPMG and Dominick DeGiorgio,

unlawfully, willfully and knowingly would and did attempt to evade and defeat a

substantial part of the income taxes due and owing to the United States by tax shelter

clients and others, in violation of Title 26, United States Code, Section 7201.

75.   It was further a part and an object of the conspiracy that JEFFREY

STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP

WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY

46

DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, wilfully and knowingly would and did make and subscribe and cause others to make and subscribe United States individual, corporation, and partnership income tax returns, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and that the defendants and their co-conspirators did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(l).

76.     It was further a part and an object of the conspiracy that JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, unlawfully, wilfully and knowingly would and did aid and assist in, and procure, counsel,

47

and advise the preparation and presentation under, the internal revenue laws, of certain United States individual, corporation, and partnership income tax returns which were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206(2).

## Means and Methods of the Conspiracy

77.   Among the means and methods by which JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-conspirators not named as defendants herein KPMG and Dominick DeGiorgio, would and did carry out the conspiracy were the following:

a.   They would and did concoct tax shelter transactions and false and fraudulent factual scenarios to support them so that wealthy United States citizens would pay certain of the conspirators and other participants in the transactions approximately 5 to 7% of income or gain instead of paying federal and state taxes on that income or gain.

b.   They would and did prepare false and fraudulent documents to

48

deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, and opinion letters.

     c.     They would and did conceal the contents of tax shelter sales presentations in order to prevent the IRS from discovering the true facts regarding those shelter transactions.

     d.     They would and did prepare and provide to their clients false and fraudulent representations that the clients were required to make in order to obtain opinion letters that purported to justify using the phony tax shelter losses to offset income or gain. At times, the conspirators presented to their clients these false and fraudulent client representations after the all-in costs of approximately 5 to 7% of the desired tax loss were collected from the tax shelter clients.

     e.     They would and did prepare and cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated the phony tax losses and therefore substantially understated the tax due and owing by the shelter clients.

     f.     They would and did (i) fail to report on certain tax returns the losses and the gain or income they sheltered and thus fraudulently understate gross amounts of income and gain; and (ii) disguise the shelter losses on certain tax returns in a manner intended to deceive the IRS.

     g.     They would and did take various steps to prevent the creation and

49

retention of documents that might reveal to the IRS the true facts regarding the fraudulent tax shelters as well as certain conspirators' role in designing, marketing, and implementing them, including but not limited to concealing from the IRS that the opinion letters provided by KPMG, the RUBLE Law Firm, and other firms were not independent and were instead prepared by entities involved in the design, marketing, and implementation of the tax shelters.

h.     They would and did take various additional steps to conceal from the IRS the existence of the shelters, their true facts, and certain conspirators' role in designing, marketing, and implementing the shelters, including, but not limited to, failing to register the shelters, using sham attorney-client privilege claims, and concealing documents and providing false and misleading information in response to IRS and Senate investigations.

### Overt Acts

78.     In furtherance of the conspiracy and to effect the illegal objects thereof, JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, the defendants, and their co-conspirators, including co-