# EXHIBIT

# E

## Statement of Facts

1.  KPMG LLP ("KPMG") is a Delaware limited liability partnership and is one of the "Big Four" public accounting firms.

2.  From 1996 until 2002, KPMG, through its tax partners, assisted high net worth United States citizens to evade United States individual income taxes on billions of dollars in capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters. A number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including: (i) preparing false and fraudulent tax returns for shelter clients; (ii) drafting false and fraudulent proposed factual recitations and representations as part of the documentation underlying the shelters; (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners and the high net worth individual clients knew they were not true; (iv) actively taking steps to conceal from the IRS these shelters and the true facts regarding them; and (v) impeding the IRS by knowingly failing to locate and produce all documents called for by IRS summonses and misrepresenting to the IRS the nature and extent of KPMG's role with respect to certain tax shelters.

3.  This course of conduct was deliberately approved and perpetrated at the highest levels of KPMG's tax management, and involved dozens of KPMG partners and other personnel. Certain individuals involved were later promoted to firm-wide leadership positions. Moreover, during the period 1996 through 2002, KPMG changed its policies and practices in a manner that encouraged the sale of tax "products" to multiple clients. In this regard, KPMG changed its compensation structure in a manner that encouraged the sale of tax products, set policies and goals that demanded the creation and sale of tax products, and created within its tax department groups of partners and other personnel who were specifically charged with developing and selling tax shelters.

4.  Throughout the period in question, the firm's internal control systems failed to prevent the improper and illegal conduct because of inherent weaknesses in the system of internal controls and because those controls that were in place were overridden by certain individuals in tax management. KPMG has implemented changes and enhancements to its internal control systems and will implement additional enhancements pursuant to the Deferred Prosecution Agreement with the Government, to ensure that such failures cannot recur. Further, KPMG has taken a number of personnel actions intended to ensure that all of the partners and employees responsible for the illegal conduct described herein have been separated from the firm. KPMG intends not only to ensure that none of its partners will in the future participate with its clients and others in fraud, but indeed, KPMG wants in the future to ensure that the highest standards of ethics and compliance with United States tax laws will be met by the firm, its leadership, partners,

personnel and clients.

### *The Fraudulent Tax Shelter Activities*

5.    KPMG tax partners helped design or sell the following tax shelters (and variations of them) to high net worth United States citizens during the period in question:  Foreign Leveraged Investment Program ("FLIP"); Offshore Portfolio Investment Strategy ("OPIS"); Bond Linked Issue Premium Structure ("BLIPS"); and Short Option Strategy ("SOS").

6.    FLIP was marketed and sold by KPMG between 1996 and 1999 to at least 80 high net worth individual clients and generated at least $1.9 billion in bogus tax losses; KPMG's gross fees from FLIP transactions were at least $17 million.  OPIS was marketed and sold by KPMG between 1998 and 2000 to at least 170 high net worth individual clients, and generated at least $2.3 billion in bogus tax losses; KPMG's gross fees from OPIS transactions were at least $28 million.  BLIPS was marketed and sold by KPMG between 1999 and 2000 to at least 186 high net worth individual clients, and generated at least $5.1 billion in bogus tax losses; KPMG's gross fees from BLIPS transactions were at least $53 million.  SOS was marketed and sold by KPMG tax partners between 1998 and 2002 to at least 165 high net worth individual clients, and generated at least $1.9 billion in bogus tax losses; KPMG's estimated gross fees from SOS transactions were at least $17 million.  In addition, at least 14 KPMG partners engaged in SOS transactions for their own account.

7.    KPMG tax partners typically marketed the shelters to financially sophisticated, high net worth individuals who had at least $20 million in taxable gain, and who therefore would be interested in a shelter that would generate bogus losses that could be used to offset that gain, usually in the same tax year.  For each of these tax shelters, the high net worth individual client selected the amount of the loss he or she wanted to generate, and the KPMG tax partners and the other promoters would then calibrate the size of all aspects of the transaction to generate that loss.  KPMG and the other promoters and participants charged the high net worth individual clients a percentage of the selected tax loss, usually between 5 and 7%, to implement the transaction, an amount that included the fees of the promoters and other participants, as well as a small portion that would be used to execute the purported "investment" transactions.  KPMG's share was usually 1 to 1.25% of the tax loss.  KPMG's practice of charging a percentage of the purported tax losses mirrored the practice of competing tax shelter promoters, including other major accounting and law firms that developed and sold similar shelters.

8.    FLIP and OPIS were designed by KPMG tax partners, a New York lawyer who at the time was a partner in a prominent national law firm (the "New York Lawyer"), other individuals, and two KPMG tax professionals who left KPMG in 1997 to form a purported "investment advisory" firm located

in San Francisco, which in truth and in fact was in the business of promoting tax shelters (the "purported investment advisory firm"). FLIP, OPIS, and variations sold by another major accounting firm were substantially similar. These shelters were intended to generate substantial capital losses through the use of a pre-arranged series of purchases of and options on stock of one of two prominent international banks followed by redemptions of those investments by the bank.

9.  The FLIP and OPIS opinions signed by KPMG tax partners, and the representations drafted by KPMG tax partners and knowingly adopted by the high net worth individual clients, falsely stated that: (a) the client requested KPMG's opinion "regarding the U.S. federal income tax consequences of certain investment portfolio transactions," when in truth and in fact these were tax shelter transactions designed to generate bogus tax losses; (b) the "investment strategy" was based on the expectation that a leveraged position in the foreign bank securities would provide the "investor" with the opportunity for capital appreciation, when in truth and in fact the strategy was based on the expected bogus tax benefits to be generated; and (c) certain money was paid as part of an investment (i.e., for a warrant or a swap), when in truth and in fact the money constituted fees due to promoters and other facilitators of the transaction. All of these opinion letters were substantially identical, save for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transactions.

10. Senior KPMG tax professionals criticized the viability of these transactions and specifically questioned whether the transaction had economic substance or risk and whether the non-resident alien, whose participation as an equity holder of the foreign corporation was critical to the expected tax treatment of the redemption, would be respected by the IRS as a true equity holder or would instead be treated as a service provider or debt holder being paid a fee to accommodate the "investor."

1.  KPMG tax partners were instructed not to permit potential OPIS "investors" to retain a copy of KPMG's PowerPoint presentation describing the transaction because to do so would "DESTROY any chance the client may have to avoid the step transaction doctrine." In some cases KPMG tax partners took steps described below in paragraph 25 to assist high net worth individual clients to report the transactions in a fraudulent manner with the intent to evade federal income taxes.

12. BLIPS was designed by KPMG tax partners, the purported investment advisory firm, the New York Lawyer, and others. The BLIPS transaction was intended to generate a substantial ordinary or capital loss through the use of a loan issued at an above-market interest rate and with a substantial "loan premium" which was not in fact a true loan. KPMG tax partners and the purported investment advisory firm enlisted three prominent international banks — including one bank that also participated in FLIP,

OPIS, and SOS — to provide the purported "loans" used by the high net worth individual clients who participated in this shelter.

13.   The BLIPS tax opinions signed by the KPMG tax partners purported to rely upon certain factual representations made by the high net worth individual clients.  These representations, which were devised by KPMG tax partners and others involved in designing BLIPS and were knowingly adopted by the high net worth individual clients, were false and misleading.  The New York Lawyer issued substantially identical opinions reaching the same conclusion and purporting to rely upon the same false representations.

14.   Among the false representations in the BLIPS opinion letter was the representation that the high net worth individual client as well as the purported investment advisory firm "believed there was a reasonable opportunity to earn a reasonable pre-tax profit from the [BLIPS] transactions," when there was no such opportunity.  As the KPMG tax partners and the high net worth individual clients well knew, there was no "reasonable likelihood of earning a reasonable pre-tax profit" from BLIPS, and instead the "investment" component of BLIPS was negligible, unrelated to the large "loans" that were the key elements of the purported tax benefits of BLIPS, and was simply window dressing for the BLIPS tax shelter.

15.   The opinion letters and other documents implementing BLIPS also contained the false and fraudulent representation (among others) that the BLIPS "investment" was "highly leveraged."  In truth and in fact, and as the KPMG tax partners and the high net worth individual clients well knew, there was no "leverage" in the BLIPS transaction — the negligible "investment" component was carried out and secured using only cash contributed by the high net worth individual client.

16.   Another false representation contained in the opinion letters was that the duration of the individual's participation in the three-phase, seven-year investment program was dependent upon the performance of the program relative to alternative investments.   The KPMG tax partners and the high net worth individual clients well knew throughout the development and implementation of BLIPS, and at the time the high net worth individual clients made this representation and the KPMG opinions were issued, that this representation was false and fraudulent.  The principal purpose of the BLIPS transaction was to generate a tax loss to offset substantial income or gains, and in order to generate this purported tax benefit, the individuals had to and would withdraw from the BLIPS program by year end.  Therefore, the KPMG tax partners and the high net worth individual clients knew and expected that the transactions would terminate by year end and indeed in approximately 60 days, the earliest time at which the high net worth individual client could trigger the promised tax loss, not at some investment-related point in any purported "seven-year" program.  Throughout 1999, and as expected by the BLIPS participants, each of the high net worth individual clients who engaged in a BLIPS transaction

exited the transaction before year end (i.e., upon completion of the first 60 day "phase"). None of those individuals remained for three phases or seven years, and none earned a direct profit on their investment.

17. The "investment program" created by the purported investment advisory firm for the BLIPS transactions was described as a program of investments in foreign currencies intended to take advantage of volatility in foreign currencies through investments in foreign currency contracts, options and foreign currency denominated debt securities. However, when the high net worth individual clients who engaged in BLIPS transactions exited the transaction, the purported investment advisory firm typically acquired publicly traded equity securities to distribute to those clients, and to which the bogus tax basis generated through BLIPS would be "attached." In at least one case, a KPMG tax partner worked with the purported investment advisory firm and a high net worth individual client to identify publicly traded stocks that had already suffered large losses during the calendar year and used those stocks for "attaching" the bogus tax basis, for the purpose of creating the impression that the tax losses arose from the poor performance of the stocks and not from the BLIPS tax shelter.

18. Notwithstanding serious and valid concerns expressed by certain KPMG tax partners and other professionals throughout the development of BLIPS about the honesty of the proposed opinion letter and the credibility of the proposed factual representations (as well as other defects in the tax analysis contained in the opinions), Washington National Tax ("WNT"), the Department of Professional Practice - Tax ("DPP-Tax"), and other members of tax leadership approved BLIPS.

19. In March 2000, KPMG's tax leadership was advised by two of KPMG's top technical tax experts that BLIPS was "frivolous" and would "lose" in court, and was advised by professional and legal compliance personnel of the risks associated with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil liability and penalties, action by the IRS's Director of Practice, and action by State Boards of Accountancy. Nevertheless, and despite the obvious facts about BLIPS and the warnings conveyed during that time frame, KPMG's tax leadership decided to authorize the issuance of favorable opinions on all of the 1999 transactions, and proceeded with the implementation of another series of BLIPS transactions in 2000.

20. SOS and variations on that shelter were designed to generate a substantial ordinary or capital loss through the creation of an artificially high basis in an interest in a partnership or other entity through a series of purchases and sales of offsetting options on foreign currency. KPMG's top technical experts concluded that the losses claimed from SOS transactions were *not* more likely than not to be upheld in court if challenged by the IRS. Nonetheless, KPMG's tax leadership permitted its tax professionals to market and implement the transactions, all of which were substantially

similar, and to prepare tax returns incorporating these bogus tax losses.

21.    One KPMG tax partner from the Stratecon group (the "Stratecon Partner") even issued KPMG tax opinions stating that the bogus tax losses generated by the SOS tax shelter transactions were more likely than not to withstand challenge by the IRS, notwithstanding the conclusion of KPMG's top technical experts to the contrary.  These opinion letters, and other associated documents, were false and fraudulent in many ways, including the following:  they misrepresented SOS as an investment, when in truth and in fact, as the Stratecon Partner and the high net worth individual clients well knew, it was a tax shelter designed to generate tax losses; they falsely claimed that the "investor" would have entered into the option positions independent of the other steps that made up SOS, when in truth and in fact, as the Stratecon Partner and the high net worth individual clients well knew, the "investors" would not; and they falsely claimed that the option positions were contributed to a partnership to "diversify" the client's "investment" when in truth and in fact, as the Stratecon Partner and the high net worth individual clients well knew, the contribution was simply a necessary step in the tax shelter and was executed for the purpose of generating the tax loss.  Although the Stratecon Partner took several steps to conceal his activity from both the IRS and some members of KPMG leadership, several senior tax partners knew of this activity.  Ultimately, KPMG's Office of General Counsel determined that the Stratecon Partner had violated firm policies and recommended that the firm terminate him, but that recommendation was rejected in late 2002 by the former Deputy Chairman and tax leadership.

22.    In addition to the SOS transactions implemented by the Stratecon Partner, a number of other KPMG tax partners assisted high net worth individual clients with SOS transactions for a fee generally equal to 1% of the tax losses to be generated.  In these transactions, KPMG did not issue an opinion as to the legitimacy of claiming the losses purportedly generated by the shelter but those transactions were supported by opinions issued by other firms.  When a senior KPMG tax partner at WNT reviewed a draft SOS opinion letter to be issued by the New York Lawyer to several high net worth individual clients of KPMG, the tax partner suggested that the representations upon which the draft opinion letter was based were not credible and questioned whether the high net worth individual client would be able to swear under oath in a court of law that the representations were true.  Nonetheless, another KPMG tax partner continued to assist in the implementation of this SOS transaction and prepared and signed the tax returns of these clients incorporating the bogus tax losses, as did other KPMG tax partners in other SOS transactions.

### *Steps Taken to Avoid IRS Scrutiny of the Tax Shelters*

23.    KPMG tax partners actively took steps to conceal these shelters from the IRS.  These actions included: (i) deciding not to register the tax shelters

with the IRS, as required by law; (ii) preparing tax returns for some high net
worth individual clients that fraudulently attempted to make it less likely
that the individuals would be audited or, if audited, less likely that the IRS
would learn through the audit of the clients' participation in the tax shelter;
and (iii) improperly seeking to conceal the transactions under the veil of
sham attorney-client privilege claims.

24.     As part of their efforts to conceal the tax shelters from the IRS, KPMG tax
        leaders decided not to register those tax shelters as KPMG was required by
        law to do. Specifically, the decisions not to register the tax shelters were
        made in the face of advice from its professional and legal compliance
        personnel that the shelters should have been registered. On at least one
        occasion, those professional and legal compliance personnel warned that a
        willful failure to register the shelters could be criminal conduct. ✓

25.     KPMG tax professionals prepared tax returns for some high net worth
        individual clients that fraudulently attempted to conceal the shelters from
        IRS scrutiny. Specifically, some KPMG tax partners worked with high net
        worth individual clients to use a grantor trust and net the short-term capital
        losses generated by these tax shelters with the long-term capital gains that
        the shelters were designed to offset. By this improper and fraudulent
        conduct, the high net worth individual clients reported on their tax returns
        only a small net gain or loss created by subtracting the large bogus shelter
        loss from the large long-term capital gain rather than reporting both large
        figures on their individual income tax returns. The purpose of making use
        of this "grantor-trust netting" was to conceal the bogus tax shelter losses
        from the IRS and thus reduce the risk of an audit of the high net worth
        individual clients, thereby reducing as well the risk that the IRS would
        scrutinize the shelters. Despite stark warnings by the partner-in-charge of
        the personal financial planning group within WNT that to engage in
        "grantor trust netting" might be criminal, a leader of the PFP group decided
        that each individual KPMG tax partner should decide for himself or herself
        whether he or she felt comfortable advising high net worth individual
        clients to engage in "grantor trust netting" or to participate in this practice.

26.     The Stratecon Partner took additional fraudulent steps to conceal shelter
        transactions from the IRS by purporting to have the high net worth
        individual clients engage a law firm to provide legal advice, which law firm
        would then purport to engage KPMG to work under the direction of the law
        firm. Although under *United States v. Kovel*, communications by non-
        lawyer professionals such as accountants are protected under the attorney-
        client privilege when the accountant is in fact working under the direction
        of an attorney, numerous *Kovel* arrangements established by this former
        partner were sham arrangements because the individuals did not directly
        engage the law firm, in many instances never even spoke to the lawyers
        whom they had purportedly engaged, and the Stratecon Partner's work was
        done outside of the purported lawyer-client privilege. The purpose of this
        improper conduct was to enable the high net worth individual client, with

the assistance of the Stratecon Partner, to conceal the fraudulent tax shelter from the IRS by attempting to cloak all of the work for the shelter in the attorney-client privilege. The Stratecon Partner's conduct was well known to his supervisors who were later promoted to the positions of Vice Chairman in charge of Tax and Chief Financial Officer. This abuse of the attorney-client privilege was used by the Stratecon Partner (with the knowledge and approval of his supervisors) to circumvent the firm's internal controls, and to prevent others at KPMG from having full access to documents relating to the Stratecon Partner's fraudulent activities.

27.    Some KPMG tax partners and tax leaders also routinely attempted to cloak in the attorney-client privilege communications that revealed the true nature of their conduct even though those communications were not privileged — i.e., they were not conveying confidential information to attorneys for the purpose of receiving legal advice — by routinely copying an Associate General Counsel on email communications and memoranda in an effort to conceal information contained in those communications and memoranda from the IRS and others.

### *KPMG's Responses to IRS and Senate Investigations of its Fraudulent Tax Shelter Activities*

28.    Despite the efforts described above by the tax partners to prevent IRS scrutiny of these tax shelters, the IRS became aware of certain of these tax shelters and in September 2001 it initiated an examination of KPMG for its failure to register the transactions with the IRS. As part of this examination, in early 2002 the IRS issued 25 summonses to KPMG calling for the provision of information relating to numerous tax strategies with which KPMG may have been involved. In response to these 25 summonses, KPMG provided the IRS with several hundred boxes of documents responsive to the summonses. However, hundreds of documents were withheld on claims of privilege that were later rejected by a United States District Court based on the Court's determination, which KPMG did not appeal, that KPMG had "misrepresent[ed] its unprivileged tax shelter marketing activities as privileged communications."

29.    In addition, the IRS summonses required KPMG to designate a knowledgeable person to testify under oath at the IRS. KPMG's tax leadership designated the partner in charge of the PFP group (the "PFP Leader") to testify. A KPMG representative who attended the first of the PFP Leader's four days of testimony expressed the view to several KPMG tax leaders that the PFP Leader's testimony was, in many respects, misleading and evasive. This testimony was not supplemented or corrected.

30.    One of the 25 summonses to which KPMG responded called for production of documents relating to transactions described in an IRS administrative notice designated as Notice 2000-44. KPMG tax partners understood that documents relating to BLIPS and SOS were called for in response to this

summons and others. KPMG produced certain documents relating to BLIPS but did not produce any documents relating to SOS. Despite the involvement of a number of its tax partners in the marketing and sale of SOS transactions, which was well known to several members of KPMG's tax leadership and certain partners responsible for responding to the summonses, no documents relating to SOS were collected as part of the initial summons response process, and on several occasions prior to early 2003, the IRS was falsely advised that KPMG had largely complied with the IRS summonses.

31.     In addition, as several members of KPMG's tax leadership and certain partners responsible for responding to the summonses well knew, information and documents relating to the Stratecon Partner's activities were called for by summonses issued by the IRS to KPMG. Indeed, the Stratecon Partner had arranged for at least 14 KPMG partners to engage in SOS transactions for their own account. Nevertheless, KPMG did not produce to the IRS in response to summonses any documents or information relating to the Stratecon Partner's tax shelter activities until 2004, and on several occasions prior to early 2003, the IRS was falsely advised that KPMG had largely complied with the IRS summonses.

32.     In early 2003, the IRS became aware that KPMG tax partners had helped some high net worth individual clients participate in SOS tax shelters. In May 2003, IRS agents directly asked KPMG, through its outside counsel, what role KPMG had played in the SOS shelters. A KPMG tax partner seeking information in response to that inquiry conveyed the IRS' inquiry to the PFP Leader, who falsely advised that the only role that KPMG had played with respect to SOS was to assist a couple of high net worth individual clients in preparing and filing tax returns that reflected the tax losses from SOS transactions. This false representation was then relayed to the firm's counsel, and then made to the IRS. In fact, KPMG was in possession of numerous responsive documents and the existence of those documents was known to senior tax leaders and legal compliance personnel directing the summons-response process. Yet, none of the SOS transactions marketed and sold by KPMG tax partners were provided to the IRS until late 2003 and early 2004.

33.     In January 2003, the Permanent Subcommittee on Investigations of the United States Senate's Committee on Governmental Affairs (the "Subcommittee") commenced an investigation into efforts of several major accounting firms, including KPMG, to mass market abusive tax shelters. As part of that investigation, the Subcommittee issued a subpoena to KPMG calling for the production of certain documents, including information relating to tax shelters used by certain KPMG partners to avoid their own taxes. KPMG was in possession of numerous documents responsive to that request and several senior tax partners and KPMG's Office of General Counsel were well aware of those tax shelters and documents and the Subcommittee's request for them. In February 2003, KPMG stated that "to

the best of its knowledge and belief, after reasonable inquiry to date, the firm has not yet identified any documents that are responsive to this request," and the firm subsequently negotiated with the Subcommittee as to the scope of the subpoena. None of the documents relating to SOS transactions, including tax shelters used by certain KPMG partners on their own account, was produced to the Senate.

34.   In November 2003, several KPMG tax partners testified in a public hearing before the Subcommittee. The PFP Leader delivered KPMG's official statement to the Subcommittee, and then falsely denied in response to one question that KPMG's fee was a percentage of the tax loss to be generated by the shelters. In addition, when asked by a Senator whether FLIP, OPIS and BLIPS were "designed and marketed primarily as tax reduction strategies," the PFP Leader falsely stated "Senator, I would not agree with that characterization." The testimony of KPMG's representatives before the Subcommittee was misleading and evasive in other ways, at one point prompting a Senator to admonish the PFP Leader to "try an honest answer" and at another point prompting a Senator to state to KPMG's Vice Chairman in charge of Tax that "I can't get a straight answer out of you to a very direct question."

### *KPMG's Cooperation*

35.   At the outset of the criminal investigation, KPMG made the decision to cooperate with the Government. To that end, KPMG, on its own initiative, determined to condition employment and payment of legal fees for its current and former partners on their cooperation in the investigation, and took disciplinary action, including by refusing to pay attorneys' fees and by terminating the employment of those who chose not to cooperate with the criminal investigation. KPMG also declined to enter into any joint defense agreements with any current or former personnel or any other organizations or individuals whose conduct has been the subject of the Government's investigation. KPMG responded to grand jury subpoenas by providing the Government with documents reflecting the improper and illegal conduct of its tax partners and others, and responded to numerous specific requests for information on particular issues. As the Government's investigation progressed, the firm periodically authorized waivers of attorney-client and work product privileges in order to provide the Government with documents containing factual information of material interest to the Government's investigation. The firm also agreed to limited requests made by the Government to refrain from conducting certain internal inquiries that might have interfered with the Government's own investigation.

36.   KPMG has also agreed to fully cooperate with the Government's investigation into criminal wrongdoing associated with the development, promotion, and implementation of tax shelters.

58TMKPMC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              05 cr 05262

5   KPMG, LLP,

6                   Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         August 29, 2005
9                                        11:45 a.m.

10
    Before:
11
                        HON. LORETTA A. PRESKA,
12
                                         District Judge
13

14                              APPEARANCES

15  DAVID N. KELLEY
         United States Attorney for the
16       Southern District of New York
    JUSTIN WEDDLE
17  KEVIN DONNING
    STANLEY OKULA
18       Assistant United States Attorneys

19  SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         Attorneys for Defendant
20  ROBERT S. BENNETT
    CARL RAUH
21  JOSEPH BARLOON
    MATTHEW D. MICHAEL
22

23  ALSO PRESENT:  SVEN HOLMES

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C
                           (212) 805-0300

58TMKPMC

1          (Case called)

2          (In open court)

3          MR. WEDDLE: Good morning, your Honor, Justin Weddle

4    for the government. Sitting next to me is Kevin Donning,

5    Special Assistant United States Attorney, Department of

6    Justice, tax division. Next to him is Assistant United States

7    Attorney Stan Okula. The government is ready.

8          MR. BENNETT: My name is Robert Bennett, defense.

9    Seated next to me is Sven Holmes, chief compliance officer with

10   KPMG, chief legal officer. Next to him is Carl Rauh, my

11   partner at Skadden, Arps; and Joseph Barloon and Matt Michael

12   of Skadden, Arps.

13         THE COURT: Mr. Widdle, I understand there is a

14   deferred prosecution agreement in this matter?

15         MR. WEDDLE: There is, your Honor. I've handed an

16   original to your clerk earlier this morning.

17         THE COURT: And Mr. Bennett, do you and Mr. Holmes

18   have the deferred prosecution agreement before you?

19         MR. BENNETT: Yes, your Honor.

20         THE COURT: And has it been signed, gentlemen?

21         MR. BENNETT: Yes, your Honor.

22         THE COURT: Who signed it, please?

23         MR. BENNETT: I signed it as outside counsel, and

24   Mr. Holmes signed it on behalf of the company, the partnership.

25         THE COURT: And do I correctly understand that Exhibit

58TMKPMC

1  A is a board resolution approving the execution of the deferred

2  prosecution agreement?

3           MR. BENNETT:  That's correct, your Honor.

4           THE COURT:  And is Exhibit A a true and correct copy

5  of a resolution duly adopted by the board of KPMG?

6           MR. BENNETT:  Yes, your Honor.

7           THE COURT:  Do I correctly understand that the board

8  unanimously adopted the resolution?

9           MR. BENNETT:  Yes, your Honor.

10          THE COURT:  And, gentlemen, do you represent that the

11  board resolution is effective with respect to KPMG partnership

12  agreement and any other governing documents?

13          MR. BENNETT:  Yes, your Honor.

14          THE COURT:  May I inquire, Mr. Holmes, do you

15  understand that KPMG has a right not to be held to answer on a

16  felony unless the grand jury has returned an indictment?  Does

17  the firm understand that?

18          MR. HOLMES:  Yes, your Honor

19          THE COURT:  Do you understand that this particular

20  information charging KPMG with conspiring to defraud the United

21  States and to commit tax evasion, to cause the filing of false

22  and fraudulent tax returns, and to aid in and assist in the

23  preparation of false and fraudulent tax returns, in violation

24  of 18 U.S.C. Section 371, is, in fact, a felony?

25          MR. HOLMES:  Yes, your Honor.

4

58TMKPMC

1       THE COURT:  And does the firm understand that it's
2   under no obligation to waive its right to have the case
3   presented to the grand jury for indictment?
4           MR. HOLMES:  Yes, your Honor.
5           THE COURT:  Does the firm understand that if it does
6   not waive its right to have the case presented to the grand
7   jury, if the government wishes to prosecute the firm, the
8   government will have to present the case to the grand jury,
9   which might or might not indict the firm?
10          MR. HOLMES:  Yes, your Honor.
11          THE COURT:  And, finally, sir, do I correctly
12  understand that after consultation with counsel the firm has
13  determined that it is, in fact, in its best interest to waive
14  indictment in this circumstance?
15          MR. HOLMES:  Yes, your Honor.
16          THE COURT:  And that the firm did so in this document
17  dated August 29, which I'm holding up?
18          MR. HOLMES:  Yes, your Honor.
19          THE COURT:  Is that your signature there on the top
20  line?
21          MR. HOLMES:  It is, your Honor.
22          THE COURT:  I find the firm has knowingly and
23  voluntarily waived its right to have its case presented to the
24  grand jury.
25          Mr. Bennett, does the firm waive a reading of the

58TMKPMC

1  information?

2  |  MR. BENNETT:  Yes, your Honor, we waive.

3  |  THE COURT:  As I mentioned before in substance, the

4  information charges the firm with conspiring, in violation of

5  18 U.S.C. Section 371, to defraud the United States and to

6  commit tax evasion, the filing of false and fraudulent tax

7  returns, and to aid and assist in the preparation of false and

8  fraudulent tax returns in connection with a multibillion dollar

9  fraud relating to the design, marketing, and implementation of

10  tax shelters as well as in connection with efforts to impede

11  and impair IRS and Senate investigations of that conduct.

12  |  Mr. Holmes, has the firm reviewed the information with

13  its attorneys?

14  |  MR. HOLMES:  Yes, your Honor.

15  |  THE COURT:  Is the firm satisfied with the

16  representation and advice of its attorneys?

17  |  MR. HOLMES:  Yes, your Honor.

18  |  THE COURT:  Counsel, shall I enter a plea of not

19  guilty?

20  |  MR. BENNETT:  Yes, your Honor.

21  |  THE COURT:  Mr. Widdle, would you summarize, please,

22  the terms and conditions of the deferred prosecution agreement?

23  |  MR. WEDDLE:  Yes, your Honor.  Among other things, the

24  agreement provides that assuming KPMG does not violate the

25  terms of the agreement or commit crimes, the prosecution of the

6

58TMKPMC

1    information just filed will be deferred until December 31,

2    2006, at which point, again assuming no violations, the

3    government will move to dismiss the information without

4    prejudice.  Because the charge will be dismissed without

5    prejudice, it could be refiled in the event of a violation by

6    KPMG that occurs after December 31, 2006.  In the event of

7    violations of the agreement, the government could prosecute

8    KPMG on the conspiracy charge filed today and on any other

9    criminal charges or could elect to extend the term of the

10   deferral, but not for longer than a total of five years.

11               Also, as part of the agreement, KPMG will admit its

12   fraudulent conduct.  KPMG's admissions are set forth in Exhibit

13   C to the agreement and the agreement itself states that KPMG

14   admits the facts set forth in Exhibit C.  KPMG's statement of

15   facts essentially admits that KPMG committed fraud in

16   connection with the design, marketing, and implementation of

17   tax shelters referred to by KPMG and its coconspirators as

18   FLIP, OPIS, BLIPS, and SOS, including by drafting

19   representations as part of those shelters that KPMG personnel

20   and clients knew to be false.  The statement of facts also

21   admits that KPMG personnel attempted to conceal the shelters

22   from the IRS by fraudulent means, and that KPMG knowingly

23   failed to produce documents in response to IRS summonses, and

24   made misrepresentations to the IRS as part of its civil

25   investigation of tax shelters.  In addition, in the event of

58TMKPMC

1   violation, KPMG's admissions, which are Exhibit C, may be used
2   against KPMG and admitted in evidence against them.

3          The agreement also provides that KPMG will pay $456
4   million in fines, restitution, and penalties, according to a
5   payment schedule set forth in the agreement.  This money must
6   be paid in full by December 21, 2006.

7          The agreement provides that KPMG will adopt permanent
8   restrictions on and elevated standards for its tax practice.

9          The agreement requires KPMG to cooperate with the
10  government's ongoing investigation.  This obligation may and
11  likely will extent beyond the period of deferral.

12         The agreement requires KPMG to implement and maintain
13  an effective compliance and ethics program.

14         And the agreement requires KPMG to submit to oversight
15  and monitoring by an independent monitor of, among other
16  things, its compliance with the deferred prosecution agreement,
17  and to provide the monitor with full access to information in
18  connection with that oversight.  The term of the monitor is
19  three years, unless it is extended pursuant to the agreement,
20  such as for a violation.

21         In addition to the other remedies for violations I've
22  already mentioned, in the event of a violation, the government
23  may extend the period of the monitorship beyond the three-year
24  term described in the agreement.

25         Finally, the agreement provides in paragraph 10 that

58TMKPMC

1   KPMG waives its right to a speedy trial.

2        Thank you, your Honor.

3        THE COURT:  Mr. Bennett, Mr. Holmes, are those the

4   terms and conditions of the agreement as you understand them?

5        MR. BENNETT:  Yes, your Honor.

6        THE DEFENDANT:  Yes, your Honor.

7        THE COURT:  Mr. Holmes, does the firm understand the

8   requirements of the agreement and has the firm had adequate

9   time to review it and to go over it with counsel?

10       MR. HOLMES:  Yes, your Honor.

11       THE COURT:  And does the firm understand that in the

12   event of a violation of the agreement, the firm may be

13   prosecuted on the conspiracy charge that is contained in the

14   information or on any charges that are later filed?

15       MR. HOLMES:  Yes, your Honor.

16       THE COURT:  Does the firm understand that in the event

17   of a violation of this agreement, KPMG's admissions that are

18   made part of the agreement may be used against the firm and

19   admitted into evidence?

20       MR. HOLMES:  Yes, your Honor.

21       THE COURT:  Does the firm admit the truth of the facts

22   that are set out in Exhibit C, the statement of facts that's

23   attached to the agreement?

24       MR. HOLMES:  Yes, your Honor.

25       THE COURT:  And does the firm also understand that

58TMKPMC

1    under the terms of the agreement the period of the deferral of

2    the prosecution or of the monitorship may be extended?

3              MR. HOLMES:  Yes, your Honor.

4              THE COURT:  Counsel, are there any other agreements

5    between the defendant and the government that are not set forth

6    in the written plea agreement?

7              MR. BENNETT:  No, your Honor.

8              MR. WEDDLE:  No, your Honor.

9              THE COURT:  The agreement is acceptable to the Court

10   as is the statement of facts.  I find that they were knowingly

11   executed and authorized by the board.

12             The agreement on the statement of facts shall be

13   publicly filed.

14             Mr. Widdle, I understand that Exhibit D to the

15   agreement is an order permitting the disclosure of certain tax

16   information by a tax preparer.  What does that order purport to

17   do, please?

18             MR. WEDDLE:  Your Honor, the agreement does two things

19   to ensure that the monitor is not hampered by disclosure rules.

20             THE COURT:  The order, Exhibit D.

21             MR. WEDDLE:  I'm describing the agreement first, your

22   Honor, and then I am just going to mention the order because

23   there are two provisions.  And I think in some sense this order

24   is belt and suspenders for something that we've already agreed

25   is proper under a regulation.  But to the extent there is any

58TMKPMC

1   question about that, we are asking your Honor to enter an

2   order.

3           What we're asking for is that the monitor not be

4   hampered by disclosure rules in monitoring the firm's

5   compliance with the agreement.  So in the agreement the parties

6   have agreed that the monitor's performance of his or her duty

7   is a "quality review" under the regulations which would permit

8   disclosure.  In addition, the parties are requesting that your

9   Honor enter an order pursuant to 26 United States Code Section

10  7216(b)(1)(B) that would eliminate any kind of doubt about the

11  propriety of the disclosure of information and ensure that the

12  monitor has performed his or her duties pursuant to the

13  agreement.

14          THE COURT:  Anything to add to that, Mr. Bennett?

15          MR. BENNETT:  Nothing, your Honor.

16          THE COURT:  I certainly find that it's in the

17  interests of justice to enter this order in order to facilitate

18  the monitor's carrying out of his responsibilities.

19          Mr. Widdle, with respect to the Speedy Trial Act --

20          MR. WEDDLE:  Yes, your Honor.  The government moves

21  for the exclusion of time from the Speedy Trial Act from today

22  through December 31, 2006, pursuant to Title 18 United States

23  Code Section 3161(h)(2).  The defendant's waiver of the speedy

24  trial is contained in the agreement.

25          THE COURT:  Any objection, Mr. Bennett?

58TMKPMC

1         MR. BENNETT: No objection.

2         THE COURT: It certainly is the Court's finding that

3  it is in the interests of justice to exclude time between today

4  and December 31, 2006 from calculation under the Speedy Trial

5  Act.

6         Is there anything further, gentlemen?

7         MR. WEDDLE: Nothing from the government, your Honor.

8         MR. BENNETT: Nothing from the defense, your Honor.

9         THE COURT: Good morning, ladies and gentlemen.

10                    o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300