# EXHIBIT

# EE

## 1 of 3

480.1

December 31, 2000

Mr. Carlos Sala
2424 Ginny Way
Lafayette, CO   80026

Dear Mr. Sala:

### Re: Investments in Foreign Currency

You ("Investor") have requested our opinion regarding certain U.S. federal income tax consequences of various investment transactions ("Transactions"), described more fully below, that Investor has made in foreign currency and foreign currency derivatives, such as options, directly and indirectly through Deerhurst Management, Inc. ("Deerhurst").

### I.   Summary of the Transactions

#### A.   Trial Account

On October 23, 2000, Investor established a trial account with Deerhurst for the purpose of evaluating a long-term investment with that firm. Deerhurst is one of the leading foreign currency management firms in the country. Based in Fort Lee, New Jersey, Deerhurst has been in operation since 1991 and has a historical profitability of 18.2 % after fees on an unleveraged basis.

Historically, Deerhurst invested monies via separate managed accounts for investors. They required a minimum investment of $5 million per account in order to execute transactions with a high enough nominal value to be economical both for the investor and for Deerhurst. In order to increase the monies under management, they have decided to reduce the investment

KPMGZ12060117

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 2

minimum per investor so long as the investor is willing to place their account in Deerhurst Trading Strategies LLC, a fund that will commingle these investments, as described below. The first step in this process is the formation of the trial account.

The trial account is formed to introduce the investor to Deerhurst's trading strategy. Minimum investment size is $500,000. Deerhurst utilizes its "diversified trading strategy, a combination of technical trading systems with a discretionary overlay. The diversified strategy utilizes a combination of currency spot trades, currency forwards and currency options to trade a broad category of currencies. Most trading is short term, though some are mid-term to long term of up to one year. The account is extremely active, with high turnover and generally small profits on a majority of positions and small losses on a minority of positions, except for core positions, which are taken infrequently and are designed to position the portfolio for major currency moves. Such core positions may be taken in spot, forwards or options, depending upon the specific market environment.

**B.    Increasing Investments**

During the initial trial period, Deerhurst would employ leverage in executing these transactions, but in no case will that leverage exceed 2-1. After a 30-45 day trial period, the investor is expected to increase his investment. Such increase would be implemented by increasing the amount of cash and/or the amount of leverage to a 4-1 level. At the Investor's election, such leverage will be limited to a 3-1 level if the investor agrees to enter into Deerhurst Investors, a domestic pooled investment entity that is treated as a Partnership for federal income tax purposes ("Fund I") with others that have elected this 3-1 increase. The Fund I allows the investor to minimize the leverage for a short period to experience the trading at this level before continuing at 4-1 in the Fund I, while allowing Deerhurst the ability to trade in greater blocks, producing economies of scale.

At the time of increasing the investment, if it is done by increasing the leverage, Investor was advised by Manager of the prudence of doing so through the use of a limited liability vehicle. Investor determined to use a wholly owned S corporation ("S Corp") to achieve this advantage. Investor then contributed the entire portfolio, including certain long and short European-style foreign currency options (respectively, "Long Options" and "Short Options", and collectively "Options") with Deerhurst Management, LLC, an unrelated financial institution

NYLIB1/801884/2

KPMGZ12060118

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 3

("Bank") to S Corp[1] and then to Fund I. The Long Options had a cost of $60,987,866.79, and the Short Options resulted in premiums received by Investor of $60,259,568.94. At the time of the transfer the Short Options were out of the money.

At the time Investors signed the subscription documents for Fund I, the documents indicated that if the account was profitable at year end, the account would be automatically rolled up into the Deerhurst Trading Strategies LLC, a second pooled investment entity treated as a partnership for U.S. federal income tax purposes ("Fund II"). If the account had net losses, it could still be rolled up if the investors so elected, or the funds would be returned to the investors penalty free with any economic gains or losses to date.

## C. Rollup into Fund II

On December 21, 2000, the account was rolled into the Fund II in a 2-step process. Initially, the individual trades were distributed from Fund I back to S Corp in the original foreign currency. Once at S Corp level, Deerhurst then liquidated the positions into US dollars to avoid any illiquidity and volatility issues typical of trades over the year-end. This is a strategy that Deerhurst has performed for clients in prior years. On December 29, 2000, the dollars were then contributed to the Fund II and S Corp was liquidated, as it was no longer needed.

## D. Fund II Investments

Fund II will continue to enter into a number of foreign currency transactions on behalf of the investors including spot, forward and options transactions similar to those done in the trial account and increased leverage periods. Deerhurst continues to utilize a 4-1 leverage on these transactions. The funds are intended to be left in Fund II for a 5-year period. While the documents prohibit a withdrawal for the initial year, any withdrawals after that one-year period will be subject to a substantial early withdrawal penalty that decreases over time until the end of the 5-year period.

Based on the historical results of Deerhurst and the amount of leverage employed, if the investors stay in for the full 5-year period they should earn a profit of 1300% over this period.

---

[1]    Deerhurst have advised us that the Options provided for transferability, i.e. could be sold or otherwise

NYLIB1/4018842

KPMGZ12060119

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 4

## II.    Representations:

### A.    Investor Representations:

For purpose of rendering our opinion, Investor has represented as follows:

1.    Investor, through S Corp, entered into the trial period, increased leverage, and Fund I and Fund II for substantial non-tax business reasons, including to produce an overall economic profit from the movement of foreign currencies.

2.    Based upon Investor's own independent evaluation and upon the advice of Deerhurst, Investor believed that by entering into Fund I and II, Investor could diversify his portfolio, and create profits from an activity that has no correlation to the major equity markets.

3.    Based upon advice of the Deerhurst as to the probability of the Funds, and specifically the foreign currencies reaching certain levels at which the options transactions would be profitable, and upon Investor's own independent evaluation, Investor believed that Investor had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits.

4.    Based on the advice of Deerhurst, and upon Investor's own independent evaluation, Investor had an opportunity to make an aggregate gross return in excess of the sum of Investor's net investment in the trial account and the Funds.

5.    Investor contributed the trial account to S Corp and from S Corp to the Fund I for substantial non-tax business reasons, including use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst.

6.    Neither Investor nor S Corp will hedge such person's risks with respect to the Options' net position with respect to the Bank.

7.    Neither Investor nor S Corp has identified, nor will it identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

---

transferred separately from each other (subject to satisfying Bank's credit requirements).

KPMGZ12060120

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 5

8.  Neither Investor nor S Corp has elected, nor will it elect, under Treas. Reg. §1.988-3(b) to treat exchange gain or loss on any forward contracts, futures contracts or option contracts as capital gain or loss.

9.  Investor owned 100% of the issued and outstanding stock of S Corp.

10. At the time of the contribution of the Options to S Corp the Options were not subject to any liabilities, and S Corp assumed no liabilities and distributed or paid no money or other property to Investor in connection with such contribution.

11. S Corp has elected to be treated as an S corporation for U.S. federal income tax purposes.

12. Investor and S Corp each uses the U.S. dollar as such person's functional currency.

13. Investor/S Corp is not related to the other members of Fund I or Fund II

14. Whether and when Investor terminated Investor's investment in Fund I was within Investor's sole discretion and control subject to the rollup provision in the subscription agreement, the execution of which itself was within in Investor's sole discretion and control.

15. There existed no understanding, agreement, obligation, or arrangement pursuant to which any Investor described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/S Corporation (and Fund I as transferee of Investor) and Bank were contractually obligated to perform under the foreign currency transactions in accordance with their stated terms subject to the rollup provisions in the subscription agreement.

16. Investor has not entered into a confidentiality agreement or otherwise agreed (orally or in writing) to any obligations of confidentiality with respect to the Transactions.

17. Investor is an individual whose "tax home" as defined in Section 911(d)(3) of the Internal Revenue Code of 1986, as amended ("Code") is the United States.

18. Investor has reviewed the description of the Transactions as set forth herein and such description is accurate and complete, and there are no pertinent facts relating to the Transactions that have not been set forth in such description.

NYLIB1/801884/2

KPMGZ12060121

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 6

**B.**   **Deerhurst/Fund I Representations:**

For purpose of rendering our opinion, Deerhurst/Fund has represented as follows::

1.   Deerhurst/Fund I have not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

2.   Fund I will determine its members' distributive shares income, gain, loss, deduction, or credit and will maintain its members' capital accounts in accordance with Code Section 704 and the Treasury Regulations promulgated thereunder.

3.   Fund I has not made an election under Code Section 754 and will not do so for the taxable year or years in which the Transactions occur.

4.   Fund I has not elected, and will not elect, under Treas. Reg. §301.7701-3 to be classified as a corporation.

5.   Fund I entered into the Transactions for substantial non-tax business reasons, including to produce an overall profit from investments in foreign currency and foreign currency options.

6.   The Short Options were out of the money at the time that they were contributed by Investor to S Corp and at the time that they were contributed by S Corp to Fund I.

7.   At the time of the contribution of the Options to Fund I the Options were not subject to any liabilities, and Fund I assumed no liabilities and distributed or paid no money or other property to Investor in connection with such contribution.

8.   The Options are not listed on or subject to the rules of a qualified board or exchange as those terms are used in Code Section 1256(g)(5).

9.   Fund I has not elected, and will not elect, under Treas. Reg. §1.988-3(b) to treat exchange gain or loss on any forward contracts, futures contracts or option contracts as capital gain or loss.

10.   Deerhurst/Fund I uses the U.S. dollar as its functional currency.

KPMGZ12060122

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 7

## III.    Conclusions

In rendering our opinions, we have reviewed representations and advice, including financial information, from various parties to the Transactions and made certain assumptions, which representations, advice and assumptions are referred to below. In rendering our opinions, we have also examined such agreements, certificates, instruments and documents, and we have made such other inquires of officers, owners and representatives of the entities involved in the Transactions as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, records, agreements, certificates, instruments, documents, and responses to such inquiries. If any such representations, advice, assumptions, records, agreements, certificates, instruments, documents, or responses is inaccurate in any material respect, or any such agreements, certificates, instruments, and documents prove not to be authentic, the opinions contained herein may not be relied upon. In rendering our opinion, we have reviewed the applicable provisions of the Code and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.", "Treasury Regulations", or "Regulations") promulgated thereunder; relevant decisions of the U.S. federal courts; published Revenue Rulings ("Rev. Rul." or "Ruling") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service ("IRS"); and such other materials as we have considered relevant. In certain instances we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

Based on and subject to the summary set out at Section I above, the Representations set out at Section II above, and the analysis of the pertinent statutory provisions and legal doctrines at Section IV below, as of the date hereof:

A.    For U.S. federal income tax purposes it is more likely than not that:

1.    The Options will be treated as separate instruments

2.    Investor will not recognize taxable gain or loss upon the contribution of the Options to S Corp.

3.    Investor's basis in its Corp stock will be increased by Investor's basis in the Long Option and Debt Securities immediately before the transfer, and Corp's tax basis in the Long Option and Debt Securities will equal

KPMGZ12060123

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 8

Investor's tax basis in the Long Option and Debt Securities immediately before the transfer.

4. At the time of the contribution of the Options to S Corp, the Short Options will not be considered liabilities for purposes of Code Section 358.

5. Fund I will be classified as a partnership

6. S Corp will not recognize material taxable gain or loss upon the contribution of the Options to Fund I.

7. S Corp's basis in its interest in Fund I will be equal to S Corp's basis in the Long Option, reduced by the amount of liabilities as determined for purposes of Code Section 752 assumed by Fund I and increased by Investor's share of such liabilities.

8. At the time of the contribution of the Options to the Fund I, the Short Options will not be considered liabilities for purposes of Code Section 752.

9. S Corp will not recognize gain or loss on the receipt of a distribution of foreign currency from Fund I in exchange for Investor's interest in Fund I.

10. The basis of foreign currency received as a distribution in exchange for S Corp's interest in Fund I will equal S Corp's basis in such interest immediately before such distribution.

11. Gain or loss recognized by S Corp on the conversion of the foreign currency received in exchange for S Corp's interest in Fund will be treated as ordinary income or loss.

B. Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions set forth herein will be upheld if challenged by the IRS.

C. Based upon the foregoing, the IRS should not be successful were it to a penalty against Investor under Code Section 6662(b)(2) or (3) for taking the positions set forth herein in Investor's U.S. federal income return with respect to the Transactions.

KPMGZ12060124

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 9

## IV.   Analysis

### A.   The Options

#### 1.   Taxation of Options Generally

The tax consequences of the issuance of an option are set out not in the Code, but in cases and Rulings. The fundamental case regarding the timing of income arising from an option is Virginia Iron Coal & Coke Co. v. Comm'r, 37 B.T.A. 195 (1938), a reviewed decision. In that case the taxpayer granted Texas Gulf Sulphur Co. ("TGS") a four-year option to buy stock of a subsidiary in exchange for a one-time payment of $300,000 in 1930 and annual payments of $125,000. The payments were to be applied to the purchase price if TGS exercised the option. After paying $300,000 in 1930 and $125,000 in 1931, in 1933 TGS notified the taxpayer that TGS was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 reporting the premiums as income in the year received. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:

> It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss that the property had in the hands of the seller. In that event they would not have been income and their return as income when received would have been improper. . . [citations omitted]. But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.
>
> Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax

NYLIB1/801884/2

KPMGZ12060125

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 10

> purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.

> *Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made.* The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. Its property was then free of the option. It had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.

> The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. *Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised.* That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance. [emphasis added]

37 B.T.A. 197-199. A dissent argued that the taxpayer recognized income in the year of receipt because it had unfettered control of the premium at that time. The dissent added that the income could be included in the year the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that TGS "forfeited" the premiums only

NYLIB1/801884/2

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 11

in 1933. That theory was untenable because the taxpayer had absolute control of the funds since 1930, so TGS had nothing to "forfeit". The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

The rationale of the Virginia Iron Coal case, that the receipt of an option premium is not income, has consistently been accepted by the IRS. The first holding of I.T. 3835, 1947-1 C.B. 53, states that the premium received by the writer (issuer or optionor) of a put or call option which is not exercised constitutes a short-term capital gain, under section 117(g)(2) of the Internal Revenue Code of 1939, to be taken into account in computing his gross income, for federal income tax purposes, only for the taxable year in which the failure to exercise the option became final. Rev. Rul. 58-234, 1958-1 CB 279, notes that section 117(g)(2) of the Internal Revenue Code of 1939 specifically provided that "gains . . . attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains . . .", although the Internal Revenue Code of 1954 contained no provision treating such gains as capital gain, either short-term or long-term. Therefore, the IRS held that the premium received by the writer of a put or call option which is not exercised constitutes ordinary income under section 61 of the 1954 Code, to be included in his gross income only for the taxable year in which the failure to exercise the option becomes final. Like the court in Virginia Iron Coal case, the IRS used an "open transaction" approach:

> An optionor, by the mere granting of an option to sell ("put"), or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for federal income tax purposes, in A.E.

KPMGZ12060127

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 12

> Hollingsworth v. Comm'r, 27 B.T.A. 621, acquiescence, C. B. XII-
> 1, 6 (1933). It is manifest, from the nature and consequences of
> "put" or "call" option premiums and obligations, that there is no
> federal income tax incidence on account of either the receipt or the
> payment of such option premiums, i.e., from the standpoint of
> either the optionor or the optionee, unless and until the options
> have been terminated, by failure to exercise, or otherwise, with
> resultant gain or loss. The optionor, seeking to minimize or
> conclude the eventual burden of his option obligation, might pay
> the optionee, as consideration for cancellation of the option, an
> amount equal to or greater than the premium. Hence, no income,
> gain, profits, or earnings are derived from the receipt of either a
> "put" or "call" option premium unless and until the option expires
> without being exercised, or is terminated upon payment by the
> optionor of an amount less than the premium. Therefore, it is
> considered that the principle of the decision in North American Oil
> Consolidated v. Burnet, 286 U.S. 417, Ct. D. 499, C. B. XI-1, 293
> (1932), which involved the receipt of "earnings," is not applicable
> to receipts of premiums on outstanding options.

Rev. Rul. 78-182, supra, which deals with options on the Chicago Board Options Exchange,
follows Rev. Rul. 58-234 in holding, inter alia, that as to the writer of a put or call, "there is no
federal income tax incident on account of either the receipt or the payment of such option
premium, that is, from the standpoint of either the optionor or the optionee, unless and until the
options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss."
As discussed below, PLR 8036067, infra, PLR 7938018, infra, and PLR 8115024 hold that the
assumption of a warrant in a corporate reorganization is not an event that would trigger such
gain.

Based on the foregoing, it is more likely than not that no income or loss would be
recognized with respect to an Option at the time the Option was entered into. Furthermore, as
discussed below, it is more likely than not that any income or loss arising from the termination of
an Option would be treated as income or loss of Fund I, the then owner of Option, and would not
be directly attributed to Investor.

KPMGZ12060128

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 13

## 2. The Options as Separate Instruments

In determining the U.S. federal income tax consequences of the Transactions, it must be determined whether the Long Option and the Short Option would be treated as separate instruments or the Options would be integrated in some way.

Each Option may be transferred or assigned independently, an important factor in determining if two instruments should be treated as one. For example, Congress needed to add Code Section 269B to the Code to provide special rules for the treatment of a stapled entity. A stapled entity is one where the stock of one entity cannot be traded without trading the stock of the other entity. The legislative history of this provision indicates that the law in this regard was unclear. Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Tax Reform Act of 1984, 98th Cong., 2d Sess., 454 (1984). We are not aware of any efforts by Congress to treat non-stapled entities as a single entity.

Further, Investor and Bank, and Fund I and Bank, retain real net economic risk that they will not hedge with each other. As discussed below, it is more likely than not that Treas. Reg. §1.446-4 would not apply to the Options. Even if these Regulations were to apply, however, there is nothing in them that would cause the Options to be integrated.

Third, the Treasury has issued detailed, complex rules governing foreign currency transactions. Under these Regulations, transactions under Code Section 988 (referred to as "section 988 transactions") may not be integrated. Treas. Reg. §1.988-1(c) provides in relevant part:

> [T]he amount of exchange gain or loss from a section 988 transaction shall be separately computed for each section 988 transaction, and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the section 988 transaction)

As discussed below, the acquisition and disposition of each of the Long Option and the Short Option are section 988 transactions.

In addition, Congress has recognized that separate instruments are generally given separate effect, even when one transaction may significantly offset the risk of the other. See e.g.

NYLIB1/801884/2

KPMGZ12060129

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 14

Code Section 1092 (loss on one position of a straddle is deferred until gain is recognized on the offsetting position; the offsetting positions are not netted); Code Section 1258 (recharacterizing certain gain attributable to the time value of a taxpayer's investment as ordinary income, not purporting to recharacterize the transaction as a borrowing); and Code Section 1259 (constructive sale provision).

Finally, case law recognizes that a taxpayer can hold long and short positions in property at the same time, and that each position is a separate property. In <u>Smith v. Comm'r</u>, 78 T.C. 350 (1982), the court held that each leg of a straddle should be treated as separate property, whether the legs were acquired at different times or at the same time. See also, <u>Stoller v. Comm'r</u>, 994 F.2d 855 (DC Cir. 1993) aff'g in part and rev'g in part, 60 TCM (CCH) 1554 (1990) (separate contracts were respected); <u>Richardson v. Comm'r</u>, 121 F.2d 1 (2d Cir. 1941) (can hold long and short positions at the same time). See also, Rev. Proc. 65-29, 1965-2 CB 1023; Rev. Rul. 78-182, 1978-1 CB 265; <u>Arnall v. U.S.</u>, a District Court case unofficially reported at 59-2 USTC ¶9779 (N.D. Ga. 1959).

Consequently, based on the foregoing, it is more likely than not that the Options would be treated as separate instruments.

### 3.    Tax Basis in the Long Options

In Rev. Rul. 78-182, <u>supra</u>, the IRS concluded that the tax basis of the purchaser of put or a call option with respect to certain stock was the premium paid for the option plus any fees or other costs associated with acquiring the options. The position taken by the IRS in Rev. Rul.78-182 should be equally applicable in the instant case. Consequently, it is more likely than not that Investor's tax basis in a Long Option would equal the premium paid to Bank with respect thereto and any other costs associated with acquiring such options.

### 4.    Treas. Reg. §1.446-4 is Inapplicable

Treas. Reg. §1.446-4 provides that the timing of income, gains, deduction and losses from a hedging transaction as defined in Treas. Reg. §1.1221-2(b)(1) match those of the hedged transaction. Treas. Reg. §1.1221-2(f) provides, with two exceptions, that the absence of a proper identification of a transaction as a hedging transaction establishes that the transaction is not a hedging transaction. The exceptions are (i) for inadvertent error (ii) an anti-abuse rule that

KPMGZ12060130

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 15

provides, in appropriate circumstances, not that the transaction is a hedging transaction but that gain from the transaction is ordinary. Based upon the representations contained in II, above, neither Investor, S Corp, nor Fund I has identified or will identify the Options as being part of a hedging transaction. Consequently then it is more likely than not that the matching rule of Treas. Reg. §1.446-4 will not apply.

### 5.    The Options are not Code Section 1256 Contracts

Code Section 1256(a) requires mark-to-market treatment for a "section 1256 contract" held by a taxpayer at the close of the taxpayer's taxable year and upon the termination or transfer of a taxpayer's rights or obligations with respect to such a contract during the year by assignment, lapse, or otherwise. This is achieved by treating each such contract held by the taxpayer as sold on such date for the contract's fair market value. Code Section 1256(a)(1). Code Section 1256(a)(2) provides that "proper adjustment shall be made in the amount of gain or loss subsequently realized for gain or loss taken into account by reason of such paragraph (1)".

Code Section 1256(b) defines a section 1256 contract as (i) a regulated futures contract within the meaning of Code Section 1256(g)(1), (ii) a foreign currency contract within the meaning of Code Section 1256(g)(2), (iii) a nonequity option within the meaning of Code Section 1256(g)(3), and (iv) a dealer equity option within the meaning of Code Section 1256(g)(4).

A futures contract is not defined in Code Section 1256. However, the Commodities Future Trading Commission ("CFTC") has defined a futures contract as:

> [A]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at the initiation of the contract; (2) *which obligates each party to the contract* to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery or offset. [emphasis added]

See CFTC Glossary: A: Layman's Guide to the Language of the Futures Industry. Because an option is conditional, each party to the contract is not so obligated. As a result, it is more likely than not that the Options would not be treated as futures contracts for purposes of Code Section 1256. Furthermore, even if the Options constituted futures contracts, over-the-counter futures

NYLIB1/801884/2

KPMGZ12060131

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 16

contracts between two private parties, such as the Options, are not "regulated futures contracts" within the meaning of Code Section 1256(g)(1). See Rev. Rul. 87-43, 1987-1 CB 252. Consequently, it is more likely than not that the Options would not constitute regulated futures contracts within the meaning of Code Section 1256(g)(1).

Code Section 1256(g)(3) defines a nonequity option as any listed option, within the meaning of Code Section 1256 (g)(5), that is not an equity option. Code Section 1256(g)(6) defines an equity option as an option to buy or sell stock or an option the value of which is directly or indirectly determined by reference to one or more stocks or a stock index. It is more likely than not that the Options would not be equity options under this definition. Code Section 1256(g)(5) defines a listed option as any option listed on, or subject to the rules of, a qualified board or exchange. Code Section 1256(g)(7) defines a qualified board or exchange as a national securities exchange that is registered with the SEC; a domestic board of trade designated as a contract market by the CFTC; or any other exchange, board of trade or other market that the Treasury determines has certain rules. In the instant case, the Options are not listed on a CFTC-designated contract market. Consequently, it is more likely than not that the Options are not listed options within the meaning of Code Section 1256(g)(5).

Code Section 1256(g)(4) defines a dealer equity option as, among other things, an equity option. As discussed above, it is more likely than not that the Options would not be equity options under Code Section 1256(g)(5). Therefore, it is more likely than not that the Options would not be dealer equity options within the meaning of Code Section 1256(g)(4).

Lastly, Code Section 1256(g)(2)(A) defines a foreign currency contract to mean a contract that (i) settles in or with reference to a currency in which positions are traded through regulated futures contracts; (ii) is traded in the interbank market; and (iii) is entered into at an arm's length price determined by reference to the price in such market. The legislative history of Code Section 1256 assumed that the IRS would provide guidance through Revenue Rulings, Notices, etc. as to the types of contracts that would fall within this definition. H.R. Conf. Rpt. No. 986, 97th Cong., 2d Sess., 25 (1982). No such guidance has yet been published.

Although one of the parties to the Options, Bank, is a person who is eligible to participate in the interbank market, the Options themselves are not ones that are so traded. The scope of this

KPMGZ12060132

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 17

provision regarding foreign currency contracts is evidenced in the legislative history, which reflects the fact that interbank trading was substantially similar to regulated futures contracts:

> Trading in foreign currency for future delivery is conducted through regulated futures contracts, and is also conducted through contracts negotiated with any one of a number of commercial banks which comprise an informal market for such trading (bank forward contracts). . . . Although bank forward contracts differ from regulated futures contracts, the volume of trading through forward contracts in foreign currency in the interbank market is substantially greater than foreign currency trading on futures exchanges, and prices are readily available.

S. Rep. No. 475, 97th Cong., 2d Sess. 26 (1982)

The conclusion that options that are not traded in the interbank market are not foreign currency contracts within the meaning of Code Section 1256(g)(2) was recently confirmed in FSA 200025020 (3/17/00), Issue 3[2]. In the discussion and analysis contained at Issue 3 of this Field Service Advice, the author concluded that foreign currency contracts within the meaning of Code Section 1256(g)(2) include only foreign currency forward contracts traded in interbank markets and do not include foreign currency options that do not constitute nonequity options under Code Section 1256(g)(3). The FSA concluded that gains and losses on such non-listed foreign currency options would be treated as ordinary under Code Section 988, discussed below. Based on the foregoing, because the Options are not traded in the interbank market, it is more likely than not that the Options would not be foreign currency contracts within the meaning of Code Section 1256(g)(2).

Based on the foregoing, it is more likely than not that the Options would not constitute section 1256 contracts subject to the mark-to-market rules of Code Section 1256.

Were the Options section 1256 contracts that were subject to the mark-to-market rules, the transfer of the of the Options to the Fund I would require Investor to recognize any gain or loss that arose with respect to each of the Options from the time the Options were acquired to the

---

[2]    Although an FSA does not constitute authority that can be relied upon by a taxpayer, it is useful in understanding the position of the author on the issues addressed therein.

KPMGZ12060133

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 18

date of such transfer. Because the period of time that Investor held the Options was very short, it is not anticipated that any such gain or loss would be material. Were the Options section 1256 contracts that were subject to the mark-to-market rules upon their transfer by Investor to S Corp or by S Corp to Fund I it is possible that the IRS might contend that the transfer should be treated either (i) as if Investor sold the Options to S Corp and S Corp sold the options to Fund I or (ii) as if Investor/S Corp closed Investor's/S Corp's position in the Options and S Corp/Fund I entered into "new" Options having the same terms. Were the IRS successful in making such contention, the transfer of the Options would not be subject to the rules regarding contributions to a corporation or a partnership as discussed below. We believe that it is more likely than not that the IRS would not be successful were it to so contend.

The purpose of enacting Code Section 1256 as part of the Economic Recovery Act of 1981 ("1981 Act") was to conform the tax treatment of regulated futures contracts to the daily cash settlement, mark-to-market system employed by U.S. commodity futures exchanges for purposes of determining margin requirements. Under this system, even though a trader does not close out a position, but continues to hold it, the trader receives any gain in the position in cash as a matter if right each trading day and the trader has the right to withdraw such amount. Correspondingly, if the position declines in value, the trader is required to deposit additional funds. Thus, Congress intended Code Section 1256 to apply the doctrine of "constructive receipt" to the economic gains or losses realized by the taxpayer at year-end even though the taxpayer continued to hold such positions. See General Explanation of the Economic Recovery Act of 1981 (H.R. 4242, 97th Cong., P.L. 97-34) prepared by the Staff of the Joint Committee on Taxation (12/31/81) ("1981 General Explanation") at 296. In Murphy v. U.S., 992 F.2d 929 (9th Cir. 1991), aff'g an unreported District Court decision, the court concluded that Code Section 1256 was constitutional because Congress premised recognition of gain or loss under Code Section 1256 on the existing doctrine of constructive receipt.

The 1981 General Explanation also provides:

> If a taxpayer holds futures contracts at the beginning of a taxable year, any gain or loss subsequently realized *on these contracts* must be adjusted to reflect any gain or loss taken into account *with respect to these contracts* in a prior year.

NYLIB1/801884/2

KPMGZ12060134

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 19

Although Congress could just as easily provide that the mark-to-market rules created a constructive sale and repurchase of the contracts to adjust the basis of the contracts to reflect the gains and losses triggered under Code Section 1256(a)(1), it did not do so. Rather it chose to apply constructive receipt principles to merely trigger mark-to-market gain or loss with respect to a contract at a particular point in time and to adjust the amount of subsequent gain or loss with respect to such contract by reference to such previously recognized gain or loss.

Code Section 1256(a) as enacted pursuant to the 1981 Act only applied to contracts held by a taxpayer at year-end and did not address events occurring within the year, such as a termination or transfer of a contract. To do so, Congress added Code Section 1256(c) as part of the Technical Corrections Act of 1982 ('1982 Act"). Code Section 1256(c) provides relevant part:

> (1) IN GENERAL. The rules of paragraphs (1) [income and loss recognition], (2) [proper adjustment], and (3) [character] of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse, or otherwise.

In enacting Code Section 1256(c)(1) Congress clearly intended the rules of Code Section 1256(a)(1), (2), and (3) to apply to transfers by a partner to a partnership. See JCS-20-82, Description of H.R. 6056, Technical Corrections Act of 1982, prepared for Use by the Committee for Ways and Means for a Hearing on April 27, 1982 by the Staff of the Joint Committee on Taxation ("Description"). At page 3, the Description provides:

> The bill would require expressly that gains and losses be taken into account when a taxpayer's rights in a regulated futures contract are transferred. Thus, section 1256(a) would apply when transfers of regulated futures contracts are made to and from partnerships and other flow through entities.

Although the legislation could have provided that a transfer to a partnership (or other flow through entity) would be deemed to be a sale by the partner to the partnership or the termination of the contract by the partner and the entering into of a "new" contract by the

NYLIB1/801884/2

KPMGZ12060135

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 20

partnership, it did not do so. Rather, it merely required that such a transfer trigger the mark-to-market gain recognition and other rules of Code Section 1256(a).

Based on the foregoing, it is more likely than not that the application of Code Section 1256(a)(1) upon the transfer of the Options by Investor to Fund I would not cause Investor to be treated either (i) as Investor/S Corp selling the Options to S Corp/Fund I or (ii) as closing Investor's/S Corp's position in the Options and S Corp/Fund I entering into "new" Options having the same terms, and that that the transfer of the Options to S Corp and by S Corp to Fund I would subject to the rules regarding contributions to a corporation or a partnership, as discussed below and a Code Section 1256(a)(2) "proper adjustment" would be made with respect to any subsequent gain or loss recognized by the transferee with respect to the contributed Options.

### 6. Acquisition of the Options is a Section 988 Transaction

Code Section 985(a) generally requires that all income tax determinations with respect to a taxpayer be made in the taxpayer's functional currency. Code Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain conditions are met. Treas. Reg. §1.988-1(c) provides that any currency of a taxpayer or a QBU other than its functional currency is "nonfunctional currency". Since the U.S. dollar is the functional currency of Investor, any other currency will be nonfunctional currency.

Code Section 988 governs the U.S. federal income tax treatment of certain transactions in foreign currency, described as "section 988 transactions", and governs such transactions notwithstanding any other provisions of Chapter 1 (Sections 1 through 1400) of the Code.

A section 988 transaction includes entering into or acquiring an option, warrant or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency. Code Section 988(c)(1) and Treas. Reg. §1.988-1(a). Consequently, it is more likely than not that the acquisition of the Options is a section 988 transaction.

Code Section 988(c)(1)(D) and Treas. Reg. §1.988-1(a)(7)(i) exclude from the scope of a section 988 transaction a regulated futures contract and a nonequity option that would be marked to market under Code Section 1256 if held on the last day of the taxable year. As discussed

NYLIB1/801884/2

KPMGZ12060136

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 21

above, it is more likely than not that the Options are not regulated futures contracts or nonequity
options that would be marked to market under Code Section 1256. Therefore, it is more likely
than not that the Options would not be excluded from the scope of a section 988 transaction.

## B. Contribution of Options to S Corp

### 1. Code Section 351

Code Section 1371 generally provides that except as otherwise provided and except to the
extent inconsistent with subchapter S, the rules of subchapter C apply to an S corporation and its
shareholders. Under subchapter C, Code Section 351(a) generally provides that no gain or loss is
recognized by a transferor of property to a corporation in exchange for its stock, if that transferor
together with any other persons transferring property to the corporation as part of the same
transaction control the transferee corporation immediately after the exchange. "Control" for this
purpose means the ownership of stock possessing at least 80% of the total combined voting
power of all classes of stock entitled to vote and 80% of the total number of shares of each other
class of stock. Code Section 368(c). Furthermore, control need not be acquired in the exchange;
preexisting control suffices. See Rev. Rul. 73-473, 1973-2 CB 115. In the instant case, Investor
owns 100% of the issued and outstanding stock of S Corp.

The assets transferred to S Corp consisted of Options. Although neither the Code nor the
Treasury Regulations define the term "property", such term has been given a broad
interpretation. Consequently, the Long Options should constitute property for purposes of Code
Section 351. This conclusion is based on U.S. v. Stafford, 727 F.2d 1043 (11th Cir. 1984), in
which a legally unenforceable contract right was found to be property for purposes of Code
Section 351 where the Court found that the obligation was " morally" binding. In the instant case
the contractual rights inherent in the Long Options are legally binding. See also, PLR 9013016
(12/22/89) involving the transfer of timber cutting rights. Cf., Dillon v. U.S., an unreported
District Court case unofficially reported at 84-2 USTC ¶9921 (S.D. Tex, 1981), in which the
court held that a contractual right to participate as a partner in a second partnership constituted
property contributed to the first partnership for purposes of Code Section 721. Consequently, it
is more likely than not that the Long Options would constitute property for purposes of Code
Section 351.

NYLIB1/801884/2

KPMGZ12060137

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 22

While the Short Options are not property under this standard, it is more likely than not that Investor would recognize no gain or loss on their transfer to Corp. This is because as previously discussed, gain or loss is only recognized with respect to an option when the option terminates and, in the instant case, no such termination occurs on the transfer of the Options to S Corp. Furthermore, Code Section 351(a) provides the general statutory rule for nonrecognition of gain upon the contribution of property to a corporation. This rule should not be overridden in the absence of a clear statement of intent, in either the Internal Revenue Code or the Treasury Regulations, to do so. See Hempt Bros., Inc. v. U.S., 354 F. Supp. 1172 (M.D. Pa. 1973), aff'd, 490 F.2d. 1172 (3rd. Cir. 1973), cert. denied, 419 U.S. 826 (1974). In this regard, the Tax Court has held that it is not appropriate to break apart separate elements of an integrated Code Section 351 transaction in order to give one such element tax effect under another section of the Code. See Makover v. Comm'r, T.C. Memo. 1967-53; Hartley v. Comm'r, T.C. Memo. 1967-38. The IRS has adopted this position in G.C.M. 37873 (3/5/79), in which a partnership transferred its assets to a corporation in a Code Section 351 transaction. The partnership had previously elected under Rev. Proc. 71-21, 1971-2 CB 549, to defer the inclusion of certain service income until the services were performed. Rev. Proc. 71-21 provided, as a requirement to obtaining the deferral, that such deferred income had to be taken into account if the taxpayer who made the election ceased to exist or its liability to perform the services ended. The IRS concluded that the requirement to terminate the deferral under the Revenue Procedure overrode the general nonrecognition rules of Code Section 351. This position was adopted more recently in TAM 9716001 (4/18/97). TAM 9716001 involved the transfer of an obligation with respect to accrued vacation pay of employees of a transferred business together with an amount of cash anticipated to be sufficient to fund such obligation. The IRS Agent argued that the cash payment should be treated as an amount of income, separate and distinct from the Code Section 351 transaction. The IRS National Office, however, refused to bifurcate the transaction. Consequently, it is more likely than not that the IRS would not be successful were it to assert that the transfer of the Short Options to S Corp should be given independent tax effect apart from Code Section 351.

In Rev. Rul. 83-156, 1983-2 CB 66, the IRS ruled that a transfer of assets by a parent corporation ("P") to its wholly-owned subsidiary ("S1") immediately followed by a transfer of such assets by the subsidiary to a newly formed partnership among the subsidiary and subsidiary's newly formed subsidiary (S-2) as part of the same plan did not prevent the transfer by parent to subsidiary from qualifying under Code Section 351(a). GCM 39053 (1/8/82),

NYLIB1/801884/2

KPMGZ12060138

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 23

addressed Rev. Rul. 83-156 and Rev. Rul. 83-34, 1983-1 CB 79, in which P dropped down assets
to an 80%controlled S1, which in turn dropped down the assets to an 80% owned S2, leaving P
with only a 64% economic interest in the transferred assets. The GCM clarified that the rationale
behind both Rev. Rul. 83-156, supra, and Rev. Rul 83-34, supra, was that each transfer was to be
independently tested under Code Section 351 and Code Section 721, as the case may be, with the
result that if the requirements of the pertinent Code Section met as to each subsequent transfer,
the prior transfer was untainted. In PLR 8503012 (9/26/84), a number of persons transferred
interests in equipment to a newly formed corporation which in turn transferred such assets to a
partnership in which it became a 50% partner together with unrelated person. The qualification
of the transfer to the corporation under Code Section 351 was not an issue specifically addressed
in the private letter ruling. Nevertheless, the author expressed reservations as to whether the
transfer would qualify under Code Section 351, distinguishing the situation in the private letter
ruling in which the subsequent transfer was to a partnership in which unrelated parties held a
significant interest and the transferor did not maintain complete control of the business of the
partnership. Although the facts of the instant case are closer to the facts in PLR 8503012
(9/26/84) than to Rev. Rul. 83-156, supra, based upon Rev. Rul. 83-156, supra, and the rationale
expressed in GCM 39053 (1/8/82), it is more likely than not that the transfer of the Options by S
Corp to Fund I would not prevent the transfer by Investor to Corp from qualifying under Code
Section 351(a).

Notwithstanding that the transfers generally meet the requirements of Code Section
351(a), Code Section 351(e) provides that Code Section 351(a) does not apply to a transfer of
property to an investment company. As a result, if Code Section 351(e) applies gain or loss will
be recognized on a transfer of property to an investment company. Treas. Reg. §1.351-1(c)(1)
elaborates on this provision by providing that property will be considered transferred to an
investment company if:

(i)     The transfer results, directly or indirectly, in diversification of the transferors'
        interests, and

(ii)    The transferee is (a) a regulated investment company, (b) a real estate investment
        trust, or (c) a corporation more than 80% of the value of whose assets (excluding
        cash and nonconvertible debt obligations from consideration) are held for
        investment and are readily marketable stocks or securities, or interests in
        regulated investment companies or real estate investment trusts.

NYLIB1/801884/2

KPMGZ12060139

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 24

Treas. Reg. §1.351-1(c)(5) clarifies that diversification occurs if two or more persons transfer nonidentical assets to the corporation, unless these assets are an insignificant portion of the total value of the assets transferred. That provision also provides:

> If there is only one transferor... to a newly organized corporation, the transfer will generally be treated as not resulting in diversification.

However, Treas. Reg. §1.351-1(c)(5) also provides:

> If a transfer is part of a plan to achieve diversification without recognition of gain, such transfer, however delayed, of the corporate assets... to an investment company in a transaction purporting to qualify for nonrecognition treatment, the original transfer will be treated as resulting in diversification.

Looked at on its own it is more likely than not that the transfer of the Options would not result in prohibited diversification, because Investor is the sole shareholder of S Corp. Furthermore, because, as discussed below, it is more likely than not that that the contribution of the Options by S Corp to Fund would it self not result in prohibited diversification because all of the assets contributed to Fund I are options having the same counterparty and term as the Options, it is more likely than not that the transfer of the Options by S Corp to Fund I would not result in prohibited diversification were the transfer to Fund I taken into account under Treas. Reg. §1.351-1(c)(5).

Even if Fund I would be as treated as an investment company were it a corporation, as discussed below, it is more likely than not that the transfer of the Options by S Corp to Fund I would be respected as a step separate from the contribution of the Options to S Corp by Investor. Furthermore, by analogy to Rev. Rul. 83-156, supra, and the rationale expressed in GCM 39053 (1/8/82), it is more likely than not that the two transfers would be independently analyzed and respected. Lastly, were the steps reversed, the transfer by Investor of an interest in Fund I to S Corp would not appear to constitute a transfer described in Code Section 351(e). Consequently, although we can find no authority addressing this particular fact pattern, it is more likely than not that the IRS would be unsuccessful were it to contend that the transfer of the Options by Investor

KPMGZ12060140

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 25

to S Corp is a transfer subject to Code Section 351(e) because such transfer is followed by a transfer by S Corp to Fund I, were it an investment company.

The IRS might also argue, and in certain cases it has been suggested, that a section 351 transfer will be respected for tax purposes only if it has a "business purpose". See e.g. Rev. Rul. 55-36, 1955-1 CB 340; West Coast Marketing Corp. v. Comm'r, 46 TC 32 (1966). See also, Estate of Kluener v. Comm'r, 154 F3d 630 (6th Cir. 1998), aff'g in part and rev'g in part T.C. Memo-1996-519, in which the Tax Court determined that, where a shareholder contributed horses to a controlled corporation which sold the horses and distributed the proceeds to the shareholder, there was no business purpose for the transfer, and as a result Code Section 351 would not apply and that the correct way to view the transaction was to treat the corporation as a conduit for the shareholder in effecting the sale, i.e. to disregard the transfer to the corporation entirely. Although the discussion of business purpose for the transaction was couched in terms of the applicability of Code Section 351, the decision not address whether in the absence of such a business purpose would a non-taxable exchange become taxable, but rather whether there was sufficient substance to the transactions to recognize the existence of the corporation in the first place.

It should be noted that, the Treasury Regulations promulgated under Code Section 351 do not require such a purpose. This should be compared to the Treasury Regulations relating to qualification of a transaction as a tax-free reorganization. See Treas. Reg. §1.368-1(b). As discussed below, we believe that it is more likely than not that the Transactions would have the requisite business purpose because of their economic substance. Because the consideration that Investor received on the contribution (i.e., the increase in value of S Corp) was equal to net fair market value of the transferred assets, and the S Corp stock that Investor received provided Investor with an opportunity to profit from such ownership, it is more likely than not that the IRS would not be successful were it to argue that the transfer of the Options to S Corp should be denied Code Section 351 treatment because of the absence of a business purpose.

Based on all of the foregoing, it is more likely than not that the transfer of the Options by Investor to S Corp would constitute transfers described in Code Section 351(a).

KPMGZ12060141

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 26

### 2.    Code Section 1234(b)

Code Section 1234(b) provides that gain or loss with respect to any "closing transaction" with respect to an option by the grantor of the option will be treated as short-term capital gain or loss. Code Section 1234(b)(2)(A) broadly defines a "closing transaction" as any termination of the taxpayer's obligation under an option, other than through the exercise or lapse of the option. Code Section 1234(b)(2)(A) was enacted as part of the Tax Reform Act of 1976. According to the legislative history, the purpose of enacting such subsection was to eliminate the ability of taxpayers to enter into certain tax strategies that would permit them to obtain ordinary loss and capital gain through the use of certain transactions in which the taxpayer had the right to treat the acquisition of an offsetting option as a "closing transaction" which caused the recognition of income. See H. Rpt. No. 94-1192, 94th Cong., 2d Sess., 5 (5/26/76). The closing transactions that were intended to be addressed were those described in a series of widely circulated private letter rulings issued to the Chicago Board Options Exchange ("CBOE"). In these, the IRS held, among other things, that certain setoff transactions that the taxpayer elected to treat as "closing transactions" under the CBOE rules were recognition events.[3] Consequently, it appears that Code Section 1234(b) merely determines character of recognized gain or loss and does not itself create a recognition event. See e.g. Treas. Reg. §1.1234-1, which discusses Code Section 1234 in terms of the character of gain or loss recognized. See also Treas. Reg. §1.1234-1(f), which provides that losses described under Code Section 1234 are subject to the general disallowance rules of the Code, i.e. that Code Section does not create an independent loss allowance rule, but rather any loss described in Code Section 1234 is not allowed if it would be otherwise disallowed under the Code.[4] As discussed above, Code Section 351(a) generally provides that no gain or loss is recognized upon the transfer of property to a partnership and it is more likely than not that

---

[3]    Although the legislative history did not cite such private letter rulings, one appears to be 7404080200A. Subsequently, in Rev. Rul. 78-182, supra, the IRS described the U.S. federal income tax treatment of transactions in options traded over the Chicago Board Options Exchange, Incorporated ("CBOE"). The IRS pointed out that if a taxpayer paid an amount equal to the then fair market value of the option and declared the transaction a "closing transaction", under the CBOE rules the taxpayer would be released from liability to settle the closed option. In the Ruling the IRS treated such a 'termination' as a recognition event. See, Rev. Rul. 78-182, B.5.

Cf. Rev. Rul. 79-314, 1979-2 CB 132, and Rev. Rul. 80-101, 1980-1 CB 70, in which certain corporate nonrecognition rules were permitted to override general gain recognition rules, where the interpretation of the nonrecognition rules was clear.

KPMGZ12060142

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 27

the Options would be property for this purpose.  Consequently, because it is more likely than not that the transfer of the Options by Investor to Corp would be a nonrecognition event under Code Section 351, it is more likely than not that Code Section 1234(b)(2) would not independently cause gain or loss to be recognized by Investor on the transfer.

In the context of non-traded options, the IRS has ruled that the assumption by an acquiring corporation in a corporate reorganization of warrants to purchase the target company's stock does not constitute a closing transaction, because neither did the option lapse nor did the grantor's obligation terminate.  Rather, the requirement that the grantor issue stock pursuant to the warrants was assumed by the acquiror.  PLR 8038087 (6/26/80) and PLR 7938018 (6/19/79).  Although not directly on point, because such private letter ruling involve transactions under Code section 368, rather than Code Section 351, such private letter rulings support the proposition that the assumption of an undertaking to perform under an option in the context of a nonrecognition transaction is not a transaction with respect to which gain or loss is otherwise recognized.  This should be particularly true where, as in the instant case, the legal relationship of the optionor and optionee remain unchanged.

3.  <u>No Assignment of Income</u>

The assignment of income doctrine is a judicially created doctrine under which the income earned from property must be included in the gross income of the person who beneficially owns the property.  See <u>Blair v. Comm'r</u>, 300 U.S. 5 (1937).  As discussed above, it is more likely than not that the Long Options would be treated as property for purposes of Code Section 351.

An analogy may be found in two cases involving the transfer of contract claims for money damages in litigation.  In <u>Cold Metal Process Co. v. Comm'r</u>, 306 F.2d 292 (6th Cir. 1957), rev'g 25 T.C. 1333 (1956), the IRS attempted to tax amounts received in litigation to the transferor where the transferor had transferred the claims prior to the conclusion of the litigation.  The Court of Appeals, relying on the Tax Court's findings of fact, concluded that at the time of the transfer:

> there was no certainty that the transferor's rights thereto would ever be established or that the money would ever be paid to the

KPMGZ12060143

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 28

> transferor or the transferee. The amount that might eventually be
> collected was unliquidated.

In its analysis, the Court of Appeals distinguished a number of cases including Est. of
Holmes, 1 T.C. 508 (1943), in which the Tax Court taxed dividends that were declared, but
unpaid, at the time of transfer to the transferor rather than to the transferee. The Court of
Appeals noted that the Tax Court considered the dividend similar to interest in that the liability
and the amount were both unquestioned at the time of the transfer and that a future maturity date
was the only thing that prevented immediate payment. Whereas the litigation claim was

> an unliquidated chose in action. Cold Metal divested itself of all
> title, interest and control at that time. Later developments over
> which Cold metal had no control transformed it into taxable
> income that was paid to and received by the new owner for its sole
> benefit. These facts fall far short of classifying the transaction as
> an anticipatory assignment of income taxable to the assignor when
> later paid.

Similarly, in Jones v. Comm'r, 306 F.2d 292 (5th Cir. 1961), rev'g T.C. Memo. 1960-115,
a subcontractor transferred a claim for additional compensation that was subject to litigation
between the prime contractor and the U.S. government to a corporation of which he was a
majority shareholder. The IRS asserted that upon recovery, the proceeds were taxable to the
transferor shareholder rather than to the transferee corporation. Based upon the fact that at the
time of transfer the claim was ˙ doubtful, uncertain and contingent˙ at the time of its transfer and
the transfer was "full, complete, final and definite", the Court of Appeals held that the recovery
was taxable to the transferee corporation rather than the transferor shareholder. The Court of
Appeals also noted that there was a commercial rationale for the transfer rather than the transfer
being gratuitous.

In the instant case, the Options are contract rights similar to the claims in the Cold Metal
Process Co. and Jones cases; at the time of the transfer there was no immediate right to payment
or certainty as to whether an Option would settle in or out of the money; there were commercial
reasons for the Investor to transfer the Options to Corp and the transfer of the Options was not
gratuitous. Consequently, based upon the Cold Metal Process Co. and Jones cases, it is more

KPMGZ12060144

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 29

likely than not that the transfer of the Option to Fund would not constitute an anticipatory
assignment of income arising on the settlement of the Options that would be taxable to Investor.

Consequently, under this rule any income derived from the transfer of the Long Options
would be included in the income of its beneficial owner, Corp, rather than in the income of the
Investor.

As discussed above, it is more likely than not that a Short Option would not be treated as
property for purposes of Code Section 351. Nevertheless, it is more likely than not that the
rationale of these cases would equally apply to it and rule any income derived from the transfer
of a Short Option would be included in the income of its beneficial owner, Corp, rather than in
the income of the Investor.

### C. Basis of Investor in S Corp Stock and Basis of Corp in Options

#### 1. Investor 's Basis in S Corp Stock

##### (a) In General

Code Section 358(a) provides that in a transaction to which 351applies the basis
of nonrecognition property received in such exchange equals the basis of the property
exchanged. However, Code Section 358(d)(1) generally requires that the transferor's basis be
reduced by the amount of liabilities of the transferor that are assumed by the transferee. Treas.
Reg. §1.358-3 expands this to require a reduction in the amount of liabilities to which the
transferred property is subject. It is possible that the IRS might contend that the potential claims
by Bank against Investor under a Short Option constitute liabilities for purposes of Code Section
358. If the potential claims by Bank against Investor under a Short Option were considered
liabilities for purposes of Code Section 358, Investor's basis in Investor's Corp stock would be
reduced.

As discussed below, it is more likely than not that such claims do not constitute
liabilities for purposes of Code Section 358.

NYLIB1/801884/2

KPMGZ12060145

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 30

### (b)    Agency Doctrine Inapplicable

It is possible that the IRS might attempt to assert that Investor was acting as an agent of Corp in acquiring the Options. Were the IRS successful, Investor would not be treated as having contributed the Options to S Corp and, as a result Investor's tax basis in Investor's S Corp shares would be computed without regard to the contribution of the Options by Investor to S Corp.

The Supreme Court has addressed the issue of when an agency relationship exists and affects tax results of a transaction in a number of cases. In Comm'r v. Bollinger, 485 U.S. 340 (1988), a taxpayer engaged in rental real estate development, both in an individual capacity and through a series of partnerships. Since state usury law limited the rate of interest that could be charged to non-corporate debtors, at the request of the taxpayer, Bollinger formed a wholly owned corporation to be the nominal borrower. An agreement provided that the corporation would hold title to the property as the partnership's nominee and agent solely to secure financing. The partnership had sole control of and responsibility for the property and was the principal and owner during financing, construction and operation. The corporation itself had no assets, liabilities or bank accounts. In every case, the lenders regarded the partnership as the owner of the property and were aware that the corporation was acting as an agent of the partnership in holding record title. Further, the partnerships reported the income and losses generated by the property on their partnership tax returns and actively managed the properties.

Using the six-part test established in National Carbide Corp. v. Comm'r, 336 U.S. 422 (1949), the Supreme Court held that the corporation was a bona fide agent of the taxpayer and partnerships and rejected the contention of the Service that the corporation was the true owner of the real estate developments. The six "National Carbide factors" applied were:

1) whether the corporation operates in the name and for the account of the principal;

2) whether the agent corporation binds the principal by its actions;

3) whether the corporation transmits money received for the account of the principal to the principal;

4) whether the receipt of income is attributable to the services and assets of the principal and not the agent;

NYLIB1/801884/2

KPMGZ12060146

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 31

5) whether the corporation is a true agent; that is, whether its relations with its principal are dependent on the latter's ownership of the agent; and

6) whether its business purposes are the carrying on of the normal duties of an agent

The Court found that the genuineness of the agency relationship was adequately assured in this instance because  (1) the relationship was set forth in a written agreement at the time each development was begun;  (2) the corporation acted as an agent and not principal with respect to the development for all purposes; and  (3) the corporation held itself out as the agent and not as a principal in all dealings with third parties related to the asset.

In Cottage Savings Assoc. v. Comm'r, 499 U.S. 554 (1991), the taxpayer was a savings and loan association which had large unrealized losses from its portfolio of long-term, low interest home mortgages.  Due to regulatory constraints, the taxpayer was unable to sell the loans without the risk that the resulting losses would result in regulatory closure of the savings and loan.  As an alternative, the taxpayer's regulator proposed that the taxpayer trade participations in various mortgages in its loan portfolios with other savings and loans with the intention that such trades would be treated as recognition events for federal income tax purposes.  The taxpayer did so.

The IRS contended that the trades were not tax recognition events, arguing in part that the trades had no economic effect.  The IRS argued that the taxpayer's partners in the trade were merely acting as its agents, resulting in the taxpayer's retaining de facto ownership in the "transferred" interests.  In finding for the taxpayer, the Supreme Court held that the transactions did have economic effect because  (1) there was no evidence that the parties had acted other than at arm's length and,  (2) the taxpayer had not retained de facto ownership.  The Court reasoned that because the mortgages traded involved different mortgagors and different properties securing the mortgages, there was in fact an exchange of legally distinct properties giving rise to a true economic effect for tax purposes.

In Northern Indiana Pub. Serv. Co. v. Comm'r, 115 F. 3d 506 (7th Cir. 1997), the court addressed the agency issue as well.  At issue was whether a foreign subsidiary of the taxpayer carried on sufficient business activity so as to require recognition of its interest transactions with the taxpayer which would result in tax exempt treatment under the US/Netherlands Income Tax Treaty.  The IRS took the position that the treaty was inapplicable, claiming that the subsidiary

NYLIB1/801884/2

KPMGZ12060147

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 32

was a mere conduit or agent in the borrowing and interest paying process. The Tax Court, 105
T.C. 341 (1995), rejected the IRS's argument and held that the subsidiary was recognizable for
tax purposes and, therefore, the payments were tax exempt under the treaty.

In affirming the decision, the Court of Appeals stated that "so long as a foreign subsidiary
conducts substantive business activity--even minimal activity--the subsidiary will not be
disregarded for federal tax purposes, notwithstanding the fact that the subsidiary was created
with a view to reducing taxes." 115 F. 3d at 511.

It is unlikely that an application of the National Carbide agency factors to the
Transactions would result in a finding of agency. No indicia of a principal/agent relationship
between Corp and Investor exist. Corp and Investor acted independently of one another. In
acquiring the Options, Investor did not operate in the name of Corp, had no authority to bind
Corp by its actions, did not transmit or receive funds on behalf of Corp, did not receive income
attributable to services or assets of Corp, and did not act as a true agent or have as its business
purpose the carrying out of normal duties of an agent. Furthermore, as in Bollinger, there were
no agency agreements involved and no party acted as the agent of another or held itself out as an
agent in dealings with third parties. Moreover, as in Cottage Savings, the parties acted at arm's
length and that the transactions between them had both legal and economic significance. Finally,
Investor had all of the benefits and burdens of ownership of the Options until the Options were
contributed to Corp. Accordingly, it is more likely than not that the agency doctrine would not
apply to the Transactions.

### (c) Short Options are Not Liabilities for Purposes of Code Section 358

#### i. In General

Neither Code Section 358(d) nor Treas. Reg. §1.358-3 defines the term "liability".
In the present situation a Short Option is a European-style option, which means that they can
only be exercised or settled on its termination date[5], and at the date of transfer it was out of the
money. Thus, at the time of the transfer the claims of Bank against Investor under a Short

---

[5]    This is to be distinguished from American-style Options that can be exercised at any time on or before their
termination date.

KPMGZ12060148

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 33

Option were entirely speculative and contingent, because it was unknown whether a Short Option would be in the money on its termination.

In <u>Old Harbor Native Corp. v. Comm'r</u>, the Tax Court analyzed an option contract as having two elements: "(1) a continuing offer to do an act, or to forbear from doing an act, which does not ripen until the contract is accepted; and (2) an agreement to leave the offer open for a specified or reasonable period of time". See also, Rev. Rul. 58-234, 1958-1 CB 279. This position is also consistent with <u>La Rue v. Comm'r</u>, 90 T.C. 465 (1988), and <u>Long v. Comm'r</u>, 71 T.C. 1 (1978), aff'd and remanded, 660 F.2d 416 (10th Cir. 1981), discussed in detail in Section G.2, below, in which claims were not recognized as a liability for purposes of Code section 752 where liability for the claims had not been established and was contested.

In an analogous situation, under Code Section 246(c)(4) and its predecessors, the IRS has ruled that the rights of a counterparty against the writer of an out-of-the-money call option do not mature into a legal obligation until the counterparty exercises its rights under the option. Code Section 246 deals with the ability of a corporation to claim a dividend received deduction if the recipient has held the payor's stock for a requisite period of time. Code Section 246(c)(4) states in relevant part:

> The holding periods determined for purposes of the subsection shall be appropriately reduced...for any period in which –
>
> (A)   the taxpayer has an option to sell, is under a contractual obligation to sell, or has made (and not closed) a short sale of, substantially identical stock or securities....

As noted, the statute itself distinguishes between a "contractual obligation to sell" and an "option to sell", implying that an option is not such an obligation. The IRS has specifically recognized this distinction and has ruled in Rev. Rul. 80-238, 1980-2 CB 96, that the writing of a call that is not in the money does not create an obligation to sell the referenced stock or security for purposes of the predecessor of Code Section 246(c)(4). This analysis was elaborated upon in GCM 38305 (3/12/80), issued in connection with Rev. Rul. 80-238, which states in part:

> The writing of a call on stock owned as in the present case provides the purchaser of the call with an option to buy the

NYLIB1/801884/2

KPMGZ12060149

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 34

> underlying at a specified price within a stated period of time. See,
> Rev. Rul. 58-234, 1958-1 CB 279. If the market price of the stock
> were to fall during such period, reasonable business practice would
> dictate that the call holder not exercise his option to obtain the
> underlying stock since the same stock could be purchased on the
> open market at the lower figure. See, Rev. Rul. 78-128, 1978-1
> CB.

More recently, the IRS addressed the issue again in a 1992 Field Service Advice,
FSA 1999-898.[6] The FSA involved a program of purchase and sales of corporate stocks,
described as a "Dividend Rollover Program" involving the acquisition of shares of stock and the
writing of call options. The FSA found that the prices of the stocks used in this program were
very stable and the issuing companies had an established history of dividend payments in
previously announced amounts. Consequently, the FSA concluded that the probability of a fall
in the market value of the stock in excess of 14% in 18 days or less was very remote. As it
turned out, all of the call options sold by the taxpayer were exercised. In addressing whether the
call options created a contractual obligation to sell, the FSA stated:

> *The Service's position is that a call option should be deemed an
> obligation to sell under section 246(c)(3) where the option's price
> is so deep-in-the-money that it is almost guaranteed, at the time the
> option is written, that the option will be exercised.* In Progressive
> Corp. v. United States, 970 F.2d 188 (6th Cir. 1992), the Sixth
> Circuit approved of the position taken by the Service in Rev. Rul.
> 80-238, 1980-2 CB 96, and remanded the case to the trial court for
> a determination as to whether the call options at issue in
> Progressive were so deep-in-the-money as to be the equivalents of
> the contractual obligations to sell. We think it likely that other
> courts will also adopt the Service's position on this issue.
>
> The determination as to whether the call option is so deep-in-the-
> money as to be equivalent to a contractual obligation to sell will
> depend on the totality of circumstances surrounding the
> transaction, including the amount of the difference between the
> strike price and the fair market value of the stock, and past market
> volatility of the stock involved.

---

[6]     See also, FSA 199904033.

KPMGZ12060150

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 35

Thus, the IRS takes the position for purposes of Code Section 264(c)(4) that unless at the time the call option is written "it is almost guaranteed…that the option will be exercised", the writer of the call option is not to be treated as under a contractual obligation to sell the referenced stock or security for purposes of Code Section 246(c)(4). This conclusion is consistent with the decision in Progressive Corp. v. U.S., cited in the FSA where the court expressed a view that a call option could be so deep-in-the-money as to constitute a contractual obligation to sell, i.e. the exercise of the option was sufficiently certain to be "guarantee". In the instant case, it is not "almost guaranteed" that at the time of the transfer a Short Option would be in the money on its termination.

Bank's claims against Investor under a Short Option are similar to the back office claims in La Rue, but are even less certain. Investor only has an obligation to make a payment under a Short Option if it is in-the-money on the expiration date, whereas in La Rue, Goodbody had an obligation to its customers for its back office failures at the time they occurred and was merely waiting to see if claims would be filed to determine the extent and amount of its liability. Even more analogous is Long, where liability for the claims had not been established and was contested.

Base on the foregoing, it is more likely than not that Bank's claim against Investor under the Short Options would not be considered a liability of Investor for purposes of Code Section 358.[7]

ii.    **Short Sale Rulings**

In Rev. Rul. 95-45, 1995-1 CB 53 26, 1995-1 CB 131, the IRS ruled that the obligation to return securities sold short creates a liability for purposes of Code Sections 357 and 358 in conjunction with a Code Section 351 incorporation of a going business, The Ruling

---

[7]    On April 4, 2000, Senate Finance Committee Chairman Roth and Senator Moynihan (D-NY) introduced a bill ("2000 Bill") to be included in the Trade and Development Act of 1999 (otherwise known as the Africa/CBI trade bill). This bill would have treated certain contingent obligations as liabilities for purposes of, among other provisions, Code Section 752. The 2000 Bill was ultimately not included in Africa/CBI trade bill, but there can be no assurance that a similar bill could be introduced for inclusion in other legislation.

NYLIB1/801884/2

KPMGZ12060151

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 36

maintained that a short sale created an obligation to return the securities borrowed to effect the sale.[8]

A holder's claim against the writer of an out-of-the-money call option is clearly distinguishable from the obligation created under a short sale. As discussed above, a short sale must always be closed through the seller purchasing and delivering the borrowed securities. The uncertain features are the price at which the securities will be acquired, and when the short sale will be closed. In contrast, the seller of an option does not know whether he will ever be called on to perform under the option. Options often expire unexercised. The seller's obligation is uncertain and speculative, similar to the obligations in Long, and as recognized in Rev. Rul. 80-238, supra, FSA 1999-898, and GCM 38305 (3/12/80). Even in the case of a cash-settled option, such as the Short Options, the obligation of the writer to make a payment, which is analogous to the consummation of the stock sale described in Rev. Rul. 80-238, supra, FSA 1999-898, and GCM 38305 (3/12/80) is dependent upon price movement of the asset subject to the contract over the term of the contract, or in the case of a European style option, at the option's termination date.

Based upon the foregoing, it is more likely than not that Rev. Rul. 95-45, supra, would be distinguishable from the sale of a Short Option, because the short sale creates a legally enforceable obligation to deliver securities. It is the creation of such an enforceable obligation, coupled with the receipt of sale proceeds by the partnership that allowed the IRS to bootstrap itself into the liability conclusion reached by the Ruling. See also Rev. Rul. 88-77, 1988-2 CB 129, cited in the Ruling, that also involved noncontingent, legally enforceable obligations. As discussed above, the undertaking to perform under an option is not treated as fixed or legally

---

[8]     Rev. Rul. 95-26, 1995-1 CB 131 applies a similar analysis to characterize the short-sale obligation of a
partner who contributes its interest in the sales proceeds, in conjunction with a Code Section 721, as a
liability for purposes of Code Section 752. Applying the same reasoning as in Rev. Rul. 95-45, Rev. Rul.
95-26 cites Deputy v. du Pont for the proposition that a short sale creates an obligation to return the
borrowed securities. Because that obligation results in an increase in asset basis, the ruling concludes that
the obligation constitutes a "liability," even though acknowledging that the sales proceeds are not currently
taxable. In contrast, Rev. Rul. 95-8, although issued in conjunction with the other two rulings, holds that an
exempt organization's income from a short sale does not result in unrelated business taxable income under
Code Section 511 from "debt-financed property" under Code Sections 512(b)(4) and 514(a) and (b). Its
rationale is that there is no "acquisition indebtedness" within section 514(c) because under Deputy v. du
Pont, 308 U.S. 488 (1940) a short-sale obligation creates an "obligation" but not an "indebtedness."

NYLIB1/801884/2

KPMGZ12060152

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 37

enforceable at the time the option is entered into.[9]  Cf. Salina Partnership LP, FPL Group, Inc. v. Comm'r, T.C. Memo 2000-352, discussed below.

### iii.  2000 Legislation

On December 15, 2000 the House and Senate passed H.R. 5662. This legislation was enacted in late December 2000. Section 309 of H.R. 5662 provides:

> PREVENTION OF DUPLICATION OF LOSS THROUGH ASSUMPTION OF LIABILITIES GIVING RISE TO A DEDUCTION.

---

[9]  Rev. Rul. 95-74, 1995-2 CB 36, the IRS concluded that contingent environmental liabilities are not liabilities for purposes of Code Section 358.357(c), but, while admitting that the liabilities were not fixed or enforceable, the Ruling reached its conclusion by relying on Code Section 357(c)(3)(A), which excludes deductible liabilities from Code Section 357(c). This Ruling could be read as treating contingent liabilities as liabilities under Code Section 357(c) (and presumably the partnership analog of Code Section 752) unless they do not give rise to an asset, are deductible, or otherwise fit within an exception under Code Section 357(c)(3). However, this reading is belied by a recent FSA in which the Service issue of whether a contingent liability is the type of liability that is to be taken into account for purposes of I.R.C. sections 357 and 358. However, because of the specific language of I.R.C. sections 357(c)(3) and 358(d)(2), as interpreted by Rev. Rul. 95-74, 1995-2 C.B. 36, we do not believe that it is necessary to address this broader issue. That is, we will assume for purposes of the following discussion that such contingent liability is the type of liability to be taken into account currently under I.R.C. sections 357 and 358. The FSA then goes on to analyze the obligations under Code Section 357(c)(3) However, this reading is belied by a recent FSA in which the Service faced the issue of whether a contingent liability is the type of liability that is to be taken into account for purposes of I.R.C. sections 357 and 358. The FSA stated: "However, because of the specific language of I.R.C. sections 357(c)(3) and 358(d)(2), as interpreted by Rev. Rul. 95-74, 1995-2 C.B. 36, we do not believe that it is necessary to address this broader issue. That is, we will assume for purposes of the following discussion that such contingent liability is the type of liability to be taken into account currently under I.R.C. sections 357 and 358." The FSA goes on to analyze the obligations under Code Section 357(c)(3). See, 199905008 (10/29/98). Consequently, it appears that the Service has not reached the conclusion that contingencies themselves do not keep the obligation from being a "liability" for purposes of Code Sections 357/752.

The IRS has asserted its theory that a short sale creates a liability for Code Section 752 purposes in Fulcrum Financial Partners v. Comm'r, No. 3944-96 (Tax Court filed 3/5/96) and FFP Acquisition Partners, L.P. v. Comm'r, No. 3943-96 (Tax Court, filed 3/5/96). In each of these cases, the issue was whether a short sale obligation was a liability within the meaning of Code Section 752. The taxpayers have argued that the obligation is a contingent amount that could not be determined. The IRS used the same analysis as in Rev. Rul. 95-26. FFP Acquisition Partners was dismissed on May 22, 1997, because of jurisdictional issues.

NYLIB1/801884/2

KPMGZ12060153