**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 38

(a) IN GENERAL. -- Section 358 [of the Internal Revenue Code of 1986] (relating to basis to distributees) is amended by adding at the end the following new subsection:

"(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.--

"(1) IN GENERAL. -- If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability --

"(A) which is assumed in exchange for such property, and

"(B) with respect to which subsection (d)(1) does not apply to the assumption.

"(2) EXCEPTIONS. -- Except as provided by the Secretary, paragraph (1) shall not apply to any liability if --

"(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

"(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

"(3) LIABILITY. -- For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title."

(b) DETERMINATION OF AMOUNT OF LIABILITY ASSUMED. -- Section 357(d)(1) of the internal Revenue Code of 1986 is amended by inserting "section 358(h)," after "section 358(d),"

KPMGZ12060154

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 39

> (c) APPLICATION OF COMPARABLE RULES TO
> PARTNERSHIPS AND S CORPORATIONS. -- The Secretary of
> the Treasury or his delegate --
>
> (1) shall prescribe rules which provide appropriate adjustments
> under subchapter K of chapter 1 of the Internal Revenue Code of
> 1986 to prevent the acceleration or duplication of losses through
> the assumption of (or transfer of assets subject to) liabilities
> described in section 358(h)(3) of such Code (as added by
> subsection (a)) in transactions involving partnerships, and
>
> (2) may prescribe rules which provide appropriate adjustments
> under subchapter S of chapter 1 of such Code in transactions
> described in paragraph (1) involving S corporations rather than
> partnerships.
>
> (d) EFFECTIVE DATES. --
>
> (1) IN GENERAL. -- The amendments made by this section shall
> apply to assumptions of liability after October 18, 1999.
>
> (2) RULES. -- The rules prescribed under subsection (c) shall
> apply to assumptions of liability after October 18, 1999, or such
> later date as may be prescribed in such rules.

In the instant case, Investor transferred all of the assets to which the Short Option
was associated to Partnership. Consequently, it is more likely than not that the exception
contained in Code Section 358(h)(2), as added by Section 309 of H.R. 5662 would apply with
the result that it is more likely than not that a Short Option would not be considered to be an
obligation of Investor that would constitute a liability for purposes of Code Section 358 under
Section 309 of H.R. 5662.

### iv.   Amount of Liability

Even if the obligation under a Short Option were considered a liability, it is more
likely than not that Investor's basis in S Corp and the amount realized by S Corp upon the
disposition of its interest in Fund would not be affected. This is because it is more likely than
not that the amount of the "liability" would be considered zero. In Rev. Rul. 95-45, supra, the
taxpayer sold securities short and contributed the $1,000x proceeds and the short sale obligation

KPMGZ12060155

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 40

to a corporation in exchange for stock in a Code Section 351 transfer. At the time of the transfer, the value of the securities was $800x. The IRS concluded that the short sale obligation was a liability, and that the amount of the liability was $1,000x.

If the IRS is correct that the amount of the liability is determined by the original value of the securities to be delivered, a Short Option is distinguishable. Manager has advised us that at the time that a Short Option was created, it was out of the money. Consequently, Investor would not have had to transfer anything to satisfy the undertaking under the Option. By contrast the short seller would have had to transfer securities worth $1,000x. The IRS might assert that the amount of the liability is not the actual amount of the liability but the amount included in basis. This argument produces an incorrect result in other contexts, and should be rejected here. To illustrate, assume that a taxpayer purchases an asset with $ 1,000x of borrowed funds, repays a portion of the loan with other assets, and then contributes the property and the liability to a corporation. Under the IRS approach, the taxpayer's basis under Code Section 358 in the stock received would be reduced by $ 1,000x, the original amount of the loan included in basis. This is clearly the incorrect result, and it is more likely than not that basis would be reduced only by the actual amount of the liability. In the case of an out of the money option, this must be zero.

## 2. S Corp's Basis in Options

If a transaction is one described in Code Section 351(a), the transferee's tax basis in the transferred assets is determined under Code Section 362(a). Under Code Section 362(a)(1), the transferee's tax basis equals the transferor's tax basis increased by the amount of gain, if any, recognized by the transferor on the transfer. In the instant case, because it is more likely than not that the transfer qualifies under Code Section 351(a), it is more likely than not that Investor would not recognize any gain on the transfer of the Options to S Corp. Consequently, it is more likely than not that S Corp's tax basis in the transferred Options would equal Investor's tax basis in each immediately prior to the transfer.

## D. Contribution of the Options to Fund I

## 1. Fund I is Treated as a Partnership

Treas. Reg. §301.7701-2(b)(1)-(8) describes certain entities that are classified as corporations for U.S. federal tax purposes. Treas. Reg. §301.7701-3 provides that an entity not

NYLIB1/801884/2

KPMGZ12060156

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 41

described in Treas. Reg. §301.7701-2(b)(1), (3), (4), (5), (6), (7), or (8) is considered to be an "eligible entity", which may elect to be classified as either a corporation or, if it has 2 or more owners, a partnership. Treas. Reg. §301.7701-(3)(b)(1) provides that a domestic eligible entity that has two or more members and does not elect to be classified as a corporation will be classified as a partnership for U.S. federal income tax purposes.

Based on the facts set forth above, it is more likely than not that Fund I would constitute a domestic eligible entity. Consequently, if Fund I, as represented, has not elected and does not elect to be classified as a corporation, it is more likely than not that Fund I would be treated as a partnership for U.S. federal income tax purposes.[10]

---

[10] Fund has represented that Fund will determine its members' distributive shares income, gain, loss, deduction, or credit and will maintain its members' capital accountants in accordance with Code Section 704 and the Treasury Regulations promulgated thereunder. As a result, on liquidation of Fund or a member's interest therein, such capital account will affect the amount such member will receive. It should be noted that a partner's basis in his or her partnership interest and the partner's capital account in the partnership are not necessarily the same. See, Willis, Pennel, Postlewaite, Partnership Taxation, Vol. 1, ¶5.02 (6th Ed. 1997). See also, Treas. Reg. §1.704-1(b)(2)(iv)(g)(1), which reflects this rationale.

Establishment and maintenance of a partnership's capital accounts is governed by the rules of Treas. Reg. §1.704-1(b)(2)(iv). Treas. Reg. §1.704-1(b)(2)(iv)(b)(2) provides that a partner's capital account is increased by "the fair market value of property contributed by him to the partnership (net of liabilities secured by such contributed property that the partnership is considered to assume or take subject to under section 752)". Treas. Reg. §1.704-1(b)(2)(iv)(h) provides:

For purposes of this paragraph (b)(2)(iv), the fair market value assigned to property contributed to a partnership.... will be regarded as correct, provided that (1) such value is reasonably agreed to among the partners in arm's-length negotiations, and (2) the partners have sufficiently adverse interests. Valuation of property contributed to the partnership... shall be on a property-by-property basis....

Consequently, we have been advised that Investor's initial capital account in Fund equaled the net value of the Options contributed to Fund and thus fully reflected the amount that Investor receives on liquidation of Fund or his interest therein.

Although the Short Option is not a liability, its acceptance by Fund represents the assumption by Fund of an economic undertaking. In that regard it is analogous to assuming a Code Section 752 liability and treating it in the same manner as such a liability for capital account purposes is consistent with establishing a capital account for Investor that reflects Investor's economic interest in the partnership. Lastly, nothing in Treas. Reg. §1.704-1(b)(2)(iv)(h) would appear to prevent the partners from agreeing to a negative value for such an undertaking if in fact that item reflects a potential economic cost to the partnership. Such an approach appears to be consistent with the revaluation rules of Treas. Reg. §1.704-1(b)(2)(iv)(f) and the book value adjustment rules of Treas. Reg. §1.704-1(b)(2)(iv)(g).

KPMGZ12060157

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 42

Under common law the courts have held that a partnership is respected for tax purposes if the parties join together to jointly conduct a business and share the profits. See e.g. Comm'r v. Culbertson, 337 U.S. 733 (1949). In Comm'r v. Culbertson, supra, 741, the Court stated that whether a partnership existed for tax purposes depends on "whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both"

In PLR 9914006 (12/23/98), a limited liability company ("LLC") was owned by a partnership and a corporation all of the stock of which was owned by the partnership. Under the LLC agreement, the corporation was not entitled to receive any distributions, and did not receive any allocations of income, gain, profit, loss, deduction, credit, or other amount from the LLC. One of the issues in the ruling was whether the LLC was a partnership for tax purposes. The IRS cited Culbertson, supra, and Comm'r v. Tower, 327 U.S. 280 (1946) for the general principles applicable to determine whether a partnership exists. The ruling states that "The primary inquiry is whether the parties intended to join together to operate a business and share in its profits and losses". Because the corporation in the ruling had no interest in the profits and losses of the LLC, the IRS concluded that the corporation was not a partner, and that therefore the partnership was the sole owner of the LLC. Thus, the critical issue in this ruling was whether the purported partners joined together to conduct a business and share the profits and losses. In the present situation, Investor and the other members invested in Fund I with the intent of jointly conducting an activity (investing) and sharing the profits and losses therefrom, and this is reflected in the terms of the Fund I's organizational documents.

In ASA Investerings Partnership v. Comm'r, T.C. Memo. 1998-305, aff'd 201 F.3d 505 (D.C. Cir. 2000), the court found that a partnership formed by Allied Signal and ABN, a foreign partner, was not a valid partnership arrangement for U.S. federal income tax purposes. The court based its holding, in part, on what it viewed as the two party's different investment objectives. In the court's view, Allied Signal only wanted the capital losses while ABN was only interested in earning a specified rate of return on its investment. ABN did not want to share in any losses. The court found that Allied Signal was obligated to pay all expenses and guarantee ABN a minimum profit and made all the critical management decisions. As a result, the court concluded that ABN was not a partner in a partnership, but rather was a mere lender. The court noted that Allied Signal agreed to enter into the transaction before it even knew that ABN would be involved.

NYLIB1/801884/2

KPMGZ12060158

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 43

The Allied Signal case is distinguishable from the Transactions in several key respects. Each member invested in Fund I in anticipation of realizing profits from Fund I's investment activities. Investor and the other members all have the potential for profit or loss in respect of their collective investment in Fund I. No member was guaranteed a particular minimum profit. Each member shares proportionately in the income, gain, loss and deductions of Fund I, so that there is no issue of recharacterization as in the Allied Signal case.

Based upon the foregoing, it is more likely than not that Fund I would be treated as a partnership under the common law principles contained in these cases.

### 2.     Contribution to Fund I

#### (a)     Code Section 721 -Generally

Code Section 721 (a) and Treas. Reg. §1.721-1 generally provide that no gain or loss is recognized by either the partnership or any partner in the case of a contribution of property to the partnership in exchange for a partnership interest. Although the term "property" is not defined in subchapter K of the Code, its common meaning implies that to be property an asset or right must involve some potential economic return (even if that return would not generate a profit). For example in Dillon v. U.S., an unreported District Court case unofficially reported at 84-2 USTC ¶9921 (S.D. Tex, 1981), the Court held that a contractual right to participate as a partner in a second partnership constituted property contributed to the first partnership for purposes of Code Section 721. Furthermore, although neither the Code nor the Regulations define the term "property" under Code Section 721, that section is similar to Code Section 351 in the corporate context, where the term "property" is given a broad interpretation, and serves to distinguish services from property. See also, Stafford v. U.S., 611 F.2d 990 (5th Cir. 1980); PLR 8225069 (3/24/82).

Consequently, it is more likely than not that the Long Options would qualify as property for purposes of Code Section 721 and that Code Section 721 would generally apply to the contribution of the Long Options by S Corp to Fund I. There is less certainty regarding whether the Short Options also constitutes property or rather represent undertakings of S Corp assumed by Fund I. However, as discussed above, the concept of property for this purpose is very broad and could be read to include a contractual arrangement endowing the taxpayer with

NYLIB1/801884/2

KPMGZ12060159

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 44

the opportunity to realize an economic return. See Dillon v. U.S., supra, As discussed below, even if the Short Option was not property for purposes of Code Section 721, it is more likely than not that it would not constitute a liability of Corp within the meaning of Code Section 752.

### (b)    Investment Partnership Rules

Notwithstanding that Code Section 721(a) generally provides for nonrecognition of gain or loss upon the contribution of property to a partnership, Code Section 721(b) provides that the nonrecognition rule of Code Section 721(a) does not apply to gain realized on a transfer of property to a partnership that would be treated as an investment company within the meaning of Code Section 351. Thus, gain, but not loss, will be recognized, if the partnership would be an investment company within the meaning of Code Section 351 were it incorporated.

As discussed above, Treas. Reg. §1.351-1(c)(1) provide that property will be considered transferred to an investment company if:

> (i)     The transfer results, directly or indirectly, in diversification of the transferors' interests, and

> (ii)    The transferee is (a) a regulated investment company, (b) a real estate investment trust, or (c) a corporation more than 80% of the value of whose assets (excluding cash and nonconvertible debt obligations from consideration) are held for investment and are readily marketable stocks or securities, or interests in regulated investment companies or real estate investment trusts. ·

Treas. Reg. §1.351-1 (c)(5) clarifies that diversification occurs if two or more persons transfer nonidentical assets to the corporation, unless these assets are an insignificant portion of the total value of the assets transferred.  As discussed above, Treas. Reg. §1.351-1(c)(5) also provides that

---

11    The Taxpayer Relief Act of 1997amended Code Section 351(e) by expanding the definition of investment company assets to take into account all stock and securities held by the company, and by treating as stock and securities for this purpose, among other things, money, stocks and other equity interests in a corporation, evidences of indebtedness, options, forwards or futures contracts, derivatives, foreign currency, any other asset specified in Treasury Regulations, and equity interests in non-corporate entities that are readily convertible into or exchangeable for such assets. To date, the IRS has not issued any such Regulations.

KPMGZ12060160

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 45

"If there is only one transferor... to a newly organized corporation, the transfer will generally be treated as not resulting in diversification."

Deerhurst has advised us that all of the assets contributed to Fund I are options having the same counterparty and terms as the Options. As a result, it is more likely than not that the contribution by S Corp to Fund I would not result in prohibited diversification, with the result that it is more likely than not that the contribution would not be one described in Code Section 721(b).

Even if the contribution of the Options by S Corp to Fund I were a transaction described in Code Section 721(b), it is more likely than not that S Corp would recognize gain to the extent of any appreciation in the value of any of the Options at the time of its contribution to Fund I, but would not recognize any loss with respect to any depreciation in value. Given the fact that the Options were contributed to Fund I shortly after their acquisition, it is more likely than not that any such gain would not be material and, under Code Section 722, would increase S Corp's basis in its membership interest in Fund I.

### (c)    Code Section 1256

For the reasons discussed above with respect to the contribution of the Options to S Corp, it is more likely than not that the contribution of the Options by S Corp to Fund I would not be a transaction subject to the mark-to-market rules of Code Section 1256.

### (d)    Code Section 1234(b)

For the reasons discussed above with respect to the contribution of the Options to S Corp, it is more likely than not that the transfer of the Options to the Fund I is not a transaction on which gain or loss would be recognized under Code Section 1234(b).

### 3.    Basis of Partnership Interest

### (a)    In General

Code Section 722 provides, in general, that the basis of a partnership interest to the partner is equal to the amount of money plus the adjusted basis of the property contributed to the partnership, increased by the amount of gain, if any, recognized by the partner on the

NYLIB1/801884/2

KPMGZ12060161

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 46

contribution.  Consequently, it is more likely than not that S Corp's basis in Fund I would be equal to the basis of the Long Options, increased by the gain recognized on the contribution.

It is more likely than not that the transfer would be viewed as a contribution of the Long Options to Fund I and Fund I's assumption of S Corp's undertakings under the Short Options.  The IRS might assert that S Corp acquired an economic unit consisting of the Long and Short Options and that its basis should be only its net cost.  As discussed above, such position is not supported by case law, which recognizes and respects the separate nature of the transactions.  In Smith v. Comm'r, supra, the court held that straddle legs should be treated as separate property whether acquired at different times or at the same time.  See also, Stoller v. Comm'r, supra; Arnall v. U.S., a District Court case unofficially reported at 59-2 USTC ¶9779 (ND Ga. 1959).  As discussed above, it is more likely than not that the Options would be treated as separate instruments.

Code Section 752(b) provides that any decrease in a partner's share of the partnership liabilities or the assumption by the partnership of a partner's individual liabilities is treated as a distribution of money from the partnership to the partner.  Under Code Section 733, a partner's basis in the partnership interest is decreased by the amount of money and the adjusted basis of property other than money distributed to a partner other than in liquidation of the partner's interest.  Thus, if the potential claims by Bank against Investor/S Corp under the Short Option were considered liabilities for purposes of Code Section 752, S Corp's basis in Fund I would be reduced by such, but would be increased by S Corp's share, as determined under Code Section 752, of the liabilities of Fund I, including the Short Option.  In addition, the amount of such liabilities would be treated as additional consideration received by Investor on the sale or redemption of its interest in Fund I. See Code Section 752(d).

> **(b)**     **Short Option as a Liability**

> **I.**     **Code Section 752 In General**

Code Section 752 itself does not define the term "liabilities".  In 1988, the IRS issued temporary and proposed Regulations under Code Section 752 (TD 8237, December 30, 1988), concerning the treatment of partnership liabilities.  In Temp. Treas. Reg. §1.752-1T(g) the IRS defined the term "liability" for purposes of Code Section 752 as follows:

NYLIB1/801884/2

KPMGZ12060162

## BROWN & WOOD LLP

Mr. Carlos Sala
December 31, 2000
Page 47

> an *obligation is a liability* of the obligor for purposes of section
> 752 and the regulations thereunder to the extent, but only to the
> extent, that incurring or holding such liability gives rise to -
>
> (1) The creation of, or increase in, the basis of any property owned
> by the obligor (including cash attributable to borrowings);
>
> (2) A deduction that is taken into account in computing the taxable
> income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the
> obligor's taxable income and is not properly chargeable to capital.
> [emphasis added]

In 1991, the IRS replaced these temporary and proposed Regulations with
permanent Regulations. These new Regulations (TD 8380, 12/23/91) eliminated, without
explanation, the definition of "liability" that was contained in the temporary and proposed
Regulations. Nevertheless, because the definition in the 1988 temporary and proposed
Regulations was based on pre-existing interpretations, and is supported by the legislative history
of the Deficit Reduction Act of 1984, it may still be viewed as applicable.

The IRS's Revenue Rulings defining the term "liability" in the context of Code
Section 752 tend to be consistent with the definition in the 1988 Regulations, requiring both an
obligation and the creation of either basis, a deduction, or an expenditure that is neither
deductible or chargeable to capital. However, it does not appear that the IRS has taken the
position that a liability arises prior to the time an obligation would be considered to a rise under
the general federal income tax principles.

The view that that the IRS has taken the position that a liability does not arise
prior to the time an obligation would be considered to a rise under the general federal income tax
principles is confirmed in Rev. Rul. 73-301, 1973-2 CB 215. In the Ruling, the IRS ruled that
interim payments received by a partnership for services rendered in connection with a long-term
contract reported on the completed contract method do not constitute liabilities for purposes of
Code Section 752. Instead, the ruling characterizes such payments as "unrealized receivables",
the income from which increases the basis of partners' interest only when recognized by the
partnership for tax purposes. The Ruling emphasizes that the partnership had fully earned the

NYLIB1/801884/2

KPMGZ12060163

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 48

payments and was under no obligation to return them or perform additional services to retain them. Although the partnership received money, there was no attendant legally binding obligation to repay and, consequently, no liability. See also, Kovtan v. Comm'r, 54 T.C. 331, 338 (1970), aff'd per curiam, 448 F.2d 1268 (9th Cir. 1971);[12] Rev. Rul. 81-241, 1981-2 CB 146 The IRS's position in Rev. Rul. 73-301 is consistent with the position of the Tax Court in Helmer v. Comm'r, T.C. Memo. 1975-160, discussed below.

The courts have also held that unmatured claims are not liabilities under Code Section 752. In Long v. Comm'r, supra, the court considered whether contested liabilities were liabilities within the meaning of Code Section 752. The partnership in this case was in the construction business and was sued for defects in a building. The suits were pending when one of the partners died, raising the question of the partnership basis. The court rejected the argument that the contingent claims were liabilities for purposes of Code Section 752, stating:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated. This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. . . . We think that partnership liabilities should be treated in the same manner. . . . We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party suggests such a distinction. Those liabilities should be taken into account only when they are fixed or paid. . . .
>
> The Kansas City Life-TWA and USF&G claims were too contingent at the death of the decedent to be included in the estate's initial computation of its basis in the decedent's partnership interest. Liability for those claims had not been established and was in fact contested. Moreover, the amounts of damages sought were by no means definite or fixed.

71 T.C. at 7-8 [Citations omitted].

---

[12]     In Kovtan v. Comm'r, no interest deduction was allowed to a partnership where a note was found to be

KPMGZ12060164

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 49

The Tax Court again held contingent claims are not liabilities within the meaning of Code Section 752 in La Rue v. Comm'r, supra. The taxpayers in this case were general partners of Goodbody & Co., a stock brokerage firm. Because of its inability to keep up with the trading volume, Goodbody incurred large "back-office" liabilities due to the following types of transactions: (i) the failure to purchase securities at a stated price; (ii) the failure to sell securities at a stated price; (iii) differences between the securities actually held and the securities the partnership should have held; and (iv) the failure to receive dividends or interest on securities held for customers. Goodbody was fully liable for the losses represented by these errors. Another firm acquired the assets and assumed the liabilities of Goodbody for an amount equal to the difference between the fair market value of the assets and the liabilities. In an attempt to minimize their gain, the partners sought to increase their basis in Goodbody by including the reserves for the back office claims as partnership liabilities under Code Section 752. The court rejected this attempt, noting that the reserves were for potential liabilities, and that the amount of the liabilities was speculative and could not be determined with reasonable accuracy.

> Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. Essentially, Goodbody's books were in error because of the back office problems, and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.
>
> Petitioners have not shown that these amounts were determinable with reasonable accuracy. As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable,

unenforceable. This implies that the note was not an obligation of the partnership.

KPMGZ12060165

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 50

> because the smaller the amount of the transaction the less likely the
> customer would be to claim it. In addition, the exact amount of loss
> or gain was not determinable until actual purchase or sale.
> Valuation of the claims may be a purely ministerial matter because
> of the ready market for securities, but is not readily determinable
> until purchase or sale occurs. The additional reserves reflected
> potential liabilities of the partnership, valued by reference to listed
> stock prices but before actual sale or purchase and, accordingly,
> represented estimates. Accrual accounting requires that the amount
> be determinable with "reasonable accuracy." A loss is not
> determinable until the securities are actually purchased or sold and
> the transaction closed. We accordingly hold that because the
> reserves were not a fixed obligation of the partnership sufficiently
> determinable in amount in 1970, they cannot be included in the
> partners' bases in that year.

90 T.C. at 479

      The court stated that the "all events" test of Code Section 461 (a), which is used
to determine when an expense can be accrued for deduction purposes, should also be applied to
determine when a liability is fixed or definite and thus includible in basis. In La Rue, the claims
or obligations were too speculative and contingent to be accrued as an expense, and therefore
could not be included in basis. In the present situation, at the time of the transfer the claims of
Bank against Investor under the Short Option are entirely speculative and contingent, and the
amount thereof cannot be determined.

      As discussed above, under Rev. Rul. 80-238, supra, FSA 1999-898, and GCM
38305 (3/12/80), it appears that the IRS view is that the obligation of the writer of a call option
that is not in-the-money would not arise prior to the exercise of the option by the holder.
Accordingly, it is more likely than not that Bank's claim under a Short Option would not be
considered a liability at the time of the transfer of the Options to Fund I for purposes of Code
Section 752.

      **ii.**    **The Helmer Case**

      In what appears to be the only decided case on point, the Tax Court agreed with
the IRS that the holder's claim against the grantor of an option is not a liability within the

NYLIB1/801884/2

KPMGZ12060166

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 51

meaning of Code Section 752. In Helmer v. Comm'r, supra, a partnership sold an option to purchase land that it owned and distributed the premium to the partners. The taxpayer asserted that the holder's claim against the partnership to perform under the option was a liability for purposes of Code Section 752, and thus increased his basis in his partnership interest. If the option were not considered a liability, then the amount of the premium distributed would exceed the partner's basis in the partnership, and the partner would recognize gain on the excess under Code Section 731. The court agreed with the IRS that the holder's claim against the partnership to perform under the option did not create a liability to the partnership. The partnership had no obligation to return the premium, and the premium had no restriction on its use, other than that it would be credited against the purchase price if the option were exercised.

The option agreement, however, created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future. Therefore we hold that no liability arose under Code Section 752 and the partners' bases cannot be increased by such amounts. 34 TCM (CCH) at 731.

Likewise, a Short Option contract creates no obligation to return the premium to the purchaser. Indeed, the premium represents deferred income to the seller and is not a liability.

Consequently, based upon the Helmer case, it is more likely than not that a Short Option would not be considered a "liability" for purposes of Code Section 752.

iii.      Treatment of Short Sales

In Rev. Rul 95-26, 1995-1 CB 131, the IRS ruled that a partnership obligation to return securities sold short creates a partnership liability for purposes of Code Section 752. The Ruling addressed each prong of the obligation/deduction-basis-capital test. First, it maintained that a short sale created an obligation to return the securities borrowed to effect the sale. Second, the ruling maintains that the cash proceeds of the short sale create a partnership asset, thereby increasing basis and bringing the obligation within the definition of liability based upon the logic of Rev. Rul. 88-77, 1988-2 CB 129.

Based on the discussion above with respect to the contribution of the Short Option to S Corp, it is more likely than not that Rev. Rul. 95-26, supra, would be distinguishable from a Short Option, because the short sale creates a legally enforceable obligation to deliver securities.

NYLIB1/801884/2

KPMGZ12060167

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 52

It is the creation of such an enforceable obligation, coupled with the receipt of sale proceeds by the partnership allowed the IRS to bootstrap itself into the liability conclusion reached by the Ruling.

Lastly, in Salina Partnership LP, FPL Group, Inc. v. Comm'r, T.C. Memo 2000-352, the taxpayer purchased a 98% interest in Salina Partnership LP, a Delaware limited partnership. Among the transactions that Salina had entered into prior to taxpayer's purchase was a short sale of U.S. Treasury bills. Under Regulations then in effect, the purchase of 50% or more of the interests in a partnership within a 12 month period caused a constructive termination of the partnership, involving a deemed liquidation of the "old" partnership and a contribution of the assets, subject to partnership liabilities to a "new partnership". As a result of the constructive termination, the "new" partnership received the Treasury bills subject to the "old" partnership's undertakings under the short sale. The IRS contended that such undertakings constituted liabilities for purposes of Code Section 752, whereas the taxpayer contended that the undertakings did not. The Court concluded that the partnership's obligation to close its short sale by replacing the Treasury bills that it had borrowed represented a partnership liability for purposes of Code Section 752.

In making its argument that the short sale did not create such a liability, the taxpayer relied upon Helmer, supra, for the proposition that an "open transaction" did not create a liability. The court distinguished the option in Helmer from a short sale, stating that a short sale transaction and the writing of an option are "materially different" because the option in Helmer, as is the case with the Short Options, created no claim for repayment or demand for further services. Thus the court implicitly affirmed its decision in Helmer that an option which may expire unexercised is not a liability for purposes of Code Section 752.

Based upon the foregoing, it is more likely than not that Rev. Rul. 95-26, supra, would be distinguishable from the Fund I's assumption of obligations under a Short Option, because as recognized in the Salina case, the short sale creates a legally enforceable obligation to deliver securities, whereas an option does not create a similar obligation. It is the creation of such an enforceable obligation, coupled with the receipt of sale proceeds by the partnership that allowed the IRS to bootstrap itself into the liability conclusion reached by the Ruling. See also, Rev. Rul. 88-77, supra, cited in the Ruling, that also involved noncontingent, legally enforceable

KPMGZ12060168

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 53

obligations. As discussed above, the requirement to perform under an option is not treated as fixed or legally enforceable at the time the option is entered into.

### iv.    2000 Legislation

As discussed above with respect to the transfer of the Short Option to Corp, it is more likely than not that the exception contained in Code Section 358(h)(2), as added by Section 309 of H.R. 5662 would apply with the result that it is more likely than not that a Short Option would not be considered to be an obligation of Investor that would constitute a liability for purposes of Code Section 752 under any Regulation promulgated pursuant to Section 309 of H.R. 5662.

### v.    Amount of Liability

As discussed above with respect to the transfer of the Short Option to Corp, even if the obligation under the Short Option is considered a liability, it is more likely than not that the amount of the "liability" would be considered zero.

### E.    Withdrawal from Fund

### 1.    Recognition of Gain or Loss

When S Corp withdraws from Fund I, S Corp received a liquidating distribution of Fund I assets with a value equal to the then value of S Corp's Fund I interest. Code Section 731(a) provides that a partner does not recognize gain on the distribution of property from a partnership, except to the extent that the amount of money received exceeds the partner's adjusted basis for the partnership interest. Loss is recognized only if the property distributed consists solely of money, unrealized receivables and inventory. Code Section 731(b) provides that a partnership does not recognize gain or loss on the distribution to a partner of property, including money.

S Corp's withdrawal from Fund I would, more likely than not, not cause S Corp to recognize the premium income on a Short Option (if held by Fund I upon such withdrawal) because, as discussed above, such withdrawal did not cause a Short Option to "terminate".

On S Corp's withdrawal from Fund I, S Corp received a distribution of foreign currency. Under general principles of tax law, foreign currency is generally considered to be property and

NYLIB1/801884/2

KPMGZ12060169

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 54

not money. See Rev. Rul. 74-7, 1974-1 CB 198. However, in 1994, Congress amended Code Section 731 to provide that for purposes of this section, the term "money" would include "marketable securities," which is defined to include foreign currency, options, forward or futures contracts, notional principal contracts, and derivatives.

Nevertheless, Code Section 731(c)(3) provides that this special definition will not apply if Fund I is an "investment partnership" and each partner is an "eligible partner". Code Section 731(c)(3)(C)(i) defines an "investment partnership" as any partnership that has never been engaged in a trade or business and substantially all of the assets of which consist of money, stock, notes, bonds, debentures, interest rate, currency or equity notional principal contracts, foreign currencies, and specified other marketable securities. An "eligible partner" is any partner who has not contributed to the partnership any property other than that described in Code Section 731(c)(3)(C)(i). Code Section 731(c)(3)(C)(i) states that investing, trading, or dealing in such assets is not a trade or business for this purpose.

Because Fund I is not engaged in any trade or business except investing in the types of property listed in Code Section 731(c)(3)(C)(i) and each member of Fund I has contributed only such property to Fund I, it is more likely than not that distributions to S Corp would not be considered money for purposes of Code Section 731(a), and that S Corp would not recognize gain on the distribution of the Foreign Currency. Under Code Section 731(b), it is more likely than not that Fund I would not recognize gain or loss on the distribution of the Foreign Currency.

2.   <u>Basis of Foreign Currency Distributed</u>

Code Section 732(b) provides that the basis of property distributed to a partner in liquidation of a partnership interest is equal to the partner's adjusted basis in the partnership interest, reduced by the amount of any money distributed. As discussed above, foreign currency is property, but is not considered money.

In Rev. Rul. 74-7, <u>supra</u>, a U.S. citizen converted dollars into a foreign currency, and at the end of his trip, converted the foreign currency back to dollars. The IRS held that the foreign currency was a capital asset, and that any gain or loss on reconversion was capital gain or loss. Code Section 1221 defines the term "capital asset" as property held by the taxpayer with certain exceptions. In Rev. Rul. 87-124, 1987-2 CB 205, the IRS cited Rev. Rul. 74-7 for the proposition

NYLIB1/801884/2

KPMGZ12060170

## BROWN & WOOD LLP

Mr. Carlos Sala
December 31, 2000
Page 55

that foreign currency is property to a U.S. resident. See also, American Home Products Corp. v. U.S., 601 F.2d 540 (Ct. Cl. 1979); B. F. Goodrich Co. v. Comm'r, 1 T.C. 1098, 1104 (1943), non acq. 1974-2 CB 5.

Congress implicitly agreed with the rule that foreign currency is not money when it amended Code Section 731(c) to provide that, for purposes of Code Sections 731(a)(1) and 737, the term "money" includes marketable securities, which is then defined to include foreign currency and options, forward or futures contracts notional principal contracts and derivatives. The language of Code Section 731(c) clearly limits the change to Code Section 731(a)(1) and Code Section 737, and the rule cannot be applied to other Sections of the Code. The legislative history of the change confirms this: "While the bill generally (subject to exceptions provided in the bill) treats marketable securities as money where the term is used in sections 731(a)(1) and 737, the bill does not change the treatment of marketable securities as property where the term property is used (for example, in determining a partner's net pre-contribution gain under section 737(b))." H.R. Rep. 103-826 (Pt.1), 103rd Cong., 2d Sess. 188, fn. 9 (1994)".

Consequently, it is more likely than not that foreign currency would be treated as property for purposes of Code Section 732, and that the basis of the Foreign Currency received by S Corp would equal S Corp's basis in its interest in Fund I immediately before the liquidating distribution.

### 3. Consequences to Fund I

The general rule is that a partnership does not adjust the basis of its remaining assets to reflect the distribution of property to a partner. Code Section 734(a). However, a special election is available under Code Section 754 that would allow such an adjustment. Fund I has represented that it not made this election, and thus Fund I will not be required to adjust the basis of its assets to reflect the distribution to S Corp of the Foreign Currency.

In the Administration's 1999 budget proposal, the President proposed modifying these rules by requiring a partnership to adjust the basis of its assets following the distribution of property to a partner. The proposal would require the partnership to increase the basis of its remaining property by the excess of (1) the amount of money and the basis the property distributed, over (2) the amount by which the distributee partner's share of the partnership's

NYLIB1/801884/2

KPMGZ12060171

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 56

basis in its assets and money is reduced by the distribution. The partnership would reduce the basis of its property by the excess of the amount in (2) over the amount in (1).

Under the Administration's 1999 budget proposal, the adjustment to basis would be made to the basis of the partnership's nondepreciable capital assets held after the distribution. The description of the proposal specifically notes that "unrealized receivables" are included in the term nondepreciable capital asset. If the required positive basis adjustment cannot be made because the partnership does not own any nondepreciable capital assets, then the partnership will recognize a long-term capital loss. In the case of a required negative adjustment, the adjustment is first made to the basis of nondepreciable capital assets, and then to the basis of other assets. If the partnership cannot make the required adjustment because it has insufficient basis in its assets, the partnership would recognize a long-term capital gain.

Under the Administration's 1999 budget proposal, the proposed changes would be effective for distributions made after the date of enactment and, consequently, would have no effect on the Transactions.

**F.**     **Disposition of the Foreign Currency**

Code Section 985(a) generally requires that all income tax determinations with respect to a taxpayer be made in the taxpayer's functional currency. Code Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain conditions are met. Treas. Reg. §1.988-1(c) provides that any currency of a taxpayer or a QBU other than its functional currency is "nonfunctional currency".

Code Section 988 governs the U.S. federal income tax treatment of certain transactions in foreign currency, described as "section 988 transactions", and governs such transactions notwithstanding any other provisions of Chapter 1 (Sections 1 through 1400) of the Code. Furthermore, in the case of transactions by individuals, Code Section 988(e) limits the applicability of the Code Section 988 rules to transactions the expenses of which meet the requirements of Code Section 162 or Code Section 212. Code Section 988(e)(3); Treas. Reg. §1.998-1(a)(9). As discussed below, it is more likely than not that the Transactions would meet these standards.

NYLIB1/801884/2

KPMGZ12060172

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 57

Code Section 988(a) provides:

Notwithstanding any other provision of this chapter [i.e., Sections 1 - 1400]

(1)     TREATMENT AS ORDINARY GAIN OR LOSS. ---

(A)     IN GENERAL. -- Except as otherwise provided in this section, any
foreign currency gain or loss attributable to a section 988 transaction shall
be computed separately and treated as ordinary income or loss (as the case
may be).

Code Section 988(c)(1) provides:

(A)     GENERAL. --The term "section 988 transaction" means any transaction
described in subparagraph (B) if the amount which the taxpayer is entitled
to receive (or is required to pay) by reason of such transaction --

(i)     is denominated in terms of a nonfunctional currency , or

(ii)    is determined by reference to the value of 1 or more nonfunctional
currencies.

(B)     DESCRIPTION OF TRANSACTIONS. -- For purposes of subparagraph
(A), the following transactions are described in this subparagraph:...

(iii)   Entering into or acquiring any...option

Section 988(c)(1)(C)(i) further provides that in the case of any disposition of
nonfunctional currency, the disposition is treated as a section 988 transaction and any gain or
loss from such transaction is treated as foreign currency gain or loss. See also, Treas. Reg.
§§1.988-1(a)(2)(iii), 1.988-2(d)(1), 1.988-2(d)(4) and 1.988-3(a).

The acquisition of nonfunctional currency is also treated as a section 988 transaction for
purposes of determining the taxpayer's basis in such currency and determining exchange gain or
loss thereon. Treas. Reg. §1.988-1(a)(1).

NYLIB1/801884/2

KPMGZ12060173

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 58

Treas. Reg. §1.988-2(a)(1)(i) provides that the recognition of exchange gain or loss upon the sale or other disposition of nonfunctional currency is governed by the recognition provisions of the Code that apply to the sale or disposition of property, such as Code Section 1001.[13] Treas. Reg. §1.988-2(a)(2)(i) provides that exchange gain or loss realized from the disposition of a nonfunctional currency is determined by reference to the taxpayer's basis in such currency and the amount realized. Treas. Reg. §1.988-2(a)(2)(ii)(B) provides that the exchange of nonfunctional currency for property is treated as an exchange of such currency for units of functional currency at the then spot rate and the purchase of the property for such units of functional currency. Treas. Reg. §1.988-2(a)(2)(ii)(C) provides an example that involves the use of nonfunctional currency to purchase items of equipment. The example concludes that such purchase is a disposition of such currency with the amount realized measured by reference to the spot price of the currency on the date of purchase and the use of such functional currency to purchase the equipment.

Based upon Investor's/S Corp's representation, it is more likely than not that the U.S. dollar would be treated as S Corp's functional currency. Consequently, it is more likely than not that the disposition of the Foreign Currency received by S Corp would be a transaction that is treated a "section 988 transaction" on which gain or loss is recognized. Code Section 988(c)(1)(C). Under Code Section 988(a)(1) and Treas. Reg. §1.988-3(a), such gain or loss is treated as ordinary income or loss.

Treas. Reg. §1.988-2 provides rules for determining the amount of gain or loss that arises from a section 988 transaction and that is characterized as ordinary under Treas. Reg. §1.988-3. Treas. Reg. §1.988-2(a)(2)(i) provides that on a disposition of nonfunctional currency exchange

---

[13]    Treas. Reg. §1.988-2(a)(1)(iii) provides, however, that no gain or loss is recognized with respect to: (i) an exchange of units of a nonfunctional currency for different units of the same currency, (ii) the deposit of a nonfunctional currency in a demand or time deposit or similar instrument (including a certificate of deposit) issued by a bank or other financial institution if such instrument is denominated in the same currency; (iii) the withdrawal of nonfunctional currency from a demand or time deposit or similar instrument issued by a bank or other financial institution if such instrument is denominated in the same currency, (iv) the receipt of nonfunctional currency from a bank or other financial institution from which the taxpayer purchased a certificate of deposit or similar instrument denominated in such currency by reason of the maturing or other termination of such instrument, and (v) the transfer of nonfunctional currency from a demand or time deposit or similar instrument issued by a bank or other financial institution to another demand or time deposit or similar instrument denominated in the same currency issued by a bank or other financial institution.

KPMGZ12060174

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 59

gain is the entire amount of the excess of the amount realized on its disposition over the
taxpayer's adjusted basis in the currency and the exchange loss is the entire amount of the excess
of the taxpayer's adjusted basis in the currency over the amount realized on its disposition.
Treas. Reg. §1.988-2(a)(2)(ii) provides that the amount realized on the disposition of
nonfunctional currency is determined under Code Section 1001(b) and Treas. Reg. §1.988-
2(a)(2)(iii)(A) provides that the adjusted basis of nonfunctional currency is determined under the
applicable provisions of the Code. Neither such Treasury Regulation nor the preamble thereto
limits the amount of exchange gain or loss on the disposition of nonfunctional currency to that
portion of the gain or loss attributable to a change in exchange rates. Instead, such Treasury
Regulation simply applies the mechanical provisions of other Code Sections in order to
determine the amount of gain or loss and then characterize all of such gain or loss as exchange
gain or loss.[14]

Treas. Reg. §1.988-1(a)(11) gives the IRS the power to exclude a transaction from the
provisions of Code Section 988 if the substance of the transaction or transactions indicates that
the transactions are not properly considered section 988 transactions. There is no guidance under
Treas. Reg. §1.988-1(a)(11) as to what would not properly be considered a section 988
transaction. Some insight may be gained from the example in the Regulation, which deals with
the reverse situation. In the example, the taxpayer transfers nonfunctional currency to a newly
formed corporation with no other assets and sells the stock, claiming that the transaction is not a
section 988 transaction. In the example, the Commissioner recharacterized the transaction as
being a section 988 transaction because an asset not subject to Code Section 988, the stock, was
substituted for an asset that was subject to Code Section 988. In the instant case, S Corp
acquired the foreign currency in a transaction described in Treas. Reg. §1.988-1(a)(1) and -
2(a)(1). The acquisition of the foreign currency is not the surrogate for a transaction involving
an asset not described in Code Section 988. Based on the foregoing, it is more likely than not

---

[14]    Code Section 988(b)(1). It appears that this regulatory approach was adopted based upon the legislative
history of the amendments made to Code Sections 988(b) and (c) in the Technical and Miscellaneous
Revenue Act of 1988. The House, Senate and Conference Committees each included identical language in
their reports describing the measurement and recognition of foreign currency gain or loss. The Committees
said: "Further, any gain or loss on a nonfunctional currency disposition is foreign currency gain or loss
regardless of whether the difference between acquisition and disposition prices is due to spot rate
movements between acquisition and disposition dates, forward discount or premium, bid-asked spreads, or
other factors". Treasury's all gain/loss approach would appear to be based upon this directive.

KPMGZ12060175

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 60

that the IRS would not be successful were it to attempt to recharacterize the transaction under Treas. Reg. §1.988-1(a)(11).

Treas. Reg. §1.988-2(f) gives the Commissioner the power to recharacterize the timing, source, and character of gains and losses with respect to a section 988 transaction in accordance with its substance. The example in the Regulation involves a taxpayer who denominated a transaction that was in substance a forward sales contract as a notional principal contract and who attempted to apply the rules relating to notional principal contracts to the transactions. In the instant case, the acquisition and disposition of the foreign currency are reported consistently with the form of the transactions and consistently with their economic substance. Consequently, it is more likely than not that the IRS would not be successful were it to attempt to change the timing, character or source of the loss recognized by S Corp from the disposition of the Foreign Currency.

Treas. Reg. §1.988-2(a)(1)(i) provides that the recognition of gain or loss from the sale or disposition of a nonfunctional currency is governed by the other provisions of the Code that apply to the sale or disposition of property, and cites Code Section 1001 and 1092 as examples of such provisions. Treas. Reg. §1.988-2 does not, however, specifically refer to Code Section 165 in connection with the allowance of a deduction of a loss sustained under Code Section 988. Consequently, there is some uncertainty as to whether Code Section 988 independently provides for the allowance of a loss sustained in a Section 988 transaction or whether such loss must also be tested under Code Section 165. The language of Code Section 988(a)(1) to the effect that notwithstanding any other provisions of the Code a loss sustained in a Section 988 transaction shall be treated as an ordinary loss, supports the view that Code Section 988 provides an independent allowance. This position is further supported by Code Section 988(e) which limits the loss incurred by an individual to those incurred in transactions in which expenses allocable to the transaction would be deductible under Code Section 162 or 212. Because the individual loss allowance rules of Code Section 165(c) contain provisions that are substantially the same, if Code Section 988 losses of an individual were subject to Code Section 165(c) there would have been no need to include similar limitations with Code Section 988(e). Thus, although the law is not entirely clear, Code Section 988 could be viewed as providing for the deduction of a loss from a Code Section 988 transaction independently of Code Section 165.

NYLIB1/801884/2

KPMGZ12060176

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 61

Even were the IRS to successfully contend that a loss recognized under Code Section 988 must meet the requirements of Code Section 165, it is more likely than not that the loss would still be deductible in the instant case.  This is because Code Section 165(b) calculates the amount of deduction based on the adjusted basis rules of Code Section 1011, which equally apply under Treas. Reg. §1.988-2(a).  Furthermore, as discussed below, were the loss claimed by S Corp in S Corp's individual return, we believe that it is more likely than not that Code Section 165(c) standard would be met.

Notwithstanding this general statutory language relating to Code Section 165, Treas. Reg. §1.165-1 (b) provides that for the loss to be allowable under Code Section 165(a) the loss must be evidenced by closed and completed transactions, fixed by identifiable events, and be actually sustained during the taxable year; that the loss be a bona fide loss; and that substance rather than form should govern.  As discussed above, the loss on the sale of the foreign currency is evidenced by closed and completed events and fixed by an identifiable event, the sale.  As discussed below, it is more likely than not that the loss will be treated as being bona fide (as opposed to being treated as a sham) and as having sufficient economic substance to be sustained.  Consequently, it is more likely than not that the IRS would be unsuccessful were it to attempt to deny under Code Section 165 the deduction of a loss recognized by S Corp with respect to the Options or the Foreign Currency under Code Section 988.

Based on the forgoing, it is more likely than not that the entire amount of loss recognized by S Corp on its disposition of the Foreign Currency would constitute an ordinary loss under Code Section 988 and Treas. Reg. §1.988-3(a).  Further, it is more likely than not that such ordinary loss would be treated as derived from U.S. sources. Code Section 988(a)(3); Treas. Reg. §1.988-4.

**G.**     <u>**Rules Relating to the Limitation of Deductions**</u>

It is possible that the IRS also may attempt to assert that one or more of the following apply to the Transactions.

**1.**     <u>**Sham Transaction, Economic Substance, and Business Purpose Doctrines**</u>

There are innumerable cases addressing the judicially developed doctrines of "sham transaction", "business purpose", and "economic substance".  One of the most recent attempts to

NYLIB1/801884/2

KPMGZ12060177

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 62

synthesize these cases appears in "Appendix II To JCX-82-99: Description and Analysis of Present-Law Rules and Recent Proposals Relating to Corporate Tax Shelters", Prepared by the Staff of the Joint Committee On Taxation, JCX-84-99, November 10, 1999 ("JCT Appendix").

    (a)    **"Sham Transaction Doctrine"**

With respect to the "sham transaction doctrine", the JCT Appendix describes two types of "shams", "shams in fact" and "shams in substance". The first involves transactions that in fact never occur. As an example, the JCT Appendix cites Goodstein v. Comm'r, 267 F.2d 127 (1st Cir. 1959), in which assets were never purchased and a loan never incurred by the taxpayer. It is more likely than not that the Transactions would not constitute one or more "shams in fact", based upon the advise of Deerhurst that every transaction did in fact occur as described in Part I hereof.

With respect to the "sham in substance" aspect of the doctrine, the JCT Appendix II cites Yosha v. Comm'r, 861 F2d 494 (7th Cir. 1988) as an example. In Yosha, the taxpayers entered into a series of transactions on the London Metals Exchange ("LME") that were not "shams in fact" because they actually occurred. The taxpayers, however, were fully protected against loss through arrangements by the promoter with the LME brokers, and the transactions were structured so that the taxpayers could not earn a profit from them, i.e., as an economic matter the trades were voided although as a legal and factual matter they occurred.[15] Thus the taxpayers were in the position of economically, or "in substance", never having entered into the transactions. A similar analysis is applied in determining whether a taxpayer is the owner for U.S. federal income tax purposes of a particular asset. Thus, if the taxpayer has none of the economic risk of an owner and none of the economic benefits of an owner, the taxpayer would ordinarily not be treated as the owner, i.e. the taxpayer's economic ownership is voided, and such situations could be viewed as "shams in substance".

---

[15] Because the arrangements to protect against loss were arranged by the promoter, the court was not faced with addressing the effect of bona fide hedging transactions with unrelated parties. Hedges provided by a party involved in the transactions was also viewed as a negative factor in ACM Partnership v. Comm'r, T.C. Memo. 1997-115, aff'd in part and rev'd in part 157 F3rd 231 (3rd Cir. 1998), cert. denied, 526 U.S. 1017 (1999).

NYLIB1/801884/2

KPMGZ12060178

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 63

In the instant case, neither S Corp nor Fund I entered into arrangements that voided the economic effects of any of the Transactions. Consequently, it is more likely than not that the Transactions would not constitute one or more "shams in substance". Much confusion about the sham transaction doctrine has arisen because the courts often treat transaction that fail the "economic substance" or "business purpose" doctrines " as "shams". In this regard, the JCT Appendix notes:

> [T]he delineation between [the sham transaction] doctrine (particularly as applied to "shams in substance") and the "economic substance" and the "business purpose" doctrines…is not always clear. Some courts find that if transactions lack economic substance and business purpose, they are "shams" not withstanding that the purported activity did actually occur.

JCT Appendix at n. 23

### (b) **Economic Substance and Business Purpose Doctrines**

As with the relationship of the sham transaction doctrine to the business purpose and economic substance doctrines, there is some confusion about the relation of the latter two to each other. Again, the JCT Appendix is helpful in trying to clarify the confusion:

> In its common application, the courts use business purpose (in combination with economic substance ) as part of a two-prong test for determining whether a transaction should be disregarded for tax purposes: (1) the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction, and (2) the transaction lacks economic substance. [citation omitted]

JCT Appendix, at n 63 This language mirrors the language of the 4th Circuit Court of Appeals in <u>Rice's Toyota World, Inc. v. Comm'r</u>, 752 F.2d 89 (4th Cir. 1985).[16] Consequently,

---

[16]  "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." <u>Rice's Toyota World, Inc. v. Comm'r</u>, 752 F.2d 89 at 91.

KPMGZ12060179

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 64

to determine whether the Transactions will be respected in the instant case one needs to test the transactions under each prong.  This is because the Transactions will not be respected for U.S. federal income tax purposes only if they fail both prongs, i.e., the Transactions lack both business purpose and economic substance.

      i.    **Business Purpose**

      For a transaction to have a business purpose there must be a business or commercial reason for the taxpayer to engage in the transaction without regard to tax benefits.  Friedman v. Comm'r, 869 F.2d 785, 792 (4th Cir. 1989); Rice's Toyota World, Inc. v. Comm'r, supra.  The existence of such a purpose was recently addressed in United Parcel Service of America, Inc. v. Comm'r, T.C. Memo. 1999-268.

      In the United Parcel Service case, the taxpayer tried to avoid taxation with respect to certain fees by restructuring them as insurance.  Economically, the taxpayer was in substantially the same position as before the restructuring, but through the arrangements was able to exclude the payments from income.  The taxpayer put forth a number of purported commercial reasons for the restructuring of the fees.  The taxpayer argued that (i) it was required to restructure the arrangements because such payments would fall afoul of restrictions under some state insurance laws; (ii) it intended to leverage the profits into the creation of a new reinsurer that could become a full-line insurer; (iii) by removing the fees from its operating ratios it could obtain larger rate increases than had it received the fees directly; and (iv) by restructuring the fees it protected its transportation business from the risk increased liabilities.  However, the taxpayer offered no credible evidence that the restructuring would in fact achieve goals (i), (iii), and (v).  The court also found that goal (ii) could have been accomplished by merely making an investment in such a reinsurer.

      Similarly, in Winn-Dixie Stores Inc. v. Comm'r, 113 T.C. No. 21 (1999), the court disallowed interest deductions on policy loans in a COLI program that insured the lives of approximately 30,000 workers.  The program resulted in a pre-tax loss for the taxpayer.  The taxpayer argued that (i) the program enabled it to fund costs of one of it benefit programs, and (ii) increased the benefits it could offer to its employees under such program.  As to (i), the court found that there was no contemporary evidence that it had purchased the COLI policies to provide such funding; that the COLI policies were not designed to fund such benefits; that the

NYLIB1/801884/2

KPMGZ12060180

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 65

taxpayer's CFO never told the entity that was planning the COLI transactions that the purpose was to fund the benefit program; and that projections showed that the cash flow from the program was needed to pay future interest and premiums as opposed to being available t fund the benefits plan. As to (ii), the court found that the described additional benefits were not related to the COLI program.

In Compaq Computer Corp. v. Comm'r, 113 T.C. No. 17 (1999) the court disallowed foreign tax credits associated with dividends on certain American Depositary Receipts. Among the factors taken into account was that the officer of the taxpayer in charge of the investments made no inquiry into the commercial aspects of the transactions.

Lastly, in ACM Partnership v. Comm'r, supra, and Saba Partnership v. Comm'r, T.C. Memo. 1999-359, involving similar transactions, the courts found that the purported business purposes of the transactions were unsupported by the evidence and, similar to the foregoing cases, the individuals involved with execution of the transaction did not exhibit behavior consistent with trying to achieve the purported commercial purposes.

The common thread in these cases is that to have the requisite business purpose to support the tax benefits achieved, there must be a purported commercial reason for engaging in the various transactions, the transaction must be consistent with such reason, and such reason must be supportable by contemporary evidence, including a showing that the transaction was handled in a business-like manner. This analysis is supported by a number of cases.

For example, in Levy v. Comm'r, 91 T.C. 838 (1988), the taxpayers entered into a sale-leaseback of computer equipment for the asserted reason of diversifying their business and investments. In upholding the tax benefits the court stated:

> Based upon our careful examination of the relevant facts and evidence in this case, we conclude that petitioners entered into the transaction in issue for sound business reasons (namely to diversify their investments by entering into a legitimate long-term investment involving the purchase and leaseback of computer equipment). Petitioners approached the decision to enter into this transaction in a businesslike manner. Petitioner's financial advisor thoroughly and in good faith investigated the proposed purchase-leaseback transaction. He prepared cash flow analyses which

NYLIB1/801884/2

KPMGZ12060181

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 66

> included the components of the transaction that were critical to
> earning a profit on the investment. Those components included the
> current fair market value and projected residual value of the
> equipment, the fair rental value of the lease, and the rent
> participation agreement. He explained to petitioners the
> significance of and risks associated with the projected residual
> value of the equipment and the rent participation agreement. In
> addition, he explained to petitioners the tax consequences of the
> transaction. Petitioners also retained a law firm with expertise in
> leasing transactions to investigate the financial status and
> creditworthiness of each participant involved in the transaction, to
> investigate each participant's business reputation, and to handle the
> legal aspects of this complex transaction.
>
> We are satisfied that petitioners had a good faith and substantial
> business purpose for entering into the transaction. Petitioners
> participated in the purchase leaseback transaction only after they
> were convinced that the investment had a reasonable possibility of
> producing a profit.

91 T.C. 838, 855-856. Similarly, see Pearlsten v. Comm'r, T.C. Memo. 1989-621; Rubin v.
Comm'r, T.C. Memo. 1989-484.

In Caruth Corp. v. Comm'r, 865 F.2d 644 (5th Cir. 1989), aff'g 688 F. Supp.
1129 (N.D. Tex. 1987), the issue was whether a charitable contribution would be allowed for a
contribution of stock of a controlled corporation after the dividend was declared, but before the
dividend record date. The court upheld the deduction in part upon finding that lag between the
declaration and record dates had a business purpose:

> [Taxpayer] contends that the distinction between the two dates was
> designed to encourage his nephews… to sell their shares to
> him….The lag between the declaration date and record dates was
> designed to give the nephews an opportunity to sell. The plan
> failed in this respect; the nephews held their shares.
>
> The district court made factual findings that the [taxpayer] wished
> to buy out his nephews' interests in North Park Incorporated, and
> that he believed declaration of a dividend might facilitate this
> objective. We review these findings pursuant to the clearly
> erroneous standard, and find clear support in the record. With

NYLIB1/801884/2

KPMGZ12060182

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 67

> these factual findings in place, we believe it obvious that the
> distinction between declaration and record date did, as [taxpayer]
> contends, serve a legitimate business purpose.

865 F.2d at 650

Lastly, it should be noted that a transaction can have an appropriate business purpose even if the transaction itself does not generate a profit. For example, in Chisolm v. Comm'r, 79 F.2d 14 (2nd Cir. 1935), cert. denied 296 U.S. 641 (1935), the court held that the desire to pool and jointly manage assets was adequate business purpose to own and manage such assets through a partnership. See Caruth v. Comm'r, supra; Horn v. Comm'r, 968 F.2d 1229 (D.C. Cir. 1992).

As stated above, Investor/S Corp believed that Investor/S Corp had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits. Also as stated above, Investor contributed the Options to S Corp and S Corp contributed the Options to Fund for substantial non-tax business reasons, including use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst. These reasons the Transactions will more likely than not satisfy any business purpose requirement for Investor's entering into the Transactions in the first instance and for contributing the Options to S Corp and causing S Corp to contribute the Options to Fund I. The IRS might assert that Investor could have accomplished the same result by contribution cash to S Corp and having S Corp or Fund acquire the Options, and that there was no business purpose for the form chosen by Investor. However, long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69 F. 2d 809 (2d Cir. 1934). Therefore, a taxpayer is free to choose the most tax-favored method of accomplishing an economic result without any business justification for the method chosen, so long as that method is no more circuitous than another and the transaction itself has the requisite business purpose.

ii.     **Economic Substance**

It is well established that a transaction or series of transactions may not be respected for tax purposes unless the transaction or transactions have economic substance separate and distinct from the economic benefit derived from tax reduction. Gregory v.

NYLIB1/801884/2

KPMGZ12060183

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 68

Helvering, 293 U.S. 465 (1935). Transactions failing to meet this standard lack the requisite "economic substance" (often interpreted as a having a reasonable possibility of pre-tax profit) and so will not be respected for tax purposes. However, the Supreme Court has held that a transaction should be respected if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". Frank Lyon Co. v. U.S., 435 U.S. 561, 583-584 (1978). Thus, transactions have been upheld where the transactions were designed to achieve a tax benefit, but were endowed with positive pretax economics. See e.g. Northern Indiana Public Service Company v. Comm'r, 105 T.C. 341 (1995), aff'd, 115 F.3d 506 (7th Cir. 1997).

> The Yosha decision articulated the standard slightly differently:

>> A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages—may indeed have had no other interest in the transaction."

Yosha v. Comm'r, supra, 861 F.2d at 499

It should be noted that a taxpayer need not be correct in its judgment of possible economic benefits, only reasonable or rational. Profit motive depends on the taxpayer's subjective and good faith intent to earn a profit. Finoli v. Comm'r, 86 T.C. 697, 722 (1986). The fact that a venture fails to produce a profit in the anticipated amount or at all does not indicate that the venture was not profit-motivated. King v. U.S., 545 F.2d 700, 708 (10th Cir. 1976). However, that profit potential cannot be illusory. In ACM Partnership v. Comm'r, supra, the Tax Court found that at the time it entered into the partnership, the taxpayer's only real opportunity to earn a profit was through an increase in the credit quality of the issuers of certain notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. The court found no impact on credit quality was possible as the lenders were extremely highly rated at the time of the transaction. Moreover, the court did a 6-year review of 3-month LIBOR rates and did not find an increase of even 300 basis points in the necessary time frame. Since the analysis of the historical data showed no reasonable basis for expecting a profit, the court ruled against the

NYLIB1/801884/2

KPMGZ12060184

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 69

taxpayer. "We do not suggest that a taxpayer refrain from using the tax laws to the taxpayer's advantage. In this case, however, the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance." In its analysis, the Third Circuit focused upon the foregoing finding of the Tax Court, stating:

> Tax losses such as these, which are purely an artifact of tax
> accounting methods and which do not correspond to any actual
> economic losses, do not constitute the type of 'bona fide' losses
> that are deductible under the Internal Revenue Code and
> regulations.

157 F.3d at 252. The Third Circuit also noted:

> [O]n November 3, 1989, [the partnership] invested $175 million of
> its cash in private placement Citicorp notes paying just three basis
> points more than the cash was earning on deposit, then sold the
> same notes 24 days later for consideration equal to their purchase
> price, in a transaction whose terms had been finalized by
> November 10, 1989, one week after [the partnership] acquired the
> notes. These transactions . . . offset one another and with no net
> effect on [the partnership]'s financial position.

See also Saba Partnership v. Comm'r, supra, Merryman v. Comm'r, 873 F.2d 879 (5th Cir 1989) (conduit partnership without economic substance disregarded).

In Compaq Computer Corp. v. Comm'r, supra, in addition to finding no business purpose for the transactions, the Tax Court also found a lack of economic substance. This was because as the transactions were designed and executed, the taxpayer was bound to suffer a pre-tax loss. The Tax Court reached a similar conclusion for the same reason in Winn-Dixie Stores Inc. v. Comm'r, supra.

From these cases it appears that the "substance" necessary to meet the requirements of the "economic substance" doctrine is somewhat different from the "substance" required under the "sham in substance" doctrine. As discussed above, the latter requires that the transaction have the economic consequences consistent with what the transaction purports to be:

KPMGZ12060185

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 70

Does the taxpayer really have the economic incidents of ownership if the taxpayer purports to own the asset?  The former requires that, having passed the "sham in substance" test, the transaction make economic sense: Does the taxpayer have a reasonable possibility of economically benefiting from the transaction without regard to tax benefits?

Sheldon v. Comm'r, 94 T.C. 738 (1990) is inconsistent with the economic substance cases, in its suggestion that that there must be not only a reasonable possibility of making a profit, but also the possibility must relate to a profit that is greater than de minimis.[17] A handful of other decisions have indicated in the context of Code Section 165(c)(2), discussed below, that the court should consider whether the profit motive for a transaction was greater or less than the tax motive.  See e.g. Fox v. Comm'r, 82 T.C. 1001 (1994); Estate of Baron v. Comm'r, 83 T.C. 542 (1984), aff'd, 798 F.2d 65 (2d Cir. 1986).  However, to date these cases appear to represent a minority view.  Thus, the tax benefits achieved in a transaction should not be denied under the economic substance doctrine merely because the transaction's principal purpose was to achieve such tax benefits.  See e.g. Northern Indiana Public Service Co. v. Comm'r, supra.  Congress has precluded such a broad test for all disallowance by incorporating such a principal purpose test into specific Code Sections such as Code Section 269.  Long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible".  Helvering v. Gregory, 69 F. 2d 809 (2d Cir. 1934). See also, Cottage Savings Association v. Comm'r, 499 U.S. 554 (1991), upholding tax benefits achieved by a transaction executed solely for tax purposes.

In Notice 99-59, 1999-52 IRB 1 (December 9, 1999), the IRS announced that it would challenge "certain types of transactions" designed to generate a non-economic tax loss. The IRS stated that the transactions are "cast in a variety of forms".  In one "typical arrangement", a partnership contributes capital to a newly-organized foreign corporation, which borrows a roughly equal amount from a bank.  The corporation acquires securities with the loan

---

[17]     On December 23, 1997, the IRS issued Notice 98-5, announcing that the IRS will issue regulations effective on and after such date dealing with foreign taxes paid or accrued in connection with certain abusive transactions. Such transactions were described as those in which the anticipated economic benefits are insubstantial in relationship to the anticipated tax benefits. It is currently uncertain as to when or whether such regulations will be issued, the criteria they will establish with respect to the insubstantiality of anticipated economic benefits, or whether such regulations will have application beyond the area of foreign taxes.

KPMGZ12060186

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 71

proceeds, and then distributes these securities to the partnership as a dividend, thus reducing the value of the corporation to zero. However, since the dividend is paid subject to the bank debt, the amount of the distribution is treated as zero, so the partnership recognizes no income and retains his original basis in the corporation's shares. Ultimately, the corporation pays off the bank debt with the proceeds of the original capital contribution, and the partnership disposes of the shares of the corporation, recognizing a tax loss equal to the amount of the original capital contribution even though economically the partnership is back where it started. The IRS concluded that "In the view of the Service and the Treasury Department, the arrangement described above (or any similar arrangement) does not produce an allowable loss." The Transactions are factually wholly unlike the arrangement described in Notice 99-59, are based on entirely different tax principles, and so are not a "similar arrangement".

Lastly, in Salina Partnership LP, FLP Group, Inc. v. Comm'r, supra, a partnership had been previously formed by an investment bank and made a series of investments. Understanding from the investment bank that the purchase of 50% or more of the interests in the partnership would provide certain tax benefits, the taxpayer purchased 98% of the outstanding partnership interests. The IRS conceded that the partnership was profitable and such profitability provided the taxpayer with sufficient profit motive to imbue the *post-purchase portion* of the transaction with economic substance. However the IRS contended that the pre-purchase part of the transactions did not have sufficient economic substance and, accordingly the taxpayer's tax benefits achieved through the transaction should be denied. The court stated that although the purchase of the partnership interest provided the taxpayer with a perceived tax benefit, "this factor, standing alone, is insufficient to render the transaction a sham in substance". The court found that the investment in the partnership provided the taxpayer with a reasonable opportunity to earn profits independent of tax benefits, and that such opportunity imbued the entire transaction with a sufficiently valid business purpose to give the transaction the economic substance necessary to be respected.

### (c)    Conclusion

Based upon the representations provided by Investor in II, above, it is more likely than not that the Transactions will have the requisite economic substance and business purpose to be respected under the authorities discussed above.

KPMGZ12060187

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 72

### 2. **Code Section 165**

#### (a) **In General**

Code Section 165(a) provides:

> There shall be allowed as a deduction any loss sustained during the
> taxable year and not compensated for by deduction or otherwise.

Treas. Reg. §1.165-1 further provides that for the loss to be allowable under Code
Section 165(a) the loss must be evidenced by closed and completed transactions, fixed by
identifiable events, and be actually sustained during the taxable year; that the loss be a bona fide
loss; and that substance rather than form should govern. The loss arising in connection with the
Transactions is evidenced by closed and completed events and fixed by an identifiable event, the
disposition of the Foreign Currency, and as discussed above, it is more likely than not that the
loss will be treated as being bona fide (as opposed to being treated as a sham) and as having
sufficient economic substance to be sustained. Consequently, it is more likely than not that the
loss from the disposition of the Foreign Currency will meet the requirements of Code Section
165(a).

However, it is possible that the IRS would contend otherwise. In Rev. Rul. 2000-
12, 2000-11 IRB 1, Situation 1, a corporation purchased two privately placed debt instruments
from unrelated issuers for $1,000,000. The notes bore interest at a fixed rate adjusted for a
contingency as of a reset date. In the case of one note, if the contingency occurred, the interest
rate would double, but if it did not occur, the interest rate would be reduced to zero. In the case
of the other note, the effects of the contingency were reversed. As a result, at the time the notes
were purchased, based upon their structure on the reset date it could be expected that the value of
one note would increase while the value of the other note would decrease by approximately the
same amount. As a further result, the amount of the tax loss suffered with respect to the note that
declined in value significantly exceeded the amount of the economic loss suffered by the
taxpayer on the two notes. Thus, the Ruling compared the tax loss on one instrument to the
economic loss from the combined position. The Ruling concluded that the loss on the note that
declined in value was not allowable because it did not reflect actual economic consequences. As
support for its position, that such a loss was not "bona fide" and did not reflect "actual economic
consequences", the Ruling cited <u>ACM Partnership v. Comm'r</u>, <u>supra</u>; <u>Scully v. U.S.</u>, 840 F.2d

NYLIB1/801884/2

KPMGZ12060188

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 73

478 (7th Cir. 1988); and <u>Shoenberg v. Comm'r</u>, 77 F.2d 446 (8th Cir.) 1935).  See also, Notice 99-59, 1999-52 IRB 761, in which the IRS took the same position in reliance on the same authorities.  In addition, the Ruling cited <u>Lerman v. Comm'r</u>, 939 F.2d 44 (3rd Cir. 1991), <u>cert. denied</u>, 502 U.S. 984 (1991) , and <u>Keane v. Comm'r</u>, 865 F.2d 1088 (9th Cir. 1989).

 In <u>ACM Partnership v. Comm'r</u>, <u>supra</u>, the Third Circuit Court of Appeals did in fact adopt the concept of a bona fide loss.  However, the taxpayer in <u>ACM</u> acknowledged in its own submissions that the transaction was structured so that the securities in issue were purchased and sold at the same price.  The Court of Appeals stated:

> As the Supreme Court emphasized in <u>Cottage Savings</u>, deductions are allowable only where the taxpayer has sustained a "bona fide " loss as determined by its "[s]ubstance and not mere form." According to ACM's own synopsis of the transactions, the contingent installment exchange would not generate actual economic losses.  Rather, ACM would sell the Citicorp notes for the same price at which they were acquired, generating tax losses which offset precisely the tax gains reported earlier in the transaction with no net gain or loss from the disposition.  Tax losses such as these, which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses do not constitute the type of "bona fide" losses that are deductible under the Code and regulations. [citations omitted]

Thus, the Court of Appeals denied the allowance of a loss arising from the purchase and sale of a security in a manner akin to a "repo" or a "reverse repo" transaction, which is generally treated as a lending transaction rather than a sale upon which gain or loss is recognized.

 To try to get an understanding of the Court of Appeals' concept of a bona fide loss it is useful to examine footnote 31.  Footnote 31 provides:

> While it is clear that a transaction such as ACM's that has neither objective non-tax economic effects nor subjective non-tax purposes constitutes an economic sham whose tax consequences must be disregarded, and equally clear that a transaction that has both objective non-tax economic significance and subjective non-tax purposes constitutes an economically substantive transaction whose tax consequences must be respected, its is also well

NYLIB1/801884/2

KPMGZ12060189

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 74

> established that where a transaction objectively affects the
> taxpayers net economic position, legal relations, or non-tax
> business interests, it will not be disregarded merely because it was
> motivated by tax considerations. See, e.g., Gregory, 293 U.S. at
> 468-69, 55 S. Ct. at 267 ("if a reorganization in reality was
> effected... the ulterior purpose will be disregarded"), Northern
> Indiana Pub. Serv. Co., 115 F.3d at 512 (emphasizing the Gregory
> and its progeny "do not allow the Commissioner to disregard
> economic transactions...which result in actual, non-tax-related
> changes in economic position" regardless of tax avoidance motive"
> and refusing to disregard role of the taxpayer's foreign subsidiary
> which performed a "recognizable business activity" of securing
> loans and processing payments for parent in foreign markets in
> exchange for legitimate profit); Kraft Foods Co. v. Comm'r, 232
> F.2d 118, 127-128 & n. 19 (2d Cir. 1956) ( refusing to disregard
> tax effects of debenture issue which "affected ... legal relations"
> between taxpayer and corporate parent by financing subsidiary's
> acquisition of venture used to further its non-tax business
> interests). In analyzing both the objective and the subjective
> aspects of ACM's transaction in this case where the objective
> attributes of an economically substantive transaction were lacking,
> we do not intend to suggest that a transaction which has actual,
> objective effects on a taxpayer's non-tax affairs must be
> disregarded merely because it was motivated by tax considerations.

In the instant case, as discussed above, the Transactions were motivated by non-tax reasons and so more likely than not will not be treated as "shams in substance", and none of the transactions occurred at predetermined prices that would insure no economic change of position for Fund, as was the case for the so-called Citicorp notes in the ACM case. Consequently, it is more likely than not that the reasoning set forth in ACM for concluding a loss is not "bona fide" will not be applicable to the loss sustained from the Transactions.

Rev. Rul. 2000-12, supra, also cited Scully v. U.S., supra, and Shoenberg v. Comm'r, supra, for the proposition that the losses described in the Ruling were not "bona fide". In Scully, the Seventh Circuit Court of Appeals held that there was no deductible loss involving the sale of real estate by trustees of the family trust to other family trusts with the same fiduciaries, beneficiaries and remaindermen. This disposition merely resulted in a reshuffling of assets which resulted in no "genuine economic loss" because the taxpayer retained control over

NYLIB1/801884/2

KPMGZ12060190