**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 75

the property – i.e., the sale was effectively a circular transaction with no economic substance. Citing from 7J. Mertens, Law of Federal Income Taxation §28.26 (1980), the Court of Appeals relied upon the following principle for its conclusion that the loss incurred on the sale of the real estate was not deductible:

> Losses will not be allowed which are claimed in connection with transactions which do not vary control or change the flow of economic benefits....[A taxpayer] will not be permitted to transfer assets from one pocket to another and take a loss thereby where he remains at the conclusion of the transfer the real owner of the property, either because of retention of title, command over the property, either directly or through the person who appears as the nominal vendee or transferee.

In the instant situation, Fund I did not continue to own, beneficially or otherwise, the asset, i.e. the Bonds, the disposition of which generated a loss. Accordingly, the reasoning set forth in Scully for denying a loss deduction is not applicable to the loss sustained from the Transactions.

In Schoenberg, the Eighth Circuit Court of Appeals held that there was no deductible loss where an investor sold stock at a loss and on the same day bought the same number of identical shares through his investment company. A little more than thirty days later, the investor purchased the shares from his investment company at a lower price than that for which he had originally sold them. The Court of Appeals denied the investor's loss deduction, stating that: "where such sale is made as part of a plan whereby substantially identical property is to be reacquired and that plan is carried out, the realization of loss is not genuine and substantial; it is not real". Economically, the transaction was again a circular transaction with no economic substance. Schoenberg, like Scully, is a case in which the court held that a loss was not realized by the taxpayer because the taxpayer held the same beneficial interest in the purportedly sold assets both before and after the sales. As previously stated, in the instant situation I did not continue to own, beneficially or otherwise, the asset the disposition of which resulted in a loss. Accordingly, the reasoning set forth in Schoenberg for denying a loss deduction also is not applicable to the loss sustained from the Transactions.

Rev. Rul. 2000-12, supra, also cited Lerman v. Comm'r, supra, and Keane v. Comm'r, supra, for the proposition that courts have disallowed loses from option straddle transactions that were found to be devoid of economic substance, where the trades were

NYLIB1/801884/2

KPMGZ12060191

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 76

prearranged to generate a loss for tax purposes while deferring offsetting gain. These cases are only two of many involving the so-called "London option transactions". In each of the cases in which the loss was denied, the denial was based upon the inability of the taxpayer to make a profit from the transaction, i.e. that the transactions did not meet the standards, discussed above, regarding economic substance and business purpose In the instant situation, it is more likely than not that the Transactions did have the requisite economic substance and business purpose. Accordingly, the reasoning set forth in these cases for denying a loss deduction also is not applicable to the loss sustained by Investor in the Transactions.

Furthermore, there is no support for the implication in Rev. Rul. 2000-12, supra, that the mere existence of offsetting position means a loss is not "bona fide". Code Section 1256 was added Code Section 1256 to the Internal Revenue Code by the Economic Recovery Tax Act of 1981. Among other reasons stated in the General Explanation of the Economic Recovery Tax Act of 1981 (the "General Explanation"), Congress enacted Code Section 1256 "to prevent taxpayers from claiming the tax benefits which were allegedly obtained by using a futures straddle as a tax shelter". Thus, Code Section 1256 was enacted to address the abuse that the courts sought to address in the "London option transactions" cases. It did so not through an outright disallowance of any losses inherent in such positions, but rather by accelerating the tax consequences of holding such positions by marking to market the positions at the close of the taxable year or upon certain other events. Thus, in those situations in which the offsetting positions are entered into with the requisite economic substance and business purpose, it would appear that losses arising from the offsetting positions should be allowed unless they are restricted by Code Section 1256. Code Section 1092 was also adopted by the Economic Recovery Tax Act of 1981 to deal with offsetting positions. The Tax Court in Smith v. Comm'r, 78 T.C. 350 (1982), aff'd without published opinion, 820 F.2d 1220 (4th Cir. 1987), refused to find a non-statutory wash sale rule that would deny the losses and looked to the adoption of Code Section 1092 by the Economic Recovery Tax Act of 1981 as evidence that the mere existence of offsetting positions was not enough to deny a loss. Although ultimately finding for the IRS and against the taxpayer, the losses were denied on the grounds that there was an absence of a sufficient profit motive. Accordingly, it is more likely than not that the mere existence of offsetting positions will not be enough to allow the IRS to successfully contend that a loss arising therefrom is not "bona fide".

KPMGZ12060192

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 77

Based upon the foregoing, it is more likely than not that the loss sustained from the Transactions will be allowable under Code Section 165(a).

### (b) Code Section 165(c)(2) and Code Section 183

Notwithstanding that the loss sustained from the Transactions meets the requirements of Code Section 165(a) and the Transactions have the requisite economic substance and business purpose, Code Sections 165(c) and 183, impose additional limitations on the ability of individuals[18] to claim losses. Code Section 165 applies to loss deductions, and Code Section 183 applies to all deductions. If an individual incurs a loss from the disposition of assets in the individual's trade or business or in a transaction entered into for profit, Code Sections 165(c) and 183 generally permit the allowance of such loss.

If an individual incurs a loss in the individual's trade or business, Code Section 165(c)(1) generally permits the allowance of such loss. In determining whether such a business exists, the courts have required that the criteria of Code Section 183 be met. See Farmer v. Comm'r, T.C. Memo 1994-342. The determination of whether a transaction has been undertaken for profit for purposes of Code Section 183 is based on all the facts and circumstances. Treas. Reg. §1.183-2(b) lists nine specific factors that are to be taken into account in making this determination. This regulation also provides that "[a]lthough a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity... with the objective of making a profit". While there has been substantial litigation regarding whether such motive exists, the cases have established that a taxpayer need only have a good faith expectation of earning a profit from the activities undertaken. See e.g. Burger v. Comm'r, 809 F.2d 355 (7th Cir. 1987); Johnson v. U.S., 11 Cl. Ct. 17 (1986).

If an individual incurs a loss in a transaction which does not involve the individual's trade or business, Code Section 165(c)(2) and Treas. Reg. §1.165-1(e) require, like Code Section 183(a) and Treas. Reg. §1.183-1, that the loss be incurred in a transaction entered

---

[18]    In the case of a partnership (or entity treated as a partnership) Code Section 165(c)(3) is applied at the partnership level.

KPMGZ12060193

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 78

into for profit. Thus, these statutory and regulatory provisions mirror the Code Section 183 standard.

Notwithstanding the parallel nature of Code Section 183(a) and Code Section 165(c)(2), courts have imposed a judicial gloss that appears to create a standard higher than that imposed by the statutes, i.e., that the taxpayer's profit motive be the "primary" motive for entering into the transaction. The first case that did so was Fox v. Comm'r, supra. The Tax Court in Fox derived this primary profit motive test from a footnote in Helvering v. National Grocery Co., 304 U.S. 282, 289 n.5, reh'g denied, 305 U.S. 669 (1938), which involved the constitutionality of the accumulated earnings tax. The footnote stated in relevant part:

> Similarly, the deductibility of losses under [Code Section 165(c)(2)] may depend upon whether the taxpayer's motive in entering into the transaction was *primarily profit*. [emphasis added].

In addition, the Tax Court in Fox relied on an earlier Tax Court case involving the deductibility of a loss under Code Section 165(c)(2), Smith v. Comm'r, supra. In Smith, however, the Tax Court did not impose the "primary" test articulated in Fox, but rather stated at p. 391:

> The mere fact that petitioners may have had a strong tax avoidance motive in entering into their commodity tax straddles does not in itself result in a disallowance of petitioners' losses under Section 165(c)(2), provided petitioners also had a non-tax profit motive for their investments at the time, See, Knetsch v. U.S., 172 Ct. Cl. 378, 348, F. 2d 932, 936-937 (1965). Such hope of deriving an economic profit aside from the tax benefits *need not be reasonable so long as it is bona fide*. See, Bessenyey v. Comm'r, 45 T.C. 261, 274 (1965), aff'd 379 F.2d 252 (2nd Cir. 1967). [emphasis added].

Both the Fox and Smith cases, as well as the bulk of subsequent cases involving the application of the "primary" standard, arose in connection with commodities straddle transactions in which looking at the transactions as a whole, the taxpayer had little or no

NYLIB1/801884/2

KPMGZ12060194

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 79

opportunity to earn any meaningful profit.[19]  Neither the Knetsch case nor the Bessenyey case cited by the Tax Court in Smith required the profit motive of the taxpayer to be the primary standard for engaging in the transactions in issue, although the Knetsch decision did refer to the National Grocery Co. Supreme Court decision discussed above.

When a court has thoughtfully attempted to deal with the primary standard, the results have often yielded confusion.  For example, in Nickson v. Comm'r, 962 F.2d 973, 976 (10th Cir. 1992), a case involving the application of Code Section 183, the court first appeared to apply the primary standard by requiring that the taxpayer engage in the transaction with the "dominant hope and intent to realizing a profit", but then went on to provide that "the determination crucial to the instant case [is]-whether the taxpayers had an actual and honest profit objective".  See also, Nickerson v. Comm'r, 700 F.2d 402, 404 (7th Cir. 1973).

This confusion may be due in part to the fact that in Fox v. Comm'r, supra, which first applied the primary standard in the context of Code Section 162(c)(2), the taxpayers had little or no opportunity to make more than a relatively small fixed economic profit from the commodity straddle transactions into which the taxpayer entered.  Such a situation is unlike the instant case in which, based on the Representations from Investor, based on Investor's own independent evaluation, Investor believed that Investor had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits.  Such a profit potential is more analogous to the situation in Smith v. Comm'r, supra.  Consequently, based on the Summary at I, above, the Representations at II, above, and the rationale applied in Smith v. Comm'r, supra, it is more likely than not that the requisite profit motive exists to support the deduction of any loss arising to Investor from the Transactions under Code Section 165(c)(2) and under Code Section 183.

---

[19]    The Tax Court in Sheldon v. Comm'r, supra, applied these principles where in certain of the transactions before the Court the taxpayer demonstrated that it could have made a profit. The Tax Court denied the claimed deductions stating that: "[i]n instances where intermediate repos would have or did generate some form of [positive] carry, these amounts were nominal, either fixed or short term and stable and, in any event merely reduced the fixed losses by relatively insignificant amounts." It should be noted that the Tax Court ultimately found that even what nominal profit there was in Sheldon was absorbed by losses on related and, arguably, integrated transactions. 94 T.C. 738, 768 and 769. See also Est. of Baron v. Comm'r, supra

NYLIB1/801884/2

KPMGZ12060195

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 80

### (c)    Notice 2000-44

### i.    Description of Notice 2000-44

On August 11, 2000, the IRS released Notice 2000-44, supra. The Notice describes certain arrangements that the IRS and the Treasury believe "have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests".

One version of the arrangements addressed in the Notice is described as follows:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

NYLIB1/801884/2

KPMGZ12060196

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 81

Among other things, the Notice states that "[t]he purported losses resulting from the transaction described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of section 165".

## ii.    Authority to Issue Notice 2000-44

IRS Notices are issued under the statutory authority of Code Section 7805(a) which states: "the Secretary [of the Treasury]...shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. Furthermore, authority for the issuance of Notices exists in Treas. Reg. §301.7805-1(a) which states: "[t]he Commissioner [of the Internal Revenue Service], with the approval of the Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of the Code ... including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue". However, Section 7805(b)(1)(C) of the Code limits the express statutory authority for Notices to those "substantially describing the expected contents of any temporary, proposed, or final regulation".

Under Code Section 7805(b)(1)(C), a proposed, temporary, or final Treasury Regulation may be given retroactive effect to the date on which, among other things, "any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public". It appears that the rationale for granting this statutory authority was to enable the Treasury Department and the IRS to secure retroactive effect for intended future Treasury Regulations by giving notice of its intent to issue such Regulations while affording it the appropriate time to properly substantially and procedurally issue such regulations. Therefore, we believe that the retroactive application of Treasury Regulations to the date of the issuance of the Notice as provided in Code Section 7805(b)(1)(C) requires the Notice to contain some indication of an intent to issue Treasury Regulations. It does not appear that Notice 2000-44 contains such an intent since it neither describes in any detail the contents to be included in a future temporary, proposed, or final regulation nor does it reference any specific intent to issue future regulations under any specific statutory provision. Compare, Notice 97-21, 1997-1 CB 407. Consequently, it is at least questionable whether Notice 2000-44 is properly issued under Code Section 7805.

NYLIB1/801884/2

KPMGZ12060197

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 82

### iii. Legal Weight Accorded an IRS Notice

For purposes of the penalty provisions of Code Section 6662, the IRS considers Notices authority that will be binding on the IRS and can be relied on by taxpayers to the same extent as a Revenue Ruling or a Revenue Procedure.[20] Revenue Rulings do not have the force or effect of Treasury Regulations. Treas. Reg. §601.601(d)(2)(v)(d).

There appears to be only one case in which a court weighed the effect to be given an IRS Notice, and in that case the court treated an IRS Notice as if it were a Revenue Ruling. Constantino v. TRW, Inc., 13 F.3d 969, 980-981 (6th Cir. 1994). Even if one assumes the Sixth Circuit's approach of treating a Notice as a Revenue Ruling is correct, there nonetheless exists a lack of uniformity among the courts in their treatment of Revenue Rulings.

As a general matter, the Tax Court is inclined to treat a Revenue Ruling merely as the view of one of the parties to the litigation. See, e.g., Trinova Corp. and Subsidiaries v. Comm'r, 108 T.C. 68 (1997); Nielson-True Partnership v. Comm'r, 109 T.C.112, 124 n 13 (1997) (citing Gordon v. Comm'r, 88 T.C. 630, 635 and Est. of Lang v. Comm'r, 64 T.C. 404, 407 (1976), aff'd in part and rev's in part 613 F.2d 770 (9th Cir. 1980)). The Tax Court has stated that it considers a Revenue Ruling to be "advisory only" and a mere "useful guide, outlining some of the factors to be considered" in interpreting the Code. Burck v. Comm'r, 63 T.C. 556 (1975), aff'd 533 F.2d 768 (2d Cir 1976). Rather than giving deference to Revenue Rulings, the Tax Court has treated the rulings as "merely the Commissioner's position with respect to a specific factual situation". Pasqualini v. Comm'r, 103 T.C. 1, 8 n. 8 (1994) (citing Tandy Corp v. Comm'r, 92 T.C. 1165, 1170 (1989)).

The Circuit Courts, however, have struggled with the exact deference, if any, to give to Revenue Rulings. The Fifth Circuit has recognized that "revenue rulings are odd creatures, unconducive to precise categorization in the hierarchy of legal authorities. They are

---

[20]    Rev. Rul. 90-91, 1990-2 CB 262. It is also important to note that the authority of the IRS to issue Revenue Rulings is derived directly from its regulatory authority. Treas. Reg. §601.201(a)(5) and §601.601(d)(2)(v) define what constitutes a Revenue Ruling and sets forth its effects. With the exception of Code Section 7805(b)(1)(C), there is no such provision, statutory or regulatory, that provides for either the parameters for issuing Notices or their effect. Thus, for the reasons discussed above, we believe that an argument exists that the IRS does not have the requisite authority to bind taxpayers or courts to a Notice, though the IRS is free to bind itself as it did in Rev. Rul. 90-91.

NYLIB1/801884/2

KPMGZ12060198

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 83

clearly less binding on the courts than treasury regulations or Code provisions, but probably (and in this circuit certainly) more so than the mere legal conclusions of the parties". McLendon v. Comm'r, 135 F.3d 1017 (5th Cir. 1998). Likewise, the Third Circuit Court of Appeals has stated that it will "give weight to IRS revenue rulings and [will] not disregard them unless they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable". Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1145 (3rd Cir. 1993), cert. denied, 511 U.S. 1004 (1994) (quoting Geisinger Health Plan v. Comm'r, 985 F.2d 1210, 1216 (3rd Cir. 1993). Similarly, in discussing a Revenue Ruling, the Fourth Circuit in Wood noted, without holding, that "it is well established that considerable weight is to be given to an agency's construction of a statute that it is charged with administering." Wood v. Comm'r, 955 F.2d 908, 913 (4th Cir. 1992), cert. dismissed 505 U.S. 1231 (1992). Additionally, the Second Circuit has held that a Revenue Ruling is presumed to "have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code". Gillespie v. U.S., 23 F.3d 36, 39 (2d Cir. 1994)(quoting Salomon, Inc. v. U.S., 976 F.2d 837, 841 (2d Cir. 1992). However, the Second Circuit's decisions in Gillespie and Salomon, Inc. seem irreconcilable with its statement in Canisius College v. United States that "the statutory interpretation [of] a revenue ruling does not have the force of law and is of little aid in interpreting a tax statute". Canisius College v. U.S., 799 F.2d 18 n. 8 (2d Cir. 1986) cert. denied 481 U.S. 1014 (1987) (citing Dixon v. U.S., 381 U.S. 68, 73 (1965); Biddle v. Comm'r, 302 U.S. 573, 582 (1938); Temple University v. U.S., 769 F.2d 126, 137 ( 3d Cir. 1985) cert. denied 476 U.S. 1182 (1986)). The Ninth Circuit followed the Second Circuit's opinion in Salomon, Inc. and afforded Rev. Rul. 82-20 "great deference" where the Ruling was neither unreasonable nor inconsistent with the Code. Walt Disney Inc. v. Comm'r, 4 F.3d 735 (9th Cir. 1993).

Notwithstanding this lack of uniformity among the courts as to what weight, if any, to afford Revenue Rulings, the courts "have not looked favorably upon bootstrapping revenue rulings issued shortly prior to or after the initiation of litigation". Ludwig v. Comm'r, 68 T.C. 979 n. 4 (1977) (citing Fribourg Navigation Co. v. Comm'r, 383 U.S. 272, 279 (1966), rev'g 335 F.2d 15 (2d Cir. 1964); Busse v. Comm'r, 479 F.2d 1147, 1152 n. 12 (7th Cir. 1973)). See also, Silco, Inc. v. U.S., 779 F.2d 282 (5th Cir. 1986).

As a result, the weight given to a Revenue Ruling in litigation will generally depend upon the forum chosen. At best, Revenue Rulings will be given little or no weight and at worst a court will give significant deference to a Revenue Ruling. However, the amount of

KPMGZ12060199

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 84

deference, if any afforded to a Revenue Ruling by a court will be further dependent upon the context in which it was issued. Moreover, if the Revenue Ruling is issued in connection with litigation, a court that would otherwise give deference to a Revenue Ruling may give it no weight at all. Consequently, were the IRS to contend that Notice 2000-44 were to apply to the Transactions and a court were to treat the Notice as if it were a Revenue Ruling, it is more likely than not that the Notice does not constitute authority that would bind a court, but could be given significant weight by the court in reaching its conclusion and in that case it would have to be distinguished on the basis of fact or by refuting the legal analysis upon which it relies.

### iv. Application of Notice 2000-44 and the Authorities cited therein to the Transactions

As support for its position in Notice 2000-44 that the losses described therein were not "bona fide" and did not reflect "actual economic consequences", the Notice cited ACM Partnership v. Comm'r, supra; Scully v. U.S., 840 F.2d 478 (7th Cir. 1988); and Shoenberg v. Comm'r, 77 F.2d 446 (8th Cir.) 1935). See also, Rev. Rul. 2000-12, supra, Situation 1, and Notice 99-59, supra, in which the IRS took the same position in reliance on the same authorities. These authorities have been addressed in the context of the Transactions above.

As discussed above, in the instant case the Transactions were motivated by non-tax reasons and so more likely than not will not be treated as "shams in substance." In the instant case, the Transactions were not structured to insure that there was no economic change of position for Investment Fund, as was the case for the so-called Citicorp notes in the ACM case. Consequently, as we discussed above, it is more likely than not that the reasoning set forth in ACM for concluding a loss is not "bona fide" will not be applicable to the loss sustained from the Transactions. With respect to Scully v. U.S., supra, and Shoenberg v. Comm'r, supra, in the instant case neither Initial Member nor Investment Fund continued to own, beneficially or otherwise, the asset that generated a loss. Accordingly, as discussed above, it is more likely than not that the reasoning set forth in Scully and Schoenberg for denying a loss deduction, will not be applicable to the loss sustained from the Transactions. As a result, it is more likely than not that the authorities cited in Notice 2000-44 will not provide a basis for denying the deduction of a loss sustained from the Transactions.

NYLIB1/801884/2

KPMGZ12060200

## BROWN & WOOD LLP

Mr. Carlos Sala
December 31, 2000
Page 85

### 3.  Step Transaction Doctrine

In determining the tax consequences of a series of events, the courts use a step transaction analysis to determine the scope of the transaction to which the tax law should be applied. The step transaction doctrine combines and treats a series of separate steps "as a single transaction if they are in substance integrated, interdependent, and focused toward a particular end result". Bittker & Lokken, Federal Taxation of Income, Estates and Gifts (2d ed.), ¶4.3.5. The courts have articulated three different formulations of the step transaction doctrine: the "binding commitment" test, the "interdependence" test, and the "end result" test. Penrod v. Comm'r, 88 T.C. 1415, 1429 (1987).

It is unclear how the IRS might attempt to apply the step transaction doctrine to the Transactions. One possibility is that the IRS might try to integrate the purchase of the Options with their subsequent transfer to Fund and argue that this integration caused the Options to have been purchased by Fund and not Investor. However, Investor had no binding commitment to make such transfer and the value of the interest in Fund was determined on the date of the transfer. The IRS might also try to disregard Investor's ownership of an interest in Fund on the theory that Investor is economically compelled to dispose of it (to realize the tax loss) and so Investor should not be treated as a partner in Fund. However, because there is no legally binding obligation for Corp to dispose of such interest, as discussed below the "binding commitment" test would not apply. Furthermore, as discussed below, because each transaction set out above (Investor's purchase of the Options, Investor's investment in Fund, Investor's withdrawal from Fund, and Investor's disposition of the Foreign Currency) was independently undertaken, and each transaction presented the relevant party with the potential for economic gain or loss consistent with therewith (e.g., Investor has the economic benefits and burdens of a partner while it is a member of Fund) it is more likely than not that the IRS would be unsuccessful were it to attempt to apply the "mutual interdependence" test to achieve such treatment. Lastly, as discussed below, because each of the transactions had economic significance to each of the parties and the parties had alternatives available to them, it is more likely than not that the IRS would be unsuccessful were it to attempt to apply the "end result" test to achieve such treatment.

Under the "binding commitment" test, a series of transactions are integrated only if there is a binding legal commitment to undertake each of the steps. Comm'r v. Gordon, 391 U.S. 83, 96 (1968). It is more likely than not that this formulation would not apply to the Transactions,

NYLIB1/801884/2

KPMGZ12060201

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 86

because Investor was not bound in any way to purchase or sell the Options, to contribute the Options to Fund, or to withdraw from Fund.

Under the "interdependence" test, a series of transactions are integrated only if the steps are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series". Manhattan Building Co. v. Comm'r, 27 T.C. 1032, 1042 (1957), acq., 1957-2 CB 5. The interdependence test focuses on whether the first step would have occurred without the second. For example, in Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517 (10th Cir. 1991), the court applied the interdependence test to integrate two purportedly independent transactions and deny the claimed loss because the two agreements were, by their terms, dependent on each other. Unlike the factual situation in Associated Wholesale Grocers, each transaction set out above (Investor's purchase of the Options, Investor's investment in Fund, and Investor's withdrawal from Fund) was independently undertaken by Investor, and each transaction presented Investor with the potential for economic gain or loss. See also, Security Industrial Insurance Co. v. United States, 702 F.2d 1234 (5th Cir. 1983). Where each step has independent economic significance, the courts will not integrate the steps. Redding v. Comm'r, 630 F.2d 1169 (7th Cir. 1980), cert. denied, 450 U.S. 913 (1981). In Rev. Rul. 79-250, 1979-2 CB 256, mod., Rev. Rul. 96-29, 1966-1 CB 59, the IRS agreed, but also inserted a requirement that each step must be "undertaken for valid business purposes and not mere avoidance of taxes".

Based upon the foregoing, it is more likely than not that each step undertaken by Investor will be viewed as independent from the others and, consequently, it is more likely than not that the "interdependence" formulation of the step transaction doctrine will not be applicable to the transactions. Furthermore, even adopting the position of the IRS in Rev. Rul. 79-250, based on the representations made to us, each of the transactions undertaken by Investor and Fund were supported by a reasonable expectation of profit.

The "end result" formulation integrates a series of transactions into a single transaction "when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result". King Enterprises, Inc. v United States, 418 F.2d 511, 516 (Ct. Cl. 1969). The courts, however, have limited the expansive scope of the end-result test.

NYLIB1/801884/2

KPMGZ12060202

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 87

In Esmark, Inc. v. Comm'r, 90 T.C. 171 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989), the taxpayer wanted to dispose of certain businesses owned by one of its subsidiaries. Mobil, an unrelated company, acquired a portion of Esmark's outstanding shares from the public in a tender offer, and then tendered these shares to Esmark in exchange for stock of a wholly owned subsidiary of Esmark. Under the law at the time, the exchange of the subsidiary's stock for the Esmark shares was tax-free at the corporate level. By contrast, a sale of the subsidiary's stock for cash, which could then have been used to buy back the Esmark shares, was taxable at the corporate level.

Although it recognized that the reduction of taxes was a significant factor in structuring the transaction, that Mobil's tender offer was part of an overall plan, and that Mobil, not Esmark, had borne the economic cost of the tender offer, the Tax Court held that Mobil's ownership of the Esmark shares, "however transitory," must be respected, and the transaction treated as a redemption of the Esmark shares. In rejecting the IRS's attempt to apply the step transaction doctrine to recast the transactions, the court stated:

> That Mobil's tender offer was but part of an overall plan is not in dispute. The existence of an overall plan does not alone, however, justify application of the step-transaction doctrine. Whether invoked as a result of the "binding commitment," "interdependence," or "end result" tests, the doctrine combines a series of individually meaningless steps into a single transaction. In this case, respondent has pointed to no meaningless or unnecessary steps that should be ignored.
>
> Respondent proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. This recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner.

90 T.C. at 195-197. The court further noted that each of the steps "had permanent economic consequences," and could not be combined. 90 T.C. at 198. See also, Grove v. Comm'r, 490 F2d 241 (2d Cir. 1973) and Carrington v. Comm'r, 476 F2d 704 (5th Cir. 1973). The Tax Court

KPMGZ12060203

Case No. 1:05-cv-00636-LTB-KLM   Document 44-35   filed 12/13/05   USDC Colorado   pg 14 of 40

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 88

subsequently reaffirmed the Esmark step transaction analysis. Turner Broadcasting System v. Comm'r, 111 T.C. 315 (1998).[21]

More recently, in True v. U.S., 190 F.3rd 1165 (10th Cir. 1999), the Court of Appeals affirmed the District Court's summary judgement in favor of the IRS regarding the integration of one series of transactions under the "end result" formulation of the step transaction doctrine, where the evidence clearly showed that the end result intended from the outset was the sole outcome intended to be achieved by entering into the transactions from the outset. With respect to such series of transactions, the Court of Appeals also concluded that such integration would be appropriate under the "mutual interdependence" formulation as well, because the facts showed that each of the steps would have been fruitless without the others. The Court of Appeals, however, reversed the District Court's summary judgement integrating another series of transactions. The Court of Appeals concluded that there was a factual issue under the "end result" formulation, because the evidence created a genuine factual issue as to whether the end result achieved was the sole intended result from the outset. The Court of Appeals concluded that there similarly was a factual issue under the "mutual interdependence" formulation, because it appeared that the each of the steps might have economic significance on its own. The conclusion that can be drawn from the True decision appears to be that if the facts demonstrate that at the time of entering into series of transactions an investor has in mind a sole outcome and no other outcome can be discerned, a court can apply the "end-result" formulation of the step transaction doctrine to disregard intermediate steps, particularly if those intermediate steps had a little economic significance on their own to fall within the "mutual interdependence" formulation.

In both Salomon, Inc v. U.S., 976 F.2d 837 (2d Cir. 1992) and Walt Disney, Inc. v. U.S., 4 F.3d 735 (9th Cir. 1993), the issue was whether a transfer of assets to a subsidiary as part of a divisive "D" reorganization resulted in the recapture of investment credit. While both courts seemed to apply the "end result" formulation to integrate the transfer of assets and subsequent

---

[21]   The IRS agrees that the step transaction doctrine does not permit the creation of new steps or the reordering of existing steps. See, Rev. Rul. 78-197, 1978-1 CB 83. In each of PLR 8815003 (December 11, 1987); PLR 8738003 (May 22, 1987); PLR 8735007 (May 18, 1987); and PLR 8735006 (May 18, 1987), an unrelated underwriter acquired a corporation's outstanding debt, exchanged that debt for other securities of the corporation, and then sold such other securities to the public. In each technical advice memorandum, the IRS held that the step transaction doctrine cannot be applied to reverse the order of the transactions.

NYLIB1/801884/2

KPMGZ12060204

## BROWN & WOOD LLP

Mr. Carlos Sala
December 31, 2000
Page 89

spin-off, each court cited facts that would indicate a "binding commitment" or "mutual independence" test. In Walt Disney, the court cited an overall intention for the steps to occur, and the fact that the company had a legal obligation to transfer the assets and distribute the stock. In Salomon, the court based its conclusion in part on the fact that at the time of the asset transfer the taxpayer intended to spin-off the stock, establishing the interdependent nature of the steps. The District Court concluded that such interdependent relationship also existed in the series of transaction integrated under the step transaction doctrine in True.

Investor and Fund I each was placed at risk with respect to their respective investments. Investor bore the risk that the Long Option or a Short Option might decline in value while it owned them prior to contributing them to Fund I. Similarly Fund I bore the risk of the Options while it owned them. Thus, the transactions had the type of economic significance lacking in the integrated transactions in True and in Salomon. Investor also available a number of alternative transactions with respect to both the Options and the investment in Fund I. Consequently, although the issue is inherently a factual one, based on Esmark it is more likely than not that the "end result" formulation of the step-transaction doctrine will not apply to the transactions described above.

Based on the foregoing analysis, it is more likely than not that the step transaction doctrine will not apply to the Transactions. Each transaction undertaken by Investor had independent economic significance and placed Investor at risk.

### 4.    Code Section 269

Code Section 269(a)(1) provides that if a person or persons acquire, directly or indirectly, control of a corporation, and if the principal purpose of the acquisition is the evasion or avoidance of income tax by claiming the benefit of a deduction, credit, or other allowance that would not otherwise be available, then the deduction or other allowance may be disallowed. Control for this purpose means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock. The Regulations promulgated under section 269 define "allowance" as anything in the internal revenue laws which has the effect of diminishing tax liability including, among other things, a deduction, a credit, an adjustment, an exemption or an exclusion. Treas. Reg. §1.269-1(a).

NYLIB1/801884/2

KPMGZ12060205

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 90

Although Investor has acquired control of S Corp, it is more likely than not that Code Section 269(a)(1) will not be applicable. In Modern Home Fire and Casualty Insurance Company v. Comm'r, 54 T.C. 839 (1970), a case involving the use of an S Corporation purportedly to gain multiple surtax exemptions the Tax Court concluded that the prohibited purpose did not exist where the transaction involved the use of a corporation that takes advantage of provisions, such as the pass through nature of an S corporation, representing Congressionally granted benefits. See also Western Hemisphere Trade Corp. v. U.S., 612 F.2d 558 (Ct. Cl. 1979) (holding that taking advantage of Western Hemisphere Trade Corporation status was not a tax avoidance purpose); Rev. Rul. 70-238, 1970-1 CB 61(holding that taking advantage of western hemisphere trade corporation status was not a tax avoidance purpose). But c.f. FSA 199926011 (3/26/99) (concluding that a series of reorganizations designed to create a corporation that could take advantage of the 80/20 company rule of section 861(c)(1)(A) had a tax avoidance purpose, however the FSA did not explain why the court's reasoning in the Modern Home Life Casualty and Western Hemisphere cases should not apply to an 80/20 company).

It is also more likely than not that, due to the pass-through nature of an S corporation, the use of an S corporation by an individual, such as Investor does not involve the prohibited purpose because the individual could have obtained the same tax advantages had the individual entered into the transactions directly. In Cromwell Corp. v. Comm'r, 43 T.C. 313 (1964), the taxpayer was a corporation formed by investors to effect a bootstrap acquisition, pursuant to which it borrowed a substantial portion of the purchase price to be paid for the stock of the acquired corporation, purchased the stock with these funds plus additional sums contributed by its shareholders, filed a consolidated return with its newly acquired subsidiary, and then had the subsidiary distribute a dividend that the taxpayer used to discharge the indebtedness. The IRS attacked the transaction under Code Section 269, alleging that the taxpayer was not entitled to file a consolidated return with the subsidiary and the dividend was not eligible for the dividends-received deduction. The IRS also argued that if the consolidated return was proper, the acquiror was not entitled to eliminate the intercompany dividend.

The Tax Court rejected all of these assertions, stating that, regardless of the taxpayer's purpose in effecting the transaction in this manner, it did not thereby obtain a tax benefit that it would not otherwise have enjoyed. The court noted that other methods could have been used in making the acquisition, all of which would have produced the same net effect for tax purposes as the method chosen by the parties (i.e., the acquisition of another corporation with a limited

NYLIB1/801884/2

KPMGZ12060206

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 91

equity investment). The purpose of Code Section 269, said the court, is to prevent a distortion of the taxpayer's net income, as "where a taxpayer is attempting to secure the benefit of built-in tax advantages, typically a net operating loss carry-over, by combining two corporations via an acquisition". See also Rev. Rul. 63-40, 1963-1 CB 46 (mere change of business not enough to invoke Code Section 269); Zanesville Inv. Co. v. Comm'r, 335 F.2d 507 (6th Cir. 1964). In a later cases of similar import, the courts distinguished between a tax-motivated acquisition and a tax-motivated method used to effect a business-motivated acquisition, and it refused to apply Code Section 269 to a transaction of the latter type. Cherry v. US, 264 F. Supp. 969 (C.D. Cal 1967); Keller v. Comm'r, 77 T.C. 1014 (1981), aff'd, 723 F2d 58 (10th Cir. 1983).

Code Section 269(a)(2) provides that if a corporation directly or indirectly acquires property of another corporation not controlled, directly or indirectly, immediately before such acquisition in a carryover basis transaction, and if the principal purpose of the acquisition is the evasion or avoidance of income tax by claiming the benefit of a deduction, credit, or other allowance that would not otherwise be available, then the deduction or other allowance may be disallowed. In addition to the absence of the prohibited motive, in the instant case, Code Section 269(a)(2) should not apply to the contribution of the Options by Investor to S Corp, because the transferor, Investor is not a corporation.

## 5. Disguised Sale Provisions

Code Section 707(a)(2)(B) provides rules for distinguishing sales of property to a partnership from bona-fide contributions and distributions. If (i) there is a transfer of money or other property to a partnership, (ii) there is a related transfer of money or other property from the partnership to the partner, and (iii) the transfers when viewed together are properly characterized as a sale or exchange of property, the transfers are treated as occurring between the partnership and a person not a partner. Treas. Reg. §1.707-3(b)(1) provides that a contribution of property and a distribution will be treated as a sale only if, based on all the facts and circumstances, the distribution would not have been made but for the contribution, and, if the transfers are not simultaneous, the distribution is not dependent on the entrepreneurial risks of the partnership.

Treas. Reg. §1.707-3(b)(2) states that the determination of whether a disguised sale has occurred is based on all the facts and circumstances, and that generally the facts and

KPMGZ12060207

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 92

circumstances existing on the date of the first transfer are considered. The Regulations then provide a list of ten factors that tend to prove that a sale has occurred.

1.  The timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of the earlier transfer.

2.  The transferor has a legally enforceable right to the subsequent transfer

3.  The partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured.

4.  Any person has made or is legally obligated to make contributions to the partnership in order to permit the partnership to make the transfer of money or other consideration.

5.  Any person has loaned or has agreed to loan the partnership the money or other consideration required to enable the partnership to make the transfer, taking into account whether the obligation is subject to contingencies related to the results of the partnership operations.

6.  The partnership has incurred or is obligated to incur debt to acquire the money or other consideration necessary to permit it to make the transfer, taking into account the likelihood that the partnership will be able to incur that debt (considering such factors as whether any person has agreed to guarantee or otherwise assume personal liability for that debt).

7.  The partnership holds money or other liquid assets, beyond the reasonable needs of the business, that are expected to be available to make the distribution, taking into account the income that will be earned from those assets.

8.  The partnership distributions, allocations, or control of operations is designed to effect an exchange of the burdens and benefits of ownership of property.

9.  The transfer of money or other consideration by the partnership to the partner is disproportionately large in relation to the partner's general and continuing interest in partnership profits.

10. The partner has no obligation to return or repay the money or other consideration to the partnership, or has such an obligation but it is likely to become due at such a distant point in the future that the present value of the obligation is small in relation to the amount of money or other consideration transferred by the partnership to the partner.

NYLIB1/801884/2

KPMGZ12060208

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 93

Treas. Reg. §1.707-3(c) contains a presumption that contributions and distributions within two years are part of a sale unless the facts and circumstances clearly establish that the transfers do not constitute a sale.

While the Regulations do not list factors that would indicate a sale has not occurred, the examples indicate that the absence of these factors is evidence that a sale has not occurred. See e.g., Treas. Reg. §1.707-3(f), Example 3.

None of these factors is present in S Corp's transfer of the Long Options and Short Options to Fund I, and Fund I's distribution of property to S Corp in liquidation of his interest in Fund I. S Corp did not have a legally enforceable right to a particular amount of a subsequent distribution; S Corp had only the right that every partner had to withdraw from Fund I. The timing of the distribution to S Corp was not set, but was based on S Corp's decision, and the amount of the distribution was based on the value of S Corp's membership interest in Fund I at that time. S Corp's right to receive the distribution was not secured in any manner; no person was obligated to make contributions to Fund I so that it could make the distribution to S Corp; no person loaned or agreed to loan money to Fund I so that it could make the distribution to S Corp; and Fund I was not obligated to incur debt to make the distribution. Fund I did not and will not hold liquid assets beyond the reasonable needs of its activities, and the distributions, allocations and control were not be designed to shift the benefits and burdens of ownership. The distribution from Fund I reflected the value of S Corp's membership interest in Fund I.

Consequently, it is more likely than not that the contribution of the Options and the subsequent liquidating distribution to S Corp will not be treated as a sale under Code Section 707.

Treas. Reg. §1.707-3(c)(2) and §1.707-6(c) (in relevant part) require disclosure to the IRS in accordance with Treas. Reg. §1.707-8 if a partner transfers property to a partnership and within two years receives money or other consideration from the partnership, or a partnership transfers property to a partner and within two years receives consideration from the partner (both without regard to the order of the transfers); the transferor treats the transfers as other than a sale; and the transfer of money or other consideration from the partnership to the partner is not presumed to be a guaranteed payment, is not a "reasonable preferred return", and is not an "operating cash flow distribution". Treas. Reg. §1.707-8(b) requires this disclosure to be on

NYLIB1/801884/2

KPMGZ12060209

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 94

Form 8275 or a statement attached to the transferor's return and that it includes certain items set out in the regulations. Treas. Reg. §1.707-8(c) states that if more than one transferor transfers property to a partnership pursuant to a plan, the disclosure may instead be made by the partnership on behalf of all of the transferors instead of by each transferor separately.

Here, within a two-year period after S Corp has contributed an option to Fund I, Fund I distributed foreign currency to S Corp. Therefore, Fund I, as a transferor of property (the foreign currency) to a partner, would be required to disclose its distribution of the foreign currency. In addition, S Corp, as a transferor of property (the option) to a partnership, would be required to disclose its contribution of the Option. Alternatively, since both S Corp and other partners will have contributed property to Fund I as part of similar investment scheme, under Treas. Reg. §1.707-8(c), it is more likely than not that Fund I may instead disclose the contributions to Fund I on behalf of all contributing partners.

### 6. The Partnership Anti-Abuse Regulations; <br> Disregard of Fund I under Common Law

In December 1994, the IRS issued Treas. Reg. §1.701-2 (the "Anti-Abuse Regulations") in an effort to stop what it perceived were abuses of the partnership form. These Regulations consist of two broad rules: the "abuse of subchapter K rule" and the "abuse of entity rule".

Notwithstanding a transaction's literal compliance with the Code and Regulations, the Regulations authorize the IRS to recast the transaction for federal tax purposes as it deems appropriate if the requirements of the anti-abuse Regulations are satisfied. The IRS can; (1) disregard the partnership in whole or in part; (2) treat one or more partners as not partners; (3) adjust the method of accounting used by the partnership or a partner to clearly reflect the partnership's or the partner's income; (4) reallocate the partnership's income, gain, loss, credit, or deduction; or (5) otherwise adjust or modify the claimed tax treatment. Treas. Reg. §1.701-2(b). In addition, the IRS can treat a partnership as an aggregate of its partners to carry out the purpose of the Code or Treasury regulations. Treas. Reg. §1.701-2(e).

KPMGZ12060210

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 95

### (a)    Validity of the Regulations

These Regulations were severely criticized by practitioners and commentators when they were adopted as being invalid, and the controversy has not been resolved. It is reasonable to believe that the validity of these Regulations will be challenged in court.

The commentators have argued that the Regulations are invalid because they are vague and lack clear and workable standards.[22] The language of the Regulations is exceedingly broad, and even the inclusion of examples in the final Regulations does not help to elucidate the meaning of the broad terms. Further, it has been argued that the Regulations are invalid as they were adopted in violation of Executive Order 12866. This Executive Order applies to all significant regulatory actions, which includes a Treasury Regulation, that is likely to result in a rule that may (i) have an annual effect on the economy of $100 million or more; (ii) adversely affect in a material way the economy or a sector; or (iii) raise novel legal or policy issues. The partnership anti-abuse Regulations satisfy each of these requirements.

Commentators have also asserted that the Regulations are invalid because they are an unconstitutional usurpation of legislative and judicial powers. The Regulations grant the IRS the power to disregard the language of the statute when literal compliance with specific provisions is not consistent with the "intent" of subchapter K, and then creates that intent without relying on anything of Congressional origin. In adopting subchapter K as part of the Internal Revenue Code of 1954, Congress specifically considered and rejected the type of tax avoidance test that appears in the Regulation. See S. Rep. No.938, 94th Cong., 2d Sess 100 (1976). The courts have held that the IRS does not have the authority to disregard statutory provisions merely to reach the result that the IRS desires. See Crooks v. Harrelson, 282 U.S. 55 (1930); Comm'r v. Brown, 380 U.S. 563 (1965); Busse v. U.S., 479 F2d 1147 (7th Cir. 1973), acq., 1978-2 CB 1; Woods Investment Co. v. Comm'r, 85 T.C. 274 (1985), acq., 1986-2 CB 1. See also RLC Industries Co. v. Comm'r, 98 T.C. 457 (1992), aff'd 58 F3rd 413 (9th Cir. 1995). Furthermore, the Regulations attempt to supersede the statute and add restrictions not found in subchapter K.

---

22      See, e.g., McKee, Nelson and Whitmore, Federal Taxation of Partnerships and Partners (3rd Ed. 2000 Sup. #1), at ¶1.05; Banoff, Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2, 66 Tax Notes 1859 (March 20, 1995); Gouwar, The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority, 11, No.4 J. of Partnership Tax'n 287 (1995).

NYLIB1/801884/2

KPMGZ12060211

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 96

Moreover, the Regulations are not based on any specific legislative grant of authority. Consequently, the Regulations would appear to be invalid under <u>Chevron USA, Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984) and <u>Rowan Cos. Inc. v. U.S.</u>, 452 U.S. 247 (1981). The Regulations usurp judicial power by granting the IRS the power to apply the substantive law on a case by case basis, which is a judicial function. The courts are thus relegated to the role of determining whether the IRS has abused its discretion, rather than hearing the case de novo where the IRS and the taxpayer are on an equal footing.

    **(b)**    <u>Abuse of Subchapter K Rule</u>

Treas. Reg. §1.701-2(b), the abuse of subchapter K rule, provides that:

> [I]f a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances.

Thus, two requirements must be met to invoke this rule: a principal purpose of the transaction must be to reduce the present value of the partners' aggregate tax liability, and the tax reduction must be inconsistent with the intent of subchapter K.

    **(c)**    <u>Intent of Subchapter K</u>

The Regulations state that the intent of subchapter K is to permit the conduct of business and investment activities without incurring an entity level tax. Treas. Reg. §1.701-2(a) then provides that the following requirements are implicit in the intent of subchapter K:

1.    The partnership must be bona fide and each partnership transaction or series of related transactions must be entered into for a substantial business purpose.[23]

---

[23]   See, Statement of John Rooney, attorney advisor in the Treasury's Office of Tax Legislative Counsel to the ABA Tax Section on January 29, 1995, reprinted in Sheppard, 66 Tax Notes 776, 778 (1995), that "[s]ubstantial business purpose and principal purpose of tax avoidance cannot co-exist."

KPMGZ12060212

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 97

2.  The form of each partnership transaction must be respected under substance over form principles.

3.  The tax consequences to each partner of partnership operations and of transactions between the partner and partnership must accurately reflect the partners' economic agreement and clearly reflect the partners' income.

However, because certain provisions of the Code and Regulations were adopted for administrative convenience and other policy objectives, this test will be satisfied if the ultimate results are clearly contemplated by that provision.

The first implicit intent of subchapter K, that a partnership is bona fide and that transactions be entered into for a business purpose, seems to be a restatement of well established principles. See e.g. Comm'r v. Culbertson, supra, Gregory, supra, and Rice's Toyota World, supra. However, the Regulations do not elaborate on what is meant by these terms, and also insert the term "substantial" in the business purpose requirement. Culbertson held that a partnership would be respected for tax purposes if the parties had joined together to jointly conduct a business and share the profits. As Justice Frankfurter expressed in his concurring opinion:

> In plain English, if an arrangement among men is not an arrangement which puts them all in the same business boat, then they cannot get into the same boat merely to seek the benefits of [partnership tax provisions]. But if they are in the same business boat, although they may have varying rewards and responsibilities, they do not cease to be in it when the tax collector appears.

337 U.S. at 754

The determination of whether the abuse of subchapter K rule is applicable is based on all of the facts and circumstances, including a comparison of the business purpose for the transaction and the tax benefit. Treas. Reg. §1.701-2(c) contains a non-exclusive list of factors that indicate, but do not establish, that a partnership was formed or availed of with a principal purpose of tax reduction in a manner inconsistent with the intent of subchapter K. The factors are:

KPMGZ12060213

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 98

1.  The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's business directly.

2.  The present value of the partners' aggregate federal tax liability is substantially less than if purportedly separate transactions that are designed to achieve a particular end result are treated as steps in a single transaction. For example, the analysis may show that that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest was liquidated or disposed of would be a partner only temporarily in order to provide the tax benefits to the remaining partners.

3.  One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities, or have little or no participation in the profits from the partnership's activities other than a preferred return in the nature of a payment for the use of capital.

4.  Substantially all of the partners are related.

5.  Partnership items are allocated in accordance with the literal language of Treas. Reg. §1.704-1 and §1.704-2 but the results are inconsistent with the purpose of Code Section 704(b).

6.  The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained by the contributing partner.

7.  The benefits and burdens of ownership of partnership property are in substantial part shifted to the distributee partner before or after the property is actually distributed to the distributee partner.

These factors are difficult to apply, even with the aid of the examples

The first factor appears to be a restatement of the substantiality test of Treas. Reg. §1.704-1(b)(2)(iii), although there the test is limited to allocations of partnership income and deduction and does not create an artificial comparison to hypothetical events occurring outside of the partnership. In the instant case, there is no assurance that the present value of the partners' aggregate federal tax liability would necessarily be substantially less than had the partners owned the partnership's assets and conducted the partnership's business directly. An initial question is: what should the point of comparison should be? If one of the goals of the Transactions is to

NYLIB1/801884/2

KPMGZ12060214

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 99

create a limited liability pooled investment vehicle for the S Corp and others, it would be impossible for the S Corp do so "directly"; a limited liability vehicle with two or more members would be necessary. If a corporation were used, the similar basis rules would achieve a similar outside basis result, and if the corporation were willing to register as an investment company, regulated investment company status could be elected to pass through character, etc. Thus, there is no certainty that the test could be applied in the instant case, or if the test were applied to one or more alternative structures, there is no certainty that this factor would apply to the Transactions.

The second factor appears to be a restatement of the "end-result" formulation of the step transaction doctrine. As discussed above, each transaction was undertaken for independent reasons, no step was dependent on another step, and S Corp was at risk with respect to each transaction. Consequently, it is more likely than not that this factor will not be present.

The third factor is not present in this case, as no partner has a nominal interest in Fund I. Treas. Reg. §1.701-2(d)(1), Ex. 1 holds that a 1% interest in a partnership is not nominal. All of the members of Fund I have interests significantly in excess of 1%. Further, each member shares proportionately in all items of Fund I income, gain or loss, and no partner is substantially protected from risk of loss from the partnership's activities.

The fourth factor is also not present. We have been informed that none of the partners are related.

The fifth factor relates to the allocation of partnership income. Each item of Fund I income, gain, loss, or deduction will be allocated in accordance with the interests in Fund I, and each partner's capital account will be appropriately charged. There will be no special allocations of any item of income, gain, loss, credit, or deduction.

The sixth factor is also not present in this case. There is no property that has been "nominally" contributed to Fund I by any partner. Further, all property contributed to Fund I is owned by Fund I, and no partner has in substantial part retained the benefits and burdens of ownership of the contributed property. The assets that S Corp receives from Fund I were not the same assets that S Corp contributed.

NYLIB1/801884/2

KPMGZ12060215

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 100

Finally, seventh factor is also not present. The benefits and burdens of ownership of Fund I property will not be shifted to any distributee partner before or after the property is actually distributed.

Based on the foregoing, it is more likely than not that the IRS would be unsuccessful were it to assert that the Transactions are inconsistent with the intent of subchapter K.

### (d)    Abuse of Entity Rule

The other part of the anti-abuse Regulations, the abuse of entity rule, is found in Treas. Reg. §1.701-2(e). This Regulation provides that the IRS may treat a partnership as an aggregate of its partners "as appropriate to carry out the purpose of any provision" of the Code or Regulations. However, this rule will not apply to the extent that (a) a provision of the Code or Regulations prescribes the treatment of a partnership as an entity and (b) entity treatment and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. Thus, under Treas. Reg. §1.701-2(e)(2), a partnership may not be so disregarded when a provision of the Code prescribes entity treatment for such a partnership and that treatment and the ultimate tax results, taking into account all relevant facts and circumstances, are clearly contemplated by that provision.

Although there is no authority in point, as discussed above, the partnership provisions themselves (including the Treas. Reg. §1.701-2(a) intent of subchapter K anti-abuse rules) contemplate the use of a partnership as a vehicle to permit taxpayers to conduct joint activities; Code Section 722 by its terms contemplates a that a partner's tax basis in the partner's partnership interest is determined with reference to the tax basis of property contributed by the partner; and the partnership provisions contemplate that there can be disparities between a partner's tax basis in its partnership interest and the partnership's tax basis in its assets (see, e.g., Code Section 754). Furthermore, the examples contained in Treas. Reg. §1.702-1(f) relate to the use of the partnership to gain advantage of its entity status outside of subchapter K. Consequently, although the matter cannot be free from doubt because of the absence of direct authority, it is more likely than not that the IRS would not be successful were it to attempt to disregard Fund I as an entity under Treas. Reg. §1.701-2(e).

KPMGZ12060216

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 101

### (e)    Disregard of Fund I under Common Law

In appropriate circumstances, a partnership can be ignored for U.S. federal
income tax purposes although a valid partnership was formed under local law. As discussed
above, in PLR 9914006 (12/23/98), because a member in the ruling had no interest in the profits
and losses of the limited liability company, the IRS concluded that the corporation was not a
partner, and the limited liability company was not a partnership. This was because in the view of
the IRS the purported partners had not joined together to conduct a business and share the profits
and losses. In the present situation, S Corp and the other members invested in Fund I with the
intent of jointly conducting an activity (investing) and sharing the profits and losses therefrom.

ASA Investerings Partnership v. Comm'r, supra, concerned a transaction
substantially similar to that in ACM, supra. In ASA Investerings, the court found that the
partnership formed by Allied Signal and ABN, a foreign partner, was not a valid partnership
arrangement for U.S. federal income tax purposes based on what it viewed that ABN did not
want to share in any losses. As a result, the court concluded that ABN was not a partner in a
partnership, but rather was a mere lender. The court noted that Allied Signal agreed to enter into
the transaction before it even knew that ABN would be involved. In the instant case, each
member invested in Fund I in anticipation of realizing profits from Fund I's investment
activities. S Corp and the other members of Fund I all have the potential for profit or loss in
respect of their collective investment in Fund. No member was guaranteed a particular minimum
profit. Each member shares proportionately in the income, gain, loss and deductions of Fund, so
that there is no issue of recharacterization as in the Allied Signal case. Finally, S Corp is not a
party to the critical management decisions of Fund I.

Based upon the foregoing, it is more likely than not that the IRS would be
unsuccessful were it to attempt to disregard Fund as an entity under the common law principles
contained in these cases.

### 7.    Code Section 1092

Code Section 1092(a)(1) provides that any loss on one or more "positions" is taken into
account for any taxable year only to the extent that the loss exceeds the unrecognized gain (if
any) on "offsetting positions" held by the taxpayer or a related party. Code Section 1092(d)(2)

KPMGZ12060217

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 102

defines a "position" as an interest (including an option) in "personal property", defined in Code Section 1092(d)(1) as any personal property "of a type that is actively traded". Code Section 1092(d)(7)(B) states that foreign currency for which an active interbank market exists is presumed to be actively traded.

In the instant case, S Corp withdrew from Fund before the Option positions terminated. As a result, there was no unrealized gain in any such position at that time, and based on the foregoing, no related person with respect to S Corp or Fund, within the meaning of Code Section 1092 (d)(4), held an offsetting position with respect to the positions held by Investor, S Corp or Fund. Accordingly, without regard to whether the Options constitute "personal property", it is more likely than not that any loses that Investor incurs from the transferred Options or Investor's investment in Fund will not be limited by Code Section 1092.

### 8. <u>Code Section 1366(d)</u>

Code Section 1366(d) provides that a shareholder of an S corporation may not take into account a loss in excess of the shareholder's tax basis in the stock of the S corporation and certain indebtedness of the S corporation. As discussed above, it is more likely than not that Investor's tax basis in Investor's Corp stock is increased by the amount of Investor's tax basis in the Foreign Currency. Consequently, it is more likely than not that Code Section 1366(d) will not limit a deduction arising from any loss incurred on the disposition of the Foreign Currency.

### 9. <u>Code Section 465</u>

Generally, the "at risk" provisions limit the ability of certain taxpayers, including Investor, to currently deduct the losses attributable to certain activities to the extent those losses exceed the taxpayer's "amount at risk" in the "activity". Code Section 465(a) provides that in the case of certain taxpayers engaged in an "activity" to which the section applies, any "loss from such activity" for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is "at risk for such activity" at the close of the taxable year.

Code Section 465 does not specifically address the application of the "at risk" rules to an S corporation. Treas. Reg. §1.465-10(c) and (d), which were proposed prior to the Subchapter S Revision Act of 1982, which eliminated the requirement that an S corporation itself be at risk,

NYLIB1/801884/2

KPMGZ12060218

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 103

equates an S corporation's amount at risk to the amount of such shareholder's basis in the stock of the S corporation.

For purposes of Code Section 465, a taxpayer is considered "at risk" for an activity with respect to the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. Code Section 465(b) and Prop. Treas. Reg. §1.425-23(a)(1). Code Section 465 does not specifically address the application of the "at risk" rules to an S corporation. Treas. Reg. §1.465-10(c) and (d), which was proposed prior to the Subchapter S Revision Act of 1982 that eliminated the requirement that an S corporation itself be at risk, equates an S corporation's amount at risk to the amount of such shareholder's basis in the stock of the S corporation.

Under Code Section 465(c)(3)(B)(ii), the trade or business activities (as opposed to non-trade or business activities undertaken for the production of income) of an S corporation, other than those described in Code Section 465(a)(1), may be aggregated as a single activity with that of the where 65 percent or more of the losses for the taxable year are allocable to persons who actively participate in the management of such activities. Based upon the representations above, this would include Investor. No such rules are provided for non-trade or business activities undertaken for the production of income. In addition, Code Section 465(c)(3)(C) provides that such activities are aggregated or treated as separate activities as Treasury prescribes by Regulations. No such Regulations have been proposed or adopted since enactment of the provision in 1978. By analogy to the rule under Code Section 465(c)(B)(ii), it is more likely tan not that the IRS would not be successful were it to attempt to deny such 65% shareholders the right to aggregate activities undertaken for the production of income in a different manner from such trade or business activities.

Based upon the foregoing, it is more likely than not that any loss S Corp incurs upon the disposition of Foreign Currency received from the liquidation of S Corp's interest in Fund I and which will be allocated to Investor under the rules of subchapter S of the Code, will not be limited by the "at risk" rules, because it is more likely than not that such loss will not exceed Investor's tax basis in Corp, determined as discussed above.

In addition, losses attributable to an activity under Code Section 465 do not include those from the disposition of that activity. Compare Prop. Treas. Reg. §1.465-12(a) with Prop. Treas.

KPMGZ12060219

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 104

Reg. §1.465-13(a).  Cf. Prop. Treas. Reg. §1.465-66(a) ("In general, this section will cause amounts disallowed by section 465 in previous taxable years to be allowed for the taxable year of transfer or disposition [of an activity or an interest in the activity].")

Based upon the foregoing, it is more likely than not that any loss that Investor incurred upon the disposition of the Foreign Currency distributed by Fund will not be limited by the "at risk" rules, because it is more likely than not that such loss will not exceed Investor's tax basis in such foreign currency, determined as discussed above.  Furthermore, such loss was incurred upon disposition of Investor's interest in Fund I, which may be viewed as a separate activity.

### 10.    Code Section 469

Conceptually similar to the application of the Code Section 465 "at risk" rules, the passive activity loss rules of Code Section 469 apply to certain taxpayers, such as Investor.  The aggregate amount of deductions disallowed for the taxable year under Code Section 469 is generally equal to a net amount designated as the "passive activity loss."  A taxpayer's passive activity loss for any taxable year is the excess of the taxpayer's passive activity deductions for the taxable year over the taxpayer's passive activity gross income for the taxable year.  Treas. Reg. §1.469-2T(b)(1).  Under the Regulations, in order to compute a taxpayer's passive activity gross income and passive activity deductions, the taxpayer must first determine the items of gross income "from a passive activity" and the items of deduction that "arise in connection with a passive activity."

Like Code Section 465, Code Section 469 does not specifically apply to an S corporation.  Treas. Reg. §1.469-4(d)(5)(i) requires S corporations to group their activities for purposes of applying the Code Section 469 rule, which limit losses from certain activities in which a taxpayer does not materially participate.

Code Section 469(c) states that for purposes of this section the term "passive activity" means any activity that involves the conduct of any trade or business in which the taxpayer does not materially participate.[24]  Code Section 469(c)(6) further provides that, to the extent provided

---

[24]   Under Code Section 469(h)(2), a limited partner is presumed not to materially participate in a limited partnership.

KPMGZ12060220

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 105

in regulations, the term "trade or business" includes any activity in connection with a trade or business or any activity with respect to which expenses are allowable as a deduction under Code Section 212. Treas. Reg. §1.469-1(e)(2) and §1.469-4(b)(1)(i) provide that the term "trade or business activity" includes any activity that involves the conduct of a trade or business within the meaning of Code Section 162.

Code Section 469(e)(1)(A)(ii) excludes from the category of income or loss from a passive activity gain or loss from the disposition of property held for investment. Treas. Reg. §1.469-1T(e)(6) provides extends this concept to certain investment/trading entities by providing that the activity of trading personal property for the account of owners of interests in the activity is not a passive activity, regardless of whether the activity is a trade or business and regardless of a partner's level of participation. Treas. Reg. §1.469-1T(e)(6) provides an example of "trading for the account of owners of interests in the activity". This example indicates that a partnership's trading activities consists of "trading for the account of its partners" where the capital employed by the partnership in the trading activity consists of amounts contributed by the partners in exchange for their partnership interests. It is more likely than not that the example will be equally applicable to activities undertaken by an S corp.

The term "personal property" is defined in the regulations to have the same meaning as under Code Section 1092(d), but without regard to Code Section 1092(d)(3) which generally excludes stock from the definition. As discussed above, it is more likely than not that the Options and similar options traded by Fund I will qualify as personal property under this definition.

With respect to the instant case, it is more likely than not that S Corp's participation in Fund I will constitute an activity that is not a passive activity based upon the exception for the "activity of trading personal property for the account of owners of interests in the activity" described in Treas. Reg. §1.469-1T(e)(6). Accordingly, it is more likely than not that the income (or loss) generated by Fund I will not be subject to the limitations under Code Section 469. Similarly, it is more likely than not that such conclusion will extend to the losses from the redemption of S Corp's interest in Fund I, since the assets were not used in a passive activity. Accordingly, it is more likely than not that income (or loss) of Fund I and the loss upon disposition of the assets received by S Corp and allocated to Investor upon redemption of S Corp's interest in Fund I will not be subject to the limitations under Code Section 469.

KPMGZ12060221

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 106

### 11. Code Section 482

Code Section 482 gives the IRS the power to, among other things, reallocate income and deductions, among "two or more organizations, trades, or businesses... owned or controlled directly or indirectly by the same interests...." Treas. Reg. §1.482-1(i)(1) provides that an organization for this purpose includes an organization of any kind, including a sole proprietorship. Treas. Reg. §1.482-1(a)(2) gives the IRS the power allocate "income, deductions, credits, allowances, basis, or any other item or element affecting taxable income" among members of a controlled group.

It unclear how the IRS could apply Code Section 482 to deny any loss Investor/S Corp recognizes upon the disposition of the foreign currency that S Corp received upon the redemption of his interest in Fund. This is because this loss could logically have been incurred by no other party to the Transactions. Moreover, such disposition by S Corp is independent of and separate from the activities of the Deerhurst and Fund I. Furthermore, if such loss were reallocated to Fund I under Code Section 482, it is more likely than not that S Corp would be entitled to its share of such loss as a member of Fund I. Lastly, were the IRS to assert that Code Section 482 applies to the Transactions, for the reasons discussed below it is more likely than not that the IRS will not be successful in making such assertion.

The Code does not define the requisite ownership or control necessary to fall within Code Section 482. Treas. Reg. §1.482-1(i)(4), defines "controlled" as follows:

> Controlled includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.[25]

---

[25] No case addresses facts specifically like the instant case. The Fifth Circuit Court of Appeals has held in a different factual context that the burden of proof is upon the government to demonstrate the appropriateness of the presumption. See Dallas Ceramic Co. v. U.S., 598 F.2d 1382 (5th Cir. 1979). Once the presumption has been established, however, the burden of proof would appear to fall on the taxpayer.

KPMGZ12060222

**BROWN & WOOD LLP**

Mr. Carlos Sala
December 31, 2000
Page 107

In a Field Service Advice relating to a so-called lease stripping transaction, FSA 199914018 (1/5/99), the IRS contended that it could apply Code Section 482 to transactions between a non-controlling party and a corporation if the non-controlling party acts in concert with a controlling party. As discussed below, the existing case law does not support such a contention.

We have been advised that there is no agreement pursuant to which Investor/S Corp has the right to control Fund I or vice versa. Consequently, it is more likely than not that Investor/S Corp and Fund I will not be treated as within the relationship described in Code Section 482. The IRS might contend that because of the fact that Investor/S Corp discussed its investment in Fund with the Deerhurst, Investor and Deerhurst are acting in concert within the meaning of Code Section 482 and the Regulations promulgated thereunder.

It is more likely than not that such an argument would not succeed. As discussed above, the concept of "acting in concert" in the context of Treas. Reg. §1.482-1(i)(4) relates to two or more person so acting to exercise control over a third person. Any other interpretation would subject any arm's length commercial transactions undertaken pursuant to a contract to Code Section 482. The only case which appears to deal with the "acting in concert" element of Code Section 482 is B. Forman Co., Inc. v. Comm'r, 453 F.2d 1144 (2d Cir. 1972), cert. denied 407 U.S. 934, reh'g denied, 409 U.S. 899 (1972), which is factually distinguishable from the instant situation. In Forman, two corporations acquired equal interests in a third corporation, neither individually having the requisite voting power to control the third, but having a written agreement and jointly appointed officers and directors pursuant to which they mutually exercised control over the third. In short, the third corporation was controlled either by both shareholders or by nobody, and the court adopted the former view. In the instant case no such agreement or mutual exercise of control exists, and in fact Fund is controlled by Deerhurst. The Forman situation is markedly different from the instant situation in which Investor/S Corp and Deerhurst are not acting in concert to control any third party, i.e. Fund I, because Investor/S Corp has no power to control Fund I; only Deerhurst does. Consequently, it is more likely than not that there would be no concerted action of the type required so as to permit the IRS to reallocate income or deductions between the two under Code Section 482.

In Notice 95-53, 1995-2 CB 334, the IRS raised the possibility that a noncontrolling and controlling party could be considered "acting in concert" for purpose of applying Code Section

NYLIB1/801884/2

KPMGZ12060223

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 108

482 in the context of a tax-advantaged transaction. Here again, however, the "acting in concert"
aspect of Code Section 482 was asserted with respect to a noncontrolling party exercising control
over a third party. Furthermore, Proposed Treasury Regulations issued pursuant to the Notice
were issued under Code Section 7701(l) and not under Code Section 482. To our knowledge, a
court has not reviewed this position, and we believe that the decision in the Forman case is the
appropriate standard. As discussed above, under such standard it is more likely than not that
Code Section 482 will not be applicable to the Transactions.

### H.    Application of Code Section 6662

### 1.    Substantial Understatement of Taxable Income

Code Section 6662(b)(2) provides for a 20% underpayment penalty for taxpayers if there
is a substantial understatement of income tax on a return. For non-corporate taxpayers, an
understatement is considered substantial for this purpose if it exceeds the greater of 10% of the
correct tax or $5,000. See Code Section 6662(d)(1). An understatement generally does not
include deficiency amounts attributable to a position that is supported by "substantial
authority"[26] or for which there is adequate disclosure.

Substantial authority for a position exists if the weight of authorities supporting the
position is substantial in relation to the weight of authorities against the position. See Treas
Reg. §1.6662-4(d). Authorities for this purpose include (but are not limited to) applicable
provisions of the Code, proposed, temporary and final regulations, revenue rulings and revenue
procedures; court cases; Congressional intent as reflected in committee reports; private letter
rulings and technical advice memoranda issued after October 31, 1976; and actions on decision
and general counsel memoranda issued after March 12, 1981. The weight of an authority
depends upon its relevance and persuasiveness, and the type of document. Treas. Reg. §1.6662-
4(d)(3).

The "substantial authority" standard is higher than the "reasonable basis" standard but
generally below "more likely than not". See Treas. Reg. §1.6662-4(d)(2). The "reasonable

---

[26]    There is considered to be substantial authority for a return position if substantial authority is present either
on the last day of the taxable period covered by the taxpayer's return, or on the date the return is filed
Treas. Reg. §1.6662-4(g)(1)(i)(A) and §1 6662-4(d)(3)(iv)(C).

KPMGZ12060224

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 109

basis" standard has been recently defined in Treas. Reg. §1.6662-3(b)(3) as a position that is
significantly higher than not frivolous or not patently improper. The Internal Revenue Manual
("IRM") states that the standard is one where a position is arguable but fairly unlikely to prevail
in court. The IRM further states that "the substantial authority exception can be met when the
taxpayer has less than a 50 percent, but more than a one-in-three likelihood of being sustained on
the issue." See IRM (20)535 (1997). The "more likely than not" standard is one where there is a
greater than 50 percent likelihood that a position will be upheld if challenged by the IRS. See
Treas. Reg. §1.6662-4(d)(2).

If the position involves a tax shelter,[27] there must be both "substantial authority" for the
position and the taxpayer must have "reasonably believed that the tax position was more likely
than not the proper treatment". For purposes of our analysis, we have assumed that the
Transactions would constitute a "tax shelter". The "reasonable belief" requirement can be
satisfied if the taxpayer reasonably relies in good faith (i.e., the taxpayer discloses all the facts it
knows or should know) on the opinion of a qualified tax professional that unambiguously states
there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by
the IRS.

### 2. Substantial Valuation Misstatement

Code Section 6662(b)(3) provides for a 20% underpayment penalty for taxpayers if there
is a substantial valuation misstatement under chapter1 of the Code. Code Section 6662(e)(1)(A)
provides that there is a substantial valuation misstatement if, among other things, the
value/adjusted basis of any property claimed on any income tax return is 200% or more of the
amount determined to be the correct amount of such valuation/adjusted basis. Code Section
6662(h)(1) increases the penalty to 40% in the case of any gross valuation misstatement. Code
Section 6662(h)(2) provides that there is a substantial valuation misstatement if, among other
things, the valuation/adjusted basis of any property claimed on any income tax return is 400% or
more of the amount determined to be the correct amount of such valuation/adjusted basis. The

---

[27]    Prior to the Taxpayer Relief Act of 1997, a tax shelter was generally defined as any plan or arrangement the
principal purpose of which was the avoidance or evasion of U.S. federal income tax. Tax avoidance or
evasion was considered the principal purpose if that purpose exceeded any other purpose. The 1997 Tax
Act modified the definition of tax shelter by requiring only a "significant" (rather than principal) tax
avoidance or evasion purpose.

KPMGZ12060225

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 110

penalty does not apply, however, if the reasonable cause exception of Code Section 6664(c) and Treas. Reg. §1.6664-4, discussed below applies.

Because the tax basis of the Long Options is more than 400 percent of the net basis of the Options, the terms of Code Section 6662(h)(2) might appear to apply, absent the Code Section 6664(c) reasonable cause exception. However, the legislative history of Code Section 6662(e) implies that the provision is intended to apply only where excessive basis arises as a result of an excessive valuation, i.e. an issue of fact, as opposed to an issue of law.

The gross valuation misstatement penalty is an extension of the 20% penalty under Code Section 6662(e) for a "substantial valuation misstatement", which exists if the value or adjusted basis claimed on the return is 200% or more of the correct amount. This penalty, which was part of the 1989 modification of the civil tax penalty regime, first entered the tax law in 1981 as Code Section 6659, which imposed a penalty on an underpayment arising from a "valuation overstatement." Under Code Section 6659(c), a "valuation overstatement" occurred where the value or adjusted basis claimed on a tax return was 150% or more of the correct amount. The amount of the penalty was 10% of the underpayment at an overstatement of 150% and rose to 30% of the underpayment for an overstatement of 250%.

A dispute with the IRS regarding the basis of an asset can arise either from an issue of fact or from an issue of law. The Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 discussion of the reasons for the new penalty made clear that Congress was concerned only with basis overstatement resulting form excessive valuations, not incorrect application or interpretation of law. It stated:

> The Congress believed that a specific penalty was needed to deal with various problems related to the valuation of property. The particular need is illustrated by the fact that there are about 500,000 tax disputes outstanding which involve property valuation questions of more than routine significance. These cases alone involve approximately $2.5 billion in tax attributable to the valuation issues.
>
> The Congress recognizes that valuation issues frequently involve difficult issues of fact. Often these issues seemed to be resolved simply by "dividing the difference" in the values asserted by the

KPMGZ12060226

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 111

> Internal Revenue Service and those claimed by the taxpayer. Because of this approach to valuation questions, the Congress believes that taxpayers were encouraged to overvalue certain types of property and to delay resolution of the valuation issues....

> In recognition of the fact that valuation issues often are difficult, especially where unique property is concerned, the Congress decided to adopt a test for the application of a new penalty under which on significant overvaluations will be penalized. [Emphasis added].

Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 at 332.

The Joint Committee provided two examples of the situations that the provision was intended to address. Neither example involved a disputed tax-free reorganization, Code Section 351 exchange, or like-kind exchanges, common situations resulting in legal disputes over the adjusted basis of property. Instead, one example involved an excessive valuation in the context of a charitable deduction and the other involved a basis adjustment arising from an excessive estate tax valuation. At no point did the Joint Committee Explanation refer to basis adjustments arising from disputes over matters of law.

Furthermore, the amendments made in 1989 would indicate that no change in this view was intended. Thus, a separate penalty provision, Code Section 6662(e)(1)(B), was enacted to deal with valuation and basis adjustments arising from adjustments under Code Section 482, which involves both issues of fact and issues of law.

Based upon the foregoing, a fair reading of the statute and its legislative history strongly suggest that a basis overstatement arising from issues of law, such as the Transactions, should not be the type of overstatement intended to be reached by Code Section 6662(e)(1)(A).

### 3.    Code Section 6664(c)

Code Section 6664(c) provides a general exception to Code Section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the

KPMGZ12060227

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 112

extent of the taxpayer's effort to determine proper tax liability.  See Treas. Reg. §1.6664-4(b).
Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good
faith" if the advice is based on all pertinent facts and circumstances and the law as it relates to
those facts and circumstances.  For example, relevant facts include the taxpayer's purpose for
entering into a transaction and for structuring the transaction in a particular manner.  All facts
that are relevant to the tax treatment of a transaction must be disclosed.  Treas. Reg. §1.6664-
4(c)(1)(i).

The regulations also set forth certain general opinion requirements ("General Opinion
Requirements") that must be satisfied in order for reliance on tax advice, including opinion
letters, to be considered reasonable and in good faith.  Treas. Reg. §1.6664-4(c)(1).  The General
Opinion Requirements (all of which must be satisfied) are as follows:

    (i)    The opinion was based on all pertinent facts and circumstances, including the
taxpayer's purposes (and the relative weight of such purposes) for entering into
the transaction and for structuring the transaction in a particular manner.  In
addition, reliance on an opinion will not be considered reasonable if the taxpayer
fails to disclose a fact that it knows or should know to be relevant to the proper
tax treatment of an item.

    (ii)    The opinion was based on the law as it relates to those facts and circumstances

    (iii)    The opinion was not based on any unreasonable factual or legal assumptions
(including assumptions as to future events).

    (iv)    The opinion did not unreasonably rely upon the representations, statements, findings
or agreements of the taxpayer or any other person.  For example, the opinion must not
be based upon a representation or assumption that the taxpayer knows or has reason
to know is unlikely to be true.

Although we have found no court case that has construed the General Opinion
Requirements (which were issued in August of 1995; see, T.D. 8617), numerous judicial
decisions have relied upon similar principles in holding that a taxpayer's reliance upon the
advice of a tax professional qualified for the reasonable cause and good faith exception to the
substantial understatement penalty.  See e.g. Mauerman v. Comm'r, 22 F.3d 1001 (10th Cir.
1994) (the substantial understatement penalty was not imposed where a physician reasonably
relied in good faith upon his independent tax advisor); Vorsheck v. Comm'r, 933 F.2d 757 (9th

KPMGZ12060228

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 113

Cir. 1991) (the taxpayers' reliance on their tax accountants precluded imposition of the
substantial understatement penalty); Heasley v. Comm'r, 902 F.2d 380 (5th Cir. 1990) (the
taxpayers' efforts to assess their proper tax liability by consulting an accountant and their limited
experience in tax matters precluded the application of the substantial understatement penalty);
Daoust v. Comm'r, T.C. Memo. 1994-203 (the negligence and substantial understatement
penalties were not imposed where the taxpayers reasonably relied upon professional advisors);
and English v. Comm'r, T.C. Memo. 1993-111 (the negligence and substantial understatement
penalties were not imposed where the taxpayers relied upon the advice of their accountants on a
complex tax matter).

The U.S. Supreme Court also reaffirmed the right of a taxpayer to rely upon the
substantive advice of the taxpayer's accountant or attorney to avoid penalties in U.S. v. Boyle,
469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid
filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on
professionals as to questions of substantive law, which would). According to Boyle:

> When an accountant or attorney advises a taxpayer on a matter of
> tax law, such as whether a liability exists, it is reasonable for the
> taxpayer to rely on that advice. Most taxpayers are not competent
> to discern error in the substantive advice of an accountant or
> attorney. To require the taxpayer to challenge the attorney, to seek
> a "second opinion," or to try to monitor counsel on the provisions
> of the Code himself would nullify the very purpose of seeking the
> advice of a presumed expert in the first place. Id. at p. 251.

## V.    Conclusion

Based upon the conclusion set forth at III, above, that there is a greater than 50 percent
likelihood that the tax treatment will be upheld if challenged by the IRS, the IRS should not be
successful were it to attempt to impose a penalty against Investor under Code Section 6662(b)(2)
or (3) for positions taken in Investor's U.S. federal income tax return with respect to the
Transactions.

This opinion does not address, and is not intended to address any tax issues, whether U.S.
federal, state, local or foreign, other than those specifically addressed herein. This opinion is

NYLIB1/801884/2

KPMGZ12060229

**BROWN & WOOD** LLP

Mr. Carlos Sala
December 31, 2000
Page 114

being issued to the addressee solely for the addressee's use and the use of the addressee's
professional advisors to determine the amount, if any, of the addressee's U.S. federal income
liability.  The addressee or the addressee's professional advisors may not use this opinion for any
other purpose without our prior written consent.

Very truly yours,

KPMGZ12060230