# EXHIBIT LL

# "IT SEEMED LIKE SUCH A GOOD IDEA AT THE TIME"
## TAX SHELTERS, THE MORNINING AFTER

**Darrell D. Hallett**
**John M. Colvin**
Chicoine & Hallett
Seattle, Washington

In the post-Enron world, the general public has become aware again of "tax shelters." Tax shelters are the subject of Senate Hearings. The war on tax shelters is prominently featured in New York Times articles, mentioned on popular television shows (at least two 60 Minutes segments), and employed to justify proposed IRS budget increases.

While "tax shelters" have probably existed as long as there was a tax code, two developments have recently combined to bring cachet back to a term that, for many, conjured up the non-existent cattle, fixed commodities trading, and overvalued stamps of the late 1970s and early 1980s:

First, during the 1990s, attorneys and accountants developed and marketed a wide array of arrangements that purportedly resulted in significant tax savings for their clients. Many of these arrangements were promoted by groups that the IRS and public had long believed the pillars of tax compliance, i.e., large accounting firms and prominent law firms. The anecdotal evidence about how the culture at some of these institutions had changed in pursuit of the large fees associated with tax shelter promotion is overwhelming. The bulk of the tax products offered by these groups were marketed to corporations and individuals having significant taxable income, usually in the millions of dollars.

Second, the internet, with its capability to reach large, fairly well targeted audiences, exploded, coincidentally at the same time as IRS enforcement efforts slowed. Tax protestor-types and promoters of dubious tax avoidance schemes, often involving the use of offshore bank accounts, were able to reach a far broader audience than ever before.

The IRS and the Department of Justice Tax Division have reacted to each of these developments, often in ways that are creative and surprising, to make what the promoters once believed was a low risk enterprise into one that is fraught with peril, including the possibility of criminal prosecution. This outline discusses recent significant developments in the investigation and prosecution of tax shelters, and the special concerns that these developments raise for practitioners.

I.      DEVELOPMENTS.

    A.    Criminal Investigations of Promoters of Technical Tax Shelters.

The high-end tax shelter industry was brought into the public spotlight in November of 2003, when the Senate Permanent Subcommittee on Investigations held two

days worth of hearings on the industry, looking at tax shelters offered by the Big Four accounting firms (focusing primarily, but not exclusively, on the BLIPS shelter offered by KPMG), and the legal and financial industry that assisted in the creation of the relatively complex financial structures needed to accomplish the shelter's goals. The hearings may still be viewed on the Subcommittee's website. While many of the witnesses either defended their roles or apologized for their participation, one lawyer invoked his Fifth Amendment right to avoid self-incrimination.

Substantial internal documents were gathered by the Senate investigators, and a 100+ page report was issued at the time of the hearings. Subsequently, most of the documents cited in that report were released (amounting to several hundred pages of documents, including many revealing emails), and, in August of 2004, more than 3,000 additional pages were released.

Even with the publicity associated with the Senate Hearings, it was still a surprise for many when, early in 2004, it became public that the US Attorneys Office for the Southern District of New York was investigating KPMG and many of its partners who had been associated with the promotion of the BLIPS shelter. Many clients of the accounting firm and several KPMG partners (and former partners) have been interviewed as part of that investigation.

BLIPS were a variant of the "Son of Boss" transaction, listed by the IRS as an abusive transaction in Notice 2000-44. It is therefore perhaps not surprising that other firms that offered the transaction have also fallen under scrutiny. In May of 2004, the Wall Street Journal reported that there was a criminal probe of Ernst & Young, also apparently related to that firm's offering of Notice 2000-44 transactions.

It appears likely that similar investigations involving high profile tax specialists involved in the creation of tax shelters will not be uncommon in the future. In April of 2004, Tax Analysts reported that Nancy Jardini, the Chief of IRS Criminal Investigations, conveyed that, while CI had historically worked largely with the Small Business/Self Employed Division (SBSE) and that Division's fraud referral program, CI had "really reinvigorated their relationship with the Large and Midsize Business Division (LMSB), particularly in our work in shelters. We're doing a lot of what will ultimately prove to be high-profile work in tax shelters right now." Thus, it appears that the KPMG and E&Y investigations will not be isolated incidents, but part of a larger group of tax fraud cases against highly respected tax advisors and their large corporate and individual clients.

In this regard, in the last few years, the IRS has put in place mechanisms for collecting substantial information regarding who was promoting tax shelters. In December of 2001, the IRS issued Announcement 2002-2, which set forth a disclosure initiative whereby the IRS agreed to waive the accuracy-related penalty for any underpayment of tax attributable to items disclosed by taxpayers within a 120-day period expiring April 23, 2002. The disclosure initiative resulted in excess of 1,600 separate disclosures from approximately 1,200 separate taxpayers, reflecting billions of dollars in taxes. While many taxpayers disclosed because they knew that the promoter of the transaction in which they were involved was under audit and information provided or

compelled in that audit was likely to lead the IRS to the taxpayer's door, there were several taxpayer disclosures that identified transactions that the IRS had never previously encountered.

One requirement for participation in the Announcement 2002-2 disclosure initiative was that the taxpayer had to agree to provide information about the promoter and agree to provide marketing materials if requested. The number of promoters identified in the taxpayer responses to this initiative greatly exceeded IRS expectations, resulting in a significant increase in the number of promoter-related investigations. From this perspective, this Disclosure Initiative appears to have been very successful for the IRS, and may lead to additional criminal investigations.

In connection with the tax shelter disclosure requirements (which have been modified frequently since first going into effect in 2000), taxpayers are now required to file a tax shelter disclosure form (Form 8886) with respect to certain transactions that have certain features which indicate that they *may be* a tax shelter. While the rules require a taxpayer to indicate if they have participated in a transaction with respect to which the IRS has identified as an abusive transaction in public notices (the obvious), it also requires disclosure of transactions which may be far more benign. For example, a disclosure form is required for any section 988 transaction (gain or loss from the sale of foreign currency) which results in a loss in excess of $50,000. While the form 8886 is filed along with the taxpayer's return, the taxpayer is also required to send a copy to the Office of Tax Shelter Analysis (OTSA). Again, in connection with any transaction with respect to which disclosure is required, the taxpayer is required to provide information about the promoter.

### B. IRS Offshore Voluntary Compliance Initiative (OVCI).

In the late 1990s, the IRS became aware that there were many American using credit and debit cards to access funds on deposit in offshore banks. In particular, one individual brought substantial information to the IRS regarding U.S. depositors in one Caribbean bank. In 2000, the IRS and DOJ began a campaign to obtain information regarding accounts issued by banks in tax-haven jurisdictions. The IRS and DOJ were successful in obtaining court orders issuing John Doe summonses on the international affiliates of MasterCard, Visa, and American Express with respect to accounts held by taxpayers in various jurisdictions. As many of the accounts were held in corporate names, or could not otherwise be associated with U.S. persons, the IRS followed this effort up with John Doe summonses on retailers to determine if a US person received the economic benefit of transactions paid for by the cards. For example, the IRS obtained a John Doe summons on Amazon.com to determine who received the merchandise purchased with the offshore cards, and a John Doe summons on Southwest Airlines to determine whose travel was purchased with the offshore cards. Most recently, the IRS has obtained court approval to serve John Doe summonses on two or three large processors of credit card information. With this information in hand, the IRS began to identify and aggressively audit the taxpayers.

The IRS made this program a high priority because preliminary estimates indicated that perhaps as many as 1 to 2 million Americans may have had offshore accounts. However, the results of this program have been somewhat mixed. In a July 21, 2004, statement to the Senate Finance Committee prepared for hearing addressing the so-called "tax gap," the Acting Inspector General of TIGTA (Pamela Gardiner) provided the following assessment of the offshore credit card program:

> The IRS has begun addressing taxpayers' attempts to avoid taxes through the use of offshore techniques. Congressional witnesses have estimated that 1 to 2 million taxpayers avoid $40 to $70 billion in taxes annually using offshore bank accounts. The IRS developed the Offshore Credit Card Project (OCCP) to address this problem and made it a strategic priority for FYs 2003-2004. The OCCP uses information from the transactions of credit cards issued from offshore banks to identify taxpayers evading taxes and the promoters of this type of scheme.
>
> IRS results as of March 31, 2004, for this Project have been mixed. Although nearly $5 million in additional assessments have been made on approximately 300 cases, the direct examiner cost associated with these cases is almost $1.5 million. This cost does not include the intensive labor costs associated with initiating these cases. In addition, the vast majority of the more than 3,000 completed cases have been closed without an assessment of any additional taxes.

In early 2003, the IRS announced a limited amnesty, providing that individuals who had participated in offshore financial arrangements that were not properly reflected on their tax returns could come forward and disclose this information to the IRS through April 15, 2003. The IRS in return would agree to limit the potential penalty exposure to only the accuracy and delinquency penalties (foregoing fraud). This program was known as the Offshore Voluntary Compliance Initiative (OVCI).

The OVCI program was far more successful than the credit card program had been on a costs and results basis, as Acting Inspector General Gardiner indicated in her July 21, 2004 statement:

> Another IRS Project, called the Offshore Voluntary Compliance Initiative (OVCI), grew out of the OCCP and provided an opportunity for users of offshore accounts to come forward and pay back taxes, interest, and certain penalties but avoid fraud penalties or criminal prosecution. This initiative ran from January 14 to April 15, 2003. The OVCI reflected attempts to bring taxpayers back into compliance quickly while simultaneously gathering more information about the promoters of these offshore schemes. As part of the request to participate in the OVCI, applicants were required to provide full details on those who promoted or solicited the offshore financial arrangement.

IRS results for the OVCI were more encouraging than those from the OCCP. In February 2004, the IRS reported this initiative had yielded over $170 million in taxes, interest, and penalties to the United States Treasury. The data the Treasury Inspector General for Tax Administration (TIGTA) reviewed indicated that the direct examiner costs associated with this project were only around $220,000. However, the data showed that even though the applicants voluntarily provided the tax information, over half of the completed cases had been closed without additional assessments.

On another level, it was more successful. Shortly after the OVCI closed, in June of 2003, Kevin Brown (Chief of Staff to Commissioner Everson) provided some information about the number of promoters identified at the Virginia Conference on Federal Taxation. Mr. Brown indicated that the IRS had received 1,253 applications to participate in the OVCI program. He also indicated that, thanks in part to the effectiveness of the OVCI program, the number of Abusive Tax Avoidance Transaction (ATAT) promoters in agency databases had soared from 25 in 2001 to 888 in June of 2003, providing substantial assistance to the IRS's efforts to track down promoters.

### C. Lead Development Centers – Focus on Investigating and Enjoining Promoters.

The increase in abusive tax schemes over the last several years became a political priority for the IRS when the issue was raised in hearings before the Senate Finance Committee a few years ago. The Abusive Tax Avoidance Transactions (ATAT) and Promoters area was chosen to be one of the IRS' strategic priorities in 2003. To coordinate the investigation of promoters, the SB/SE Division established the Compliance function Lead Development Center (LDC) in April 2002 (which is distinct from the CI Lead Development Center). The purpose of the LDC is to centralize the development of potential leads regarding abusive tax transactions and their use by promoters and return preparers. The LDC also authorizes and monitors promoter investigations (also called I.R.C. § 6700 investigations) assigned to SB/SE agents.

The LDC receives leads about promoters of abusive tax schemes from various internal and external sources, including field agents, tax professionals, and the general public. If a LDC agent determines that a § 6700 investigation is warranted, the agent contacts CI and Chief Counsel to determine whether a particular promotion is already under scrutiny and whether a criminal investigation would be hindered by a parallel civil SB/SE Division examination. The ultimate decision of whether to proceed in situations where there is an ongoing criminal investigation are made on a case-by-case basis after mutual agreement is obtained from both divisions.

The parallel civil/criminal approach is a significant departure from the rules of the past, where the criminal investigation of a promoter almost always took priority over the civil investigation of that person. According to the prepared testimony of Commissioner Rossotti before the Senate Finance Committee in April of 2002, in response to Congressional criticism in 2001 regarding how long abusive promotions were allowed to continue, an IRS internal task force determined that a parallel approach would be justified

in many cases. This parallel approach has been employed, for example, in the recent cases against the infamous author, Irwin Schiff.

A TIGTA review determined that most of the 2,154 leads received in the LDC through the latter part of 2003 were from sources within the IRS:

- From revenue agents – 40 percent.
- From other programs – 21 percent.
- From the Offshore Compliance Program – 13 percent.
- From an issue specialist – 5 percent.
- From outside sources – 3 percent.
- Could not be determined – 10 percent.

The remaining 8 percent were leads the LDC identified internally, primarily while conducting Internet research on existing leads.

In July, 2004 hearings on the "Tax Gap," Commissioner Everson reported to the Senate Finance Committee that, as of June 2004, the SB/SE Division has 927 promoters and return preparers under § 6700 investigation. In some cases, primarily, but not solely, involving the promotion of what the IRS considers frivolous positions (e.g. "slavery reparations"), the IRS requests that the DOJ file suit in U.S. District Court under sections 7407 and 7408 to seek injunctions to halt further abusive conduct. The Court may bar an individual, or group of individuals, from promoting particular tax positions, preparing tax returns, or representing taxpayers before the IRS. The DOJ also typically asks Courts to order the promoter to turn over client lists if he or she has not yet done so. Commissioner Everson reported that:

> As of June of 2004, 186 promoters (some of whom were also return preparers) had been referred to the Department of Justice for injunctive action. The Department of Justice has filed injunction suits against 101 of those promoters, and declined to sue 36 of them. Of the 101 sued, 67 have been enjoined (by temporary restraining order, preliminary injunction, or permanent injunction), and 34 are awaiting court action. The Department of Justice is evaluating 49 referred promoters for possible suit. Another 55 cases are being reviewed by Chief Counsel for possible referral.

Agents conducting § 6700 investigations are instructed to secure client lists as early in the investigation as possible. Once the client list is obtained, the SB/SE Division Compliance function has procedures in place to refer the clients of the targets of § 6700 investigations to the Ogden Campus Fraud Referral Program for further action.

D.   International Initiatives.

The IRS announced earlier this year that it had joined with the tax authorities of Australia, Canada, and the UK to form a joint international task force to increase collaboration and share information about abusive transactions that cross international

boarders. The taxing authorities expect to share expertise, and share information (to the extent allowed in the relevant treaties) in identifying and pursuing promoters.

The international complexion of the current crop of tax shelters is readily apparent. For example, like many "offshore providers," the Anderson Ark & Associates web site was geared at both US and Canadian residents. While tax loss in the United States from the various Anderson Ark & Associates schemes has been estimated in excess of $30 million, the Canadian tax loss may have been equally large or larger.

While the schemes involved in Anderson's Ark & Associates were relatively blunt edged, many of the more technical tax shelters also had a significant international component, often relying upon the services of large European banks (often the London branch offices) to act as counterparties.

Over the last four years, through the threat of sanctions, the OECD has succeeded in convincing all but a handful of nations to agree to enter into tax treaties or tax information exchange agreements (TIEAs) with the developed world. The United States has already entered into many such agreements with many of the countries which were formerly considered black holes for obtaining information in support of tax prosecutions, such as the Channel Islands (Jersey and Guernsey), the Isle of Man, the Cayman Islands, Antigua and Barbuda, the Bahamas, Curaçao (Netherlands Antilles), and the British Virgin Islands. Many other jurisdictions have committed to entering into similar agreements.

With respect to the TIEAs that were recently signed, these agreements typically had prospective effective dates, and the IRS has only recently been authorized to make requests. As many promoters advocated the use of offshore accounts, the opening up of a significant portion of the world's hitherto inaccessible information will make uncovering these shelters and their participants much easier.

## II.    ISSUES ARISING IN TAX SHELTER INVESTIGATIONS

### A.    Tax Shelters as a Means to Commit Securities Fraud.

With respect to public companies, or entities that have ambitions of becoming public companies, the goal of the company's participation in tax shelters may not have always been merely the simple reduction in taxes. In some cases, the primary goal of participation in the tax shelters may have been the financial statement benefits. For example, the Examiner's report in Enron contained a discussion of the 11 tax shelters in which Enron had participated. The goal of most of these shelters appears to have been long term financial statement benefits. Indeed, unlike most tax shelters which provide the bulk of the benefits in the first year of participation, the majority of the tax benefits in the Enron shelters were projected to be received in future years.

The use of tax shelters to create financial statement benefits creates significant potential exposure under the securities laws. Even if the case is not yet a criminal case, if the IRS discovers violations of securities laws, these violations may be reported to the SEC.

### B. The Problem of the Investor's Factual Representations.

Most of the technical shelters are supported by very extensive legal opinions, which address many of the complicated technical legal issues supporting the accounting firm's or law firm's analysis. Unfortunately, legal opinions do not exist in a vacuum, and must be applied to the facts of the transaction. Often critical facts regarding the business purpose of the transaction are included in the text of the opinion. These facts may differ substantially from the real purpose of the transaction, giving rise to liability on the part of both the opinion writer, who has a duty to investigate the facts and not make unreasonable assumptions, especially as to material matters, and on the part of the opinion recipient, who if he wishes to rely upon the opinion should verify that the material facts stated therein are correct.

In the Enron Examiner's Report on Enron's Tax Transactions (Exhibit J to the Examiner's Second Interim Report), one of Enron's tax shelters (Cochise) was questioned on the grounds that the representations in the opinion about the non-tax purpose of the transaction appeared inaccurate:

> *Enron Representations and the Determination of Principal Purpose*
>
> The Cochise Tax Opinion relies heavily on Enron's representation that obtaining the benefits of the Post-Acquisition Losses was more important to Enron than acquiring the benefits of the Pre-Acquisition Losses. In particular, Enron made the following representation:
>
>> While the Carryover Benefit is significant (and may be qualitatively somewhat superior to the Purchase Benefit in that it is presented for accounting purposes in an arguably more favorable light), it is materially less important than the Purchase Benefit, and thus Enron's principal purpose for engaging in the Maliseet Transactions was to obtain the Purchase Benefit.[123]
>
> This discussion in the Cochise Tax Opinion emphasizes that the Post-Acquisition Losses are more valuable to Enron than the benefits from the carryover basis ... .
>
> The Examiner has concluded that there is significant factual uncertainty whether Enron's representation that the Carryover Benefit was more important to it than the Purchase Benefit was accurate when made ... . The desire to record benefits as "pre- tax" income may have been the more substantial purpose for Enron in the transaction.
>
> The Examiner has concluded that the validity of the Cochise Tax Opinion may be called into question by the issue of whether the factual representations and assumptions on which it is based were accurate when made.

The most recent case discussing whether a tax opinion can be relied upon in establishing "reasonable cause" for purposes of avoiding the accuracy penalty is (*Long Term Capital Holdings v. United States*, 330 F. Supp.2d 122 (D.Conn. 2004). In an exhaustive opinion that may work far-reaching changes in the way law and accounting firms write tax opinions, the court rejected the taxpayer's claim that it reasonably relied upon the opinion of the law firm. While a full discussion of the 40+ page ruling on the penalties (following 160 pages on the merits of the transaction) is beyond the scope of this outline, the court both criticized the legal discussion of the case law, and, moreover, concluded that certain factual assumptions made in the opinion were clearly unreasonable:

> The substance of the King & Spalding opinion does not provide a basis for concluding that the advice rendered to Long Term was based on all pertinent facts and circumstances or does not unreasonably rely on unreasonable factual assumptions. While the opinion states that it relies on assumptions and representations expressly made by Long Term, including that Long Term entered the OTC transaction for business purposes other than tax avoidance and reasonably expected to derive a material pretax profit from it and that there was no preexisting agreement on the part of OTC to sell its partnership interest to LTCM, it makes no effort to demonstrate, factually or analytically, why it was reasonable to rely on those assumptions and representations. Moreover, there is no evidence, such as internal King & Spalding memoranda, revealing King & Spalding' analysis of the claimed non-existence of an agreement on the part of OTC to exercise its put option or any breakout of Long Term's claimed expectation of profit or business purpose. As seen in the Court's discussion above, particularly the existence of evidence clearly contrary to certain representations regarding the settlement payment to Turlington, see supra Part III.B.4.c., a reasonably diligent analysis of all facts and circumstances would have revealed at least some of those assumptions to be unreasonable and unsupportable.

> In essence, the testimony and evidence offered by Long Term regarding the advice received from King & Spalding amounted to general superficial pronouncements asking the Court to "trust us; we looked into all pertinent facts; we were involved; we researched all applicable authorities; we made no unreasonable assumptions; Long Term gave us all information." The Court's role as fact finder is more searching and with specifics, analysis, and explanations in such short supply, the King & Spalding effort is insufficient to carry Long Term's burden to demonstrate that the legal advice satisfies the threshold requirements of reasonable good faith reliance on advice of counsel.

> There was other evidence in the record suggesting the absence of reasonable good faith reliance on legal advice. Noe discussed the King &

Spalding advice with other partners only to the extent of informing them that King & Spalding would render a "should" level opinion. There was no evidence that any partners other than Scholes has ever read the King & Spalding opinion, only that the principals specifically discussed that "should" level opinions would provide penalty protection. Merton was unaware of what assumptions, if any, were made by King & Spalding. Rosenfeld erroneously believed Long Term had a written opinion from King & Spalding at the time of the OTC transaction, apparently based on Scholes informing him that King & Spalding had issued a "should" level opinion.

The U.S. Attorney's Office for the Southern District of New York has also raised questions about the validity of statements made by investors in form representation statements generated by KPMG and signed by investors with respect to the BLIPS shelter.

If significant statements regarding the economics and subjective purpose of the transaction are inaccurate, the opinion may not protect the taxpayer involved in the tax shelter from the assertion of penalties. However, if material representations are intentionally incorrect or misleading, there is potential criminal exposure on the part of both the opinion writer and the tax shelter investor.

C.   Privilege Issues.

The IRS's investigation of the technical tax shelters was initially met with less than enthusiastic cooperation on the part of the firms which the IRS believed were promoting the shelters. The reluctance to provide information led to a series of summons enforcement actions, whose holdings have suggested that privileges in the tax shelter arena will be very narrowly construed.

In *United States v. BDO Seidman*, 337 F.3d 802 (7th Cir. 2003), the Seventh Circuit held, *inter alia*, that clients' "participation in potentially abusive tax shelters is information ordinarily subject to full disclosure under the federal tax law." 337 F.3d at 812:

Further, Congress has determined that tax shelters are subject to special scrutiny, and anyone who organizes or sells an interest in tax shelters is required, pursuant to I.R.C. § 6112, to maintain a list identifying each person to whom such an interest was sold. This list-keeping provision precludes the Does from establishing an expectation of confidentiality in their communications with BDO, an essential element of the attorney-client privilege and, by extension, the § 7525 privilege. At the time that the Does communicated their interest in participating in tax shelters that BDO organized or sold, the Does should have known that BDO was obligated to disclose the identity of clients engaging in such financial transactions. Because the Does cannot credibly argue that they expected that their participation in such transactions would not be disclosed, they

>cannot now establish that the documents responsive to the summonses, which do not contain any tax advice, reveal a confidential communication. Id. (internal citations omitted).

In *John Doe #1 v. Wachovia Corp.*, 268 F. Supp. 2d 627 (W.D.N.C. 2003), the court held that investor lists held by a bank regarding taxpayers it had assisted with tax shelters were not privileged communications. The *Wachovia* case involved clients of a bank [First Union] "who used the bank to facilitate and implement tax advice concerning investment strategies. Legal advice on tax matters was provided by [a law firm] and accounting advice was received from the accounting firm of KPMG, LLP." 268 F. Supp.2d at 629. Critical to the court's decision was the fact that the law firm, to which the bank directed clients, sold a package to investors which contained a description of a transaction and a memorandum as to potential tax consequences stemming from the transaction. This tenuous connection between the law firm and the clients of the bank, who used the bank to facilitate and implement tax advice concerning investment strategies, did not support the assertion of attorney-client privilege over investor lists held by the bank. *See* 268 F. Supp.2d at 633–34. Further casting doubt on the application of the privilege in instances where a legal opinion is disseminated, the *Wachovia* court also held that if a legal opinion, which might have been privileged when it was give to clients, loses its privileged status when it is subsequently circulated to third parties, including investors. *See* 268 F. Supp.2d at 636.

In *John Doe No. 1 and John Doe No. 2 v. KPMG L.L.P., United States, Intervenor*, 325 F. Supp.2d 746 (N.D.Tex. 2004)), taxpayer- plaintiffs sought to enjoin KPMG from disclosing their identities to the IRS. The court rejected this argument, holding "[d]isclosing Plaintiffs' identities to the IRS . . . only reveals Plaintiffs' participation in these shelters; it does not reveal any confidential communication made regarding these tax shelters." 325 F. Supp.2d at 752-53 *citing United States v. BDO Seidman*, 337 F.3d 802, 812 (7th Cir. 2003). The court went on to find that:

>Plaintiffs' had no reasonable expectation of confidentiality as to their participation in the . . . tax shelter because of the provisions in I.R.C. §§ 6111 and 6112. Section 6111 requires the organizer of a tax shelter to register the tax shelter with the IRS, and § 6112 requires organizers and sellers of tax shelters to maintain lists of investors in tax shelters. . . . If Plaintiffs' tax returns were audited, Plaintiffs would be required to explain how the losses resulted. Knowing that any information included on a tax return could be questioned during an audit, Plaintiffs could not have reasonably believed their participation in the tax shelter was confidential. . . . The Court, therefore, adopts the Seventh Circuit's conclusion that §§ 6111 and 6112 destroy any reasonable expectation of confidentiality as to participation in a tax shelter. See *BDO Seidman*, 337 F.3d at 812.

325 F. Supp.2d at 753.

In *United States v. KPMG, LLP*, 316 F.Supp.2d 30, (D.D.C. May 4, 2004), the court ruled that communications between the accounting firm that offered certain tax

strategies, and a law firm that provided concurring opinions for several of them were not privileged:

> Further evidence suggesting that Brown & Wood was not engaged in rendering true legal advice, but was rather a partner with KPMG in its tax shelter marketing strategy, is found in a 1997 e-mail exchange between Gregg Ritchie at KPMG Los Angeles and Randall A. Hamilton at KPMG Des Moines. In response to Hamilton's question about whether his FLIP customer must pay a fee for the Brown & Wood legal opinion, even if the customer did not request that opinion, Ritchie states:
>
>> If we are found to be a promoter of a tax shelter, the client is not protected from [I.R.C. §] 6662 penalties by reliance on our opinion only. Also, *our deal with Brown & Wood is that if their name is used in selling the strategy, they will get a fee. We have decided as a firm that B&W opinion should be given in all deals.*
>
> Third Halpert Decl. Ex. A (emphasis added).
>
> This arrangement was carried on for years. For example, Documents 897, 898, and 899 are an exchange of e-mails in September 2000 and May 2001 which the Special Master characterized as relating to "a fee alleged to be due outside counsel by a client of both the outside counsel and KPMG." Final Report and Recommendation at 62. Such a characterization understates the importance of these e-mails, however, for what they really are is additional evidence of the improper arrangement between KPMG and Brown & Wood to further KPMG's tax shelter marketing strategy.

While privilege is often a very significant card for the practitioner to hold in a criminal tax investigation, the defense attorney should be aware that the recent case law may severely curtail his ability to claim privilege in the tax shelter setting.

  D. <u>Targets Beyond the Promoter and the Participants.</u>

  Aside from the accounting firms and law firms who typically devised the recent technical shelters, banks and financial institutions were active and necessary participants in many of the shelters. These institutions closely scrutinized the tax-motivated transactions with respect to which they assisted, often reviewing the opinions, and sometimes making representation statements that were critical to the opinion. Some of these institutions built a significant book of business facilitating shelter transactions. In light of their profit from this activity, clearly it is possible that the IRS or some clever prosecutor may choose to scrutinize their participation very closely.

  E. <u>Fraud by the Tax Shelter Promoters on their Clients.</u>

  Especially in situations where the tax shelters were completely without any reasonable factual or legal support, and those situations where purported tax shelter "investments" (which are used to justify the deduction or loss) turn out to be bogus, the

DOJ has charged tax shelter promoters with committing fraud on their clients. This was done by the DOJ Tax Division in the Anderson Ark & Associates Indictment. The specter of fraud charges raises a new set of concerns regarding the handling of alleged fraud proceeds, e.g., money laundering, acceptance of fees, and possible fee forfeiture.