IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| CARLOS E. SALA and | ) | |
| TINA ZANOLINI SALA, | ) | |
| | ) | 05-cv-00636-LTB-OES |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION
FOR STAY PENDING RELATED CRIMINAL TRIAL

---

Defendant, the United States of America ("United States"), by its undersigned counsel,

submits the following memorandum in support of its motion for a temporary stay of this civil

action.  The motion is made at the request of the Office the United States Attorney for the

Southern District of New York ("OUSA"), which Office is responsible for the Government's

prosecution of a related criminal proceeding - United States v. Stein, et al. (No. S1 05 Cr. 888,

S.D. N.Y.) (hereinafter "Stein").[1]   That case is the largest criminal tax case ever filed and

---

[1]         In its Rule 26 Statement the United States explained that such a request might be forthcoming.
The OUSA has requested that similar stay motions be filed in other civil cases handled by the Department
of Justice's Tax Division and by the IRS.  Those other civil cases are pending in the United States Tax
Court, the Court of Federal Claims and federal district courts in Texas and California.  Exhibit 1, Fourth
Declaration of Shirah Neiman filed in Shasta Strategic Investment Growth Fund, LLC and Presidio
Growth LLC (Tax Matters Partner) v. United States, (Case No. C-04-4264 N.D. Cal.) (hereinafter

involves criminal charges against accountants and lawyers, including the former leadership of

KPMG, one of the largest accounting firms in the world.  The tax shelter transaction at issue here

is the subject of a Superseding Indictment in <u>Stein</u>, and the witnesses and evidence in the civil

and criminal cases necessarily overlap.  The stay request is intended to prevent prejudice to the

Government's criminal case and ongoing investigation.  The stay request is also made by the

Justice Department's Tax Division which is responsible for the defense of this civil case.

Because of the pendency of the criminal trial, critical witnesses in this case who have

information about Carlos Sala and his motivations and considerations in first considering, and

ultimately participating in, a tax shelter transaction, have already and/or will likely assert their

Fifth Amendment privilege and refuse to provide testimony necessary for the Government to

fully and fairly defend this case.

A trial in <u>Stein</u> is scheduled for September 2006.   The United States requests that this

case be stayed until the conclusion of the trial in <u>Stein</u>.

## **INTRODUCTION**

Plaintiffs, Carlos and Tina Sala's ("Salas") refund claim arises out of a $60,449,984

deduction reported on their 2000 joint federal income tax return.  <u>See</u> Exhibit D to United States'

Reply to Plaintiffs' Response to Motion for Relief Under Fed. R. Civ. P. 56(f) with Respect to

Plaintiffs' Motion for Partial Summary Judgment, Docket No. 44 (hereinafter "Reply"), at Line

17.  Tellingly, the claimed deduction offsets a nearly identical amount of reported income –

**$ 60,476,388**.  (*Id*.)  Thus, despite earning in excess of sixty million dollars in 2000, Plaintiffs'

reported owing **$ 0** in federal income taxes.

---

"<u>Shasta</u>").   That court recently granted the Government's stay request and, at least to date, such relief has
either been granted or is pending in other courts.

1463212.11463212.1

The United States challenges the claimed deduction because it arises from an illegal tax shelter transaction and lacks both a profit motive and is devoid of economic substance.  26 U.S.C. § 165; *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002) (recognizing the validity of judicially crafted doctrines to invalidate favorable tax treatments of shelter transactions.)   The Plaintiffs' carefully selected shelter was designed solely to generate tax losses -- in this case, **over sixty million dollars worth** for the Salas alone – and accomplished this feat in a matter of two months.  The Salas' tax shelter is one of the shelters specifically encompassed by the charges in the Superseding Indictment.

Because of the extensive overlap of this civil case and the criminal case pending in the Southern District of New York, the United States requests a stay to prevent harm to the criminal prosecution and to permit the United States the opportunity to mount a full and complete defense in this case unencumbered by claims of Fifth Amendment privilege and with access to all relevant information.

A declaration by Chief Counsel to the United States Attorney for the Southern District of New York and Assistant United States Attorney Shirah Neiman is annexed hereto in support of the Government's Motion.[2]  Exhibit 2.

## SUMMARY

The civil and criminal cases overlap.  In broad strokes, Carlos Sala ("Sala") considered or agreed to participate in virtually all of the various illegal shelter transactions described in the <u>Stein</u> criminal indictment.  Exhibit A to Reply (Docket No. 44).  KPMG has admitted that these

---

[2]     Should this Court deem it helpful, a supplemental declaration can be submitted, under seal, explaining with more precision the harm to the criminal prosecution in *Stein* in the absence of a stay of this civil case.

1463212.11463212.1

shelters were bogus.  Most importantly, the OUSA states that the **SOS shelter that is the subject of this civil lawsuit is one of the SOS shelter transactions encompassed by the charges in the Indictment**.  Moreover, the criminal defendants are either KPMG partners or individuals who worked with KPMG on various shelter transactions.  Several of the criminal defendants participated in communications about Sala and these shelters.  Indeed, Sala even initiated some of these communications.  These communications indicate that those criminal defendants were intimately involved in assisting the Salas in entering into and implementing their shelter.  At least one criminal defendant, R.J. Ruble ("Ruble"), an attorney, communicated directly with Sala's counsel (Larry Nemirow, Esq.) and with a KPMG partner about Sala's SOS transaction.

KPMG partner Tracie Henderson, Sala's accountant, tax shelter adviser and tax return preparer, appears as a common thread throughout Sala's consideration of shelter transactions.  Henderson was a member of KPMG's Innovative Strategies group which, according to the indictment, was focused on "designing, marketing, and implementing tax shelters for individual clients."  Henderson, through counsel, is refusing to testify in this case based upon her assertion of her Fifth Amendment privilege.  Exhibit 3.   The head of Innovative Strategies at the time was criminal defendant Jeffrey Eischeid ("Eischeid") with whom Henderson had communications regarding Sala's shelter transactions.

Prior to entering the SOS shelter, Sala, working with Henderson, committed to a BLIPS transaction.  BLIPS is also one of the illegal shelter transactions encompassed by the criminal indictment. Sala later changed his mind after the IRS issued a Notice invalidating the transaction.  A short time later, Henderson was instructed by criminal defendant Eischeid to suggest that Sala

consider an OPIS shelter.  OPIS is also one of the illegal shelter transactions covered by the indictment.  Sala ultimately settled upon SOS which is the transaction at issue here.  Each of these transactions, whether consummated or not, bears upon Sala's motivations for seeking to shield his income from taxation using the SOS shelter.  His motivation for entering into the shelter is an important issue in this case.

On October 17, 2005, criminal charges were filed against nineteen individuals in connection with OPIS (a variation of FLIP), BLIPS and SOS.  Many of the criminal defendants have information relevant to this case.  For example, with regard to Sala's failed BLIPS transaction, Henderson, at Sala's request, spoke with criminal defendant David Amir Makov ("Makov") about the economics of the BLIPS deal.  Discovery of what was discussed will reveal Sala's motivations in seeking out these transactions and whether these transactions were entered into for profit, both of which are at issue here.

Criminal defendant Ruble wrote opinion letters for KPMG's clients in connection with these shelter transactions.  Ruble wrote an opinion letter for the Salas' SOS shelter.  The indictment charges Ruble with preparing opinion letters he knew to be false and fraudulent and which contained false representations by the clients.  Sala paid Ruble $75,000.  Henderson had conversations with Ruble, and Ruble also spoke with Sala's counsel, Larry Nemirow about the SOS shelter.  Henderson also spoke with criminal defendant Makov shortly before Sala entered the SOS shelter, presumably about that shelter transaction.  The testimony of these individuals will likewise provide information about what Sala knew and what he intended regarding the SOS transaction.

1463212.11463212.1

In light of the criminal charges, none of the criminal defendants can reasonably be expected to testify.  Some have already declined to do so, albeit in other civil cases.  Others not indicted, but still fearing prosecution, will likely refuse as well.  Tracie Henderson, identified as a probable witness by both parties, has represented through counsel that she will refuse to answer questions if deposed and intends to assert her Fifth Amendment privilege against self-incrimination.  However, these witnesses have critical knowledge of Plaintiffs efforts to shelter income, their motivation in entering into a shelter transaction, and that Plaintiffs lacked a profit motive in doing so.  Further, they can establish that the representations made by Sala and others that are contained in the Ruble opinion letter to Sala, are false.  In light of this, absent a stay, the Government will be unfairly prejudiced in developing evidence to mount a full and fair defense in this case.

Moreover, the OUSA has information which would be helpful to the defense, but which it cannot reveal either because of grand jury secrecy rules, or because to do so would prejudice the criminal case.  The Government should not be forced to make a "Hobson's Choice" where it must decide either to protect the criminal case by not making important evidence available to its attorneys in the civil case, or protect the civil case by prematurely exposing the evidence to be used in the criminal trial.  No matter the choice it makes, one or both of the Government's cases will be unfairly prejudiced.

Because of the strong public interest in the criminal prosecution, because of the harm to the public interest if the Government cannot properly defend this civil case, and because any delay will not unduly prejudice the Plaintiffs, the United States requests that this case be temporarily stayed.

1463212.11463212.1

## THE SUPERSEDING INDICTMENT

The seventy-page Superseding Indictment filed on October 17, 2005 charges individuals with crimes including conspiracy to defraud the Internal Revenue Service, tax evasion and obstruction of the IRS.  Exhibit A to the Reply (Docket No. 44).    The Superseding Indictment alleges that:

- KPMG, LLP ("KPMG"), a co-conspirator, provided tax services to individual clients, including some of the wealthiest individuals in the United States through its practice known as Personal Financial Planning.  The KPMG Group that focused on tax shelters was known as either "CaTS" and "Innovative Strategies" (*id*. at ¶¶ 1-2).  Criminal defendant Jeffrey Eischeid was the head of KPMG's Innovative Strategies Group (*id*. at ¶ 11);

- Criminal defendant R.J. Ruble is a New York tax lawyer who provided fraudulent tax opinions to KPMG clients for numerous shelter transactions, including BLIPS and SOS (*id*. at ¶¶ 16 , 27, 47 and 49);

- Criminal defendant David Amir Makov helped form a limited liability company and used this and related entities to participate in certain shelter transactions (*id*. at ¶ 13);

- Criminal defendant Larry Delap ("Delap") was a KPMG partner and Partner-in-Charge of its Department of Professional Practice-Tax.  (*id*. at ¶ 14);

- Criminal defendant Steven Gremminger ("Gremminger") was a KPMG partner and associate general counsel and the primary legal contact for KPMG's tax practice (*id*. at ¶ 15);

- Criminal defendant Carol Warley ("Warley") was a KPMG partner and was part of the Innovative Strategies group (*id*. at ¶ 20);

- The criminal defendants participated in a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters, by preparing and causing to be prepared, and filing and causing to be filed with the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent tax shelter losses (*id*. at  ¶¶ 25 and 78(rr));

- The fraudulent shelters included OPIS, BLIPS and SOS shelters (*id.* at 28);

1463212.11463212.1

- SOS shelters were designed to generate substantial losses through a series of prearranged  transactions that involved clients entering into virtually offsetting foreign currency option positions, sometime transferring these positions to a partnership or other entity, then withdrawing from the transactions and claiming a loss in a desired amount (*id*. at 47);

- KPMG's National Tax Office reviewed draft SOS opinion letters prepared by Ruble and others, and determined that the transactions described in those opinion letters were not more likely than not to withstand IRS challenge.  Nevertheless, KPMG partners, including Jeffrey Eischeid, Larry Delap, Steven Gremminger, Carol Warley and others, along with Ruble and others, assisted in marketing and implementing SOS transactions for KPMG clients.  In many of  these transactions, KPMG did not issue an opinion letter, but instead, certain lawyers, including Ruble, did.  (*id*. at 47); and

- The SOS opinion letters were false and fraudulent in a number of ways, including that they falsely described SOS as an investment and falsely claimed that the client would have entered into the options positions independent of the other steps that made up SOS.  (*id*. at ¶ 49).

### FACTS IN SUPPORT OF A STAY

It bears repeating here:

> The Carlos Sala **SOS shelter** that is the **subject of this civil lawsuit** is one of the SOS shelter transactions **encompassed by** the charges in the **Indictment**.

Exhibit 2 at ¶ 2) (emphasis supplied.)

By way of background, Plaintiffs' initial contact with KPMG was through Tim Gillis, a KPMG partner and an old friend of Carlos Salas.  Exhibit G to Reply (Docket No. 44).   In the months leading up to his participation in the SOS transaction, Sala worked with KPMG accountant Tracie Henderson on a number of potential shelter options.  Several of the criminal defendants also participated in these efforts.

*Sala's Quest to Shelter Income*

The informal discovery that the United States has performed to date shows that plaintiff Carlos E. Sala ("Sala") used KPMG as his agent to locate and present to him loss-generating tax shelters, and to develop and implement his entry into the loss-generating transaction.  In that role, KPMG, through Tracie Henderson, presented to Sala at least seven separate tax shelters, both before and after the failed BLIPS deal, and spent a great deal of effort selecting and placing Sala into the SOS transaction at issue in this case.

The first known transaction KPMG presented to Sala is called the Tax Relief Act Charitable Trust (TRACT) tax shelter.  KPMG presented that tax shelter to Sala on October 1, 1999.  See TRACT Presentation, Exhibit H to Reply (Docket No. 44).  On October 18, 1999, TRACT was invalidated by TREAS. REG. 1.643(a)-8.

The second known transaction KPMG presented to Sala was the BLIPS2000 variant of the Son of BOSS tax shelter.  KPMG's promotion and implementation of the BLIPS shelter is also the subject of the Stein criminal indictment and KPMG has conceded that the "losses" generated by BLIPS are "bogus," and the transaction was premised on false and fraudulent representations. See Composite Exhibit Transcript of Hearing and accompanying Statement of Facts Exhibit E to Reply at p.5 at ¶20.  The record indicates that Sala agreed to enter into the BLIPS2000 transaction on or about June 6, 2000.  Exhibit I to Reply (Docket No. 44).  Prior to reaching an agreement on BLIPS, Sala directed Tracie Henderson to contact criminal defendant David Amir Makov to inquire about the economics of the transaction. February 10, 2000 email from Henderson to Makov, Exhibit J to Reply.  A June 2000 memorandum to another criminal defendant, Larry Delap (with a copy to criminal defendant Eischeid) reported on

1463212. 11463212.1

communications between the Salas' counsel and KPMG about the Salas' request to change the terms of their shelter engagement letter with KPMG to delete any reference to the IRS challenging "the program."  June 30, 2000 Delap Memorandum, Exhibit K to Reply.  The BLIPS tax shelter was invalidated as an abusive tax shelter by IRS Notice 2000-44, released August 13, 2000.  Sala backed out of that transaction in late August or early September 2000.

The third known transaction KPMG presented to Sala is known as the Common Trust Fund Straddle (CTF) tax shelter.  KPMG began discussing offering this loss-generating transaction to Sala as early as May 23, 2000.  See Exhibit L to Reply.  On October 6, 2000, while assisting Sala in finding a replacement for BLIPS2000, Tracie Henderson sent an email to Jeffrey Eischeid stating that Sala "doesn't seem inclined to [do] CTF.  He must decide about this other transaction by Friday."[3]  Exhibit M to Reply.  It appears from the record that the "other transaction" referenced in the email was an options transaction promoted by R.J. Ruble or Brown & Wood LLP; however, while discovery has not yet been taken as to this matter, it may well be that this "other transaction" is the SOS transaction at hand.  Id.

The fourth known transaction KPMG presented to Sala is called the Offshore Portfolio Investment Strategy (OPIS).[4]  OPIS is yet another of the shelters encompassed by the Stein criminal indictment, and KPMG has conceded that the "losses" generated by OPIS are "bogus" as well.  See Composite Exhibit Transcript of Hearing and accompanying Statement of Facts at p. 3, ¶6, Exhibit E to Reply.  On October 3, 2000 Jeffrey Eischeid, indicted KPMG partner, emailed Tracie Henderson "scripts for [her] conversations with clients on the following [OPIS]

---

[3]     The CTF transaction was invalidated as an abusive tax shelter by IRS Notice 2003-54.

[4]     The OPIS tax shelter was invalidated as an abusive tax shelter by IRS Notice 2001-45.

deals." Exhibit N to Reply.  Sala and his friend Martin White[5] were identified as part of the sixth

presentation group.  Id.; see also Exhibit G to Reply.

The fifth known transaction KPMG presented to Sala was the transaction at issue, the

SOS variant of the Son of BOSS tax shelter; a transaction also invalidated as an abusive tax

shelter by IRS Notice 2000-44.  Sala entered into that transaction on October 23, 2000, two

months after the Notice invalidating the tax shelter was released on August 13, 2000.  As with

BLIPS and OPIS, the SOS transaction is encompassed by the Stein criminal indictment and

KPMG has admitted its invalidity. See Composite Exhibit Transcript of Hearing and

accompanying Statement of Facts at ¶20, Exhibit E to Reply.  In connection with SOS shelter

transactions, the indictment brings criminal charges against numerous defendants, including

several believed by counsel to be specifically involved with Sala, including Jeffrey Eischeid,

Carol Warley, David Amir Makov and R.J. Ruble.

The sixth known transaction KPMG presented to Sala (via his Colorado tax counsel

Lawrence Nemirow of Davis Graham & Stubbs LLP) is referenced as "involv[ing] options on a

mutual fund pool held in a Rabbi Trust." On October 10, 2000 this "alternative" was discussed in

a meeting between Gary Powell (KPMG employee) and Lawrence Nemirow.  See Exhibit O to

Reply.

The seventh known transaction KPMG presented to Sala is known as the Partnership

Option Portfolio Strategy (POPS).[6]  KPMG was discussing this loss-generating transaction with

Sala at least as early as November 3, 2000.  Exhibit P to Reply.

---

[5]     The documents provided by KPMG indicate that Martin "Tony" White, president of DoubleClick, also sought to shelter his tax year 2000 DoubleClick income.  Those documents show that KPMG also placed him into the BLIPS2000 transaction (which ultimately failed).  See Exhibit I to Reply.

The eighth known transaction is referenced as a "Jones Day transaction."  On September 6, 2000 Tracie Henderson emailed Tim Gillis (a KPMG partner) stating that she had just spoken with Sala, and that "we are hoping to do a Jones Day transaction for Sala.  However, it appears that Jones Day may be getting cold feet; they are having second thoughts about writing the opinion letter."  Exhibit Q to Reply.  It is unclear whether the Jones Day transaction is different from the seven other loss-generating tax shelters offered to Sala, and whether Jones Day was getting "cold feet" in response to Notice 2000-44.

*Sala's Incomplete Declaration*

Plaintiff Carlos Sala attempts to minimize the role of KPMG in this case.  In fact, He insists that "KPMG played no role in the transactions at issue in this case, other than as a return preparer, compensated on an hourly basis."  Response to Rule 56(f) Motion (Docket No. 33) at 15.  As explained more fully below, this is not accurate.

Sala does admit that he used KPMG to find and set up the BLIPS2000 shelter, which he backed out of when Notice 2000-44 was released.  Plaintiffs' Response to Rule 56(f) (Docket No. 33 at 15.  When Sala backed out of BLIPS2000, KPMG lost out on its $700,000 fee.  Exhibit R to Reply (Docket No. 44) at 3.  What Sala has failed to disclose was that after that BLIPS2000 deal fell through, he told Tracie Henderson, KPMG partner, that he would do a transaction with KPMG if KPMG was able to find one, "but if not, he would use KPMG as his advisor on another deal."  September 6, 2000 Email from Tracie Henderson to Tim Gillis, Exhibit Q to Reply.

Sala's declaration states that he paid KPMG only for its preparation of his 2000 tax returns.  Sala Declaration at ¶8(f),(g).  Docket No. 32.  However, of the $25,000 KPMG charged

---

[6]     The POPS tax shelter was invalidated as an abusive tax shelter by Notice 2002-50.

Sala, only $6,225 was for preparation of Sala's tax returns and the rest was to cover KPMG's tax advisor's fee.  Exhibits S, T and U to Reply.  The drafts of this bill show that the "tax advice" was in regard to Sala's DoubleClick Form W-2, which indicated $51,748,681 in income from salary and the exercise of his stock options and involved KPMG's discussions regarding lowering that stock option gain.  Exhibit U to Reply.

The declaration also states that KPMG had no dealings with Deerhurst, the firm Sala claims implemented the SOS transaction, and that he did not invest in, or claim a loss with respect to, any KPMG-promoted investments.  Sala Declaration (Docket No. 32) at ¶¶8(d), 8(f), 9.  The limited informal discovery the United States has conducted up to this date belie these statements.  As discussed below, KPMG's own documents show that it, as Sala's agent, took a significant, material role in locating, developing, and implementing Sala's entry into this abusive tax shelter, and that plaintiffs paid KPMG an advisor's fee for that material assistance.  The United States' information on this subject comes from KPMG's own records produced by KPMG's counsel, Skadden Arps.  There is no indication that any of this information was available or provided in the "over 1800 pages of documents [plaintiffs] provided to the IRS." Sala Declaration at ¶7 (Docket No. 32); Response (Docket No. 33) at 11.

The below facts, as they are now known, detail the extensive work KPMG (which has admitted that these SOS transactions were fraudulent and bogus) did to locate, develop, and implement Sala's entry into this abusive tax shelter, and show that KPMG, as Sala's agent and advisor in this transaction, "worked with" Deerhurst Management and MultiNational Strategies, in addition to several outside attorneys from several firms, when locating, developing, and implementing Sala's entry.

1463212.11463212.1

- On August 13, 2000 IRS Notice 2000-44 was released, invalidating the BLIPS2000 transaction.  Five days later, Tracie Henderson emailed Sala a chronology titled "Timing of the Transaction" which set forth the dates on which each step of the BLIPS2000 transaction would occur.  See Exhibit V to Reply (Docket No. 44).  It is clear that at this point, Sala and KPMG were still preparing to go forward with the BLIPS2000 transaction.

- On August 31, 2000 Tim Gillis emailed Tracie Henderson regarding a conversation he had with Sala, stating that "they are rethinking what if anything they should do."  See Exhibit W.  This email indicates that by this time, Sala was aware that the IRS had invalidated the BLIPS2000 transaction he had been planning to enter.  Six days later, Tracie Henderson emailed Tim Gillis stating that she had just gotten off the telephone with Sala and that "**he said he would do a transaction with [KPMG] if we are able to do one.  Otherwise, he will use us as an advisor on another transaction**.  We are hoping to do a Jones Day transaction for Carlos Sala."  See Exhibit Q to Reply (emphasis added).  This conversation makes clear that Sala asked KPMG to play a continuing role as his agent to find him a transaction, that he would pay KPMG for its effort, and that in its role as agent, KPMG was already searching for new loss-generating transactions.

- On September 14, 2000 Tracie Henderson met with Bruce Amman (the Morgan Stanley investment advisor to Sala and Martin White[7]) at Benny's (a Denver restaurant) to "discuss investment."  (Sala was billed for the cost of the meal.)  See Exhibit P to Reply.

---

[7]      The documents provided by KPMG indicate that Martin "Tony" White was also placed into this SOS variant of the Son of BOSS transaction.  See Exhibit X.

Without having had the opportunity to take discovery as to the particulars, it can only be surmised that this meeting was part of KPMG's active attempts to locate a new transaction.

- On October 3, 2000 Jeffrey Eischeid (indicted former head of KPMG's "Innovative Strategies" group and Partner-in-Charge of KPMG's Personal Financial Planning group) emailed Tracie Henderson the script for her conversation with Sala on the Offshore Portfolio Investment Strategy (OPIS) tax shelter.  See Exhibit N to Reply.  The Innovative Strategies group was KPMG's name for the KPMG division that designed, marketed, and implemented tax shelters.  Superseding Indictment, Exhibit B to Reply at ¶2.  The Superseding Indictment charges, and KPMG admits, that OPIS is a fraudulent transaction.  Exhibit A to Reply at ¶¶ 34-37; Exhibit E to Reply at pp 1-4.

- Jeffrey Eischeid's email was copied to Steven Gremminger (indicted KPMG partner and associate general counsel in KPMG's Office of General Counsel) and indicated that Carlos Sala and Martin White trading had not commenced.  See Exhibit N to Reply.  It is unclear why there was confusion as to whether any trading had commenced; regardless, this email indicates that two of the indicted KPMG persons were involved in marketing shelters to Sala, and monitoring, at minimum, the transactional activity necessary to carry out the shelters.

- On October 6, 2000 Sala sent Tracie Henderson a September 15th draft Brown & Wood LLP opinion letter titled "Re: Investments in Foreign Currency." Exhibit Y to Reply (full attachment not included).  This opinion letter appears to be a template for the SOS transaction eventually entered into by Sala.  That same day, Tracie Henderson billed Sala

$450 for a one-hour discussion of the "new strategy."  <u>See</u> Exhibit P to Reply.  Three days later, Tracie Henderson's billing records show that she read the opinion letter, called R.J. Ruble (believed to be the author of this draft opinion), and discussed the contents of that call with Sala.  <u>See</u> Exhibit P to Reply.  Those records show that Tracie Henderson billed Sala $2500 for those 5 hours of work.

- On October 9, 2000 Gary Powell (KPMG employee) scheduled a meeting with Lawrence Nemirow for the purpose of presenting two alternative tax shelter transactions.  The persons scheduled to attend were R.J. Ruble, Mary Heath (KPMG Tax Partner, D.C. Office), Carol Warley (KPMG partner, Washington National Tax and a <u>Stein</u> criminal defendant), Tracy Stone (KPMG partner, Washington National Tax), and Pamela Weems (KPMG partner).  <u>See</u> Exhibit Z to Reply.  That meeting took place the following day, but at that meeting only one transaction alternative was presented.  KPMG did not present the second transaction because Lawrence Nemirow refused to sign a non-disclosure agreement.  <u>See</u> Exhibit AA to Reply.  It was at this meeting that the tax shelter involving "options on a mutual fund pool held in a Rabbi Trust" was discussed.  <u>Id</u>.

- Also on October 9, 2000 Tracie Henderson emailed Jeffrey Eischeid stating that "Sala talked to Beckett Cantley [a tax attorney then practicing with Rachelson & White] about R.J. Ruble's option strategy and he likes it.  He has seven clients doing the transaction.  Carlos [Sala] wants me to talk to him tomorrow at 1:00.  Hopefully, I can talk to R.J. Ruble first.  Carlos doesn't seem inclined to [enter into the] CTF [Common Trust Fund Shelter].  He must decide about this other transaction by Friday."  <u>See</u> Exhibit BB to

1463212.11463212.1

Reply.  The following day, Tracie Henderson made that telephone call to Beckett

Cantley, and billed Sala $900 for the two-hour call.  See Exhibit P to Reply.  As

discussed above, KPMG began discussing the CTF[8] transaction with Sala as early as May

23, 2000.

- Two days later, on October 11, 2000, it appears that KPMG stepped up its efforts to

    locate a new transaction.  On that date, Tracie Henderson found Sala an "attorney" in

    Bruce N. Lemmons (then practicing with Holland & Hart) and "investment help" in

    David Amir Makov (a Stein criminal defendant and co-owner of Presidio).  See Exhibit

    P.  Sala was billed $450 for Tracie Henderson's effort.  Id.  The next day, Tracie

    Henderson had a one-hour telephone call with Makov, billing Sala $450 for that

    discussion.  See Exhibit P.  This call took place well after Sala backed out of the

    BLIPS2000 transaction, which was set up using Presidio as a promoter.  The reason

    Tracie Henderson was using Makov for "investment help" at this point in time is

    unknown, but this evidence nevertheless points to KPMG's role as Sala's agent in

    locating, developing, and implementing his entry into a loss-generating transaction.

- On October 13, 2000 Tracie Henderson had a 1.5 hour telephone call with Bruce

    Lemmons, and billed Sala $675 for that discussion.  See Exhibit P to Reply.  At this time,

    the United States has no knowledge of the substance of this telephone call, and without

    discovery cannot determine why KPMG sought another attorney's help during the period

    in which it was charged with finding Sala a loss-generating transaction.  The probable

    fact may be that Lemmons and Makov jointly developed, marketed, and implemented

---

[8]     CTF was invalidated as an abusive tax shelter by Notice 2003-54.

these or similar tax shelters.[9]  The documentary evidence indicates that Sala paid Holland & Hart, Lemmon's firm, $4,200 in professional fees for its role in this transaction.  See Exhibit CC to Reply.

- On November 3, 2000 Tracie Henderson presented Sala with another tax shelter transaction, the POPs shelter.  See Exhibit P to Reply.  As discussed above, POPs was another tax shelter transaction later invalidated by IRS Notice 2002-50.  Sala was billed $450 for this discussion.  See Id..  One month later, on December 6, 2000 Tracie Henderson, Sala, and Kevin Brady (KPMG Senior Manager) met in Atlanta[10] for lunch at Nona's Italian Kitchen to discuss personal financial planning.  Sala was billed for the cost of the meal.  See Id.

- On December 23, 2000 Bruce Amman sent Tracie Henderson updated income projections for Sala's 2000 tax year, along with a spreadsheet showing Sala's interest gains and losses.  See Exhibit DD to Reply.  It was at this point that KPMG knew exactly how much of a loss would be required to offset Sala's income.  On or about December 29, 2000, Sala liquidated Solid Currencies LLC (creating the $60,449,984 in artificial tax losses) and contributed the remaining assets to Deerfield Trading Strategies LLC. See Exhibit EE to Reply.  On or about December 31, 2000, or at least in a letter dated that

---

[9]      It appears that Makov actively developed BLIPS with KPMG and others, as charged in the Superseding Indictment, and acted as investment adviser while Lemmons wrote shelter opinion letters.  See Exhibits KK and NN (reflecting that Lemmons met with Tracie Henderson and Stein criminal defendants Eischeid, John Larson, Amir Makov, R.J. Ruble and Mark Watson in connection with OPIS, BLIPS and possibly other shelter transactions),

[10]     KPMG's Innovative Strategies group was headquartered in Atlanta, and it is believed that Tracie Henderson worked out of this office.

date, Brown & Wood LLP issued its tax opinion letter blessing the SOS transaction.  <u>See</u> Exhibit EE.

- On March 20, 2001 Tracie Henderson spent two hours discussing "strategy issues" with Lawrence Nemirow, billing Sala $900.  <u>See</u> Exhibit P to Reply.  On April 9, 2001, Lawrence Nemirow forwarded to Tracie Henderson an email he sent to R.J. Ruble with changes he wanted to make to the Brown & Wood representation letters.  Exhibit FF to Reply. Mr. Nemirow requested that R.J. Ruble change the language of one paragraph from "Investor actively participates in management" to read "Investor invests directly in marketable securities."  <u>Id</u>.  This change was likely made to bolster the plaintiffs' position that there was a business purpose to the transaction.

- On April 12, 2001 Tracie Henderson emailed R.J. Ruble asking him to re-send the Sala opinion letter to her, as she hadn't received it.  She also stated that Lawrence Nemirow "would like an email from you [R.J. Ruble] stating that you considered any developments from December 31 (the date of the Opinion Letter) through the issue date."  <u>See</u> Exhibit GG to Reply.  On April 9, 2001 Lawrence Nemirow had emailed Tracie Henderson, stating that he had received a final opinion letter from R.J. Ruble, but was waiting for Sala to execute his representation letter before he would release the opinion letter.  <u>See</u> Exhibit HH to Reply.  It is clear that even when Sala's Colorado attorney was independently working on matters related to this transaction, he kept KPMG closely informed as to his activities.

- Finally, on August 21, 2003 Tracie Henderson emailed Jeffrey Eischeid and stated that Deerhurst Management and MultiNational Strategies LLC[11] are firms that KPMG has "worked with" to provide tax advantaged transactions to their clients.  See Exhibit II to Reply.  While Sala declared that KPMG had no relationship with Deerhurst, KPMG, by its own admission, used those firms to provide tax-advantaged transactions to its clients.

## ARGUMENT

Because of the extensive overlap of this civil case and the criminal case pending in the Southern District of New York, a stay is warranted to prevent harm to the criminal prosecution and to permit the United States the opportunity to mount a full and complete defense in this case unencumbered by claims of Fifth Amendment Privilege and with access to all relevant information.  The overwhelming weight of legal authority points to the necessity of a stay in such a situation.

**A.    LEGAL STANDARD**

Federal courts may stay civil proceedings pending the outcome of a related criminal prosecution in "the interests of justice."  United States v. Kordel, 397 U.S. 1, 12, n. 27 (1970); *Degen v. United States*, 517 U.S. 820, 827 (1996) (a trial court's inherent authority to manage discovery in a civil suit, includes the ability to manage the impact of a criminal proceeding to avoid interference with a related civil case); S.E.C. v. Nacchio, 2005 WL 1799372 (M.J. Shaffer) (D. Colo. 2005) (a trial court is "vested with considerable discretion to stay proceedings where required in the interests of justice") (copy attached).

---

[11]       In plaintiffs' Rule 26(a) disclosures, they identify Michael N. Schwartz, owner of MultiNational Strategies, as having information regarding "the investment program offered to Plaintiff Carlos E. Sala by Deerhurst, including the formation, the nature and structure of the specific assets bought and/or sold, the history of the investment opportunity and the future profit projections."

The Fifth Circuit in <u>Campbell v. Eastland</u>, 307 F.2d 478 (5th Cir. 1962), <u>cert. denied</u>, 371 U.S. 955 (1963), set forth the policy considerations supporting the deferral of civil discovery pending the trial of a criminal proceeding as follows:

> The very fact that there is a clear distinction between civil and criminal actions requires a government policy determination of priority: which case should be tried first.  Administrative policy gives priority to the public interest in law enforcement.  This seems so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities.

<u>Id</u>. at 487.   In keeping with this approach, requests made by Government prosecutors may be viewed more favorably than requests made on behalf of private litigants.  <u>Russell v. United States</u>, 76-1 USTC ¶ 9377 (10th Cir. 1976) (copy attached) (commenting favorably upon the trial court's decision to give "substantial weight to the Government's demonstrated concern for the interference with the criminal proceeding.")

This Court recently enumerated factors to be considered in determining whether a stay is appropriate.  <u>S.E.C. v. Rivelli</u>, No. 05CV1039 (RPM), 2005 WL 2789317 (D. Colo. October 26, 2005) (copy attached) (hereinafter "<u>Rivelli</u>").   The <u>Rivelli</u> factors include: (1) the extent to which the criminal and civil cases overlap, (2) the status of the criminal case, (3) whether indictments have been issued, (4) the interest of the plaintiff in proceeding expeditiously with the civil litigation, (5) the potential prejudice to the plaintiff by delay, (6) the efficient use of judicial resources, (7) the interest of non-parties to the civil litigation, (8) the interest of the public and (9) the extent to which a parties' Fifth Amendment Rights are implicated.  <u>Id</u>.

More generally, this Court (M.J. Shaffer) in <u>S.E.C. v. Nacchio</u>, <u>supra</u>, recognized that a stay is appropriate when a criminal case and a civil action involve common questions of law or

1463212.11463212.1

fact or overlap in large measure.  Id. (citing Pfizer Ireland Pharmaceuticals v. Albers Medical, Inc., 225 F.R.D. 591, 592 (W.D. Mo. 2004) and S.E.C. v. Downe, 1993 WL 22126 (S.D.N.Y. 1993) (copy attached)).

**B.      THE *RIVELLI* FACTORS  SUPPORT A STAY**

The factors set forth in S.E.C. v.  Rivelli support the granting of a stay until the conclusion of the criminal trial scheduled for September 2006.

1.      The Criminal and Civil Cases Overlap

Despite having determined SOS shelters to be invalid, and that the "losses" generated by them were not "more likely than not" to pass IRS scrutiny, KPMG personnel, including criminal defendants Jeffrey Eischeid, Larry Delap, Steven Gremminger and Carol Warley, and Sala's KPMG accountant Tracie Henderson, and others, participated in placing KPMG clients into SOS shelters.   According to Assistant United States Attorney Shirah Neiman, "[t]he Carlos Sala SOS shelter that is the subject of this civil lawsuit is one of the SOS shelter transactions encompassed by the charges in the Indictment."  Exhibit 2 at ¶ 2. (emphasis added).

The Superseding Indictment charges Ruble, who Sala paid $75,000 for his opinion letter blessing the SOS transaction, with preparing "false and fraudulent" opinion letters, "falsely and misleadingly" describing the SOS transaction, falsely asserting that clients would have entered into the option positions without the other steps comprising the transaction knowing that the clients would not have entered the transaction absent the anticipated tax loss, and falsely claiming the option positions were entered into for 'substantial non-tax business reasons.' Exhibit A to Reply (Docket No. 44)  at ¶ 47.

1463212.11463212.1

Some of the other shelters which were presented to Sala and which he considered, included BLIPS and OPIS, are also the subject of the indictment.  The indictment charges KPMG employees and others, including Jeffrey Eischeid, R.J. Ruble, Larry Delap and Carol Warley with participating in a scheme  to "defraud the IRS by devising, marketing, and implementing fraudulent shelters," including BLIPS, OPIS, and SOS by "filing and causing to be filed with the IRS false and fraudulent U.S. individual tax returns containing the tax shelter losses."  Id. at ¶ 25.

To be entitled to a deduction here, Plaintiffs must show, *inter alia*, that the shelter loss was incurred either in a trade or business or in a "transaction entered into for profit."   26 U.S.C. § 165(c).   Therefore, communications regarding Sala and SOS, BLIPS, OPIS and the other shelter transactions Sala considered are relevant to this case.  See Sochin v. C.I.R., 843 F.2d 351, 355 n. 8 (9th Cir. 1988) (recognizing the admissibility of in tax cases "of transactions involving persons not before court" to establish the lack of bona fides of a transaction) cert. denied 488 U.S. 824.  That KPMG now concedes that the deductions associated with these shelters are "bogus," merely reinforces the need for discovery to learn what was communicated to and about the Salas and their shelter transactions.

As a practical matter, the Government cannot reasonably be expected to accept Sala's version of events as being complete or accurate.  Therefore, the Government must seek out the testimony of others.  Communications pertaining to Sala and his tax shelters most often involved Tracie Henderson, Sala's accountant and tax shelter adviser.   As set forth above, Ms. Henderson had extensive communications with Sala, with various *Stein* criminal defendants, and with third parties, including Sala's counsel and investment adviser, about Sala and his shelter transactions.

1463212.11463212.1

Henderson obviously will be a key witness in this case; a fact which Plaintiffs have acknowledged in their Rule 26 disclosures.  Henderson, through her counsel, had advised that she intends to rely upon her Fifth Amendment privilege against self-incrimination and refuse to testify *in this case*.  Exhibit 3.

Many of the *Stein* criminal defendants were also involved in either discussions about Sala's shelters or in their implementation, including Ruble, Eischeid, Warley and Makov.  Not surprisingly, several of the criminal defendants have already refused to provide testimony in other civil cases and can be expected to do so here as well.  By way of example, criminal defendants Ruble, Eischeid and Gremminger have each asserted their Fifth Amendment privilege against self-incrimination and refused to testify.  <u>See</u> Declarations of Damon W.D. Wright, Esq. and Stuart D. Gibson, filed in <u>Shasta Strategic Investment Fund, LLC v. United States</u>, (Case No. 04-4264) at Docket Nos. 92 and 83, and annexed hereto as Exhibits 4 and 5, respectively.

Finally, the overlap in the civil and criminal cases can be seen in the likely harm to the Government's interest in both cases should discovery be permitted prior to the criminal trial. This is discussed in depth at ¶ 8, <u>infra</u>.

     2.     <u>The Criminal Case is Far Along and Therefore a Stay is Appropriate</u>

The stay requested is not for an indefinite period.  The likelihood of criminal charges being filed is not in doubt.  An Indictment and Superseding Indictment have been handed down. A trial is scheduled for September, 2006.  While some courts will decline to stay a civil proceeding when a related criminal matter is only in the investigative stage, such reasoning is inapplicable here given the fact of the Superseding Indictment.  *See S.E.C. v. Treadway*, 2005 WL 713826 at *3-4 (S.D.N.Y. March 30, 2005) (copy attached).

1463212.11463212.1

3.      Indictments have been issued

A Superseding Indictment has been returned.

4.      The Interest of the Plaintiff in Proceeding to
        Judgment is Similar to that of Any Other Civil Litigant

                        *and*

5.      The Potential Prejudice to Plaintiffs' is Minimal

Two of the *Rivelli* factors address the Plaintiffs' interest in proceeding expeditiously to judgment.  The United States does not dispute that Plaintiffs here, like all Plaintiffs, have such an interest.  However, any potential prejudice to Plaintiffs from delaying the civil case is minimal.  If Plaintiffs ultimately prevail in this case, they will be entitled to an award of interest (presently a generous 7%) as permitted by law.  Therefore, as the pleadings in this case acknowledge, the delay is not without compensation.  (26 U.S.C. § 6611; Complaint at p. 6.)  Moreover, it should be noted that "the desire to conclude a civil dispute quickly – whether to cut the parties' litigation expenses or to advance the court's docket - is not a compelling reason for interfering with" a criminal proceeding.  In re Grand Jury Proceedings, 995 F.2d 1013, 1017 (11th Cir. 1993).

        In addition to allegations of monetary harm, Plaintiffs contend that they will suffer a generalized harm to their "business dealings" due to the Government's assertion of a fraud defense in response to Plaintiffs' pre-discovery request for summary judgment.[12]  *See* Plaintiffs' Opposition to Defendant's Motion for Relief Under Fed. R. Civ. P. 56(f) at p. 25.  The merits of

---

[12]      Although Plaintiffs express surprise of having to confront fraud allegations in this case, they were made aware of this possibility prior to filing suit.  Attached as Exhibit A to the Plaintiffs' Complaint is a document mailed to Plaintiffs' present counsel months prior to the commencement of this lawsuit.  There the IRS provided notice that "[i]t should not be inferred by the determination of the Accuracy-Related Penalty . . . that fraud penalties will not be sought" if it is deemed appropriate to do so.  (Plaintiffs' Complaint at Exhibit A, Form 886-A Explanation of Items.)

the Government's position on the fraud issue at this preliminary stage are addressed in the Government's Motion for Rule 56(f) Relief (Docket No. 18) and in a Reply (Docket No. 44) submitted in support of that motion.  To the extent that the Government is justified in pleading a fraud defense, and noting the revealing sequence of events described above, Plaintiffs' claim of prejudice is not well taken.  At this time, the facts show that in 2000, Mr. Sala (a former Senior Vice-President and Chief Financial Officer for Abacus Direct Corp. (now Double-Click), and other entities, and  the Mergers and Acquisitions manager at Ernst & Young in New York), shopped for months for an abusive tax shelter to shelter his entire $60 million income for 2000.  When a shelter was declared invalid by the IRS, he simply moved on to another scheme.  The scheme he eventually chose has become the subject of a criminal indictment and declared by KPMG to be bogus.  That Mr. Sala should now be surprised at a fraud allegation is disingenuous at best.

      6.     <u>The Granting of a Stay Will Permit the Efficient Use of Judicial Resources</u>

It is likely that the record developed in the criminal case will shed light on the claims herein, refocus the parties on what factually remains in dispute and narrow the issues for adjudication.   A stay will also likely negate the need for two Courts to hear discovery disputes regarding witnesses and testimonial privileges and rights.  Moreover, the testimony developed in the criminal case will likely impact how discovery proceeds here and lessen the likelihood of disputes.

      7.     <u>The Interest of Non-Parties Supports the Grant of a Stay</u>

Some non-party witnesses can be expected to, and in fact have already, invoked their Fifth Amendment privilege against self-incrimination.  Apart from the fact that the United States

1463212. 11463212.1

should not be forced to defend its position with the testimony of witnesses who will likely decline to testify fully or at all, proceeding will impose additional burdens on the witnesses themselves, including the cost of counsel to appear.  Further, the granting of a stay until the conclusion of the trial in *Stein* is also likely to reduce the extent of third-party discovery allowing both parties to review the record and testimony presented at that trial.  This may reduce the number of witnesses who may need to be deposed or, at the least, narrow the scope of future discovery.

8.     Public and Government Interests Warrants a Stay

The interest of the Government and the pubic are aligned and supports the granting of a stay here.  The public has an interest in "ensuring that the criminal process is not subverted" by ongoing civil cases.  S.E.C. v. Nacchio, supra, 2005 WL 1799372 at *5.   While the public may have some interest in the resolution of civil disputes, "that interest pales in comparison to the public interest as a whole in unraveling [a] criminal  . . . scheme and punishing those responsible for that scheme."  Ashworth v. Albers Medical, Inc., 229 F.R.D. 527, 532 (S.D. W.Va. 2005).

Judge Wisdom, writing for the Fifth Circuit in *Campell v. Eastland*, explained that [a]dministrative policy gives priority to the public interest in law enforcement" and that it "seems so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claim or liabilities."  C*ampell,* 307 F.2d at 487.

The policy favoring a stay warrants the granting of relief here.  In her declaration, Chief Counsel to the OUSA and Assistant United States Attorney Shirah Neiman explains the harm the criminal and civil cases would suffer absent the grant of a stay.  The public has a significant

interest in ensuring the unprejudiced resolution of both this case and the related criminal case. Rule 6(e) of the Federal Rules of Criminal Procedure prevents Government counsel in this case from reviewing the evidence obtained and considered by the grand jury.  Exhibit 2 at ¶ 4. Although the prosecutors could seek an order under Rule 6(e) alleging a particularized need to share this information with the Government's civil attorneys, to do so at this point in the criminal case would prejudice the criminal case by inevitably providing the defendants in the criminal case earlier and greater access to information than they are entitled to under the rules, statutes and case law that govern the prosecution of the criminal case.  Id. at ¶ 7.  Thus, counsel for the Government in this case has not had, and does not expect to have, access to the fruits of the grand jury's investigative efforts.

Without a stay in this case, the United States will be forced to make a "Hobson's choice" where it must decide either to protect the criminal case by not making important evidence available to its attorneys and the Court in this civil case, or protect the civil case by prematurely exposing the evidence to be used in the criminal trial.  No matter what choice it makes, one or both of the Government's cases will be unfairly prejudiced.

If the Government chooses to protect the criminal case, both its civil case and its criminal case will be unfairly prejudiced because the Government's civil attorneys will be forced to take and defend civil depositions while they lack information that the prosecutors are temporarily unable to share with them about documents, facts, witnesses and the criminal defendants.  The prosecutors believe there are witnesses who are cooperating with the Government in the criminal case who the Government's civil counsel would need to depose in order to mount a full and fair defense of this civil case.  Id. at ¶ 6.  The prosecutors further believe that Government counsel in

1463212.11463212.1

this civil case is not even aware of the identity of some of the witnesses.  Id. at ¶ 6.  Without full knowledge of this information in the prosecutors' possession, the Government's civil attorneys will not be able to fairly (or even adequately) cross-examine unfriendly witnesses during civil depositions.  Id. at  6.  This might preclude later effective cross-examination at trial.  Id. at 6.

The civil case will also be prejudiced during depositions of friendly witnesses because prosecutors would not be able to share information with the Governments' civil attorneys that would allow them to conduct an effective direct examination, make necessary objections during cross-examination, and ask necessary follow-up or redirect questions of those friendly witnesses in order to help clarify their testimony or defend their credibility.  Id. at ¶ 6.  The result will be an inadequate testimonial record on the important issues and facts and would make the witnesses susceptible to unfair impeachment and thus potentially useless at **both** the civil and the criminal trial.  Id. at ¶ 6.

On the other hand, if the Government chooses to protect the civil case, the criminal case will be unfairly prejudiced.  Id. at ¶ 7.  This would occur if the Government has to obtain a Rule 6(e) order allowing it to share the identities of witnesses and their prior statements with its civil attorneys to adequately defend the civil case.  Id. at ¶ 7.  In turn, this otherwise protected information will be available in the Sala case and therefore the criminal defendants, when it would otherwise not be available in the criminal case.  Id. at ¶ 7.

In addition, to allow deposition testimony to go forward now, will give the criminal defendants an unwarranted and premature view of the witnesses' testimony which forms part of the evidence the Office of the United States Attorney intends to offer at the criminal trial, thereby interfering with the prosecution of the criminal case.  Id. at ¶ 8.  Even if the Court

entered protective orders, this information would be used during depositions of witnesses with ties to the criminal defendants and thus make its way into their hands.  Id. at ¶ 8. Moreover, as a matter of fairness, any deposition or civil trial testimony would have to be made available to the *Stein* defendants prior to the criminal trial.  Id. at 8.  Similarly, disclosure of impeachment information with respect to witnesses who may be hostile to the Government would also result in unwarranted and premature disclosure of evidence the Government would use in the criminal trial, provide those witnesses with the opportunity to tailor their testimony in advance of the criminal trial and thereby interfere with the prosecution of the criminal case.  Id. at ¶ 8.

As previously explained, the same witnesses whose testimony the United Sates would rely upon to support its civil case are presently under indictment and awaiting trial or have indicated that they will not provide testimony in light of the investigation and trial.  Therefore, the United States will not have an opportunity to develop its evidence in this case through discovery of those witnesses.  The assertion of Fifth Amendment privileges will deprive the Government of meaningful access to the most knowledgeable fact witnesses and undermine the Government's ability to present a defense.  The Court should not require the United States to defend this case without those witnesses.

The interests outlined above have been recognized by the fact that other courts in similar tax shelter cases have granted stays.  Id. at ¶ 9.   Therefore, the failure of the Government to secure a stay of this case will necessarily undermine decisions of others courts which have granted that relief.

1463212.11463212.1

**CONCLUSION**

In conclusion, there are compelling reasons to grant a stay.  The related criminal case is the largest criminal tax case ever filed.  It involves criminal charges against accountants and lawyers, including the former leadership of one of the most prominent accounting firms, who were supposed to provide independent ax advice rather than creating false and fraudulent transactions for their wealthy clients.  As noted above, a stay will protect the interests of the public and the Government, which in many ways are intertwined.  Granting a stay will promote effective law enforcement by ensuring that this civil case does not interfere with the criminal case pending in the Southern Distinct of New York.  Likewise, the stay will allow the Government a reasonable opportunity after the conclusion of the criminal trial to develop its defense in this case, which will also serve the interests of the Government and the public.   These interests outweigh Plaintiffs' interest in resolving this case promptly and any prejudice to the Plaintiffs, if it exists, is minimal.

1463212.11463212.1

For the reasons set forth above, the Government respectfully requests that its Motion for Stay be granted and that this proceeding be stayed until the conclusion of the criminal trial in *United States v. Stein*, scheduled for September 2006.

WHEREFORE, United States prays that its motion be granted and that a stay be entered pending the criminal trial in <u>United States v. Stein</u>.


Dated this 15th day of December, 2005.      WILLIAM J. LEONE
Acting United States Attorney
MARK S. PESTAL
Assistant United States Attorney

<u>s/ David N. Geier</u>
DAVID N. GEIER
PHILIP E. BLONDIN
ANTON L. JANIK, JR.  CO#35164
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone:    (202) 616-3448
             (202) 307-6322
             (202) 305-2558
Facsimile:    (202) 307-0054
Email:David.N.Geier@usdoj.gov

Street Address:      Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on December 15, 2005, I electronically filed the foregoing

Memorandum in Support of Motion for Stay Pending Related Criminal Trial with the Clerk of

Court using the ECF system which will send notification of such filing to the following e-mail

addresses:

dhallett@chicoine-hallett.com

jcolvin@chicoine-hallett.com

s/ David N. Geier
DAVID N. GEIER
Attorney for Defendant
United States of America
Trial Attorney, Tax Division
United States Department of Justice
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683
Telephone:    (202) 616-3448
Facsimile:    (202) 307-0054
Email:David.N.Geier@usdoj.gov

Street Address:              Judiciary Center Building
                             555 Fourth Street, N.W.
                             Washington, D.C. 20001