# EXHIBIT

# 5

1 | KEVIN V. RYAN (CSBN 118321)
United States Attorney

2

3 | STUART D. GIBSON (MnSBN 34587)
Senior Litigation Counsel
Stuart.D.Gibson@usdoj.gov

4 | BARRY E. REIFERSON (CTSBN 420974)
Trial Attorney

5 | Barry.E.Reiferson@usdoj.gov
JENNIFER K. BROWN (CSBN 224041)

6 | Trial Attorney
Jennifer.K.Brown@usdoj.gov

7 | Tax Division, U.S. Department of Justice
P.O. Box 403

8 | Washington, DC 20044
Tel: (202) 307-6586 (Mr. Gibson)

9 |    (202) 514-6058 (Mr. Reiferson)
   (202) 307-0401 (Ms. Brown)

10 | Fax: (202) 307-2504
Attorneys for United States of America

11

12 | UNITED STATES DISTRICT COURT

13 | NORTHERN DISTRICT OF CALIFORNIA

14 | SAN FRANCISCO DIVISION

15

16 | SHASTA STRATEGIC INVESTMENT )   Case No. C-04-4264-VRW
FUND, LLC; AND PRESIDIO GROWTH )   Related to Case Nos. C-04-4309, C-04-4310,

17 | LLC (Tax Matters Partner), )   C-04-4398, C-04-4399 and C-04-4064
)

18 |        Petitioners, )   DECLARATION OF STUART D. GIBSON
)   IN SUPPORT OF MOTION FOR RULE 56(f)

19 |      v. )   RELIEF AND RENEWED MOTION TO
)   STAY PROCEEDINGS

20 | UNITED STATES OF AMERICA, )
)

21 |        Respondent. )   Date:  November 3, 2005
)   Time:  2:00 p.m.

22 | )

23 |    STUART D. GIBSON, in accordance 28 U.S.C. §1746(2), declares:

24 |    1.    I am a Senior Litigation Counsel employed in the Tax Division of the United States

25

26 | Department of Justice, with my office in Washington, D.C. I have been assigned as lead counsel to

27 | represent the United States in this case. I make this declaration in support of the concurrently filed

28 | Motion for Rule 56(f) Relief and Renewed Motion to Stay Proceedings.

**Cases Involving Tax Shelters – Like This One – Are Fact Intensive and Require Discovery**

2.      This case involves a series of transactions called BLIPS, developed and marketed by Presidio and the accounting firm KPMG.  BLIPS is an acronym whose initials stand for the words "Bond Linked Issue Premium Structure."   In August 2000, the Internal Revenue Service determined that BLIPS is an abusive tax shelter of the type commonly referred to as "Son of BOSS."

3.      According to the indictment returned by a federal grand jury sitting in the Southern District of New York (discussed more fully at ¶12 below), and the KPMG Statement of Facts, KPMG and Presidio marketed the BLIPS tax shelter in 1999 and 2000 to individuals or groups of individuals who had realized at least $20 million in taxable income from other sources, and who wanted to shelter that income from taxation.

4.      The courts have applied a number of well-established principles of tax law in disallowing tax benefits claimed by tax shelter participants.  They include the substance-over-form, sham transaction, step transaction, and economic substance doctrines.  To apply these doctrines the courts must examine the particular facts and circumstances of each series of transactions, and this examination is always fact intensive.  One example of such a case is, ASA Investerings Partnership v. Commissioner, 76 T.C.M. (CCH) 325 (1998), aff'd 201 F.3d 505 (D.C. Cir. 2000), cert. denied, 531 U.S. 871 (October 2, 2000).  Because the United States is contesting whether the participants in the BLIPS transactions at issue here were entitled to claim the substantial paper tax losses purportedly generated by BLIPS as reported on their tax returns, in part by relying on these doctrines of tax law, the issues in this case will also need to be resolved based upon all facts and circumstances regarding the involved transactions and activities.  This requires the United States to take discovery into those fact issues.

1

2

**Respondent's Counsel Requires Discovery to Oppose the Motion for Partial**
**Summary Judgment, and Present the Respondent's Position on the Disputed Facts**

3          5.          The United States contests whether a number of the specific transactions that make up

4    the BLIPS tax shelter actually occurred, or actually occurred in the manner reflected in the

5    documents filed with, and represented in, the petitioners' motion for partial summary judgment.

6
     Because of the grand jury investigation that has been pending in the Southern District of New York
7

8    since 2004, and because of the matters involving BLIPS that will be the subject of a trial to be held

9    in the criminal case entitled United States of America v. Stein, *et al.*, Case number 05 Crim. 888

10   (LAK) (SDNY), counsel for the United States in this case has had only a limited opportunity to

11   conduct discovery into the facts and circumstances and the *bona fides* of the BLIPS transactions at
12
     issue here. For example, the United States attempted to delve into these fact issues by taking the
13

14   deposition of R. J. Ruble, the New York lawyer whom counsel for the United States has reason to

15   believe was intimately involved in designing the BLIPS transactions, in drafting the representations

16   of fact allegedly made by all the participants in the BLIPS transactions (and on which the opinion

17   letters are allegedly based), and in writing the Brown & Wood opinion letters that describe and
18
     discuss the BLIPS transactions. The petitioners claim to have relied upon those opinion letters to
19

20   support the tax benefits claimed on the income tax returns filed by BLIPS participants. They also

21   attached copies of those letters to the petitions filed in these cases. Yet Ruble refused to answer any

22   questions about the tax shelter opinion, relying upon his privileges under the Constitution, including
23
     the Fifth Amendment. So, for example, Ruble would not say whether he wrote the letters, whether
24

25   he signed them, whether he played a role in developing the factual representations contained in the

26   letters, or whether the factual representations contained in the letters were, in fact, accurate. Ruble

27

28                                                    - 3 -                                  C-04-4264-VRW

also refused to answer a question about whether BLIPS is a sham, which is one of the issues raised and discussed in the petitioners' motion for partial summary judgment.

## The Parties Have Taken Limited Discovery Since May 24, 2005

6.    The parties have conducted only limited discovery since the discovery period began on May 24, 2005. Most of that discovery has been taken by the petitioners, who have taken only the "friendly" deposition of former Presidio partner Amir Makov, as well as document and contention discovery from the United States.

7.    On August 17, 2005, the United States served upon counsel for petitioners its First Set of Requests for Admission and First Set of Interrogatories. The requests sought to have the petitioners admit the authenticity of and applicability of the business records exception to the hearsay rule of 213 documents obtained by the Senate Permanent Subcommittee on Investigations during its investigation, and which bear on the issues in this case – including whether BLIPS is a sham, as raised in the petitioners' motion for partial summary judgment. Attached to this declaration as Exhibit 1 is the petitioners' response, served September 19, 2005. The petitioners admitted the authenticity of only 8 of those documents, and declined to admit any other matter about which an admission was sought, including that R.J. Ruble either drafted or played a role in drafting the Brown & Wood LLP tax shelter opinion letters attached to the petitions filed in these cases. Because the respondent will seek to offer these and other documents to support its position in this case, it will need to take third-party discovery to authenticate and lay the necessary foundation for their admissibility.

- 4 -                                                 C-04-4264-VRW

**The United States Requires Discovery to Develop Admissible Evidence in Order to Oppose the Motion for Partial Summary Judgment and Adequately Defend This Case**

8.      To fully develop the respondent's case, to present evidence to oppose the motion for partial summary judgment, and to present evidence either in support of its own dispositive motion or at trial, counsel for the United States must obtain relevant and admissible evidence by conducting the following discovery:

A.      Taking depositions pursuant to subpoenas duces tecum of persons involved in developing, planning, marketing and implementing the BLIPS tax shelter. The deponents would include at least the following witnesses: Jeffrey Stein, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Wiesner, John Larson, Robert Pfaff, Mark Watson, Kerry Bratton, Domenick Degiorgio, John Rolfes, William Boyle, Francesco Piovanetti, Steven Rosenthal, Jeffrey Zysik, Evelyn Elgin, Larry DeLap, Carol Worley, Shannon Liston, and Randy Bickham;

B.      Taking Rule 30(b)(6) depositions pursuant to subpoenas duces tecum of Presidio; Bayerische Hypo und Vereinsbank (HVB); Deutsche Bank; KPMG LLP; and Sidley, Austin, Brown & Wood, LLP; and

C.      Taking depositions pursuant to subpoenas duces tecum of the persons who participated in these six strategic investment funds: Kenneth Jones (Princeton and Olympus), Edward Shimmon (Shasta), David Shimmon (Belford), James Vaughn (Sill), and Darren Keeter (Sanford), and the depositions of the KPMG partners and former partners who sold the BLIPS tax shelter to these five participants: Dale

- 5 -                                             C-04-4264-VRW

Baumann, (Olympus, Princeton and Belford), Jeffrey Eischeid (Sanford), Erika L.

Quock (Shasta), and Gary N. Powell and Pamela D. Weems (Sill).

9.     In addition, because the grand jury recently returned indictments against many of the individuals identified in ¶8.A. above, charging (among other things) that they conspired to defraud the United States and the Internal Revenue Service in connection with developing, planning, marketing and implementing the BLIPS tax shelter, it is important that counsel for the United States in this case obtain access to and review testimony and documents which will be used to prove the criminal case. Only by doing so can counsel for the respondent in this case present evidence to show a full and accurate picture of all the facts necessary for the Court to rule on the pending motion for partial summary judgment, and ultimately on the case as a whole.

10.    Also, as in other lawsuits involving complex tax shelter transactions, it may be necessary to have one or more experts in financial and economic matters review materials developed during discovery, and prepare expert opinions.

### Why the United States Cannot Take the Necessary Discovery

11.    I have learned that Shirah Neiman, Assistant United States Attorney and Chief Counsel to the United States Attorney for the Southern District of New York, is supervising a team of attorneys and law enforcement personnel who are conducting a federal grand jury investigation into a number of areas and subjects, including the BLIPS transactions developed and marketed by KPMG and Presidio.

12.    Neiman's team is also prosecuting United States of America v. Stein, et al., Case number 05 Crim. 888 (LAK) (SDNY). On August 24, 2005, the grand jury returned an indictment in that case charging nine individuals, including principals of Petitioner Presidio Growth LLC, John

- 6 -                          C-04-4264-VRW

Larson and Robert Pfaff, with one count of conspiracy to defraud the United States and evade federal income taxes, in violation of 18 U.S.C. §371, as a result of their participation in and orchestration of the BLIPS transactions at issue here and other transactions. I have learned that those indictments were unsealed on August 29, 2005.[1/] I have also learned that on September 6, 2005, the following defendants in that case were arraigned before United States District Judge Lewis A. Kaplan on charges of conspiracy to defraud the United States and its agency the Internal Revenue Service: John Larson, Raymond J. (R.J.) Ruble, Robert Pfaff, Jeffrey Stein, John Lanning, Richard Smith, Jeffrey Eischeid, Philip Wiesner, and Mark Watson. I have been told that the United States advised the court in New York that the criminal investigation is ongoing, and that the United States Attorney expects to file a superseding indictment, bringing more charges against the original nine defendants, and charging at least twelve additional individuals. I have learned that Judge Kaplan ordered the United States Attorney to file any superseding indictment by October 17, 2005 and set May 1, 2006 as a firm trial date for the criminal trial to begin.

13.    At first because of the pending grand jury investigation, and now because of the continuing grand jury investigation and the pending criminal trial, counsel for the United States in this case has been, and remains, unable to obtain from the United States Attorney who is prosecuting the criminal case any documents, witness identities or witness testimony which would assist them in defending this case. In particular,

A.    Rule 6(e) Documents. Counsel for the United States in this case lacks access to "matters occurring before the grand jury," under Fed.R.Crim.P. 6(e). Therefore, I have not had access to the testimony and documents which formed the basis for the indictment, in which the grand

---

[1/]The Indictment was filed as Ex. A to the Respondent's Renewed Motion to Stay Proceedings.

-7-                                    C-04-4264-VRW

jury determined that probable cause exists to believe that the criminal defendants engaged in a massive fraud upon the United States when they developed, marketed and implemented the BLIPS tax shelter. Nor will I be able to obtain access to those documents and that testimony until they are made public.

B.  Rule 16(a)(1)(E) Documents. To the extent the prosecutors may possess documents relevant to the defense of this civil lawsuit, which they are required to turn over to the criminal defendants under Fed.R.Crim.P. 16(a)(1)(E), I have been advised by the prosecutors that prior to the conclusion of the criminal trial they will not disclose those documents to counsel for the United States for defense of this civil lawsuit.

C.  Identities of Witnesses and their Testimony. I have been advised by the attorneys conducting the criminal proceedings for the United States in New York that the practice of the Office of the United States Attorney for the Southern District of New York is not to identify the witnesses who may testify for the prosecution until the time of trial, and not to produce under 18 U.S.C. §3500 the statement of any witness who testifies for the United States, until shortly before that witness testifies at the criminal trial. Accordingly, I have been advised by the prosecutors that they will not disclose the identities of witnesses or their statements to counsel for the United States for defense of this civil lawsuit.

In summary, I do not have access to the evidence gathered by the prosecutors, which they may rely upon to prove that the criminal defendants – including Presidio's principals Larson and Pfaff – committed felonies when they developed, marketed and implemented BLIPS. I will not have access to that information until it is made public at the criminal trial.

- 8 -                                        C-04-4264-VRW

14.    I believe that the United States cannot pursue a normal course of civil discovery at this time without jeopardizing its defense of this case, its prosecution of the criminal case, or both. To take the depositions listed in ¶8 above would result in two possible outcomes, one of which would jeopardize the defense of this case, and the other of which would interfere with the prosecution of the criminal case. In particular, if witnesses refuse on Fifth Amendment grounds to answer some or all questions posed in a deposition, that refusal to testify will hamper the United States' ability to discover and obtain admissible evidence with which to defend against Presidio's claims in this case. And if witnesses actually testify, then I believe that they would be prematurely disclosing evidence the government may rely upon to prove the criminal case, not only to defendants Larson and Pfaff, but also to defendants who are not affiliated with any party to this lawsuit. Moreover, because petitioners' counsel in this case also represents defendant John Larson in the criminal case, he will have an opportunity to cross examine during civil discovery in this case some or all of the same witnesses who may testify against his client John Larson in the criminal trial that is scheduled to begin next May. I understand that this would interfere with the criminal case, by giving the defendants in that case access to testimony that would be unavailable to them until shortly before the deponent is scheduled to testify in the criminal trial.

- 9 -                                                    C-04-4264-VRW

**Given an Opportunity to Take Discovery Without Interfering With the Criminal Case, the United States Expects to Develop the Following Evidence Which Would Refute the Petitioners' Case and Prove the Respondent's Case**

15.     Finally, when the trial in the criminal case has concluded, and the United States may pursue discovery in this case without interfering with the prosecution of the criminal case, I have reason to believe the United States will be able to discover, at minimum, the facts listed below – all taken from the indictment and the KPMG Statement of Facts[2] – that would prove the United States is entitled to judgment in this case:

a.      KPMG, one of the "Big Four" accounting firms, had a special group focused on designing, marketing, and implementing tax shelters for individual clients that was known at different times as CaTS (Capital Transaction Strategies), and IS (Innovative Strategies). KPMG's Washington National Tax department, which was designed to provide expert tax advice to KPMG professionals, also participated in designing tax shelters and drafting opinion letters relating to those shelters.[3]

b.      Jeffrey Stein was a tax partner at KPMG from at least in or about 1987 through in or about January 2004. In or about 1996, Stein became the partner-in-charge of KPMG's international tax group; in or about March 1998, Stein became Vice Chairman-Tax Operations; in or about 2000, Stein became Vice Chairman of Tax Services; and in or about April 2002, Stein became Deputy Chairman of KPMG.[4]

---

[2] The Statement of Facts was filed as Ex. C to the Renewed Motion to Stay Proceedings.

[3] Indictment, Ex. A to Respondent's Renewed Motion to Stay Proceedings, at ¶2. All further citations to the Indictment will refer to Ex. A.

[4] Ex. A, ¶7.

- 10 -                                                    C-04-4264-VRW

1       c.      John Lanning was a tax partner at KPMG from at least in or about 1982 through in or

2   about 2000. In or about October 1996, Lanning became Vice Chairman-Tax Operations, and in or

3
    about March 1998, Lanning became Vice Chairman of Tax Services.[5]
4

5       d.      Richard Smith was a tax partner at KPMG from at least in or about 1995 through in or

6   about 2004. He worked in Washington National Tax, became a leader of Washington National Tax,

7   became Area Managing Partner for the Western Region of KPMG's tax practice in January 2002,

8   and then in May 2002 became Vice Chairman of KPMG in charge of tax.[6]

9
        e.      Jeffrey Eischeid was a tax partner in KPMG's Atlanta office from at least 1997
10

11  through in or about 2004. During that period he served as head of KPMG's Innovative Strategies

12  group and Partner-In-Charge of KPMG's Personal Financial Planning group.[7]

13      f.      Phillip Weisner was a tax partner at KPMG from at least in or about 1984 through in

14  or about June 2004. He served as Partner-In-Charge of Washington National Tax during 1998 and

15
    part of 1999.[8]
16

17      g.      John Larson was a KPMG senior tax manager based in KPMG's San Francisco office

18  prior to 1997. In 1997 he resigned his position at KPMG and formed a limited liability company

19  with Robert Pfaff called Presidio.[9]

20

21

22  _____

23      [5]Ex. A, ¶8.

24      [6]Ex. A, ¶9.

25      [7]Ex. A, ¶10.

26      [8]Ex. A, ¶11.

27      [9]Ex. A, ¶12.

28                                      - 11 -                        C-04-4264-VRW

h.     Robert Pfaff was a KPMG tax partner based in Denver prior to 1997.  In or about 1997, Pfaff resigned his position at KPMG and formed Presidio with John Larson.[10]

I.     In or about 1999, Larson and Pfaff, along with David Amir Makov formed another LLC.  As detailed more fully below, Larson, Pfaff, Makov and others used two Presido LLC's and certain related entities to participate in tax shelter transactions as, among other things, the purported investment advisor.[11]

j.     Raymond J. Ruble, known as "R. J. Ruble," was a tax partner in the New York, New York office of Brown & Wood, LLP.[12]

k.     Mark Watson was a KPMG tax partner and Partner-In-Charge of the PFP division of Washington National Tax from at least June 1998 through July 2000.  In or about August 2000, Watson was transferred to a KPMG affiliate partnership in Amsterdam.[13]

l.     During the period from at least in or about 1996 through at least in or about 2003, Stein, Lanning, Smith, Eischeid, Wiesner, Larson, Pfaff, Ruble and Watson, and others (the conspirators) participated in a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters, by preparing and causing to be prepared, and filing and causing to be filed with the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent tax shelter losses, and by fraudulently concealing from the IRS those shelters.[14]

---

[10]Id.

[11]Id.

[12]Ex. A, ¶13.

[13]Ex. A, ¶14.

[14]Ex. A, ¶15.

C-04-4264-VRW

m. The conspirators designed and marketed these tax shelters as a means for wealthy individuals with taxable income or gains, generally in excess of $10 million in 1997 and of $20 million in 1998-2000, to fraudulently eliminate or reduce tax paid to the IRS. As marketed and implemented, instead of the wealthy clients paying U.S. individual income taxes generally exceeding 20% of the income or gain, the client could choose the amount of tax loss desired, and pay certain of the conspirators and others an all-in cost generally equal to approximately 5 to 7% of the desired tax loss. This "all-in" cost included the fees of KPMG, Presidio, the various law firms that supplied opinion letters (including Brown & Wood, LLP), the bank participants, and others, as well as a small portion that would be used to execute purported "investments" that were designed to make it appear that the tax shelters were legitimate "investments" rather than tax shelters.[15/]

n. The size of the purported "investments," the timing of the transactions, and the amount of the fees to certain conspirators and participants were all determined based on the tax loss to be generated.[16/]

o. In order to conceal the true nature of the tax shelters from the IRS and shield wealthy clients from IRS penalties for underpayment of U.S. individual income taxes, KPMG and/or a law firm provided clients with opinion letters containing false and fraudulent representations and statements and claiming that the tax shelter losses were "more likely than not" to survive IRS challenge.[17/]

---

[15/] Ex. A, ¶16.

[16/] Ex. A, ¶16.

[17/] Ex. A, ¶17.

p.        The law in effect from at least in or about August 1997 provided that if a taxpayer

claimed a tax benefit that was later disallowed, the IRS would impose substantial penalties, usually

at least 20% of the tax deficiency, unless the tax benefit was supported by and independent opinion

relied on by the taxpayer in good faith that the tax benefit was "more likely than not" to survive IRS

challenge.  The conspirators issued false and fraudulent opinion letters with the intent that the clients

would provide the opinion letter and/or the false and fraudulent representations and statements

contained therein to the IRS if an audit occurred.[18]

q.        Among the fraudulent tax shelter transactions designed, marketed, and implemented

by the defendants Stein, Lanning, Smith, Eischeid, Wiesner, Larson, Pfaff, Ruble, and Watson and

their co-conspirators was BLIPS---"Bond Linked Issue Premium Structure."[19]

r.        BLIPS was marketed and sold from at least in or about 1999 through at least in or

about 2000 to at least 186 wealthy individuals, and generated at least $5.1 billion in phony tax

losses.[20]

s.        BLIPS was intended to generate a substantial ordinary or capital loss through the use

of a purported loan issued at an above-market interest rate and with a substantial "loan premium"

that was not in fact a true loan.[21]

t.        The BLIPS series of pre-arranged transactions involved the client purportedly

borrowing money from one of three banks – Deutsche Bank, Bayerische Hypo und Veriensbank

---

[18]Id.

[19]Ex. A, ¶18.

[20]Ex. A, ¶21.

[21]Ex. C, ¶12.

- 14 -                                          1350578.1

1   (HVB) and National Westminster Bank, all of which were audit clients of KPMG at the time – in

2   order to make purported foreign currency investments including currencies that were "pegged" to the

3
4   United States dollar. The bank involved in the purported loan also served as the counterparty on all

5   of the purported currency and other transactions involved in BLIPS. The transaction was designed

6   by Smith, Eischeid, Wiesner, Larson, Pfaff, Watson, and Ruble, and others under the supervision of

7   Stein and Lanning, so that after a short period of time (virtually always approximately 67 days), the

8   client would exit the purported BLIPS transaction and trigger the desired tax loss.[22/]

9
10          u.      Stein, Lanning, Smith, Eischeid, Wiesner, Larson, Pfaff, Watson, and Ruble and their

11  co-conspirators and others, implemented and caused to be implemented the transactions and

12  generated and caused to be generated false and fraudulent documentation to support the transactions,

13  including but not limited to KPMG and Brown & Wood opinion letters claiming that the purported

14  tax losses generated by the shelters were more likely than not to withstand challenge by the IRS. In

15
16  general, all of these opinion letters were identical, except for the names of the clients and entities

17  involved, the dates, and the dollar amounts involved in the transactions.[23/]

18          v.      The conspirators issued and caused to be issued the opinion letters although, as they

19  well knew, (I) the tax positions taken were *not* more likely than not to prevail against an IRS

20  challenge if the true facts regarding those transactions were known to the IRS, and (ii) the opinion

21
22  letters and other documents used to implement BLIPS were false and fraudulent in a number of

23  ways, including, but not limited to the following[24/]:

24  _____

25          [22/]Ex. A, ¶26.

26          [23/]Ex. A, ¶27.

27          [24/]Ex. A, ¶28.

28                                              - 15 -                                      1350578.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

• BLIPS was falsely and misleadingly described as an investment program, when in truth and in fact, BLIPS was designed, marketed, and implemented to generate phony tax losses in order to eliminate income taxes for wealthy clients and garner substantial fees for KPMG; Presidio; Brown & Wood, LLP; the conspirators and others.

• BLIPS was falsely described as a three-stage, seven-year investment program, when in truth and in fact, all participants were expected to withdraw at the earliest opportunity and within the same tax year in order to obtain their tax losses. Indeed, Smith, Eischeid, Wiesner, Larson, Pfaff, Ruble and Watson caused the opinion letters to have the false representation (which the BLIPS clients adopted) that the duration of the client's participation in the participation in the purported three-phase, seven year investment program was dependent upon the performance of the program relative to alternative investments, when in truth and fact, the duration of the client's participation was dependent on the client's desire to obtain the phony tax losses to be generated.

• BLIPS was falsely described as a "leveraged" investment program, when in truth and fact, the purported loan transactions that were part of BLIPS (and were the aspect of BLIPS that purported to generate the tax loss) were shams – no money ever left the bank and none of the banks ever assigned any capital cost to these purported BLIPS loans. Indeed, at least one of the banks did not fund the "loans" at all – it neither set aside from its own funds nor obtained from the market any money to cover these purported "loans" and "loan premiums." In addition, the sham loans were not in any way used in the purported "investment" program involving trades related to pegged currencies but, instead, were used only to generate a phony tax loss. The only money used in making and securing the trades involving pegged currencies as part of BLIPS was money contributed by the client as part of the 7% all-in cost.

• The BLIPS opinion letters falsely stated that the client (based on the client's purported "independent review") as well as Presidio "believed there was a reasonable opportunity to earn a reasonable pre-tax profit" from BLIPS, when indeed there was no such opportunity. Instead the "investment" component of BLIPS was negligible, unrelated to the large "sham" loans that were the key elements of the purported tax benefits of BLIPS, and was simply window dressing for the BLIPS tax shelter fraud. Indeed, Watson calculated that because none of the purported "loan" proceeds were used in any investments, the small "investment" component funded with a portion of the 7% all-in cost would have to generate a 240% annual return in order to cover a portion of the large fees paid to the bank, and would require an even higher return to cover fees paid to KPMG and other conspirators just to break even. Watson performed this calculation and distributed it to others involved in designing, reviewing, and approving BLIPS prior to the implementation of any BLIPS transaction and prior to the issuance of any KPMG BLIPS opinion letters.

- 16 -

1

2

3

4

5

6

7

The opinion letters and other documents were misleadingly drafted to create the false impression that KPMG, Presidio, Brown & Wood, and the banks were all independent service providers and advisors, rather than co-promoters and designers of the BLIPS shelter, each of which earned a fee based upon the amount of the phony tax loss generated. Thus, for example, the KPMG BLIPS opinion letter misleadingly claims that the client "requested our opinion regarding the U.S. federal income tax consequences of certain investment transactions that have been concluded" but the opinion letters, which falsely describe a purported seven-year investment program and a withdrawal from that program based on the purported investment performance of the program, were drafted prior to the commencement of any BLIPS transaction.

8

9

10

11

12

13

14

15

16

17

18

• Similarly, the KPMG engagement letter used for BLIPS contained the following false and fraudulent statements, among others, (I) that the client had engaged KPMG "to provide tax consulting services. . . with respect to participation in an investment program involving investments in foreign currency positions," when in truth and fact KPMG marketed a tax shelter to the clients and the clients engaged KPMG to assist the clients in generating phony tax losses using the tax shelter; and (ii) that KPMG "understands that Client intends to engage" Presidio "to provide Client with investment advisory services and trading strategies," when in truth and fact, Presidio was engaged to assist the clients in generating phony tax losses using a tax shelter; (iii) that Presidio "had advised the Client that the utilization of a high degree of leverage is integral to the Investment Program," when in truth and in fact, the purported "leverage" was a sham loan designed only to support the creating of phony losses; and (iv) that KPMG's fees would not be dependent on "the amount of any tax savings projected," when in truth and fact the amount of KPMG's fee, as well as the size of the nominal investment made as part of the fraudulent tax shelter, and fees for Presidio and other participants in the transaction were all determined by the amount of phony tax losses desired by the client to offset income or gain.

19

w.      When KPMG's Washington National Tax approved the BLIPS documentation in

20

August 1999, one of the KPMG tax shelter salesmen who helped devise BLIPS wrote to Ruble: "We

21

have received our 'get out of jail free card' from [Washington National Tax]."[25/]

22

x.      In or about February 24, 2000, Wiesner wrote to Stein, Lanning, Watson and others,

23

24

that of the BLIPS transactions implemented in 1999 all clients terminated the transaction at their

25

earliest opportunity prior to year-end 1999, and questioned whether the factual representations in

26

27

[25/]Ex. A, ¶29.

28

- 17 -                                                    1350578.1

1  future BLIPS transactions would be credible, but nevertheless recommended that BLIPS opinion

2  letters for the 1999 transactions be issued without revision.[26]

3

4         y.     In or about March 2000, and prior to the issuance of any BLIPS opinion letters to

5  clients, during a meeting attended by Stein, Lanning, Smith, Eischheid and certain co-conspirators

6  and others, a top KPMG technical expert involved in reviewing the KPMG BLIPS opinion told the

7  other participants in substance and in part that if the IRS litigates BLIPS in court, the BLIPS

8  participants would "lose."   During this same meeting, participants also discussed the risks of

9

10  proceeding with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil

11  penalties, civil liability for fraud, action by the IRS's Director of Professional Practice, and action by

12  the state Boards of Accountancy.[27]

13         z.     In addition to preparing and causing to be prepared false and fraudulent

14  documentation relating to and implementing BLIPS, and in addition to preparing and causing to be

15

16  prepared tax returns that fraudulently incorporated phony tax shelter losses, Stein, Lanning, Smith,

17  Eischeid, Wiesner, Larson, Pfaff, Ruble, and Watson and their co-conspirators employed various

18  means to fraudulently conceal BLIPS from the IRS including not registering BLIPS as required by

19  law; preparing and causing to be prepared tax returns that fraudulently concealed the phony losses

20  from the IRS; attempting to conceal from the IRS the losses and transactions with sham attorney-

21

22  client privilege claims; and obstructing IRS and Senate investigations into their tax shelter

23  activities.[28]

24

---

25      [26]Ex. A, ¶30.

26      [27]Ex. A, ¶31.

27      [28]Ex. A, ¶34.

28   1350578.1

aa.     David Amir Makov prepared a "loan premium rationale" designed to falsely make it appear that there were legitimate business and economic purposes for structuring the BLIPS purported loan in the manner it was structured.[29]

16.     I have learned that Neiman's team is also prosecuting United States v. Domenick Degiorgio, Case No. 05 Crim. 853 (BSJ) (SDNY).  According to the Information filed in that case, Domenick Degiorgio was responsible for supervising HVB's participation in various tax shelter transactions, including the BLIPS transactions.  HVB made the purported loan in the case of one of the strategic investment funds in these six cases, Olympus Strategic Investment Fund.  I have learned that on August 11, 2005 Degiorgio pleaded guilty to an Information charging him with four felony counts relating to his participation in BLIPS and other transactions.  I have read the Information to which Degiorgio pleaded guilty.  That Information charged, among other things, that there was no reasonable expectation that the purported investment component of the BLIPS transactions would produce a profit, exclusive of fees and costs.  I have read the transcript of the arraignment on Degiorgio's guilty plea.  According to the transcript, Degiorgio testified under oath to the following facts, which also contradict the Petitioners' assertions in this case:

(1)     The loan proposed by the BLIPS promoters – including Larson and Pfaff – was a sham;

(2)     BLIPS was falsely represented to be a three-stage, seven-year investment program when, in reality, it was a short-term program designed to create losses for tax purposes; and

---

[29]Ex. A, ¶50u.

- 19 -

(3)    BLIPS falsely claimed that the investment component of the program was leveraged,

when it was not.  The purported loan was not used in the relatively small trades

related to two foreign currencies.

17.    I believe that discovery of the specific facts listed in paragraph 15 will lead to the

discovery of additional facts in support of the United States' position that the BLIPS transactions

were shams and lacked economic substance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 12, 2005                    Respectfully submitted,


*/s/ Stuart D. Gibson*
STUART D. GIBSON
Senior Litigation Counsel
Tax Division, Department of Justice

- 20 -

1350578.1