# EXHIBIT A

Factiva

Article 39

# THE WALL STREET JOURNAL.
## EUROPE

REVIEW & OUTLOOK (Editorial)
**Congress and KPMG**
815 words
31 August 2005
The Wall Street Journal Europe
A6
English
(Copyright (c) 2005, Dow Jones & Company, Inc.)

**KPMG** avoided the fate of Arthur Andersen Monday when it announced a deal with federal prosecutors over the marketing and sale of "abusive" tax shelters. But the price of survival was high. The accounting firm will pay $456 million in fines and restitution and has agreed to let a federal monitor look over its shoulder. At the same time, no fewer than eight former **KPMG** executives and an outside lawyer were indicted on conspiracy charges for designing and selling the shelters.

That **KPMG** avoided indictment as a firm shows that the U.S. Justice Department has learned something from its 2002 indictment of Arthur Andersen over its involvement with Enron. That conviction was thrown out earlier this year by the Supreme Court, but its vindication came too late for its 28,000 mostly innocent employees. Not to mention for the broader U.S. economy, which was reduced to only four major accounting firms just when Sarbanes-Oxley was gaining momentum.

**KPMG** will survive this "deferred prosecution" by admitting wrongdoing. But it's easy to forget amid the righteous indignation over tax shelters with names like FLIP, BLIP, OPIS and SC2 that the legality of these tax-avoidance techniques has **never** really been tested. The IRS banned each of them in the late 1990s or early 2000s, but no court has ruled on their propriety.

**KPMG** maintained for years that the shelters were legitimate, and Monday's plea is as much the product of a legal strategy designed to avoid the corporate death sentence of an indictment as a calculation about the firm's chance of prevailing at trial. Arthur Andersen's fate amply demonstrated that such a victory could easily prove Pyrrhic.

The IRS's standard in evaluating tax shelters is whether the transaction serves a "legitimate economic purpose," or is crafted entirely to avoid taxes. Senators Carl Levin (Democrat, Michigan) and Norm Coleman (Republican, Minnesota) have proposed legislation that would enshrine that doctrine in law.

Speaking on the Senate floor last month, Mr. Levin described the distinction: "Abusive tax shelters are very different from legitimate tax shelters, such as deducting the interest paid on home mortgage or Congressionally approved tax deductions for building affordable housing. Abusive tax shelters are complicated transactions promoted to provide large tax benefits unintended by the tax code" (our emphasis). In other words, it's OK to avoid taxes in any of the myriad ways Congress approves of. It's abusive if Congress didn't intend it -- assuming anyone can ever figure out what Congress really intends.

Factiva

Take the scheme known as SC2, one of those **KPMG** has come under fire for marketing. As reported in the Los Angeles Times, SC2 involved donating nonvoting shares in a Subchapter S corporation to a nonprofit entity; **KPMG**'s nonprofit of choice was the Los Angeles Fire and Police Pension System. The pension system would accept the shares, making them 90% owners of an S Corporation that would then retain the Corporation's profits for several years. At that point, the pension fund would sell the shares back to the original owners. The pension plan pockets the proceeds while the S Corporation owners have converted the firm's profits from regular income into long-term capital gains, taxed at a lower rate.

Does SC2 serve an "economic interest"? Well, the participant in the scheme does pay the pension system for the shares when he buys them back, benefiting the firemen and policemen's pension fund. The fund adds money to its coffers, and the taxpayer lowers his tax bill. Whether that's abuse is for a judge or jury to decide, but Mr. Levin's test -- that Congress didn't intend S corporations to be used that way -- doesn't seem adequate here.

Some of the other schemes involved deliberately taking a capital loss on bonds structured to lose value over time, although presumably without putting capital at (much) real risk. But buying bonds at a premium with the intention of writing off their depreciation on one's taxes is a time-honored investment tactic, so the legal question of where to draw the line is hardly clear-cut.

**KPMG** admitted to wrongdoing in marketing the shelters, but the individual trials to come would do a public service if they clarified when tax avoidance becomes tax evasion. The accused individuals who spoke up Monday claimed to be innocent and said they'd fight the charges in court.

In the meantime, the finger-waggers in Congress might acknowledge their role in creating the 6,000-page, 2.8-million-word, tax code Frankenstein that facilitates the tax-avoidance industry. President George W. Bush's tax-reform commission is due to report at the end of September. Here's hoping that a simple system with a low rate that encourages voluntary compliance will lead its list of recommendations.

Document WSJE000020050831e18v0000z

More Like This

**Related Factiva Intelligent Indexing™+**

© 2006 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.