# EXHIBIT C



## UNITED STATES TAX COURT

KEITH A. and LAURA B. TUCKER,       )
                                    )
                Petitioners,        )
                                    )
            v.                      )   Docket No.  12307-04
                                    )
COMMISSIONER OF INTERNAL REVENUE,   )   Judge Laro
                                    )
                Respondent.         )

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF RESPONDENT'S MOTION FOR STAY OF PROCEEDINGS

Respondent, in response to the Court's Order dated September 26, 2005, directing that respondent, on or before October 24, 2005, supplement his Motion for Stay, submits the following Supplemental Memorandum in Support of Respondent's Motion For Stay of Proceedings.

As set forth in detail below, the petitioners' tax shelter transactions, which were promoted to petitioners by KPMG, LLP (KPMG) and are at issue in this Tax Court case, are now directly at issue in a criminal tax shelter prosecution of certain former KPMG partners and an attorney who supplied legal opinions to petitioners and otherwise participated in the petitioners' transactions.

Accordingly, for the reasons set forth in respondent's original Motion for Stay, as amplified herein, respondent requests that the Court stay its proceedings in this case pending the completion of the related criminal trial.

Docket No. 12307-04          - 2 -

Respondent's Previous Motion For Stay

1. On May 31, 2005, respondent filed a Motion for Stay, requesting that the Court, pursuant to T.C. Rule 50, stay its proceedings pending the resolution of federal criminal proceedings whose progress and outcome were expected to affect the disposition of this case.

2. Respondent related that there was an ongoing federal grand jury investigation in the Southern District of New York regarding certain tax shelter activities. Respondent indicated that the responsible U.S. Attorney's office had advised respondent that a certain group of transactions, including the specific transactions at issue in this case, were under investigation, and that subjects of the grand jury investigation included accountants, lawyers, bankers and individual taxpayers. Respondent's motion also noted that the grand jury was investigating whether there was criminal obstruction of justice in connection with failure to produce records in response to IRS summonses relating to this group of transactions.

3. Because the Tax Court case would involve both documents and testimony that could adversely affect the ongoing criminal investigation, because the criminal investigation was likely to have a significant impact on the disposition of the issues in this case, and to avoid prejudicing the criminal case by

Docket No. 12307-04        - 3 -

submissions of the parties, discovery activities, or trial of this case, the U.S. Attorney requested that respondent seek to stay these proceedings pending the conclusion of the related criminal matter.

The KPMG Tax Shelter Transactions At Issue In This Case

4.  In a document entitled "Declaration of Keith A. Tucker" (attached as Exh. A[1]), Tucker stated that in December 2000, Timothy Speiss, a partner in KPMG's "Innovative Strategies" group, advised Tucker that KPMG could develop a solution to Tucker's 2000 tax planning needs.  (Exh. A, pars. 6, 12)  Tucker stated that KPMG recommended he engage Brown & Wood "to provide a legal opinion that would give me additional comfort in the face of an IRS challenge," and that Brown & Wood provided him with such an opinion. (Exh. A, par. 16)  Tucker further stated that based on the tax and legal advice of KPMG and Brown & Wood, he engaged KPMG to implement and execute the transaction for him in December 2000. (Exh. A, par. 17)

5.  The KPMG transaction produced a claimed Schedule E loss from foreign currency options allegedly entered into by petitioners' Subchapter S corporation, Sligo (2000) Company,

---

[1] The Tucker Declaration, which was originally submitted to the U.S. District Court for the Northern District of Texas under seal, was unsealed by an order of that court dated April 12, 2004.

Docket No. 12307-04          - 4 -

Inc. ("Sligo"), and Epsolon Limited ("Epsolon"), a foreign
entity claimed to have been owned and controlled by Sligo.
Petitioners claim to have contributed to Sligo a put option to
sell Japanese Yen that petitioners had purchased for
$51,000,000, and that Sligo concurrently assumed petitioners'
obligation to fulfill a put option to sell Japanese Yen that
petitioners had previously sold for $50,490,000. (petition, par.
5.a.(15))  Petitioners claim their contribution of the long yen
put to Sligo, plus contributed cash, created $53,024,700 of
basis in Sligo. (petition, par. 5.a.(17))

6.  The petition alleges that Epsolon engaged in various
other foreign currency options transactions (petition, pars.
5.a.(4) through (12)), that Epsolon realized a $39,584,511 loss
for 2000 as a result, (petition, par. 5.a.(12)) and that Sligo's
distributive share of Epsolon's loss was $39,188,666. (petition,
par. 5.a.(13))  The petition further claims that because
petitioners had a $53,024,700 basis in their shares of Sligo,
they were required to take Sligo's distributive share of
Epsolon's loss into account in determining their taxable income.

The KPMG Deferred Prosecution Agreement

7.  On August 26, 2005, KPMG and the United States entered
into a Deferred Prosecution Agreement (attached as Exh. B).  At

Docket No. 12307-04          - 5 -

page 3 of the Deferred Prosecution Agreement, KPMG admitted that as set forth in an incorporated Statement of Facts, it had:

> Assisted high net worth United States citizens to evade United States individual income taxes on billions of dollars of capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters. A number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including: (i) preparing false and fraudulent tax returns for shelter clients; (ii) drafting false and fraudulent proposed factual statements and representations as part of the documentation underlying the shelters; (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners and the high net worth individual clients knew they were not true; (iv) actively taking steps to conceal from the IRS these shelters and the true facts regarding them; and (v) impeding the IRS by knowingly failing to locate and produce all documents called for by IRS summonses and misrepresenting to the IRS the nature and extent of KPMG's role with respect to certain tax shelters.

8. In the section of the Statement of Facts entitled "The Fraudulent Tax Shelter Activities," KPMG admitted at par. 5 that "KPMG tax partners helped design or sell the following tax shelters (and variations of them) to high net worth United States citizens during the period in question." (emphasis added)  Among the shelters so described was Short Options Strategy ("SOS") and its variations.

9. Paragraph 20 of the Statement of Facts recited that "SOS and variations on that shelter were designed to generate a

Docket No. 12307-04            - 6 -

substantial ordinary or capital loss through the creation of an artificially high basis in an interest in a partnership or other entity through a series of purchases and sales of offsetting options on foreign currency."

10. Paragraph 28 of the Statement of Facts recites that in early 2002, the IRS issued 25 summonses to KPMG calling for information relating to tax strategies in which KPMG was involved. In paragraph 30 of the Statement of Facts, KPMG admits that "KPMG tax partners understood that documents relating to BLIPS and SOS were called for" in response to IRS summonses, but that KPMG "did not produce any documents relating to SOS," and that "on several occasions prior to early 2003, the IRS was falsely advised that KPMG had largely complied with the IRS summonses."

11. In paragraph 32 of the Statement of Facts, KPMG further admits that "in May 2003, IRS agents directly asked KPMG, through its outside counsel, what role KPMG had played in the SOS shelters," that a KPMG tax partner "falsely advised that the only role that KPMG had played with respect to SOS was to assist a couple of high net worth individual clients in preparing and filing tax returns that reflected the tax losses from SOS transactions," and that "[t]his false representation was then relayed to the firm's counsel, and then made to the IRS."   KPMG

Docket No. 12307-04          - 7 -

further admits that "none of the SOS transactions marketed and

sold by KPMG tax partners were provided to the IRS until late

2003 and early 2004."

The August 29, 2005 Indictment

  12.  On August 29, 2005, an Indictment (attached as Exh. C)

was unsealed in the Southern District of New York, charging

seven former KPMG tax partners, one former KPMG tax manager and

Brown & Wood attorney Raymond J. Ruble with criminal violations

under 18 U.S.C. §371 stemming from their involvement in KMPG tax

shelters, including the Short Options Strategy and its variants.

The indictment charged at par. 15 that:

> During the period from at least in or about 1996
> through at least in or about 2003, the defendants
> JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY
> EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF,
> RAYMOND J. RUBLE, also known as "R.J. Ruble," and MARK
> WATSON, and others known and unknown to the Grand Jury
> (hereinafter their "co-conspirators") participated in
> a scheme to defraud the IRS by devising, marketing,
> and implementing fraudulent tax shelters, by preparing
> and causing to be prepared, and filing and causing to
> be filed with the IRS false and fraudulent U.S.
> individual income tax returns containing the
> fraudulent tax shelter losses, and by fraudulently
> concealing from the IRS those shelters.

  13.  Par. 7 of the indictment identified JEFFREY STEIN as a

KPMG tax partner who, in or about 2000, became Vice Chairman of

KPMG Tax Services.

Docket No. 12307-04          - 8 -

14. Par. 10 of the indictment identified JEFFREY EISCHEID as a KPMG tax partner who, during the year 2000, was head of KPMG's Innovative Strategies Group.

15. Par. 13 of the indictment identified RAYMOND J. RUBLE, also known as "R.J. Ruble," as a tax partner in the New York, New York office of a prominent national law firm.

16. Par. 18 of the Indictment charged that "[a]mong the fraudulent tax shelter transactions designed, marketed and implemented by the defendants…and their co-conspirators were FLIP ("Foreign Leveraged Investment Program"), OPIS ("Offshore Portfolio Investment Strategy"), BLIPS ("Bond Linked Issue Premium Structure"), SOS ("Short Option Strategy") and their variants." (emphasis added)

17. Par. 32 of the indictment charged that "SOS and its variants were designed to generate substantial capital and ordinary losses through a series of pre-arranged transactions that involved the clients entering into virtually offsetting foreign currency options positions with a bank,…transferring the offsetting options positions to a partnership or other entity and then withdrawing from the transaction, claiming a loss in the desired amount." Par. 32 further stated that "for many of these SOS-type transactions, KPMG did not issue an opinion letter, but instead certain lawyers, including RUBLE, issued

Docket No. 12307-04          - 9 -

'more likely than not' opinion letters with respect to those

transactions.  The SOS opinion letters, and other associated

documents, were false and fraudulent in a number of ways well

known to the defendants SMITH, EISCHEID and RUBLE...."

     18.  As to Obstruction of IRS investigations, the

Indictment, relative to "SOS tax shelters," states that "SMITH

and others caused KPMG falsely to claim to the IRS that the

production of documents and information relating to the

summonses was substantially complete" (par. 40) and that

"EISCHEID intentionally caused KPMG's representatives to falsely

respond that KPMG was not involved in SOS, but may have prepared

a couple of tax returns containing SOS losses." (par. 41)

The October 17, 2005 Superseding Indictment

     19.  On October 17, 2005, a Superseding Indictment was

unsealed in the Southern District of New York.  The indictment

charged at par. 25 that the original nine defendants, as well as

ten additional defendants:

          participated in a scheme to defraud the Internal
          Revenue Service by devising, marketing, and
          implementing fraudulent tax shelters, by preparing and
          causing to be prepared, and filing and causing to be
          filed with the IRS false and fraudulent U.S.
          individual income tax returns containing the
          fraudulent tax shelter losses, and by fraudulently
          concealing from the IRS those shelters.

Docket No. 12307-04          - 10 -

20. The superseding indictment, at par. 28, repeats the charge from the August 29th indictment that among the fraudulent tax shelter transactions designed, marketed, and implemented by the defendants (including Ruble) were FLIP, OPIS, BLIPS, and "SOS ('Short Options Strategy') and their variants."

21. At par. 47, under the heading "The Fraudulent SOS Shelters," the superseding indictment states that "these shelters were referred to by various names, including Short Option Strategy, Spread Option Strategy, SOS, Binary Option, Digital Option, Gain Mitigator, Loss Generator, COINS, BEST, [and] FX Transaction (hereinafter 'SOS')."

22. Par. 47 further states that KPMG's Washington National Tax Office "reviewed draft 'more likely than not' SOS opinion letters prepared by the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," and other firms, and determined that the transactions described therein were not more likely than not to withstand IRS challenge." Par. 47 of the superseding indictment further charges that "nevertheless, between 1998 and 2002, the defendants JEFFREY STEIN,...JEFFREY EISCHEID,...and RAYMOND J. RUBLE...and their co-conspirators, assisted in marketing and implementing SOS transactions for KPMG clients...."

23. Par. 32 of the superseding indictment alleges that "SOS was marketed and sold from at least in or about 1998 through at

Docket No. 12307-04          - 11 -

least in or about 2002 to at least 165 wealthy individuals, and
generated at least $1.9 billion in phony tax losses…."

24. Par. 78.e of the indictment alleges that on or about
December 15, 1997, Ruble stated that Ruble's managing partner
had approved his working with KPMG on a joint basis to develop
and market tax products and jointly to share in the fees.

25. Par. 47 of the superseding indictment further alleges
that for many SOS transactions, "KPMG did not issue an opinion
letter, but instead certain lawyers, including RUBLE, issued
'more likely than not' opinion letters with respect to those
transactions so that clients would claim the fraudulent SOS
losses and evade taxes."  Par. 49 of the superseding indictment
further alleges that the SOS opinion letters were false and
fraudulent in a number of ways.

26. Par. 27 of the superseding indictment charges that the
conspirators issued such false and fraudulent opinion letters
"with the intent that the clients would claim the fraudulent tax
shelter losses on tax returns and provide the opinion letter and
other false and fraudulent transactional documents and/or the
false and fraudulent representations and statements contained
therein to the IRS if and when the client was audited."

Docket No. 12307-04          - 12 -

27. At par. 51, the superseding indictment alleges that many SOS transactions marketed by KPMG were arranged and implemented by an unnamed New York, New York tax shelter firm pseudonymously identified as "the Shelter Boutique."

28. Pars. 52 and 53 of the superseding indictment allege that in addition to the fees collected by the Ruble law firm for the issuance of opinion letters on SOS and other tax shelter transactions, Ruble accepted side payments from the Shelter Boutique relating to his participation in devising, marketing, and implementing tax shelters. At pars. 81-83, the superseding indictment charges Ruble with the additional crime of tax evasion under 26 U.S.C. § 7201 for failing to report those side payments as income during the period 1998-2001.

29. The superseding indictment, at par. 54, alleges that RUBLE, STEIN, EISCHEID and the other named defendants, in addition to preparing false and fraudulent documentation relating to the shelter transactions, and preparing and causing to be prepared tax returns that incorporated the phony tax shelter losses, also fraudulently concealed the transactions by, inter alia, not registering the shelters with the IRS as required by law and obstructing IRS and Senate investigations into their tax shelter activities.

Docket No. 12307-04          - 13 -

30. As to obstruction of the IRS, par. 60 of the
superseding indictment states that IRS summonses called for the
production of documents relating to SOS tax shelters, and that
although KPMG personnel directing responses to those summonses
were aware of KPMG's involvement in marketing and implementing
SOS transactions, nevertheless, none of the SOS tax shelters
marketed or implemented by KPMG, or in which KPMG personnel
participated, were disclosed to the IRS.  Par. 60 further
alleges that various KPMG personnel falsely claimed that the
production of documents and information relating to the
summonses was substantially complete.

31. Par. 61 of the superseding indictment further alleges
that when the IRS in May 2003 inquired about KPMG's failure to
produce SOS information, JEFFREY EISCHEID and another person
caused KPMG's representatives to falsely respond that KPMG was
not involved in SOS.  As a result, Par. 85 of the superseding
indictment charges EISCHEID with Attempts To Interfere With The
Internal Revenue Laws under 26 U.S.C. § 7212.

The Abundant Connections Between Petitioners' Transactions, The
Criminal Defendants, And The Criminal Prosecution

32. As set forth in a letter dated October 20, 2005 from
Shirah Neiman (Chief Counsel to the United States Attorney for
the Southern District of New York) to Donald L. Korb, Chief

Docket No. 12307-04          - 14 -

Counsel, Internal Revenue Service (copy attached as Exh. E), the Tucker tax shelter transaction at issue in this civil case is a shelter which KPMG referred to as an SOS shelter, and is encompassed within the charges in the indictment, including paragraphs 47-51 of the superseding indictment.

33. The fact that petitioners' transactions are among the SOS transactions described in the superseding indictment is confirmed by the following:

a. The petitioners' description of the foreign currency options transactions of Sligo and Epsolon as set forth in the Tax Court petition corresponds with the description of the SOS Shelters as set forth at par. 47 of the superseding indictment.

b. Par. 47 of the superseding indictment notes that the SOS shelters were referred to by various names, including "Spread Option." On June 29, 2004, the IRS received a response to a "John Doe" summons that had been served on Sidley Austin Brown & Wood (the successor firm to Brown & Wood) relative to tax shelter transactions in which SABW had participated. The response, attached hereto as Exh. F, identified Keith Tucker as a participant in "Diversified - Spread Options." Additional documents referenced below also refer to petitioners' transactions as "options spreads."

Docket No. 12307-04          - 15 -

     c.   Par. 47 of the superseding indictment also states
that the SOS shelters were referred to as "digital options."  In
response to informal discovery,[2] petitioners provided the
document attached as Exh. G, entitled "Epsolon Limited."
That document, at item 4), claims that on December 20, 2000,
Epsolon entered into a series of "digital" options.

   34. As set forth below, respondent is currently in
possession of documents demonstrating that at minimum, three of
the indicted individuals, R.J. Ruble, Jeffrey Eischeid and
Jeffrey Stein, had direct involvement in planning, approving,
executing, or providing legal opinions with respect to Keith
Tucker's KPMG tax shelter transactions.  The documents also
illustrate the central role of KPMG's Timothy Speiss in
developing, coordinating and arranging Tucker's transactions.
(As later discussed, Speiss has stated in writing his intention
to claim the protection of the Fifth Amendment at any deposition
or trial in the present case.)

     a.   In his Declaration (Exh. A, pars. 12, 17), Mr.
Tucker indicates that KPMG Tax Partner Timothy Speiss advised
him in December 2000 that KPMG could analyze and develop a

---

[2] Most of the Exhibits referenced in the following discussion
were supplied by petitioners in response to respondent's
informal discovery.  All documents that were produced by
petitioners are identified with a "KTTC" Bates number prefix.

Docket No. 12307-04          - 16 -

customized solution to his tax planning needs, and that based on

tax and legal advice of both KPMG and Brown & Wood, he engaged

KPMG to implement and execute that transaction.

        b.    In response to informal discovery, petitioners

provided respondent with a copy of a "Memorandum For Record re:

Keith Tucker," dated January 18, 2001, prepared and signed by

KPMG Tax Partner Eugene Schorr (attached as Exh. H, KTTC 588-

591). Under the page 2 heading: "Background," Schorr states

that

> Mr. Tucker anticipated substantial income for the
> year 2000 resulting from the increasing value of
> Waddell & Reed shares.  Mr. Tucker earned substantial
> income from the exercise of options in August of
> 2000.  Accordingly, I asked Mr. Timothy Speiss, the
> northeast PIC of Innovative Strategies, to meet with
> Mr. Tucker to discuss certain KPMG strategies to
> mitigate his year 2000 tax liabilities.  Mr. Speiss
> met with Tucker to present various KPMG strategies.

Under the page 2 heading: "KPMG Innovative Tax Solution For

Mr. Tucker," Schorr states that on or about December 14, 2000,

Speiss advised him that he had discussed proposing a tax

solution for Mr. Tucker with the KPMG "tax leadership"

(including, specifically, criminal defendants JEFFREY EISCHEID

and JEFFREY STEIN), who agreed that Speiss could develop such a

solution for Mr. Tucker.

Docket No. 12307-04          - 17 -

　　　　c.　Schorr states at Exh. H., p. 2, that "Tim

conferred with Diversified and Brown & Wood to develop a

'customized solution' for Mr. Tucker." Schorr relates at page 3

that

- Tim developed the tax and investment structure with Helios and Brown & Wood

- Tim obtained KPMG approval for this "customized solution" for Mr. Tucker

- Tim communicated the transaction to Mr. Tucker

- Tim orchestrated the transaction including engaging Frank Montgomery to provide the legal services necessary to complete the transaction

- Tim issued an engagement letter under my signature as engagement partner (I did not sign the letter)

- Tim coordinated the transaction for Mr. Tucker during Christmas week while Mr. Tucker was on vacation

- Tim reviewed all investment decisions with Diversified

- Tim arranged for the wire transfer of fees to KPMG

　　　　d.　Speiss' central involvement in arranging the

Tucker transactions, as related by Schorr, is confirmed by a

facsimile dated December 16, 2000 from Speiss to Tucker

(attached as Exhibit I, KTTC 1310-14), in which Speiss discusses

the pre-planning of the transactions, including the formation of

the required entities, the planning of the options transactions,

the planned generation of tax losses in 2000 and 2001 ("review

Docket No. 12307-04            - 18 -

point 4"), and "the ability to be exempted from penalty based upon obtaining tax opinion reliance and investor due diligence." ("review point 24")

     e.   The early involvement of Brown & Wood in Tucker's transactions was in the person of criminal defendant R.J. RUBLE. This is evidenced by a December 18, 2000 email (attached as Exh. J, KTTC 3217) from Speiss to several recipients regarding "Project Epsolon," wherein Speiss states: "Finally, we were able to speak with R. J. Ruble this evening and he answered our questions WRT opinion matters."

     f.   As shown by an email string attached as Exh. K, (KTTC 2768-71) on December 19, 2000, Speiss sent an email to Jimmy Haber of the Diversified Group, requesting that Haber forward Keith Tucker's address to R.J. Ruble for purposes of the "engagement letter." The email string indicates that Haber acted on that request by forwarding Tucker's name and address to Ruble on December 20, 2000.

     g.   A Brown & Wood letter to Tucker dated December 26, 2000, reciting that Tucker had asked the firm to act as special U.S. income tax counsel for him in connection with "various digital foreign currency option trades," (emphasis added) is attached hereto as Exh. L (KTTC 2755-56). Ruble, in

Docket No. 12307-04          - 19 -

the December 27, 2000 email attached hereto as Exhibit M (KTTC

2772), acknowledges receipt of the Tucker letter.

      h.   R.J. Ruble was also deeply involved in drafting

and providing opinion letters for Tucker in connection with his

options transactions.  In the January 26, 2001 email string

attached hereto as Exhibit N, (KTTC 2773) under the heading

"Hechler and Tucker opinions," Ruble writes to James Haber of

the Diversified Group that "I just got a call from Tim Speiss of

KPMG asking how these two opinions were progressing."  Haber's

reply states that

> These opinions will be two opinions.  One is increase
> in outside basis by virtue of a 351 contribution of
> two options into an S Corp. and the second, a loss
> generated by the CFC strategy.  You do not have
> information on these opinions as yet.  Orrin just
> finished a form opinion for the CFC part with the help
> of Bryan Cave.  I am reviewing the opinion and putting
> together the closing documents to send to you in the
> next day or two.

      i.   In a January 30, 2001 Memorandum from Orrin

Tilevitz, Esq. of the Diversified Group to R.J. Ruble, attached

hereto as Exhibit O (KTTC 2774), Tilevitz wrote:

> You will need to write opinions to Sligo (2000)
> Company, Inc., Clare 2000 Company, Inc., and
> [Redacted].  Each is an S Corporation that acquired a
> series of options through a CFC.  The CFC's trading
> activities resulted in gain recognized at the CFC
> level (but not passed through to the S corporation)
> and loss recognized at the S corporation level.  Also,
> the shareholder of each corporation separately
> acquired an option spread through a single- member LLC

Docket No. 12307-04          - 20 -

and contributed the LLC interest to the S corporation in a section 351 transaction with the tax goal of increasing outside basis sufficiently that a shareholder could deduct the S corporation's loss. Each shareholder will also need an opinion on this issue (separate from the one issued to the S corporation). Jimmy will be sending you, under separate cover, detailed descriptions of these transactions.

j.   On March 14, 2001, Mox Tan of Helios Financial sent an email to R.J. Ruble that attached draft letters containing taxpayer representations "for the basis step opinions for Hechler, Tucker, and [redacted]." A copy of the Tan email is attached hereto as Exh. P. (KTTC 3168)

k.   On March 16, 2001, James Haber of the Diversified Group sent Ruble an email (attached as Exh. Q, KTTC 2779) asking if the taxpayer representation letters for Hechler and Tucker were "okay." By an email of the same date (attached as Exh. R, KTTC 2780), Ruble responded that "the rep lettere (sic) should just repeat the reps in the opinions."

l.   By facsimile dated March 23, 2001 (attached as Exh. S, KTTC 2781-84), James Haber of the Diversified Group faxed to Susan Sodano/R.J Ruble a draft taxpayer representation letter for Keith Tucker and requested "[p]er our conversation, can you please substitute #14 of the attached revised Rep. letter into the opinion."

Docket No. 12307-04          - 21 -

m.    On April 10, 2001, Haber sent an email to Ruble (attached as Exh. T, KTTC 2793) inquiring about when the Tucker and Hechler tax opinions would be completed.

n.    On April 18, 2001, James Haber sent Susan Sodano and R.J. Ruble a five page facsimile (Exh. U, KTTC 2980-84) attaching proposed revisions to a legal opinion for Keith Tucker captioned "Re: Investment in Foreign Entity."

o.    In a letter dated April 24, 2001 to Keith Tucker, (attached as Exh. V, KTTC 2758) James Haber stated: "Enclosed please find your Brown & Wood tax opinion."

p.    By letter dated June 28, 2001 (attached hereto as Exhibit W, KTTC 2759), R.J. Ruble advised Keith Tucker that

> Brown & Wood LLP previously issued to you a more-likely-than not opinion, dated December 31, 2000,[3] ("Letter") regarding certain United States federal income tax consequences of investing in a foreign entity that acquires an option spread and other investment assets as described more fully therein ("Transactions").
>
> We are unaware of any change in law, or interpretation of law, that would adversely affect the United States federal income tax treatment of the Transactions, since the date of the Letter and through March 26,

---

[3] Given the preceding facts, it is apparent that the tax opinion referenced in Ruble's letter was backdated to December 31, 2000.

Docket No. 12307-04                - 22 -

2001 (the date you filed your 2000 tax year individual
income tax returns).

                    Very truly yours,

                    (SIGNED)

                    R.J. Ruble

        q.   In his Declaration (attached hereto as Exh. A),
Keith Tucker states at par. 26 that "In April 2002, KPMG advised
me that it had received summonses from the IRS.  KPMG advised me
that the investment structure was not subject to disclosure to
the IRS pursuant to those summonses and that KPMG would not
disclose to the IRS KPMG's tax advice to me.  Tucker further
states at par. 27 of the Declaration that "[i]n a telephone
conference on August 27, 2003, Mr. Speiss, a tax partner at
KPMG, advised me for the first time that KPMG had changed its
view and reached the conclusion that my name and the tax advice
I received from KPMG with respect to the investment structure
planned for me by KPMG were responsive to an IRS summons and,
therefore, were going to be disclosed to the IRS."

        r.   Tucker thereafter commenced a legal proceeding
against KPMG under the pseudonym "John Doe 1" in the United
States District Court for the Northern District of Texas to
enjoin KPMG from responding to the IRS summons as to Tucker and

Docket No. 12307-04          - 23 -

his transactions.  See John Doe 1 and John Doe 2 v. United

States, 398 F.3d 686 (5th Cir. 2005).

The Tax Court Should Stay Its Proceedings In This Case Until The
Related Criminal Trial Has Been Concluded

35.  The above recitation leaves no doubt that the

transactions at issue in this Tax Court case are encompassed

within the criminal indictments and are therefore directly at

issue in the criminal prosecution in the Southern District of

New York.  Tucker, with the advice and assistance of KPMG,

entered into SOS transactions as described at par. 47 of the

superseding indictment (also referred to as "spread options" or

"digital options" transactions).  At least two of the indicted

KPMG partners, Eischeid and Stein, decided that KPMG would

arrange the options transactions for Tucker (Exh. H).  Criminal

defendant Ruble was directly and substantially involved in the

Tucker transactions from at least December 18, 2000 through at

least June 28, 2001.  Documents cited herein establish that

Ruble conferred with KPMG to develop a tax solution for Tucker

(Exh. H), that Ruble arranged the Brown & Wood engagement letter

for Tucker (Exhs. K, L, and M), that Ruble was involved in

drafting a "taxpayer representations" letter from Tucker in

connection with legal opinions regarding Tucker's transactions

(Exhs. P, Q, R and S), and that Ruble was centrally involved in

Docket No. 12307-04          - 24 -

the preparation of "more-likely-than-not" tax opinions for Tucker (Exhs. J, K, L, M, N, O, P, Q, R, S, T, U, V and W) which were intended to give Tucker "additional comfort in the face of an IRS challenge…." (Exh. A)  Finally, as generally alleged at pars. 59-61 and par. 85 of the superseding indictment, KPMG failed to produce documents with respect to Tucker's transactions in response to IRS summonses (Exh. A).  In sum, Tucker's tax shelter transactions are directly involved in this criminal prosecution, as are KPMG defendants Eischeid and Stein, as well as Brown and Wood defendant Ruble.  Also at issue in the criminal case are the actions of KPMG personnel in concealing Tucker's and others' shelters transactions by failing to comply with IRS summonses.

36.  Importantly, a stay of proceedings in this case will protect the valid Fifth Amendment privileges of prospective witnesses (Ruble, Eischeid, and Stein) who are currently under indictment.  Further, as indicated by Shirah Neiman, Chief Counsel to the U.S. Attorney for the Southern District of New York, the criminal investigation is still ongoing. (Exhibit E) Thus a stay will also protect the Fifth Amendment privileges of other prospective third party witnesses who are at risk of potential indictment.  Allowing a civil case to proceed during the pendency of a criminal prosecution can inappropriately put a

Docket No. 12307-04          - 25 -

party or witness in the position of having to testify in order

to present or defend the civil case when the testimony may be

incriminating and subject to a valid Fifth Amendment privilege.

See United States v. Kordel, 397 U.S. 1, 25 (1970).

    37.  Given their significant roles in Tucker's transactions,

criminal defendants Ruble, Eischeid and Stein, as well as other,

unindicted third party witnesses involved in Tucker's

transactions, are critical to the presentation of respondent's

case before this Court.  Inasmuch as Ruble, Eischeid and Stein

are currently under indictment and other third party witnesses

remain in criminal jeopardy due to the ongoing nature of the

criminal investigation, none of these individuals can reasonably

be expected to cooperate in civil discovery by providing

deposition testimony in this case.  In this regard, Mr. Ruble,

prior to being indicted, twice claimed the protection of the 5th

Amendment regarding his involvement in KPMG transactions, first

in response to questioning by a United States Senate Committee,[4]

and more recently on August 2, 2005 in a United States District

Court case, Shasta Strategic Investment Fund, LLC, and Presidio

Growth, LLC, Case No. C-04-4264-VRW, (ND CA).  Shasta involves

----

[4] See The Role Of Professional Firms in the U.S. Tax Shelter
Industry, Permanent Subcommittee On Investigations, Committee on
Homeland Security and Governmental Affairs, United States
Senate, February 8, 2005, p. 106.

Docket No. 12307-04          - 26 -

KPMG BLIPS transactions in which Ruble is alleged to have participated. As evidenced by pages 7 through 17 of Ruble's deposition transcript in <u>Shasta</u> (copy attached as Exh. X), Ruble answered only two questions: his name and address. He refused to respond to all other questions, invoking his Fifth Amendment privilege against self-incrimination.

38. Timothy Speiss, who like Ruble was at the very center of Tucker's transactions and is thus a critical witness in this proceeding, has represented through his legal counsel that he will claim the protection of the Fifth Amendment in the instant Tax Court case. In a letter dated October 20, 2005 from Peter Driscoll, Esq. to the Office of Chief Counsel, Mr. Driscoll represents that with respect to the case of <u>Keith A. and Laura B. Tucker v. Commissioner</u>, Docket No. 12307-04, "Mr. Speiss would, on our advice, assert his right not to testify based on his Fifth Amendment privilege against self-incrimination if subpoenaed to testify at a deposition or trial in the above-referenced matter." A copy of Mr. Driscoll's letter is attached hereto as Exh. Y.

39. Without the ability to depose or compel trial testimony from Speiss, Ruble, Stein, Eischeid and others (most significantly KPMG's Timothy Speiss, who engineered and spearheaded the Tucker transactions), respondent will be

Docket No. 12307-04          - 27 -

severely impaired in his ability to develop and present relevant evidence in this case. Moreover, given petitioners' stated intention to file a motion for partial summary judgment in the near term with respect to substantive legal issues associated with petitioners' KPMG transactions, respondent would be severely prejudiced were the court to decline to stay this case and entertain such a motion in the context of an incomplete factual record. Staying this case would avoid unfairly prejudicing respondent in that manner.

40. In addition, were cooperating witnesses in the criminal proceeding to be called to testify in the Tax Court case, either upon deposition or at trial, the criminal prosecution could be prejudiced, since such testimony would provide an unfair and inappropriate preview of the government's evidence, theories, and strategies in the case. Moreover, respondent would be prevented from fully and effectively examining such witnesses since respondent is not in possession of evidence developed by the grand jury.[5]

41. Importantly, a stay would also help ensure that the court decided this case on the basis of a complete factual record, rather than a piecemeal record. Were the court to stay

---

[5] The same would be true in the highly unlikely event that a defendant in the criminal case were to agree to be deposed or testify in the Tax Court case prior to the criminal trial.

Docket No. 12307-04          - 28 -

this case pending the completion of the related criminal

proceedings, both parties would enjoy the benefit of access to

evidence presented at the criminal trial, ensuring a

substantially more complete record in this civil tax case and

thereby promoting the interests of justice.

42. Most significantly, as stated by Shirah Neiman, Chief

Counsel to the U.S. Attorney for the Southern District of New

York, because this pending Tax Court case involves a transaction

encompassed in the indictment, permitting this case to move

forward would jeopardize and interfere with the ongoing criminal

prosecution and investigation. (Exh. E)

43. Finally, as related by Ms. Neiman in Exh. E, the Hon.

Lewis A. Kaplan has set a firm May 1, 2006 trial date for the

criminal case. Discovery in accordance with this schedule was

timely provided on October 5, 2005 to the first nine defendants,

and will be made available to the ten recently charged

defendants on October 24, 2005 when they are arraigned. Given

the firm May 1, 2006 trial date established by Judge Kaplan, a

stay in this case would be of a reasonable duration and

therefore would not significantly prejudice petitioners,

particularly since a stay would afford petitioners equal access

to documents and testimony that become public as a result of the

criminal trial.

Docket No. 12307-04          - 29 -

     For the reasons set forth above, respondent respectfully requests that the Court grant respondent's Motion for Stay of Proceedings and stay the instant case until the related criminal trial has been concluded.

                              DONALD L. KORB
                              Chief Counsel
                              Internal Revenue Service


Date: **OCT 2 1 2005**          By: _____
                                   JAMES D. HILL
                                   Special Trial Attorney
                                   (Large & Mid-Size Business)
                                   Tax Court Bar No. HJ1129
                                   Enquirer Bldg.
                                   312 Elm St.
                                   Suite 2350
                                   Cincinnati, OH 45202-2727
                                   Telephone: (513) 263-4875


OF COUNSEL:
PETER J. LABELLE
Division Counsel
(Large & Mid-Size Business)
JOSEPH F. MASELLI
Area Counsel
(Heavy Manufacturing & Transportation)
MARY HELEN WEBER
Deputy Area Counsel (SL)
(Strategic Litigation)

Docket No. 12307-04

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF RESPONDENT'S MOTION FOR

STAY OF PROCEEDINGS was served on counsel for petitioner by

mailing the same on ____OCT 2 1 2005____ in a postage paid

wrapper addressed as follows:

> Duane Webber, Esq.
> BAKER & MCKENZIE
> 815 Connecticut Ave., N.W.
> Suite 1100
> Washington, D.C.  20006-4078

Date: ____OCT 2 1 2005____

JAMES D. HILL
Special Trial Attorney (SL)
(Cincinnati)
(Large & Mid-Size Business)
Tax Court Bar No. HJ1129