# EXHIBIT D

480.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

           -against-                               S1 05 Crim. 0888 (LAK)

JEFFREY STEIN, et al.,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                      Stanley J. Okula, Jr.
                      Justin S. Weddle
                      Assistant United States Attorney
                      MICHAEL J. GARCIA
                      UNITED STATES ATTORNEY

                      Robert S. Fink
                      Caroline Rule
                      KOSTELANETZ & FINK, LLP
                      *Attorneys for Defendant Richard Smith*

LEWIS A. KAPLAN, *District Judge.*

        Former KPMG partner Richard Smith and eighteen others, all but two formerly employed by or affiliated with KPMG, stand indicted for allegedly designing, marketing, and implementing fraudulent tax shelters for wealthy individual clients and deliberately concealing those tax shelters from the IRS. The government moves the Court for an order disqualifying attorney Robert Fink, Esq., and the firm of Kostelanetz & Fink, LLP ("K&F"), from continuing to serve as Smith's counsel. It contends that K&F has conflicts of interest created by the prior

2

representation by K&F of (1) Domenick DeGiorgio, a co-conspirator in the alleged tax fraud scheme
who has agreed to cooperate with the government and who likely will be called to testify at trial, and
(2) an unidentified co-conspirator in the alleged scheme (referred to in the Superseding Indictment
and herein as "CC-10"). This is the Court's decision and findings of fact following an evidentiary
hearing.

*Facts*

A.     *The Prior Representation of DeGiorgio*

According to the government, Smith and DeGiorgio – a former officer of the German
bank Hypo und Vereinsbank ("HVB") – played substantial roles in securing the participation of
KMPG and HVB in a series of allegedly fraudulent tax shelter transactions known as Bond Linked
Issue Premium Structures ("BLIPS").[1] Although DeGiorgio initially defended the propriety of the
BLIPS shelters, he later agreed to cooperate with the government and, on August 11, 2005, pleaded
guilty to, among other things, tax fraud conspiracy charges relating to his role in the BLIPS
transactions.[2] The government now expects to call him as a witness against Smith.[3]

DeGiorgio's relationship with K&F began in November 2003 – several months
before the firm was retained by Smith – when HVB engaged K&F partner Bryan Skarlatos to
represent DeGiorgio, who was scheduled to testify in the following week before a Senate

---

[1]     Gov. Ltr. Br. at 1-2.

[2]     *Id.* at 2.

[3]     *Id.*

subcommittee investigating allegedly fraudulent tax shelters.[4] In preparation for the Senate hearing, Skarlatos and Andrew Kirk Susong, then an associate at K&F, met with DeGiorgio on at least three occasions.[5] Although the parties dispute whether Skarlatos ever met with DeGiorgio privately and whether DeGiorgio shared any confidential information with Skarlatos that was not disclosed publicly during DeGiorgio's Senate testimony,[6] the Court finds that DeGiorgio did impart confidences to Skarlatos that remain undisclosed. On November 20, 2003, Skarlatos accompanied DeGiorgio to his appearance before the subcommittee, during which DeGiorgio testified that the BLIPS transactions, in his view, were legal.[7]

Shortly thereafter, Skarlatos learned that several targets of the government's investigation, including Smith, had expressed interest in hiring K&F.[8] Skarlatos brought this fact to DeGiorgio's attention, and DeGiorgio agreed to the firm's representation of Smith and to the termination of his own attorney-client relationship with the firm.[9] Skarlatos then helped DeGiorgio to find another attorney.[10]

---

[4]
     Skarlatos Decl. ¶ 3.

[5]
     *Id.*

[6]
     Tr., Jan. 19, 2006, at 64, 68, 88-89; Skarlatos Decl. ¶ 4.

     Gov. Ltr. Br. at 2; Skarlatos Decl. ¶¶ 4-5; *id.* Ex. A

[8]
     Skarlatos Decl. ¶ 5.

[9]
     *Id.*

[10]
     Tr., Jan. 19, 2006, at 56-57.

Smith formally retained K&F in March 2004, having been advised of the former representation of DeGiorgio.[11] Skarlatos worked on Smith's case until shortly after DeGiorgio pleaded guilty in August 2005, when Smith's defense team learned that DeGiorgio was cooperating with the government and thus likely to take a position contrary to his own Senate testimony and thus adverse to Smith (i.e., that the BLIPS transactions were not, in fact, legal).[12] Realizing that its former representation of DeGiorgio had become a conflict, K&F attempted to screen Skarlatos from the matter, erecting a "wall" that, they claim, prohibited Skarlatos from working on the case and barred other members of the team from discussing Smith's defense with Skarlatos.[13] As with most walls, this one was not built overnight.

On August 12, 2005, the day after DeGiorgio's guilty plea, Skarlatos participated in a conference with the government on Smith's behalf – despite the then apparent conflict – allegedly because Skarlatos was to play a key role in discussing some of the more technical tax issues and it was not possible to postpone the meeting or prepare another attorney to fill his shoes.[14] During this meeting, Fink responded to the government's reference to DeGiorgio's likely testimony by attacking DeGiorgio's credibility based on DeGiorgio's contrary testimony before the Senate.[15] Although Skarlatos was present during this exchange, there is no indication that he said anything to defend or to impugn his former client.

---

[11]

*Id.*; Skarlatos Decl. ¶ 6; Fink Decl. ¶ 2.

[12]

Skarlatos Decl. ¶¶ 7-8; Fink Decl. ¶¶ 7-8.

[13]

Fink Decl. ¶ 7; Skarlatos ¶ 8.

[14]

Skarlatos Decl. ¶ 8; Rule Decl. ¶ 7.

[15]

Gov. Ltr. Br. at 2; Rule Ltr. Br. at 2.

Following DeGiorgio's guilty plea, Skarlatos asked DeGiorgio's new attorney if DeGiorgio would be willing to sign a written waiver of any potential conflict of interest.[16] DeGiorgio refused to sign the waiver, and his position with respect to the disqualification of K&F remains somewhat murky. Although he repeatedly has refused to join in the government's motion to disqualify, he still refuses to waive the conflict and the attorney-client privilege with respect to confidential statements he allegedly made to Skarlatos.[17] He has expressed concerns about K&F's continued involvement in the case insofar as it concerns the protection of the confidences he imparted to Skarlatos. He has requested that, if K&F is permitted to represent Smith at trial, the Court issue an order (1) requiring K&F to continue to screen Skarlatos from Smith's case and (2) prohibiting K&F from taking any role in cross-examining him at trial, including sharing information about him with counsel for Smith's co-defendants or any independent attorney hired to cross-examine him on Smith's behalf.[18]

## B.   The Prior Representation of CC-10

The second alleged conflict involves K&F's former representation of CC-10, an unindicted co-conspirator affiliated with The Diversified Group ("Diversified"), a New York-based tax shelter boutique. Although CC-10 and Smith apparently have never met or spoken to each other, both are alleged to have participated in another fraudulent tax shelter vehicle known as Short Option

---

16

Skarlatos Decl. ¶¶ 9-10.

17

Tr., Jan. 19, 2006, at 102.

18

*Id.* at 102-03.

6

Strategies ("SOS").[19]  According to the government, Smith helped to implement a number of SOS deals, many of which were arranged through Diversified.[20]  The government asserts further that CC-10 provided millions of dollars in illegal and unreported side fees to Smith's co-defendant, Raymond Ruble, in exchange for opinion letters from Ruble falsely opining that the SOS shelters were likely to survive IRS review.[21]

On May 4, 2005, CC-10 appeared before the grand jury in this case as the custodian of records for Diversified, which had been asked to produce an employee to authenticate certain corporate documents.[22]  Robert Fink, a K&F partner now leading Smith's defense, represented CC-10 in connection with this appearance, although CC-10 was represented also by another attorney, William Wachtel, Esq., who was present during all but one of the meetings between Fink and CC-10.[23]  According to Wachtel, CC-10 knew that K&F already was representing Smith before CC-10 retained it and was not concerned about a potential conflict.[24]  Prior to CC-10's grand jury appearance, Judge Griesa – the Part I Judge at the time – conducted a *Curcio* hearing regarding any

---

[19]

Gov. Ltr. Br. at 3.

[20]

*Id.*

[21]

*Id.*

[22]

*Id.* at 2 n.1; Wachtel Ltr. ¶ 1.

[23]

Tr., Jan. 19, 2006, at 107; Wachtel Ltr. ¶ 1.

[24]

Wachtel Ltr. ¶ 2.

potential conflict posed by K&F's joint representation of CC-10 and Smith at which CC-10 waived any potential conflict on the record.[25]

Although Fink's role with respect to CC-10 was limited both temporally and substantively to CC-10's May 2005 grand jury appearance, K&F had not formally terminated the attorney-client relationship with CC-10 by the time the government filed the instant motion to disqualify in November 2005.[26] In early December 2005, Fink, apparently motivated by the government's motion, asked CC-10 to sign a written waiver of conflict after consulting with an independent attorney regarding the joint representation.[27] CC-10 promptly complied. In January 2006, moreover, Wachtel notified Fink that the attorney-client relationship between Fink and CC-10 had been terminated.[28]

## C.    *The Government's Motion*

The government does not dispute that the potential conflict involving CC-10 became apparent at least as early as May 2005, when Fink accompanied CC-10 to his appearance before the grand jury in this case, having represented Smith in previous meetings with the government. Similarly, the DeGiorgio conflict was apparent to the government no later than August 2005, when DeGiorgio pleaded guilty to tax fraud conspiracy charges, and probably well before that time, when

---

Opp'n Br. at 11-12 (quoting the transcript of the May 4, 2005 *Curcio* hearing, which has been sealed by Judge Griesa).

26

Tr., Jan. 19, 2006, at 108.

27

Fink Decl. ¶ 14; *id* Ex. C.

28

Wachtel Ltr. ¶ 6; Tr., Jan. 19, 2006, at 108.

8

DeGiorgio first agreed to cooperate with the government.[29]   The government raised the CC-10 conflict with Smith's defense team several times during the spring and summer of 2005 and raised the DeGiorgio conflict at least once following DeGiorgio's guilty plea.[30]   When K&F did not agree to terminate its representation of Smith voluntarily, however, the government delayed for nearly three months before moving for disqualification on November 15, 2005.

Notwithstanding this prejudicial and unjustified delay, the government now contends that these conflicts of interest are so serious that they cannot be waived by Smith and require the immediate disqualification of K&F.[31]   According to the government, Skarlatos' prior representation of DeGiorgio would cripple the Smith defense team's ability to cross-examine DeGiorgio, who the government claims is likely to testify against Smith at trial.[32]   The government contends also that the Smith defense team would face similar problems in attacking the credibility of CC-10 if CC-10 testifies at trial or if the government offers co-conspirator statements by CC-10 to support its case.[33]   Finally, the government asserts that Smith's defense team would not be able to counsel Smith to

---

Tr., Jan. 19, 2006, at 123; Gov. Rep. Br. at 5-6.

[30]

Gov. Rep. Br. at 5-6.

[31]

*Id.* at 10-11; Gov. Ltr. Br. at 7-8.

The government claims that, because of the prior representation, Fink could not use any information that he or other lawyers at his firm (i.e., Skarlatos) received from DeGiorgio to cross-examine him, and would be impaired by conflicting duties of loyalties to Smith and DeGiorgio even in deciding whether and how vigorously to impeach DeGiorgio's credibility on cross. *See* Gov. Ltr. Br. at 6.

[33]

*Id.* at 7

9

cooperate or to exculpate Smith by pointing the finger at other alleged members of the conspiracy if either strategy would prejudice DeGiorgio or CC-10.[34]

D.     *Smith's Waiver of the Conflicts*

1.     *The Written Waivers*

In December 2005, after the government had filed this motion, Fink asked Smith to consult with independent counsel regarding the purported conflicts.[35]  Smith complied, meeting twice with Virginia attorney Thomas Lawson for a total of about two and a half hours, during which time he discussed the possible conflicts that might arise from K&F's prior representation of DeGiorgio and CC-10.[36]  Following these meetings, Smith executed two separate written waivers relating to these potential conflicts of interest.[37]

2.     *The* Curcio *Hearing*

On January 19, 2006, this Court held an evidentiary hearing on the government's motion.  It conducted also an inquiry of Smith pursuant to *United States v. Curcio.*[38]

---

[34]

*Id.*

[35]

Fink Decl. Ex. A & C.

[36]

Tr., Jan. 19, 2006, at 11-12.

[37]

Fink Decl. Ex. A & C.

[38]

680 F.2d 881 (2d Cir. 1982).

After determining that Smith, an attorney as well as a tax professional, was competent to understand and consider the conflicts at issue,[39] the Court advised Smith at length about his right to conflict-free representation under the Sixth Amendment and about the dangers stemming from the two conflicts of interest, including the fact that attorneys from K&F would be unable to use information gleaned from DeGiorgio or CC-10 in Smith's defense and limited in their ability to cross-examine DeGiorgio and CC-10 if either testifies at trial.[40] The Court further advised Smith on the dangers posed by allowing K&F to remain in the case, but prohibiting any K&F attorney from cross-examining either DeGiorgio or CC-10 and from discussing those witnesses with any independent attorney hired to cross-examine them on Smith's behalf.[41] The Court then confirmed that Smith previously had discussed these issues with Lawson, an independent attorney, and offered Smith the opportunity to consult Lawson or other counsel again.[42]

After listening to these warnings and declining the opportunity to consult further with Lawson or another attorney, Smith testified that he understood the risks and that he wanted to continue with K&F as his counsel, even if the firm were barred from cross-examining DeGiorgio or CC-10 on his behalf and from sharing any information about DeGiorgio or CC-10 with any other attorney Smith hired for the cross-examination of those potential witnesses.[43] Smith stated also that he understood that by electing to continue with K&F as his counsel, he would be waiving the right

---

[39] Tr., Jan. 19, 2006, at 34-35.

[40] *Id.* at 37-40.

[41] *Id.* at 41-42.

[42] *Id.* at 42-43.

[43] *Id.* at 44-45.

11

to attack a conviction in this case – either on appeal or collaterally – on the ground that he had received ineffective assistance of counsel based on the conflicts of interest stemming from K&F's prior representation of DeGiorgio and CC-10.[44]

At the close of the hearing several hours later, after a lunch break and testimony from a number of other witnesses relating to the purported conflicts, the Court again asked Smith if he wanted K&F to represent him despite these conflicts of interest.[45]  Smith declined the Court's renewed offer to consult with an independent attorney and confirmed that he still wanted K&F to represent him.[46]

*Discussion*

A.   *Legal Standards*

The Sixth Amendment provides that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense" in all criminal prosecutions.[47] Although it does not grant criminal defendants an absolute right to be represented by counsel of their choice,[48] the Second

---

[44]

*Id.* at 45-46.

[45]

*Id.* at 130-31

[46]

*Id.* at 130.

U.S. Const. amend. VI

[48]

*United States v. Jones,* 381 F.3d 114, 119 (2d Cir. 2004), *cert. denied,* 543 U.S. 1072 (2005) ("The Sixth Amendment guarantees a criminal defendant an effective advocate, not necessarily the advocate of his or her choosing.") (citing *Wheat v. United States,* 486 U.S. 153, 159 (1988).

12

Circuit has "consistently recognized that the right of an accused who retains an attorney to be

represented by that attorney is 'a right of constitutional dimension.'"[49] Accordingly, a defendant's

"[c]hoice of counsel should not be unnecessarily obstructed by the court."[50]

The Sixth Amendment right to the effective assistance of counsel includes also the

right to be represented by an attorney free from conflicts of interest.[51] This right may be violated

if the attorney has "'(1) a potential conflict of interest that result[s] in prejudice to the defendant, or

(2) an actual conflict of interest that adversely affect[s] the attorney's performance."[52] An attorney

has a potential conflict of interest if "the interests of the defendant could place the attorney under

inconsistent duties in the future."[53] An attorney has an actual conflict of interest, however, when,

"the attorney's and defendant's interests diverge with respect to a material factual or legal issue or

---

[49]

      *United States v. Perez*, 325 F.3d 115, 124 (2d Cir. 2003) (quoting *United States v. Wisniewski*, 478 F.2d 274, 285 (2d Cir.1973)).

[50]

      *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982) (quoting *United States v. Bernstein*, 533 F.2d 775, 788 (2d Cir. 1976)); *see also Perez*, 325 F.3d at 125; *United States v. Bubar*, 567 F.2d 192, 203 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977) (recognizing a defendant's "constitutional right to be represented by counsel of his own choice"); *United States v. Armedo-Sarmiento*, 524 U.S. 591, 592 (2d Cir. 1975) (holding that the Sixth Amendment protects a criminal defendant's selection of retained counsel).

[51]

      *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002) (citing *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998)); *see also Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000); *United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000); *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994).

      *Perez*, 325 F.3d at 125 (quoting *Levy*, 25 F.3d at 152)

[53]

      *Jones*, 381 F.3d at 119 (citing *United States v. Kliti*, 156 F.3d 150, 153 n. 3 (2d Cir. 1998)); *see also Perez*, 325 F.3d at 125.

to a course of action"[54] or "when the attorney's representation of the defendant is impaired by loyalty owed to a prior client."[55]

In some cases, the right to a defendant's counsel of choice conflicts with the right to an attorney of undivided loyalty.  In such instances, "the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government."[56]  The district court, however, must ensure that the defendant makes this choice knowingly and intelligently.  Accordingly, after learning of the possibility of a conflict of interest, the district court first must determine "whether the attorney has an actual conflict, a potential conflict, or no conflict at all."[57]  As the Second Circuit has explained,

> "[i]f the court discovers no genuine conflict, it has no further obligation.  At the other end of the spectrum, if the court determines that counsel has an actual conflict that is so severe as to indicate *per se* that the rendering of effective assistance will be impeded, or is analogous to such a conflict in breadth and depth, the court must . . . disqualify counsel.  And if, between these two extremes, the court determines that the attorney suffers from a lesser [actual] or only a potential conflict, then it may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice."[58]

---

*Perez,* 325 F.3d at 125; *see also United States v. Feyrer,* 333 F.3d 110, 116 (2d Cir. 2003); *Schwarz,* 283 F.3d at 91; *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir. 1993), *cert. denied,* 511 U.S. 1022 (1994).

*Jones,* 381 F.3d at 119.

56

*Perez,* 325 F.3d at 125 (citing *Cunningham,* 672 F.2d at 1073).

*Id.* (citing *Levy,* 25 F.3d at 153).

58

*Id.* (internal citations and quotation marks omitted).

Before accepting a defendant's waiver in the case of a lesser actual or potential conflict, the court must advise the defendant of the dangers arising from the conflict, encourage the defendant to seek advice from independent counsel, and then determine whether the defendant understands the dangers of proceeding with conflicted counsel and knowingly and intelligently chooses to continue with the representation in spite of the conflict.[59]  District courts "do, of course, retain discretion to reject a defendant's knowing and intelligent waiver when his attorney's conflict jeopardizes the integrity of judicial proceedings."[60]  Absent such institutional concerns, however, "courts will not 'assume too paternalistic an attitude in protecting the defendant from himself,' and although the defendant's choice of counsel 'may sometimes seem woefully foolish' to the court, the choice remains his.[61]

## A.    The DeGiorgio Conflict

K&F appears to argue that its prior representation of DeGiorgio creates no genuine conflict of interest.  Skarlatos maintains that he never met privately with DeGiorgio and that DeGiorgio did not share any confidential information with him during the course of the representation that was not disclosed publicly as part of the Senate Subcommittee hearings.[62]  Further, Smith's attorneys contend that even if DeGiorgio did share confidences with Skarlatos, Skarlatos did not discuss these confidences or the substance of the DeGiorgio matter with any other

---

59

   *Curcio,* 680 F.2d at 888-89.

60

   *Perez,* 325 F.3d at 125.

61

   *Id.* at 126 (quoting *United States v. Curcio,* 694 F.2d 14, 25 (2d Cir. 1982)).

62

   Skarlatos Decl. ¶ 4; Tr., Jan. 19, 2006, at 64.

15

attorney at K&F aside from Susong, who no longer is employed there.[63]   Accordingly, K&F asserts that any conflict arising from Skarlatos' prior representation of DeGiorgio should not be imputed to Fink and the other members of the team.[64]

There are two significant problems with this argument. First, Skarlatos' assertion that he received no confidential information from DeGiorgio is untenable.  As Judge Weinfeld explained in *T.C. Theatre Corp. v. Warner Bros. Pictures*,[65] in any attorney client relationship, the court should presume that "confidences were disclosed to the attorney bearing on the subject matter of the representation" and should not "inquire into their nature and extent."[66]  Even if this presumption were rebuttable – as Smith's attorneys now assert – it has not been rebutted it here.  DeGiorgio testified that he met with Skarlatos privately and imparted confidences during those meetings that were not disclosed publicly as a result of his Senate testimony.[67]  Skarlatos' billing records and a memo written by Susong – each of which describe one or more meetings with DeGiorgio without listing any other attendees – also suggest that Skarlatos and Susong met with DeGiorgio in private.[68] The Court finds that DeGiorgio did share confidences with Skarlatos and that the continued representation of Smith would present a genuine conflict of interest.

---

[63]

Opp'n Br. at 24.

[64]

*Id.*

[65]

113 F.Supp. 265 (S.D.N.Y. 1953).

[66]

*Id.* at 268.

[67]

Tr., Jan. 19, 2006, at 87-90.

[68]

*Id.* at 68-73.

The claim that this conflict attaches only to Skarlatos and should not be imputed to the rest of K&F also is unpersuasive. The Second Circuit has made clear that "[a]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences."[69] This presumption may be rebutted in some cases where the firm has instituted "practices and structures . . . sufficient to avoid disqualifying taint,"[70] including "the intentional construction of a 'Chinese Wall,' or [other] *de facto* separation that effectively protects against any sharing of confidential information."[71]  In this case, however, the presumption has not been rebutted.

K&F admits that courts have been more willing to find the presumption to be rebutted where the firm in question has been very large, a description that does not apply to a thirteen attorney boutique like K&F.[72]  Nevertheless, it contends that there is no *per se* rule that a small firm cannot implement an effective wall or other adequate safeguards.[73]  Whether a firm has rebutted the presumption, however, depends on the specific facts of the case, and a firm's size, although not controlling, may be relevant.  Here, K&F is a small tax firm and the representations at issue all relate to a highly publicized controversy regarding allegedly fraudulent tax shelters that has culminated in what may be the largest criminal tax case in history.  The Court cannot ignore the very real risk

---

[69]

    *Hempstead Video, Inc. v. Incorporated Village of Valley Stream,* 409 F.3d 127, 133 (2d Cir. 2005).

[70]

    *Id.* at 137.

[71]

    *Id.* at 138.

[72]

    Tr., Jan. 5, 2006, at 9.

[73]

    Opp'n Br. at 27

17

that discussion of these representations, possibly including confidential information, has occurred in this relatively intimate environment, although it certainly does not mean to suggest any deliberate or reckless betrayal of client confidences.

Moreover, the safeguards K&F has instituted are not particularly reassuring. Although K&F purportedly screened Skarlatos from the Smith matter in August 2005, he already had worked on the case for nearly eighteen months. He then represented Smith at a meeting with prosecutors *after* learning of DeGiorgio's guilty plea.[74] Further, although K&F initially maintained that there was "not one document" on the firm's computer system relating to DeGiorgio,[75] Skarlatos later testified that he found three such documents on the firm's computer system, including a memo prepared by Susong about DeGiorgio and notes from a conversation between Skarlatos and attorneys from HVB about DeGiorgio.[76] These files were organized using a document management program known as WorldDocs, which enables users to search for documents by title or keyword.[77] There is no indication that these documents were password protected or that other attorneys at the firms could not have viewed them simply by doing a keyword search for DeGiorgio's name

In seeking to avoid imputation of Skarlatos' knowledge, K&F bears the burden of demonstrating the adequacy of the safeguards it implemented. Although the Court accepts the good faith of all concerned, it is not persuaded that DeGiorgio's confidences have not been shared within the firm. Accordingly, Skarlatos' conflict of interest is imputed to the rest of K&F.

---

74

Skarlatos Decl. ¶ 8.

75

Opp'n Br. at 26.

76

Tr., Jan.19, 2006, at 60-63

77

*Id.* at 60.

18

*B.*      *The CC-10 Conflict*

       Although Fink contends that he received no privileged information from CC-10, he does not dispute that CC-10 shared confidences with him. Because Fink is Smith's primary attorney, there is no question that Fink's prior representation of CC-10 creates a conflict with respect to his continued representation of Smith.[78]

*C.*      *The Purported Waivers*

       The Court next must consider whether these two conflicts of interest are waivable and, if so, whether Smith's waivers were made knowingly and intelligently.

       As discussed above, a defendant generally is entitled to waive the right to conflict-free representation unless the conflict is so significant that it would render counsel's assistance ineffective *per se* or would jeopardize the integrity of the judicial proceedings. In determining whether a case rises to this level, courts must balance "the defendant's constitutional right against the need to preserve the highest ethical standards of professional responsibility."[79] The Second Circuit has found that the balance tips away from the defendant's right to counsel of choice only in a "very narrow category of cases."[80]

       In *United States v. Jones,* a prosecution for an alleged conspiracy to distribute heroin and cocaine, the government suspected defendant's counsel of relaying drug-related information to

---

[78]

       *Id.* at 114, 116-17.

[79]

       *Cunningham,* 672 F.2d at 1070.

[80]

       *Perez.* 325 F.3d at 126.

another of his clients, an alleged drug dealer.[81] The Second Circuit held that this created an unwaivable conflict because the representation would be tainted by the attorney's own "self-interest in avoiding criminal charges" and by the possibility that the government would subpoena the attorney to testify at trial regarding the illicit relationship between his two clients.[82]

Similarly, in *United States v. Schwarz,* the Second Circuit found an unwaivable conflict based on defense counsel's simultaneously representation of Charles Schwarz, one of the police officers accused of the 1997 assault on Abner Louima, and the Policeman's Benevolent Association (the "PBA"), which was a defendant in a civil suit based on the assault.[83] The PBA's retainer agreement provided that counsel would receive $10 million dollars over a two year period, but permitted the PBA to hold back portions of this fee "to ensure the PBA's satisfaction with [counsel's] performance."[84] Because Schwarz's interests in the criminal prosecution diverged on at least one substantial point from the interests of the PBA in the civil litigation, the court found that counsel's "representation of Schwarz was in conflict not only with his ethical obligation to the PBA as his client, but also with his own substantial self-interest" in the $10 million retainer fee.[85] This

---

81

381 F.3d at 120.

82

*Id.* at 120-21; *see also United States v. Fulton,* 5 F.3d 605, 608-13 (2d Cir. 1993) (conflict could not be waived where defense counsel had been implicated in a related crime, and was therefore concerned not only with representing the defendant but also with his own 'personal reputation, and more than that, the potential that he himself might be accused of a crime;" the court found that this conflict would "affect virtually every aspect of [counsel's] representation of the defendant").

83

283 F.3d at 91.

84

*Id.*

85

*Id.* at 96.

conflict created "the distinct possibility . . . that, at each point the conflict was felt, [counsel] would sacrifice Schwarz's interests for those of the PBA."[86]

By contrast, the Second Circuit has made clear that "lesser conflicts, such as an attorney's representation of two or more defendants or his prior representation of a trial witness, are generally waivable."[87]  In *United States v. Perez,* for example, the court held that a defendant was entitled to waive a conflict created by his counsel's prior representation of a defendant in a similar – and possibly related – currency smuggling scheme.[88]  Despite assertions that counsel "was blinded by his own substantial self interest," the court found that counsel had nothing "approaching the sort of fiscal self-interest that was present in [*Schwarz*]," considering that there was "no indication that [counsel] had a continuing relationship with, or an exceptionally lucrative retainer from, [the other defendant]."[89]  Nor did the possibility that the defendant might be offered a plea agreement that implicated his counsel's former client pose an insurmountable impediment to the representation; the court found that this possibility did create a conflict, "but one whose likelihood a defendant could assess and knowingly decide to waive."[90]  The court rejected also the argument that the conflict was unwaivable because defense counsel was a potential witness for the government,

---

[86]

    *Id.*

[87]

    *Perez,* 325 F.3d 127.

[88]

    *Id.* at 128-29.

[89]

    *Id.* at 127.

[90]

    *Id.* at 128.

holding that defendant's agreement to stipulate to certain facts eliminated the need for testimony from his attorney.[91]

The court reached a similar conclusion in *United States v. Cunningham*.[92] There, the district court had granted the government's motion to disqualify counsel to defendant Patrick Cunningham on the ground that the attorney previously had represented John Spain, an unindicted co-conspirator whom the government planned to call as a witness at trial.[93] The Second Circuit reversed. It found that because Cunningham had been represented by the same attorney for more than six years in a substantial number of related investigations and prosecutions – during which time counsel had become "familiar with all nuances" of the case – forced disqualification would not merely defeat Cunningham's abstract right to be represented by counsel of his choice," but "could subject him to real prejudice" in the prosecution.[94] On the other hand, the court found that the government's interest in disqualification was relatively weak, especially considering that Spain himself had not moved to disqualify Cunningham's attorney or even joined in the government's motion, and that Cunningham had agreed that his counsel's cross-examination of Spain would be limited to facts disclosed in a prior related proceeding.[95]

As these cases make clear, the Second Circuit has considered a number of different factors in determining whether a conflict can be waived including, among other things, (1) whether

---

91
    *Id.* at 128-29.
92
    672 F.2d at 1073.
93
    *Id.* at 1066.
94
    *Id.* at 1070-71.
95
    *Id.* at 1071-73.

22

disqualifying the defendant's chosen counsel would create "real prejudice" to the defendant based

on the length of the representation and/or counsel's familiarity with the case,[96] (2) whether there is

a possibility that the attorney could be called as a witness at the defendant's trial or implicated in

the defendant's alleged crimes,[97] (3) whether the continued representation would conflict with the

attorney's own personal financial or liberty interests, as opposed to the interests of a current or

former client,[98] (4) whether, if the conflict concerns the interests of another client, the attorney's

relationship with the other client is continuing or has been terminated,[99] (5) whether any other

current or former client affected by the conflict has initiated or joined in the motion to disqualify

defendant's chosen counsel,[100] and (6) the availability of measures that might limit the dangers posed

by the conflict, such as restricting an attorney's cross-examination of a former client.[101]

---

[96]

*Id.* at 1071.

*Cunningham*, 672 F.2d at 1075 (holding that disqualification of counsel for defendant Sweeney would be necessary only if defendant's counsel were called to testify at trial, and remanding for a determination or whether such testimony would be admissible); *see also Jones*, 381 F.3d at 120; *Perez*, 325 F.3d at 128; *Fulton*, 5 F.3d at 608.

[98]

*Jones*, 381 F.3d at 120-21; *Schwarz*, 283 F.3d at 96; *Perez*, 325 F.3d at 127; *Fulton*, 5 F.3d at 608.

[99]

*Schwarz*, 283 F.3d at 96 (disqualification necessary where counsel simultaneously represented client with potentially adverse interest); *Perez*, 325 F.3d at 127 (disqualification not necessary where counsel no longer represented client with potentially adverse interests).

[100]

*Cunningham*, 672 F.2d at 1072 (reversing district court decision disqualifying counsel solely at the behest of the government, not the counsel's former client, who was the source of the alleged conflict); *United States v. Kaufman*, 429 F.2d 240, 247 (2d Cir.), *cert. denied*, 400 U.S. 925 (1970) (upholding disqualification of defendant's attorney on the motion of a co-defendant who was a former client of the attorney).

[101]

*Cunningham*, 672 F.2d at 1073

Here, these factors weigh in favor allowing Smith to waive the conflicts posed by K&F's prior representation of DeGiorgio and CC-10, as long as K&F has no role in cross-examining either of them at trial. On one hand, disqualification would result in real prejudice to Smith, not merely in the deprivation of an abstract right. Given the small number of firms specializing in complex criminal tax cases and the large number of defendants, witnesses, and other unindicted conconspirators, many of whom are represented by counsel, it would be difficult to find a qualified attorney with no prior relationship to the case in time to prepare adequately for trial. And even if Smith could find unconflicted counsel, requiring him to find new counsel now would deprive him of the benefit of two years of preparation by Fink and his colleagues, who have developed a significant body of knowledge about the case, formulated theories for Smith's defense, consulted with experts, begun reviewing the millions of pages of documents produced by the government, and formed what Smith characterized as "a very close working relationship."[102] Although nearly eight months remain before trial is scheduled to begin, it would be extremely difficult for a new attorney to learn the complexities of the case. Further, disqualification would cost Smith the nearly $1 million in attorneys fees he has already paid to K&F.[103] The government's delay in filing this motion has exacerbated Smith's plight significantly, reducing the amount of time Smith would have to find new counsel and prepare for trial and allowing Smith to spend additional financial resources on representation by K&F.

On the other hand, the conflicts of interest at issue here – taken separately or together – are not nearly as significant or pervasive as those in *Jones* or *Schwarz*. The government has not

[102]

Opp'n Br. at 30-31; Tr., Jan. 19, 2006, at 8

[103]

Tr., Jan. 19, 2006, at 7.

indicated a desire to call any of Smith's attorneys as a witness in Smith's trial and has not suggested that any member of K&F was involved in the tax fraud alleged in this case. Nor is there any indication that K&F has reason to expect any future fees from DeGiorgio or CC-10; the firm's relationship with both clients has been terminated and, in any event, Smith appears to have paid the firm far more than both former clients combined.[104] Continued representation in this case, therefore, would not conflict with the personal financial or liberty interests of Smith's attorneys. The fact that neither DeGiorgio nor CC-10 has joined in the government's motion also weighs against disqualification here. Finally, Smith has consented to measures that might limit the dangers posed by the conflicts. Specifically, he is willing to proceed with his current counsel even if they are barred from cross-examining DeGiorgio and CC-10 and from discussing those witnesses with counsel for any of his co-defendants or with any independent attorneys hired to cross-examine them on Smith's behalf. Accordingly, the Court finds that these conflicts are waivable.

There is no doubt that Smith's waiver was knowing and intelligent. As discussed above, Smith executed two separate written waivers in December 2005.[105] Then, on January 19, 2006, this Court held a *Curcio* hearing, at which it advised Smith of the dangers posed by the conflicts of interest and encouraged him to consult with independent counsel.[106] After stating that he understood the risks associated with the conflicts, Smith testified that he wish to continue with

---

104

> Skarlatos and Susong billed a total of 63 hours on the DeGiorgio matter. *See* Opp'n Br. at 7. K&F has not submitted evidence regarding the exact number of hours billed on the CC-10 matter, but Fink has averred that he believes that the representation was limited to accompanying CC-10 to the grand jury and a handful of brief meetings. Tr., Jan. 19, 2006, at 113; Fink Decl. ¶¶ 10-12. In contrast, the firm has billed nearly 2,000 hours on Smith's case, for a total of nearly a million dollars. Tr., Jan. 19, 2006 at 7; Fink Decl. ¶ 2.

105

> Fink Decl. Ex. A & C.

106

> Tr., Jan. 19, 2006, at 34-46

25

K&F as his attorneys, even if attorneys from the firm were prohibited from cross-examining DeGiorgio or CC-10 and from discussing those witnesses with counsel for any of his co-defendants or with any independent attorneys hired to cross-examine those witnesses on his behalf.[107] The Court therefore finds that Smith has waived his right to conflict-free representation and that this waiver was knowing and intelligent.

## *Conclusion*

The government's motion for an order disqualifying Smith's attorneys is denied on the condition that (1) no attorney affiliated with K&F participates in any way in the cross examination of DeGiorgio or CC-10, should either testify at trial, and (2) K&F adopts procedures satisfactory to the Court that will (a) screen Skarlatos from Smith's case and (b) insulate counsel for Smith's his co-defendants and any independent attorneys hired to cross-examine DeGiorgio and/or CC-10 on Smith's behalf from any information K&F might have about DeGiorgio and CC-10. The government and K&F shall submit an agreed order – or, if they cannot reach an agreement, separate proposed orders – setting forth these procedures by February 6, 2006.

SO ORDERED.

Dated: January 26, 2006

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

107

*Id.* at 44-45