# EXHIBIT
# F

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| EPSOLON LIMITED, by and through | ) | |
| SLIGO (2000) COMPANY, INC., | ) | |
| Tax Matters Partner, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05-999 T |
| | ) | |
| v. | ) | Judge Margaret M. Sweeney |
| | ) | |
| THE UNITED STATES OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE AND OBJECTION TO**
**DEFENDANT'S MOTION TO SUSPEND PROCEEDINGS**

A. Duane Webber
George M. Clarke III
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006
(202) 452-7000

David G. Glickman
Robert H. Albaral
Baker & McKenzie LLP
2300 Trammel Crow Center
2001 Ross Avenue
Dallas, TX 75201
(214) 978-3000

## TABLE OF CONTENTS

BACKGROUND.....................................................................................1

ARGUMENT

    I.    THE ISSUES ARE NOT RELATED OR
        SUBSTANTIALLY SIMILAR...........................................3

        A.    The Actions Involve Different Taxpayers and
                Different Issues....................................................3

        B.    The Actions Involve Different Transactions.....................8

    II.    THE DENIAL OF THE MOTION WILL NOT RESULT
        IN HARDSHIP OR INEQUITY TO THE DEFENDANT..............11

        A.    Denial of the Motion Would Result in No Harm to the
                Defendant...........................................................11

        B.    Any Alleged Harm to the Defendant Would Be
                Self-Inflicted.......................................................12

        C.    Any Potential Harm to Defendant Would Not Be
                Alleviated by Granting the Motion................................14

        D.    Granting of the Motion to Stay Would Result in
                Harm to the Plaintiff..............................................16

    III.    THE DURATION OF THE REQUESTED SUSPENSION OF
         PROCEEDINGS IS UNREASONABLE.................................19

        A.    Under the Circumstances, the Duration is Unreasonable......19

        B.    This Case May Soon Be Resolved if Not Suspended...........21

CONCLUSION...................................................................................22

APPENDIX:

Exhibit A    Memorandum of Law in Support of Defendants' Joint Motion to
             Strike References to the "SOS" Strategies in the Indictment,
             *United States v. Stein, et al.*, 05 Cr. 888 (LAK)(ECF)(S.D.N.Y.)

**Exhibit B**     Memorandum in Support of Motion for Relief in Connection with
Rule 16 Discovery, Dkt. No. 05-888 (S.D.N.Y.)

**Exhibit C**     Memorandum from Deputy Attorney General Larry Thompson
to all United States Attorneys, dated January 20, 2003

## TABLE OF AUTHORITIES

**Cases**

*Afro-Lecon, Inc. v. United States*, 820 F.2d 1198 (Fed. Cir. 1987)………………………………….2

*Ampetrol, Inc. v. United States*, 30 Fed. Cl. 320 (1994)……………………..…..……..2, 3, 7, 19, 20

*C3, Inc. v. United States*, 5 Cl. Ct. 659 (1984)…………………………………………..3, 5, 7, 20

*Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1962)…………………………......………………12, 13

*Landis v. North American Co.*, 299 U.S. 248 (1936)………………………………………………..2

*St. Paul Fire and Marine Ins. Co. v. United States*, 24 Cl. Ct. 513 (1991)………….3, 6, 7, 19, 20

*Tucker v. Commissioner*, Docket No. 12307-04 (T.C.)……………………….........………12, 14, 15

*United States v. Andolschek*, 142 F.2d 503 (2nd Cir. 1944)…………………………………….....13

<b>IN THE<br/>UNITED STATES COURT OF FEDERAL CLAIMS</b>



| | |
|---|---|
| **EPSOLON LIMITED, by and through** ) | |
| **SLIGO (2000) COMPANY, INC.,** ) | |
| **Tax Matters Partner,** ) | |
| ) | |
| **Plaintiff,** ) | **No. 05-999 T** |
| ) | |
| **v.** ) | **Judge Margaret M. Sweeney** |
| ) | |
| **THE UNITED STATES OF** ) | |
| **AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |

<b>PLAINTIFF'S RESPONSE AND OBJECTION TO<br/>DEFENDANT'S MOTION TO SUSPEND PROCEEDINGS</b>

Plaintiff, Epsolon Limited, by and through its Tax Matters Partner, Sligo (2000)
Company, Inc., whose managing member is Keith A. Tucker ("Mr. Tucker"), hereby responds to
Defendant's Motion to Suspend Proceedings, dated January 13, 2006 (the "Motion"). Plaintiff
respectfully objects to the granting of the Motion.

<b>BACKGROUND</b>

Plaintiff filed its complaint for readjustment of partnership items on September 15, 2005
(the "Complaint") to contest the untimely issuance of and determinations in the Notice of Final
Partnership Administrative Adjustment, dated June 17, 2005 (the "FPAA"), issued by the
Commissioner of Internal Revenue (the "Commissioner"). The proposed adjustments in the
FPAA relate to Plaintiff's U.S. Return of Partnership Income for the tax year ending December
31, 2001.

On November 10, 2005, Defendant filed a motion for extension of time until January 13,
2006 to file an answer in response to the Complaint, and that motion was granted over Plaintiff's

<b><i>Klamath v. US, 5:04-cv-278-TJW:<br/>US Motion to Reconsider Order Denying Stay- Exhibit F</i></b>

objection. Instead of filing an answer, however, Defendant filed the Motion (and a brief in support of the Motion (the "Brief")) and now moves this Court to suspend the proceedings in this timely filed and otherwise proper civil tax case in favor of an allegedly "related" criminal prosecution and "ongoing" federal grand jury investigation in the Southern District of New York. (Brief at 1.) That prosecution and investigation relates primarily to an accounting firm, KPMG, LLP, and certain of its principals or other tax professionals who allegedly acted in concert with such principals. (*Id.*) Basically, Defendant alleges that "the type of shelter involved here (which was referred to by the alleged conspirators as an 'SOS') and its variants, and the specific Tucker/Epsolon transactions at issue in this suit, are encompassed by the indictment" in the criminal prosecution (Superseding Indictment, *United States v. Stein, et al.,* S05 Crim 888 (LAK) (SDNY), the "Indictment", submitted by Defendant with the Motion as Exhibit 5 to the Declaration of David R. House, "House Decl., Ex. 5"). (Brief at 2.)

Defendant alleges two bases for its stay request. The first is to "prevent prejudice to the Government's criminal case and ongoing investigation." (*Id.*) The second is that "critical witnesses . . . have already and/or will likely assert their Fifth Amendment privilege and refuse to provide testimony necessary for the Government to fully and fairly defend this case." (*Id.*)

As Defendant notes in its Brief (at 21-22), whether a court will grant a civil stay pending resolution of a criminal case is determined on a case-by-case basis. *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1202 (Fed. Cir. 1987). And a court deciding whether to grant a stay will weigh the "'competing interests'" of the parties and "'maintain an even balance.'" *Ampetrol, Inc. v. United States*, 30 Fed. Cl. 320, 321 (1994) (quoting *Landis v. North American Co.*, 299

2

U.S. 248, 254-255 (1936)). The question for this Court is simply whether granting the stay is appropriate based on the specific facts of this case.[1]

In this regard, the three-part test applied by this Court requires that the moving party: (1) "make a clear showing, by direct or indirect proof, that the issues in the civil action are 'related' as well as 'substantially similar' to the issues in the criminal investigation," (2) "make a clear showing of hardship or inequity if required to go forward with the civil case while the criminal investigation is pending," and (3) "establish that the duration of the requested stay is not immoderate or unreasonable." *St. Paul Fire & Marine Ins. Co. v. United States*, 24 Cl. Ct. 513, 515 (1991). *See also, C3, Inc. v. United States*, 5 Cl. Ct. 659, 660 (1984) and *Ampetrol*, 30 Fed. Cl. at 321. Defendant's Motion does not pass any of the parts of this three-part test. Thus, this case must not be stayed.

## ARGUMENT

### I.     THE ISSUES ARE NOT RELATED OR SUBSTANTIALLY SIMILAR.

#### A.     The Actions Involve Different Taxpayers and Different Issues.

The United States has not identified *any* indictments relating to Plaintiff. This is for good reason. There are none. Said more directly, *there are no indictments of the Plaintiff or a person directly related to the Plaintiff*. This is crucial to the inquiry before this Court. The Indictment makes charges against a number of individuals, all of whom were KPMG personnel

---

[1]     Defendant's statement that "this Court has granted Motions to Stay filed by the United States on grounds similar to those presented below" is disingenuous at best. (Brief at 2-3.) Neither of those motions to stay were opposed by the Plaintiffs in those cases. *See* Plaintiff's Response to Defendant's Motion to Suspend (filed November 9, 2005) in *Presidio Advisors, LLC, Norvest Ltd. v. United States*, Fed. Cl. No. 05-411T ("plaintiff does not oppose defendant's Motion to Suspend this action); *Prestop Holdings v. United States*, Fed. Cl. No. No. 05-576 T (no response to motion to stay even filed). Based on the Tax Court proceedings in this case, it should have been obvious to Defendant that Plaintiff intends to vigorously oppose any proposed stay in this case.

3

(with the exception of one attorney, Mr. R.J. Ruble, formerly a partner at a major law firm) (the "Indicted Individuals"). (Indictment at ¶¶8-24.) Although the United States tries to establish a connection between the Indicted Individuals and Plaintiff, there is no meaningful connection.

Defendant's Brief focuses on the alleged involvement of "three of the indicted individuals, R.J. Ruble, Jeffrey Eischeid and Jeffrey Stein," as well as "the central role of KPMG's Timothy Speiss in developing, coordinating, and arranging Tucker's transactions." (Brief at 15.) Defendant's focus on Messrs. Eischeid and Stein is a red herring. It is obvious, even from the materials submitted by Defendant (*see, e.g.*, House Decl. Ex. 10), that those individuals had at most a tangential and indirect role in Plaintiff's transactions. Similarly, although Mr. Ruble rendered two tax opinions with respect to Plaintiff's transactions, Mr. Tucker did not have extensive direct involvement with Mr. Ruble and no materials submitted by Defendant show otherwise.

While there is no doubt that Mr. Speiss played a role in advising Plaintiff as to the transactions at issue in this case, that does not make Mr. Speiss an indispensable witness. Indeed, Plaintiff has no intention of calling Mr. Speiss (or any of the Indicted Individuals) in this case. Plaintiff does not believe that any testimony of any witness is necessary to resolve this case because there are questions of law that should be determinative and that can be based on stipulated facts or ascertained from documentary evidence. Even if the Court does not ultimately embrace that view, there is no basis for the allegation that Mr. Speiss is a witness critical to this proceeding simply because he was involved in structuring Plaintiff's transactions. The metes and bounds of those transactions, including the economic consequences thereof (to the extent even relevant), can readily be determined based on the documents underlying those transactions. Defendant's laundry list of contacts between Mr. Tucker and Mr. Speiss (as well as some

4

contacts with Indicted Individuals) (Brief at 14-20) is not followed by any *analysis* as to why those contacts make Mr. Speiss (or the Indicted Individuals) critical to Defendant's case. In short, there simply is no criminal proceeding that is relevant to this civil proceeding that might even potentially support a suspension of the proceedings herein. As can be seen from the jurisprudence cited by Defendant, this case stands in stark contrast to the situations in which this Court has previously granted a stay.

In *C3,* the plaintiff corporation had filed a complaint against the government to collect amounts due under an army contract. The government answered and filed a counterclaim that contained allegations of fraud. The government also sought to stay the proceedings pending the termination of an on-going grand jury investigation. Defendant's Brief cites the court's discussion in *C3* of the first part of the three-part test, in which the court noted that it "'requires no extensive comparative factual analysis'" to conclude the civil action and criminal investigation issues are related and substantially similar. (Brief at 23, *citing C3,* 5 Cl. Ct. at 661.) That was certainly true in *C3,* where the payments sought by the plaintiff corporation were characterized as "'tainted by fraud'" and were "the *primary focus* of the grand jury's investigation." *C3,* 5 Cl. Ct. at 660 (emphasis added). Obviously, the issue under criminal investigation in *C3,* whether or not the payments were affected by fraud, *bore directly on the resolution of the civil complaint* – that is, whether or not the plaintiff would get paid.

The facts in *C3* are significantly different from the facts in this case. As even the IRS admits, the issues presented in the Indictment are not related to the underlying proper tax treatment of the transaction entered into by Plaintiff (or by any other taxpayer). As very senior IRS personnel have stated publicly, there has been no conclusion by the government that the SOS transactions are "criminally fraudulent tax shelters per se" and the KPMG criminal case is

5

about the four core activities at the center of the Indictment: (i) registration of tax shelters by tax professionals; (ii) so-called grantor trust netting (something Plaintiff did not engage in and Defendant cannot reasonably assert to the contrary); (iii) the drafting of false factual representations by tax professionals; and (iv) obstruction of justice by tax professionals. See Stratton, "IRS Defends Action Against KPMG Professionals," Tax Notes Today (Sept. 20, 2005). None of these core activities have anything to do with the proper tax treatment under the Internal Revenue Code of the transactions entered into by Plaintiffs. See also, Stratton, "IRS Official Stands Firm on Case Against KPMG, Tax Notes Today (Nov. 1, 2005) (Mr. John Klotsche, at the time senior advisor to the Commissioner, emphasized that "[t]he case against KPMG . . . is not about criminalizing tax practice of technical tax shelters, aggressive tax planning, or tax opinions for abusive shelters . . .[i]t is about core criminally fraudulent activities").

Similarly, in *St. Paul Fire and Marine*, a plaintiff corporation had filed a complaint against the government to collect amounts due under an army contract. Co-plaintiff insurance company, as surety for contract performance, also filed a complaint against the government regarding the contract. The government answered and sought to stay the proceedings pending the termination of an on-going criminal investigation. The criminal investigation was of *plaintiff corporation* for fraud in relation to the contract at issue. Defendant's Brief also cites the court's statement in *St. Paul Fire and Marine* regarding the first part of the three-part test, which notes that "'defendant may satisfy its burden to make a *prima facie* showing of the ultimate fact, circumstantially." (Brief at 23, citing *St. Paul Fire and Marine*, 24 Cl. Ct. at 516.) This showing is quite evident in a case in which payments under a contract are sought by a corporation *which is itself under investigation for fraud with respect to that contract.* The issue under

6

investigation in the criminal matter (*i.e.*, fraud of the plaintiff regarding the contract at issue) bore directly on the resolution of the civil complaint (*i.e.,* whether or not the plaintiff would get paid). Like the facts of *C3,* the facts of *St. Paul Fire and Marine* also bear no similarity to the facts in this case and do not support the granting of a stay in this case.

Finally, in *Ampetrol*, plaintiff corporation filed suit against the government for failure to pay pursuant to a contract for the sale of gasoline. The complaint alleged the contract arose from the sale by the plaintiff to a third party that was organized by the United States as a front organization in an undercover operation and that acted on behalf of the United States. *The sale of gasoline was also the central focus of pending criminal proceedings*. Defendant's brief cites *Ampetrol* as the most recent use by the court of the three-part test for granting a stay, and, importantly, as a case "which granted a stay despite the fact that Ampetrol was not a defendant in the criminal proceedings." (Brief at 23, citing *Ampetrol*, 30 Fed. Cl. 320 at 321.) Defendant fails to divulge, however, that "[a]lthough Ampetrol [was] not a defendant in the criminal proceeding" in *Ampetrol*, "one of the persons indicted [was] Martin Nociforo, *president of Ampetrol during the events at issue in both the complaint and indictment*." *Ampetrol*, 30 Fed. Cl. 320 at 321 (emphasis added). While the corporation that sought the payments under the contract was not indicted, the corporation's *president* was under indictment. The related criminal proceedings bore directly on the resolution of the issues asserted in the civil complaint (*i.e.,* whether or not the plaintiff would get paid). In contrast, Plaintiff in the above-captioned case has not been indicted, and no person that is directly or indirectly related to Plaintiff has been indicted. Accordingly, the conclusions in *C3, St. Paul Fire and Marine*, and *Ampetrol* are inapposite because the parties involved in the relevant civil and grand jury matters are not materially the same.

7

**B. The Actions Involve Different Transactions.**

Defendants also have not demonstrated that the transactions undertaken by Plaintiff that are relevant to this case are the subject of the Indictment. The transactions cited in the Indictment as allegedly "fraudulent tax shelters" and as allegedly giving rise to "fraudulent tax shelter losses" are identified by the acronyms of "FLIP," "OPIS," "BLIPS," and "SOS" (the "KPMG Transactions"). (Indictment at ¶¶25-28.) Defendant's Brief indicates that "the Tucker tax shelter transaction at issue in this civil case is a shelter which KPMG referred to as an SOS shelter, and the specific Tucker/Epsolon transaction is encompassed within the charges" in the Indictment. (Brief at 14.) However, KPMG personnel did not at any time suggest to Mr. Tucker that the transactions implemented by Plaintiff constituted an "SOS shelter," and did not otherwise refer to, identify, or characterize the transactions as such in any communication with Mr. Tucker. In fact, in a file memorandum prepared by Mr. Eugene Schorr (a tax partner at KPMG), dated January 18, 2001, Mr. Schorr references a "short options strategy" that KPMG proposed to Mr. Tucker but later withdrew. (House Decl., Ex. 10.) It is clear that "SOS" stands for a "short options strategy" transaction, which is a transaction in which Plaintiff did not engage. Plaintiff's transactions are not otherwise identified as an "SOS shelter" in any document in Plaintiff's possession. Counsel for Plaintiff previously has requested that counsel for the Commissioner in Mr. Tucker's related Tax Court case provide any information that might support or substantiate the statement quoted from the Brief above and, as of the time this response was filed, has received no reply. In any event, it should be noted that based on Plaintiff's thorough research at this point, there are *no* reported court opinions that address the merits of the tax treatment of *any* of the KPMG Transactions.

8

As set out by some of the Indicted Individuals in great detail (*see* Memorandum of Law
in Support of Defendants' Joint Motion to Strike References to the "SOS" Strategies in the
Indictment, *United States v. Stein, et al.,* 05 Cr. 888 (LAK)(ECF)(S.D.N.Y.) (the
"Memorandum", attached as Plaintiff's Exhibit A), filed in the allegedly related criminal
proceeding), even the very definition of "SOS transactions" is suspect.   The Memorandum
explains that "the Indictment barely even contains any description of what the SOS transactions
allegedly were," that eleven types of transactions were lumped together in this description, and
that nothing inherent in the description supports a conclusion they were in violation of any clear
provision of the tax law.  (*Id.* at pages 4-5.)

Further, there is no allegation in the Indictment that any transaction that actually is an
"SOS transaction" (whatever that is supposed to mean) did not comply with the technical
requirements of the Code and Regulations.  (*Id.* at pages 5-6.)  More specifically, nothing in the
allegations regarding the SOS transactions states that they violated any clear requirement of the
tax law, that the tax treatment of the transactions was a fraudulent or even incorrect application
of tax law, or that the Indicted Individuals were incorrect in concluding that the tax consequences
more likely than not would be sustained.  (*Id.* at page 2.)  Conclusory rhetoric, epithets like
"phony" and "fraudulent," and innuendo regarding "wealthy clients" run throughout the
Indictment, but it is devoid of any specific allegations relating to the appropriate tax treatment of
any particular transactions.  The Indictment makes no allegations whatsoever regarding the tax
treatment of SOS transactions, or why the tax benefits derived from the SOS transactions as
reported by various taxpayers were not entirely proper under the tax law at that time.  (*Id.* at
pages 6-7.)  Regardless of whether any transaction that might fall within the scope of an "SOS
transaction" is ever determined by a court to not "work" for tax purposes, it is sufficient to say

9

that Defendant has not shown that Plaintiff's transactions are included in the ill-defined category of so-called SOS transactions included in the Indictment (to the extent the allegations in the Indictment with respect to the SOS transactions even survive the pending motions to dismiss in that case).

The alleged connection between the substantive tax liability issue in this case and the Indictment relating primarily to KPMG appears more designed to inject innuendo in this proceeding than to establish any genuine nexus between this case and the criminal proceedings. Such a speculative connection is not sufficient to support a suspension of proceedings. Grand juries indict individuals and organizations, and not transactions. Defendant has not shown that Plaintiff or persons directly related to Plaintiff have been indicted, are in the process of being indicted, or at the very least, are likely to be indicted. Only under those circumstances might a suspension of this proceeding be appropriate (i.e., depending on the nature of the indictment and its relationship to the civil action). Defendant has not, and cannot, offer any such evidence. Plaintiff's conduct did not violate any law.

Finally, Defendant cannot establish in this proceeding that the proper federal income tax treatment of Plaintiff's transactions is at issue in any other judicial forum. Plaintiff's have asked this Court for a redetermination of partnership items based on adjustments proposed by the Commissioner in the FPAA, relating to the proper federal income tax treatment of Plaintiff's transactions. Defendant has not even alleged, much less established, that the criminal proceedings in the Southern District of New York involve a similar determination. It would be inappropriate to hold Plaintiff's case in this Court hostage pending the outcome of a proceeding which is of uncertain and dubious relevance.

10

*Klamath v. US, 5:04-cv-278-TJW:*
*US Motion to Reconsider Order Denying Stay- Exhibit F*

Because this case is not related to the Indictment or the ongoing criminal investigation of KPMG in any meaningful way, and because this case is not substantially similar to either of those other proceedings, this Court's precedents mandate that the Court deny Defendant's Motion. Although this issue can be resolved that simply, the two other factors relevant to the determination of the propriety of a stay in this case also compel the conclusion that this case should not be stayed.

## II.  THE DENIAL OF THE MOTION WILL NOT RESULT IN HARDSHIP OR INEQUITY TO THE DEFENDANT.

### A.  Denial of the Motion Would Result in No Harm to the Defendant.

There is no question in this case as to whether Plaintiff's discovery seeks information that would not otherwise be available in criminal proceedings. Plaintiff has not issued any discovery, and there is no pending informal or formal discovery from either party. Moreover, Plaintiff does not intend to issue any discovery relating to the criminal proceeding. If any discovery requests raise legitimate questions or concerns in the future, the parties at the appropriate time can discuss and resolve those matters informally, and if necessary, formally with the Court. A suspension of proceedings is not necessary to protect any theoretical Government interest relating to Plaintiff's potential discovery and clearly can await any actions by Plaintiff that the Defendant wants to assert may jeopardize those interests.

Defendant's statements that proceeding with the case now "would impair the case development by the Tax Division attorney assigned to defend this case because he lacks access to information currently protected from disclosure by FRCP 6(e)," and that proceeding with discovery now "would also undermine defendant's effective examination of witnesses" due to lack of access to grand jury materials (Brief at 26) are without support. There is no lack of

11

evidence in this case. Indeed, Mr. Tucker has produced approximately 3,000 pages of potentially relevant materials in related Tax Court proceedings. *Tucker v. Commissioner*, Docket No. 12307-04 (T.C.). Such materials are available in this case and, on information and belief, copies of such materials are currently in the possession of counsel for Defendant. Defendant likely has even more materials obtained from requests for information from KPMG, Sidley Austin Brown & Wood, LLP, and others that preceded this action.

Moreover, Defendant handles most civil tax cases without the benefit of information derived from a grand jury proceeding, and is not limited by FRCP 6(e) from pursuing information within the scope of the discovery rules as in any other civil case. Defendant's only complaint is that it does not have a unique and unfair advantage (which is not available in the typical civil case) because it cannot access directly any fruits of the grand jury proceedings. Finally, Defendant has not identified any information that is uniquely available from Mr. Speiss or any Indicted Individuals. In short, Defendant is not harmed in any material way by Defendant's potential inability to adduce testimony from Mr. Speiss or the Indicted Individuals as witnesses at any trial or by its alleged lack of information.

**B.     Any Alleged Harm to the Defendant Would Be Self-Inflicted.**

In any event, any alleged harm to Defendant as a result of this Court's denial of its motion to stay would be self-inflicted. Defendant chose to initiate a civil tax dispute by issuing the FPAA in June 2005, even though the grand jury investigation relating to KPMG was then already well underway. Defendant's Brief cites *Campbell* as the "seminal case" on the issue of whether proceedings in a civil case should be suspended pending the resolution of a related criminal case and notes that the court identified a significant number of factors in that case that favored a stay of a civil case to allow a criminal prosecution to proceed. (Brief at 21, n.9.) The

12

court's analysis in *Campbell,* however, related to "a civil action and a criminal action involving the same parties," which, as discussed in detail above, is simply not the case here. *Campbell,* 307 F.2d at 487.   Moreover, even the court in *Campbell* agreed that when balancing the competing interests of civil and criminal actions, it is appropriate to give "great weight" to the Government's initiation of a civil tax dispute. *Id.* At 489.  The court observed that:

> When the Government is the moving party and has made a claim for tax deficiencies, it has elected, as in bringing an indictment in a criminal case, not to "leave the transactions in obscurity from which a trial will draw them, (but to) . . . expose them fully."

*Id.* (citing *United States v. Andolschek*, 142 F.2d 503 (2nd Cir. 1944).  Although this Court is a refund forum in certain circumstances, this is not a refund action.  Plaintiff did not initiate this action, Defendant did.  Defendant *elected* to issue the FPAA, and Plaintiff is entitled to pursue a timely redetermination of partnership items, notwithstanding any pending grand jury investigation.  The natural operation of the law does not give the Government license to pursue allegedly conflicting courses of action only to then interfere with the ability of taxpayers to protect their rights (directly threatened by the United States) under the law on a timely basis.

The perceived evidentiary weaknesses in Defendant's civil tax case identified in Defendant's Motion as a basis therefore were the **direct result of the actions of the United States** in indicting or threatening to indict various allegedly necessary witnesses.  Thus, any evidentiary problem caused by the actions of the United States in indicting the Indicted Individuals and in threatening to indict nearly every other person with even tangential involvement in the KPMG Transactions is its own doing.  Accordingly, any problem concerning the availability of potential witnesses is Defendant's problem, and not a problem for Plaintiff or the Court.  The actions of instituting this controversy through the issuance of the FPAA and then indicting the Indicted

13

**Klamath v. US, 5:04-cv-278-TJW:**
**US Motion to Reconsider Order Denying Stay- Exhibit F**

Individuals and threatening Mr. Speiss have predictable consequences, and it is Defendant who is responsible for such consequences and not Plaintiff.

The United States clearly knows that when it indicts people, they may (at least if properly advised) assert their Fifth Amendment rights. This is criminal procedure "101." If the matters are truly related as alleged by Defendant, to believe that it could contemporaneously prosecute both a criminal action and a civil action and *not* have perceived evidentiary problems was wishful thinking by Defendant at best. Having done so, the United States has made its bed and must lie in it. Plaintiff did nothing to cause Defendant's alleged evidentiary concern and Plaintiff should not be penalized for it. If Defendant cannot effectively present the relevant facts to the court in this case without the testimony of Mr. Speiss (which Plaintiff highly doubts), Defendant can grant Mr. Speiss testimonial or even transactional immunity. If the United States feels that holding an indictment over Mr. Speiss' head is more important for other reasons, then it can choose to do so and risk forfeiting his testimony in this case. The solution to this self-imposed "Hobson's choice," that Defendant claims is so unfair so as to warrant a stay in this case, is clearly in Defendant's own very capable hands.

## C.    Any Potential Harm to Defendant Would Not Be Alleviated by Granting the Motion.

Defendant's first allegation that a suspension of proceedings is necessary to prevent prejudice to a criminal case and investigation is erroneous because a stay in this case will not prevent any such harm. As Defendant admits, the Tax Court denied a motion to stay in *Tucker*, which involves the same underlying transactions as this case. (Brief at 3.) That case is in the midst of discovery and is calendared for trial in September 2006. As discussed in greater detail below, to the extent that the disclosure of information in the Tax Court case creates any

14

perceived harm, as alleged by Defendant, the disclosure of similar information in the instant case cannot result in *further* harm to the criminal proceedings. To that end, Defendant asserts in its Brief that:

> [T]he Tax Court may have believed that proceeding with trial in that case would not have an impact on the criminal case. *The Government does not agree.*

(Brief at 3, n.1) (emphasis added.)  Thus, Defendant admits that any perceived harm from this case already has been done by the Tax Court's denial of the Commissioner's motion to stay the proceedings in that court.[2]

Similarly, a stay of the proceedings in this case will not resolve the second basis cited by Defendant as a reason for the Motion, i.e., that critical witnesses are likely to assert their Fifth Amendment privilege and refuse to testify in the civil case.  While Plaintiff certainly wishes no ill will to Mr. Speiss, for purposes of this case, in the absence of immunity from prosecution (which the United States controls), he might as well be dead.  Defendant would have this Court believe that after the criminal trial (now slated not to even <u>begin</u> until September 2006) evidentiary problems with testimony will somehow disappear.  (*See* Brief at 25-26).  This is demonstrably false.  There is absolutely no reason to believe that Mr. Speiss (or any of the

---

[2]      Defendant's suggestion that the Tax Court may have denied the motion to stay the proceedings in *Tucker* because "the Tax Court considered that its rules do not permit the broad, far-reaching discovery encouraged in the Rules of the United States Court of Federal Claims," and thus "may have believed that proceeding with trial in that case would not have an impact on the criminal case" (Brief at 3, n.1.) is at best a red herring. There is no evidence that the Tax Court considered the scope of its discovery rules, in absolute terms or relative to those of any other court, in reaching its conclusion that the Government's request for a stay had no merit. Moreover, regardless of the relative breadth of the form of the discovery rules of the Tax Court and this Court, in practice approximately 3,000 pages of documents have already been submitted in informal discovery in the Tax Court.   Finally, Defendant's assertion in this regard conveniently ignores the extensive informal discovery requirements mandated by the Tax Court, *see Branerton Corporation v. Commissioner*, 61 T.C. 691 (1974), which equal or surpass the breadth of the discovery requirements under the Rules of the Court of Federal Claims.

15

Indicted Individuals for that matter) will be any more willing to testify in this case <u>after</u> the criminal trial than <u>before</u> it.  Unless the United States changes its position and either grants Mr. Speiss immunity after that trial (which the United States has not suggested) or tones down its rhetoric so substantially that Mr. Speiss is given subjective comfort that he will not be indicted and tried (also, a very unlikely scenario), Mr. Speiss is unlikely to talk for quite some time, if ever.

The statute of limitations on tax crimes, as provided by section 6531, is generally six years from the date of the alleged offense.  Given that the various allegations in the Indictment stretch up through at least 2002 with respect to Mr. Speiss (*see, e.g.*, Brief at 20) (and depending on how one views Mr. Speiss' potential involvement in the overall alleged conspiracy, even longer), Mr. Speiss will not be talking to anyone about this case (other than his lawyer) until at least 2008.  Unless this Court is willing to tolerate Defendant's alleged evidentiary problem for the next two years – and run roughshod over any sense of justice due Plaintiff in the meantime – the Court might as well consider Mr. Speiss dead and make Defendant litigate its case to the best of its current ability.

**D.      Granting of the Motion to Stay Would Result in Harm to the Plaintiff.**

Substantial hardship and inequity would accrue to Plaintiff if Defendant's Motion is **granted.**  Plaintiff has a right to a timely and cost effective adjudication of the proper tax treatment of its transactions without unnecessary expenses and procedural delays.  Granting the Motion would strip Plaintiff of this right in favor of an unsupported assertion of a tenuous connection between this case and a criminal proceeding in which Plaintiff is not involved.

As noted above, there are no reported court opinions that address the merits of the tax treatment of any of the KPMG Transactions.  Nonetheless, because of the Indictment, the United

States has now placed the careers, the honor, the finances, and even the freedom of at least nineteen men and women in jeopardy based on their involvement with allegedly "fraudulent tax shelters." While the appropriateness of such a strategy in the criminal proceeding is not an issue before this Court, Defendant's actions in exploiting that strategy are.

The Indictment arose against the Indicted Individuals out of a grand jury investigation of KPMG. KPMG escaped an indictment itself only by entering into a Deferred Prosecution Agreement with the United States (the "KPMG Agreement" (House Decl. Ex. 1). The KPMG Agreement, dated August 26, 2005, required KPMG to literally abandon the Indicted Individuals, its former clients, and everyone else with whom it had dealt with respect to the subject transactions. For example, the KPMG Agreement required KPMG to admit to fraudulent conduct both by itself *and on the part of the Indicted Individuals*. *See, e.g.*, Defendant's Brief at page 7, *quoting* KPMG Agreement at 3. As part of these admissions, KPMG also agreed never to make (or allow any of its employees to make) any statements that might contradict the admissions in the KPMG Agreement (i.e., any statements that might assist the Indicted Individuals in their criminal cases or KPMG's former clients in their civil cases). (KPMG Agreement at 16.) However, this was only the beginning.

In order to preserve its own existence and avoid the downfall experienced by Arthur Andersen LLP, KPMG was obliged to agree to "cut off" support for the legal fees and costs of all of the Indicted Individuals. (*See* Memorandum in Support of Motion for Relief in Connection with Rule 16 Discovery, Dkt. No. 05-888 (S.D.N.Y.) at 5 (attached as Plaintiff's Exhibit B).) This resulted from a Department of Justice policy change in January of 2003 that caused large organizations facing indictments to refuse to indemnify employees and former employees in criminal cases in order to avoid indictment of the organization. (Memorandum from Deputy

17

Attorney General Larry Thompson to all United States Attorneys, dated January 20, 2003 at 5 (attached as Plaintiff's Exhibit C).) Such a policy, and KPMG's acquiescence to it, essentially has allowed the United States to turn KPMG into its hand puppet, and to apply the full force and fury of indictments and subsequent prosecution (which properly should have been levied against (and defended by) the vast resources of a major accounting firm) against the Indicted Individuals, individuals who have been set up as scapegoats by KPMG and cut loose from any KPMG funding, advice, or other support.

With the KPMG Agreement (and thereby KPMG) in its pocket and its prosecutorial guns deliberately and carefully trained on the isolated and abandoned Indicted Individuals, the United States clearly intends to railroad the Indicted Individuals in the same manner that it did KPMG and with the same consequences. The United States will continue to pressure the Indicted Individuals, *despite the absence of even a single court decision finding that the KPMG Transactions do not "work" for tax purposes*, to enter into plea agreements to avoid a burdensome criminal trial that many of the Indicted Individuals simply cannot afford. Plaintiff has no doubt, and neither should the Court, that those agreements – when eventually extorted from the Indicted Individuals – will find their way into Defendant's "evidence" in this case in the same manner that Defendant used KPMG's coerced, self-serving, and irrelevant statements in its Brief.

Without regard for the truth, the United States is seemingly on a path to pursue and use as many of these alleged and coerced "facts" as it can to undermine Plaintiff's ability to fairly and objectively determine the merits of the proper tax reporting of the transactions in which it engaged. Granting Defendant's Motion will only allow the United States more time to unfairly extract more of these irrelevant and highly prejudicial materials from the Indicted Individuals

18

(and perhaps others). The United States wants to avoid at any cost a fair hearing on the merits of this case. This Court must stand firm against Defendant's advance (and against the awesome prosecutorial power of the United States) to ensure that Plaintiff (and other taxpayers who may seek to have their tax liabilities determined by this Court) have a fair and objective opportunity to present and argue their case, whatever may be the outcome.

## III.  THE DURATION OF THE REQUESTED SUSPENSION OF PROCEEDINGS IS UNREASONABLE.

### A.  Under the Circumstances, the Duration is Unreasonable.

Given that Defendant's Motion does not satisfy the first two requirements for any stay of the proceedings in this case, the proposed duration of the requested suspension is patently unreasonable. Even if Defendant's position regarding the basis for a stay had any merit, a stay of the proposed proportions would exceed reasonable bounds. As noted in Defendant's brief, a stay of six to nine months was allowed in *St. Paul Fire and Marine* for completion of a criminal investigation and proceedings and trial, if an indictment was issued, and a stay of at least six months was allowed in *Ampetrol*, pending completion of the related criminal trial. (Brief at 24.) Defendant in its Motion requests a suspension until the conclusion of the criminal trial relating to the Indictments. Given that it is approximately eight months until the beginning of the criminal trial (if it begins at that time as now scheduled) the actual delay in this Court's proceedings could be much longer than eight months. Defendant's Brief is silent as to the likelihood that the criminal trial will commence in accordance with the current schedule and the expected duration of the trial. The Brief merely makes the conclusory statement that "because the trial in the criminal case is scheduled for September 11, 2006, suspending proceedings in this case until after the criminal proceedings are resolved is not an unreasonable delay in the proceedings in this

case." (Brief at 29.) Based on the foregoing, Plaintiff cannot agree and neither should this Court.

In light of the number of Indicted Individuals and the novel issues before the court in the criminal proceeding, not to mention the delay caused by the continuing jeopardy to these individuals prior to the expiration of all criminal statutes of limitation under which they could conceivably be charged, the criminal proceedings could continue for a very lengthy period indeed. In addition, in light of the many procedural and other motions that have been or are likely to be filed by the numerous Indicted Individuals, it is not certain that any trial will begin on September 11, 2006 as scheduled. Further, Defendant alleges that the grand jury proceedings that gave rise to the Indictments continues and may generate further indictments. The date of any trial or other proceedings relating to any such indictments is unknown at this time. Defendant essentially wants an indefinite stay that may extend well into 2007 or beyond.

Moreover, the Court should examine what Defendant most likely would do with the extra time. As explained above, Defendant will likely use that time to further leverage the threatened indictments and coerce prejudicial admissions to be used as generic "evidence" against Plaintiff and other taxpayers. The time would not be used to resolve any issues in the criminal matter that might bear directly on the issues in the case before this Court, as was the case in *St. Paul Fire and Marine*,*C3* , and *Ampetrol*. In fact, resolution of issues in the criminal matter have no direct bearing on the determination of the proper tax treatment of certain items in Plaintiff's partnership tax return, which is the only substantive issue in this case. Given that any suspension will not allow for the timely disposition of any issue relevant to this case, any suspension of the proceedings in this case would be unreasonable.

20

**B.   This Case May Soon Be Resolved if Not Suspended.**

Plaintiff intends to file a motion for summary judgment in this case. The basis for this motion is that the FPAA was not issued within the requisite period of limitations. The resolution of such motion will require no testimony from any of the Indicted Individuals and will require this Court to review only a small number of documents that already are in the possession of both parties. If Plaintiff's motion is granted, no substantive issues will remain to be addressed in this case, and therefore none of the concerns Defendant cites as a basis for the Motion would arise. Accordingly, a suspension of proceedings of any duration at this point would be unreasonable, given the possible resolution of the case in the short term.

If the Court decides to grant Defendant's Motion to Stay, notwithstanding the compelling analysis set forth in this Response and Objection, for the reasons articulated in the preceding paragraph Plaintiff respectfully requests that the terms of any such suspension allow the parties (and the Court) to resolve Plaintiff's motion for summary judgment with respect to the timeliness of the FPAA.

21

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully prays that Defendant's Motion to Suspend Proceedings be denied, that Defendant be required to file its Answer in this case, and that this case proceed on in its normal course under the Rules of the Court of Federal Claims.

Respectfully submitted,


/s/ A. Duane Webber
A. Duane Webber
Attorney of Record

George M. Clarke III
Of Counsel

Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006
(202) 452-7000

David G. Glickman
Robert H. Albaral
Of Counsel

Baker & McKenzie LLP
2300 Trammel Crow Center
2001 Ross Avenue
Dallas, TX 75201
(214) 978-3000

Attorneys for Plaintiff,
Epsolon Limited

Dated: January 30, 2006

22