# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

— — —

CARLOS E. SALA and           )
TINA ZANOLINI SALA,          )
                             )     Case No:
          Plaintiffs,        )     05-CV-00636-LTB-OES
                             )
vs.                          )
                             )
UNITED STATES OF AMERICA     )
                             )
          Defendant.         )
------------------------------

THE DEPOSITION OF

CARLOS SALA

DENVER, COLORADO

SEPTEMBER 15, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: MARTHA H. BENNETT
FILE NO.: A007B16

1 partner.  He seemed like a very solid tax accountant that

2 would do a routine type of tax preparation.  That was my

3 conclusion.  He was fairly young, too, by the way.  He's

4 progressed now in his career.  But this was six years ago.

5          Q.    And you didn't inquire within the firm about

6 someone else who might be able to help?

7          A.    No, because that would have been a new

8 introduction to somebody brand-new, and I already felt

9 comfortable that I had a relationship that could provide the

10 services.

11          Q.    When did you come into contact with Tracie

12 Henderson?

13          A.    I researched it when you did one of the

14 previous filings, so I tried to really peg it correctly.  And

15 it was in late November.

16          Q.    Of --

17          A.    Of 1999.

18          Q.    1999?

19          A.    Yes.

20          Q.    Pricewaterhouse was doing your return for 1999

21 during that time; correct?

22          A.    Correct.  That's right.

23          Q.    So at the same time that Pricewaterhouse was

24 doing your return, were you looking to find another

25 accountant at that time?

1          A.     I wasn't looking.  I happened to be in Dallas,

2 Texas for other business.  A friend of mine, Tim Gillis,

3 happened to be in Dallas as well.  He called me up and said,

4 Can we do lunch?

5          At that lunch, Tracie Henderson was introduced to

6 me, and we talked about the financial services that she

7 offered, which were tax planning, tax compliance.  And that's

8 how I met her.  Nothing really developed after that first

9 initial meeting.

10          Q.     Did you tell me earlier that you didn't engage

11 Pricewaterhouse in tax planning?

12          A.     Correct.

13          Q.     Because you didn't think an accounting firm

14 should do that?

15          A.     No, not tax planning; investment-management

16 services.  Tax planning, yes.  Absolutely.

17          Q.     All right.

18          A.     By the way, I think that Pricewaterhouse may

19 have done some estate-tax planning for me.

20          Q.     What did you and Tracie talk about at that

21 first lunch?

22          A.     Very little with Tracie; it was mostly with

23 Tim, my friend.  And we mostly talked about the Internet,

24 about my experience at Abacus.

25          KPMG was trying to figure out how to create an

1 on-line initiative within their tax group, and he asked me if

2 I would be willing to talk to one of their senior tax

3 partners and provide some advice as to how to go about going

4 to the Internet.

5          Q.     Would that be for compensation?

6          A.     No, this was a favor to a friend.  You know

7 what?  They sent me a T-shirt.

8          Q.     You're a hard negotiator.

9          A.     It was a favor to a friend.

10         Q.     Was it the right size?

11         A.     Probably not.

12         Q.     And did you talk to Tracie Henderson at that

13 meeting?

14         A.     Yeah, we were introduced; she was there.  My

15 recollection is she listened 90 percent of the meeting.  And

16 then she talked and she was telling me, This is what I do.

17 If you'd like to have any of these services, I would be very

18 happy to work with you.

19         Q.     Did you tell her what was going on at Abacus?

20         A.     We talked about the fact that we had already

21 entered into a contract to sell the business.

22         Q.     Did you talk about the options that you had?

23         A.     No.

24         Q.     Did you talk about any part of your personal

25 finances?

Page 62

1          A.     No, I just met her.  No way.

2          Q.     Well, you were with Tim as well?

3          A.     I know, but I wouldn't have felt comfortable

4 talking about my compensation with somebody I just met.  With

5 Tim, that would be okay, but I had just met her.

6          Q.     When was your next contact with Ms. Henderson?

7          A.     You know, it was in 2000, and maybe in the

8 spring.  I don't recall exactly.  But it was in 2000.

9          Q.     And who called who?

10          A.     She would have called me.  There would be no

11 reason for me to call her.

12          Q.     What did she say to you?

13          A.     I don't recall what she said on our initial

14 call.  My guess is, How are you doing?  Here I am; here's

15 KPMG; if you need any services, keep us in mind.

16          Q.     What is it that Tracie told you she could do?

17          A.     She was big on estate-tax planning; that was

18 the big thing that they thought she could help me with.

19          Q.     What did that mean?

20          A.     Preparation of your wills, working with

21 attorneys, planning for transition of wealth from one

22 generation to another generation.  Those types of things.

23          Q.     Did she help you prepare a will?

24          A.     No.  I hired an attorney.  Actually, I hired

25 first an attorney at Holland & Hart, and then I hired Davis

1 BLIPS.

2          Q.    And when BLIPS didn't work out, did you tell

3 her that you still wanted to try to do a transaction with her

4 at KPMG?

5          A.    Can I give you a little more background there?

6          Q.    Sure.

7          A.    My recollection is that she presented BLIPs to

8 me.  It had to do with an investment in the Argentinian peso,

9 I think.  And I started trying to get a good understanding of

10 the transaction, and in doing so, there was a meeting, I

11 think, with the money manager on the BLIPS transaction.

12          Q.    Who was that?

13          A.    I think it was someone from Presidio?

14          Q.    Do you know who it was?

15          A.    If you gave me a name, I might be able to tell

16 you.

17          Q.    David Makov?

18          A.    No, I would remember that.

19          Q.    We'll come back to that.

20          A.    It was someone from Presidio; it was in New

21 York.  That meeting dealt with the tax structure, I believe.

22          Q.    What do you mean by "tax structure"?

23          A.    Well, there was a tax component to that

24 transaction.

25          Q.    What was that?

1          A.     I can't recall.

2          Q.     When you say a "tax component," meaning that

3 there was a designed tax loss as parts of the transaction?

4          A.     Yes, but I don't recall the details of it.

5          What I remember mostly about it was the Argentinian

6 peso, and the Argentinian peso had to devalue a certain

7 amount within a period of time.  I was fairly confident that

8 the Argentinian peso would devalue, but it had to devalue in

9 a very short period of time, like maybe 90 days.  And I may

10 note that you can't time that.

11          So I was very, very questionable as to the economic

12 portion of that transaction because of the short period of

13 time where you had to make money.

14          So I tried to get a meeting with someone who had

15 some expertise on the investment side of that transaction,

16 and that was here in Denver.  I went there.  The guy never

17 showed up.  I left.

18          Then the next thing that happened is:  I was in

19 Atlanta visiting family; I met with Tracie; she introduced me

20 to her boss; a guy named Jeff Eischeid.  I talked to him for

21 less than 30 minutes; we talked mostly about the Internet

22 again.  Everybody was talking about the Internet at that

23 time.

24          I asked him at that time, If I'm going to consider

25 this transaction, I really need to look at documents early on

1 because I'm sure I'm going to have a lot of comments --

2 because I always do.  His response back to me was, We can

3 show you the documents, but we're not going to take any

4 changes or comments.  That was a huge turnoff.

5         So the combination of the Argentinian peso issue

6 with the short duration -- the issue was:  How can you go

7 into a transaction of this complexity without being able to

8 provide comments?  Those were red flags for me.

9         Q.    Had you previously invested in foreign

10 currency?

11        A.    In my personal investments?

12        Q.    Yes.

13        A.    No.

14        Q.    Had you come into contact with the Argentinian

15 peso in your profession?

16        A.    No.

17        Q.    But you had formed an opinion about the

18 valuation of the Argentinian peso?

19        A.    I have.

20        Q.    Did you talk with others about that?

21        A.    I may have talked to Goldman about it, because

22 I was intrigued.

23        Q.    Do you have a specific recollection of talking

24 to Goldman Sachs about it?

25        A.    I don't.  But I was intrigued about what was

1 going on in Argentina with the government.  If you remember

2 back then -- well, I don't know if you remember.

3         Let me just say:  The Argentinian economy was the

4 wonder of Latin America in the 1990s; the finance minister

5 was credited for this great miracle.  And what he had done is

6 he pegged the Argentinian peso to the dollar on parity.  What

7 he was trying to do was control inflation by the peg, and the

8 peg was in the Wall Street Journal all the time.

9         What was going on is that it was a significant

10 amount of cash flowing from the United States into Argentina,

11 but a lot of that money (inaudible) quickly, because it was

12 going into financial assets, rather than property and

13 equipment.

14         So what happened is:  To maintain the peg to the

15 dollar, the Argentinian peso was buying huge amounts of

16 reserves in the free market to try to keep it at the peg.  I

17 think at one point, it had $11,000,000,000 worth of reserves

18 and it was (inaudible) a billion dollars a day.  So this was

19 in the newspapers, and I was following it with great

20 interest.  So I knew these guys were never going to be able

21 to sustain that.

22         Subsequently, it turned out that they devalued it

23 from 1 to 1 to 3 to 1; the finance minister was fired; the

24 president of the country was fired; they went through three

25 presidents in 18 months or so; the finance minister was put

Page 74

1 in jail by one of the presidents.

2          It was just a huge thing, and I was following

3 everything.  That's why I had already formed an opinion on

4 the Argentinian peso.  You didn't have to be a

5 foreign-currency expert to do that.

6          Q.     And you had an analysis that the 90-day period

7 was too short?

8          A.     Absolutely.

9          Q.     But you don't recall talking with anyone else

10 about it specifically?

11          A.     I'm sure I told Tracie that.

12          Q.     I'm not asking who you told; I'm asking who

13 you sought advice from to see if others agreed with you.

14          A.     No one that I can recall.

15          Q.     Okay.  Is that the reason why you didn't enter

16 into these BLIPS transaction?

17          A.     Those were the two primary reasons.  I think

18 there was a third reason as well.  It had to do with Notice

19 2000-44.

20          From my recollection, Notice 2000-44 came out.

21 Tracie Henderson made me aware that that notice was out

22 there.  She said, We don't know what this really means inside

23 KPMG, but the impression I get is that you're grandfathered

24 in if you want to do BLIPS.  We will still be able to do it

25 if you'd like to.

Page 75

1           But at that point, I already had reservations on the

2  other two issues.  I said, Why do I need to go through this

3  assessment of 2000-44 when I'm not comfortable with the

4  transaction?

5           Q.    Had you already committed to BLIPS?

6           A.    No, I never came close to committing to BLIPS.

7           Q.    So I don't understand.  What did you

8  understand was the grandfathering if you hadn't entered into

9  the transaction?

10          A.    The grandfathering meant that these were

11 clients that they had talked to about doing BLIPS before this

12 issue had come up.  That's what she meant.

13          Q.    But the IRS notice would have still impacted

14 your decision whether to go into it?

15          A.    Oh, sure.  It would have had to be addressed.

16          Q.    The grandfathering is KPMG's willingness to do

17 the transaction with you, not the impact of IRS Notice

18 2000-44 on the transaction?

19          A.    Absolutely correct.

20          Q.    So you were aware of 2000-44 when you decided

21 not to do the BLIPS transaction?

22          A.    I was aware of it.

23          Q.    And you've indicated, then, that there were

24 three reasons why you didn't do BLIPS?

25          A.    Yes.

Page 78

1          Q.      Who is "he"?  Raby?

2          A.      Schwartz.  So spring, early summer, maybe.

3          Q.      But when did you know that you were going to

4 enter into the Deerhurst transaction?

5          A.      Not until I had negotiated all the details and

6 made all the reviews.

7          Q.      So the point where you became concerned about

8 Kevin Overburg at Pricewaterhouse was at the point where you

9 knew you were going to enter into the transaction?  That's

10 what I'm trying to --

11          A.      Sure; sure.  I think it didn't happen

12 overnight -- my decision to hire Tracie Henderson.  What was

13 really happening is:  Here she's developing a relationship

14 with him.  I liked her.  At some point throughout 2000, I

15 said, There's no real reason to stay at Pricewaterhouse

16 because I don't have the same relationship now that I have

17 with Tracie.

18          And then when Kevin called me in 2000, then I said,

19 Well, furthermore, I don't think he can really handle a

20 proper review of the transaction as it relates to the tax

21 return.  So it was a combination of things.

22          But I think that my decision to hire Tracie, which I

23 did not communicate to Kevin until after -- much later --

24 just evolved as I got comfortable with Tracie Henderson in my

25 discussions with her.

1          Q.      And when did you hire Tracie?

2          A.      Maybe in the summer.   Maybe in the summer of

3 2000.

4          Q.      So by the summer of 2000, had you decided to

5 shift your business away from Pricewaterhouse?

6          A.      Yes.

7          Q.      Based upon your contacts with Tracie?

8          A.      Yes.   And another thing:   I respected Tim Gill

9 as my friend, who was a partner at KPMG, and he had glowing

10 references about Tracie.   So put it all together, and that's

11 how things happened.

12         Q.      What was the initial purpose of the formal

13 engagement of KPMG?   Was it to do your tax returns, or was it

14 to do your tax planning?

15         A.      Both.   Primarily my tax return, but both.   She

16 just kept talking about how good she was at estate taxes and

17 consulting on that, because she knew I was concerned about

18 that.

19         Q.      Estate taxes?

20         A.      Yes.

21         Q.      Did you any do estate-tax planning with Tracie

22 Henderson?

23         A.      I did not do it with her.   I did some

24 estate-tax planning with Morgan Stanley during that time.   I

25 may have mentioned it to her, and she said, Hey, I'm great at

Page 80

1 this, so consider me as you're looking at this.

2          Q.     But you didn't?

3          A.     But I didn't.  I never did, actually.  I used

4 law firms, and I used investment firms.

5          Q.     Morgan Stanley?

6          A.     Yes.

7          Q.     Who you started working with in 1999?

8          A.     No, in the year 2000.

9          Q.     2000?

10          A.     Yeah.  They were introducing me to all of

11 their services, so that was one of them.

12          Q.     All right.  Do you recall the first

13 transaction?  Was BLIPS the first transaction that Tracie

14 presented to you?

15          A.     That I can call, yes.

16          Q.     Was that transaction what caused the formal

17 engagement at KPMG by you?  Caused you to formally engage

18 KPMG?

19          A.     That transaction?

20          Q.     The consideration of that transaction.

21          A.     No.  Because if I didn't do BLIPS, which I

22 didn't do it, that would have been not relevant to my

23 engagement of KPMG going forward.

24          Q.     Was it working with them on BLIPS that caused

25 you to engage them?

Page 89

1          Q.    And "compliance," as you're using it, means

2  tax compliance with the federal income tax laws in connection

3  with your tax return?

4          A.    Correct.

5          Q.    You met Kevin Grady?

6          A.    Yes.

7          Q.    That was your first meeting?

8          A.    Yes.  You know, I'm trying to recall, but I

9  know I had lunch with Kevin Brady.  I don't know if it was at

10 that first lunch, or if it was at another time when I was in

11 Atlanta where I had lunch with him.  But it could have been.

12         Q.    Who, other than Tracie Henderson, did you

13 confer with about the BLIPS transaction?

14         A.    No one else.

15         Q.    Just Tracie Henderson?

16         A.    Yes.

17         Q.    How come you didn't call Goldman Sachs about

18 the Argentinian peso?

19         A.    I didn't get to that point.  When I was going

20 to have the meeting on the economics of the transaction, it

21 was here in Denver and the guy didn't show up, so I didn't

22 have enough facts.  And it never got to a point where I was

23 seriously thinking about BLIPS, because there were issues

24 that came up, and I decided not to do it.

25         And I never got to do some real due diligence, like

1 projections, profit, legal opinion.   None of that.

2          Q.     Did the Deerhurst transaction compute a

3 probability of profit?

4          A.     I prepared a projection.

5          Q.     What conclusion did you come to with respect

6 to Deerhurst?

7          A.     I projected that I was going to make a ton of

8 money.

9          Q.     In percentages, in a wide range, what were you

10 looking at as a return?

11          A.     I think my annual rate of return was somewhere

12 between 60 to 75 percent.

13          Q.     Return on investment?

14          A.     Yes.

15          Q.     Over the course of five years, or each year?

16          A.     Each year; each year.

17          Q.     60 to 70 percent a year?

18          A.     Yeah.   On a leveraged basis.

19          Q.     4 to 1?

20          A.     4 to 1, including leverage.

21          Q.     So without leverage?

22          A.     About 16 or 17 percent without leverage.

23          Q.     And you felt pretty comfortable with those

24 numbers, at least based upon your due diligence?

25          A.     At the time.

Page 111

1  insistence?

2          A.      Yes.

3          Q.      So your first conversation about Deerhurst was

4  with Mr. Raby?

5          A.      Yes.

6          Q.      And that lasted how long?

7          A.      I can't recall.

8          Q.      Was it a short conversation?

9          A.      It would be logical that it would have been a

10 short conversation.

11         Q.      Did he tell you to call Mr. Schwartz?

12         A.      I can't recall.

13         Q.      How did the meeting get set up in New York, if

14 you can recall?

15         A.      I don't recall.

16         Q.      Who was present at the meeting?

17         A.      It was Mr. Schwartz, Mr. White, and I.

18         Q.      Was Mr. Raby there?

19         A.      No.

20         Q.      What was discussed?  Had you talked to

21 Mr. Schwartz g119.

22                 Before that meeting?

23         A.      I don't think so.

24         Q.      So you meet him for the first time and talk to

25 him for the first time?

Page 112

1        A.      Yes.

2        Q.      What does he tell you?

3        A.      He described the Deerhurst transaction in some

4 detail.

5        Q.      What did he say?

6        A.      Well, that it would require an investment in

7 foreign currencies; that he was working with a manager who

8 had a very long established track record; that it was a very

9 nice way of diversifying from the equity markets, and to some

10 extent the fixed-income markets as well; and that it would be

11 a nice way to provide a portion of your assets, if you were

12 to do an asset-allocation analysis.  He said that.  Then he

13 also said that there was a tax component to the transaction.

14       Q.      And what was the tax component.

15       A.      That when you invested in foreign currencies,

16 there are some tax benefits that can be obtained when you do

17 some trading of foreign currencies.

18       Q.      And did he tell you anything about the amount

19 of the deductions that you could generate?

20       MR. HALLETT:  Are we on the first meeting still?  Is

21 that what you're directing your attention to?

22       MR. GEIER:  Yes, I'm just following up on his

23 statement.

24       A.      No, I don't recall that.

25       Q.      (By Mr. Geier)  Did you inquire about the

1 amount of the tax deduction that you could obtain?

2          A.    I don't recall inquiring about it.

3          Q.    Did you ask him any questions?

4          A.    Many, I'm sure.

5          Q.    What did you ask him?

6          A.    How the trading occurs --

7          Q.    Did you ask him anything about timing?

8          MR. HALLETT:  Let him finish his answer.

9          A.    I don't recall my specific questions.  I just

10 know that whenever a proposal like that, as the proposal is

11 being presented to me, I have questions about what's being

12 discussed.  So it would have been questions about the

13 investment program, and some initial questions as to the tax

14 treatment of the transaction.

15          Q.    (By Mr. Geier)  Did you ask him if there was a

16 dollar limit on the amount of deductions that you could

17 obtain?

18          A.    I'm sure I did not.

19          Q.    Why are you sure?

20          A.    You asked me a question earlier about, Did you

21 talk about the amount of the tax deductions?  And we didn't.

22 There wasn't like a limit or anything.

23          Q.    Did you ask him about the timing of the

24 transaction?

25          A.    I don't think so.

1          Q.     Was that a concern to you?

2          A.     At that meeting, no.  I was just trying to
3 find out what the transaction was all about.

4          Q.     And it was clear to you at that meeting that
5 the tax loss was a component of the transaction?

6          A.     Yes.

7          Q.     And it was clear to you at that meeting that
8 there was going to be an investment in foreign currencies?

9          A.     Yes.

10         Q.     Did you understand at that meeting that Andrew
11 Krieger would be the trader in charge of trading?

12         A.     I don't know if I did at that meeting or not.

13         Q.     How long did the meeting last?

14         A.     A breakfast.  Maybe an hour.

15         Q.     What else do you recall, if anything, that
16 Mr. Schwartz told you about this transaction during that
17 hour?

18         A.     Nothing else in that first initial meeting.

19         Q.     Investment in foreign currency; there was a
20 tax-loss component --

21         A.     We talked about our pasts for a while.  Who
22 are you?  What do you do?

23                The reason I remember the meeting -- the real reason
24 I remember -- the thing I remember most about the meeting was
25 what Tony White ate.  It was more impressionable to me in

1 that meeting what he ate, versus the tax losses in that

2 meeting.

3          And the reason is:  I've never seen anyone order

4 what he ordered, which was sausage, bacon, and ham.  And I

5 said, My, God, you're going to die of cholesterol.  And he

6 said -- I'll tell you off the record what he said.

7          Q.    Can you recall anything else that Mr. Schwartz

8 conveyed to you about the transaction?

9          A.    No, that's all I recall.

10          Q.    Did he have any documentation?

11          A.    No.

12          Q.    Did he tell you about his background?

13          A.    Yes.

14          Q.    Did he tell you about his background in

15 connection with other transactions which had tax loss as a

16 component?

17          A.    No.

18          Q.    But you had understood from Mr. Raby that Mr.

19 Schwartz was involved in such transactions?

20          A.    Yes.

21          Q.    Did you ask him about those transactions?

22          A.    I don't think so.

23          Q.    Did you do any due diligence at that initial

24 meeting?

25          A.    A little bit.

Page 120

1 that I would be the largest investor in Deerhurst.  And, as a

2 result, Mr. White was going to be the second largest investor

3 in Deerhurst.

4         In the investment field, size brings purchasing

5 power.  It's just the way it is.  I thought, also, that if we

6 made money, we were going to make a lot of money, and I

7 didn't mind sharing even the larger part of the 20 percent

8 with Deerhurst.

9         But on the asset-management fee, I thought that I

10 should be able to guard on the downside, so I was willing to

11 give up an assured fee versus a contingent fee based on

12 profits.

13         And I told both Krieger and Schwartz that I was not

14 going to do the transaction unless the fees were lower.

15         Q.    Did you run any numbers on 2 and 20 versus 1

16 and 30?

17         A.    No, I didn't.

18         Q.    Let's go back.  You were telling me about a

19 second meeting that occurred with yourself, Mr. Schwartz, and

20 Mr. White?

21         A.    Yes.

22         Q.    How far from the first meeting?  How much time

23 elapsed between the two?

24         A.    Maybe a couple of months.

25         Q.    Okay.  So it wasn't just a matter of a week or

Page 121

1  two?

2          A.      No, because it would have been the next time

3  that I was in New York.  I wasn't in New York every week.

4          Q.      Who set up this meeting?

5          A.      I don't recall.

6          Q.      Were there telephone communications between

7  yourself and anyone else, other than Mr. White and Mr. Dice,

8  in connection with Deerhurst prior to that second meeting?

9          A.      I don't think so.

10          Q.      Did you do any due diligence between the two

11  meetings?

12          A.      No, I didn't know enough.

13          Q.      And did you talk with any financial advisor

14  about the transaction?

15          A.      No.

16          Q.      Did you talk to an accountant?

17          A.      No.

18          Q.      Did you talk to anyone at KPMG?

19          A.      No.

20          Q.      Did you talk to Mr. Raby?

21          A.      Mr. Raby?  I don't think so, no.

22          Q.      Did Mr. Schwartz call you in between and talk

23  to you?

24          A.      Probably to set up a meeting.

25          Q.      But no more?

1          A.     No.

2          Q.     Did you say to him at the conclusion of the

3   first meeting, We need documents; we need to start looking at

4   this thing?

5          A.     No.

6          Q.     So the second meeting -- how long did that

7   last?

8          A.     Probably an hour to an hour and a half.

9          Q.     I don't know if you're going to be able to

10  remember this, but it's somewhat critical:   What did

11  Mr. White eat?

12         A.     You know, it wasn't a lunch meeting.

13         MR. HALLETT:   You just got your second smile.

14         A.     We probably drank tea, because he likes his

15  afternoon tea.

16         Q.     Sugar?

17         A.     No, I don't think so.

18         Q.     We'll move on.

19         This was an hour and a half.   What was the purpose

20  of this meeting?

21         A.     To really get into more details of the

22  transaction.

23         Q.     Okay.

24         A.     Here's the other thing, too:   I try to be a

25  fairly private person, even when public companies report

1 about you.  So I don't prefer to get into significant details

2 on my own financial affairs in a restaurant.  I'm going to do

3 that in a more private setting.

4          Q.     So this was a more private setting?

5          A.     Yes.  It was Mr. White's residence.

6          Q.     Did Mr. Schwartz make a presentation?

7          A.     He did.  It was a verbal presentation.

8          Q.     Did he have any documents?

9          A.     I don't think so.

10         Q.     So July?  August?

11         A.     I don't know; I can't recall.  I think someone

12 has testified to the date of that meeting, and I would concur

13 with what they testified, but I can't remember what it was.

14         I'm not sure if that makes any sense.

15         Q.     It makes sense, but it doesn't help me now.

16 But I understand what you're saying.

17         A.     I just can't recall.

18         Q.     I understand.  I'm only asking you what you

19 can recollect.  Tell me about the presentation that was made.

20         A.     Now, that I recall more than the timing and so

21 forth, because it was more substance.

22         He made a presentation as to what the trading was

23 all about; what Andrew Krieger was all about; what his firm

24 was all about; how it was that his trades made money.  I

25 think he discussed about making short-term trades.  He

1 discussed the fact that there was a very high volume of

2 trades.

3          Then we went into a discussion -- that was the first

4 part of the discussion.  The second part of the discussion

5 was a discussion of the structure of the transaction.

6          That to introduce us to Andrew Krieger and his

7 investment programs, that a way of doing so would be to set

8 up a trial account with a smaller amount of funds invested.

9          That Krieger was used to dealing with large amounts

10 of capital in terms of his trades, but was willing to

11 actually pool some funds together and trade those as one

12 account.

13          So a second step of the structure of this investment

14 would be to pool the funds into a partnership; trade that for

15 some time.  And then if everyone was happy, then there would

16 be a long-term commitment -- to enter into a five-year

17 program where Mr. Krieger would make a significant investment

18 in hiring traders and people and infrastructure to trade for

19 five years.

20          So we went through the structure of the transaction

21 in that fashion.

22          Q.    Was it your understanding that everybody

23 entered into that partnership that you were referring to?

24          A.    At the time, yes.

25          Q.    Did you learn before you entered the