IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLORADO

| | | |
|---|---|---|
| CARLOS E. SALA and | ) | |
| TINA ZANOLINI SALA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 05-cv-00636-LTB-PAC |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

UNITED STATES' RESPONSE TO
PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

The United States of America, by its undersigned counsel, hereby responds to the

Plaintiffs' Motion for Partial Summary Judgment ("plaintiffs' motion").

## INTRODUCTION

In 2000, plaintiff Carlos Sala ("Sala") received over $60 million in income, mostly in

connection with his work as the Chief Financial Officer of Abacus Direct, Inc. ("Abacus").

Ordinarily, a taxpayer might expect to pay approximately $24 million in federal income taxes on

such income.  But as we will describe, Sala actively shopped for a tax shelter so he could avoid

paying any income tax, and he ultimately engaged in a series of transactions that we refer to as

the "Deerhurst Shelter."  Sala put $728,000 at risk in order to generate the purported $60 million

in tax losses.

In this suit, Sala seeks to recover the tax, interest, and penalties he and his wife were required to pay after the Internal Revenue Service disallowed the tax loss. Sala (to date) has not filed a summary judgment motion with respect to the tax loss claimed from the Deerhurst Shelter. If Sala were to win this case on the merits, he would be entitled to a refund of the tax and interest that he paid, along with additional interest. Sala has, however, filed a partial motion for summary judgment with respect to a dispute over whether he may take advantage of Internal Revenue Code section 6404(g) (26 U.S.C.).[1] The § 6404(g) issue raised by Sala is relevant only if he loses his case on the merits of the Deerhurst Shelter. That is, even if he loses the case on the merits, he contends that he would still be entitled to a refund of approximately $1.5 million of interest that he paid before filing this suit.

The United States contends that Sala is not entitled to any relief from the payment of interest under § 6404(g) because this "is a case involving fraud." I.R.C. § 6404(g)(2). But whether the Court agrees with the United States' position is not a matter that needs to be decided now. Plainly, the question of fraud, assuming it does not become moot, is one that is highly contentious and fact intensive. Since material facts are in dispute, it should be decided after a trial, and Sala's motion for partial summary judgment should be denied.

## FACTS

The artificial paper tax loss was generated through a carefully structured plan to buy and sell nearly offsetting options in the face amount of $60 million, contribute them to entities created merely to hold them, and then promptly liquidate them prior to year's end, to create

---

[1]     Sala's motion was filed on June 30, 2005. Pursuant to Rule 56(f), the Court allowed the United States to take discovery before responding to the partial motion for summary judgment.

artificial paper tax losses.  The promoter of the transaction represented this as a foreign currency trading program including "'a combination of technical trading systems with a discretionary overlay.'" Declaration of David N. Geier ("Geier Decl."), Ex. I at LN454.  The trading was to include foreign currency spot trades, currency forwards, and currency options in extremely "active accounts."  *Id.*

The Deerhurst Shelter involved a series of carefully constructed and tax-motivated steps, involving 30 individuals who collectively sought over $160 million in ordinary losses and $102 million in capital losses each for their 2000 tax year.  Geier Decl. Exs. A-C; D at 176.  By the end of 2000, everyone in the Deerhurst Shelter, including its principal Michael Schwartz ("Schwartz"), came away with what had been promised to them: a tax loss.  Geier Decl. Exs. D at 176; F at 87-88, 138-39; G at 16-17; H at 53; K at 32.  Sala, and his close friends, Martin White ("White") and Christopher Dice ("Dice"), together accounted for over half of the shelter's funds, claiming over $100 million of its purported ordinary losses and $27 million of its capital losses.  Geier Decl. Exs. A; F at 186-87.  In Sala's case, the tax loss approximated $60 million.

 The details of the transaction and the facts surrounding Sala's participation shed light on why this is a case involving fraud.  In short, knowing that the transaction was created solely to create artificial tax losses, and otherwise lacked any economic purpose, Sala attempted to gain a tax benefit to which he knew he was not entitled.

## CARLOS SALA

Sala is an extremely sophisticated investor who paid close attention to the details of the financial transactions he entered, including the Deerhurst transactions.  Geier Decl, Exs. F at 219-22; G at 36, 44; H at 138; E at 21, 28-29, 33, 48, 51; J.  In fact, Sala read all of the Deerhurst

materials and wanted to fully comprehend, and in fact did comprehend, all aspects of the transaction.  Geier Decl. Ex. H at 138.  Sala made his personal investments through large financial institutions, including Goldman Sachs and Morgan Stanley, and forced these financial powerhouses to compete for his business, often on a trade-by-trade basis, in order to reduce to his transaction costs.  Geier Decl. Ex. E, p. 39-41.

Equipped with this financial sophistication and background, Sala undertook a year-long quest to locate a shelter transaction not only for himself, but for his close friends and fellow officers at Abacus, White (CEO) and Dice (President).  Geier Decl. Ex. G at 22-23, 26-27.

1.    Sala's Year Long Quest for A Shelter Transaction

Abacus was sold to Double-Click, Inc. in 1999.  Geier Decl. Ex. F at 13, 15.  At that time, Sala knew that his Abacus stock options would generate substantial income for him when they were sold, which he intended to do in the first quarter of 2000.  Geier Decl. Ex. K at 246-47.  Up until this time, Sala and Abacus had retained the accounting firm of PriceWaterhouseCoopers ("PWC") for the preparation of their tax returns and to provide financial services.  Geier Decl. Ex. E at 42, 55.   John Raby ("Raby") was Sala's PWC contact for financial services.  *Id.* at 42-45.  Sala had no problems with the work PWC performed.  *Id.* at 42.

However, by February 2000, PWC was no longer placing its clients into tax-motivated transactions.  Geier Decl. Ex. L at 20, 25.  Shortly thereafter, Sala claimed he determined that PWC was no longer qualified to work on his personal tax returns.  Geier Decl. Ex. E at 55.  Despite terminating his relationship with PWC, Sala continued to work privately with Raby, who did not bill Sala for his services.  According to Sala, although he never advised Raby of his

desire to avoid tax on the gains from his stock sale, Raby presented Sala with a shelter opportunity.  Geier Decl. Exs. E at 66, 77; L at 74-76.

In late 1999, in addition to working with Raby, Sala was also working with a KPMG partner Tracie Henderson, who provided tax-advantaged strategies to her clients.  Geier Decl. Ex. E at 59-60.  Sala testified that he first met Henderson in Texas and that the two did not discuss Sala's personal finances at that time because Sala, "being a private person," would not have had such a conversation until he had developed a working relationship and a level of trust. Geier Decl. Ex. E at 60-63.

However, Sala's testimony is contradicted by an e-mail Henderson sent just days after their meeting, reiterating that during the meeting the two discussed various shelter opportunities, including an "option strategy" and "OPIS."[2]  Geier Decl. Ex. M.  Henderson explained that KPMG was interested in "doing [a shelter] transaction," but that an issue still remained involving the participation of a third party.[3]  Geier Decl. Ex. M.

---

[2]      Both of these strategies are described in the Superseding Indictment in *United States v. Stein*, the criminal case brought against promoters of abusive tax shelters pending in the United States District Court for the Southern District of New York.  *See United States v. Stein, et al.*, S1 05 Cr. 888 (LAK) (S.D.N.Y. 2005).  KPMG has since conceded that OPIS and the option strategy, as well as the BLIPS shelter discussed *infra*, were shelter strategies utilized by its clients, including Carlos Sala, which were fraudulent.  KPMG has also admitted that, by preparing and signing the tax returns associated with these transactions, it assisted the preparation of false and fraudulent returns.  Docket Entry No. 20: KPMG Statement of Facts at ¶¶ 2, 8-20.  KPMG admits that Sala's Deerhurst Shelter is one of these shelters.  Geier Decl. Ex. BB at ¶ 11.

[3]      The two also discussed "golden parachute" payments that Sala expected as reflected by Henderson's reference to "280G" of the Internal Revenue Code.  *Id.*

By the summer of 2000, Sala had committed to a Bond Linked Issue Premium Structure ("BLIPS") shelter transaction.[4]  Geier Decl. Ex. CC.  However, Sala explained that he ultimately rejected the BLIPS transaction for several reasons, including that the IRS had become aware of the transaction and had issued a Notice, Notice 2000-44, describing the transaction as creating artificial tax losses.  Geier Decl. Ex. E at 74-75.  By the fall of 2000, Sala represented to Henderson, that "he will do a transaction with [KPMG] if we are able to do one" and that he would use KPMG as an "advisor" on another transaction if KPMG was unable to locate one for him.  Geier Decl. Ex. M and its attached Ex. 155.  Henderson mentioned the possibility of Sala doing a "Jones Day" transaction although she candidly acknowledged in an email that the law firm, Jones Day, was getting "cold feet" about providing an opinion letter.[5]  *Id.*

### THE DEERHURST TRANSACTION

Sala was introduced to the Deerhurst Shelter by PWC's Raby.   Raby put Sala in touch with Michael Schwartz ("Schwartz")[6] and his company MultiNational Strategies, LLC, the

---

[4]     A BLIPS shelter transaction purports to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.  BLIPS specifically involves a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness.  Geier Decl. Ex. Z.

[5]     The United States was unable to pursue discovery of Tracie Henderson because of her representation through her counsel that she would assert her Fifth Amendment privilege if made to testify regarding her work with Sala and the matters involved here.  The parties have agreed that should Henderson's position change and that she will agree to provide testimony, that her deposition may be taken prior to trial.

[6]     Schwartz's resume included a master's degree in taxation, work for several of the big accounting firms, including tax shelter work for PWC and KPMG, and the formation of his own business.  Sala testified that he knew nothing about the transaction or its possible benefits before agreeing to meeting with Schwartz in New York.  Geier Decl. Ex. E at 103-05.

principals behind the Deerhurst Shelter.[7]  According to Raby, Sala wanted any investment to have a tax benefit regardless of its nature.  Geier Decl. Ex. L at 44, 79-80.

### 1. The Required Steps

The tax losses created by the Deerhurst Shelter were to be achieved by following the following precise pre-determined steps.

According to the promotional materials prepared by Schwartz, the transaction would proceed as follows:  (1) Sala would open a foreign currency trading test account for a one-month test period,  Geier Decl. Ex. C at 234; (2) after the test period, Sala was required to deposit 15% of his demanded ordinary loss and was advised that due to increased leverage (risk) he should form an S corporation to shield himself from personal liability,  *Id.* at 234-35; (3) Sala would then contribute his test account, "consisting of [...] option positions" to an S corporation and then to a general partnership to create a tax basis equal to the face amount of the long positions, but not reduced by the face amount of the short options, Geier Decl. Ex. B at 231; and (4) the shelter would be liquidated "**[a]t year end**," thereby generating either "a large capital loss" via the "liquidation of the S Corp." or, in Sala's case, a "large ordinary loss" by the liquidation out of a "lower tier LLC [actually here, a partnership] to the Sub S Corporation prior to roll-up," (emphasis added) Geier Decl. Exs. B; C at 234-35.  The actual foreign currency trades were to be conducted by Andrew Krieger ("Krieger").  As we will show below, there was no economic

---

[7]     Shortly after referring Sala, Raby became a shareholder in MultiNational Strategies and received a large commission, nearly $1 million, for introducing Sala, Dice and White and others to the shelter.  Geier Decl. Ex. DD.  However, Raby did not stay in business long with Schwartz.  Raby testified that the  IRS's regulation of shelter activity, particularly the requirement that the identity of shelter participants be disclosed, negatively impacted business.   Geier Decl. Ex. L at 88-89.

reason or trading purpose in using an S corporation or a general partnership structure for this transaction.  Declaration of David DeRosa ("DeRosa Decl.") at 4(c).  Moreover, this trading strategy was extremely low risk and low reward, and was not likely to make meaningful returns compared to the money invested.  *Id.* at 4(a).

### a.  Sala's legal opinion letter

Before filing a tax return reporting a significant tax consequence, participants in a transaction will often obtain legal "opinion letters" stating that the tax benefit generated by the transactions are likely to survive IRS scrutiny.  Sala obtained a legal opinion letter from Raymond J. Ruble[8] on April 16, 2001[9] ("Ruble Opinion")  Geier Decl. Ex. I at p.1-3.  Sala read that opinion page-by-page.  The Ruble Opinion explained that after utilizing the test account for 30 days, because of the increasing leverage (risk) in the third step of the Deerhurst Shelter Sala was advised of the prudence using an S corporation.  *Id.*  Then, by contributing the S corporation's assets to a general partnership, the Ruble Opinion explained that Sala could reduce risk and obtain economies of scale.  *Id.*  However, Krieger in fact traded the body of funds as one economic unit without distinction, and simply assigned trades to each partner's account based upon their pro-rata partnership percentage.  Geier Decl. Ex. Q at 176.  According to the Ruble Opinion, at year's end the transaction would conclude, because liquidation was necessary to

---

[8]      The United States was also unable to pursue discovery from Raymond J. Ruble because of his assertion of Fifth Amendment protections.  Ruble is currently under criminal indictment. *See United States v. Stein, et al.*, S1 05 Cr. 888 (LAK) (S.D.N.Y. 2005).  Among other things, the indictment alleges that Ruble prepared fraudulent opinion letters to deceive the IRS and in taking various steps to conceal from the IRS the existence of fraudulent tax shelters.  *See id.* at p.63.

[9]      Sala had received several drafts prior to his entry into the Deerhurst Shelter.

"avoid any illiquidity and volatility issues typical of trades over the year-end." Geier Decl. Ex. I at p.3. According to the Ruble Opinion, the liquidation involved only trading positions. The Ruble Opinion also explained that Sala's funds were to remain on deposit for 5 years, Sala was not permitted to withdraw these funds during the first year, and thereafter could only do so with the assessment of an early termination fee. *Id.* at p. 1-4. According to the Ruble Opinion, Sala should earn a profit of 1300%. *Id.*

In procuring the Ruble Opinion, Sala represented that he invested in a test account, an S corporation, and then a partnership, all for substantial non-tax business reasons and that the description of the transaction contained in the Ruble Opinion, and reflected above, "[was] accurate and complete, and there are not pertinent facts relating to the Transactions that have not been set forth in such description." *Id.* at p.4-5.

However, the following material facts were known to Sala but not contained in the Ruble Opinion: (1) the required buy-in was 15% of the expected tax deduction, *see* Geier Decl. Exs. C at 235; K at 8; (2) the losses would in fact be generated in 2000, *see* Geier Decl. Exs. C at 234; G at 16-17;  H at 53; K at 32; (3) Sala's own profit projections were much less optimistic than those stated in the Ruble Opinion, *see* Geier Decl. Exs. E at 90-91; N at 275-78; (4) Sala had renegotiated the Deerhurst fee structure to 1 and 30 (1% management fee and 30% of the profits) from 2 and 20, *see* Geier Decl. Ex. K at 48-49; (5) the transaction was structured differently for individuals who were seeking ordinary versus capital losses, *see* Geier Decl. Exs. C at 234-35; K at 25-27; and finally, (6) Sala had a side deal which provided him an exit strategy from the transaction without further cost, even during the alleged one-year lock-up period and then

throughout the stated five-year life of the transaction, conditioned upon Sala not being able to obtain the tax benefits of the transaction.  Geier Decl. Exs. K at 234; O at 72.

> b. *Actual events*

Sala believed that he would reap economic returns in excess of 60% and perhaps even 75% each year, year over year, throughout the next five years, and therefore he would achieve earnings in excess of the $24 million windfall he would get from taking a $60 million tax deduction in the first two months.  Geier Decl. Ex. E at 90-91. However, Sala's own expert conceded that the chance of even hitting 40% per year, year over year for five years, was something less than 1%.  Geier Decl. Ex. X at 78.

On or about October 23, 2000, Sala deposited $500,000 with Deerhurst ostensibly was a test account to determine if he wished to commit additional funds.  Geier Decl. Exs. I at 453-54; K at 40-41; P.  In contrast to the usual intensity with which he reviewed his investment, Sala did not review the November performance of his test account prior to agreeing to place an additional $8,425,000 into the transaction on November 21, 2000.   Geier Decl. Ex. K at 166-68; P.

From November 24 through 28, Sala acquired the offsetting options that are the focal point of this case, at a net cost to him of $728,298.  Geier Decl. Exs. I at 454-55; R.  These trades were then contributed in a single day to Sala's wholly owned S corporation and then transferred to Deerhurst Investors, a partnership, before being liquidated in early December 2000.  Geier Decl. Ex. S.  Sala testified that he did not use the S corporation to acquire these options because

he was going to transfer the positions just days later, even though Sala's justification for the S corporation was to provide liability protection for these trades.[10]  Geier Decl. Ex. K at 13-16.

During the month of December, when Sala's funds were pooled with the funds of other participants, Deerhurst Investors held $24 million in assets and on average each day there existed well over $20 million in cash sitting in its account.  DeRosa Decl. ¶ 4(d).  The remaining funds were spread across seven foreign currency pairs such that they offset one another and there was virtually no foreign currency exposure or risk.  DeRosa Decl. ¶ 4(a).  At the planned liquidation, Solid Currencies received the full value of its partnership interest ($9,021,108) in cash.  Geier Decl. Exs. W; BB at 892.  Although given as the reason for the liquidation, there were no liquidity or volatility issues warranting a liquidation.  DeRosa Decl. at Ex.1 p.39.

2.    <u>Deerhurst Shelter results</u>

In connection with the Deerhurst Shelter, Sala incurred the following expenses:

| | |
|---|---:|
| (1) Legal fee paid to Brown & Wood LLP for Ruble Opinion | $75,000 |
| (2) Incentive and Management Fees | 56,021 |
| (3) Additional legal fees | 5,770 |
| (4) Tax preparation fees | <u>25,000</u> |
| **TOTAL** | **$163,031** |

Geier Decl. Exs. U, V.

Therefore, at its conclusion, Sala deposited $8,925,000 and incurred fees of at least $163,301 to generate a "profit" of $65,496.  Geier Decl. Ex. W.  Taking into account only the incentive and management fees, Sala incurred costs of $56,021 to generate a $65,496 profit.

---

[10]    Sala's S corporation, Solid Currencies, was created on November 8, 2000, two weeks before the long and short positions were acquired.  Geier Decl. Ex. T.

Sala negotiated a reduced management fee in exchange for giving up an additional 50% of his profits in the incentive fee.  Geier Decl. Exs K at 49, 59-61; Y.  The management fee charged (on 4 times the deposited funds) was not consistent with industry practice and was excessive. Sala knew this; his counsel told him.  Geier Decl. Ex. H at 95.  Had Sala's funds been placed in an interest-bearing account during this same period (October to December), interest alone would have accounted for $50,000 of these "profits."  DeRosa Decl. ¶ 4(f).

Sala paid $728,000 in return for long and short options said to generate $60 million in tax deductions, which offset his entire ordinary income for that tax year. Sala's potential for economic gain on these offsetting options was somewhere in the range of $550,000.  DeRosa Decl. ¶ 4(b).  Sala's total risk was equal to his net cost of $728,000.  *Id.*  However, because these options created a $24 million tax loss, he was guaranteed a profit.

3.   Larry Nemirow

Sala retained attorney Larry Nemirow ("Nemirow") to advise him on his decision to enter the Deerhurst Shelter.  Nemirow was recommended by Raby.  Geier Decl. Ex. H at 15-16, 81-82. Nemirow made it clear to Sala that his role as a legal advisor would be very limited.  *Id.* at 73-75, 152-53.  Nemirow did not provide Sala with a recommendation on the merits of the tax losses.  *Id.* at 73-75.  Instead, he agreed to review the Ruble Opinion and advise Sala whether the opinion could protect Sala from penalties should the transaction be challenged by the IRS.  *Id.* at 15-16, 81-82.

Nemirow was not aware that Raby was to be compensated based upon the amount of Sala's tax losses and indicated at his deposition that such a fact would have been important for him to know.  Geier Decl. Exs. H at 106; K at 14-15, 27-28.  Nemirow also expressed his

concern over the fee structure.  *Id.* at 95.  Nemirow was also concerned about whether the S

corporation used to generate the tax benefits actually shielded Sala from personal liability. *Id.* at

68-70.

      4.      <u>IRS Notice 2000-44</u>

      IRS Notice 2000-44 ("the Notice"), was issued in August, 2000, and was reviewed by

Sala before entering the Deerhurst Shelter.  Geier Decl. Ex. Z.  The Notice describes "certain

transactions that were being marketed to taxpayers for the purpose of generating artificial tax

losses."  In one variant a "taxpayer purchases and writes options and purports to create

substantial positive basis in a partnership interest by transferring those option positions to a

partnership."  The Notice advises that the partnership may engage in other investment activities

as well.  According to the Notice, the faulty tax claim is that the taxpayer's basis is increased by

the cost of the purchase options (the long options) but not decreased by the assumption of

taxpayers obligation under the sold options (the short options).  The Notice then states that the

described transaction as well as "transactions that are the same as or substantially similar to the

transactions described" are "listed transactions" under IRC § 6011(a) and are therefore required

to be registered with the IRS.

      The relevance of Notice 2000-44 is Sala's testimony regarding it.  According to Sala, the

only conversation he had with anyone regarding the impact of the Notice on the Deerhurst

Shelter was with Schwartz, and that Schwartz advised him that the Notice did not apply.  Geier

Decl. Ex. E at 99, 134.  Contrary to Sala's testimony, Nemirow testified at his deposition that he

advised Sala that the Notice did in fact apply to the Deerhurst Shelter and cautioned him about

this.  Geier Decl. Ex. H at 72-73.  Before consulting with Nemirow, Sala was told by the law

firm Wilkie Farr & Gallagher that the Deerhurst Shelter was simply too close to the facts contained in the Notice.  *Id.* at 58-59.

## LEGAL STANDARD

Summary judgment is available only in cases where there are no material issues of fact and a formal trial would be fruitless.  *Webbe v. McGhie Land Title Company*, 549 F.2d 1358, 1361 (10th Cir. 1977); *Machinery Center, Inc. v. Anchor Nat. Life Ins. Co.,* 434 F.2d 1, 6 (1970); *Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir. 1966).  As provided in Federal Rule of Civil Procedure 56(c) a motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  A motion for summary judgment should be granted only when the moving party has established the absence of any genuine issue as to a material fact.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The Court must examine the summary judgment papers in the light most favorable to the party opposing the motion.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Webb v. Allstate Life Insurance Co.*, 536 F.2d 336, 339-40 (10th Cir. 1976).  All the ambiguities and disagreements must be resolved in favor of the party against whom summary judgment is sought.  *Webb v. Allstate Life Insurance Co.,supra*.  And where different ultimate inferences may properly be drawn, the case is not one for summary judgment.  *United States v. Diebold*, 369 U.S. 654, 655 (1962).  Summary judgment is generally not appropriate when the unresolved issues are primarily factual.  *Machinery Center, Inc. v. Anchor Nat. Life Ins. Co.*, 434 F.2d at 6.

## ARGUMENT

### PLAINTIFFS ARE NOT ENTITLED TO A REFUND OF EXCESS INTEREST BECAUSE THIS IS A CASE INVOLVING FRAUD.

The Internal Revenue Code imposes interest on all unpaid federal income tax liabilities. I.R.C. § 6101(a). The purpose of charging interest on the underpayment of taxes is similar to the purpose that a bank charges interest when a loan is made: interest is a form of compensation for the use of money. *United States v. Childs*, 266 U.S. 304, 307 (1924); *see also Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 565-66 (1950) ("the taxpayer, by its failure to pay the taxes owed, had the use of funds which rightfully should have been in the possession of the United States"). Interest is not a penalty. *See Avon Products, Inc. v. United States*, 588 F.2d 342, 343 (2nd Cir. 1978) ("it is a clearly established principle that interest is not a penalty but is intended only to compensate the Government for delay in payment of tax").

Section 6404 of the Code allows taxpayers relief from interest charges in limited circumstances. At issue here is section 6404(g), which suspends interest if the IRS does not provide a taxpayer, within 18 months of the filing of the return, a notice advising it of the tax due. This section was added to the Code in 1998, and in appears that Congress was concerned that, under then-present law, interest accrued "without regard to whether the taxpayer [was] aware that there is tax due." H.R. Conf. Rep. No. 105-599 at 259 (1998). Presumably, if a taxpayer was aware of the tax due, he could immediately pay it so that interest would not unnecessarily increase the total amount of the liability. However, interest is not always suspended under section 6404(g).

For example, in a case involving fraud, such as this one, taxpayers must pay the resulting

interest even if the IRS does not advise them of the increased tax liability until after 18 months has passed.  26 U.S.C. § 6404(g)(2)(B).  The Government contends that whether this is "a case involving fraud" will require the Court to hear evidence and make particular findings of fact. Since an inquiry into fraud is necessarily one that is fact intensive, it is an issue that is ill suited for disposition by summary judgment.  Plainly there are facts in dispute, and a trial will be necessary to resolve those disputes.

### A.  The Deerhurst Shelter Lacked Economic Substance

A transaction will be accorded tax recognition only if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached."  *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-84 (1978).  It is well established that transactions having no appreciable effect, other than tax reduction, on a taxpayer's beneficial interest will not be recognized for tax purposes.  *See Knetsch v. United States,* 364 U.S. 361, 366 (1960).

In *Frank Lyon Co.*, the Supreme Court set out a two-pronged test which required that a transaction show economic substance by (1) having an objective economic profit potential, and (2) being compelled by business or regulatory realities expressing tax-independent considerations, such that it is not shaped solely by tax-avoidance features having "meaningless labels attached."  *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985) *(construing Frank Lyon Co.*, 435 U.S. 561).  However, the Tenth Circuit's view holds that "the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects

other than the creation of income tax losses." *James v. Commissioner*, 899 F.2d 905, 908-09 (10th Cir. 1990), *citing Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988), *cert. denied*, 488 U.S. 824 (1988).

The courts, including the Tenth Circuit, recognize that in making an economic substance determination, the court should focus upon the activity that actually created the tax deduction, and not the window dressing that hid it.  *Klamath Strategic Investment Fund v. United States*, 2007 U.S. Dist. LEXIS 6939 at *26 (E.D.Tex. 2007) ("When applying the economic substance doctrine, courts emphasize that the transaction to be analyzed is the particular transaction that gives rise to the tax benefit, and not collateral transactions which do not produce [the] tax benefits"); *James*, 899 F.2d at 910 ("The only transactions at issue in this case are the purported sales by the Communications Group to the joint ventures.  These sales cannot be legitimized because they are on the periphery of some legitimate transactions"); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356-57 (Fed. Cir. 2006), *pet. for cert. pend'g*, No. 06-659 (S. Ct.) ("the transaction to be analyzed is the one that gave rise to the alleged tax benefit").  *See also Black & Decker Corp.*, 436 F.3d 431, 441 (4th Cir. 2006); *Nicole Rose Corp. v. Commissioner*, 320 F.3d 282, 283-84 (2d Cir. 2002); *ASA Investerings* Partnership, 201 F.3d 505, 514 n.6 (C.A.D.C. 2000); *ACM Partnership v. Commissioner*, 157 F.3d 231, 260 (3d Cir. 1998).  Here, the transaction to be focused upon is the one generating the tax losses: the specific transaction occurring from October to December 2000, involving the entering into, the transfer, and the sale of the options, as well as the liquidation of the general partnership and S corporation used to artificially inflate Sala's tax basis.

To begin, we point out that the Court must construe the facts in favor of the United States, the non-moving party. While Sala will undoubtedly argue that the Deerhurst Shelter had economic substance, the evidence, including the report of David DeRosa establishes that it does not. For the purposes of this motion, the Court must resolve this disputed matter in the favor of the United States.

In determining a transaction's business purpose, the Court focuses on whether the entities used actually served any business need or whether it was "essentially wasteful activity," the only purpose of which was the generation of tax losses. *ASA Investerings*, 201 F.3d at 512-517. As the D.C. Circuit wrote, "In order to satisfy the legal test for this kind of partnership, [there must be] a non-tax business purpose need for the partnership in order to accomplish the goals of the partners." *See Boca Investerings Partnership v. United States*, 314 F.3d 625, 632 (C.A.D.C. 2003). This analysis includes the consideration of whether the stated non-tax business purposes could have been achieved outside the S corporation or general partnership. *See, e.g., ASA Investerings*, 201 F.3d at 517; *Boca Investerings*, 314 F.3d at 632; *accord Andantech,* 331 F.3d 972, 980 (C.A.D.C. 2003) ("Although it is possible that the computer leasing business could have been profitable and beneficial to any of the parties involved, there was no evidence of a non-tax need to form the partnership in order to take advantage of the potential profits of the business"); *Saba Partnership v. Commissioner*, T.C. Memo 2003-31.

Sala claims that he contributed his test account to his S corporation "for substantial non-tax business reasons, including the use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst." Geier Decl. Ex. I, p. 4. The Ruble Opinion states that the S corporation was to be used for purposes of

protecting Sala from liability stemming from the account being traded at three times leverage. *Id.* This purported reason is utterly false. In fact, the account was not traded at three times leverage, and the S corporation afforded Sala no protection at all. Instead it was needed for its ability to artificially inflate the basis in the option trades for purposes of generating massive tax losses.

First, the S corporation account was never traded with leverage. *Id.* at p. 34. Second, the 23 basis trades underlying the tax deductions in question were not entered into within the S corporation; in fact, Sala entered into them personally. Geier Decl. Ex. I, pp. 2-3. Because he entered into those trades in his own name, not that of his S corporation, Sala himself was ultimately liable for those trades.[11] The fact that Sala transferred them to the S corporation does not lessen his liability. Third, even had the S corporation been liable on those trades, Sala's own tax counsel doubted the validity of any protections afforded by the S corporation. Geier Decl. Ex. H, pp. 68-70. Even having this information before he entered the transaction, Sala did nothing to remedy these faults. Instead, he intended to and did proceed through the tax shelter's steps as set forth by the promoters.

Similarly, the Deerhurst Investors General Partnership (the "general partnership") was a sham created for tax purposes. Indeed, Schwartz admitted that the general partnership was used for the generation of the ordinary tax losses, and that everyone who wanted an ordinary tax loss went into the general partnership. Geier Decl. Ex. D, pp. 131-134. The marketing materials also made this clear. In fact, those marketing materials clearly state that the buy-in was 15% of the

---

[11]     However, because of the offsetting nature of the options used to generate the massive artificial losses in this tax shelter, Sala's ultimate liability was capped at the net premium of the long and short options.

expected tax loss if an ordinary loss is desired, and 10% of the expected tax loss if a capital loss was desired—clearly evidence of the true nature of the transaction, and of the reason for the partnership.  Geier Ex. C. at 234.

Furthermore, the general partnership did not itself provide any further profit potential to Sala on the contributed trades—the profit potential on the offsetting options was no greater inside the partnership than it was outside.  In fact, the business purpose for even trading with Deerhurst was questionable, to say the least.  In contravention to industry standards, its fees were calculated as a multiple of the leveraged trading size of the account,[12] and were not based upon the actual dollars present in the account.  DeRosa Decl. at Ex. 1, p. 40.  Fully realizing that the putative partnership would also appear highly suspect, the promoters, as early as the design stage, manufactured a list of alleged business purposes for the general partnership.  Geier Decl. Ex. B; C; I at p. 1-4.  As will become clear at trial, each is totally contrived and utterly meritless. The general partnership was used solely for its ability to generate massive sham tax deductions.

For example, Sala implausibly claims that value was created from centralizing the various partners' offsetting options.  Geier Decl. Ex. I, p. 2.  But, Krieger, the trader who oversaw all the trading testified that it did not matter to him, or to his trading style, whether the accounts were held individually, in an S corporation, or in a general partnership.  Geier Decl. Ex. Q at 176.  Rather, he traded the body of funds as one economic unit without distinction, and simply allocated trades to each partner's account based upon partnership percentage.  *Id.*

---

[12]     While the accounts were never actually leveraged, Sala agreed to being charged fees as if the accounts were leveraged at 3x nominal and 4x nominal, such that he was incurring management fees of 3% to 4%, and incentive fees of 30%—giving away much of any possible profit.  As testified to by the United States' expert witness, such fees are highly irregular for the industry.  DeRosa Decl. Ex. 1 at p. 40.

Moreover, the option trades used for the creation of the tax loss were entered into while the accounts were held in the individual investor's hands and simply transferred to the general partnership—those trades were not entered into by the general partnership. Thus, the existence of the general partnership was inconsequential for purposes of the tax basis trades, instead it was useful solely for the tax benefits a general partnership is alleged to have created through application of the tax basis rules. Accordingly, there were no economies of scale by moving the trades into a general partnership.

The promoters also developed a contrived reason for the liquidation at the end of the transaction. That liquidation was needed in order to pass the artificial tax losses back to the taxpayer. Geier Decl. Ex. B at ¶8. Sala's litigating position, and the position set forth in the Ruble Opinion, is that it was necessary to liquidate and hold foreign currencies at the end of the year due to illiquidity and volatility in the markets. Geier Decl. Ex. I, p. 3. However, the trader in charge of all the trading activity was entirely unaware that this was the purported reason for the liquidation, and first testified instead that there was absolutely no reason to go to cash at the end of the year—the currencies were liquid and volatility was simply not a concern. Geier Decl. Ex. Q, pp. 234-35. The trader attempted to reshape that testimony and stated that it was too cumbersome to transfer actual positions from the S corporations into Deerhurst Trading LLC, the entity that was to begin operation in the following year, and thus zeroed out the accounts to cash. *Id.* However, this argument is belied by the fact that both the S corporation and the general partnership were set up with the partners transferring in actual trades—the long and short options in addition to cash. In fact, each of the 30 participants in the tax shelter purchased and contributed their basis trades to the partnership. *Id.*

We know that these entities were necessary in order to create the massive artificial losses that Sala sought.  We know that the entities were liquidated once the tax losses were generated, and in fact were only in operation for less than 60 days.  Geier Decl. Ex. I, p. 2-3.  We know that the stated reason why a general partnership was necessary to the transaction was false: Krieger traded these funds as an aggregate lump sum no matter how the funds were actually held by the individual investor.  We know that the stated reasons why the S corporation was needed for the transaction were false: Sala had no liability protection in the tax trades because he entered into them personally, not through his S corporation.  We also know that while it was stated that leverage would be increased once the S corporation was used, there was never any increase in leverage, and in fact, no leverage was employed.  DeRosa Decl. at ¶4(a).  We also know that Sala was trading on his own in a Deerhurst account before he transferred his cash and positions to the S corporation and general partnership.   Geier Decl. Ex. I p. 1-2.  It is clear that Sala could have, and in fact did, accomplish his trading purpose outside of these entities.  In fact, Sala could well have kept trading in his personal account.  However, he would have had the same economic result and incurred far fewer costs; but of course *without* the massive artificial tax losses.

We also know that Sala was in the transaction to get a tax loss.  He spent a year shopping around for a tax loss.  He signed paperwork to enter one abusive tax shelter but then backed out after Notice 2000-44 was released.   Geier Decl. Ex. CC.  We know that Sala knew the transaction was not supported.  When Sala entered the Deerhurst Shelter it was contrary to the advice of both Willkie Farr & Gallagher LLP and Nemirow, his counsel.  Geier Decl. Ex. H, p. 58-59.  Even though he purported to be projecting big gains, Sala entered a side agreement in which he could get out of the shelter at any time, not if his profits did not materialize, but if the

tax loss did not materialize.   Geier Decl. Ex. O.  Sala reviewed financial statements only once in 2000–the first week the transaction started.  Furthermore, Sala knew that this transaction was set up from the beginning to generate a tax loss in 2000.  Indeed, the marketing materials show that the buy-in price was 15% of the tax loss desired.  Geier Decl. Ex. K at 166-68.

In sum, Sala gained nothing of substance by transferring his offsetting options to the S corporation and then to the general partnership, other than the sham tax deductions.  The transfers offered no liability protection for the basis trades, no economies of scale, no lower fees, nor did the transfers offer any economic benefit other than the sham tax deductions.  Instead, it left the fundamental economics of the original offsetting options in place, while adding large fees and an enormous, fictitious tax benefit.  In fact, Sala, his two colleagues who also entered this transaction, his personal tax lawyer, and the promoters were all told that the tax losses would be created in 2000, before anyone entered the transaction.  Geier Decl. Exs. F at 87-88, 138-39; G at 16-17, 38-39.  The Deerhurst Shelter was a sham from the start, and it required the use of an entity that could be used to create and then transfer the inflated basis back to the taxpayer.  *See Keeler v. Commissioner*, 243 F.3d 1212, 1218 (10th Cir. 2001) (finding that the deliberate incurrence of first year losses may be an indication that a transaction lacks economic substance, and thus will not be accorded tax recognition); *Bohrer v. Commissioner*, 945 F.2d 344, 348 (10th Cir. 1991); *Miller v. Commissioner*, 836 F.2d 1274, 1277 (10th Cir. 1988).

With regards to the determination of objective economic profit potential, the courts make it clear that merely engaging in business activity is not sufficient.  *ASA Investerings*, 201 F.3d at 512.  The pursuit of business activity in furtherance of tax avoidance "is no more a business purpose than actually engaging in tax avoidance."  *Id.* at 514 n.6.  This principle was recently

reaffirmed by the Second Circuit, which stated, "[t]he IRS's challenge to the taxpayer's characterization is not foreclosed merely because the taxpayer can point to the existence of some business purpose or objective in addition to its tax-avoidance objective." *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231 (2d Cir. August 3, 2006) (internal citation omitted). A *de minimis* business purpose will not validate a partnership whose true purpose was the generation of tax deductions. *ASA Investerings*, 201 F.3d at 513.

The Supreme Court takes the view that "a transaction will be disregarded if it did 'not appreciably affect [the taxpayer's] beneficial interest except to reduce tax.'" *ASA Investerings*, 201 F.3d at 516, *quoting Knetsch v. United States*, 364 U.S. 361, 366 (1960). The Tenth Circuit finds this same comparison is relevant to the transaction's economic substance. *Keeler*, 243 F.3d at 1214-15 (noting the "hefty opportunities for tax savings" and that the profit potential appeared "anemic beside the[] considerable capacity for tax gaming"); *Bohrer*, 945 F.2d at 348 (holding that the existence of some potential for profit does not foreclose a finding of no economic substance); *see also Keeler*, 243 F.3d at 1218 (finding in a straddle case that deduction of several million dollars in losses distorted the taxpayer's economic results and violated the principle that tax advantages must be linked to actual losses), *citing Gregory v. Helvering*, 293 U.S. 465, 469 (1935) and *Bohrer*, 945 F.2d at 347.

In this tax shelter, Sala paid $728,000 in return for long and short options said to generate $60 million in tax deductions, which offset his entire income for that tax year. Sala's potential for economic gain on these offsetting options was somewhere in the range of $500,000, or about 0.83% when compared to the non-economic losses he claimed. DeRosa Decl. at ¶4(b). The transaction made only $65,000 in 2000, but Sala's fees to set up the deal were over $165,000,

and had Sala simply put this money into an interest bearing account, he would have made at least $50,000.  DeRosa Decl. at ¶4(f).  The objective economics simply do not exist.  When Sala's pre-tax profit potential is examined, including the actual profit made, it is orders of magnitude less than the risk-free sham tax losses the deal created.  This transaction was not set up for investment gains.  It was set up to create artificial, paper tax losses.

According to Sala, and despite his investment acumen, his ability to forecast financial returns for Wall Street, and his personal knowledge of the foreign currency markets, he really and truly believed that he would reap economic returns in excess of 60% and perhaps even 75% each year, year over year, throughout the next five years, and therefore he would achieve earnings in excess of the windfall from a $60 million tax deduction.  Geier Decl. Ex. E, p. 90-91.  But there is almost no likelihood of hitting those percentages, year over year.  In fact, Sala's own expert testified that even hitting 40% per year, year over year for five years, was something less than 1%.  Geier Decl. Ex. X at 78.  Looking to the actual numbers, from October 23, 2000 through December 21, 2000 (when the tax losses were purportedly generated), Sala's funds grew less than 0.73%, inclusive of interest.  ($65,000/$8,925,000 x 100)  The transaction had no objective economic substance.

### B.  Sala Filed a False or Fraudulent Return With the Intent to Evade Tax

The legal standard applicable to deciding whether a case is "a case involving fraud" under Section 6404 has not been addressed by any court.  However, the issue of what constitutes fraud, or at least what constitutes a false or fraudulent return, has been addressed by many courts in tax cases and such cases may offer guidance here.  For example, IRC § 6501(c)(1) provides for an exception to the period of limitations for the assessment of a tax liablity in the case of "a

false or fraudulent return with the intent to evade tax."  The cases interpreting this provision

establish that fraud is often proved by circumstantial evidence and reasonable inferences from

the facts.  *Petzodt v. Commissioner*, 92 T.C. 661, 669 (1989).  Fraud  may also be inferred "from

any conduct, the likely effect of which would be to mislead or conceal."  *Spies v. United States*,

317 U.S. 492, 499 (1943).

Whether fraud exists is a factual determination that must be made after reviewing the

particular facts and circumstances of the case.  *Upshaw's Estate v. Commissioner*, 416 F.2d 737,

741 (7th Cir. 1969); *DiLeo v. Commissioner*, 96 T.C. 858, 874 (1991); *Petzoldt v. Commissioner*,

92 T.C. 661, 669 (1989).  The critical inquiry is whether the taxpayer intended to evade taxes

that he knew or believed he owed.  *Granado v. Commissioner*, 792 F.2d 91, 93 (7th Cir. 1986);

*Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968).  Since direct evidence of fraud is

rarely available, fraud may be proved by various kinds of circumstantial evidence and reasonable

inferences from the facts.  *Edelson v. Commissioner,* 829 F.2d 828, 832 (9th Cir. 1987); *Bussell*

*v. Commissioner*, T.C. Memo. 2005-77 (2005); *see also Spies v. United States*, 317 U.S. 492,

499 (1943); *Stephenson v. Commissioner*, 79 T.C. 995 (1982).[13]

---

[13]    Plaintiffs have argued that because the IRS did not assert that plaintiffs filed a false or fraudulent return with an intent to evade tax that the United States cannot so argue now. Plaintiffs are incorrect.  A refund case proceeds by *de novo* review.  *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932) ("the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax," and that "involves a redetermination of the entire tax liability.").  It is immaterial whether or not the IRS determined fraud at the administrative level. *R.E. Dietz Corp. v. United States*, 939 F.2d 1, 5 (2d Cir. 1991) ("The factual and legal analysis employed by the [IRS] is of no consequence to the district court." "'[T]he court does not sit in judgment of the [IRS]; the court places itself in the shoes of the [IRS],'" *quoting National Right to Work Legal Def. & Educ. Found. v. United States*, 487 F.Supp. 801, 805 (E.D.N.C. 1979).
      Since this Court must reach its own conclusion on whether plaintiffs are entitled to a refund, anything the IRS did or did not consider is immaterial.  *Associated Wholesale Grocers, Inc. v. United States*, 1989 U.S.Dist. LEXIS 14047 at *4,5 (D. Kan. June 7, 1989).  The particulars of the contents of the IRS's administrative record are irrelevant, because the

To that end, courts have developed a nonexclusive list of factors, or "badges of fraud," that demonstrate fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992). These badges of fraud include: "(1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash." *Jondahl v. C.I.R.*, at *8. The factual record reveals that several badges of fraud are present in this case.

1. Sala's Explanations for His Decisions and Actions in Connection With Deerhurst Shelter are Implausible or Inconsistent

a. *Sala's negotiated fee structure is inconsistent with his projected profits.*

Sala testified that based upon his own projections he believed that his returns on the Deerhurst Shelter would be in excess of 60% each year for five years. Geier Decl. Ex. E, pp. 90-91. This sky-high projection is implausible not only because it is plainly unreasonable to expect such consistently huge returns from any investment, especially one where the investment is in a volatile and discretionary trading strategy, but also because the fee structure Sala demanded contradicted this "belief."

---

government is not bound in this lawsuit by the IRS's findings and conclusions, or lack thereof, at the administrative level. *Blansett v. United States*, 283 F.2d 474, 477 (8th Cir. 1960); *see also Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 328 (1974) (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level"). The United States may defend this tax refund suit upon any legal ground, even if that legal ground was not considered or relied upon by the IRS at the time it reviewed the underlying returns and made its assessments. *Blansett*, 283 F.2d at 477.

Sala renegotiated the Deerhurst fee structure from "2 and 20" to "1 and 30." Geier Decl. Ex. K at 48-49. Sala was willing to give up an extra 10% of his expected nearly $100 million in profits because he did not truly believe that these profits would materialize. Further, Sala purported to make his demand for a new fee structure without first projecting its financial impact upon him. Geier Decl. Ex. E, p.120. Instead, Sala implausibly explained that he was willing to give up an additional 10% of his expected spectacular returns because he would be content to have made such huge gains and that this fee structure would work as an incentive to Deerhurst. Geier Decl. Ex. K, pp. 48-49. In fact, the only plausible explanation for Sala's demand that Deeerhurst accept more of his profits for less of a management fee, was that he never expected a large profit and wanted to reduce the costs of the transaction. Moreover, the trades for all the participants were made together so the trader had no incentive to treat Sala any differently. Geier Decl. Ex. Q, p.176. Sala, an extremely sophisticated investor, who had convinced major Wall Street brokerage firms to compete for his business one trade at a time, certainly would not agree to pay Deerhurst even a single dollar more than he had to.

> b. *Sala's demand for an exit strategy is wholly inconsistent with his expressed motives for participating in the shelter.*

Sala's explanation that he was motivated by profits and not by the tax consequences of the transaction is belied by his demand to be able to exit from the transaction if either a tax opinion could not be obtained (by March 8, 2001) or the tax positions did not withstand IRS scrutiny (at anytime). Geier Decl. Ex. K at 234; O at 72. Not surprisingly, Sala made no similar demand should the profits not meet his "reasonable expectations." If this transaction truly was, as Sala testified, driven by the potential for profits, then whether or not the tax loss was valid

certainly would not cause him to plan for a premature exit from the transaction and therefore forgo the substantial economic benefits he projected.

### c. Sala's behavior regarding the test period makes its stated purpose implausible.

If the test period truly permitted Sala to evaluate the transaction before committing additional funds as Sala explained, then his failure to review the trading activity during the test period before increasing his $500,000 initial investment by a factor approaching 17 cannot be explained without reference to the expected tax benefits, which required that Sala first acquire positions in his own name (i.e., the test period) so that he could contribute the positions to a new entity and generate the tax basis in a manner that the marketing materials dictated.  Geier Decl. Ex. B at 231.  The contribution of $8,925,000 in cash, instead of that sum in the form of offsetting options, which were acquired at a net cost of $728,000, would not allow Sala to argue that he was entitled to a tax basis of $60 million in the S corporation.  That is, the tax benefits were dependent on Sala first acquiring the options in his own name, and the test period was critical to accomplishing that step.  As explained, the S corporation offered no benefit to Sala in this transaction.

Further, given Sala's due diligence in vetting this transaction, it is not plausible that Sala failed to pay close attention to the trading activity and profits before deciding to deposit an additional $8,425,000 in late November unless the trading activity and profits were inconsequential to him.  His failure to do so can only be explained in light of the tax loss that was to be generated by year's end.

> *d. Sala's expressed concerns about personal liability are inconsistent with his actions.*

The stated reason for creation of the S corporation was to shelter Sala from personal liability. However, had Sala truly believed that he had personal exposure, he would not have permitted the options to be first acquired in his own name, especially since the S corporation had been formed weeks earlier purportedly to shield him from personal liability. Sala's counsel, Nemirow, knew that the S corporation did not serve its stated purpose and Sala knew this as well.

> *e. Sala made representations to this Court and the IRS that are inconsistent with what actually occurred in the Deerhurst Shelter.*

Sala's declaration states that he, through his S corporation, only received foreign currency back from the partnership. Docket Entry No. 32, Sala Declaration at ¶8(h). The Ruble Opinion also states that only individual foreign currency trades were transferred back from the general partnership upon liquidation. Geier Decl. Ex. I, p. 3. The Ruble Opinion states that this type of property transfer is required for the tax benefits to be created. *Id.* at 52-53. However, Sala's own brokerage statement for his S corporation clearly states that $9,029,569.65 in U.S. dollars was transferred back to him. Geier Decl. Ex. BB at 892. Both at the time Sala signed his return, as well as at the time Sala signed his declaration, he knew that in fact he had received his entire partnership interest in U.S. dollars, not foreign currency.

## 2. Intent to Mislead Can be Inferred From Sala's Pattern of Conduct.

Sala's intent to evade tax can be inferred from his pattern of conduct in both seeking out the Deerhurst Shelter and in the reasons he selected the Deerhurst Shelter. Sala spent the end of 1999 and the better part of 2000 traveling the country searching for a tax shelter in which he, White, and Dice could participate. Sala's investigation included his consideration of several

shelters, including BLIPS, OPIS, and an option strategy.  There is evidence that Sala also was presented a "Jones Day" transaction that was rejected because the involved law firm was getting "cold feet."  *See supra* p. 4-6.

Sala testified that Schwartz informed him that IRS Notice 2000-44 did not apply to the Deerhurst Shelter and therefore did not register the Deerhurst Shelter as a listed transaction and the IRS was never notified of Sala's participation in the Deerhurst Shelter.  Geier Decl. Ex. E at 99, 134.  Even though Sala was advised by counsel that in his view the terms of the Notice describe the Deerhurst Shelter, Sala knew that Deerhurst would not report the transaction to the IRS.  Geier Decl. Ex. E at 99, 134.  This was of such great importance that he backed out of a BLIPS shelter transaction described in IRS Notice 2000-44.  *Id.* at 74-75.  The only reasonable explanation for this sequence of events is that Sala wanted to conceal his participation in the Deerhurst Shelter because he knew the revelation of such to the IRS would hinder his effort.

3.  Sala's Testimony Lacks Credibility.

The testimony that Sala has provided in the course of discovery is not credible.  When considering an issue of fraud, the lack of credibility of a taxpayer's testimony and the inconsistencies in his testimony are heavily weighted factors.  *Toussaint v. C.I.R.*, 743 F.2d 309, 312 (5th Cir. 1984).

Sala testified that he never told Raby that he wanted to participate in a tax shelter.  Geier Decl. at Exs. E at 66, 77; L at 74-76.  However, Raby knew to refer Sala to Schwartz who was recruiting participants for the Deerhurst Shelter.  Geier Decl. Ex. L at 44.  Sala also testified that when he actually went to meet with Schwartz in New York that he knew nothing about the Deerhurst Shelter or the possible advantages it might present for him.  Geier Decl. Ex. E at 103-

105.  It stretches the bounds of logic and reason to believe that Sala would alter his business schedule to meet with someone he did not know, for reasons not disclosed to him, to discuss a concept that Sala did not have the slightest bit of information about.  Yet, this is exactly what Sala would have the Court believe.

Sala also testified that he did not discuss tax shelters or his personal finances with Henderson at their first meeting.  Geier Decl. Ex. E at 60-63.  That is untrue.  Henderson sent a follow-up email as a result of that meeting in which she discussed many specifics regarding Sala's personal finances, including his interest in two shelters, an "option strategy" and "OPIS." Geier Decl. Ex. M and its attached Ex. 155.

   *a.  Sala's testimony regarding IRS Notice 2000-44 is not credible*

Sala's testimony on the Notice is not credible.  According to Sala, the only conversation he had with anyone regarding the impact of the Notice as to the Deerhurst Shelter was with Schwartz.  Geier Decl. Ex. E at 99.  According to Sala, Schwartz advised him that the Notice did not apply.  Geier Decl. Ex. E at 134.  Sala would have this Court accept that he did not consult his specially retained tax counsel, Nemirow, on this critical point.  In fact, contrary to Sala's testimony, Nemirow advised him that, in his opinion, the Deerhurst Shelter fell within the plain terms of the Notice and cautioned him about this.  Geier Decl. Ex. H at 72-73.  Sala was also less than candid in his testimony because Nemirow was not the first counsel to have raised these concerns to him.  Prior counsel, Willkie Farr & Gallagher LLP, also expressed dissatisfaction with the Deerhurst Shelter because it was their belief that the Deerhurst Shelter was simply too close to those transactions described in the Notice.  *Id.* at 58-59.

4.  <u>Additional Factors Establishing Fraud.</u>

In addition to the enumerated "badges of fraud," a taxpayer's education and business background and the context of the events in question are also relevant to the determination of fraud.  *Bussell v. Commissioner*, at *11.  By all accounts, including his own, Sala is an extremely sophisticated investor who paid attention to all the details of financial transactions, both in his professional and personal life.  This is reflected clearly in his resume which boasts of his work as a mergers and acquisitions manager for Ernst & Young, his CPA license, and his extensive background in performing financial and legal due diligence.  Geier Decl. Ex. J.  Prior to the Deerhurst Shelter, Sala was savvy enough to require the large investment houses such as Goldman Sachs and Morgan Stanley complete for his business on a transaction-by-transaction basis.  Geier Decl. Ex. E, p. 39-41.  This was the education, experience, and sophistication that Sala brought to his year long quest to locate a tax shelter transaction.  This remarkable competence was also the reason that his fellow Abacus officers and friends, White and Dice, entrusted him with finding them the perfect tax shelter for their millions as well.  Sala used all the mental and financial resources available to him to further his objective to evade paying the tax he knew was due.

Also indicative of Sala's fraudulent intent was his affirmative representation that he agreed with the facts set forth in the Ruble opinion, and provided to Ruble a complete and accurate representation of the transaction.  Geier Decl. Ex. I, p. 4-5.  In fact, Sala was well aware that those facts were not accurate.

For example, Sala did not commit to a five year program and in fact, specially negotiated for and obtained the right to exit the transaction at any time should the tax treatment of the

- 33 -

transaction not withstand IRS scrutiny or during the lock-up period should he not obtain a satisfactory opinion letter.  Geier Decl. Ex. K at 234; O at 72.  Further, the Ruble Opinion did not describe that the participants were told that losses would be generated in 2000.  Moreover, the Ruble Opinion contained projections of profitability that were markedly different than even his own unrealistic projections.

Finally, given the emphasis on the structure of the transaction as contained in the Ruble Opinion, it is remarkable that the opinion does not address that the structure was contingent upon the character of the losses that the participant was seeking.  That is, the investors who sought capital losses, such as Sala's close friend White, were not participants in the partnership structure because the liquidation of the partnership was designed to generate ordinary losses. Thus, the suggestion that the general partnership was created to provide for less risk and economies of scale is simply not accurate.

In sum, the United States contends that the question of fraud is one that must be decided at trial.  This case involves a highly sophisticated taxpayer and a clever scheme designed to avoid taxes.  The evidence developed during discovery supports the United States' contention that this is "a case involving fraud" for the purposes of IRS § 6404(g).  Once the Court hears the testimony and receives evidence, it will be well-positioned to rule on the question of fraud. Certainly it is not an issue that should be resolved on a motion for summary judgment.

## **CONCLUSION**

For the reasons set forth above, plaintiffs are not entitled to a grant of partial summary judgment and a refund of over $1.5 million in interest under 26 U.S.C. § 6404(g)(2) because this case involves fraud.  Plaintiffs' motion should be denied.

Dated this 5th day of February, 2007.       TROY A. EID
United States Attorney

MARK S. PESTAL
Assistant United States Attorney


s/ David N. Geier
DAVID N. GEIER
ANTON L. JANIK, JR.  CO#35164
AMY MATCHISON
Trial Attorneys, Tax Division

U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone:    (202) 616-3448
             (202) 305-2558
             (202) 307-6531
Facsimile:    (202) 307-0054
Email:David.N.Geier@usdoj.gov

Street Address:         Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20001

CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on February 5, 2007, I electronically filed the foregoing UNITED

STATES' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

with the Clerk of Court using the ECF system which will send notification of such filing to the

following e-mail addresses:

> dhallett@chicoine-hallett.com
> jcolvin@chicoine-hallett.com

and I hereby certify that I have mailed or served the document to the following non

CM/ECF participants in the manner (mail, hand delivery, etc.)  indicated by the non-participants

name:

> Internal Revenue Service
> Office of Associate Area Counsel
> 701 Market Street, Suite 2200
> Philadelphia, PA 19106

> s/ Amy Matchison
> AMY MATCHISON
> Attorney for Defendant
> United States of America
> Trial Attorney, Tax Division
> United States Department of Justice
> Ben Franklin Station
> P.O. Box 683
> Washington, D.C. 20044-0683
> Telephone:      (202) 307-6531
> Facsimile:       (202) 307-0054
> Email:Amy.T.Matchison@usdoj.gov

> Street Address:          Judiciary Center Building
>                          555 Fourth Street, N.W.
>                          Washington, D.C. 20001