Carlos and Tina Sala v. United States of America

Civil Action No.  05-cv-00636-LTB

# Expert Report of David F. DeRosa, Ph.D.

December 13, 2006

# Expert Report

## Table of Contents

**INTRODUCTION AND SUMMARY**

Qualifications . . . . . . . . . . . . . . . . . . . . . . 3
Purpose of Report. . . . . . . . . . . . . . . . . . . 5
Disclosure Compliance. . . . . . . . . . . . . . . . . 6
Summary of Conclusions . . . . . . . . . . . . . . . 7

**THE FOREIGN EXCHANGE MARKET**

Overview of the Foreign Exchange Market. . . . . . . . 10
Market Conventions . . . . . . . . . . . . . . . . . 13
Spot Transactions. . . . . . . . . . . . . . . . . . 14
Forward Transactions . . . . . . . . . . . . . . . . 15
Options on Foreign Exchange. . . . . . . . . . . . . 17
Digital Options. . . . . . . . . . . . . . . . . . . 19
Foreign Exchange Option Spread Strategies. . . . . . . 20

**OPINIONS AND BACKGROUND FOR OPINIONS**

The Risk and Reward Potential of the Exhibit 1 Trades Was
Extremely Limited, and of Little Economic Value to Sala..22

Each Four-Sided Spread Position Was a Single Transaction,
Consisting of Offsetting Spread Positions. . . . . . . 25

Separating the Long Options from the Short Options in the
Exhibit 1 Trades Would Not Have Been Economically Feasible.
. . . . . . . . . . . . . . . . . . . . . . . . . . . .30

The Four-Sided Spread Positions Were Inconsistent with the
Manager's Historical and Promoted Trading Style. . . . . 33

The Liquidation of the Spread Positions in Early December
Was Highly Unusual Given the Diversity of the Currencies 38

The Management Fees Were in Excess of Industry Standards.40

The Trades Done in the Period October–December 2000 (Not
Including the Exhibit 1 Trades), and From January 2001 On,

in the Sala and Solid Currencies Accounts Were Unlike the 23 Exhibit 1 Trades. . . . . . . . . . . . . . . . . . . .44

There Was No Economic or Trading Purpose in Using an S-Corp or a General Partnership Structure for the Transactions in November-December 2000. . . . . . . . . . . . . . . . . .53

**Appendix A: Dr. DeRosa's Resume – Including Past Testimony. . 57**

**Appendix B: Documents Relied Upon . . . . . . . . . . . . . 62**

**Appendix C: Formulas for Calculation of Maximum Payoffs from**

**Spreads . . . . . . . . . . . . . . . . . . . . . . . . . . 65**

**Exhibit 1: Transaction Journal. . . . . . . . . . . . . . . 67**

**Exhibit 2: Risk Reward Table. . . . . . . . . . . . . . . . 68**

**Exhibit 3: USD Put/CHF Call Detail Analysis . . . . . . . . 69**

**Exhibit 4: Digital Option Substitute . . . . . . . . . . . .70**

**Exhibit 5: Comparison of Fee Structures, 1 year. . . . . . .71**

**Exhibit 6: Comparison of Fee Structures, 5 years . . . . . .72**

**Exhibit 7: December 2000 Deerhurst Foreign Currencies. . . .73**

# I. INTRODUCTION AND SUMMARY

## I.A   QUALIFICATIONS

I have had extensive experience with the international capital markets over the past thirty years and with managing and evaluating hedge funds over the past twelve years. I was a derivatives portfolio manager at Alliance Capital Management, a currency trader at Swiss Bank Corporation, and a hedge fund trader at Quadrangle Investments LLC. I am currently on the board of directors of six hedge funds, Rubicon Fund Management, BlueCrest Capital International, The Children's Investment Fund, GSA Capital International, Preston Capital Management, and the CCC Carbon Fund. The combined capital of these funds is approximately $25 billion.

I am the president and owner of DeRosa Research and Trading, Inc. DeRosa Research and Trading, Inc. is a member of the National Futures Association. I am an adjunct professor of finance at the Yale School of Management and Fellow of the International Center for Finance at Yale, where I have taught courses in

international finance, derivatives, and emerging markets financial policy since 1996. Among those courses are "Foreign Exchange and its Related Derivative Instruments" and "International Financial Markets."  I am also an adjunct associate professor of industrial engineering and operations research at Columbia University where I teach a course in foreign exchange and related derivative instruments.

I received my Ph.D in finance and economics from the Graduate School of Business of the University of Chicago and my A.B. in economics from the College of the University of Chicago. In addition to Yale and Columbia, I have served on the faculties of the Graduate School of Business of the University of Chicago, the University of Southern California, and Loyola University of Chicago.

I am the author of three books on foreign exchange derivatives: Options on Foreign Exchange, 2nd ed. John Wiley & Sons, 2000 (Japanese Language Edition, Toyo Keizai, Tokyo); Currency Derivatives, John Wiley & Sons, 1998; and Managing Foreign Exchange Risk, Revised Edition, Irwin / McGraw-Hill, 1996 (Japanese

Language Edition, Yuuhikaku, Tokyo). I am also the author of In Defense of Free Capital Markets: The Case Against a New International Financial Architecture, Bloomberg Press, January, 2001.

My full curriculum vitae is attached hereto as Appendix I. In my CV I have included my publications for the last 10 years as well as a list of trials, depositions and hearings where I have testified in the last 4 years.

I.B  PURPOSE OF REPORT

I have been asked by the Department of Justice to review, analyze, and write a report explaining the events that occurred in Carlos Sala's Deerhurst transactions.  At the direction of the Department of Justice, my review focused on account and trading activity, the potential for profit including the determination of maximum profit potential in 2000, whether the structures created to carry out the transactions provided any economic or financial advantage to Carlos Sala, the use of leverage, the purchase of long options, whether any potential return could have been achieved differently, and the

liquidation of positions in 2000.  I have also been asked to review the testimony given by Carlos Sala, Michael Schwartz, and Andrew Krieger, as well as representations contained in the Deerhurst marketing materials and in the Brown & Wood legal opinion letter.  All of my review and analysis are within my areas of expertise in the fields of foreign exchange trading, fund management, finance, and economics.

I.C  DISCLOSURE COMPLIANCE

Appendix B: Documents Relied Upon, lists the materials I have considered in preparing my report.

I have been compensated for my time in this case at a rate of $350 per hour.

I.D   SUMMARY OF CONCLUSIONS

My report addresses various transactions undertaken by Carlos Sala ("Sala"), Solid Currencies Inc. ("Solid Currencies"), Deerhurst Investors GP, as well as the trading of Deerhurst Management ("Deerhurst") and their broker Refco.  I have looked at trading activity entered on behalf of Sala from late October 2000 through December 2000, and from January 2001 to 2004. Included in this analysis are 23 trades which Deerhurst records indicate occurred in late November 2000.  These 23 trades are listed in Exhibit 1 (DH MSN 00002262) to this report, henceforth the "Exhibit 1 Trades."  The 23 trades consisted of the sale of 11 options (short transactions), and the purchase of 12 options (long transactions).  I will also refer to the subset of the Exhibit 1 Trades, where Sala purchased options, as the "long premium option trades."  The total cost of the long premium option trades was $60,987,866.79.

Overview of Events and Transactions

According to the documents provided to me, on October 23, 2000 Sala opened a trading account, titled "Carlos

Sala/Beckenham," at Refco with a deposit of $500,000. Deerhurst was given trading authorization.  For the next month, until approximately November 28, foreign exchange spot and forward, as well as foreign exchange option trades were executed for the account.  For the rest of 2000, trading for the benefit of Sala also took place in two other entities, the Solid Currencies account at Refco, and in the Deerhurst Investors GP account at Refco.

This report describes and analyzes the trading of Deerhurst on behalf of Sala during four periods: October 23 – November 30, 2000; December 1 – December 19, 2000; December 20 – December 28, 2000; and January 2001 to 2004.

It is part of my conclusion that the trades and trading style during the first three periods (in 2000) were often without economic purpose or substance, i.e., economic value, and unlike what was described in the Deerhurst promotional information (including DHSala00001801-1820 and DHSala00000220-278).

In this report, I will refer to 20 of the Exhibit 1 Trades comprising five four-sided spread positions – a term that I explain below.

Based on the analysis in this report, I conclude that:

- During October-December 2000, the trading strategy was extremely low risk and low reward; not likely to make meaningful returns compared to the money invested.

- Each four-sided spread position was a single transaction, consisting of offsetting spread positions.  Therefore, there was a net premium on each four-sided spread position.

- The spread positions in the Exhibit 1 Trades could not economically have been separated.

- The four-sided spread positions were inconsistent with the manager's historical and promoted trading style, as well as the trades that occurred after January 1, 2001.

- The liquidation and stated rationale of the Exhibit 1 Trades in early December 2000 was

highly unusual given the diversity of the currencies that comprised the trades.

- The management fees were far in excess of industry standards.

- The trades done in the period October-December 2000 (not included among the Exhibit 1 Trades), and from January 2001 to 2004, in the Sala and Solid Currencies accounts were unlike the 23 Exhibit 1 Trades.

- There was no economic reason or trading purpose in using an S-Corp or a general partnership structure for the transactions conducted in November-December 2000.

## II. <u>THE FOREIGN EXCHANGE MARKET</u>

**Overview of the Foreign Exchange Market**

The foreign exchange market is the largest of the financial and capital markets. The Bank for International Settlements in Basel publishes a triennial survey of the foreign exchange market. The

closest survey to the time of the transactions discussed in this report was in April 2001. The 2001 survey estimated the daily turnover in April 2001 for all foreign exchange trading was $1.2 trillion dollars.[1]

Foreign Exchange trading occurs 24-hours a day except on weekends. London, New York and Tokyo are the largest centers for foreign exchange trading yet trading takes place in dozens of small financial centers. The largest volume of trading is done in the interbank foreign exchange market, where wholesale buying and selling of foreign exchange and derivative instruments on foreign exchange takes place.[2] A small fraction of foreign exchange is traded on exchanges such as the Chicago Mercantile Exchange. In 2001, the total notional value of foreign exchange traded on the Chicago Mercantile exchange was $2 trillion – equivalent to less than two days of trading on the Interbank market.[3] The Interbank market has no centralized physical exchange trading floor (such as

---

[1] Bank for International Settlements _Triennial Central Bank Survey of Foreign Exchange and Derivatives Market Activity in 2001._ (Final global results March 2002). Basel. p. 1.
[2] op. cit.
[3] Chicago Mercantile Exchange 8K SEC Filing 12/6/02 p. 41

the New York Stock Exchange). Rather trading is
conducted through a network of dealers entering into
over-the-counter transactions with each other. Large
money-center banks and a handful of investment banks
dominate the trading. Over-the-counter transactions
are private transactions between two parties. The
terms of the transactions are governed by agreements
between the parties - typically in the form of an
International Swap and Derivatives Association
("ISDA") agreement or a Foreign Exchange and Options
Master Agreement ("FEOMA") (discussed in section III.C
below).[4]

The majority of trading in the foreign exchange market
is buying and selling U.S. dollars against other
currencies. The largest volume of trades is the dollar
against the euro. The second largest volume of trades
is the dollar against the yen. In 2001, 30.18% of all
foreign exchange trading was the dollar versus the
euro, 19.69% was the dollar versus the yen, and 2.56%
was the euro versus the yen.[5]

---

[4] See website of ISDA: www.isda.org.  See website of Federal Reserve
Bank of New York: www.ny.frb.org
[5] Bank for International Settlements Triennial Central Bank Survey of Foreign
Exchange and Derivatives Market Activity in 2001. (Final global results March
2002). p. 11

**Market Conventions**

The convention of the market is to quote the dollar in yen. Hence a quotation for dollar/yen ("USD/JPY") of 110.08 means that one dollar is worth 110.08 yen. When the euro trades directly against the yen ("EUR/JPY") it is quoted in yen. A quotation for EUR/JPY of 110.08 means that one euro is worth 110.08 yen. Market participants sometimes talk about foreign exchange "pips." A pip is the smallest unit of quotation in the foreign exchange market. In the case of USD/JPY one pip is $1/100^{th}$ of one Japanese yen. For instance, the spread strategy involving USD/JPY that is analyzed in this report has strike prices of 113.87 and 113.89 which traders would say was 2 pips wide.  While UDS/JPY and EUR/JPY are quoted to two decimal digits, EUR/USD is quoted in four decimal digits (e.g. 1.1010 – meaning that one euro is worth $1.1010).

Dealers quote foreign exchange in the form of bid prices and ask prices. The bid is where a dealer is willing to buy. The ask is where a dealer is willing to sell. The difference between the bid and the ask is called the "spread" or "bid-ask spread."

For example, a dealer might quote USD/JPY as 125.10 – 125.12. This means the dealer is willing to buy dollars (for yen) at 125.10 or, alternatively, sell dollars at 125.12.

**Spot Transactions**

The most basic transaction done in the foreign exchange market is called a spot deal. Spot deals in foreign exchange are done for a multitude of purposes, some commercial, some financial, and some pure speculation on the future direction of exchange rates. In a spot transaction, counterparties agree to exchange sums of different currencies at a time in the future called the value date. By market convention, spot value dates are two bank business days after the trade date. Local holidays do not count as valid value dates.[6] An example of a spot deal is a situation where a U.S.-based business sells tools to a company in Japan that pays in yen. The yen proceeds of the sale can be converted to dollars by doing a spot transaction. Yen would be sold for dollars for

---

[6] DeRosa, David F. <u>Options on Foreign Exchange</u>, 2nd ed. John Wiley & Sons, 2000.

settlement in two bank business days. The yen part of the transaction would be settled in Japan using a local bank. The dollar side would be settled in the United States.  In spot transactions, "trade date" is the date the parties agree to the transaction.  The "settlement date," or value date, is the date the parties exchange currencies.

**Forward Transactions**

There are also foreign exchange trades for extended settlement beyond the spot value day. These are called forward transactions. Forward foreign exchange is routinely quoted for value in one week, one month or even 12 months or even longer. Forwards are often employed by hedgers to manage foreign exchange risk. An example of a hedger would be a U.S.-based manufacturer who makes a deal to sell oil drilling equipment to a company in Japan.  The Japanese company agrees to pay the manufacturer 10 billion yen in one month's time. If the manufacturer wanted to "lock in" the proceeds of the sale -- so as to avoid the risk of the yen falling in value - he or she could do so by selling yen forward. This would immunize the manufacturer against fluctuations in the yen against

the dollar. At settlement, in one month's time, the forward deal would call for the manufacturer to deliver yen and receive dollars. The manufacturer would use the yen received from the sale of the drilling equipment to satisfy the forward transaction. Forward exchange rates, called "outrights," are quoted for every future valid spot value date for major currencies, such as the yen, the euro, the pound sterling, and the Swiss franc. Forward outrights necessarily differ from the spot exchange rate because of differences in the interest rates between the buying and selling currencies. By way of illustration, interest rates in Japan have been significantly lower than those in the United States over the past decade. The forward exchange rate for yen could not be the same as the spot exchange rate because that would guarantee a riskless but profitable arbitrage trade: Traders could borrow in yen (the currency with the lower interest rate) and invest in dollars (at the higher interest rate) and complete the transaction by hedging forward to eliminate currency risk from the equation. This would be a riskless yet profitable transaction, something that rarely happens in markets.

The market precludes this by setting the forward away from the spot.

## Options on Foreign Exchange

More relevant to this case are put and call options on foreign currencies. The vast majority of such options are traded on the interbank market. Most of the same banks and investment banks that deal in spot and forward foreign exchange also deal currency options. A call on a currency is the right but not the obligation to buy a specified amount of that currency (called the face amount) on or before the option expiration date at a fixed strike price. Likewise a put is the right but not the obligation to sell foreign currency. These standard options are called "vanilla" options to distinguish them from other forms of options, some of which are called "exotic" options. When a trader buys a call or put option, he or she pays the seller of the option a price, called the "premium." The seller of a call option is obligated to deliver the face amount of foreign currency in exchange for the option strike if the option owner chooses to exercise the option. Similarly, the seller of a put option is obligated to buy a sum of foreign currency in exchange for the

option strike if the option owner chooses to exercise the option.  In option transactions, "trade date" is the date the parties agree to the transaction.  The "premium settlement date," is the date the buyer pays the option premium.  "Expiration date" is the date the option expires.  "Expiration value date" is normally two bank business days after expiration and it is the date when the parties exchange currencies, if the option has been exercised.[7]

Most interbank currency options are "European" exercise, meaning the option can be exercised only in the final twenty-four hours of its life. At expiration a yen put is "in-the-money" if the "bid" for a spot exchange rate is above the option strike.[8] For example, suppose an investor held a yen put struck at 110.00 having a face of one million dollars (alternatively 110 million yen). If the spot exchange rate at expiration were quoted 120.00-120.05 the option would be "in-the-money."  The investor would be correct to exercise the option because it gave him the right to buy dollars (sell yen) at 110.00 which can in turn be

---

[7] op. cit.
[8] A currency call option that is in-the-money-forward refers to the case where the prevailing forward exchange outright exceeds the option strike.

sold at the bid price of 120.00. If the investor exercised the option, he would exchange $1,000,000 for 110 million yen (1,000,000 * 110). The investor could simultaneously purchase 110 million yen for $916,666.67 (110,000,000 / 120). The investor's gross profit, not counting the cost of the option, would be $83,333.33 ($1,000,000 - $916,666.67).

Most currency options expire at 10 AM EDT. This is called the "New York cut." The window for exercise on a European-exercise vanilla option is the last 24-hours of its life.

The Bank for International Settlements estimates that daily interbank trading in currency options was $60 billion in 2001.[9]

## Digital Options

A digital option (also sometimes called "binary option") is a cash settled lump-sum binary payoff option. This means that if the option is out-of-the-money at expiration it will pay nothing, but if it is in-the-money at expiration it will pay a fixed amount,

---

[9] op. cit., p. 18

the lump-sum, regardless of how far it is in-the-money.   This differs from a plain vanilla option in that the plain vanilla option will be worth more as it moves deeper into-the-money.

A digital option can be either American or European exercised.   It can also be either a put or call. Unlike vanilla options which may be exercised in the 24-hour period which precedes their 10:00am EST cutoff, digital options may only be exercised at exactly 10:00am EST on their expiration date. Regardless of its style or form a digital option will always produce one of two payoff scenarios: an at- or in-the-money cash prize, or, if out-of-the-money, zero.

**Foreign Exchange Option Spread Strategies**

There are many foreign exchange option strategies, but I would like to highlight the general category of spread strategies, as they are relevant to the opinions in this case.  By the term spread strategy I mean a transaction wherein an investor buys an option on a currency and simultaneously sells a second option

on the same currency with the same expiration date, but with a different strike.

Spread strategies on major exchange rates are common in the foreign exchange market. Generally, spreads represent a "bet" that a given currency will appreciate or depreciate in value, but only to a certain point. In a "bull" spread, the investor buys a call and sells a higher-strike call.[10] The investor is limiting his upside potential, as he does not participate in the appreciation of the currency above the higher strike. The tradeoff, however, is that the premium received for selling the higher strike option reduces the cost of purchasing the lower strike option. The investor also limits his potential loss to the net premium paid for the component options. Spreads are utilized mainly to mitigate the risk of outright, or one directional, trades.

---

[10] In a "bear" spread the investor buys a put and sells a lower-strike put. Bull and bear spreads are examples of "vertical spreads." There are also calendar spreads involving the purchase and sale of like options, except with different expiration dates.

III. <u>OPINIONS AND BACKGROUND FOR OPINIONS</u>

III.A   THE RISK AND REWARD POTENTIAL OF THE EXHIBIT 1 TRADES WAS EXTREMELY LIMITED, AND OF LITTLE ECONOMIC VALUE TO SALA.

The 23 option trades in Exhibit 1 possessed risk characteristics inconsistent with the size of the capital of the Sala and Solid Currencies accounts, both by notional size and by actual cash deposited. These 23 trades consisted of the sale of 11 options (short transactions) and the purchase of 12 options (long transactions).

In late November 2000, Sala entered into these option trades. These were essentially the only trades in the account at the time. (DHSala 00000839-887)  There was approximately $8,925,000 (the amount deposited) in the Sala account at Refco.  The net cost of these options was $728,298.  One of the 23 options was a relatively small long outright position which cost $11,438, and had no risk beyond the cost of the premium (a stand-alone short option has risk beyond its premium).  The

remaining 22 options, which were all spread trades, per Exhibit 1, had no risk beyond the net cost of the option premium at inception. Their profit was similarly limited.  Exhibit 2 illustrates the risk/reward structure of these trades.  For example, the dollar/Swiss four-sided position had a net premium cost of $153,315.  This was the entirety of its risk. The maximum potential payout at expiration (or at any time before expiration) was $254,170.[11] This means that the risk/reward ratio for the combined four-sided position was 1.7:1 (for an investment of $153,315, one might ultimately receive $254,170).

There is no industry standard for risk/reward ratios, other than that they must be greater than 1:1; in other words, one would reasonably never pay more for an investment than one could potentially receive upon liquidation.  The appropriate risk/reward ratio for a trader is a function of his or her appetite for risk, which covers a wide spectrum.  However, in the speculative business of hedge funds, including that of Deerhurst, a typical risk/reward ratio would be far

---

[11] DeRosa, David F. Options on Foreign Exchange, 2nd ed. John Wiley & Sons, 2000.

greater.  Indeed, in an email from Andrew Krieger ("Krieger"), who ran Deerhurst, to Michael Schwartz, who introduced Sala to Deerhurst, Krieger wrote:

> Most of my trades have at least a 4:1
> expected risk reward at the outset.
> (DHSala 00001817)

1.7:1 is significantly lower than that.  Note that the other four-sided spread positions were all even lower, right down to the sterling/yen spread with an extremely low risk/reward ratio of 1.1:1.  There was a small two-sided spread trade in dollar/yen with a risk/reward ratio of 4.7:1, but its premium of $6,141 made it insignificant in size to the five four-sided spread positions.

The maximum potential profit to Sala for the Exhibit 1 Trades was $412,060 (see Appendix C for Formulas for Calculation).  This represents only 2.5% of the long option premium of $60,987,866.79.  In comparing the $60,987,866.79 long option premium to the actual net cost of these options to Sala ($728,297.85), it was a startlingly small 1.2%.

III.B     EACH FOUR-SIDED SPREAD POSITION WAS A SINGLE

TRANSACTION, CONSISTING OF OFFSETTING SPREAD

POSITIONS.

Three of the 23 Exhibit 1 Trades were comparatively

small and account for $17,579 of the long option

premium.  The remaining 20 of the option trades

consisted of five four-sided spread trades on

different currency pairs.  The combined premium of the

12 trades within Exhibit 1 which were long premium

options was $60,987,867.

A simple, or two-sided, spread trade is used to

benefit from a limited movement in a currency's price,

as opposed to an outright position which often has

unlimited potential for profit or loss.  When a four-

sided spread strategy is employed, the risk or profit

potential is further constrained.  In the case of the

five four-sided spread trades (see Exhibit 3 for the

example of dollar/Swiss), each had its own currency

pair (dollar vs. Swiss franc; dollar vs. yen; euro vs.

yen; euro vs. dollar; pound sterling vs. dollar).

Within each of the five four-sided spreads, Sala
bought a put and a call in the currency pair and also
sold a put and call in the currency pair.  The face
amount of each of these four sides, i.e., the amount
of currency in the trade, was the same within each
four-sided spread position.  However, the strike price
for each side was different.  The strike price can be
defined here as the place or the direction to where a
trader bets that the currency will move.  Two of the
strike prices in each four-sided spread were above the
spot price, where the currency pair was at the time of
the trade.  The other two strike prices were below the
spot price.  The usual purpose of such a complex
strategy is to benefit from a movement in the
underlying price of the currency pair to within or
beyond the strike prices either above or below the
spot price.  If the options had been held to
expiration, which in this case was one year, the
payout could have been from only one direction from
the spot price.  Therefore, by its nature, one half of
the four-sided spread trade had to expire worthless if
held to expiration, and one half could potentially
have had a profit.

In this strategy, if held to expiration, a trader is betting that the price of each currency pair will move either up or down a certain minimum amount, and the profit, if any, will be a matter of how much it does move. If the four-sided spread trades are closed out before expiration, as was the case in these trades, the profit or loss is a function mainly of the spot exchange rate, the volatility of the spot price, and of the time remaining on the option.

The nature of spread trades such as these, is that one buys and sells multiple options which offset the often considerable risk of an outright option. Of the 23 Exhibit 1 Trades, as stated above, 12 were bought for a combined premium of $60,987,867. It should be noted that the remaining 11 were sold at the same time for $60,259,569. Therefore, Sala had a net cash outlay of $728,298.

The following is a detailed description of one of the four-sided spread trades. It is representative of the 20 trades comprising the four-sided spread trades. Please note that all five of these four-sided spread trades have the same structure.

### Sala Buys and Sells US Dollar Call/Swiss Franc Put

|  | Option 1 | Option 2 |
|---|---|---|
|  | Sala Buys | Sala Sells |
| Trade date | 11/27/00 | 11/27/00 |
| Expiry date | 11/27/01 | 11/27/01 |
| Face in US Dollars | 235,870,000 | 235,870,000 |
| Face in Swiss Francs | 435,302,980 | 437,774,720 |
| Strike Price | 1.8540 | 1.8560 |
| Premium | ($6,156,207) | $6,085,446 |

### Sala Buys and Sells US Dollar Put/Swiss Franc Call

|  | Option 3 | Option 4 |
|---|---|---|
|  | Sala Buys | Sala Sells |
| Trade date | 11/27/00 | 11/27/00 |
| Expiry date | 11/27/01 | 11/27/01 |
| Face in US Dollars | 235,870,000 | 235,870,000 |
| Face in Swiss Francs | 403,573,570 | 403,266,939 |
| Strike Price | 1.7110 | 1.7097 |
| Premium | ($10,755,672) | $10,673,118 |

From a single counterparty, in this case the broker Refco, Sala bought and sold the four options simultaneously, paid out the $6,156,207 and $10,755,672 premiums (the combined long premium of this spread was $16,911,879); and received the $6,085,446 and $10,673,118 premiums. Therefore, the net cash outlay was $153,315. At the time the trade was put on, the spot exchange rate for USD/CHF (the

number of Swiss francs in the US dollar) was approximately 1.7746 (currency prices change constantly; this was the Bloomberg price as of 5PM NY Time on 11/27/00).  These were fairly liquid options, so that during normal business hours, the four positions could have been closed out or liquidated without great difficulty, or expense, again simultaneously.  If held to option expiration on 11/27/01, the following were the possible outcomes:

1.  USD/CHF rate is between 1.7110 and 1.8540: all options expire worthless.

2.  USD/CHF rate is between 1.8540 and 1.8560: the payout is between zero and a maximum of $254,170 (see Appendix C).

3.  USD/CHF rate is above 1.8560: the payout is exactly $254,170.

4.  USD/CHF rate is between 1.7110 and 1.7097: the payout is between zero and a maximum of $179,348 (see Appendix C).

5.  USD/CHF rate is below 1.7097: the payout is exactly $179,348.

For the Exhibit 1 Trades, there was no risk beyond the total net premium; that is, under no circumstances could Sala have lost more than the total net premium. The significance of the construction of these four-sided spread trades is that both the potential for profit as well as the risk of loss was completely measurable and bracketed.  Furthermore, these trades were entered and liquidated as spreads, and would never have been separated into outright positions.

III.C    SEPARATING THE LONG OPTIONS FROM THE SHORT OPTIONS IN THE EXHIBIT 1 TRADES WOULD NOT HAVE BEEN ECONOMICALLY FEASIBLE.

Separation of the offsetting long and short option components of the Exhibit 1 Trades would have required Sala to pay at a minimum $60,000,000 to purchase the long options, as well as further funding as margin collateral for the short component.

It is the industry practice for Master Trading Agreements (or related Credit Support Annexes) to establish margin requirements for foreign exchange and foreign exchange options, either held as long or short positions.[12]   The FEOMA (Foreign Exchange and Options Master Agreement), which was part of Carlos Sala's Refco account application makes reference to Security Interest (LN 00000452).   This gives Refco the right to require Sala to deposit collateral to secure performance.   In the case of the Exhibit 1 Trades, should the longs have been separated from the shorts, Sala would have had to pay $60,000,000 for the total long premium.   In addition, the short premium would have been impounded and subject to further margin calls.   Impounding the proceeds from a short sale is industry standard practice.   The trader is required to keep the full short premium received from the option sale on deposit with the custodian. The impounded premium is not available for margin purposes.   The trader must also post collateral for margin on the short option.   Each broker has its own requirements. Most, however, require some percentage of the face

---

[12] See website of ISDA: www.isda.org.   See website of Federal Reserve Bank of New York: www.ny.frb.org

value of the short option.  Moreover, the required margin balance increases without limit if the short option goes into-the-money.[13]

Some basic facts about margin can be understood from industry standards for foreign exchange and options on foreign exchange and a discussion is relevant to my opinions. Typical master trading agreements establish margin requirements for both long and short positions in currency options.  These requirements would have applied had Refco ever allowed the long and short component options of the five four-sided spreads to be split into stand-alone individual options. Separating these offsetting currency options from each other would have meant Sala would have ended up being outright long 12 currency options, with no offsetting short currency option, and outright short 11 currency options, with no offsetting long currency option. This creates a massive step up in the margin requirement and is why the offsetting option spreads would never be separated.

---

[13] This is self-evident because the potential payment from the short option at expiration rises as the option goes into the money.

To summarize, if Sala had chosen to separate the 23 Exhibit 1 Trades into their stand-alone long and short options either with different brokers or into distinct non-offsetting accounts at Refco, he would have had to deposit more than $60,000,000 for the long options. In addition, Sala would have had to post collateral for the short option in the event their prices moved up.  The out-of-pocket $60,000,000 would be in excess of 82 times the amount of the net premium of $728,297.85 Sala paid to Refco to enter into the Exhibit 1 Trades as offsetting currency options.

III.D    THE FOUR-SIDED SPREAD POSITIONS WERE INCONSISTENT WITH THE MANAGER'S HISTORICAL AND PROMOTED TRADING STYLE.

While the Exhibit 1 Trades could benefit from some volatility in their currencies, their performance was limited from the outset.  Trades such as these never could have enabled Sala to obtain the impressive

DeRosa Research and Trading, Inc.                                    33

performance results that Deerhurst Management promoted in its performance table (DHSala00000233) for the period February 1991 – July 2000.  During those years Deerhurst periodically, usually once or twice a year, had a significant up-month, often over 10%.  This type of performance is one of the key factors investors look for in hedge funds.  With the four-sided spread strategy, it would be impossible to ever obtain such a return.

Leaving aside the small outright trade, the maximum profit possible from this strategy was $412,060 (see Exhibit 2).  This would represent a 4.6% profit on deposited capital.

Andrew Krieger, who ran Deerhurst, stated that he leveraged trades during November 2000 at 2:1, and December 2000 at 3:1.  In fact, no leverage was employed.  If such leverage had been employed, this would have reduced the maximum profit potential to 2.3% or 1.5% for November and December 2000, respectively.  Under no circumstances could the trades during the October-December period have achieved the results indicated in the Deerhurst historical

performance table (DHSala 00001810).  Therefore, I
conclude that the trading strategy for the Exhibit 1
Trades must have been substantively different from the
strategy in Deerhurst's past.

Furthermore, Krieger's trades on Sala's behalf from
late November through December 2000 were inconsistent
with his bullish views on dollar/yen.  In his Forbes
Magazine columns from the time ("Sell Yen, buy
Dollars", December 11, 2000), he predicted that there
would be large outright moves in dollar/yen.  Yet, for
Sala's account, his trading was conservative in the
extreme, limited by a low risk, low payoff spread
strategy.

The most significant feature of the 23 Exhibit 1
Trades was the sheer size of their option premiums.
In order to express Deerhurst's strategic view of
these positions, this size of premium was not
necessary.  Furthermore, the premiums are
disproportionately large to the overall market
exposure.  Indeed, in his deposition, Krieger stated:

    Someone would have directed - some went on my

> desk that a certain amount of premium should be
> spent and that what I should do is figure out
> what trades I liked working with that requirement.
> (Krieger Deposition p. 164)

This is an indication that premium size was the first step in Krieger's decision of what to trade. It was a requirement. This is not industry practice and at best results in a contrived trading position. It puts into doubt why the trades were put on. Assuming a trader has a trading strategy he wants to express in advance of this "requirement" (i.e., a certain size of option premium), he can only be constrained by a preset premium size. Under this scenario, the other components of the trade must be adjusted, perhaps taking on some other trading risk.

Deerhurst could have achieved the same trading objective without approaching the size of premiums purchased and sold. Indeed the four-sided strategy could have been reduced to a series of digital options (see definition on page 19).[14] Each digital would be structured to pay a flat amount of cash at expiration

---

[14] I obtained implied volatilities, interest rates, and spot exchange rates from Bloomberg L.P. The model is described in Reiner, Eric and Mark Rubinstein "Breaking down the Binomial Barriers," Risk R September 1991 and DeRosa, David Options on Foreign Exchange, Second Editon, New York, Wiley 2000.

if the option is in the money, meaning that spot is above (for calls) or below (for puts) its strike (see Exhibit 4). The strike prices for the digitals could be set as narrow range -- in my calculations I assumed a strike price every one pip. Thus I was able to replicate to a close approximation the payout structure of the USD/CHF four-side strategy with a cluster of 33 digital options. I have calculated the value of such a group of digital options in the case of the USD/CHF four-sided trade (see Exhibit 3). The actual net cost of the USD/CHF four-sided trade was $153,315 whereas the initial value of the 33 digital option cluster substitute would have been $151,680 by my calculation. The difference is de minimus, which is not surprising given that the four-sided strategy and the digital substitute have virtually the same payoff matrices. Of relevance to this case, is the fact that a near perfect substitute for the USD/CHF trade existed in the form of digital options and that this substitute case cost less than 1% of the long option premium in this four-sided strategy. Digital options possessing nearly identical payoffs could have been used to substitute the other four-sided spread trades.

III.E        THE LIQUIDATION OF THE SPREAD POSITIONS IN

EARLY DECEMBER 2000 WAS HIGHLY UNUSUAL GIVEN THE

DIVERSITY OF THE CURRRENCIES.


All five of the four-sided spread trades in Exhibit 1

were one-year options, that is, with an expiration

date of November 27, 2001.  The remaining smaller

positions had different expirations, a one-week

expiration for the dollar/yen two-sided spread, and a

three-month expiration for the pound sterling/yen

outright option.  The two-sided spread expired

worthless on December 1, 2000, with a loss, therefore,

of the $4,005 net premium.  The remaining 21 options

were liquidated in the first half of December 2000.

Each spread position was unwound completely on the

same day.  It is not unusual to put on a one-year

option trade, and then liquidate the position a week

or two later.  There can be many reasons for doing

this.  Perhaps the market changed.  Perhaps the

position increased in value and one wants to take profit.  Perhaps there is a better use for the capital.   However, it is unusual for a trader to determine that all the positions of a diverse group of currency pairs would cease to be good bets at the same time.

Moreover, the argument advanced by Michael Schwartz (Schwartz Deposition p. 227) that positions were unwound because of end-of-year risk is implausible. There is no significant price volatility on such long term option spreads particular to year-end.  Indeed, there was no economic or trading reason to liquidate all of the foreign currency positions before year-end.

III.F  THE MANAGEMENT FEES WERE IN EXCESS OF INDUSTRY
STANDARDS.

Hedge funds typically receive both management fees and
performance fees, and these fees can vary depending on
demand for a fund, the manager's past performance,
risk, specialization, as well as the perception of the
entire field.  Probably the most common fee structure
that I have observed over the past two decades is what
is called "2 and 20."  That is, 2% (annually, paid
monthly) of the money under management, plus 20% of
the net new trading profits.  It would not be unusual
to see "1 and 30," or even, though less so, "3 and
15."  The usual fee structure for Deerhurst clients
was "2 and 20," although Sala negotiated "1 and 30."

The Deerhurst fee structure is unusual and is highly
irregular for the industry.  Sala was charged a
management fee of 1%.  However, in reality the fee to
Sala was 3% in December 2000.  This is reflected by
the fact that Sala paid a fee based upon the stated
leveraged notional value of the funds and not on the
actual amount he deposited.  The leveraged notional
value is computed by multiplying the account value by

the stated leverage to be employed.  Therefore, by December 2000, Sala was charged a management fee on approximately $27 million.  Only a fraction of the $8,925,000 deposited was committed to trading during the October-December period.  More specifically, under 10% of the funds in Sala's Deerhurst account was committed to the 23 Exhibit 1 Trades.  While in certain circumstances there can be a justification for such a fee structure, as would be the case if Sala's account was in fact leveraged, such justification does not apply here where zero leverage is employed.

Leverage was an essential element in Deerhurst's justification of its fee structure.  An account with a fee structure of "2 and 20," for example, was assessed on the notional value of the account, which was a multiple of the invested capital.  So, if $1,000,000 was invested in the trading program, and the leverage was 3:1, then the management fee would climb to 6% of the investment.  Implicit is that the account was being traded as if it were $3,000,000.

The net premium of the 23 Exhibit 1 Trades, $728,298, represented just over 8% of Sala's investment in

Deerhurst.  If one divides that by the notional capital for November or December 2000, the capital utilization becomes 4% and under 3%, respectively. Not only is leverage not employed for these trades, and others before and after during October-December 2000, a small fraction of the Sala's account was committed to these trades.

It is noteworthy that Sala demanded a fee of "1 and 30;" a departure from the usual "2 and 20" (see Schwartz Deposition p.193).  In general, this is not necessarily a better deal for an investor.  If a hedge fund were to have an annual return of better than 10%, then the investor would be left with more money under the "2 and 20" fee structure.[15]  The promotional Deerhurst performance table, with which Sala was familiar, showed a simple average annual return larger than 16%.  Sala stated that he expected to receive a 60-70% return per year, based on the leveraging of these projections (Sala Deposition pp 81-82).  On the basis of these returns, using the lower end of 60%, then the difference between using a fee structure of

---

[15] $9,000,000 x 10% = $900,000.
For 1&30 fees: (1% x $9,000,000) + (30% x $900,000) = $360,000.
For 2 &20 fees: (2% x $9,000,000) + (20% x $900,000) = $360,000.

"2 and 20" versus "1 and 30," would have been gross $450,000 more to Sala with "2 and 20" in the first year (see Exhibit 5).  If this performance were to have held for the five years of the lockup, the compounded gross advantage to Sala of using the "2 and 20" fee structure would have been over $9,500,000. (see Exhibit 6).

It is not rational that Sala, a sophisticated investor, would have demanded a fee structure that would reduce his profits unless he did not have high confidence that Deerhurst's returns would be as expected.  This is not a business where people voluntarily leave money on the table.

III.G   THE TRADES DONE IN THE PERIOD OCTOBER-DECEMBER 2000 (NOT INCLUDING THE EXHIBIT 1 TRADES), AND FROM JAN 2001 ON, IN THE SALA AND SOLID CURRENCIES ACCOUNTS, WERE UNLIKE THE 23 EXHIBIT 1 TRADES.

Both foreign currencies and foreign currency options were traded in the Sala and Solid Currencies Refco brokerage accounts before and after the 23 Exhibit 1 trades, and these merit analysis and opinion.

### October 23 - November 30, 2000

The first Sala Refco account was in the name "Sala, Carlos/Beckenham" and opened October 23, 2000 with a deposit of $500,000 (DHSala 00000835). A number of small foreign currency trades, all with notional size under $25,000, were entered prior to the Exhibit 1 Trades. In addition, a small number of low risk foreign currency option spreads were entered and liquidated in early November 2000, all with relatively small premiums as compared to the Exhibit 1 Trades in late November. On November 21, Sala deposited another $8,425,000 in the account. In the period November 24-28, the 23 Exhibit 1 Trades were entered. On or about November 28,

Sala's account appears to have been renamed and renumbered as Solid Currencies.  Shortly thereafter, the positions in Solid Currencies (i.e., Exhibit 1 Trades) were contributed to Deerhurst Investors GP. During this period, there was no leverage employed.

### December 1 - December 19, 2000

At the end of November, Solid Currencies was one of many partners in Deerhurst Investors GP.  The five four-sided option positions were all liquidated on December 4 and December 5.  The small dollar/yen spread expired on December 1.  The small pound sterling/yen call was sold on December 14.

Deerhurst Investors GP entered into other foreign exchange and foreign exchange option trades in December 2000.  Up to December 20, the trades consisted mainly of unwinding the positions transferred in from the S-Corps, including Solid Currencies.  None of these trades were important in size or risk (Exhibit 7).  During December 2000, there was approximately $24,000,000 equity in Deerhurst Investors GP.  Yet despite its size, the currency trading was held static, i.e., with little activity,

spread across seven currency pairs.  On close examination, these seven pairs of foreign currencies offset one another so that there was virtually no foreign currency exposure or risk.  In other words, until December 20, 2000, Deerhurst Investors GP essentially had no foreign currency position (see highlighted box for December 19 net currency positions in Exhibit 7).  Therefore, on average each day, well over $20 million was sitting in the account in cash, uninvested.  During this period there was no leverage employed.  It should be noted that according to the Brown & Wood legal opinion (LN 00000454), either 3:1 or 4:1 leverage was to be employed during this period.

Deerhurst, in its December 2000 monthly statement for Solid Currencies, showed monthly income of $77,435 (DHMSN 00000006).  Based on the December 1 starting capital of $8,943,673, if Sala had placed his money in an interest-bearing account in a financial institution, he would have expected to receive over $50,000 through December 31, 2000 (basis the December 1, 2000 1-month LIBOR rate of 6.6125%).  This means that most of the monthly profit was attributable to the mere accrual of interest.

December 20 - December 31, 2000

Beginning on December 20, there were foreign currency and foreign currency option trades initiated in Deerhurst Investors GP and then transferred to Solid Currencies where the trades were paid for and settled.

Based on the Refco daily trade reports for Deerhurst Investors GP and the Solid Currencies monthly statement for December 2000, and the Deerhurst production reports, the following sequence of transactions occurred:

Step 1. December 20, 2000. Deerhurst Investors GP purchased a one-year put option on the euro (call option on the dollar) with face amount of EUR 26,004,030 (alternatively USD 23,065,574.61) for premium settlement on December 22. (DHMoly 000221). The option expiration date was December 20, 2001. Deerhurst Investors GP did not pay the option premium to Refco. Deerhurst Investors GP sold euros spot, EUR

10,401,612 against USD 9,423,860.47, for value December 27, 2000. (DHMoly 000226)

Step 2. December 22, 2000. Deerhurst Investors GP transferred $8,084,301.65 to Solid Currencies. The transfer represented the entirety of Solid Currencies' account balance at this time. (DHSala 00000892)

Step 3. December 22, 2000. Deerhurst Investors GP transferred the Step 1 put option on the euro (EUR 26,004,030) to Solid Currencies. According to the account statements the option's premium settlement date was revised to December 26. Solid Currencies paid the premium amount of $915,342 to Refco. After paying the option premium, the running balance in the Solid Currencies account was $7,168,959.65. (DHMoly 000221; DHMoly 000024; DHSala 00000892; DHMoly 000030; DHMoly 000010-13).

Step 4. December 22, 2000. Deerhurst Investors GP transferred the Step 1 spot trade to buy euros against dollars (EUR 10,401,612 against USD 9,423,860.47) to Solid Currencies. This trade came to value on December 27, 2000. This spot transaction effectively hedged the put option on the euro that was received in Step Step 3. To settle the spot trade Solid Currencies needed to have $9,423,860.47 in its account on

December 27. (DHMoly 0000226; DHMoly 000024; DHSala 00000892; DHMoly 000029; DHMoly 000010-13)

Step 5.  <u>December 26, 2000</u>.  Solid Currencies closed out the option transferred to it in Step 3 by selling a put    option on the euro (EUR 26,004,030) with premium settlement on December 27.  The option expiration date was December 20, 2001.  Solid Currencies received a premium of $725,512 for the option. The difference in the buying and selling prices for the options caused Solid Currencies to take a loss of $189,830.   After the sale of the option Solid Currencies' running account balance was USD 7,894,471.65. (DHSala 00000892)

Step 6.  <u>December 26, 2000</u>.  Solid Currencies sold the euro against the dollar (EUR 10,401,612 against USD 9,613,169.81 for value December 27, 2000. Solid Currencies made a profit of $189,309.34 on the euro trade.  However, when netted with the option trade that began in Step 1 the net loss was only $520 - this attests to the efficiency of hedging the option with the spot transaction.  Euro spot trades settle in two bank business days after trade date, which would have been December 28.  At this point the running account balance was $8,083,780.90. The Solid Currencies

account records a transaction labeled "rollover" on December 26, 2000, that was reversed (cancelled) in a bookkeeping entry on December 27, the next day. (DH Sala 00000892; DHSala 00000893 and security sequence 3585954)

Step 7. <u>December 27, 2000</u>. Deerhurst Investors GP transferred $945,268 to Solid Currencies. After this transaction the Solid Currencies account showed a running account balance of $18,642,218.80. This balance was struck before the reversal of the rollover. (DHSala 00000892)

Step 8. <u>December 27, 2000</u>. The euro spot trade transferred to Solid Currencies required a dollar payment of $9,423,860.47 on December 27, 2000. The funding for the payment was accomplished with a reverse rollover transaction done on December 27, 2000 which effectively brought forward the proceeds of the euro sale done in Step 6. The reverse rollover is reflected by Solid Currencies' overnight borrowing of EUR 10,402,612 from Refco on December 27, 2000. Solid Currencies was charged EUR 1,979.20 in interest for this borrowing (it is customary in the industry that interest is charged in the currency borrowed). The EUR 10,402,612 was repaid to Refco the following day.

The running balance was $9,029,048.99 at the end of the day on December 27, 2000. (DHSala 00000892; DHSala 00000890 and security sequence 3587051)

Step 9.  December 26, 2000.  Solid Currencies entered a spot trade in dollar/yen for settlement December 28, 2000.  This position was entered into and closed out the same day for a $52.90 loss.  The running balance of the Solid Currencies account was $9,028,996.09 (DH Sala 00000892).

Step 10.  December 29, 2000.  The Solid Currencies account was closed.

Based on the Deerhurst statements issued to Solid Currencies (DH MSN 000022395), Sala's interest was worth $9,021,108 upon liquidation on December 21, 2000.  In fact, Sala received slightly more than this amount in US dollars, $9,029,569.35, from Deerhurst Investors GP.

Following the closeout of the euro foreign exchange trade and the euro put option, Solid Currencies was dissolved and all of its free cash was transferred to Deerhurst Trading Strategies on December 29, 2000.

January 1, 2001 to 2004

Deerhurst Trading Strategies began trading for Carlos Sala at the beginning of 2001, under the management of Andrew Krieger, and there was a dramatic change in the trading.  In Krieger's deposition (page 64), he described his average active trading volume as "between 200 and 500 trades" per day. However, for the period of late October-December 2000 for Sala, Solid Currencies, and Deerhurst Investors GP, there was never a day that approached that trading volume. Based upon the documents made available to me by the Department of Justice, from January 1, 2001 forward, the volume of the Deerhurst trades increased significantly.  Furthermore, the Deerhurst performance starting in January 2001 was volatile enough to indicate that risk and leverage were considerably greater than in the October-December 2000 period. This was the first time Sala was exposed to real trading risk.  Also, in reviewing the trades from 2001 to 2004, I never found another similar four-sided spread position.

III.H   THERE WAS NO ECONOMIC OR TRADING PURPOSE IN USING AN S CORP OR A GENERAL PARTNERSHIP STRUCTURE FOR THE TRANSACTIONS IN NOVEMBER-DECEMBER 2000.

Based on the size, risk profile, and types of trades, there was no trading advantage in transferring from the personal Sala account to Solid Currencies, then to Deerhurst Investors GP, and finally back to Solid Currencies.   There was no reason to expect that there would have been better prices or preferred executions in any one entity over the others.   There were no economies of scale.

The structure of the Sala trades in October-November 2000 was that the initial trades were executed in Sala's individual account.   In November a corporation, Solid Currencies Inc., was formed, and a new account in its name was opened at Refco.   On November 21, Sala deposited $8,425,000 in his account at Refco.   On November 28, the Sala positions, including the deposited $8,425,000, were renamed and renumbered as the Solid Currencies account at Refco.   The stated purpose (DHSALA 0000234) of this change was to manage the increased risk and liability associated with the

trading. In fact there never was any risk to Sala beyond the net premiums he already paid.

During the October-December 2000 period, Deerhurst managed funds for Sala in two different structures: individually, as managed accounts, and through Deerhurst Investors GP, a hedge fund. It is important to compare the terms "managed account" and "hedge fund", as they are often used interchangeably. A managed account is typically a stand-alone investment vehicle owned by a single entity (a person, group, or institution), and managed by a trading advisor or operator. A hedge fund may be managed by the same professional people, but with a hedge fund the money from a group of investors is pooled, and is owned by the group of investors. In this sense, it is like a mutual fund. When a fund manager puts on a trade in a hedge fund, that trade is owned by the hedge fund, and the fund is owned by the investors proportionate to their ownership stake. Similarly, if the fund manager wishes to put on a trade for a group of managed accounts, the manager may choose to do a single trade which is then split proportionately into each of the managed accounts. This is called allocating a trade

and is common practice with foreign currency fund managers. The fund manager has an allocation model which it shares with its broker, so that the trade is split automatically between the managed accounts. The overall result is basically the same between the group of managed accounts and the hedge fund: a large single trade is fairly apportioned to all the investors by their percentage ownership of the total, so that no one investor gets a better price or better terms than another.

This comparison is background for the trades done individually for Sala and Solid Currencies, as well as for Solid Currencies through the hedge fund structure of Deerhurst Investors GP. In his deposition Krieger testified that he had done the Exhibit 1 Trades for the managed accounts, which included Sala, by this formula:

Well, there are a lot of investors who would have all received a slice of the trade. My market view is not going to change whether - - whether the position is going to be for one person or 10 people, the market view will be the same. The only difference is what percentage of that trade would go to which people. (Krieger Deposition p. 162)

The significance of this statement is that there was no business or trading reason to trade for Sala though a GP structure versus a managed account for these trades.  The exact same price and terms, including interest and fees, could have been achieved through either vehicle, and his trading strategy would have been the same either through an individual account, S-Corp, or General Partnership.

Stated this 13th Day of December, 2006.

David F. DeRosa, Ph.D.

APPENDIX A: Dr. DeRosa's Resume - Including Past Testimony

## DeRosa Research and Trading, Inc.

495 White Oak Shade Road
New Canaan, CT 06840
Tele (203) 801-4340  Fax (203) 801-4342
derosa@derosa-research.com

# David DeRosa

## Education

**The University of Chicago, Graduate School of Business**  Chicago, Illinois
Doctor of Philosophy (Ph.D.), December 1978.  Finance and Economics.
- Dissertation: <u>Rates of Return on Common Stocks and Inflation</u>

**The University of Chicago**  Chicago, Illinois
Bachelor of Arts (AB), August 1972.
- Major Field: Economics

## Experience

1997 - Present   **DeRosa Research and Trading, Inc.**  New Canaan, Connecticut
*President and Owner*
- Consultant for international financial markets and derivative instruments matters.
- Expert witness in foreign exchange, international finance, emerging markets, derivatives, and risk management.
- Commodity Trading Advisor (effective May 1998).

Spring 1996 -   **Yale School of Management**  New Haven, Connecticut
Present   *Adjunct Professor of Finance*
- Instructor for advanced graduate courses in international finance, financial policy in emerging markets, foreign exchange, derivatives, and asset management.

Summer  2006   **Columbia University** New York, New York
*Adjunct Associate Professor Industrial Engineering and Operations Research*
- Instructor in graduate program in Financial Engineering

1998 - 2004   **Midwest Independent Transmission System Operator**  Carmel, Indiana
*Director, Chairman of the Markets Committee,  Member of the Finance and Audit Committee*
- Member of a seven-director board for MISO, which oversees wholesale transmission electricity in the Midwest and portions of Canada.

1999 - Present   **Rubicon Fund Management**  Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered macro-hedge fund.

2002 - Present   **BlueCrest Capital International**  Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered investment company.

2003 - Present   **The Children's Investment Fund**  Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered European equity, event-driven hedge fund.

2005 - Present   **GSA Capital International**   Cayman Islands
*Director*
- Member of board of directors of Cayman Island-registered statistical arbitrage hedge fund.

2005 - Present   **CCC Carbon Fund**   Cayman Islands
*Director*
- Member of board of directors of Cayman Island-registered hedge fund.

| 1998 - 2004 | **Bloomberg News** New Canaan, Connecticut |
|---|---|
| | *Financial Columnist* |

- Regular columnist for Bloomberg News, Bloomberg Radio, and Bloomberg Magazines on international finance, foreign exchange, and global politics.

| 1996-1997 | **Quadrangle Investments, LLC** Greenwich Connecticut |
|---|---|
| | *Co-Founder and Managing Partner* |

- Global trader of foreign exchange, options, and exotic options on foreign exchange.
- Founder of macro-fundamental hedge fund with $32 million in assets.

| 1993 - 1996 | **Swiss Bank Corporation** New York, New York |
|---|---|
| | *Director, Foreign Exchange Trading* |

- Global proprietary trader of foreign exchange, options, and exotic options on foreign exchange.
- Head of SBC technical education for North America.
- Instructor, intensive training courses for traders.
- Spoke to financial press (wire services, newspapers, and television) re: foreign exchange issues.

| Spring 1995 - Fall 1996 | **The University of Chicago, Graduate School of Business** Chicago, Illinois |
|---|---|
| | *Lecturer in Finance* |

- Concurrent with Swiss Bank.

| 1992 – 1993 | **BEA Associates** New York, New York |
|---|---|
| | *Vice President and Derivatives Portfolio Manager* |

- Portfolio Manager in $7 billion hedging and arbitrage group.

| 1988 - 1992 | **Alliance Capital Management L.P.** New York, New York |
|---|---|
| | *Vice President – Derivatives and Synthetics* |

- Handled portfolio management, product design, trading, and marketing for start-up derivatives group.

| 1985 - 1988 | **DeRosa & Company** Los Angeles, California |
|---|---|
| | *President and Owner* |

- Established NASD broker-dealer firm which performed soft-dollar funded quantitative research for investment managers. Company sold in 1988.

| 1984 - 1985 | **International Financial Advisers** Kuwait City, Kuwait |
|---|---|
| | *Acting General Manager* |

- Advised and ran operations of IFA, a registered investment banking firm in Kuwait owned by members of the royal family and their close business associates.

| 1981 - 1983 | **Consulting Center For Finance and Investment** Riyadh, Saudi Arabia |
|---|---|
| | *Senior Vice President* |

| 1980 - 1981 | **Wilshire Associates** Santa Monica, California |
|---|---|
| | *Senior Associate* |

| 1979 - 1980 | **The University of Southern California** Los Angeles, California |
|---|---|
| | *Assistant Professor of Finance and Business Economics* |

| 1979 | **Ministry of Finance and National Economy** Riyadh, Saudi Arabia |
|---|---|
| | *Economic Advisor* |

| 1975 - 1978 | **Loyola University of Chicago** Chicago, Illinois |
|---|---|
| | *Instructor in Finance* |

## David DeRosa – Continued

### Books

In Defense of Free Capital Markets: The Case Against a New International Financial Architecture, Bloomberg Press, January, 2001.

Options on Foreign Exchange, 2nd ed. John Wiley & Sons, 2000 (Japanese Language Edition, Toyo Keizai, Tokyo).

Currency Derivatives, John Wiley & Sons, 1998.

Managing Foreign Exchange Risk, Revised Edition, Irwin / McGraw-Hill, 1996 (Japanese Language Edition, Yuuhikaku, Tokyo).

### Expert Witness

K2 Trading, et.al v. United States – Expert Report and deposition for the United States Court of Federal Claims

Jade Trading, et al.  v. United States – Expert Report and Testimony in the United States Court of Federal Claims (2005)

COLM Producer, Inc., Kornman & Associates, and the Ettman Family Trust v. The United States, expert report and deposition for U.S. District Court, Northern District of Texas

Compton et al v. Alex Brown et al., Case No. 24-C-03-007514, Deposition for Circuit Court of Baltimore City

Klamath v. The United States and Kinabalu v. The United States, expert report U.S. District Court, Eastern District of Texas

Tusher v. Bulldog Capital Management, L.P. – Expert report and testimony in JAMS Arbitration December (2003-September 2004)

United States of America v. Polina Sirotina; Mamed Mekhtiev; Albert Guglielmo; Philip Levinson, and Justin Fauci (Evergreen International Spot Trading) – Testimony in U.S. District Court, Eastern District of New York (May – June 2003)

"Opening Trade in Financial Services – The Chile and Singapore Examples" – Testimony before the U.S. House of Representatives Committee on Financial Services (March 2003)

High Risk Opportunities Hub Fund LTD. v. Credit Lyonnais and Societe Generale – Affidavit to Supreme Court of the State of New York (May 2002)

Hermes v. J.P. Morgan – Affidavit to Superior Court of New York (2002)

Re: Enron – Testimony in U.S. Bankruptcy Court (Jan 2001)

De Kwiatkowski v. Bear Stearns – Testimony in U.S. District Court, Southern District of New York (May 2000)

Dorigol v. J.P. Morgan – NASD Arbitration

Kiely v. Gunnar and Crew – NASD Arbitration

LMP v. Morgan Stanley – NASD Arbitration

MK Link v. WSW Capital – NASD Arbitration

National Reserve Bank v. Credit Agricole – Arbitration

**Expert Witness. continued**

Morano v. Access Wealth Planning – NASD Arbitration

Evergreen Security, LTD v. Windels Marx Lane & Mittendorf, LLP – Expert Report in U.S. District Court, Middle District of Florida (November 2003)

State of Florida v. Richard Maseri -- Deposition

Appendix B:    Documents Relied Upon

In preparing this report, I have relied upon the following materials supplied to me by the Department of Justice:

1. Complaint filed by Carlos and Tina Sala;

2. Scheduling Order;

3. Deerhurst Shelter promotional materials;

4. Opinion letter (unsigned) by R.J. Ruble regarding the transaction at issue (KPMGZ12060117-230);

5. Correspondence -
    (a) Letter dated November 2, 2000 to Carlos Sala enclosing *October 2000* Deerhurst statement for Carlos Sala (DHHSala00000569-588);
    (b) Letter dated November 17, 2000 to Deerhurst and Michael Schwartz (DHSala 00000071-73);
    (c) Letter (undated) to Refco re account assignment (DHSala 00000022-24);
    (d) Letter dated December 5, 2000 to Carlos Sala enclosing *November 2000* Deerhurst statement for Carlos Sala (account assigned to Solid Currencies on November 28, 2000) (DHSala 00001740-41);
    (e) Letter dated December 7, 2000 to Carlos Sala enclosing *November 2000* Deerhurst statement for Solid Currencies (DHSala 00001737-39);
    (f) Letter dated January 5, 2001 to Carlos Sala enclosing *December 2000* Deerhurst statement and advising of the liquidation of Solid Currencies (DHSala 00000594-99);
    (g) Refco Customer statements dated October 31, November 30 and December 31, 2000 and January 5, 2001 (DHSala 00000821-912);
    (h) Refco Customer statements dated February 28, March 30, April 30, May 31, June 29, July 31, August 31, September 28, October 31, November 30, and December 31, 2001 (DHSala 00000913-975);
    (i) Account Daily Equity Reports for Carlos Sala and Solid Currencies for November 2000 (DHSala 00001689-1724);
    (j) Refco Customer Confirmation sheets (DHSala 00001026-1610);
    (k) Transaction Journal (DHSala 00001725-26);

6. Attachment I with handwritten notes indicating premiums paid and received (LN 00736);

7. Facsimile to Larry Nemirow from Deerhurst Management (LN 00619-620);

8. Foreign Exchange Trading Program with handwritten notes (LN 00933-947);

9. LoneStar Strategy documents (DHSala 04007-04038, 4055-4061, 4067-4069);

10. Weekly Reports (DHSala 2345-2465);

11. LoneStar Misc. (DHSala 2466-2468, 2469-2477, 2478-2554, 2555-2562, 2563-2632);

12. LoneStar Financial Information (DHSala 2640-2801);

13. Deerhurst Participants and their respective entities:
    (a) Tony (Martin) White/Umbrella Currencies, Inc. and Wired Currencies, Inc. (DH MSN 066-268 and 2497-2699);
    (b) Paul Bagwell/Balanced Currencies, Inc. (DH MSN 0467-0513 and 1486-1532);
    (c) Gregory Stringer/Standard Currencies, Inc. (DH MSN 0410-0466 and 2299-2355);
    (d) Tom Smach/Stapled Currencies, Inc. (DH MSN 0334-0409 and 2356-2431);
    (e) Carl Vertuca/Virtual Currencies, Inc. (DH MSN 0269-0333 and 2432-2496);
    (f) Carlos Sala/Solid Currencies, Inc. (DH MSN 0001-0065 and 2234-2298);
    (g) Rodger Bagwell/Branded Currencies, Inc. (DH MSN 0514-0573 and 1533-1592);
    (h) Kathleen Aburrow/Astro Currencies, Inc. (DH MSN 0574-0620 and 1439-1485);
    (i) Ronald Budacz/Bundled Currencies, Inc. (DH MSN 0621-0698 and 1593-1670);
    (j) Gary Jacobs/Joint Currencies, Inc. (DH MSN 0699-0753 and 2009-2063);
    (k) Dominic Dean/Dual Currencies, Inc. (DH MSN 754-802 and 1960-2008);
    (l) Christopher Dice/Draft Currencies, Inc. (DH MSN 803-895 and 1867-1959);
    (m) Pierre Panos/Principle Currencies, Inc. (DH MSN 1145-1190 and 2117-2162);

DeRosa Research and Trading, Inc.                                    63

(n) Ronald Snyder/Secured Currencies, Inc. (DH MSN 1191-1260 and 2163-2233);

(o) Randy Henderson/Hard Currencies (DH MSN 1261-1281 and 2700-2720);

(p) Multinational Currencies, Inc. (DH MSN 1282-1438 and 2721-2877);

(q) Alan Born/Border Currencies, Inc. (DH MSN 1671-1762);

(r) Arthur Cuff/Central Currencies, Inc. (DH MSN1763-1814);

(s) Mark Crossen/Cross Currencies, Inc. (DH MSN 1815-1866);

(t) Robert King/Kensington Currencies, Inc. (DH MSN 2064-2116);

14. DHMoly 000001-334;

15. 2 CDs of NCM Bates labeled documents;

16. Documents produced by Michael Schwartz;

17. DHMoly 225-236;

18. Brown and Wood opinion letter dated April 16, 2001;

19. KPMGZ12060117;

20. DHSala0000233;

21. DHSala0000549;

22. DHSala 4088-8101;

23. DHSala0000275-0000278;

24. LN000019-000020;

25. DHSala00004202-00004284.

Appendix C:
Formulas for Calculation of Maximum Payoffs from Spreads


Each four-sided spread trades consisted of two sides, a call spread and a put spread.  The maximum payoff to a four-sided spread trade is the greater of the maximum payoff to the component call spread and put spread.

Define
       USD    U.S. Dollar
       CHF    Swiss Franc
       EUR    Euro
       JPY     Japanese Yen
       GBP    British Pound ("Sterling")


The maximum payoffs in dollars associated with the call and put spreads are as follows:

1. EUR/JPY

Euro Call spread

       [Face in Euros] x [Short Strike – Long Strike] / [USD/JPY at expiration]

Euro Put Spread

       [Face in Euros] x [Long Strike – Short Strike] / [USD/JPY at expiration]


2. USD/CHF and USD/JPY

Dollar Call spread

       [Face in USD] x [1- Long Strike/Short Strike]

Dollar Put spread

       [Face in USD] x [Long Strike/Short Strike -1]


3. EUR/USD

DeRosa Research and Trading, Inc.                                          65

Dollar Call spread

    [Face in EUR] x [Short Strike - Long Strike]

Dollar Put spread

    [Face in EUR] x [Long Strike - Short Strike]


4. GBP/JPY

Sterling Call spread

    [Face in GBP] x [Short Strike - Long Strike] / [USD/JPY at Expiration]


Sterling Put spread

    [Face in GBP] x [Long Strike - Short Strike] / [USD/JPY at Expiration]


The methodology follows David DeRosa, <u>Options on Foreign Exchange: Second Edition</u>, Wiley, New York, 1990

———————————————————————————————

EXHIBIT I

Received = 60,259,568.94

Paid = 60,987,866.78

(728,297.85)

DH MSN 00002262

```
PORT: Separate  Include  (*    )
BROK: ALL                        Trades: Open
CPTY: ALL
CURR: Include (REFCO  )           TRADER: ALL
PURP: ALL / NoFilt
```

OTC OPTION TRANSACTIONS
========================================

                    DEERHURST PRODUCT1
                    SOLID CURRENCIES INC                                                          OI
                                                                              CALC DATE: NV 30,00      PREP: NV 30,00
                                                                                                      TIME: 11:05:34
                    TRANSACTION JOURNAL  JA 01,99 - NV 29,00                   Transaction AS OF: JA 01,99 - NV 29,00
                                                                              Maturity AS OF: JA 01,99 - DC 31,49
                                                                              PAGE # 13

| TRANS. DATE | TRANSACTION NUMBER | COUNTER PARTY | TYPE | CUR | FACE AMOUNT | COUNTER CUR | STRIKE | A/E | MATURITY DATE | USD VALUE | PURPOSE | BROKER | BROKER FEE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NV 24,00 | 63969. 0 | REFCO | LEC | GBP | 1,602,000 | JPY | 162.000000 | A | FB 20,01 | -11,438.28 | BTC OPT | BTC | 0.00 |
| NV 24,00 | 63966. 0 | REFCO | SEP | JPY | -241,368,000 | JPY | 113.000000 | E | DC 01,00 | 2,136.00 | BTC OPT | BTC | 0.00 |
| NV 24,00 | 63998. 0 | REFCO | LEP | JPY | 239,232,000 | USD | 112.000000 | E | DC 01,00 | -6,141.00 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64708. 0 | REFCO | LEP | CHF | 437,302,980 | USD | 1.854000 | E | NV 27,01 | -6,156,207.00 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64744. 0 | REFCO | SEC | CHF | -403,266,939 | USD | 1.709700 | E | NV 27,01 | 10,673,117.50 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64754. 0 | REFCO | SEC | CHF | -437,774,720 | USD | 1.856000 | E | NV 27,01 | 6,085,446.00 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64770. 0 | REFCO | LEC | CHF | 403,573,570 | USD | 1.711000 | E | NV 27,01 | -10,755,672.00 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64531. 0 | REFCO | LEC | CHF | -117,935,000 | JPY | 90.100000 | E | NV 27,01 | -5,670,503.50 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64574. 0 | REFCO | SEP | CHF | 117,935,000 | JPY | 97.700000 | E | NV 27,01 | -2,420,214.90 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64578. 0 | REFCO | SEP | EUR | -117,935,000 | JPY | 89.980000 | E | NV 27,01 | 5,600,497.28 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64601. 0 | REFCO | SEC | EUR | 117,935,000 | JPY | 97.900000 | E | NV 27,01 | 2,370,210.46 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64626. 0 | REFCO | LEC | EUR | -117,935,000 | USD | 0.882000 | E | NV 27,01 | -4,340,385.39 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64647. 0 | REFCO | SEC | EUR | 117,935,000 | USD | 0.884000 | E | NV 27,01 | -4,250,377.40 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64682. 0 | REFCO | LEP | EUR | 117,935,000 | USD | 0.814000 | E | NV 27,01 | -3,090,274.39 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64738. 0 | REFCO | SEP | EUR | 117,935,000 | USD | 0.812500 | E | NV 27,01 | 3,025,268.62 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64385. 0 | REFCO | LEP | EUR | -13,609,699,000 | USD | 115.400000 | E | NV 27,01 | 1,480,084.25 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64406. 0 | REFCO | LEC | JPY | 13,586,112,000 | USD | 115.200000 | E | NV 27,01 | -1,521,361.50 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64496. 0 | REFCO | SEC | JPY | -12,453,936,000 | USD | 105.600000 | E | NV 27,01 | -5,938,027.25 | BTC OPT | BTC | 0.00 |
| NV 27,00 | 64535. 0 | REFCO | SEC | JPY | -12,442,142,500 | USD | 105.500000 | E | NV 27,01 | 5,879,059.75 | BTC OPT | BTC | 0.00 |
| NV 28,00 | 65088. 0 | REFCO | LEC | GBP | 200,489,500 | JPY | 163.100000 | A | NV 27,01 | -5,216,255.62 | BTC OPT | BTC | 0.00 |
| NV 28,00 | 65111. 0 | REFCO | LEC | GBP | 200,489,500 | JPY | 163.300000 | A | NV 27,01 | 15,747,989.10 | BTC OPT | BTC | 0.00 |
| NV 28,00 | 65120. 0 | REFCO | SEP | GBP | -200,489,500 | JPY | 150.390000 | A | NV 27,01 | 15,742,302.58 | BTC OPT | BTC | 0.00 |
| NV 28,00 | 65141. 0 | REFCO | LEP | GBP | 200,489,500 | JPY | 150.500000 | A | NV 27,01 | -15,861,385.96 | BTC OPT | BTC | 0.00 |

DeRosa Research and Trading, Inc.
Privileged and Confidential
Saia v. US

EXHIBIT 2

## Risk Reward Table

|  | USD Call CHF Put | USD Put CHF Call | USD/CHF 4-sided |
|---|---|---|---|
| Cost in USD | $70,761 | $82,554 | $153,315 |
| Max Payout | $254,170 | $179,348 | $254,170 |
| Long option premium | $6,156,207 | $10,755,672 | $16,911,879 |
| RiskRwd on cost | 3.6 | 2.2 | 1.7 |

|  | EUR Call JPY Put | EUR Put JPY Call | EUR/JPY 4-sided |
|---|---|---|---|
| Cost in USD | $50,281 | $70,395 | $120,676 |
| Max Payout | $208,380 | $136,033 | $208,380 |
| Long option premium | $2,420,215 | $5,670,504 | $8,090,718 |
| RiskRwd on cost | 4.1 | 1.9 | 1.7 |

|  | USD Put JPY Call | USD Call JPY Put | USD/JPY 4-sided | USD Call JPY Put |
|---|---|---|---|---|
| Cost in USD | $58,967 | $41,278 | $100,245 | $4,005 |
| Max Payout | $111,787 | $204,393 | $204,393 | $18,903 |
| Long option premium | $5,938,027 | $1,521,362 | $7,459,389 | $6,141 |
| RiskRwd on cost | 1.9 | 5.0 | 2.0 | 4.7 |

|  | EUR Call USD Put | EUR Put USD Call | EUR/USD 4-sided |
|---|---|---|---|
| Cost in USD | $90,506 | $65,366 | $155,873 |
| Max Payout | $235,870 | $176,903 | $235,870 |
| Long option premium | $4,340,385 | $3,090,274 | $7,430,660 |
| RiskRwd on cost | 2.6 | 2.7 | 1.5 |

|  | GBP Call JPY Put | GBP Put JPY Call | GBP/JPY 4-sided |
|---|---|---|---|
| Cost in USD | $71,039 | $113,662 | $184,701 |
| Max Payout | $176,903 | $209,159 | $209,159 |
| Long option premium | $5,216,256 | $15,861,386 | $21,077,642 |
| RiskRwd on cost | 2.5 | 1.8 | 1.1 |

|  | outright GBP Call JPY Put |
|---|---|
| Cost in USD | $11,438 |
| Max Payout | NA |
| Long option premium | $11,438 |
| RiskRwd on cost | NA |

Total long premium    $   60,987,867

8.16% of invested capital was committed to these trades

1.0% = cost vs. long prem for all 5
2.5% = max payout vs. long prem for 5
$412,060 = max profit (not incl small outright)
4.6% = max profit basis capital

DeRosa Research and Trading, Inc.
Privileged and Confidential
Sala v. US

EXHIBIT 3

## Detail Analysis — DHSala00001140 & 1

| CHF Put | INVESTOR BUYS Option 1 | INVESTOR SELLS Option 2 | Net value |
|---|---|---|---|
| Trade Date | 27-Nov-00 | 27-Nov-00 | |
| Expiry Date | 27-Nov-01 | 27-Nov-01 | |
| Face in USD | $ 235,870,000.00 | $ 235,870,000.00 | |
| Face in CHF | CHF 437,302,980 | CHF 437,774,720 | |
| | | | |
| Statement date | 30-Nov-00 | 30-Nov-00 | |
| Mkt price | 0.02017 | 0.019780 | 55,901.19 |
| Trade price | 0.026100 | 0.025800 | 70,761.00 |
| | | | |
| **STRIKES** | | | |
| Strike | 1.8540 | 1.8560 | |
| | | | |
| Actual Price | 0.5394 | 0.5388 | |
| liquidation 12/05/00 | $6,156,207.00 | $6,085,446.00 | $70,761.00 |
| USD Call | $ 3,880,061.50 | $ 3,821,094.00 | $58,967.50 |
| CHF Put | 0.01407 | 0.01389 | |
| Premium in USD | $6,153,244 | $6,082,499 | |
| Premium difference | ($2,963) | ($2,947) | |
| | | | |
| Maximum return | CHF 471,740 | $ 254,170.26 | |

## Detail Analysis — DHSala00001142 & 3

| CHF Call | INVESTOR BUYS Option 1 | INVESTOR SELLS Option 2 | Net value |
|---|---|---|---|
| Trade Date | 27-Nov-00 | 27-Nov-00 | |
| Expiry Date | 27-Nov-01 | 27-Nov-01 | |
| Face in USD | $ 235,870,000.00 | $ 235,870,000.00 | |
| Face in CHF | CHF 403,573,570 | CHF 403,266,939 | |
| | | | |
| Statement date | 30-Nov-00 | 30-Nov-00 | |
| Mkt price | 0.058943 | 0.058487 | 107,556.72 |
| Trade price | 0.045600 | 0.045260 | 82,554.00 |
| | | | |
| Strike | 1.7110 | 1.7097 | |
| | | | |
| Actual Price | 0.5845 | 0.5849 | |
| liquidation 12/05/00 | 10,755,672 | 10,673,118 | $82,554.00 |
| USD Call | $ 15,017,842.83 | $ 14,914,060.17 | $103,782.65 |
| CHF Put | 0.02664 | 0.02687 | |
| Premium in USD | $10,753,162 | $10,837,105 | |
| Premium difference | ($2,510) | **$163,987** | ($83,942.69) |
| | | | |
| Maximum return | CHF 306,631 | $ 179,347.84 | |

DeRosa Research and Trading, Inc.       Exhibit 4
Privileged and Confidential
Sala v. US

Digital Option Substitute for Four-Sided USD/CHF Strategy

|     | Strike | Payoff | Value |
|-----|--------|--------|-------|
| 1   | 1.8541 | $12,722 | $3,835 |
| 2   | 1.8542 | $12,721 | $3,833 |
| 3   | 1.8543 | $12,720 | $3,831 |
| 4   | 1.8544 | $12,719 | $3,829 |
| 5   | 1.8545 | $12,719 | $3,827 |
| 6   | 1.8546 | $12,718 | $3,825 |
| 7   | 1.8547 | $12,717 | $3,823 |
| 8   | 1.8548 | $12,717 | $3,821 |
| 9   | 1.8549 | $12,716 | $3,819 |
| 10  | 1.8550 | $12,715 | $3,818 |
| 11  | 1.8551 | $12,715 | $3,816 |
| 12  | 1.8552 | $12,714 | $3,814 |
| 13  | 1.8553 | $12,713 | $3,812 |
| 14  | 1.8554 | $12,713 | $3,810 |
| 15  | 1.8555 | $12,712 | $3,808 |
| 16  | 1.8556 | $12,711 | $3,806 |
| 17  | 1.8557 | $12,711 | $3,804 |
| 18  | 1.8558 | $12,710 | $3,803 |
| 19  | 1.8559 | $12,709 | $3,801 |
| 20  | 1.8560 | $12,709 | $3,799 |
|     | Total  | $254,300 | $76,334 |
| 21  | 1.7109 | $13,786 | $5,807 |
| 22  | 1.7108 | $13,787 | $5,805 |
| 23  | 1.7107 | $13,788 | $5,803 |
| 24  | 1.7106 | $13,789 | $5,801 |
| 25  | 1.7105 | $13,790 | $5,800 |
| 26  | 1.7104 | $13,790 | $5,798 |
| 27  | 1.7103 | $13,791 | $5,796 |
| 28  | 1.7102 | $13,792 | $5,794 |
| 29  | 1.7101 | $13,793 | $5,792 |
| 30  | 1.7100 | $13,794 | $5,790 |
| 31  | 1.7099 | $13,794 | $5,789 |
| 32  | 1.7098 | $13,795 | $5,787 |
| 33  | 1.7097 | $13,796 | $5,785 |
|     | Total  | $179,285 | $75,347 |
|     | Total Cost |       | $151,680 |

DeRosa Research and Trading, Inc.                                                Exhibit 5
Privileged and Confidential
Sala v. US

### Comparison of "1 and 30" versus "2 and 20" fee structure for Sala trading

| $ 9,000,000 | | gross P&L | 1&30 | 2&20 | Difference |
|---|---|---|---|---|---|
| 5% | $ | 450,000 | 225,000.00 | 270,000.00 | (45,000.00) |
| 9% | $ | 810,000 | 333,000.00 | 342,000.00 | (9,000.00) |
| **10%** | **$** | **900,000** | **360,000.00** | **360,000.00** | – |
| 11% | $ | 990,000 | 387,000.00 | 378,000.00 | 9,000.00 |
| 15% | $ | 1,350,000 | 495,000.00 | 450,000.00 | 45,000.00 |
| 20% | $ | 1,800,000 | 630,000.00 | 540,000.00 | 90,000.00 |
| 25% | $ | 2,250,000 | 765,000.00 | 630,000.00 | 135,000.00 |
| 60% | $ | 5,400,000 | 1,710,000.00 | 1,260,000.00 | **450,000.00** |

In one year with 60% return, the cost to Sala of 1&30 versus 2&20 = $450,000
At 60% compounded over 5 yrs, the cost to Sala of 1&30 vs 2&20 = $9,500,000

DeRosa Research and Trading, Inc.
Privileged and Confidential
Sala v. US

Exhibit 6

## Comparison of 1&30 and 2&20 Fee Structures for $9,000,000 with 60% Annual Return over 5 Years

| year | starting capital | 60% return | 1% mgt fee | 30% perf | ending cap |
|---|---|---|---|---|---|
| 1 | 9,000,000 | 5,400,000 | 90,000 | 1,620,000 | 12,690,000 |
| 2 | 12,690,000 | 7,614,000 | 126,900 | 2,284,200 | 17,892,900 |
| 3 | 17,892,900 | 10,735,740 | 178,929 | 3,220,722 | 25,228,989 |
| 4 | 25,228,989 | 15,137,393 | 252,290 | 4,541,218 | 35,572,874 |
| 5 | 35,572,874 | 21,343,725 | 355,729 | 6,403,117 | 50,157,753 |

| year | starting capital | 60% return | 2% mgt fee | 20% perf | ending cap |
|---|---|---|---|---|---|
| 1 | 9,000,000 | 5,400,000 | 180,000 | 1,080,000 | 13,140,000 |
| 2 | 13,140,000 | 7,884,000 | 262,800 | 1,576,800 | 19,184,400 |
| 3 | 19,184,400 | 11,510,640 | 383,688 | 2,302,128 | 28,009,224 |
| 4 | 28,009,224 | 16,805,534 | 560,184 | 3,361,107 | 40,893,467 |
| 5 | 40,893,467 | 24,536,080 | 817,869 | 4,907,216 | 59,704,462 |

**Sala benefits more with 2&20 over 1&30 by the following amount:**          **$9,546,709**

DeRosa Research and Trading, Inc.
Privileged and Confidential
Sala v. US
(DHMoly 000071-000240)

EXHIBIT 7

**Total Foreign Currency Pair Positions of Deerhurst Investors GP in December 2000 (amounts are in base currency, except SGD):**

| Date | Total Acct Value | EUR/CHF | EUR/JPY | GBP/JPY | USD/CHF | EUR/USD | GBP/USD | USD/JPY | USD/SGD |
|---|---|---|---|---|---|---|---|---|---|
| 12/1/2000 | $ 23,488,827 | 1,292,800 | 2,911,048 | | (2,146,410) | (1,292,800) | 775,680 | 2,564,800 | (2,028) |
| 12/4/2000 | $ 24,001,687 | (848,808) | 2,911,048 | | (2,377,242) | (1,231,825) | 775,680 | 5,129,600 | (2,028) |
| 12/5/2000 | $ 23,937,118 | (1,618,248) | 2,911,048 | | (1,800,162) | (1,215,682) | 775,680 | 2,564,800 | (2,028) |
| 12/6/2000 | $ 23,975,908 | (1,618,248) | 2,911,048 | | (1,543,682) | (1,276,657) | 775,680 | 2,564,800 | (2,028) |
| 12/8/2000 | $ 24,002,935 | (1,618,248) | 2,911,048 | | (2,492,658) | (1,203,948) | 769,180 | 2,564,800 | (2,028) |
| 12/11/2000 | $ 24,015,389 | (1,618,248) | 2,911,048 | | (2,492,658) | (1,292,800) | 775,680 | 2,564,800 | (2,028) |
| 12/12/2000 | $ 23,971,212 | (1,618,248) | 2,911,048 | | (2,492,658) | (1,292,800) | 775,680 | 2,564,800 | (2,028) |
| 12/13/2000 | $ 23,962,436 | (1,618,248) | 2,911,048 | | (2,697,842) | (1,381,651) | 641,200 | 2,564,800 | (2,028) |
| 12/14/2000 | $ 23,934,723 | (1,618,248) | 2,911,048 | | (2,564,800) | (1,292,800) | 662,575 | 2,564,800 | (2,028) |
| 12/15/2000 | $ 23,949,331 | (1,618,248) | 2,911,048 | | (2,564,800) | (1,292,800) | 662,575 | 2,564,800 | (2,028) |
| 12/18/2000 | $ 23,946,287 | (1,618,248) | 2,911,048 | | (2,564,800) | (1,292,800) | 662,575 | 2,564,800 | (2,028) |
| 12/19/2000 | $ 23,951,162 | (1,618,248) | 2,911,048 | | (2,587,103) | (1,302,841) | 869,129 | 2,614,755 | (2,028) |
| 12/20/2000 | $ 24,048,937 | | | | 27,600,000 | | | | |
| 12/21/2000 | $ 24,053,167 | | | | 27,600,000 | | | | |
| 12/26/2000 | $ 2,507,027 | | | | 27,600,000 | | | | |
| 12/29/2000 | $ - | | | | | | | | |

This box collapses the currency pairs into their net individual currency exposure, for 12/19/00:

| EUR | CHF | GBP | JPY | USD | SGD |
|---|---|---|---|---|---|
| 2,911,048 | (4,393,863) | 1,654 | 162,174,375 | 4,905 | (2,028) |
| (1,618,248) | 4,393,863 | (864,010) | 126,730,383 | (2,587,103) | |
| (1,302,841) | | 869,129 | (288,904,759) | 1,125,873 | |
| | | | | (1,234,918) | |
| | | | | 2,614,755 | |

Net Currency Positions for 12/19/00:

| (10,041) | - | 6,773 | (1) | (76,488) | (2,028) |
|---|---|---|---|---|---|