# EXHIBIT E

1   A.   I wasn't looking.  I happened to be in Dallas,
2   Texas for other business.  A friend of mine, Tim Gillis,
3   happened to be in Dallas as well.  He called me up and said,
4   Can we do lunch?
5        At that lunch, Tracie Henderson was introduced to
6   me, and we talked about the financial services that she
7   offered, which were tax planning, tax compliance.  And that's
8   how I met her.  Nothing really developed after that first
9   initial meeting.
10   Q.   Did you tell me earlier that you didn't engage
11   Pricewaterhouse in tax planning?
12   A.   Correct.
13   Q.   Because you didn't think an accounting firm
14   should do that?
15   A.   No, not tax planning; investment-management
16   services.  Tax planning, yes.  Absolutely.
17   Q.   All right.
18   A.   By the way, I think that Pricewaterhouse may
19   have done some estate-tax planning for me.
20   Q.   What did you and Tracie talk about at that
21   first lunch?
22   A.   Very little with Tracie; it was mostly with
23   Tim, my friend.  And we mostly talked about the Internet,
24   about my experience at Abacus.
25        KPMG was trying to figure out how to create an

60

1   on-line initiative within their tax group, and he asked me if
2   I would be willing to talk to one of their senior tax
3   partners and provide some advice as to how to go about going
4   to the Internet.
5           Q.    Would that be for compensation?
6           A.    No, this was a favor to a friend.  You know
7   what?  They sent me a T-shirt.
8           Q.    You're a hard negotiator.
9           A.    It was a favor to a friend.
10          Q.    Was it the right size?
11          A.    Probably not.
12          Q.    And did you talk to Tracie Henderson at that
13  meeting?
14          A.    Yeah, we were introduced; she was there.  My
15  recollection is she listened 90 percent of the meeting.  And
16  then she talked and she was telling me, This is what I do.
17  If you'd like to have any of these services, I would be very
18  happy to work with you.
19          Q.    Did you tell her what was going on at Abacus?
20          A.    We talked about the fact that we had already
21  entered into a contract to sell the business.
22          Q.    Did you talk about the options that you had?
23          A.    No.
24          Q.    Did you talk about any part of your personal
25  finances?

```
 1          A.   No, I just met her.  No way.
 2          Q.   Well, you were with Tim as well?
 3          A.   I know, but I wouldn't have felt comfortable
 4   talking about my compensation with somebody I just met.  With
 5   Tim, that would be okay, but I had just met her.
 6          Q.   When was your next contact with Ms. Henderson?
 7          A.   You know, it was in 2000, and maybe in the
 8   spring.  I don't recall exactly.  But it was in 2000.
 9          Q.   And who called who?
10          A.   She would have called me.  There would be no
11   reason for me to call her.
12          Q.   What did she say to you?
13          A.   I don't recall what she said on our initial
14   call.  My guess is, How are you doing?  Here I am; here's
15   KPMG; if you need any services, keep us in mind.
16          Q.   What is it that Tracie told you she could do?
17          A.   She was big on estate-tax planning; that was
18   the big thing that they thought she could help me with.
19          Q.   What did that mean?
20          A.   Preparation of your wills, working with
21   attorneys, planning for transition of wealth from one
22   generation to another generation.  Those types of things.
23          Q.   Did she help you prepare a will?
24          A.   No.  I hired an attorney.  Actually, I hired
25   first an attorney at Holland & Hart, and then I hired Davis
```

1  Graham to do that work for me.
2         Again, that's business, to me, that you're better
3  off going to a law firm than going to an accounting firm to
4  do that.
5         Q.    When you talked to Tracie at that point in
6  time, did you tell her what was going on with you
7  financially?
8         A.    In 2000?  Yes, at some point.  I'm sure we
9  talked about the fact that I had left Abacus, and that I was
10 no longer working at Abacus.  And she said, What are you
11 doing?  And that was most of the discussion.
12        Q.    Did you tell her what your financial situation
13 was?
14        A.    I don't recall.  At some point I did; I just
15 don't recall if it was the next conversation or not.
16        Q.    Did she present you with possible transactions
17 for you to become involved in?
18        A.    I don't think she put it that way.
19        Q.    What did she say?
20        A.    My guess would be -- my recollection, which
21 would be in a general way, would be that she would say, I
22 have an idea; I'd like to present it to you and see what you
23 think.
24        Q.    Was there any compensation for any of her
25 services at this point in time?

```
 1   component, and I didn't think much of it.
 2           Q.    Help me out with this, if you can.  John Raby
 3   and Tracie Henderson seem to be two people in 2000 who were
 4   trying to present ideas to you.
 5           A.    Yes.
 6           Q.    In addition to Goldman Sachs and Morgan
 7   Stanley?
 8           A.    In addition to -- yes, that's right.  And
 9   there were probably other people that would call me and say,
10   Hey...
11           Q.    Sure.  People calling out of the blue a little
12   bit?
13           A.    Yes.
14           Q.    But Tracie Henderson, at this point, wasn't
15   out of the blue?
16           A.    No.
17           Q.    You met her in 1999?
18           A.    That's correct.
19           Q.    And John Raby wasn't out of the blue?
20           A.    Correct, I had a relationship with him.
21           Q.    What I'm trying to figure out is -- and you
22   were receptive to listening to ideas?
23           A.    Yes.
24           Q.    But you didn't provide any guidance to these
25   people about what sorts of things you might be interested in
```

1  in jail by one of the presidents.
2           It was just a huge thing, and I was following
3  everything. That's why I had already formed an opinion on
4  the Argentinian peso. You didn't have to be a
5  foreign-currency expert to do that.
6           Q.   And you had an analysis that the 90-day period
7  was too short?
8           A.   Absolutely.
9           Q.   But you don't recall talking with anyone else
10 about it specifically?
11          A.   I'm sure I told Tracie that.
12          Q.   I'm not asking who you told; I'm asking who
13 you sought advice from to see if others agreed with you.
14          A.   No one that I can recall.
15          Q.   Okay. Is that the reason why you didn't enter
16 into these BLIPS transaction?
17          A.   Those were the two primary reasons. I think
18 there was a third reason as well. It had to do with Notice
19 2000-44.
20          From my recollection, Notice 2000-44 came out.
21 Tracie Henderson made me aware that that notice was out
22 there. She said, We don't know what this really means inside
23 KPMG, but the impression I get is that you're grandfathered
24 in if you want to do BLIPS. We will still be able to do it
25 if you'd like to.

74

1          But at that point, I already had reservations on the
2   other two issues. I said, Why do I need to go through this
3   assessment of 2000-44 when I'm not comfortable with the
4   transaction?
5          Q.   Had you already committed to BLIPS?
6          A.   No, I never came close to committing to BLIPS.
7          Q.   So I don't understand. What did you
8   understand was the grandfathering if you hadn't entered into
9   the transaction?
10         A.   The grandfathering meant that these were
11  clients that they had talked to about doing BLIPS before this
12  issue had come up. That's what she meant.
13         Q.   But the IRS notice would have still impacted
14  your decision whether to go into it?
15         A.   Oh, sure. It would have had to be addressed.
16         Q.   The grandfathering is KPMG's willingness to do
17  the transaction with you, not the impact of IRS Notice
18  2000-44 on the transaction?
19         A.   Absolutely correct.
20         Q.   So you were aware of 2000-44 when you decided
21  not to do the BLIPS transaction?
22         A.   I was aware of it.
23         Q.   And you've indicated, then, that there were
24  three reasons why you didn't do BLIPS?
25         A.   Yes.

75

1    Q.   And you seem to indicate -- and correct me if
2  I'm wrong -- that the IRS Notice 2000-44 was a small reason?
3    A.   It was a reason.  I couldn't quantify whether
4  it was big, small, or medium.  It was not the primary.  It
5  was lesser in importance than the first two, especially at
6  that point.
7         Obviously I know more about 2000-44 now, but at that
8  time I gave tremendous weight to the two primary reasons.
9  And the fact that there was now a tax issue that had to be
10 addressed just added to my conviction of not doing BLIPS.
11 But I just never got close to it.  I never looked at
12 documents; I never looked at an opinion.
13   Q.   You never saw a BLIPS document?
14   A.   If I did, I can't recall.
15   Q.   Did there come a time when you entered into a
16 formal arrangement with KPMG to retain them?
17   A.   I'm sure I did.
18   Q.   With respect to the BLIPS matter, was it
19 before the BLIPS of after the BLIPS?
20   A.   My recollection would be probably sometime
21 during the discussions that we had.  The BLIPS discussion
22 went on for some time.  Maybe she mentioned it in the spring
23 of 2000, and we had discussions throughout the summer.  At
24 some point, I felt comfortable with Tracie and I think she
25 sent me an engagement letter at some point.

```
 1    projections, profit, legal opinion.  None of that.
 2           Q.    Did the Deerhurst transaction compute a
 3    probability of profit?
 4           A.    I prepared a projection.
 5           Q.    What conclusion did you come to with respect
 6    to Deerhurst?
 7           A.    I projected that I was going to make a ton of
 8    money.
 9           Q.    In percentages, in a wide range, what were you
10    looking at as a return?
11           A.    I think my annual rate of return was somewhere
12    between 60 to 75 percent.
13           Q.    Return on investment?
14           A.    Yes.
15           Q.    Over the course of five years, or each year?
16           A.    Each year; each year.
17           Q.    60 to 70 percent a year?
18           A.    Yeah.  On a leveraged basis.
19           Q.    4 to 1?
20           A.    4 to 1, including leverage.
21           Q.    So without leverage?
22           A.    About 16 or 17 percent without leverage.
23           Q.    And you felt pretty comfortable with those
24    numbers, at least based upon your due diligence?
25           A.    At the time.
```

```
24           Q.    He told us in his deposition that he formally
25    left in February and announced that he was leaving, I think,
```

1    idea that he was talking about, other than what you just
2    described?
3         A.   Not to my recollection.
4         Q.   With regard to KPMG, there were BLIPS -- some
5    other transactions were mentioned -- or at least the name
6    thrown out -- but BLIPS was the only transaction that you
7    actually had more than just a brief discussion about?
8         A.   BLIPS was the only transaction.  But I
9    wouldn't even say "names."  I would say the only name that I
10   have any recollection of whatsoever was the OPIS one that I
11   just mentioned.
12        Q.   Did Tracie -- was this over the phone when you
13   talked to her?
14        A.   Over the phone, yes.
15        Q.   And it was an idea that she was working on for
16   you?
17        A.   I don't know if it was even an idea.  It
18   was -- Well, we have this transaction we've done in the past
19   called OPIS.  I wasn't that interested in her pursuing that.
20   I was like, What's the point?
21        Q.   Why?  Because of the notice?
22        A.   No, she was telling me we're trying to feel
23   internally here what the notice means to us.  And I think I
24   was already considering the Deerhurst transaction.  Any
25   transaction that I go into, I put a lot of time into it -- a

99

1  estate-tax planning. Things like that.
2      Q.   Okay.
3      A.   And actually, I should say bringing up
4  investment ideas, because BLIPS would fall into that.
5      Q.   All right. You talked with Mr. Raby about the
6  Deerhurst transaction in the summer?
7      A.   Spring or summer.
8      Q.   Spring or summer of 2000?
9      A.   Yes.
10     Q.   Did he call you, or meet with you?
11     A.   I'm sure he called me.
12     Q.   What did he tell you about the transaction?
13     A.   Not much. I think it was an opportunity to
14  introduce me to Michael Schwartz. So it would have been
15  something like, I have an idea -- just like he did with
16  Jenkens & Gilchrist, I'm sure -- if you're in New York and
17  you have an hour to meet with Mike Schwartz. That's all I
18  can recall.
19     Q.   He didn't tell you anything about why he
20  wanted to meet with you? I mean, about what the transaction
21  was just to see if that might be something --
22     A.   Sure. Well, the reality is that I can't
23  recall, unless I speculate.
24     MR. HALLETT: Don't speculate.
25     A.   All right.

1    Q.    (By Mr. Geier)  I'm going to ask you to
2    speculate.  There's an objection to it, I understand, but I
3    think it's appropriate in a deposition to explore the best
4    you can.  And if it's speculation, just let me know that
5    that's what you're doing.
6         MR. HALLETT:  No, I object.  We'll go to "the man"
7    on that.
8         MR. GEIER:  Darrell, we don't need to argue.  I just
9    need an instruction from you --
10        MR. HALLETT:  I'm instructing him not to speculate.
11   He can give his best recollection, but if it's pure
12   speculation, I'm going to instruct the witness not to
13   speculate.
14        Based upon advice of counsel, don't answer a
15   question if you're speculating.
16        Q.    (By Mr. Geier)  In this discovery deposition,
17   are you refusing to answer the question I posed to you based
18   upon advice of Counsel?
19        A.    Yes.
20        Q.    I'll move on.  Is it likely that you would
21   have wanted to know what the idea was before committing some
22   of your time to a meeting?
23        A.    Yes.
24        Q.    Were you looking for an investment in foreign
25   currencies?

```
 1              A.    No, I wasn't looking.
 2              Q.    Did you understand before you met with Michael
 3   Schwartz that the Deerhurst transaction involved foreign
 4   currencies?
 5              A.    Before?
 6              Q.    Before.
 7              A.    No.
 8              Q.    Did you understand before you met with Michael
 9   Schwartz that the transaction involved the generation of a
10   tax loss?
11              A.    No, not to my recollection.
12              Q.    Did you have an understanding of who Michael
13   Schwartz was before you met with him?
14              A.    Yes, I had an idea; of course.
15              Q.    Who did that come from?
16              A.    I'm sure it came from John Raby.
17              Q.    What was your idea?
18              A.    I can't recall.  I have an idea, but...
19              Q.    What was that idea?
20              A.    My idea of Mike -- which I'm not sure was what
21   Raby told me -- was that Mike was heading a firm that had
22   strategies and investments that had an investment component
23   to them and also a tax component to them.
24              Q.    And is that what you were looking for?
25              A.    I wasn't looking.  I was receptive to
```

105

1   that I would be the largest investor in Deerhurst.  And, as a
2   result, Mr. White was going to be the second largest investor
3   in Deerhurst.
4            In the investment field, size brings purchasing
5   power.  It's just the way it is.  I thought, also, that if we
6   made money, we were going to make a lot of money, and I
7   didn't mind sharing even the larger part of the 20 percent
8   with Deerhurst.
9            But on the asset-management fee, I thought that I
10  should be able to guard on the downside, so I was willing to
11  give up an assured fee versus a contingent fee based on
12  profits.
13           And I told both Krieger and Schwartz that I was not
14  going to do the transaction unless the fees were lower.
15        Q.    Did you run any numbers on 2 and 20 versus 1
16  and 30?
17        A.    No, I didn't.
18        Q.    Let's go back.  You were telling me about a
19  second meeting that occurred with yourself, Mr. Schwartz, and
20  Mr. White?
21        A.    Yes.
22        Q.    How far from the first meeting?  How much time
23  elapsed between the two?
24        A.    Maybe a couple of months.
25        Q.    Okay.  So it wasn't just a matter of a week or

```
 1              Q.    When you say "tax justification," there was a
 2   concern, then, that the transaction might not hold up from a
 3   tax standpoint?
 4              A.    No, I don't think so.  I think that Schwartz
 5   was -- he told me he was trying to be extra conservative and
 6   make sure that from the government's perspective -- the
 7   Treasury's perspective -- that he had a methodology that was
 8   familiar, and at one point proposed by the Treasury, is what
 9   I recall.
10              Q.    So Mr. Schwartz was aware that the IRS may not
11   look favorably on the transaction?
12              A.    I wouldn't say that.
13              Q.    So Mr. Schwartz was aware that the IRS would
14   question the transaction?
15              A.    Every person would be aware that any
16   transaction may be questioned.
17              Q.    That transaction was described in IRS Notice
18   2000-44; correct?
19              A.    It's interesting that you ask that question.
20   At that time, I don't think Mike Schwartz thought that it
21   was.
22              Q.    What about you?
23              A.    I didn't know.  I was relying on some legal
24   advice.  So what I did know --
25              MR. HALLETT:  Let him finish the answer before you
```