# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - -

| | |
|---|---|
| CARLOS E. SALA and<br>TINA ZANOLINI SALA, | )<br>)<br>) Case No: |
| Plaintiffs, | ) 05-CV-00636-LTB-OES<br>) |
| vs. | )<br>) |
| UNITED STATES OF AMERICA | )<br>) |
| Defendant. | ) |

**CERTIFIED COPY**

THE DEPOSITION OF

LAURENCE NEMIROW

DENVER, COLORADO

SEPTEMBER 14, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: MARTHA H. BENNETT
FILE NO.: A007B17

1

```
 1           A.    I don't recall.  I mean, people don't usually
 2   tell me why they need representation; they just ask for
 3   representation.  But, no, I don't recall.
 4           Q.    Did you ask him if there was litigation
 5   involved with this transaction?
 6           A.    No, I did not.
 7           Q.    What did he in particular ask you to do?
 8           A.    I don't recall what he asked me to do, but I
 9   think I recall what I told him I would be willing to do.
10           Q.    All right.  What was that?
11           A.    I would review the tax opinion from Brown &
12   Wood with a view towards trying to ensure that it would
13   provide penalty protection in the event that the IRS asserted
14   civil penalties.
15           I also told him that I would review the underlying
16   transactional documents, and comment on them, and try to make
17   sure that they worked.
18           Q.    What does that mean, "try to make sure that
19   they worked"?
20           A.    That they produced the intended deal; the
21   intended economic arrangement between the parties.
22           Q.    What was that intended economic relation
23   between the parties?
24           A.    Well, Carlos is part of the Deerhurst
25   transaction, invested in a limited liability company.  And
```

```
 1   what I'm talking about are the terms of the investment in
 2   that company.  I think "Deerhurst Strategies" is the name of
 3   the company.
 4            Q.   Could that have been "Deerhurst Trading
 5   Strategies"?
 6            A.   That could have been, yes.
 7            Q.   And your role, then, in that regard, was to
 8   ensure that the formation documents were correct to put them
 9   in that?
10            A.   No, not the formation documents; it was the
11   terms of the Deerhurst Trading Strategies deal.  It was a
12   complex document.  I read the document and made sure the
13   allocation provisions in the LLC agreement would stand up,
14   and if they were what was intended; and if the termination
15   provisions would work.  All the economic provisions of the
16   document, were what I looked at.
17            Q.   You said "they would work."  Does that mean to
18   you that they would survive legal scrutiny?
19            A.   What I meant to say was that they would
20   capture the intended economic arrangement between Carlos and
21   the company and the rest of the members.
22            Q.   Okay.  Now, we're talking here about Deerhurst
23   Trading Strategies, LLC?
24            A.   Uh-huh.
25            Q.   Were you aware of when that transaction would
```

16

1   don't think so.
2           Q.   With regards to this transaction, the
3   Deerhurst transaction, you were aware that these tax benefits
4   were to be created in 2000; correct?
5           A.   If they were created, it would be in 2000.
6           Q.   Was there ever any intention that they not be
7   created?
8           A.   I think there were optional phases in the
9   transaction, so it may or may not have gone ahead.
10          Q.   Did any of your clients discuss not going
11  ahead?  The three that we're discussing here.
12          A.   They may have; I don't remember.  I can't
13  recall anyone discussing it or not discussing it.  It's
14  possible they did.
15          Q.   Okay.  Let's just clarify the record a little
16  bit here.  When we were talking about whether or not an
17  intermediary entity -- S Corp or LLC -- was necessary for
18  this transaction, I asked you, then:  Could this transaction
19  and the tax benefits be achieved without this intermediary,
20  such as an S Corp or a C Corp?  Could you just give us your
21  answer?
22          A.   I think so.
23          Q.   You think that the tax benefits could be still
24  be achieved?
25          A.   I think so; I think so.  I haven't thought it

```
 1        Q.   Do you know whether there was any oral
 2   communication and opinion by Mr. Lemons to Mr. Sala with
 3   regards to his analysis?
 4        A.   That, I don't know either.
 5        Q.   Did you ever talk with Mr. Lemons about his
 6   analysis for Mr. Sala?
 7        A.   I don't believe we ever talked about the
 8   transaction for Mr. Sala.
 9        Q.   Did you ever talk with Mr. Lemons about this
10   transaction for Mr. White?
11        A.   No.
12        Q.   Same question with regards to Mr. Dice.
13        A.   No.
14        Q.   Do you know whether Mr. Sala sought any
15   analysis or advice from any person other than you with
16   regards to this transaction -- other than your and
17   Mr. Lemons' transaction?
18        A.   I believe he told me that he sought advice
19   from a New York firm.
20        Q.   Do you recall the name of the New York firm?
21        A.   I believe it was Wilke, Farr & Gallagher.  I'm
22   not 100 percent sure, but I believe that's correct.
23        Q.   Do you know what the purpose of that contact
24   with Wilke Farr was?
25        A.   I believe it was to be represented in this
```

```
 1   transaction.
 2            Q.    I'm sorry; you'll have to clarify that answer.
 3            A.    He was looking for representation in the
 4   transaction.
 5            Q.    For purposes of entry into the transaction?
 6            A.    Correct.
 7            Q.    Is that the role that you filled subsequently?
 8            A.    Yes.
 9            Q.    So the contact with Wilke Farr was before you
10   came onto the scene in this transaction?
11            A.    Correct.
12            Q.    Do you know whether Wilke Farr accepted him as
13   a client for purposes of analyzing this transaction?
14            A.    I don't believe so.
15            Q.    Do you know why they didn't?
16            A.    I think they didn't like the transaction,
17   because it was close to this Notice 2000-44.
18            Q.    How did you come by that knowledge?
19            A.    Carlos told me.
20            Q.    When did Carlos tell you this?
21            A.    At the outset of my engagement.
22            Q.    Did he tell you this before he was being
23   represented by you?
24            A.    Yes.
25            Q.    What was your reaction to that news?
```

```
 1    Sala?
 2         A.    Yes.
 3         Q.    Did you provide any input into the conclusions
 4    in that opinion letter?
 5         A.    Yes.
 6         Q.    What was the input that you gave?
 7         A.    I requested the opinion.
 8         Q.    All right.  Why did you request that opinion
 9    letter?
10         A.    I was concerned about whether the S Corp would
11    provide limited liability.
12         Q.    Why was that?
13         A.    Because the S Corp was engaging in -- it was
14    engaging in option transactions which, to my mind, could have
15    resulted in a liability.
16         Q.    Meaning what?
17         A.    Meaning that I was concerned that Mr. Sala
18    would end up personally liable for some of the transactions
19    engaged in by the S Corp
20         Q.    Was this due to the amount of leverage that
21    was being used at the time in terms of the trading?
22         A.    It was due to the fact that it was engaged in
23    option transactions.
24         Q.    Was your concern based at all upon the amount
25    of leverage that was being used in these transactions?
```

| | |
|---|---|
| 1 | A. It gave me a fair amount of comfort, yes. |
| 2 | Q. Did that second Rosenman & Colin opinion |
| 3 | address each of those issues? |
| 4 | A. I believe it addressed only limited liability, |
| 5 | which was my concern. |
| 6 | Q. Your concern was whether or not Mr. Sala could |
| 7 | be personally liable for these option trades; correct? |
| 8 | A. Exactly. |
| 9 | Q. But you were not concerned about |
| 10 | undercapitalization of the S Corp? |
| 11 | A. Not separately concerned. That may have been |
| 12 | an issue for the limited liability. In other words, if |
| 13 | you're undercapitalized, you can lose limited liability. |
| 14 | Q. Do you know whether the Rosenman & Colin |
| 15 | opinion actually spelled out either of those concerns: |
| 16 | leverage or undercapitalization? |
| 17 | A. I don't recall. |
| 18 | Q. In regards to the Deerhurst transaction, did |
| 19 | you consider bringing any other clients of yours into the |
| 20 | Deerhurst transaction? |
| 21 | A. No. |
| 22 | Q. Why is that? |
| 23 | A. I don't generally create deals involving my |
| 24 | clients. |
| 25 | Q. Wasn't this deal already created? |

```
 1            Q.    Why is that?
 2            A.    Because I think it dealt with substantially
 3   similar transactions.
 4            Q.    Yet you still advised Mr. Sala to go forward
 5   with the transaction?
 6            A.    No.
 7            Q.    You did not?
 8            A.    I didn't advise him to go forward with the
 9   transaction.
10            Q.    Did you advise Mr. Sala not to go forward with
11   the transaction?
12            A.    No.
13            Q.    Did you provide him any advice either way on
14   entering into this transaction?
15            A.    Quite possibly, but I don't remember.
16            Q.    Did you caution Mr. Sala that you believed the
17   Deerhurst transaction fell within Notice 2000-44?
18            A.    Yes.
19            Q.    What did you say to him?
20            A.    I said that the IRS would likely challenge the
21   transaction.
22            Q.    What was his response?
23            A.    I don't recall.
24            Q.    Did he seem concerned?
25            A.    I don't recall.
```

73

1      Q.   How early in your representation of Mr. Sala
2  was this conversation?
3      A.   Early on.
4      Q.   Was it before Mr. Sala entered into the
5  transaction?
6      A.   Yes.
7      Q.   You said you reviewed the Brown & Wood opinion
8  letter.  In the Brown & Wood opinion letter, it dealt with
9  Notice 2000-44; is that correct?
10     A.   That's correct.
11     Q.   Am I correct that the Brown & Wood opinion is
12 of the opinion that this transaction does not fall within
13 Notice 2000-44?
14          MR. HALLETT:  Objection; form.
15     A.   I don't think that's correct.
16     Q.   (By Mr. Janik)  Am I correct that the Brown &
17 Wood opinion letter took the opinion that this transaction
18 was more likely than not to survive IRS scrutiny?
19     A.   Yes.
20     Q.   You said earlier that you believe this
21 transaction fell within 2000-44.  You also said that you
22 believed that the IRS would challenge this transaction.  Did
23 you believe -- at the time that Mr. Sala hired you to review
24 this transaction -- that this transaction more likely than
25 not was going to survive IRS scrutiny?

74

| | | |
|---|---|---|
| 1 | A. | I didn't have an opinion on that matter. |
| 2 | Q. | Why is that? |
| 3 | A. | Because it wasn't what I was asked to do. |
| 4 | Q. | But you were asked to review the conclusions of the Ruble opinion letter; correct? |
| 6 | A. | I was asked to review the opinion letter with a view towards evaluating whether it would likely provide protection against civil penalty.  I wasn't asked to give an opinion on the transaction. |
| 10 | Q. | Do you know why you were limited in that regard? |
| 12 | A. | No -- actually, I think I do, at least in part.  I limited my own role that way; I described my role to Carlos that way. |
| 15 | Q. | Okay.  Did you limit your role in that way based upon your understanding of the transaction you had already developed at that point in time? |
| 18 | A. | Yes. |
| 19 | Q. | That included your prior review of the Brown & Wood/Ruble opinion letter? |
| 21 | A. | I don't whether I had reviewed the opinion letter already, but I was aware of the nature of the transaction. |
| 24 | Q. | Okay. |
| 25 | | (Exhibit 104 marked for identification.) |

```
 1          A.    I don't think that says "deduction claims."
 2          Q.    What does it say?
 3          A.    I don't know what it says.  I can't read it.
 4          Q.    Nevertheless, do you believe that the
 5   deduction claims were the primary motive of the transaction?
 6          A.    No.
 7          Q.    Why is that?
 8          A.    Because there were also economics in the
 9   transaction, which could have been the primary motive.
10   Either one of them could have been, and I don't know which
11   one of them was.
12          Q.    Could they have equal weight?
13          A.    I don't know.
14          Q.    Did you ask anyone?  Did you ask Mr. Sala?
15          A.    You know, I don't recall whether I asked him
16   that question.
17          Q.    But wouldn't that have been important to you
18   to be able to opine on whether penalties were protected or
19   not?
20          A.    It was important to me to know whether the
21   representations were accurate that were relied on in giving
22   the opinion, so I discussed those with Mr. Sala.
23          Q.    I'm still unclear on your answer.  You were
24   hired to help analyze whether or not Mr. Sala would be
25   subject to penalties on this transaction; correct?
```

1   A. I would say it differently. I would say I was
2   hired to review the opinion with an eye towards commenting on
3   it in order to provide comfort that it would protect against
4   civil penalties.
5   Q. But instead of focusing or questioning
6   Mr. Sala as to his primary motive in this transaction, you
7   merely limited yourself to making sure that the
8   representations in this opinion letter matched the facts?
9   A. I'm not sure that I didn't ask him about his
10  primary motive. I just don't recall whether I did or not.
11  Q. Did you ask Mr. White what his primary motive
12  was?
13  A. I don't recall.
14  Q. Did you ask Mr. Dice what his primary motive
15  was?
16  A. I don't recall that either.
17  Q. Did you ask any of your clients what their
18  primary motives were?
19  A. I'm not going to comment on other
20  conversations with other clients.
21  Q. That telephone number at the top -- is that a
22  telephone number at the very top of the page?
23  A. Presumably.
24  Q. Do you know whose telephone number that is?
25  A. No.

```
1            A.     I don't recall discussing that.
2            Q.     Did you discuss it with Mr. Dice?
3            A.     No, I don't recall.
4            Q.     Can you help me understand the relative role
5     that Mr. Sala, Mr. White, and Mr. Dice played with regards to
6     interacting with you as to your work on this deal?
7            A.     I tended to interact more with Carlos than
8     with Mr. White or Mr. Dice.
9            Q.     Were there any particular issues or questions
10    that you would turn to one or the other to discuss?
11           A.     Carlos was very much into the entire deal.  I
12    just spent a lot of time with Carlos on every aspect of the
13    transaction.
14           Q.     What about Mr. White?
15           A.     Less so with Mr. White and Mr. Dice.
16           Q.     Did Mr. Sala raise any concerns with the
17    transaction to you?
18           A.     I don't recall.  I'm sure he did.  He raised
19    concerns about various aspects of the transaction, having to
20    do with things like the size of the management fee and the
21    general partners' cut of the profits, and how they were
22    worded.
23           Q.     Was this pre-entry or post-entry?
24           A.     It was pre-entry.
25           Q.     What did you do to resolve those issues?
```

```
 1            Q.    Do you know whether Mr. Ruble had an
 2   assistant?
 3            A.    I may have known that, and it may have been
 4   Susan Sodano.
 5            Q.    Right underneath that, if you could read what
 6   that says.
 7            A.    "Oral engagement letter."
 8            Q.    And what's below that?
 9            A.    Something "of engagement letter."  I can't
10   read the first word.
11            Q.    And below that?
12            A.    "Would tell me at closing.  Will give."
13            Q.    Is that in reference to the assurance -- do
14   you know what that's in reference to?
15            A.    It looks like that's in reference to the
16   assurance of the opinion.
17            Q.    Did you receive any information from Deerhurst
18   or MultiNational Strategies with regards to Deerhurst's prior
19   investment performance?
20            A.    I may have; it's possible.  I don't remember.
21            Q.    Did you consider that part of your role for
22   Mr. Sala to review that information?
23            A.    Just to point out to him the importance of
24   that, of knowing what their prior history was.
25            Q.    But it was not your duty to investigate the
```

102

```
 1             Q.    (By Mr. Janik)  But earlier you stated you
 2      didn't know whether or not you had asked that.
 3             A.    Right.
 4             Q.    And I'm trying to determine:  If you knew
 5      that, would it have made a difference?
 6             MR. HALLETT:  Objection; asked and answered.
 7             A.    Yeah, I think it's the same answer.
 8             Q.    (By Mr. Janik)  Okay.  So regardless of
 9      whether you knew that, it wouldn't have made a difference?
10             A.    I don't think that was my answer.  I think
11      you're asking me for a speculative answer, and I don't think
12      it would be useful for me to speculate on how that would have
13      influenced my conclusions.  It would just be speculation,
14      because I don't know.
15             Q.    Can you just answer as best you can?
16             MR. HALLETT:  Objection; asked and answered.  He
17      said he didn't want to speculate.
18             A.    That was the best answer I could give.
19             Q.    (By Mr. Janik)  So the fact that someone is
20      being paid a commission which is pegged, in part, to the tax
21      losses claimed by the clients they bring in, in the abstract,
22      isn't that important to a decision about an analysis of civil
23      penalties?
24             A.    It could be important to aspects of the
25      analysis.  I'm not sure that it would be important to the
```

106

1          A.    Yes.

2          Q.    (By Mr. Hallett)  Based upon your discussions
3    that you had with Mr. Sala from early October 2000 to April
4    16, 2001, did Mr. Sala convey to you that he, in good faith,
5    wanted to understand the draft and the final form of the tax
6    opinion?

7          A.    Yes.

8          MR. JANIK:  Objection; form; foundation; leading;
9    compound.

10         Q.    (By Mr. Hallett)  Did he express to you why he
11   wanted to understand the tax opinion?

12         A.    He may have; I don't recall.  Carlos wanted to
13   understand everything.

14         Q.    And he wanted to understand everything.  Did
15   he want to understand documents like the subscription
16   agreement?

17         A.    Maybe that document to a lesser extent.

18         Q.    Let's put aside the tax opinion.  What other
19   documents do you recall looking at and discussing with Carlos
20   that you could tell he wanted to understand?

21         MR. JANIK:  Objection; foundation.

22         A.    The private-placement memorandum and the LLC
23   operating agreement for Deerhurst Strategies.

24         Q.    (By Mr. Hallett)  Did he seek your advice and
25   a better understanding of those documents with matters of no

138

```
 1   significant amount of time"?
 2        A.   It was hours.
 3        MR. JANIK:   Calls for speculation.
 4        Q.   (By Mr. Hallett)   For example, on Exhibit 110,
 5   it states as follows:   "Investor, through S Corp, entered
 6   into the trial period, increased leverage, and Fund 1 and
 7   Fund II for substantial non-tax business reasons, including
 8   to produce an overall economic profit from the movement of
 9   foreign currencies."
10        Did you discuss that representation with Mr. Sala?
11        MR. JANIK:   Foundation.
12        A.   Yes.
13        Q.   (By Mr. Hallett)   Did you advise Mr. Sala as
14   to whether the final form of that representation that appears
15   in Exhibit 110, from the information he provided you and any
16   other information you obtained, was a fair and accurate
17   representation?
18        A.   No, I would have relied on Carlos for that.
19   We would have discussed it together.  I wouldn't have told
20   him whether it was fair and accurate.  I wasn't making the
21   reps; he was.
22        Q.   No, I'm sorry.  Your point is well taken; I
23   misstated.  I'm not asking whether you determined that the
24   transaction was invested in for substantial non-tax business
25   reasons to produce this overall economic profit; I'm asking
```