# EXHIBIT I

# B R O W N  &  W O O D LLP

ONE WORLD TRADE CENTER
NEW YORK, NY 10048-0557
TELEPHONE: 212-839-5300
FACSIMILE: 212-839-5599

April 16, 2001

Mr. Carlos Sala
2424 Ginny Way
Lafayette, CO   80026

Dear Mr. Sala:

## Re: Investments in Foreign Currency

You ("Investor") have requested our opinion regarding certain U.S. federal income tax consequences of various investment transactions ("Transactions"), described more fully below, that Investor has made in foreign currency and foreign currency derivatives, such as options, directly and indirectly through Deerhurst Management, Inc. ("Deerhurst").

## I.    Summary of the Transactions

### A.    Trial Account

On October 23, 2000, Investor established a trial account with Deerhurst for the purpose of evaluating a long-term investment with that firm.  Deerhurst is one of the leading foreign currency management firms in the country.  Based in Fort Lee, New Jersey, Deerhurst has been in operation since 1991 and has a historical profitability of 18.2 % after fees on an unleveraged basis.

Historically, Deerhurst invested monies via separate managed accounts for investors. They required a minimum investment of $5 million per account in order to execute transactions with a high enough nominal value to be economical both for the investor and for Deerhurst.  In order to increase the monies under management, they have decided to reduce the investment

**LN 00000453**

LOS ANGELES · SAN FRANCISCO · WASHINGTON DC · BEIJING · TOKYO REPRESENTATIVE OFFICE
AFFILIATED WITH BROWN & WOOD, A MULTINATIONAL PARTNERSHIP WITH OFFICES IN LONDON AND HONG KONG

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 2

minimum per investor so long as the investor is willing to place their account in Deerhurst Trading Strategies LLC, a fund that will commingle these investments, as described below. The first step in this process is the formation of the trial account.

The trial account is formed to introduce the investor to Deerhurst's trading strategy. Minimum investment size is $500,000. Deerhurst utilizes its "diversified trading strategy, a combination of technical trading systems with a discretionary overlay. The diversified strategy utilizes a combination of currency spot trades, currency forwards and currency options to trade a broad category of currencies. Most trading is short term, though some are mid-term to long term of up to one year. The account is extremely active, with high turnover and generally small profits on a majority of positions and small losses on a minority of positions, except for core positions, which are taken infrequently and are designed to position the portfolio for major currency moves. Such core positions may be taken in spot, forwards or options, depending upon the specific market environment.

**B.    Increasing Investments**

During the initial trial period, Deerhurst would employ leverage in executing these transactions, but in no case will that leverage exceed 2-1. After a 30-45 day trial period, the investor is expected to increase his investment. Such increase would be implemented by increasing the amount of cash and/or the amount of leverage to a 4-1 level. At the Investor's election, such leverage will be limited to a 3-1 level if the investor agrees to enter into Deerhurst Investors, a domestic pooled investment entity that is treated as a Partnership for federal income tax purposes ("Fund I") with others that have elected this 3-1 increase. The Fund I allows the investor to minimize the leverage for a short period to experience the trading at this level before continuing at 4-1 in the Fund I, while allowing Deerhurst the ability to trade in greater blocks, producing economies of scale.

At the time of increasing the investment, if it is done by increasing the leverage, Investor was advised by Manager of the prudence of doing so through the use of a limited liability vehicle. Investor determined to use a wholly owned S corporation ("S Corp") to achieve this advantage. Investor then contributed the entire portfolio, including certain long and short European-style foreign currency options (respectively, "Long Options" and "Short Options", and

**LN 00000454**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 3

collectively "Options") with Deerhurst Management, LLC, an unrelated financial institution ("Bank") to S Corp[1] and then to Fund I. The Long Options had a cost of $60,987,866.79, and the Short Options resulted in premiums received by Investor of $60,259,568.94. At the time of the transfer the Short Options were out of the money.

At the time Investors signed the subscription documents for Fund I, the documents indicated that if the account was profitable at year end, the account would be automatically rolled up into the Deerhurst Trading Strategies LLC, a second pooled investment entity treated as a partnership for U.S. federal income tax purposes ("Fund II"). If the account had net losses, it could still be rolled up if the investors so elected, or the funds would be returned to the investors penalty free with any economic gains or losses to date.

### C.   Rollup into Fund II

On December 21, 2000, the account was rolled into the Fund II in a 2-step process. Initially, the individual trades were distributed from Fund I back to S Corp in the original foreign currency. Once at S Corp level, Deerhurst then liquidated the positions into US dollars to avoid any illiquidity and volatility issues typical of trades over the year-end. This is a strategy that Deerhurst has performed for clients in prior years. On December 29, 2000, the dollars were then contributed to the Fund II and S Corp was liquidated, as it was no longer needed.

### D.   Fund II Investments

Fund II will continue to enter into a number of foreign currency transactions on behalf of the investors including spot, forward and options transactions similar to those done in the trial account and increased leverage periods. Deerhurst continues to utilize a 4-1 leverage on these transactions. The funds are intended to be left in Fund II for a 5-year period. While the documents prohibit a withdrawal for the initial year, any withdrawals after that one-year period will be subject to a substantial early withdrawal penalty that decreases over time until the end of the 5-year period.

---

[1]   Deerhurst have advised us that the Options provided for transferability, i.e. could be sold or otherwise transferred separately from each other (subject to satisfying Bank's credit requirements).

**LN 00000455**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 4

Based on the historical results of Deerhurst and the amount of leverage employed, if the investors stay in for the full 5-year period they should earn a profit of 1300% over this period.

**II.     Representations:**

**A.     Investor Representations:**

For purpose of rendering our opinion, Investor has represented as follows:

1.     Investor, through S Corp, entered into the trial period, increased leverage, and Fund I and Fund II for substantial non-tax business reasons, including to produce an overall economic profit from the movement of foreign currencies.

2.     Based upon Investor's own independent evaluation and upon the advice of Deerhurst, Investor believed that by entering into Fund I and II, Investor could diversify his portfolio, and create profits from an activity that has no correlation to the major equity markets.

3.     Based upon advice of the Deerhurst as to the probability of the Funds, and specifically the foreign currencies reaching certain levels at which the options transactions would be profitable, and upon Investor's own independent evaluation, Investor believed that Investor had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits.

4.     Based on the advice of Deerhurst, and upon Investor's own independent evaluation, Investor had an opportunity to make an aggregate gross return in excess of the sum of Investor's net investment in the trial account and the Funds.

5.     Investor contributed the trial account to S Corp and from S Corp to the Fund I for substantial non-tax business reasons, including use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst.

6.     Neither Investor nor S Corp will hedge such person's risks with respect to the Options' net position with respect to the Bank.

7.     Neither Investor nor S Corp has identified, nor will it identify, any of the Options as being part of a hedging transaction under Treas. Reg. §1.446-4.

**LN 00000456**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 5

8.  Neither Investor nor S Corp has elected, nor will it elect, under Treas. Reg. §1.988-3(b) to treat exchange gain or loss on any forward contracts, futures contracts or option contracts as capital gain or loss.

9.  Investor owned 100% of the issued and outstanding stock of S Corp.

10. At the time of the contribution of the Options to S Corp the Options were not subject to any liabilities, and S Corp assumed no liabilities and distributed or paid no money or other property to Investor in connection with such contribution.

11. S Corp has elected to be treated as an S corporation for U.S. federal income tax purposes.

12. Investor and S Corp each uses the U.S. dollar as such person's functional currency.

13. Investor/S Corp is not related to the other members of Fund I or Fund II.

14. Whether and when Investor terminated Investor's investment in Fund I was within Investor's sole discretion and control subject to the rollup provision in the subscription agreement, the execution of which itself was within in Investor's sole discretion and control.

15. There existed no understanding, agreement, obligation, or arrangement pursuant to which any Investor described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/S Corporation (and Fund I as transferee of Investor) and Bank were contractually obligated to perform under the foreign currency transactions in accordance with their stated terms subject to the rollup provisions in the subscription agreement.

16. Investor has not entered into a confidentiality agreement or otherwise agreed (orally or in writing) to any obligations of confidentiality with respect to the Transactions.

17. Investor is an individual whose "tax home" as defined in Section 911(d)(3) of the Internal Revenue Code of 1986, as amended ("Code") is the United States.

18. Investor has reviewed the description of the Transactions as set forth herein and such description is accurate and complete, and there are no pertinent facts relating to the Transactions that have not been set forth in such description.

**B.**     **Deerhurst/Fund I Representations:**

**LN 00000457**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 6

For purpose of rendering our opinion, Deerhurst/Fund has represented as follows::

1. Deerhurst/Fund I have not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

2. Fund I will determine its members' distributive shares income, gain, loss, deduction, or credit and will maintain its members' capital accounts in accordance with Code Section 704 and the Treasury Regulations promulgated thereunder.

3. Fund I has not made an election under Code Section 754 and will not do so for the taxable year or years in which the Transactions occur.

4. Fund I has not elected, and will not elect, under Treas. Reg. §301.7701-3 to be classified as a corporation.

5. Fund I entered into the Transactions for substantial non-tax business reasons, including to produce an overall profit from investments in foreign currency and foreign currency options.

6. The Short Options were out of the money at the time that they were contributed by Investor to S Corp and at the time that they were contributed by S Corp to Fund I.

7. At the time of the contribution of the Options to Fund I the Options were not subject to any liabilities, and Fund I assumed no liabilities and distributed or paid no money or other property to Investor in connection with such contribution.

8. The Options are not listed on or subject to the rules of a qualified board or exchange as those terms are used in Code Section 1256(g)(5).

9. Fund I has not elected, and will not elect, under Treas. Reg. §1.988-3(b) to treat exchange gain or loss on any forward contracts, futures contracts or option contracts as capital gain or loss.

10. Deerhurst/Fund I uses the U.S. dollar as its functional currency.

## III.   Conclusions

In rendering our opinions, we have reviewed representations and advice, including financial information, from various parties to the Transactions and made certain assumptions, which representations, advice and assumptions are referred to below.  In rendering our opinions, we have also examined such agreements, certificates, instruments and documents, and we have

LN 00000458

## BROWN & WOOD LLP

Mr. Carlos Sala
April 16, 2001
Page 7

made such other inquires of officers, owners and representatives of the entities involved in the Transactions as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, records, agreements, certificates, instruments, documents, and responses to such inquiries. If any such representations, advice, assumptions, records, agreements, certificates, instruments, documents, or responses is inaccurate in any material respect, or any such agreements, certificates, instruments, and documents prove not to be authentic, the opinions contained herein may not be relied upon. In rendering our opinion, we have reviewed the applicable provisions of the Code and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.", "Treasury Regulations", or "Regulations") promulgated thereunder; relevant decisions of the U.S. federal courts; published Revenue Rulings ("Rev. Rul." or "Ruling") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service ("IRS"); and such other materials as we have considered relevant. In certain instances we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

Based on and subject to the summary set out at Section I above, the Representations set out at Section II above, and the analysis of the pertinent statutory provisions and legal doctrines at Section IV below, as of the date on which the Transactions occurred:

A.  For U.S. federal income tax purposes it is more likely than not that:

1.  The Options will be treated as separate instruments.

2.  Investor will not recognize taxable gain or loss upon the contribution of the Options to S Corp.

3.  Investor's basis in its Corp stock will be increased by Investor's basis in the Long Option and Debt Securities immediately before the transfer, and Corp's tax basis in the Long Option and Debt Securities will equal Investor's tax basis in the Long Option and Debt Securities immediately before the transfer.

4.  At the time of the contribution of the Options to S Corp, the Short Options will not be considered liabilities for purposes of Code Section 358.

5.  Fund I will be classified as a partnership.

**LN 00000459**

NYLIB1/801884/3

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 8

6.  S Corp will not recognize material taxable gain or loss upon the contribution of the Options to Fund I.

7.  S Corp's basis in its interest in Fund I will be equal to S Corp's basis in the Long Option, reduced by the amount of liabilities as determined for purposes of Code Section 752 assumed by Fund I and increased by Investor's share of such liabilities.

8.  At the time of the contribution of the Options to the Fund I, the Short Options will not be considered liabilities for purposes of Code Section 752.

9.  S Corp will not recognize gain or loss on the receipt of a distribution of foreign currency from Fund I in exchange for Investor's interest in Fund I.

10.  The basis of foreign currency received as a distribution in exchange for S Corp's interest in Fund I will equal S Corp's basis in such interest immediately before such distribution.

11.  Gain or loss recognized by S Corp on the conversion of the foreign currency received in exchange for S Corp's interest in Fund will be treated as ordinary income or loss.

B.  Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions set forth herein will be upheld if challenged by the IRS.

C.  Based upon the foregoing, the IRS should not be successful were it to a penalty against Investor under Code Section 6662(b)(2) or (3) for taking the positions set forth herein in Investor's U.S. federal income return with respect to the Transactions.

## IV.   Analysis

### A.   The Options

### 1.   Taxation of Options Generally

The tax consequences of the issuance of an option are set out not in the Code, but in cases and Rulings. The fundamental case regarding the timing of income arising from an option is Virginia Iron Coal & Coke Co. v. Comm'r, 37 B.T.A. 195 (1938), a reviewed decision. In that

**LN 00000460**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 52

purposes of Code Section 752 under any Regulation promulgated pursuant to Section 309 of
H.R. 5662.

       **v.**    **Amount of Liability**

      As discussed above with respect to the transfer of the Short Option to Corp, even
if the obligation under the Short Option is considered a liability, it is more likely than not that the
amount of the "liability" would be considered zero.

    **E.**    **Withdrawal from Fund**

    **1.**    **Recognition of Gain or Loss**

      When S Corp withdraws from Fund I, S Corp received a liquidating distribution of Fund I
assets with a value equal to the then value of S Corp's Fund I interest.  Code Section 731(a)
provides that a partner does not recognize gain on the distribution of property from a partnership,
except to the extent that the amount of money received exceeds the partner's adjusted basis for
the partnership interest.  Loss is recognized only if the property distributed consists solely of
money, unrealized receivables and inventory. Code Section 731(b) provides that a partnership
does not recognize gain or loss on the distribution to a partner of property, including money.

      S Corp's withdrawal from Fund I would, more likely than not, not cause S Corp to
recognize the premium income on a Short Option (if held by Fund I upon such withdrawal)
because, as discussed above, such withdrawal did not cause a Short Option to "terminate".

      On S Corp's withdrawal from Fund I, S Corp received a distribution of foreign currency.
Under general principles of tax law, foreign currency is generally considered to be property and
not money.  See Rev. Rul. 74-7, 1974-1 CB 198. However, in 1994, Congress amended Code
Section 731 to provide that for purposes of this section, the term "money" would include
"marketable securities," which is defined to include foreign currency, options, forward or futures
contracts, notional principal contracts, and derivatives.

      Nevertheless, Code Section 731(c)(3) provides that this special definition will not apply
if Fund I is an "investment partnership" and each partner is an "eligible partner".  Code Section
731(c)(3)(C)(i) defines an "investment partnership" as any partnership that has never been
engaged in a trade or business and substantially all of the assets of which consist of money,

**LN 00000504**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 53

stock, notes, bonds, debentures, interest rate, currency or equity notional principal contracts, foreign currencies, and specified other marketable securities. An "eligible partner" is any partner who has not contributed to the partnership any property other than that described in Code Section 731(c)(3)(C)(i). Code Section 731(c)(3)(C)(i) states that investing, trading, or dealing in such assets is not a trade or business for this purpose.

Because Fund I is not engaged in any trade or business except investing in the types of property listed in Code Section 731(c)(3)(C)(i) and each member of Fund I has contributed only such property to Fund I, it is more likely than not that distributions to S Corp would not be considered money for purposes of Code Section 731(a), and that S Corp would not recognize gain on the distribution of the Foreign Currency. Under Code Section 731(b), it is more likely than not that Fund I would not recognize gain or loss on the distribution of the Foreign Currency.

2.   **Basis of Foreign Currency Distributed**

Code Section 732(b) provides that the basis of property distributed to a partner in liquidation of a partnership interest is equal to the partner's adjusted basis in the partnership interest, reduced by the amount of any money distributed. As discussed above, foreign currency is property, but is not considered money.

In Rev. Rul. 74-7, supra, a U.S. citizen converted dollars into a foreign currency, and at the end of his trip, converted the foreign currency back to dollars. The IRS held that the foreign currency was a capital asset, and that any gain or loss on reconversion was capital gain or loss. Code Section 1221 defines the term "capital asset" as property held by the taxpayer with certain exceptions. In Rev. Rul. 87-124, 1987-2 CB 205, the IRS cited Rev. Rul. 74-7 for the proposition that foreign currency is property to a U.S. resident. See also, American Home Products Corp. v. U.S., 601 F.2d 540 (Ct. Cl. 1979); B. F. Goodrich Co. v. Comm'r, 1 T.C. 1098, 1104 (1943), non acq. 1974-2 CB 5.

Congress implicitly agreed with the rule that foreign currency is not money when it amended Code Section 731(c) to provide that, for purposes of Code Sections 731(a)(1) and 737, the term "money" includes marketable securities, which is then defined to include foreign currency and options, forward or futures contracts notional principal contracts and derivatives. The language of Code Section 731(c) clearly limits the change to Code Section 731(a)(1) and Code Section 737, and the rule cannot be applied to other Sections of the Code. The legislative

**LN 00000505**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 55

the partnership cannot make the required adjustment because it has insufficient basis in its assets, the partnership would recognize a long-term capital gain.

Under the Administration's 1999 budget proposal, the proposed changes would be effective for distributions made after the date of enactment and, consequently, would have no effect on the Transactions.

F.    **Disposition of the Foreign Currency**

Code Section 985(a) generally requires that all income tax determinations with respect to a taxpayer be made in the taxpayer's functional currency. Code Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain conditions are met. Treas. Reg. §1.988-1(c) provides that any currency of a taxpayer or a QBU other than its functional currency is "nonfunctional currency".

Code Section 988 governs the U.S. federal income tax treatment of certain transactions in foreign currency, described as "section 988 transactions", and governs such transactions notwithstanding any other provisions of Chapter 1 (Sections 1 through 1400) of the Code. Furthermore, in the case of transactions by individuals, Code Section 988(e) limits the applicability of the Code Section 988 rules to transactions the expenses of which meet the requirements of Code Section 162 or Code Section 212. Code Section 988(e)(3); Treas. Reg. §1.998-1(a)(9). As discussed below, it is more likely than not that the Transactions would meet these standards.

Code Section 988(a) provides:

Notwithstanding any other provision of this chapter [i.e., Sections 1 - 1400]

(1)    TREATMENT AS ORDINARY GAIN OR LOSS. ---

(A)    IN GENERAL. -- Except as otherwise provided in this section, any foreign currency gain or loss attributable to a section 988 transaction shall be computed separately and treated as ordinary income or loss (as the case may be).

Code Section 988(c)(1) provides:

**LN 00000507**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 56

> (A)   GENERAL. --The term "section 988 transaction" means any transaction described in subparagraph (B) if the amount which the taxpayer is entitled to receive (or is required to pay) by reason of such transaction --
>
> (i)   is denominated in terms of a nonfunctional currency , or
>
> (ii)   is determined by reference to the value of 1 or more nonfunctional currencies.
>
> (B)   DESCRIPTION OF TRANSACTIONS. -- For purposes of subparagraph (A), the following transactions are described in this subparagraph:...
>
> (iii)   Entering into or acquiring any...option....

Section 988(c)(1)(C)(i) further provides that in the case of any disposition of nonfunctional currency, the disposition is treated as a section 988 transaction and any gain or loss from such transaction is treated as foreign currency gain or loss. See also, Treas. Reg. §§1.988-1(a)(2)(iii), 1.988-2(d)(1), 1.988-2(d)(4) and 1.988-3(a).

The acquisition of nonfunctional currency is also treated as a section 988 transaction for purposes of determining the taxpayer's basis in such currency and determining exchange gain or loss thereon. Treas. Reg. §1.988-1(a)(1).

Treas. Reg. §1.988-2(a)(1)(i) provides that the recognition of exchange gain or loss upon the sale or other disposition of nonfunctional currency is governed by the recognition provisions of the Code that apply to the sale or disposition of property, such as Code Section 1001.[13] Treas. Reg. §1.988-2(a)(2)(i) provides that exchange gain or loss realized from the disposition of a

---

[13]   Treas. Reg. §1.988-2(a)(1)(iii) provides, however, that no gain or loss is recognized with respect to: (i) an exchange of units of a nonfunctional currency for different units of the same currency, (ii) the deposit of a nonfunctional currency in a demand or time deposit or similar instrument (including a certificate of deposit) issued by a bank or other financial institution if such instrument is denominated in the same currency; (iii) the withdrawal of nonfunctional currency from a demand or time deposit or similar instrument issued by a bank or other financial institution if such instrument is denominated in the same currency, (iv) the receipt of nonfunctional currency from a bank or other financial institution from which the taxpayer purchased a certificate of deposit or similar instrument denominated in such currency by reason of the maturing or other termination of such instrument, and (v) the transfer of nonfunctional currency from a demand or time deposit or similar instrument issued by a bank or other financial institution to another demand or time deposit or similar instrument denominated in the same currency issued by a bank or other financial institution.

**LN 00000508**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 57

nonfunctional currency is determined by reference to the taxpayer's basis in such currency and the amount realized.  Treas. Reg. §1.988-2(a)(2)(ii)(B) provides that the exchange of nonfunctional currency for property is treated as an exchange of such currency for units of functional currency at the then spot rate and the purchase of the property for such units of functional currency.  Treas. Reg. §1.988-2(a)(2)(ii)(C) provides an example that involves the use of nonfunctional currency to purchase items of equipment.  The example concludes that such purchase is a disposition of such currency with the amount realized measured by reference to the spot price of the currency on the date of purchase and the use of such functional currency to purchase the equipment.

Based upon Investor's/S Corp's representation, it is more likely than not that the U.S. dollar would be treated as S Corp's functional currency.  Consequently, it is more likely than not that the disposition of the Foreign Currency received by S Corp would be a transaction that is treated a "section 988 transaction" on which gain or loss is recognized.  Code Section 988(c)(1)(C).  Under Code Section 988(a)(1) and Treas. Reg. §1.988-3(a), such gain or loss is treated as ordinary income or loss.

Treas. Reg. §1.988-2 provides rules for determining the amount of gain or loss that arises from a section 988 transaction and that is characterized as ordinary under Treas. Reg. §1.988-3.  Treas. Reg. §1.988-2(a)(2)(i) provides that on a disposition of nonfunctional currency exchange gain is the entire amount of the excess of the amount realized on its disposition over the taxpayer's adjusted basis in the currency and the exchange loss is the entire amount of the excess of the taxpayer's adjusted basis in the currency over the amount realized on its disposition.  Treas. Reg. §1.988-2(a)(2)(ii) provides that the amount realized on the disposition of nonfunctional currency is determined under Code Section 1001(b) and Treas. Reg. §1.988-2(a)(2)(iii)(A) provides that the adjusted basis of nonfunctional currency is determined under the applicable provisions of the Code.  Neither such Treasury Regulation nor the preamble thereto limits the amount of exchange gain or loss on the disposition of nonfunctional currency to that portion of the gain or loss attributable to a change in exchange rates.  Instead, such Treasury Regulation simply applies the mechanical provisions of other Code Sections in order to

**LN 00000509**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 58

determine the amount of gain or loss and then characterize all of such gain or loss as exchange gain or loss.[14]

Treas. Reg. §1.988-1(a)(11) gives the IRS the power to exclude a transaction from the provisions of Code Section 988 if the substance of the transaction or transactions indicates that the transactions are not properly considered section 988 transactions. There is no guidance under Treas. Reg. §1.988-1(a)(11) as to what would not properly be considered a section 988 transaction. Some insight may be gained from the example in the Regulation, which deals with the reverse situation. In the example, the taxpayer transfers nonfunctional currency to a newly formed corporation with no other assets and sells the stock, claiming that the transaction is not a section 988 transaction. In the example, the Commissioner recharacterized the transaction as being a section 988 transaction because an asset not subject to Code Section 988, the stock, was substituted for an asset that was subject to Code Section 988. In the instant case, S Corp acquired the foreign currency in a transaction described in Treas. Reg. §1.988-1(a)(1) and -2(a)(1). The acquisition of the foreign currency is not the surrogate for a transaction involving an asset not described in Code Section 988. Based on the foregoing, it is more likely than not that the IRS would not be successful were it to attempt to recharacterize the transaction under Treas. Reg. §1.988-1(a)(11).

Treas. Reg. §1.988-2(f) gives the Commissioner the power to recharacterize the timing, source, and character of gains and losses with respect to a section 988 transaction in accordance with its substance. The example in the Regulation involves a taxpayer who denominated a transaction that was in substance a forward sales contract as a notional principal contract and who attempted to apply the rules relating to notional principal contracts to the transactions. In the instant case, the acquisition and disposition of the foreign currency are reported consistently with the form of the transactions and consistently with their economic substance. Consequently, it is more likely than not that the IRS would not be successful were it to attempt to change the

---

[14] Code Section 988(b)(1). It appears that this regulatory approach was adopted based upon the legislative history of the amendments made to Code Sections 988(b) and (c) in the Technical and Miscellaneous Revenue Act of 1988. The House, Senate and Conference Committees each included identical language in their reports describing the measurement and recognition of foreign currency gain or loss. The Committees said: "Further, any gain or loss on a nonfunctional currency disposition is foreign currency gain or loss regardless of whether the difference between acquisition and disposition prices is due to spot rate movements between acquisition and disposition dates, forward discount or premium, bid-asked spreads, or other factors". Treasury's all gain/loss approach would appear to be based upon this directive.

LN 00000510

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 59

timing, character or source of the loss recognized by S Corp from the disposition of the Foreign Currency.

Treas. Reg. §1.988-2(a)(1)(i) provides that the recognition of gain or loss from the sale or disposition of a nonfunctional currency is governed by the other provisions of the Code that apply to the sale or disposition of property, and cites Code Section 1001 and 1092 as examples of such provisions. Treas. Reg. §1.988-2 does not, however, specifically refer to Code Section 165 in connection with the allowance of a deduction of a loss sustained under Code Section 988. Consequently, there is some uncertainty as to whether Code Section 988 independently provides for the allowance of a loss sustained in a Section 988 transaction or whether such loss must also be tested under Code Section 165. The language of Code Section 988(a)(1) to the effect that notwithstanding any other provisions of the Code a loss sustained in a Section 988 transaction shall be treated as an ordinary loss, supports the view that Code Section 988 provides an independent allowance. This position is further supported by Code Section 988(e) which limits the loss incurred by an individual to those incurred in transactions in which expenses allocable to the transaction would be deductible under Code Section 162 or 212. Because the individual loss allowance rules of Code Section 165(c) contain provisions that are substantially the same, if Code Section 988 losses of an individual were subject to Code Section 165(c) there would have been no need to include similar limitations with Code Section 988(e). Thus, although the law is not entirely clear, Code Section 988 could be viewed as providing for the deduction of a loss from a Code Section 988 transaction independently of Code Section 165.

Even were the IRS to successfully contend that a loss recognized under Code Section 988 must meet the requirements of Code Section 165, it is more likely than not that the loss would still be deductible in the instant case. This is because Code Section 165(b) calculates the amount of deduction based on the adjusted basis rules of Code Section 1011, which equally apply under Treas. Reg. §1.988-2(a). Furthermore, as discussed below, were the loss claimed by S Corp in S Corp's individual return, we believe that it is more likely than not that Code Section 165(c) standard would be met.

Notwithstanding this general statutory language relating to Code Section 165, Treas. Reg. §1.165-1 (b) provides that for the loss to be allowable under Code Section 165(a) the loss must be evidenced by closed and completed transactions, fixed by identifiable events, and be actually sustained during the taxable year; that the loss be a bona fide loss; and that substance rather than

**LN 00000511**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 62

### (b)    Economic Substance and Business Purpose Doctrines

As with the relationship of the sham transaction doctrine to the business purpose and economic substance doctrines, there is some confusion about the relation of the latter two to each other.  Again, the JCT Appendix is helpful in trying to clarify the confusion:

> In its common application, the courts use business purpose (in combination with economic substance...) as part of a two-prong test for determining whether a transaction should be disregarded for tax purposes: (1) the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction, and (2) the transaction lacks economic substance. [citation omitted]

JCT Appendix, at n. 63.  This language mirrors the language of the 4th Circuit Court of Appeals in Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89 (4th Cir. 1985).[16]  Consequently, to determine whether the Transactions will be respected in the instant case one needs to test the transactions under each prong.  This is because the Transactions will not be respected for U.S. federal income tax purposes only if they fail both prongs, i.e., the Transactions lack both business purpose and economic substance.

### i.    Business Purpose

For a transaction to have a business purpose there must be a business or commercial reason for the taxpayer to engage in the transaction without regard to tax benefits.  Friedman v. Comm'r, 869 F.2d 785, 792 (4th Cir. 1989); Rice's Toyota World, Inc. v. Comm'r, supra.  The existence of such a purpose was recently addressed in United Parcel Service of America, Inc. v. Comm'r, T.C. Memo. 1999-268.

In the United Parcel Service case, the taxpayer tried to avoid taxation with respect to certain fees by restructuring them as insurance.  Economically, the taxpayer was in substantially the same position as before the restructuring, but through the arrangements was able

---

[16]    "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89 at 91.

**LN 00000514**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 63

to exclude the payments from income. The taxpayer put forth a number of purported commercial reasons for the restructuring of the fees. The taxpayer argued that (i) it was required to restructure the arrangements because such payments would fall afoul of restrictions under some state insurance laws; (ii) it intended to leverage the profits into the creation of a new reinsurer that could become a full-line insurer; (iii) by removing the fees from its operating ratios it could obtain larger rate increases than had it received the fees directly; and (iv) by restructuring the fees it protected its transportation business from the risk increased liabilities. However, the taxpayer offered no credible evidence that the restructuring would in fact achieve goals (i), (iii), and (v). The court also found that goal (ii) could have been accomplished by merely making an investment in such a reinsurer.

Similarly, in Winn-Dixie Stores Inc. v. Comm'r, 113 T.C. No. 21 (1999), the court disallowed interest deductions on policy loans in a COLI program that insured the lives of approximately 30,000 workers. The program resulted in a pre-tax loss for the taxpayer. The taxpayer argued that (i) the program enabled it to fund costs of one of it benefit programs, and (ii) increased the benefits it could offer to its employees under such program. As to (i), the court found that there was no contemporary evidence that it had purchased the COLI policies to provide such funding; that the COLI policies were not designed to fund such benefits; that the taxpayer's CFO never told the entity that was planning the COLI transactions that the purpose was to fund the benefit program; and that projections showed that the cash flow from the program was needed to pay future interest and premiums as opposed to being available t fund the benefits plan. As to (ii), the court found that the described additional benefits were not related to the COLI program.

In Compaq Computer Corp. v. Comm'r, 113 T.C. No. 17 (1999) the court disallowed foreign tax credits associated with dividends on certain American Depositary Receipts. Among the factors taken into account was that the officer of the taxpayer in charge of the investments made no inquiry into the commercial aspects of the transactions.

Lastly, in ACM Partnership v. Comm'r, supra, and Saba Partnership v. Comm'r, T.C. Memo. 1999-359, involving similar transactions, the courts found that the purported business purposes of the transactions were unsupported by the evidence and, similar to the foregoing cases, the individuals involved with execution of the transaction did not exhibit behavior consistent with trying to achieve the purported commercial purposes.

**LN 00000515**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 64


       The common thread in these cases is that to have the requisite business purpose to support the tax benefits achieved, there must be a purported commercial reason for engaging in the various transactions, the transaction must be consistent with such reason, and such reason must be supportable by contemporary evidence, including a showing that the transaction was handled in a business-like manner. This analysis is supported by a number of cases.

       For example, in <u>Levy v. Comm'r</u>, 91 T.C. 838 (1988), the taxpayers entered into a sale-leaseback of computer equipment for the asserted reason of diversifying their business and investments. In upholding the tax benefits the court stated:

> Based upon our careful examination of the relevant facts and evidence in this case, we conclude that petitioners entered into the transaction in issue for sound business reasons (namely to diversify their investments by entering into a legitimate long-term investment involving the purchase and leaseback of computer equipment). Petitioners approached the decision to enter into this transaction in a businesslike manner. Petitioner's financial advisor thoroughly and in good faith investigated the proposed purchase-leaseback transaction. He prepared cash flow analyses which included the components of the transaction that were critical to earning a profit on the investment. Those components included the current fair market value and projected residual value of the equipment, the fair rental value of the lease, and the rent participation agreement. He explained to petitioners the significance of and risks associated with the projected residual value of the equipment and the rent participation agreement. In addition, he explained to petitioners the tax consequences of the transaction. Petitioners also retained a law firm with expertise in leasing transactions to investigate the financial status and creditworthiness of each participant involved in the transaction, to investigate each participant's business reputation, and to handle the legal aspects of this complex transaction.
>
> We are satisfied that petitioners had a good faith and substantial business purpose for entering into the transaction. Petitioners participated in the purchase leaseback transaction only after they were convinced that the investment had a reasonable possibility of producing a profit.

**LN 00000516**

BROWN & WOOD LLP

Mr. Carlos Sala
April 16, 2001
Page 65


91 T.C. 838, 855-856.  Similarly, see Pearlsten v. Comm'r, T.C. Memo. 1989-621; Rubin v.
Comm'r, T.C. Memo. 1989-484.

        In Caruth Corp. v. Comm'r, 865 F.2d 644 (5th Cir. 1989), aff'g 688 F. Supp.
1129 (N.D. Tex. 1987), the issue was whether a charitable contribution would be allowed for a
contribution of stock of a controlled corporation after the dividend was declared, but before the
dividend record date.  The court upheld the deduction in part upon finding that lag between the
declaration and record dates had a business purpose:

> [Taxpayer] contends that the distinction between the two dates was
> designed to encourage his nephews... to sell their shares to
> him....The lag between the declaration date and record dates was
> designed to give the nephews an opportunity to sell.  The plan
> failed in this respect; the nephews held their shares.

> The district court made factual findings that the [taxpayer] wished
> to buy out his nephews' interests in North Park Incorporated, and
> that he believed declaration of a dividend might facilitate this
> objective.  We review these findings pursuant to the clearly
> erroneous standard, and find clear support in the record.  With
> these factual findings in place, we believe it obvious that the
> distinction between declaration and record date did, as [taxpayer]
> contends, serve a legitimate business purpose.

865 F.2d at 650.


        Lastly, it should be noted that a transaction can have an appropriate business
purpose even if the transaction itself does not generate a profit.  For example, in Chisolm v.
Comm'r, 79 F.2d 14 (2nd Cir. 1935), cert. denied 296 U.S. 641 (1935), the court held that the
desire to pool and jointly manage assets was adequate business purpose to own and manage such
assets through a partnership.  See Caruth v. Comm'r, supra; Horn v. Comm'r, 968 F.2d 1229
(D.C. Cir. 1992).

        As stated above, Investor/S Corp believed that Investor/S Corp had a reasonable
opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the
Transactions, without regard to tax benefits.  Also as stated above, Investor contributed the
Options to S Corp and S Corp contributed the Options to Fund for substantial non-tax business

LN 00000517

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 66

reasons, including use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst. These reasons the Transactions will more likely than not satisfy any business purpose requirement for Investor's entering into the Transactions in the first instance and for contributing the Options to S Corp and causing S Corp to contribute the Options to Fund I. The IRS might assert that Investor could have accomplished the same result by contribution cash to S Corp and having S Corp or Fund acquire the Options, and that there was no business purpose for the form chosen by Investor. However, long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69 F. 2d 809 (2d Cir. 1934). Therefore, a taxpayer is free to choose the most tax-favored method of accomplishing an economic result without any business justification for the method chosen, so long as that method is no more circuitous than another and the transaction itself has the requisite business purpose.

### ii. Economic Substance

It is well established that a transaction or series of transactions may not be respected for tax purposes unless the transaction or transactions have economic substance separate and distinct from the economic benefit derived from tax reduction. Gregory v. Helvering, 293 U.S. 465 (1935). Transactions failing to meet this standard lack the requisite "economic substance" (often interpreted as a having a reasonable possibility of pre-tax profit) and so will not be respected for tax purposes. However, the Supreme Court has held that a transaction should be respected if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". Frank Lyon Co. v. U.S., 435 U.S. 561, 583-584 (1978). Thus, transactions have been upheld where the transactions were designed to achieve a tax benefit, but were endowed with positive pretax economics. See e.g. Northern Indiana Public Service Company v. Comm'r, 105 T.C. 341 (1995), aff'd, 115 F.3d 506 (7th Cir. 1997).

The Yosha decision articulated the standard slightly differently:

> A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 67

> prospect of such advantages—may indeed have had no other
> interest in the transaction."

Yosha v. Comm'r, supra, 861 F.2d at 499.

It should be noted that a taxpayer need not be correct in its judgment of possible economic benefits, only reasonable or rational. Profit motive depends on the taxpayer's subjective and good faith intent to earn a profit. Finoli v. Comm'r, 86 T.C. 697, 722 (1986). The fact that a venture fails to produce a profit in the anticipated amount or at all does not indicate that the venture was not profit-motivated. King v. U.S., 545 F.2d 700, 708 (10th Cir. 1976). However, that profit potential cannot be illusory. In ACM Partnership v. Comm'r, supra, the Tax Court found that at the time it entered into the partnership, the taxpayer's only real opportunity to earn a profit was through an increase in the credit quality of the issuers of certain notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. The court found no impact on credit quality was possible as the lenders were extremely highly rated at the time of the transaction. Moreover, the court did a 6-year review of 3-month LIBOR rates and did not find an increase of even 300 basis points in the necessary time frame. Since the analysis of the historical data showed no reasonable basis for expecting a profit, the court ruled against the taxpayer. "We do not suggest that a taxpayer refrain from using the tax laws to the taxpayer's advantage. In this case, however, the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance." In its analysis, the Third Circuit focused upon the foregoing finding of the Tax Court, stating:

> Tax losses such as these, which are purely an artifact of tax
> accounting methods and which do not correspond to any actual
> economic losses, do not constitute the type of 'bona fide' losses
> that are deductible under the Internal Revenue Code and
> regulations.

157 F.3d at 252. The Third Circuit also noted:

> [O]n November 3, 1989, [the partnership] invested $175 million of
> its cash in private placement Citicorp notes paying just three basis
> points more than the cash was earning on deposit, then sold the

LN 00000519

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 68

> same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after [the partnership] acquired the notes. These transactions . . . offset one another and with no net effect on [the partnership]'s financial position.

See also Saba Partnership v. Comm'r, supra; Merryman v. Comm'r, 873 F.2d 879 (5th Cir. 1989) (conduit partnership without economic substance disregarded).

In Compaq Computer Corp. v. Comm'r, supra, in addition to finding no business purpose for the transactions, the Tax Court also found a lack of economic substance. This was because as the transactions were designed and executed, the taxpayer was bound to suffer a pre-tax loss. The Tax Court reached a similar conclusion for the same reason in Winn-Dixie Stores Inc. v. Comm'r, supra.

From these cases it appears that the "substance" necessary to meet the requirements of the "economic substance" doctrine is somewhat different from the "substance" required under the "sham in substance" doctrine. As discussed above, the latter requires that the transaction have the economic consequences consistent with what the transaction purports to be: Does the taxpayer really have the economic incidents of ownership if the taxpayer purports to own the asset? The former requires that, having passed the "sham in substance" test, the transaction make economic sense: Does the taxpayer have a reasonable possibility of economically benefiting from the transaction without regard to tax benefits?

Sheldon v. Comm'r, 94 T.C. 738 (1990) is inconsistent with the economic substance cases, in its suggestion that that there must be not only a reasonable possibility of making a profit, but also the possibility must relate to a profit that is greater than de minimis.[17] A handful of other decisions have indicated in the context of Code Section 165(c)(2), discussed below,  that the court should consider whether the profit motive for a transaction was greater or

---

[17] On December 23, 1997, the IRS issued Notice 98-5, announcing that the IRS will issue regulations effective on and after such date dealing with foreign taxes paid or accrued in connection with certain abusive transactions. Such transactions were described as those in which the anticipated economic benefits are insubstantial in relationship to the anticipated tax benefits. It is currently uncertain as to when or whether such regulations will be issued, the criteria they will establish with respect to the insubstantiality of anticipated economic benefits, or whether such regulations will have application beyond the area of foreign taxes.

**LN 00000520**

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 69

less than the tax motive. See e.g. Fox v. Comm'r, 82 T.C. 1001 (1994); Estate of Baron v. Comm'r, 83 T.C. 542 (1984), aff'd, 798 F.2d 65 (2d Cir. 1986). However, to date these cases appear to represent a minority view. Thus, the tax benefits achieved in a transaction should not be denied under the economic substance doctrine merely because the transaction's principal purpose was to achieve such tax benefits. See e.g. Northern Indiana Public Service Co. v. Comm'r, supra. Congress has precluded such a broad test for all disallowance by incorporating such a principal purpose test into specific Code Sections such as Code Section 269. Long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69 F. 2d 809 (2d Cir. 1934). See also, Cottage Savings Association v. Comm'r, 499 U.S. 554 (1991), upholding tax benefits achieved by a transaction executed solely for tax purposes.

In Notice 99-59, 1999-52 IRB 1 (December 9, 1999), the IRS announced that it would challenge "certain types of transactions" designed to generate a non-economic tax loss. The IRS stated that the transactions are "cast in a variety of forms". In one "typical arrangement", a partnership contributes capital to a newly-organized foreign corporation, which borrows a roughly equal amount from a bank. The corporation acquires securities with the loan proceeds, and then distributes these securities to the partnership as a dividend, thus reducing the value of the corporation to zero. However, since the dividend is paid subject to the bank debt, the amount of the distribution is treated as zero, so the partnership recognizes no income and retains his original basis in the corporation's shares. Ultimately, the corporation pays off the bank debt with the proceeds of the original capital contribution, and the partnership disposes of the shares of the corporation, recognizing a tax loss equal to the amount of the original capital contribution even though economically the partnership is back where it started. The IRS concluded that "In the view of the Service and the Treasury Department, the arrangement described above (or any similar arrangement) does not produce an allowable loss." The Transactions are factually wholly unlike the arrangement described in Notice 99-59, are based on entirely different tax principles, and so are not a "similar arrangement".

Lastly, in Salina Partnership LP, FLP Group, Inc. v. Comm'r, supra, a partnership had been previously formed by an investment bank and made a series of investments. Understanding from the investment bank that the purchase of 50% or more of the interests in the partnership would provide certain tax benefits, the taxpayer purchased 98% of the outstanding partnership interests. The IRS conceded that the partnership was profitable and such profitability

**LN 00000521**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 70

provided the taxpayer with sufficient profit motive to imbue the *post-purchase portion* of the transaction with economic substance. However the IRS contended that the pre-purchase part of the transactions did not have sufficient economic substance and, accordingly the taxpayer's tax benefits achieved through the transaction should be denied. The court stated that although the purchase of the partnership interest provided the taxpayer with a perceived tax benefit, "this factor, standing alone, is insufficient to render the transaction a sham in substance". The court found that the investment in the partnership provided the taxpayer with a reasonable opportunity to earn profits independent of tax benefits, and that such opportunity imbued the entire transaction with a sufficiently valid business purpose to give the transaction the economic substance necessary to be respected.

  (c)  **Conclusion**

   Based upon the representations provided by Investor in II, above, it is more likely than not that the Transactions will have the requisite economic substance and business purpose to be respected under the authorities discussed above.

  2.  **Code Section 165**

   (a)  **In General**

   Code Section 165(a) provides:

> There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by deduction or otherwise.

   Treas. Reg. §1.165-1 further provides that for the loss to be allowable under Code Section 165(a) the loss must be evidenced by closed and completed transactions, fixed by identifiable events, and be actually sustained during the taxable year; that the loss be a bona fide loss; and that substance rather than form should govern. The loss arising in connection with the Transactions is evidenced by closed and completed events and fixed by an identifiable event, the disposition of the Foreign Currency, and as discussed above, it is more likely than not that the loss will be treated as being bona fide (as opposed to being treated as a sham) and as having sufficient economic substance to be sustained. Consequently, it is more likely than not that the loss from the disposition of the Foreign Currency will meet the requirements of Code Section 165(a).

**LN 00000522**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 78

reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits. Such a profit potential is more analogous to the situation in Smith v. Comm'r, supra. Consequently, based on the Summary at I, above, the Representations at II, above, and the rationale applied in Smith v. Comm'r, supra, it is more likely than not that the requisite profit motive exists to support the deduction of any loss arising to Investor from the Transactions under Code Section 165(c)(2) and under Code Section 183.

    (c)    **Notice 2000-44**

    i.    **Description of Notice 2000-44**

On August 11, 2000, the IRS released Notice 2000-44, supra. The Notice describes certain arrangements that the IRS and the Treasury believe "have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests".

One version of the arrangements addressed in the Notice is described as follows:

[A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example),

LN 00000530

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 79

even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero.  On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

Among other things, the Notice states that "[t]he purported losses resulting from the transaction described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of section 165".

ii.      **Authority to Issue Notice 2000-44**

IRS Notices are issued under the statutory authority of Code Section 7805(a) which states: "the Secretary [of the Treasury]…shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code.  Furthermore, authority for the issuance of Notices exists in Treas. Reg. §301.7805-1(a) which states: "[t]he Commissioner [of the Internal Revenue Service], with the approval of the Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of the Code … including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue".  However, Section 7805(b)(1)(C) of the Code limits the express statutory authority for Notices to those "substantially describing the expected contents of any temporary, proposed, or final regulation".

Under Code Section 7805(b)(1)(C), a proposed, temporary, or final Treasury Regulation may be given retroactive effect to the date on which, among other things, "any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public".  It appears that the rationale for granting this statutory authority was to enable the Treasury Department and the IRS to secure retroactive effect for intended future Treasury Regulations by giving notice of its intent to issue such Regulations while affording it the appropriate time to properly substantially and procedurally issue such regulations.  Therefore, we believe that the retroactive application of Treasury Regulations to the date of the issuance of the Notice as provided in Code Section 7805(b)(1)(C) requires the Notice to contain some indication of an intent to issue Treasury Regulations.  It does not appear that Notice 2000-44 contains such an intent since it neither describes in any detail the contents to be included in a future temporary, proposed, or final regulation nor does it reference any specific intent to issue future regulations under any specific statutory provision.  Compare, Notice 97-21, 1997-1 CB

LN 00000531

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 80

407. Consequently, it is at least questionable whether Notice 2000-44 is properly issued under Code Section 7805.

### iii.    Legal Weight Accorded an IRS Notice

For purposes of the penalty provisions of Code Section 6662, the IRS considers Notices authority that will be binding on the IRS and can be relied on by taxpayers to the same extent as a Revenue Ruling or a Revenue Procedure.[20] Revenue Rulings do not have the force or effect of Treasury Regulations. Treas. Reg. §601.601(d)(2)(v)(d).

There appears to be only one case in which a court weighed the effect to be given an IRS Notice, and in that case the court treated an IRS Notice as if it were a Revenue Ruling. Constantino v. TRW, Inc., 13 F.3d 969, 980-981 (6th Cir. 1994). Even if one assumes the Sixth Circuit's approach of treating a Notice as a Revenue Ruling is correct, there nonetheless exists a lack of uniformity among the courts in their treatment of Revenue Rulings.

As a general matter, the Tax Court is inclined to treat a Revenue Ruling merely as the view of one of the parties to the litigation. See, e.g., Trinova Corp. and Subsidiaries v. Comm'r, 108 T.C. 68 (1997); Nielson-True Partnership v. Comm'r, 109 T.C.112, 124 n 13 (1997) (citing Gordon v. Comm'r, 88 T.C. 630, 635 and Est. of Lang v. Comm'r, 64 T.C. 404, 407 (1976), aff'd in part and rev's in part 613 F.2d 770 (9th Cir. 1980)). The Tax Court has stated that it considers a Revenue Ruling to be "advisory only" and a mere "useful guide, outlining some of the factors to be considered" in interpreting the Code. Burck v. Comm'r, 63 T.C. 556 (1975), aff'd 533 F.2d 768 (2d Cir 1976). Rather than giving deference to Revenue Rulings, the Tax Court has treated the rulings as "merely the Commissioner's position with respect to a specific factual situation". Pasqualini v. Comm'r, 103 T.C. 1, 8 n. 8 (1994) (citing Tandy Corp v. Comm'r, 92 T.C. 1165, 1170 (1989)).

---

[20]    Rev. Rul. 90-91, 1990-2 CB 262. It is also important to note that the authority of the IRS to issue Revenue Rulings is derived directly from its regulatory authority. Treas. Reg. §601.201(a)(5) and §601.601(d)(2)(v) define what constitutes a Revenue Ruling and sets forth its effects. With the exception of Code Section 7805(b)(1)(C), there is no such provision, statutory or regulatory, that provides for either the parameters for issuing Notices or their effect. Thus, for the reasons discussed above, we believe that an argument exists that the IRS does not have the requisite authority to bind taxpayers or courts to a Notice, though the IRS is free to bind itself as it did in Rev. Rul. 90-91.

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 81

The Circuit Courts, however, have struggled with the exact deference, if any, to give to Revenue Rulings. The Fifth Circuit has recognized that "revenue rulings are odd creatures, unconducive to precise categorization in the hierarchy of legal authorities. They are clearly less binding on the courts than treasury regulations or Code provisions, but probably (and in this circuit certainly) more so than the mere legal conclusions of the parties". McLendon v. Comm'r, 135 F.3d 1017 (5th Cir. 1998). Likewise, the Third Circuit Court of Appeals has stated that it will "give weight to IRS revenue rulings and [will] not disregard them unless they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable". Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1145 (3rd Cir. 1993), cert. denied, 511 U.S. 1004 (1994) (quoting Geisinger Health Plan v. Comm'r, 985 F.2d 1210, 1216 (3rd Cir. 1993). Similarly, in discussing a Revenue Ruling, the Fourth Circuit in Wood noted, without holding, that "it is well established that considerable weight is to be given to an agency's construction of a statute that it is charged with administering." Wood v. Comm'r, 955 F.2d 908, 913 (4th Cir. 1992), cert. dismissed 505 U.S. 1231 (1992). Additionally, the Second Circuit has held that a Revenue Ruling is presumed to "have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code". Gillespie v. U.S., 23 F.3d 36, 39 (2d Cir. 1994)(quoting Salomon, Inc. v. U.S., 976 F.2d 837, 841 (2d Cir. 1992). However, the Second Circuit's decisions in Gillespie and Salomon, Inc. seem irreconcilable with its statement in Canisius College v. United States that "the statutory interpretation [of] a revenue ruling does not have the force of law and is of little aid in interpreting a tax statute". Canisius College v. U.S., 799 F.2d 18 n. 8 (2d Cir. 1986) cert. denied 481 U.S. 1014 (1987) (citing Dixon v. U.S., 381 U.S. 68, 73 (1965); Biddle v. Comm'r, 302 U.S. 573, 582 (1938); Temple University v. U.S., 769 F.2d 126, 137 ( 3d Cir. 1985) cert. denied 476 U.S. 1182 (1986)). The Ninth Circuit followed the Second Circuit's opinion in Salomon, Inc. and afforded Rev. Rul. 82-20 "great deference" where the Ruling was neither unreasonable nor inconsistent with the Code. Walt Disney Inc. v. Comm'r., 4 F.3d 735 (9th Cir. 1993).

Notwithstanding this lack of uniformity among the courts as to what weight, if any, to afford Revenue Rulings, the courts "have not looked favorably upon bootstrapping revenue rulings issued shortly prior to or after the initiation of litigation". Ludwig v. Comm'r, 68 T.C. 979 n. 4 (1977) (citing Fribourg Navigation Co. v. Comm'r, 383 U.S. 272, 279 (1966), rev'g 335 F.2d 15 (2d Cir. 1964); Busse v. Comm'r, 479 F.2d 1147, 1152 n. 12 (7th Cir. 1973)). See also, Silco, Inc. v. U.S., 779 F.2d 282 (5th Cir. 1986).

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 82

As a result, the weight given to a Revenue Ruling in litigation will generally depend upon the forum chosen. At best, Revenue Rulings will be given little or no weight and at worst a court will give significant deference to a Revenue Ruling. However, the amount of deference, if any afforded to a Revenue Ruling by a court will be further dependent upon the context in which it was issued. Moreover, if the Revenue Ruling is issued in connection with litigation, a court that would otherwise give deference to a Revenue Ruling may give it no weight at all. Consequently, were the IRS to contend that Notice 2000-44 were to apply to the Transactions and a court were to treat the Notice as if it were a Revenue Ruling, it is more likely than not that the Notice does not constitute authority that would bind a court, but could be given significant weight by the court in reaching its conclusion and in that case it would have to be distinguished on the basis of fact or by refuting the legal analysis upon which it relies.

> iv.    **Application of Notice 2000-44 and the Authorities cited therein to the Transactions**

As support for its position in Notice 2000-44 that the losses described therein were not "bona fide" and did not reflect "actual economic consequences", the Notice cited ACM Partnership v. Comm'r, supra; Scully v. U.S., 840 F.2d 478 (7th Cir. 1988); and Shoenberg v. Comm'r, 77 F.2d 446 (8th Cir.) 1935). See also, Rev. Rul. 2000-12, supra, Situation 1, and Notice 99-59, supra, in which the IRS took the same position in reliance on the same authorities. These authorities have been addressed in the context of the Transactions above.

As discussed above, in the instant case the Transactions were motivated by non-tax reasons and so more likely than not will not be treated as "shams in substance." In the instant case, the Transactions were not structured to insure that there was no economic change of position for Investment Fund, as was the case for the so-called Citicorp notes in the ACM case. Consequently, as we discussed above, it is more likely than not that the reasoning set forth in ACM for concluding a loss is not "bona fide" will not be applicable to the loss sustained from the Transactions. With respect to Scully v. U.S., supra, and Shoenberg v. Comm'r, supra, in the instant case neither Initial Member nor Investment Fund continued to own, beneficially or otherwise, the asset that generated a loss. Accordingly, as discussed above, it is more likely than not that the reasoning set forth in Scully and Schoenberg for denying a loss deduction, will not be applicable to the loss sustained from the Transactions. As a result, it is more likely than not

LN 00000534