# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

------------------------------X

CARLOS E. SALA and
TINA ZANOLINI SALA,

         Plaintiffs,

      vs.

UNITED STATES OF AMERICA,

       Defendant.

------------------------------X

**CERTIFIED COPY**

   ) 'Civil Action No.
   )  05-CV-00636
   )  LTB-PAC


October 24, 2006

10:30 a.m.


Continued Deposition of CARLOS E.

SALA, held at the offices of Katten, Muchin

& Rosen, LLP, 575 Madison Avenue, New York,

New York, pursuant to Adjournment, before

Elisabeth F. Nason, a Notary Public of the

State of New York.


Atkinson-Baker, Inc.
Court Reporters
www.depo.com
800-288-3376

Reported by:
ELISABETH F. NASON
JOB NO. A00921C

1

1                        Carlos Sala

2        Q.      When did you learn this?

3        A.      During this litigation.

4        Q.      Did you learn that Mr. White wanted a

5    capital loss?

6        A.      During this litigation.

7        Q.      You didn't learn it beforehand?

8        A.      Not before the Deerhurst transaction.

9        Q.      You didn't talk to him about that?

10       A.      No.

11       Q.      Did you understand in reviewing the

12   materials, that some people wanted capital losses

13   and some people wanted ordinary losses?

14       A.      I knew from one document that if you

15   were going to generate ordinary losses, that their

16   required investment was different from the

17   required investment if you were going to have

18   capital loss, but that's all I knew.  I didn't

19   have any capital losses, so I didn't really

20   investigate the capital side.

21       Q.      Prior to participating in the

22   transaction, did Mr. Schwartz ask you if you

23   wanted ordinary or capital losses?

24       A.      I'm sure we had a discussion about

25   that.

1                    Carlos Sala

2        Q.    Did you have a discussion about the

3   amount that you wanted?

4        A.    At some point, yes.

5        Q.    Prior to entering into the

6   transaction?

7        A.    Probably, yes.  I can't recall the

8   exact date that we had the discussion.

9        Q.    But it was prior to entering the

10  transaction?

11       A.    That would be my guess, but not

12  confirmation.  I don't know 100 percent.

13       Q.    You understood that for ordinary

14  losses, you had to put in a certain percentage of

15  losses you expected?

16       A.    Yes, I did.

17       Q.    That would have been a decision you

18  made prior to entering into the transaction?

19       A.    Yes.

20       Q.    You calculated how much losses you

21  wanted prior to entering into the transaction?

22       A.    Yes.

23       Q.    You had a goal?

24       A.    Yes, I knew how much money was

25  ultimately going to be reporting as a loss if you

Carlos Sala

1

2      contributed and exercised a number of

3      transactions.

4          Q.    Were the basis trades ever provided to

5      you, a copy of the basis trades?

6          A.    I received confirmations of all the

7      trades during that period of time.

8          Q.    Did you receive a sheet in which you

9      were shown what trades constituted the basis

10     trades?

11         A.    I don't recall.

12             MR. GEIER:  I show you what we will

13         mark as Exhibit 156.

14             (Exhibit 156, certificate of

15         incorporation, marked for identification, as

16         of this date.)

17             (Handing.)

18         Q.    Is that a certificate of incorporation

19     for Solid Currencies?

20         A.    Let me put some glasses on here to

21     make sure.

22             MR. GEIER:  We have a stipulation, we

23         can move past this.  This is a document that

24         you all provided.  This one was provided by

25         Mr. Schwartz.  I think we have an identical

Carlos Sala

1

2      Q.    It was generally your understanding

3    that the tax losses that you were going to derive

4    were going to occur in 2000?

5      A.    Yes.

6      Q.    That was based upon a conversation

7    with Michael Schwartz?

8      A.    A number of things, conversations with

9    Michael Schwartz, an understanding and

10   understanding the transaction as well.

11     Q.    You understood that the transaction,

12   your holdings would be liquidated in 2000 in order

13   to generate the loss?

14     A.    Yes.

15     Q.    Did you understand that there was a

16   reason to liquidate the holdings other than for

17   tax reasons?

18     A.    Sure.  I mean we wanted to do a number

19   of things.  One is we didn't want to hold the

20   positions at year end.  Year end is usually very

21   illiquid time of year for most markets, not just

22   the foreign currency markets.  People leave,

23   traders leave.  There is not enough liquidity in

24   the market, you can take advantage of that, like

25   in the municipal bond market or the cash money

Carlos Sala

```
 1
 2        Q.     Maybe because you wanted to change the
 3   deal Mr. Sala, at that point in time.
 4             MR. HALLETT:  Wait, wait.
 5        A.     What I mean is that I viewed the
 6   transaction as a five year transaction.  All the
 7   costs that would have been incurred, fees, were
 8   part of a five year investment.
 9        Q.     Mr. Sala, did anything in the opinion
10   letter that you obtained and filed with your tax
11   return or at least obtained prior to filing your
12   tax return, did anything mention any events after
13   2000?
14             MR. HALLETT:  Read that back.
15        Q.     I will ask it again.  Did your initial
16   opinion from Mr. Ruble, did it involve events
17   after 2000?
18        A.     To my recollection, it did address the
19   structure of the investment, which is a five year
20   investment.
21        Q.     Did it opine on the tax consequences
22   of anything beyond your 2000 tax year?
23        A.     I have to look at it more carefully,
24   but I can tell you that the conclusion that was
25   reached in that opinion wouldn't have been the
```

Carlos Sala

1

2      same had a five year horizon not been taken into

3      account.

4           Q.    Did it opine on anything beyond 2000?

5           A.    I have to look at the opinion itself

6      to be able to specifically tell you that.  So I

7      don't know.  It's 112 page opinion, so --

8           Q.    But it has to do with a $60 million

9      loss, correct?

10          A.    Sure.

11          Q.    That loss was claimed in 2000?

12          A.    Yes.

13          Q.    The opinion addressed the loss in

14     2000, correct?

15          A.    Yes.

16          Q.    It didn't address the loss in any

17     other year, did it, it didn't give you a more

18     likely than not answer as to whether something

19     would be deducted or included in income?

20              MR. HALLETT:  I'm registering a

21          continuing objection.  You are on a roll

22          over here and you continue to cut him off

23          before he can continue the answer.  I would

24          ask you please, after the question, let him

25          give a complete answer.

Carlos Sala

1

2          MR. GEIER:  I'm trying to make this as

3      time efficient as possible.  I don't want to

4      be strapped for time at the end of the day.

5      With that being said, I will let him

6      continue on.

7          Q.   With Mr. Hallett's statement, I will

8  certainly try to slow down for you.  When you paid

9  for the opinion, Mr. Ruble's opinion, you didn't

10  know that you were going to be going back to them

11  because the deal was going to change, did you?

12          A.   No.

13          Q.   When you went back in 2001 and asked

14  for a new opinion, that was based upon events that

15  occurred after the first opinion?

16          A.   It was related to the events that

17  occurred within the first opinion.  The second

18  opinion, if you will see by the brief nature of

19  it, was confirming the conclusions of the first

20  opinion, so they were very much related.  In fact,

21  yes, I think he said nothing would lead me to

22  change my previous opinion, that kind of thing.

23          Q.   Just standing by the first opinion?

24          A.   Correct.

25          Q.   But the deal changed at some point,

Carlos Sala

1

2    correct?

3        A.    Yes.

4        Q.    The transaction changed?

5        A.    To some extent, 50 percent of it.

6        Q.    Half the transaction was an investment

7    that wasn't even discussed at the beginning of the

8    transaction?

9        A.    Correct.

10       Q.    That is why you went back to get a new

11   opinion?

12       A.    Correct.

13       Q.    Did you pay for the new opinion?

14       A.    No, I didn't pay additional amounts.

15       Q.    Was it discussed whether you would?

16       A.    There was a discussion, but I never

17   received a bill.

18       Q.    How much was it supposed to be?

19       A.    There was a discussion as to whether

20   we would be charged.  The discussion was is he

21   going to charge us for an update to this previous

22   opinion and I think the response was I don't know

23   and I expected a bill, but I never received one.

24       Q.    Do you know if Deerhurst was charged

25   any money?

```
 1                         Carlos Sala
 2        A.    I don't know.
 3        Q.    So you acknowledge that there was a
 4   $75,000 fee paid to Mr. Ruble in connection with
 5   an opinion letter?
 6        A.    Yes.
 7        Q.    And you paid other attorneys as well?
 8        A.    Yes.
 9        Q.    Few thousand dollars?
10        A.    Yes.
11        Q.    You paid KPMG for reviewing the
12   transaction?
13        A.    No, I paid KPMG in conjunction to
14   preparing my tax return.
15        Q.    You consulted with KPMG prior to
16   entering into the transaction?
17        A.    Only for the tax return preparation.
18   For instance, had they not prepared the tax
19   return, there would have been no fees for them
20   associated with that Deerhurst.
21        Q.    You can take a look at their bills.
22        A.    Sure.
23        Q.    Part of your profit was interest,
24   correct?
25        A.    Other, I'm certain there was a
```

                         Carlos Sala

component of it.

    Q.    You are familiar with how interest

accrues, correct?

    A.    Yes.

    Q.    Sort of second nature to you?

    A.    I know the concept of it.

    Q.    Do you recall at that time in 2000,

what the interest rates, what you were earning on

your money just in a safe investment?

    A.    I don't recall what the interest rates

were at that time.

    Q.    So for the $60,000 to $80,000 profit

that you are talking about, did you ever determine

how much of that was just interest being paid to

you?

    A.    I would assume that -- well, interest

does accrue.  When you make an investment in your

account, it's reflected only when it's paid.  So

to the extent that there was interest, to the

extent that that interest was actually paid and

earned, it would have been reflected in that

amount.  There may have been interest that

was -- that had not been paid and perhaps earning

interest, but I don't recall.

Carlos Sala

1

2    Q.    It was accruing?

3    A.    I'm sure it would have been accruing,

4 but I'm not sure that the statement that Deerhurst

5 gave me reflected the accrual or was it just a

6 cash interest, I don't know.

7    Q.    You don't know if any of your profits

8 were related to interest in 2000?

9    A.    No, I think that some of it would have

10 included some interest.

11    Q.    Did you ever try to determine and do a

12 breakdown at any point of how much of your profit

13 was based on interest?

14    A.    No, not at all at that time.

15    Q.    You didn't look?

16    A.    I can't recall if I looked, but I have

17 no recollection of it.

18    Q.    As you sit here today and back in

19 2000, you don't know if the $70,000 or the 60 to

20 80,000 in profits, how much of that was

21 attributable to anything that Mr. Kreiger did in

22 terms of the trades?

23    A.    I don't recall the components of the

24 gains, no, I don't.

25    Q.    Were you aware that the members, there

Carlos Sala

were certain initial expenses for the startup of

the transaction?

    A.    I was not aware of those expenses.   I

knew that there were organizational expenses with

the Deerhurst Trading Strategies, which would have

been in 2001, but not in 2000.

    Q.    Were those expenses something you

understood would be paid by the members?

    A.    By the fund.

    Q.    Therefore, by the members?

    A.    It would have resulted -- it would

have affected the members' capital accounts, yes.

    Q.    In effect, you were paying your pro

rata share of the fund's startup costs?

    A.    Yes.

    Q.    Did you understand that the estimate

of those fund's startup costs were about $95,000?

    A.    I don't recall what they were.

    Q.    Do you recall that the fund's startup

costs were estimated and provided to you in

advance of the transaction?

    A.    I don't recall.

    Q.    But if it had been provided in the

documents, you would have seen it and noted it?

Carlos Sala

1

2      A.      Probably, yes.

3      Q.      Do you recall ever talking to anyone

4   about where you stood in relationship to the other

5   investors in terms of percentage of investment?

6      A.      I didn't talk to anyone, but I

7   remembered when I received my K-1, there is

8   usually apportionment percentage there, so I knew

9   I was a significant investor.

10      Q.      What do you mean by significant?

11      A.      Large investor.  I think Michael

12   Schwartz told me of those people contemplating

13   going into the fund, I was a large investor in

14   that respect.

15      Q.      You knew before you entered into the

16   LLC that you were a large investor?

17      A.      Yes.

18      Q.      You knew actually when you entered

19   into the transaction to begin with in October,

20   that you were going to be the largest investor,

21   correct?

22      A.      I didn't know I was going to be the

23   largest, but I knew I was going to be close to the

24   largest or large.

25      Q.      What that gave you, you believe that

Carlos Sala

 1
 2  you had certain clout in negotiations, correct?
 3       A.    Correct.
 4       Q.    Part of that clout you exercised in
 5  renegotiating the fees?
 6       A.    Correct.
 7       Q.    Because you would be able to tell
 8  Mr. Kreiger and Mr. Schwartz, if you don't agree
 9  to my fees, I'm going to take my $9 million and go
10  elsewhere?
11       A.    I did say that.
12       Q.    They wanted your $9 million?
13       A.    I think that's true.
14       Q.    Did you ever add up all your expenses
15  associated with this transaction other than the 1
16  and 30 expenses?
17       A.    No.
18       Q.    You never have done an analysis of
19  what your total costs were for the transaction?
20       A.    No.
21       Q.    Did you ever do an estimate going into
22  the transaction of what your costs might be?
23       A.    I felt that the costs there were two
24  sets of expenses, right.  It would have been my
25  own expenses that I paid out-of-pocket say to

1                          Carlos Sala

2          Q.    You renegotiated the fee from 2 and 20

3     to 1 and 30, it was with the expectation that you

4     would be making a lot of money with Mr. Kreiger?

5          A.    It was.

6          Q.    You never did an analysis, did you, of

7     the significance of going from 2 and 20 to 1 and

8     30?

9          A.    Not a new analysis, no.  I knew that

10    my fees would be lower, so that's good.

11         Q.    Your fees could be higher than 30

12    percent of the profits?

13         A.    When you renegotiated from 2 and 20 to

14    1 and 30 initially, I thought you were talking

15    about 2000.

16         Q.    Did you ever do an analysis about how

17    that might impact you financially based upon the

18    returns you were projecting?

19         A.    No, I didn't go back and try to

20    reforecast based on a new arrangement.

21         Q.    Based on the returns you were

22    forecasting for this transaction, which you

23    seriously believed to be truthful, 1 and 30, was

24    not necessarily a good business decision, was it?

25         A.    There was -- the reason is if there

Carlos Sala

1

2  was no risk, you are absolutely right, but in

3  every investment there is risk, so I was

4  protecting -- I was giving up some of my upside,

5  which I felt was great, to protect some of my

6  downside, so it seemed like a reasonable tradeoff.

7      Q.    Sounds reasonable.  Did you do an

8  analysis to show how much of the upside you were

9  giving and how much of the downside?

10     A.    Mentally, I mean I can do the analysis

11  right now.  I can say I'm going to reduce my

12  guaranteed fees by 50 percent and I'm going to

13  give up 10 personal points of a very large upside

14  if it materializes.  Even though there is risk to

15  that upside, it's ideal, I would consider

16  absolutely.  I mean, you know, I don't have to do,

17  you know, I don't have, you know, I don't have to

18  do an extensive written analysis to make that

19  judgement.  I can make it today.

20     Q.    But at different times in this

21  transaction, you would agree that you did an

22  extensive written analysis; is that correct?

23     A.    Absolutely.

24     Q.    You negotiated, it was your idea to go

25  from 1 and 30?

Carlos Sala

1

2          A.       It was my idea to go from 2 to 120.

3    They came back and Andy Kreiger came back and said

4    look, if I'm going to give some of the management

5    fee, I want to increase the profit sharing fee to

6    30.   I didn't, it was not my idea to give him more

7    on the profit sharing.

8          Q.       But you chose to go with 1 and 30 over

9    2 and 20?

10         A.       I agreed, yes.

11         Q.       That's what you wanted to do?

12         A.       What I wanted to do was go 1 and 20.

13   What I agreed to do towards the end was to 1 and

14   30.

15         Q.       You could have done 2 and 20, but you

16   didn't want that?

17         A.       No, I was unwilling to do that.

18         Q.       You didn't do any calculations to

19   determine how it might impact you?

20         A.       No, I didn't do a calculation.

21         Q.       It would have been easy enough to do

22   based on your projections?

23         A.       It wasn't that easy because my

24   historical results were based on 2 and 20, so I

25   would have had to have gone back and asked

                          Carlos Sala

1

2   Deerhurst to say redo your nine years' worth of

3   historical results, assuming you had actually

4   charged 1 and 30 instead of 2 and 20.  Only they

5   could have done that.  That would have been

6   actually restated historical results.  I then

7   would have had to put that in my own analysis to

8   have done so, so it would have required a fair

9   amount of work.

10        Q.    You didn't ask them to do that?

11        A.    No.

12        Q.    Prior to entering into the

13   transaction, you reviewed the draft legal

14   opinions?

15        A.    Yes.

16        Q.    The draft opinions were prepared by

17   who?

18        A.    Brown & Wood.

19        Q.    How did you obtain copies of them?

20        A.    I don't recall exactly how I obtained

21   the copies.  They gave them to me.  It would have

22   been one of three sources.  It would have been

23   Brown & Wood would have forwarded it to me.

24   Schwartz would have forwarded it to me or John

25   Raby would have forwarded it to me.

```
 1                         Carlos Sala

 2              MR. GEIER:  Let's take a look at

 3         Exhibit 159.

 4              (Exhibit 159, e-mail, marked for

 5         identification, as of this date.)

 6              (Handing.)

 7         Q.    I hand you 159.  It looks to be an

 8    e-mail that you were sending to Tracie Henderson

 9    with a call spread memorandum attached.  Do you

10    recognize this?

11         A.    Not really, but --

12         Q.    Is that your e-mail address?

13         A.    That is my e-mail address.

14         Q.    Do you recognize that as being

15    Tracie's e-mail address?

16         A.    Yes.

17         Q.    Was she your accountant in October

18    2000?

19         A.    Yes.

20         Q.    Do you have any doubt that you sent

21    this?

22         A.    No, no, I don't doubt that.

23         Q.    Do you see that the e-mail is dated

24    October 6th, but if you see the Brown & Wood

25    opinion on the first page, it's dated September
```

Carlos Sala

1
2     15th?

3         A.    Yes.

4         Q.    Is it your testimony that you just

5     don't know where this draft came from physically?

6         A.    I don't.

7         Q.    Do you know why you sent it over to

8     Tracie?

9         A.    Sure.  It -- she was going to prepare

10    my return for 2000.  I would have wanted to make

11    sure she reviewed it and felt comfortable enough

12    to sign the return later on.

13        Q.    Was this draft document intended to

14    explain to her what the transaction was about?

15        A.    Yes.

16        Q.    Did you read this document at the

17    time, I'm not going to quiz you on it?

18        A.    You know, highly likely I read the

19    opinion at some point and I went through it in

20    great detail with Larry Nemirow.  I can't tell you

21    it was October the 6th, October 15th, I mean, but

22    during this period of time, I read the Brown &

23    Wood opinion page by page.

24        Q.    This would have been the opinion that

25    you read, this version is what I'm trying to get

                          Carlos Sala

1
2    him.   That's what he told me.
3          Q.    Let's take a look at what has been
4    marked previously as Exhibit 12.
5                (Handing.)
6          Q.    Do you know what Exhibit 12 is?
7          A.    I recognize it.
8          Q.    First of all, it's a letter to you,
9    but it's enclosing your statement, your Deerhurst
10   statement for October?
11         A.    Yes.
12         Q.    Is this a typical statement that you
13   received from Deerhurst?
14         A.    Yes.
15         Q.    Does it contain all the information
16   that is typically in --
17         A.    I think at this point, this only shows
18   the P&L activity.  I think at some point we
19   started receiving balance sheets also.
20         Q.    In 2001 or 2002?
21         A.    I believe so.
22         Q.    When the performance started to be a
23   concern to you?
24         A.    I'm not sure if it was at that time or
25   before, but this exhibit only shows a P&L and

Carlos Sala

1

2     subsequent ones.  I'm not sure when we started

3     receiving more substantial statements.

4          Q.    This exhibit is complete, correct?

5          A.    Yes, to the best of my knowledge.

6          Q.    Let's take a look at your statement.

7     It shows a beginning cash investment of 500,000,

8     correct?

9          A.    Yes.

10         Q.    Notional investment of a million.  Do

11    you understand that to be a two to one leverage?

12         A.    Yes.

13         Q.    Shows that there were trading gains of

14    $2,643, correct?

15         A.    Yes.

16         Q.    Also interest of 610?

17         A.    Yes.

18         Q.    Did you compute what kind of profit

19    you had based upon the amount of dollars invested?

20         A.    No.

21         Q.    Can you do a rough calculation just

22    looking at these numbers?

23         A.    What do you want me to do, to see an

24    annual rate of returns?

25         Q.    You earned about $3,200 on investment

```
 1                    Carlos Sala

 2   of 5 million, but I guess it's --

 3        A.    It's 2,000 for 10 days on half

 4   million, so you would have to multiply that times

 5   roughly 36, so it would be roughly call it 80,000

 6   on $500,000.  So it would be annualized rate of

 7   return of about 16, 17 percent, somewhere in

 8   there.

 9        Q.    Is that taking into account the

10   management fee?

11        A.    Yes, I'm taking the 2,212, it was on

12   10 days a week, October 31, so I'm saying times

13   52, it would be higher than that.  It would be

14   about 20 percent return, top of my head.

15        Q.    That's including $600 of interest?

16        A.    Yes.

17             MR. GEIER:  Mark this as Exhibit 186.

18             (Exhibit 186, letter dated December 5

19        with attachment, marked for identification,

20        as of this date.)

21             (Handing.)

22             MR. GEIER:  This is a document that is

23        a letter dated December 5 with an

24        attachment.

25        Q.    Do you see that?
```

Carlos Sala

1

2  A.  Yes.

3  Q.  Go to the first page of that exhibit.

4 Shows that you contributed an extra $8,425,000,

5 correct?

6  A.  You are saying the first page?

7  Q.  The second page.

8  A.  Yes.

9  Q.  Do you recall when that contribution

10 was made?

11  A.  I don't recall.

12  Q.  Take a look at another document.  I

13 will tell you for now for our purposes, it's

14 November 21.  Did you perform any analysis or

15 review before contributing the 8,425,000?

16  A.  Do you mean in addition to what has

17 already been discussed, no.

18  Q.  In October, the transaction took

19 place.  Did you review the trades that took place

20 in October?

21  A.  The actual trades?

22  Q.  Yes.

23  A.  No.

24  Q.  You didn't look at the trades?

25  A.  No.

Carlos Sala

1

2      Q.    Did you conduct any review before

3 deciding whether or not to commit an extra 8.4

4 million dollars into the transaction?

5      A.    Not further review other than what we

6 discussed.

7      Q.    Prior to submitting the 8,425,000, you

8 received the statement for October, correct?

9      A.    The previous statement?

10      Q.    Yes.

11      A.    Yes, Exhibit 12.

12      Q.    Did you have any other financial

13 information from the company?

14      A.    No, I didn't.  No, I don't think so.

15      Q.    Was your 8.4 million, did you

16 contribute that based upon the October numbers?

17      A.    I wouldn't say it was based on October

18 numbers.  I think it's based on my entire analysis

19 of the transaction and my willingness to invest in

20 the transaction, not the October statement.  The

21 October statement was for one week, you know, you

22 wouldn't make that decision based on that.

23      Q.    Is it fair to say that you were ready

24 to commit your 8.4 million at the time you

25 initially entered the transaction?

Carlos Sala

1

2      of your entire portfolio into an investment clause

3      whose returns and performance would be independent

4      of the equity markets.  In other words, the

5      correlation between the results of this investment

6      versus the equity market is very low.

7              MR. GEIER:  Objection.  Foundation.

8          Q.    What, if any, view did you have as to

9      the attractiveness of the equity markets in the

10     last quarter of 2000?

11         A.    The equity market had reached some

12     very high levels.  I was very concerned that there

13     would be a major correction in the equity markets

14     and in fact, that's why I sold all of the shares

15     that I received in the Double Click transaction.

16         Q.    Did you sell those shares as soon as

17     you bid?

18         A.    I did.

19         Q.    Was there a lock-up period on those

20     shares?

21         A.    Yes, there was.

22         Q.    What does lock-up period mean for the

23     record?

24         A.    It means that you contractually agree

25     not to initiate or execute any transactions

Carlos Sala

1

2   associated with securities that you hold until a

3   certain date.

4        Q.    Do you recall when that lock-up period

5   expired for you?

6        A.    I believe it was in February 2000.

7        Q.    How long after that did you sell your

8   stock?

9        A.    Took three weeks to sell them.

10        Q.    Did you sell it as rapidly as you

11   could?

12        A.    I did.

13        Q.    Why?

14        A.    Because of my belief that especially

15   NASDAQ, which Double Click was a NASDAQ traded

16   company, was overvalued.

17        Q.    What was your investment practice

18   after February and March of 2000, particularly

19   looking at whether you invested, by equities, you

20   mean stocks?

21        A.    Yes.

22        Q.    What was your practice of investing in

23   stocks after February, March 2000?

24            MR. GEIER:  Objection.

25        A.    I went from holding over 95 percent of