# EXHIBIT L

THE DEPOSITION OF

JOHN RABY

DENVER, COLORADO

SEPTEMBER 13, 2006

1            A.    Yes, it did.

2            Q.    For Mr. Sala, is that how you were compensated
3    for the work -- bringing him into Deerhurst?

4            A.    Yes, it was.

5            Q.    I want to move away from Mr. Sala's
6    transactions.

7            You were marketing these transactions to investors,
8    to attorneys, and to accountants; is that correct?

9            A.    I didn't market the transactions to investors
10   directly.  I marketed the transactions to attorneys,
11   accountants, and financial advisors.  And actually, I
12   wouldn't even market it to them.  I would go and I would show
13   them the transaction, and then I would give them the
14   parameters for the client it might work for, and then they
15   would determine whether or not they were willing to introduce
16   us to their clients.

17           Q.    So you knew enough about the transactions to
18   explain it to the people you were trying to get interested in
19   it?

20           A.    Yes.

21           Q.    With that understanding, can you tell me about
22   the transactions, other than Mr. Sala's Deerhurst
23   transaction, that you remember being involved in at
24   MultiNational Strategies.

25           A.    We did two transactions.  I recall the names

15

1  A.  My responsibilities were to come in and help
2  build the practice.  I was specifically charged with
3  investment-advisory services and estate-planning services --
4  services outside the traditional tax compliance and tax
5  planning -- because I didn't have any experience in that area
6  directly when I came on board.
7  Q.  Did you have clients?
8  MR. HATCH:  Object to form.
9  Q.  (By Mr. Geier)  While you were a director, did
10 you have your own clients?
11 A.  I had clients that I inherited from the firm.
12 Q.  Okay.
13 A.  And then I was responsible for trying to
14 acquire new clients.
15 Q.  Would it be fair to generally characterize the
16 clients as having high net worths?
17 A.  Yes.
18 MR. HATCH:  When you say did he have clients, are
19 you talking about clients for PWC?
20 MR. GEIER:  Yes.
21 Q.  (By Mr. Geier)  Just to clarify:  As a
22 director, did you have any clients outside of your work for
23 PricewaterhouseCoopers at the time?
24 A.  No, I did not.
25 Q.  All of them were clients at the firm?

20

```
 1         A.    Yeah, that notice came out, I believe, after
 2   either -- I believe it came out after I left
 3   PricewaterhouseCoopers.
 4         Q.    Sometime in 2000?
 5         A.    Yeah.  It would have been my last year at
 6   PricewaterhouseCoopers.
 7         Q.    And was it part of your practice to know about
 8   such things as that notice?
 9         A.    Not really, because my job was more managing
10   the clients and doing the things that we previously talked
11   about.  The finance and treasury department would do tax
12   strategies.  But PricewaterhouseCoopers had exited
13   investments with tax-loss components, and they were no longer
14   in that business.
15         Q.    They were no longer in that business as of?
16         A.    February of 2000.  Actually -- yeah, February
17   of 2000.
18         Q.    So they had been in the business, and in
19   February they stopped?
20         A.    That is my understanding, yes.
21         Q.    If I mention a transaction called a BLIP or
22   BLIPS, does that ring a bell?
23         A.    No, it does not.
24         Q.    What about FLIP?
25         A.    The name rings a bell, but I'm not familiar
```

25

```
 1    PricewaterhouseCoopers' client.
 2             Q.    Do you know when he became a client of the
 3    firm?
 4             A.    I do not.
 5             Q.    Do you know when --
 6             A.    If you're defining the firm as PWC dating back
 7    to Carlos being with PW, I don't know when he became a client
 8    of the firm.
 9             Q.    Did he ever become a client of yours?
10             MR. HATCH:   Object to form.
11             Q.    (By Mr. Geier)   In connection with the firm?
12             A.    I did not implement any investment strategies
13    or estate-planning strategies with Carlos directly.
14             Q.    Did you earn a commission for referring
15    Mr. Sala to the Deerhurst transaction?
16             A.    After I left PricewaterhouseCoopers, is that
17    your question?
18             Q.    I'm asking just in general.
19             A.    Yes.
20             Q.    You did?
21             A.    Yes.
22             Q.    For his participation in the transaction?
23             A.    Yes.
24             Q.    From the beginning?
25             A.    No, not from the beginning.
```

27

```
 1              Q.    What was your commission based upon?
 2              MR. HALLETT:  Objection; leading.
 3              A.    My commission was based upon the total amount
 4    of fees that the firm received, and I would receive a portion
 5    of those fees.  "The firm" being MultiNational Strategies.
 6              Q.    (By Mr. Geier)  Did you receive any
 7    compensation as a direct result of referring Mr. Sala to the
 8    Deerhurst transaction?
 9              A.    Yes.
10              Q.    Was that based upon the amount of tax losses
11    that Mr. Sala was seeking in the transaction?
12              A.    Initially, yes, it was -- based upon a
13    component of the tax losses and the investment.  You could
14    look at it either way.
15              Q.    Okay.  At least initially, there was a
16    component of your compensation based upon the amount of tax
17    losses that Mr. Sala was seeking?
18              MR. HALLETT:  Objection; leading.
19              Q.    (By Mr. Geier)  Is that correct?
20              A.    A component.
21              Q.    Okay.
22              A.    But it's more fairly stated that over the
23    five-year period, the underlying economics were that we were
24    getting paid an asset-based management fee.  And this is how
25    it was represented to me by Mike.  We were getting paid an
```

|    |    |
|----|----|
| 1  | this time, Mike was away from PWC; he had left -- Mike had |
| 2  | managed the finance and treasury practice where we had |
| 3  | investments that had tax components attached to them.  So I |
| 4  | thought -- I knew Mike was out on his own, and I thought it |
| 5  | might be a good idea for Carlos to meet Mike. |
| 6  | Q.    During this time, Pricewaterhouse had a |
| 7  | relationship with an investment-advisory firm, correct?  You |
| 8  | mentioned the name of it earlier. |
| 9  | A.    Yes. |
| 10 | Q.    And when you refer business to that firm, |
| 11 | Pricewaterhouse receives a commission? |
| 12 | A.    Right. |
| 13 | Q.    And you were working for Pricewaterhouse at |
| 14 | the time you were talking to Mr. Sala? |
| 15 | A.    Yes. |
| 16 | Q.    So when you referred him to Mr. Schwartz, was |
| 17 | there an understanding that Pricewaterhouse would receive |
| 18 | compensation? |
| 19 | A.    Carlos had already expressed no interest in |
| 20 | investing in that piece of our investment practice.  There |
| 21 | were multiple investment practices, and he had already |
| 22 | expressed, through the previous relationship we built, that |
| 23 | he didn't have an interest in investing in that. |
| 24 | Q.    Did he tell you why? |
| 25 | A.    He was working with Goldman Sachs -- no, he |

44

```
 1          A.    No, I was not.
 2          Q.    Are you positive?
 3          A.    Yes.
 4          (Exhibit 97 marked for identification.)
 5          Q.    Take a look at Exhibit 97.  Just for the
 6   record, it's a January 12, 2001 letter addressed to Carlos
 7   Sala and to you.
 8          A.    Okay.
 9          Q.    When you're done, I'll ask if you recognize
10   the letter.
11          A.    (Reading.)  I don't recognize the letter, but
12   obviously I received a copy of it.
13          (Exhibit 98 marked for identification.)
14          Q.    98 is another copy of that letter.  This is
15   what appears to be the same letter, and it appears to have
16   your signature.
17          A.    Yes.
18          Q.    Take a look at it.
19          A.    Yeah, I see that.
20          Q.    Is that your signature on the third page of
21   Exhibit 98?
22          A.    Yes, it is.
23          Q.    Is there any doubt that you received this
24   letter?
25          A.    No.
```

```
 1           Q.    And this letter was sent to your home;
 2   correct?
 3           A.    Yes.
 4           Q.    It wasn't sent to you at your place of
 5   business?
 6           A.    Right.
 7           Q.    That's your home address?
 8           A.    Right.
 9           Q.    But you were working for
10   PricewaterhouseCoopers at the time?
11           A.    That is correct.
12           Q.    And it doesn't indicate that you're affiliated
13   with PricewaterhouseCoopers on the letter; is that correct?
14           A.    That is correct.
15           Q.    Can you explain to me what you were doing
16   around January or so with Jenkens & Gilchrist and Mr. Sala?
17           A.    I must have introduced Mr. Sala to those
18   folks.  He didn't ultimately engage in a transaction with
19   them.  And because PricewaterhouseCoopers no longer had an
20   investment practice with potential benefits associated with
21   it, I introduced him to these folks.
22           Q.    And you directed that the correspondence be
23   sent to you home; correct?
24           A.    Yes, obviously.
25           Q.    And did you meet with Jenkens & Gilchrist in
```

75

1  connection with Mr. Sala?
2       A.   I can't recall that I had a face-to-face
3  meeting with them.  I may have had phone conferences with
4  them.
5       Q.   Did you explain to Jenkens & Gilchrist that
6  Mr. Sala was looking for a tax loss?
7       A.   I can't recall.  I probably explained to them
8  that he was exploring investment strategies which would have
9  tax advantages to them.
10      Q.   Are you speculating, or are you telling me
11 that you recall telling them that?
12      A.   I am speculating.  I'm certain I didn't tell
13 them he was looking for tax losses.
14      Q.   Looking for tax strategies?
15      A.   Tax losses.
16      Q.   But you would have told them that he was
17 looking for "tax strategies"?  You would have used a
18 different word?
19      A.   No.  I probably would have said, He's
20 exploring the possibility of investments with a tax benefit
21 associated with them.
22      Q.   Would you have explained what the tax benefit
23 he was looking for was?
24      A.   No, because I didn't know what exactly he was
25 looking for.  And I didn't --

1  Mr. Sala Sala had investment advisors?
2       MR. HALLETT: Objection. That has been asked and
3  answered multiple times.
4       A.    Yes, I knew he had investment advisors.
5       Q.    (By Mr. Geier) So is it your testimony that
6  all you knew from Mr. Sala is that he just wanted a profit?
7       MR. HALLETT: Objection. Argumentative; asked and
8  answered.
9       A.    He wanted to achieve a profit in any
10 transaction he entered into, and he wanted to explore the
11 possibility of having a tax advantage to that.
12      Q.    (By Mr. Geier) Mr. Raby, is there any client
13 that you have that doesn't want to achieve a profit in a
14 transaction?
15      MR. HALLETT: Objection. That's vague and ambiguous
16 as to time. Objection.
17      A.    Yeah, they all want to achieve a profit.
18      Q.    (By Mr. Geier) Okay. Did Mr. Sala have more
19 specific goals, other than the tax and wanting to achieve a
20 profit, that you learned of when you were looking for a
21 transaction for him in 2000?
22      A.    No, those were the goals.
23      Q.    Make money and have a tax component to it?
24      A.    Right.
25      Q.    Was he looking for a particular type of

79

```
 1  transaction?
 2       A.   No.  That was the type of transaction that he
 3  was looking for.
 4       Q.   And he conveyed this to you?
 5       A.   I can't recall.
 6       Q.   Did you meet with Mr. Sala and any
 7  representatives of Jenkens & Gilchrist?
 8       A.   Not that I can recall.
 9       Q.   Generally, who is Jenkens & Gilchrist?
10       A.   It's a law firm.
11       Q.   Okay.  And did you have prior contact with
12  someone at Jenkens & Gilchrist?
13       A.   I had learned of this Donna Guerin through my
14  work.
15       Q.   What did you learn of her that caused you to
16  reach out to her?
17       A.   I learned that they were a firm that had tax
18  solutions and investments that could be potentially viable
19  for clients.
20       Q.   Had you had contact with Donna Guerin on
21  behalf of a prior client?
22       A.   Not that I can recall.
23       Q.   Did you have contact with Donna Guerin prior
24  to your working with Mr. Sala?
25       A.   Not that I can recall.
```

|   |   |
|---|---|
| 1 | account of the work that you did for them for Deerhurst; |
| 2 | correct? |
| 3 | A. They are suing MultiNational Strategies. |
| 4 | Q. Are you a defendant? |
| 5 | A. I am personally named as a defendant. |
| 6 | Q. So they're suing you? |
| 7 | A. Yeah. |
| 8 | Q. And is MultiNational Strategies paying your |
| 9 | legal bills? |
| 10 | A. For Jacobs and King? |
| 11 | Q. Uh-huh. |
| 12 | A. No, they are not. |
| 13 | Q. I believe you testified that you left |
| 14 | MultiNational Strategies in 2000? |
| 15 | A. Yes. |
| 16 | Q. Why did you leave? |
| 17 | A. Because at that time, Mike had represented to |
| 18 | me, and the IRS had passed overarching rules which now made |
| 19 | it so that if you engaged in a transaction -- even if it |
| 20 | wasn't a listed transaction -- if you engaged in any sort of |
| 21 | tax planning that would provide a loss, you would have to |
| 22 | disclose it directly on your return. |
| 23 | And so at that point, it became a disadvantage to |
| 24 | us, and the penalties became exorbitant at that point as |
| 25 | well. |

```
 1              So we decided that we couldn't keep practicing
 2   anymore, because our clients were going to have to disclose
 3   everything on their tax return.
 4        Q.   Okay.  Let's go back to Mr. Schwartz.  At the
 5   time that you met him, you both were working for
 6   PricewaterhouseCoopers; correct?
 7        A.   Yes.
 8        Q.   You were working in different offices; is that
 9   correct?
10        A.   Yes.
11        Q.   You were working in Denver?
12        A.   I was working in Denver.
13        Q.   And Mr. Schwartz -- where was he working?
14        A.   He was working in New York.
15        Q.   How is it that you came into contact with each
16   other the first time?
17        A.   I believe Mr. Schwartz spoke at a conference
18   at PWC about what he was doing in his practice.
19        Q.   What was he doing at that time?
20        A.   He was doing investments strategies, which
21   would also generate favorable tax consequences for clients.
22        Q.   And did you talk with him at that time about
23   the possibility of having a mutually beneficial relationship
24   professionally?
25        A.   I can't recall.  But probably.
```