**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Case No. 1:05-cv-00636-LTB-PAC

| | |
|---|---|
| CARLOS E. SALA, and<br>TINA ZANOLINI-SALA, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | )<br>) |

---

PLAINTIFFS' REPLY RE: MOTION PARTIAL SUMMARY JUDGMENT
ON INTEREST SUSPENSION ISSUE

---

Plaintiffs CARLOS E. SALA and TINA ZANOLINI-SALA, by and through their

undersigned counsel, hereby reply to the United States' Opposition to Plaintiff's Motion for

Partial Summary Judgment.

# I.  Introduction

In its opposition, the government has not raised any factual issue with respect to the issue

raised in Plaintiffs' Motion for Partial Summary Judgment, i.e., whether Plaintiffs meet the basic

requirements for interest suspension pursuant to § 6404(g).  Instead, the government raised an

affirmative defense – claiming that this is "a case involving fraud" within the meaning of 26

U.S.C. § 6404(g)(2)(B).[1]

---

[1] Throughout this brief, references to "section" or "§" refer to sections in Title 26 of the U.S. Code, The Internal Revenue Code of 1986, unless otherwise specified.

To prove fraud, the government must be prepared to show by clear and convincing evidence that Plaintiff knew his tax reporting position was illegal, and that he attempted to evade his taxes when he filed his 2000 tax return, claiming the loss that is in dispute in this case. Nothing the government alleges in its response comes even close to showing it can meet that heavy burden at trial.  For example, the government repeatedly compares Plaintiff's net cash investment ($728,000) in 24 foreign currency long and short options positions whose acquisition forms the basis for his tax loss, with the amount of the tax loss ($60 million).  But the tax loss is based upon the tax law at the time, requiring that the short options be disregarded in computing the tax gain or loss.  That is the position taken in a 100-page legal opinion obtained by Plaintiff, and confirmed by two independent attorneys <u>before</u> Plaintiff claimed the loss.

Plaintiff's claim is not based upon concealed transactions, or purported transactions that did not occur, as is the situation in most tax fraud cases.  It is based upon facts that are largely undisputed following the substantial discovery conducted by the government in this case. Perhaps the best evidence that Plaintiff's reporting position is legitimately debatable and not fraudulent is the government's failure to move for summary judgment on the basic issue in this case: whether the claimed loss is allowable.

If the law were so clearly contrary to Plaintiff's position, such that he should be deemed to know his reporting position was illegal, then the government would certainly be entitled to summary judgment on the merits.  Notably, nowhere in the government's 35-page brief is there any discussion of the law regarding the correct tax treatment of Plaintiff's acquisition of the options.  The government seeks to avoid this most fundamental issue, and, instead, relies upon labels such as "sham" and "economic substance," and tries to paint Plaintiff as someone other

than who he actually is, namely, a highly intelligent and honest individual who conducted a thorough investigation of both the economics and the tax consequences of his investment.

The government correctly notes that if Plaintiff prevails in establishing his entitlement to the tax loss at issue, the fraud issue becomes moot.  However, failing to eliminate the government's untenable fraud defense on summary judgment will greatly and unnecessarily expand the issues at trial.  Whether Plaintiff's claimed tax loss is allowable involves significant legal issues (i.e. whether short option positions are treated as liabilities) and limited issues of fact.  Permitting the government to pursue its fraud allegation will both delay and greatly increase the cost of resolving the real issues in dispute between the parties.

In its effort to convince this Court that there is a genuine issue of material fact as to fraud, the government makes a host of allegations that are completely unsupported by, and often completely contrary to, the discovery record.  In its brief, the government misstates and mischaracterizes testimony, and overreaches in its conclusions in an effort to convince this Court that this is case involving fraud so that it can escape its obligation to refund illegally collected interest.  However, before addressing those disputed matters, they should be placed in context by acknowledging the facts that do bear directly upon the economic substance of the Deerhurst investment and the allowability of Plaintiff's tax loss, and which are not disputed.  Indeed, the government's expert, David DeRosa ("DeRosa") and Plaintiff's expert, Robert Kolb ("Kolb"), are in remarkable agreement with respect to the most important facts which bear upon Plaintiff's claimed loss.  These facts include the following:

(a)      Plaintiff invested almost $9 million in cash with Deerhurst and was committed to leave the money invested for five years (or suffer substantial penalties) (Exhibit 3 – Deposition of David DeRosa, January 11, 2007 ("DeRosa Dep."), at 36, 80-82);

(b)     Deerhurst was managed by Andrew Krieger ("Krieger"), who was acknowledged as a highly-reputable foreign exchange trader with many years of experience (Exhibit 3 - DeRosa Dep., at 43);

(c)     In late November of 2000, part of Plaintiff's investment was used by Krieger to acquire 24 long and short options on various foreign currencies.  The amount paid for the long options $60,987,866,79; the total amount received for the short options was $60,289,568.94.

(d)     Krieger acquired the long and short options, as well as the other investment positions with the intent to make a profit.  Indeed, DeRosa testified as follows:

> Q:     Do you think he ever entered into a trade not expecting to make money?
>
> …
>
> A.     The only answer that I have for you is that I don't believe Andy Krieger ever went into a trade with the intent of losing money.
>
> …
>
> Q.     So you can't form any conclusion, based on everything you've seen as to whether he was trying to make money?
>
> A.     He probably thought he was going to make money on every trade that he did.  He didn't, though.

Exhibit 3 - DeRosa Dep., at 131-133.

(e)     The 24 options were disposed of by Krieger within a few weeks of their acquisition, yielding a profit of $91,010, according to DeRosa (Exhibit 4 – Report of David DeRosa, Ph.D. in Rebuttal to the Expert Report of Robert W. Kolb, Ph. D. ("DeRosa Rebuttal Report"), at 10; Exhibit 3 - DeRosa Dep., 170-171), or $111,599 according to Kolb (Exhibit 5 - Report of Robert W. Kolb, PhD. ("Kolb Report"), at 21 and exhibit 15 therein; Exhibit 4 - DeRosa Rebuttal Report, at 10; Exhibit 3 - DeRosa Dep., 170-171);

4

(f)     The maximum profit potential of the investment in the 24 options was $553,126 (Exhibit 4 - DeRosa Rebuttal Report, at 6, n.1; Exhibit 3 - DeRosa Dep., at 140) or $545,130 (Exhibit 5 - Kolb Report, at 20-21);

(g)     Even though the acquisition and subsequent transactions involving the 24 options resulted in an economic profit, whether or not a tax loss results depends upon the treatment of the short options.  Plaintiff claims the tax law required the short options to be disregarded as a liability in determining his investment basis.  If that claim is upheld, the acquisition and subsequent transactions involving the options result in a tax loss of  approximately $60 million;

(h)     Although the transactions producing the tax loss occurred in November and December of 2000, the $8.9 million invested with Deerhurst remained invested for approximately four years, and Plaintiff made every effort throughout that time to make as much money as possible.  (Exhibit 7 – Deposition of Carlos Sala, dated October 25, 2006 ("Sala Dep. Vol II"), at 198);

(i)     The transactions that formed the basis of the tax loss – as well as hundreds or thousands of other transactions undertaken by Deerhurst during the pendency of the investment – actually occurred, i.e., were conducted on real financial markets with real counterparties. Exhibit 3 - DeRosa Dep., at 83-87.

With respect to the alleged fraud issue, there is no dispute that: (1) Plaintiff performed an extraordinary investigation into the economics of the proposed Deerhurst investment (Exhibit 3 - DeRosa Dep. at 80; Exhibit 11 – Deposition of Andrew Krieger, dated October 26 and 27, 2007 ("Krieger Dep. Vol. II"), at 438-446) before he entered into it, and continued to monitor the status of his investment during the entire four year investment period.  This is completely inconsistent with a taxpayer who fraudulently enters into sham transactions having no economic

potential, which are undertaken solely for tax reasons; (2) Plaintiff received a 100 plus page legal opinion from the New York law firm of Brown & Wood, exhaustively discussing the merits of all legal issues involved; (3) Plaintiff had Denver attorney Laurence Nemirow ("Nemirow") of Davis Graham & Stubbs spend 90 hours independently reviewing the Brown & Wood legal opinion to determine the reasonableness of its legal analysis and conclusions (Exhibit 8 – Deposition of Laurence Nemirow, dated September 14, 2006 ("Nemirow Dep."), at 54); (4) Plaintiff requested yet a third attorney, Bruce Lemons of Holland & Hart, to read the Brown & Wood opinion and advise as to whether it could legitimately be relied upon. Exhibit 9 – Deposition of Bruce Lemons, dated October 6, 2006 ("Lemons Dep."), at 66-67.

The government misstates its burden of avoiding summary judgment.  Ordinarily, the non-moving party must establish that there are genuine issues of material fact remaining for trial, and produce competent evidence supporting its position that it can introduce evidence at trial sufficient to prevail (with doubts being resolved in the non-moving party's favor).  However, when the nonmoving party raises an affirmative defense that requires proof under the "clear and convincing evidence" standard (e.g., fraud), the burden is far higher.  The evidentiary submissions of the nonmoving party must meet the heavy burden of establishing that a rational finder of fact could find fraud by clear and convincing evidence.

Even acknowledging that fraud is a factually intense issue, the government's evidentiary submissions in this case do not come close to meeting its heavy burden.  They are woefully insufficient on their face.  The so-called evidence of fraud assembled by the government is not evidence.  Much of it is no more than opinion and speculation.  Furthermore, the government's characterization on brief of the underlying documents and testimony is often blatantly misleading and false.  For example:

(1)      On page 22 of its brief, the government states that Plaintiff "*signed* paperwork to enter one abusive tax shelter but then backed out." This is simply false. Exhibit CC, the government's purported evidentiary support, is nothing more than an internal email between KPMG employees requesting the preparation of an engagement letter for a transaction that Plaintiff in fact rejected. Plaintiff never *signed* any documents committing him to enter into this or any other transaction promoted by KPMG. Exhibit 7 - Sala Dep. Vol II, at 231. The fact that Plaintiff rejected a KPMG-promoted tax shelter that the government now considers "abusive" does nothing to show that he had fraudulent intent with respect to an investment transaction not promoted by KPMG.

(2)      On page 4 of its Response, the government states:

> Equipped with this financial sophistication and background, Sala undertook a year-long quest to locate a shelter transaction not only for himself, but for his close friends and fellow officers at Abacus, White (CEO) and Dice (President).

The government cites portions of the deposition of Christopher Dice as its sole support for this assertion. The Christopher Dice ("Dice") testimony cited above says nothing of "a year-long quest" to locate a tax shelter. Dice testified as follows:

Q.      And who did you talk to?

A.      Well the first person I talked to was Carlos Sala.

Q.      Why was that?

A.      Well, we had both exercised our options and sold the stock I think, literally, over the same period of time, over a few fays. And sometime subsequent to that or around that, Carlos just mentioned that he was researching investments that had favorable tax treatment.

…

Q.      So in 2000, you weren't looking at a BLIP [sic] transaction?

A.      I don't recall looking at any specific transaction that was BLIPS.

Q.      Do you recall looking at any other transaction other than the one you ultimately chose?

A.      No.

…

Q.      Did Mr. Sala tell you about any other transactions he was considering?

A.      Perhaps tangentially.

Q.      Are you aware that Mr. Sala was looking at other transactions other than the Deerhurst transaction?

A.      Yes.

Q.      Do you know that from him telling you that?

A.      Yes

Q.      Do you know how many?

A.      No.

Q.      Were there a few?

A.      I would have – one or two.  But I'm not sure on that.

Response, Geier Dec., Exh. G, at 22, 26, 36.

None of the cited Dice testimony even mentions Martin White ("White"), let alone suggests "a year-long quest" on White's behalf.  This is not surprising, because White indicated that he and Sala were looking for investment opportunities, and that the only transactions considered with tax benefits were BLIPS and Deerhurst.  Exhibit 19 – Deposition of Martin White, dated August 30, 2006 ("White Dep."), at 122-125.

(3)      In another example of twisting the facts, the government states that Nemirow of Davis Graham & Stubbs told him that the management fee charged by Deerhurst was "not consistent with industry practice."  Response, at 12.  The government asks this Court to conclude that from that assertion that Plaintiff was not genuinely concerned with economics and

8

profitability – just with obtaining a tax loss.  In fact, the underlying Nemirow testimony cited by the government reveals that Plaintiff was indeed concerned about economics, and, for that reason, he expressed *his concerns* regarding the Deerhurst fee structure *to Nemirow*, rather than the other way around:

> Q.    Did Mr. Sala raise any concerns with the transaction to you?
>
> A.    I don't recall.  I'm sure he did.  He raised concerns about various aspects of the transaction, having to do with things like the size of the management fee and the general partners' cut of the profits, and how they were worded.
>
> Q.    Was this pre-entry or post-entry?
>
> A.    It was pre-entry.
>
> Q.    What did you do to resolve those issues?
>
> A.    We read the transaction documents together and commented on them.
>
> Q.    And you negotiated better terms; am I correct? Different terms?
>
> A.    Better terms, probably.
>
> Q.    Do you recall what any of those terms were?
>
> A.    Actually, Carlos negotiated most of the better terms, and I tended to clarify the actual language in the document.  But Carlos was the front person for negotiating the economic terms.
>
> Q.    Can you identify an economic term that Mr. Sala negotiated?
>
> A.    I believe we got a management fee that was smaller than the other management fees paid by the other investors.
>
> Q.    What about a performance-based fee?  Did he negotiate a different --
>
> A.    I think he negotiated a different performance-based fee.
>
> …
>
> Q.    And you said that Mr. Sala negotiated a difference in that.  Were you part of those negotiations?

> A.       No.  I discussed them with Carlos, but I don't think I was a party to the negotiation.
>
> Q.       Did you identify that to Mr. Sala as something he may have wanted to look at?
>
> A.       I think Carlos figured that out by himself.
>
> Q.       Did he come to you for any advice on that matter?
>
> A.       No.  I think he came to me to implement the deal that he struck; to make sure that it was implemented in the documents.

Exhibit 8 - Nemirow Dep., at 94-96.

(4)      The government argues that one "badge of fraud" is Plaintiff's stated rationale for employing an S corporation, i.e., to limit his personal liability.  However, the government's own expert, DeRosa, testified that his personal hedge fund was set up so that investors participated through limited liability vehicles, whose purpose, consistent with their description, was to limit liability.  Exhibit 3 - DeRosa Dep., at 48-63.  Interestingly, DeRosa's funds were also structured as Cayman Island entities in order to enable foreign investors to avoid US income taxes, despite the fact that nothing of substance occurred in the Caymans.  Exhibit 3 - DeRosa Dep., at 57-63.  While certain trades may have been purchased in Plaintiff's individual account prior to being transferred to the S corporation and the general partnership, this doesn't diminish the protection provided by an S corporation with respect to any further trading or liability incurred while the general partnership is operating.

(5)      The government argues (Response, at 8) there was no economic reason for the use of a partnership to conduct Deerhurst investment transactions in the year 2000.  The government cites Krieger's testimony that he traded "the body of" all partners funds (including Plaintiff's) as a unit, and suggests that the partnership had no economic purpose.  The government conveniently omits Krieger's testimony, acknowledged by DeRosa, stating that by combining the

investments of Plaintiff and the other partners in a partnership pool, Krieger's management of investments was simpler and less costly. Exhibit 3 - DeRosa Dep., at 184; Exhibit 11 - Krieger Dep. Vol II, at 514-515.

(6)     The government argues that when Plaintiff's entry into the Deerhurst transaction it was contrary to the advice of both the New York law firm of Willkie Farr & Gallagher and Nemirow.  Response, at 22.  That argument, which would lead the court to believe that Plaintiff did not rely upon counsel, and, indeed, acted contrary to advice of counsel, is blatantly misleading and contrary to the discovery record.  With respect to Willkie Farr & Gallagher, Nemirow's recollection is that the firm was unwilling to undertake any work because of the possible application of Notice 2000-44.  Response, Geier Dec. Exh. H, at 59.  Nemirow was engaged by Plaintiff and, in fact, did spend a substantial amount of time reviewing every page of the Brown & Wood opinion and providing Plaintiff advice as to the reasonableness of Brown & Wood's analysis and conclusions, including Brown & Wood's discussion about Notice 2000-44. Exhibit 8 - Nemirow Dep., at 148-159.  In light of the fact that Nemirow provided confirming advice as to the reasonableness of the Brown & Wood discussion of Notice 2000-44, the government is simply incorrect when it states that Plaintiff ignored the advice of his own counsel.

While the government may dispute the tax benefits associated with the Deerhurst investment, it is not credible to assert that this is a transaction involving fraud.  It is not fraudulent, and indeed it is completely reasonable, to:

(1)     negotiate lower fees,

(2)     demand the ability to exit an investment if funds were required to pay taxes,

(3)     enter into an investment test period in order to determine whether or not to commit to a longer investment time period, or

(4)     choose a legal structure to protect against personal liability, as well as to provide tax benefits.

# II.  Argument

The government attempts to show that there is a triable issue of fact with respect to whether or not Plaintiff committed fraud in connection with the claimed loss.  The government's argument is unavailing for two reasons.  First, the government has not submitted any evidence from which a rational trier of fact could find that there was fraud shown by clear and convincing evidence.  Second, the legal principles governing the tax treatment of transactions designed to produce a tax loss through the acquisition of long and short option positions, regardless of whether the tax loss is matched by an economic loss are, at the very least, uncertain and fairly debatable.  Tax reporting positions that are fairly arguable, even if they are highly controversial, do not amount to fraud.

## A.     The Government Has Not Established A Triable Issue Regarding Fraud.

### 1.     When Raising an Affirmative Defense that Must be Established by Clear and Convincing Evidence, the Nonmoving Party Must Present Clear and Convincing Evidence that the Defense is Applicable.

A nonmoving party may oppose a summary judgment motion by asserting that triable issues of fact remain with respect to an affirmative defense raised by that party.  However, when the affirmative defense that the nonmoving party seeks to interpose requires proof by clear and convincing evidence at trial, then the nonmoving party has the burden of producing evidence (in opposition to the summary judgment motion) from which it could be found, by clear and convincing evidence, that the asserted defense is applicable.  *Fina Technology, Inc. v. Ewen*, 857 F. Supp. 1151, 1154 (N.D. Tex. 1994), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Malek v. Martin Marietta Corp.*, 859 F. Supp. 458, 465 (D. Kan. 1994).

The Supreme Court has defined "clear and convincing evidence" as that which gives the finder of fact "an abiding conviction that the truth of [the proponent's] factual contentions are 'highly probable,'" meaning that such evidence "instantly tilt[s] the evidentiary scales in the affirmative when weighed against the evidence … offered in opposition." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). The clear and convincing standard of proof "leaves no room for mere conjecture." *Exxon v. United States*, 45 Fed.Cl. 581, 745 (1999), *rev'd in part on other grounds*, 244 Fed.3d 1341 (Fed. Cir. 2001).

In short, a nonmoving party who endeavors to resist summary judgment by relying on a defense that requires proof by clear and convincing evidence must offer evidence that a rational fact finder could conclude to be overwhelming, when compared to the evidence offered by the other side.

### 2. To Establish Fraud, the Government Must Demonstrate Conduct Intended to Conceal or Mislead by Clear and Convincing Evidence.

Fraud is the intentional evasion of a tax believed to be owing. *Webb v. Commissioner*, 394 F.2d 366, 377 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81. Fraud is never to be presumed or assumed, but must be proven by affirmative evidence showing *substantial understatements* of income and a *specific intent* to evade tax. *Beaver v. Commissioner*, 55 T.C. 85, 92 (1970); *McGee v. Commissioner*, 61 T.C. 249, 256 (1973), *aff'd* 519 F.2d 1121 (5th Cir. 1975).[2]

Like other species of fraud, tax fraud requires "actual, intentional wrongdoing." *Mitchell v. Commissioner*, 118 F.2d 308, 310 (5th Cir. 1941), *rev'g* 40 B.T.A. 424 (1939) Fraud "implies bad faith, intentional wrongdoing and a sinister motive." *Webb v. Commissioner*, 394 F.2d at 377. The

---

[2] The determination of fraud is the same for purposes of § 6663 (imposing fraud penalty) and § 6501(c)(1) (extending statute of limitations in case of false or fraudulent return). *Neely v. Commissioner*, 116 T.C. 79, 85 (2001). As § 6404(g)(2)(B) contains similar language, it is certainly subject to the same standard.

government must show that the taxpayer intended "to evade tax believed to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such tax." *Recklitis v. Commissioner*, 91 T.C. 874, 909 (1988); *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968). While fraud may be inferred from circumstantial evidence, "[f]raud is usually inferred from 'conduct, the likely effect of which would be to mislead or conceal.'" *Payne v. Commissioner*, 224 F.3d 415, 420 (5th Cir. 2000), quoting *Spies v. United States*, 317 U.S. 492, 499 (1943).

Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." *United States v. Pechenik*, 236 F.2d 844, 846 (3d Cir. 1956). Because of the specific intent requirement, negligence, no matter how great, does not constitute fraud:

> Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific intent to evade a tax believed to be owing.

*Mitchell v. Commissioner*, 118 F.2d 308, 310 (5th Cir. 1941); *Parks v. Commissioner*, 94 T.C. 654 (1990). *Kellett v. Commissioner*, 5 T.C. 608, 618 (1945) (holding taxpayer's negligence, even gross negligence, is not enough to prove a willful attempt to evade tax).

In a fraud case, the burden is on the government to demonstrate fraud by "clear and convincing evidence." § 7454(a); *Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983). The clear and convincing evidence standard is indeed a substantial one. In civil tax fraud cases, fraud may not be found under "circumstances which at most create only suspicion." *Davis v. Commissioner*, 184 F.2d 86, 87 (10th Cir. 1950); *Cirillo v. Commissioner*, 314 F.2d 478, 482 (3d Cir. 1963). Even when a taxpayer's actions raise a "strong suspicion" of fraud (and could be characterized as meeting one or more of the "badges of fraud" discussed below), fraud will not be upheld when the government fails to prove by clear and convincing evidence that suspicious behavior is "attributable to [the taxpayer's] fraudulent intent to evade tax … as opposed to [the taxpayer's] negligence and

his disregard of tax rules and regulations." *Brodsky v. Commissioner*, T.C. Memo. 2001-240, citing *Toussaint v. Commissioner*, 743 F.2d 309, 312 (5th Cir. 1984), *aff'g* T.C. Memo. 1984-25, and *Petzoldt v. Commissioner*, 92 T.C. 661, 700 (1989).

In situations where there are two alternative explanations for a taxpayer's misreporting, intentional wrongdoing or negligence, the government must offer convincing evidence that the underpayment is intentional as opposed to merely negligent.  For example in *Groves v. Commissioner*, T.C. Memo. 1999-415, the court considered the case of an experienced tax attorney who misreported the basis of certain stock in calculating his gain, ultimately holding that the government had not offered any evidence that the taxpayer "intended to underpay tax that was as convincing as the many indications that [the taxpayer's] conduct was more fairly viewed as negligent."

> **3.    The Government's Perceived Lack of Credibility on the Part of the Plaintiff Does Not Establish Fraud.**

While the government cites a Tax Court case listing eleven "badges of fraud" which have been developed by the courts (Response, at 27), it is clear – and the government does not contest – that eight of the factors are inapplicable (understating income, maintaining inadequate records, concealment of income or assets, failing to cooperate with tax authorities, engaging in illegal activities, filing false documents, failing to file tax returns, and dealing in cash).  While the government argues that three of the factors are present (implausible or inconsistent explanations, an intent to mislead which may be inferred from a pattern of conduct, and lack of credibility of the taxpayer's testimony), what the government is essentially saying in its discussion of all three factors (Response, at 27-32) is that certain aspects of the Plaintiff's testimony lack credibility.

Significantly, none of the evidence cited by the government relates to any concrete action taken by Plaintiff to mislead or conceal from the government the nature of the transactions: (1) at

the time the Deerhurst investments was entered into.  Indeed, Plaintiff responded to the

government's request for documents with thousands of pages of transaction documents regarding

the Deerhurst investment transaction and related events, which he has kept since the time those

events occurred; (2) in Plaintiff's individual income tax returns (and the related S corporation and

partnership returns); (3) in the amended tax return filed with the IRS, removing the originally

claimed loss <u>prior to</u> the IRS's audit of the return; (4) during the course of the IRS audit of the

originally filed and amended tax return (in fact Plaintiff completely cooperated in the audit and

provided all relevant documents and information to the IRS); and (5) in the claim for refund filed

subsequent to the IRS audit.

Without concrete evidence of steps taken to hide or conceal the transactions at the time they

were entered into, when the return was filed, or thereafter, there is simply no triable issue of fraud.

Plaintiff firmly disputes the government's argument that Plaintiff was misleading in connection with

statements made on his deposition.  In fact, a review of his deposition in its entirety shows that he

was a remarkably credible and forthcoming witness.  Exhibit 6 – Deposition of Carlos Sala, dated

September 15, 2006 ("Sala Dep. Vol I"); Exhibit 7 - Sala Dep. Vol. II.  However, even if the Court

accepted the government's assertions that some of the explanations made by Plaintiff in his

deposition regarding transactions occurring six or seven years ago were erroneous, that does nothing

to prove fraud.[3]

Even in a case where the taxpayer pled guilty to filing false tax returns (§ 7206(1)) relating

to unreported income arising out of an embezzlement, the Tax Court did not permit the government

to rely solely on the conviction for misstating items on a tax return to meet its burden of proving

---

[3] For example, in *Mosteller v. Commissioner*, T.C. Memo. 1986-505, while finding that the taxpayer's testimony was not wholly credible, the court refused to allow this credibility gap carry respondent's heavy burden of proving fraud by clear and convincing evidence.

fraud by clear and convincing evidence.  In fact, the court ruled that, despite the criminal conviction

for false statements on the tax return, the typical "badges of fraud" were not present:

> The typical indicia of an intent to evade tax are not present. Petitioner maintained adequate records, made all pertinent information available to the Internal Revenue Service, and cooperated with the Internal Revenue Service's investigation. In short, petitioner understated his income, but respondent has not established that petitioner intended to evade tax. Accordingly, we reject respondent's determinations.

*Kemp v. Commissioner*, T.C. Memo. 2004-153.

A close examination of the government's factual assertions about Plaintiff's purported

inconsistent statements reveals that, unlike the taxpayer in *Kemp*, Plaintiff made no intentional false

statements.  For example:

(1)     The government argues that the ultimate fee structure agreed to by Plaintiff and

Deerhurst indicates that Plaintiff did not actually expect to make large profits from Deerhurst.

(Response, at 27-28).  The government submits Plaintiff's own detailed and contemporaneous

projections as to his possible profit under various assumptions.  Response, Geier Dec. at Exh. N.

While the government disputes that Plaintiff could really make the profits he projected, it does not

dispute that he took the time and effort to estimate profitability wholly aside from tax savings.  That

consideration itself belies the government's argument that he had no genuine intent to earn profits

on his investment.

Indeed, Plaintiff's attempt to minimize investment management fees likewise proves his

focus on profits, not just taxes.  While most investors in Deerhurst paid a 2% management fee plus

20% of any profits, Plaintiff negotiated a fee structure where he paid a lower fixed management fee

(1%), in exchange for a higher portion of the profits (30%).  The government's assertion that this

trade-off is inconsistent with an expectation of large profits ignores several significant facts.  First,

Plaintiff realized that, just as in every volatile investment, there were significant downside risks.

Exhibit 7 - Sala Dep. Vol. II, at 60-62.  Second, the parties on the other side of the transaction (Deerhurst and Schwartz) were willing to concede their guaranteed management fees in exchange for a higher portion of the profits.  Exhibit 12 - Deposition of Michael Schwartz, dated June 28, 2006 ("Schwartz Dep. Vol. I"), at 193-194.  Third, the government's own expert, DeRosa, indicated that Mr. Krieger was a "formidable" exchange trader, who was famous for the work he did while at Banker's Trust (Exhibit 3 - DeRosa Dep., at 42-45), i.e., someone an investor could reasonably expect to generate large profits.  While certainly large profits were desired, there are no guarantees, and protecting oneself against downside risk by negotiating a more favorable fee structure is not fraudulent behavior.

(2)     The government argues that Plaintiff's demand for an "exit strategy" is inconsistent with his expressed investment motives for entering into the Deerhurst transaction.  (Response, at 28-29).  The government ignores the undeniable fact that rational businessmen typically attempt to obtain provisions allowing them to extricate themselves from a transaction on favorable terms.  Plaintiff had previous experience with investments such as hedge funds, which limited his ability to withdraw funds, so this was not an unusual concept to him. Exhibit 6 - Sala Dep. Vol. I, at 53-55.  When Deerhurst's performance proved disappointing, Plaintiff shifted his investment into a second fund managed by Krieger, Lone Star, in an effort to improve profitability.  Later, Krieger gave Plaintiff the option of withdrawing all of his money from the account, but Plaintiff continued to invest, indicating his desire to keep trying to realize a large profit under Krieger's management.  Exhibit 7 - Sala Dep. Vol. II, at 201-202.  Only after both Deerhurst and Lone Star proved less successful than Plaintiff had hoped, did he withdraw his funds entirely from under Krieger's management earlier than the end of the five-year period.  Exhibit 7 - Sala Dep. Vol. II, at 198-200.

18

At the inception of the transaction, Plaintiff also obtained an agreement whereby he could withdraw his investment early without incurring penalties if he was not able to receive a tax opinion prior to the time he filed his tax return.  Plaintiff's insistence that he receive a tax opinion addressing the issues that could be raised regarding the allowability of the claimed tax loss hardly shows fraudulent intent; it shows the opposite, especially in light of the fact that Plaintiff had two other independent attorneys review the opinion for reasonableness.  Moreover, this agreement was not initiated by Plaintiff, but instead suggested by Nemirow, who expressed his concern that an attorney could not opine on a transaction that had not yet occurred.  Exhibit 8 - Nemirow Dep., at 78-79.  Nemirow wanted Plaintiff to have the option to leave the transaction if it did not transpire as set out in the draft opinion letter, or if the tax advantages were not available.  Moreover, if a legal opinion was not forthcoming, Plaintiff did not intend to take the tax loss on his tax return, and wanted the funds (which would otherwise be invested with Deerhurst) to pay taxes.  The refusal to proceed without a legal opinion is hardly indicative of fraud.  It is indicative of a taxpayer trying to ensure that the tax treatment of an investment was properly reported on his tax return.

(3)     The government argues that Plaintiff's intent to mislead can be inferred from his pattern of conduct of "shopping for a tax shelter."  The government points to Plaintiff's decision not to go forward with KPMG's BLIPS transaction when the IRS published Notice 2000-44.[4] (Response, at 30-31).  The government fails to disclose Plaintiff's testimony that his rejection of BLIPS was not due entirely to the IRS's view of it, but also because a representative of the investment firm involved in BLIPS did not show up for a scheduled meeting to answer Plaintiff's

---

[4]  This notice stated the IRS position that the tax benefits claimed from certain transactions were invalid in its view.  One of the two factual scenarios described is similar to the KPMG BLIPS transaction.

questions about the transaction (Exhibit 6 - Sala Dep. Vol. I, at 71-72, 100), the refusal of the promoters to permit revisions and comments to the transaction documents, and most importantly, Plaintiff's conclusion from his preliminary review that the BLIPS transaction had insufficient profit potential. Exhibit 6 - Sala Dep. Vol. I, at 71-72.

      As to the government's list of other KPMG promoted transactions, which it attempts to link to Plaintiff, the documents cited by the government do nothing more than show attempted salesmanship on the part of KPMG.  The fact is, KPMG's salesmanship was unsuccessful in convincing Plaintiff to enter into any of its promoted transactions.  Finally, even if Plaintiff were looking for a transaction with tax benefits, and rejected one or more presented to him, this does nothing to establish that he intended to evade taxes with respect to the investment transaction he ultimately did pursue.

      (4)     The government implies that Plaintiff was not credible when he stated on deposition that he had no recollection of discussing his compensation or personal finances with Tracie Henderson at their first meeting, because Henderson's post-meeting email indicates that two transactions (OPIS and an "option strategy") may have been discussed. Response, at 5.  The government fails to note that a third participant at the meeting, Tim Gillis, was deposed by the government, and he, like Plaintiff, had no recollection that these transactions were discussed. Exhibit 14 - Deposition Timothy Gillis, dated October 23, 2006 ("Gillis Dep."), at 43-48. Furthermore, Plaintiff stated that Henderson discussed her services at the end of the meeting. Exhibit 6 - Sala Dep. Vol. I, at 59-64. This could have easily concluded with a very brief mention of the two transactions, without having discussed Plaintiff's compensation or personal finances.  To base an assertion of fraud on conflicting or inaccurate memories of what at most was a brief part of a conversation at an introductory meeting more than seven years ago

20

regarding proposals for transactions that never occurred (and were not even subsequently

investigated) is preposterous.

(5)     The government argues that Plaintiff's testimony regarding Notice 2000-44 is not

credible.[5]  Response, at 32.  While Plaintiff indicated that he initially did have concerns generally

about the Notice, he testified that he relied upon the Brown & Wood tax opinion for the position

that the Notice was contrary to existing law:

> Q.     So you read 2000-44, at the examples that Mr. Ruble cited, and
> determined that you didn't think that it would apply to this transaction; right?
>
> A.     I'll tell you -- if I can respond.
>
> Q.     Sure.
>
> A.     I knew there was an issue on this transaction, and then I read the
> discussion on 2000-44 in the opinion. When I read the discussion, there were two
> things that came to mind.  One was giving a discussion as to the weight that
> courts give to notices as it related to new Reg rules and so forth.
>
> But the more significant piece for me was the fact that 2000-44 seemed to
> contradict existing law.  That's what caught my eye.  And I said, Okay, who
> knows what weight it has -- any notice.
>
> But secondly, this notice contradicts existing law. And it was already addressed
> by Mr. Ruble, and Mr. Schwartz would have concurred with that.  So I was very
> comfortable that 2000-44, because of its positions, was fine as it related to our
> transaction.  That's what I remember.

Exhibit 6 - Sala Dep. Vol. I, at 136-137; Exhibit 15 - Opinion of Brown & Wood, dated

April 16, 2001 ("Brown & Wood Opinion").  Reliance upon a well-reasoned discussion

of the impact and validity of an IRS Notice is hardly suggestive of fraud.

(6)     The government also argues that the Plaintiff is not credible because his testimony

conflicts with Nemirow's regarding whether the two ever discussed Notice 2000-44.  Response,

---

[5]  In Notice 2000-44, the IRS set out its position that the tax benefits claimed under certain
transaction were not available.  One of the two variants discussed in the Notice employed short
options to obtain a basis increase.

at 32.  It is simply a fact of life that six years after discussions occur, memories will fade as to precisely what was and was not discussed  These minor discrepancies in testimony are of no consequence; they do not establish that Plaintiff intended to conceal the transaction from the government.  In fact, Plaintiff shared the transaction with his attorney, Nemirow, who did review the transaction and legal opinion for Plaintiff, and advised that it was reasonable.  Exhibit 8 - Nemirow Dep., at 148-159.  Moreover, while Plaintiff still does not recall discussions about Notice 2000-44 with Nemirow, Nemirow recalls his own review of the Brown & Wood tax opinion's analysis of the validity of the Notice and the weight that should be afforded it. Exhibit 8 - Nemirow Dep., at 71-73, 156-157.  He recalls his (Nemirow's) conclusion that Brown & Wood's analysis of Notice 2000-44 was reasonable.

(7)     The government has continuously attempted to tarnish this case with distorted facts regarding KPMG's alleged involvement with Deerhurst.  One of the most flagrant distortions is found in footnote 2 of Defendant's Response.  Response, at 5.  The government leads the Court to believe that the Deerhurst strategy was a KPMG strategy which KPMG has now admitted was fraudulent.  The government points to nothing in the record to support any assertion that KPMG participated in the formation, design, promotion or implementation of the Deerhurst strategy.  In fact, the information in the record is directly to the contrary. Exhibit 12 - Schwartz Dep. Vol. I, at 68-69; Exhibit 11 - Krieger Dep. Vol II, at 389-390; Exhibit 16 - Deposition of Kevin Brady, dated September 27, 2006 ("Brady Dep."), at 63-64; Exhibit 17 - Deposition of Angie Napier, dated September 26, 2006 ("Napier Dep."), at 158-159.

In Footnote 2, rather than citing to competent evidence, such as deposition testimony, exhibits, or a declaration, the government cites to a letter written by KPMG counsel, Joseph Barloon ("Barloon"). Barloon's letter was written to Plaintiff's counsel.  In it, he objected to

Plaintiff's Rule 30(b)(6) deposition and refused to provide responses in accordance with the Rule.  Instead, Barloon, as counsel, proceeded to make responses.  Barloon's letter does not assert that he has any first hand knowledge of the facts, and acknowledges "that KPMG does not have access to the individuals with the most direct knowledge of the topics set forth below." Response, Geier Dec. Exh. AA, at 2.

While Barloon claims that the Deerhurst transaction is within the group of fraudulent SOS transactions described in KPMG's factual admission (¶ 11), the letter is internally inconsistent, stating in response to the third area of inquiry that:

> KPMG has no information indicating whether it provided any advice or recommendations to any of its clients regarding the Deerhurst Transaction beyond that set forth in documents provided to you and the government.

Response, Geier Dec., Exhibit AA, at 3.  Barloon also stated that KPMG did not issue any opinions regarding Deerhurst.  *Id*., at response to the fourth area of inquiry.

There are no documents showing KPMG had any involvement with Deerhurst other than as Plaintiff's return preparer.  How can a transaction in which KPMG had no participation in the formation, design, promotion or implementation, and with respect to which KPMG provided no advice or recommendations be considered a fraudulent KPMG transaction?  It cannot.

The government fails to acknowledge the testimony of two ex-employees of KPMG who had direct involvement in KPMG's relationship with Plaintiff and the preparation of his 2000 tax return.  Kevin Brady was a Senior Manager at KPMG who prepared Plaintiff's 2000 tax return. His only knowledge of Deerhurst was that it was Plaintiff's investment advisor, not that it was a KPMG-promoted transaction.  Exhibit 16 - Brady Dep., at 63.  Angie Napier, an employee of KPMG who worked in the innovative strategies group as an assistant for Tracie Henderson and others and whose role was to prepare documents for all of the group's transactions, testified that

she had no knowledge that KPMG was ever involved in the promotion of Deerhurst.  Exhibit 17

- Napier Dep., at 158. There was no testimony from Kevin Brady, Angie Napier, nor anyone

else, that KPMG had any involvement in the Deerhurst Strategy other than the preparation of

Plaintiff's tax return.  Exhibit 12 - Schwartz Dep. Vol. I, at 68-69; Exhibit 11 - Krieger Dep. Vol.

II, at 389-390.  The willingness of KPMG's present counsel to attempt to support the

government's case here must be considered in context.  KPMG entered into a deferred

prosecution agreement and made "agreed statements of fact" in connection therewith to avoid

criminal prosecution – a likely death penalty for an accounting firm, as it was in the case of

Arthur Andersen.  A review of Barloon's letter in its entirety discloses KPMG's willingness to

make unsupported statements, even though they are harmful to its prior clients.

      (8)    The government argues that Plaintiff's representation in a declaration previously

filed in this case that he received only foreign currency from the partnership is inconsistent with

brokerage statements that "clearly state that $9,029,569.65 in U.S. dollars was transferred back

to [Sala.]"  Response, at 30.  (Plaintiff's position is that foreign currencies were transferred and

then converted to U.S. dollars.) The government fails to point out extensive deposition testimony

from Krieger refuting the government's position in this regard, and stating that there were no

U.S. dollars transferred from the partnership to Solid Currencies (Plaintiff's S corporation), but

rather there was an assignment of trades involving foreign currencies already executed by the

partnership.  Exhibit 11 - Krieger Dep. Vol. II, at 485-502.  It also fails to take into account the

analysis of its own expert, DeRosa, who understood that foreign currency was in fact transferred

from the partnership to the S corporation.  Exhibit 18 – Report of David F. DeRosa, Ph.D.

("DeRosa Report"), at 48.  Finally, the $9,029,569.65 figure asserted by the government does not

even appear on the statement referenced by the government.  Response, Geier Dec., Exh. AA, at

892.

> **4.      Even if the Government is Correct that the Deerhurst Transaction Lacked Economic Substance, this does not Establish Fraud.**

The government devotes much of its Response (pp. 16-25) to claiming that the Deerhurst

transaction was motivated by tax considerations and lacked economic substance.  In arguing

"economic substance" and "sham," the government is attempting to fit a square peg in a round

hole.  The undisputed facts indicate that almost $9 million was invested by Plaintiff in

Deerhurst[6], along with millions of dollars from other investors, in a foreign currency investment

program directed by a highly regarded currency trader that was anticipated to last for five years.

Real transactions were entered into on real markets, and real money was made and lost.  Krieger

entered into every transaction, including those which formed the basis for Plaintiff's tax loss

with the intent to make a profit.  Plaintiff performed extensive due diligence on the economics of

the investment.  Exhibit 7 - Sala Dep. Vol. II, at 214-219, 236-239; Exhibit 10 - Krieger Dep.

Vol. I, at 127; Exhibit 11 - Krieger Dep. Vol II, at 439-440; Exhibit 3 - DeRosa Dep., at 74-80.

In fact, not merely accepting the analysis provided to him by individuals connected with

Deerhurst, Plaintiff prepared his own analysis of the economics of the investment, which the

government acknowledges at page 29 of its Response.  Moreover, after funds were invested,

Plaintiff closely monitored the status of his investments, and revised the structure of the

investment in hopes of achieving profits.  Exhibit 7 - Sala Dep. Vol. II, at 198-205, 249-250;

Exhibit 11 - Krieger Dep. Vol. II, at 442-447.  This is inconsistent with the behavior of a person

---

[6] While the government characterizes the investment amount as a "buy-in" or a "deposit," it was neither of those things, but rather a long term investment, as the discovery record indisputably establishes.

investing in a transaction having no economic purpose, and who believes the transaction to be a sham.

Even focusing on the short period of time that Plaintiff's money was invested in 2000, the discovery record shows an actual economic profit. Indeed, the government acknowledges a net profit on all of the 2000 investment of $65,000. The government attempts to diminish the significance of this profit by arguing that Plaintiff paid fees of $165,000 to make the profit of $65,000. Response, at 11, 24-25. However, most of the fees that the government includes are for preparation of the 2000 tax return[7] and to Brown & Wood for the tax opinion. Those fees were not paid for and not expenses of the Deerhurst investment. Moreover, they were paid in 2001, such that, in any event, they would not enter into profit or loss calculations for 2000. Finally, most of Plaintiff's money ($8.4 million) was invested in 2000 for only approximately one month. A $65,000 profit on an investment of $8.9 million would represent an annualized rate of return of 7-8% on an annual basis, far higher than returns generated on many other investments during that time period.

Looking at the transaction without the benefit of hindsight, the appropriate question to ask is what was the *profit potential* of the transactions undertaken by Deerhurst in 2000. Again, the government ignores DeRosa's favorable testimony that the profit potential of the 24 most significant trades implemented in 2000 was more than $545,000.[8] DeRosa further concluded

---

[7] The fees paid for the preparation of the tax return also relate to far more than Deerhurst. Exhibit 6 - Sala Dep. Vol. I., at 224-229.

[8]  As discussed previously, the 24 trades yielded a profit of $91,010, according to DeRosa (Exhibit 4 - DeRosa Rebuttal Report, at 10; Exhibit 3 - DeRosa Dep., 170-171), or $111,599 according to Kolb (Exhibit 5 - Kolb Report, at 21 and exhibit 15 therein; Exhibit 4 - DeRosa Rebuttal Report, at 10; Exhibit 3 - DeRosa Dep., 170-171).

that there was a significant and realistic probability of achieving the maximum profits. Exhibit 3 - DeRosa Dep., at 140-141.

While Plaintiff vigorously opposes the government's characterization of the Deerhurst investment as having no economic substance, even assuming *arguendo* that the government is correct in this characterization, it does not establish fraud.

There are many tax cases in which courts have held that the underlying transactions lack economic substance or were entered into largely for tax considerations, but, nevertheless  do not sustain the government's assertion of penalties against the taxpayer.  For example, in *Katz v. Commissioner*, 90 T.C. 1130, 1139-1142 (1988), the court determined that commodity spread transactions were pre-arranged and lacked economic substance.  In spite of this, the court refused to apply the fraud penalty, noting "an absence of the usual badges of fraud."  90 T.C. at 1143; Also see *Melnik v. Commissioner*, T.C. Memo. 2006-25 (holding no accuracy penalty applicable when accountant structured complex offshore transaction lacking economic substance).

In *Brountas v. Commissioner*, 73 T.C. 491 (1979), the government alleged that a tax shelter drilling program was "a tax gimmick and a fraud."  While the Court sustained many of the IRS's determinations, it ruled that an assertion of fraud could not be based on the fact that tax considerations played a dominant role in the structure of the transaction, concluding that "tax planning is not fraud."  73 T.C. at 588.

In this case, millions of dollars were invested, and real profits and losses were generated on real trades with real counterparties.  While some transactions generated significant tax benefits, the transactions were nevertheless real and indisputably had a significant potential for profit and loss, entirely independent of tax considerations.

Even if the tax consequences of a complex transaction are ultimately determined to be different from what was reported on a return, this does not mean that the transaction was fraudulent. As this court held in *United States v. Kilpatrick*:

> [I]t is not illegal to be innovative in putting an elaborate dress on prosaic transactions.  Leveraged financing and complex investment programs have been commonplace in our economy.  What divides a tax shelter from a tax fraud is the existence of some actual economic purpose and what divides civil from criminal liability is the intent of the actor.[9]

*Unites States v. Kilpatrick,* 726 F. Supp. 789, 794 (D. Colo. 1989).

> **5.      The Government Has Failed to Show That There Would Be Sufficient Evidence at Trial to Negate Plaintiff's Reliance on Nemirow, Brown & Wood, and Lemons.**

In *United States v. Boyle*, 469 U.S. 241 (1985), the Supreme Court reasoned that, generally, taxpayers may rely upon the analysis of their tax advisers as a defense to most penalties under the Code:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely upon that advice.  Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney.  To require the taxpayer to challenge the attorney, to seek a "second opinion," or try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking advice of a presumed expert in the first place.

*Boyle*, 469 U.S. at 250.

---

[9] *Kilpatrick* was a criminal tax fraud case.  However, the elements of fraud are identical for criminal and civil purposes, i.e., specific intent to evade tax and knowledge that a reporting position has no legal basis, such that collateral estoppel prevents an individual who has been convicted of fraud under § 7201 from denying the elements of the civil tax fraud penalty.  *DiLeo v. Commissioner*, 96 T.C. 858, 885-86 (1991).  The only difference between civil and criminal fraud is that the government's burden in a criminal case is to prove fraud "beyond a reasonable doubt," as compared to the "clear and convincing evidence" standard applicable in a civil tax case.

Accordingly, in cases where the facts of the transaction(s) are disclosed to a professional who assists the taxpayer with his or her filing requirements, it is difficult or impossible for the government to establish the requisite fraudulent intent.  *Zipp v. Commissioner*, T.C. Memo. 1998-371 (finding reliance upon an accountant a factor in holding that Commissioner had failed to clearly and convincingly prove fraud); *Ross Glove Co. v. Commissioner*, 60 T.C. 569, 608 (1973) (no fraud demonstrated where evidence did not show the taxpayer ignored or misinformed his attorneys or accountants); *Marinzulich v. Commissioner*, 31 T.C. 487, 492 (1958) (no fraud proven where the taxpayer's accountant had complete access to all the information bearing on their tax liability); *Dagon v. Commissioner*, T.C. Memo. 1984-138 (no fraud where the taxpayer did not conceal any records from his tax return preparer); *Compton v. Commissioner*, T.C. Memo. 1983-647 (no fraud where the taxpayer turned over sufficient records to his tax preparer for her to accurately determine his tax liability for the years at issue).  Plaintiff is aware of no case in which a fraud penalty has been upheld when all material facts were disclosed to a tax professional.

In *Melnik v. Commissioner*, T.C. Memo. 2006-25, knowing that their scrap metal company was going to be acquired by an independent third party, two taxpayer-brothers "sold" their stock to Clend, a BVI holding company organized for this purpose, in exchange for a private annuity.  The Tax Court found a lack of any independent business purpose on the part of Clend and determined that the arrangement was a sham.  In reaching this conclusion, it relied substantially on its findings that certain key documents with respect to the annuity transaction were backdated and that the taxpayer had attempted to manipulate the chronology to make the transaction appear more supportable.

Despite these factual findings, the Tax Court *declined* to impose the accuracy penalty (a penalty less serious than the fraud penalty).  The Tax Court explained that the accuracy penalty

could not be imposed in light of the significant role played by the attorney, Mr. Pennoni, in structuring the transaction:

> The record consisted solely of a substantial number of stipulated exhibits and the testimony of three witnesses called by petitioners. The three witnesses testified, among other things, that the private annuity transactions were planned and implemented by Mr. Pennoni, who assured petitioners that the transactions were legitimate and were entitled to respect under Federal income tax law. The exhibits reflect the planning and implementation of the private annuity transactions and, on their faces, do not support a conclusion that petitioners' decision to enter into the transactions was *per se* negligent.
>
> The uncontroverted record establishes that petitioners relied upon Mr. Pennoni, who was the driving force behind the planning of the annuity transactions and who assured petitioners that there was a reasonable basis for the income tax reporting of the private annuity transactions and the HouTex stock sale.
>
> We conclude that, under the circumstances, petitioners' reliance upon Mr. Pennoni was reasonable, that petitioners had reasonable cause for the underpayment, and that petitioners acted in good faith with respect to the underpayment within the meaning of section 6664(c)(1).

In *Melnik*, reliance upon an apparently qualified tax professional precluded imposition of the accuracy penalty in a case where (1) the purpose of the plan was not to govern the prospective relationship between the parties, but to attempt to avoid the consequences of an already agreed-to sale; (2) there was no independent third party – all parties were under the control of the taxpayers; (3) virtually all of the funds were made available for the taxpayers' immediate benefit; and (4) documents were backdated. This case has none of those objectionable features.

In *Medieval Attractions, N.V. v. Commissioner*, T.C. Memo. 1996-455, the Tax Court considered a case where tax advisors at Coopers & Lybrand suggested tax-favorable structures to a sophisticated international client. Subsequently, backdated documents consistent with Coopers & Lybrand's advice appeared:

> C&L apparently put its own pecuniary interest and its desire to continue working for petitioners over its duty to reasonably ascertain the true facts and fully to

inform petitioners of the consequences of following C&L's advice. Petitioners provided information to C&L, albeit not all correct information, and C&L chose to be selective with the information. C&L chose to use the information that assisted C&L with petitioners' tax planning strategy and to claim ignorance of any other information. Cf. *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) (defining "willful blindness"); *United States v. Aleman*, 728 F.2d 492, 494 (11th Cir. 1984).

C&L suggested tax-avoidance strategies, and petitioners tried to comply with C&L's recommendations, even when petitioners believed that compliance involved fabricating documents. C&L failed to advise petitioners fully as to their obligations and failed to make any effort to obtain the correct facts. These failures, coupled with C&L's use of the "form" created by the false documents, amounted to tacit advice by C&L that petitioners' actions were not only acceptable but desired. C&L's tacit approval caused petitioners to continue in the practice — C&L suggested the plan, petitioners responded, and C&L continued with the next tax planning strategy. The Spanish investors were sophisticated businessmen, but they relied on C&L to advise them with respect to the requirements of U.S. law.

Despite the complicity between the taxpayer and his accountants in creating inappropriate deductions and the presence of many other badges of fraud (including backdated documents), the court held that the government "has not negated the alternative explanation, [the taxpayer's] reliance upon C&L, by clear and convincing evidence," and refused to sustain the IRS's assertion of fraud.

Unlike the professions in *Melnik* or *Medieval Attractions*, none of the attorneys who advised Plaintiff as to tax consequences and the reasonableness of the Brown & Wood opinion, participated in the promotion, design or implementation of the transactions.  Moreover, unlike most fraud cases (where taxpayers hide their activities from their accountants and attorneys), nothing was hidden from Plaintiff's advisors.  All were given full access to the transaction documents and the tax opinion.  Each advisor agreed that the position was reasonable.  This is simply not the stuff of fraud.

Plaintiff relied upon Brown & Wood, a well-regarded New York City law firm, who issued an opinion on the Deerhurst transaction.  (Exhibit 6 - Sala Dep. Vol. I, at 127-128). Of equal or

greater significance, Plaintiff relied upon Nemirow, who had access to all of the material facts, and

who advised him that the Brown & Wood opinion was reasonable. (Exhibit 7 - Sala Dep. Vol. II, at

220-222, 262).  Plaintiff contacted Lemons, of Holland & Hart in Salt Lake City, for additional

confirmation that the opinion was reasonable (Exhibit 7 - Sala Dep. Vol II, at 222-224).  Finally,

Plaintiff also supplied his return preparer a copy of the draft opinion, in order to be sure that the

preparer would be comfortable with the reporting of the transaction.  (Exhibit 7 - Sala Dep. Vol. II,

at 67-68, 234-235).

The Government's attempts to negate Plaintiff's reliance upon the Brown & Wood

opinion by claiming that there were material facts known to Plaintiff, but not contained in the

Brown & Wood opinion (Response, at 9).  However, the government fails to show how any of

these asserted facts could reasonably be expected to have changed Brown & Wood's opinion,

and - of critical importance to the fraud issue - that Plaintiff knew these facts would materially

change the conclusions reached in the opinion.  For example, while the government argues that

there was a "15% buy-in of the expected tax deduction" (which was not disclosed in the Brown

& Wood opinion), Deerhurst's requirement that participants invest at least 15% of the anticipated

tax loss shows that real money was required to be invested ($8.9 million for Plaintiff) over a

substantial period of time.  Similarly, the fact that Plaintiff's profit projections were less

optimistic than those assumed by Brown & Wood likewise is largely beside the point, because

Plaintiff's projections were of substantial profits.  Finally, Plaintiff's negotiation of fees and an

exit strategy likewise shows a genuine intent to make money, aside from tax savings.  The fact is,

and the government does not argue to the contrary, Plaintiff concealed nothing from Brown &

Wood.  The most significant facts set forth in the opinion (Opinion, at 1-2), including Plaintiff's

intent to make a profit, his independent evaluation, and his reliance upon the professional management of Deerhurst – are true.

**B.     The Government Cannot Establish Fraud As A Matter Of Law Because The Legal Position At Issue Is Uncertain.**

For this to be "a case involving fraud," there must be fraud. In light of the specific intent requirement, the government must show that: (1) under the Internal Revenue Code, the loss claimed by Plaintiff was not allowable; and (2) Plaintiff knew that his reporting was illegal. The government must be able to show that Plaintiff *knew* the reporting position was improper and *not even arguable*.

Attempting to elevate this complex civil tax case involving the deductibility of losses incurred in connection with Plaintiff's acquisition and disposition of options in foreign currencies into "a case involving fraud," the government argues that the transaction had no economic substance. Yet nowhere does the government disclose that no court has <u>ever</u> held that the transactions Plaintiff entered into, or any substantially similar transactions entered into by other taxpayers, did not result in a deductible loss under the Internal Revenue Code.

To be sure, the IRS takes the position that the loss is not deductible, and announced that position in Notice 2000-44, 2000-2 C.B. 255. But, it is the courts, not the IRS, that ultimately determine the validity of a tax reporting position. Even where the IRS has published a ruling stating its position that a particular tax strategy or reporting position is invalid, the Tax Court views such rulings as the litigating position of a party and accords it no deference. *Electronic Arts, Inc. v. Commissioner*, 118 T.C. 226, 263 n.13 (2002) (collecting cases); *McLaulin v. Commissioner*, 115 T.C. 255, 263 (2000).

Here, Plaintiff invested $8.9 million in an investment program that acquired long and short positions on millions of dollars worth of foreign currencies.  Plaintiff reported both an economic profit (which the government alleges never happens in a tax shelter) and a tax loss in the first year.  The tax loss occurred because of the legal position taken on the tax return that unexercised, unexpired short options are not liabilities taken into account in determining a taxpayer's basis (which is in turn used to determine a taxpayer's gain or loss) in a partnership.  That position is based upon the IRS' *prevailing* argument in a 1975 Tax Court case, *Helmer v. Commissioner*, T.C. Memo. 1975-160.

*Helmer* has not been reversed.  In fact, several months ago, the district court for the Eastern District of Texas issued a ruling on partial summary judgment in favor of taxpayers (who had also participated in a transaction described in Notice 2000-44) with respect to the legal issue of whether contingent obligations (similar in some respects to the short option positions in this case) are taken into account in the determination of basis.  The court held as follows:

> It is clear from the record that the government has often and consistently relied upon the principle that a "liability" under Section 752 does not include an obligation that is contingent.  The government has applied this principle when it works to its benefit (to increase taxes owed).  The Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed).  The Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.

*Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp.2d 608, 619 (E.D. Tex. 2006).

The government has recognized the significance of the legal issue in this case concerning the treatment of short options in determining basis. Yet, the government ***never*** in its brief states that the legal position is wrong, let alone explains why.

The IRS' Office of Chief Counsel Attorneys and Treasury Officials recognized in 1995 that "existing authority is contrary to a position that options create liabilities."  *See* Tandon, Crystal, *IRS, Treasury Shared Views of Shelter Lawyers,* Tax Analysts, Oct. 17, 2005 (attached as Exhibit 20).  The "existing authority" was primarily the Tax Court's decision in *Helmer.* *Helmer* was still good law when Plaintiff entered into the transactions giving rise to his tax loss (and to date has not been overruled), and was one of the authorities relied upon by Brown & Wood in the tax opinion issued to Plaintiff.  Exhibit 15 - Brown & Wood Opinion, at 44-52.

Claiming a tax benefit based upon fairly debatable legal issues, let alone long-standing Tax Court authority, will not support a finding of fraud, irrespective of actual intent on the part of the taxpayer.  *United States v. Harris*, 942 F.2d 1125, 1132-34 (7th Cir. 1991) (given confusing Tax Court precedent regarding tax treatment of payments to mistresses – sometimes as income, but more commonly as gifts - fair notice barred tax fraud finding for failure to report such payments).  Cases where findings of fraud were reversed by appellate courts because the tax law was not sufficiently clear to establish "fair notice" that the defendants' tax reporting positions were illegal or improper include:

1.      *United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985).  In *Mallas*, the taxpayers claimed a write-off of 3.5 to 1 by purportedly paying, largely with borrowed funds, "advance minimum royalties" for coal subleases.  The government contended that the arrangement was nothing more than a sham to create tax deductions, particularly since the properties covered by the subleases did not have sufficient coal from which to recover the amount of the advance royalties purportedly paid.  However, the government could not point to a statute, regulation, or court decision clearly establishing that "advance royalties" are not deductible unless the

properties covered by the leases involved have sufficient coal reserves from which to recoup the royalties.  Thus, the court reversed the fraud conviction;

2.      *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974).  The defendant was a Cherokee Indian convicted of tax evasion for not reporting on her tax returns income she derived from the operation of a motel, restaurant, two gift shops, and some apartments, all of which were located on Cherokee Indian Reservation property in North Carolina.  The Court of Appeals noted that a federal statute pertaining to the creation of trusts (one of which held the land from which defendant's income was derived) provided, to some degree, for exemption from taxation with respect to individual Indians' rights to use and occupy the land.  But neither the statute nor applicable court decisions clearly resolved the issue as to whether defendant's income was exempt from tax.  The court held that the defendant presented a "non-frivolous argument" that the income was exempt, but concluded that it need not resolve the merits of that argument to resolve the criminal case.  Because there was no statute, regulation, ruling, or court decision clearly rejecting the defendant's position, the defendant had no "clear notice" that her tax reporting position was contrary to law.  The court held she therefore could not be criminally prosecuted;

3.      *United States v. Garber*, 607 F.2d 92, 98 (5th Cir. 1979) (*en banc*).  The defendant was convicted for not reporting on her tax returns amounts she received over a period of three years from the sale of her blood to a clinical laboratory.  The Fifth Circuit reversed the conviction, holding that the question as to whether income from the sale of one's blood is taxable was "completely novel and unsettled by any clearly relevant precedent."

4.      *United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991).  In *Harris*, the defendants, twin sisters, were convicted of criminal failure to file returns and tax evasion for not reporting

over five hundred thousand dollars ($500,000) received from "a wealthy widower partial to the company of young women." The Seventh Circuit reversed the convictions of both sisters, one (Conley) for insufficiency of the evidence and the other (Harris) because "the current law on the tax treatment of payments to mistresses provided Harris no fair warning that her conduct was criminal." In regard to this conclusion as to the defendant Harris, the court noted that it was not deciding that, under the tax laws, the payments in question did <u>not</u> constitute taxable income. The *Harris* court acknowledged that while there was conflicting case law, if the identical question were presented in the civil context, a court might indeed, after examining all of the authorities, determine that the payments constituted taxable compensation. However, because the case was a criminal case, the government was required to go further and demonstrate that the standards governing the tax treatment of the widower's payments were not in doubt:

> If the obligation to pay a tax is sufficiently in doubt, willfulness is impossible as a matter of law, and the "defendants' actual intent is irrelevant." *United States v. Garber*, 607 F.2d 92, 98 (5th Cir. 1979) (*en banc*), quoting *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974).

942 F.2d at 1132.

The court in *Harris* specifically held that the issue as to whether the tax law is sufficiently clear to provide the defendant with fair notice that his conduct is illegal is a question of law. If the trial judge finds the law was not sufficiently clear, then the court must dismiss the indictment.

In *Harris*, the substantive tax law issue presented was whether the amounts paid to the defendant were non-taxable gifts, or payments for services rendered. The statute involved (Section 61 of the Code) is very general and provides no standards to distinguish gifts from taxable payments. Treasury Regulations and rulings likewise failed to provide specific

standards.  The landmark Supreme Court case, *Commissioner v. Duberstein*, 363 U.S. 278

(1960), held that, in determining whether an amount qualifies as a non-taxable gift the "payor's

intent" is the critical factor.

The court in *Harris* proceeded to examine those Tax Court cases which applied the

principles of *Duberstein* in analogous situations in order to determine whether there was

sufficient authority to establish that the payments to Harris should be treated as taxable

compensation for services rendered, rather than gifts.  Since Tax Court cases did not clearly

establish that payments received by women who had been the mistresses of the payor should be

treated as compensation rather than as gifts, fraud did not lie.  The *Harris* court noted that, in the

handful of civil Tax Court cases touching on the character of payments to mistresses, there was a

*bona fide* dispute as to the proper characterization of such payments, with the cases treating such

payments as non-taxable gifts perhaps being in the majority.

While the cases cited in this section are criminal cases, both civil and criminal fraud

requires the intentional violation of a "known legal duty;" the only difference between civil and

criminal fraud is the burden of proof ("beyond a reasonable doubt" versus "clear and

convincing").  Thus, the same principles preclude a finding of civil fraud when the tax

consequences of a transaction are not black and white.

Moreover, the existence of a substantial civil controversy precludes the imposition of civil

penalties less onerous than the fraud penalty.  In *Carter v. Commissioner*, T.C. Memo. 1977-322,

the Tax Court agreed with the IRS that purported management fees paid by a corporation to an

employee-shareholder should be disallowed as a deduction and treated as a constructive dividend.

The Tax Court found that no services were performed, no management agreement existed and the

shareholder who provided the "management services" was also paid a salary by the company

paying for the management fees.  Significantly, however, the Court refused to apply the negligence penalty, pointing out that "the issue as to whether these transfers were constructive dividends *is a complex legal issue on which there can be an honest difference of opinion.*"  *Id.* (Emphasis supplied).

The tax loss claimed in this case rested on a legal principle established by the IRS in its victory in *Helmer*, which to date has not been overruled or repudiated by any court.  In light of this precedent in favor of the legal treatment claimed by the Plaintiff, the principles of fair notice prevents the government from being able to assert that the legal position is fraudulent.

## III.  Conclusion

This case involves tax law principles supported by several lawyers' analyses of long standing case law.  Plaintiff's claimed tax loss results from the application of those principles to facts that are largely undisputed following the extensive discovery conducted by the government.  Nevertheless, the government attempts to elevate this to a fraud case in a belated effort to avoid summary judgment on Plaintiff's interest suspension claim.  Tax fraud requires the highest standard of proof: that a taxpayer knew there was no basis for the reporting position taken on his return, and took that position solely in an effort to evade taxes known to be due and owing.  The very nature of the core issue in this case belies the government's assertion that it embraces fraud.  Many years of case law illustrate what does and does not establish tax fraud.  What does establish fraud includes understatement of income, inadequate records, concealment, failing to cooperate with the IRS, and filing false documents. The government points to not one fact in the discovery record that would tend to prove those traditional "badges of fraud" are present in this case.

For these reasons, Plaintiffs respectfully request that the Court enter an Order

determining Plaintiffs are entitled to interest suspension under §6404(g) as a matter of law.

DATED this 26th day of February, 2007.

CHICOINE & HALLETT, P.S.

s/ John M. Colvin
John M. Colvin
Darrell D. Hallett
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs Carlos E. Sala
    and Tina Zanolini-Sala
1011 Western Ave. Suite 803
Seattle WA, 98104
Telephone: (206) 223-0800
Facsimile: (206) 467-8170

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2007, I electronically filed PLANTIFFS' REPLY RE: MOTION PARTIAL SUMMARY JUDGMENT ON INTEREST SUSPENSION ISSUE, using the CM/ECF system, which will send notification to the following:

| | |
|---|---|
| David N. Geier: | David.N.Geier@usdoj.gov |
| Amy T. Matchison: | Amy.T.Matchison@usdoj.gov |
| Anton. L. Janik, Jr.: | Anton.L.Janik@usdoj.gov |

I declare under the penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 26th day of February, 2007.

CHICOINE & HALLETT, P.S.

s/ John M. Colvin
John M. Colvin
Darrell D. Hallett
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs Carlos E. Sala
        and Tina Zanolini-Sala
1011 Western Ave. Suite 803
Seattle WA, 98104
Telephone: (206) 223-0800
Facsimile: (206) 467-8170