# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

CARLOS E. SALA and              ¦     No. 05-CV-00636-LTB-MEH
TINA ZANOLINI SALA
                                ¦
          Plaintiffs,
                                ¦
v.
                                ¦
UNITED STATES OF AMERICA,
                                ¦
          Defendant.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ¦


DEPOSITION OF
DAVID DEROSA
DENVER, COLORADO
January 11, 2007


ATKINSON-BAKER, INC.
COURT REPORTERS
800-288-3376
www.depo.com


REPORTED BY PAM D. BUCKNER, CSR

FILE NO. A100255

Page 42

1 would assume that he was entering into transactions that

2 he thought could possibly yield a profit.

3          Q    Okay.

4          A    I don't think he set out to yield a loss.

5          Q    Let's clarify that.  So we're clear on the

6 record, I'm not talking about Mr. Krieger making a

7 profit.  I'm talking about Mr. Krieger managing those

8 funds in a way to make a profit.

9          A    We understand each other.

10         Q    Okay.  Good.  Now, let me ask you a little

11 bit about you said it's your opinion that Mr. Krieger is

12 a formidable foreign exchange trader?

13         A    Formidable.

14         Q    Right.  Was he a formidable foreign

15 exchange trader in 2000?

16         A    I don't know all the trades that he did.

17 I do know the trades that were done for Mr. Sala's

18 account, and when I first saw them, I was greatly

19 surprised that these were trades that Mr. Krieger would

20 do.

21         Q    I'm asking you about do you have an

22 opinion as to Mr. Sala's reputation as to whether or not

23 in 2000 --

24         A    Mr. Sala?

25         Q    No, I'm sorry.  I don't want to ask that.

1           A     It's fine.

2           Q     Mr. Krieger's reputation, did he have a

3 reputation in -- prior to 2000 as being a formidable

4 foreign exchange trader?

5           A     Yes.

6           Q     Did you know that before you got involved

7 in this case?

8           A     Sure.

9           Q     Did you read that in -- how did you come

10 to know that?

11          A     Well, for part of my career, I was a

12 foreign exchange trader.  His name was well known in the

13 foreign exchange market.

14          Q     And he was highly regarded?

15          A     I don't know if that's true.  Some people,

16 yes; some people, no.

17          Q     Did you have an opinion?

18          A     I never met Mr. Krieger.

19          Q     What do you mean by the term "formidable"?

20          A     He was a guy who had a very large risk

21 appetite.  That's what I meant by formidable.

22          Q     Did he have a lot of experience?

23          A     Well, yeah, he did.  He did have a lot of

24 experience.  He was at Salomon, and then he was at

25 Bankers Trust.  That's when he became famous, and then he

1  was with Soros for a while, for a very short period of

2  time.   I read the deposition.   And then he went off on

3  his own.

4          Q     And he managed money for a period of time

5  for Ross Perot?

6          A     There was some involvement with Perot, but

7  I wasn't clear from the deposition what exactly that was.

8          Q     Did you do any research yourself, other

9  than what you -- other than what is in your report,

10 beginning at appendix B, you list documents you relied

11 upon --

12              MR. HALLETT:   And I think, Counsel, we've

13 gotten some additional lists in the last couple of days.

14              Q     (BY MR. HALLETT)   But other than what's

15 listed there, did you do any research bearing upon

16 Mr. Krieger's experiences, his history, his track record?

17              A     No, I just worked with the documents that

18 I cited.

19              Q     All right.   Did you believe that -- let's

20 take the period January 1, 2001, forward.

21              A     Uh-huh.

22              Q     Did you believe that Mr. Sala intended to

23 make a profit on his money that was invested in

24 Deerhurst?

25              MR. GEIER:   Objection.

Page 45

1          A     I certainly believed that Mr. Sala hoped

2 to make a profit on those trades.   I believed he hoped to

3 make a profit.   I can't believe that he set out to create

4 a loss.

5          Q     (BY MR. HALLETT)  Okay.

6          A     So I'm not sure -- your question hits me

7 in a strange sort of way.

8          Q     I don't know how I can make it any

9 simpler.   Did he intend to make money on those

10 transactions?

11          A     I don't know.   I assume he did, but I

12 don't know.   This is the first time I ever met Mr. Sala.

13          Q     You concluded in your report that Mr. Sala

14 was a sophisticated investor.

15          MR. GEIER:  Objection.  Misstates.

16 Objection.

17          A     Where did I say that?

18          Q     (Reviewed documents.)

19          THE DEPONENT:  While you are doing that,

20 may I just go get some more coffee?

21          MR. HALLETT:  Sure.

22          Q     (BY MR. HALLETT)  Page 43 of your report,

23 the last paragraph, the statement is made, is it -- "It

24 is not rational that Sala, a sophisticated investor" --

25          A     Yes.

1 to that, right.

2          Q     When you say, "as expected," what do you

3 mean by that?  Expected by whom?

4          A     Well, expected in an analysis that he,

5 himself, and Mr. Salomon had done.

6          Q     The profit projection?

7          A     The 60-plus percent.

8          Q     Okay.

9          A     Yes, per year, 60-plus.

10          Q     I want to talk about that a little bit

11 later.  Let me switch to another matter.  Are you

12 associated with a venture or an entity by the name of

13 Deerhurst Partners Limited?

14          A     Me?

15          Q     I'm sorry.  DeRosa Partners Limited?

16          A     Yes.

17          Q     And do you have an interest in that

18 venture?

19          A     Yes, I do.

20          Q     What's the nature of that venture?

21          A     It's just a family trust is all.

22          Q     Does it do investing?

23          A     It did passive investing.  It holds shares

24 of a hedge fund.

25          Q     Is it a limited partnership?

1          A      Yes, it is.

2          Q      Does it have a corporate general partner?

3          A      DeRosa Research and Trading, Inc.

4          Q      And do you have the -- do you have an

5 interest in DeRosa Research and Trading, Inc.?

6          A      I own 100 percent.

7          Q      So the structure is there's a limited

8 partnership, and then there's, I take it, limited

9 partners who are individuals.

10          A      My wife.

11          Q      And there's a general --

12          A      And me.

13          Q      And you are limited partners?

14          A      Yes.

15          Q      Individually.  And then there's a

16 corporation that's the general partner?

17          A      DeRosa Research and Trading, Inc.

18          Q      And you own the stock in the corporation?

19          A      Yes.

20          Q      And would it be fair to state that the

21 structure -- that structure was selected with a limited

22 partnership in a corporate general partner to limit the

23 liability exposure?

24          A      It was selected not, per se, for that, but

25 there was a time period many years ago when I considered

1 the possibility of becoming a hedge fund -- of launching

2 a hedge fund.  And so I originally had set it up with the

3 prospect that we would start out with some of our own

4 money and then look for outside investors.

5          Q    But my question was:  The structure that

6 was chosen, a limited partnership with a corporate

7 general partner, was that structure selected based upon

8 advice of counsel to limit liability of yourself and your

9 wife?

10          A    It may have achieved that possibility.  It

11 may have achieved that, but it was set up because that's

12 the way most hedge funds are set up, on-shore hedge

13 funds.  So I just copied the standard way of doing it.  I

14 really wasn't worried about liability.

15          Q    All right.  Do you recall giving testimony

16 on deposition in Jade Trading?

17          A    I guess, yeah.

18          Q    Let me read you a portion of that

19 testimony, and I'll be happy to show it to you, if you

20 want to see.  Beginning on page 128.

21              The question was, "When you formed that

22 partnership, you say it's DeRosa Investments."

23              "Partners."

24              "QUESTION:  Partners.  Sorry.  So the two

25 partners would be you and your wife; is that right?

1          "ANSWER:  Yes.

2          "QUESTION:  No other partners?"

3     A    That's not -- okay.  Go ahead.

4     Q    "ANSWER:  No -- well, yes.  DeRosa

5 Research and Trading.

6          "QUESTION:  As a partner?

7          "ANSWER:  The general partner, right.  So

8 it is -- and I own that outright.

9          "QUESTION:  And it's a limited

10 partnership?

11         "ANSWER:  Yes.

12         "QUESTION:  With the corporation as the

13 general partner?

14         "ANSWER:  Yes.

15         "QUESTION:  And that provides everybody

16 with limited liability?

17         "ANSWER:  Yes, I assume.  I'm hoping you

18 are right.

19         "QUESTION:  Certainly that was the

20 business purpose, correct?

21         "ANSWER:  Yes.

22     A    Well, wait.  Certainly what was the

23 business purpose?

24     Q    The limited liability.

25     A    No, no, no, no, no.  It was set up as an

Page 52

1 investment partnership.  That was the purpose.  We didn't

2 set it up to get limited liability.  From whom?  From

3 ourselves?

4          Q    I'm talking about --

5          A    Read the rest.

6          Q    I'm --

7          A    You haven't finished reading it.

8               MR. HALLETT:  Just a moment.  Let's go off

9 the record for a minute.  Let's take five minutes.

10              (Short recess.)

11              MR. HALLETT:  Okay.  Back on the record.

12          Q    (BY MR. HALLETT)  Let me clarify again.

13 My question was whether DeRosa Partners, the structure,

14 the ownership structure that was set up, was it set up as

15 a limited partnership that actually was to do the

16 investing; is that correct?

17          A    Yes.  It was set up in anticipation of

18 getting outside investors, who would participate as

19 limited partners.

20          Q    Okay.  And the trading was anticipated to

21 take place at the limited partnership level?

22          A    Well, maybe.  If I had gone forward with

23 the project, which I didn't, I did not go -- I set it up,

24 but I never looked for outside investors.  What would

25 have happened is, initially, the trading would have been

1 in the limited partnership but phase two of it was to

2 establish a pair of Cayman Islands companies, one of

3 which would be the residual place for trading.

4                    Why Cayman?  For non-U.S. taxpayers who

5 wanted to invest in the fund.  So the limited partnership

6 was actually going to be a feeder fund.  I stopped it

7 midway.  I didn't go ahead with the whole project.  I

8 never looked for outside investors.  I did, in fact, set

9 it up.  The business was to start a hedge fund, but I

10 just didn't go forward with it.

11           Q     But my question is:  Was the purpose for

12 choosing the structure of the limited partnership with a

13 corporate general partner to provide the partners with

14 limited liability?

15                    MR. GEIER:  Mr. Hallett has been asking

16 you some very specific questions, so it might help speed

17 things up in his questioning of you if listen to the

18 questions that he's asking you very specifically and

19 answer those questions.

20                    THE DEPONENT:  I will do my best.  May I

21 now hear the question again.

22                    MR. HALLETT:  Yes, I appreciate that,

23 Counsel.

24                    THE DEPONENT:  I'm not trying to -- I'm

25 just trying to get you to the place where it really is.

Page 54

1          MR. GEIER:  I think if you just answer the

2 question put to you directly --

3          THE DEPONENT:  I will do that.

4     Q    (BY MR. HALLETT)  Let me rephrase it.  Was

5 the structure chosen of having a limited partnership with

6 a corporate general partner to limit the liability

7 exposure of the investors?

8     A    It was chosen -- no, not really.  I have

9 to say yes or no, but it's -- I'm not trying to be dense

10 about this.  That's the way people invest in funds.  Did

11 it achieve that?  Yes, that's one of the things it would

12 have achieved.

13     Q    You say that's how people invest in funds?

14     A    In hedge funds.  Typically on-shore

15 investors invest through limited partnership structures.

16     Q    Do they do that in part to protect limited

17 liability?

18     A    I'm not a lawyer, but I would guess that

19 in part they do it for that reason.

20          MR. GEIER:  Objection.

21     Q    (BY MR. HALLETT)  Okay.  When you

22 testified on the deposition in Jade Trading, and you were

23 asked questions, "And it's a limited partnership," and

24 you answered "Yes."

25          And the question, "With the corporation as

1 the general partner," and you answered "Yes."

2          And the question was, "And that provides

3 everybody with limited liability," and your answer was,

4 "Yes, I assume.  I'm hoping you are right."

5          A    It was a wise -- did you ask the question,

6 or do you want me to respond to that?

7          Q    Was that truthful testimony?

8          A    I'm hoping that that's my understanding of

9 how the thing works, yes.

10          Q    All right.  Quadrangle Investments.

11          A    Yes.

12          Q    Tell me what Quadrangle Investments is.

13          A    Well, that was a hedge fund.

14          Q    And is Quadrangle Investments a

15 corporation?

16          A    No.

17          Q    What is it?

18          A    It was an LLC.

19          Q    And what was -- did it have numerous

20 investors as individuals?

21          A    Quadrangle was owned by myself and another

22 full-time person, and also a portion of it was owned by a

23 gentleman who obtained the investment funds.  But

24 Quadrangle itself was an investment manager.

25          Q    All right.  Now, so Quadrangle was a

1 limited liability company?

2      A    LLC.   That's correct.

3      Q    And it was -- did it actually do

4 investing?

5      A    As a manager.

6      Q    As a manager.   And by whom were the

7 investments held?

8      A    They were held in really the same

9 structure that we were just discussing about DeRosa

10 Partners.   There were two feeder funds.   One was called

11 Versailles America, and the other was called the

12 Versailles Fund.   The Versailles America was a Delaware

13 limited partnership for U.S. investors, and the

14 Versailles Fund was a Cayman Islands mutual fund.

15      Q    Okay.   Looking on your report --

16      A    Where are we now?

17      Q    It's appendix A.   It's actually the first

18 page of appendix A where you've got your experience.

19      A    Uh-huh.

20      Q    On the second page, 1996, 1997 Quadrangle

21 Investments, LLC.   That's the one we've been talking

22 about?

23      A    Yes.

24      Q    And you were a co-founder and managing

25 partner?

Page 57

1          A    Yes.

2          Q    And then this was a limited liability

3 company, and it actually had an interest in a Cayman

4 Islands company?

5          A    No.

6          Q    Did -- who owned Quadrangle Investments?

7          A    I owned 37 and a half percent, and the

8 other professional person whom I worked with owned the

9 same, and then there was an outside investor who got -- I

10 guess it's a 10 percent -- whatever the remainder is.  He

11 got the rest.  He got 25 percent not 10 percent.  Excuse

12 me.  He got that as a reward for finding the investors in

13 the fund themselves.

14         Q    Were they -- were you all limited

15 partners?

16         A    I'm not sure what you mean by were they

17 all --

18         Q    Let me ask it this way.  Strike that.  Was

19 it set up as a limited liability company in part to limit

20 the liability of the individual investors?

21         A    Certainly that was one of its functions.

22         Q    All right.  Now, it did not -- I'm sorry.

23 You may have testified to this.  In turn, was there a

24 Cayman Islands fund involved in that venture?

25         A    Yes.

1         Q     And that was a separate Cayman Islands

2 fund?

3         A     That was a Cayman Islands company that I

4 had no economic interest in, but that's where the

5 investors put their money because they were not U.S.

6 taxpayers.

7         Q     I see.  Was that Cayman Islands fund --

8 was that set up primarily to avoid U.S. tax?

9         A     It was set up so that non-U.S. taxpayers

10 could efficiently and legally invest in some securities

11 that would be the -- not U.S. securities.  This is the

12 way that the vast majority of hedge funds are set up.

13        Q     Okay.  Here's -- let's -- your testimony

14 in Jade Trading at page 292, the following statement was

15 made:  "Quadrangle was the management company."

16        A     Right.

17        Q     "The funds that we ran were Cayman

18 domiciled funds.  They -- most -- the answer to your

19 question is most of the funds used in hedge funds are

20 formed as Caymanian" -- Caymanian?

21        A     Caymanian.

22        Q     -- "or Burmudian or some other entity,

23 primarily to avoid U.S. taxes for non-U.S. taxpayers."

24        A     To legally -- we're not talking about

25 evading.

Page 59

1          Q      I understand.

2          A      Just so we know.

3          Q      I understand.  That's a correct statement

4 of the testimony I just read you?

5          A      Yeah, it's a correct statement.

6          Q      Okay.  Now, I see on your list of

7 experience, again, part of appendix A, the first page, an

8 entity called Rubicond Fund, of which you're a director?

9          A      Yes.

10          Q      The Rubicond Fund, what does it do?

11          A      That is a macro hedge fund that does

12 currency and bond trading and some equity trading on

13 what's known as a macro level.

14          Q      Okay.  Is that fund domiciled in the

15 Cayman Islands?

16          A      All of the funds that I'm involved with,

17 and most of the funds I know -- would it be efficient if

18 I just described that because that will cover --

19                 MR. GEIER:  I think, Mr. DeRosa, what you

20 should do is listen to the question very carefully and

21 then respond.

22                 THE DEPONENT:  You're absolutely right.

23          Q      (BY MR. HALLETT)  And the U.S. investors

24 in that fund, do they invest through Delaware limited

25 liabilities companies?

Page 60

1          A     Through a Delaware -- through two Delaware

2 limited partnerships.

3          Q     Delaware limited partnerships?

4          A     Yes.

5          Q     So the investor is an investor in a

6 Delaware limited partnership, and then does the Delaware

7 limited partnership have an interest in Rubicond?

8          A     No.

9          Q     Then where does the Delaware limited

10 partnership get its returns?

11          A     Okay.  I am -- if you can think of it, I

12 am an investor -- I am on the board of directors of their

13 funds, not of their management company.

14          Q     Yes.

15          A     So what Rubicond, the asset management

16 company, does is trades on behalf of those investors in

17 that vehicle.

18          Q     Right.  But the -- what activity, if any,

19 is undertaken by the Cayman Islands fund?

20          A     Okay.  That is where the -- I'm sorry.

21 It's hard.  I want to give the gentleman the right

22 answer.

23          Q     Take your time.  There's no hurry.

24                MR. GEIER:  Can you repeat the question.

25          Q     (BY MR. HALLETT)  What activity, if any,

Page 61

1  is conducted by the Cayman Islands fund?

2          A      It is a pool of money that Rubicond

3  invests.

4          Q      All right.  The Cayman Islands fund, does

5  it have any employees?

6          A      You know, I don't think it does.

7          Q      Is its address a law firm in the Cayman

8  Islands?

9          A      Yes, it is.

10         Q      Is it essentially a mail drop?

11         A      No.  It's not -- I don't know what a mail

12  drop --

13         Q      A mailing address.

14         A      It's a law firm in Cayman.

15         Q      Well, does the law firm perform any

16  management functions for the fund?

17         A      The law firm is the lawyer for the fund.

18  The Caymanian lawyer for the fund.

19         Q      They give legal advice for the fund?

20         A      Yes.

21         Q      Do they do any actual management for the

22  fund?

23         A      Well, no, they don't do day-to-day

24  management, but they are the lawyers for the fund.

25         Q      I see.

1                    (Discussion off the record.)

2          Q      (BY MR. HALLETT)    Let me read you part of

3 your deposition testimony in Klamath Strategic

4 Investments funds case on page 75.    The question was

5 asked:

6                    "The Rubicond Fund, does it have employees

7 in the Cayman Islands?

8                    "ANSWER:    No.

9                    "Does it have an office in the Cayman

10 Islands?

11                    "ANSWER:    It has a registered office at a

12 law firm in Cayman.

13                    "QUESTION:    Do the lawyers of the law firm

14 have any involvement in the operations of the fund?

15                    "ANSWER:    No.

16                    "QUESTION:    So it's just a convenient

17 address?

18                    "ANSWER:    It's a domicile.    Cayman provides

19 that."    Is that correct testimony?

20                    MR. GEIER:    Objection.

21          A      Yeah, I think that's what I just told you.

22          Q      (BY MR. HALLETT)    Okay.    And then the

23 question was with respect to the law office:

24                    "What functions are performed at that

25 office?

Page 63

1          "ANSWER:  They receive communication.

2 It's the legal address of the company."

3          MR. GEIER:  Are you reading again from the

4 testimony?

5          MR. HALLETT:  Yes.

6          MR. GEIER:  Is there a question posed?

7      Q    (BY MR. HALLETT)  The question is:  Was

8 that accurate testimony?

9          MR. GEIER:  I'm going to object.

10     A    True.

11          THE DEPONENT:  Pardon me?

12          MR. GEIER:  I'm objecting.

13     Q    (BY MR. HALLETT)  Okay.  Now, I want to

14 talk about this case specifically.  Do you recall

15 approximately when you were hired by the government in

16 this case?

17     A    I don't remember.  It must have been about

18 six months ago, I think, but I don't really remember.

19     Q    All right.  Who -- have you actually

20 worked on the case yourself?

21     A    Oh, yeah.  Absolutely.

22     Q    Who else has worked on Mr. Sala's case?

23     A    First of all, the report is mine, but

24 Peter Halle did some of the background work.

25     Q    Let me just stop you right there, if I

1          Q     Now, it's a question.  You're ahead of me,

2 as usual.  My questions is:  What caused you to make the

3 revision?

4          A     I made an error in the spreadsheet on that

5 cell, and I copied one cell to another, and I copied the

6 wrong cell, and it calculated something other than what I

7 wanted to do.  I made a spreadsheet error.

8          Q     And how did you come to discover that in

9 connection with doing your rebuttal report?

10          A     I read Dr. Kolb's report.

11          Q     Were you looking for -- I think, his

12 maximum profit --

13          A     Oh, I --

14          Q     Excuse me, if I could finish.  I think his

15 maximum profit potential was $545,000.  So were you

16 trying to figure out what's the difference between him

17 and I?

18          A     Sure.

19          Q     And you actually found that you were a

20 little bit higher than he was?

21          A     Uh-huh.

22          Q     So in that area, you don't have any

23 material disagreement with Dr. Kolb in terms of what the

24 maximum profit potential was?

25          A     Not on that.

Page 141

1          Q    Okay.  Oh, on staying on your rebuttal

2 report on page 8, I'm looking at the top of the page of

3 page 8, an you state the maximum -- "The probabilities of

4 getting the maximum return range from approximately

5 20 percent to 50 percent for each four-sided spread."  Do

6 you see that?

7          A    Yes.

8          Q    Can you tell me how you calculated the

9 probability of getting the maximum return?

10          A    Well, I don't remember exactly, but if I

11 were to sit down and do it today, which is probably

12 exactly what I did before, I calculated which side of the

13 spread made money, the greater amount of money, okay,

14 because they were two-sided.  So the exchange rate could

15 go up or the exchange rate could go down.  One side made

16 more than the other.

17          Q    Excuse me.  If I could stop you right

18 there.  What do you mean by "made more"?  You mean the

19 actual profit?

20          A    I'm sorry.  That was trader talk.  Yeah,

21 if, at expiration -- and we're only talking about at

22 expiration, not if they sold it like after a month or

23 something like that.

24          Q    Okay.

25          A    If, at expiration, the better side paid

1 that.  We'll break now.

2              (Short recess.)

3              MR. HALLETT:  Back on the record.

4      Q     (BY MR. HALLETT)  On page 10 of your

5 rebuttal report, the next to the last bullet point --

6      A     All right.

7      Q     -- there's statements made in Exhibit 15

8 of Dr. Kolb's report shows a profit of $111,599.

9      A     Well, we've got another problem here with

10 the pagination.  My rebuttal report, right?

11     Q     Uh-huh.

12     A     What's this?  Is that the old one?

13             MR. GEIER:  This is probably the copy that

14 started the whole mess.

15     A     I'm sorry.  What page?

16     Q     Page 10.

17     A     Yes.

18     Q     Next to the last bullet point, it states

19 that Dr. Kolb's report shows a profit of $111,599.

20     A     Yeah.

21     Q     And you say by your calculation, the

22 profit was ninety-one thousand ten?

23     A     Yeah.

24     Q     How did you arrive at the ninety-one

25 thousand ten?

1          A      We gave you today or yesterday -- because

2 you had mentioned to Anton that you wanted to see some

3 calculations.  We gave you the spreadsheet or a PDF of

4 the spreadsheet line by line.  It shows where we got the

5 profit from.  The short answer is that we got it probably

6 the same way as Dr. Kolb in the sense that I don't think

7 there's any disagreement about the profit or loss on the

8 ones that are in dollars.  But when we calculated the

9 profit or loss on the ones they sold, they were the

10 nondollars where the dollar isn't in the currency pair.

11 We converted that at the spot exchange rate that day.

12               However, that said, one of the options in

13 there, one of the calculations -- I'd have to look at

14 it -- I suspect, but I don't know for a fact, that

15 Dr. Kolb did not convert the Euros to dollars in his

16 calcu -- because that -- if you know the spot exchange

17 rate, then -- which I looked at last night -- you'll see

18 the two figures almost line up then.

19               MR. HALLETT:  Could you hand me the

20 worksheets that we were provided yesterday.

21               MS. RIXE:  Uh-huh.

22               MR. HALLETT:  We looked through and

23 couldn't find, but we really didn't know what it should

24 look like --

25               MR. JANIK:  Jane, it's the e-mail.

1 doing one or ten people?

2          A    That's correct.

3          Q    Okay.  I notice you leave out -- you quote

4 part of his testimony, but you leave out his testimony

5 where he testified on that matter that there were

6 additional reasons, at least from his standpoint, for the

7 partnership, that it was simpler, it was less costly, and

8 that there was liability protection for the investors.

9          A    Oh.

10          Q    Did you choose to ignore that?

11          A    No.

12               MR. GEIER:  Objection.  Foundation.

13          Q    (BY MR. HALLETT)  Did you accept it?

14          A    I think it's to a certain extent -- wait.

15 I was arguing from the investors' point of view, not from

16 Krieger's point of view.  Krieger would have loved to

17 have had everything in one account.  I'm not talking

18 about him.  I'm talking about the investors.

19          Q    Okay.  I'm glad we clarified that because

20 as I read it, the heading says there was no economic or

21 trading purpose in using and S corporation or a general

22 partnership for the transactions.  You're not saying that

23 Krieger didn't have an economic or trading purpose in

24 having a general partnership?

25          A    He would -- most -- sorry.