# EXHIBIT 4

Report of David DeRosa, Ph.D.

In Rebuttal to the Expert Report of Robert W. Kolb, Ph.D.

Carlos and Tina Sala v. United States of America

Civil Action No. 05-cv-00636-LTB

December 26, 2006

I disagree with the main points of Dr. Kolb's Expert Report, dated 13 December, 2006. In addition, Dr. Kolb has made factual errors and inaccurate representations. My rebuttal addresses these as well as the general topic of Andrew Krieger's trading which is at the center of Dr. Kolb's opinions.

There are three main topics which comprise my rebuttal:

1. I view the five four-sided spread trades as single transactions. Dr. Kolb does not. I will show why the basis of his opinion is incorrect.
2. Dr. Kolb overstates claims of the potential profitability of the Krieger trading strategy. It is my belief that during October-December 2000, Mr. Krieger's trading strategy was of small risk and return potential to Carlos Sala.
3. I believe that Dr. Kolb may be correct in his understanding of Mr. Krieger's use of the term leverage, but he fails to address that the Sala accounts were not leveraged during 2000.

## 1. Single Transactions

Dr. Kolb's report centers on the 20 options comprising the five four-sided trades, which also contain the vast majority of the long option premium. The other three options, for my report, or four options, for Dr. Kolb's report, represent an insignificant portion of the total option premium. Indeed, the majority of Dr. Kolb's report is devoted to analyzing these 20 options, and they are consistently referred to as "condors," or four-sided spreads. This is appropriate because the longs and shorts of each four-sided spread are in fact locked together.

In my report I advance the argument that the component long and short options making up each four-sided spread are forever locked together and hence are rightfully considered single transactions. Dr. Kolb's report states this not to be the case. His report makes an erroneous argument that the components of each four-sided spread can be thought of as shares of stock in a portfolio:

> "Just as I might consider my holdings of Apple Computer and General Motors as a two-stock portfolio and be concerned about the overall results for that portfolio, so I can conceive several options as a portfolio for conceptual clarity and convenience. Doing so does not make the options into a single instrument any more

than my thinking of my stock portfolio makes Apple and General Motors into the same stock." (Kolb, page 22).

In this opinion, Dr. Kolb's report makes an unsupported transition from the four options within each four-sided spread to shares of common stock, like Apple Computer and General Motors, that comprise a stock portfolio. From here the Kolb report advances the idea that the component options can be separated from one another just like shares of stock that can be moved into and out of a portfolio.

This misses the essential point that Mr. Sala would have had to pay in excess of $60,000,000 in cash in order to separate the long options from the short options. As such, the argument of Dr. Kolb's report fails to defeat the single transaction concept.

From the outset, Dr. Kolb's argument does not make sense in part because of the lack of outward similarities between the shares of stock he mentions. Apple Computer and General Motors are different securities, representing different industries, products, and markets. The options within a four-sided spread strategy are anything but

different from one another. For example the dollar/Swiss foreign currency options are options with the same value date, size, and other contract terms.

More to the point, Dr. Kolb's report is inconsistent with the facts of securities trading as well as foreign currency trading. Capital requirements are not considered. Credit issues from the perspective of the counterparty bank are not considered. It is the consideration of these issues that leads to the conclusion that each spread within the designated trades was indeed a single transaction.

The four-sided spreads involve buying and selling very similar options. If one plays out the analogy with Apple and General Motors shares, the error of the analogy becomes evident. For example, were an investor to purchase stock in Apple and simultaneously sell short stock in General Motors the margin implications would be as follows. The Apple stock would require full payment up front in a cash account, or at a minimum a 50% deposit in a margin account. The short sale of General Motors would require similar margin treatment (the proceeds of a short sale is not counted as it is impounded by the broker). Over time, the margin on the short sale would rise and fall with movements

in the stock price. This is complicated enough but when the analogy is extended to separating long and short foreign currency options the picture becomes more complex.

Purchase of long foreign currency options requires payment in full, up front, of the option premium. There is no margin because the options have to be paid in full. A separate short sale of a foreign currency option requires margin money be posted - and the amount of margin changes over time in part based on the extent to which the option is in-the-money or out-of-the-money. In the case of the designated spreads, if Mr. Sala were to have separated the longs from the shorts, he would have had to pay in excess of $60,000,000 for the long options. In addition, Mr. Sala would have had to lock up the full proceeds of the sale of the short options, plus post margin for the shorts.

The only financial relief to an option spread trader is where the components are kept welded together, as it were, in a spread. This is what Mr. Sala had with the five four-sided spreads. His long and short option premiums were allowed to offset each other because the component options could not be separated. I go into this at length in my own

report and also treat the issue of broker credit considerations, which lead to the same conclusions.

Moreover, as I explain in my expert report, these trades were intentionally put on as a unit and closed out as a unit. They could not have been economically separated.

## 2. Profitability and Maximum Potential Payoff[1]

Dr. Kolb's report overstates the claims of the potential profitability of the Krieger trading strategy. It is my belief that the trading during October-December 2000, was of small risk and return potential to Mr. Sala. In Exhibit 13, and throughout his report, Dr. Kolb's report refers to the maximum potential payoff of the designated trades. Some very impressive numbers are presented. Yet, on closer examination, many of the claims made by Dr. Kolb are inconsistent with the true potential for profitability. For example, Dr. Kolb's report makes the following points that are inaccurate:

---

[1] In exhibit 2 of my expert report, I erroneously stated the maximum payout for the GBP/JPY as $209,159. In fact, it was $350,224. This means that the maximum profit would have been $553,126, not $412,060. The following corrections within the report are that the risk reward ratio for sterling/yen was 1.9:1, not 1.1:1, the maximum potential profit represented only 2.8%, not 2.5%, of the total long option premium of $60,987,866.79 (page 24); $553,126 would represent 6.2%, not 4.6%, profit on deposited capital, and with 2:1 and 3:1 leverage, the maximum profit potential would have been 3.1% or 2.1%, not 2.3% or 1.5%, for November and December 2000, respectively. This correction does not alter the conclusions of my expert report.

DeRosa Rebuttal of Kolb Report                  6

- The Kolb report asserts that there was a maximum potential profit of 76.29% (Kolb, p. 21). That is a huge number. However, the calculation does not consider the fact that Mr. Sala had invested $8,925,000. Dr. Kolb's report only considers the premiums on the options - and that was a very small part of the total account. In fact, most of the cash in the account was left dormant and uninvested (except for money market instruments). If the Kolb report had considered the entirety of the account, a much smaller profit number, i.e., 6.2%, would have been arrived at. If we apply the leverage of 2:1 for November or 3:1 for December 2000, the maximum potential profit drops from 6.2% to approximately 2 or 3%.
- Even the 76.29% maximum return on option premium - as startling as that may seem - would not have been close to what Mr. Krieger held out to prospective investors. 76.29% equates to a risk reward ratio of 1.8:1, whereas Mr. Krieger promoted doing trades at a 4:1 risk reward ratio (DHSala 00001817). Dr. Kolb's report does not take this into account.

- While it may be impossible to perfectly calculate the odds of obtaining the maximum return for all of the four-sided spreads, it can be done for each individual spread. The probabilities of getting the maximum return range from approximately 20% to 50% for each four-sided spread. When taken together, the odds of getting the maximum return would be less than the weighted average of the five, perhaps significantly. This is because the euro is closely and positively correlated with the Swiss franc, and these currencies would have to move inversely to obtain maximum returns. Dr. Kolb's report does not consider this. Furthermore, it is incorrect to take the numerical average of the five implied volatilities (Kolb, Table 2). This is a false methodology both from an economic perspective and from a mathematical perspective, because it fails to consider that the correlations between the various currencies are not equal to one.

- Dr. Kolb's report is in error on page 16, where it states that profits are largest when the Swiss franc and the Japanese yen rise against the dollar. The exact opposite is true.

DeRosa Rebuttal of Kolb Report                                           8

- The focus of Dr. Kolb's report on the maximum potential payoff does not consider the unlikely possibility of it being achieved. For example, just to take three of the four-sided spreads, the maximum payoff would have been when the euro was strong against the dollar and the yen, and the dollar also was strong against the yen. This would require the yen to plunge in value at the same time the dollar was falling against the euro. While this is statistically possible, this scenario is improbable, and this information would militate against the potential profits Mr. Sala could have made.

- The maximum potential return of $2,232,043 for the GBP/JPY long option is displayed in Exhibit 13, as well as on page 20 of the Kolb report. To consider such a profit potential is not sound analysis. The only way this maximum profit could happen is if the currency of Japan, the second largest industrial economy of the world, were to go to zero value. Dr. Kolb's report hedges by stating that it is theoretical and the odds of it happening are nil, yet this scenario is included in the maximum profit exhibit. The result is that the reader is left

with the impression of this potentially being a huge winner. The premium for this trade was $12,210, out of the total long premium of $60,987,866.79 for the designated options. To suggest a maximum payoff of $2,232,043 in any way is misleading.

- The Kolb report states on page 21 and in Exhibit 14, that profit of the designated options would have been $241,604, if held to expiration. The only profit calculations that belong in this analysis are those made at the time of the trade. What is important are the expected potential profits of the trades at the time of the transactions, by objective measurements. Even the actual profit at liquidation, except for the fact that all five four-sided trades were closed out a week after being entered, has no significance as to the merits of the strategy.

- In Exhibit 15, Dr. Kolb's report shows a profit of $111,599 for the designated trades. By my calculations, the profit was $91,010.

- The Kolb report on page 21 calculates the percentage rate of return of 15.36% on the designated option trades. It then annualizes this

number to get to 877.02%. This is contrary to any industry standard of good practice for reporting of performance, because it bases the performance on the option premium and not on the total invested capital in Mr. Sala's account – a number in excess of $8.9 million. All in all, Mr. Sala made a profit of $91,010 on the designated options, having invested $8,925,000. Yet, Dr. Kolb's report asserts that Mr. Sala enjoyed a rate of return of 877.02%.

### 3. Leverage

Andrew Krieger in his deposition, and Dr. Kolb in his report, measure leverage in many ways: first, in terms of determining the size and risk of trades on the basis of standard deviation; second, as a percentage of tolerable loss; and third, as a related matter, as the notional size of the account and the management fees on which they are based.

> Standard Deviation. Both Mr. Krieger in his deposition (Day 2, p. 415), and the Kolb report on page 25, refer to employing leverage so that

there would be an annual standard deviation of 13-16% unleveraged, and multiplied up basis the degree of leverage.

<u>Risk of loss</u>. In Mr. Krieger's deposition (Day 1, p.105; Day 2, p.413-5), he refers to an account in which the client is willing to lose $1 million on $10 million capital. If the client is willing to risk $1 million on $5 million capital, then that is a 2:1 leveraged account, according to Mr. Krieger.

<u>Notional size</u>. The capital deposited into the account is a fraction of the full size by which the account will be traded. The management fees will be based on the full size of the account. (Krieger Day 2, p. 405; Kolb, p.29)

These three concepts are all closely linked, and I will address them together. The maximum loss on the designated options was the entire net premium of $728,297.85. The maximum potential gain after premium was $553,126. The options were one-year in term. Mr. Sala's account was funded with $8,925,000. Therefore, his percentage rate of

return was bracketed by -8% to +6%: a range that was inconsistent with the stated standard deviation of 13-16% based on deposited capital, let alone a higher standard deviation of 26-32% based on 2:1 leverage. Over the course of a year, any number of options and foreign currency trades with various levels of risk could have been entered. However, in late November 2000, when the designated options were put on, this was the portfolio. As I stated in my expert report, the amount of capital that was committed to the designated options did not constitute leverage by any industry standard.

### 4. Other points

Due Diligence. On page 5 of his report, Dr. Kolb stated that "Sala performed a great deal of due diligence." There is no industry standard, custom, or guidelines for due diligence.

Fee structure. On page 31, the Kolb report states that Mr. Krieger had incentive fees of 20-30% of profits, and that he had every incentive to work hard to make money for his clients. This statement makes no distinction of the

difference in fee structure between "2 and 20," which most of the other Deerhurst investors had, and "1 and 30," which Mr. Sala negotiated. The difference between these two fee structures is significant, and has a profound impact on how much is left on the table for the fund manager, in this case Mr. Krieger, and the client, Mr. Sala. As I covered in my expert report, Mr. Sala negotiated a fee structure that in a relative sense, would benefit him in a lower profit scenario (under 10% return per year). If Mr. Sala had had an annual return of 60% (due to leverage), based on his own projections, he would have left an extra $9.5 million in fees on the table over the five year lock-up. Dr. Kolb's report does not consider why Mr. Sala would have voluntarily negotiated these fees if he, Mr. Sala, had been so optimistic about Mr. Krieger's trading ability.

Dated the 26th Day of December, 2006.

*[signature]*

David F. DeRosa, Ph.D.