# EXHIBIT 5

# Pt. I of III

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:05-cv-00636-LTB

CARLOS E. SALA, and
TINA ZANOLINI-SALA,

       Plaintiffs,

v.

UNITED STATES OF AMERICA,

       Defendant.

_____

**REPORT OF ROBERT W. KOLB, PH.D**

_____

DATED this 13th day of December, 2006.

## A.    Introduction

My name is Robert W. Kolb, and my address is 9638 Mountain Ridge Place, Boulder, Colorado 80302. Over the last 25 years, I have written over 20 books (counting various editions), and about 50 refereed academic journal articles on financial derivatives, corporate financial management, investment and portfolio management, international finance, financial institutions and markets, and related topics. I have recently contracted to act as the Series Editor of *Blackwell's Companions to Finance Series* which will entail commissioning approximately 65 volumes to cover every area of finance. I am in the process of completing the 5th edition of *Futures, Options and Swaps* (this edition with James A. Overdahl, Chief Economist of the Commodity Futures Trading Commission), which will be published in January 2007. Earlier editions of this book have been translated into several languages and were used as the standard text on financial derivatives for the Chartered Financial Analyst series of exams. I am the lead editor of the *Encyclopedia of Business Ethics and Society* and have recently written chapters for that publication on "Commodity Futures Trading Commission," "Executive Compensation," "Financial Derivatives," "Freedom and Liberty," "Distributive Justice," and "Dignity." I recently published an edited volume entitled *The Ethics of Executive Compensation* and two more edited volumes are in press: *Corporate Retirement Security: Social and Ethical Issues*, and *The Ethics of Genetic Commerce*.

I have been accepted as an expert in several federal courts on matters pertaining to finance generally and pertaining to financial derivatives in particular. In these various proceedings, I have testified on behalf of the U. S. federal government as well as private clients.

In addition to my writings and testimony experience, I have had academic appointments at the University of Florida, Emory University, the University of Miami, and the University of Colorado at Boulder. Additional information about my publications and appointments can be found in my *Curriculum Vitae* attached as Appendix A of this report.

**B.      Purpose of Report and Summary Conclusions**

I have been asked by counsel for plaintiffs to analyze the investment program of Carlos Sala in foreign currencies, including a variety of options on foreign exchange, especially as managed on his behalf by Deerhurst and its affiliates (hereafter referred to collectively as "Deerhurst.") I have been asked to evaluate the profit potential and actual outcome of the Deerhurst trading generally and to focus more specifically on 24 designated option positions that are detailed in Exhibit 1 of this report. I have also been requested to evaluate the due diligence performed by Mr. Sala preparatory to beginning the Deerhurst investment program, and to assess the profit potential of the trading program in which Mr. Sala participated. More specifically I have been asked to address the following issues, which are presented with my basic conclusions. These issues are examined more closely in sections D.1–D.5 of this report:

1.      **Evaluate whether an investor with the information received by Carlos Sala in 2000 reasonably could have anticipated making a profit.**

Yes, he could have.

2.      **Evaluate the profit potential of the 24 designated options that were entered into on behalf of Mr. Sala and generated the tax basis in the Deerhurst partnership.**

Each of these options had significant profit potential. Collectively they also had significant

profit potential and were in fact profitable.

3. **Evaluate whether the options in this case, with a particular focus on the 24 designated options of Exhibit 1, were separate individual financial instruments and whether they could be traded individually and independently.**

Each option is an independent financial instrument with its own contractual terms and is individually and independently tradeable both in theory and in practice. This is true of options generally, and it is true of the 24 designated options as well.

4. **Evaluate the profit potential of the entirety of the Deerhurst trading program that occurred from October, 2000 to December 22, 2000 and from late 2000 until 2004.**

The Deerhurst trading program had significant profit potential for the period October 2000 to December 2000, and was in fact profitable. For the period from late 2000 until 2004, the entire trading program had significant profit potential net of all costs.

5. **Determine whether Andrew Krieger's incentives and trading pattern reflect those of an investment advisor who is trading to make a pre-tax profit.**

They do.

C. **Methods of Analysis and Materials Examined**

My methods of analysis are drawn from my extensive knowledge of options and financial markets generally and follow practices common among financial economists. In reaching my conclusions in this matter, I examined and considered the following documents:

The complaint in this matter; Option confirmations from Refco; Refco account statements for 2000; Financial statements for Deerhurst Trading Strategies, LLC prepared by Arthur Andersen; Forms 1065 for Deerhurst for several years; Deerhurst Trading Strategies monthly profit and loss statements; Financial Statements prepared

by Deerhurst for 2000; Minutes of various Deerhurst investor meetings in 2001-2002; Various daily trading statements for Deerhurst Investors GP in 2000; Depositions of Michael Schwartz, Andrew Krieger, and Carlos Sala with accompanying exhibits; Andrew Krieger's materials regarding his trading performance; Sala's spreadsheet of profit projections; Sala's records regarding his personal trading in stock options in 2000.

**D.      Analysis**

This section of the report considers in detail each of the major matters I have been asked to investigate and upon which I am offering an expert opinion.

**D.1      Evaluate whether an investor with the information received by Carlos Sala in 2000 reasonably could have anticipated making a profit.**

In 2000, Carlos Sala entered an investment program that involved the trading of foreign currency and options on foreign currency. The description of the program held out the promise of very high investment returns coupled with significant tax advantages.

In 2000 Sala was a finance professional and a sophisticated investor. His previous professional experience included working for Ernst and Young in their merger and acquisitions department, where his primary job was to conduct due diligence pertaining to merger transactions. Sala also served as the Chief Financial Officer of two public companies, Abacus Direct, Inc. and Dal-Tile International. In these capacities, Sala had extensive experience in financial matters that extended deep into the world of investments. This included a strong familiarity with foreign exchange trading, as Sala had been responsible for executing foreign exchange transactions for his firms. Those activities had involved entering the spot and forward foreign exchange market to manage his firm's foreign exchange exposure.

In addition, Sala traded options for his personal account including "straddles," and

"strangles," both familiar methods of options trading that involve establishing positions in two or more related options in order to exploit predictions of future price movements in the underlying asset on which the options are written. For this trading in early 2000, the options were stock options and Sala traded hundreds of contracts involving many thousands of dollars. More sophisticated than simple option positions, Sala actively traded options in conjunctions with stocks to shape the risk and return profile of his investments.

In the second half of 2000, Sala was introduced to an investment opportunity, the "Deerhurst program," that would be managed by the experienced and highly successful trader, Andrew Krieger. Before investing, Sala performed a great deal of due diligence. As part of his investigation of the Deerhurst program, Sala had numerous conversations with both Andrew Krieger and Michael Schwartz. In addition, he carefully investigated the historical returns that Krieger had achieved for his clients over a period of almost ten years. To that end, Krieger gave Sala information on his trading history that had been examined and confirmed by an independent CPA firm. Here the focus was clearly on the investment expertise and profit potential that Krieger would bring to the venture. (Krieger's trading history and the impact on Sala's decision to invest are explored in greater detail in section D.3 of this report.)

As part of his inquiry into the investment merits of the envisioned program, Sala even traveled several times to meet with Krieger. While on site, Sala viewed Krieger's trading operations and interviewed traders in Krieger's shop. In Krieger's view, Sala pressed his due diligence to the point of annoyance. Speaking of the visits that Sala made to interview him, Krieger testified: "I don't remember the specifics, but I remember being surprised at how annoyingly thorough he was with his

questioning; everything about risk controls to processing of trades to historical trade performance, what could go right, what could go wrong, where did I make money, where would I loss [sic] money, what environments were good. He asked a lot of probing questions." (Krieger deposition, p. 440) Not only did Sala show extraordinary interest in the details of the investment before entering the Deerhurst program, but he participated actively in monitoring the ongoing progress of the project in 2001-2002. This included questioning fees, participating in an ongoing evaluation of the trading program, and actively seeking alternative means of achieving profitability.

In sum, in the second half of 2000, Sala closely evaluated the profit potential of Krieger and the Deerhurst program. Convinced of Krieger's ability to make money, Sala joined the Deerhurst trading program in the fall of 2000. Based on the information that Sala gathered and the due diligence he performed, it was reasonable for Sala to conclude that the Deerhurst program could generate significant, even very large profits.

**D.2    Evaluate the profit potential of the 24 designated options that were entered into on behalf of Mr. Sala and generated the tax basis in the Deerhurst partnership.**

Of the many hundreds of transactions conducted in the Deerhurst program, I have been asked to evaluate closely the economic characteristics of 24 designated options. Deerhurst entered these 24 foreign currency options positions on Sala's behalf in the period November 20-28, 2000 as detailed in Exhibit 1, with each row of the table pertaining to one of the 24 options. The first column of the exhibit shows a letter identifier that was assigned to each option for ease of reference. The subsequent columns supply the relevant information about each option's characteristics: the currencies involved, whether the option was bought or sold, the strike price, the premium, and the

expiration date. The rows of the table each pertain to a single option and I have grouped them based on their economic relevance to each other (e.g., same currency pair, same expiration date, same or related strike prices). I have organized these 24 options into seven groups, or portfolios, of options with economic affinities as follows: A-D, G-I, K-N, O-R, S, T, W, and X (hereafter STWX, with each set of four options taken as a system. There were also two other pairs of options, E and F, and U and V. These groups of options will each be discussed in chronological order following the progression from very small and simple positions to larger and more complex option investments.

**Options E and F**–These two options have the same terms, currency pair, expiration date, strike price, and so on, except they were purchased at slightly different prices. Once acquired, the two may be analyzed together because of this identity of features.

Every foreign exchange option is simultaneously a call option on one currency and a put option on another currency. In the case of options E and F, each option is a call option on the British pound (GBP) and a put option on the Japanese yen (JPY). At the discretion of the option holder, the option holder receives (calls) a certain number of British pounds and pays (puts) a certain number of Japanese yen for them. So the greater the value of the pound in terms of yen–that is the more yen that a pound buys–the more lucrative this option position will be.

Taken together, these two options cost GBP 8,579 = JPY 1,329,745, given the spot rate of GBP 1 = JPY 155.00. The purchase of these gives the owner the right at the expiration date of February 20, 2001 to pay a total of JPY 259,524,000 and receive a total of GBP 1,602,000. At expiration the options will have value and should be exercised if the spot exchange rate exceeds the strike price of 162.00 JPY per GBP, that is if GBP 1 > JPY 162.00. For the overall investment to

become profitable, however, the exchange rate must be high enough to cover the purchase price of the two options. If the exchange rate at expiration is GBP 1 = JPY 162.8301, the trade breaks even. That is, the profit on exercising the option exactly offsets the purchase price of the two options. For any higher exchange rate (i.e., GBP 1 > JPY 162.8301), the overall trade becomes profitable. Exhibit 2 shows the profit and loss potential of options E and F considered together. As the graph shows, the maximum possible loss is GBP 8,579 = JPY 1,329,745, given the spot rate of GBP 1 = JPY 155. There is also the possibility of gain ranging from very small to very large, just depending on the exchange rate at expiration. For example, if the pound appreciated even modestly (say, to GBP 1 = JPY 165) the gains would be substantial, 261.42%. If the pound appreciated dramatically against the yen by the expiration date, the profits could be very large as Table 1 shows:

| Table 1 Profits on Options E and F at Various Exchange Rates at Expiration | | | |
|---|---|---|---|
| **JPY per GBP at Expiration** | **Profit/Loss in JPY** | **Approximate Profit/Loss in U. S. Dollars** | **Percentage Gain/Loss** |
| ≤162.00 | -1,329,745 | -$12,216 | -100.00 |
| 162.8301 | 0 | 0 | 0.00 |
| 165.0000 | 3,476,255 | 31,936 | 261.42 |
| 175.0000 | 19,496,255 | 179,111 | 1,466.16 |
| 185.0000 | 35,516,255 | 326,286 | 2,670.91 |
| **Note:** The approximate profit and loss in U. S. dollars (USD) is computed at the spot rate that prevailed when the options were purchased, USD 1 = JPY 108.85. | | | |

As Exhibit 2 and Table 1 show, the certainty of a limited loss coupled with a virtually unlimited profit potential is a very attractive feature of options as a speculative profit-oriented

investment. Of course, the chance of an exchange rate of GBP 1 = JPY 185 on the expiration date is quite low as the price of these options reflects.

In virtually all discussions and analyses of options, it is customary to focus on the payoffs at expiration, such as those presented in Exhibit 2, even when the trader may not intend to hold an option until it expires. Thus, virtually any options textbook will have graphs like those of Exhibits 2-11. There are several reasons for this focus on payoffs at expiration. First, European style options (such as all of the options concerned in this litigation) can be exercised only at expiration, so the price of the option at any time prior to expiration is largely a function of the expected value of the option at expiration. Second, prior to expiration, the price of a foreign exchange option depends on six factors (the current exchange rate, the interest rates in each currency, the time until expiration, the riskiness or volatility of the exchange rate, and the exercise price specified in the option contract.) Of these six factors, only the exercise price is constant. All of the other factors are variable, so it is relatively difficult to evaluate all of them at a single moment. At expiration, by contrast, the value of an option depends only on the spot exchange rate and the exercise price, both of which are fixed at that moment and immediately observable.

**Options U and V**–Just like options E and F, we may view options U and V as a portfolio of two options. (The two options are distinct financial instruments carrying their own rights and obligations. Either could be traded singly. In fact, the two options have distinctly different terms as they have two different strike prices.) Considered together, the portfolio of two options produces risk and reward characteristics that are significantly different from those of either option considered alone. Options U and V are both JPY puts/USD calls. Thus, both options are essentially a bet on a

rising dollar relative to the yen. However, instead of buying two options, in this case we have the purchase of one option with the lower strike price of USD 1 = JPY 112.00 and the sale of the other option with a higher strike price of USD 1 = JPY 113.00. Exhibit 3 shows the profit and loss profile for each option considered individually. As the graph shows, the purchased option, with a strike price of USD 1 = 112.00 JPY, has the characteristic shape that we already noted in considering options E and F. The other option has the same essential shape, but because this option was sold, the payoffs shown are exactly the negative of the purchaser's. So the payoffs on the option sold in this case largely, but not entirely, offset the payoffs of the option that was purchased.

Together, these two options constitute a position that is known as a "call spread" or a "bull spread with calls." It is bullish on the dollar because the combined option position pays off when the dollar rises relative to the yen. This kind of call spread is perhaps the simplest and most widely used of all option portfolio positions. The virtues of trading two options in this way can be seen by considering the profit and loss characteristics of the two options combined. The graph in Exhibit 4 shows that the combined position has limited potential of loss, but it also has limited potential for gain. Compared with merely buying a call, the call spread portfolio is cheaper because selling one call partially funds the purchase of the other. However, this cost reduction carries with it a necessary limitation on the profit potential. In this case, the purchased call, V, costs $6,141, while the sold call, U, brought in $2,136, for a net cost of $4,005 = JPY 442,052 at the spot exchange rate of USD 1 = JPY 110.3750 on the trade date. The option portfolio reaches its maximum payoff of JPY 1,693,948 at an exchange rate of USD 1 ≥ JPY 113.00, which would almost quadruple the investment. Thus selling the call reduced the investment cost by slightly more than one-third, at a cost of sacrificing

**Expert Report of Robert W. Kolb   December 12, 2006   10**

some of the upside potential that would have been available merely by buying the call. The desirability of trading a call spread as opposed to merely buying a call outright depends on the trader's funding situation and beliefs about the amount and timing of movements in the exchange rate. In summary, these early option trades (options E, F, U and V) are all very simple, have short terms to expiration, and involve only very limited investment.

**More Complex Trades**–The remaining 20 options traded for Sala in late November all share similar characteristics and they are highly distinct from the options we have been considering. Although all options are distinct financial instruments, we can conceptualize these 20 options as five groups of four options each based on evident relationships of currencies involved, strike prices chosen, common expiration dates, size of position, and the risk profiles of the resulting investments. Therefore, I will discuss options A-D in detail as a template or representative case. Once that is accomplished, we can generalize the analysis of options A-D to the other four sets of four options, which are options G-J, options K-N, options O-R, and options STWX.

**Options A-D**–Options A-D all involve the euro (EUR) and the JPY, and all have the same expiration date of November 27, 2001. For each option, the amount in euros is EUR 117,935,000, but the amount in JPY varies. Each of the four options is for a different strike price. The four options themselves fall into two groups, each of which constitutes a spread. Options A and B constitute a call spread much like options U and V just considered. The payoff profile for options A and B considered as a portfolio, shown in Exhibit 5, has the same shape as that for options U and V considered as a portfolio. This can be confirmed by comparing Exhibits 4 and 5. However, there is one very significant difference, and that is the scale. While the underlying currencies involved in the

options U and V was around $2 million, the underlying currency amount of each of the options A-D is more than $100 million, or about 50 times as large.

We have seen that options U and V and options A and B can be considered as two-option portfolios called call spreads that are designed to profit for a rise in exchange rates of the call currency over the put currency. The call spread comprised by options A and B become profitable, as shown in Exhibit 5, if the EUR strengthens against the JPY, i.e., if a EUR buys more JPY.

A more complete understanding of options A and B requires consideration of options C and D as well, because they are clearly related. Options C and D are very similar instruments, but they are traded in a way such that the two options would be profitable together if the EUR weakens against the JPY, i.e., if a EUR is worth fewer JPY. Exhibit 6 shows the payoff profiles at expiration for options C and D considered as a portfolio. As Exhibit 6 shows, options C and D taken together will profit if the EUR weakens against the JPY.

Thus, while options A and B taken together constitute a bet that the EUR will rise relative to the JPY, options C and D taken together constitute a bet that the EUR will fall relative to the JPY. The apparently contradictory nature of these positions is resolved by considering the total effect of all four options, A-D, taken together. Exhibit 7 shows the payoff profile for options A-D considered as a portfolio. Taken together options A-D constitute a speculation that the exchange rate between the EUR and JPY will be volatile. That is, the overall position will profit if the EUR either strengthens or weakens against the JPY. It will lose if the exchange rate stays the same or remains relatively unchanged. As Exhibit 7 shows, the portfolio of options A-D will hit its maximum profit for a strengthening EUR at an exchange rate of EUR 1 ≥ JPY 97.90. If the EUR weakens against the

JPY, the position attains its maximum profit at an exchange rate of EUR 1 ≤ JPY 89.98. The maximum profit from a strengthening EUR is JPY 10,376,346; the maximum profit from a weakening EUR is JPY 941,546. As these values indicate, and as Exhibit 7 shows, the profitability will be much greater if the EUR strengthens against the JPY. So the portfolio is constructed not as an equally-balanced volatility play with equal profit potential no matter which way the EUR moves, but it has been designed to capture greater returns from a strengthening EUR.

The portfolio of options A-D taken together cost EUR 141,522 = JPY 13,210,654 when it was entered on November 27, 2000. That day the spot exchange rate was EUR 1 = JPY 93.347, a value close to the mid-point of the trough of Exhibit 7. So this investment will lose if the exchange rate remains near this initial point. For example, if the spot exchange rate remains unchanged and the position is held to expiration, the entire investment will be lost.

However, a relatively modest movement in the EUR/JPY exchange rate in either direction will bring profits at expiration. If the EUR strengthens to EUR 1 ≥ JPY 97.9, the maximum profit of JPY 10,376,346 will be achieved. This is only a move of 4.88%, with a resulting 78.55% profit on the investment. On the other hand, a falling EUR will bring the maximum profit on that side of the bet if the EUR falls to EUR 1 ≤ JPY 89.98, a necessary move of only 3.61 percent. In that case, the profit would be JPY 941,546, for a more modest profit of 7.13%.

The analysis has focused on payoffs at expiration. Of course, the options need not be held until expiration. They can be closed out, or offset, at any time. So these options presented additional chances for profit if the EUR made short term moves against the JPY during the life of the option. Similarly if market conditions changed to increase the perceived volatility in exchange rates, the

**Expert Report of Robert W. Kolb   December 12, 2006    13**

values of options also change, and these could have presented additional opportunities for profit. Of course, some short term market changes could make the overall value of options A-D weaker.

In summary, options A-D are best understood as a set of two options spreads. One spread is designed to profit when the EUR strengthens against the JPY, while the other spread is designed to profit when the EUR weakens against the JPY. Both of these two-option spreads are very common ways of speculating in the options market. When they are considered as a position of four options, we have seen that the overall position is designed to profit from a modest move in the value of the EUR relative to the JPY in either direction, but with greater profit potential from a strengthening EUR. Trading a set of four options together as a portfolio is less typical than trading the simple spreads of options A and B or options C and D, but such a strategy is by no means uncommon. Traders call this strategy a "condor." Only familiar and common trading strategies receive such colorful names, so to have achieved this distinction indicates that the condor enjoys wide familiarity and easy recognition among traders. (Why is it called a "condor?" I don't really know, but I think it must be because the profitability "wings" in the graph of Exhibit 7 reminded someone of huge outstretched wings. Condors are discussed in more detail in my text *Futures, Options, and Swaps 4e*, Malden, MA: Blackwell Publishing, Inc., 2003, pp. 362-366.)

**Options G-J, K-N, O-R, STWX**–Given the relatively detailed profit analysis of the four-option portfolio A-D, we can now quickly address four other four-option portfolios that are very similar. First the differences: All of the four-option portfolios involve different currency pairs; all are for different amounts of investment; all give different percentage levels of payoffs for both rising and falling currencies. However, the similarities overwhelm these differences. All of the twenty

options that were traded to comprise all five condors were traded on November 27 or 28, 2000; all of the options had the same expiration date of November 27, 2001; all of the four-option portfolios were designed to profit from a currency either rising or falling relative to the other currency in the pair, that is all five four-option portfolios were volatility investments; all of the portfolios had markedly better payoffs if currencies moved in one direction rather than the other; and all of the portfolios had payoff patterns very similar to the payoff pattern noted for options A-D.

Exhibits 8-11 show the payoff patterns for portfolios G-J, K-N, O-R, and STWX, respectively. As these graphs clearly show, all are betting on movement in the respective exchange rates. While movement in either direction will give a profit, these options would produce a decidedly better outcome if the exchange rate in question moves in one direction rather than the other. We have already seen these points in our discussion of options A-D, where we noted that a EUR that strengthens relative to the JPY would generate a profit of 78.55% while a weakening EUR could only yield a 7.13% profit. A similar pattern applies to all of the other four-option portfolios, as Exhibits 8-11 show.

The table of Exhibit 12 summarizes the key parameters for all five four-option portfolios. While the table details the kinds of movements in the exchange rates that are necessary to give the maximum profits and indicates the maximum percentage profits for each four-option portfolio, it is possible to make some generalizations by way of further summary. First, if a currency strengthens in one direction by about 2.6 to 5.3%, that relatively modest movement generates a profit ranging from about 53 to 111%. If those same currencies weaken by about 3.2 to 5.5%, that price movement generates a profit ranging from 5.8 to 15.3%.

While all of the four-option portfolios are first and foremost investments that anticipates volatile exchange rates, we have also noted that movement in one direction rather than another creates a larger benefit. For these 24 options, the profits are largest when:

> EUR rises against JPY
> GBP rises against JPY
> EUR rises against USD
> Swiss franc (CHF) rises against USD
> JPY rises against USD

Taken together these positions bet on European currencies (EUR, GBP, CHF) against all others, specifically JPY and USD. But they also include a bet on the JPY rising against the USD. In briefest terms, these 24 option positions prosper most when the European currencies rise against the JPY, which in turn rises against the USD, that is, the EUR, GBP, and CHF appreciate relative to JPY, which, in turn, appreciates relative to USD.

**Exchange Rate Volatility and Prospects for Profit**–As we have seen, Sala's four-option portfolios prosper with exchange rate movement. How reasonable was it in late November 2000 to anticipate or hope that exchange rates might move enough to make Sala's investment in the 24 designated options pay off? While these options clearly reflect a bet on volatility, what if that volatility does not in fact materialize, or even worse, what if it was not reasonable to anticipate such volatility? The New York Federal Reserve Bank (NYFRB) publishes information on foreign exchange rate volatility at the end of each month. These volatility estimates are called "implied volatilities" because they are the standard deviations of foreign exchange rates implied by actual options trading. As such, they provide a valuable source of independent data on exchange rate volatility.

Pertaining to options, traders speak interchangeably of "standard deviation" and "volatility." The standard deviation is a statistical measure expressed as a percent that indicates how much a particular variable is likely to change. In option trading, the key variable of interest is the price of the underlying asset, such as a share of stock that underlies a stock option. Thus, in rough term if a stock price or exchange rate has an annualized standard deviation of 15%, that means that there is approximately a 2/3 chance that the stock price or exchange rate will stay in a range of not less than -15% and not more than +15% compared to its starting price over the next year. For example, consider a stock with a current stock price of $100 and a standard deviation of 15%. There is approximately a 2/3 probability that the stock price will be in the range of $85 to $115 after one year. This is a purely statistical result based on the characteristics of the normal distribution.

Table 2 shows the up and down movements for each currency represented in these four-option portfolios needed to give the maximum returns, as was discussed in conjunction with Exhibit 7. It also shows the NYFRB volatility estimate. Taking the average NYFRB volatility estimate of 13.45% from the table below, we can say, roughly speaking, that there is about a 2/3 probability that the movement in the exchange rate will be within a range of -13.45% to + 13.45% in the next year. As Table 2 also shows, these options need only a movement about 1/3 as large as the average standard deviation to hit the maximum payoff on the expiration date. That is, a movement in the exchange rate of 4-5% would give the maximum payoff.

However, during the term the options are held, any substantial movement in the foreign exchange rates will also bring profit potential which could be captured by liquidating these positions. In short, when we compare the NYFRB estimated volatilities with the price movements needed for

Sala's maximum profits, there certainly seems to be enough market volatility anticipated to carry these positions into profitability. Not only was this true from a prospective standpoint as of November 2000, it also accords with the actual historical results that Sala experienced, as discussed later in this report. That is, the exchange rates did move enough to generate substantial profits on these 24 designated options. Thus, at the time these positions were established in late November, 2000, it was perfectly reasonable for Sala to hope that these positions would be profitable as individual option positions, as four-option portfolios, and as a collective investment as well.

| Table 2 Volatility Analysis for Sala's Four-Option Portfolios | | | |
| --- | --- | --- | --- |
| Option Portfolio | Currency Pair | Range of Percentage Changes Needed for Maximum Gain | NY Federal Reserve Bank Estimated Volatilities (%) |
| A-D | EUR/JPY | EUR: -3.61% to + 4.88% | 14.20% |
| G-J | GBP/JPY | GBP: -4.17% to +4.06% | N/A |
| K-N | CHF/USD | USD: -5.46% to + 2.63% | 13.60% |
| O-R | EUR/USD | EUR: -3.20% to +5.31% | 14.10% |
| STWX | JPY/USD | USD: -5.13% to +3.77% | 11.90% |
| Averages | | -4.31% to +4.13% | 13.45% |

**Note:** The NY Federal Reserve Bank implied volatility data is for November 30, 2000. The bank does not provide an estimate for the volatility of the GBP/JPY exchange rate. The data can be accessed at: http://www.ny.frb.org/markets/impliedvolatility.html.

To this point, this report has considered possible outcomes and payoffs in a variety of currencies. But as a U.S. taxpayer, Sala must certainly have been interested in his dollar position from all of these option investments, the 20 options involved in the five four-option portfolios or condors, as well as options E and F and options U and V. The next section considers dollar

**Expert Report of Robert W. Kolb   December 12, 2006    18**

outcomes, both in terms of maximum potential profits, as well as under the actual market conditions that developed in the period following November 2000.

## Profitability Analysis

I consider the profitability in U. S. dollars of the 24 designated options in four ways, by focusing on:

> Maximum Possible Profits at Expiration for All 24 Options
> Maximum Possible Profits at Expiration for 22 Options
> Result of Holding 24 Options to Expiration
> Actual Historical Trading Results for All 24 Options

**Maximum Possible Profits at Expiration for all 24 Options**–Exhibit 13 shows the maximum possible profits at expiration for all 24 options organized into seven portfolios. Portfolios K-N, STWX and U and V all have a maximum payoff that is paid in USD. However, the other portfolios have their payoffs in a foreign currency, and those payments must be translated into USD. For others, the dollar is one of the currencies involved in the option, so the maximum possible USD profit depends on the exchange rate. Therefore, I have used the following convention: When the dollar was not one of the currencies constituting the option, I translated the foreign currency payoff into USD using the spot exchange rate that prevailed on November 27, 2000, the day that the bulk of these option positions were established. This was the case for portfolios A-D, G-J, O-R, and E and F.

Thus, to find the maximum possible profit for portfolios A-D, G-J, O-R and E and F, I found the exchange rate that provided the maximum payment in the foreign currency at expiration and translated that amount into USD at the same exchange rate. Then I subtracted the USD cost of the portfolio to find the maximum possible profit in USD reported in column 6 of Exhibit 13.

The two options E and F are both the same call option, except they were traded at different prices. As call options, E and F have virtually unlimited profit potential as the graph of Exhibit 2 shows. At expiration, the owner of E and F has the option to deliver JPY 259,524,000 and receive GBP 1,602,000. The profit from such an exercise depends on the exchange rate that prevails at expiration. Clearly, the greater the value of the GBP in terms of JPY, the better for the owner of these options. The theoretical maximum profit from exercising these options occurs if the yen is worthless. In that case, one could deliver the JPY with zero value and receive GBP 1,602,000, which would be total profit from the exercise. Given that the two options cost a total of USD 12,210, the theoretical maximum profit would be the value of the GBP 1,602,000 = USD 2,245,043, less the cost of the two options, which was USD 12,210, for a net profit of USD 2,232,832, as shown in column 6 of Exhibit 13. Of course, this theoretical maximum is rather fanciful, as no one expects the JPY to become worthless. But if this theoretical maximum is not the maximum profit of interest, then what is? No alternative is clear, so I have elected to treat options E and F as a special case. The other portfolios, K-N, STWX, and U and V, all have their payoffs in USD. The maximum possible profits for these portfolios are also detailed in column 6 of Exhibit 13.

For all seven portfolios, the maximum profit is USD 2,777,962. However, this figure includes options E and F, which was already discussed as having a virtually unlimited profit potential. I believe it is more meaningful to leave options E and F out of the account, as considered below.

**Maximum Possible Profits at Expiration for 22 Options**–If we exclude options E and F from the analysis for the reasons just explained, the total investment for the remaining 22 designated options is USD 714,554. The maximum potential profit at expiration for these 22 options is USD

545,130, as shown in column 5 of Exhibit 13, for a maximum potential profit of 76.29%. Because this figure ignores the potential profits from options E and F, I believe it is a conservative estimate of the maximum potential profit. However, it must be acknowledged that achieving this maximum was very unlikely, because attaining this maximum requires the right levels for all of the various exchange rates we have been discussing.

**Result of Holding 24 Options to Expiration**–In analyzing options, it is customary to look to their value at expiration, whether one intends to hold until expiration or not. Had the 24 options that were purchased from November 20-28, 2000 been held to their respective expiration dates, some would have expired worthless and others would have had considerable value. Exhibit 14 shows the outcome of such a strategy. As the last column of the figure indicates, holding all 24 options until their expiration date would have yielded total profits of USD 241,604 on an initial investment of USD 726,763, for a profit of 33.24% in one year.

**Actual Historical Trading Results for All 24 Options**–We now turn to examine the actual profitability on these 24 options, as detailed in Exhibit 15. All of these options were initiated in a brief period from November 20-28, 2000 for a total price of USD 726,763. The options were liquidated in December 2000 on several different dates as shown in column 3 of Exhibit 15. Closing the options positions yielded a total of USD 838,362 for a profit of USD 111,599– a profit of 15.36% in 24 days. This rate of return implies an annualized profitability of 877.02%. In other words, had the same investment success been repeated through the year, Sala's investment would have been multiplied by almost a factor of nine times.

**Summary**–We have considered the theoretical and actual profitability of the 24 designated

options in four ways. The options had very significant maximum potential for profit at and before expiration. If the options had been held to their respective expiration dates in 2000 and 2001 they would have realized a return in excess of 33 percent over one year. Finally, we considered the actual trading results realized by Deerhurst on Sala's behalf. The actual result was a 15.36% profit in 24 days.

**D.3    Evaluate whether the options in this case, with a particular focus on the 24 designated options of Exhibit 1, were separate individual financial instruments and whether they could be traded individually and independently.**

By their very nature, each option contract is an independent and separately tradeable financial instrument. This is true of each of the 24 options that have been discussed in such detail here. Each option contract involves a buyer and seller with distinct obligations to the other party that are independent of other options they may have traded with other parties.

To make the economic relationships among options clearer, I have considered them as various two-option and four-option portfolios. This is a conceptualization on my part. Just as I might consider my holdings of Apple Computer and General Motors as a two-stock portfolio and be concerned about the overall results for that portfolio, so I can conceive several options as a portfolio for conceptual clarity and convenience. Doing so does not make the options into a single instrument any more than my thinking of my stock portfolio makes Apple and General Motors into the same stock.

There can be practical limitations for a particular trader in executing and maintaining particular option positions. These typically arise when the broker wishes to limit the risk that its

**Expert Report of Robert W. Kolb   December 12, 2006    22**

customers assume, because the broker can be ultimately responsible for the losses incurred by those for whom they execute trades. But this limitation in no way justifies any conclusion that options must be treated as one integrated unit or that options can be lumped together as one financial instrument.

Even within practical limitations of actual market conditions, options generally, and these 24 options in particular, can be traded in a variety of ways. One way options are often traded within a spread trading framework is by using a technique known as "legging" or "re-striking." As a simple example, consider options A and B. Say, for example, that the EUR appreciates against the JPY to EUR 1 = JPY 98. In that case, the two options A and B will be generating paper profits, because the sold option will be losing value relative to the purchased option, and the purchased option, B, with a strike price of 97.7 will be in the money. In such a situation, a trader who believes that the EUR will continue to appreciate against the JPY might well close option A (by offsetting it through purchase) and sell a different option with a somewhat higher strike price, say 98.1 or 98.2. This allows option B to continue to increase in value if the EUR rises against the JPY, but it also provides new down-side protection in case the EUR begins to fall relative to the JPY. In this situation, the trader has "legged out" of one spread (by removing one side, or one "leg," of the spread) and has "legged into" a different spread. As an alternative description the trader who transacts as in this example has changed the strike price of the sold option.

**D.4  Evaluate the profit potential of the entirety of the Deerhurst trading program that occurred from October, 2000 to December 22, 2000 and from late 2000 until 2004.**

Krieger's track record and the use of leverage appear to have been fundamental in Sala's

consideration in appraising the Deerhurst investment opportunity. Sala testified that he "...projected that I was going to make a ton of money" by investing in Deerhurst Trading Strategies. (Sala deposition, p. 90) Sala expected to make returns in the range of "60 to 75 percent," and this was to be achieved by using 4:1 leverage. (See Sala deposition, p. 90). Krieger's historical performance with an un-leveraged account was in the 16-17% range of annual returns. Sala believed that by using 4:1 leverage the expected annual return would be four times as large, bringing the total return into the 60-75% range.

Sala prepared spreadsheets to project the performance of a hypothetical investment of $9,000,000 under Krieger's management. Sala used Krieger's historical performance as a guide and followed that projected performance over a contemplated five-year period, presumably 2001-2005. Sala worked with an assumed level of leverage of 4:1 to create different scenarios, and he projected cumulative after-tax profits in the range of $32-57 million over the five-year horizon.

Three factors are key to the viability of these projections: 1. The ability of Krieger to replicate his historical results; 2. The application of 4:1 leverage; and 3. Sala's understanding of the meaning of that 4:1 leverage.

**Krieger's Concept of Leverage**–In finance, the most typical or ordinary definition of leverage involves using borrowed funds to invest. For example, when one buys stock on margin, one borrows funds from the broker and uses a mix of personal and borrowed funds to acquire stock. The key consequences of such a policy are two-fold. First, one must pay interest to the broker for funds borrowed. Second, the rate of return on the investor's equity in a leveraged investment is riskier than the rate of return on the purchased stock. If the stock rises 1%, the investor's equity increases by

more than 1%. If the stock falls 1%, the investor's equity decreases by more than 1%.

Some financial instruments, such as options, have inherent leverage. If one purchases a call option the value of the option will rise or fall with the underlying stock, but the percentage change in the value of the option will be higher than that of the stock itself. So even if one pays for an option without borrowing any funds to finance the purchase, it is an inherently leveraged investment.

Given that typical methods of investing in foreign exchange and foreign exchange options involves this same kind of inherent leverage, Krieger developed the following understanding of leverage that he used in his own trading. Krieger explained to clients that he could manage a portfolio with an annual standard deviation in the 13-16% range, and this would be an "un-leveraged" portfolio in his sense. If one was making profitable investment decisions, the return on a portfolio could be increased by taking larger positions on the same capital base. However, this would involve greater risk. So for clients with higher risk tolerance Krieger would manage portfolios more aggressively. For Krieger, a portfolio managed with 2:1 leverage would have an annual standard deviation of 26-32%. A portfolio managed with 4:1 leverage would have an annual standard deviation of about 60%.

In his spreadsheet analysis, Sala assumed that a portfolio leveraged 4:1 in Krieger's terms would have an expected return four times as large as the expected return on an un-leveraged portfolio. According to Krieger's deposition (pp. 431 *et seq.*) this is slightly incorrect. A highly leveraged portfolio would have a higher percentage of its funds used to buy assets, so less would be available to earn interest. Consequently, a portfolio with 4:1 leverage would not have quite four times the expected return of an un-leveraged portfolio. However, Sala's understanding was basically

in agreement with Krieger's methods–both agreed that a portfolio traded with 4:1 leverage would have *approximately* four times the expected return as an un-leveraged portfolio. Thus, if Krieger were able to replicate the trading skill he had demonstrated in the past, and if he traded Sala's funds at a leverage of 4:1, Sala was correct in anticipating very high returns with profits in the many millions of dollars over five years.

**Analysis of Risk in Krieger's Trading History**–As mentioned earlier, Krieger provided Sala with a record of his trading results that had been reviewed and confirmed by an independent CPA firm. These data showed the monthly returns over 107 months in the period from 1991–2000. Working from the data that Krieger provided to Sala, I computed the mean monthly investment return as 1.4829%, which implies an annualized return of 19.32% over this ten-year period. As the document Krieger provided to Sala clearly states, these performance figures are net of fees and reflect interest earned on funds held in the portfolio. The standard deviation of monthly returns for the entire period was 4.8380%, implying an annualized standard deviation of returns of 16.7593%. This is quite consistent with Krieger's depiction of the risk level of an un-leveraged portfolio.

Faced with these performance figures and the intention to assume a riskier investment posture, i.e., more leverage in the sense that Krieger used the term, it was reasonable for Sala to believe that he faced very favorable, even highly lucrative, investment prospects. Sala might have slightly miscalculated in thinking that a portfolio leveraged 4:1 would have a full $4 \times 19.32\% = 77.28\%$ profit per year, but he was essentially correct in thinking that Krieger's continuing excellent investment performance would yield returns in the range of 60-75% annually. The key, of course, was Krieger's ability to continue his earlier excellent performance. If Krieger could continue the kind

of performance he had exhibited over the past decade, issues of how to treat the interest earned on invested funds would be trivial.

Exhibit 16 illustrates this point with a simulation analysis that projects Krieger's past performance into the five-year period contemplated for Deerhurst. It is based on the 107 months of return data that Krieger provided to Sala for the decade of 1991-2000, so it therefore simulates Krieger's performance in the management of an un-leveraged portfolio. Drawing randomly from this distribution of returns, I created ten random 60-month performance histories for illustrative purposes. (A formal simulation analysis might involve tens of thousands of such performance histories. My purpose is merely to indicate the kinds of results that would have been likely to occur had Krieger been able to replicate successes similar to his earlier trading history.) These simulated performance histories appear as the black lines of Exhibit 16, all starting from an original point of $8,990,046, Sala's investment in Deerhurst. As Exhibit 16 shows, the ten paths trend upward randomly. The randomness results from drawing each month's projected performance at random from the 107 months of Krieger's historical performance. The results tend to trend upward because the average performance of those 107 months was so good. Of the ten simulations, the lowest value attained after 60 months was $10,478,061 and the highest was $35,125,122. The average terminal value of the ten simulations was $22,137,319, for an average monthly pre-tax return of 1.51%, very close to Krieger's historical 1.4829% monthly return. (The difference is due to randomness and the small number of simulation runs. As the number of simulations increased, one would expect the simulation average to come ever closer to 1.4829%.) In Exhibit 16, the red line indicates the average of the 10 simulated paths, while the blue line shows how Sala's investment would have grown had Krieger

simply earned his average monthly return each month.

Again, this simulation is for an un-leveraged portfolio. Had Krieger invested Sala's highly leveraged funds with the same success, the five-year results would have been much richer by tens of millions of dollars. Very roughly speaking, one could multiply the un-leveraged terminal wealth levels of $10-$35 million by a factor slightly less than 4. Based on Krieger's earlier experience, this would have been the pre-tax result after fees and expenses.

**Fees and Expenses**–While Sala's investment in Deerhurst Trading Strategies certainly had the potential for large profits, those potential profits must be weighed against various fees and expenses that were incurred in order to initiate and execute the trading program. Here the key is to identify those incremental fees and expenses that were incurred in association with the program and to exclude from consideration those fees and expenses that would have been incurred in any event. I have grouped these fees and expenses into two categories for ease of discussion: Trading Expenses and Setup Expenses. The Setup Expenses include program initiation expenses, tax advice, and accounting services.

**Setup Expenses**–The following is a complete list of all potentially relevant expenses in this category to be found in the documents for this case of which I am aware:

> Davis Graham & Stubbs for various legal services in establishing Deerhurst investment
>     (8 invoices totaling $4,717)
> Holland & Hart for tax advice (invoice for $1,240)
> Opinion Letter from Brown and Wood (invoice for $75,000)
> Fee to establish S-Corp ($50)

The total of all these expenses, some of which were incurred in 2000 and some in 2001, was $81,007. Based on counsel for plaintiffs statement, I understand that all of these are fully attributable

to the Deerhurst investment. This amount is quite low, perhaps even trivial, relative to the profits that Sala hoped to attain. After all, $81,007 is less than 1% of the amount that Sala invested in Deerhurst, and it must be measured against Sala' expectation of returns of 60-75% per year.

**Trading Expenses**–The dollar amount of trading expenses is quite a bit larger than the setup expenses. Krieger stipulated a traditional fee structure with two components: a management fee computed as a percentage of the assets under management, plus an incentive fee computed as a percentage of the trading profits. Sala negotiated a 1% management fee multiplied by the amount of leverage, plus an incentive fee of 30% the trading profits. Sala also negotiated an agreement that the incentive fee was to be accrued and paid at the end of the contemplated five-year horizon only on the net trading profits garnered over the entire five-year period.

The various Forms 1065 for Deerhurst Trading Strategies list a number of fees and expenses: Mark Up Expenses Non 1256, Option Mark Up Expenses, Administration Expenses, Broker Fees, Clearing Fees, Management Fees, MTD Incentive, Organization Expenses, Refco Broker Fees, and Various Mark Up Expenses. Most of these expenses are a direct function of executing trades, such as broker fees and mark up expenses, so they would vary directly with the amount of trading performed.

However, in Krieger's representations regarding his trading performance, the performance results were presented as being net of fees, which included these broker fees, mark up expenses, asset management fees, and incentive fees. Thus, in considering the investment project and believing in Krieger's skill, Sala should have been anticipating that fees on an un-leveraged portfolio could be covered and still produce an annualized return of 19.32%.

The fees present a familiar story, in that everything depends on investment performance. If Krieger were able to trade for Deerhurst with the same success he reported for the 1990s, the fees would shrink into insignificance. If a money manager can return 19.32% after fees, then let the fees be as high as the sky. On a successfully managed and highly-leveraged portfolio, by extension of the same reasoning, the fees would be much higher than on an un-leveraged portfolio, but the profits would rise more than proportionately compared to the fees.

**D.5.     Determine whether Andrew Krieger's incentives and trading pattern reflect those of an investment advisor who is trading to make a pre-tax profit.**

By the fall of 2000 Andrew Krieger had a long history of investment success and was able to produce to Sala a decade-long record of quite stunning investment results. Traders such as Krieger make money by attracting funds to invest, and that ability to attract new investment funds turns critically on a record of previous success. In the investment management industry, there are enormous returns to scale, because managing a very large portfolio is not so much more expensive than managing a much smaller portfolio, yet the income in the form of management and incentive fees is largely a function of the value of the assets under management. These incentives are common in the industry. They certainly seem to have been the usual consideration for Krieger in the fall of 2000–as well as during the subsequent years. Krieger had every general incentive as a money manager to return high profits to his clients, including Sala.

Turning to the particulars of the Deerhurst matter, Krieger also had specific incentives to seek profits in his trading. The contract terms for Sala and the other investors did a very good job of ensuring "incentive compatibility" between the desires of the investors and Krieger. First, Krieger

was himself a Deerhurst investor, so as a fellow investor he was going to share the same fate as those for whom he was managing money. Second, his compensation arrangement gave him strong incentives to seek profits.

Krieger was paid in two ways for his money management services. He received a percentage of the assets under management each quarter. He also received a share of the profits that he earned for his clients, ranging from 20-30%. Clearly a track record of investment success helps to attract new funds from outside investors, as we have already discussed. But investment success makes the existing pool of assets larger too. This raises the funds under management and raises the asset management fee: "Double the funds you are managing; double the asset management fee you receive." This is a manifestly clear incentive for investment success. The incentive fee–the 20-30% of profits–that the contract promised Krieger was an even stronger incentive to seek profits. No matter what other factors might have been in play, Krieger would do best when his clients made money. Thus, he had every incentive to work hard for his clients to make money.

As Krieger himself pointed out, we are now far removed in time from the events of 2000 and the market conditions that prevailed then. Therefore, it is now difficult, if not impossible, to reconstruct the trading position of Deerhurst for a given moment in time in any detail. This is due to the hundreds, thousands, or even tens of thousands of trades that Krieger's trading style involved. Thus, I have not attempted such a Herculean task of reconstruction. However, I have examined the periodic trading reports of Deerhurst and they all appear to be fully compatible with profit-seeking behavior. Given the clear incentives that Krieger faced, one would hardly expect to find anything else.

**Expert Report of Robert W. Kolb   December 12, 2006   31**

By way of briefest summary, Sala's expectations of making a "ton of money" would have been fulfilled if Krieger had replicated his historical performance. As we all know, however, "Past investment performance is no guarantee of future investment results." The failure of Krieger's trading performance in 2001-2002 to resemble his past performance fully explains Sala's investment losses and his evident disappointment.

**E. Conclusion**

In the fall of 2000, Sala believed he had found an investment opportunity with extremely favorable investment potential that would also provide significant tax advantages. He formed this belief after extensive due diligence concerning Deerhurst. He determined to begin with a test investment in late 2000. Through Deerhurst, Sala participated in hundreds of trades in 2000, and these included the 24 designated options discussed above that generated the tax basis in the partnership. These 24 options taken together not only had considerable profit potential, they actually did yield a profit when they were sold, and they also would have given a profit had they been held to expiration.

Buoyed by this initial success, Sala invested approximately $9 million in the Deerhurst program, which was to be managed by Andrew Krieger with a planned investment horizon extending from 2001-2005. Based on Sala's examination of Krieger's decade-long track record of 19% annual returns after expenses for an un-leveraged portfolio, Sala decided to invest in a leveraged portfolio in the pursuit of yet greater returns.

Had Krieger been able to replicate his earlier performance as he went forward into the 2001-2005 period, Sala would have made many millions of dollars after all fees and expenses. The entire

outcome of the investment project depended upon Krieger's continuing success. If Krieger traded with the same results he enjoyed earlier, all fees and expenses would have been covered with ease, leaving very rich returns for all of his investors. As events quickly began to prove in 2001, Krieger was unable to replicate his earlier successes. In some months and in some years, Deerhurst made trading profits, while in other periods they lost. However, looking at the overall results, instead of earning 19.32% per year as Krieger had been able to do in the past, the results for 2001-2002 for Deerhurst averaged -29.09% per year. The ultimate result was that Sala lost approximately half of his $9 million investment, a result that Sala certainly did not anticipate in 2000 and that ran so contrary to his reasonable expectations.

**Appendix**

In the past four years I have testified in only one matter as an expert: Jade Trading, LLC et. al. v. USA. In this current matter, my compensation for services rendered is $550 per hour. Finally, I attach my current *curriculum vitae* as an appendix to this report.