# EXHIBIT 6

# Pt. I of II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - -

CARLOS E. SALA and                    )
TINA ZANOLINI SALA,                   )
                                      )        Case No:
            Plaintiffs,               )        05-CV-00636-LTB-OES
                                      )
vs.                                   )
                                      )
UNITED STATES OF AMERICA              )
                                      )
                 Defendant.           )
------------------------------

# CERTIFIED COPY

THE DEPOSITION OF

CARLOS SALA

DENVER, COLORADO

SEPTEMBER 15, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  MARTHA H. BENNETT
FILE NO.:  A007B16

1

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF COLORADO

3                               - - -

4

5   CARLOS E. SALA and                 )
    TINA ZANOLINI SALA,                )
                                       )            Case No:
6              Plaintiffs,             )          05-CV-00636-LTB-OES
                                       )
7   vs.                                )
                                       )
8   UNITED STATES OF AMERICA           )
                                       )
9              Defendant.              )
    ------------------------------

10

11

12        Deposition of CARLOS SALA, taken on behalf of

13   Defendant, at 1550 17th Street, Suite 500, Denver, Colorado,

     Commencing at 9:41 a.m., Friday, September 15, 2006,

14   before Martha H. Bennett.

15

16

17

18

19

20

21

22

23

24

25

                                                                    2

1                         A P P E A R A N C E S

2

3

4        FOR THE PLAINTIFF:
         CHICOINE & HALLETT
5        BY:  DARRELL HALLETT, ESQ.
              MS. CONNIE TANG
6        Waterfront Place One, Suite 803
         1011 Western Avenue
7        Seattle, Washington 98104
         (206)223-0800
8

9

10       FOR THE DEFENDANT:
         U.S. DEPARTMENT OF JUSTICE
         TAX DIVISION
11             BY:  ANTON L. JANIK, ESQ.
                    DAVID N. GEIER, ESQ.
12                  AMY T. MATCHISON, ESQ.
         555 Fourth Street, N.W. 7, Suite 7911
13       Washington, D.C. 20001

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3   WITNESS:  CARLOS SALA

 4

 5   EXAMINATION                                    PAGE

 6   BY MR. GEIER.....................................5

 7

 8

 9   EXHIBITS:

10   113 - Curriculum Vitae..........................29

11   114 - Letter from Tracie Henderson to Carlos Sala;
            June 28, 2000.............................81
12
     115 - Letter from Tracie Henderson to Carlos Sala;
13          June 30, 2000.............................83

14

15

16

17

18

19

20

21

22

23

24

25
```

1            DENVER, COLORADO; SEPTEMBER 15, 2006

2                   - - -

3        MR. GEIER:  This is the deposition of Carlos Sala

4 we're taking today.  The parties have agreed to stop the

5 deposition to accommodate the needs of the parties.  That

6 would be without prejudice to either side to finish the

7 deposition at a mutually convenient date, time, and place.

8        Is that correct, Mr. Hallett?

9       MR. HALLETT:  So stipulated.

10               CARLOS SALA,

11         having first been duly sworn, was

12         examined and testified as follows:

13             EXAMINATION

14 BY MR. GEIER:

15      Q.    Good morning, Mr. Sala.

16      A.    Good morning, Mr. Geier.

17      Q.    We've met before, but just to be formal on

18 this record, my name is David Geier, and I'm one of the

19 attorneys for the United States and defending against the

20 refund action that you've brought.  With me is Anton Janik

21 and Amy Matchison.

22      I'm going to -- as we've done with all the

23 witnesses -- ask you a series of questions.  And if we can

24 try, as you're aware -- although we always haven't been

25 successful -- but if we can go by a couple of rules, that may

1    help us.

2              One would be to allow me to finish the question; and

3    I'll allow you to finish the answer.  Is that fair?

4              A.    Absolutely.

5              Q.    And both of us -- especially you in answering

6    the questions -- need to give verbal responses so that the

7    court reporter can type them up.  Is that fair?

8              A.    Yes.

9              Q.    If you don't understand a question, will you

10   let me know?

11             A.    I will.

12             Q.    If you need a break at any point, if you can,

13   give me a couple minutes' heads-up.  You don't need to tell

14   me why you need a break; just let me know that you're going

15   to need a break, and I'll try to conclude the thought process

16   so that we can take a break.

17             A.    I will do it.

18             Q.    Can you tell me where you live.

19             A.    I live at 2424 Ginny Way, Lafayette, Colorado

20   80026.

21             Q.    And how long have you lived there?

22             A.    Approximately eight years.

23             Q.    And prior to living at that address?

24             A.    I lived in Dallas, Texas.

25             Q.    And how long did you live in Dallas?

```
 1              A.     About eight years.

 2              Q.     Prior to that?

 3              A.     Prior to that I lived in Manhattan for about

 4   three years.  And prior to that, I lived in Atlanta for about

 5   15 years.  And I lived in D.C. for less than a year,

 6   somewhere in there.

 7              Q.     That takes us back to what year?

 8              A.     To when I was in high school.

 9              Q.     You were in high school in the District of

10   Columbia?

11              A.     No, no, no; in Atlanta.  I went to college in

12   D.C. for the first year.

13              Q.     So where did you start your schooling beyond

14   high school?

15              A.     American University, for less than a year.  I

16   was interested in business, and American, as you know, is

17   more driven to government-type careers.  And then I returned

18   to the University of Georgia.

19              Q.     Did you obtain a four-year degree from the

20   University of Georgia?

21              A.     I did.

22              Q.     Did you have a major?

23              A.     I had two majors:  Finance and accounting.

24              Q.     Within the four years?

25              A.     Yes.
```

```
1              Q.    Have you had any other formal schooling since
2    that time?
3              A.    No.
4              Q.    Do you hold any professional licenses?
5              A.    Yes, I'm a CPA.
6              Q.    And where are you licensed?
7              A.    In the state of Georgia, I guess.  I hadn't
8    thought about it 20 years, but it would be the state of
9    Georgia.
10             Q.    Do you keep up your license?
11             A.    No.
12             Q.    So you're not active?
13             A.    I'm not active.
14             Q.    And that's the only professional license you
15   hold?
16             A.    Yes.
17             Q.    Have you practiced as a CPA?
18             A.    Yes.  I started my career with Ernst & Young
19   in Atlanta, and started in the audit group.
20             Q.    Was that right out of school?
21             A.    Yes.  And I was with Ernst & Young for three
22   years in Atlanta, and then I transferred to the New York
23   office, where I joined their mergers-and-acquisitions
24   practice.  I was there for an additional three years.  So I
25   practiced for six years as a CPA.
```

1      Q.    Can you tell me about the work that you did at

2   Ernst & Young, maybe in general terms.

3      A.    Sure.   Initially, as an auditor, I would go

4   into mostly large companies and perform audits to support a

5   usually unqualified opinion on financial statements, issue

6   back fines.   That was mostly the work for the first three

7   years.

8      Q.    Let me follow up about the audits.   You were

9   verifying the financial statements of public companies?

10     A.    Yes.

11     Q.    What did that work involve?

12     A.    It involved a significant amount of

13  verification of the underlying accounts; discussions with

14  management; verification with external parties; lots of due

15  diligence; a fair amount of accounting work working with the

16  accounting departments.   Depending on how complex the

17  companies worked, the level of work would vary.   But all in

18  all, it was with a mind toward having enough work, even

19  documentary evidence, to be able to support an opinion.

20     Q.    An opinion that the financials were what they

21  purported to be?

22     A.    If it was an unqualified opinion, yes.   It

23  wasn't always an unqualified opinion, but that would be the

24  objective.

25     Q.    Can you explain what a qualified opinion would

9

1    be, then?

2              A.    Sure.   An unqualified opinion would say that,

3    We have no qualifications or no objections as to the

4    financial statements as stated.

5              A qualified opinion would provide some qualification

6    as to why it is that the accounting does not agree with the

7    financial statements as stated.

8              Q.    You mentioned a term as you were describing

9    the audit work.   You said "due diligence"?

10             A.    Yes.

11             Q.    Is that a term of art?

12             A.    It's a common term that's practiced by

13   accountants, bankers, attorneys.   And at that point in my

14   first three years, due diligence meant investigations,

15   discussion, confirmations to get a general understanding of a

16   particular issue.

17             So in the first three years, it was directly related

18   to issuing audit opinions, although sometimes we would do

19   maybe an agreed-upon engagement, which would basically mean

20   you don't have to issue an opinion; we want you to review, we

21   want you to send something, we want you to look at a business

22   for us and then report back to us and see if you have any

23   concerns.   That would be due diligence.

24             Now, when I moved to New York from Atlanta, my

25   due-diligence efforts and practice was very significant.   In

1    fact, most of the practice involved due-diligence efforts.

2    That's basically going into target companies that were to be

3    acquired by our clients and performing significant levels of

4    due diligence as to the target's operations, their financial

5    statements, their legal liabilities, trying to uncover any

6    potential liabilities that haven't been reported, and then

7    documenting all of that and reporting back to our clients.

8            So I would say 60 to 70 percent of our practice was

9    due diligence, in conjunction with attorneys, bankers.  You

10   know, the typical suspects you would see in a large

11   acquisition.

12           Part of the practice was consulting -- on-call

13   consulting -- where our clients were large financial buyers

14   for the most part, or strategic acquirers as well.  And they

15   would have questions about acquisitions, accounting, business

16   issues related to the acquisitions, and I would pick up the

17   phone and advise my clients.

18           Q.    You talked a lot about different types of due

19   diligence that you were doing.

20           A.    Yes.

21           Q.    What was your specific responsibility?  Was

22   there a team of people doing due diligence?

23           A.    Yes.

24           Q.    What was your role specifically in connection

25   with that effort?  And if it was different, if you could

1    elaborate.

2           A.    In a lot of the cases, I lead the team on a

3    day-to-day basis.  Usually there would be a partner that be

4    would in charge of the engagement, followed by a manager who

5    would actually run the engagement on a day-to-day basis.  I

6    was a manager.

7           Q.    So you reported to a partner?

8           A.    I reported to a partner -- to an M&A partner,

9    mergers-and-acquisitions partner.

10          So I was usually out in the field, visiting

11   companies, talking to targets, and I usually had people

12   reporting to me in these efforts as well -- more junior

13   personnel.

14          So I was heavily involved in the operation of the

15   due diligence efforts.

16          Q.    And pretty much always in the role that you

17   described?

18          A.    Yes.

19          Q.    Running it day-to-day?

20          A.    Yes.

21          Q.    And reporting to someone?

22          A.    To a partner.

23          Q.    And supervising people with less seniority

24   that you?

25          A.    That's right.

1          Q.     So the general question we had on the table

2     was what you were doing at Ernst & Young, and you talked

3     about the audit functions.  Can you shed light on the other

4     work that you did?

5          A.     Most of the discussion was on the due

6     diligence, and that was when I was in the

7     mergers-and-acquisitions group.  That's wasn't in the audit

8     group.

9          Q.     Okay.

10         A.     Ernst & Young had a separate group outside of

11    the audit group, based in New York, whose job was to consult

12    and provide due diligence to companies worldwide.  So I was

13    on the road most of my time.  It could be anywhere; wherever

14    the deal came up.  Basically, I was working all the time.

15         Q.     Is there a special type of practice that you

16    had or a specialty?

17         A.     Well, the due-diligence practice was really

18    the primary piece of the practice, but then there was also a

19    consulting piece.

20         Say, a banker was looking into making a loan for a

21    company to be acquired and they needed help in assessing the

22    projections of a company.  I would go in there and say, Okay,

23    I'll help you in looking at the business, understanding the

24    business environment of that company, understanding the

25    financials, and I'll help you with projections as well.

1          So we had a fairly significant effort in terms of

2     forecasting and projecting results for companies of all

3     sizes.

4          Maybe the smallest acquisition that I worked on was

5     as little as $30,000,000, but most of them were

6     multi-billion-dollar types of deals.

7          Q.    Who would define the scope of your work?  Was

8     it the client?  What was your role in defining the scope of

9     what you were doing?

10         A.    It was in conjunction between the clients and

11    us.  It didn't really need to be so well defined.  These were

12    sophisticated clients.  These were leveraged buyout firms.

13    This was in the 1980s.  There were a lot of leveraged buyouts

14    that we worked on.  Usually very sophisticated financial

15    acquirers, very senior people at companies that were

16    acquiring other companies, and we knew that they wanted us to

17    do a financial due diligence.  And we would agree together as

18    to what that meant.

19         Q.    Okay.

20         A.    If it was the usual, it meant reviewing the

21    financial statements, talking to management, trying to

22    uncover potential liabilities that hadn't been reported,

23    giving them a heads-up as to any potential losses that might

24    come up, working with attorneys on the legal side of any

25    cases that might be there and trying to quantify what those

1    might be.  That would be a typical engagement.

2          In some cases, they might say, I want you to go and

3    do something special somewhere.  Take a trip somewhere and

4    talk to the management and find out as much as you can about

5    how they run their businesses.

6          There was a lot of consulting and due diligence.

7    Pretty comprehensive financial due diligence.

8          Q.    Is there any other general type of work that

9    you did at Ernst & Young that you haven't described to me?

10          A.    No.  The only thing I would say is that there

11    was a lot of interaction with a lot of different parties.  We

12    interacted with the tax group in terms of due diligence.

13          And acquisitions -- there was usually a tax partner

14    that would look at the tax side, who would interact with that

15    person, who would interact with the client's attorneys, who

16    would interact with bankers that might be considering loaning

17    moneys for the acquisition.

18          Q.    And did there come a point in time when you

19    decided do leave Ernst & Young?

20          A.    Yes.

21          Q.    Was that your decision?

22          A.    It was.

23          Q.    How did that come about?

24          A.    One of my clients, a leveraged-buyout firm, a

25    very prestigious one comprised of Fortune 50 CEOs and

1    financial institutions that would provide the capital for

2    acquisitions, was considering the acquisition of a firm that

3    was based in Dallas, Texas.  That firm had operations in

4    Mexico and Canada, and we did an extensive due diligence on

5    the target.

6          After doing so much due diligence, you can really

7    get so involved in it that you become an expert on the

8    company, and in many cases you know more about the company

9    than a lot of the people in the company.

10         So this target, which was comprised of these

11   different operations, had companies all over the place.

12   Several different companies that were independently owned

13   were now going to be put under a group umbrella.  There

14   wasn't really anyone in the company that had sufficient

15   expertise -- financial expertise -- to run a now much bigger

16   company.

17         It was a $650,000,000 acquisition that was going to

18   be reporting to a board of directors -- and I note some

19   Fortune 50 CEOs -- very sophisticated investors, and they

20   needed more financial expertise within the company to be able

21   to handle that environment.

22         In addition to that, it was highly leveraged.  It

23   had over $650,000,000 in purchase price; it had $450,000,000

24   or so in debt.  So we now had 20 to 23 banks that we had to

25   report to.  We had international operations; we had currency

1    issues; we had the Mexican operation, which was a

2    $100,000,000 business.

3          So they came to me and asked if I would join them,

4    initially as executive vice president of international

5    operations, which basically meant I had responsibility and

6    oversight over the operations outside of the U.S. -- that

7    meant Mexico and Canada -- and spend most of my time with the

8    Mexican business.

9          That Mexican business used a functional currency of

10   a peso, so it had significant exposure to fluctuation for the

11   peso in terms of being a dollar-denominated investor.  This

12   company, which is called Dal-Tile International, was a

13   significant purchaser of foreign equipment, both in its fixed

14   assets and also in inventory for resale.  Most of that

15   equipment came from Italy and other places around the world,

16   as well.

17         Usually, back then -- it was prior to the euro -- so

18   we were buying products and property that were denominating

19   in lira.  So we had exposure also with foreign currency.

20         So my first year and a half was to basically help

21   manage that business.  I reported to the board of directors;

22   I reported to the CEO; I helped the CEO to report to the

23   board, as well; I would make presentations to the board as to

24   those operations.

25         After a year and a half, they needed a more

17

1  sophisticated CFO, so I stepped into the CFO role.  I was

2  fairly young at the time, though; I was thirty years old.

3  Time does pass quickly, if you think about it.

4          Q.   Not today, it won't.

5          A.   I'm sure you're right.

6          Q.   I just want to say, for the record, I think I

7  got your counsel to smile -- probably for the first time.

8          A.   Put that on the record.  That would be a

9  first.

10         MR. HALLETT:  He's giving a narrative here.  I

11 assume that's okay with you.  It gets it all out there.

12         MR. GEIER:  I'm fine with that.

13         THE DEPONENT:  I'm trying to answer it the best I

14 can.  Is that okay?

15         MR. HALLETT:  Sure.  When we get to the guts of the

16 deposition, then we'll tighten it up a little bit.  If the

17 government wants to know your background, just tell them.

18         Q.   (By Mr. Geier)  Please go on.

19         A.   So a year and a half after being with the

20 company, I went into the CFO role.  My role changed.  Now I

21 had complete responsibility of the financial operations of

22 the company, which included the Mexican operations, the

23 Canadian operations, but also the U.S., which had 11

24 manufacturing plants, 285 retail locations, 8000 employees.

25 Complex business.

1               So I spend a fair amount of time on the operations,

2     but I also spent a ton of time with the bankers and the

3     investors.  So I was in New York most of the time.  I was

4     going back and forth for meetings and things like that.

5               We did a lot of financings and refinancings.  It was

6     leveraged before; then we took it public.  We refinanced

7     roughly $500,000,000 worth of debt; about $1,000,000,000

8     worth of capital.  Many different types of transactions.

9     Very big business doing all of that.

10              And then I was there until Abacus Direct --

11              Q.    Don't move on yet.

12              MR. HALLETT:  Yeah, let him ask the questions.

13              Q.    (By Mr. Geier)  A couple of questions before

14    we get on to Abacus.  I think that was an efficient way of

15    doing things.

16              First, what was your salary range while you were at

17    Dal-Tile?

18              A.    Yes.

19              Q.    Could you spell it for the reporter?

20              A.    D-a-l T-i-l-e International.

21              Q.    What was your salary range?

22              A.    I'm going to give you my best estimate.  I

23    think when I joined, which was back in 1990, I think my

24    initial base salary was $125- plus -- I think my cash

25    compensation was like $175,000.  Plus I had approximately, at

```
 1    that point, 200,000 in options.

 2              Q.    In options?

 3              A.    In options.  Which was supposed to be worth

 4    millions of dollars; it didn't turn out to be that.  That was

 5    the initial salary.  Then it progressed from there, and I was

 6    at $225- plus a bonus of about $200.  So I started at about

 7    $175,000 cash compensation and then it went onto probably

 8    $400-

 9              Q.    Of cash compensation?

10              A.    Of cash compensation.

11              Q.    Plus bonuses?

12              A.    Plus the options.

13              Q.    Plus bonuses?

14              A.    Well, the cash compensation would have

15    included the bonuses.

16              Q.    Okay.

17              A.    The options would have been separate.  And

18    when I left, I think I had over 300,000 shares of options.

19              Q.    How much was that worth around that time?

20              A.    It varied.  At some point, it was probably

21    worth about $3,000,000.  And, ultimately, by the time that we

22    were able to register the shares, they became worthless.  So

23    it went from 3- to 0.

24              Q.    So there were restrictions on the shares?

25              A.    Restricted shares.
```

1        Q.    So you couldn't sell them?

2        A.    No.

3        Q.    Did you have a financial advisor?

4        A.    No.

5        Q.    You were your own financial advisor?

6        A.    Yes.

7        Q.    Did you have your own investments at the time?

8        A.    Somewhat.   Much more limited than I do now.

9        Q.    Can you describe them generally?   I'm not

10  asking what you were invested in.   But would it have been

11  stocks or --

12       A.    It would have been stocks and maybe some

13  bonds.   But frankly, I was too busy in my professional career

14  to spend much time on the investment side.

15       Q.    A couple more questions.   You mentioned

16  currency because part of the entity is not in the United

17  States.   So there was concern about protecting against swings

18  in the difference between the dollars and the pesos?

19       A.    Yes.

20       Q.    What was your role, if any, in handling that

21  part of the company?

22       A.    I was the primary person in managing that risk

23  of exposure.

24       Q.    Did you hedge?

25       A.    We hedged.

1          Q.    Can you explain what you did in your role.

2          A.    Sure.   Fortunately, we're almost naturally

3    hedged, because we manufactured in Mexico.   That meant that

4    we had peso-denominated costs.   And 50 percent of our

5    revenues were domestic in Mexico, so we were able to cover,

6    to a large extent, our cost exposure in Mexico.

7          Now, 50 percent of our revenues in that operation

8    was coming up to the States and was dollar-denominated.   So

9    as the peso devalued, actually we were getting more pesos, so

10   it was a natural hedge.

11         When we were making purchases of inventory and

12   property, what we would try to do -- instead of being at the

13   risk of the market when we had to pay for the goods, we would

14   buy forwards and try to match the timing of the payment to

15   the forwards.   So you get a futures contract.

16         Q.    Just so we're clear on the record about a

17   "forward," can you --

18         A.    That would be a contract to buy a currency at

19   some future date.   And typically, you try to match that date

20   to when you have an obligation.   So that would be hedging

21   yourself.

22         Q.    Did the firm have a broker or someone who they

23   put these transactions through?

24         A.    Yeah.   I'm sure we had -- we had many banking

25   relationships, so I forgot it.   It was a Dallas-based bank

1    who actually did our currency trading, and I forget the bank.

2              Q.    Who determined how many forward contracts to

3    buy or the value of a forward contract?  Was that you?

4              A.    It was either me or someone that worked for

5    me.

6              Q.    You had the ultimate authority?

7              A.    Yes.  I guess the ultimate authority would be

8    with the CEO, but he delegated that with me.

9              Q.    And you started to mention Abacus.

10             A.    Yes.

11             Q.    So there came a time when you left Dal-Tile?

12             A.    Yes.

13             Q.    How did that come about?

14             A.    Do you want me to give a narrative again?

15             Q.    Sure.

16             A.    All right.  When I was with Dal-Tile, I

17   received a call from a headhunter --

18             Q.    Let me back up for a second so I don't forget

19   this.  Who was the leveraged-buyout firm that you were

20   talking about?

21             A.    AEA Investors.

22             Q.    Sorry about that.  Go ahead.

23             A.    When at Dal-Tile, I received a call from an

24   executive recruiter out of New York, who knew someone that I

25   had worked with at Ernst & Young.  He presented the Abacus

1    Direct opportunity.

2         Now, at that point, the revenues of my company were

3    about $700,000,000 a year and Abacus's revenues were about

4    $17,000,000 a year.  So we were doing Abacus's business in

5    about three days.

6         So I said, This doesn't make any sense to me.  But

7    the guy was convincing enough that he said, Look, whenever

8    you're in New York, let's meet.  Or I'll tell you what, I'll

9    come down to Dallas and I'll meet you at the airport.

10        So we met at the airport and he was a great guy.

11        Q.    Who was it?

12        A.    Ted Kister (phonetic,) the headhunter.  He

13   explained the Abacus business model.  That was intriguing to

14   me, because we struggled to make margin in my business, and

15   Abacus's business had a very, very high margin -- like 40

16   percent net margins.

17        As a result of that, I said, Well, that may be an

18   interesting opportunity to look at.  He sent more

19   information.  They had gone public; the public offering was

20   very successful.  And we decided the next time I would be in

21   New York, I would meet Tony White.

22        You know Tony now; he's a very charming type of guy.

23   I met with him and I immediately liked him.  Spent three

24   hours at lunch that first initial meeting, and I thought, You

25   know, maybe I should look at this more closely.

24

```
 1              I met some of the other people and got a better

 2    handle on the business model.  And then, I think before it

 3    was fashionable to go from a large company to a small

 4    company, I made that decision to go.

 5         Q.    When was this?

 6         A.    This was in 1997.

 7         Q.    And what was your compensation coming into

 8    Abacus?

 9         A.    I think my base was about $225- plus a bonus

10    that would have been similar to what I was making at

11    Dal-Tile.  But my options was really the attractive piece of

12    this, because it was, I think, 300,000 options.

13         Q.    300,000 --

14         A.    Options.

15         Q.    What does that mean?

16         A.    Stock options that were issued upon --

17         Q.    You're talking about shares?

18         A.    No, stock options.  Options to buy 300,000

19    shares.

20         Q.    At a set price?

21         A.    At a strike price, yes.

22         Q.    So coming in, you were awarded from the

23    get-go?

24         A.    Yes.  And the compensation went up from there,

25    both on the cash side and on the stock-option side.
```

1          Q.    What were your responsibilities there?

2          A.    I was responsible for all the financial

3    functions, which included, of course, accounting and finance,

4    and also the legal side and dealing with the attorneys.

5    Strategic planning; really working on the strategic direction

6    with the CEO, Tony White, and the board, and I did all kinds

7    of deals.

8          If there was a significant deal to be done within

9    the company -- joint ventures, partnerships, things like

10   that -- I would either review them, or I would negotiate

11   them.

12         Q.    When you say "review them," like in a

13   partnership, meaning reviewing the terms of the deal?

14   Reviewing the partnership?  What?

15         A.    Yes.

16         Q.    All of that?

17         A.    All of that, yes.

18         Q.    Okay.

19         A.    If there was a deal that was being negotiated

20   by, say, someone in the operations side to work with a

21   partner, they would come to me and say, Hey, is this okay to

22   do?  I would review the documents, and I had say, Yeah, it's

23   okay.

24         But if it was a significant deal, I was involved in

25   negotiating it.

```
 1              Q.    The different types of entities -- business

 2     entities -- you were familiar with them in your capacities

 3     with Dal-Tile and then Abacus.  Did you deal with LLCs?

 4              A.    I'm sure I did.

 5              Q.    S Corporations?

 6              A.    Perhaps.

 7              Q.    Partnerships?

 8              A.    I'm sure we had partnerships.

 9              Q.    Okay.  Other responsibilities at Abacus?

10              A.    No, I think that covers it.

11              Q.    And can you tell us very briefly what the

12     company did?

13              A.    Sure.  The company had the largest database of

14     consumer purchasing behavior.  What that means is:  They had

15     a huge database of almost everyone in the United States,

16     about 95 million households of non-face-to-face purchases;

17     that means through a catalog -- back then it wasn't on

18     line -- but those types of purchases.

19          What happened is we would aggregate these purchases

20     and these database on five modeling techniques and try to

21     predict who would be the best candidate to provide new

22     marketing offers to -- for instance, sending a catalog to.

23     And it was mostly in the catalog industry.

24              Q.    Let me ask you:  It's fair to say -- and

25     probably quite obvious at this point -- that in your
```

1    experience up to this point that you have reviewed a large

2    amount of financial data?

3            A.    Yes.

4            Q.    Sifted through it to learn what it means?

5            A.    Yes.

6            Q.    You've also created and reviewed financial

7    forecasts?

8            A.    Many, many, many times.

9            Q.    Ever do a break-even analysis?

10           A.    Sure.

11           Q.    What is that?

12           A.    A break-even analysis would be where you would

13   quantify the cost of a project and try to quantify the

14   potential profits of that project, and determine when the

15   profits generated would cover your costs.  So that would be

16   break-even at that point.

17           Q.    That's something you were comfortable with?

18           A.    Yes.

19           Q.    Were part of your responsibilities, up to this

20   point in time -- did they involve computing the potential

21   returns on investments?

22           A.    Yes.

23           Q.    In your modeling and in your analysis, were

24   you taking into account before- and after-tax considerations?

25           A.    Yes.

1          Q.    That is projecting returns before tax and

2    after tax?

3          A.    Yes.

4          Q.    That's something you were doing yourself?

5          A.    Yes.

6          Q.    That was important to your job?

7          A.    Yes.

8          Q.    I know we spent a lot of time talking about

9    your experience, which I've asked you to do; but let's go

10   ahead and put your resume in.

11         (Exhibit 113 marked for identification.)

12         Q.    I'm showing you Exhibit 113, which appears to

13   be a resume that you produced to the government in connection

14   with this case.  Do you recognize that?

15         A.    Yes, I do.

16         Q.    Is this a fair and accurate description of

17   your professional experience?

18         A.    Yes, it is.

19         Q.    And your education?

20         A.    Yes.

21         Q.    Okay.  Are there any additions to this?  Is

22   this the latest version?

23         A.    Yes.

24         Q.    You started with Abacus in 1997?

25         A.    Yes.

1          Q.    And what was your compensation in the final

2    year?  Was it 1999 when you left?  Is that right?

3          A.    Yes.  I think my cash compensation that year

4    would have been close to a half a million dollars, with

5    salary and bonus, plus stock options.

6          Q.    Did there come a point when you started to

7    exercise the stock options?

8          A.    Yes.

9          Q.    Well, first, you left the company in 1999?

10         A.    Yes.

11         Q.    What happened?

12         A.    We were acquired by a New York-based firm

13   called DoubleClick.

14         Q.    And you were not asked to stay on?

15         A.    I could have.

16         Q.    Were you asked to stay on?

17         A.    I could have.  I had no desire to be the CFO

18   of a subsidiary of a bigger company.

19         Q.    So you made a decision to stop with Abacus and

20   DoubleClick?

21         A.    Yes.

22         Q.    So you never worked with DoubleClick?

23         A.    No.  I think I left just about the time that

24   the acquisition closed.

25         Q.    When did you leave?

```
 1              A.    I think it was December of '99.  I think.

 2              Q.    Okay.

 3              A.    I'm a little fuzzy on the dates exactly.

 4              Q.    Did you exercise the options in 1999?

 5              A.    Perhaps.  I would have -- if I did, it would

 6       have been early in the year, because we entered into a

 7       contract to sell the business in June of '99.  Once that

 8       happened, you're not allowed to sell.

 9              Q.    You're locked up at that point for a period of

10       months?

11              A.    Yes.

12              Q.    Six months?

13              A.    I think it was maybe more, because we had to

14       wait -- DoubleClick accounted for the transaction of the

15       pooling arrangements.  So, as a result of that, you had to

16       wait until the year-end financial statement was actually

17       released to the public, which would have been in February of

18       2000.

19              Q.    Do you have any idea of what your total

20       compensation, including the exercise of options, was in 1999?

21       A rough estimate.  Are we looking at over $1,000,000?  Are we

22       looking at over $5,000,000?

23              A.    This is an estimate.  It would probably be

24       over $1,000,000, but I could be wrong.

25              Q.    And well below $5,000,000?
```

```
 1          A.     Yes.

 2          Q.     Who is Christopher Dice?

 3          A.     Christopher Dice is Abacus's chief operating

 4   officer.  Somewhere after I was hired, our chief operating

 5   officer relocated to New Hampshire.  He remained with the

 6   company, but we needed someone to replace him, and Tony White

 7   and I recruited Chris Dice.

 8          Q.     What was the line of authority between the

 9   three of you?

10          A.     Cris Dice and I both reported to Tony White,

11   independently.

12          Q.     And on the corporate ladder you were equals?

13          A.     Yes.

14          Q.     In terms of lines of authority?

15          A.     Yes.

16          Q.     Was Christopher Dice a friend of yours?

17          A.     Yes, he's a friend.  At the time, he wasn't,

18   but we became friends.

19          Q.     Do you still stay in touch with him?

20          A.     Yes.

21          Q.     How often do you talk to him?

22          A.     Well, my guess is we talk about once a month.

23   I was doing some strategy consulting for a New York-based

24   firm recently, and they needed a CEO, and I referred Chris to

25   the company.  So as a result of my consulting services, we
```

```
 1   touch base about once a month.

 2           Q.    Do you maintain a friendship, though?  Or is

 3   this a business relationship?

 4           A.    We maintain a friendship, but most of our

 5   discussions are about this business.

 6           Q.    And Mr. White -- is he a friend of yours?

 7           A.    Yes.

 8           Q.    Is he a close friend?

 9           A.    Absolutely.

10           Q.    When you were with Abacus, did there come a

11   point when you hired brokers or financial advisors for your

12   own personal needs?

13           A.    I used brokers to execute my transactions.  I

14   didn't really -- I didn't pay for their advice, actually.

15           Q.    Did you stay with the same brokers?

16           A.    No, I've changed.  I've done business with

17   Merrill Lynch; I've done business with Goldman and Morgan

18   Stanley.  I probably had a Charles Schwab account back then.

19           Q.    Did you?

20           A.    Yes, probably.

21           Q.    When did you first engage Goldman Sachs to do

22   work for you?

23           A.    Well, as a result of our merger with

24   DoubleClick, Goldman was representing DoubleClick.  And I

25   knew Goldman from a prior history.  At AEA Investors, the
```

33

```
 1    chairman of that group used to be the co-chairman of Goldman

 2    Sachs.  And I had done an IPO with Goldman -- not an IPO, a

 3    dead offering with Goldman.

 4          So I knew Goldman.  They were on the other side of

 5    DoubleClick.  And I think some people in the private banking

 6    group asked to be introduced to us during the time of the

 7    acquisition with DoubleClick.  So that would have been late

 8    '99, maybe.

 9          Q.    Okay.  And did someone from Goldman become a

10    broker or a representative for you?

11          A.    Yes.

12          Q.    Who was that?

13          A.    Tim Dolan.

14          Q.    Anybody else?

15          A.    Bill Scherr.

16          Q.    And anyone else?

17          A.    We had a team.  They were junior analysts.

18    There was another guy named Ron Roderick.  And there was a

19    very junior analyst, but I forgot her name.

20          Q.    What kind of work did they do for you?

21          A.    A number of things.  They helped me execute

22    the sale of my DoubleClick stock, which we did in conjunction

23    with daily trades and that kind of thing.  But I was heavily

24    involved in executing the trades with them.

25          They would bring ideas for investment proposals.  We
```

1    did a fair amount of option trading in the year 2000; a fair

2    amount of straddles -- covered.  And just general investment

3    advice.

4              Q.    Did you have a main point of contact?

5              A.    It was Tim Dolan first, and then Tim left the

6    firm.  And then Bill Scherr became the main point.

7              Q.    Does Goldman Sachs have a reputation in

8    foreign currency?

9              A.    Sure.

10             Q.    What is that reputation?

11             A.    One of the leading brokers in the world and

12   traders of foreign currency.  Probably one of the top firms

13   trading currencies and expertise.

14             Q.    How did you compensate Goldman Sachs?  How was

15   Goldman Sachs compensated for the work they did for you?

16             A.    They would charge a commission on trades.

17             Q.    Did they charge a management fee?

18             A.    No.

19             Q.    Just execution?

20             A.    Yes.

21             Q.    Do you know what that commission was?

22             A.    It varied.  I can't remember what it was.  It

23   was so many cents per share on equities; it was so many

24   dollars per thousand on bonds.  On option ideas, I think it

25   was about 1 percent of the round-trip trade.  That's about

1     it.

2              Q.    Was there any lockup period you had with

3     Goldman when you couldn't withdraw your money?

4              A.    No.

5              Q.    You could take your money any time you wanted?

6              A.    Yes.

7              Q.    It's your money?

8              A.    Yes.  But I might add:  They did present a

9     number of investment opportunities to me on their buyout

10    funds, where if I had invested, I would not have been able to

11    take my money out.

12             Q.    And the purpose of those investments was to

13    acquire something?

14             A.    Yes.

15             Q.    To acquire a business?

16             A.    Both for businesses or doing trading on

17    securities, as well -- opportunistic trades.

18             Q.    Why was there a lockup for buying securities?

19             A.    You would commit so much money in the fund;

20    the fund would be looking for acquisition targets; but in the

21    meantime, it was trying to maximize its profit potential.  So

22    if there was a discount debt that they felt was attractive

23    somewhere in the world, they would go out there and buy it.

24             Q.    But the goal was for the fund to have enough

25    resources to buy entities when it thought it was good to do?

```
 1              A.     That's right.

 2              Q.     Okay.  I think you mentioned that Goldman

 3   Sachs did covered straddles for you in 2000?

 4              A.     Yes, I believe that's right.

 5              Q.     Who came up with the ideas, and what are

 6   covered straddles?

 7              MR. GEIER:  I know that's compound, but if Counsel

 8   will permit...

 9              MR. HALLETT:  That's all right.

10              A.     Goldman came up with the ideas, and I would

11   look at them and agree or disagree as to whether we should be

12   doing them.

13              A covered straddle, in the form that I remember

14   doing it, would take different forms.  First, a straddle.  A

15   straddle would be selling or writing a call option and buying

16   a put option.  And usually in a straddle, those two are out

17   of the money.  Actually, in a straddle, they would be in the

18   money.

19              We were doing strangles.  Strangles are out of the

20   money.  Is that clear?  Should I go through that again?

21              Q.     (By Mr. Geier)  Just if you could explain the

22   general transaction, that would be helpful.

23              A.     So we're buying put options and writing call

24   options.  Most of the time, we were out of the money, in

25   terms of the options; and that would have, by definition,
```

37

1    meant a strangle.

2           If those options had been in the money, that would

3    be more of a straddle.  And they were covered because the

4    underlying security on the option was common stock that I

5    actually owned; that's what made it covered.

6           Q.    But you had the stock already?

7           A.    Yes.

8           Q.    What was the relationship between the call

9    options and the put options?  Were they approximates of each

10   other in value?

11          A.    Typically.  Because the puts -- well, in this

12   case, the calls would fund the puts -- the purchase of the

13   puts.  If you were writing calls, you were getting premiums,

14   and you were taking those premiums and buying puts.  So they

15   were fairly close.

16          Q.    So at the point of entering the transaction,

17   you weren't coming up with the cash?

18          A.    Maybe some cash.

19          Q.    The difference between the two -- the call and

20   the put?

21          A.    Right.

22          Q.    But to the extent that they offset each other,

23   you just came up with the difference?

24          A.    That's right.

25          Q.    Am I going to be graded after this?

1        A.      I thought about that.

2        Q.      When did you start working with Goldman Sachs?

3        A.      In 2000.

4        Q.      What percentage of your assets did you place

5    with Goldman Sachs?

6        A.      At some point I placed most of my assets

7    there.  I say that -- they exercised all of my stock options,

8    so they received the proceeds.

9        But I thought it would be wise -- there were

10   significant assets, so I thought it would be wise to use

11   another firm as well.  To keep them honest, frankly, and

12   mostly on fees.

13       Expertise, they had it.  But I wanted to make sure

14   that the fees I was being charged were reasonable relative to

15   other firms, and at that point I directed some of my money to

16   Morgan Stanley, after I had exercised.  Morgan Stanley never

17   exercised any shares for me.

18       Q.      At some point you shifted some money to Morgan

19   Stanley?  Assets?

20       A.      Yes.

21       Q.      When was that?

22       A.      It would have been somewhere between the

23   spring and summer of 2000.

24       Q.      At the point where you shifted your assets

25   between Goldman and Morgan Stanley, can you give a percentage

1    of who had what amount?

2           A.    Almost 50/50.

3           Q.    And you said "keep them honest."  In terms of

4    commissions?  What did you mean by that?

5           A.    What that meant is:  Commissions on trades can

6    be negotiated, whether they say it or not.  I was putting

7    most of my money in fixed income.

8           Q.    Is that bonds?

9           A.    Bonds, yes.  Transparency in that fixed-income

10    market -- which is the bond market -- as a buyer, especially

11    in the year 2000 -- it's changed somewhat since then -- and

12    when you're buying corporate bonds or municipal bonds,

13    transparency as to how much you're paying is (inaudible).

14        I would actually say it was impossible for the

15    average investor to actually know.  Trust me, because I've

16    tried extremely hard to get transparency.

17        So one way -- as much as I've tried, actually, I

18    don't think you can get 100 percent.  But one way to figure

19    out whether the price that's being quoted to you by a bond is

20    go somewhere else and see where it's quoted.

21        If somebody says, 110.50 on this bond, you don't

22    know the spread that the bank is keeping.  Aside from the

23    commission that they're charging -- you do know what the

24    commission is, and that's negotiated, as well.

25        But that's not where the money is many times for

1     these banks.  The money is in between the spread at which

2     they buy it and what they sell it to you.  It's very

3     difficult to know that.

4              Since then, there's been databases that record where

5     transactions are.  It's much easier on equities than it is on

6     fixed income.

7              Q.    So you have Morgan Stanley quote you and

8     Goldman Sachs quote you, and take the best deal?

9              A.    And sometimes on the bond.  I'll give you an

10    example.  One time I sold a bond where I said, Goldman, give

11    me the best price you can.  I made a phone call five minutes

12    later:  Morgan, give me the best price you can.  The

13    difference was $15,000 on this one bond.

14             That's what I mean by "keeping them honest."

15    "Keeping them competitive" is a better description.

16             Q.    Fair enough.  What about your accounting

17    situation in 1999?  Did you have an accountant?

18             A.    Yes.

19             Q.    Have we gone through all your investment

20    advisors in the 1999-2000 period?  Or are there other people

21    you worked with?

22             A.    No one else had any significance.

23             Q.    And what were the assets you claimed -- in the

24    summer of 2000, when you said it was 50/50, what's the total?

25             A.    Roughly 58- $60,000,000.

1          Q.     So you split 30-and-30 in rough numbers?

2          A.     Rough numbers.  Very rough.

3          Q.     And who were the people at Morgan Stanley?

4          A.     I started with a guy named Bruce Adam

5     (phonetic), but quickly developed into a team, because we

6     needed more expertise, especially in the fixed-income market.

7     So I dealt with Kevin Crumb, who was a fixed-income

8     specialist, and Chris O'Neal.

9          Q.     Let's talk about your accountants first and

10    then go back.  Did you have an accountant in 1999?

11         A.     Pricewaterhouse.

12         Q.     How long had you been with them?

13         A.     Two years, maybe.  When I joined Abacus.

14         Q.     Any problems with them?

15         A.     No.

16         Q.     And were they working for Abacus, too?

17         A.     Yes.

18         Q.     Any problems with the relationship between

19    Abacus and Pricewaterhouse?

20         A.     No.

21         Q.     Who were your points of contact?

22         A.     John Raby was my most senior contact, and

23    underneath him was Kevin Overburg (phonetic).

24         Q.     Now, I didn't distinguish.  Was that a point

25    of contact personally or professionally?

1          A.    Personally.  Professionally it was audit

2    group, tax group.

3          Q.    How did you get in touch with Mr. Raby?

4          A.    He got in touch with me.  He would come visit

5    once a quarter and say, Here's some estate-tax planning ideas

6    that we might be able to help you with.  We can help you with

7    investment -- I frankly didn't look at accounting firms as

8    investment advisors, so I really didn't give it much weight.

9          I started to have access to Goldman Sachs and

10   Pricewaterhouse to give me investment advice.  I didn't think

11   that was very (inaudible).  But he tried, to his credit.

12   Probably once a quarter, he could come in and try to have

13   discussions with me -- create a relationship.

14         Q.    He wasn't your accountant at Pricewaterhouse,

15   or was he?

16         A.    It's interesting, because I heard his

17   deposition a few days back, and I viewed him as part of "my

18   accountant."  I mean, he and Kevin sort of were -- I thought

19   Kevin reported to John Raby; maybe I'm wrong.  So I viewed

20   both of them as being on my account as a team, whose primary

21   responsibility was tax compliance, but could offer ideas for

22   tax and estate planning.

23         Q.    How were they compensated?

24         A.    On an hourly basis.

25         Q.    Kevin Overburg for his time?

43

```
 1           A.    Yes.

 2           Q.    And John Raby for his time?

 3           A.    Yes.

 4           Q.    What was the range of fees?

 5           A.    I can't recall.

 6           Q.    Are we over $300 an hour for these guys?

 7           A.    You know, Pricewaterhouse is a pretty

 8    expensive firm, so I can't recall.

 9           Q.    Not even a rough estimate?

10           A.    I know what rates are for firms of that size.

11    $300 might be a good idea.

12           Q.    Okay.  And did you have in your mind a

13    distinction between what Kevin was doing and what John was

14    doing?

15           A.    Somewhat.  I looked at Kevin more as strictly

16    compliance; strictly doing my return.  I looked at Raby as

17    supervising that function, but also more expansive in terms

18    of financial services.

19           Q.    What type of financial services did he provide

20    to you in 1999 and 2000?

21           A.    He was proposing to provide estate tax

22    planning services and investment-management services.

23           Q.    I'm not sure what that means.

24           A.    Meaning, if I wanted to have Pricewaterhouse

25    look at my portfolio and say, Hey, your asset allocation
```

1    seems right, or, You need change it.  Things like that.

2            Q.    Did they do that?

3            A.    No, I never hired him for it.  He would

4    propose that, but I never hired Pricewaterhouse to do that

5    work.  I just don't think that's really their core business.

6    They wanted it to be part of their business, but it wasn't

7    their core business.

8            Q.    In what context were you paying for John

9    Raby's time?

10           A.    In the context of supervising the compliance.

11   But, you know, I don't recall the bills that he would send

12   me, but if I had received a bill that said, "Kevin Overburg,

13   so many hours, tax-return preparation; John Raby, so many

14   hours, tax-return preparation," I would have thought that

15   he's supervising Kevin.  But I can't recall the bills.

16           Q.    So Kevin came to you with ideas -- ?

17           A.    No, John Raby did.

18           Q.    I'm sorry, John came to you with ideas.  Can

19   you recall any context in which you engaged his services

20   specifically?

21           A.    No, I never engaged him on any of his

22   services.  He would market them, but I never engaged him.

23           Q.    How much time would you estimate that he spent

24   with you in 1999 and 2000 pitching ideas?

25           A.    I would say an estimate would be an hour a

1    quarter.  I would talk to him for an hour.

2              Q.    Did he talk to you about your financial goals,

3    so that he knew what ideas to pitch to you?

4              A.    He might have, but I can't recall.

5              Q.    Did you talk to him about what was happening

6    with you personally at Abacus?

7              A.    I can't recall.

8              Q.    Did you ever tell Mr. Raby that you were going

9    to or did receive a large amount of income in 2000, and that

10   you would like him to pitch some ideas to you?

11             A.    No, never.

12             Q.    And you don't know if he knew that you had

13   that income?

14             A.    My guess would be that, since I was a client

15   and was with a very successful business, and the fact we had

16   sold the business for a large amount, if he was any kind of

17   practicing financial-services advisor, he would have to

18   figure it out.

19             Q.    But you never sat down with him?

20             A.    No.

21             Q.    You never asked for his help?

22             A.    No, never.

23             Q.    How long were you with Morgan Stanley?

24             A.    Well, spring or summer of 2000.

25             Q.    Okay.

1          A.     Until maybe three months ago, when my main

2    contact at Morgan Stanley left the firm and I followed him.

3          Q.     To?

4          A.     To McDonald Financial Group, which was just

5    acquired by UBS.

6          Q.     Is Goldman Sachs still handling any of your --

7          A.     Yeah.

8          Q.     Do you know what it means if a company is

9    undercapitalized?

10         A.     I have an idea.

11         Q.     What does that mean?

12         A.     It would mean that its capital base may not be

13   sufficient to support its asset base and liabilities.

14         Q.     What are the ramifications of that?

15         A.     Potentially, if there are significant losses,

16   the company could be unable to pay or really satisfy the

17   losses.

18         Q.     Have you heard the term "thinly capitalized"?

19         A.     If it's a term that's a legal term, no.

20         Q.     Have you heard the term at all?

21         A.     No.

22         Q.     Okay.  Do you know what a "blended cash

23   currency and option strategy" is?

24         A.     No.

25         Q.     Have you ever heard that before?

47

1          A.      Blended cash?

2          Q.      Blended cash currency and option strategy.

3          A.      The answer is no. You can make assumptions

4   from the title what it is; but, no, I don't.

5          Q.      Never asked anybody what it was?

6          A.      No.

7          Q.      And just hearing the name, you don't know what

8   it is?

9          A.      You know, it sounds familiar, like I've dealt

10  with it sometime in my career or whatever. But I can't tell

11  you the specifics of it right now.

12         Q.      Where do you think you might have heard it?

13         A.      Maybe in my finance books, talking to people

14  who were pitching options. I don't know. It could be

15  anywhere. Maybe reading.

16         You know, I've read a fair amount about options in

17  different publications; I've read the SEC. There's actually

18  a publication called "Characteristics of Options" -- required

19  reading for option traders -- that banks give you. I may

20  have heard about it there, too.

21         Q.      But aside from having heard about it, you're

22  not very familiar with it?

23         A.      No.

24         Q.      Is it fair to say, then, that as of the fall

25  of 2000, you were happy with Goldman Sachs?

```
 1              A.    Yes.

 2              Q.    And had confidence in them?

 3              A.    Yes, although we had lost some money on my

 4      option trades; I wasn't too happy about that.

 5              Q.    Trades that they had advised you on?

 6              A.    Yes.

 7              Q.    Part of investing is "sometimes you win;

 8      sometimes you lose"?

 9              A.    You do; but, frankly, I take it very

10      seriously.  That sounds like a casual way of looking at it.

11              Q.    But it's a fact of investing?

12              A.    It is a fact.  But I was losing money in some

13      of those trades, and I was very upset about that.

14              Q.    So did you get out of those trades?

15              A.    Yes.

16              Q.    You didn't have to wait for any periods of

17      time to get out of them?  You made the decision of when you

18      wanted to exit?

19              A.    Yes.

20              Q.    Did you pull money from Goldman Sachs as a

21      result of that?

22              A.    I did.  I gave more money to Morgan Stanley.

23      It was a conjunction of two things:  That -- but then I had a

24      discussion with Morgan Stanley [sic] where they were trying

25      to change the business arrangement where they wanted to start
```

1   charging an asset-management fee, and I told them that I

2   wasn't going to do that.  So I stopped giving them more

3   money.

4           Q.    Morgan Stanley?

5           A.    No, Goldman Sachs.  And I gave the money to

6   Morgan Stanley.

7           Q.    What period of time was this?

8           A.    This was probably sometime in 2000 or 2001.

9           Q.    How much money did you end up leaving with

10  Goldman Sachs after the time that they advised you of

11  management fees?

12          A.    It was about $14,000,000, I think, that I had

13  access to that I directed to Morgan Stanley.

14          Q.    And how much was at Goldman Sachs at that

15  point?

16          A.    I can't recall.

17          Q.    Was it over $10,000,000?

18          A.    Yes, I'm sure it was.

19          Q.    What were the percentages after you

20  reallocated?

21          A.    I think at that point, Morgan Stanley had more

22  than Goldman.

23          Q.    Three-quarters, one-quarter?

24          A.    No, not that much.  But clearly Morgan Stanley

25  had more.  That's my recollection.

1      Q.   Are you saying that this is based on losing

2  money in the options, or is this based upon the management

3  fee?

4      A.   I think it was three things.  It was that.

5  And Tim Dolan, my primary contact, left; and his replacement

6  introduced the idea of charging us -- my wife and I -- an

7  asset-management fee.  I was so turned off about that that I

8  said, Forget it; I'm not doing it.

9      Q.   So you didn't pay the asset management fee?

10     A.   No.

11     Q.   And you stayed with Goldman Sachs, then?

12     A.   They backed away.  They saw the reaction.

13  Here's what happened.  I just bought a very significant

14  municipal-bond portfolio, where they just got a ton of

15  commissions in spreads -- hundreds of thousands of dollars,

16  I'm sure.

17     And they come in a few months later and say, Hey, we

18  want to manage that portfolio you just put in place, and we

19  want to start charging you an asset-management fee on trades

20  you already made money on.  No way.

21     Q.   You like managing your own portfolio?  You

22  didn't want to pay someone to manage the portfolio?

23     A.   That's correct.

24     Q.   Have you paid anyone to manage a portfolio for

25  you?

1        A.     No.

2        Q.     Have you paid anyone to manage any assets?

3        MR. HALLETT:  Excuse me.  Up to what period of time?

4 Today?

5        MR. GEIER:  Yeah.

6        A.     I've been in mutual funds where they're

7 actually the ones doing all the trading.

8        Q.     (By Mr. Geier)  Other than mutual funds?

9        A.     On the purchase of direct securities?  Is that

10 what you're referring to?

11        Q.     I'm not saying manage a real estate building.

12 Securities.

13        A.     I entered a hedge fund back in '98 or '99 -- a

14 technology hedge fund -- and we paid management fees for

15 that.

16        Q.     What was the management fee?

17        A.     I think it was 2 and 20.

18        Q.     Is that pretty standard?

19        MR. HALLETT:  Could you clarify that?

20        THE DEPONENT:  2 percent management fee; 20 percent

21 profit-sharing incentive on profits.

22        Q.     (By Mr. Geier)  Quarterly or monthly?

23        A.     I'm sure it was quarterly.  So the answer to

24 your question is, Yes, I have.

25        Q.     In the context of that hedge fund?

1          A.     Hedge fund, things like that.

2          Q.     What was the hedge fund?  What was the

3   investment?

4          A.     I think I put in about $50,000,000, and it did

5   not do well.

6          Q.     What was the strategy?

7          A.     The strategy was finding technology companies,

8   most of them having on-line (inaudible), and making

9   investments in these promising growth companies, and then

10  having a very substantial return on those.

11         I was introduced to this hedge fund by an investor

12  in Abacus.  One of my responsibilities at Abacus was to visit

13  investors and talk to them frequently.  This guy was a money

14  manager; had been with Goldman Sachs, by the way, in the tech

15  group years earlier; left; worked for a money manager; they

16  had invested in Abacus.

17         One of the things they do is they say, Hey, would

18  you like to put some money with us?  I liked him.  I think

19  his name was John Levenson.  He created a hedge fund; I went

20  in with him; and, unfortunately, lost half of the value that

21  I invested.

22         Q.     Was there a lockup on that?

23         A.     There were restrictions on withdrawing the

24  cash, yes.  I think it was only twice a year.

25         Q.     That you were allowed to?

1          A.      Maybe.  Maybe once a year.  There were

2    restrictions.

3          Q.      Could you withdraw all of it?  Only at certain

4    times?

5          A.      Only at certain times.  Which is, by the way,

6    not unusual for hedge funds.

7          Q.      Because they're looking to acquire businesses?

8          A.      In this case, it wasn't that.  That was more

9    in the previous example, where there would be a buyout fund.

10          In this case, it's to allow the trader to have

11    orderly execution of their trades.  If you said -- this

12    happens a lot, by the way.

13          If you said to a money manager, You're losing money;

14    I want my money out tomorrow -- and the securities happen to

15    be very depressed, they're going to get more depressed when

16    you start selling.

17          So many money managers put restrictions, because

18    they want to make sure that they get better pricing on the

19    exit.

20          Q.      They want to be able to manage the timing of

21    the withdrawal to make it orderly in the market; is that what

22    you're saying?

23          A.      Correct.  Orderly market, and to maximize

24    their own price.

25          Q.      Not hurt themselves on their investments?

1    They pull out in a slow way?

2           A.    Could be.  At least give them the ability to

3    do it if they need to.  When there's a very liquid marked,

4    you can get out like that.

5           Q.    Did there come a point in 2000, Mr. Sala, when

6    you terminated your relationship with Pricewaterhouse?

7           A.    Yes, I did.  Actually, you know what?  It

8    wasn't --

9           Q.    Let me back up; this may help.  Your 1999

10   return was prepared by Pricewaterhouse; correct?

11          A.    Correct.

12          Q.    And you would have been working with them into

13   2000 on the 1999 return?

14          A.    I did.

15          Q.    Did there come a point in 2000 when you

16   stopped working with them?

17          A.    I think it was 2001.  And the reason I say

18   that is because John Raby had left, and I received a call

19   from Kevin Overburg saying, Hey, you know, we've got to get

20   ready for the 2000 return.  At that point -- and John was

21   gone -- I had a much more complicated transaction.  Frankly,

22   I didn't think he had the expertise on these kinds of

23   transactions.

24          Q.    What kinds of transactions?

25          A.    The Deerhurst transaction, which was a large

55

```
 1   transaction with legal opinions and things like that.  I

 2   think at that point I told him, I'm going to use another

 3   firm.

 4           Q.    Okay.

 5           A.    That was in 2001 when that happened.

 6           Q.    You didn't talk to Tracie Henderson with KPMG

 7   in 2000?

 8           A.    I did.

 9           Q.    But you hadn't committed to using them?

10           A.    Not yet.

11           Q.    We'll get into that.  So your reasoning for

12   leaving Pricewaterhouse was that in connection with your 2000

13   returns, you didn't think that they had the expertise?

14           A.    No.  I think, as a firm, Pricewaterhouse

15   absolutely has the expertise.

16           Q.    I'm not sure I understand.

17           A.    Two things:  John had left, so my primary

18   contact was gone.  My secondary contact was Kevin Overburg

19   out of the Boulder office, and I thought it was more

20   complicated and that he personally didn't have the expertise.

21           Q.    You didn't think Kevin had the expertise?

22           A.    Yes.

23           Q.    Did you ask John Raby if he could make a

24   recommendation?

25           A.    Well, John wasn't working for Pricewaterhouse
```

1    at the time.

2           Q.    I understand.  But he did?  He had worked at

3    Pricewaterhouse?

4           A.    Yes, he had.

5           Q.    And he knew the accountants there?

6           A.    I'm sure.

7           Q.    Did you ask him for a recommendation?

8           A.    No, I did not.

9           Q.    Did you ask Kevin?  I'm just not sure if --

10          A.    I can tell you why.

11          Q.    Okay.  Please.

12          A.    I'm answering yes and no, but I'm trying to be

13   narrative.  I'll tell you exactly.

14          Kevin calls; he wants to do the return.  I didn't

15   think he really had the expertise himself.  He's a great guy,

16   by the way, and very competent as a tax preparer.  But this

17   was a much more complicated transaction than I thought he had

18   expertise on.

19          By that time, however, I had already been introduced

20   to Tracie Henderson, who I thought had the expertise and who

21   I felt could do the return extremely well, just like

22   Pricewaterhouse.  There was no need at that point to

23   introduce somebody brand-new at Pricewaterhouse.

24          I didn't have an allegiance to the firm at

25   Pricewaterhouse.  One guy was gone; the second guy really

```
 1     wasn't a guy to do it.  I already had another relationship

 2     started, and then I decided to change.

 3             Q.    Did you hear Mr. Raby testify about

 4     Pricewaterhouse leaving the market on these tax products?

 5             A.    I did.

 6             Q.    Were you aware that that was happening?

 7             A.    At that time, I don't know.

 8             Q.    Did Mr. Raby talk to you about that?

 9             A.    I don't think so.

10             Q.    And when did you start looking for another

11     accountant?

12             A.    I think it would have been summer, fall, of

13     2000.

14             Q.    Did you talk to Kevin Overburg about your tax

15     situation in 2000 at all?

16             A.    I don't recall, but my -- I don't recall.

17             Q.    You had a reaction?

18             A.    I'm sure I did.

19             Q.    Something caused you to believe that Kevin

20     didn't have the experience to handle your return?

21             A.    On a more complicated return, yes.

22             I mean, I worked at Ernst & Young, so I sort of know

23     that there are different specialties within a firm and even

24     tax departments.

25             Kevin was a manager at Pricewaterhouse; he wasn't a
```

1    partner.  He seemed like a very solid tax accountant that

2    would do a routine type of tax preparation.  That was my

3    conclusion.  He was fairly young, too, by the way.  He's

4    progressed now in his career.  But this was six years ago.

5         Q.   And you didn't inquire within the firm about

6    someone else who might be able to help?

7         A.   No, because that would have been a new

8    introduction to somebody brand-new, and I already felt

9    comfortable that I had a relationship that could provide the

10   services.

11        Q.   When did you come into contact with Tracie

12   Henderson?

13        A.   I researched it when you did one of the

14   previous filings, so I tried to really peg it correctly.  And

15   it was in late November.

16        Q.   Of --

17        A.   Of 1999.

18        Q.   1999?

19        A.   Yes.

20        Q.   Pricewaterhouse was doing your return for 1999

21   during that time; correct?

22        A.   Correct.  That's right.

23        Q.   So at the same time that Pricewaterhouse was

24   doing your return, were you looking to find another

25   accountant at that time?

```
 1              A.    I wasn't looking.  I happened to be in Dallas,

 2   Texas for other business.  A friend of mine, Tim Gillis,

 3   happened to be in Dallas as well.  He called me up and said,

 4   Can we do lunch?

 5              At that lunch, Tracie Henderson was introduced to

 6   me, and we talked about the financial services that she

 7   offered, which were tax planning, tax compliance.  And that's

 8   how I met her.  Nothing really developed after that first

 9   initial meeting.

10              Q.    Did you tell me earlier that you didn't engage

11   Pricewaterhouse in tax planning?

12              A.    Correct.

13              Q.    Because you didn't think an accounting firm

14   should do that?

15              A.    No, not tax planning; investment-management

16   services.  Tax planning, yes.  Absolutely.

17              Q.    All right.

18              A.    By the way, I think that Pricewaterhouse may

19   have done some estate-tax planning for me.

20              Q.    What did you and Tracie talk about at that

21   first lunch?

22              A.    Very little with Tracie; it was mostly with

23   Tim, my friend.  And we mostly talked about the Internet,

24   about my experience at Abacus.

25              KPMG was trying to figure out how to create an
```

1   on-line initiative within their tax group, and he asked me if

2   I would be willing to talk to one of their senior tax

3   partners and provide some advice as to how to go about going

4   to the Internet.

5            Q.    Would that be for compensation?

6            A.    No, this was a favor to a friend.  You know

7   what?  They sent me a T-shirt.

8            Q.    You're a hard negotiator.

9            A.    It was a favor to a friend.

10            Q.    Was it the right size?

11            A.    Probably not.

12            Q.    And did you talk to Tracie Henderson at that

13   meeting?

14            A.    Yeah, we were introduced; she was there.  My

15   recollection is she listened 90 percent of the meeting.  And

16   then she talked and she was telling me, This is what I do.

17   If you'd like to have any of these services, I would be very

18   happy to work with you.

19            Q.    Did you tell her what was going on at Abacus?

20            A.    We talked about the fact that we had already

21   entered into a contract to sell the business.

22            Q.    Did you talk about the options that you had?

23            A.    No.

24            Q.    Did you talk about any part of your personal

25   finances?

```
 1              A.    No, I just met her.  No way.

 2              Q.    Well, you were with Tim as well?

 3              A.    I know, but I wouldn't have felt comfortable

 4    talking about my compensation with somebody I just met.  With

 5    Tim, that would be okay, but I had just met her.

 6              Q.    When was your next contact with Ms. Henderson?

 7              A.    You know, it was in 2000, and maybe in the

 8    spring.  I don't recall exactly.  But it was in 2000.

 9              Q.    And who called who?

10              A.    She would have called me.  There would be no

11    reason for me to call her.

12              Q.    What did she say to you?

13              A.    I don't recall what she said on our initial

14    call.  My guess is, How are you doing?  Here I am; here's

15    KPMG; if you need any services, keep us in mind.

16              Q.    What is it that Tracie told you she could do?

17              A.    She was big on estate-tax planning; that was

18    the big thing that they thought she could help me with.

19              Q.    What did that mean?

20              A.    Preparation of your wills, working with

21    attorneys, planning for transition of wealth from one

22    generation to another generation.  Those types of things.

23              Q.    Did she help you prepare a will?

24              A.    No.  I hired an attorney.  Actually, I hired

25    first an attorney at Holland & Hart, and then I hired Davis
```

1    Graham to do that work for me.

2              Again, that's business, to me, that you're better

3    off going to a law firm than going to an accounting firm to

4    do that.

5              Q.    When you talked to Tracie at that point in

6    time, did you tell her what was going on with you

7    financially?

8              A.    In 2000?  Yes, at some point.  I'm sure we

9    talked about the fact that I had left Abacus, and that I was

10   no longer working at Abacus.  And she said, What are you

11   doing?  And that was most of the discussion.

12             Q.    Did you tell her what your financial situation

13   was?

14             A.    I don't recall.  At some point I did; I just

15   don't recall if it was the next conversation or not.

16             Q.    Did she present you with possible transactions

17   for you to become involved in?

18             A.    I don't think she put it that way.

19             Q.    What did she say?

20             A.    My guess would be -- my recollection, which

21   would be in a general way, would be that she would say, I

22   have an idea; I'd like to present it to you and see what you

23   think.

24             Q.    Was there any compensation for any of her

25   services at this point in time?

```
 1              A.    No.

 2              Q.    Did she present any deals for you -- or ideas?

 3              A.    She did.

 4              Q.    In 1999 or 2000?

 5              A.    In 2000.

 6              Q.    Can you tell me what those were?

 7              A.    The only one that I recall is BLIPS.  It's the

 8   only one that I gave consideration to.  We may have had a

 9   discussion where I said to her that I had had one meeting

10   with Jenkens & Gilchrist and I was not very impressed.  We

11   may have had that type of discussion.

12              Then later on in 2000 -- I think in the fall -- she

13   asked if I had any interest in looking at maybe a couple of

14   other things that I don't even recall their names.

15              Q.    Did those other transactions involve, as a

16   component, a tax loss?

17              A.    Yes.

18              Q.    Did you communicate to her that that was

19   something that was desirable for you in the 2000 year?

20              A.    What I said to her was, I'll look at it --

21   just like anybody else.  She said, Here's an idea; it has a

22   tax component to it.  And I said, Okay, I'm receptive; tell

23   me about it.

24              Q.    Did you communicate to her what you were

25   looking for, so that she could help you?
```

1         A.     No.  Actually, no.  Never.

2         Q.     You just told her that you would be receptive

3    to listening to her if she presented transactions?

4         A.     I didn't even say those words to her.  I would

5    say, If you have an idea, I'm happy to listen.

6         Q.     And you knew her ideas involved, as a

7    component, a tax loss?

8         A.     Yes, I did.

9         Q.     When you were talking to Tracie about the

10   Jenkens & Gilchrist presentation, did you tell her what it

11   involved?

12        A.     I don't think so, because I don't think I got

13   a full understanding of it, ever.  I was so unimpressed with

14   the investment aspect -- if it was even an investment aspect.

15        It has a half an hour meeting that I had with

16   someone from Jenkens & Gilchrist -- which I don't even

17   remember who it was -- and another person, who I don't think

18   worked for them.

19        Q.     Donna Guerin?

20        A.     I don't know.

21        Q.     Okay.

22        A.     And it was at the request of John Raby to

23   listen to this presentation.  And I was so unimpressed with

24   it.  What I said to Tracie would have been something like, I

25   was presented with this transaction which had a tax

65

1   component, and I didn't think much of it.

2           Q.    Help me out with this, if you can.   John Raby

3   and Tracie Henderson seem to be two people in 2000 who were

4   trying to present ideas to you.

5           A.    Yes.

6           Q.    In addition to Goldman Sachs and Morgan

7   Stanley?

8           A.    In addition to -- yes, that's right.   And

9   there were probably other people that would call me and say,

10  Hey...

11          Q.    Sure.   People calling out of the blue a little

12  bit?

13          A.    Yes.

14          Q.    But Tracie Henderson, at this point, wasn't

15  out of the blue?

16          A.    No.

17          Q.    You met her in 1999?

18          A.    That's correct.

19          Q.    And John Raby wasn't out of the blue?

20          A.    Correct, I had a relationship with him.

21          Q.    What I'm trying to figure out is -- and you

22  were receptive to listening to ideas?

23          A.    Yes.

24          Q.    But you didn't provide any guidance to these

25  people about what sorts of things you might be interested in

1    or what your goals were?

2         A.    No, none.

3         Q.    And you didn't discuss that it would be a

4    favorable factor -- did you discuss that it would be a

5    favorable factor if a tax loss was part of the transaction?

6         A.    Could you --

7         Q.    I'll restate it.

8         MR. HALLETT:   It is ambiguous as to who said what.

9         MR. GEIER:   I'll restate it.

10        Q.    (By Mr. Geier)   Part of our agreement was that

11   if you didn't understand a question, you'd ask me to repeat

12   it.  I appreciate you telling me that, and I'll do my best.

13        At any point in 2000 or before, did you advise

14   either Tracie or John that a tax-loss component of the

15   transaction would be something that you would be very

16   interested in?

17        A.    No.  On these things, if you have an idea,

18   I'll listen.  And the knowledge that I think they got from

19   public documents, they knew that I had significant income for

20   that year.  So I never said, Go look for this for me; or, I

21   need a loss of this amount.  Never.

22        Q.    And you don't recall telling them what your

23   expected income was for the year?

24        A.    No.  But you know what?  It wasn't that

25   difficult to figure out.

```
 1              Q.     I understand.  Abacus was a public company; it
 2    was the takeover and word on the street?
 3              A.     Yeah.  People would call me and say, Can I
 4    manage your assets?
 5              Q.     Just for the record, I didn't know what you
 6    earned that year prior to this.
 7              A.     Remind me to give you, off the record, an old
 8    story about how common it was, and I'll tell you how common
 9    it was.
10              Q.     Okay.  It was your impression that they
11    understood your financial situation when they were looking
12    for products for you?
13              A.     Yes.
14              Q.     Have you told me as much as you can all about
15    the Jenkens & Gilchrist presentation?
16              A.     Everything.
17              Q.     To this day, you have no idea what it
18    involved?
19              A.     I don't.
20              Q.     Do you know what the underlying--
21              A.     No, nothing.
22              Q.     -- asset might be?
23              A.     No.
24              Q.     Was this in person or on the phone?
25              A.     It was at some airport somewhere; I was
```

1    traveling a lot.  Somehow John said they'll be in the same

2    city for an hour.

3              It was one of these deals -- I was very unimpressed.

4    They come in; I'm in between planes.  Hey, let me tell you

5    this thing and a few details about this.  When you ask

6    questions, they're not prepared.  It was not very

7    professional from my perspective.

8              MR. GEIER:  Let's go off the record for a second.

9              (Whereupon, a discussion was held off the record.)

10             Q.    You mentioned that Tracie contacted you in the

11   spring of 2000?

12             A.    That's my best guess.

13             Q.    How often was she in contact with you over the

14   next several months?

15             A.    She'd call me once a month, maybe.  I like

16   Tracie; she's a very personable person.  She'd call and say,

17   How are you doing?  Where have you been?  She'd ask me about

18   my wife.  She was really trying to develop and build a

19   rapport with me, is what she was trying to do, I think.

20             Q.    You mentioned that the only idea that you

21   recall that she presented was the BLIPS?

22             A.    Yes.

23             Q.    Do you recall telling her at any point that

24   you would like to do a transaction with her?

25             A.    Yeah, I said I would consider looking at

1    BLIPS.

2            Q.    And when BLIPS didn't work out, did you tell

3    her that you still wanted to try to do a transaction with her

4    at KPMG?

5            A.    Can I give you a little more background there?

6            Q.    Sure.

7            A.    My recollection is that she presented BLIPs to

8    me.  It had to do with an investment in the Argentinian peso,

9    I think.  And I started trying to get a good understanding of

10   the transaction, and in doing so, there was a meeting, I

11   think, with the money manager on the BLIPS transaction.

12           Q.    Who was that?

13           A.    I think it was someone from Presidio?

14           Q.    Do you know who it was?

15           A.    If you gave me a name, I might be able to tell

16   you.

17           Q.    David Makov?

18           A.    No, I would remember that.

19           Q.    We'll come back to that.

20           A.    It was someone from Presidio; it was in New

21   York.  That meeting dealt with the tax structure, I believe.

22           Q.    What do you mean by "tax structure"?

23           A.    Well, there was a tax component to that

24   transaction.

25           Q.    What was that?

1          A.    I can't recall.

2          Q.    When you say a "tax component," meaning that

3    there was a designed tax loss as parts of the transaction?

4          A.    Yes, but I don't recall the details of it.

5          What I remember mostly about it was the Argentinian

6    peso, and the Argentinian peso had to devalue a certain

7    amount within a period of time.  I was fairly confident that

8    the Argentinian peso would devalue, but it had to devalue in

9    a very short period of time, like maybe 90 days.  And I may

10   note that you can't time that.

11         So I was very, very questionable as to the economic

12   portion of that transaction because of the short period of

13   time where you had to make money.

14         So I tried to get a meeting with someone who had

15   some expertise on the investment side of that transaction,

16   and that was here in Denver.  I went there.  The guy never

17   showed up.  I left.

18         Then the next thing that happened is:  I was in

19   Atlanta visiting family; I met with Tracie; she introduced me

20   to her boss; a guy named Jeff Eischeid.  I talked to him for

21   less than 30 minutes; we talked mostly about the Internet

22   again.  Everybody was talking about the Internet at that

23   time.

24         I asked him at that time, If I'm going to consider

25   this transaction, I really need to look at documents early on

71

1    because I'm sure I'm going to have a lot of comments --

2    because I always do.  His response back to me was, We can

3    show you the documents, but we're not going to take any

4    changes or comments.  That was a huge turnoff.

5              So the combination of the Argentinian peso issue

6    with the short duration -- the issue was:  How can you go

7    into a transaction of this complexity without being able to

8    provide comments?  Those were red flags for me.

9              Q.    Had you previously invested in foreign

10   currency?

11             A.    In my personal investments?

12             Q.    Yes.

13             A.    No.

14             Q.    Had you come into contact with the Argentinian

15   peso in your profession?

16             A.    No.

17             Q.    But you had formed an opinion about the

18   valuation of the Argentinian peso?

19             A.    I have.

20             Q.    Did you talk with others about that?

21             A.    I may have talked to Goldman about it, because

22   I was intrigued.

23             Q.    Do you have a specific recollection of talking

24   to Goldman Sachs about it?

25             A.    I don't.  But I was intrigued about what was

1    going on in Argentina with the government.  If you remember

2    back then -- well, I don't know if you remember.

3           Let me just say:  The Argentinian economy was the

4    wonder of Latin America in the 1990s; the finance minister

5    was credited for this great miracle.  And what he had done is

6    he pegged the Argentinian peso to the dollar on parity.  What

7    he was trying to do was control inflation by the peg, and the

8    peg was in the Wall Street Journal all the time.

9           What was going on is that it was a significant

10   amount of cash flowing from the United States into Argentina,

11   but a lot of that money (inaudible) quickly, because it was

12   going into financial assets, rather than property and

13   equipment.

14          So what happened is:  To maintain the peg to the

15   dollar, the Argentinian peso was buying huge amounts of

16   reserves in the free market to try to keep it at the peg.  I

17   think at one point, it had $11,000,000,000 worth of reserves

18   and it was (inaudible) a billion dollars a day.  So this was

19   in the newspapers, and I was following it with great

20   interest.  So I knew these guys were never going to be able

21   to sustain that.

22          Subsequently, it turned out that they devalued it

23   from 1 to 1 to 3 to 1; the finance minister was fired; the

24   president of the country was fired; they went through three

25   presidents in 18 months or so; the finance minister was put

1  in jail by one of the presidents.

2          It was just a huge thing, and I was following

3  everything.  That's why I had already formed an opinion on

4  the Argentinian peso.  You didn't have to be a

5  foreign-currency expert to do that.

6          Q.    And you had an analysis that the 90-day period

7  was too short?

8          A.    Absolutely.

9          Q.    But you don't recall talking with anyone else

10  about it specifically?

11          A.    I'm sure I told Tracie that.

12          Q.    I'm not asking who you told; I'm asking who

13  you sought advice from to see if others agreed with you.

14          A.    No one that I can recall.

15          Q.    Okay.  Is that the reason why you didn't enter

16  into these BLIPS transaction?

17          A.    Those were the two primary reasons.  I think

18  there was a third reason as well.  It had to do with Notice

19  2000-44.

20          From my recollection, Notice 2000-44 came out.

21  Tracie Henderson made me aware that that notice was out

22  there.  She said, We don't know what this really means inside

23  KPMG, but the impression I get is that you're grandfathered

24  in if you want to do BLIPS.  We will still be able to do it

25  if you'd like to.

74

1          But at that point, I already had reservations on the

2     other two issues.  I said, Why do I need to go through this

3     assessment of 2000-44 when I'm not comfortable with the

4     transaction?

5          Q.    Had you already committed to BLIPS?

6          A.    No, I never came close to committing to BLIPS.

7          Q.    So I don't understand.  What did you

8     understand was the grandfathering if you hadn't entered into

9     the transaction?

10         A.    The grandfathering meant that these were

11    clients that they had talked to about doing BLIPS before this

12    issue had come up.  That's what she meant.

13         Q.    But the IRS notice would have still impacted

14    your decision whether to go into it?

15         A.    Oh, sure.  It would have had to be addressed.

16         Q.    The grandfathering is KPMG's willingness to do

17    the transaction with you, not the impact of IRS Notice

18    2000-44 on the transaction?

19         A.    Absolutely correct.

20         Q.    So you were aware of 2000-44 when you decided

21    not to do the BLIPS transaction?

22         A.    I was aware of it.

23         Q.    And you've indicated, then, that there were

24    three reasons why you didn't do BLIPS?

25         A.    Yes.

1          Q.    And you seem to indicate -- and correct me if

2    I'm wrong -- that the IRS Notice 2000-44 was a small reason?

3          A.     It was a reason.  I couldn't quantify whether

4    it was big, small, or medium.  It was not the primary.  It

5    was lesser in importance than the first two, especially at

6    that point.

7               Obviously I know more about 2000-44 now, but at that

8    time I gave tremendous weight to the two primary reasons.

9    And the fact that there was now a tax issue that had to be

10   addressed just added to my conviction of not doing BLIPS.

11   But I just never got close to it.  I never looked at

12   documents; I never looked at an opinion.

13         Q.    You never saw a BLIPS document?

14         A.    If I did, I can't recall.

15         Q.    Did there come a time when you entered into a

16   formal arrangement with KPMG to retain them?

17         A.    I'm sure I did.

18         Q.    With respect to the BLIPS matter, was it

19   before the BLIPS of after the BLIPS?

20         A.    My recollection would be probably sometime

21   during the discussions that we had.  The BLIPS discussion

22   went on for some time.  Maybe she mentioned it in the spring

23   of 2000, and we had discussions throughout the summer.  At

24   some point, I felt comfortable with Tracie and I think she

25   sent me an engagement letter at some point.

1          Q.    So there came a point where, because of the

2     complicated nature of Deerhurst, you didn't want to stay with

3     your accountant at Pricewaterhouse; correct?

4          A.    That was one reason.  And the second reason

5     was that Raby had left.

6          Q.    But you specifically mentioned that it was the

7     complicated nature of the Deerhurst transaction.

8          A.    Both reasons.

9          Q.    And the Deerhurst transaction didn't come to

10    light until about when?

11         A.    I don't know.  I can't recall.

12         Q.    October or so?  Does it help if I tell you

13    that you entered the transaction in late October?

14         A.    Then it would have been way before that.  My

15    initial discussions -- it was before the summer.  Because I

16    think what happened -- I'm going to give you my best

17    recollection.

18         What happened is Raby introduced me to Schwartz

19    sometime in 2000, and that would have been -- it was warm

20    weather, because it was in New York the first time that I met

21    Schwartz at a breakfast meeting.  And I don't think I was

22    wearing a coat; that's why I think it was warm weather.

23         That would have been the first introduction to the

24    Deerhurst transaction.  And I believe at that point he may

25    not have had all the details finalized.

1          Q.     Who is "he"?  Raby?

2          A.     Schwartz.  So spring, early summer, maybe.

3          Q.     But when did you know that you were going to

4    enter into the Deerhurst transaction?

5          A.     Not until I had negotiated all the details and

6    made all the reviews.

7          Q.     So the point where you became concerned about

8    Kevin Overburg at Pricewaterhouse was at the point where you

9    knew you were going to enter into the transaction?  That's

10   what I'm trying to --

11         A.     Sure; sure.  I think it didn't happen

12   overnight -- my decision to hire Tracie Henderson.  What was

13   really happening is:  Here she's developing a relationship

14   with him.  I liked her.  At some point throughout 2000, I

15   said, There's no real reason to stay at Pricewaterhouse

16   because I don't have the same relationship now that I have

17   with Tracie.

18         And then when Kevin called me in 2000, then I said,

19   Well, furthermore, I don't think he can really handle a

20   proper review of the transaction as it relates to the tax

21   return.  So it was a combination of things.

22         But I think that my decision to hire Tracie, which I

23   did not communicate to Kevin until after -- much later --

24   just evolved as I got comfortable with Tracie Henderson in my

25   discussions with her.

1              Q.    And when did you hire Tracie?

2              A.    Maybe in the summer.  Maybe in the summer of

3    2000.

4              Q.    So by the summer of 2000, had you decided to

5    shift your business away from Pricewaterhouse?

6              A.    Yes.

7              Q.    Based upon your contacts with Tracie?

8              A.    Yes.  And another thing:  I respected Tim Gill

9    as my friend, who was a partner at KPMG, and he had glowing

10   references about Tracie.  So put it all together, and that's

11   how things happened.

12             Q.    What was the initial purpose of the formal

13   engagement of KPMG?  Was it to do your tax returns, or was it

14   to do your tax planning?

15             A.    Both.  Primarily my tax return, but both.  She

16   just kept talking about how good she was at estate taxes and

17   consulting on that, because she knew I was concerned about

18   that.

19             Q.    Estate taxes?

20             A.    Yes.

21             Q.    Did you any do estate-tax planning with Tracie

22   Henderson?

23             A.    I did not do it with her.  I did some

24   estate-tax planning with Morgan Stanley during that time.  I

25   may have mentioned it to her, and she said, Hey, I'm great at