# EXHIBIT 6

# Pt. II of II

```
 1   this, so consider me as you're looking at this.

 2          Q.    But you didn't?

 3          A.    But I didn't.  I never did, actually.  I used

 4   law firms, and I used investment firms.

 5          Q.    Morgan Stanley?

 6          A.    Yes.

 7          Q.    Who you started working with in 1999?

 8          A.    No, in the year 2000.

 9          Q.    2000?

10          A.    Yeah.  They were introducing me to all of

11   their services, so that was one of them.

12          Q.    All right.  Do you recall the first

13   transaction?  Was BLIPS the first transaction that Tracie

14   presented to you?

15          A.    That I can call, yes.

16          Q.    Was that transaction what caused the formal

17   engagement at KPMG by you?  Caused you to formally engage

18   KPMG?

19          A.    That transaction?

20          Q.    The consideration of that transaction.

21          A.    No.  Because if I didn't do BLIPS, which I

22   didn't do it, that would have been not relevant to my

23   engagement of KPMG going forward.

24          Q.    Was it working with them on BLIPS that caused

25   you to engage them?
```

```
1              A.    Yes, to get comfortable with Tracie.

2              Q.    And were you comfortable with Tracie by the

3    time BLIPS was first presented to you, or did it take some

4    time for you to develop the comfort?

5              A.    It took time.

6              Q.    After?

7              A.    It always takes time.

8              Q.    So you worked with Tracie for a while on the

9    BLIPS transactions, and then you became comfortable, and then

10   you engaged KPMG?

11             A.    Yes.

12             (Exhibit 114 marked for identification.)

13             Q.    I'm going to show you what we've marked as

14   Exhibit 14.  This is a letter dated June 28, 2000 to you from

15   Tracie Henderson at KPMG; is that correct?

16             A.    Yes.

17             Q.    What is this letter?

18             A.    Let me read it, if you don't mind.

19             Q.    Sure; take your time.

20             A.    Okay.

21             Q.    Do you recognize this letter?

22             A.    Yes.

23             Q.    Is that your signature on Page 3?

24             A.    Yes.

25             Q.    Dated July 6th?
```

1          A.     Yes.

2          Q.     Is that Tracie Henderson's signature above

3    yours?

4          A.     It appears to be, yes.

5          Q.     From your relationship with Tracie Henderson,

6    you recognize her signature?

7          A.     Yes.

8          Q.     Do you recall seeing this letter on or about

9    June 20, 2000?

10         A.     I don't, but I probably did.

11         Q.     Do you have any doubt?

12         A.     There is no reason to doubt.

13         Q.     Do you know what the purpose of this letter

14   was?

15         A.     In reading it, the purpose is to send an

16   engagement letter for consulting services.

17         Q.     More specifically, for tax matters?

18         A.     Yes.

19         Q.     Didn't it say in the first line "to assist you

20   in tax matters"?

21         A.     Yes.

22         Q.     And what were those tax matters that you were

23   contemplating when you signed this engagement letter?

24         A.     I have no idea.

25         Q.     Take a look at "Fees" on Page 2.

1         A.    Yes.

2         Q.    The second sentence talks about fees being 60

3 percent of standard rates "to defend any 2000 tax-return

4 position introduced by us."

5         A.    Uh-huh.

6         Q.    So, clearly, KPMG was intending to introduce

7 you to tax-return positions for 2000?

8         A.    Yeah.  I think this would relate to their

9 introduction of BLIPS to me.

10         Q.    Their introduction of BLIPS, though -- KPMG

11 was going to be paid a commission for that work; correct?

12         A.    I'm not sure how they were getting paid.

13         MR. HALLETT:  Excuse me.

14         MR. GEIER:  You can ask a question on your turn.

15         MR. HALLETT:  No, no, no.  I was just going to

16 object to the form.

17         A.    I don't recall how they were getting paid.

18         Q.    (By Mr. Geier)  So you think that this was in

19 connection with BLIPS?

20         A.    In reading it now --

21         Q.    Yes.

22         A.    -- as it relates to the fees, that would be a

23 logical conclusion.

24         Q.    Okay.  Let's take a look at another exhibit.

25         (Exhibit 115 marked for identification.)

1          This is a letter dated June 30, 2000 directed to you

2    and signed by Tracie Henderson as well.  Take a look at that.

3          MR. HALLETT:  Just for the record, the last page is

4    an unsigned copy.  Is that what you've got?  You don't have a

5    signed copy?

6          MR. GEIER:  This is not a signed copy.

7          MR. HALLETT:  That's what I mean.  Does he have a

8    signed copy?

9          MR. GEIER:  Let's let the witness take a look and

10   answer the question.  We'll get to a signed copy.

11         A.   Without reading every sentence, I think I see

12   this.

13         Q.   (By Mr. Geier)  Have you seen this document

14   before?

15         A.   I believe I have.

16         Q.   This is a letter to you from Tracie Henderson?

17         A.   Yes.

18         Q.   Is this letter in connection with the BLIPS

19   transaction?

20         A.   I believe it is.

21         Q.   And at the time of this letter, you had

22   already talked with Tracie about the BLIPS transaction?

23         A.   Yes.

24         Q.   And this letter just talks about professional

25   fees as well, correct?

1          A.     Yes.

2          Q.     And it talks about a fee at the bottom of Page

3    3, assuming you would enter the transaction.  It contemplates

4    a fee of $700,000.

5          A.     That's a good contemplation on their side; not

6    that I would have agreed with that.

7          Q.     But that's what this letter says?

8          A.     Yes.

9          Q.     And so you had engaged Tracie Henderson to

10   perform general services for you prior to getting very far

11   into the BLIPS transactions; correct?

12         A.     Can you repeat that?

13         Q.     Your review of the BLIPS transaction -- did it

14   start shortly after this letter?

15         A.     After the letter of 115?

16         Q.     June 30th.  115.

17         A.     I can't recall when I started looking at this,

18   whether it was before or after.

19         Q.     You mentioned that you met with somebody in

20   contemplation of this.  Was it Steven Bus (phonetic)?

21         A.     No.

22         Q.     Was it Jeff Mangerry (phonetic)?

23         A.     No.

24         Q.     You just know it was somebody from Presidio?

25         A.     Yes.

1          Q.     Those names don't ring a bell?

2          A.     They don't.

3          Q.     So in June -- late June -- as it appears from

4    the two exhibits we just looked at, you were retaining Tracie

5    Henderson for general tax matters?

6          A.     I wouldn't say that -- I would say that just

7    from Exhibit 114.

8          Q.     And with respect to 115, you were at least

9    being presented with the BLIPS transaction?

10         A.     Yes.

11         Q.     And that seemed to be concurrent?

12         A.     Concurrent with?

13         Q.     Your retaining Tracie in general tax matters

14   and considering the BLIPS transaction?

15         A.     Well, if "concurrent" means that the dates are

16   close to each other, yes.  One is dated June 28th, and the

17   other is dated June 30th.

18         Q.     Right.

19         MR. HALLETT:  How about lunch?  I'm just thinking of

20   beating the crowd and getting back here at 12:30.

21         MR. GEIER:  Okay.

22         (Whereupon, a lunch recess was taken from 11:42 a.m.

23   through 12:37 p.m.)

24         Q.     (By Mr. Geier)  When you talked with Tracie

25   Henderson about BLIPS, did you talk about the potential

1      benefit of a BLIPS transaction?

2              A.     Yes.

3              Q.     And did she communicate to you what benefits

4      might be derived from the transaction?

5              A.     Yes.

6              Q.     What were they?

7              A.     Tax losses that could be generated from the

8      transaction.  She did mention it was tax losses.

9              Q.     Did she mention that you would have control

10     over the amount of the losses?

11             A.     I don't recall.

12             Q.     Any other benefits?

13             A.     Supposedly an economic benefit if you timed

14     the devaluation of the Argentinian peso in that short a

15     period of time.

16             Q.     And if you didn't?

17             A.     Then you would lose money on the investment.

18             Q.     Did the tax benefits still outweigh the

19     investment, even if you lost money?

20             A.     That's my understanding.

21             Q.     You mentioned that you talked to Jeffrey

22     Eischeid/// and Tracy Henderson about BLIPS?

23             A.     Yes.

24             Q.     And I think you mentioned that you talked to

25     him about needing documents?

1          A.     Yes.

2          Q.     And needing to review them?

3          A.     Yes.

4          Q.     When was this in relationship to the June 28th

5    and 30th letters that we saw earlier?  I think Exhibits 114

6    and 115.

7          A.     I can't recall.  But I can certainly find out,

8    because I was there for a wedding -- a family relative

9    wedding.  My guess is after, but I don't know.

10         Q.     Was that a meeting that Tracie set up?

11         A.     Yes.  It wasn't really much of a meeting that

12   we set up.  It was a lunch to introduce me to Kevin Brady,

13   who was going to be in the compliance area.

14         And so we went to lunch, and then we walked over to

15   our offices, and he said, Hey, if you have time, let me

16   introduce you to her superior.  He had a few minutes, so we

17   chatted.

18         Q.     Was it your understanding that Kevin Brady

19   would do your tax returns?

20         A.     Yes.

21         Q.     And did you meet with Kevin Brady and discuss

22   his qualifications?

23         A.     Yes.  But, frankly, I was at that point

24   looking to Tracie as her being the one that would be

25   supervising the compliance, as well.

1          Q.    And "compliance," as you're using it, means

2     tax compliance with the federal income tax laws in connection

3     with your tax return?

4          A.    Correct.

5          Q.    You met Kevin Grady?

6          A.    Yes.

7          Q.    That was your first meeting?

8          A.    Yes.  You know, I'm trying to recall, but I

9     know I had lunch with Kevin Brady.  I don't know if it was at

10    that first lunch, or if it was at another time when I was in

11    Atlanta where I had lunch with him.  But it could have been.

12         Q.    Who, other than Tracie Henderson, did you

13    confer with about the BLIPS transaction?

14         A.    No one else.

15         Q.    Just Tracie Henderson?

16         A.    Yes.

17         Q.    How come you didn't call Goldman Sachs about

18    the Argentinian peso?

19         A.    I didn't get to that point.  When I was going

20    to have the meeting on the economics of the transaction, it

21    was here in Denver and the guy didn't show up, so I didn't

22    have enough facts.  And it never got to a point where I was

23    seriously thinking about BLIPS, because there were issues

24    that came up, and I decided not to do it.

25              And I never got to do some real due diligence, like

```
 1   projections, profit, legal opinion.  None of that.

 2            Q.    Did the Deerhurst transaction compute a

 3   probability of profit?

 4            A.    I prepared a projection.

 5            Q.    What conclusion did you come to with respect

 6   to Deerhurst?

 7            A.    I projected that I was going to make a ton of

 8   money.

 9            Q.    In percentages, in a wide range, what were you

10   looking at as a return?

11            A.    I think my annual rate of return was somewhere

12   between 60 to 75 percent.

13            Q.    Return on investment?

14            A.    Yes.

15            Q.    Over the course of five years, or each year?

16            A.    Each year; each year.

17            Q.    60 to 70 percent a year?

18            A.    Yeah.  On a leveraged basis.

19            Q.    4 to 1?

20            A.    4 to 1, including leverage.

21            Q.    So without leverage?

22            A.    About 16 or 17 percent without leverage.

23            Q.    And you felt pretty comfortable with those

24   numbers, at least based upon your due diligence?

25            A.    At the time.
```

```
 1              Q.    At the time?

 2              A.    Yes.

 3              Q.    It didn't work out that way, did it?

 4              A.    No.

 5              Q.    How much of your principal did you end up

 6    losing in the transaction?

 7              A.    About half, I think.

 8              Q.    I'm going to backtrack again.  We'll get back

 9    to Deerhurst.

10              Did you talk to John Raby about BLIPS at all?

11              A.    I don't think so, but I don't recall.

12              Q.    With respect to Deerhurst, did you understand

13    that John Raby was to be compensated?

14              A.    At what point in time?

15              Q.    You tell me.

16              A.    Okay.  Well, let's take it year by year.  In

17    the year 2000, I didn't know, because he was a

18    Pricewaterhouse guy.

19              Q.    When were you working with him, he was talking

20    to you about Deerhurst and working at Pricewaterhouse at the

21    same time?

22              A.    He made the introduction to Deerhurst, and I

23    believe he was still at Pricewaterhouse.  Let me think.

24              Q.    He told us in his deposition that he formally

25    left in February and announced that he was leaving, I think,
```

1    in November or December.

2                A.      Of what year?

3                Q.      Of 2000.

4                A.      Okay.  Then --

5                Q.      He told us, and you were there -- and I don't

6    mean to misstate his testimony -- but my recollection of his

7    testimony is that around November/December he announced his

8    intention to leave Pricewaterhouse in 2000, and in February

9    or so --

10               MR. HALLETT:  Hang on.  He announced it in December

11   of 2000.

12               Q.      (By Mr. Geier)  He announced in December that

13   he was leaving in 2000, and turned to MultiNational

14   Strategies at the beginning of the year.  We saw the contract

15   dated January 11, 2001.

16               A.      Okay.  That's right.  So let's take 2000

17   first.

18               Q.      Okay.

19               A.      Compensation at that point would have been

20   that he made the introduction, and I had no idea how he would

21   be compensated.

22               Q.      Let's stay at that point.  Did you understand

23   that he was working with you in order to get paid?

24               A.      In 2000?

25               Q.      At any time that he was working with you.

```
 1              A.    I think when he joined Mike Schwartz's firm, I
 2    viewed him now as being part of Schwartz's firm, and I felt
 3    comfortable in calling him with questions at that point.
 4              Q.    Let's back up a little bit.
 5              A.    Okay.
 6              Q.    You were working with him in 2000, looking for
 7    a transaction?
 8              A.    Well, what he did -- let me make sure I get
 9    the dates correct.
10              Q.    Okay.
11              A.    What I recall from John in 2000 was an
12    introductory meeting to a Jenkens & Gilchrist transaction.
13    That was very brief.
14              Q.    Okay.
15              A.    And it never occurred to me how he would be
16    compensated on that.
17              Q.    He wasn't billing you for his time?
18              A.    In 2000, I don't think I received a bill from
19    him.
20              Q.    Did you expect that Pricewaterhouse would be
21    paid for the time that Mr. Raby was working for you?
22              A.    I didn't think about it.  It was kind of like,
23    Hey, I want you to meet with these guys, and so forth.
24              And then with Deerhurst, which I believe my first
25    introduction was in the spring or summer of 2000.
```

1          Q.     Summer, I think is what you said.

2          A.     Somewhere in that period of time.  So he would

3     have -- call it the spring or summer of 2000 -- made the

4     introduction to Mike Schwartz.

5          That introduction was not time-consuming.  He

6     basically said, You should meet Mike Schwartz.  I met with

7     Mike Schwartz in New York.  Raby never explained any details

8     of the investment in Deerhurst; Schwartz did that.

9          So did I know that was an arrangement to compensate

10    Raby?  I don't know, and I didn't think about it.

11         Q.     Did there come a time when you learned that

12    Mr. Raby was being compensated?

13         A.     When I really learned about his compensation

14    was in a deposition -- I think it was Schwartz.  Before that,

15    I guessed he would be compensated by Schwartz.  I didn't know

16    how much, though.

17         Q.     Because that's the usual practice on

18    transactions of this type?

19         A.     I think it's the usual practice in the

20    investment field.  If you're in a mutual fund and you have a

21    stockbroker, the stockbroker that puts you in the mutual

22    funds gets a 5 percent fee, usually.  So that happens.

23         We concluded that there was some compensation

24    agreement.  I don't know if he was making money on me,

25    though, or if he was making money on future MultiNational

1   Strategies deals.  I didn't know how it worked.

2          Q.    Is it your testimony, then, that you did not

3   have a discussion with Mr. Raby about compensation for the

4   work he was doing with you in connection with Deerhurst?

5          A.    Absolutely correct.

6          Q.    Do you remember if you considered a

7   transaction called the Taxpayer Relief Act Charitable

8   Trust -- the TRACT?

9          A.    Yes.  I remember that I never considered that.

10         Q.    Tell me what you remember.

11         A.    I'm certain about it.

12         Q.    Okay.

13         A.    The reason is:  When I read one of the

14  government filings, there was an exhibit with a document

15  that -- I think it had that name.  And I looked at it, and I

16  said, I have no idea what this document is.  I've never seen

17  it in my life.

18         So I did some research to try to figure out whether

19  it was even possible for me to have looked at that document.

20  My conclusion was that it wasn't.  Now, if it happened, I

21  have no recollection whatsoever.

22         Q.    What was your research?

23         A.    Well, why don't you give me the -- my

24  recollection is that there was a date of November 1st.

25         MR. HALLETT:  Let him give you the document.

1          Q.    (By Mr. Geier)  Go ahead with November 1st.

2          A.    If that's correct.  My recollection is that it

3    was November 1st.  So I started thinking, Well, did I even

4    know Tracie Henderson November 1st?  And my conclusion was

5    that I hadn't been introduced to her, because I was

6    introduced to her in Dallas.  So I went through my credit

7    receipts to figure out when I was in Dallas, and I think it

8    was November 28th or 29th.  We didn't even talk about a

9    transaction.

10          And then I saw in your footnotes on your filing that

11   that said that in that transaction, there was a notice or

12   some publication, or something that the IRS issued, basically

13   saying they were not in agreement with that transaction.

14          So my conclusion -- this is speculation, and I

15   shouldn't speculate.  But my conclusion is that --

16          MR. HALLETT:  You can answer without waiving my

17   objection to your speculating in the future.

18          A.    Okay -- is that we probably had a meeting on

19   November 1st.  And that meeting was going to take place, and

20   they were preparing that to show me that for that meeting.

21          I don't believe that meeting ever took place,

22   because I didn't meet them until late in the month.  Between

23   the time that that was prepared and the time that they met

24   me, the IRS came out with a notice that said that this was

25   not a good transaction.  That was my conclusion on all these

1    things.

2            Q.    (By Mr. Geier)   What about a transaction

3    called POPS?  Have you ever heard of that, other than seeing

4    it in our papers and this litigation?  Partnership Option

5    Portfolio Strategy.

6            A.    Never.   That's the only time I saw it was in

7    your --

8            Q.    And the same predicate for an OPIS, an

9    Offshore Portfolio Investment Strategy?

10           A.    OPIS -- I had heard the name, but that's all I

11   know.   I don't know any details.

12           Q.    And how did you hear?

13           A.    Papers.   Even in today's paper, there was an

14   article.

15           Q.    But back in '99 and 2000 would be what my

16   focus would be.

17           A.    I think Tracie Henderson might have mentioned

18   that.  She said, My discussion about BLIPS before; she said,

19   We were trying to figure out what the notice means to our

20   transactions and if it affects BLIPS or OPIS, and what we can

21   do or can't do.  That's all I recall.

22           Q.    So was it a transaction that Tracie had

23   mentioned to you in terms of trying to analyze whether it was

24   workable?

25           A.    The name, yeah.

1          Q.    But in connection with a potential transaction

2     for you?

3          A.    To offer me, right.

4          Q.    What about a Jones Day transaction?

5          A.    I have no clue.

6          Q.    What about a Common Trust Fund?

7          A.    No clue.

8          Q.    Thank you.

9          A.    Sure.

10         Q.    So with respect to Mr. Raby, other than the

11    Jenkens & Gilchrist -- for lack of a better name, since we

12    don't know the name of it -- and other than Deerhurst, was

13    there any other idea that he floated to you in the 1999-2000

14    time period?

15         A.    I think he was trying to get me to consider

16    using their investment-management services and some

17    estate-tax planning work.

18         Q.    What were the investment-managing services?

19    Was this where they referred it to another entity?

20         A.    I didn't realize that at the time.  I became

21    aware of the fact that it was being outsourced a couple of

22    days ago.

23         Q.    At Mr. Raby's deposition?

24         A.    Yes.

25         Q.    Was there any other specific transaction or

```
 1   idea that he was talking about, other than what you just

 2   described?

 3            A.    Not to my recollection.

 4            Q.    With regard to KPMG, there were BLIPS -- some

 5   other transactions were mentioned -- or at least the name

 6   thrown out -- but BLIPS was the only transaction that you

 7   actually had more than just a brief discussion about?

 8            A.    BLIPS was the only transaction.  But I

 9   wouldn't even say "names."  I would say the only name that I

10   have any recollection of whatsoever was the OPIS one that I

11   just mentioned.

12            Q.    Did Tracie -- was this over the phone when you

13   talked to her?

14            A.    Over the phone, yes.

15            Q.    And it was an idea that she was working on for

16   you?

17            A.    I don't know if it was even an idea.  It

18   was -- Well, we have this transaction we've done in the past

19   called OPIS.  I wasn't that interested in her pursuing that.

20   I was like, What's the point?

21            Q.    Why?  Because of the notice?

22            A.    No, she was telling me we're trying to feel

23   internally here what the notice means to us.  And I think I

24   was already considering the Deerhurst transaction.  Any

25   transaction that I go into, I put a lot of time into it -- a
```

1    significant amount of time.  There are only so many resources

2    that you can look at.  At some point on any investment, you

3    basically say, I'm not going to put in any more time into

4    that.

5            Q.    You said when you talked with Tracie, you

6    talked about the potential tax benefit to the BLIPS deal?

7            A.    I'm sure we did.

8            Q.    And the other benefits that you talked about?

9            A.    We talked about the economics of the

10   Argentinian peso doing this and that, and so forth.

11           Q.    And did she offer any advice with respect to

12   the merits itself?

13           A.    She offered to put me in touch with someone

14   that could provide that advice, but they never showed up.

15           Q.    That was someone at Presidio?

16           A.    That was another turnoff.  Here we are to have

17   a meeting, and he doesn't show up.

18           Q.    And your conversation with Jeffrey Eischeid

19   included the BLIPS transaction?

20           A.    A very brief one, yes.

21           Q.    Where he wanted to get papers to you?

22           A.    No, no.  I wanted to get papers.  He was

23   saying, Oh, we can get them to you.  And then there was

24   discussion, I want them early to be able to make a thorough

25   review.  And that's when he said to me, You can do that, but

100

1    we're unwilling to accept changes.

2          Q.    Did you understand there to be a deadline for

3    making a decision on the BLIPS?

4          A.    No.

5          Q.    When you say "early enough," was that in

6    relationship to the fact that the tax year was approaching

7    the end, and that you wanted to make a decision before the

8    end of the year?

9          A.    Yes.

10         Q.    Because your hope was to generate a tax loss

11   in 2000; correct?

12         A.    It would have been one of the reasons to have

13   looked at that investment.  I didn't want this to happen:  I

14   didn't want to say, Hey, we really want to do a transaction

15   with you, and it would make sense from a timing perspective

16   to get that done within a period of time.  So now, Here.  And

17   you have no time to do proper due diligence and address it.

18         Q.    Because of the end of the tax year?

19         A.    That would be one reason, yes.

20         Q.    BLIPS and Deerhurst -- the ultimate question:

21   Which came first?

22         A.    I don't know.  They were in competition.

23   Perhaps the better answer is that -- or the better response

24   is:  BLIPS and Deerhurst were competing for a client.  And

25   I'm sure Tracie Henderson looked at Deerhurst as competition.

1      Q.     Did you share with her the Deerhurst?

2      A.     At some point.

3      Q.     At what point?

4      A.     When she introduced me to BLIPS, I'm sure I

5  told her, You know, I'm considering other investments, other

6  transactions.  I'm sure I mentioned Deerhurst.  And at some

7  point, when I decided to hire her as my tax preparer, I would

8  have shared my opinion and things like that.

9      Q.     When did you make that decision?

10     A.     To hire her as my tax preparer?

11     Q.     Uh-huh.

12     A.     Probably in the fall of 2000.

13     Q.     Prior to entering into Deerhurst, or after?

14     A.     No, prior.

15     Q.     Okay.  You mentioned that Tracie introduced

16  you to her boss, Jeffrey Eischeid?

17     A.     Yes.

18     Q.     Is he the head of a group at KPMG?

19     A.     I don't know.

20     Q.     Do you know what group Tracie was in?

21     A.     I don't know the name of it.  I don't know.

22     Q.     What did you understand was the function of

23  Tracie's group, as opposed to --

24     A.     Two functions for the most part.  Tax

25  compliance and tax services, such as year-end tax planning,

1    estate-tax planning.  Things like that.

2              Q.    Okay.

3              A.    And actually, I should say bringing up

4    investment ideas, because BLIPS would fall into that.

5              Q.    All right.  You talked with Mr. Raby about the

6    Deerhurst transaction in the summer?

7              A.    Spring or summer.

8              Q.    Spring or summer of 2000?

9              A.    Yes.

10             Q.    Did he call you, or meet with you?

11             A.    I'm sure he called me.

12             Q.    What did he tell you about the transaction?

13             A.    Not much.  I think it was an opportunity to

14   introduce me to Michael Schwartz.  So it would have been

15   something like, I have an idea -- just like he did with

16   Jenkens & Gilchrist, I'm sure -- if you're in New York and

17   you have an hour to meet with Mike Schwartz.  That's all I

18   can recall.

19             Q.    He didn't tell you anything about why he

20   wanted to meet with you?  I mean, about what the transaction

21   was just to see if that might be something --

22             A.    Sure.  Well, the reality is that I can't

23   recall, unless I speculate.

24             MR. HALLETT:  Don't speculate.

25             A.    All right.

103

1          Q.     (By Mr. Geier)  I'm going to ask you to

2     speculate.  There's an objection to it, I understand, but I

3     think it's appropriate in a deposition to explore the best

4     you can.  And if it's speculation, just let me know that

5     that's what you're doing.

6               MR. HALLETT:  No, I object.  We'll go to "the man"

7     on that.

8               MR. GEIER:  Darrell, we don't need to argue.  I just

9     need an instruction from you --

10              MR. HALLETT:  I'm instructing him not to speculate.

11    He can give his best recollection, but if it's pure

12    speculation, I'm going to instruct the witness not to

13    speculate.

14              Based upon advice of counsel, don't answer a

15    question if you're speculating.

16              Q.     (By Mr. Geier)  In this discovery deposition,

17    are you refusing to answer the question I posed to you based

18    upon advice of Counsel?

19              A.     Yes.

20              Q.     I'll move on.  Is it likely that you would

21    have wanted to know what the idea was before committing some

22    of your time to a meeting?

23              A.     Yes.

24              Q.     Were you looking for an investment in foreign

25    currencies?

104

1          A.    No, I wasn't looking.

2          Q.    Did you understand before you met with Michael

3    Schwartz that the Deerhurst transaction involved foreign

4    currencies?

5          A.    Before?

6          Q.    Before.

7          A.    No.

8          Q.    Did you understand before you met with Michael

9    Schwartz that the transaction involved the generation of a

10   tax loss?

11         A.    No, not to my recollection.

12         Q.    Did you have an understanding of who Michael

13   Schwartz was before you met with him?

14         A.    Yes, I had an idea; of course.

15         Q.    Who did that come from?

16         A.    I'm sure it came from John Raby.

17         Q.    What was your idea?

18         A.    I can't recall.  I have an idea, but...

19         Q.    What was that idea?

20         A.    My idea of Mike -- which I'm not sure was what

21   Raby told me -- was that Mike was heading a firm that had

22   strategies and investments that had an investment component

23   to them and also a tax component to them.

24         Q.    And is that what you were looking for?

25         A.    I wasn't looking.  I was receptive to

1  listening.

2          Q.   During 2000, were you talking to Mr. White

3  about your potential transactions?

4          A.   As I would learn about an idea, I discussed it

5  with Mr. White.

6          Q.   Did you have an understanding that you would

7  share this information?

8          A.   No.   We share almost about every investment

9  idea, whether it's in the wine business or -- on anything.

10  We share the ideas.

11          Q.   In 2000, did Mr. White have a large amount of

12  income?

13          A.   Yes.

14          Q.   Over $100,000,000?

15          A.   From my recollection, nowhere near

16  $100,000,000.

17          Q.   $30,000,000?

18          A.   More than that, I think.

19          Q.   And you were aware of that during 2000;

20  correct?

21          A.   Yes.

22          Q.   Did you talk with him at any point in 2000

23  about the idea of entering into a transaction to obtain a tax

24  loss?

25          A.   I talked to him about ideas that were

 1    investments that contained a tax component to them, yes.

 2            Q.    Did your conversations involve that you both

 3    were looking for transactions that involved tax losses, given

 4    your personal financial situation?

 5            A.    No, I wouldn't characterize it that way.

 6            Q.    How would you characterize it?

 7            A.    The way I would characterize it was that there

 8    were literally only a couple of ideas that came my way that I

 9    gave any consideration to -- that had an investment portion

10    to it, a tax-component portion to it.  And we talked about

11    whether it would be attractive for him as well.

12            Q.    Did he say it would be attractive?

13            A.    Yes.

14            Q.    And did you say it would be attractive to you?

15            A.    Yes.

16            Q.    Did you compute at any point how much a dollar

17    of tax loss was worth to after taxes?

18            A.    What do you mean by that?

19            Q.    Let's say you have $60,000,000 of income and

20    you're able to have a $100 tax loss, how much is that $100

21    tax worth to you after taxes?

22            MR. HALLETT:  Vague and ambiguous.

23            Q.    (By Mr. Geier)  $60,000,000 of income?

24            A.    Yes.

25            Q.    And you have, let's say, a $10,000 tax loss

107

```
 1    that you were able to generate.  The amount of the tax loss

 2    is $10,000.

 3              A.    Okay.

 4              Q.    How much is that worth to you after taxes?

 5              A.    In today's world, (inaudible) as long as the

 6    deduction was allowed.

 7              Q.    So if it was a $10,000 deduction, what was

 8    your tax break?

 9              MR. HALLETT:  At what time, Counsel?

10              MR. GEIER:  In 2000.

11              A.    I don't recall my taxes, but it probably was

12    the highest tax rate.  So was it about 40 percent back then?

13    --  only in federal.

14              Q.    (By Mr. Geier)  I think that's correct.

15              A.    Off on your federal, plus state --

16              Q.    Okay.  So assuming it was at --

17              MR. HALLETT:  Wait, wait, wait.  Let him answer the

18    question.

19              A.    So it would be 45 percent times the amount of

20    the tax loss.  That would have been the tax cash benefit to

21    me.

22              Q.    45 percent?

23              A.    Yeah, 40 percent for federal and 5 percent for

24    state; that's 45 percent, I think.

25              Q.    So you're doing federal and state together?
```

```
1              A.    Yes.

2              Q.    I appreciate that.  For federal, it would be?

3              A.    40 percent times the amount of the tax -- the

4       deduction.

5              Q.    And the deduction in my example was $10,000.

6              A.    It would be $4000.

7              Q.    That it would be worth to you after taxes?

8              A.    Yes.

9              Q.    If you can get a $10,000 tax deduction that's

10      allowed, you're up $4000 after taxes?

11             A.    Yes.

12             Q.    Thank you.

13             A.    Sure.

14             Q.    Did you do that analysis when you were

15      considering any of these transactions?

16             A.    I'm sure I did.

17             Q.    So you did for Deerhurst?

18             A.    Yes.

19             Q.    In Deerhurst, do you recall roughly?  Did you

20      generate about $60,000,000 in deductions?

21             A.    I did.

22             Q.    Did you calculate before you entered the

23      transactions how much that would be worth to you after taxes?

24             A.    Roughly.

25             Q.    What was that?
```

1          A.     If I do my math again, 40 percent times 60

2     would be about $24,000,000.

3          Q.     $24,000,000 after taxes?

4          A.     Yes.

5          Q.     So is it fair to state that in the Deerhurst

6     transaction, you invested about 8.9 million?

7          A.     Yes.

8          Q.     And even if you lost all of that, you would

9     still be economically ahead if you were able to obtain a

10    $60,000,000 tax deduction?

11         A.     If that tax deduction were to be guaranteed, I

12    think you're right.

13         Q.     Okay.  In addition to talking to Mr. White,

14    did you also talk to Mr. Dice in 2000 about these

15    transactions that we've been discussing?

16         A.     Only Deerhurst, I believe.

17         Q.     Did you tell him about the Deerhurst

18    transaction?

19         A.     I don't think so.  I think it was Raby who

20    told him.  I think Raby asked me if it was okay to talk to

21    Mr. White and Mr. Dice, and I said, Of course.

22         Q.     And you didn't refer Mr. Raby to them?

23         A.     I may have said, Hey, John Raby is going to

24    call you.  You talk to him if you want to.

25         Q.     Is it your testimony that it was at Mr. Raby's

```
1    insistence?

2              A.    Yes.

3              Q.    So your first conversation about Deerhurst was

4    with Mr. Raby?

5              A.    Yes.

6              Q.    And that lasted how long?

7              A.    I can't recall.

8              Q.    Was it a short conversation?

9              A.    It would be logical that it would have been a

10   short conversation.

11             Q.    Did he tell you to call Mr. Schwartz?

12             A.    I can't recall.

13             Q.    How did the meeting get set up in New York, if

14   you can recall?

15             A.    I don't recall.

16             Q.    Who was present at the meeting?

17             A.    It was Mr. Schwartz, Mr. White, and I.

18             Q.    Was Mr. Raby there?

19             A.    No.

20             Q.    What was discussed?   Had you talked to

21   Mr. Schwartz g119.

22                   Before that meeting?

23             A.    I don't think so.

24             Q.    So you meet him for the first time and talk to

25   him for the first time?
```

1          A.     Yes.

2          Q.     What does he tell you?

3          A.     He described the Deerhurst transaction in some

4    detail.

5          Q.     What did he say?

6          A.     Well, that it would require an investment in

7    foreign currencies; that he was working with a manager who

8    had a very long established track record; that it was a very

9    nice way of diversifying from the equity markets, and to some

10   extent the fixed-income markets as well; and that it would be

11   a nice way to provide a portion of your assets, if you were

12   to do an asset-allocation analysis.  He said that.  Then he

13   also said that there was a tax component to the transaction.

14         Q.     And what was the tax component.

15         A.     That when you invested in foreign currencies,

16   there are some tax benefits that can be obtained when you do

17   some trading of foreign currencies.

18         Q.     And did he tell you anything about the amount

19   of the deductions that you could generate?

20         MR. HALLETT:  Are we on the first meeting still?  Is

21   that what you're directing your attention to?

22         MR. GEIER:  Yes, I'm just following up on his

23   statement.

24         A.     No, I don't recall that.

25         Q.     (By Mr. Geier)  Did you inquire about the

1    amount of the tax deduction that you could obtain?

2              A.    I don't recall inquiring about it.

3              Q.    Did you ask him any questions?

4              A.    Many, I'm sure.

5              Q.    What did you ask him?

6              A.    How the trading occurs --

7              Q.    Did you ask him anything about timing?

8         MR. HALLETT:   Let him finish his answer.

9              A.    I don't recall my specific questions.  I just

10   know that whenever a proposal like that, as the proposal is

11   being presented to me, I have questions about what's being

12   discussed.  So it would have been questions about the

13   investment program, and some initial questions as to the tax

14   treatment of the transaction.

15             Q.    (By Mr. Geier)  Did you ask him if there was a

16   dollar limit on the amount of deductions that you could

17   obtain?

18             A.    I'm sure I did not.

19             Q.    Why are you sure?

20             A.    You asked me a question earlier about, Did you

21   talk about the amount of the tax deductions?  And we didn't.

22   There wasn't like a limit or anything.

23             Q.    Did you ask him about the timing of the

24   transaction?

25             A.    I don't think so.

113

1     Q.    Was that a concern to you?

2     A.    At that meeting, no.  I was just trying to

3  find out what the transaction was all about.

4     Q.    And it was clear to you at that meeting that

5  the tax loss was a component of the transaction?

6     A.    Yes.

7     Q.    And it was clear to you at that meeting that

8  there was going to be an investment in foreign currencies?

9     A.    Yes.

10     Q.    Did you understand at that meeting that Andrew

11  Krieger would be the trader in charge of trading?

12     A.    I don't know if I did at that meeting or not.

13     Q.    How long did the meeting last?

14     A.    A breakfast.  Maybe an hour.

15     Q.    What else do you recall, if anything, that

16  Mr. Schwartz told you about this transaction during that

17  hour?

18     A.    Nothing else in that first initial meeting.

19     Q.    Investment in foreign currency; there was a

20  tax-loss component --

21     A.    We talked about our pasts for a while.  Who

22  are you?  What do you do?

23     The reason I remember the meeting -- the real reason

24  I remember -- the thing I remember most about the meeting was

25  what Tony White ate.  It was more impressionable to me in

1     that meeting what he ate, versus the tax losses in that

2     meeting.

3             And the reason is:  I've never seen anyone order

4     what he ordered, which was sausage, bacon, and ham.  And I

5     said, My, God, you're going to die of cholesterol.  And he

6     said -- I'll tell you off the record what he said.

7             Q.    Can you recall anything else that Mr. Schwartz

8     conveyed to you about the transaction?

9             A.    No, that's all I recall.

10            Q.    Did he have any documentation?

11            A.    No.

12            Q.    Did he tell you about his background?

13            A.    Yes.

14            Q.    Did he tell you about his background in

15    connection with other transactions which had tax loss as a

16    component?

17            A.    No.

18            Q.    But you had understood from Mr. Raby that Mr.

19    Schwartz was involved in such transactions?

20            A.    Yes.

21            Q.    Did you ask him about those transactions?

22            A.    I don't think so.

23            Q.    Did you do any due diligence at that initial

24    meeting?

25            A.    A little bit.

1          Q.    Tell me.

2          A.    How many years were you -- I think he

3    mentioned about Pricewaterhouse.  How long have you been in

4    New York?  What kind of clients have you had?  What areas of

5    taxation were you in?  Who were your clients?  Were they

6    corporate clients?

7          I remember he was talking about national taxation.

8    I had an interest in that because of my previous job.  We

9    talked about the days of foreign distribution, I think.

10         So that was it.  It was very preliminary.

11         Q.    Okay.  Did you know that his company was

12   called MultiNational Strategies?

13         A.    He informed me of that, yes.

14         Q.    And how long had they been in business?

15         A.    I think for a very short period of time.

16         Q.    Did you talk about clients at MultiNational

17   Strategies?

18         A.    No.

19         Q.    Did you ask him about clients at any point?

20         A.    Yes, I called referrals, but not from Mike

21   Schwartz.

22         Q.    You didn't ask Mike Schwartz for referrals?

23         A.    No.  At some point -- no, I didn't.

24         Q.    You got no referrals from Mike Schwartz; is

25   that what you're telling me?

```
 1              A.    On Mike Schwartz?

 2              Q.    At all.

 3              A.    No.

 4              Q.    And you didn't ask for any?

 5              A.    No.

 6              Q.    So you didn't do any background investigation

 7    on Michael Schwartz?

 8              A.    I did in terms of asking him about his

 9    background.

10              Q.    I didn't mean to overlook what you've already

11    stated.  "Other than," that's how I should have asked you.

12              A.    For instance, it's like this:  The fact that

13    he had worked at what you call a Big Four, Big Six, Big

14    Eight -- whatever you call it -- firm; was a partner; was in

15    charge of certain aspects of practices -- I knew the type of

16    guy he was.  I didn't need to have another partner tell me,

17    Yeah, he's a good guy.

18              Q.    You didn't need that assurance?

19              A.    I did not.

20              Q.    And you didn't need assurances of knowing that

21    what Michael told you was accurate?

22              A.    Well, I did need assurance about that.  That's

23    a different thing.  I'm just talking about whether he is a

24    qualified person to discuss tax issues.

25              Q.    Did you ask him about the circumstances of why
```

```
 1    he left his prior firms?

 2              A.    Yes, I did.

 3              Q.    And what did you learn?  Did you learn that he

 4    was unhappy?

 5              A.    I believe so, yes.

 6              Q.    Did you learn that he was overlooked for a

 7    promotion?

 8              A.    I did not learn that.  I learned that in his

 9    deposition.

10              Q.    Just so that we're clear, because, obviously,

11    this meeting happened long ago.  Was anyone else at that

12    meeting?

13              A.    No, I'm positive.

14              Q.    All right.  So the meeting took place.  Is

15    there anything else you can tell me or recall that Michael

16    Schwartz said to you in that meeting about the transaction,

17    other than his background?

18              A.    Casual chat:  Where he lives; that kind of

19    stuff.

20              Q.    Aside from that?

21              A.    Nothing else.

22              Q.    Can you recall any questions that you had

23    other than what you conveyed?

24              A.    No.

25              Q.    Can you recall any questions that Mr. White
```

1     asked?

2             A.     I don't think he asked any.  I can't recall.

3             Q.     He was too busy eating?

4             A.     Yeah, he was; that's true.  I can't recall.

5             Q.     So to the best of your knowledge, you've given

6     me, as best you're able to, your recollection of what

7     transpired at that breakfast meeting with Michael Schwartz?

8             A.     Yes.

9             Q.     What about next in connection with how the

10    Deerhurst transaction progressed for you?  What did you do?

11            A.     Then there was a subsequent meeting at

12    Mr. White's residence in New York.  And again, it was

13    Mr. Schwartz, me, and Mr. White.

14            Q.     In New York -- you, Mr. Schwartz, and Mr.

15    White?

16            A.     Yes.

17            Q.     Same group?

18            A.     Same group.

19            Q.     Let me ask you a question about the

20    transaction.  What was the significance of the 1 and 30 to

21    you in entering into the transaction -- the 1 percent

22    management fee?

23            A.     Negotiating the fee?

24            Q.     Yeah.  What was the significance of that?

25            A.     You know, somewhere down the line I found out

1   that I would be the largest investor in Deerhurst.  And, as a

2   result, Mr. White was going to be the second largest investor

3   in Deerhurst.

4           In the investment field, size brings purchasing

5   power.  It's just the way it is.  I thought, also, that if we

6   made money, we were going to make a lot of money, and I

7   didn't mind sharing even the larger part of the 20 percent

8   with Deerhurst.

9           But on the asset-management fee, I thought that I

10  should be able to guard on the downside, so I was willing to

11  give up an assured fee versus a contingent fee based on

12  profits.

13          And I told both Krieger and Schwartz that I was not

14  going to do the transaction unless the fees were lower.

15          Q.    Did you run any numbers on 2 and 20 versus 1

16  and 30?

17          A.    No, I didn't.

18          Q.    Let's go back.  You were telling me about a

19  second meeting that occurred with yourself, Mr. Schwartz, and

20  Mr. White?

21          A.    Yes.

22          Q.    How far from the first meeting?  How much time

23  elapsed between the two?

24          A.    Maybe a couple of months.

25          Q.    Okay.  So it wasn't just a matter of a week or

120

```
 1   two?

 2          A.   No, because it would have been the next time

 3   that I was in New York.  I wasn't in New York every week.

 4          Q.   Who set up this meeting?

 5          A.   I don't recall.

 6          Q.   Were there telephone communications between

 7   yourself and anyone else, other than Mr. White and Mr. Dice,

 8   in connection with Deerhurst prior to that second meeting?

 9          A.   I don't think so.

10          Q.   Did you do any due diligence between the two

11   meetings?

12          A.   No, I didn't know enough.

13          Q.   And did you talk with any financial advisor

14   about the transaction?

15          A.   No.

16          Q.   Did you talk to an accountant?

17          A.   No.

18          Q.   Did you talk to anyone at KPMG?

19          A.   No.

20          Q.   Did you talk to Mr. Raby?

21          A.   Mr. Raby?  I don't think so, no.

22          Q.   Did Mr. Schwartz call you in between and talk

23   to you?

24          A.   Probably to set up a meeting.

25          Q.   But no more?
```

```
 1              A.     No.

 2              Q.     Did you say to him at the conclusion of the

 3    first meeting, We need documents; we need to start looking at

 4    this thing?

 5              A.     No.

 6              Q.     So the second meeting -- how long did that

 7    last?

 8              A.     Probably an hour to an hour and a half.

 9              Q.     I don't know if you're going to be able to

10    remember this, but it's somewhat critical:  What did

11    Mr. White eat?

12              A.     You know, it wasn't a lunch meeting.

13              MR. HALLETT:  You just got your second smile.

14              A.     We probably drank tea, because he likes his

15    afternoon tea.

16              Q.     Sugar?

17              A.     No, I don't think so.

18              Q.     We'll move on.

19              This was an hour and a half.  What was the purpose

20    of this meeting?

21              A.     To really get into more details of the

22    transaction.

23              Q.     Okay.

24              A.     Here's the other thing, too:  I try to be a

25    fairly private person, even when public companies report
```

122

1  about you.  So I don't prefer to get into significant details

2  on my own financial affairs in a restaurant.  I'm going to do

3  that in a more private setting.

4          Q.     So this was a more private setting?

5          A.     Yes.  It was Mr. White's residence.

6          Q.     Did Mr. Schwartz make a presentation?

7          A.     He did.  It was a verbal presentation.

8          Q.     Did he have any documents?

9          A.     I don't think so.

10          Q.     So July?  August?

11          A.     I don't know; I can't recall.  I think someone

12  has testified to the date of that meeting, and I would concur

13  with what they testified, but I can't remember what it was.

14          I'm not sure if that makes any sense.

15          Q.     It makes sense, but it doesn't help me now.

16  But I understand what you're saying.

17          A.     I just can't recall.

18          Q.     I understand.  I'm only asking you what you

19  can recollect.  Tell me about the presentation that was made.

20          A.     Now, that I recall more than the timing and so

21  forth, because it was more substance.

22          He made a presentation as to what the trading was

23  all about; what Andrew Krieger was all about; what his firm

24  was all about; how it was that his trades made money.  I

25  think he discussed about making short-term trades.  He

1    discussed the fact that there was a very high volume of

2    trades.

3           Then we went into a discussion -- that was the first

4    part of the discussion.  The second part of the discussion

5    was a discussion of the structure of the transaction.

6           That to introduce us to Andrew Krieger and his

7    investment programs, that a way of doing so would be to set

8    up a trial account with a smaller amount of funds invested.

9           That Krieger was used to dealing with large amounts

10   of capital in terms of his trades, but was willing to

11   actually pool some funds together and trade those as one

12   account.

13          So a second step of the structure of this investment

14   would be to pool the funds into a partnership; trade that for

15   some time.  And then if everyone was happy, then there would

16   be a long-term commitment -- to enter into a five-year

17   program where Mr. Krieger would make a significant investment

18   in hiring traders and people and infrastructure to trade for

19   five years.

20          So we went through the structure of the transaction

21   in that fashion.

22          Q.    Was it your understanding that everybody

23   entered into that partnership that you were referring to?

24          A.    At the time, yes.

25          Q.    Did you learn before you entered the

124

```
 1    transaction that Mr. White, for part of the investment,

 2    didn't enter the partnership?

 3          A.    No.  I learned that much, much later.

 4          Q.    When did you learn that?

 5          A.    I think through this case.

 6          Q.    Did you know going in that Mr. White sought

 7    ordinary loss?

 8          A.    Yes.

 9          Q.    Did you know that he also sought capital

10    losses?

11          A.    That, I didn't recall until later.

12          Q.    Is it possible that you knew it at that time?

13          A.    It's possible.

14          Q.    You saw the Rosenman & Colin memorandum?

15          A.    No.

16          Q.    You never saw it in advance of entering the

17    transaction?

18          A.    No.  I saw it when it was produced with

19    Natbony's.

20          Q.    September 26th?

21          A.    Yes.

22          Q.    How long did you understand the test period to

23    be?

24          A.    About a month.

25          Q.    And that was to give you some sort of comfort
```

1   level?

2          A.      Yeah, with Krieger and his trades.  They were

3   such short-term trades that you could get a significant

4   amount of trades done in a short period of time.

5          Q.      You had a chance, though, prior to entering

6   into the transaction, to look at ten years' worth of trades

7   that Mr. Krieger had done?

8          A.      Yes.

9          Q.      Did Mr. Krieger ever deny you any information?

10          A.      No.

11          Q.      You could have looked at the actual trades

12   that he made in the last ten years, had you asked?

13          A.      Sure.

14          Q.      So you had a sense before the test period of

15   exactly what types of trades he was doing; correct?

16          A.      Yes.  But it wasn't my money.  For instance,

17   let me give you an example.  One of my projects in college

18   was futures trading.  We looked at futures trading; we look

19   at the profitability.  But one of the exercises was actually

20   giving you a $10,000 theoretical amount to trade futures, and

21   at the end of the quarter, we'd see how we did.

22          So you can examine history, but going through the

23   reality of making your investment is a different process and

24   experience.

25          Q.      And in your mind, 30 days was sufficient for

1    you to have a good understanding of what the program would

2    be?

3           A.    Yes.

4           Q.    With committing $9,000,000 after that?  Or

5    $8,400,000 after?

6           A.    I didn't know that at the time.  I would have

7    to see how the experiment was going.

8           Q.    Did it go well?

9           A.    Yes.

10          Q.    You were very happy with what happened in the

11   first 30 days?

12          A.    I was pleased.

13          Q.    What else did Mr. Schwartz tell you at that

14   meeting?

15          A.    Then we talked about the fact that there were

16   tax components to the transaction.  Either he volunteered, or

17   I asked, if he had a legal opinion supporting the tax

18   treatment of the transaction.  He said he did.  And he told

19   me the firm, Brown & Wood, a leading Wall Street firm.

20          So I said to him, Can we talk to his lawyer?  And he

21   called him and got him on the phone.

22          Q.    Okay.  At that meeting?

23          A.    At that meeting.  And we talked to that

24   attorney for about 20 minutes.

25          Q.    R.J. Ruble?

1          A.     Yes.

2          Q.     And what did Mr. Ruble say?

3          A.     Well, I did most of the questioning, and he

4   did most of the responding.  I think Mr. Schwartz and

5   Mr. White were listening.

6          I think I started the meeting saying, Hey, we're

7   considering a transaction in foreign currencies that Mike has

8   described; are you familiar with that transaction?  He said

9   yes.  I said, Well, tell me what you know.  And he described

10   the transaction in good detail.

11          At that point, I confirmed that this was our

12   transaction that he was talking about.  I said to him, Have

13   you looked at the tax aspects of this?  He said yes.  And I

14   said, Are you able and willing to issue a tax opinion on the

15   tax component of this transaction?  He assured me that was

16   the case.

17          And I asked him about the fee -- what that was.  I

18   heard $75,000.  Mike Schwartz apparently heard a different

19   number -- that was in his testimony.  But I heard $75,000 and

20   that's what I paid him.

21          Q.     Okay.  Go ahead.

22          A.     So that was the bulk of the meeting.  But I'm

23   sure I asked him questions that were specific to the tax

24   treatment; I just can't recall the specific questions.

25          Q.     So is it fair to say that before you

```
 1    questioned the trader -- Michael Schwartz wasn't entering

 2    into the trades?

 3            A.    No.

 4            Q.    It was going to be Andrew Krieger?

 5            A.    Yes.

 6            Q.    Deerhurst management?

 7            A.    Yes.

 8            Q.    They were the experts?

 9            A.    Yes.

10            Q.    And you hadn't talked to them yet?

11            A.    Not yet.

12            Q.    But before you wanted to talk to them, you

13    wanted to talk to Mr. Ruble on the phone to see if he would

14    be willing to provide a tax opinion?

15            A.    No, it wasn't that way.  I was there with Mike

16    describing the transaction.  So I said to him, If you have a

17    tax opinion -- if you have someone, can you call them on the

18    phone?

19            Q.    Why were you concerned about the tax opinion

20    at that time if you hadn't yet discussed the underlying

21    trade?

22            A.    Well, we hadn't discussed the historical

23    trading results.  But we had discussed with Schwartz the

24    trading program.

25            Q.    But he wasn't running the trading program.
```

1          A.    No, but he was aware of how the trading

2     program worked.

3          Q.    Did you ask at that meeting to get Mr. Krieger

4     on the phone?

5          A.    I asked at that meeting to a -- not on the

6     phone.  I asked at that meeting to have a face-to-face with

7     Krieger.

8          Q.    After you talked to Mr. Ruble, then you asked

9     Mr. Schwartz?

10         A.    It was probably before.

11         Q.    Do you have a specific recollection, Mr. Sala,

12    that you asked before you got on the phone with Mr. Ruble?

13    Do you remember that?

14         A.    Not specific, but there's a reason why I said

15    that.

16         Q.    Okay.  Tell me.

17         A.    The reason was -- the first part of the

18    meeting had to do with the investment program and investment

19    results.  And my recollection would be that, at that point, I

20    would have said, We need a meeting with Andy Krieger in

21    person.

22             The last part of the presentation of the entire

23    meeting was the tax aspect and the call to Ruble.  And the

24    reason I know that is because I remember we were sitting at a

25    conference table, and we had to move because of the phone,

1    and we never went back to that conference table.

2            So at that point, we had already talked about the

3    investment program, and we never went back to that.   And then

4    we finished with the tax component of the transaction and the

5    discussion with Ruble.

6            Q.    Just to be clear:  Do you have a firm memory

7    that it occurred the way that you're saying?  Or are you

8    guessing that that's the way it is based on how you think it

9    should have played out?

10           A.    It's how I think it should have played out.

11           Q.    Okay.  You don't have a firm memory?

12           A.    Not 100 percent; definitely not.

13           Q.    But you are the one who inquired about the tax

14   opinion?

15           A.    No, I wouldn't say that.  I think I said

16   earlier in my testimony that either I did or that Schwartz

17   told me that he had a tax opinion.

18           Q.    You're not sure which?

19           A.    I don't.

20           Q.    Either he asked, or you mentioned it?

21           A.    Yes, one of the two.  I don't think it would

22   have mattered to me at the time.  Either one.

23           Q.    Okay.  Was Mr. Ruble aware -- you said he told

24   you about the transaction, and you felt he understood the

25   transaction?

1      A.    Yes.

2      Q.    Did you discuss with Mr. Ruble at that time

3    that the transaction contemplated a buy-in based upon the

4    amount of the tax loss that you were seeking?

5      A.    No.

6      Q.    Did you ever have that conversation with

7    Mr. Ruble?

8      A.    I only had one conversation with Mr. Ruble,

9    and that was it.

10      Q.    That was it?

11      A.    Yes.

12      Q.    And he didn't mention the fact that the

13    transaction was keyed to the amount of the tax loss that

14    someone was seeking?

15      A.    Say that again.

16      Q.    The amount to be deposited into the

17    transactions was to be tied as a percentage of the tax loss

18    that someone was seeking.

19      MR. HALLETT:  Is that a question?

20      MR. GEIER:  Yes.

21      A.    He did not mention that.

22      Q.    (By Mr. Geier)  Were you aware of that?

23      A.    At some point, and I don't think it was at

24    that meeting.  I became aware of that through Schwartz when

25    he showed me his projections.  Do you want me tell you?

1        Q.      Yeah.

2        A.      Schwartz prepared an analysis that was based

3   on a proposed Treasury economic substance test, which never

4   became law.  In that test, it compared the present value of

5   the tax benefits to the present value of the taxes to be

6   made, based on the gains of the investment over its life --

7   present value using some Treasury rate -- and comparing that

8   to the initial tax benefits.

9        And to the extent that the present value of the

10  taxes to be paid was higher than the initial tax benefit,

11  that would suffice on that proposed test.

12       Therefore, that analysis would drive the amount that

13  you had to invest to generate a certain level of return.  So

14  that's how I understood it worked.

15       That was very complicated.  But, if you want more

16  explanation, I can try to do it.

17       Q.      I think we're on the same page; I just want to

18  make sure.

19       At a certain point you learned that the investment

20  deposited into the transaction was tied into how much loss

21  you were seeking?

22       A.      Yes.  What I learned was that one

23  justification of the tax component of this transaction was

24  based on this analysis, which would result in an investment

25  level that would be linked to a tax loss.

1          Q.    When you say "tax justification," there was a

2     concern, then, that the transaction might not hold up from a

3     tax standpoint?

4          A.    No, I don't think so.  I think that Schwartz

5     was -- he told me he was trying to be extra conservative and

6     make sure that from the government's perspective -- the

7     Treasury's perspective -- that he had a methodology that was

8     familiar, and at one point proposed by the Treasury, is what

9     I recall.

10         Q.    So Mr. Schwartz was aware that the IRS may not

11    look favorably on the transaction?

12         A.    I wouldn't say that.

13         Q.    So Mr. Schwartz was aware that the IRS would

14    question the transaction?

15         A.    Every person would be aware that any

16    transaction may be questioned.

17         Q.    That transaction was described in IRS Notice

18    2000-44; correct?

19         A.    It's interesting that you ask that question.

20    At that time, I don't think Mike Schwartz thought that it

21    was.

22         Q.    What about you?

23         A.    I didn't know.  I was relying on some legal

24    advice.  So what I did know --

25         MR. HALLETT:  Let him finish the answer before you

1    ask another question.

2             A.    And, to a certain extent, Mike Schwartz,

3    because I knew he was a tax guy.  But what I knew about

4    2000-44 was that it was an issue to be addressed in this

5    transaction.

6             Q.    (By Mr. Geier)  Now, I know you rely on the

7    tax opinion.  But you do your own analysis.  You know that

8    there's risk and benefit to every transaction; right?

9             A.    Yes.

10            Q.    And one of the risks in this transaction was

11   that the IRS would disallow it?

12            A.    Yes.

13            Q.    So you looked at IRS Notice 2000-44 yourself?

14            A.    You know, I don't know that I did.  I don't

15   think I did until -- you know what?  I don't think I've ever

16   seen the actual complete notice as of today.

17            Q.    You saw a portion of the notice?

18            A.    Yes.

19            Q.    It was in the opinions that you saw?

20            A.    Exactly.  But to say I received the official

21   notice and I read the whole thing, I don't think so.

22            Q.    But the notice, as far as Mr. Ruble or your

23   counsel thought, might apply to the transaction?

24            A.    Yes, absolutely.

25            Q.    And you read that?

135

1           A.      Yes, I did.

2           Q.      Did it appear to describe the transaction that

3    you were entering into?

4           A.      I don't think so.

5           Q.      Do you recall why not?

6           A.      I don't recall.  But I don't think I said,

7    Hey, this is our transaction.  What I think -- what I

8    remember about 2000-44 was that there was an example where I

9    did say, Hey, there's a component here that sounds like the

10   KPMG transaction -- talking about loan premiums, I think.

11          But I don't think that I read any portions of the

12   2000-44 that said, Hey, this is our transaction.

13          Q.      So you think that in Mr. Ruble's opinion

14   letter, the portion that was cited pertained to BLIPS --

15          A.      No, no, no, no.

16          Q.      You read that elsewhere?

17          A.      That is when Tracie Henderson talked about --

18   she's the one that raised the issue of 2000-44 to me.  I

19   think when I read that, I said, Okay, I see the link is here.

20          In our transaction at that time, I never said, A

21   variance is our transaction.  In fact, I know I didn't.

22          Q.      So you read 2000-44, at the examples that Mr.

23   Ruble cited, and determined that you didn't think that it

24   would apply to this transaction; right?

25          A.      I'll tell you -- if I can respond.

```
1              Q.    Sure.

2              A.    I knew there was an issue on this transaction,

3    and then I read the discussion on 2000-44 in the opinion.

4    When I read the discussion, there were two things that came

5    to mind.  One was giving a discussion as to the weight that

6    courts give to notices as it related to new Reg rules and so

7    forth.

8              But the more significant piece for me was the fact

9    that 2000-44 seemed to contradict existing law.  That's what

10   caught my eye.  And I said, Okay, who knows what weight it

11   has -- any notice.

12             But secondly, this notice contradicts existing law.

13   And it was already addressed by Mr. Ruble, and Mr. Schwartz

14   would have concurred with that.  So I was very comfortable

15   that 2000-44, because of its positions, was fine as it

16   related to our transaction.  That's what I remember.

17             Q.    Did it contradict current law with respect to

18   BLIPS, as well?

19             A.    I don't know.

20             Q.    What was it contradicting?  What was your

21   understanding of what it was contradicting?

22             A.    Sure.  The treatment of contingent liabilities

23   as a liability for tax purposes.

24             Q.    Did you ever ask to engage a law firm with

25   regard to the Deerhurst transactions -- and that engagement
```

1    was refused?

2              A.    No.   I heard that testimony.   I have to --

3              MR. HALLETT:   Just answer the question.

4              Q.    (By Mr. Geier)   You heard that testimony from

5    Mr. Nemirow?

6              A.    Yes.

7              Q.    Your counsel?

8              A.    Yes.

9              Q.    You hired him?

10             A.    Yes.

11             Q.    And you consulted with him on the Deerhurst

12   transaction?

13             A.    Yes.

14             Q.    And he told you that Wilke Farr refused to

15   enter into an engagement with you with respect to Deerhurst?

16             A.    No, he never told me.   His testimony was that

17   I told him that.

18             Q.    And you never told him that?

19             A.    No.   Larry is a great guy, but I just think he

20   got it wrong.   But anyway...

21             Q.    Mr. Nemirow also shared with you, before you

22   entered the transaction, that he thought the IRS Notice

23   2000-44 did pertain to the transaction; didn't he?

24             A.    I don't recall the exact details of the

25   transaction.   But I'm sure that we discussed 2000-44 as an

1    issue of concern that had to be addressed in the transaction.

2              MR. HALLETT:  You mean in the opinion?

3              THE DEPONENT:  In the opinion; I'm sorry.

4         Q.    (By Mr. Geier)  And he told you, though, that

5    he thought that IRS Notice 2000-44 covered the transaction?

6         A.    I don't think so at that point.

7         Q.    He didn't ever share that with you?

8         A.    I think maybe after the Treasury regulations

9    in the summer of 2003 that he would have made a statement to

10   that effect.  But not in 2000.

11        Q.    Anything else that you discussed with Mr.

12   Ruble at the second meeting with Mr. Schwartz that you

13   haven't conveyed?

14        A.    I don't think so.

15        Q.    Did you talk about IRS Notice 2000-44?

16        A.    No, definitely not.

17        Q.    Did you talk about contingent liability?

18        A.    Yes, we did.

19        Q.    Did you talk about economic substance?

20        A.    Yes.

21        Q.    Who brought that up?

22        A.    I don't recall.

23        Q.    Do you recall having a concern about whether

24   this transaction had economic substance?

25        A.    At what point?

1          Q.     Any time prior to entering into the

2    transaction.

3          A.     I wanted to make sure the economics were

4    right.   And this was a transaction driven by a profit motive,

5    absolutely.

6          Q.     And not a tax motive?

7          A.     The primary motive being a profit.

8          Q.     And you knew that was an issue from the tax

9    standpoint?

10         A.     I don't know if I knew exactly, based on the

11   statute.   But my logic would say yes.

12         Q.     So you had a concern that the transaction had

13   economic substance.   But I'm not understanding why that would

14   even become an issue on your plate.  ·How did that rise to a

15   level of concern for you?

16         A.     Well, remember the analysis I described --

17   that Mr. Schwartz prepared the Treasury proposal?

18         Q.     That Mr. Schwartz prepared?

19         A.     Yes.

20         Q.     In writing?

21         A.     Yes.

22         Q.     You're talking about the economics?

23         A.     Yes.   That's how it was raised.

24         Q.     He raised it?

25         A.     Yes.

1          Q.    He raised that there was a concern about

2   whether this transaction has economic substance?

3          A.    No, he didn't raise it that way.  He said, On

4   any transaction that has a large component -- a tax component

5   to it -- that one test that you can do, if the IRS were to

6   question economic substance to this.... So as a result of

7   that discussion, economic substance became an issue in my

8   mind.

9          Q.    In entering into any business transaction for

10  yourself, personally, your goal is to maximize your profits?

11         A.    Absolutely.

12         Q.    That's your Number 1 priority?

13         A.    It depends.

14         Q.    In this transaction, it was to maximize your

15  profits?

16         A.    Yes.

17         Q.    And based upon your independent analysis, the

18  actions that you take in effectuating the transactions are to

19  maximize the return on your money?

20         A.    Yes.

21         MR. GEIER:  We'll go off the record.

22         (Whereupon, a discussion was held off the record.)

23         MR. GEIER:  At this point, it is approaching the

24  time agreed upon by Counsel, and I didn't want to go into a

25  new area and go over the time.

1          So we'll stop at this point, and we'll pick up our

2    direct at a mutually convenient date, time, and place.   And

3    Mr. Hallett will have a chance to do his cross at that time.

4          MR. HALLETT:   So stipulated.

5          (Whereupon, the proceedings concluded at 1:53 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

142

REPORTER'S CERTIFICATE

 1

 2

 3

 4          I, Martha H. Bennett, Shorthand Reporter, certify;

 5          That the foregoing proceedings were taken before me

 6   at the time and place therein set forth, at which time the

 7   witness was put under oath by me;

 8          That the testimony of the witness, the questions

 9   propounded, and all objections and statements made at the

10   time of the examination were recorded stenographically by me

11   and were thereafter transcribed;

12          That the foregoing is a true and correct transcript

13   of my shorthand notes so taken.

14          I further certify that I am not a relative or

15   employee of any attorney of the parties, nor financially

16   interested in the action.

17          I declare under penalty of perjury under the laws of

18   Colorado that the foregoing is true and correct.

19

20          Dated this 24th day of Sept, 2006

21

22

23          _____

24          MARTHA H. BENNETT

25