# EXHIBIT 7

# Pt. I of III

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

- - - - - - - - - - - - - - - - - - - - - - - - x    **CERTIFIED COPY**

CARLOS E. SALA and            )
TINA ZANOLINI SALA,           )
                              )
              Plaintiffs,     )
                              )
         vs.                  )  Civil Action No.
                              )   05-CV-00636
UNITED STATES OF AMERICA,     )   LTB-PAC
                              )
              Defendant.      )
- - - - - - - - - - - - - - - - - - - - - - - - X

October 24, 2006

10:30 a.m.

Continued Deposition of CARLOS E.

SALA, held at the offices of Katten, Muchin

& Rosen, LLP, 575 Madison Avenue, New York,

New York, pursuant to Adjournment, before

Elisabeth F. Nason, a Notary Public of the

State of New York.

Atkinson-Baker, Inc.
Court Reporters
www.depo.com
800-288-3376

Reported by:
ELISABETH F. NASON
JOB NO. A00921C

1

```
 1
 2    A P P E A R A N C E S:
 3
 4         CHICONE & HALLETT
 5         Attorneys for Plaintiffs
 6              Waterfront Place One, Suite 803
 7              1011 Western Avenue
 8              Seattle, Washington 98104
 9         BY:   DARRELL D. HALLETT, ESQ.
10               CORI FLANDERS-PALMER, ESQ.
11
12         U.S. DEPARTMENT OF JUSTICE
13         Attorneys for Defendant
14              Tax Division
15              PO BOX 683
16              Washington, D.C. 20044
17         BY:   DAVID N. GEIER, ESQ.
18               ANTON L. JANIK, JR., ESQ.
19
20
21
22
23
24
25
```

1

2      -------------------- I N D E X--------------------

3   WITNESS               EXAMINATION BY      PAGE

4   CARLOS SALA          MR. GEIER          07

5                       MR. HALLETT       XX

6

7      --------------- INFORMATION REQUESTS--------------

8   DIRECTIONS:

9    DI                           256

10

11      ---------------------- EXHIBITS--------------------

12   EXHIBIT                            FOR ID.

13    Exhibit 156, certificate of       27

14    incorporation,

15    Exhibit 157, e-mail dated November 28,   53

16    2003,

17    Exhibit, 158, series of e-mails      53

18    Exhibit 159, e-mail,            63

19    Exhibit 160, Brown & Wood draft opinion  65

20    dated November 13,

21    Exhibit 161, final opinion dated April   69

22    16, 2001,

23    Exhibit 162, document titled       83

24    discretionary program, Bates stamp 274,

25    Exhibit 163, FX trading program,    100

1

2     Exhibit 164, projections,                    103

3     Exhibit 165, fax,                            110

4     Exhibit 166, private placement               124

5     memorandum,

6     Exhibit 167, subscription agreement,         139

7     Exhibit 168, REFCO individual account        144

8     information,

9     Exhibit 169, REFCO account application,       147

10    Exhibit 170, customer agreement and          148

11    trading authorization,

12    Exhibit 171, REFCO Capital Markets           149

13    third party full trading authorization,

14    Exhibit 172, REFCO Capital Markets           149

15    trading authorization,

16    Exhibit 173, foreign exchange and            150

17    options master agreement dated November

18    20, 2000,

19    Exhibit 174, letter dated November 17,       151

20    2000,

21    Exhibit 175, letter dated November 17,       153

22    2000,

23    Exhibit 176, copy of a document from         153

24    Mr. Nemirow's files,

25    Exhibit 177, document addressed to           153

1

2    REFCO Capital Markets,

3    Exhibit 178, document from Mr. Sala's    153

4    files,

5    Exhibit 179, document from    154

6    Mr. Nemirow's files,

7    Exhibit 180, document on Deerhurst    154

8    Trading Strategies, LLC stationery

9    dated November 20, 2000,

10    Exhibit 181, document dated October 30,    154

11    2001 addressed to Mr. Carlos Sala,

12    Exhibit 182, IRS form 966,    157

13    Exhibit 183, document on stationery of    157

14    Deerhurst Management, Inc.,

15    Exhibit 184, document on KPMG    157

16    stationery,

17    Exhibit 185, document on Mr. Sala's    158

18    stationery dated November 28, 2003,

19    Exhibit 186, letter dated December 5    165

20    with attachment,

21    Exhibit 187, letter dated December 7,    168

22    2000,

23    Exhibit 188, letter dated January 5,    172

24    2001,

25    Exhibit 189, e-mail dated November 2,    179

1

2   1999,

3   Exhibit 190, e-mail dated June 15,    184

4   2000,

5   Exhibit 191, e-mail dated August 18,   186

6   Exhibit 192, e-mails,    188

7   Exhibit 193, 2000 income tax returns,   192

8   Exhibit 194, 2001 income tax return,   192

9   from KPMG's files,

10   OTHER ATTACHMENTS: Exhibits 1, 3, 6, 11, 12, 22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carlos Sala

1

2 C A R L O S   E.   S A L A,   resumed as a

3 witness, having been previously sworn by the

4 Notary Public, was examined and testified

5 further as follows:

6 EXAMINATION BY

7 MR. GEIER:

8       Q.   Good morning, Mr. Sala.  We are here

9 to continue your deposition.  Same general

10 guidelines apply about questions.  If you don't

11 understand, please let me know and I will try and

12 rephrase the question for you, is that fair?

13       A.   Yes.

14       Q.   We will each try our best not to step

15 on each other's questions and responses, how's

16 that?

17       A.   That's fine.

18       Q.   Is it correct that you didn't dispose

19 of any documents in connection with the Deerhurst

20 transaction?

21       A.   Yes, that's correct.

22       Q.   Am I correct to say that it's your

23 practice that if you executed a document in

24 connection with the Deerhurst transaction, you

25 would have kept a copy of it?

Carlos Sala

```
 1
 2      A.    More than likely.
 3      Q.    Do you have any reason to doubt that?
 4      A.    No.
 5      Q.    Is it also fair to say that you were
 6   careful in your review of the Deerhurst
 7   transaction, is that your position?
 8      A.    Yes.
 9      Q.    Did you consider yourself to be very
10   deliberate?
11      A.    Yes.
12      Q.    Did you read all the documents?
13      A.    I can't testify that I read every
14   document, but I certainly read most documents.
15      Q.    Did you read the private placement
16   memorandum?
17      A.    Yes, I did.
18      Q.    Did you read the subscription
19   document?
20      A.    Yes, I did.
21      Q.    Did you read the disclosure statement?
22      A.    Yes, I did.
23      Q.    Did you read any of the marketing
24   material that Mr. Schwartz provided?
25      A.    Yes, I did.
```

```
 1                          Carlos Sala
 2          Q.    Did you read any documents about the
 3    history of Deerhurst and the prior performance of
 4    Deerhurst?
 5          A.    Yes, I did.
 6          Q.    Did you read the LLC agreement?
 7          A.    Yes, I did.
 8          Q.    Did you read the general partnership
 9    agreement?
10          A.    Yes.
11          Q.    You read drafts of the opinion letters
12    as well?
13          A.    Yes.
14          Q.    This was all prior to committing to
15    enter into the Deerhurst transaction; is that
16    correct?
17          A.    Yes.
18          Q.    In fact, that was your practice when
19    you were looking at other transactions as well
20    during the 2000 time period, correct, to read all
21    the documents?
22                MR. HALLETT:  Objection to the form of
23          the question.  Ambiguous as to other
24          transactions.
25          A.    But yes, that's my practice.
```

Carlos Sala

1

2    Q.    You were presented materials about the

3    BLIPS transaction?

4    A.    I don't recall what materials I was

5    presented.  If I was presented with something, I

6    would have read it I'm sure, but I don't recall

7    having been presented with many documents.  In

8    fact, at one point I asked to see documents and I

9    don't ever recall seeing the transactional

10   documents.

11   Q.    It was something that you were

12   requesting so that you could review; is that

13   correct?

14   A.    Yes.

15   Q.    In reading the Deerhurst documents

16   that we were talking about, the marketing

17   materials, the background information, the LLC,

18   the general partnership agreement, did you come

19   across anything that you now know is inconsistent

20   with how the transaction played out?

21   A.    Let me think about that for a second.

22   Q.    Sure.

23   A.    Not that I can recall.

24   Q.    Let's talk generally about this

25   transaction if we could.  Sometime in late October

Carlos Sala

1

)  2   2000, towards the end of October 2000 is when you

3   entered into the Deerhurst transaction, correct?

4       A.    Correct.

5       Q.    At a certain point, you understood

6   prior to entering the transaction that you would

7   be acquiring what I'm going to refer to as basis

8   trades.  Do you know what that term means, basis

9   trades?

10      A.    I have a good idea.

11      Q.    Tell me what your understanding of

12  basis trades is.

13      A.    Basis trades would be making an

)  14  investment into an entity where you can -- where

15  you can generate tax basis for tax purposes.

16      Q.    In this case, there were certain

17  trades, long options and short options that were

18  part of the basis trades, correct?

19      A.    Correct.

20      Q.    You understood going in that these

21  trades, that the long options would be acquired

22  and certain short options would be sold, correct?

23      A.    Yes.

24      Q.    That you would increase basis by the

25  long options, but not reduce it by the short

)

1                          Carlos Sala

2    options?

3          A.     Yes.

4          Q.     That was your understanding going in?

5          A.     Yes.

6          Q.     You knew there would be a certain

7    amount of basis trades that would tie into the tax

8    losses that you were seeking, correct?

9          A.     I generally knew that the sum of those

10   trades would be close in range to a tax loss, I

11   would say tied.

12         Q.     Close in range?

13         A.     Close in range.

14         Q.     Who told you that?

15         A.     During discussions with Michael

16   Schwartz.

17         Q.     Did Mr. Kreiger tell you that?

18         A.     No.

19         Q.     Did anyone else other than

20   Mr. Schwartz tell you that?

21         A.     No.

22         Q.     Did you have concerns in this

23   transaction to protect yourself from personal

24   liability?

25         A.     Yes, I did.

Carlos Sala

1

2     Q.     That is one of the reasons I think

3   that you may have indicated already that the

4   S Corporation was formed?

5     A.     Yes, that's correct.

6     Q.     Were the basis trades fairly

7   significant in size?

8     A.     Yes, my recollection is they were

9   significant.

10     Q.     $60 million in long options

11   approximately, $60 million in short options

12   approximately?

13     A.     Approximately.

14     Q.     Were the basis trades acquired in your

15   own name or in the name of the S Corp., Mr. Sala?

16     A.     My understanding they were acquired in

17   my own account.

18     Q.     Why didn't you acquire them in your

19   S Corp.?

20     A.     It was very close between when the

21   account was formed and the transfer to the S

22   Corp., so it would have been in days.

23     Q.     The S Corp. was already formed when

24   the stock was acquired, correct?

25     A.     I don't recall when the S Corp. was

Carlos Sala

1

2      formed.

3           Q.     Would it surprise you to learn that

4      the S Corp. was formed in November 8, 2000, does

5      that sound about right?

6           A.     Could be within one or two weeks.   I

7      don't recall the exact date.

8           Q.     It was formed prior to the basis

9      trades?

10          A.     I don't recall exactly when the basis

11     trades occurred, so I can't tell you specifically

12     exactly.

13          Q.     But it was your understanding that you

14     acquired the basis trades in your own name?

15          A.     Yes, from what I recall.

16          Q.     Was that significant for tax purposes

17     as far as you understood, that it was acquired in

18     your own name and then transferred into another

19     entity?

20          A.     From my recollection, I didn't think

21     it made any difference.

22          Q.     You didn't think it made any

23     difference?

24          A.     Whether it was in my own account or in

25     the S Corp.'s name.

1          Carlos Sala

2     Q.    You could have acquired them it's your

3   understanding, in the S Corp.?

4     A.    From my limited understanding of that

5   issue, that it could have been either in the S

6   Corp. or in the individual account.

7     Q.    So why is it that you agreed to assume

8   the liability of those trades in your own name if

9   it could have been done in either, Mr. Sala?

10     A.    At the time, I knew I was going to

11   contribute all of the assets in the account to the

12   S Corp. and it would have been a matter of timing

13   in terms of when they were acquired to when they

14   were contributed to the S Corp.

15     Q.    I don't understand what you mean by

16   timing.  Could you explain that?

17     A.    Just it would have been almost not

18   exactly simultaneously, but close in proximity in

19   terms of time.

20     Q.    You understood it was supposed to be

21   close in time?

22     A.    Yes.

23     Q.    Why was it supposed to be close in

24   time from the time you acquired the securities in

25   your own name to the time you contributed?

1               Carlos Sala

2        A.    I don't think I ever thought about it.

3        Q.    Never questioned it?

4        A.    No.

5        Q.    You knew it was going to happen that

6    way?

7        A.    Yes.

8        Q.    You knew it was a step that had to be

9    taken in this transaction?

10       A.    I'm not sure if it is a step that had

11   to be taken in this transaction.   It was a

12   structure that we elected making in this

13   transaction.

14       Q.    Was it your decision to make this?

15       A.    In conjunction with Michael Schwartz.

16       Q.    Did you instruct Michael Schwartz

17   after the basis trades were acquired to transfer

18   everything to the S Corp.?

19       A.    Certain that I instructed that to

20   happen, yes.

21       Q.    You instructed it in advance, ahead of

22   time?

23       A.    Sure.   You have to have the

24   instructions before the transfer would occur to

25   the S Corp.

1                        Carlos Sala

2          Q.     The instructions were signed weeks

3    before the actual assignment was made?

4          A.     I have no recollection of when that

5    occurred.

6          Q.     Do you know what leverage was employed

7    in acquiring the basis trades?

8          A.     I believe during the time that I

9    traded in my individual account, it was two to

10   one.

11         Q.     Did you review the transactions to

12   verify that you were trading at two to one?

13         A.     No.

14         Q.     Do you know what two to one means?

15         A.     Yes.  In this context, two to one

16   meant that Deerhurst would trade a typical account

17   using certain risk parameters based on standard

18   deviation, so a certain account would assume a

19   certain risk and with that risk, it would expect

20   to deliver a certain return.  If you expanded the

21   risk to two to one, your return hopefully would be

22   expanded as well.  At that point, it was traded at

23   twice the risk level of the standard Deerhurst

24   account for this type of program.

25         Q.     What was the standard risk level?

Carlos Sala

1

2     A.    I forget specifically the deviation,

3  the standard deviation measurement, but what I

4  recall at that point was talking to Andy Kreiger

5  about how it was measured and he maybe -- he gave

6  me a number as to what the standard deviation was.

7  I just don't recall it.

8     Q.    Standard deviation from what; was it a

9  physical account that there was a standard

10  deviation from?  When you are explaining a

11  standard deviation, my understanding would be that

12  there is a baseline.  So I'm trying to learn what

13  did you understand the baseline to be from which

14  there would be a standard deviation.

15     A.    He traded an account assuming that the

16  securities in that account would fluctuate in

17  value up and down.  And that risk measurement

18  using a standard deviation methodology, was X.  So

19  call that one times standard deviation.  And if

20  you were to increase the risk to two times that

21  standard deviation, that would have been the

22  increase in leverage.

23         As you know, in foreign currencies,

24  foreign currencies are inherently leveraged

25  because of the structure of how you can control a

Carlos Sala

1

2  foreign currency contract.  So at that point, he

3  would have expected a security, a foreign

4  currency, to go up and down in value and he could

5  measure the standard deviation of that fluctuation

6  according -- with the corresponding return as

7  well.  So that would have been -- call it one

8  standard deviation.  Two standard deviations would

9  have been taken twice the risk.

10      Q.    Is it based upon each foreign currency

11 has its own set of standard deviations or was

12 there some sort of account, general combined

13 account from which the standard deviations were

14 taken?

15      A.    It was a combined account, but you

16 could measure either one.

17      Q.    Whose name was the account in?

18      A.    It wasn't a -- he didn't tell me it

19 was a specific name.  It was historically he had

20 done trading for a number of clients with a target

21 standard deviation of X.  So it would have been

22 not just one client, perhaps more than one client.

23      Q.    Target standard deviation from what,

24 from the normal returns on a specific currency,

25 from --

Carlos Sala

A.    It would have been a portfolio, a complete portfolio in one account that would have fluctuated in price up or down and that standard deviation would have been measured based on that fluctuation of those currencies inside that account.

Q.    What was inside that account?

A.    Currency trades, options, spots trades, forwards, futures.

Q.    Did you know the components of that account in terms of percentages of different currencies?

A.    No, I didn't look into the actual trades of what he described as a standard account.

Q.    Is it fair to say that in there is a standard deviation of two from the standard account, you don't know what the baseline really was?

A.    The baseline -- I did review the results of those accounts, the returns.  Those were the ones that were provided to me from Deerhurst.  So he basically gave me historical results that generated a certain return initially in the high teens.  And those returns, meaning 15,

Carlos Sala

1

2   16, 17, maybe 18 percent, that would have

3   corresponded to the one standard deviation.  So

4   two standard deviations would have meant you are

5   taking twice the risk but hopefully generating

6   twice the return.

7        Q.    The chart that Mr. Kreiger provided

8   you was the baseline?

9        A.    Yes.

10        Q.    You understood from that chart that

11   that was exactly the types of trades you would be

12   making in your program?

13        A.    Similar trades, yes.

14        Q.    Identical trades?

15        A.    You can't say that I was going to have

16   a trade in my account in the year 2002 that would

17   have been exactly the same trade as a trade that

18   was reported in that spreadsheet in 1995, but with

19   similar risk characteristics.

20        Q.    Trading the same exact types of

21   commodities or foreign currencies that you traded?

22        A.    It would have been traded foreign

23   currencies.  It would have been foreign currencies

24   that would have had similar risk characteristics,

25   but it wouldn't have been the specific instrument

Carlos Sala

1

2   exactly like it was traded seven years ago.

3       Q.    It's the same strategy?

4       A.    It's a strategy, yes.

5       Q.    In the same products?

6       A.    In similar products, foreign

7   currencies.  It doesn't have to be the same

8   currency.  For instance, many of the trades that

9   we did in the Deerhurst program involved a Euro.

10   The Euro had not been introduced in the mid 90's

11   for instance.

12       Q.    Can you explain to me what your

13   understanding was of the level of risk, can you

14   quantify it for me of what you were assuming

15   during the course of the transaction from October

16   2000 forward; was it very risky, was it moderately

17   risky, what was your understanding of the

18   strategy?

19       A.    I thought there was a fair amount of

20   risk in terms of to generate those types of

21   returns, so there was an -- it wasn't the riskiest

22   thing in the world compared to say the hedge fund

23   disaster that occurred in the last month losing

24   five billion in a week.  It wasn't that risky, but

25   it clearly involved risk.

```
 1                      Carlos Sala
 2          Q.     The basis trades that we talked about,
 3    do you recall how long they were held in your
 4    account prior to them being liquidated?
 5          A.     I don't recall, I don't recall.
 6          Q.     Do you recall how long they were in
 7    the Solid Currencies account before they were
 8    transferred to Deerhurst General Partnership?
 9          A.     I don't recall the timing of any of
10    the trades, so I wouldn't be able to tell you
11    about that.
12          Q.     Was it your understanding that the
13    basis trades, you did understand that those trades
14    would be transferred to the S Corp. fairly
15    quickly?
16          A.     Yes.
17          Q.     Matter of days?
18          A.     Yes.
19          Q.     From the S Corp. to the general
20    partnership, would it be the same thing?
21          A.     Fairly quickly, yes.
22          Q.     Almost at the same time that they were
23    transferred to the S Corp.?
24          A.     Within days for sure.
25          Q.     Did you understand why you were making
```

1                     Carlos Sala

2    a series of transfers of stock that was acquired

3    making two transfers of the stock in very short

4    order?

5              MR. HALLETT:  You say the stock?

6              MR. GEIER:  The options and the

7         currencies.  Thank you.

8         A.    Sure.  The general concept was to

9    start with the individual account, increase the

10   individual account, increase the leverage.  With

11   that increase in leverage, protect yourself

12   against losses that may exceed your capital

13   contribution.  Then aggregate those funds and

14   trades with other investors so that they could be

15   traded as one account, meaning the partnership, so

16   that within the context of that structure, yes, I

17   understood that.

18        Q.    Did you understand that you were going

19   to be contributing to Deerhurst Investors General

20   Partnership?

21        A.    Yes.

22        Q.    Did you understand that Tony White was

23   going to contribute some of his to the general

24   partnership and some not to?

25        A.    No, I didn't know that at the time.

                              Carlos Sala
1

2          Q.     When did you learn this?

3          A.     During this litigation.

4          Q.     Did you learn that Mr. White wanted a

5   capital loss?

6          A.     During this litigation.

7          Q.     You didn't learn it beforehand?

8          A.     Not before the Deerhurst transaction.

9          Q.     You didn't talk to him about that?

10         A.     No.

11         Q.     Did you understand in reviewing the

12  materials, that some people wanted capital losses

13  and some people wanted ordinary losses?

14         A.     I knew from one document that if you

15  were going to generate ordinary losses, that their

16  required investment was different from the

17  required investment if you were going to have

18  capital loss, but that's all I knew.  I didn't

19  have any capital losses, so I didn't really

20  investigate the capital side.

21         Q.     Prior to participating in the

22  transaction, did Mr. Schwartz ask you if you

23  wanted ordinary or capital losses?

24         A.     I'm sure we had a discussion about

25  that.

Carlos Sala

1

2          Q.    Did you have a discussion about the

3     amount that you wanted?

4          A.    At some point, yes.

5          Q.    Prior to entering into the

6     transaction?

7          A.    Probably, yes.  I can't recall the

8     exact date that we had the discussion.

9          Q.    But it was prior to entering the

10    transaction?

11         A.    That would be my guess, but not

12    confirmation.  I don't know 100 percent.

13         Q.    You understood that for ordinary

14    losses, you had to put in a certain percentage of

15    losses you expected?

16         A.    Yes, I did.

17         Q.    That would have been a decision you

18    made prior to entering into the transaction?

19         A.    Yes.

20         Q.    You calculated how much losses you

21    wanted prior to entering into the transaction?

22         A.    Yes.

23         Q.    You had a goal?

24         A.    Yes, I knew how much money was

25    ultimately going to be reporting as a loss if you

1                    Carlos Sala

2    contributed and exercised a number of

3    transactions.

4         Q.    Were the basis trades ever provided to

5    you, a copy of the basis trades?

6         A.    I received confirmations of all the

7    trades during that period of time.

8         Q.    Did you receive a sheet in which you

9    were shown what trades constituted the basis

10   trades?

11        A.    I don't recall.

12             MR. GEIER:  I show you what we will

13        mark as Exhibit 156.

14             (Exhibit 156, certificate of

15        incorporation, marked for identification, as

16        of this date.)

17             (Handing.)

18        Q.    Is that a certificate of incorporation

19   for Solid Currencies?

20        A.    Let me put some glasses on here to

21   make sure.

22             MR. GEIER:  We have a stipulation, we

23        can move past this.  This is a document that

24        you all provided.  This one was provided by

25        Mr. Schwartz.  I think we have an identical

```
 1                        Carlos Sala
 2        document that you prepared.
 3            Q.    Is this a certificate of
 4   incorporation?
 5            A.    Yes.
 6            Q.    Reflecting the incorporation on
 7   November 8, 2000 on the first page?
 8            A.    Yes.
 9            Q.    Solid Currencies is your S Corp.?
10            A.    Yes.
11            Q.    It's the S Corp. utilized in the
12   Deerhurst transaction?
13            A.    Yes.
14                 MR. GEIER:  I will show you what we
15            will mark as 157.  Let me take it back.
16            This is Exhibit 11 from Mr. Schwartz'
17            deposition.  We will not re-mark it, we will
18            just refer to it as Exhibit 11.
19            Q.    This reflects long and short positions
20   and a net payment 728,000, correct?
21            A.    It appears so.
22            Q.    This is something that you obtained
23   from Deerhurst?
24            A.    I believe so, but I think I obtained
25   this much later.  I think I obtained this when I
```

Carlos Sala

1
2      was responding to the IDR from the IRS in terms of

3      my audit is what I recall.  Certainly with the

4      handwritten notes here.

5           Q.    Was it your understanding that this

6      reflects the basis trades that we have been

7      talking about?

8           A.    That was the purpose of generating the

9      document.

10          Q.    With respect to the basis trades, it

11     shows that you received a premium of

12     $60,259,568.94, correct?

13          A.    That's what the document says.  I

14     haven't footed that to make sure it does, but

15     that's what the document says.

16          Q.    It shows premiums paid of 60,987,866,

17     correct?

18          A.    Correct, the document says that.

19          Q.    The difference between the premiums

20     received and the premiums paid is about 728,000,

21     correct?

22          A.    Correct.

23          Q.    Do you recall that number being the

24     difference from memory from the netting of the

25     basis trades?

Carlos Sala

1

2    A.    Roughly, but I can't be specific.

3    Q.    You didn't receive $60 million in your

4    account at any time, did you?

5    A.    No.  My accountant reflected a net

6    balance of 60 million if that's what you mean.

7    Q.    In fact, the cost to you was the net

8    between these two numbers, correct?

9    A.    The net cost, yes.

10   Q.    Approximately 700 and some odd

11   thousand dollars; is that correct?

12   A.    Correct.

13   Q.    You didn't write a check for

14   $60 million that you can recall?

15   A.    No, I would have remembered that one.

16   Q.    You probably would have remembered

17   receiving $60 million in premiums as well?

18   A.    That's a good assumption.  I want you

19   to know that I don't have pink glasses like my

20   colleague did at your deposition.

21   Q.    You are wearing your own and not your

22   wife's I think was the testimony.  Off the record.

23        (Discussion held off the record.)

24   Q.    Was there ever a discussion Mr. Sala,

25   that the tax losses that we are talking about,

1                         Carlos Sala

2      which is approximately $60 million --

3           A.    Yes.

4           Q.    -- that you claimed in 2000, was there

5      a discussion that you had with anyone at Deerhurst

6      or Multinational Strategies that the tax loss

7      would occur in 2000?

8           A.    Certainly no one at Deerhurst.  As we

9      talked about just now with Michael Schwartz, there

10     would have been a discussion with him in terms of

11     the amount of the loss.

12          Q.    And the year?

13          A.    And the year.

14          Q.    Can you tell me what that discussion

15     was?

16          A.    I don't recall specifically.  I'm just

17     going from general concept memory, but I don't

18     recall that there was a phone call or a discussion

19     that I had with Michael Schwartz specifically to

20     that, but because Michael Schwartz -- I think we

21     talked about that, we didn't have a discussion

22     about the tax loss and the amount of the

23     investment.  Then I conclude based on that, that

24     we would have had a discussion like that

25     generally, but I don't remember specific.

Carlos Sala

1

2      Q.    It was generally your understanding

3  that the tax losses that you were going to derive

4  were going to occur in 2000?

5      A.    Yes.

6      Q.    That was based upon a conversation

7  with Michael Schwartz?

8      A.    A number of things, conversations with

9  Michael Schwartz, an understanding and

10 understanding the transaction as well.

11     Q.    You understood that the transaction,

12 your holdings would be liquidated in 2000 in order

13 to generate the loss?

14     A.    Yes.

15     Q.    Did you understand that there was a

16 reason to liquidate the holdings other than for

17 tax reasons?

18     A.    Sure.  I mean we wanted to do a number

19 of things.  One is we didn't want to hold the

20 positions at year end.  Year end is usually very

21 illiquid time of year for most markets, not just

22 the foreign currency markets.  People leave,

23 traders leave.  There is not enough liquidity in

24 the market, you can take advantage of that, like

25 in the municipal bond market or the cash money

Carlos Sala

1

2      market.  So we didn't want to hold those positions

3      towards year end, we wanted it to be more liquid.

4      That's one reason.

5                  Secondly, we had the opportunity to

6      invest in a fund that was Deerhurst Trading

7      Strategies.  That fund was starting January 1st,

8      2001 and we wanted to make a contribution to that

9      fund, so we liquidated the remaining positions to

10     go into the fund.

11          Q.    When you made a contribution to

12     Deerhurst Investors General Partnership, you

13     didn't liquidate, you just transferred your

14     account?

15          A.    I believe that's right.

16          Q.    You could have transferred your

17     account into LLC as well?

18          A.    I don't know, we didn't talk about

19     whether we would make a contribution of securities

20     in kind or whether it was a cash contribution.

21          Q.    But you had a discussion with someone

22     that you needed to liquidate in order to invest in

23     the new fund?

24          A.    I think two things as I said.  It made

25     business sense from an economic perspective to

                          Carlos Sala

1

2    liquidate towards the end of the year and I also

3    knew that I was going to go into the Deerhurst

4    Trading Strategies, so it also would be easy to

5    make the contribution in cash rather than

6    currencies or securities of any kind.

7         Q.    It would be easier?

8         A.    Sure.

9         Q.    To make the contribution in cash?

10        A.    Sure.

11        Q.    Than the securities that were already

12   existing?

13        A.    Absolutely.

14        Q.    You could have executed an assignment

15   like you had done twice before, correct?

16        A.    Yes, but it's much easier to transfer

17   cash into any account.  I just changed brokers

18   from Morgan Stanley to McDonald Financial Group.

19   I transferred securities from one institution to

20   the other institution.  It was a real pain.

21        Q.    Were you transferring securities from

22   one institution to another institution going into

23   Deerhurst LLC?

24        A.    I was transferring from one account to

25   a fund, so the same institution, but different

Carlos Sala

1

2    structures, different accounts, different funds.

3        Q.    The S Corp. had an account, correct,

4    Solid Currencies?

5        A.    Yes, it was my own account.

6        Q.    You had an account separate from Solid

7    Currencies, correct?

8        A.    Correct.

9        Q.    You transferred positions into the

10   S Corp., correct?

11       A.    Correct.

12       Q.    Then you transferred the positions in

13   the S Corp. into the general partnership, correct?

14       A.    Correct.

15       Q.    That wasn't that difficult, was it,

16   Mr. Sala?

17       A.    No, but I'm telling you though in my

18   opinion, opening an account is always easier to

19   make a cash contribution because one thing that

20   you will have to do when you actually do transfer

21   securities in kind is to make sure that those

22   securities one by one were transferred accurately.

23   And in fact, that was done when I made those other

24   transfers.   I believe Peter Molyneux at Deerhurst

25   made sure that what was transferred out of one

1              Carlos Sala

2    account was actually received in the other

3    account.

4              When you transfer cash, it's very easy

5    because you transfer one number, you receive one

6    number.  When you transfer securities, you are

7    transferring many assets, many securities.  You

8    have to make sure that the basis on one account

9    gets reported on the new account.  You have to

10   make sure that that basis not only is right in

11   terms of the actual economic transfer, but also

12   for tax purposes that it gets reported correctly.

13   So it is I think, significantly more difficult to

14   transfer securities because of the administrative

15   complexity of doing such versus a cash transfer,

16   which is one wire transfer.

17        Q.    You knew this going into the

18   transaction about the complexity of making these

19   transfers, correct, that it would be difficult?

20             MR. HALLETT:  Objection.

21        Q.    The transfers that you are just

22   talking about how complex they are, you understood

23   it was complex to make these transfers prior to

24   even entering into the Deerhurst transaction?

25        A.    I think you mischaracterized what I

Carlos Sala

1

2    said.  I said it was more complex than

3    transferring cash.

4         Q.    You knew it was more complex before

5    you entered into the transaction to transfer

6    securities than cash?

7         A.    Yes, I know that, yes.

8         Q.    Yet you purchased assets in the name

9    of yourself and then two or three days later,

10   transferred them twice to the S Corp. and to

11   Deerhurst Investors General Partnership; isn't

12   that correct?

13        A.    It is correct, but I just want to make

14   sure that you understand that while the securities

15   were transferred in those cases, you asked me the

16   question first is it the same as transferring cash

17   and I responded one was more complex.  Now what

18   level of complexity, it varies.

19             For instance, when it was in the

20   account, in the personal account, there were few

21   positions.  Those accounts, they were fairly easy

22   to transfer to the S Corp. and to the partnership.

23   There were many more trades outside of the -- in

24   the GP did a lot of trades, so I don't know how

25   many trades we had, but it would have been an

Carlos Sala

1

2   issue.

3       Q.    I was just going to ask you that.   Do

4   you know what the GP was holding at the end of the

5   year?

6       A.    I think the GP wasn't in existence at

7   the end of the year.

8       Q.    December 21, do you know what they

9   were holding at the time they were wrapping up?

10      A.    I suspect that at that point we were

11  liquidating many of the positions because of the

12  year end trades.   So I don't know.   I can't recall

13  exactly what they were.

14      Q.    Do you recall how much you made in

15  2000 on the Deerhurst transaction?

16      A.    60 to 80,000 roughly.

17      Q.    That's not taking into account all

18  your expenses, correct?

19      A.    No, that's taking into account my

20  expenses, my account increased $60,000 if that's

21  what you mean.

22      Q.    Mr. Sala, you paid a $75,000 fee in

23  connection with the transaction, you may have paid

24  it the following year, but you made it to

25  Mr. Ruble for an opinion letter, correct?

```
 1                        Carlos Sala
 2        A.     Sure, but --
 3               MR. HALLETT:   Wait, let him answer the
 4        question.
 5        A.     I paid 75,000 in April of 2001 in
 6   connection with the filing of my tax return.
 7        Q.     You knew going into this transaction
 8   that you would be paying $75,000 for an opinion
 9   for your 2000 return, correct?
10        A.     Well, it wasn't exactly like that.   I
11   knew that there was a $75,000 opinion fee, but the
12   way that that $75,000 opinion fee covered my
13   entire transaction for the entire time, it wasn't
14   like it covers one day, two days, a month.
15        Q.     It only covered events in 2000,
16   correct, Mr. Sala?
17        A.     Well, no.   You know what, because when
18   I went into Lone Star in 2001, I went back to
19   Brown & Wood and said diversifying from the
20   diversified strategy into Lone Star, will that
21   have an impact on my tax position.   Now, if it
22   only covered the one three month period of 2000,
23   why would I have come back in 2001 and said make
24   sure that this is okay in terms of a five year
25   transaction.
```

1        Carlos Sala

2        Q.    Maybe because you wanted to change the

3   deal Mr. Sala, at that point in time.

4        MR. HALLETT:   Wait, wait.

5        A.    What I mean is that I viewed the

6   transaction as a five year transaction.   All the

7   costs that would have been incurred, fees, were

8   part of a five year investment.

9        Q.    Mr. Sala, did anything in the opinion

10  letter that you obtained and filed with your tax

11  return or at least obtained prior to filing your

12  tax return, did anything mention any events after

13  2000?

14       MR. HALLETT:   Read that back.

15       Q.    I will ask it again.   Did your initial

16  opinion from Mr. Ruble, did it involve events

17  after 2000?

18       A.    To my recollection, it did address the

19  structure of the investment, which is a five year

20  investment.

21       Q.    Did it opine on the tax consequences

22  of anything beyond your 2000 tax year?

23       A.    I have to look at it more carefully,

24  but I can tell you that the conclusion that was

25  reached in that opinion wouldn't have been the

1              Carlos Sala

2    same had a five year horizon not been taken into

3    account.

4         Q.    Did it opine on anything beyond 2000?

5         A.    I have to look at the opinion itself

6    to be able to specifically tell you that.  So I

7    don't know.  It's 112 page opinion, so --

8         Q.    But it has to do with a $60 million

9    loss, correct?

10        A.    Sure.

11        Q.    That loss was claimed in 2000?

12        A.    Yes.

13        Q.    The opinion addressed the loss in

14   2000, correct?

15        A.    Yes.

16        Q.    It didn't address the loss in any

17   other year, did it, it didn't give you a more

18   likely than not answer as to whether something

19   would be deducted or included in income?

20            MR. HALLETT:  I'm registering a

21        continuing objection.  You are on a roll

22        over here and you continue to cut him off

23        before he can continue the answer.  I would

24        ask you please, after the question, let him

25        give a complete answer.

1                       Carlos Sala

2              MR. GEIER:   I'm trying to make this as

3         time efficient as possible.   I don't want to

4         be strapped for time at the end of the day.

5         With that being said, I will let him

6         continue on.

7         Q.    With Mr. Hallett's statement, I will

8    certainly try to slow down for you.   When you paid

9    for the opinion, Mr. Ruble's opinion, you didn't

10   know that you were going to be going back to them

11   because the deal was going to change, did you?

12        A.    No.

13        Q.    When you went back in 2001 and asked

14   for a new opinion, that was based upon events that

15   occurred after the first opinion?

16        A.    It was related to the events that

17   occurred within the first opinion.   The second

18   opinion, if you will see by the brief nature of

19   it, was confirming the conclusions of the first

20   opinion, so they were very much related.   In fact,

21   yes, I think he said nothing would lead me to

22   change my previous opinion, that kind of thing.

23        Q.    Just standing by the first opinion?

24        A.    Correct.

25        Q.    But the deal changed at some point,

Carlos Sala

1

2    correct?

3          A.    Yes.

4          Q.    The transaction changed?

5          A.    To some extent, 50 percent of it.

6          Q.    Half the transaction was an investment

7    that wasn't even discussed at the beginning of the

8    transaction?

9          A.    Correct.

10         Q.    That is why you went back to get a new

11   opinion?

12         A.    Correct.

13         Q.    Did you pay for the new opinion?

14         A.    No, I didn't pay additional amounts.

15         Q.    Was it discussed whether you would?

16         A.    There was a discussion, but I never

17   received a bill.

18         Q.    How much was it supposed to be?

19         A.    There was a discussion as to whether

20   we would be charged.  The discussion was is he

21   going to charge us for an update to this previous

22   opinion and I think the response was I don't know

23   and I expected a bill, but I never received one.

24         Q.    Do you know if Deerhurst was charged

25   any money?

Carlos Sala

1

2      A.     I don't know.

3      Q.     So you acknowledge that there was a

4  $75,000 fee paid to Mr. Ruble in connection with

5  an opinion letter?

6      A.     Yes.

7      Q.     And you paid other attorneys as well?

8      A.     Yes.

9      Q.     Few thousand dollars?

10     A.     Yes.

11     Q.     You paid KPMG for reviewing the

12  transaction?

13     A.     No, I paid KPMG in conjunction to

14  preparing my tax return.

15     Q.     You consulted with KPMG prior to

16  entering into the transaction?

17     A.     Only for the tax return preparation.

18  For instance, had they not prepared the tax

19  return, there would have been no fees for them

20  associated with that Deerhurst.

21     Q.     You can take a look at their bills.

22     A.     Sure.

23     Q.     Part of your profit was interest,

24  correct?

25     A.     Other, I'm certain there was a

1               Carlos Sala

2   component of it.

3        Q.    You are familiar with how interest

4   accrues, correct?

5        A.    Yes.

6        Q.    Sort of second nature to you?

7        A.    I know the concept of it.

8        Q.    Do you recall at that time in 2000,

9   what the interest rates, what you were earning on

10   your money just in a safe investment?

11        A.    I don't recall what the interest rates

12   were at that time.

13        Q.    So for the $60,000 to $80,000 profit

14   that you are talking about, did you ever determine

15   how much of that was just interest being paid to

16   you?

17        A.    I would assume that -- well, interest

18   does accrue.  When you make an investment in your

19   account, it's reflected only when it's paid.  So

20   to the extent that there was interest, to the

21   extent that that interest was actually paid and

22   earned, it would have been reflected in that

23   amount.  There may have been interest that

24   was -- that had not been paid and perhaps earning

25   interest, but I don't recall.

Carlos Sala

1

2     Q.    It was accruing?

3     A.    I'm sure it would have been accruing,

4 but I'm not sure that the statement that Deerhurst

5 gave me reflected the accrual or was it just a

6 cash interest, I don't know.

7     Q.    You don't know if any of your profits

8 were related to interest in 2000?

9     A.    No, I think that some of it would have

10 included some interest.

11    Q.    Did you ever try to determine and do a

12 breakdown at any point of how much of your profit

13 was based on interest?

14    A.    No, not at all at that time.

15    Q.    You didn't look?

16    A.    I can't recall if I looked, but I have

17 no recollection of it.

18    Q.    As you sit here today and back in

19 2000, you don't know if the $70,000 or the 60 to

20 80,000 in profits, how much of that was

21 attributable to anything that Mr. Kreiger did in

22 terms of the trades?

23    A.    I don't recall the components of the

24 gains, no, I don't.

25    Q.    Were you aware that the members, there

1          Carlos Sala

2  were certain initial expenses for the startup of

3  the transaction?

4          A.    I was not aware of those expenses.   I

5  knew that there were organizational expenses with

6  the Deerhurst Trading Strategies, which would have

7  been in 2001, but not in 2000.

8          Q.    Were those expenses something you

9  understood would be paid by the members?

10         A.    By the fund.

11         Q.    Therefore, by the members?

12         A.    It would have resulted -- it would

13  have affected the members' capital accounts, yes.

14         Q.    In effect, you were paying your pro

15  rata share of the fund's startup costs?

16         A.    Yes.

17         Q.    Did you understand that the estimate

18  of those fund's startup costs were about $95,000?

19         A.    I don't recall what they were.

20         Q.    Do you recall that the fund's startup

21  costs were estimated and provided to you in

22  advance of the transaction?

23         A.    I don't recall.

24         Q.    But if it had been provided in the

25  documents, you would have seen it and noted it?

Carlos Sala

1

2      A.      Probably, yes.

3      Q.      Do you recall ever talking to anyone

4  about where you stood in relationship to the other

5  investors in terms of percentage of investment?

6      A.      I didn't talk to anyone, but I

7  remembered when I received my K-1, there is

8  usually apportionment percentage there, so I knew

9  I was a significant investor.

10     Q.      What do you mean by significant?

11     A.      Large investor.  I think Michael

12 Schwartz told me of those people contemplating

13 going into the fund, I was a large investor in

14 that respect.

15     Q.      You knew before you entered into the

16 LLC that you were a large investor?

17     A.      Yes.

18     Q.      You knew actually when you entered

19 into the transaction to begin with in October,

20 that you were going to be the largest investor,

21 correct?

22     A.      I didn't know I was going to be the

23 largest, but I knew I was going to be close to the

24 largest or large.

25     Q.      What that gave you, you believe that

```
 1                        Carlos Sala
 2   you had certain clout in negotiations, correct?
 3         A.    Correct.
 4         Q.    Part of that clout you exercised in
 5   renegotiating the fees?
 6         A.    Correct.
 7         Q.    Because you would be able to tell
 8   Mr. Kreiger and Mr. Schwartz, if you don't agree
 9   to my fees, I'm going to take my $9 million and go
10   elsewhere?
11         A.    I did say that.
12         Q.    They wanted your $9 million?
13         A.    I think that's true.
14         Q.    Did you ever add up all your expenses
15   associated with this transaction other than the 1
16   and 30 expenses?
17         A.    No.
18         Q.    You never have done an analysis of
19   what your total costs were for the transaction?
20         A.    No.
21         Q.    Did you ever do an estimate going into
22   the transaction of what your costs might be?
23         A.    I felt that the costs there were two
24   sets of expenses, right.  It would have been my
25   own expenses that I paid out-of-pocket say to
```

Carlos Sala

1

2    Larry Nemirow in 2000.  If I walked out of the

3    investment in late 2000, that would have been it.

4    Only in 2001 when the fund was established, there

5    were fund related expenses.  Those seemed fairly

6    small for the entire fund, so to the extent

7    that -- I don't think anybody actually knew what

8    those fund expenses would have been until they

9    were billed, accounting types of fees.  So I don't

10   think I would have had the transparency to say

11   hey, this is what the fund is going to get charged

12   for professional fees and so forth.

13        Q.    Didn't the private placement

14   memorandum tell you pretty much what the estimate

15   would be?

16        A.    I don't recall that.  I don't recall.

17        Q.    Regardless of whether you recall, you

18   don't recall ever putting down on a piece of paper

19   what the expenses might be?

20        A.    No, I never did that.

21        Q.    In order to determine whether you have

22   a profit in the transaction, you need to look at

23   all your costs, correct?

24        A.    Correct.

25        Q.    Part of your costs were your

Carlos Sala

1

2    attorneys' fees, correct?

3        A.    Yes, correct.

4        Q.    Any fees that you were being charged

5    against your account?

6        A.    Correct, but I knew in 2000 -- I got a

7    statement from Deerhurst and that statement

8    basically showed that my account had increased, so

9    I knew I was making money.

10       Q.    Did you ever have a conversation with

11   Tracie Henderson or anyone else at KPMG about the

12   risk of claiming expenses on tax returns in

13   connection with your Deerhurst transaction?

14       A.    Not that I can recall.  I saw that

15   document, but I have no recollection of that.

16       Q.    What is a high water mark, Mr. Sala?

17       A.    High water mark is typically used in

18   the hedge fund industry and it sets a benchmark

19   that an account has to exceed before sharing

20   profits with the manager.

21       Q.    Did you ever come to an agreement

22   about what the high water mark would be in the

23   Deerhurst transaction?

24       A.    I'm not sure if there was an

25   agreement, but I remember discussions later on

1          Carlos Sala

2    when the fund's performance was not doing well, at

3    some point, Andy Kreiger tried to make an effort

4    to say hey, can we reduce the high water mark in

5    return for something.  I can't remember what it

6    was.

7          Q.    What was the high water mark?

8          A.    Roughly 8.9, 9 million, something in

9    there.

10          Q.    The level of your investment?

11          A.    Yes, close to that, maybe a little

12   higher because when I went into the fund, I had

13   profits, so that would have increased my

14   investment level.

15          Q.    The high water mark would have been

16   the highest level that you obtained in the

17   investment?

18          A.    Correct.

19          Q.    In your case, it would have been the

20   8.9 million approximately?

21          A.    Little higher, 9 million.

22          Q.    Just the profits that occurred at the

23   end of 2000?

24          A.    Correct.

25          Q.    Because you made money in 2000?

```
 1                         Carlos Sala
 2        A.     Correct.
 3        Q.     Do you recall having a discussion with
 4   Mr. Kreiger in which you agreed that the high
 5   water mark for this transaction would only be the
 6   level of your investment?
 7        A.     I don't recall.
 8        Q.     Would that have made sense?
 9        A.     That would have been the level of my
10   investment into the fund.
11        Q.     Into the fund, meaning it would have
12   included your profits?
13        A.     Correct.
14        Q.     Wouldn't have made sense not to
15   include the profits?
16        A.     Seems that way, yes.
17               MR. GEIER:  Mark as 157.
18               (Exhibit 157, e-mail dated November
19          28, 2003, marked for identification, as of
20          this date.)
21               (Exhibit 158, series of e-mails dated
22          November 28, marked for identification, as
23          of this date.)
24               (Handing.)
25        Q.     Show you what has been marked as
```

```
 1                      Carlos Sala
 2    Exhibit 157.  It appears to be an e-mail dated
 3    November 28, 2003, correct?
 4              MR. GEIER:  You can look at this
 5         without showing it.
 6              (Handing.)
 7    A.    Yes.  What was the question?
 8    Q.    Do you recognize that document?
 9    A.    Vaguely, but --
10    Q.    It's a document you produced to us,
11    correct?
12    A.    Probably.
13    Q.    Look at the bottom, see it says
14    DHSala?
15    A.    Yes, highly likely.
16    Q.    Any doubt that you produced it to us?
17    A.    No.
18    Q.    Who is the e-mail from and to?
19    A.    From Peter Molyneux to me.
20    Q.    What is Mr. Molyneux saying?
21    A.    He is saying that my initial
22    investment is 8,925,000.  And that as of 10-31-03,
23    current value was $4,830,422.  He says that he
24    confirms that I will be charged a 1 percent
25    management fee on the net asset value.  By the
```

Carlos Sala

1

2  way, this is not a high water mark.

3       Q.    Show you Exhibit 158, the next

4  document.  This is a document also bearing a

5  DHSala Bates stamp 2638.  This time a series of

6  e-mails on November 28th from you to Mr. Molyneux

7  and from Mr. Molyneux to you; is that correct?

8       A.    Yes.

9       Q.    In it you were asking Mr. Molyneux to

10  confirm the high water mark?

11       A.    Yes.

12       Q.    You are saying was it 8.925 that was

13  the level of your investment, correct?

14       A.    Correct.

15       Q.    Or was it something higher?

16       A.    Actually that was the level of my

17  initial investment.  I remember I had a

18  conversation with Peter in relation to this

19  discussion where he said that in fact, we had

20  reached slightly higher than that because of the

21  gains.  So at that point, it was fine.  I mean we

22  were so far away from the high water mark, that it

23  didn't really matter to me whether it was 8.925 or

24  $9 million, but I remember having a verbal

25  discussion with him regarding the high water mark

1          Carlos Sala

2    and initially, I thought my initial investment was

3    8.925.

4              At some point, I realized there was a

5    gain in 2000.  We did have a conversation related

6    to that.  At that point, I said it doesn't really

7    matter, we are so far out --

8         Q.   When you wrote this e-mail to

9    Mr. Molyneux, you don't mention the gain?

10        A.   I don't, yes.  I think it was a

11   subsequent discussion that we had over this and it

12   had to do with Andy's -- Andy made a comment to me

13   about changing the high water mark.

14             I do recall having a discussion with

15   Peter in terms of which one was it.  Initially as

16   it states here in the document, I remember that my

17   initial thought was that it was 8.925, but I also

18   remember having a discussion that it was slightly

19   higher than that.

20        Q.   When did the discussion occur after

21   this e-mail?

22        A.   During this time, I'm sure it was

23   after because at that point, I thought here as I

24   have evidenced by the e-mail, that it was 8.925,

25   so it would have been after that.

1                    Carlos Sala

2        Q.    After that?

3        A.    Yes.

4        Q.    Immediately after this e-mail was

5    sent, you exited from the transaction, correct?

6        A.    No, I exited in February 2004.

7        Q.    Okay.  You notified Mr. Kreiger that

8    you were exiting from the transaction on November

9    28th?

10       A.    Yes, but we had more negotiations with

11   Andy where he I believe dropped the 30

12   percent -- he was willing to drop the expenses,

13   but we stayed -- I said to Andy, look Andy,

14   11-28-2003 was near the time where I filed my

15   qualified amended return, so I had a need for

16   liquidity because I was writing a large check.  I

17   wanted to make sure that I could exit Deerhurst if

18   I needed to.

19            At that point, he gave me a release

20   that said you can exit.  I had a conversation with

21   Andy on the phone, said Andy, we still want to

22   make money on this thing.  I still trust you can

23   make money as originally anticipated and we are

24   going to give you one more chance.  So we

25   continued and stayed with it even though I already

1                          Carlos Sala

2      had a release from Andy, so we actually stayed on

3      until sometime in 2004.

4           Q.    Did you ever renegotiate the 30

5      percent fee with Andy at that time?

6           A.    Yes, subsequent to this.  I believe

7      that fee, he was willing to drop it to 15 percent.

8                 MR. HALLETT:  Excuse me.

9           A.    Subsequent to Exhibit 158, the date of

10     11-28-2003, Andy Kreiger was willing to drop the

11     incentive fee to 15 percent if we ever reached

12     that high, but just to show you -- I mean how I

13     really wanted to make sure money on this, I

14     already made the qualified amended return.  I

15     already paid the government and still stuck around

16     with this guy for another six months.

17          Q.    You were contractually obligated to

18     stay in or suffer a penalty?

19          A.    No, I had already received a release

20     from him.

21          Q.    When did you receive a release?

22          A.    Around this time, 2003.  This time

23     meaning Exhibit 158, so I still stayed even though

24     I had no contractual reason to stay.  I tried

25     everything I could to make money with this guy.

Carlos Sala

Q.    You renegotiated the fee from 2 and 20 to 1 and 30, it was with the expectation that you would be making a lot of money with Mr. Kreiger?

A.    It was.

Q.    You never did an analysis, did you, of the significance of going from 2 and 20 to 1 and 30?

A.    Not a new analysis, no.  I knew that my fees would be lower, so that's good.

Q.    Your fees could be higher than 30 percent of the profits?

A.    When you renegotiated from 2 and 20 to 1 and 30 initially, I thought you were talking about 2000.

Q.    Did you ever do an analysis about how that might impact you financially based upon the returns you were projecting?

A.    No, I didn't go back and try to reforecast based on a new arrangement.

Q.    Based on the returns you were forecasting for this transaction, which you seriously believed to be truthful, 1 and 30, was not necessarily a good business decision, was it?

A.    There was -- the reason is if there

1                          Carlos Sala

2     was no risk, you are absolutely right, but in

3     every investment there is risk, so I was

4     protecting -- I was giving up some of my upside,

5     which I felt was great, to protect some of my

6     downside, so it seemed like a reasonable tradeoff.

7          Q.     Sounds reasonable.  Did you do an

8     analysis to show how much of the upside you were

9     giving and how much of the downside?

10         A.     Mentally, I mean I can do the analysis

11    right now.  I can say I'm going to reduce my

12    guaranteed fees by 50 percent and I'm going to

13    give up 10 personal points of a very large upside

14    if it materializes.  Even though there is risk to

15    that upside, it's ideal, I would consider

16    absolutely.  I mean, you know, I don't have to do,

17    you know, I don't have, you know, I don't have to

18    do an extensive written analysis to make that

19    judgement.  I can make it today.

20         Q.     But at different times in this

21    transaction, you would agree that you did an

22    extensive written analysis; is that correct?

23         A.     Absolutely.

24         Q.     You negotiated, it was your idea to go

25    from 1 and 30?

```
 1                        Carlos Sala
 2         A.    It was my idea to go from 2 to 120.
 3    They came back and Andy Kreiger came back and said
 4    look, if I'm going to give some of the management
 5    fee, I want to increase the profit sharing fee to
 6    30.  I didn't, it was not my idea to give him more
 7    on the profit sharing.
 8         Q.    But you chose to go with 1 and 30 over
 9    2 and 20?
10         A.    I agreed, yes.
11         Q.    That's what you wanted to do?
12         A.    What I wanted to do was go 1 and 20.
13    What I agreed to do towards the end was to 1 and
14    30.
15         Q.    You could have done 2 and 20, but you
16    didn't want that?
17         A.    No, I was unwilling to do that.
18         Q.    You didn't do any calculations to
19    determine how it might impact you?
20         A.    No, I didn't do a calculation.
21         Q.    It would have been easy enough to do
22    based on your projections?
23         A.    It wasn't that easy because my
24    historical results were based on 2 and 20, so I
25    would have had to have gone back and asked
```

```
                           Carlos Sala
 1
 2   Deerhurst to say redo your nine years' worth of
 3   historical results, assuming you had actually
 4   charged 1 and 30 instead of 2 and 20.  Only they
 5   could have done that.  That would have been
 6   actually restated historical results.  I then
 7   would have had to put that in my own analysis to
 8   have done so, so it would have required a fair
 9   amount of work.
10         Q.    You didn't ask them to do that?
11         A.    No.
12         Q.    Prior to entering into the
13   transaction, you reviewed the draft legal
14   opinions?
15         A.    Yes.
16         Q.    The draft opinions were prepared by
17   who?
18         A.    Brown & Wood.
19         Q.    How did you obtain copies of them?
20         A.    I don't recall exactly how I obtained
21   the copies.  They gave them to me.  It would have
22   been one of three sources.  It would have been
23   Brown & Wood would have forwarded it to me.
24   Schwartz would have forwarded it to me or John
25   Raby would have forwarded it to me.
```

Carlos Sala

1

2          MR. GEIER:  Let's take a look at

3     Exhibit 159.

4               (Exhibit 159, e-mail, marked for

5     identification, as of this date.)

6               (Handing.)

7     Q.    I hand you 159.  It looks to be an

8     e-mail that you were sending to Tracie Henderson

9     with a call spread memorandum attached.  Do you

10    recognize this?

11    A.    Not really, but --

12    Q.    Is that your e-mail address?

13    A.    That is my e-mail address.

14    Q.    Do you recognize that as being

15    Tracie's e-mail address?

16    A.    Yes.

17    Q.    Was she your accountant in October

18    2000?

19    A.    Yes.

20    Q.    Do you have any doubt that you sent

21    this?

22    A.    No, no, I don't doubt that.

23    Q.    Do you see that the e-mail is dated

24    October 6th, but if you see the Brown & Wood

25    opinion on the first page, it's dated September

Carlos Sala

1

2    15th?

3         A.    Yes.

4         Q.    Is it your testimony that you just

5    don't know where this draft came from physically?

6         A.    I don't.

7         Q.    Do you know why you sent it over to

8    Tracie?

9         A.    Sure.  It -- she was going to prepare

10   my return for 2000.  I would have wanted to make

11   sure she reviewed it and felt comfortable enough

12   to sign the return later on.

13        Q.    Was this draft document intended to

14   explain to her what the transaction was about?

15        A.    Yes.

16        Q.    Did you read this document at the

17   time, I'm not going to quiz you on it?

18        A.    You know, highly likely I read the

19   opinion at some point and I went through it in

20   great detail with Larry Nemirow.  I can't tell you

21   it was October the 6th, October 15th, I mean, but

22   during this period of time, I read the Brown &

23   Wood opinion page by page.

24        Q.    This would have been the opinion that

25   you read, this version is what I'm trying to get

1                    Carlos Sala

2   at.

3          A.    I don't know to be perfectly honest.

4   I don't know which version I reviewed page by

5   page.  I don't even know how many versions.  Do

6   you know how many versions there were?

7          Q.    We can get to that.

8          A.    I don't recall how many versions.

9          Q.    You understood this to be representing

10  the transaction or similar to the transaction that

11  you would be entering into?

12         A.    Yes, a draft of it.

13         Q.    This is in October 2000.  Okay.  Do

14  you recall any conversation that you had with

15  Tracie about this?

16         A.    Yes, I asked her if she felt

17  comfortable with signing the return, she said yes.

18  She didn't say yes right away.  At some point she

19  said yes after reviewing it.

20              MR. GEIER:  Just for completeness, I

21         will show you what we will mark as Exhibit

22         160.

23              (Exhibit 160, Brown & Wood draft

24         opinion dated November 13, marked for

25         identification, as of this date.)

```
 1                    Carlos Sala
 2              (Handing.)
 3      Q.     Before I show you 160, which is
 4  another version, you entered into this transaction
 5  in October, correct, 2000?
 6      A.     Yes, October, late October.
 7      Q.     So here is 160, which is a Brown &
 8  Wood draft opinion dated November 13.
 9      A.     Okay.
10      Q.     First getting back to the October 6 or
11  actually either one of these.  Well, do you
12  recognize the number 160?
13      A.     Generally, yes.
14      Q.     These are, at least one of these
15  versions you reviewed prior to entering into the
16  transaction?
17      A.     Yes.
18      Q.     Maybe others you reviewed during the
19  course of the transaction?
20      A.     Others?
21      Q.     Meaning the one dated November 13.
22  It's possible that you reviewed that during the
23  course of the transaction?
24      A.     It's possible, yes.
25      Q.     But you saw the general legal opinion
```

1                          Carlos Sala

2      prior to entering into it?

3              A.     Yes.

4              Q.     Did Tracie advise you ever that she

5      was familiar with this type of a transaction?

6              A.     I don't recall, but I don't think so.

7              Q.     Were the draft opinions that you

8      reviewed prior to entering into the transaction,

9      consistent with the representation being made by

10     Mr. Schwartz about the transaction?

11             A.     Generally, yes.

12             Q.     Do you know if any of the opinions

13     talked about the buy-in to the transaction being a

14     percentage of the tax losses?

15             A.     I don't recall.

16             Q.     Do you know if the opinions

17     represented that you were told in advance that

18     there would be a tax loss in 2000?

19             A.     Can you repeat that.

20             Q.     Do you know if the opinions discussed

21     the fact that you had been advised prior to

22     entering into the transaction that the tax loss

23     would occur in 2000?

24             A.     I don't recall.

25             Q.     Do you recall any conversations you

Carlos Sala

1
2    had with Tracie Henderson about any draft Brown &

3    Wood opinions?

4         A.    Just as I stated, in fact she felt

5    comfortable with the form of the opinion, the

6    contents, to be able to send a tax return.  I

7    remember discussing that with her.

8         Q.    Did she talk to you about any risk she

9    perceived you entering into the transaction?

10        A.    There is one additional item that

11   comes into mind; that is that she thought that

12   since the transaction included the use of an

13   S Corp., that she knew of an attorney who had the

14   expertise to review this type of transaction,

15   especially the use of S Corp. and she gave me the

16   name of Bruce Lemons.  That's how I contacted

17   Bruce Lemons to review the transaction, I know

18   that, but that's the extent of what I remember,

19   but she came back after her review and said that

20   she felt comfortable.

21        Q.    Did she explain there was any risk?

22        A.    I don't think I talked to her about

23   risks, but could be, I just don't recall.

24        Q.    Did you talk to anyone about risk?

25        A.    What kind of risk, investment risk?

1                       Carlos Sala

2           Q.      Any risk.

3           A.      Sure, I talked about investment risks.

4           Q.      To who?

5           A.      To Kreiger, to Schwartz, I'm sure to

6      Tony White.

7           Q.      What about the risk in terms of tax?

8           A.      We knew that since there was a more

9      likely than not opinion that there was a risk,

10     that there would be an audit and a difference of

11     opinion.  It wasn't a guaranteed tax position, so

12     from that perspective, there would have been some

13     risk.

14                  MR. GEIER:  I will show you what we

15          will mark as Exhibit 161.

16                  (Exhibit 161, final opinion dated

17          April 16, 2001, marked for identification,

18          as of this date.)

19                  (Handing.)

20          Q.      Here is 161.  This is what appears to

21     be a final opinion that you obtained from Brown &

22     Wood dated April 16, 2001; is that correct?

23          A.      Yes.

24          Q.      If you could turn to page 78 of the

25     numbered pages.  At the top left-hand corner of

Carlos Sala

1
2     each page, do you see there is a discussion of IRS

3     notice 2000-S-44?

4          A.     Yes.

5          Q.     Do you recall if you read this prior

6     to entering into the transaction?

7          A.     Yes, I did.

8          Q.     You were aware that the IRS notice had

9     been issued?

10         A.     I was.

11         Q.     In fact, the issuance of the IRS

12     notice caused you to have concerns about whether

13     you wanted to do a BLIPS deal?

14         A.     In part, different issue from this

15     issue in 2000-S-44.  From what I recall, vague,

16     but I will tell you my recollection.  My

17     recollection is that 2000-S-44 had a variant that

18     was specific to the loan premium transaction that

19     would have been similar to the transaction BLIPS

20     from KPMG.

21              As it related to this transaction, I

22     believe the issue was the treatment of contingent

23     liabilities and I believe that my conclusion,

24     which was I think stated here and his opinion, was

25     that that position in 2000-S-44 contradicted

Carlos Sala

1

2    existing law at the time and that as a result of

3    it, felt comfortable and the attorneys more

4    importantly felt comfortable in giving me

5    assurance that the position in this transaction

6    was an accurate one versus the purported position

7    as it related to Deerhurst on 2000-S-44.

8         Q.   My question is that you understood

9    that 2000-S-44 described your Deerhurst

10   transaction, you just took issue with the

11   conclusion, correct?

12        A.   I wasn't sure because I think Michael

13   Schwartz told me that 2000-S-44, that he felt did

14   not impact the Deerhurst transaction.  I believe

15   he told me that, but even if it did, I

16   think -- frankly there were many issues associated

17   in the tax opinion.  There was one of many.  And

18   2000-S-44 was not -- well publicized as it is now.

19   So it would have been one of many issues that were

20   covered by the opinion.

21        Q.   My question to you was simply as you

22   understood, you read 2000-S-44 prior to entering

23   into the Deerhurst transaction, correct?

24        A.   I think I read portions of it.  I

25   don't think I read the entire 2000-S-44.

                         Carlos Sala

1

2       Q.    You read portions of it as it was in

3  the draft opinion letters prepared by Brown &

4  Wood?

5       A.    Yes.

6       Q.    In those draft opinion letters, it

7  talks about a transaction in which an individual

8  purchases and writes options to create basis and

9  then transfers those positions to an entity,

10 correct?

11      A.    Relates to this opinion?

12      Q.    Look at page 78.

13      A.    Yes, I would have read 78.

14      Q.    You would have read this before,

15 similar language in the prior drafts.

16      A.    I don't recall, but if it was in

17 there, it's highly likely.  This is dated April

18 16th.

19      Q.    I can take you through each one, but

20 let's assume it's in there.

21      A.    If it's in there, it's highly likely I

22 read it.  There it is.

23      Q.    You understood that 2000-S-44 talked

24 about writing options to create basis and then to

25 transfer those options into another entity,

1                          Carlos Sala

2      correct?

3           A.    I don't recall if at that time I

4      understood, but I read it, it could be that I did.

5      I just don't recall.

6           Q.    Did you ever question anybody as to

7      whether 2000-S-44 applies to this transaction?

8           A.    I think I had a discussion with

9      Michael Schwartz about this.

10          Q.    Anyone else?

11          A.    No.

12          Q.    Just Michael Schwartz?

13          A.    Well, take that back.   Maybe Larry

14     Nemirow as well.

15          Q.    Are you sure?

16          A.    I don't recall.

17          Q.    You can recall Michael Schwartz?

18          A.    Yes.

19          Q.    Michael Schwartz told you he didn't

20     think it applied?

21          A.    I believe so.

22          Q.    Do you know why?

23          A.    I don't know why.

24          Q.    Did you follow up?

25          A.    No, not further since it was already

Carlos Sala

1

2    covered in the opinion.  The opinion seemed

3    accurate to me.

4        Q.    Do you know what position the opinion

5    took with respect to 2000-S-44 in this transaction

6    or just that the law was wrong?

7        A.    I think there was a discussion -- two

8    sets of discussions.  This is -- I reviewed the

9    opinion more recently, so I can tell you it's not

10   like going back six years from memory, but I

11   believe the opinion had a discussion as to the way

12   that you would assign to weight that you would

13   assign to a notice being similar to a revenue

14   ruling and the different court approaches to that.

15   And then there was a discussion that the opinion

16   actually took -- really -- that the notice

17   contradicted case law and that would have been the

18   kin part of it.

19       Q.    You knew going into this transaction

20   that the IRS viewed this transaction completely

21   differently than your advisors?

22       A.    No, because Michael Schwartz, I think

23   he expressed at the time he didn't think it

24   applied to our transaction.  However, I did read

25   these pages here and felt that even if it did

Carlos Sala

1

2   apply, that the analysis that had been done here

3   was reasonable.

4        Q.    You don't recall participating in any

5   specific conversation with anyone else about

6   2000-S-44, specific conversation?

7        A.    Well, I remember having a conversation

8   with Tracie Henderson about 2000-S-44 as it

9   related to BLIPS, but not Deerhurst.

10       Q.    You mentioned and you agree with me,

11  that you had a lot of clout when you entered into

12  the transaction because of the significance of

13  your investment amount, correct?

14       A.    Some clout.

15       Q.    You were able to renegotiate your

16  fees?

17       A.    Sure.   If I had all the clout, I would

18  have said 120.   We would have -- we ended up 130,

19  so I didn't dictate everything.

20       Q.    You could have walked away and they

21  could have come back to you and said we agree to

22  your terms, you didn't do that?

23       A.    Maybe I could have.   They didn't seem

24  willing to do that.

25       Q.    When you had conversations with

75

Carlos Sala

1
2     Mr. Kreiger, did you ever talk to him about maybe

3     opening an account directly with him and not

4     through Mr. Schwartz?

5          A.    I'm not sure that was ever discussed

6     at all since Mr. Schwartz was the one that

7     introduced me to Mr. Kreiger.

8          Q.    Did you ever discuss with Mr. Schwartz

9     or Mr. Kreiger that you didn't want your

10    investment to be locked up for five years and that

11    you were perfectly willing to allow him to make

12    some investments for you and periodically

13    reevaluate how you were doing?

14         A.    We didn't have that discussion.

15         Q.    You didn't raise it?

16         A.    No.

17         Q.    You didn't think about it at the time?

18         A.    I didn't think about it.

19         Q.    You understood that you were agreeing

20    to lock your money in effect, for five years?

21         A.    I did.  It made sense to me.

22         Q.    You also understood that when you

23    entered the transaction, there was a one year

24    period where you couldn't exit no matter what?

25         A.    I understood those terms.

Carlos Sala

1

2      Q.    Those terms didn't bother you?

3      A.    No, this was not so unusual.  I mean

4   Andy was -- explained it to me he was going to

5   have to make some significant commitments to

6   hiring additional traders, additional financial

7   commitments himself in terms of infrastructure and

8   systems and he needed the assurance of longer term

9   investors and it's not unusual to have lock-up

10  periods for buyout funds and hedge funds and

11  things like that.

12     Q.    What is a buyout fund?

13     A.    That would be a fund that accumulates

14  funds, monies to purchase companies.

15     Q.    There wasn't another asset here,

16  meaning that it's important to keep all the money

17  together so you have the money for a period of

18  time in order to use it to acquire another

19  business?

20     A.    Yes.

21     Q.    That wasn't happening here, correct?

22     A.    It's a different structure.

23     Q.    They were just buying and selling

24  foreign currency?

25     A.    Yes, but some of those were long term

```
1                        Carlos Sala
2    positions too.
3         Q.    A lot of them were short term
4    positions?
5         A.    Correct.
6         Q.    Most of them were short term
7    positions?
8         A.    Yes, but some significant positions
9    you don't want to exit, they are illiquid.
10         Q.    Do you know what the minimum amount
11    you could have invested in the LLC was?
12         A.    I don't know.
13         Q.    Did you review the documents that
14    talked about it?
15         A.    Yes.
16         Q.    Would you be surprised to learn that
17    the minimum investment, at least according to some
18    of the documents you were supplied, was $500,000?
19         A.    No, I wouldn't be surprised.
20         Q.    Were you told that the minimum
21    investment you needed to invest was based on the
22    percentage of the tax losses you wanted?
23         A.    It was part of the calculation, yes.
24         Q.    You had to invest a percentage of the
25    tax losses?
```

Carlos Sala

1

2    A.    I mean I could have invested any

3    amount I wanted, but in order to -- I mean, as you

4    link the investment to the tax loss, there wasn't

5    anything magical about that.  The reason for that

6    was to follow an analysis that Michael Schwartz

7    did, which was a proposed treasury economic

8    substance test, and he felt that for tax reasons,

9    it was prudent to follow that logic and as a

10   result of that, it was prudent to have an

11   investment level that was sufficient to satisfy

12   that test.  That is how the whole buying as you

13   put it, comes into play.

14        Q.    Did you discuss the Deerhurst

15   transaction with any other investment advisor that

16   you had?

17        A.    I inquired as to Andy Krieger's trade

18   background with people that I thought maybe might

19   be able to give me some information.

20        Q.    Who?

21        A.    It was Mr. White's attorneys here in

22   New York did a background search on him.  I think

23   either myself or Mr. White on the phone asked that

24   both Morgan Stanley and Goldman Sachs to inquire

25   within their organizations that they knew who Andy

Carlos Sala

1

2     Kreiger was.  I may have asked Tracie Henderson to

3     see if she knew of anybody who knew who Andy

4     Kreiger was.  I think that would be it.

5          Q.    What did Morgan Stanley tell you about

6     Mr. Kreiger?

7          A.    Morgan Stanley told me nothing.

8          Q.    What did Goldman Sachs tell you about

9     Mr. Kreiger?

10         A.    Goldman Sachs came back and said he

11    was a well-known trader, that being at Bankers

12    Trust, but that they didn't know much more than

13    that.

14         Q.    You understand now that it was an

15    option to you at the time that you could have

16    talked to Mr. Kreiger and to invest with him

17    directly, correct?

18         A.    No, I don't.

19         Q.    You couldn't have invested with him

20    directly, he didn't want your money?

21         A.    He never proposed that as an option to

22    me.

23         Q.    You never proposed that to him?

24         A.    No.

25         Q.    You never proposed as I suggested,

Carlos Sala

1
2    negotiating your own steps and transactions with

3    Mr. Kreiger?

4         A.    No, because he made it very clear to

5    me that he was creating this fund to be able to

6    support further investment.  So he -- I'm not sure

7    he would have actually agreed to it.  Maybe he

8    would have, but I don't know.  You have to ask

9    him.

10        Q.    He also told you that the fees were 2

11   and 20 percent, correct?

12        A.    Yes.

13        Q.    You don't know until you ask if

14   something can change?

15        A.    Good point, I never even thought to

16   ask.

17        Q.    Did you understand if any of

18   Mr. Kreiger's other clients had a lock-up on their

19   funds prior to the Deerhurst transaction?

20        A.    I don't know.

21        Q.    Did you inquire about that?

22        A.    No, I didn't.

23        Q.    Did you inquire whether that was

24   Mr. Kreiger's standard practice?

25        A.    I didn't.

1          Carlos Sala

2          Q.    Did you understand whether he made

3    people keep their money in for five years?

4          A.    I have no idea.

5          Q.    Were you aware that Mr. Kreiger

6    participated in the Deerhurst transaction?

7          A.    I became aware of that sometime after

8    I entered into the Deerhurst Trading Strategies

9    fund.

10          Q.    When?

11          A.    I think when I was having weekly calls

12    with him and I was complaining about the

13    performance.  He came back and told me how he was

14    feeling the pain along with me because he was a

15    co-investor.

16          Q.    How did that strike you?

17          A.    I thought it was at least good that he

18    was feeling the same pain I was.

19          Q.    Did you ask him why he needed to be in

20    such a transaction when he could have traded on

21    his own account?

22          A.    Did I ask him that, no.

23          Q.    Did you wonder?

24          A.    No.  Andy's personal trading was the

25    least of my concerns.  I wanted to -- my

Carlos Sala

1
2    concern -- my emphasis was on improving the
3    performance of Deerhurst Trading Strategies.
4              MR. GEIER:  I will show you Exhibit
5         162.
6              (Exhibit 162, document titled
7         discretionary program, Bates stamp 274,
8         marked for identification, as of this date.)
9              (Handing.)
10             MR. GEIER:  This is a document titled
11        the discretionary program, starts with Bates
12        stamp DHSala 274.
13        Q.   Do you recognize that document?
14        A.   I do.
15        Q.   This is a document that Mr. Kreiger
16   provided to you?
17        A.   Him or someone in his office.
18        Q.   This was something that was provided
19   to you in connection with your review of the
20   Deerhurst transaction prior to agreeing to enter
21   into it?
22        A.   Yes.
23        Q.   It's something you reviewed?
24        A.   Yes.
25        Q.   You reviewed it quite carefully?

Carlos Sala

1

2      A.     Yes.

3      Q.     You made projections based upon the

4  numbers contained in this document?

5      A.     Yes.

6      Q.     Did you review the results for 2000?

7      A.     Yes, I did.

8      Q.     Did you see that there was a loss for

9  every month leading up to the time that you made

10  your investment?

11      A.     Whether there was a -- two months.

12      Q.     This was an overall loss for the year?

13      A.     Yes.

14      Q.     You saw that?

15      A.     Yes.

16      Q.     Did you see in 1999 there was a profit

17  of .73 percent?

18      A.     Yes.

19      Q.     Do you see in 1999 trading wasn't

20  performed for six months?

21      A.     Yes.

22      Q.     You were aware of that?

23      A.     I was.  I talked to Kreiger about it.

24      Q.     Is there a reason why you didn't use

25  the 2000 results in your projections?

Carlos Sala

1

2     A.     I have to go back --

3     Q.     Or did you?

4     A.     I think I did.  Yes, I did.

5     Q.     Did you ask Mr. Kreiger why he didn't

6  trade for the six months in 1999?

7     A.     Yes.

8     Q.     What did he tell you?

9     A.     He said that he had been trading a

10 very large account.  He had a contractual

11 agreement with that investor, with that very large

12 investor to trade only with him.  He said he had

13 some compensation accrued that would be paid

14 sometime late in '99, but if he went on and did

15 trading for somebody else, that that compensation

16 would be forfeited.  So he basically said it was

17 more profitable and lucrative for me to sit and do

18 nothing than to give up the amounts that I had

19 accrued.  So I just sat back until that contract

20 expired and then resumed trading.

21     Q.     Did the client leave him?

22     A.     I think the client lost -- I don't

23 know who the client was, but my recollection is

24 that he said unrelated to Mr. Kreiger, he was a

25 very large player in futures, currencies and so

Carlos Sala

1

2  forth and lost what he said over a billion dollars

3  somewhere else and needed to pull out because it

4  would -- because of liquidity issues.

5      Q.    So the client had left was your

6  understanding?

7      A.    He needed liquidity because he had

8  incurred losses on other investors.

9      Q.    The client cancelled his agreement

10 with Mr. Kreiger was your understanding?

11     A.    My understanding.

12     Q.    I'm not sure I understand.  What did

13 you do to follow up on this, if anything?  If the

14 client left, Mr. Kreiger was telling you that he

15 still couldn't trade even though the client left

16 him?

17     A.    Yes, contractually he had a

18 contractual agreement with him that limited his

19 trading outside of his involvement, the client's

20 involvement, and I never looked at the contract.

21 I'm telling you what he told me.

22     Q.    He told you the client left him?

23     A.    Yes.

24     Q.    Pulled his money out?

25     A.    I believe so.

Carlos Sala

1

2    Q.    There is no trades during those six

3  months?

4    A.    Yes.

5    Q.    Did you ever talk to a client of

6  Mr. Kreiger's?

7    A.    I talked to two references.  I talked

8  to the  --

9    Q.    Did you ever talk to a client of

10  Mr. Kreiger's, an actual client?

11    A.    Yes.

12    Q.    Who was that?

13    A.    The Perot family foundation.

14    Q.    Who did you talk to?

15    A.    The head of that family office.

16    Q.    Who?

17    A.    I can research the name somewhere, but

18  I talked to -- if I asked Andy who the head of the

19  Perot Family Office is, that's who I talked to,

20  six years ago, so the name doesn't come --

21  actually, I talked to him twice.  I talked to him

22  back when I was doing a reference on Kreiger.  And

23  I talked to him again prior to going into Lone

24  Star.

25    Q.    Was it your understanding that the

Carlos Sala

 1
 2    Perot family foundation was in Lone Star?
 3         A.    Not a foundation, it was a family
 4    office.
 5         Q.    Was the family office investing in the
 6    Lone Star program?
 7         A.    Correct.
 8         Q.    Were they investing in any other
 9    program?
10         A.    I think they had some mutual types of
11    investments --
12         Q.    Do you know if it was a discretionary
13    program?
14         A.    I don't know.
15         Q.    Did you ask him?
16         A.    I might have.
17         Q.    You don't recall?
18         A.    I don't recall.
19         Q.    Did you talk to anyone else?
20         A.    I did.  I talked to Ron DiRusso, who
21    subsequently went to work for Andy.  He had done
22    some trades with Kreiger I believe.
23         Q.    Mr. DiRusso was a trader himself?
24         A.    Yes, he was a trader himself.
25         Q.    What was his relationship to

Carlos Sala

1

2     Mr. Kreiger?

3          A.    He was -- I wanted to understand his

4     reputation, Krieger's reputation as a trader from

5     somebody who understood Krieger's trades and Ron

6     DiRusso was someone who had worked with Andy

7     Kreiger or they knew each other from a

8     professional perspective and they had actually

9     done trades together, maybe as a client.  I think

10    Kreiger was either a client of DiRusso or brokers

11    or vice versa, I can't recall the connection as to

12    who was a client of whose.  I wanted him to give

13    me a character reference on Kreiger from a

14    trader's perspective, that kind of thing --

15         Q.    So who put you in touch with

16    Mr. DiRusso?

17         A.    Mr. Kreiger gave his contact info.

18         Q.    The Perot Family Office didn't tell

19    you what they were investing in with Mr. Kreiger?

20         A.    Someone told me he had a $50 million

21    investment with Kreiger, that would have been

22    either Kreiger or Perot.  I don't know if the

23    Perot Family Office would have actually

24    volunteered that information, they are private

25    people.  So I knew they were the largest investor

Carlos Sala

1

2  that Kreiger had at the time.  They had done some

3  work together, had developed some trading software

4  together.  They knew each other very well, that

5  was very clear.

6      Q.    Did you know what they were investing

7  in with Mr. Kreiger?

8      A.    Yes, commodities, foreign currencies,

9  futures.

10     Q.    But not just tied to foreign

11  currencies?

12     A.    Foreign currencies.

13     Q.    They were investing in other things?

14     A.    In addition, but the bulk of it was

15  foreign currencies from my understanding.

16     Q.    What percentage?

17     A.    I think -- I should not speculate, it

18  was the most significant piece of their portfolio.

19     Q.    Was this within the Lone Star trading

20  program that they invested?

21     A.    That was part of it, but I believe

22  they also invested in other programs.

23     Q.    How much was in Lone Star?

24     A.    I don't know.  I think the total

25  investment that Kreiger had with Perot that they

                              Carlos Sala

1

2   were working together was -- the number that

3   sticks to my mind was $15 million, but these are

4   ballpark figures.   As I said, he is a private

5   individual.

6          Q.    At the time that you met Mr. Kreiger,

7   do you know how many clients he had?

8          A.    I don't know how many clients he had.

9          Q.    Did you inquire?

10          A.    I probably asked him.

11          Q.    Did you talk to any current clients?

12          A.    Yes.   Perot was a current client and

13   Ron DiRusso, I believe they had professional

14   trades and again, I don't know who was a client of

15   who, but at that point, they were doing business

16   together, DiRusso went to work for him subsequent.

17          Q.    Do you see in the discretionary

18   program Mr. Kreiger represents that he reorganized

19   his business to accept assets from an expanded

20   clientele.   Do you see that in the note below the

21   chart for March 1999 through August 1999?

22          A.    Let me just read that.   Okay.

23          Q.    He reorganized his business.   Are you

24   telling me that he told you something different

25   when you spoke with him?

Carlos Sala

1

2    A.    No, that refers to the one large

3  client that exited.  No, I'm not --

4    Q.    It doesn't mention that here.

5    A.    That's what it was.

6    Q.    Did you inquire from any other client

7  of Mr. Kreiger's what their trading policies were?

8    A.    What do you mean by trading policies?

9    Q.    On this note, it talks about

10  individual accounts may vary, performance may vary

11  depending upon factors, one of them is the

12  client's trading policies.  Do you see that?

13    A.    Yes.

14    Q.    Did you ask about that?

15    A.    No.

16    Q.    Did you ask about the degree of

17  leverage that was employed?

18    A.    Yes.

19    Q.    Who did you ask that to?

20    A.    I think I had a discussion with Perot

21  about that.

22    Q.    What was the degree of leverage?

23    A.    I don't recall.

24    Q.    Do you recall asking about the fee

25  structure?

1                        Carlos Sala

2          A.    Probably did, but I can't recall.

3          Q.    What was it?

4          A.    I can't recall.

5          Q.    Did you ask?

6          A.    I always asked about fees.

7          Q.    Did you ask about the brokerage or

8    dealers that were being used to trade those

9    accounts?

10         A.    Yes, I did.

11         Q.    Was it Beckingham?

12         A.    REFCO.

13         Q.    And was it Beckingham as well?

14         A.    I don't recall if Beckingham was

15   involved, I don't recall that.

16         Q.    Do you see some of the results here,

17   take a look.  Did you compare Mr. Kreiger's

18   results to how the market was doing, the stock

19   market or general indexes were doing overall?

20         A.    No, this was unrelated to the stock

21   market.  It would have been a futile exercise.

22         Q.    It would have been easy to do?

23         A.    Not a relevant exercise because

24   the -- this program doesn't have a high

25   correlation -- equities don't correlate less any

1                          Carlos Sala

2    to the equities market.

3          Q.    Were you looking for something

4    counter-cyclical?

5          A.    Yes, I was looking for something

6    outside of the equity markets.

7          Q.    Counter-cyclical, is that a term that

8    you used for --

9          A.    I have used that term, but I'm not

10   sure I would say counter-cyclical.

11         Q.    Did you ever use it to describe why

12   you wanted to enter into the Deerhurst

13   transaction?

14         A.    I don't remember having used that term

15   related to this.

16         Q.    What does counter-cyclical mean to

17   you?

18         A.    Meaning the economy goes through

19   cycles up and down and the equity markets usually

20   is ahead of those cycles, looks ahead.

21   Counter-cyclical would be an investment that would

22   offset the natural trend of the economic cycles.

23   That is not necessarily what this is.  This could

24   be up or down regardless of the cycle of the

25   economy.

Carlos Sala

1

2     Q.     Let me ask you a question.   Have you

3  seen -- this was previously marked as Exhibit 1 by

4  the parties.

5          (Handing.)

6     Q.     This is a document entitled portfolio

7  managed by Andy Kreiger.   Did you review this

8  document prior to entering into the transaction?

9     A.     Yes.

10    Q.     Who provided this to you?

11    A.     Mr. Kreiger.

12    Q.     Take a look, let's see.   What was the

13  purpose of him providing this to you?

14    A.     When I looked at the results, I asked

15  him if there was any confirmation supporting his

16  results and he stated to me that an accounting

17  firm had actually done an agreed upon procedures

18  report looking at his results from a number of

19  years.   As a result of that, I asked for the

20  report and he provided it to me.

21    Q.     You understood that this ran hand in

22  hand with the discretionary program?

23    A.     Pretty close, yes.

24    Q.     You reviewed these and did you talk to

25  Mr. Kreiger about what appears on here?

Carlos Sala

1

2      A.    I don't have a specific recollection,

3  but I would think so, yes.

4      Q.    For 1995, the discretionary program

5  shows a return of 23 percent, correct?

6      A.    Yes.

7      Q.    But on this exhibit, what is the

8  number one, shows at least for the last six months

9  of 1995, of only 6 percent.

10      A.    Correct, seems consistent if you

11  looked at the August through December time frame.

12      Q.    Do you know what is meant by an

13  examination?  If you take a look at Bates stamp

14  238 on Exhibit 1, next to last paragraph, there is

15  a reference to the agreed upon procedures of

16  substantially less in scope than an examination.

17  Is that an accounting term?

18      A.    Yes.

19      Q.    What does that mean you to?

20      A.    He means an audit.

21      Q.    When it says substantially less in

22  scope, what does that mean?

23      A.    It means an audit is very

24  comprehensive in scope.  It would look at

25  financial statements of an entity.  It would look

1            Carlos Sala

2    at all the components of their financial

3    statements.  This report here, it's a report that

4    is also a standard accounting report called an

5    agreed upon procedures report.  That is very

6    common where you actually look at something

7    specific.  In this case, the specificity of the

8    report concentrated on looking at historical

9    performance results.  So they weren't looking at

10   the balance sheet of an entity, let's say, as an

11   example.

12        Q.    Were they trying to confirm whether

13   these trades actually occurred?

14        A.    Yes, they did that.

15        Q.    Do you know that?

16        A.    Yes, in this report.

17        Q.    Based upon what is said here?

18        A.    Yes.

19        Q.    What did they rely on?

20        A.    It's based on the agreed upon

21   procedures that they list from one through four,

22   based on that.  Any professional accounting firm

23   would have had to have looked at the underlying

24   transactions to derive these results.

25        Q.    Did you talk to Mr. Farber who

1                        Carlos Sala

2     prepared this?

3          A.     No.

4                MR. HALLETT:   It's getting toward

5          lunchtime.

6                MR. GEIER:   Okay, we will try to get

7          to a point.

8          Q.     Do you know the scope of trades that

9     were included in Exhibit 1, was it every trade?

10         A.     Which one is Exhibit 1?

11         Q.     This, it says Exhibit 1 on it,

12    portfolio managed by Andy Kreiger.

13         A.     Yes.

14         Q.     Was it all of his trades in whatever

15    portfolios he was managing or was it only the

16    discretionary program?

17         A.     Where are you?   It would have been a

18    discretionary program.

19         Q.     You know that from matching numbers

20    up?

21         A.     Yes, the numbers tie.

22         Q.     You already told me you spoke to

23    Mr. Kreiger and the broker in all the trades of

24    the discretionary program were through REFCO?

25         A.     I don't think it was that specific.

1                    Carlos Sala

2   I knew they used REFCO, that's all I knew.   They

3   could have used other brokers.

4              MR.  GEIER:   Let me just tell you where

5         I am, I'm probably 19 pages in.   Not that I

6         started on page 1, until 30 something pages.

7         We can take a break now if you would like.

8              (Luncheon recess:   12:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        Carlos Sala

 2              A F T E R N O O N    S E S S I O N

 3                   (Time noted:  1:40 p.m.)

 4    C A R L O S    S A L A,    resumed and testified

 5    as follows:

 6    EXAMINATION (Cont'd.)

 7    BY MR. GEIER:

 8         Q.    Mr. Sala, look at Exhibit 1.  In fact,

 9    you don't have to look at Exhibit 1.  You can get

10    your glasses out for another document.

11         A.    What did I do with them?

12         Q.    Did you ever heard of Woodhill

13    America?

14         A.    No.

15         Q.    Have you ever heard of Woodhill

16    Partners?

17         A.    No.

18         Q.    Do you have any idea what they did?

19         A.    No, I have never heard of them.

20         Q.    I show you what we will mark as

21    Exhibit 163.

22              (Exhibit 163, FX trading program,

23         marked for identification, as of this date.)

24              (Handing.)

25         Q.    This is a document that you only
```