# EXHIBIT 7

# Pt. II of III

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
3    ------------------------------X       **CERTIFIED COPY**
4    CARLOS E. SALA and              )
     TINA ZANOLINI SALA,             )
5                                    )
                    Plaintiffs,      )
6                                    )
              vs.                    )   Civil Action No.
7                                    )    05-CV-00636
     UNITED STATES OF AMERICA,       )    LTB-PAC
8                                    )
                    Defendant.       )
9    ------------------------------X

10

11                   October 24, 2006

12                   10:30 a.m.

13

14          Continued Deposition of CARLOS E.

15       SALA, held at the offices of Katten, Muchin

16       & Rosen, LLP, 575 Madison Avenue, New York,

17       New York, pursuant to Adjournment, before

18       Elisabeth F. Nason, a Notary Public of the

19       State of New York.

20

21

22   Atkinson-Baker, Inc.
     Court Reporters
23   www.depo.com
     800-288-3376

24   Reported by:
     ELISABETH F. NASON
25   JOB NO. A00921C

Carlos Sala

1

2    recently produced to us, I think just within the

3    last couple of weeks.

4         A.    Really.  I would have thought that was

5    produced with the previous production, but I could

6    be wrong.

7         Q.    Something you have had all along?

8         A.    I think so.

9              MR. HALLETT:  I don't know if that's

10             correct either.

11             MR. GEIER:  We have an e-mail from

12             Connie sending it to us.

13             MR. HALLETT:  Okay.

14        Q.    Who prepared this?  Just for the

15   record, this is an FX trading program, it's got

16   some handwritten comments.  Says after fees on, it

17   looks to be a chart that in part talks about a

18   Treasury Department economic substance test.

19        A.    You know, I know -- you said Connie

20   prepared this?

21        Q.    No, gave it to us.

22        A.    Sorry, I don't think -- I take that

23   back.  I don't think I have ever seen this exhibit

24   document.  I think the one that I produced was

25   similar to this and I think the analysis was

1                    Carlos Sala

2    similar, but it had different numbers.

3         Q.    Do you know who prepared this

4    document?

5         A.    My guess is Michael Schwartz.

6         Q.    Do you know how it came into your

7    possession?

8         A.    I don't know if this is actually from

9    me.  I think it may be from Mr. White.  The reason

10   I say that is because that looks like his

11   handwriting.

12        Q.    You have seen a similar one?

13        A.    Yes.

14        Q.    Who prepared that?

15        A.    Mr. Schwartz.

16        Q.    Did he provide it to you?

17        A.    Yes.

18        Q.    What was the purpose of that?

19        A.    To show the analysis that I referred

20   to earlier in the deposition regarding the

21   proposed Treasury Department economic substance

22   test.

23        Q.    Did he explain it to you?

24        A.    Yes.

25        Q.    Did you compute your profits the same

Carlos Sala

1

2     way he computed his?

3              MR. HALLETT:  Is this an exhibit?

4         What is the number on this?

5              MR. GEIER:  163.

6         A.    The one he gave me was different than

7     this one, so I can't testify to this one, but if

8     we can find the other one --

9              MR. GEIER:  Let's take a look at 164.

10             (Exhibit 164, projections, marked for

11        identification, as of this date.)

12             (Handing.)

13             MR. HALLETT:  For the record, I

14        think this came from Tony White.

15             MS. FLANDERS-PALMER:  It came from

16        Mr. White inadvertently, not produced

17        initially.

18             THE WITNESS:  This is really

19        Mr. White's document, not my document.

20        Q.    Do you recognize Exhibit 164?

21        A.    Yes.

22        Q.    What is this?

23        A.    These are projections.

24        Q.    Who prepared this document?

25        A.    I did.

Carlos Sala

1

2      Q.     What was the purpose?

3      A.     To show the potential profitability of

4   an investment in Deerhurst.

5      Q.     This is what you believed the profits

6   to be entering the transaction?

7      A.     Well, this is what I believe the

8   profits could be.

9      Q.     What you expected them to be?

10     A.     Well, projections, right, so this is

11  to the best of my ability, to forecast, that's

12  what I forecasted them to be.

13     Q.     Did you expect them to be what you

14  forecasted them to be?

15     A.     Yes.

16     Q.     Taking into account risk associated

17  with the investment?

18     A.     Yes.

19     Q.     Even with risk, this is what you

20  determined to be your expected returns going in?

21     A.     Sure.  The returns going hand in hand

22  with the risk.

23     Q.     It shows an original investment of

24  9 million.  Was that to approximate what your

25  initial investment was?

Carlos Sala

1

2    A.    Yes.

3    Q.    When did you prepare this document?

4    A.    Sometime during the entry of

5 Deerhurst.  I can't recall exactly when.

6    Q.    You have different scenarios here?

7    A.    Yes.

8    Q.    The scenario one is over how many

9 years?  What is the average annual per Deerhurst,

10 what does that mean?

11    A.    That would have been -- if you flip

12 back to the third page, there is a page there that

13 is called historical results.  Those were results

14 provided by Deerhurst and those results, the

15 average of those results excluding the year 2000

16 could have been scenario -- would have been used

17 for scenario one.

18    Q.    Scenario one is 1991 through 1999,

19 excluding 2000?

20    A.    Correct.

21    Q.    Using those numbers on the third page

22 of the document?

23    A.    Yes.

24    Q.    Without leverage?

25    A.    Without leverage and then -- well, but

1               Carlos Sala

2    then they were leveraged to get to scenario one.

3    The results in page 3 are without leverage --

4         Q.     How did you apply leverage, what did

5    you do to apply leverage to your numbers?

6         A.     I multiplied the unleveraged amounts

7    by four.

8         Q.     Why did you do that?

9         A.     Because the account was to be traded

10   four to one, leveraged four to one.

11        Q.     Four to one being the same leverage

12   that you were talking about earlier, four standard

13   deviations from some --

14        A.     Basically, yes.

15        Q.     The leverage doesn't refer to how much

16   of the money, if you invested 9 million, it

17   doesn't mean that you are trading at 27 million or

18   $36 million worth of notional value?

19        A.     No, it would have a notional value

20   that would be obviously higher than the one to

21   one.

22        Q.     Would it be four to one to match the

23   four times leverage?

24        A.     Yes, it would be the trading size of

25   the account, four to one.

Carlos Sala

1

2       Q.     Meaning if I understand correctly, if

3 you invest $9 million and you are leveraging it

4 four to one, your trading size is really

5 $36 million?

6       A.     That's a fair assessment.

7       Q.     That's what you mean by leverage?

8       A.     Yes, yes. I think my definition

9 before of leverage when we talked about risk,

10 that's really what I meant by leverage, but in

11 this case, there were two concepts here. There

12 was a concept that I described earlier as to risk

13 associated with four to one. And then there was

14 also a concept of trading size, account trading

15 size, which is not unusual.

16       Q.     So four to one here means what?

17       A.     Trading size.

18       Q.     Meaning that you invest 9 million, but

19 you are really trading $36 million?

20       A.     Yes.

21       Q.     That's risky?

22       A.     Yes, absolutely. It is risky.

23       Q.     Do we have two different definitions

24 of risk here, the standard deviation and this or

25 are they all the same in your mind?

1                         Carlos Sala

2          A.     They are related.

3          Q.     Directly related?

4          A.     Directly related.

5          Q.     Are there any differences between the

6     two?

7          A.     Sure.  I'm sure you could trade a 36

8     million trading size account, but it may have

9     slightly different risk parameters based on the

10    securities that you buy.

11         Q.     Scenario two is again, referring to

12    page 3, but excluding three of the years?

13         A.     Yes, those were I believe, the partial

14    years.

15         Q.     Scenario three includes the partial

16    years?

17         A.     Yes.

18         Q.     Scenario four takes the last full five

19    years?

20         A.     Correct.

21         Q.     So is 1999 included in that?

22         A.     Well, probably not.

23         Q.     Because it wasn't a full year?

24         A.     Yes.

25         Q.     Did you come to a conclusion of which

Carlos Sala

1

2  one of these scenarios you thought would be the

3  most realistic?

4        A.    No, I thought it would average between

5  one to the other.

6        Q.    Let's walk through one of them really

7  quickly.  The scenario one shows you invested

8  $9 million at the beginning of the year?

9        A.    Yes.

10       Q.    Then you were applying a 72.92 percent

11  rate of return?

12       A.    Yes.

13       Q.    When you increased the 9 million by a

14  72 percent profit, you get to the 15,563,000

15  pre-tax profit is subtracted out of the 9 million?

16       A.    Yes.

17       Q.    When you applied combined federal and

18  state tax rate?

19       A.    Yes.

20       Q.    And determined how much taxes would be

21  due, nearly $3 million?

22       A.    Yes.

23       Q.    After tax investment 15,563,000 and

24  you subtracted out the taxes paid?

25       A.    Yes.

```
 1                        Carlos Sala
 2          Q.    You did that for each year?
 3          A.    Yes.
 4          Q.    Until you got a cumulative total at
 5    the end of year five?
 6          A.    Yes.
 7          Q.    Anything more to these numbers?
 8          A.    No.
 9          Q.    Take a look at what we will mark as
10    165.
11                (Exhibit 165, fax, marked for
12          identification, as of this date.)
13                (Handing.)
14                MR. GEIER:   165 is a fax on the front
15          page, but if you look at the next page,
16          starts with Mike, I have pulled from our
17          records.
18          Q.    Have you seen this document before?
19          A.    No, I don't think so.
20                MR. HALLETT:   Counsel, where did this
21          come from?
22                MR. GEIER:   I believe two places, I
23          believe actually your client produced it I
24          believe, but it's a Larry Nemirow document.
25                MR. HALLETT:   I don't see a Bates on
```

1                    Carlos Sala

2        it.

3             MR. GEIER:  Look at DHSala 1817.  It

4        has 1817 we used in Michael Schwartz'

5        deposition.  I assume it's a document that

6        came from your client.  It's a different

7        copy of the same document.

8             MR. HALLETT:  This is the same

9        document.

10            MR. GEIER:  That page, absolutely.

11            MR. HALLETT:  What, the cover page is

12       not.

13            MR. GEIER:  Michael pulled from our

14       records is also DHSala 1817 and was Exhibit

15       5 from Michael Schwartz.

16            MR. HALLETT:  What is the exhibit

17       number now, 165?

18            MR. GEIER:  Yes, the whole exhibit is

19       165.

20       Q.    Mr. Sala, I will hold up here DHSala

21  1817.  I'm letting you know that's where we got

22  the document from originally.  Does that help you

23  determine if you have seen this before?

24       A.    No, I don't recall seeing this

25  document ever.  I am surprised, it would have come

1                     Carlos Sala

2    from my files, but --

3         Q.    Can you turn the page just to see if

4    there is any other pages in that exhibit that you

5    recognize.  If you don't, you don't.

6              MR. HALLETT:  You said this came from

7         DHSala?

8              MR. GEIER:  1817.  I'm giving you a

9         Bates number.

10             MR. HALLETT:  Hang on, don't get

11        excited.

12             MR. GEIER:  Let the record reflect

13        that we are still on the record while we are

14        trying to sort through.

15             MR. HALLETT:  Didn't we produce stuff

16        we got from Nemirow?  The fact that that has

17        DHSala, that it comes from Sala.

18             MR. GEIER:  It was produced to us

19        before the Nemirow subpoena if that helps

20        you.

21             MR. JANIK:  I think you Bates stamped

22        Nemirow's LN.

23             MR. HALLETT:  We did.

24        A.    I don't recall this at all.

25             MR. HALLETT:  For the record, our

```
                              Carlos Sala
 1
 2        system isn't perfect.
 3               MR. GEIER:   I'm not suggesting it is.
 4        I'm just explaining to you if you look back
 5        at the Schwartz deposition on June 28, '06,
 6        you will see that this was the number 5.
 7        A.    I'm just saying I'm surprised that it
would come from our records because I don't
 8
 9   recall.
10        Q.    This is not a document you have ever
11   seen?
12        A.    No, I don't think so.
13               MR. GEIER:   Makes the questioning a
14        lot easier, Mr. Sala.
15               THE WITNESS:   That's a positive.
16               MR. GEIER:   All depends how you look
17        at it.   Look at what we will mark as Exhibit
18        166.   You will let us know if you realized
19        it was a document.
20               THE WITNESS:   We will.
21               MR. HALLETT:   We will try to sort that
22        out so we can tell you how it did come
23        about.
24               MR. GEIER:   I would like to be able to
25        talk to him about it.   We can do that on a
```

1          Carlos Sala

2      telephone continuation.

3      A.    You know, it's interesting, just one

4  thing to point out about this document.  Larry

5  Nemirow had different clients.  It says cc Eric

6  Kramer, so I just understand it's --

7      Q.    I know that, but what I'm representing

8  to you is that before we subpoenaed Larry Nemirow,

9  this document was an early Bates stamp 1817, one

10  of your early productions.  It may have been

11  something that you produced to the IRS.  That I

12  don't know.

13          THE WITNESS:  If I produced it, I

14      just -- this is the first document that I

15      have seen in this whole thing that would

16      have come from me that I say I have no clue.

17          MR. GEIER:  But it's not something you

18      reviewed?

19          THE WITNESS:  No, no.

20          MR. GEIER:  I'm going to show you a

21      document.

22      Q.    This is Exhibit 6.  Do you recognize

23  that document?

24      A.    Yes.

25      Q.    Do you see it has a DHSala Bates stamp

114

Carlos Sala

1
2      at the bottom?

3              A.      Yes.

4              Q.      When did you receive this document?

5              A.      Sometime in the fourth quarter of

6      2000.

7              Q.      Did you receive it prior to making

8      your investment in Deerhurst?

9              A.      I think so.

10             Q.      Pretty confident that you would have?

11             A.      I think so, yes.  I mean I can't give

12     you 100 percent certainty, but I think so.

13             Q.      Do you have any doubt?

14             A.      A little bit because I can't recall

15     when I received it.

16             Q.      Did you review this prior to making

17     your investment decision?

18             A.      I don't know.  Can I read it?

19             Q.      Sure.

20             A.      I think so.  I think I read it.

21             Q.      Do you recall who provided it to you?

22             A.      This would have definitely been

23     Michael Schwartz.

24             Q.      Does the document reflect your

25     understanding of the Deerhurst transaction?

```
 1                      Carlos Sala
 2        A.    You know, I just briefed through it
 3   very quickly.  If you want to, I will read the
 4   whole thing carefully.
 5        Q.    Whatever you need to do.
 6        A.    Okay, I have read it.
 7        Q.    Does it reflect your understanding of
 8   the Deerhurst transaction?
 9        A.    Yes.
10        Q.    Did you discuss this document with
11   anyone?
12        A.    I can't recall, but probably with
13   Michael Schwartz.
14        Q.    No specific memory though?
15        A.    No.
16        Q.    Did you discuss it with Mr. Ruble?
17        A.    I don't think so.  This document, no,
18   no.
19        Q.    Did you discuss it with Mr. Nemirow?
20        A.    Perhaps, I don't recall.
21        Q.    You don't recall?
22        A.    No.
23        Q.    And Mr. Lemons?
24        A.    No.
25        Q.    You use the word leverage in this
```

Carlos Sala

1

2      document.   Do you see that?

3           A.     Yes.

4           Q.     What did you have an understanding of

5      what leverage meant in this?   Is it multiplying

6      the notional size of the trades?

7           A.     It's what I testified, both things.

8      It's the trading size of the account associated

9      with the description of risk that I testified to

10     earlier.

11          Q.     Do you see down at the bottom of page

12     1 of this document entitled foreign exchange

13     trading program.   It talks about contribution of

14     the option spreads.

15          A.     Where are you?

16          Q.     Very bottom of the page, one line up,

17     contribution of the option spreads.

18          A.     Yes.

19          Q.     Do you know what an option spread is?

20          A.     Yes.

21          Q.     What is it?

22          A.     It would be a -- the simultaneous

23     purchase of purchasing a long option or you could

24     sell an option as well with an offsetting option

25     trade as well.   So in this case, my understanding

Carlos Sala

1

2   would be buying a long option and in this case, a

3   call option and then shorting a call option, that

4   would be a spread.

5        Q.    That would be the spread?

6        A.    Yes.

7        Q.    Do you see the next sentence, at year

8   end, it would be a large capital loss.  Then it

9   goes on to the next page and says or a large

10   ordinary loss?

11       A.    Yes.

12       Q.    Ordinary loss would be like a

13   liquidation of the option spread out of a lower

14   tier LLC to the sub S corporation prior to roll

15   up.

16       A.    I see that.

17       Q.    What did that mean?

18       A.    I'm not sure what a lower tier LLC is.

19       Q.    Could it have meant Deerhurst

20   Investors Partnership?

21       A.    I don't know.

22       Q.    Did you ask Mr. Schwartz what it

23   meant?

24       A.    I don't recall asking him that

25   question, but yes, I don't -- frankly I don't

1                     Carlos Sala

2    remember ever seeing a lower tier LLC description

3    before.

4          Q.    You recall this document, correct?

5          A.    Yes.

6          Q.    You believe that you read it before

7    you entered into the transaction?

8          A.    Yes.

9          Q.    You have also seen a document that

10   talks about a required investment of 15 percent of

11   the expected ordinary loss in the next paragraph.

12         A.    Yes.

13         Q.    Says required, correct?

14         A.    It says required.

15         Q.    It would require an investment?

16         A.    Yes.

17         Q.    Talks about a management fee of 2 and

18   20, correct?

19         A.    Yes.

20         Q.    My understanding is that you recall

21   seeing this document and reviewing it, you think

22   you reviewed it prior to entering into the

23   transaction, correct?

24         A.    Yes, I think so.

25         Q.    You don't --

Carlos Sala

1

2   A.   Not 100 percent sure.

3   Q.   You don't have a specific recollection

4   of talking about this with anyone?

5   A.   A specific one, no.  Generally I would

6   have with Michael Schwartz.

7   MR. GEIER:  Let's take a look at

8   another document that was previously marked

9   as Exhibit 22.

10   (Handing.)

11   Q.   This is a DHSala document this is

12   entitled FX two trading plan outline of proposed

13   plan.  Do you recall seeing this document before?

14   A.   Yes.

15   Q.   Who provided this to you?

16   A.   Michael Schwartz.

17   Q.   Do you recall, was it prior to you

18   entering into the transaction?

19   A.   I believe so.

20   Q.   Would it have been around the time of

21   the prior exhibit that we just looked at?

22   A.   Probably.

23   Q.   Did you talk to anyone about this

24   document?

25   A.   Michael Schwartz.

1                        Carlos Sala

2          Q.     Was this document consistent with your

3     understanding of the transaction?

4          A.     Yes.

5          Q.     Did you know how many clients

6     Mr. Kreiger had at the time you entered into the

7     Deerhurst, I think you answered it?

8          A.     I didn't know, no.

9          Q.     Did he have any?

10         A.     I assume so, but I don't know.  I knew

11    he was trying to increase the number of clients

12    and generate some funds, I know that.

13         Q.     Do you see here on paragraph 4 of this

14    document it talks about Deerhurst generally has an

15    investment minimum of 5 million?

16         A.     Yes, I see that.

17         Q.     Did you talk to Mr. Kreiger about

18    that?

19         A.     Probably, although I don't have a

20    specific recollection, but probably.

21         Q.     Did you talk to other clients about

22    the investment minimum?

23         A.     No, I didn't have a reason to.

24         Q.     See if paragraph B --

25         A.     I take that back.  Probably talked to

1                        Carlos Sala

2    Mr. White, who is not a client, so to that extent,

3    yes.

4          Q.    Paragraph number 8, last paragraph of,

5    what is number 8?

6          A.    Yes.

7          Q.    Can you read that?

8          A.    Which paragraph, the last one?

9          Q.    Yes, number 8.

10         A.    Should the investing entity be

11   liquidated, the investor ordinarily would be

12   expected to realize a tax loss equal to the

13   difference between the tax basis and the fair

14   market value of the portfolio.

15         Q.    Did you question anything about what

16   circumstances you wouldn't be able to obtain the

17   tax loss described herein?

18         A.    Not to my recollection.

19         Q.    Did you ask about it to anyone?

20         A.    Not to my recollection.

21         Q.    Did you ever ask anyone the certainty

22   of obtaining a tax loss?

23         A.    Certainty?  No, not to my

24   recollection.

25         Q.    How much was the tax loss in this

```
 1                        Carlos Sala
 2    transaction worth to you?
 3          A.    How much was the tax loss reported?
 4          Q.    In real dollars.
 5          A.    I'm not sure what that means.
 6          Q.    You claimed a $60 million loss?
 7          A.    Sure.
 8          Q.    What was the benefit to you?
 9          A.    It was around, I think I testified
10    $24 million.
11          Q.    State and federal?
12          A.    I don't recall if it was just state or
13    federal.
14                MR. HALLETT:  I think he did testify
15          to that before, I think it's on the record.
16          When I read my deposition last night, I
17          think I read that 24 million.
18          Q.    Do you see in the FX trading plan in
19    paragraph 8, it says, at all times during the
20    operation of the strategy, there will continue to
21    be long and short FX options positions?
22          A.    Yes.
23          Q.    There are no exceptions there, is
24    there?
25          A.    No.
```

1                          Carlos Sala

2        Q.    It's telling you at all times?

3        A.    That's what it says.

4              MR. GEIER:    Take a look at the private

5        placement memorandum.    Mark this as 166.

6              (Exhibit 166, private placement

7        memorandum, marked for identification, as of

8        this date.)

9              (Handing.)

10       Q.    Exhibit 166, this is a copy of the

11  LLC's private placement memorandum?

12       A.    Yes.

13       Q.    The LLC is the entity that you entered

14  into starting approximately at the beginning of

15  2001.   If not, the very tail end of 2000?

16       A.    Yes, yes.

17       Q.    After the general partnership was

18  liquidated and after the S Corp. was liquidated?

19       A.    Yes.

20       Q.    Do you see on page 4 that there is a

21  minimum subscription amount?

22       A.    Yes.

23       Q.    How much is that?

24       A.    $500,000.

25       Q.    Were you ever given the option to

124

```
 1                    Carlos Sala
 2   invest in the LLC without investing in the test
 3   account?
 4        A.    I don't think I ever had that
 5   discussion.
 6        Q.    Did you ever review a Rosenman & Colin
 7   opinion?
 8        A.    No, you asked me that before.
 9        Q.    You said you had never seen it?
10        A.    No, I mean aside from there was a -- I
11   thought they provided me with an opinion on the
12   S Corp. liability, but I didn't review the opinion
13   on the entire transaction.
14        Q.    Did you read this private placement
15   memorandum before investing?
16        A.    Yes, I did.
17        Q.    Take a look at page 18.
18        A.    Yes.
19        Q.    Do you see it says tax considerations?
20        A.    Yes.
21        Q.    Do you see in bold it says tax
22   memorandum underneath it?
23        A.    Yes, I see that.
24        Q.    Do you see it says that the tax risk
25   described below are submitted by a separate tax
```

1                          Carlos Sala

2    memorandum prepared for the managing member by

3    Rosenman & Colin.  Do you see that?

4         A.    I do see that.

5         Q.    This memorandum must be accompanied by

6    the tax memorandum.  Do you see that?

7         A.    I do.

8         Q.    That memorandum is referring to the

9    private placement memorandum?

10        A.    Yes.

11        Q.    Did you ever ask to see a copy of it?

12        A.    I don't think I ever got a copy.

13        Q.    Did you ever ask?

14        A.    No.

15        Q.    You didn't inquire.  Did you notice

16   when you read it before investing, that there was

17   a reference to this tax memorandum?

18        A.    I don't recall that reference at the

19   time.

20        Q.    What did you understand was the role

21   of Beckingham Trading?

22        A.    Beckingham was an entity that was

23   formed to provide better execution of the trades

24   of Deerhurst Trading Strategies and maybe other

25   funds as well and other transactions related to

```
 1                      Carlos Sala
 2   Andy Krieger's operation.
 3              Yet what did -- the way it was
 4   described to me, because I asked a number of
 5   times, was that Beckingham, by assisting in
 6   clearing the trades, would be able to generate a
 7   more favorable price in executing the trades than
 8   if someone in the fund had to go and execute
 9   merely through a third party in the market.  So
10   basically Beckingham would have traders calling
11   different counterparties to try and get the best
12   pricing.  That's their function as I understood it
13   and as I was told.  I asked that question numerous
14   times from Andy Kreiger.
15        Q.    Why did you question numerous times?
16        A.    Just because there were significant
17   expenses, clearing expenses that were being paid
18   on the P&L and I wanted to make sure that I got
19   assurance that it was being done efficiently.
20        Q.    Who was doing Beckingham's job before
21   Beckingham, do you know, did you ask Mr. Kreiger?
22        A.    Yes, I did.  It would have been a
23   broker.
24        Q.    Like REFCO?
25        A.    Could have been, or it could have been
```

1                         Carlos Sala

2     a number of brokers on the street.

3          Q.     Who worked for Beckingham?

4          A.     My understanding is there were some

5     traders that provide services as Beckingham.

6          Q.     Same individuals who were working for

7     Deerhurst Management Company?

8          A.     That would be my guess, yes, but I

9     don't know specifically who they were.

10          Q.     Did you understand there was no

11     physical difference in operations between

12     Beckingham and Deerhurst?

13          A.     Well, not -- my understanding was that

14     they had hired traders that were concentrating on

15     the Beckingham operation and whose job was -- one

16     of the primary functions of the jobs was to

17     actually clear trades for Deerhurst at a more

18     favorable pricing.

19          Q.     Did they have other traders who were

20     not working with Beckingham?

21          A.     I don't know, but my guess is yes, but

22     I don't know.

23          Q.     What did they do as opposed to

24     Beckingham?

25          A.     Kreiger had operation that did a

1                          Carlos Sala

2    number of things.  One of them was the Deerhurst

3    Trading Strategies fund, but he also had other

4    businesses.  Lone Star, Northbridge Capital I

5    think and they were trading as well.  He was

6    trading for his own account as well.  I don't know

7    who was trading for whom.

8          Q.    It could have been the same traders

9    were doing all sorts of different jobs?

10         A.    Could be, although I don't have

11   visibility to that.

12         Q.    Did you talk to anyone about this

13   arrangement other than Mr. Kreiger outside of

14   Deerhurst?

15         A.    I talked to Kreiger, I talked to

16   DiRusso, I talked to Peter Molyneux, I talked to

17   Michael Schwartz and I discussed it with

18   Mr. White.

19         Q.    What did you talk to Mr. Schwartz

20   about this arrangement?

21         A.    Just confirming if his understanding

22   of Beckingham was the same as had been given to

23   me.

24         Q.    Did you call your broker?

25         A.    No.

```
 1                      Carlos Sala
 2          Q.    Did you call Goldman Sachs and ask
 3     them about this?
 4          A.    No.
 5          Q.    Did you talk to anyone outside the
 6     transaction?
 7          A.    No, they would have said it was
 8     Beckingham.
 9          Q.    I mean the role being played by
10     Beckingham, you understood you were paying a
11     commission to REFCO too?
12          A.    They were commissions and being paid
13     to clear the trades.  REFCO could have gotten some
14     of that --
15          Q.    REFCO was making money too?
16          A.    That would be my guess, but Beckingham
17     would have come in, it would have been a
18     competitive type of bidding system.
19          Q.    It wasn't trading competitively for
20     prior clients, was that your understanding?
21          A.    If he wasn't shopping the street, the
22     pricing wouldn't have been as efficient.
23          Q.    Did you understand that he wasn't
24     shopping the streets on his prior transactions,
25     Mr. Sala?
```

Carlos Sala

1

2      A.     Yes, he told me that he wasn't -- he

3  didn't have the resources to shop the street as he

4  was shopping the street with Beckingham, so

5  Beckingham would have provided more efficient

6  clearing mechanism.

7      Q.     When he was trading for a single

8  client for the Perot family, he wasn't trying to

9  get the best possible price for his clients, is

10  that your understanding?

11      A.     I'm sure he was, but assigning more

12  resources he could get better resources.   Can I

13  give you an example?

14      Q.     I want to know what the additional

15  resources are.

16          MR. HALLETT:   Let him explain.

17          MR. GEIER:   You can ask him about

18      that.

19      A.     I mean if I buy a security, any

20  security, I am going to try to get the best

21  pricing possible, but unless I have a competitive

22  environment and I put the resources into doing so,

23  I may not get the best possible price.

24      Q.     When he was dealing with a single

25  large investor of 100 million, was it your

1                            Carlos Sala

2    understanding that he wasn't trying to get the

3    best or had the resource to get the best possible

4    price?

5         A.    I don't know if I have -- if he had an

6    equivalent trading operation as Beckingham, so I

7    have no idea what he was doing for the 100

8    million.

9         Q.    Did you ever question anyone about

10   whether the Beckingham fees were reasonable?

11        A.    I did.

12             MR. HALLETT:  Asked and answered

13        twice.

14        Q.    When?

15        A.    Several times.

16        Q.    Before you entered the transaction?

17        A.    I did when I read one of these

18   documents, so yes.

19        Q.    Who did you question?

20        A.    Both Peter Molyneux and Andy Kreiger.

21        Q.    What did you do to determine if the

22   responses given to you made sense?

23        A.    They gave me assurances that it made

24   sense and I trusted them.

25        Q.    They told you and you said okay?

```
 1                    Carlos Sala
 2        A.    Yes.
 3        Q.    At a certain point later on, you
 4   became concerned about the Beckingham fees?
 5        A.    Yes, when they were recorded in the
 6   P&L.
 7        Q.    Did you question Mr. Kreiger again
 8   about those?
 9        A.    I did.
10        Q.    Did you try to have those fees
11   eliminated?
12        A.    Every time that I questioned him, he
13   gave me assurance again that the actual costs
14   would be higher without Beckingham.  He was
15   insistent on that.
16        Q.    Did you do anything with respect to
17   his response to you?
18        A.    I trusted him.  He told me the same
19   story several times, so --
20        Q.    Did you ever talk to Mr. Nemirow about
21   these fees?
22        A.    No -- well, I don't know, maybe I did.
23   I don't know.
24        Q.    Did Mr. Nemirow ever express concerns
25   about the fees?
```

Carlos Sala

1

2      A.      Mr. Nemirow, not that I can recall to

3  me.

4      Q.      Anybody else?

5      A.      Not that I can recall.  Mr. White, he

6  and I would commiserate.

7      Q.      Mr. Kreiger would tell you don't

8  worry, the fees are what I say they are and you

9  will pay more if I don't charge you these fees?

10     A.      He didn't say that.  He said this

11  is -- Beckingham provides a clearing trade,

12  clearing service.  It allows us to get more

13  competitive pricing on the street and as a result,

14  the cost to clear the trades are less because of

15  Beckingham than without Beckingham.

16     Q.      Did he offer you any numbers to show

17  you?

18     A.      No.

19     Q.      Did you ask for any data?

20     A.      No.

21     Q.      Did you talk with Tracie Henderson

22  about the fees?

23     A.      No.

24     Q.      Do you know how long Beckingham was in

25  business at the time you entered into the

Carlos Sala

1
2     transaction?

3          A.    I don't know, but I thought Beckingham

4     was formed as part of the establishment of the

5     fund.  I may be wrong.

6          Q.    Okay.  Let's take a look at what has

7     been marked as Exhibit 3.

8               (Handing.)

9          Q.    This is a disclosure document,

10    correct?

11         A.    Yes.

12         Q.    It's a document provided to you with

13    respect to the Deerhurst transaction?

14         A.    Yes.

15         Q.    You received it prior to making your

16    decision to participate in Deerhurst?

17         A.    Yes.

18         Q.    You reviewed it?

19         A.    Yes.

20         Q.    You read it all?

21         A.    Yes.

22         Q.    Directing your attention to page 6.

23    Middle of the page it says, Deerhurst will execute

24    transactions on behalf of customer accounts

25    through its affiliate?

1                          Carlos Sala

2          A.    Yes.

3          Q.    You read here, didn't you, that BTC,

4     referring to Beckingham, was recently organized.

5     Do you see that?

6          A.    Yes.

7          Q.    You also read that it had limited

8     capital and resources?

9          A.    Yes.

10          Q.    Did you question Mr. Kreiger about

11     that?

12          A.    I did question him about Beckingham.

13          Q.    Did that add any risk to the

14     transaction in your mind?

15          A.    No, it was a related party to

16     Deerhurst.  He explained the function.  I was

17     satisfied.

18          Q.    Do you see a little further down it

19     says, because Beckingham is relatively nominal

20     capital.  Do you see that?

21          A.    Yes.

22          Q.    What does nominal mean?

23          A.    In this context, it would be a

24     relatively small amount of capital.

25          Q.    The risk of the inability of BTC to

Carlos Sala

1

2    perform would be higher than with respect to other

3    market participants.  Do you see that?

4         A.    Yes.

5         Q.    What does that tell you, Mr. Sala?

6         A.    What it says here is that the risk

7    that BTC would not be able to deliver on a

8    trade -- perform a trade higher than someone that

9    would be highly capitalized, such as a CitiBank,

10   let's say.

11        Q.    How does that affect your risk in this

12   transaction?

13        A.    I don't think it did.

14        Q.    You don't think the fact they are

15   telling you there is nominal capital and a risk of

16   BTC to perform, you discounted that?

17        A.    Yes, I thought it was a disclosure

18   they had to make, but I thought they would be

19   prudent traders.

20        Q.    Why did you think it was a disclosure

21   they had to make?

22        A.    They are -- most financial products

23   have certain required disclosures.  Those would be

24   one of your required disclosures, that there was a

25   party that was going to be part of the

1                          Carlos Sala

2     transaction.

3          Q.    Did you follow up on this, did you ask

4     anyone?

5          A.    Yes, I talked to Kreiger about the

6     whole Beckingham relationship.

7          Q.    How about the nominal capital and risk

8     of the inability to perform?

9          A.    No, I didn't.

10         Q.    Did you talk to anyone else?

11         A.    No, other than Mr. Kreiger.

12         Q.    But you didn't talk to Mr. Kreiger

13    about the inability of BTC to perform?

14         A.    I don't recall.

15         Q.    You didn't attribute it in any way to

16    making your analysis and review of the

17    transaction?

18         A.    No.

19         Q.    That's not based on anything other

20    than your gut?

21         A.    No, just I looked at -- I remember

22    what Kreiger told me, which I described already.

23    I thought that they would be prudent traders.   I

24    didn't think they would get into situations where

25    they wouldn't be able to perform and I was happy

1                    Carlos Sala

2    with that.

3         Q.    Okay.  If BTC couldn't perform, how

4    did that impact you, do you know?

5         A.    It would have impacted the fund, so in

6    theory, it could have gone back to the fund to

7    provide additional capital on a trade.

8         Q.    You traded individually too, didn't

9    you?

10        A.    I did, but BTC didn't trade when I was

11   trading individually.

12        Q.    How do you know that?

13        A.    Well, I believe it says here it was

14   recently formed.  I don't think they were clearing

15   trades in 2000, at least that's what Michael

16   Schwartz in his deposition said.

17        Q.    Okay.  Forget about what Michael

18   Schwartz said in his deposition.  Did you know

19   whether BTC was involved in your individual trades

20   in 2000, did you know?

21        A.    I can't recall if I knew or not.

22            MR. GEIER:  Take a look at what we

23         will mark as Exhibit 167.

24            (Exhibit 167, subscription agreement,

25         marked for identification, as of this date.)

```
 1                        Carlos Sala
 2              (Handing.)
 3         Q.    This is a subscription agreement?
 4         A.    Yes.
 5         Q.    Did you review this document prior to
 6    entering into the transaction?
 7         A.    Yes.
 8         Q.    Do you recall what this document said
 9    about the investment minimum?
10         A.    I have no recollection.
11         Q.    Take a look at page B-1.  Do you see
12    under payment it says subscription must be at
13    least a million dollars?
14         A.    Yes.
15         Q.    That's different from what was said in
16    the private placement memorandum, wasn't it?
17         A.    I don't know.
18         Q.    Didn't we just look at it and it said
19    $500,000?
20         A.    Yes.
21              MR. HALLETT:  You are arguing, that's
22         not a question.
23              MR. GEIER:  I'm asking if he recalls.
24              MR. HALLETT:  He said he didn't know.
25         A.    Is this related to the same issue?  I
```

Carlos Sala

1
2 don't know.
3      Q.    This is a subscription document for
4 Deerhurst Trading Strategies, LLC.  Do you see
5 that?
6      A.    Yes.
7      Q.    Do you see the investment minimum is a
8 million dollars?
9      A.    It says subscription must be at least
10 a million.
11     Q.    Did anyone question you about any of
12 the disclosures that you made to the company in
13 this subscription document?
14     A.    I don't recall.
15     Q.    On page B-10, you indicated that you
16 had recent experience in the past five years in a
17 wide range of investments, correct?
18     A.    Yes.
19     Q.    On the following page, that number 10,
20 it asks you, are you subject to any civil,
21 criminal or other constraint or impediment which
22 preclude or limit your participation?
23     A.    Where are you?
24     Q.    Number 10 on page B-11.  Is that on
25 your document?

```
1                        Carlos Sala

2         A.    Yes, I see that.

3         Q.    What did you check?

4         A.    That's a mistake.

5         Q.    Did anyone talk to you about this?

6         A.    I don't recall.  That's a mistake, it

7   would be no.

8         Q.    It says --

9               MR. HALLETT:  Incidentally counsel,

10        this is an unsigned copy.  Do we have a

11        signed copy?

12              MR. GEIER:  I believe that you have

13        produced the signed copy to us.

14        Q.    Is that your handwriting on this

15   document?

16        A.    Where?

17        Q.    Any of the pages.

18              MR. GEIER:  Yes, your client signed

19        this on DHSala 166.

20              MR. HALLETT:  I stand corrected.

21        A.    Yes.

22        Q.    That's your signature on page B-17?

23        A.    Yes.

24        Q.    Did you sign it on October 20?

25        A.    It says so here.  I'm sure I did
```

                              Carlos Sala

1

2      if --

3           Q.     You wouldn't have signed it on a

4      different date?

5           A.     No, I don't think so.

6           Q.     I think we have discussed that Solid

7      Currencies was formed in November, correct,

8      November 8?

9           A.     I think we discussed that this

10     morning.

11          Q.     You saw a document with a certificate

12     of incorporation?

13          A.     Yes, that's right.

14          Q.     Do you recall when Solid Currencies

15     was dissolved?

16          A.     Late December.

17          Q.     That's good enough.  Do you recall how

18     much you put into Solid Currencies, roughly how

19     much money?

20          A.     I don't recall.

21          Q.     Was it 8.9 million dollars?

22          A.     Probably.

23          Q.     Were there any restrictions on what

24     percentage of the money could be used for

25     investment purposes?

1                         Carlos Sala

2          A.    No.

3          Q.    He could invest all of it?

4          A.    Yes.

5          Q.    Mr. Kreiger could invest it at three

6    to one leverage?

7          A.    I believe he invested it in three to

8    one leverage, yes.

9          Q.    You had $9 million trading as if it

10   were $27 million?

11         A.    Trading size of the account.

12         Q.    Trading size was 27 million.  Did

13   Solid Currencies have any other assets?

14         A.    No.

15         Q.    The 9 million was in full play?

16         A.    I think so.

17         Q.    You never told Mr. Kreiger I only want

18   you to put up half of it?

19         A.    No, other than the money.

20              MR. GEIER:  Let's take a look at the

21         next documents that we can breeze through.

22         I will show you what we will mark as Exhibit

23         168.

24              (Exhibit 168, REFCO individual account

25         information, marked for identification, as

144

```
 1                    Carlos Sala

 2        of this date.)

 3               (Handing.)

 4        Q.    168 is entitled REFCO individual

 5   account application; is that correct?

 6        A.    Yes.

 7        Q.    Is has your Bates stamp numbers at the

 8   bottom?

 9        A.    Yes.

10        Q.    It's for an individual account,

11   correct, your individual account?

12        A.    Yes.

13        Q.    The e-mail address on page Roman

14   numeral 6 is your e-mail address?

15        A.    Page 6?

16        Q.    Yes.

17        A.    Yes.

18        Q.    You had an individual account because

19   you were trading in October and November 2000

20   individually, correct?

21        A.    Yes.

22        Q.    2000?

23        A.    Yes.

24        Q.    Take a look at the last page of this

25   exhibit.  What is the last page title?
```

1                       Carlos Sala

2          A.     Beckingham Trading Company.

3          Q.     Listing executing brokers.  Who is the

4    executing broker?

5          A.     Beckingham Trading Company.

6          Q.     They were trading in 2000, weren't

7    they?

8          A.     Appears so.

9          Q.     Do you have any reason to doubt that

10   they were?

11         A.     I just don't know.

12         Q.     You signed an account application

13   which indicated that they were the executing

14   broker, correct?

15         A.     Yes, I mean this would have been --

16   Peter Molyneux would have called me and would have

17   talked to me about this and asked me to put them

18   as an executing broker.  So based on that, I would

19   assume so, but I have no knowledge or recollect

20   that they were the ones executing the trades or

21   not, so maybe they did.

22         Q.     You had no reason to believe they

23   weren't?

24         A.     No, I don't have any reason either

25   way.

```
 1                        Carlos Sala
 2        Q.    There is no other executing broker
 3    listed, is there?
 4        A.    No.
 5        Q.    Your signature on page 6 is dated
 6    10-20-2000.  Do you believe you signed it on or
 7    about that time?
 8        A.    I'm sure I did.
 9             MR. GEIER:  Let's take a look at
10        Exhibit 169.
11             (Exhibit 169, REFCO account
12        application, marked for identification, as
13        of this date.)
14             (Handing.)
15        Q.    This is a REFCO account application
16    for Solid Currencies; is that correct?
17        A.    Yes.
18        Q.    Did you ever predate or postdate any
19    documents in this transaction?
20        A.    I don't believe so to the best of my
21    knowledge.
22        Q.    This is for Solid Currencies, correct?
23        A.    Yes.
24        Q.    When is the date that this was signed?
25        A.    10-2000.
```

1                         Carlos Sala

2          Q.     Was Solid Currencies in existence at

3     the time?

4          A.     I don't know.

5          Q.     We saw the certificate of

6     incorporation?

7          A.     Yes, November 8, okay.

8          Q.     The answer is no?

9          A.     No.

10         Q.     Take a look at the last page.  Do you

11    see the executing broker?

12         A.     Yes.

13         Q.     Who is it?

14         A.     Beckingham Trading.

15                MR. GEIER:  Mark this as 170.

16                (Exhibit 170, customer agreement and

17         trading authorization, marked for

18         identification, as of this date.)

19                (Handing.)

20                MR. GEIER:  I show you what has been

21         marked as 170.  This is a customer agreement

22         and trading authorization.

23         Q.     I will represent to you Mr. Sala, we

24    have not seen one that was signed by you.  Do you

25    recall ever signing this?

```
 1                      Carlos Sala
 2        A.    Let me see this document.  I don't
 3   have a specific recollection, but I could have.
 4        Q.    You are speculating, right?
 5        A.    I'm speculating.
 6              MR. GEIER:  Show you what we will mark
 7         as Exhibit 171.
 8              (Exhibit 171, REFCO Capital Markets
 9         third party full trading authorization,
10         marked for identification, as of this date.)
11              (Handing.)
12              MR. GEIER:  We will do 172.
13              (Exhibit 172, REFCO Capital Markets
14         trading authorization, marked for
15         identification, as of this date.)
16              (Handing.)
17        Q.    Exhibit 171 has a DHSala number 41; is
18   that correct?
19        A.    Yes.
20        Q.    Just directing your attention to the
21   back, is that your signing on behalf of Solid
22   Currencies?
23        A.    Yes.
24        Q.    Is this a REFCO Capital Markets third
25   party full trading authorization?
```

1                        Carlos Sala

2          A.    Yes.

3          Q.    Document reports gives Deerhurst

4     Management Company and Beckingham Trading

5     authority to trade the account?

6          A.    Yes.

7          Q.    Trade the account for Solid

8     Currencies, correct?

9          A.    Yes.

10         Q.    172, which is DHSala 33, is the same

11    document only for you individually?

12         A.    Yes.

13         Q.    You signed it, correct?

14         A.    Yes.

15         Q.    You signed both documents on October

16    20th?

17         A.    I think that's the 20th.

18         Q.    Or 10th, in October?

19         A.    Yes, in October.  I can't tell what my

20    zero, if that's a zero or something else.

21              MR. GEIER:  I will show you what we

22         will mark as Exhibit 173.

23              (Exhibit 173, foreign exchange and

24         options master agreement dated November 20,

25         2000, marked for identification, as of this

Carlos Sala

1

2      date.)

3              (Handing.)

4      Q.    This is a foreign exchange and options

5  master agreement dated November 20, 2000.  Do you

6  see that front page?

7      A.    Yes.

8      Q.    It's between REFCO and Solid

9  Currencies, correct?

10      A.    Right.

11      Q.    If you look at page 18, is that your

12  signature?

13      A.    Yes.

14      Q.    For Solid Currencies?

15      A.    Yes.

16      Q.    It appears to be the signature for

17  REFCO as well off to the right?

18      A.    Appears to be.

19              MR. GEIER:  Show you what we will mark

20      as Exhibit 174.

21              (Exhibit 174, letter dated November

22      17, 2000, marked for identification, as of

23      this date.)

24              (Handing.)

25      Q.    A letter from you dated November 17,

Carlos Sala

1

2    2000; is that correct?

3         A.    Yes.

4         Q.    Who prepared this letter?

5         A.    I think it was Larry Nemirow on my

6    behalf.

7         Q.    Larry Nemirow prepared this document

8    for you?

9         A.    Yes, yes.

10        Q.    It could have been Deerhurst?

11        A.    No.

12        Q.    Do you know why there was a general

13   partnership in this transaction, Deerhurst

14   Investors General Partnership?

15        A.    Yes, the idea was to pool funds

16   together to be able to trade as one account.

17        Q.    Do you know whether it was a general

18   partnership and not a limited partnership?

19        A.    What's the difference between general

20   partnership and limited partnership?

21        Q.    You don't know?

22        A.    I don't, no.

23        Q.    This is a letter that you sent to

24   Deerhurst Management Company and Michael Schwartz,

25   correct?

1                        Carlos Sala

2        A.    Yes.

3              THE WITNESS:  I have to take a

4        restroom break.  Five minutes.

5              MR. GEIER:  Absolutely.

6              (Recess.)

7              MR. GEIER:  Mark this as 175.

8              (Exhibit 175, letter dated November

9        17, 2000, marked for identification, as of

10       this date.)

11             (Handing.)

12             MR. GEIER:  Off the record.

13             (Discussion held off the record.)

14             (Exhibit 176, copy of a document from

15       Mr. Nemirow's files, marked for

16       identification, as of this date.)

17             (Exhibit 177, document addressed to

18       REFCO Capital Markets, marked for

19       identification, as of this date.)

20             (Exhibit 178, document from Mr. Sala's

21       files, marked for identification, as of this

22       date.)

23             (Handing.)

24             MS. FLANDERS-PALMER:  Do you have

25       copies of all of these so we can have them

1              Carlos Sala

2       for our records?

3            MR. GEIER:  We will get the court

4       reporter to make copies.  Yes, I haven't

5       given you an extra one.  Yes, we will go

6       back and make sure.  Here is another one.

7            (Exhibit 179, document from

8       Mr. Nemirow's files, marked for

9       identification, as of this date.)

10           (Exhibit 180, document on Deerhurst

11      Trading Strategies, LLC stationery dated

12      November 20, 2000, marked for

13      identification, as of this date.)

14           (Exhibit 181, document dated October

15      30, 2001 addressed to Mr. Carlos Sala,

16      marked for identification, as of this date.)

17           (Handing.)

18           MR. HALLETT:  We will stipulate that

19      Exhibit 175 is a true and correct copy of

20      the letter dated November 20, 2000 from

21      Rosenman & Colin to Carlos Sala signed by

22      Mr. William Anthony.  It was issued by

23      Mr. Sala.  That's 175.

24           176 we will stipulate, is a true and

25      correct copy of a document that came from

1           Carlos Sala

2     Mr. Nemirow's files addressed to Peter

3     Molyneux of Deerhurst Management Trading,

4     November 22, 2000 and signed by Mr. Nemirow.

5          We will stipulate that Exhibit 177,

6     first page is a document addressed to REFCO

7     Capital Markets, re:  assignment of account

8     4160.  We will stipulate that's Mr. Sala's

9     signature and it came from Mr. Sala's files,

10    as did the attached assignment and

11    assumption document.  That page has

12    Mr. Sala's signature dated November 28,

13    2000.

14         Exhibit 178 is a true and correct copy

15    of a document coming from Mr. Sala's files,

16    addressed to REFCO Capital Markets Limited

17    regarding assignment of account 4160.

18    Signature is Mr. Sala's signature --

19         MS. FLANDERS-PALMER:  That's the same.

20         MR. HALLETT:  In fact, they are the

21    same.  177 -- oh, wait a minute.  Yes, they

22    are the same.  177 and 178 appear to be the

23    same.

24         MR. GEIER:  Okay.

25         MR. HALLETT:  179 is a document that

Carlos Sala

1
2      came from Mr. Nemirow's files on Deerhurst
3      Management Inc.'s stationery directed to
4      Mr. Nemirow from Peter Molyneux.  And it has
5      attached a letter dated November 17, 2000
6      directed to Mr. Sala from Mr. Nemirow and
7      various other documents that we stipulate
8      came from Mr. Nemirow's file.
9           Exhibit 180 is a document on Deerhurst
10     Trading Strategies, LLC stationery dated
11     November 20, 2000 addressed to Carlos Sala
12     regarding subscription for shares by Carlos
13     Sala (subscriber), and that's a three-page
14     document that came from Mr. Sala's file.
15     The third page left-hand side bears
16     Mr. Sala's signature.
17          We will stipulate that Exhibit 181 is
18     a document dated October 30, 2001 addressed
19     to Mr. Carlos Sala re:  Deerhurst Trading
20     Strategies, LLC.  Second page indicates that
21     it came from Deerhurst Trading Strategies,
22     purports to be signed by Mr. Kreiger and the
23     last page bears Mr. Sala's signature.
24          Exhibit 182 is an IRS form 966,
25     corporate dissolution or liquidation,

```
 1                      Carlos Sala

 2      corporation is Solid Currencies, Inc.   The

 3      signature is Mr. Sala's signature.

 4               (Exhibit 182, IRS form 966, marked for

 5      identification, as of this date.)

 6               (Handing.)

 7               MR. HALLETT:   Where did that come

 8      from.

 9               MR. GEIER:   Mr. Sala's files.   Exhibit

10      183 is a document on the stationery of

11      Deerhurst Management, Inc., it is directed

12      to Larry Nemirow.   It's exactly the same as

13      Exhibit 179.

14               (Exhibit 183, document on stationery

15      of Deerhurst Management, Inc., marked for

16      identification, as of this date.)

17               (Exhibit 184, document on KPMG

18      stationery, marked for identification, as of

19      this date.)

20               (Handing.)

21               MR. HALLETT:   Exhibit 184 is a

22      document on a KPMG stationery, states billed

23      to Mr. Carlos Sala, bottom has $25,000.   I

24      think that's the same as Exhibit 137.   It's

25      already been marked as an exhibit; is that
```

```
                         Carlos Sala
 1
 2        right?
 3               MS. FLANDERS-PALMER:  Yes.
 4               MR. HALLETT:  At any rate, I think its
 5        the same as the prior exhibit.  For the
 6        record, it was produced by KPMG.  The
 7        government produced it to us.
 8               MR. GEIER:  Is there a stipulation
 9        that that's an authentic copy of a bill sent
10        to Mr. Sala.
11               MR. HALLETT:  Yes, we will stipulate
12        that that is a bill that was sent to
13        Mr. Sala by KPMG on or about the date April
14        17, 2000.
15               MR. GEIER:  Take a quick five minute
16        break, see if I can't streamline what is
17        left so we can -- do you have any idea how
18        much you have?
19               MR. HALLETT:  I doubt it will be over
20        a half an hour.
21               MR. GEIER:  Well, let's do this too.
22        One more stipulation.
23               (Exhibit 185, document on Mr. Sala's
24        stationery dated November 28, 2003, marked
25        for identification, as of this date.)
```

```
1                        Carlos Sala
2              (Handing.)
3              MR. HALLETT:  Make it simpler.
4       Exhibit 184, the KPMG bill is identical to
5       Exhibit 131.
6              MR. GEIER:  One more document.
7              MR. HALLETT:  Exhibit 185 is a true
8       and correct copy of a document on Mr. Carlos
9       Sala's stationery dated November 28, 2003,
10      addressed to Deerhurst Trading Strategies,
11      LLC.  Last page is signed by Mr. Sala and
12      this document came from Mr. Sala's files.
13             MR. GEIER:  Let's take a quick break.
14             (Recess.)
15  BY MR. GEIER:
16      Q.    Mr. Sala, was it your intention in
17  entering into this transaction, to hold
18  Mr. Kreiger accountable for managing the account
19  properly?
20      A.    Yes.
21      Q.    You expected him not to act
22  negligently?
23      A.    Yes.
24      Q.    If he did something that was negligent
25  or improper, you wanted to have some recourse with
```

1                          Carlos Sala

2   respect to what he did, correct?

3          A.    I'm not sure the recourse part of your

4   question, but I would have been extremely

5   disappointed and unhappy if he had done something

6   improper.

7          Q.    Would you have reserved your ability

8   to protect yourself had he done something

9   improper?

10         A.    Yes.

11         Q.    You wanted to make him accountable?

12         A.    Yes.

13         Q.    And your brokers Goldman Sachs

14  accountable for what they do?

15         A.    Yes.

16         Q.    Did you understand that when you

17  entered into this agreement, into the subscription

18  documents and the LLC agreement, that you were

19  releasing Mr. Kreiger from liability on account of

20  his negligence?

21         A.    I don't recall specifically what part

22  of the document you are talking about.  I would

23  have to refer to it.

24         Q.    We can look quickly at the private

25  placement memorandum.  Take a look at Exhibit 166.

Carlos Sala

1

2     Turn to page 17.  Are you on page 17?

3          A.     Yes.

4          Q.     Do you see liability indemnification,

5     do you see that you are releasing Mr. Kreiger and

6     all its affiliates except in the case of gross

7     negligence?

8          A.     Let me read it real quick.

9          Q.     Sure.  Do you agree that you were

10    releasing Mr. Kreiger from your negligence?

11              MR. HALLETT:  From Mr. Sala's

12         negligence?

13              MR. GEIER:  From Mr. Kreiger's.

14         A.     Gross negligence, is that how you

15    differentiate?

16         Q.     Yes.

17         A.     Yes, I would think so.

18         Q.     Did you talk with anyone about this?

19         A.     Probably with Larry Nemirow when we

20    were reviewing the documents.

21         Q.     Do you recall talking to Larry

22    Nemirow?

23         A.     Not specifically, but we talked about

24    this document at length.

25         Q.     Did you later execute a release for

Carlos Sala

1
2   Mr. Kreiger's benefit releasing him from any

3   possible action that you might bring?

4        A.    Yes, I think that was the November 28

5   on one of those exhibits.

6        Q.    Why did you do that?

7        A.    Mr. Kreiger was insistent on the

8   release as a condition for releasing me without

9   penalty.

10        Q.    So you can't sue Mr. Kreiger, could

11   you, if you thought he did something wrong?

12        A.    Actually I reviewed -- this is what

13   happened with that.  They sent me this release.  I

14   sent it to Larry Nemirow.  He came back, I said

15   review this and tell me what this means.  He came

16   back and said I had a litigation partner review it

17   and he feels like you are not really giving them

18   much here, so it's okay to sign.  So on his

19   advice, I signed that one paragraph thing.

20        Q.    Did he tell you that you could be

21   deemed to be releasing Mr. Kreiger from liability

22   from an action that you may have against him?

23        A.    My recollection was that if there was

24   something significant that came up, that there was

25   enough legal leeway to bring an action against

Carlos Sala

1
2  him.  That's what he told me.

3      Q.    Let's take a look at what has been

4  marked previously as Exhibit 12.

5           (Handing.)

6      Q.    Do you know what Exhibit 12 is?

7      A.    I recognize it.

8      Q.    First of all, it's a letter to you,

9  but it's enclosing your statement, your Deerhurst

10 statement for October?

11     A.    Yes.

12     Q.    Is this a typical statement that you

13 received from Deerhurst?

14     A.    Yes.

15     Q.    Does it contain all the information

16 that is typically in --

17     A.    I think at this point, this only shows

18 the P&L activity.  I think at some point we

19 started receiving balance sheets also.

20     Q.    In 2001 or 2002?

21     A.    I believe so.

22     Q.    When the performance started to be a

23 concern to you?

24     A.    I'm not sure if it was at that time or

25 before, but this exhibit only shows a P&L and

Carlos Sala

1

2    subsequent ones.  I'm not sure when we started

3    receiving more substantial statements.

4         Q.    This exhibit is complete, correct?

5         A.    Yes, to the best of my knowledge.

6         Q.    Let's take a look at your statement.

7    It shows a beginning cash investment of 500,000,

8    correct?

9         A.    Yes.

10         Q.    Notional investment of a million.  Do

11    you understand that to be a two to one leverage?

12         A.    Yes.

13         Q.    Shows that there were trading gains of

14    $2,643, correct?

15         A.    Yes.

16         Q.    Also interest of 610?

17         A.    Yes.

18         Q.    Did you compute what kind of profit

19    you had based upon the amount of dollars invested?

20         A.    No.

21         Q.    Can you do a rough calculation just

22    looking at these numbers?

23         A.    What do you want me to do, to see an

24    annual rate of returns?

25         Q.    You earned about $3,200 on investment

Carlos Sala

1   of 5 million, but I guess it's --

2        A.    It's 2,000 for 10 days on half

3   million, so you would have to multiply that times

4   roughly 36, so it would be roughly call it 80,000

5   on $500,000.  So it would be annualized rate of

6   return of about 16, 17 percent, somewhere in

7   there.

8        Q.    Is that taking into account the

9   management fee?

10       A.    Yes, I'm taking the 2,212, it was on

11  10 days a week, October 31, so I'm saying times

12  52, it would be higher than that.  It would be

13  about 20 percent return, top of my head.

14       Q.    That's including $600 of interest?

15       A.    Yes.

16            MR. GEIER:  Mark this as Exhibit 186.

17            (Exhibit 186, letter dated December 5

18        with attachment, marked for identification,

19        as of this date.)

20            (Handing.)

21            MR. GEIER:  This is a document that is

22        a letter dated December 5 with an

23        attachment.

24       Q.    Do you see that?

1              Carlos Sala

2         A.    Yes.

3         Q.    Go to the first page of that exhibit.

4    Shows that you contributed an extra $8,425,000,

5    correct?

6         A.    You are saying the first page?

7         Q.    The second page.

8         A.    Yes.

9         Q.    Do you recall when that contribution

10   was made?

11        A.    I don't recall.

12        Q.    Take a look at another document.   I

13   will tell you for now for our purposes, it's

14   November 21.  Did you perform any analysis or

15   review before contributing the 8,425,000?

16        A.    Do you mean in addition to what has

17   already been discussed, no.

18        Q.    In October, the transaction took

19   place.  Did you review the trades that took place

20   in October?

21        A.    The actual trades?

22        Q.    Yes.

23        A.    No.

24        Q.    You didn't look at the trades?

25        A.    No.

```
 1                    Carlos Sala
 2       Q.    Did you conduct any review before
 3  deciding whether or not to commit an extra 8.4
 4  million dollars into the transaction?
 5       A.    Not further review other than what we
 6  discussed.
 7       Q.    Prior to submitting the 8,425,000, you
 8  received the statement for October, correct?
 9       A.    The previous statement?
10       Q.    Yes.
11       A.    Yes, Exhibit 12.
12       Q.    Did you have any other financial
13  information from the company?
14       A.    No, I didn't.  No, I don't think so.
15       Q.    Was your 8.4 million, did you
16  contribute that based upon the October numbers?
17       A.    I wouldn't say it was based on October
18  numbers.  I think it's based on my entire analysis
19  of the transaction and my willingness to invest in
20  the transaction, not the October statement.  The
21  October statement was for one week, you know, you
22  wouldn't make that decision based on that.
23       Q.    Is it fair to say that you were ready
24  to commit your 8.4 million at the time you
25  initially entered the transaction?
```

Carlos Sala

1

2     A.   Probably yes, unless I saw something

3  that would cause me concern, you know, an Amaranth

4  type of disaster that could happen in a week, half

5  the investment kind of thing.

6     Q.   You didn't make any inquiry about

7  whether anything was happening in the transaction

8  other than reviewing the October statement?

9     A.   No.

10     Q.   The statement reflects that you earned

11  interest of only $76.  Does that sound accurate to

12  you?

13     A.   Seems low.

14     Q.   Did you question it?

15     A.   I don't remember.

16     Q.   Take a look at the December 7, 2000

17  letter.

18       (Exhibit 187, letter dated December 7,

19      2000, marked for identification, as of this

20      date.)

21      (Handing.)

22     Q.   December 7, 2000 letter from Peter

23  Molyneux to you?

24     A.   Yes.

25     Q.   This purports to be a summary of

```
 1                        Carlos Sala
 2   investment activity for Solid Currencies for
 3   November, correct?
 4        A.    Yes.
 5        Q.    The prior exhibit was the investment
 6   activity for you for November?
 7        A.    Yes.
 8        Q.    Now, turning back to Exhibit 187,
 9   reflects approximately $5,600 of trading gains for
10   the month?
11        A.    Yes.
12        Q.    And $15,000 of interest?
13        A.    Yes.
14        Q.    Is it fair to say that the interest
15   that wasn't reflected on your individual account
16   appears to be reflected on the Solid Currencies
17   monthly statement?
18        A.    Perhaps.
19        Q.    Do you have any other explanation for
20   it?
21        A.    I don't know.
22        Q.    Do you recall asking about this?
23        A.    I don't recall.
24        Q.    Do you recall being aware of this?
25        A.    I don't recall.
```

1                    Carlos Sala

2          Q.    Do you recall questioning the fees

3     that were charged?

4          A.    I don't recall.

5          Q.    Do you see there is $13,000 in fees?

6          A.    Yes.

7          Q.    On $5,000 of trading gain?

8          A.    The fees actually would have also

9     included the interest earned.

10         Q.    Say that again.

11         A.    It's not just on the 5,000, it's on

12    the 5,000 plus the interest earned.

13         Q.    That's a good point.  The interest

14    counts as profits?

15         A.    Yes.

16         Q.    If your account had a profit at the

17    end of the year, you were required to keep it in

18    to the end, convert it into the LLC, correct?

19         A.    Yes.

20         Q.    So if there was no trading done and

21    interest accrued, you would have had a profit in

22    your account, correct?

23         A.    Yes.

24         Q.    And then you would have had to commit

25    it to the LLC?

1                          Carlos Sala

2          A.    Yes.

3          Q.    You understood that going in?

4          A.    Yes.

5          Q.    You also understood that if there was

6     a profit in your account at any point, it's

7     possible that Deerhurst could stop trading to lock

8     in that profit so that you would have to go into

9     the LLC?

10         A.    Could be possible.

11         Q.    Did you question or talk with anyone

12    about any of the statements that we just looked at

13    for October and November?

14         A.    These two, no, I don't recall.

15         Q.    Take a look at still what is marked

16    as, I believe December 7th is 187.  Take a look on

17    the third page of that exhibit.  Does it reflect

18    when you deposited the 8,425,000?

19         A.    Yes.

20         Q.    November 21st?

21         A.    Yes.

22         Q.    You entered the transaction sometime

23    in late October?

24         A.    Yes.

25         Q.    October 24th or so?

1                     Carlos Sala
2          A.     Probably right.
3          Q.     You contributed the extra 8.9 million
4     30 days or less from that point?
5          A.     8.4.
6          Q.     Sorry?
7          A.     Yes.
8                 (Exhibit 188, letter dated January 5,
9          2001, marked for identification, as of this
10         date.)
11                (Handing.)
12                MR. GEIER:   Letter dated January 5,
13         2001 coupled with a summary of activity for
14         Deerhurst Investors General Partnership as
15         it pertains to Solid Currencies.
16         Q.     Let's take a look at that first.  Do
17    you see that, Deerhurst Investors General
18    Partnership, Solid Currencies?
19         A.     Which page?
20         Q.     Second page.  The title is Deerhurst
21    Investors General Partnership, summary of
22    investment activity.  Is that not on yours?
23         A.     I have Deerhurst Management Company,
24    REFCO Capital Markets.  That's my third page.
25         Q.     I'm looking at the second page right

```
 1                        Carlos Sala
 2  now.
 3          A.    I have a different --
 4          Q.    Maybe they are in a different order.
 5  Okay.
 6          A.    I got 1735 and 1736.
 7          Q.    Let's take a look at 1736 if you don't
 8  mind.  That is the statement for Solid Currencies,
 9  Inc. as a partner of the general partnership,
10  correct?
11          A.    Yes.
12          Q.    It shows a contribution of $8,943,673
13  on September 1st?
14          A.    Yes.
15          Q.    A liquidation on September 21st?
16          A.    Yes.
17          Q.    Is it fair to say that Solid
18  Currencies was in the general partnership for
19  three weeks?
20          A.    I think so.
21          Q.    Is there any backup here to explain
22  where the $77,435 of income was derived?
23          A.    There was no backup sent to me, no.
24          Q.    Did you question it?
25          A.    No.
```

1                         Carlos Sala

2          Q.    Do you know how much of the 77,000 was

3      interest?

4          A.    I don't.

5          Q.    If you had 8.9 million dollars

6      deposited at least from November 21st, correct,

7      you had 8.4 million put in on November 21st,

8      right?

9          A.    I forget which one it was that showed

10     that.

11         Q.    Take a look at --

12         A.    Correct.

13         Q.    That money was earning interest from

14     the time of deposit, correct?

15         A.    Yes.

16         Q.    You had 500,000 that was deposited in

17     late October?

18         A.    Yes, yes.

19         Q.    Take a look at 1735.  This says

20     Deerhurst Management Company, Solid Currencies,

21     Inc.  Do you know what this purports to be?

22         A.    A month end statement for Solid

23     Currencies.

24         Q.    Solid Currencies, at least for part of

25     the month, was a partner in the general partner,

1                    Carlos Sala

2     correct?

3          A.     Yes.

4          Q.     That was the prior page?

5          A.     Yes.

6          Q.     Subsequent page.  It shows trading

7     gain of $560?

8          A.     Yes.

9          Q.     You had $9 million invested and it

10    shows a $560 trading gain, correct?

11         A.     Yes.

12         Q.     Sorry, loss.

13         A.     Actually that's loss, yes.

14         Q.     Interest of almost 12,500?

15         A.     Yes.

16         Q.     Management fees of over 40,000?

17         A.     Yes.

18         Q.     For a loss as reflected on this

19    statement of $30,000?

20         A.     Yes.

21         Q.     It indicates at the bottom that on

22    December 29th, the S Corp. is liquidated into the

23    LLC?

24         A.     Yes, I do believe that the incentive

25    fee accrued relates to a prior period than the

1                          Carlos Sala

2    month of December here in the statement.

3          Q.    When did you come to that realization?

4          A.    Probably at the time.

5          Q.    Did you talk to anyone about it?

6          A.    I could tell because it wasn't paid

7    until the quarter end.

8          Q.    Did you hear Mr. Schwartz testify in

9    this deposition about incentive fee, Mr. Sala?

10         A.    I don't remember.

11         Q.    Were you at his deposition?

12         A.    Yes.

13         Q.    Do you recall meeting Tracie Henderson

14   in the fall of 1999?

15         A.    Yes, fourth quarter to be specific.

16         Q.    Do you have any more of a recollection

17   of when?

18         A.    Yes, I think it was the last week of

19   November perhaps or --

20         Q.    Last week of October?

21         A.    One of the two, when I was in Dallas

22   and it was a meeting in Dallas.

23         Q.    What was the purpose of the meeting?

24         A.    I was there in Dallas for other

25   business and my friend Tim Gillis asked me to go

```
 1                       Carlos Sala
 2   to lunch and he introduced me to Tracie Henderson
 3   at that lunch.  I was staying at a hotel across
 4   the street from the KPMG offices.  He suggested we
 5   meet for lunch.  He brought Tracie Henderson with
 6   him.
 7        Q.    Did you talk to Tracie about your
 8   financial position at that time, Mr. Sala?
 9        A.    No.
10        Q.    Did you talk to Ms. Henderson about
11   tax shelters?
12        A.    No.
13        Q.    Did you talk to Ms. Henderson about
14   substantive tax advice?
15        A.    No.
16        Q.    Why not?
17        A.    That meeting context, we -- it was an
18   introductory meeting for me to get to know her.  I
19   wouldn't have gotten into that level of detail as
20   well with someone I just met.  We mostly talked
21   about the internet during that meeting, a very hot
22   topic at the time.  People knew very little about
23   how to approach it.  KPMG was trying to figure out
24   an internet strategy.  They asked if I would be
25   willing to give them advice.  And Tracie Henderson
```

                        Carlos Sala

1
2    was just sitting there listening for most of the

3    entire meeting.  I would say 90 percent of the

4    conversation was between me and Tim.

5         Q.    Did you talk to Tracie Henderson about

6    OPIS?

7         A.    No.

8         Q.    Do you know what OPIS is?

9         A.    I have heard of it.

10        Q.    It's a tax shelter, correct?

11        A.    Yes.

12        Q.    Did you talk to Tracie Henderson about

13   an options strategy?

14        A.    At that meeting, no.

15        Q.    When was the next time you talked to

16   Tracie after that initial meeting?

17        A.    I'm not sure exactly when.

18        Q.    Would it have been months later?

19        A.    Perhaps, or it could have been weeks

20   later.  I'm not sure.

21        Q.    Was Tracie Henderson working out of

22   the Dallas office if you know?

23        A.    No, she happened to be in town with --

24   I'm not sure if she was there with Tim, but she is

25   in town for other business and Tim was in town

1                           Carlos Sala

2    also.   None of us actually worked in Dallas.   We

3    just happened to be in this town at that time, so

4    it made sense to go to lunch.

5         Q.    Was Tracie soliciting you at that time

6    of your interest in entering into a shelter?

7         A.    No.

8         Q.    Entering into an OPIS transaction?

9         A.    No.

10        Q.    Are you confident that's correct?

11        A.    Yes.

12        Q.    Are you confident that you weren't

13   talking about substantive tax issues you were

14   confronting with Tracie?

15        A.    To the best of my recollection, no.

16        Q.    Were you interested in 1999 about

17   golden parachute payments?

18        A.    I saw that e-mail that was produced by

19   Tim Gillis.   That's the first time I had seen

20   this.   I don't recall.   I didn't even know what

21   280 G was until I saw that document.

22             MR. GEIER:   Let's show you a document

23        we will mark as Exhibit 189.

24             (Exhibit 189, e-mail dated November 2,

25        1999, marked for identification, as of this

```
 1                      Carlos Sala
 2        date.)
 3               (Handing.)
 4        Q.    This is an e-mail from Tracie
 5   Henderson to you dated November 2, 1999, correct?
 6        A.    Yes.
 7        Q.    Mr. Gillis was copied on it?
 8        A.    Yes.
 9        Q.    Do you recall receiving this?
10        A.    I don't recall.
11        Q.    Do you have any doubts that you
12   received this?
13        A.    Based on looking at the document, no.
14               MR. HALLETT:  Wait a minute.  Go
15        ahead.
16        A.    But I don't recall the document at
17   all, so --
18        Q.    This is dated November 2, 1999,
19   correct?
20        A.    Yes.
21        Q.    Is it fair to say that you called
22   Mr. Gillis at some point to talk to him to try to
23   place when the meeting with Tracie Henderson
24   occurred?
25        A.    I just did that a few months back
```

Carlos Sala

1

2    after I reviewed one of your files.

3         Q.    Mr. Gillis believed that it could have

4    been sometime in October 1999, correct?

5         A.    Late October, yes, sure.

6         Q.    This e-mail looks like it was a follow

7    up to your meeting.

8         A.    It does look like that.

9         Q.    Look at the bottom.  It says, I agree

10   with Tim that our firm could benefit greatly from

11   your views and perspectives.  Were you helping

12   KPMG or were you talking to Tracie about your

13   views regarding the internet and promoting their

14   business?

15        A.    Not to Tracie, but to Tim.  They were

16   trying to figure out how to address the internet.

17   I think that's what that refers to.

18        Q.    This e-mail also refers to an option

19   strategy.  Were you looking at an option strategy

20   in 1999?

21        A.    I don't recall that at all.

22        Q.    Talks about our folks are still

23   investigating the use of a note.  Do you see that?

24        A.    Yes.

25        Q.    About the BLIPS transaction uses a

1          Carlos Sala

2    note?

3          A.    I don't know.  I think it was a loan,

4    so maybe perhaps.

5          Q.    In your understanding of the BLIPS,

6    would it also involve options?

7          A.    I don't know.  I didn't get that far

8    into BLIPS.

9          Q.    Did you have any conversations about

10   BLIPS in which you understood that it involved

11   foreign currencies?

12         A.    No, I never understood it.  I never

13   really understood the details of BLIPS.

14         Q.    Do you see in the letter it says

15   regarding OPIS, were you able to talk to your

16   colleague to gauge his level of interest.  That's

17   referring to Mr. White, isn't it?

18         A.    I see that, probably, yes.

19   Incidentally for discussion, I don't believe we

20   had any substantive discussions at that initial

21   lunch.  We could have had a phone call following

22   the lunch where we would have talked about perhaps

23   some of these issues, but I don't recall.

24         Q.    It's your understanding that you met

25   in late October?

Carlos Sala

1

2  A. Yes.

3  Q. It's possible you are saying that

4 between late October and November 2 you had a

5 call?

6  A. It's possible.

7  Q. You discussed these items?

8  A. It's possible, but I'm fairly

9 confident to the best of my recollection, that at

10 that lunch, we did not talk about these issues.

11  Q. She doesn't say here following up on

12 our phone call?

13  A. True.

14  Q. She talks about it was great to meet

15 you last week?

16  A. Yes.

17  Q. You have no doubt this was sent to

18 you?

19  A. It's fair to say that, but I wouldn't

20 say I have no doubt, but it's fair to say it was

21 sent to me.  I just don't recall receiving it.

22   MR. HALLETT:  For the record, the

23   document was produced by KPMG, the

24   government?

25   MR. GEIER:  It was.

183

<pre>
 1                    Carlos Sala
 2         MR. HALLETT:  Exhibit 189.
 3         MR. GEIER:  It was produced pursuant
 4    to -- I think actually to a subpoena
 5    probably that you served on KPMG.  It was
 6    produced at the deposition of Mr. Gillis, I
 7    think, just to make things smoother is my
 8    understanding.  We served a subpoena -- I'm
 9    trying to indicate that we served a subpoena
10    on Mr. Gillis, but it was our understanding
11    from KPMG that although he is an employee,
12    he wasn't producing that document pursuant
13    to the individual subpoena, but rather he
14    was complying with the subpoena served by
15    Mr. Sala.
16         MR. HALLETT:  Okay.
17         MR. GEIER:  Because they considered it
18    to be a KPMG document and not a Gillis
19    document.
20         MR. HALLETT:  Okay.
21         (Exhibit 190, e-mail dated June 15,
22    2000, marked for identification, as of this
23    date.)
24         (Handing.)
25    Q.    This is an e-mail dated June 15, 2000
</pre>

Carlos Sala

1
2     from Tracie Henderson to you, at least that's what
3     it purports to be.  It's a document that has a
4     KPMG Bates stamp, therefore produced by KPMG.  Do
5     you recollect this document?
6          A.     Vaguely.
7          Q.     Any doubt in your mind that this was
8     not what it purports to be?
9          A.     No.
10         Q.     This is dated June 15th.  In it,
11    Ms. Henderson is talking to you about
12    communicating to you about BLIPS, correct?
13         A.     Yes.
14         Q.     It says, you will be doing BLIPS with
15    NatWest.  Do you see that?
16         A.     Yes, that's what it says.
17         Q.     Do you ever recall writing back to her
18    and saying no, that's not the case?
19         A.     I don't recall writing her back either
20    way.
21         Q.     You also see you are directed to send
22    information into Presidio?
23         A.     Yes.  I don't think I ever sent any
24    information.
25         Q.     Do you recall communicating with

Carlos Sala

1

2     anyone at Presidio?

3          A.    I do.  I think I had a meeting in New

4     York and then I was scheduled to have a meeting in

5     Denver and the guy never showed up.

6          Q.    You met in New York, but you don't

7     remember who you met with?

8          A.    I don't remember.

9          Q.    You don't remember who you were

10    supposed to meet with that never showed up?

11         A.    I definitely remember that.

12               (Exhibit 191, e-mail dated August 18,

13         marked for identification, as of this date.)

14               (Handing.)

15         Q.    191 purports to be an e-mail from

16    Tracie Henderson to you.  To KPMG, it's a KPMG

17    document as well dated August 18.  Do you

18    recognize this?

19         A.    Vaguely.

20         Q.    Do you see here she is communicating

21    to you the timing of a BLIPS transaction?

22         A.    I do.

23         Q.    That there are certain steps that

24    needed to be followed?

25         A.    Yes.

Carlos Sala

1

2     Q.    Things to occur on certain dates?

3     A.    Yes.

4     Q.    Did you understand that the BLIPS

5  transaction would result in a tax loss to you?

6     A.    Yes.

7     Q.    Do you recall if you were able to

8  determine the amount of the tax loss going into

9  the transaction?

10    A.    I don't recall.

11    Q.    Did you ever tell Tracie Henderson at

12 any point, that you were reconsidering or thinking

13 about whether you wanted to do the BLIPS deal,

14 rethinking the BLIPS deal?

15    A.    I never got that far along to say I'm

16 rethinking the whole thing.  It just got to the

17 point where I said I want to see documents, I

18 never saw them.  I elected to go a different way.

19 It wasn't like rethinking.  I think what I told

20 her was I'm not doing it at some point, but it

21 wasn't like hey, I'm questioning.  Maybe I

22 was -- you know, I don't recall, but I don't think

23 that I went through a specific discussion with her

24 saying hey, I'm not -- I don't recall.  I'm trying

25 to be responsive and refresh my recollection.

Carlos Sala

1

2      Q.    In 2000, do you recall taking a

3  vacation to Europe for three weeks?  For me a

4  three week vacation would be very memorable.

5      A.    I have been to Europe for three weeks

6  before.  Maybe it was in 2000.  I'm not sure.  I

7  have been to Europe a number of times.

8      Q.    Did you ever tell Tracie that you were

9  intending or wanted to use her as an advisor on a

10  transaction?

11      A.    I don't recall that.  I see it in the

12  e-mail, but I don't recall that.

13      Q.    Let's show you the document then, you

14  can see.

15            MR. GEIER:  This does say page one of

16      two.  I don't believe there is anything on

17      the second page, but I can't represent that

18      affirmatively.  I'm focusing on the e-mails

19      which are complete on this page.

20            (Exhibit 192, e-mails, marked for

21      identification, as of this date.)

22            (Handing.)

23      Q.    Take a look at that.  These are

24  e-mails Mr. Sala, that occurred in August and

25  September 2000 that appear on this page.  My

1                    Carlos Sala

2     question to you is, since they are not directed to

3     you, do you recall any of the events that are

4     reflected in these communications?

5          A.    Let me read it first.  I recall

6     praising Tracie Henderson at some point with Tim

7     Gillis.  I don't recall most of this.

8          Q.    I didn't hear you, you recall?

9          A.    Praising Tracie Henderson at some

10    point with Tim.  Liked her.  I thought she was

11    very competent.  I don't recall this discussion

12    about Jones Day.  I don't recall the discussion

13    about using her for another transaction.  I just

14    don't recall these things.  I don't recall leaving

15    for Europe for three weeks the next day.  I

16    probably did go to Europe.

17         Q.    You entered into the Deerhurst

18    transaction in October?

19         A.    Yes.

20         Q.    This e-mail is dated September 6.  You

21    also in 2000, were trying to find a transaction,

22    were you not, that would help reduce your tax

23    burden?

24         A.    I was looking at investments and some

25    of those investments had a tax component to it.

Carlos Sala

1
2  From that perspective, yes.

3        Q.    For instance, BLIPS?

4        A.    Yes, considered BLIPS.

5        Q.    For instance, the spread option

6  strategy, the Deerhurst transaction?

7        A.    Yes.

8        Q.    In order for them to be effective for

9  you, you needed to enter into the transaction in

10  2000, correct?

11        A.    Even the tax component?

12        Q.    Yes.

13        A.    Yes.

14        Q.    The investment component could have

15  occurred at any point, but the tax component you

16  needed to have the transaction complete during

17  2000, correct?

18        A.    Yes, yes.

19        Q.    Given that, do you recall being away

20  in Europe and trying to finalize what you wanted

21  to do with respect to Deerhurst and/or BLIPS?

22        A.    I don't.  I don't think I was in

23  Europe thinking about this contract.  I might be

24  wrong, but --

25        Q.    How many times have you been to

Carlos Sala

1

2    Europe, Mr. Sala?

3         A.    Numerous times.

4         Q.    For three weeks at a time?

5         A.    For two weeks at least, a few times.

6    I'm not sure about three weeks.  Maybe before, I'm

7    not sure.  I have been to Europe a lot.

8         Q.    Do you recall any conversation with

9    Tracie in which she told you that Jones Day was

10   getting cold feet?

11        A.    I don't recall that at all, I don't

12   recall anything about Jones Day.

13        Q.    Do you believe Tracie to be

14   trustworthy?

15        A.    Sure.

16        Q.    You had a high degree of confidence in

17   her?

18        A.    Yes, I did.

19        Q.    If she wrote something about a call

20   that she had, you have no reason to doubt what she

21   wrote?

22        A.    I don't.

23             MR. GEIER:  I have tax returns for

24        Mr. Sala for 2000 and 2001.  Let's do a

25        quick stipulation.  We can mark as 193 and

```
                        Carlos Sala
 1
 2       194.
 3             (Exhibit 193, 2000 income tax returns,
 4       marked for identification, as of this date.)
 5             (Exhibit 194, 2001 income tax return,
 6       from KPMG's files, marked for
 7       identification, as of this date.)
 8             (Handing.)
 9             MR. GEIER:  Can we reach a stipulation
10       on those.
11             MR. HALLETT:  Okay.  Marked as Exhibit
12       193, is a true and correct copy of the
13       document produced from Mr. Sala's files.
14       Front page states 2000 income tax returns
15       and beginning on the third page, it is a
16       copy of an income tax return for the year
17       2000 stamped on it.  Taxpayer's copy for
18       Carlos E. Sala, March 10.
19             Exhibit 194 is a document that
20       apparently came from KPMG's files, purports
21       to be a 2001 tax return for Carlos E. Sala,
22       unsigned copy.
23             MR. GEIER:  Stipulate that that's his
24       return.
25             MR. HALLETT:  I will stipulate to
```