# EXHIBIT 7

# Pt. III of III

1

2  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF COLORADO

3  - - - - - - - - - - - - - - - - - - - -X   **CERTIFIED COPY**

4  CARLOS E. SALA and                )
   TINA ZANOLINI SALA,               )

5                                     )
                  Plaintiffs,        )

6                                     )
            vs.                       )  Civil Action No.

7                                     )   05-CV-00636
   UNITED STATES OF AMERICA,          )   LTB-PAC

8                                     )
                  Defendant.          )

9  - - - - - - - - - - - - - - - - - - - -X

10

11                    October 24, 2006

12                    10:30 a.m.

13

14         Continued Deposition of CARLOS E.

15     SALA, held at the offices of Katten, Muchin

16     & Rosen, LLP, 575 Madison Avenue, New York,

17     New York, pursuant to Adjournment, before

18     Elisabeth F. Nason, a Notary Public of the

19     State of New York.

20

21
   Atkinson-Baker, Inc.
22 Court Reporters
   www.depo.com
23 800-288-3376

24 Reported by:
   ELISABETH F. NASON
25 JOB NO. A00921C

1

Carlos Sala

1

2      this.  We will take the return was filed

3      with the IRS.  I learned many years ago the

4      best evidence of the return was filed with

5      the IRS is a copy of that return, but I will

6      stipulate that this came from KPMG's files.

7           MR. GEIER:  We will agree to stipulate

8      so we won't have a dispute on the 2001

9      return.

10          MR. HALLETT:  If you provide me with a

11     copy that was provided to the IRS, we will

12     stipulate.

13          MR. GEIER:  Show Mr. Sala the 2000

14     return, 193.

15     Q.   Do you see on that return any mention

16  or description of the Deerhurst transaction?

17     A.   Yes, on the first page of the amounts

18  reported in that transaction are listed on line

19  17.

20     Q.   What does it reflect, a $60 million

21  loss?

22     A.   Yes.

23     Q.   It's listed on a line that says

24  partnership S Corp.'s trusts, et cetera, correct?

25     A.   Yes.

1                       Carlos Sala

2          Q.    Does it reflect how that loss was

3     generated?

4          A.    Let me see in the schedules.

5          Q.    Look at DHSala 464, it may help you.

6          A.    Yes, it shows a loss for Solid

7     Currencies.

8          Q.    Does it say what loss Solid Currencies

9     did?

10         A.    Not on that page.

11         Q.    Does it reflect anywhere on this tax

12    return how the $60 million loss was generated?

13         A.    It just shows the K-1 that was issued

14    by Solid Currencies.  To Solid Currencies I guess.

15    Yes.

16         Q.    There is no way the IRS could tell

17    from the face of this return how you derived the

18    $60 million loss, correct?

19         A.    It's pretty obvious on the face of the

20    return that the number is very large and it's

21    stated right there.

22         Q.    Does it tell you that the number was

23    derived from a transaction which there were basis

24    trades that were pegged to generate this loss?

25         A.    Not specifically.

```
 1                       Carlos Sala
 2          Q.    Generally?
 3          A.    No, it basically shows a large loss on
 4   the front of the return from a K-1.
 5          Q.    You reported over 575,859 million
 6   dollars income that year, correct?
 7          A.    Yes.
 8          Q.    How much tax did you pay in 2000?
 9          A.    575859 there was no tax.
10          Q.    You reported $60 million in income.
11   Was that real money that you received?
12          A.    As opposed to fake money?  Yes, of
13   course.
14          Q.    As opposed to --
15          A.    It was money I received.
16          Q.    Cash?
17          A.    It actually was stock options that
18   were sold and there were proceeds from that.
19          Q.    So you had $60 million of real
20   dollars?
21          A.    Yes.
22          Q.    You paid no tax on that amount?
23          MR. HALLETT:   Now you are arguing.
24   These are facts, let's not argue.
25          A.    There was an offsetting deduction that
```

1                          Carlos Sala

2     resulted in no tax.

3          Q.    That offsetting deduction was as a

4     result of the Deerhurst transaction?

5          A.    Correct.

6          Q.    Nowhere on this return do you identify

7     the Deerhurst transaction specifically or what it

8     involved, correct?

9          A.    Yes, I identify in my K-1 for Solid

10    Currencies.

11         Q.    What does the K-1 say?

12         A.    That there was a loss of $60 million.

13         Q.    Does it say how that loss was

14    generated?

15         A.    No.

16         Q.    There is no way for the IRS from

17    looking at the return, to know how you generated

18    the loss, correct?

19              MR. HALLETT:  Objection.  Pure

20         speculation on what the IRS could learn or

21         not learn and what information is in the

22         hands of the IRS.

23         A.    I don't have a clue what the IRS would

24    say.

25         Q.    You didn't tell the IRS how the

                          Carlos Sala

1

2   $60 million loss was generated?

3        A.   I reported it according to the loss

4   that was reported to me.

5        Q.   You didn't attach any of the Deerhurst

6   documents, did you?

7        A.   No.

8        Q.   Did you attach any document from the

9   Deerhurst transaction to this return?

10       A.   Aside from the one we discussed, no.

11       Q.   Which one did we discuss?

12       A.   It was 46 -- whatever one that shows

13   Solid Currencies.

14       Q.   You are talking about the schedule?

15       A.   The schedule.

16       Q.   The Solid Currencies just shows that

17   you had a corporation that suffered a loss,

18   correct?

19       A.   Yes.

20       Q.   It doesn't say how that loss was

21   generated?

22       A.   No, no, it was accurately reported.

23       Q.   It doesn't say what Solid Currencies

24   did?

25       A.   No.

1                              Carlos Sala

2       Q.    It doesn't say how long Solid

3  Currencies was in existence?

4       A.    No.

5       Q.    Didn't say that Solid Currencies

6  didn't have a real business operation, did it?

7       A.    Solid Currencies was -- it didn't

8  describe the operations of Solid Currencies.

9            MR. HALLETT:  Off the record.

10           (Discussion held off the record.)

11  BY MR. GEIER:

12       Q.    Mr. Sala, just to be clear, when was

13  the earliest under the documents as you understood

14  them at the beginning of the transaction, that you

15  could exit from the transaction once we got into

16  January 2001?

17       A.    Five years without penalty, could have

18  exited during the transaction by paying a penalty.

19       Q.    Did you pay any penalties?

20       A.    No.

21       Q.    Did you exit earlier than five years?

22       A.    A little earlier, not much, but a

23  little bit.  I was there over four years.

24       Q.    Four years and what?

25       A.    A couple of months maybe.

Carlos Sala

Q.    You ended almost half a year early?

A.    Yes.

Q.    When you say your desire to stay in, I think you testified earlier that you were doing everything you could to stay in the transaction, you agreed to stay in the transaction for five years when you entered it?

A.    Correct.

Q.    You didn't stay in for five years, you stayed in for less?

A.    Almost, almost five years, yes.

Q.    You stayed in for four years and a couple of months?

A.    Right.

Q.    You were supposed to pay a penalty when you exited early?

A.    Yes.

Q.    You didn't pay that penalty, did you?

A.    Yes, I'm agreeing with you, I didn't pay.

Q.    Mr. Kreiger could have made you pay the penalty?

A.    We were so dissatisfied throughout because of the investment performance, that

1                          Carlos Sala

2    Mr. Kreiger told us that he was not going to

3    require us to pay a penalty, so he wasn't going

4    to -- even after he said I could leave, I still

5    stayed.

6           Q.    He said you could leave orally or in

7    writing?

8           A.    It's in writing.

9           Q.    This November 28, it's allowing you to

10   draw 20 percent of your interest in the LLC,

11   correct?

12          A.    I don't know, I have to see that.

13                MR. GEIER:   I'm going to show you my

14          copy.   There is a stack of documents over

15          there.

16                MR. JANIK:   158 looks like, maybe 157,

17          something right after that, but it's not 158

18          or 159.

19                MR. GEIER:   Hang on, I'm getting

20          there.   Got it.   It was marked as 185.

21          Q.    Mr. Sala, this is a letter you sent to

22   Deerhurst, correct?

23          A.    Yes.

24          Q.    You were indicating your desire to

25   exit --

1                        Carlos Sala

2          A.     Yes.

3          Q.     -- the program?

4          A.     Yes, let me read this real quick.

5    Yes.

6          Q.     In November 2003, you are shifting

7    your investment from the diversified strategy,

8    correct?

9          A.     I'm withdrawing from the diversified

10   strategy completely.  I'm investing into Lone

11   Star, which I was already an investor.

12         Q.     You are not withdrawing completely on

13   November 28, are you, you are doing it in a series

14   of increments?

15         A.     It actually happened I believe the

16   first week of December or so when the full

17   redemption occurred.

18         Q.     You are agreeing to move your

19   investments within Mr. Kreiger's managed accounts?

20         A.     Well, what I -- he was allowing us to

21   withdraw the entire amount regardless of whether

22   we invested into another account.  And we had a

23   discussion as to how our hope was to improve the

24   performance and we then said -- I said okay, I

25   will invest what I withdraw from the Deerhurst

Carlos Sala

1
2     Trading Strategies side, I will put it into Lone
3     Star and let's see if we can make some money.
4          Q.     In this document he is not telling you
5     you can just withdraw your money and take it and
6     run, correct?
7          A.     He told me that verbally.  This
8     document reflects the fact that I also agreed to
9     invest into Lone Star as well.  By the way, there
10    was no restriction on accruing from Lone Star at
11    all, so I could have gone into Lone Star.  I could
12    have at any time been withdrawn from Lone Star,
13    but I stayed in it.
14         Q.     Did Lone Star make money for you?
15         A.     No, it lost money, that's why I
16    finally withdrew.
17         Q.     It's clear, is it not, that Lone Star
18    was not an investment in just foreign currencies,
19    correct?
20         A.     Part of it was foreign currencies.
21    Part of it was not.
22         Q.     Can you tell me what your
23    understanding was of the weighting of the
24    investments?
25         A.     Sure.  From my recollection, 30 to 40

Carlos Sala

1

2   percent would have been foreign currencies.  30 to

3   40 percent would have been fixed income.  30

4   percent let's just say, would have been other

5   commodities, metals, things like that.

6        Q.   Within the five year period, you were

7   moving significantly out of foreign currencies,

8   correct, you only had 30 percent of your

9   investment in foreign currencies?

10        A.   Ultimately, yes.

11        Q.   As of December '03?

12        A.   Yes, ultimately, yes, the first few

13   years, no, the first two years, no.

14        Q.   You agreed to put it in foreign

15   currencies for five years?

16        A.   Initially.

17        Q.   That's what the opinion letter

18   contemplates?

19        A.   Yes, I also received an opinion letter

20   saying that it was consistent with the opinion to

21   move to Lone Star.

22        Q.   But only up to a certain percentage?

23        A.   50 percent.

24        Q.   You couldn't do more because then you

25   wouldn't have gotten the opinion?

1                         Carlos Sala

2          A.    I'm not sure that's the case.

3          Q.    Did you ever inquire?

4          A.    No, that was not the intention at that

5    point to move the entire amount.

6          Q.    Do you recall how much money you lost

7    in 2001?

8          A.    Approximately $4 million.

9          Q.    You lost $4 million in 2001?

10         A.    Correct.

11         Q.    Half your money almost?

12         A.    Almost.

13         Q.    You moved half your money into Lone

14   Star in 2001?

15         A.    Yes.

16         Q.    Within a matter of months of starting

17   the five year program, you pulled almost half your

18   money out?

19         A.    It was towards the end of the year, so

20   it was almost a year.

21         Q.    August?

22         A.    No, I don't think so.  I think it was

23   November.

24         Q.    You pulled half of what was left of

25   your money out of the program?

Carlos Sala

1

2    A.   Half of it went into Lone Star in

3  November I think.

4    Q.   That was not contemplated in the

5  opinion letter that you obtained from Mr. Ruble in

6  April 2001?

7    A.   Not in that letter, in a subsequent

8  letter.

9       MR. GEIER:  No further questions at

10     this time.  Thank you, Mr. Sala.

11  EXAMINATION BY

12  MR. HALLETT:

13    Q.   Good afternoon.  My name is Darrell

14  Hallett.  What's been marked as Exhibit 193 is

15  your copy apparently of your 2000 tax return.  I

16  take it this is a copy that's been signed by

17  Mr. Henderson, but not by you, but I take it you

18  signed the return that was filed with the IRS?

19    A.   Yes, the original, yes.

20    Q.   The original 2000 tax return.  When

21  you signed that, did you review the tax return?

22    A.   Yes.

23    Q.   Is it your practice to review tax

24  returns before you sign them?

25    A.   Yes.

1       Carlos Sala

2        Q.    Is it your practice to review them in

3   detail?

4        A.    Yes.

5        Q.    In fact, did you discuss with

6   Mr. Brady, did you have numerous discussions with

7   him about items that appeared in the tax return

8   and the copy that you received?

9        A.    Yes.

10            MR. GEIER:  Objection to the form of

11       the question.

12       Q.    When you signed this tax return, did

13  you believe that you were fraudulently concealing

14  from the Internal Revenue Service anything about

15  the Deerhurst transaction?

16            MR. GEIER:  Objection to the form of

17       the question.

18       A.    Absolutely not.

19       Q.    What was your belief, if any, that you

20  had at that time as to whether or not the

21  disclosures made in this tax return were in

22  accordance with what the law requires?

23       A.    It was properly reported.

24       Q.    I see on the return a number of

25  places, quickly review, where Solid Currencies is

Carlos Sala

1
2    disclosed first on page 2 of schedule E?

3            MR. GEIER:   Objection to the form of

4        the question.

5        Q.    I'm looking at Exhibit 193.   What does

6    that disclose with respect to Solid Currencies in

7    part 2?

8        A.    Discloses the name Solid Currencies,

9    it discloses the fact that it was an S Corp.   It

10   discloses the employer identification number.

11       Q.    Do you know what an employer

12   identification number is?

13       A.    Sure.   It's a number that is used to

14   extract an entity through the IRS process.

15       Q.    Do you recall whether or not a return

16   was filed for Solid Currencies for the year 2000?

17       A.    Yes, it was.

18       Q.    Did you sign that return?

19       A.    Yes.

20       Q.    Do you recall what, if anything,

21   appeared on that return?

22       A.    It reported the activities of Solid

23   Currencies during the year 2000.   It reported to

24   the best of my recollection, the activities of

25   Solid Currencies and it went into some detail as

Carlos Sala

1

2  to the expenses and loss of Solid Currencies.

3        Q.    Do you know what a form K-1 is?

4        A.    Yes.

5        Q.    What is a form K-1?

6        A.    It's a form issued by an entity to

7  report income or loss to an individual.

8        Q.    Do you recall whether or not the Solid

9  Currencies tax return for 2000 had a K-1 or K-1s

10 attached to it?

11             MR. GEIER:  Objection.  It may help to

12        show him the return instead of divining from

13        memory.

14        A.    Yes, I recall that.

15        Q.    Do you recall from whom the K-1 was

16 received?

17        A.    From Deerhurst.

18        Q.    Do you recall whether or not there was

19 an EI number for Deerhurst?

20        A.    Yes, there was a number for Deerhurst.

21        Q.    Just for the record, I see several

22 other places on your individual income tax return

23 for 2000 for Solid Currencies disclosed.

24 Statement 4, what does that indicate with respect

25 to Solid Currencies?

Carlos Sala

1

2      A.      It indicates that interest coming from

3   partnership, S Corp., et cetera and trusts, and it

4   lists Solid Currencies an amount of 27,526.

5      Q.      Do you know whether or not Deerhurst

6   filed a partnership income tax return?

7      A.      Yes, they did.

8              MR. GEIER:  Objection.  Foundation.

9      Q.      Are you familiar with the partnership

10  income tax return form?

11     A.      I have seen that.

12     Q.      What do they generally contain?

13     A.      The income and loss of the

14  partnership.  Sometimes other kinds of financial

15  information including maybe a balance sheet and

16  other relevant financial information as to the

17  partnership.

18     Q.      Do you know whether or not the

19  Deerhurst partnership return would have reflected

20  the income, loss and assets and liabilities of

21  Deerhurst for the year 2000?

22     A.      I believe it did.

23             MR. GEIER:  Objection.  Speculation.

24     Q.      That would have been your expectation?

25     A.      Yes.

1          Carlos Sala

2               MR. GEIER:   Speculation and relevance.

3          Q.    To sum this all up, what did you

4     believe, if anything, when you filed the tax

5     return for yourself and your wife and the tax

6     return for Solid Currencies and the information

7     that was referred to as to what information was

8     available to the Internal Revenue Service if they

9     chose to look at it with respect to Deerhurst?

10              MR. GEIER:   Objection to the form of

11         the question.   Speculation.   Foundation.

12         A.    First, that the amounts reported in my

13    individual return were accurately reported to

14    reflect the financial operations of Deerhurst.

15    Secondly, that Solid Currencies reported a return

16    in accordance with its reporting responsibilities.

17    And that it properly reflected the financial

18    activity of Solid Currencies.   Third, that it used

19    all information, including K-1 from Deerhurst,

20    showing the operations of Deerhurst and the

21    financial results resulted from those operations

22    during the year 2000.

23         Q.    Did you ever instruct or request

24    Tracie Henderson to not make any disclosure that

25    she felt was otherwise appropriate on your 2000

                              Carlos Sala

1

2    tax return?

3              MR. GEIER:  Objection.  Leading.

4         Objection to the form of the question.

5         A.    No, I never did that.

6         Q.    Did Tracie Henderson ever tell you

7    that she had not made a disclosure on the 2000 tax

8    return with respect to Deerhurst she felt it was

9    otherwise required to be disclosed?

10        A.    Never.

11             MR. GEIER:  Objection to the form of

12        the question.

13        Q.    Did you ever have, to your

14   recollection, any discussion with her at all about

15   what was or was not reflected on the 2000 tax

16   return with respect to Deerhurst?

17        A.    Can you repeat the question.

18        Q.    Do you recall whether you ever had any

19   discussion with her at all about the disclosure on

20   the 2000 tax return about transactions involving

21   Solid Currencies?

22             MR. GEIER:  I didn't understand the

23        question.  Can you read it back.

24        Q.    Do you recall whether or not you ever

25   had any discussion with Tracie Henderson regarding

1                    Carlos Sala

2    the disclosure of a transactions involving Solid

3    Currencies and Deerhurst in the 2000 tax return?

4         A.    No.

5         Q.    You left that up to her?

6         A.    Yes.

7         Q.    On that same line, there is a

8    document, pardon me for not having --

9              MR. GEIER:  Objection.  Leading on the

10         last one.

11             MR. HALLETT:  I haven't finished my

12         question, maybe I will clean it up.

13             MR. GEIER:  He was --

14             THE WITNESS:  He said the last one.

15             MR. HALLETT:  The last one or the one

16         I'm about to ask.

17             MR. GEIER:  I knew what you were going

18         to ask.  I'm objecting prospectively.

19             MR. HALLETT:  Let's try to object

20         after the question is asked.

21             MR. GEIER:  I don't have a pause with

22         your client, so I'm doing the best not to

23         interrupt you or him and object.  So if I

24         don't do that I get on your bad side.  If I

25         do, I get on your bad side.  If you give me

Carlos Sala

1

2      a pause, I will be happy to make those

3      objections.

4          Q.    Did you ever tell anyone at KPMG not

5   to claim expenses related to the Deerhurst

6   transaction on your 2001 tax return?

7          A.    No.

8          Q.    Did you ever tell anyone you didn't

9   want to claim those expenses on your 2001 tax

10  return?

11         A.    Not to the best of my recollection.

12         Q.    Have you reviewed the 2001 tax return?

13         A.    I did.

14         Q.    Did you determine whether or not those

15  expenses that related to Deerhurst that was paid

16  in 2001 were in fact deducted on the tax return?

17             MR. GEIER:    Objection to the form of

18      the question.

19         A.    All expenses incurred in accordance

20  with the Deerhurst transaction were reported on

21  the 2001 tax return.

22         Q.    In 2001, you paid $75,000 to

23  Mr. Ruble?

24         A.    Yes.

25         Q.    Was that deducted on the 2001 tax

1        Carlos Sala

2   return?

3        A.    Yes.

4        Q.    Are you familiar with the term due

5   diligence?

6        A.    Yes.

7        Q.    What does the term due diligence mean

8   to you?

9        A.    It's an examination initially

10  involving extensive financial reviews of records,

11  historical performance.  It is an investigation of

12  managers that are involved in a transaction.  It

13  is an examination of documents to support what is

14  being reported to a potential party.  It's just a

15  very thorough investigation in all aspects of a

16  transaction and very financially oriented.

17       Q.    Do you recall whether or not you did

18  any due diligence before you committed any money

19  to the Deerhurst transaction?

20       A.    Extensive.

21       Q.    First of all, could you tell us what

22  you did in the way of due diligence before you

23  went into the Deerhurst transaction?

24       A.    The first thing I did is, I had many

25  questions and inquiries of John Raby and Michael

```
 1                    Carlos Sala
 2   Schwartz.
 3              MR. GEIER:  Objection to the
 4         narrative.
 5         A.    Who presented the transaction to me.
 6   Once I had some understanding of the transaction,
 7   I met with the Deerhurst principals, primarily
 8   Andy Kreiger, had an introductory meeting here in
 9   New York.
10         Q.    Do you recall where that meeting took
11   place?
12         A.    It was in a hotel.  I believe it was
13   the Royalton here in New York.
14         Q.    Do you recall who was present?
15         A.    It was Andy Kreiger, Michael Schwartz,
16   John Raby, Tony White and myself.
17         Q.    Do you recall what Mr. Kreiger said,
18   if anything, at that meeting?
19         A.    Yes.  He gave us a good overview of
20   his background where he had actually worked, what
21   his performance had been and gave us a copy of a
22   book he had written on foreign currencies, which I
23   read.  And gave us an overview of what the
24   Deerhurst transaction and its trading would be
25   like.
```

Carlos Sala

1

2      Q.    Did you ask any questions at the

3  meeting with Mr. Kreiger?

4      A.    Many questions.

5      Q.    What questions, if any, can you

6  recall?

7      A.    What he did at Bankers Trust.  What he

8  did with George Soros.  How profitable he had been

9  in the past.  How long he had been trading

10  currencies, foreign currencies.  How he got into

11  that business.  What was he doing now in terms of

12  his fund.  What were his results.  Many questions

13  of that sort.

14      Q.    How long was the book that he gave

15  you, how many pages, do you recall?

16      A.    Couple of hundred pages.

17      Q.    You testified you read that?

18      A.    Yes.

19      Q.    When did you read it?

20      A.    At the time that I was considering

21  entering the Deerhurst transaction.

22      Q.    What, if any, further meetings did you

23  have with Mr. Kreiger after that initial meeting?

24      A.    Then I flew back to New York and met

25  with Mr. Kreiger at his offices at least once,

Carlos Sala

1
2  perhaps twice.
3       Q.    How long did those meetings take
4  place?
5       A.    They took time, certainly well in
6  excess of an hour, probably about two hours of the
7  investigations and questions.
8       Q.    Did you meet any other people?
9       A.    I did.  I met Peter Molyneux, I met
10  some other employees of Mr. Kreiger's.
11       Q.    What, if anything, did you observe
12  other than meeting people?
13       A.    That it was an actual operation,
14  Mr. Kreiger was a very sophisticated trader.  That
15  he seemed to have very strong views to the
16  currency markets.  That he seemed very competent.
17       Q.    Any other meetings with Mr. Kreiger
18  before you went into the transaction?
19       A.    Sure.  I had many telephone calls
20  during the time before the transaction.
21       Q.    I believe you testified that in
22  addition, you called the office manager for the
23  Perot family?
24       A.    I did.
25       Q.    What is the first time that you talked

Carlos Sala

1

2    with anyone associated with the Perot family?

3         A.    It was prior to entering the

4    transaction, I wanted to get a reference as to

5    someone who had done extensive business with

6    Mr. Kreiger.

7         Q.    What, if anything, do you recall that

8    you were told by that person in that telephone

9    call?

10        A.    He had a very strong recommendation of

11   Mr. Kreiger, they had been doing business for a

12   number of years.  They had a significant

13   investment being managed concurrently with

14   Mr. Kreiger, number comes to mind was about

15   $50 million.  The Perot Family Office manager was

16   a very sophisticated investor, so it gave me a

17   great degree of comfort as to Mr. Kreiger's

18   experience.

19             MR. GEIER:   Objection.  Foundation.

20        Q.    That's a good point, counsel.  Why did

21   the information you obtained from the Perot Family

22   Office manager give you comfort?

23        A.    He was a very sophisticated investor

24   whose office was set up specifically to invest

25   large amounts of money, someone who had worked on

1                    Carlos Sala

2    Wall Street before who had had significant

3    experience with Mr. Kreiger.  Who understood the

4    currency markets.  Who had been very successful in

5    trading with Mr. Kreiger and who had very

6    favorable things to say about Mr. Kreiger.

7              MR. GEIER:  Objection.  Foundation.

8         Q.    Before that phone call, where had you

9    obtained information, if at all, about the Perot

10   family and their investments?

11        A.    Ross Perot is a very well-known

12   individual.  I knew he was worth several billion

13   dollars.  He had obviously run for president.  I

14   knew he had sold his stake in General Motors.

15   Highly accomplished individual.  So before that, I

16   knew of him and then when I was referred to the

17   office family, that was very specific to

18   Mr. Kreiger and Mr. Kreiger's background and

19   trading.

20        Q.    Did you in the year 2000 and prior

21   years, regularly read any financial journals or

22   magazines?

23        A.    Like?

24        Q.    Tell us some.

25        A.    On a daily basis, I read the Wall

Carlos Sala

1
2  Street Journal, read The New York Times business
3  section, Fortune, Forbes, The Economist.  I get
4  the Kiplinger's letter, which comes out every
5  couple of weeks.  I watch CNBC for several hours
6  every day.  I sometimes watch how the markets
7  close late at night, how they open.  Sometimes I
8  used to watch when I was more interested, how Asia
9  opened.  I was constantly following the financial.
10       Q.    Okay.  Did you engage Mr. Nemirow?
11       A.    When I received a draft copy of the
12  opinion from Brown & Wood, it was clear that it
13  was a very complicated opinion, it was very
14  extensive.  It was clear to me that I needed
15  a -- if I wanted to understand that, I needed an
16  opinion, objective review of the opinion.  I
17  didn't think I was qualified to do that by myself.
18  I needed help to fully understand the opinion.
19           Mr. Nemirow is a tax attorney, very
20  well qualified Harvard trained.  I have been in
21  the tax legal field for many years.  Was working
22  for a major firm in Denver, I think the largest
23  firm in Denver.  Talked to him for a -- felt very
24  comfortable with him and felt like he was
25  essential in my review of the opinion to

220

Carlos Sala

1
2    understand that properly.

3         Q.    What, if any, opinion did he express

4    to you as a result of his work that he did for

5    you?

6         A.    He felt that the opinion was well

7    crafted, that conclusions were reasonable and that

8    it could be relied upon.

9         Q.    How was he compensated, if at all?

10        A.    He was compensated on an hourly basis

11   and it was also attractive from a fee perspective,

12   that is that Mr. Nemirow already had some

13   familiarity with the transaction, so I didn't have

14   to pay from the very beginning in terms of getting

15   him up to speed with the transaction.  He also had

16   other clients that were invoked in the transaction

17   and we split those fees I think seven ways.

18        Q.    Did you spend time going through the

19   Brown & Wood draft opinion with him?

20        A.    I think we pretty much went through

21   every page of the opinion.

22        Q.    Did you ask him questions about it?

23             MR. GEIER:   Sorry.  Could you please

24        read back the question.

25             (The record was read.)

221

1                    Carlos Sala

2              MR. GEIER:  Can we clarify which

3        opinion?

4              MR. HALLETT:  The Brown & Wood draft

5        opinion.

6              MR. GEIER:  There are several.

7              MR. HALLETT:  Whatever Brown & Wood

8        draft opinion you reviewed with him.

9        A.    I reviewed the first --

10             MR. GEIER:  Objection.

11       A.    -- draft with him.  To the extent that

12   there were subsequent drafts, we reviewed changes

13   to the previous draft until it was finalized.

14       Q.    Did you ever put any restrictions on

15   what he could or couldn't see in connection with

16   his engagement with you regarding Deerhurst?

17       A.    No, it was full disclosure.

18       Q.    You testified that you believed one of

19   the reasons you engaged him was to obtain an

20   independent opinion.  Why did you believe he was

21   independent?

22       A.    He had no connection with Michael

23   Schwartz, Andy Kreiger and Brown & Wood, so I felt

24   he was independent of the author of the opinion.

25       Q.    Mr. Lemons, did you engage Mr. Lemons

```
 1                        Carlos Sala
 2   to perform any services in connection with
 3   Deerhurst?
 4        A.    I did.
 5        Q.    Can you recall approximately when you
 6   engaged him?
 7        A.    It was during that time frame of the
 8   fall of 2000.
 9        Q.    Do you recall what, if anything, you
10   asked him to do in connection with the engagement?
11        A.    I asked him to review the opinion and
12   to tell me if he felt that it was reasonable to
13   rely on that opinion and also to let me know if he
14   had any issues with the S Corp. structure of the
15   opinion.  He was from my references of him, to be
16   particularly knowledgeable with S Corps.
17        Q.    Where did you get that information
18   that he was knowledgeable with S corporations?
19        A.    Tracie Henderson had mentioned that to
20   me.
21        Q.    Did you receive any legal advice or
22   opinion from Mr. Lemons subsequent to the time you
23   engaged him?
24             MR. GEIER:  Objection to the form of
25        the question.
```

Carlos Sala

1

2       A.    Yes, he reviewed the opinion and after

3   his review, I had a conference call with him where

4   he expressed his opinion that the legal opinion

5   seemed reasonable, well crafted and could be

6   relied upon.

7       Q.    Did he tell you whether or not he had

8   actually read the opinion?

9       A.    Yes.

10      Q.    Did he tell you where he was when he

11  read the opinion?

12      A.    He said he was mostly on an airplane.

13      Q.    Did you receive a bill from him?

14      A.    I did.

15      Q.    What was the basis for the fee, do you

16  recall?

17      A.    It was an hourly basis and I believe

18  he charged half of his time to me and half of his

19  time to Mr. White.

20      Q.    Do you recall how much approximately

21  was paid to him?

22      A.    About 2,500 to $3,000.

23      Q.    Directing your attention to Exhibit

24  184, which I believe is also 131.  Can you

25  identify that document?

Carlos Sala

1
2    A.    Which exhibit?

3    Q.    Let's look at Exhibit 184.

4    A.    Yes, it's a bill I received from KPMG
5    dated April 17, 2001.

6    Q.    To the best of your recollection, did
7    you actually receive that bill?

8    A.    Yes.

9    Q.    Do you know whether or not you had
10   received any bills from KPMG prior to the receipt
11   of that bill dated April 17, 2001?

12   A.    This was the first bill I received
13   from them.

14   Q.    Do you recall whether or not you paid
15   any fees to KPMG prior to the receipt of that bill
16   dated April 17, 2001?

17   A.    I didn't pay them any fees prior to
18   this.

19   Q.    The amount shown on that bill is
20   $25,000?

21   A.    Yes.

22   Q.    Did you pay that amount?

23   A.    Yes.

24   Q.    Approximately do you recall when you
25   paid it?

Carlos Sala

1

2     A.    After April 17, 2001, but it would

3  have been sometime I believe in 2001.

4     Q.    During what period were the services

5  rendered for which KPMG was billing you?

6     A.    From December 1st, 2000 through April

7  15, 2001, although the bill has a typo, it says

8  April 15, 2000, but it should read April 15, 2001.

9     Q.    The bill lists some five bullet points

10  of what the bill is for.  Do you see those?

11     A.    Yes.

12     Q.    Did that comport with your

13  understanding of what you had actually engaged

14  KPMG and agreed to pay them to do?

15     A.    Yes.

16     Q.    What was your understanding as to what

17  you had engaged them to do and what you were

18  paying them for what they had done?

19          MR. GEIER:  Objection.

20     A.    You mean --

21     Q.    Yes.

22     A.    The first bullet point says

23  preparation of 2000 federal and income tax

24  projection including discussions with Goldman

25  Sachs and Morgan Stanley.  What that relates to is

Carlos Sala

1

2     at the end of the year, I would have collected the

3     results of any stocks and bonds that I would have

4     sold during the year.

5              MR. GEIER:  Objection.  Sorry, are you

6         asking him to interpret what each of the

7         provisions on the bill means?

8              MR. HALLETT:  I'm not asking him to

9         interpret it.  I'm asking him to give his

10        understanding of what he was paying for.  Do

11        you have an objection, object.

12             MR. GEIER:  I wanted to understand

13        what the question was, Darrell.  I heard

14        you, you answered me.

15        Q.    The question was what was his

16    understanding of what he was paying for.

17        A.    Five items here.  My understanding is

18    that the first item relates to quantifying what my

19    capital --

20             MR. GEIER:  Objection.

21        A.    -- gains or losses --

22             MR. GEIER:  Foundation.

23        A.    -- for the year were of stocks and

24    bond transactions.  To make sure that my losses

25    would offset my gains and to determine whether I

Carlos Sala

1
2  needed to sell some stocks to generate losses that

3  would offset any gains from transactions that

4  occurred during the year.  That's the first item.

5  Those transactions occurred through Goldman Sachs

6  and Morgan Stanley.  That's why they are listed.

7           The second bullet point preparation of

8  2001 federal and income tax projections for

9  investment planning purpose and related

10  consultations.  It means making a projection of my

11  2001 federal tax liability to determine whether it

12  made sense to purchase taxable securities or tax

13  exempt securities such as municipal bounds.

14           Third bullet point, preparation of

15  2000 federal and income tax returns, that's pretty

16  much what it says, it's just preparing those

17  returns for the year 2000.

18           The fourth bullet, form W-2 analysis

19  and related discussions regarding stock option

20  income.  That work related to comparing the W-2

21  that was issued and ensuring that the amounts

22  reported by the transfer agent when I sold the

23  stock, a Double Click stock that I held, was

24  reasonable when comparing it to the actual trades

25  that occurred through Goldman Sachs, which sold my

Carlos Sala

1
2    stock.  That was 600,000 shares being sold at
3    different prices and I wanted to ensure that that
4    was properly recorded.
5              The last bullet point, miscellaneous
6    tax advice would have covered any questions I may
7    have had regarding taxes, but there was nothing of
8    significance in that area.  That's the entire
9    bill.
10             MR. GEIER:  I renew my objection on
11        foundation and move to strike.
12        Q.    Let me refer you to what has been
13   admitted as Exhibit 119, which purports to be
14   addressed to you and states billing for
15   professional services.
16             MR. GEIER:  Do you have a copy?
17             MR. HALLETT:  I don't.
18             MR. GEIER:  Can you show me a copy.
19             MR. HALLETT:  Sure, I assumed you had
20        the exhibits.  You can stand over us if you
21        want.
22             MR. GEIER:  Let me correct, you said
23        it's been admitted.  If anything, it's been
24        identified at this point.
25             MR. HALLETT:  You are right, it's been

```
 1                      Carlos Sala

 2          identified.  It states billing for

 3          professional services rendered from June 1,

 4          2000 to November 30, 2000 commission with

 5          the following, it has a number of items.

 6             Q.    Did you ever receive that document?

 7             A.    No.

 8             Q.    Did you ever receive a bill that

 9      charged you for services from June 1, 2000 to

10      December 30, 2000?

11             A.    No.

12             Q.    Did you ever pay KPMG any sum for any

13      services rendered prior to December 1, 2000?

14             A.    No.

15             Q.    Did you ever pay KPMG any sum of money

16      for anything with respect to BLIPS?

17             A.    No.

18             Q.    Anything with respect to OPIS?

19             A.    No.

20             Q.    Anything with respect to Jones Day?

21             A.    No.

22             Q.    Anything with respect to any other tax

23      shelter?

24             A.    No.

25                   MR. GEIER:   Objection.
```

Carlos Sala

1

2     Q.    Did you ever agree to pay KPMG any

3  amount with respect to any tax shelter?

4     A.    No.

5     Q.    I'm going to show you another one,

6  which purports to be a letter dated June 30, 2000

7  identified as 115 produced by KPMG addressed to

8  you and purports to be signed by Ms. Tracie

9  Henderson.  Did you sign that document?

10     A.    No.

11     Q.    To your recollection, did you ever

12  sign an agreement with KPMG regarding BLIPS?

13     A.    No.

14     Q.    Did you ever agree to go into the

15  BLIPS transaction?

16     A.    No.

17     Q.    Did there come a point in time when

18  you terminated any consideration of the BLIPS

19  transaction?

20         MR. GEIER:  Read that, say that again.

21     Q.    Did there come a point in time when

22  you terminated any consideration of the BLIPS

23  transaction?

24     A.    Yes.

25     Q.    Do you recall approximately when that

1          Carlos Sala

2     was?

3          A.     I think it was in the third quarter of

4     2000.

5          Q.     Do you recall at that time why you

6     terminated your consideration in the BLIPS

7     transaction?

8          A.     For three reasons why I did that.  The

9     primary reason being that I never became

10    comfortable with the economic investment part of

11    the transaction investing in Argentinean pesos for

12    a short period of time.  The second reason is that

13    I requested to review documents and make changes

14    to those documents and the response I received

15    from KPMG was that I could review the documents,

16    but the documents were as they were and it would

17    be difficult for them to accept any changes and

18    that was a huge turnoff to me considering the

19    types of changes that were made to the Deerhurst

20    transactional documents.

21              And third, there was a discussion with

22    Tracie Henderson about 2000-S-44.  She felt there

23    was an issue there.  At that point, I wasn't very

24    comfortable with the first two issues, so I

25    decided not to pursue the assessment of that issue

                        Carlos Sala

1
2    and the rest of the consideration of the BLIPS

3    transaction.

4         Q.    Did you seek from anyone associated

5    with KPMG, a tax opinion regarding the Deerhurst

6    transaction?

7         A.    No.

8         Q.    Did you obtain from anyone associated

9    with KPMG, a tax opinion regarding the Deerhurst

10   transaction?

11        A.    No.

12        Q.    To your knowledge, did KPMG have

13   anything to do with the formation of Deerhurst?

14        A.    No.

15        Q.    To your knowledge, did KPMG have

16   anything to do with the tax position that was

17   formulated with respect to Deerhurst transactions?

18             MR. GEIER:   Objection.

19        A.    No.

20        Q.    Who did?

21        A.    Sorry?

22        Q.    Who did?

23        A.    Who had the --

24        Q.    Who played a role, if there is more

25   than one, let's talk about them, in formulating

Carlos Sala

1

2    the -- analyzing the tax position that would be

3    taken with respect to Deerhurst?

4         A.    Michael Schwartz was involved.

5              MR. GEIER:  Darrell, I think the

6         question is confusing.  If you want to reask

7         it, you asked him formulating the analyzing

8         the tax position.  Are you asking him about

9         formulating or analyzing it?

10             MR. HALLETT:  Good point.  Let's go

11        back to ground zero again.

12        Q.    Who, if anyone, did you have

13   discussions with regarding the tax consequences of

14   entering into transactions with Deerhurst?

15        A.    Michael Schwartz, I received an

16   opinion from Brown & Wood.  I then discussed that

17   opinion with Larry Nemirow and Bruce Lemons.

18        Q.    What, if any, discussions did you have

19   with Tracie Henderson concerning the Deerhurst

20   transaction?

21        A.    I provided her with a copy of the --

22             MR. GEIER:  Objection.  Do you want to

23        limit it to a time period or is this ever?

24             MR. HALLETT:  Let's take ever.

25        A.    I provided her with a copy of the

234

Carlos Sala

1
2   draft opinion to ensure that she would feel
3   comfortable that if the transaction did occur,
4   that she could sign a tax return.  And in
5   subsequent years, there was reporting in my tax
6   returns based on the results of operations of the
7   Deerhurst financial results and she was involved
8   in the reporting of those results in future tax
9   returns.
10      Q.    To your knowledge, did anyone
11  associated with KPMG have any involvement in the
12  implementations of the Deerhurst transactions?
13      A.    Absolutely not.
14      Q.    To your knowledge, did anyone
15  associated with KPMG have anything to do with
16  management of the Deerhurst transactions?
17      A.    Absolutely not.
18      Q.    Do you have any doubt about that as
19  far as what you know?
20      A.    None.
21      Q.    Counsel asked you if you considered
22  making foreign currency investments with Goldman
23  Sachs.  Do you recall that discussion?
24      A.    Yes, I do.
25      Q.    Did you?

1          Carlos Sala

2      A.     Goldman Sachs did not offer programs

3  for individual investors to trade currencies.

4  Goldman Sachs is mostly an institutional

5  investment bank.  They do have an asset management

6  side and a private banking side to manage assets,

7  but they don't look as a part of their business in

8  trading derivatives for individuals.

9          MR. GEIER:  Objection.  Foundation.

10      Last question.

11      Q.     What about Morgan Stanley, did you

12  ever consider having Morgan Stanley do currency

13  option trades for you?

14      A.     Morgan Stanley has a retail arm, but

15  they don't offer a similar product for individual

16  investors.

17          MR. GEIER:  Objection.  Foundation.

18      Non-responsive.

19      Q.     Refer you to what was marked today as

20  Exhibit 162.  In the second page of Exhibit 162

21  has -- what would you call those, how would you

22  describe the second page?

23      A.     Projections of the Deerhurst

24  investment program.

25      Q.     Did you make projections of the

Carlos Sala

1
2  Deerhurst investment program?

3      A.    Yes.

4      Q.    Did you make numerous projections of
5  the Deerhurst investment program?

6      A.    Yes, several scenarios.

7      Q.    Do you recall when the earliest time
8  was that you made projections regarding the
9  Deerhurst program?

10      A.    I don't recall exactly.

11      Q.    Time frame roughly?

12      A.    It would have been throughout the
13  examination of the Deerhurst program.

14      Q.    Are these calculations and these
15  numbers that appear on Exhibit 162 beginning on
16  the second page, are those your calculations?

17      A.    Well, the percentages that are listed
18  under unleveraged returns are returns that were
19  provided to me by Deerhurst.  These are averages
20  of those returns.  So I calculated by myself the
21  averages, the source, performance results, came
22  from Deerhurst.

23      Q.    Then under that, you have information
24  concerning leverage returns and we won't go
25  through the details, but various scenarios?

1                           Carlos Sala

2          A.    Yes.

3          Q.    First of all, do those reflect your

4    calculations?

5          A.    Yes.

6          Q.    Why did you make those calculations?

7          A.    Usually when you make projections, you

8    look at several possible scenarios.  And those

9    were reasonable scenarios that one could expect in

10   assessing this transaction.

11         Q.    Why did you go through the effort to

12   even do these projections and this analysis, for

13   what purpose, if any?

14         A.    To determine the possible

15   profitability of the Deerhurst investment.

16         Q.    Why did you want to know that?

17         A.    Because my primary concern with

18   Deerhurst was making money.

19         Q.    Counsel says you couldn't lose because

20   your tax benefit greatly exceeded your investment.

21   If you lost your entire investment, is that the

22   way you looked at it?

23         A.    No, there was no assurance or

24   guarantee that the tax benefits would be realized.

25   So that is not an accurate reflection of my view

```
 1                        Carlos Sala
 2   of this transaction at the time.
 3         Q.    In fact, I think you testified you
 4   were aware of 2044?
 5         A.    Yes.
 6               MR. GEIER:  Objection.  Leading.
 7         Q.    You were aware that the IRS could
 8   challenge this transaction?
 9               MR. GEIER:  Mischaracterizes.
10         A.    That's correct.
11         Q.    What, if any, understanding did you
12   have in a worse case that could happen, if
13   anything, if the IRS challenged this transaction?
14         A.    Worse case if we were to lose money on
15   the investment, that the tax benefits were
16   disallowed and I would end up losing money.
17         Q.    Other than the Deerhurst transaction,
18   have you ever entered into what you would
19   categorize as a tax shelter investment?
20         A.    No.
21         Q.    Have you ever agreed to enter into any
22   other tax shelter investment?
23         A.    No.
24         Q.    Have you ever entered into an
25   investment that you didn't believe at the time you
```

```
 1                      Carlos Sala
 2  entered into it would make money?
 3        A.    Never.
 4        Q.    Would you ever do that?
 5        A.    No.
 6              MR. GEIER:  Objection.
 7        Q.    Did you believe when you signed your
 8  2000 tax return that it was fraudulent?
 9        A.    No.
10        Q.    Do you believe today it was
11  fraudulent?
12        A.    No.
13        Q.    Why not?
14        A.    I think it accurately reflected the
15  activities of the year 2000.
16        Q.    Did you believe you were negligent
17  when you signed that tax return?
18        A.    No.
19        Q.    Do you believe today that you were
20  negligent when you signed that tax return?
21        A.    No, I was very diligent.
22        Q.    Why do you believe you weren't
23  negligent?
24              MR. GEIER:  Objection.
25        A.    I took great pain in ensuring that
```

```
 1                         Carlos Sala
 2    what was reported was accurate including the
 3    Deerhurst transaction.
 4         Q.    Do you consider yourself a person of
 5    integrity?
 6         A.    Yes.
 7         Q.    Have you ever tried to cheat another
 8    party --
 9         A.    No.
10         Q.    -- willfully?
11         A.    No.
12         Q.    Have you ever tried to cheat the
13    United States Government?
14         A.    No.
15               MR. GEIER:  Objection to the form of
16         the question.
17         Q.    Do you recall whether or not you paid
18    the interest that is in dispute in these
19    proceedings?
20         A.    I did.
21         Q.    Do you believe you owed it?
22         A.    No.
23         Q.    Why did you pay it?
24         A.    There were two reasons.  First, I
25    received a letter from the IRS, the big bold
```

Carlos Sala

1
2      letters saying if you don't pay this, we intend to
3      levy your assets.  I had my representative call
4      the IRS and tell them that I didn't owe this
5      interest according to the law.  The IRS still
6      continued to collect.  In fact, sent a collection
7      officer to my home who had no knowledge of the
8      issue at hand and claimed that I owe back taxes
9      and she was here to start collection procedures.
10     She also told my representative to -- that she was
11     looking at the assets that were listed in the
12     return to get -- in an effort to put liens to be
13     able to collect these monies.  So to stop these
14     collection efforts and only to stop the collection
15     efforts, I went ahead and paid the additional
16     interest knowing that I didn't owe it and that I
17     would then file for a refund.
18          Q.    The government has filed a declaration
19     in this proceeding stating that your Deerhurst
20     transaction is encompassed within the criminal
21     indictment in the Stein case.  Do you recall
22     seeing that?
23          A.    I did see that.
24          Q.    Do you recall when you first saw that?
25          A.    With the government's filing.

```
                              Carlos Sala
 1
 2         Q.    With the government's filing of the
 3    brief in this action?
 4         A.    Yes.
 5         Q.    And the government's filing of the
 6    brief in the opposition to refund the interest,
 7    that was assessed against you?
 8         A.    Yes.
 9         Q.    Did anyone associated with the
10    government ever contact you and tell you that you
11    were under investigation for criminal acts?
12         A.    No.
13         Q.    Did anybody ever contact you from the
14    government to say that your transaction was under
15    investigation by the United States Attorney's
16    Office in the Southern District of New York?
17              MR. GEIER:  Objection.
18         A.    No.
19         Q.    As to this date, other than reading
20    that declaration, has anyone with the government,
21    an attorney or any government agent, ever
22    contacted you and said that your transaction was
23    the subject of the criminal indictment in the
24    Stein case?
25              MR. GEIER:  Objection.
```

```
 1                    Carlos Sala

 2        A.    No.

 3        Q.    Mr. Ruble, what was the extent, if

 4   any, of your dealing with Mr. Ruble?

 5        A.    I had a discussion over the telephone

 6   with Mr. Ruble prior to hiring him to discuss the

 7   details of the Deerhurst transaction to ensure he

 8   had a good understanding of the Deerhurst

 9   transaction and to ensure that he could issue an

10   opinion associated with the transaction.  He then

11   provided me with an opinion of the Deerhurst

12   transaction.

13        Q.    Directing your attention to what has

14   been marked as Exhibit 161, which is the Brown &

15   Wood opinion dated April 16, 2001.  Directing you

16   to page 4 of that opinion, directing you to the

17   heading representations and the subheading

18   investor representations.  Do you understand that

19   investor here means you, Carlos Sala?

20        A.    Yes.

21        Q.    The opinion states that investor

22   through S Corp., entered into the trial period

23   increased leverage and fund one and fund two for

24   substantial non-tax business reasons including to

25   produce an overall economic profit from the
```

                              Carlos Sala

1

2     movement of the foreign currencies.  Do you see

3     that?

4          A.    Yes.

5          Q.    Is that a correct statement?

6          A.    Yes.

7          Q.    Did you believe that at the time?

8          A.    Yes.

9          Q.    Did you believe that Mr. Ruble was

10    making this up or was he taking it from you?

11         A.    No, he was taking it from me.

12         Q.    Secondly, it states number two, based

13    upon investor's own independent evaluation and

14    upon the investment advice of Deerhurst, investor

15    believed that by entering into fund one and fund

16    two, investor could diversify his portfolio and

17    create profits from an activity that has no

18    correlation to the major equity markets.  Is that

19    a correct statement?

20         A.    Yes.

21         Q.    What did you mean by you could

22    diversify your portfolio and create profits from

23    an activity that has no correlation to the equity

24    markets?

25         A.    It means he could allocate a portion

1                          Carlos Sala

2    of your entire portfolio into an investment clause

3    whose returns and performance would be independent

4    of the equity markets.  In other words, the

5    correlation between the results of this investment

6    versus the equity market is very low.

7              MR. GEIER:  Objection.  Foundation.

8         Q.   What, if any, view did you have as to

9    the attractiveness of the equity markets in the

10   last quarter of 2000?

11        A.   The equity market had reached some

12   very high levels.  I was very concerned that there

13   would be a major correction in the equity markets

14   and in fact, that's why I sold all of the shares

15   that I received in the Double Click transaction.

16        Q.   Did you sell those shares as soon as

17   you bid?

18        A.   I did.

19        Q.   Was there a lock-up period on those

20   shares?

21        A.   Yes, there was.

22        Q.   What does lock-up period mean for the

23   record?

24        A.   It means that you contractually agree

25   not to initiate or execute any transactions

Carlos Sala

1
2      associated with securities that you hold until a

3      certain date.

4          Q.    Do you recall when that lock-up period

5      expired for you?

6          A.    I believe it was in February 2000.

7          Q.    How long after that did you sell your

8      stock?

9          A.    Took three weeks to sell them.

10         Q.    Did you sell it as rapidly as you

11     could?

12         A.    I did.

13         Q.    Why?

14         A.    Because of my belief that especially

15     NASDAQ, which Double Click was a NASDAQ traded

16     company, was overvalued.

17         Q.    What was your investment practice

18     after February and March of 2000, particularly

19     looking at whether you invested, by equities, you

20     mean stocks?

21         A.    Yes.

22         Q.    What was your practice of investing in

23     stocks after February, March 2000?

24              MR. GEIER:   Objection.

25         A.    I went from holding over 95 percent of

```
1                    Carlos Sala

2    my net worth in equities, meaning stocks, to

3    perhaps 3 to 4 percent of my entire net worth in

4    stocks.

5         Q.    Aside from the Deerhurst investment,

6    which was roughly $9 million, without getting into

7    the detail, where was the bulk of your other money

8    invested, in what kind of investments?

9         A.    Bonds, fixed income bonds.

10        Q.    Deerhurst would you say was a more

11   risky investment than bonds?

12              MR. GEIER:   Objection.

13        A.    Yes.

14        Q.    Why were you willing to undertake the

15   additional risk of investing in Deerhurst as

16   opposed to simply investing everything in bonds?

17        A.    To obtain a substantially higher

18   return.

19        Q.    Do you recall in say the end of 2000,

20   roughly what percentage of your total investments

21   was in Deerhurst?

22        A.    This is at the end of 2000?

23        Q.    Yes, at the end of 2000.

24        A.    Roughly 15 percent or so.

25        Q.    Of your total investment?
```

1                          Carlos Sala

2          A.    Yes.

3          Q.    I take it you had your house and real

4    property if I may lead?

5          A.    Sure.

6          Q.    Some other assets?

7          A.    This is of liquid assets, yes.

8          Q.    Of investments.  Liquid assets, yes.

9    Why did you feel comfortable with having 15

10   percent of your assets invested in a riskier

11   investment than stocks and bonds?

12               MR. GEIER:  Objection to the form of

13        the question.

14         A.    I thought stocks were headed for a

15   significant correction and I thought that --

16               MR. GEIER:  Foundation.

17         A.    -- I could make a substantial return

18   with the Deerhurst currency program.

19         Q.    Let's take 2001, did you have

20   conversations with Mr. Kreiger in 2001?

21         A.    Numerous.

22         Q.    Do you recall any idea on what kind of

23   a frequency?

24         A.    Weekly basis.

25         Q.    Why did you have conversations on a

1                        Carlos Sala

2    weekly basis?

3         A.    I wanted to track the performance of

4    the Deerhurst investment.

5         Q.    Why did you want to do that?

6         A.    Because I was concerned that the

7    results were not matching my expectations of

8    substantial returns.

9         Q.    Did you continue to have discussions

10   in 2002?

11        A.    Numerous.

12        Q.    2003?

13        A.    Numerous.

14        Q.    Going back to the representations on

15   page 4 of Exhibit 161, just to close it out,

16   number 3 says, based upon the advice of Deerhurst

17   as to the probability of the funds and

18   specifically the foreign currencies reaching

19   certain levels in which the options transactions

20   would be profitable, and upon investor's own

21   independent evaluation, investor believed that

22   investor had a reasonable opportunity to earn a

23   reasonable profit in excess of all fees and

24   transactions costs from the transactions without

25   regard to tax benefits.  Is that a correct

```
                          Carlos Sala
 1
 2    statement?
 3         A.    Yes.
 4         Q.    Was that a statement that came from
 5    you?
 6         A.    Yes.
 7         Q.    You made that representation to
 8    Mr. Ruble?
 9         A.    Yes.
10         Q.    Did that representation in any way
11    relate to your forecasts?
12         A.    Yes.
13         Q.    Projections?
14         A.    Yes, my forecast anticipated
15    substantial positive returns and that statement
16    assumes the same thing.
17              MR. HALLETT:  Could I see Exhibit 1.
18              MR. GEIER:  Is there any writing on
19         the document?  I don't have any objection
20         unless it doesn't have any notes.
21              MS. FLANDERS-PALMER:  Here is the
22         clean copy from today.
23              MR. GEIER:  That's fine, as long as it
24         didn't have any notes on it, I have no
25         objection.
```

Carlos Sala

1

2      Q.    Counsel as I recall, asked you about

3 Exhibit 1.  Do you recall that?

4      A.    Yes.

5      Q.    Do you recall that counsel later asked

6 you if you could recall the name of a Woodhill

7 Partners?

8      A.    Yes, I recall when he asked that.

9      Q.    Do you recall that you weren't shown

10 any document when he asked you that question?

11     A.    I do recall that.

12     Q.    Directing your attention to page 240,

13 Bates stamp number of Exhibit 1, note one,

14 paragraph B, do you see the name Woodhill Partners

15 in that?

16     A.    Yes.  Now that I look at the document,

17 I recall the name.

18     Q.    Did you actually read that entire

19 document at the time you were considering the

20 Deerhurst transaction?

21     A.    Yes.

22     Q.    Was that a significant document to

23 you?

24     A.    Yes, it was.

25     Q.    Counsel also showed you Exhibit 167

Carlos Sala

1
2     and directed your attention to page B-11, which
3     has a question number 10, are you subject to any
4     civil, criminal or other constraint or are you
5     aware of any impediment or other reasons which may
6     preclude or limit your participation in any
7     company investment and has a box yes and a box no.
8     It shows that the box checked yes.
9          A.     That was a mistake, should have been
10    no.
11         Q.     Were you subject to any civil,
12    criminal or other constraint that might preclude
13    or limit your participation in the investment?
14         A.     No.
15         Q.     Were you subject to your knowledge, to
16    any other impediment or any other reason that
17    would preclude or limit your participation in the
18    investment?
19         A.     No.
20         Q.     It appears to be you checked yes and
21    you meant to check no?
22         A.     Correct.
23              MR. HALLETT:   Could I have five
24         minutes.   Off the record.
25              (Recess.)

1                        Carlos Sala

2              MR. HALLETT:  No further questions.

3         For the record, your time is up.

4    BY MR. GEIER:

5         Q.    Mr. Sala, what is Woodhill?

6         A.    I believe, refreshing my memory here

7    on the document, that was presented to me by

8    Mr. Durham, it's a client of -- it's a partnership

9    that was a client of Andy Kreiger from '95 to '96.

10        Q.    According to the document?

11        A.    Yes.

12        Q.    Do you have any other knowledge about

13   Woodhill?

14        A.    No, just what I read.

15        Q.    So all you know about Woodhill was

16   written on that piece of paper?

17        A.    Yes, I read this.  I read the full

18   document back when I reviewed this document back

19   six years ago.

20        Q.    Did you talk to anyone about Woodhill?

21        A.    No.

22        Q.    Did you talk to Mr. Kreiger about

23   Woodhill?

24        A.    I don't recall.

25        Q.    Mr. Sala, you looked at Exhibit 159,

```
 1                        Carlos Sala
 2    which is an October 16 e-mail and a September 15,
 3    2000 draft opinion from Brown & Wood, correct?
 4         A.    Yes, you showed it to me.
 5         Q.    You sent it along to Tracie Henderson,
 6    correct?
 7         A.    I think so.
 8         Q.    That's your e-mail, correct?
 9         A.    Yes, yes, but I'm saying yes, I mean I
10    just don't recall.  It says here that it was sent
11    from me.
12         Q.    That's your e-mail account, correct?
13         A.    Yes.
14         Q.    That was your e-mail account in 2000?
15         A.    Yes.
16         Q.    Do you recall sending it to Tracie
17    Henderson, a draft Brown & Wood opinion, correct?
18         A.    I think so.  I am sure she reviewed
19    one.
20         Q.    When you talked to Mr. Ruble, was it
21    just by telephone?
22         A.    Yes.
23         Q.    Did you say to Mr. Ruble I have some
24    representations I want to make to you?
25         A.    Not at that point.
```

1                        Carlos Sala

2        Q.    In fact, the representations were

3   already on paper in the drafts he provided you,

4   correct?

5        A.    There were some representations that

6   were not the final representations here.  So Larry

7   Nemirow and I went through the representations to

8   make sure that we could actually make those

9   representations in great detail, so we looked at

10  those very hard.

11       Q.    Mr. Ruble provided the representations

12  and you looked at what he provided you?

13       A.    Yes, but we made comments to that, we

14  changed some.

15       Q.    When we look at the April 16 letter,

16  which is Exhibit 161, take a look for instance at

17  the September 15 draft at page 3 and 4.  For

18  instance, do you see representation three on page

19  4?

20       A.    Yes.

21       Q.    Talks about investor believed that

22  investor had a reasonable opportunity to earn a

23  reasonable profit in excess of all fees and

24  transaction costs?

25       A.    Yes.

Carlos Sala

1

2      Q.     That was contained in the October 6,

3   correct, e-mail, the September 15 letter?

4      A.     Yes.

5      Q.     It was also contained in the April 16

6   opinion from Brown & Wood, correct?

7      A.     Yes, yes.

8      Q.     My point here is, you didn't sit down

9   here with Mr. Ruble and make these representations

10  with Mr. Ruble, correct?

11     A.     We negotiated the representations to

12  make sure I was comfortable in making these

13  representations.

14     Q.     You didn't do that with Mr. Ruble?

15     A.     My attorney did.

16     Q.     You weren't part of those

17  conversations with Mr. Ruble and Mr. Nemirow?

18     A.     Indirectly -- with Mr. Nemirow

19  absolutely.  Mr. Nemirow and I discussed them in

20  great detail.

21     Q.     Mr. Ruble and you?

22     A.     No, no.

23     Q.     Many of the representations contained

24  in the September 15 letter in one form or another,

25  wound up in the final opinion letter that you had,

Carlos Sala

1
2    correct?
3        A.    I haven't compared them, but I'm sure
4    that many of them did.
5        Q.    Who referred you to Mr. Nemirow,
6    Ms. Henderson or Mr. Schwartz?
7        A.    It wasn't Tracie Henderson.  It
8    probably was Mr. Schwartz.
9        Q.    Mr. Schwartz knew that Mr. Nemirow was
10   already familiar with the transaction?
11       A.    I believe so.
12       Q.    He told you that?
13       A.    I believe so.
14       Q.    You believe that he communicated to
15   you that Mr. Nemirow already knew about this
16   transaction?
17       A.    I believe so.
18       Q.    He communicated to you that
19   Mr. Schwartz -- that Mr. Nemirow had clients that
20   were going to participate in the transaction?
21       A.    I believe so.
22       Q.    When you retained Mr. Nemirow to
23   review the transaction, you knew going in that
24   Mr. Nemirow already had a favorable opinion of the
25   transaction; isn't that correct?

```
 1                    Carlos Sala
 2       A.     Not true at all.
 3              MR. HALLETT:  You don't need to shout
 4       and wave your finger and sneer.  Have some
 5       courtesy.
 6              MR. GEIER:  For the record, I totally
 7       absolutely disagree with your
 8       characterizations of that.  For this record,
 9       I find that to be reprehensible, I was
10       gesturing with my hands to make a point.  I
11       was doing nothing untoward and I think your
12       characterization at this late hour is
13       ridiculous.
14       A.     The answer is no.
15       Q.     You knew Mr. Nemirow already reviewed
16  the transaction?
17       A.     Mr. Nemirow.
18       Q.     Did you already know?
19  RQ            DIMR. HALLETT:  No, no, no.  He is
20       not going to answer.
21              MR. GEIER:  Don't put your finger in
22       my face.
23              MR. HALLETT:  Instructing him not to
24       answer.  Unless you let him answer the
25       question, you are not going to cut him off.
```

Carlos Sala

1
2    Could you please read back the question.

3         MR. GEIER:  Withdrawn.

4    Q.    Mr. Sala, you knew that Mr. Nemirow

5    had already reviewed the transaction prior to

6    retaining him, correct?

7    A.    That's --

8         MR. HALLETT:  Let him answer.

9         MR. GEIER:  You are the only one that

10        spoke, Darrell.  If you could let your

11        client answer the question.

12        MR. HALLETT:  You are overextending

13        your stay.  You are over your time.  You can

14        answer the question.

15   A.    I knew he was starting to review the

16   transaction.

17   Q.    You knew that Mr. Schwartz had an

18   interest in the transaction in that he wanted you

19   to participate in the transaction, correct?

20   A.    Mr. Schwartz did.

21   Q.    He stood to financially gain from your

22   participation in the transaction?

23   A.    Mr. Schwartz did.

24   Q.    That's right.  So instead of going to

25   someone independent to refer you to an attorney,

1                          Carlos Sala

2    you went to Mr. Schwartz, correct?

3              MR. HALLETT:  Objection.  You are

4         arguing with the witness.

5         A.    Not correct.  I asked a number of

6    people to give me references of people that I

7    could hire, Tracie Henderson being one of them,

8    she mentioned Bruce Lemons, Schwartz I believe,

9    and he mentioned Larry Nemirow.  By the way, when

10   I got to Larry Nemirow, his knowledge of the

11   transaction was significantly more limited than

12   when I got involved.  I was the one that pushed

13   Larry Nemirow into getting into a lot of details

14   into this transaction.  Prior to that, his

15   knowledge of the transaction was severely more

16   limited.

17        Q.    You went to Mr. Schwartz for a

18   recommendation for what attorney should look at

19   the transaction?

20        A.    It was one of a number of sources.

21        Q.    Did anyone else tell you to go to

22   Larry Nemirow other than Mr. Schwartz?

23        A.    No.

24        Q.    Just Mr. Schwartz?

25        A.    Yes.

1                    Carlos Sala

2        Q.    Mr. Schwartz was the promoter of the

3   transaction in your estimation, correct?

4        A.    He was the tax advisor on the

5   transaction.

6        Q.    You weren't looking for someone who

7   had no connection to the transaction or to

8   Mr. Schwartz, correct?

9        A.    I was.

10       Q.    You were?

11       A.    Yes.

12       Q.    In the past, had you dealt with any

13  attorneys or law firms other than Mr. Nemirow?

14            MR. HALLETT:   You mean in his entire

15       history had he dealt with any other lawyers

16       or law firms?

17       Q.    In Colorado.

18       A.    Mulholland and Bruce Lemons.

19       Q.    What other lawyer did Mr. Schwartz

20  recommend other than Mr. Nemirow?

21       A.    I believe he recommended Becky

22  Cantley.

23       Q.    You understand that Mr. Cantley

24  invested in the transaction, didn't you?

25       A.    Listen to his deposition.  I didn't

1                    Carlos Sala

2  know it at the time.

3        Q.    Looking back now, you realized that

4  Mr. Schwartz wasn't giving you independent advice?

5        A.    I don't believe that's true.

6        Q.    You believed it was independent?

7        A.    I believe that recommending Mr.

8  Nemirow it was a good source.

9        Q.    How many clients did you understand

10 that Mr. Nemirow had that was looking at this

11 transaction in addition to you and Mr. White?

12       A.    And Mr. Dice at the time.  Four I

13 believe.  Larry Nemirow is clearly independent of

14 Schwartz.

15       Q.    Did you ever go to Goldman Sachs and

16 your representatives there and ask them about

17 opportunities to invest in foreign currencies?

18       A.    We talked about opportunities of

19 investing in derivatives and they refused.

20       Q.    Did you ever ask them about

21 investments in foreign currencies, do you mean

22 derivatives, you mean options?

23       A.    Option -- well, options on

24 commodities, which foreign currency would have

25 been one of them.

Carlos Sala

1

2      Q.    Did you ask them specifically about

3  foreign currency and foreign currency options

4  specifically, Mr. Sala?

5      A.    Not specifically foreign currencies.

6      Q.    Did you provide Mr. Ruble with any

7  documents about the transaction you provided him?

8      A.    I don't recall if I provided any

9  documents through my attorney.

10      Q.    Do you recall telling your attorney to

11  provide Mr. Ruble certain documents?

12      A.    I don't recall.

13      Q.    Do you recall asking Mr. Ruble what

14  documents he had that described the transaction?

15      A.    I recall that he was already familiar

16  with the transaction.

17           MR. GEIER:    That wasn't my question.

18      Could you please read back the question.

19           (The record was read.)

20      A.    I don't recall.    Might have.

21      Q.    Do you have a recollection of doing

22  that?

23      A.    I don't recall.

24      Q.    Do you recall ever sending Mr. Ruble

25  the marketing materials that we looked at today

```
 1                        Carlos Sala
 2   that you outline the steps of the transaction?
 3        A.    I don't recall.
 4        Q.    Do you recall ever discussing those
 5   documents with him?
 6        A.    That specific document?
 7        Q.    Those documents that we looked at
 8   today.
 9        A.    I don't recall, I don't recall.
10        Q.    Do you recall asking him how he
11   acquired information about the transaction?
12        A.    I don't recall asking him that.
13        Q.    When did you start working with KPMG
14   as your advisor?
15        A.    As my tax accountants?
16        Q.    As an advisor.
17        A.    I believe in 2000 and I don't know,
18   somewhere in 2000, the second half of 2000.
19        Q.    Do you recall seeking tax advice from
20   Tracie Henderson in 1999?
21        A.    In '99, no.
22        Q.    Do you recall the e-mail we looked at
23   today reflects that you did?
24        A.    I don't recall that I had a discussion
25   with her about 280 G, the document says that I
```

```
 1                      Carlos Sala
 2    don't recall receiving advice back from her on
 3    that in '99.  I don't recall that at all, so I
 4    don't recall her giving me advice in '99.
 5         Q.    Do you think that Tracie's e-mail to
 6    you is incorrect?
 7         A.    I'm not saying it's incorrect.  I just
 8    don't recall it.
 9              MR. HALLETT:  We are covering ground
10         way over your allotted time.
11              MR. GEIER:  Cross examination almost
12         done.  Just relax.
13              MR. HALLETT:  I'm not unrelaxed.  Time
14         limits are time limits.  We could go on all
15         night.  That's why we have time limits.
16         Make the point and the objection, you are
17         treading through things that have already
18         been asked and answered and arguing.
19              MR. GEIER:  I will try to conclude
20         expeditiously.  You are repeating yourself.
21         I'm just about at the end, I am letting you
22         know as a courtesy.
23              MR. HALLETT:  For the record, it's
24         5:40.
25              MR. GEIER:  I don't have a watch.  My
```

1                          Carlos Sala

2        Blackberry says it's 5:37, so I disagree.

3        No further questions at this time.   Thank

4        you for accommodating.

5                (Time noted:   5:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1

2      C E R T I F I C A T E

3      STATE OF NEW YORK        )

4                              : ss.

5      COUNTY OF QUEENS         )

6

7              I, ELISABETH F. NASON, a Notary

8      Public within and for the State of New

9      York, do hereby certify:

10             That _____, the witness

11     whose deposition is hereinbefore set

12     forth, was duly sworn by me and that

13     such deposition is a true record of the

14     testimony given by the witness.

15             I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage, and that I

18     am in no way interested in the outcome

19     of this matter.

20             IN WITNESS WHEREOF, I have

21     hereunto set my hand this 28 day of

22     November, 2006.

23

24     _____

25             ELISABETH F. NASON