# EXHIBIT 8

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3                              - - -

4

CARLOS E. SALA and                )
5    TINA ZANOLINI SALA,           )
                                   )        Case No:
6              Plaintiffs,         )        05-CV-00636-LTB-OES
                                   )
7    vs.                           )
                                   )
8    UNITED STATES OF AMERICA      )
                                   )
9              Defendant.          )
     ------------------------------

10

11                                      **CERTIFIED COPY**

12

13

14                        THE DEPOSITION OF

15                        LAURENCE NEMIROW

16                        DENVER, COLORADO

17                        SEPTEMBER 14, 2006

18

19

20

21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY:  MARTHA H. BENNETT
25   FILE NO.:  A007B17

1     all through.  I don't know.

2           Q.    With regards to this Deerhurst transaction,

3     did Sala, White, or Dice ask you why there was an S Corp

4     involved?

5           A.    I don't remember.

6           Q.    Did you think, in your review of the

7     transaction, that an S Corp was necessary to the transaction?

8           A.    I don't remember what I thought about that.

9           Q.    But you do remember analyzing it; correct?

10          A.    Yes.

11          Q.    Can you quantity for us the amount of time you

12    spent analyzing this transaction?

13          A.    No.  I can quantify other things, but not

14    that.

15          Q.    What could you quantify?

16          A.    How much time I spent on the transaction.

17          Q.    How much time did you spend on the

18    transaction?

19          A.    Approximately 90 hours.

20          Q.    Was this 90 hours -- can you tell me from when

21    to when you believe this 90 hours was?

22          A.    Probably from October 2000 through April 15,

23    2001.

24          Q.    This 90 hours -- did that only consist of the

25    time you spent working on the deal for Mr. Sala, or other

1    transaction.

2            Q.    I'm sorry; you'll have to clarify that answer.

3            A.    He was looking for representation in the

4    transaction.

5            Q.    For purposes of entry into the transaction?

6            A.    Correct.

7            Q.    Is that the role that you filled subsequently?

8            A.    Yes.

9            Q.    So the contact with Wilke Farr was before you

10   came onto the scene in this transaction?

11           A.    Correct.

12           Q.    Do you know whether Wilke Farr accepted him as

13   a client for purposes of analyzing this transaction?

14           A.    I don't believe so.

15           Q.    Do you know why they didn't?

16           A.    I think they didn't like the transaction,

17   because it was close to this Notice 2000-44.

18           Q.    How did you come by that knowledge?

19           A.    Carlos told me.

20           Q.    When did Carlos tell you this?

21           A.    At the outset of my engagement.

22           Q.    Did he tell you this before he was being

23   represented by you?

24           A.    Yes.

25           Q.    What was your reaction to that news?

1          A.     I don't generally put my clients in touch with

2     deal makers.

3          Q.     Why is that?

4          A.     I just take deals as I find them.   That's how

5     I practice.

6          Q.     Are you saying you just deal with what comes

7     across your table?

8          A.     Yes.

9          Q.     So if these transactions come in the door, you

10    may or may not handle them?

11         A.     By "these transactions"?

12         Q.     Loss-generating transactions of the Deerhurst

13    type, tax shelters.

14         I guess the question I'm asking you is:   Your

15    practice does not involve seeking out tax shelters for your

16    clients; is that correct?

17         A.     Never.

18         Q.     Have you put a client into a listed

19    transaction?

20         A.     No.

21         Q.     To your knowledge, have any of your clients

22    ever participated in a listed transaction?

23         A.     Yes.

24         Q.     Did they come to you with these transactions?

25         MR. HALLETT:   I'm sorry, Counsel, I have to object

1    as ambiguous.  I don't understand what transactions we're

2    referring to.

3            MR. JANIK:  We're still referring to listed

4    transactions.

5            Q.    (By Mr. Janik)  At the time you were working

6    with your clients on these transactions, were they listed?

7            A.    I'm not sure I said I was working with these

8    clients on these transactions.  You asked me whether my

9    clients had ever done a listed transaction, and I said yes.

10           Q.    Do you have any involvement with them getting

11   into a listed transaction?

12           A.    Once.

13           Q.    And at the time that you were involved with

14   them getting into it, was the transaction at that time a

15   listed transaction?

16           A.    No, not apart from the Deerhurst transaction.

17           Q.    It was subsequently listed?

18           A.    Correct.

19           Q.    Did you believe that the Deerhurst transaction

20   was a listed transaction?

21           A.    I don't know what the word "listed"

22   technically means.

23           Q.    Did you believe that Notice 2000-44 applied to

24   the Deerhurst transaction?

25           A.    Yes.

```
 1          Q.    Why is that?

 2          A.    Because I think it dealt with substantially

 3     similar transactions.

 4          Q.    Yet you still advised Mr. Sala to go forward

 5     with the transaction?

 6          A.    No.

 7          Q.    You did not?

 8          A.    I didn't advise him to go forward with the

 9     transaction.

10          Q.    Did you advise Mr. Sala not to go forward with

11     the transaction?

12          A.    No.

13          Q.    Did you provide him any advice either way on

14     entering into this transaction?

15          A.    Quite possibly, but I don't remember.

16          Q.    Did you caution Mr. Sala that you believed the

17     Deerhurst transaction fell within Notice 2000-44?

18          A.    Yes.

19          Q.    What did you say to him?

20          A.    I said that the IRS would likely challenge the

21     transaction.

22          Q.    What was his response?

23          A.    I don't recall.

24          Q.    Did he seem concerned?

25          A.    I don't recall.
```

1          MR. JANIK:   This is Brown & Wood; I recognize that.

2     We're comparing the other --

3          MR. HALLETT:   I'm confused.   I thought the draft you

4     handed him was the Brown & Wood draft, with his notes on it.

5          (Exhibit 105 marked for identification.)

6          Q.    (By Mr. Janik)   Have you ever seen this

7     document before?

8          A.    Maybe.   I don't remember specifically; it's

9     possible.   It looks like it came from my files, so I probably

10    did.

11         Q.    This memorandum is dated September 26, 2000 --

12    the Rosenman & Colin is referred to as the "memorandum."   So

13    the opinion letter would be the memorandum.

14         A.    Correct.

15         Q.    Do you remember whether you were aware of the

16    memorandum at the time that you circled the "overall opinion"

17    on the Brown & Wood opinion?

18         A.    No, I don't know.

19         Q.    All right.   Let's just walk through your

20    comments on No. 104.

21         A.    Okay.

22         Q.    Let's just start at the top of the page.

23         A.    Okay.

24         Q.    To the right of "overall opinion," do you know

25    what that says next to it?

1          A.     "What events could undermine opinion?"

2          Q.     Were you speaking only from a penalties

3     purpose at this point, or were you looking at the whole

4     transaction at this time?

5          A.     I had a concern that you couldn't opine on a

6     transaction that hadn't occurred yet, and so how would you

7     know that the transaction would unfold in a way that would

8     lend itself to the opinion?  So that was my concern.

9          Q.     What conclusion did you come to?

10         A.     It was a question.  It wasn't a conclusion; it

11    was a question I would probably have asked the opinion

12    author.

13         Q.     Did you ask that question?

14         A.     I don't recall.  I must have, because I

15    wouldn't have written it down.

16         Q.     Do you recall the answer, then?

17         A.     No, but I recall what I did about it.

18         Q.     What did you do about it?

19         A.     I worked on an agreement which would have

20    allowed Carlos to withdraw his money from Deerhurst free of

21    any withdrawal fees if an opinion wasn't forthcoming from

22    Brown & Wood.

23         Q.     Forthcoming at what point in time?  After he

24    entered the transaction?

25         A.     Yes.

1   whether a pre-tax profit or a post-tax profit ought to be

2   made?

3          A.    I think we were looking for a profit.  I think

4   we believed that we would prefer to have a profit motive that

5   was pre-tax and post-tax.

6          Q.    All right.

7          A.    But I think also a profit motive that exceeded

8   the potential for losses that the transaction would create.

9          Q.    At the end of five years, there was to be a

10  return of capital and investment gain; am I correct?

11         A.    Yes.

12         Q.    Was there ever any discussion of sheltering

13  the income made on the transaction if he pulled out of the

14  transaction at that point?

15         A.    You mean, to which I was a party?

16         Q.    Yes.

17         A.    No.

18         Q.    To which you have knowledge of?

19         A.    No.

20         Q.    Did Mr. Sala ever discuss that possibility

21  with you in 2000?

22         A.    No.

23         Q.    Did you discuss that with him?

24         A.    No.

25         Q.    Did you discuss that with Tony White?

```
 1              A.      I don't recall discussing that.

 2              Q.      Did you discuss it with Mr. Dice?

 3              A.      No, I don't recall.

 4              Q.      Can you help me understand the relative role

 5      that Mr. Sala, Mr. White, and Mr. Dice played with regards to

 6      interacting with you as to your work on this deal?

 7              A.      I tended to interact more with Carlos than

 8      with Mr. White or Mr. Dice.

 9              Q.      Were there any particular issues or questions

10      that you would turn to one or the other to discuss?

11              A.      Carlos was very much into the entire deal.  I

12      just spent a lot of time with Carlos on every aspect of the

13      transaction.

14              Q.      What about Mr. White?

15              A.      Less so with Mr. White and Mr. Dice.

16              Q.      Did Mr. Sala raise any concerns with the

17      transaction to you?

18              A.      I don't recall.  I'm sure he did.  He raised

19      concerns about various aspects of the transaction, having to

20      do with things like the size of the management fee and the

21      general partners' cut of the profits, and how they were

22      worded.

23              Q.      Was this pre-entry or post-entry?

24              A.      It was pre-entry.

25              Q.      What did you do to resolve those issues?
```

1                A.    We read the transaction documents together and

2    commented on them.

3                Q.    And you negotiated better terms; am I correct?

4    Different terms?

5                A.    Better terms, probably.

6                Q.    Do you recall what any of those terms were?

7                A.    Actually, Carlos negotiated most of the better

8    terms, and I tended to clarify the actual language in the

9    document.  But Carlos was the front person for negotiating

10   the economic terms.

11               Q.    Can you identify an economic term that Mr.

12   Sala negotiated?

13               A.    I believe we got a management fee that was

14   smaller than the other management fees paid by the other

15   investors.

16               Q.    What about a performance-based fee?  Did he

17   negotiate a different --

18               A.    I think he negotiated a different

19   performance-based fee.

20               Q.    Do you know what the management fee and

21   performance-based fee were as the transaction was designed?

22               A.    For other investors, it was 2 percent for

23   management fee times what they call the trading size, which

24   they took to be 400 percent of the net asset value.  So it

25   would have been 2 percent of 400 percent -- or 80 percent --

```
 1    moment here.

 2              A.     (Reading.)

 3              Q.     My question to you is whether or not Page 110

 4    contains the standards that you applied for the purposes of

 5    determining whether or not there were penalties protection?

 6              MR. JANIK:   Foundation.

 7              A.     Yes.

 8              Q.     (By Mr. Hallett)   For example, I'm looking at

 9    Page 110, and this is a citation from the Treasury

10    Regulations.   Are those the Treasury Regulations that you

11    referred to that provided the standards that you applied?

12              MR. JANIK:   Objection; foundation.

13              A.     Correct.

14              Q.     (By Mr. Hallett)   And No. 1 says, "The opinion

15    was based on all pertinent facts and circumstances including

16    the taxpayer's purposes (and the relative weight of such

17    purposes) for entering into the transaction and for

18    structuring the transaction in a particular manner.   In

19    addition, reliance on the opinion should not be considered

20    reasonable if the taxpayer fails to disclose a fact that it

21    knows or should know to be relevant to the proper treatment

22    of the item."

23              Do you see that?

24              MR. JANIK:   Form.

25              A.     Uh-huh.
```

1          Q.     (By Mr. Hallett)  In your review of the Brown

2     &  Wood opinion, did you inquire and make an analysis to

3     determine whether or not it met this standard?

4               MR. JANIK:  Foundation.

5               A.    I thought it met the standard.

6               Q.     (By Mr. Hallett)  And did you make any

7     inquiries and make an analysis to determine whether or not it

8     did meet that standard?

9               MR. JANIK:  Foundation.

10              A.    Yes.

11              Q.     (By Mr. Hallett) And for foundation purposes,

12    let me ask you, if I didn't:  Did you read every page of

13    Exhibit 110?

14              A.    Yes.

15              Q.     And did you read it on or about April 16,

16    2001?

17              MR. JANIK:  Foundation.

18              A.    I read it on or prior to April 16, 2001.  And

19    I would subtract the changes as they accumulated, and I

20    didn't necessarily reread every page every time a new draft

21    of the opinion was issued.

22              Q.     (By Mr. Hallett)  Back to Exhibit 110, Page

23    110, and the small "ii," it says, "The opinion was based on

24    the law as it relates to those facts and circumstances."

25              Do you see that?

149

1      A.    Yes.

2      Q.    Did you apply that standard?

3      A.    I did.

4      Q.    And did you make an effort to determine if the

5  law that was cited and discussed in the opinion related to

6  the facts and circumstances that were cited and discussed in

7  the opinion?

8      MR. JANIK:   Form; foundation.

9      A.    Yes.

10     Q.    (By Mr. Hallett)  And the third one says, "The

11 opinion was not based on any unreasonable factual or legal

12 assumptions (including assumptions as to future event)."

13     Is that another standard which you applied?

14     MR. JANIK:   Foundation.

15     A.    Yes.

16     Q.    (By Mr. Hallett)  In reading the drafts of the

17 opinion and the final opinion, which is Exhibit 110, did you

18 attempt to determine whether or not the factual and legal

19 assumptions were reasonable factual and legal assumptions?

20     MR. JANIK:   Form, foundation.

21     A.    Yes, I tried to do that.

22     Q.    (By Mr. Hallett)  Okay.  And 4 on Page 110,

23 "The opinion did not unreasonably rely upon the

24 representations, statements, findings or agreements of the

25 taxpayer for any other person.  For example, the opinion must

1    not be based upon a representation or assumption that the

2    taxpayer knows or has reason to know is unlikely to be true."

3            Do you see that?

4            MR. JANIK:   Form.

5            A.    Yes, I see that.

6            Q.    (By Mr. Hallett)   In your review and analysis

7    and advice to Mr. Sala, did you attempt to determine whether

8    that standard was met?

9            MR. JANIK:   Foundation.

10           A.    Yes, I did.

11           Q.    What was your determination as to whether or

12   not that standard was met?

13           A.    I thought it was likely met.

14           Q.    (By Mr. Hallett)   Now I want to turn to Page 4

15   of Exhibit 110.  And I want you to also turn to Page 3 of

16   Exhibit 104.  I'd ask you to take a moment, and please take

17   your time, and look at -- this is under the heading on 104

18   "Investor Representations."  It's the same heading on 110,

19   "Investor Representations."

20           Do you see where I'm looking at?

21           A.    Yes.

22           Q.    And on 104, there are some nine subparagraphs

23   under "Investor Representations," and in Exhibit 110, there

24   are some 15 subparagraphs.

25           A.    There are actually 15 on 104, and 18 on 110.

1          Q.     I'm sorry; you're right.  So there's 15 on 104

2     and 18 on 110.

3          A.     Right.

4          Q.     Looking at that, do you see 104, which is the

5     draft of the opinion that you reviewed -- under "Investor

6     Representations," do any of those representations differ from

7     the "Investor Representations" that you see on Exhibit 110?

8          MR. JANIK:  Form; foundation.

9          A.     Yes, there are various differences.

10         Q.     (By Mr. Hallett)  Okay.  And do you see some

11    additional representations that are made on Exhibit 110 that

12    were not made on 104?

13         A.     Yes.

14         Q.     Did you spend any time discussing with Mr.

15    Sala the investor representations that are covered in Exhibit

16    104?

17         MR. JANIK:  Asked and answered.

18         A.     Yes.

19         Q.     (By Mr. Hallett)  For example, do you have any

20    idea how much time you spent with Mr. Sala in discussing the

21    investor representations?

22         MR. JANIK:  Calls for speculation.

23         A.     It was a significant amount of time, but I

24    don't know how much time.

25         Q.     (By Mr. Hallett)  What do you mean by "a

1    significant amount of time"?

2              A.    It was hours.

3              MR. JANIK:  Calls for speculation.

4              Q.    (By Mr. Hallett)  For example, on Exhibit 110,

5    it states as follows:  "Investor, through S Corp, entered

6    into the trial period, increased leverage, and Fund 1 and

7    Fund II for substantial non-tax business reasons, including

8    to produce an overall economic profit from the movement of

9    foreign currencies."

10             Did you discuss that representation with Mr. Sala?

11             MR. JANIK:   Foundation.

12             A.    Yes.

13             Q.    (By Mr. Hallett)  Did you advise Mr. Sala as

14   to whether the final form of that representation that appears

15   in Exhibit 110, from the information he provided you and any

16   other information you obtained, was a fair and accurate

17   representation?

18             A.    No, I would have relied on Carlos for that.

19   We would have discussed it together.  I wouldn't have told

20   him whether it was fair and accurate.  I wasn't making the

21   reps; he was.

22             Q.    No, I'm sorry.  Your point is well taken; I

23   misstated.  I'm not asking whether you determined that the

24   transaction was invested in for substantial non-tax business

25   reasons to produce this overall economic profit; I'm asking

1    whether you made inquiry of Mr. Sala that he was satisfied

2    that those were his representations.

3         A.    Yes.

4         Q.    And based on the information that you received

5    from Mr. Sala, you concluded that it was a fair and accurate

6    representation?

7         MR. JANIK:    Foundation; form.

8         A.    Yes.

9         Q.    (By Mr. Hallett)    Okay.   No. 2 states, "Based

10   upon investor's own independent evaluation and upon the

11   advice of Deerhurst, investor believed that by entering into

12   Fund I and Fund II, investor could diversity his portfolio,

13   and create profits from an activity that has no correlation

14   to the major equity markets."

15        Did you discuss that representation with Mr. Sala?

16        A.    Yes, I did.

17        Q.    Did Mr. Sala state to you what, if any, due

18   diligence he had done to examine the economics and

19   profitability, if any, of the Deerhurst transaction?

20        MR. JANIK:    Foundation.

21        A.    Yes, he did.

22        Q.    (By Mr. Hallett)    What did he tell you?

23        A.    I don't remember precisely what he did, but I

24   know he spent a lot of time talking to the principals at

25   Deerhurst, going out there and meeting with them and

1    reviewing their historical transactions.  By the way, he was

2    much better at that than I would have been.  He's much more

3    financially oriented.

4            MR. JANIK:  Objection.

5            Q.   (By Mr. Hallett)  Did he tell you that -- what

6    you just told us -- that he spent a considerable amount of

7    time doing due diligence to investigate the economics of the

8    transactions?

9            MR. JANIK:  Objection; foundation; misstates his

10   testimony.

11           A.   Yes.

12           Q.   (By Mr. Hallett)  And do you recall whether or

13   not he ever told you that he had himself, based on whatever

14   information he had, made projections as to what he expected

15   as to the profitability, if any, of the Deerhurst

16   transaction?

17           MR. JANIK:  Objection; leading; form; foundation.

18           A.   I think he did.

19           MR. HALLETT:  And you'll have to let him get all of

20   his objections out before you answer.

21           MR. JANIK:  Just a half second more.

22           Q.   (By Mr. Hallett)  Your answer to my question

23   was, "I think he did"?

24           A.   I think he did, yes.

25           Q.   And the next representation is, "Based upon

1    advice of Deerhurst as to the profitability of the funds, and

2    specifically the foreign currencies reaching certain levels

3    at which the options transactions would be profitable, and

4    upon investor's own independent evaluation, investor believed

5    that investor had a reasonable opportunity to earn a

6    reasonable profit, in excess of all fees and transaction

7    costs, from the transactions, without regard to tax

8    benefits."

9             A.    There's no doubt in my mind that Carlos

10   believed that to be true, based upon his due diligence.

11            Q.    And based on his discussions with you as to

12   what he did by way of due diligence?

13            MR. JANIK:   Objection; leading; form.

14            A.    Based on what he told me, he was excited about

15   this investment as an economic investment.

16            Q.    (By Mr. Hallett)   Your observation was that he

17   was excited?

18            A.    That he really liked it, yeah.   He thought

19   that these people knew what they were doing, and he thought

20   he stood a realistic chance at doing well in the investment.

21            Q.    Did he tell you he was excited about the tax

22   loss?

23            MR. JANIK:   Objection; foundation; form.

24            A.    I don't recall.

25            Q.    (By Mr. Hallett)   Did he tell you he was

1    excited about the profitability of it, aside from the tax

2    loss?

3            MR. JANIK:   Objection; foundation.

4            A.    I don't know if he used the word "excited."

5            Q.    (By Mr. Hallett)  Was it your observation,

6    from his statements to you, that he was excited?

7            A.    My observation was that he was persuaded that

8    this was a good investment.

9            Q.    Directing your attention to Page 78 of Exhibit

10   110, do you see the headings on that exhibit, "Notice

11   2000-44," and subheadings after that?

12           A.    Yes, I do.

13           Q.    Before this opinion was issued on April 16,

14   2001, did you read every page of the ensuing pages regarding

15   Notice 2000-44?

16           MR. JANIK:   Form; foundation.  I don't understand

17   what the question is.

18           MR. HALLETT:   Well, we'll make another crack at it.

19           MR. JANIK:   Thank you.

20           Q.    (By Mr. Hallett)  Prior to April 16, 2001, did

21   you read the portion -- I think you testified you read every

22   page.  But I want to ask you specifically:  Did you read the

23   portion of this opinion that analyzes and discusses the

24   significance, if any, of Notice 2000-44?

25           MR. JANIK:   Asked and answered.

1          Q.    (By Mr. Hallett) Did you read it?

2          A.    Yes.

3          Q.    And did you read every page?

4          A.    I read every page.

5          Q.    Did you attempt to understand the analysis and

6    the authorities that are stated on those pages?

7          A.    I did.

8          MR. JANIK:  Objection; leading.

9          Q.    (By Mr. Hallett)  Did you reach at the time

10   any conclusions as to whether or not the conclusions reached

11   in the opinion regarding Notice 2000-44 were reasonable

12   conclusions?

13         MR. JANIK:  Objection; form and compound.

14         A.    I think I reached the conclusion that it was a

15   reasonable discussion.

16         MR. JANIK:  Speculation.

17         Q.    (By Mr. Hallett)  Can you just tell us what

18   you recall was Mr. Ruble's analysis of the significance, if

19   any, to his tax opinion of Notice 2000-44?

20         MR. JANIK:  Objection; form; foundation; calls for

21   speculation.

22         A.    The opinion discusses the weight that a court

23   would give to a notice in this situation, and casts doubt on

24   whether the notice would be given any binding precedencial

25   authority.  It shows various reasons for reaching that

1    conclusion.

2            Q.    (By Mr. Hallett)   Does it discuss anything

3    else, beyond whether or not there was authority and what

4    authority Notice 2000-44 has?

5            MR. JANIK:   Objection; leading.

6            A.    I think there were various ways of attacking

7    the question of what weight would be accorded to an IRS

8    notice.

9            Q.    (By Mr. Hallett)   Did you obtain any materials

10   regarding Notice 2000-44 independent of the analysis in

11   Mr. Ruble's opinion?

12           A.    I read commentary on Notice 2000-44.

13           Q.    Do you recall what commentary you read?

14           A.    It's the woman who writes Tax Notes; I

15   remember that.

16           Q.    That would be Ms. Lee Shepard, the infamous

17   Lee Shepard.

18           A.    Yes.

19           Q.    Did you read that and analyze it in connection

20   with your review of Mr. Ruble's analysis of Notice 2000-44?

21           A.    I don't recall whether I did or not.

22           MR. JANIK:   Objection; speculation.

23           Q.    (By Mr. Hallett)   You testified, I think,

24   concerning knowledge that Mr. Sala negotiated an arrangement

25   regarding fees with Deerhurst -- fees that he would be