# EXHIBIT 15

# Pt. I

# B R O W N  &  W O O D LLP

ONE WORLD TRADE CENTER
NEW YORK, NY 10048-0557
TELEPHONE: 212-839-5300
FACSIMILE: 212-839-5599

April 16, 2001

Mr. Carlos Sala
2424 Ginny Way
Lafayette, CO   80026

Dear Mr. Sala:

Re: **Investments in Foreign Currency**

You ("Investor") have requested our opinion regarding certain U.S. federal income tax consequences of various investment transactions ("Transactions"), described more fully below, that Investor has made in foreign currency and foreign currency derivatives, such as options, directly and indirectly through Deerhurst Management, Inc. ("Deerhurst").

## I.    Summary of the Transactions

### A.    Trial Account

On October 23, 2000, Investor established a trial account with Deerhurst for the purpose of evaluating a long-term investment with that firm. Deerhurst is one of the leading foreign currency management firms in the country. Based in Fort Lee, New Jersey, Deerhurst has been in operation since 1991 and has a historical profitability of 18.2 % after fees on an unleveraged basis.

Historically, Deerhurst invested monies via separate managed accounts for investors. They required a minimum investment of $5 million per account in order to execute transactions with a high enough nominal value to be economical both for the investor and for Deerhurst. In order to increase the monies under management, they have decided to reduce the investment

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 2

minimum per investor so long as the investor is willing to place their account in Deerhurst
Trading Strategies LLC, a fund that will commingle these investments, as described below. The
first step in this process is the formation of the trial account.

The trial account is formed to introduce the investor to Deerhurst's trading strategy.
Minimum investment size is $500,000. Deerhurst utilizes its "diversified trading strategy, a
combination of technical trading systems with a discretionary overlay. The diversified strategy
utilizes a combination of currency spot trades, currency forwards and currency options to trade a
broad category of currencies. Most trading is short term, though some are mid-term to long term
of up to one year. The account is extremely active, with high turnover and generally small
profits on a majority of positions and small losses on a minority of positions, except for core
positions, which are taken infrequently and are designed to position the portfolio for major
currency moves. Such core positions may be taken in spot, forwards or options, depending upon
the specific market environment.

B.     **Increasing Investments**

During the initial trial period, Deerhurst would employ leverage in executing these
transactions, but in no case will that leverage exceed 2-1. After a 30-45 day trial period, the
investor is expected to increase his investment. Such increase would be implemented by
increasing the amount of cash and/or the amount of leverage to a 4-1 level. At the Investor's
election, such leverage will be limited to a 3-1 level if the investor agrees to enter into Deerhurst
Investors, a domestic pooled investment entity that is treated as a Partnership for federal income
tax purposes ("Fund I") with others that have elected this 3-1 increase. The Fund I allows the
investor to minimize the leverage for a short period to experience the trading at this level before
continuing at 4-1 in the Fund I, while allowing Deerhurst the ability to trade in greater blocks,
producing economies of scale.

At the time of increasing the investment, if it is done by increasing the leverage, Investor
was advised by Manager of the prudence of doing so through the use of a limited liability
vehicle. Investor determined to use a wholly owned S corporation ("S Corp") to achieve this
advantage. Investor then contributed the entire portfolio, including certain long and short
European-style foreign currency options (respectively, "Long Options" and "Short Options", and

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 3

collectively "Options") with Deerhurst Management, LLC, an unrelated financial institution ("Bank") to S Corp[1] and then to Fund I. The Long Options had a cost of $60,987,866.79, and the Short Options resulted in premiums received by Investor of $60,259,568.94. At the time of the transfer the Short Options were out of the money.

At the time Investors signed the subscription documents for Fund I, the documents indicated that if the account was profitable at year end, the account would be automatically rolled up into the Deerhurst Trading Strategies LLC, a second pooled investment entity treated as a partnership for U.S. federal income tax purposes ("Fund II"). If the account had net losses, it could still be rolled up if the investors so elected, or the funds would be returned to the investors penalty free with any economic gains or losses to date.

### C.   Rollup into Fund II

On December 21, 2000, the account was rolled into the Fund II in a 2-step process. Initially, the individual trades were distributed from Fund I back to S Corp in the original foreign currency. Once at S Corp level, Deerhurst then liquidated the positions into US dollars to avoid any illiquidity and volatility issues typical of trades over the year-end. This is a strategy that Deerhurst has performed for clients in prior years. On December 29, 2000, the dollars were then contributed to the Fund II and S Corp was liquidated, as it was no longer needed.

### D.   Fund II Investments

Fund II will continue to enter into a number of foreign currency transactions on behalf of the investors including spot, forward and options transactions similar to those done in the trial account and increased leverage periods. Deerhurst continues to utilize a 4-1 leverage on these transactions. The funds are intended to be left in Fund II for a 5-year period. While the documents prohibit a withdrawal for the initial year, any withdrawals after that one-year period will be subject to a substantial early withdrawal penalty that decreases over time until the end of the 5-year period.

---

[1]   Deerhurst have advised us that the Options provided for transferability, i.e. could be sold or otherwise transferred separately from each other (subject to satisfying Bank's credit requirements).

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 4

Based on the historical results of Deerhurst and the amount of leverage employed, if the investors stay in for the full 5-year period they should earn a profit of 1300% over this period.

## II.    Representations:

### A.    Investor Representations:

For purpose of rendering our opinion, Investor has represented as follows:

1.    Investor, through S Corp, entered into the trial period, increased leverage, and Fund I and Fund II for substantial non-tax business reasons, including to produce an overall economic profit from the movement of foreign currencies.

2.    Based upon Investor's own independent evaluation and upon the advice of Deerhurst, Investor believed that by entering into Fund I and II, Investor could diversify his portfolio, and create profits from an activity that has no correlation to the major equity markets.

3.    Based upon advice of the Deerhurst as to the probability of the Funds, and specifically the foreign currencies reaching certain levels at which the options transactions would be profitable, and upon Investor's own independent evaluation, Investor believed that Investor had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits.

4.    Based on the advice of Deerhurst, and upon Investor's own independent evaluation, Investor had an opportunity to make an aggregate gross return in excess of the sum of Investor's net investment in the trial account and the Funds.

5.    Investor contributed the trial account to S Corp and from S Corp to the Fund I for substantial non-tax business reasons, including use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst.

6.    Neither Investor nor S Corp will hedge such person's risks with respect to the Options' net position with respect to the Bank.

7.    Neither Investor nor S Corp has identified, nor will it identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 5

8.  Neither Investor nor S Corp has elected, nor will it elect, under Treas. Reg. §1.988-3(b) to treat exchange gain or loss on any forward contracts, futures contracts or option contracts as capital gain or loss.

9.  Investor owned 100% of the issued and outstanding stock of S Corp.

10. At the time of the contribution of the Options to S Corp the Options were not subject to any liabilities, and S Corp assumed no liabilities and distributed or paid no money or other property to Investor in connection with such contribution.

11. S Corp has elected to be treated as an S corporation for U.S. federal income tax purposes.

12. Investor and S Corp each uses the U.S. dollar as such person's functional currency.

13. Investor/S Corp is not related to the other members of Fund I or Fund II.

14. Whether and when Investor terminated Investor's investment in Fund I was within Investor's sole discretion and control subject to the rollup provision in the subscription agreement, the execution of which itself was within in Investor's sole discretion and control.

15. There existed no understanding, agreement, obligation, or arrangement pursuant to which any Investor described herein committed to undertake all or any of the transactions described herein upon the happening of any other transaction, except to the extent that Investor/S Corporation (and Fund I as transferee of Investor) and Bank were contractually obligated to perform under the foreign currency transactions in accordance with their stated terms subject to the rollup provisions in the subscription agreement.

16. Investor has not entered into a confidentiality agreement or otherwise agreed (orally or in writing) to any obligations of confidentiality with respect to the Transactions.

17. Investor is an individual whose "tax home" as defined in Section 911(d)(3) of the Internal Revenue Code of 1986, as amended ("Code") is the United States.

18. Investor has reviewed the description of the Transactions as set forth herein and such description is accurate and complete, and there are no pertinent facts relating to the Transactions that have not been set forth in such description.

**B.    Deerhurst/Fund I Representations:**

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 6

For purpose of rendering our opinion, Deerhurst/Fund has represented as follows::

1.   Deerhurst/Fund I have not identified, and will not identify, any of the Options as being part of a hedging transaction under Treas. Reg.§1.446-4.

2.   Fund I will determine its members' distributive shares income, gain, loss, deduction, or credit and will maintain its members' capital accounts in accordance with Code Section 704 and the Treasury Regulations promulgated thereunder.

3.   Fund I has not made an election under Code Section 754 and will not do so for the taxable year or years in which the Transactions occur.

4.   Fund I has not elected, and will not elect, under Treas. Reg. §301.7701-3 to be classified as a corporation.

5.   Fund I entered into the Transactions for substantial non-tax business reasons, including to produce an overall profit from investments in foreign currency and foreign currency options.

6.   The Short Options were out of the money at the time that they were contributed by Investor to S Corp and at the time that they were contributed by S Corp to Fund I.

7.   At the time of the contribution of the Options to Fund I the Options were not subject to any liabilities, and Fund I assumed no liabilities and distributed or paid no money or other property to Investor in connection with such contribution.

8.   The Options are not listed on or subject to the rules of a qualified board or exchange as those terms are used in Code Section 1256(g)(5).

9.   Fund I has not elected, and will not elect, under Treas. Reg. §1.988-3(b) to treat exchange gain or loss on any forward contracts, futures contracts or option contracts as capital gain or loss.

10.  Deerhurst/Fund I uses the U.S. dollar as its functional currency.

## III.   Conclusions

In rendering our opinions, we have reviewed representations and advice, including financial information, from various parties to the Transactions and made certain assumptions, which representations, advice and assumptions are referred to below.  In rendering our opinions, we have also examined such agreements, certificates, instruments and documents, and we have

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 7

made such other inquires of officers, owners and representatives of the entities involved in the Transactions as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, records, agreements, certificates, instruments, documents, and responses to such inquiries. If any such representations, advice, assumptions, records, agreements, certificates, instruments, documents, or responses is inaccurate in any material respect, or any such agreements, certificates, instruments, and documents prove not to be authentic, the opinions contained herein may not be relied upon. In rendering our opinion, we have reviewed the applicable provisions of the Code and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.", "Treasury Regulations", or "Regulations") promulgated thereunder; relevant decisions of the U.S. federal courts; published Revenue Rulings ("Rev. Rul." or "Ruling") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service ("IRS"); and such other materials as we have considered relevant. In certain instances we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

Based on and subject to the summary set out at Section I above, the Representations set out at Section II above, and the analysis of the pertinent statutory provisions and legal doctrines at Section IV below, as of the date on which the Transactions occurred:

A.    For U.S. federal income tax purposes it is more likely than not that:

   1.    The Options will be treated as separate instruments.

   2.    Investor will not recognize taxable gain or loss upon the contribution of the Options to S Corp.

   3.    Investor's basis in its Corp stock will be increased by Investor's basis in the Long Option and Debt Securities immediately before the transfer, and Corp's tax basis in the Long Option and Debt Securities will equal Investor's tax basis in the Long Option and Debt Securities immediately before the transfer.

   4.    At the time of the contribution of the Options to S Corp, the Short Options will not be considered liabilities for purposes of Code Section 358.

   5.    Fund I will be classified as a partnership.

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 8

6.      S Corp will not recognize material taxable gain or loss upon the contribution of the Options to Fund I.

7.      S Corp's basis in its interest in Fund I will be equal to S Corp's basis in the Long Option, reduced by the amount of liabilities as determined for purposes of Code Section 752 assumed by Fund I and increased by Investor's share of such liabilities.

8.      At the time of the contribution of the Options to the Fund I, the Short Options will not be considered liabilities for purposes of Code Section 752.

9.      S Corp will not recognize gain or loss on the receipt of a distribution of foreign currency from Fund I in exchange for Investor's interest in Fund I.

10.     The basis of foreign currency received as a distribution in exchange for S Corp's interest in Fund I will equal S Corp's basis in such interest immediately before such distribution.

11.     Gain or loss recognized by S Corp on the conversion of the foreign currency received in exchange for S Corp's interest in Fund will be treated as ordinary income or loss.

B.      Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions set forth herein will be upheld if challenged by the IRS.

C.      Based upon the foregoing, the IRS should not be successful were it to a penalty against Investor under Code Section 6662(b)(2) or (3) for taking the positions set forth herein in Investor's U.S. federal income return with respect to the Transactions.

## IV.     Analysis

### A.      The Options

### 1.      Taxation of Options Generally

The tax consequences of the issuance of an option are set out not in the Code, but in cases and Rulings. The fundamental case regarding the timing of income arising from an option is <u>Virginia Iron Coal & Coke Co. v. Comm'r</u>, 37 B.T.A. 195 (1938), a reviewed decision. In that

BROWN & WOOD LLP

Mr. Carlos Sala
April 16, 2001
Page 9

case the taxpayer granted Texas Gulf Sulphur Co. ("TGS") a four-year option to buy stock of a subsidiary in exchange for a one-time payment of $300,000 in 1930 and annual payments of $125,000. The payments were to be applied to the purchase price if TGS exercised the option. After paying $300,000 in 1930 and $125,000 in 1931, in 1933 TGS notified the taxpayer that TGS was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 reporting the premiums as income in the year received. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:

> It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss that the property had in the hands of the seller. In that event they would not have been income and their return as income when received would have been improper. . . [citations omitted]. But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.

> Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 10

closed by collection, without waiting to see whether or not the option is exercised.

*Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made.* The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. Its property was then free of the option. It had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.

The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. *Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised.* That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance. [emphasis added]

37 B.T.A. 197-199. A dissent argued that the taxpayer recognized income in the year of receipt because it had unfettered control of the premium at that time. The dissent added that the income could be included in the year the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that TGS "forfeited" the premiums only in 1933. That theory was untenable because the taxpayer had absolute control of the funds since 1930, so TGS had nothing to "forfeit". The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

The rationale of the <u>Virginia Iron Coal</u> case, that the receipt of an option premium is not income, has consistently been accepted by the IRS. The first holding of I.T. 3835, 1947-1 C.B. 53, states that the premium received by the writer (issuer or optionor) of a put or call option

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 11

which is not exercised constitutes a short-term capital gain, under section 117(g)(2) of the
Internal Revenue Code of 1939, to be taken into account in computing his gross income, for
federal income tax purposes, only for the taxable year in which the failure to exercise the option
became final.  Rev. Rul. 58-234, 1958-1 CB 279, notes that section 117(g)(2) of the Internal
Revenue Code of 1939 specifically provided that "gains . . . attributable to the failure to
exercise privileges or options to buy or sell property shall be considered as short-term capital
gains . . .", although the Internal Revenue Code of 1954 contained no provision treating such
gains as capital gain, either short-term or long-term.  Therefore, the IRS held that the premium
received by the writer of a put or call option which is not exercised constitutes ordinary income
under section 61 of the 1954 Code, to be included in his gross income only for the taxable year in
which the failure to exercise the option becomes final.  Like the court in <u>Virginia Iron Coal</u> case,
the IRS used an "open transaction" approach:

> An optionor, by the mere granting of an option to sell ("put"), or
> buy ("call"), certain property, may not have parted with any
> physical or tangible assets; but, just as the optionee thereby
> acquires a right to sell, or buy, certain property at a fixed price
> during a specified future period or on or before a specified future
> date, so does the optionor become obligated to accept, or deliver,
> such property at that price, if the option is exercised.  Since the
> optionor assumes such obligation, which may be burdensome and
> is continuing until the option is terminated, without exercise, or
> otherwise, there is no closed transaction nor ascertainable income
> or gain realized by an optionor upon mere receipt of a premium for
> granting such an option.  The open, rather than closed, status of an
> unexercised and otherwise unterminated option to buy (in effect a
> "call") was recognized, for federal income tax purposes, in <u>A.E.</u>
> <u>Hollingsworth v. Comm'r</u>, 27 B.T.A. 621, acquiescence, C. B. XII-
> 1, 6 (1933).  It is manifest, from the nature and consequences of
> "put" or "call" option premiums and obligations, that there is no
> federal income tax incidence on account of either the receipt or the
> payment of such option premiums, i.e., from the standpoint of
> either the optionor or the optionee, unless and until the options
> have been terminated, by failure to exercise, or otherwise, with
> resultant gain or loss.  The optionor, seeking to minimize or
> conclude the eventual burden of his option obligation, might pay
> the optionee, as consideration for cancellation of the option, an
> amount equal to or greater than the premium.  Hence, no income,
> gain, profits, or earnings are derived from the receipt of either a

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 12

"put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium. Therefore, it is considered that the principle of the decision in <u>North American Oil Consolidated v. Burnet</u>, 286 U.S. 417, Ct. D. 499, C. B. XI-1, 293 (1932), which involved the receipt of "earnings," is not applicable to receipts of premiums on outstanding options.

Rev. Rul. 78-182, <u>supra</u>, which deals with options on the Chicago Board Options Exchange, follows Rev. Rul. 58-234 in holding, <u>inter alia</u>, that as to the writer of a put or call, "there is no federal income tax incident on account of either the receipt or the payment of such option premium, that is, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss." As discussed below, PLR 8038087, <u>infra</u>, PLR 7938018, <u>infra</u>, and PLR 8113024 hold that the assumption of a warrant in a corporate reorganization is not an event that would trigger such gain.

Based on the foregoing, it is more likely than not that no income or loss would be recognized with respect to an Option at the time the Option was entered into. Furthermore, as discussed below, it is more likely than not that any income or loss arising from the termination of an Option would be treated as income or loss of Fund I, the then owner of Option, and would not be directly attributed to Investor.

2. <u>The Options as Separate Instruments</u>

In determining the U.S. federal income tax consequences of the Transactions, it must be determined whether the Long Option and the Short Option would be treated as separate instruments or the Options would be integrated in some way.

Each Option may be transferred or assigned independently, an important factor in determining if two instruments should be treated as one. For example, Congress needed to add Code Section 269B to the Code to provide special rules for the treatment of a stapled entity. A stapled entity is one where the stock of one entity cannot be traded without trading the stock of the other entity. The legislative history of this provision indicates that the law in this regard was unclear. Staff of the Joint Committee on Taxation, General Explanation of the Revenue

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 13


Provisions of the Tax Reform Act of 1984, 98th Cong., 2d Sess., 454 (1984). We are not aware of any efforts by Congress to treat non-stapled entities as a single entity.

Further, Investor and Bank, and Fund I and Bank, retain real net economic risk that they will not hedge with each other. As discussed below, it is more likely than not that Treas. Reg. §1.446-4 would not apply to the Options. Even if these Regulations were to apply, however, there is nothing in them that would cause the Options to be integrated.

Third, the Treasury has issued detailed, complex rules governing foreign currency transactions. Under these Regulations, transactions under Code Section 988 (referred to as "section 988 transactions") may not be integrated. Treas. Reg. §1.988-1(e) provides in relevant part:

> [T]he amount of exchange gain or loss from a section 988 transaction shall be separately computed for each section 988 transaction, and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the section 988 transaction).

As discussed below, the acquisition and disposition of each of the Long Option and the Short Option are section 988 transactions.

In addition, Congress has recognized that separate instruments are generally given separate effect, even when one transaction may significantly offset the risk of the other. See e.g. Code Section 1092 (loss on one position of a straddle is deferred until gain is recognized on the offsetting position; the offsetting positions are not netted); Code Section 1258 (recharacterizing certain gain attributable to the time value of a taxpayer's investment as ordinary income, not purporting to recharacterize the transaction as a borrowing); and Code Section 1259 (constructive sale provision).

Finally, case law recognizes that a taxpayer can hold long and short positions in property at the same time, and that each position is a separate property. In Smith v. Comm'r, 78 T.C. 350 (1982), the court held that each leg of a straddle should be treated as separate property, whether the legs were acquired at different times or at the same time. See also, Stoller v. Comm'r, 994 F.2d 855 (DC Cir. 1993) aff'g in part and rev'g in part, 60 TCM (CCH) 1554 (1990) (separate contracts were respected); Richardson v. Comm'r, 121 F.2d 1 (2d Cir. 1941) (can hold long and

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 14

short positions at the same time).  See also, Rev. Proc. 65-29, 1965-2 CB 1023; Rev. Rul. 78-182, 1978-1 CB 265; Arnall v. U.S., a District Court case unofficially reported at 59-2 USTC ¶9779 (N.D. Ga. 1959).

Consequently, based on the foregoing, it is more likely than not that the Options would be treated as separate instruments.

### 3.    Tax Basis in the Long Options

In Rev. Rul. 78-182, supra, the IRS concluded that the tax basis of the purchaser of put or a call option with respect to certain stock was the premium paid for the option plus any fees or other costs associated with acquiring the options.  The position taken by the IRS in Rev. Rul.78-182 should be equally applicable in the instant case.  Consequently, it is more likely than not that Investor's tax basis in a Long Option would equal the premium paid to Bank with respect thereto and any other costs associated with acquiring such options.

### 4.    Treas. Reg. §1.446-4 is Inapplicable

Treas. Reg. §1.446-4 provides that the timing of income, gains, deduction and losses from a hedging transaction as defined in Treas. Reg. §1.1221-2(b)(1) match those of the hedged transaction.  Treas. Reg. §1.1221-2(f) provides, with two exceptions, that the absence of a proper identification of a transaction as a hedging transaction establishes that the transaction is not a hedging transaction.  The exceptions are (i) for inadvertent error (ii) an anti-abuse rule that provides, in appropriate circumstances, not that the transaction is a hedging transaction but that gain from the transaction is ordinary.  Based upon the representations contained in II, above, neither Investor, S Corp, nor Fund I has identified or will identify the Options as being part of a hedging transaction. Consequently then it is more likely than not that the matching rule of Treas. Reg. §1.446-4 will not apply.

### 5.    The Options are not Code Section 1256 Contracts

Code Section 1256(a) requires mark-to-market treatment for a "section 1256 contract" held by a taxpayer at the close of the taxpayer's taxable year and upon the termination or transfer of a taxpayer's rights or obligations with respect to such a contract during the year by assignment, lapse, or otherwise.  This is achieved by treating each such contract held by the taxpayer as sold on such date for the contract's fair market value.  Code Section 1256(a)(1).

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 15

Code Section 1256(a)(2) provides that "proper adjustment shall be made in the amount of gain or loss subsequently realized for gain or loss taken into account by reason of such paragraph (1)".

Code Section 1256(b) defines a section 1256 contract as (i) a regulated futures contract within the meaning of Code Section 1256(g)(1), (ii) a foreign currency contract within the meaning of Code Section 1256(g)(2), (iii) a nonequity option within the meaning of Code Section 1256(g)(3), and (iv) a dealer equity option within the meaning of Code Section 1256(g)(4).

A futures contract is not defined in Code Section 1256. However, the Commodities Future Trading Commission ("CFTC") has defined a futures contract as:

> [A]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at the initiation of the contract; (2) *which obligates each party to the contract* to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery or offset. [emphasis added]

See CFTC Glossary: A: Layman's Guide to the Language of the Futures Industry. Because an option is conditional, each party to the contract is not so obligated. As a result, it is more likely than not that the Options would not be treated as futures contracts for purposes of Code Section 1256. Furthermore, even if the Options constituted futures contracts, over-the-counter futures contracts between two private parties, such as the Options, are not "regulated futures contracts" within the meaning of Code Section 1256(g)(1). See Rev. Rul. 87-43, 1987-1 CB 252. Consequently, it is more likely than not that the Options would not constitute regulated futures contracts within the meaning of Code Section 1256(g)(1).

Code Section 1256(g)(3) defines a nonequity option as any listed option, within the meaning of Code Section 1256 (g)(5), that is not an equity option. Code Section 1256(g)(6) defines an equity option as an option to buy or sell stock or an option the value of which is directly or indirectly determined by reference to one or more stocks or a stock index. It is more likely than not that the Options would not be equity options under this definition. Code Section 1256(g)(5) defines a listed option as any option listed on, or subject to the rules of, a qualified board or exchange. Code Section 1256(g)(7) defines a qualified board or exchange as a national securities exchange that is registered with the SEC; a domestic board of trade designated as a

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 16

contract market by the CFTC; or any other exchange, board of trade or other market that the Treasury determines has certain rules. In the instant case, the Options are not listed on a CFTC-designated contract market. Consequently, it is more likely than not that the Options are not listed options within the meaning of Code Section 1256(g)(5).

Code Section 1256(g)(4) defines a dealer equity option as, among other things, an equity option. As discussed above, it is more likely than not that the Options would not be equity options under Code Section 1256(g)(5). Therefore, it is more likely than not that the Options would not be dealer equity options within the meaning of Code Section 1256(g)(4).

Lastly, Code Section 1256(g)(2)(A) defines a foreign currency contract to mean a contract that (i) settles in or with reference to a currency in which positions are traded through regulated futures contracts; (ii) is traded in the interbank market; and (iii) is entered into at an arm's length price determined by reference to the price in such market. The legislative history of Code Section 1256 assumed that the IRS would provide guidance through Revenue Rulings, Notices, etc. as to the types of contracts that would fall within this definition. H.R. Conf. Rpt. No. 986, 97th Cong., 2d Sess., 25 (1982). No such guidance has yet been published.

Although one of the parties to the Options, Bank, is a person who is eligible to participate in the interbank market, the Options themselves are not ones that are so traded. The scope of this provision regarding foreign currency contracts is evidenced in the legislative history, which reflects the fact that interbank trading was substantially similar to regulated futures contracts:

> Trading in foreign currency for future delivery is conducted through regulated futures contracts, and is also conducted through contracts negotiated with any one of a number of commercial banks which comprise an informal market for such trading (bank forward contracts). . . . Although bank forward contracts differ from regulated futures contracts, the volume of trading through forward contracts in foreign currency in the interbank market is substantially greater than foreign currency trading on futures exchanges, and prices are readily available.

S. Rep. No. 475, 97th Cong., 2d Sess. 26 (1982).

The conclusion that options that are not traded in the interbank market are not foreign currency contracts within the meaning of Code Section 1256(g)(2) was recently confirmed in

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 17

FSA 200025020 (3/17/00), Issue 3[2].  In the discussion and analysis contained at Issue 3 of this Field Service Advice, the author concluded that foreign currency contracts within the meaning of Code Section 1256(g)(2) include only foreign currency forward contracts traded in interbank markets and do not include foreign currency options that do not constitute nonequity options under Code Section 1256(g)(3).  The FSA concluded that gains and losses on such non-listed foreign currency options would be treated as ordinary under Code Section 988, discussed below. Based on the foregoing, because the Options are not traded in the interbank market, it is more likely than not that the Options would not be foreign currency contracts within the meaning of Code Section 1256(g)(2).

Based on the foregoing, it is more likely than not that the Options would not constitute section 1256 contracts subject to the mark-to-market rules of Code Section 1256.

Were the Options section 1256 contracts that were subject to the mark-to-market rules, the transfer of the of the Options to the Fund I would require Investor to recognize any gain or loss that arose with respect to each of the Options from the time the Options were acquired to the date of such transfer.  Because the period of time that Investor held the Options was very short, it is not anticipated that any such gain or loss would be material.  Were the Options section 1256 contracts that were subject to the mark-to-market rules upon their transfer by Investor to S Corp or by S Corp to Fund I it is possible that the IRS might contend that the transfer should be treated either (i) as if Investor sold the Options to S Corp and S Corp sold the options to Fund I or (ii) as if Investor/S Corp closed Investor's/S Corp's position in the Options and S Corp/Fund I entered into "new" Options having the same terms.  Were the IRS successful in making such contention, the transfer of the Options would not be subject to the rules regarding contributions to a corporation or a partnership as discussed below.  We believe that it is more likely than not that the IRS would not be successful were it to so contend.

The purpose of enacting Code Section 1256 as part of the Economic Recovery Act of 1981 ("1981 Act") was to conform the tax treatment of regulated futures contracts to the daily cash settlement, mark-to-market system employed by U.S. commodity futures exchanges for purposes of determining margin requirements.  Under this system, even though a trader does not

---

[2]     Although an FSA does not constitute authority that can be relied upon by a taxpayer, it is useful in understanding the position of the author on the issues addressed therein.

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 18

close out a position, but continues to hold it, the trader receives any gain in the position in cash as a matter if right each trading day and the trader has the right to withdraw such amount. Correspondingly, if the position declines in value, the trader is required to deposit additional funds. Thus, Congress intended Code Section 1256 to apply the doctrine of "constructive receipt" to the economic gains or losses realized by the taxpayer at year-end even though the taxpayer continued to hold such positions. See General Explanation of the Economic Recovery Act of 1981 (H.R. 4242, 97th Cong., P.L. 97-34) prepared by the Staff of the Joint Committee on Taxation (12/31/81) ("1981 General Explanation") at 296. In Murphy v. U.S., 992 F.2d 929 (9th Cir. 1991), aff'g an unreported District Court decision, the court concluded that Code Section 1256 was constitutional because Congress premised recognition of gain or loss under Code Section 1256 on the existing doctrine of constructive receipt.

The 1981 General Explanation also provides:

> If a taxpayer holds futures contracts at the beginning of a taxable year, any gain or loss subsequently realized *on these contracts* must be adjusted to reflect any gain or loss taken into account *with respect to these contracts* in a prior year.

Although Congress could just as easily provide that the mark-to-market rules created a constructive sale and repurchase of the contracts to adjust the basis of the contracts to reflect the gains and losses triggered under Code Section 1256(a)(1), it did not do so. Rather it chose to apply constructive receipt principles to merely trigger mark-to-market gain or loss with respect to a contract at a particular point in time and to adjust the amount of subsequent gain or loss with respect to such contract by reference to such previously recognized gain or loss.

Code Section 1256(a) as enacted pursuant to the 1981 Act only applied to contracts held by a taxpayer at year-end and did not address events occurring within the year, such as a termination or transfer of a contract. To do so, Congress added Code Section 1256(c) as part of the Technical Corrections Act of 1982 ('1982 Act"). Code Section 1256(c) provides relevant part:

> (1) IN GENERAL. The rules of paragraphs (1) [income and loss recognition], (2) [proper adjustment], and (3) [character] of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 19

> or making delivery, by exercise or being exercised, by
> assignment or being assigned, by lapse, or otherwise.

In enacting Code Section 1256(c)(1) Congress clearly intended the rules of Code Section 1256(a)(1), (2), and (3) to apply to transfers by a partner to a partnership. See JCS-20-82, Description of H.R. 6056, Technical Corrections Act of 1982, prepared for Use by the Committee for Ways and Means for a Hearing on April 27, 1982 by the Staff of the Joint Committee on Taxation ("Description"). At page 3, the Description provides:

> The bill would require expressly that gains and losses be taken into
> account when a taxpayer's rights in a regulated futures contract are
> transferred. Thus, section 1256(a) would apply when transfers of
> regulated futures contracts are made to and from partnerships and
> other flow through entities.

Although the legislation could have provided that a transfer to a partnership (or other flow through entity) would be deemed to be a sale by the partner to the partnership or the termination of the contract by the partner and the entering into of a "new" contract by the partnership, it did not do so. Rather, it merely required that such a transfer trigger the mark-to-market gain recognition and other rules of Code Section 1256(a).

Based on the foregoing, it is more likely than not that the application of Code Section 1256(a)(1) upon the transfer of the Options by Investor to Fund I would not cause Investor to be treated either (i) as Investor/S Corp selling the Options to S Corp/Fund I or (ii) as closing Investor's/S Corp's position in the Options and S Corp/Fund I entering into "new" Options having the same terms, and that that the transfer of the Options to S Corp and by S Corp to Fund I would subject to the rules regarding contributions to a corporation or a partnership, as discussed below and a Code Section 1256(a)(2) "proper adjustment" would be made with respect to any subsequent gain or loss recognized by the transferee with respect to the contributed Options.

## 6.   Acquisition of the Options is a Section 988 Transaction

Code Section 985(a) generally requires that all income tax determinations with respect to a taxpayer be made in the taxpayer's functional currency. Code Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 20

conditions are met.  Treas. Reg. §1.988-1(c) provides that any currency of a taxpayer or a QBU other than its functional currency is "nonfunctional currency".  Since the U.S. dollar is the functional currency of Investor, any other currency will be nonfunctional currency.

Code Section 988 governs the U.S. federal income tax treatment of certain transactions in foreign currency, described as "section 988 transactions", and governs such transactions notwithstanding any other provisions of Chapter 1 (Sections 1 through 1400) of the Code.

A section 988 transaction includes entering into or acquiring an option, warrant or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency.  Code Section 988(c)(1) and Treas. Reg. §1.988-1(a). Consequently, it is more likely than not that the acquisition of the Options is a section 988 transaction.

Code Section 988(c)(1)(D) and Treas. Reg. §1.988-1(a)(7)(i) exclude from the scope of a section 988 transaction a regulated futures contract and a nonequity option that would be marked to market under Code Section 1256 if held on the last day of the taxable year.  As discussed above, it is more likely than not that the Options are not regulated futures contracts or nonequity options that would be marked to market under Code Section 1256.  Therefore, it is more likely than not that the Options would not be excluded from the scope of a section 988 transaction.

**B.**     **Contribution of Options to S Corp**

**1.**     **Code Section 351**

Code Section 1371 generally provides that except as otherwise provided and except to the extent inconsistent with subchapter S, the rules of subchapter C apply to an S corporation and its shareholders.  Under subchapter C, Code Section 351(a) generally provides that no gain or loss is recognized by a transferor of property to a corporation in exchange for its stock, if that transferor together with any other persons transferring property to the corporation as part of the same transaction control the transferee corporation immediately after the exchange.  "Control" for this purpose means the ownership of stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote and 80% of the total number of shares of each other class of stock.  Code Section 368(c).  Furthermore, control need not be acquired in the exchange;

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 21

preexisting control suffices. See Rev. Rul. 73-473, 1973-2 CB 115. In the instant case, Investor owns 100% of the issued and outstanding stock of S Corp.

The assets transferred to S Corp consisted of Options. Although neither the Code nor the Treasury Regulations define the term "property", such term has been given a broad interpretation. Consequently, the Long Options should constitute property for purposes of Code Section 351. This conclusion is based on U.S. v. Stafford, 727 F.2d 1043 (11th Cir. 1984), in which a legally unenforceable contract right was found to be property for purposes of Code Section 351 where the Court found that the obligation was "morally" binding. In the instant case the contractual rights inherent in the Long Options are legally binding. See also, PLR 9013016 (12/22/89) involving the transfer of timber cutting rights. Cf., Dillon v. U.S., an unreported District Court case unofficially reported at 84-2 USTC ¶9921 (S.D. Tex, 1981), in which the court held that a contractual right to participate as a partner in a second partnership constituted property contributed to the first partnership for purposes of Code Section 721. Consequently, it is more likely than not that the Long Options would constitute property for purposes of Code Section 351.

While the Short Options are not property under this standard, it is more likely than not that Investor would recognize no gain or loss on their transfer to Corp. This is because as previously discussed, gain or loss is only recognized with respect to an option when the option terminates and, in the instant case, no such termination occurs on the transfer of the Options to S Corp. Furthermore, Code Section 351(a) provides the general statutory rule for nonrecognition of gain upon the contribution of property to a corporation. This rule should not be overridden in the absence of a clear statement of intent, in either the Internal Revenue Code or the Treasury Regulations, to do so. See Hempt Bros., Inc. v. U.S., 354 F. Supp. 1172 (M.D. Pa. 1973), aff'd, 490 F.2d. 1172 (3rd. Cir. 1973), cert. denied, 419 U.S. 826 (1974). In this regard, the Tax Court has held that it is not appropriate to break apart separate elements of an integrated Code Section 351 transaction in order to give one such element tax effect under another section of the Code. See Makover v. Comm'r, T.C. Memo. 1967-53; Hartley v. Comm'r, T.C. Memo. 1967-38. The IRS has adopted this position in G.C.M. 37873 (3/5/79), in which a partnership transferred its assets to a corporation in a Code Section 351 transaction. The partnership had previously elected under Rev. Proc. 71-21, 1971-2 CB 549, to defer the inclusion of certain service income until the services were performed. Rev. Proc. 71-21 provided, as a requirement to obtaining the deferral, that such deferred income had to be taken into account if the taxpayer who made the election

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 22

ceased to exist or its liability to perform the services ended. The IRS concluded that the requirement to terminate the deferral under the Revenue Procedure overrode the general nonrecognition rules of Code Section 351. This position was adopted more recently in TAM 9716001 (4/18/97). TAM 9716001 involved the transfer of an obligation with respect to accrued vacation pay of employees of a transferred business together with an amount of cash anticipated to be sufficient to fund such obligation. The IRS Agent argued that the cash payment should be treated as an amount of income, separate and distinct from the Code Section 351 transaction. The IRS National Office, however, refused to bifurcate the transaction. Consequently, it is more likely than not that the IRS would not be successful were it to assert that the transfer of the Short Options to S Corp should be given independent tax effect apart from Code Section 351.

In Rev. Rul. 83-156, 1983-2 CB 66, the IRS ruled that a transfer of assets by a parent corporation ("P") to its wholly-owned subsidiary ("S1") immediately followed by a transfer of such assets by the subsidiary to a newly formed partnership among the subsidiary and subsidiary's newly formed subsidiary (S-2) as part of the same plan did not prevent the transfer by parent to subsidiary from qualifying under Code Section 351(a). GCM 39053 (1/8/82), addressed Rev. Rul. 83-156 and Rev. Rul. 83-34, 1983-1 CB 79, in which P dropped down assets to an 80%controlled S1, which in turn dropped down the assets to an 80% owned S2, leaving P with only a 64% economic interest in the transferred assets. The GCM clarified that the rationale behind both Rev. Rul. 83-156, supra, and Rev. Rul 83-34, supra, was that each transfer was to be independently tested under Code Section 351 and Code Section 721, as the case may be, with the result that if the requirements of the pertinent Code Section met as to each subsequent transfer, the prior transfer was untainted. In PLR 8503012 (9/26/84), a number of persons transferred interests in equipment to a newly formed corporation which in turn transferred such assets to a partnership in which it became a 50% partner together with unrelated person. The qualification of the transfer to the corporation under Code Section 351 was not an issue specifically addressed in the private letter ruling. Nevertheless, the author expressed reservations as to whether the transfer would qualify under Code Section 351, distinguishing the situation in the private letter ruling in which the subsequent transfer was to a partnership in which unrelated parties held a significant interest and the transferor did not maintain complete control of the business of the partnership. Although the facts of the instant case are closer to the facts in PLR 8503012 (9/26/84) than to Rev. Rul. 83-156, supra, based upon Rev. Rul. 83-156, supra, and the rationale expressed in GCM 39053 (1/8/82), it is more likely than not that the transfer of the Options by S

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 23

Corp to Fund I would not prevent the transfer by Investor to Corp from qualifying under Code Section 351(a).

Notwithstanding that the transfers generally meet the requirements of Code Section 351(a), Code Section 351(e) provides that Code Section 351(a) does not apply to a transfer of property to an investment company. As a result, if Code Section 351(e) applies gain or loss will be recognized on a transfer of property to an investment company. Treas. Reg. §1.351-1(c)(1) elaborates on this provision by providing that property will be considered transferred to an investment company if:

(i)     The transfer results, directly or indirectly, in diversification of the transferors' interests, and

(ii)    The transferee is (a) a regulated investment company, (b) a real estate investment trust, or (c) a corporation more than 80% of the value of whose assets (excluding cash and nonconvertible debt obligations from consideration) are held for investment and are readily marketable stocks or securities, or interests in regulated investment companies or real estate investment trusts.

Treas. Reg. §1.351-1(c)(5) clarifies that diversification occurs if two or more persons transfer nonidentical assets to the corporation, unless these assets are an insignificant portion of the total value of the assets transferred. That provision also provides:

> If there is only one transferor... to a newly organized corporation, the transfer will generally be treated as not resulting in diversification.

However, Treas. Reg. §1.351-1(c)(5) also provides:

> If a transfer is part of a plan to achieve diversification without recognition of gain, such transfer, however delayed, of the corporate assets... to an investment company in a transaction purporting to qualify for nonrecognition treatment, the original transfer will be treated as resulting in diversification.

Looked at on its own it is more likely than not that the transfer of the Options would not result in prohibited diversification, because Investor is the sole shareholder of S Corp. Furthermore, because, as discussed below, it is more likely than not that that the contribution of

BROWN & WOOD LLP

Mr. Carlos Sala
April 16, 2001
Page 24

the Options by S Corp to Fund would it self not result in prohibited diversification because all of the assets contributed to Fund I are options having the same counterparty and term as the Options, it is more likely than not that the transfer of the Options by S Corp to Fund I would not result in prohibited diversification were the transfer to Fund I taken into account under Treas. Reg. §1.351-1(c)(5).

Even if Fund I would be as treated as an investment company were it a corporation, as discussed below, it is more likely than not that the transfer of the Options by S Corp to Fund I would be respected as a step separate from the contribution of the Options to S Corp by Investor. Furthermore, by analogy to Rev. Rul. 83-156, <u>supra</u>, and the rationale expressed in GCM 39053 (1/8/82), it is more likely than not that the two transfers would be independently analyzed and respected. Lastly, were the steps reversed, the transfer by Investor of an interest in Fund I to S Corp would not appear to constitute a transfer described in Code Section 351(e). Consequently, although we can find no authority addressing this particular fact pattern, it is more likely than not that the IRS would be unsuccessful were it to contend that the transfer of the Options by Investor to S Corp is a transfer subject to Code Section 351(e) because such transfer is followed by a transfer by S Corp to Fund I, were it an investment company.

The IRS might also argue, and in certain cases it has been suggested, that a section 351 transfer will be respected for tax purposes only if it has a "business purpose". See e.g. Rev. Rul. 55-36, 1955-1 CB 340; <u>West Coast Marketing Corp. v. Comm'r</u>, 46 TC 32 (1966). See also, <u>Estate of Kluener v. Comm'r</u>, 154 F3d 630 (6th Cir. 1998), aff'g in part and rev'g in part T.C. Memo-1996-519, in which the Tax Court determined that, where a shareholder contributed horses to a controlled corporation which sold the horses and distributed the proceeds to the shareholder, there was no business purpose for the transfer, and as a result Code Section 351 would not apply and that the correct way to view the transaction was to treat the corporation as a conduit for the shareholder in effecting the sale, <u>i.e.</u> to disregard the transfer to the corporation entirely. Although the discussion of business purpose for the transaction was couched in terms of the applicability of Code Section 351, the decision not address whether in the absence of such a business purpose would a non-taxable exchange become taxable, but rather whether there was sufficient substance to the transactions to recognize the existence of the corporation in the first place.

It should be noted that, the Treasury Regulations promulgated under Code Section 351 do

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 25

not require such a purpose. This should be compared to the Treasury Regulations relating to qualification of a transaction as a tax-free reorganization. See Treas. Reg. §1.368-1(b). As discussed below, we believe that it is more likely than not that the Transactions would have the requisite business purpose because of their economic substance. Because the consideration that Investor received on the contribution (i.e., the increase in value of S Corp) was equal to net fair market value of the transferred assets, and the S Corp stock that Investor received provided Investor with an opportunity to profit from such ownership, it is more likely than not that the IRS would not be successful were it to argue that the transfer of the Options to S Corp should be denied Code Section 351 treatment because of the absence of a business purpose.

Based on all of the foregoing, it is more likely than not that the transfer of the Options by Investor to S Corp would constitute transfers described in Code Section 351(a).

## 2.    <u>Code Section 1234(b)</u>

Code Section 1234(b) provides that gain or loss with respect to any "closing transaction" with respect to an option by the grantor of the option will be treated as short-term capital gain or loss. Code Section 1234(b)(2)(A) broadly defines a "closing transaction" as any termination of the taxpayer's obligation under an option, other than through the exercise or lapse of the option. Code Section 1234(b)(2)(A) was enacted as part of the Tax Reform Act of 1976. According to the legislative history, the purpose of enacting such subsection was to eliminate the ability of taxpayers to enter into certain tax strategies that would permit them to obtain ordinary loss and capital gain through the use of certain transactions in which the taxpayer had the right to treat the acquisition of an offsetting option as a "closing transaction" which caused the recognition of income. See H. Rpt. No. 94-1192, 94th Cong., 2d Sess., 5 (5/26/76). The closing transactions that were intended to be addressed were those described in a series of widely circulated private letter rulings issued to the Chicago Board Options Exchange ("CBOE"). In these, the IRS held, among other things, that certain setoff transactions that the taxpayer elected to treat as "closing transactions" under the CBOE rules were recognition events.[3] Consequently, it appears that

---

[3]    Although the legislative history did not cite such private letter rulings, one appears to be 7404080200A. Subsequently, in Rev. Rul. 78-182, <u>supra</u>, the IRS described the U.S. federal income tax treatment of transactions in options traded over the Chicago Board Options Exchange, Incorporated ("CBOE"). The IRS pointed out that if a taxpayer paid an amount equal to the then fair market value of the option and declared the transaction a "closing transaction", under the CBOE rules the taxpayer would be released from liability to settle the closed option. In the Ruling the IRS treated such a 'termination' as a recognition

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 26

Code Section 1234(b) merely determines character of recognized gain or loss and does not itself create a recognition event. See e.g. Treas. Reg. §1.1234-1, which discusses Code Section 1234 in terms of the character of gain or loss recognized. See also Treas. Reg. §1.1234-1(f), which provides that losses described under Code Section 1234 are subject to the general disallowance rules of the Code, i.e. that Code Section does not create an independent loss allowance rule, but rather any loss described in Code Section 1234 is not allowed if it would be otherwise disallowed under the Code.[4] As discussed above, Code Section 351(a) generally provides that no gain or loss is recognized upon the transfer of property to a partnership and it is more likely than not that the Options would be property for this purpose. Consequently, because it is more likely than not that the transfer of the Options by Investor to Corp would be a nonrecognition event under Code Section 351, it is more likely than not that Code Section 1234(b)(2) would not independently cause gain or loss to be recognized by Investor on the transfer.

In the context of non-traded options, the IRS has ruled that the assumption by an acquiring corporation in a corporate reorganization of warrants to purchase the target company's stock does not constitute a closing transaction, because neither did the option lapse nor did the grantor's obligation terminate. Rather, the requirement that the grantor issue stock pursuant to the warrants was assumed by the acquiror. PLR 8038087 (6/26/80) and PLR 7938018 (6/19/79). Although not directly on point, because such private letter ruling involve transactions under Code section 368, rather than Code Section 351, such private letter rulings support the proposition that the assumption of an undertaking to perform under an option in the context of a nonrecognition transaction is not a transaction with respect to which gain or loss is otherwise recognized. This should be particularly true where, as in the instant case, the legal relationship of the optionor and optionee remain unchanged.

### 3.   No Assignment of Income

The assignment of income doctrine is a judicially created doctrine under which the income earned from property must be included in the gross income of the person who beneficially owns the property. See Blair v. Comm'r, 300 U.S. 5 (1937). As discussed above, it

---

[4]   event. See, Rev. Rul. 78-182, B.5.

Cf. Rev. Rul. 79-314, 1979-2 CB 132, and Rev. Rul. 80-101, 1980-1 CB 70, in which certain corporate nonrecognition rules were permitted to override general gain recognition rules, where the interpretation of the nonrecognition rules was clear.

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 27

is more likely than not that the Long Options would be treated as property for purposes of Code Section 351.

An analogy may be found in two cases involving the transfer of contract claims for money damages in litigation. In <u>Cold Metal Process Co. v. Comm'r</u>, 306 F.2d 292 (6th Cir. 1957), rev'g 25 T.C. 1333 (1956), the IRS attempted to tax amounts received in litigation to the transferor where the transferor had transferred the claims prior to the conclusion of the litigation. The Court of Appeals, relying on the Tax Court's findings of fact, concluded that at the time of the transfer:

> there was no certainty that the transferor's rights thereto would ever be established or that the money would ever be paid to the transferor or the transferee. The amount that might eventually be collected was unliquidated.

In its analysis, the Court of Appeals distinguished a number of cases including <u>Est. of Holmes</u>, 1 T.C. 508 (1943), in which the Tax Court taxed dividends that were declared, but unpaid, at the time of transfer to the transferor rather than to the transferee. The Court of Appeals noted that the Tax Court considered the dividend similar to interest in that the liability and the amount were both unquestioned at the time of the transfer and that a future maturity date was the only thing that prevented immediate payment. Whereas the litigation claim was

> an unliquidated chose in action. Cold Metal divested itself of all title, interest and control at that time. Later developments over which Cold metal had no control transformed it into taxable income that was paid to and received by the new owner for its sole benefit. These facts fall far short of classifying the transaction as an anticipatory assignment of income taxable to the assignor when later paid.

Similarly, in <u>Jones v. Comm'r</u>, 306 F.2d 292 (5th Cir. 1961), rev'g T.C. Memo. 1960-115, a subcontractor transferred a claim for additional compensation that was subject to litigation between the prime contractor and the U.S. government to a corporation of which he was a majority shareholder. The IRS asserted that upon recovery, the proceeds were taxable to the transferor shareholder rather than to the transferee corporation. Based upon the fact that at the time of transfer the claim was "doubtful, uncertain and contingent" at the time of its transfer and the transfer was "full, complete, final and definite", the Court of Appeals held that the recovery

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 28

was taxable to the transferee corporation rather than the transferor shareholder. The Court of
Appeals also noted that there was a commercial rationale for the transfer rather than the transfer
being gratuitous.

In the instant case, the Options are contract rights similar to the claims in the <u>Cold Metal
Process Co.</u> and <u>Jones</u> cases; at the time of the transfer there was no immediate right to payment
or certainty as to whether an Option would settle in or out of the money; there were commercial
reasons for the Investor to transfer the Options to Corp and the transfer of the Options was not
gratuitous. Consequently, based upon the <u>Cold Metal Process Co.</u> and <u>Jones</u> cases, it is more
likely than not that the transfer of the Option to Fund would not constitute an anticipatory
assignment of income arising on the settlement of the Options that would be taxable to Investor.

Consequently, under this rule any income derived from the transfer of the Long Options
would be included in the income of its beneficial owner, Corp, rather than in the income of the
Investor.

As discussed above, it is more likely than not that a Short Option would not be treated as
property for purposes of Code Section 351. Nevertheless, it is more likely than not that the
rationale of these cases would equally apply to it and rule any income derived from the transfer
of a Short Option would be included in the income of its beneficial owner, Corp, rather than in
the income of the Investor.

C.    <u>Basis of Investor in S Corp Stock and Basis of Corp in Options</u>

1.    <u>Investor 's Basis in S Corp Stock</u>

(a)    <u>In General</u>

Code Section 358(a) provides that in a transaction to which 351 applies the basis
of nonrecognition property received in such exchange equals the basis of the property
exchanged. However, Code Section 358(d)(1) generally requires that the transferor's basis be
reduced by the amount of liabilities of the transferor that are assumed by the transferee. Treas.
Reg. §1.358-3 expands this to require a reduction in the amount of liabilities to which the
transferred property is subject. It is possible that the IRS might contend that the potential claims
by Bank against Investor under a Short Option constitute liabilities for purposes of Code Section
358. If the potential claims by Bank against Investor under a Short Option were considered

BROWN & WOOD LLP

Mr. Carlos Sala
April 16, 2001
Page 29

liabilities for purposes of Code Section 358, Investor's basis in Investor's Corp stock would be reduced.

As discussed below, it is more likely than not that such claims do not constitute liabilities for purposes of Code Section 358.

### (b)   Agency Doctrine Inapplicable

It is possible that the IRS might attempt to assert that Investor was acting as an agent of Corp in acquiring the Options. Were the IRS successful, Investor would not be treated as having contributed the Options to S Corp and, as a result Investor's tax basis in Investor's S Corp shares would be computed without regard to the contribution of the Options by Investor to S Corp.

The Supreme Court has addressed the issue of when an agency relationship exists and affects tax results of a transaction in a number of cases. In Comm'r v. Bollinger, 485 U.S. 340 (1988), a taxpayer engaged in rental real estate development, both in an individual capacity and through a series of partnerships. Since state usury law limited the rate of interest that could be charged to non-corporate debtors, at the request of the taxpayer, Bollinger formed a wholly owned corporation to be the nominal borrower. An agreement provided that the corporation would hold title to the property as the partnership's nominee and agent solely to secure financing. The partnership had sole control of and responsibility for the property and was the principal and owner during financing, construction and operation. The corporation itself had no assets, liabilities or bank accounts. In every case, the lenders regarded the partnership as the owner of the property and were aware that the corporation was acting as an agent of the partnership in holding record title. Further, the partnerships reported the income and losses generated by the property on their partnership tax returns and actively managed the properties.

Using the six-part test established in National Carbide Corp. v. Comm'r, 336 U.S. 422 (1949), the Supreme Court held that the corporation was a bona fide agent of the taxpayer and partnerships and rejected the contention of the Service that the corporation was the true owner of the real estate developments. The six "National Carbide factors" applied were:

1)   whether the corporation operates in the name and for the account of the principal;

2)   whether the agent corporation binds the principal by its actions;

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 30

    3) whether the corporation transmits money received for the account of the principal to the principal;

    4) whether the receipt of income is attributable to the services and assets of the principal and not the agent;

    5) whether the corporation is a true agent; that is, whether its relations with its principal are dependent on the latter's ownership of the agent; and

    6) whether its business purposes are the carrying on of the normal duties of an agent.

    The Court found that the genuineness of the agency relationship was adequately assured in this instance because (1) the relationship was set forth in a written agreement at the time each development was begun; (2) the corporation acted as an agent and not principal with respect to the development for all purposes; and (3) the corporation held itself out as the agent and not as a principal in all dealings with third parties related to the asset.

    In <u>Cottage Savings Assoc. v. Comm'r</u>, 499 U.S. 554 (1991), the taxpayer was a savings and loan association which had large unrealized losses from its portfolio of long-term, low interest home mortgages. Due to regulatory constraints, the taxpayer was unable to sell the loans without the risk that the resulting losses would result in regulatory closure of the savings and loan. As an alternative, the taxpayer's regulator proposed that the taxpayer trade participations in various mortgages in its loan portfolios with other savings and loans with the intention that such trades would be treated as recognition events for federal income tax purposes. The taxpayer did so.

    The IRS contended that the trades were not tax recognition events, arguing in part that the trades had no economic effect. The IRS argued that the taxpayer's partners in the trade were merely acting as its agents, resulting in the taxpayer's retaining de facto ownership in the "transferred" interests. In finding for the taxpayer, the Supreme Court held that the transactions did have economic effect because (1) there was no evidence that the parties had acted other than at arm's length and, (2) the taxpayer had not retained de facto ownership. The Court reasoned that because the mortgages traded involved different mortgagors and different properties securing the mortgages, there was in fact an exchange of legally distinct properties giving rise to a true economic effect for tax purposes.

**BROWN & WOOD LLP**

Mr. Carlos Sala
April 16, 2001
Page 31

In <u>Northern Indiana Pub. Serv. Co. v. Comm'r</u>, 115 F. 3d 506 (7th Cir. 1997), the court addressed the agency issue as well.  At issue was whether a foreign subsidiary of the taxpayer carried on sufficient business activity so as to require recognition of its interest transactions with the taxpayer which would result in tax exempt treatment under the US/Netherlands Income Tax Treaty.  The IRS took the position that the treaty was inapplicable, claiming that the subsidiary was a mere conduit or agent in the borrowing and interest paying process.  The Tax Court, 105 T.C. 341 (1995), rejected the IRS's argument and held that the subsidiary was recognizable for tax purposes and, therefore, the payments were tax exempt under the treaty.

In affirming the decision, the Court of Appeals stated that "so long as a foreign subsidiary conducts substantive business activity--even minimal activity--the subsidiary will not be disregarded for federal tax purposes, notwithstanding the fact that the subsidiary was created with a view to reducing taxes." 115 F. 3d at 511.

It is unlikely that an application of the <u>National Carbide</u> agency factors to the Transactions would result in a finding of agency.  No indicia of a principal/agent relationship between Corp and Investor exist. Corp and Investor acted independently of one another.  In acquiring the Options, Investor did not operate in the name of Corp, had no authority to bind Corp by its actions, did not transmit or receive funds on behalf of Corp, did not receive income attributable to services or assets of Corp, and did not act as a true agent or have as its business purpose the carrying out of normal duties of an agent.  Furthermore, as in <u>Bollinger</u>, there were no agency agreements involved and no party acted as the agent of another or held itself out as an agent in dealings with third parties.  Moreover, as in <u>Cottage Savings</u>, the parties acted at arm's length and that the transactions between them had both legal and economic significance.  Finally, Investor had all of the benefits and burdens of ownership of the Options until the Options were contributed to Corp.  Accordingly, it is more likely than not that the agency doctrine would not apply to the Transactions.

(c)     <u>Short Options are Not Liabilities for Purposes of Code Section 358</u>

i.      **In General**

Neither Code Section 358(d) nor Treas. Reg. §1.358-3 defines the term "liability". In the present situation a Short Option is a European-style option, which means that they can

)                                                              )

**BROWN & WOOD** LLP

Mr. Carlos Sala
April 16, 2001
Page 32

only be exercised or settled on its termination date[5], and at the date of transfer it was out of the
money. Thus, at the time of the transfer the claims of Bank against Investor under a Short
Option were entirely speculative and contingent, because it was unknown whether a Short
Option would be in the money on its termination.

In Old Harbor Native Corp. v. Comm'r, the Tax Court analyzed an option
contract as having two elements: "(1) a continuing offer to do an act, or to forbear from doing an
act, which does not ripen until the contract is accepted; and (2) an agreement to leave the offer
open for a specified or reasonable period of time". See also, Rev. Rul. 58-234, 1958-1 CB 279.
This position is also consistent with La Rue v. Comm'r, 90 T.C. 465 (1988), and Long v.
Comm'r, 71 T.C. 1 (1978), aff'd and remanded, 660 F.2d 416 (10th Cir. 1981), discussed in
detail in Section G.2, below, in which claims were not recognized as a liability for purposes of
Code section 752 where liability for the claims had not been established and was contested.

In an analogous situation, under Code Section 246(c)(4) and its predecessors, the
IRS has ruled that the rights of a counterparty against the writer of an out-of-the-money call
option do not mature into a legal obligation until the counterparty exercises its rights under the
option. Code Section 246 deals with the ability of a corporation to claim a dividend received
deduction if the recipient has held the payor's stock for a requisite period of time.  Code Section
246(c)(4) states in relevant part:

> The holding periods determined for purposes of the subsection
> shall be appropriately reduced...for any period in which –
>
> (A)   the taxpayer has an option to sell, is under a contractual obligation
>       to sell, or has made (and not closed) a short sale of, substantially
>       identical stock or securities....

As noted, the statute itself distinguishes between a "contractual obligation to sell"
and an "option to sell", implying that an option is not such an obligation.  The IRS has
specifically recognized this distinction and has ruled in Rev. Rul. 80-238, 1980-2 CB 96, that the
writing of a call that is not in the money does not create an obligation to sell the referenced stock
or security for purposes of the predecessor of Code Section 246(c)(4).  This analysis was

---

[5]     This is to be distinguished from American-style Options that can be exercised at any time on or before their
        termination date.