# EXHIBIT A-1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLORADO

 3

 4

 5
     CARLOS E. SALA AND                    )
 6   TINA ZANOLINI SALA,                   )
                                           )
 7              Plaintiffs,                )
                                           )
 8              -vs-                       ) CIVIL ACTION NO.:
                                          .) 05-CV-00636-LTB-PAC
 9   UNITED STATES OF AMERICA,             )
                                           )
10              Defendants.                )

11

12

13

14          Deposition of KEVIN BRADY, taken on behalf of the

15   Defendants, at the United States Attorney's Office, 75

16   Spring Street, 600 U.S. Courthouse, Atlanta, Georgia, on the

17   27th day of September, 2006, commencing at the hour of 10:00

18   a.m., pursuant to the stipulations agreed to herein, before

19   Linda K. Jackson, CSR NO:  B-995.

20

21

22

23

24

25
```

2

1    government.  So they did.
2         Q    Who in the government, do you know?
3         A    The Department of Justice, I believe.
4         Q    And why did the Department of Justice tell
5    them to disband that group?
6              MR. FELDMAN:  That would be you.
7    BY MS. MATCHISON:
8         Q    Why is it your understanding the government
9    told them to disband the PFP?
10        A    It was part of the deferred prosecution
11   agreement that KPMG made with the government.  And, so,
12   they agreed to do it and so they did.
13        Q    Do you know Carlos Sala?
14        A    Yes.
15        Q    When did you first meet Carlos Sala?
16        A    I believe it was at the end of 2000, the year
17   2000.
18        Q    And who introduced you to Carlos Sala?
19        A    Tracie Henderson.
20        Q    How was he introduced to you by Tracie
21   Henderson?
22        A    I believe the first time was that we went and
23   met Carlos in Atlanta, picked him up at his hotel and
24   had lunch, I believe.  I don't know if we spoke on the
25   phone before that.  I believe that was the first time.

```
 1       Q    Did you have an understanding of why she
 2  introduced you to Carlos?
 3       A    Yes.  Carlos was going to be a tax client of
 4  KPMG's.
 5       Q    What do you mean by tax client?
 6       A    We would be preparing his tax returns for the
 7  current year.
 8       Q    So that would be for the tax year 2000, is
 9  that correct?
10       A    Yes.
11       Q    Do you know Tim Gillis?
12       A    No.
13       Q    At the time you met Carlos, what group were
14  you working in at KPMG?
15       A    Personal financial planning, which is the
16  group at KPMG that did individual tax work as opposed
17  to corporate tax work.
18       Q    Had Carlos previously been a client of KPMG's
19  when you met him at that meeting in 2000?
20            MR. HALLETT:  Objection.  Foundation.
21  BY MS. MATCHISON:
22       Q    You may go ahead and answer.  At times,
23  Mr. Hallett or even your attorney, Mr. Feldman, may make
24  an objection for the record.  You can go ahead and
25  answer if you understand it.
```

17

```
 1        Q    Do you know if a BLIPS transaction was ever
 2   presented to Mr. Sala?
 3        A    I do not know.
 4        Q    Are you aware of an SOS variance of the son of
 5   boss tax shelter?
 6        A    No.  I am not.
 7        Q    Are you aware of a transaction involving
 8   options on a mutual fund pool held in a Rabi trust?
 9        A    No.  I am not.
10        Q    Are you aware of a transaction known as
11   partnership option portfolio strategy or POPS?
12        A    No.  I have never heard of that.
13        Q    Have are you ever heard of a transaction
14   called FLIPS, I believe it is?
15        A    I have heard of one called FLIP.
16        Q    FLIP.  And what is your understanding of FLIP?
17        A    The same as with BLIPS and OPIS.  That it was
18   a tax strategy.  And beyond that, I couldn't tell you
19   any specifics.
20        Q    Are you aware of a transaction referenced as a
21   Jones Day transaction?
22        A    No.  I have not.
23        Q    Did you ever speak to Mr. Sala in connection
24   with proceeding with a transaction involving Presidio?
25        A    No.  I did not.
```

```
 1        A    He would have made an investment into a
 2   couple of partnerships or LLCs.  I say a couple, I'm
 3   not sure if it was more than one.  But we got a Form
 4   K-1 from an investment.  But I believe Deerhurst would
 5   have put Carlos in.
 6        Q    Do you know any of the details of his
 7   investment with Deerhurst?
 8        A    No.  I do not.
 9        Q    Do you know when Mr. Sala invested with
10   Deerhurst, what year?
11        A    I don't know for sure.  I assume it would
12   have been 2000.
13        Q    Did you have an understanding of whether or
14   not the investment in Deerhurst would provide Mr. Sala
15   with a tax loss in 2000?
16        A    I certainly recall that there was a tax loss
17   in 2000, yes.
18        Q    Was Mr. Sala looking for a tax loss in 2000,
19   to your knowledge?
20        A    To my knowledge, I do not know.  To my
21   knowledge.
22        Q    Do you know how that tax loss was created?
23        A    No.  I do not.  It was reported on Form K-1.
24        Q    Have you ever spoken with a Michael Schwartz?
25             MR. HALLETT:  Schwartz?
```

1  Q  Did you have discussions with him regarding
2  the nature of the loss?
3  A  Regarding the nature, no. Regarding the loss
4  itself being reported on the return, yes.
5  Q  What were those discussions?
6  A  That the K-1 reported a loss. And we would
7  have reported it on the original filed return. And at
8  one point we removed that loss and filed an amended
9  return.
10  Q  When you were filing the original return, did
11  you have discussions about whether or not to report that
12  loss?
13  A  No. We did not have any discussions about
14  whether or not to report it. We didn't report it.
15  Q  I think that you said that he wasn't sure if
16  it was a good loss?
17  A  Yes. What I mean is that if the IRS would
18  allow it. I think the IRS was planning on disallowing
19  that loss, which is why we amended the return.
20  Q  Have you heard the name Beckett Cantly before?
21  A  No. I have never heard of that name.
22  Q  Did you have any conversations with Tracie
23  Henderson regarding the Deerhurst transaction?
24  A  Certainly we would have discussed Deerhurst
25  and the K-1 and the reporting on the tax return, yes.

69

1    Q    Do you recall the specifics of any of those
2  conversations?
3    A    No.  It would not have been regarding the
4  transaction itself that generated the loss.  It would
5  be on the reporting of the loss itself that we would
6  have discussed.
7    Q    And what did you discuss in regards to the
8  reporting?
9    A    That it would be on his 2000 tax return.
10   Q    Just that?  Just where to put it, what year?
11   A    Yes.
12   Q    Did you ever talk to Angie Napier in regard to
13  the Deerhurst?
14   A    In regards to the Deerhurst?
15   Q    The Deerhurst loss?
16   A    No.  Possibly the reporting of it.  I don't
17  know if Angie worked on that 2000 return or not.  I
18  don't recall.  I know I did but I don't know if she
19  did.
20   Q    Did you ever have a discussion with Tracie
21  Henderson about whether or not to report the loss in
22  2000?
23   A    Again, no.  We didn't discuss whether or not
24  to report it in 2000.  It was a flow-through item on a
25  K-1 and we did report it.

70

1    Q    You mentioned discussions about whether or not
2 the IRS was going to allow the loss.
3    A    Yes.
4    Q    For the amended return, I think you said?
5    A    Uh-huh.
6    Q    Did you have any discussions about the IRS
7 allowing the loss before you filed the 2000 return?
8    A    Not that I recall.
9    Q    Did you talk to -- other than the people I
10 mentioned, anyone else regarding the Deerhurst
11 transaction?
12    A    No.
13    Q    Were you aware that the Deerhurst transaction
14 had a buy-in?
15    A    No.  I'm not aware.
16    Q    Did you have any discussions with Mr. Sala
17 prior to his becoming involved with Deerhurst, regarding
18 whether he should be involved with them?
19    A    No.  I did not.
20    Q    Didn't provide him any consulting services in
21 that regard?
22    A    No.  I did not.
23    Q    Did Tracie Henderson provide him consulting
24 services in that regard, do you know?
25    A    I do not know.

```
 1        Q    Are you aware of IRS Notice 2000-44?
 2        A    No.  Not by number, no.
 3        Q    How are you aware of it?
 4             MR. HALLETT:  Objection.  He is testifying he
 5     is not aware of it.
 6             MS. MATCHISON:  He said he was not aware of
 7        it by number.
 8   BY MS. MATCHISON:
 9        Q    I would like to know what your understanding
10   is if not by number.
11        A    I'm not good at recalling code sections and
12   numbers.  I definitely do not know what 2000-44 is
13   without an explanation of what it says.
14        Q    Did you understand that the Deerhurst
15   transaction involved foreign currency options?
16             MR. HALLETT:  Objection.  Leading.  He has
17        testified he doesn't know what it involves.
18             THE WITNESS:  No.
19   BY MS. MATCHISON:
20        Q    Okay.  Do you have any experience with foreign
21   currency options?
22        A    No.  I do not.
23        Q    Did you understand the Deerhurst transaction
24   involved leveraging?
25        A    No.
```

1       Q    Did you know the Deerhurst transaction
2   involved an S-corp?
3       A    No.  I did not.  Unless that's where the form
4   K-1 came from.  In which case, I would have reported
5   the information from the Sub S K-1 on his tax return.
6       Q    Did you review an opinion letter in regard to
7   the Deerhurst transaction?
8       A    No.  I did not.
9       Q    Do you know if there was an opinion letter
10  regarding the Deerhurst transaction?
11      A    I'm not aware of one.
12           MS. MATCHISON:  I will go ahead and show you
13      another document.  It is one we used yesterday.
14      It is marked Exhibit 124.
15                    (Exhibit 124 marked in previous
                       deposition.)
16
17  BY MS. MATCHISON:
18      Q    Take minute to look at that, if you would.
19      A    (Witness complies.)
20           Okay.
21      Q    Do you recognize that document?
22      A    No.  I do not.
23      Q    You have never seen it before?
24      A    No.  Not that I recall, no.
25           MS. MATCHISON:  I will have you look at

```
1    STATE OF GEORGIA            )

2    COUNTY OF WALTON            )      CERTIFICATE

3

4        I, Linda K. Jackson, a Certified Shorthand
     Reporter in and for the State of Georgia, do hereby certify:
5

6        That prior to being examined, the witness named in the
     foregoing deposition was by me duly sworn to testify to the
7    truth, the whole truth, and nothing but the truth.

8

9        That said deposition was taken before me at the time
     and place set forth and was taken down by me in shorthand
10   and thereafter reduced to computerized transcription under
     my direction and supervision, and I hereby certify the
11   foregoing deposition is a full, true and correct transcript
     of my shorthand notes so taken.
12

13       I further certify that I am neither counsel for nor
     related to any party to said action nor in anyway interested
14   in the outcome thereof.

15

16       IN WITNESS WHEREOF, I have hereunto subscribed my name
     this October 9, 2006
17

18

19   _____
     Linda K. Jackson
20   Certified Court Reporter B-995
     Registered Professional Reporter
21

22

23

24

25
```