IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| CARLOS E. SALA and | ) | |
| TINA ZANOLINI SALA, | ) | |
| | ) | 05-cv-00636-LTB-PAC |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## UNITED STATES' RENEWED MOTION FOR STAY

_____

Defendant, the United States of America ("United States") hereby renews its motion for stay pending the resolution of the criminal case *United States v. Stein, et al.* (No. S1 05 Cr. 888), which is set for trial September 15, 2007, in the Southern District of New York.  The United States requests that this case be stayed until at least the conclusion of the *Stein* trial, so that it may have an opportunity to depose Tracie Henderson ("Henderson") and Raymond J. Ruble ("Ruble"), witnesses that both the United States and Plaintiffs believe have information relevant to the resolution of this case.

## INTRODUCTION

As this Court is already well-apprised, Carlos and Tina Sala offset their entire $60 million in income for tax year 2000 with a non-economic loss generated by their participation in a variant of the Son of BOSS tax shelter which, for a deposit of approximately $728,000, created (in a matter of days) $60 million in sham tax losses.  The United States has challenged those

2389550.1

claimed deductions, in part because they arose from an illegal tax shelter transaction lacking in economic substance.

The Supreme Court has held that "a transaction will be disregarded if it did 'not appreciably affect [the taxpayer's] beneficial interest except to reduce tax.'" *ASA Investerings v. Comm'r*, 201 F.3d 505, 516 (D.C. Cir. 2000) (*quoting Knetsch v. United States*, 364 U.S. 361, 366 (1960)).  In considering whether a transaction is legitimate, the Tenth Circuit weighs a number of factors, including the economic substance and business purpose of the transaction. *James v. Commissioner*, 899 F.2d 905, 908-09 (10th Cir. 1990).  In general, a transaction has economic substance if an objective economic profit potential exists, and has a business purpose if it is subjectively compelled by business or regulatory realities expressing tax-independent considerations, such that it was not shaped solely by tax-avoidance features having "meaningless labels attached." *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985).[1] In considering these factors, the Tenth Circuit has rejected attempts by taxpayers to game the system to achieve favorable tax results.  *Keeler v. Comm'r*, 243 F.3d 1212, 1214-15, 1218 (10th Cir. 2001) (noting the "hefty opportunities for tax savings," that the profit potential appeared "anemic beside the[] considerable capacity for tax gaming," and that deduction of several million dollars in losses distorted the taxpayer's economic results and violated the principle that tax advantages must be linked to actual losses); *Bohrer v. Comm'r*, 945 F.2d 344, 348 (10th Cir.

---

[1]      The Tenth Circuit has expressly rejected the Fourth Circuit's formulation in *Rice's Toyota World* that the Court can only find that a transaction is a sham if it concludes both that the transaction had no economic substance and no business purpose.  The Tenth Circuit has stated that "the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses." *James v. Commissioner*, 899 F.2d 905, 908-09 (10th Cir. 1990) (*citing Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988), *cert. denied*, 488 U.S. 824 (1988)).

2389550.1

1991) (holding that the existence of some potential for profit does not foreclose a finding of no economic substance).  Because the Tenth Circuit considers both objective profit potential (in comparison to the claimed tax benefits) and subjective intent in determining whether a transaction is legitimate, discovery on both issues is critical to determining the bona fides of this tax shelter.

As explained in more detail below, Sala has stated that he consulted with both Henderson and Ruble regarding this transaction, well in advance of his entry.  Discovery into these consultations is critical.  Although we have testimony as to Sala's intent from him, from Michael Schwartz, and from Andrew Krieger, each of those persons actually participated in this shelter.  It is in each of their best interests to state that economic profit was their central concern (regardless of the fact that the tax benefits dwarfed any profit potential).  What we don't have is the testimony from his accountant—his confidant—the person who Sala "believed it was important … to understand the Deerhurst transactions and the tax consequences I understood would result from those transactions…."  *See* Docket Entry No. 61, Declaration of Carlos E. Sala re: Opposition to Motion to Stay, at ¶16 ("Sala Declaration").  While it is likely impossible to get a completely impartial statement of Sala's motive and intent in entering this tax shelter, it is not unreasonable to assume that Sala may have shared his true motivations with his accountant.  As evidence that he may have done so, several underlying documents highlight that KPMG was actively marketing a tax shelter to Sala to shelter his massive, and apparently one-time, year 2000 financial windfall.  The United States cannot get Henderson's testimony elsewhere.

As for Ruble, the arguments are similar.  Ruble wrote the 112-page legal opinion blessing the transaction.  Sala paid Ruble $75,000 for that opinion.  It is reasonable to assume that Ruble

2389550.1

spent a great deal of time investigating and considering the economic substance test, the core consideration for any tax shelter, prior to and during his writing of his legal opinion for Sala.  We also know that Sala spoke to Ruble about the contents of his opinion during this time—and that this discussion was after the IRS's Notice 2000-44 came out.  *See* Sala Declaration at ¶14.  It is likely that this conversation centered around the risks of audit, including how the IRS would be expected to challenge this transaction, and whether this transaction could survive an economic substance challenge.  It is likely that deposing Ruble will provide the United States with additional evidence related to Sala's motive and intent in entering this transaction, as well as testimony underlying what objective factors support a determination that the transaction's objective profit potential bests the claimed tax benefits.

## DISCUSSION

In our first motion to stay this proceeding, the United States pointed out that KPMG, Henderson's employer, worked extensively with Sala to locate a shelter for him to avoid tax on his significant income.  These efforts began in late 1999.  Although we now know that these efforts began with Sala's first meeting with Henderson,[2] Sala instead testified that he never would have had such discussions so early in their professional relationship.  *See* Deposition of Carlos Sala ("Sala Deposition"), Exhibit A to Declaration of Anton L. Janik, Jr. ("Janik Declaration"), at pp.61-62 ("No. I just met her.  No way.").  As has become apparent, Sala found a tax shelter that suited him—and both Henderson and Ruble played significant roles.  This inconsistency speaks to exactly why the United States seeks Henderson's testimony—Sala's testimony simply does not fit with the known facts.

---

[2]     *See* November 2, 1999 Email, Exhibit E to Janik Declaration.

KPMG has admitted that the Sala tax shelter is one of the tax shelters described in the *Stein* criminal indictment.  *See* November 17, 2006 Letter, Exhibit B to Janik Declaration.  The Office of the United States' Attorney for the Southern District of New York states that the Sala tax shelter is one of the SOS tax shelters encompassed by the *Stein* indictment.  *See* Docket Entry No. 44 at Exhibit B, Declaration of Shirah Neiman at ¶2.  In their Rule 26(a) disclosures, plaintiffs identified both Henderson and Ruble as witnesses possessing relevant information, stating that Henderson could speak to "steps taken by Plaintiffs in their review of the Deerhurst transaction, the review and analysis of the investment opportunity offered by Deerhurst and the tax consequences of the transaction by KPMG in connection with the preparation of the tax return."  *See* Rule 26(a) Disclosures, Exhibit C to Janik Declaration at ¶10.  Plaintiffs note that Ruble has relevant information regarding "his review and analysis of the investment opportunity offered by Deerhurst Management and the tax consequences of the transaction."  *Id*. at ¶7.

In denying its initial motion for stay, filed before the taking of formal discovery, this Court directed that the United States take the depositions of all witnesses not likely to refuse to testify in reliance upon their Fifth Amendment protection against self-incrimination, but not any person indicted in the *Stein* case.  Pursuant to the Court's order, the United States conducted depositions but did not schedule the depositions of either Henderson or Ruble.[3]  The facts and evidence adduced during the discovery period lead the United States to believe that the

---

[3]     Henderson's invocation of the Fifth Amendment privilege, through counsel, is found in Exhibit 3 to the United States' [First] Motion to Stay, Docket Entry No. 47.   Ruble is indicted in the *Stein* case, and has refused to provide testimony in other civil cases regarding tax shelters also falling within the purview of I.R.S. Notice 2000-44.  *See* Exhibit 5 to the United States [First] Motion to Stay, Docket Entry No. 47.

2389550.1

depositions of Henderson and Ruble are both relevant and necessary to the United States' defense in this important and precedential tax shelter case.

Tracie Henderson is a former member of the Innovative Strategies group at KPMG, and was Sala's accountant and tax shelter advisor.[4]  Innovative Strategies, headed by the *Stein*-indicted Jeffrey Eischeid, was the KPMG group which designed, marketed and helped implement tax shelters to KPMG clients, including Sala.  Henderson is a central character in the Sala tax shelter scheme, and as Sala himself testified: "I believed it was important for Ms. Henderson … to understand the Deerhurst transactions and the tax consequences I understood would result from those transactions…. I have always attempted to keep the accountants … informed about any potential transactions that would have significant tax consequences *prior* to conducting the transactions."[5]  *See* Docket Entry No. 61, Sala Declaration, at ¶16 (emphasis in original).

Indeed, from their very first meeting, and contrary to Sala's sworn testimony given in this case, Sala and Henderson discussed Sala's desire to enter a tax shelter.  In an e-mail Henderson sent just days after their first meeting in late 1999, Henderson reiterated that during their

---

[4]    Sala has testified that Tracie Henderson was Sala's return preparer.  However, the records and Sala's own testimony indicate that Sala's return preparer was Kevin Brady, another KPMG employee who was not a member of the Innovative Strategies group.  *See* Deposition of Kevin Brady, Exhibit D to Janik Declaration, at p.20; *see also* Sala Deposition, Exhibit A to Janik Declaration at p.88.  Interestingly, KPMG only became Sala's tax return preparer at or around the time Sala entered this shelter.  Before this time, his tax returns were prepared by PriceWaterhouseCoopers.  *See* Sala Deposition, Exhibit A to Janik Declaration at pp.42,55.

[5]    While Sala asserts that Tracie Henderson's only role was as his return preparer, the documents and emails already cited to and provided in the United States' several prior filings point to a far greater role on the part of Tracie Henderson—a role which may or may in part underlie her decision to assert her Fifth Amendment rights at this time.

2389550.1

meeting, the two discussed various shelter opportunities, including an "option strategy" and "OPIS."[6]  *See* November 2, 1999 Email, Exhibit E to Janik Declaration.  Henderson explained that KPMG was interested in doing a shelter transaction, but that an issue still remained involving the participation of a third party.  *Id.*

Sala admits that he gave serious consideration to another KPMG tax shelter, the BLIPS program, also set up to shelter approximately $60 million in income.  Sala Declaration at ¶18; June 2, 2000 Email, Exhibit G to Janik Declaration.  Henderson was closely involved with the marketing of this tax shelter to Sala.  The records show that Henderson was also shopping, or planning to shop, at least seven separate tax shelter transactions to Sala.[7]  *See* Docket Entry No. 44: United States' Reply to Rule 56(f) Motion, at 14.  As Sala's accountant, she must have had good reason to shop this and other shelter transactions to him.  The United States would like to hear those reasons—which go directly to Sala's motive, opportunity, and intent in selecting a tax shelter to offset his 2000 income.  The records are clear that KPMG believed Sala fully desired to and had already agreed to enter the BLIPS shelter—indeed, its own records indicate that it was already booking the referral fees to credit the KPMG persons that originally brought Sala into the KPMG deal.  *See* June 6, 2000 KPMG Teamwork Revenue Sheet, Exhibit I to Janik Declaration.

---

[6]  Both of these strategies are described in the Superseding Indictment in *United States v. Stein*. *See United States v. Stein, et al.*, S1 05 Cr. 888 (LAK) (S.D.N.Y. 2005).  KPMG has since conceded that OPIS and the option strategy, as well as the BLIPS shelter discussed *infra*, were fraudulent shelter strategies used by its clients.  *See* KPMG Statement of Facts at ¶¶ 2, 8-20, Exhibit F to Janik Declaration.

[7]  In discovery, the United States received email traffic between Tracie Henderson and Jeffrey Eischeid directly related to Sala's search for a tax shelter.  Among that traffic was an email setting forth the script for the sales pitch for an OPIS tax shelter KPMG was marketing to Sala.  *See* October 3, 2000 Email, Exhibit H to Janik Declaration.  OPIS is another variant of the Son of BOSS tax shelter.

2389550.1

Henderson billed Sala for her review of the 112-page Ruble legal opinion used to prop up the tax shelter Sala eventually entered.  *See* KMPG Billing Record for 10/9/00, Exhibit J to Janik Declaration.  In addition to direct communications between Sala and attorney Raymond Ruble, Henderson also operated as a conduit between Sala and Ruble.  In fact, emails were sent between Henderson, Sala's counsel Larry Nemirow, Ruble, and Sala, for purposes of refining the facts and arguments covered by the opinion letter.  *See* April 12 and 13, 2001 Emails, Exhibit K to Janik Declaration.  In his Rule 26(a) disclosures, Sala has already disclosed that Henderson has discoverable knowledge or information related to the issues in this case.  This information is directly relevant to whether this transaction had any economic substance.  The United States deserves the opportunity to gather what is expected to be vital and critical discovery related to Sala's motivation, expectations, and reasons underlying his quest for a tax shelter.

Additionally, in a letter KPMG sent to Sala's counsel in response to Sala's Rule 30(b)(6) deposition notice—and in lieu of such deposition—KPMG affirmed that Sala's shelter transaction was an SOS transaction "included" within the *Stein* indictment as having been marketed and implemented by KPMG.  *See* November 17, 2006 Letter at ¶¶8, 11, Exhibit B to Janik Declaration.  KPMG admits that the SOS tax shelter was fraudulent and would not withstand legal scrutiny, that legal opinions based upon representations by taxpayers were not credible, and that the tax returns KPMG prepared for taxpayers having used this transaction incorporated "bogus tax losses."  *See* KPMG Statement of Facts at ¶¶ 2, 20, Exhibit F to Janik Declaration.

Since it could not obtain testimony from Henderson, the United States deposed two KPMG employees who worked for Henderson.  The first, Kevin Brady, was introduced to Sala

2389550.1

by Henderson.  Mr. Brady not only had no knowledge of the other shelter transactions KPMG presented to Sala, he had no knowledge of the tax shelter transaction at issue.  *See* Deposition of Kevin Brady at pp.16-17, 58, 64 and 69-73, Exhibit D to Janik Declaration.  The second employee, Angie Napier was a staff employee in Henderson's Personal Financial Planning Group.  She testified that she had no involvement in connection with Sala's 2000 federal income tax return here at issue.  *See* Deposition of Angie Napier at pp.45, 77-78, 92, 119 and 159, Exhibit L to Janik Declaration.  The United States attempted to conduct discovery that could substitute for the unavailable testimony of Henderson, but the witnesses were unable to provide testimony on the same subjects as Henderson—namely, Sala's motive, opportunity, and intent in entering this tax shelter.

Raymond J. Ruble was indicted in the *Stein* case and charged with preparing opinion letters he knew to be false and fraudulent, and which contained false representations made by his clients.[8]  As discussed above, Ruble wrote one of the master legal opinions underlying this tax shelter.  Virtually identical opinions were relied upon by each of the shelter participants claiming ordinary tax losses, as Sala did.[9]  Sala states in his Declaration that he "wanted to discuss the tax ramifications of the transaction with the person who had prepared the opinion prior to any investment in Deerhurst" and that he had actually had a teleconference with Ruble and discussed the transaction with Ruble before entering it (and before he paid Ruble $75,000 for the opinion

---

[8]      Ruble, also being sued civilly, has refused to provide testimony in those other cases.  Mr. Ruble cannot be realistically expected to provide any testimony until after the conclusion of his criminal case.

[9]      Subtle differences were made in how the shelter was carried out for participants wanting capital losses.  The capital loss tax opinions were provided by a different New York law firm.

2389550.1

letter).  *See* Sala Declaration at ¶14.  Again, the reasons underlying Sala's entry into this tax shelter go directly to his motive, opportunity, and intent in selecting a tax shelter to offset his 2000 income, and tie directly into the economic substance of this transaction.  Sala has already identified in his Rule 26(a) disclosures that Ruble has discoverable knowledge or information. The United States deserves the opportunity to gather what is expected to be critical discovery.

It is reasonable to assume that both Henderson and Ruble have critical knowledge of Sala's efforts to shelter income and his motivation and intent in entering into the Deerhurst transaction.  Further, they can help establish that the representations made by Sala and others that are contained in the Ruble opinion letter are false.  Moreover, Sala has testified that he consulted Henderson and Ruble in advance of entering the tax shelter.  Both witnesses should be able to speak to Sala's intent behind his entry into the tax shelter and present to the Court the flaws in Sala's rosy view of the transaction.  This evidence is critical to the United States' case.  In light of the critical information held by these central and important figures, in the absence of a stay, the United States will be materially harmed in its ability to mount a full and fair defense in this case.

Additionally, the Office of United States Attorney has information which would be helpful to the United States' defense, but which it cannot now reveal because of the grand jury secrecy rules as well as the prejudice revelation of such would cause to the criminal case.  *See* Docket Entry No. 44 at Exhibit B, Declaration of Shirah Neiman at ¶¶4, 6.  The United States should not be forced to make the Hobson's Choice of deciding between protecting the criminal case by not making important evidence available to its civil attorneys, and protecting the civil case by prematurely exposing evidence intended to be used in the *Stein* case.  No matter which

choice it makes, one or both of the United States' cases will be unfairly prejudiced, and quite likely, materially harmed.  The *Stein* trial proceeds shortly.  This request comes not for purposes of delay, but to permit the United States access to information the United States believes is both central and essential to its defense of this case.

## CONCLUSION

For the foregoing reasons, the United States renews its motion for stay pending resolution of the criminal case *United States v. Stein, et al*.  The United States respectfully requests that this Court grant the motion.

Dated this 16th day of April, 2007.          TROY A. EID
United State Attorney
MARK S. PESTAL
Asst. U.S. Attorney

s/ Anton L. Janik, Jr.
DAVID N. GEIER
ANTON L. JANIK, JR. CO #35164
AMY T. MATCHISON
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone:  (202) 305-2558
Facsimile:   (202) 307-0054
Email: Anton.L.Janik@usdoj.gov

Street Address:          Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20001

2389550.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on April 16, 2007, I electronically filed the foregoing United States' Renewed Motion for Stay with the Clerk of  Court using the EFC system which will send notification of such filing to the following e-mail addresses:

dhallett@chicoine-hallett.com
jcolvin@chicoine-hallett.com
david.n.geier@usdoj.gov
anton.l.janik@usdoj.gov
amy.t.matchison@usdoj.gov

s/ Anton L. Janik, Jr.
ANTON L. JANIK, JR.
U.S. Department of Justice
Tax Division

2389550.1