# EXHIBIT

# A

1458101.11

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - -

```
CARLOS E. SALA and          )
TINA ZANOLINI SALA,         )
                            )      Case No:
            Plaintiffs,     )      05-CV-00636-LTB-OES
                            )
vs.                         )
                            )
UNITED STATES OF AMERICA    )
                            )
            Defendant.      )
------------------------------
```

THE DEPOSITION OF

CARLOS SALA

DENVER, COLORADO

SEPTEMBER 15, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  MARTHA H. BENNETT
FILE NO.:  A007B16

1    Q.    So you split 30-and-30 in rough numbers?

2    A.    Rough numbers.  Very rough.

3    Q.    And who were the people at Morgan Stanley?

4    A.    I started with a guy named Bruce Adam

5  (phonetic), but quickly developed into a team, because we

6  needed more expertise, especially in the fixed-income market.

7  So I dealt with Kevin Crumb, who was a fixed-income

8  specialist, and Chris O'Neal.

9    Q.    Let's talk about your accountants first and

10  then go back.  Did you have an accountant in 1999?

11    A.    Pricewaterhouse.

12    Q.    How long had you been with them?

13    A.    Two years, maybe.  When I joined Abacus.

14    Q.    Any problems with them?

15    A.    No.

16    Q.    And were they working for Abacus, too?

17    A.    Yes.

18    Q.    Any problems with the relationship between

19  Abacus and Pricewaterhouse?

20    A.    No.

21    Q.    Who were your points of contact?

22    A.    John Raby was my most senior contact, and

23  underneath him was Kevin Overburg (phonetic).

24    Q.    Now, I didn't distinguish.  Was that a point

25  of contact personally or professionally?

1    They pull out in a slow way?

2            A.    Could be.  At least give them the ability to

3    do it if they need to.  When there's a very liquid marked,

4    you can get out like that.

5            Q.    Did there come a point in 2000, Mr. Sala, when

6    you terminated your relationship with Pricewaterhouse?

7            A.    Yes, I did.  Actually, you know what?  It

8    wasn't --

9            Q.    Let me back up; this may help.  Your 1999

10   return was prepared by Pricewaterhouse; correct?

11           A.    Correct.

12           Q.    And you would have been working with them into

13   2000 on the 1999 return?

14           A.    I did.

15           Q.    Did there come a point in 2000 when you

16   stopped working with them?

17           A.    I think it was 2001.  And the reason I say

18   that is because John Raby had left, and I received a call

19   from Kevin Overburg saying, Hey, you know, we've got to get

20   ready for the 2000 return.  At that point -- and John was

21   gone -- I had a much more complicated transaction.  Frankly,

22   I didn't think he had the expertise on these kinds of

23   transactions.

24           Q.    What kinds of transactions?

25           A.    The Deerhurst transaction, which was a large

1    transaction with legal opinions and things like that.   I

2    think at that point I told him, I'm going to use another

3    firm.

4              Q.    Okay.

5              A.    That was in 2001 when that happened.

6              Q.    You didn't talk to Tracie Henderson with KPMG

7    in 2000?

8              A.    I did.

9              Q.    But you hadn't committed to using them?

10             A.    Not yet.

11             Q.    We'll get into that.   So your reasoning for

12   leaving Pricewaterhouse was that in connection with your 2000

13   returns, you didn't think that they had the expertise?

14             A.    No.   I think, as a firm, Pricewaterhouse

15   absolutely has the expertise.

16             Q.    I'm not sure I understand.

17             A.    Two things:   John had left, so my primary

18   contact was gone.   My secondary contact was Kevin Overburg

19   out of the Boulder office, and I thought it was more

20   complicated and that he personally didn't have the expertise.

21             Q.    You didn't think Kevin had the expertise?

22             A.    Yes.

23             Q.    Did you ask John Raby if he could make a

24   recommendation?

25             A.    Well, John wasn't working for Pricewaterhouse

Page 61

1    on-line initiative within their tax group, and he asked me if

2    I would be willing to talk to one of their senior tax

3    partners and provide some advice as to how to go about going

4    to the Internet.

5            Q.    Would that be for compensation?

6            A.    No, this was a favor to a friend.  You know

7    what?  They sent me a T-shirt.

8            Q.    You're a hard negotiator.

9            A.    It was a favor to a friend.

10           Q.    Was it the right size?

11           A.    Probably not.

12           Q.    And did you talk to Tracie Henderson at that

13   meeting?

14           A.    Yeah, we were introduced; she was there.  My

15   recollection is she listened 90 percent of the meeting.  And

16   then she talked and she was telling me, This is what I do.

17   If you'd like to have any of these services, I would be very

18   happy to work with you.

19           Q.    Did you tell her what was going on at Abacus?

20           A.    We talked about the fact that we had already

21   entered into a contract to sell the business.

22           Q.    Did you talk about the options that you had?

23           A.    No.

24           Q.    Did you talk about any part of your personal

25   finances?

Page 62

1          A.    No, I just met her.  No way.

2          Q.    Well, you were with Tim as well?

3          A.    I know, but I wouldn't have felt comfortable

4    talking about my compensation with somebody I just met.  With

5    Tim, that would be okay, but I had just met her.

6          Q.    When was your next contact with Ms. Henderson?

7          A.    You know, it was in 2000, and maybe in the

8    spring.  I don't recall exactly.  But it was in 2000.

9          Q.    And who called who?

10         A.    She would have called me.  There would be no

11   reason for me to call her.

12         Q.    What did she say to you?

13         A.    I don't recall what she said on our initial

14   call.  My guess is, How are you doing?  Here I am; here's

15   KPMG; if you need any services, keep us in mind.

16         Q.    What is it that Tracie told you she could do?

17         A.    She was big on estate-tax planning; that was

18   the big thing that they thought she could help me with.

19         Q.    What did that mean?

20         A.    Preparation of your wills, working with

21   attorneys, planning for transition of wealth from one

22   generation to another generation.  Those types of things.

23         Q.    Did she help you prepare a will?

24         A.    No.  I hired an attorney.  Actually, I hired

25   first an attorney at Holland & Hart, and then I hired Davis

1      A.    Yes.

2           Q.    And needing to review them?

3      A.    Yes.

4           Q.    When was this in relationship to the June 28th

5    and 30th letters that we saw earlier?  I think Exhibits 114

6    and 115.

7           A.    I can't recall.  But I can certainly find out,

8    because I was there for a wedding -- a family relative

9    wedding.  My guess is after, but I don't know.

10          Q.    Was that a meeting that Tracie set up?

11          A.    Yes.  It wasn't really much of a meeting that

12   we set up.  It was a lunch to introduce me to Kevin Brady,

13   who was going to be in the compliance area.

14          And so we went to lunch, and then we walked over to

15   our offices, and he said, Hey, if you have time, let me

16   introduce you to her superior.  He had a few minutes, so we

17   chatted.

18          Q.    Was it your understanding that Kevin Brady

19   would do your tax returns?

20          A.    Yes.

21          Q.    And did you meet with Kevin Brady and discuss

22   his qualifications?

23          A.    Yes.  But, frankly, I was at that point

24   looking to Tracie as her being the one that would be

25   supervising the compliance, as well.