**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, CHIEF JUDGE**

Case No. 05-cv-00636-LTB-GJR

CARLOS E. SALA, and
TINA ZANOLINI-SALA,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____

**MEMORANDUM OPINION AND ORDER**
_____

Babcock, C.J.

      Plaintiffs Carlos E. Sala and Tina Zanolini Sala (referred to herein as "Sala," since Tina Sala is a named plaintiff only because the Salas filed a joint tax return) have filed a motion for summary judgment on their entitlement to a refund of a portion of the interest payments on taxes they paid, they believe excessively, on their year 2000 federal tax return, pursuant to 26 U.S.C. § 6404(g). The Government asserts that Sala is not entitled to this refund because this is "a case involving fraud" under 26 U.S.C. § 6404(g)(2)(B). Based on the discussion below, Sala's motion for summary judgment is GRANTED.

**I.  BACKGROUND**

      Sala had income in the year 2000 of over $60 million, but claimed tax losses that essentially nullified his tax burden. This spawned a years-long dispute with the Internal Revenue

Service ("IRS"), culminating in this litigation. Sala ultimately paid more in taxes, but is seeking a refund for both his taxes paid and interest he paid on taxes due. Sala believes the losses he claims are legitimate; the IRS believes they are not.

Sala obtained this reported tax loss through his participation in a financial program known as the Deerhurst transaction. While there is considerable factual dispute as to some of the mechanics of this transaction, according to its promotional materials, the Deerhurst transaction traded foreign currency options in an effort to make profits independent of the equity markets. Under its "diversified" investment strategy, Deerhurst held a fluctuating package of options, including short positions and long positions, some of which are long-term and some of which are short-term. Andrew Krieger, Deerhurst's principle trader, actively traded the pooled accounts of about 30 individual investors as a single investment entity.

Investors, including Sala, initially entered the program with a comparatively modest investment of about $500,000 for a period of 30-45 days. Investors initially invested at a leverage rate of 2-1, meaning that the account would be traded at twice the value of the cash investment. If they chose to proceed with the program, they would increase their investment and their leverage, thus increasing their risk of loss and potential for profit. Investors who chose to continue made a five year commitment, with penalties for early withdrawal

Investors who chose to stay with the program placed their funds in a limited liability company, to protect them from personal liability for any losses. These individual limited liability companies were then combined into Deerhurst Investors ("DI"), a general partnership, that was the overall entity holding the pooled accounts. At the end of the year, the funds were transferred back to the individual S corporations, the S corporations liquidated their holdings, and the funds

were transferred to another Deerhurst general partnership for additional trading in the following calendar year.

The promoters of Deerhurst were explicit about the program's tax advantages. The brochure describing Deerhurst states that "Tax basis will be generated in the long options positions, but the short options should not be treated as 'liabilities'. . . creating tax basis in the excess of value at the time of the contribution." Moreover, if DI is liquidated, "the investor ordinarily would be expected to realize a tax loss equal to the difference between his tax basis and the fair market value of the portfolio." The brochure also states that an investor who remains with the program for a full five years can expect "A possible tax advantage and the opportunity, based on past trading results, to realize cumulative economic profits far in excess of any tax advantages."

In the late 1990s, Sala was Chief Financial Officer, as well as Secretary and Treasurer, for Abacus Direct, a database marketing firm. When the company was acquired by DoubleClick, Inc., in 1999, Sala received stock options in DoubleClick, which he sold in 2000 for about $60 million. Sala was seeking an appropriate vehicle for managing this substantial year 2000 income, one with both an investment and a tax loss component. Sala first heard about Deerhurst from his friend and former accountant at Price-Waterhouse, John Raby, who introduced him to Deerhurst promoter Michael Schwartz. Sala spent a great deal of time reviewing the underlying finances of Deerhurst. Krieger called Sala's questions about the risk and historic performance of the Deerhurst trading strategy "annoyingly thorough." Sala also consulted several attorneys about various legal aspects of Deerhurst. Ultimately, Sala determined that Deerhurst met his needs.

Sala entered into a test account with Deerhurst in October of 2000, investing $500,000.

On November 21, 2000 he increased his investment by $8,425,000. From November 24 through November 28, 2000 a portion of these funds were used to acquire 24 long and short options on various foreign currencies. Sala paid $60,987,866.79 for the long options and received $60,289,568.94 million for the short options, with a net cost to him of $728,298. Krieger sold these options later in the year, for a profit of $91,010, according to the Government's expert, David DeRosa (or $111,599, according to Sala's expert, Robert Kolb.).

Sala initially acquired these options in his personal account, and then moved them into his solely-owned S corporation before transferring them to DI. According to an opinion letter provided to Sala by Michael Ruble, an attorney hired by Sala to evaluate the transaction ("the Ruble letter"), on December 21, 2000 Sala's account was distributed from DI back to his S corporation, in the original foreign currency. At this point, "Deerhurst then liquidated the positions into U.S. dollars to avoid any illiquidity and volatility issues typical of trades over the year-end." On December 29, 2000, the dollars were reinvested into a second Deerhurst fund, Deerhurst Trading Strategies LLC, another pooled investment entity treated as a partnership for U.S. federal income tax purposes. Sala then liquidated the S Corporation.

Sala reported these transactions on his 2000 federal income tax return. Sala contends that even though he made a modest profit on these trades, he legitimately claimed a $60 million tax loss because the long options increased his basis while the short options did not decrease his basis. For reasons neither party makes completely clear, Sala's tax loss is also dependent on the specific steps he took to structure this transaction, particularly his use of the S corporation in relationship to the partnerships and his liquidation of his holdings from the S corporation.

The role of the accounting firm KPMG in Sala's financial transactions is in dispute, and

has implications for some of the broader issues at play in this case. KPMG is a defendant in an unrelated criminal case in the Southern District of New York, *United States v. Stein,* S1 05 CR. 888 (LAK) (S.D.N.Y. 2005). In *Stein,* the Government has indicted several accountants and lawyers, as well as KPMG, on numerous counts all associated with developing and promoting a series of fraudulent tax shelters. Sala acknowledges that KPMG Accountant Tracie Henderson prepared Sala's year 2000 tax return, and tried to market several investment opportunities to him. He states that he did not use any of these options, and that neither she nor anyone else at KPMG was involved in Deerhurst. The Government believes that Henderson and KPMG may have had a greater involvement in Deerhurst, and has moved separately to stay this case pending the resolution of *Stein*, to afford it the opportunity to depose Henderson and other *Stein* witnesses.

Sala filed his original income tax return for the year 2000 prior to April 15, 2001. On or about November 18, 2003 Sala filed an amended federal return, paying additional taxes and paying interest on the additional taxes accruing from the due date of the original return until 18 months from the due date of the return, (October 16, 2002). Although the IRS did not notify Sala prior to the filing of his amended return that he owed additional taxes, the IRS demanded the additional interest paid related to the time period from October 16, 2002 to November 18, 2003, amounting to over $1.5 million. Sala paid this amount.

On April 5, 2005 Sala filed a complaint in federal court for repayment of the taxes he claims he overpaid, and also repayment of the excess interest the IRS demanded. Sala filed this present motion for partial summary judgment on the narrow grounds that 26 U.S.C. § 6404(g) limits the IRS to only collect interest on late payments of taxes accruing up to 18 months after the taxes were due, unless the IRS notifies the taxpayer of taxes due prior to the end of the 18 month

5

period. The Government does not dispute that it failed to provide Sala the requisite notification, but contends that Sala's return falls into the exception to this law described in 26 U.S.C. § 6404(g)(2)(B) as "a case involving fraud." So the dispute between Sala and the Government regarding the excess interest payment, the subject of this motion, reduces entirely to whether Sala's underlying claim for a tax refund is a case involving fraud.

## II. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Id.* at 323. However, I should not enter summary judgment if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares* at 494.

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254. The inquiry is based on "the

quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant." *Id.* Accordingly, in a case where the underlying evidentiary standard is clear and convincing evidence, the non-moving party must show by clear and convincing evidence that there is no material fact in dispute to defeat a motion for summary judgment. *Id. See also North Texas Prod. Credit Ass'n v. McCurtain County Nat'l Bank,* 222 F.3d 800, 813 (10th Cir. 2000).

The dispute underlying this motion is whether Sala's return is a "case involving fraud" under § 6404(g). While no court has addressed fraud under this statute, it is well established that the Government must prove fraud in other parts of the tax code by clear and convincing evidence. *Upshaw's Estate v. C.I.R.,* 416 F.2d 737, 741 (7th Cir. 1969); *Hebrank v. C.I.R.,* 81 T.C. 640, 642 (1983); *Petzoldt v. C.I.R.,* 92 T.C. 661, 699 (1989). I conclude that the Government's burden of proof under 6404(g) is also clear and convincing evidence. To defeat Sala's motion for summary judgment the Government must show that a reasonable jury could find clear and convincing evidence that Sala committed fraud.

Clear and convincing evidence is evidence that "could place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L. Ed. 2d 247 (1984) (internal citations omitted.) It is evidence that "instantly tilt(s) the evidentiary scales in the affirmative when weighed against the evidence" offered by the moving party. *Id.* "Clear and convincing evidence leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only [that] the proposition at issue is probable, but also that it is highly probable." *In re Diviney,* 211 B.R. 951, 961 (Bkrtcy. N.D. Okl. 1997) (*quoting* 4 L. Sand, et al., Modern Federal Jury Instructions ¶

7

73.01 at 73-16 (1997)).

## III.  DISCUSSION

The Government argues that Sala's 2000 tax return is a case involving fraud in two steps – contending first that the transactions on which he based his claimed loss lack economic substance, and thus are not entitled to preferential tax treatment, and then making the more direct case for fraud.  The Government asserts that Sala's transactions lacked substance because there was little risk or opportunity for profit in his investments, because the amount of his tax loss far exceeds the actual money he had at risk, and because the structure of his transactions, involving the S corporation, the Partnership and end of year liquidation – had no economic purpose other than generating a tax loss.

The Government's emphasis on absence of economic substance is curious, since the issue of economic substance goes to whether Sala is entitled to his claimed loss, not to the issue of fraud. The only issue presented in Sala's motion is the interest suspension issue, which in turn relates directly to fraud. It appears that the Government wishes me to make a legal conclusion on economic substance, when this is not before me. Accordingly, even though both parties address the issue of economic substance, I will not discuss it here, except to the extent it is necessary background to the Government's arguments on fraud.

A.  <u>Has the Government Presented Clear and Convincing Evidence that Sala's 2000 Tax Return was a Case Involving Fraud?</u>

Finding fraud requires proof that the taxpayer "intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes." *Petzoldt,* 92 T.C. at 699 (*citing Stoltzfus v. U.S.,* 398 F.2d 1002, 1004 (3d Cir. 1968)). Fraud is "never imputed or presumed and the courts should not sustain findings of fraud upon

circumstances which at the most create only suspicion." *Davis v. C.I.R.,* 184 F.2d 86, 87 (10th Cir. 1950). Courts may find as evidence of fraud "any conduct, the likely effect of which would be to mislead or to conceal." *Spies v. U.S.,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943). Essential to the intent for fraud is "some element of concealment or deception." *Zell v. C.I.R.,* 763 F.2d 1139, 1144 (10th Cir. 1985).

Since direct proof of a taxpayer's intent is rarely available, "fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts." *Petzoldt,* 92 T.C. at 699. "The taxpayer's entire course of conduct may establish the requisite fraudulent intent." *Id.* Courts have established numerous indicia of fraud. These include: "(1) understatement of income (2) maintenance of inadequate records, (3) failure to file tax returns (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, and (6) failure to cooperate with tax authorities." *Id.* at 700. Other indicia of fraud include "(1) the taxpayer's engaging in an illegal activity, (2) his attempt to conceal such activity, (3) his dealing in cash, and (4) his failing to make estimated tax payments. *Id.* "Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence." *Jondahl v. C.I.R.,* T.C.M. 2005-55 at *8, 2005 WL 675444 (2005). Additionally, while the Government's "mere refusal to believe" a taxpayer is insufficient to establish fraud, "the lack of credibility of the taxpayer's testimony, the inconsistencies in his testimony and his evasiveness on the stand are heavily weighted factors in considering the fraud issue." *Toussaint v. C.I.R.,* 743 F.2d 309, 312 (5th Cir. 1984).

Under this framework, it is not enough to show that Sala's transactions lacked substance; the Government must show that Sala engaged in some act of concealment or misrepresentation.

9

The Government could, for example, show that Sala entered into the Deerhurst transaction knowing it lacked substance, or that Sala filed a tax return he knew did not reflect the realities of his transactions. The Government could also show that Sala concealed information from the IRS or tried to mislead the Government during the course of its investigation.

Here, the Government's case for fraud is hampered by the absence of apparent indicia of concealment or misrepresentation. The Government does not allege that Sala has failed to file returns, that his record keeping is inadequate, that he has tried to conceal the nature of his transactions, that he has mis-stated information on his returns, or that he has failed to cooperate with the IRS. The Government does not offer any specific or direct evidence that Sala misrepresented or misreported the facts surrounding his economic activity.

Rather, the Government relies on inferences from Sala's conduct, Sala's purported lack of credibility and Sala's alleged mis-characterizations of his transactions as possessing substance. The Government offers as its indicia of fraud Sala's "implausible or inconsistent" explanations for his behavior, his "pattern of conduct" in seeking out Deerhurst and the "lack of credibility" in his statements and testimony. In this instance, the Government's evidence is insufficient to demonstrate concealment or deception and is therefore insufficient to show fraud.

The Government contends that Sala's side agreements with Deerhurst evince Sala's lack of a profit motive in pursuing Deerhurst. Sala negotiated with Deerhurst to increase Deerhurst's share of profits in exchange for lower management fees. Sala also arranged to be able to withdraw from Deerhurst without penalty if he did not receive a favorable tax analysis of the transaction. The facts of these agreements are not in dispute. The Government argues that if Sala were seeking to maximize his profits he would not have negotiated away profits in exchange

reduced fees; and his interest in an exit strategy confirms his principle interest in a tax shelter as opposed to an investment opportunity.

The Government's argument here appears to be not that these actions show that the transaction lacked substance, but that Sala's explanations for his behavior are not credible. Either way this argument is unpersuasive. The Government imputes a motive to these agreements that is little more than speculation. Sala may have wished to further reduce his risk of loss by lowering the fees. And, in fact, Sala had negotiated reduced fee agreements in other investments, not related to this case. Sala's interest in a favorable tax opinion before committing to the program is just as plausibly evidence of his intent to act legally as it is evidence of fraud. This is underscored by the fact that Bruce Nemirow, Sala's tax counsel, advised him to negotiate this kind of agreement.  Moreover, neither of these side agreements is itself evidence of concealment or of misrepresentation. Even if the Government's theory is correct that these are indicia that Sala was not seriously interested in profits, this goes only to the substance of the transaction, not to fraud.

The Government also asserts that Sala's behavior during the test period is inconsistent with a legitimate quest for profits, and so casts doubts on his credibility. The Government avers that Sala increased his investment from $500,000 to over $8,000,000, without his customary intense scrutiny. Sala acquired the options in his own name and transferred them to an S corporation, a series of steps, the Government claims, with no economic purpose other than generating a tax loss, since by acquiring the options in his own name he lost any potential liability protection. The Government asserts that the incredibility of Sala's justifications for his actions is indicia of fraud.  But the putative gap between Sala's explanation of his behavior and the Government's claim of Sala's actual behavior is marginal.  Sala states he sought a tax advantage

11

and an investment opportunity, while the Government asserts he sought only a tax advantage. The Government's expert witness, David DeRosa, acknowledged that there was some profit and profit potential to Sala's trades. DeRosa also testified that Krieger, Deerhurst's trader, always sought profits in his trades. While the degree of substance here may or may not be sufficient to justify Sala's tax claims, the mere fact that Sala sought a tax-advantaged investment program is not evidence of fraud. Also, while the Government has cast some doubt on the credibility of Sala's explanations for using the S corporation, this is not clear and convincing evidence of fraud.

The Government's other evidence of Sala's inconsistencies and implausible explanations is similarly unpersuasive. The Government contends that Sala stated in a deposition earlier in this case that he only received foreign currency back from his S corporation, but that his brokerage statement for his S corporation states that he received the funds in U.S. dollars. But the record is not as clear on this point as the Government suggests. Sala's declaration states that at the end of 2000 the S corporation received foreign currencies from the Deerhurst partnership, which it then converted to dollars and transferred to another Deerhurst pooled investment fund. The brokerage statement the Government cites states only that the S corporation received more than $9 million on December 29, 2000. It is silent on whether this transfer was in dollars, or was in foreign currency then converted to dollars. The DeRosa report documents that the Deerhurst partnership regularly transferred foreign currencies to the S corporation. In sum, the record is too vague to find an inconsistency or contradiction here. Also, it is unclear how this inconsistency, if it exists, is evidence of an effort to conceal or misrepresent a tax liability.

The Government also cites Sala's behavior in seeking out Deerhurst as evidence of intent to mislead, pointing in particular to Sala's actions in regard to IRS Notice 2000-44, "Tax

Avoidance Using Artificially High Basis," I.R.S. Notice 2000-44, 2000-2 C.B. 255 (August 13, 2000), ("The Notice"). The Notice describes transactions where a taxpayer acquires long options and transfers them to a partnership, purporting to "create substantial positive basis" in the partnership. The taxpayer is able to claim a tax loss by claiming the positive basis from the long options, but not decreasing the basis through the short options. The Notice states that losses stated through these or similar transactions "are not allowable as deductions for federal income tax purposes." The Notice also states that transactions like these must be listed under IRC § 6011(a) and must be registered with the IRS.

The Government argues that Sala entered into Deerhurst knowing it was covered by the Notice, and entered into Deerhurst knowing it would not be registered with the IRS in order to conceal his participation from the IRS. There is no question that Sala was aware of the Notice before participating in Deerhurst. Nemirow expressed concern that the Notice applied to Deerhurst. Sala also testified that Schwartz, Deerhurst's promoter, told Sala that the Notice did not apply to Deerhurst. From this, the Government asserts that "the only reasonable explanation" of Sala's actions is that he sought to conceal his actions from the IRS.

But this conclusion does not follow from these facts. Sala commissioned the Ruble letter, analyzing the Deerhurst transaction, in part to address the issues raised by the Notice. The letter concluded that "there is a greater than 50 percent likelihood that the tax treatment of the Transactions set forth herein will be upheld if challenged by the IRS." While the Ruble letter does not argue specifically that the Notice does not apply to Deerhurst, it does argue that the Notice is not legally binding, that the authorities it relies on when applied to Deerhurst would not compel a finding of a lack of economic substance, and that "it is more likely than not that the authorities

13

cited in Notice 2000-44 will not provide a basis for denying the deduction of a loss sustained from the transaction."

The law is clear that a taxpayer may reasonably rely on the advice of counsel on issues of tax law. *U.S. v. Boyle,* 469 U.S. 241, 251, 105 S. Ct. 687, 83 L.Ed.2d 622 (1985). Sala commissioned the Ruble letter assessing the tax status of the Deerhurst transaction. Sala reviewed it carefully, and had other lawyers review it. These lawyers, including Nemirow, who initially expressed concerns about the legal status of Deerhurst, concluded that the Ruble letter was reasonable. Sala relied on this opinion, even to the extent of negotiating an exit option on his participation in Deerhurst contingent on receiving this kind of favorable legal letter. Sala also states that he understood the law at the time to allow the tax treatment of contingent liabilities in a partnership in a manner consistent with the way he handled his transactions here, relying on *Helmer v. C.I.R.,* T.C.M. 1975-160, 2000-2 C.B. 255 (May 27, 1975). If Sala believed in good faith that the tax treatment he claimed on the Deerhurst transaction was legal, the Government cannot show that Sala denied to the Government tax he knew he owed.

I note again that the issue of whether the Notice applies to Deerhurst, and whether the losses claimed by Sala in regard to Deerhurst are legitimate, is not before me. The Government proffers Sala's behavior in relation to the Notice as evidence of his lack of credibility and as evidence of his attempt to conceal his participation in Deerhurst from the IRS. I find this evidence unpersuasive. At most, the Government's evidence shows that Sala was on notice that the IRS might challenge the tax losses offered by Deerhurst but, armed with a favorable legal opinion, he chose to proceed anyway. This may be evidence that Sala was willing to incur some risks, but it does not show fraud.

The Government's attempts to undercut the Ruble letter are unavailing. The Government contends that the Ruble letter is unreliable because Sala did not disclose to Ruble several key facts about his transactions, such as his early-out option, that participants were told to expect a tax loss in the year 2000, and that the Ruble letter profitability projections differed from Sala's. The Government also finds it significant that the Ruble letter did not address the fact that the structure of the transaction depended on whether participants were seeking capital or ordinary losses. However, the Government does not explain how any of these discrepancies (assuming for the purpose of this motion that they exist) would impact Ruble's conclusions. To be sure, reliance on the Ruble letter and on court decisions does not mean that Sala is entitled to the losses he claims, since technical compliance with the tax law does not render the underlying transactions substantive. *See Bohrer v. C.I.R.,* 945 F.2d 344, 347 (10th Cir. 1991). But it does show that Sala lacked the intent necessary for fraud.

The Government offers other instances of Sala's inconsistent or implausible statements, none of which are consequential or persuasive. For example, the Government contends that it is implausible that Sala did not tell his friend John Raby that he was seeking a tax shelter when Raby referred him to Michael Schwartz, who was at that time recruiting Deerhurst participants; that it is implausible that he was unaware of Deerhurst when he met with Schwartz in New York; that he testified he did not discuss tax shelters with Tracie Henderson of KPMG at their first meeting when Henderson's email states that they did; and that he did not discuss the Notice with Nemirow when Nemirow testified that they did. However, these are all minor inconsistencies that relate to meetings conducted years earlier. Also, these inconsistencies do not themselves evince an effort to conceal; the Government proffers them instead as evidence of Sala's lack of credibility. As such,

15

they are not sufficient to create clear and convincing evidence of fraud.

The Government also refers to a letter from Joseph Barloon, KPMG's attorney, which the Government claims includes an admission that the Deerhurst transaction was fraudulent. Barloon refers to paragraph 20 of a deferred prosecution agreement in *Stein* (not provided in the record here), and describes it as encompassing "Those SOS transactions that KPMG tax professionals 'marketed and implemented' and those SOS transactions for which KPMG tax professionals 'prepared tax returns incorporating the 'bogus tax losses' of the SOS transactions. The Deerhurst transaction is an SOS transaction that resulted in claimed losses on a tax return prepared by KPMG. Accordingly, the Deerhurst transaction is within the scope of paragraph 20." Barloon never states that Deerhurst is fraudulent, and also states that KPMG has not interviewed the KPMG employees with specific knowledge of Deerhurst, that he has no independent knowledge of the relevant facts, and that KPMG's role in relation to Sala was to prepare his tax return. The information in the record before me is insufficient to conclude that KPMG has admitted that Deerhurst was fraudulent. Moreover any KPMG admission that Deerhurst was fraudulent does not show that Sala was aware that it was fraudulent. I note that the extent to which KPMG's involvement with Sala and Deerhurst implicates other issues in this case is at this time unresolved. I conclude here only that the evidence the Government has provided with this motion is insufficient to enable a reasonable fact finder to find fraud by clear and convincing evidence.

It is so Ordered that Plaintiff's motion for partial summary judgment on the interest suspension issue (Docket #5) is GRANTED.

**DONE and ORDERED,** this ___1st___ day of May, 2007 at Denver, Colorado.

                                                  s/Lewis T. Babcock
                                           United States District Chief Judge