# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

------------------------------------x

CARLOS E. SALA and                  :

TINA ZANOLINI SALA,                 :

05-cv-00636-LTB-PAC,                :

        Plaintiffs,              :   05-cv-00636-LTB-PAC

vs.                                 :

UNITED STATES OF AMERICA,           :

        Defendants.              :

------------------------------------x

DEPOSITION OF TIMOTHY GILLIS

Washington, D.C.

October 23, 2006


ATKINSON-BAKER, INC.

COURT REPORTERS

1-800-288-3376

www.depo.com

REPORTED BY:  GERCHA RICHARDS WHITE

FILE NUMBER:  A009153

1 strategies.

2    Q.   Was that part of the reason for the
3 introduction to Tracie Henderson?

4    A.   Introduction and my role in the
5 introduction was to introduce him to a person that
6 did individual work, which I did not do.

7    Q.   Okay.  So you understood that as part of
8 Tracie's practice she dealt with strategies, tax
9 strategies?

10         MR. COLVIN:  Objection, mischaracterizes
11 the testimony.

12         THE WITNESS:  I'm sorry.  Can you repeat
13    the question?

14         BY MS. MATCHISON:

15   Q.   Sure.

16        Did you understand part of Tracie's
17 practice at that time to involve tax-avoiding
18 strategies?

19   A.   I understood that Tracie's practice
20 involved at the time advising individuals on tax
21 matters.

1      Q.   If at any point you need a break, just let
2 me know and we can go off the record.
3      A.   It would be nice if we had water.
4      Q.   We can take a break.
5           (A break was taken.)
6           BY MS. MATCHISON:
7      Q.   I think right before the break you said
8 that you understood that Tracie Henderson's practice
9 involved advising individuals on tax matters.
10     A.   Correct.
11     Q.   Is that correct?
12          What does that mean tax matters?
13     A.   On -- she worked with individuals where
14 most of the practice works with corporations and I
15 don't -- I'm not using tax matters as a term of art.
16     Q.   Okay.  So it has no special meaning to you?
17     A.   No,.
18     Q.   And I'm sorry, I can't remember if you
19 testified to this earlier, but do you remember what
20 group she was in, at KPMG in Atlanta?
21     A.   Well, they worked with individuals.  You

1 mentioned the term PFP earlier.  I'm not sure if
2 that was the name of their group or not, but that
3 was -- she did work with individuals.  And PHP, I
4 assume, would be personal financial planning, but.
5    Q.  Okay.
6    A.  To clarify -- to clarify the acronyms and
7 firms our size, seems to change.  So I don't want to
8 testify that it was that acronym at that time.  I
9 don't know.
10   Q.  Okay.  Fair enough.
11       And you testified at the point, or not the
12 point, but rather your understanding is that you
13 were trying to arrange a meeting between you, Tracie
14 and Carlos in October 1999.
15       Why specifically with Tracie Henderson?
16 How did she get involved?
17   A.  I was a partner in the Atlanta office.
18 Tracie was -- my recollection was that she was a
19 young partner.  Which to be truthful, I mean I was a
20 young partner, it's easier to approach the young
21 partner than it is to approach none and Tracie was

Page 37

1 always a very approachable person.

2     Q. Okay. So because she was approachable,
3 that's why you selected Tracie Henderson to meet
4 with Carlos?

5     A. Yes.

6     Q. And did you have any specific understanding
7 about her practice that made her suitable to meet
8 with Carlos?

9     A. She worked with the individual -- she
10 worked with practice that dealt with individual
11 income taxation, which I did not do.

12     Q. Okay. And you knew that Sala -- Mr. Salsa
13 was possibly coming into a great deal of money in
14 the near future; is that correct?

15     MR. BARLOON: Asked and answered.

16     THE WITNESS: The -- I understood that in
17     the discussions with Carlos from time to time
18     that various matters would come to -- he'd
19     asked for assistance, whether it was with
20     ABACUS or in his own -- on his own and I'd also
21     understood that he was in a position where a

1    A.   No.

2    Q.   The contents seem to indicate that this is
3 follow-up items from a meeting; is that correct?

4    A.   It appears to be that.

5    Q.   Do you have any recollection of this
6 meeting?

7    A.   Which meeting?

8    Q.   The meeting that this seems to be follow-up
9 items from?

10    A.   In the last paragraph, Tracie says It was
11 great to meet you last week.  That seems to be a
12 correlation to a reference to a Dallas meeting on
13 October 28th, on the prior exhibit, and that's all I
14 recall.

15    Q.   The Dallas meeting --

16    A.   That's all I recall about this e-mail.
17 Because I thought it referred back to this meeting.

18    Q.   Okay.  Do you recall the Dallas
19 October 28th, 1999 meeting?

20    A.   I'm not sure that the meeting was on
21 October 28th.  There's about -- I do recall

1 introducing Carlos to Tracie in Dallas.  The

2 reference on the -- on the calendar appears to

3 confirm that.

4    Q.  Was this meeting in person or via -- this

5 introduction meeting, was it in person or via phone?

6    A.  It was in person.

7    Q.  Who was at that meeting?

8    A.  As best I can recall, it was Tracie, Carlos

9 and me.

10   Q.  And where was this meeting?

11   A.  In Dallas and I believe our offices were at

12 the Crescent Court.

13   Q.  So the KPMG offices in Dallas?

14   A.  Our offices are no longer there.  So I'm

15 not sure if it's the Crescent Court, but I'm pretty

16 sure that the Crescent Court was the plaza in which

17 our offices were located in.

18   Q.  Okay.  How long did the meeting last?

19   A.  I don't recall.

20   Q.  Did Tracie come to Dallas just for the

21 meeting?

1     A.   I don't know.

2     Q.   Do you remember what was discussed at the
3 meeting?

4     A.   I don't recall.

5     Q.   Do you recall introducing Tracie to Carlos?

6     A.   Yes.

7     Q.   Do you remember any specifics about that
8 introduction?

9     A.   I don't recall.

10    Q.   Do you remember discussing ABACUS in the
11 potential for a change of control in that meeting?

12    A.   It's possible, but I don't recall.

13    Q.   Okay.  Back to exhibit, if you'll take a
14 look.  In the second paragraph references a 280-G
15 question.  Do you recall what those questions were?

16    A.   I don't recall.

17    Q.   Do you have any understanding as to what
18 that means?

19    A.   I have not looked back at code section
20 280-G, but I believe that's maybe parachute
21 payments.

Page 45

1    Q.  Do you have any recollection of discussing
2 parachute payments with Mr. Sala?
3    A.  I do not.
4    Q.  Beyond even just that meeting, you have no
5 recollection --
6    A.  It's not my area of expertise.  I don't
7 know.
8    Q.  Would it be an area of expertise for
9 Tracie?  Do you know?
10   A.  I don't know.
11   Q.  How about in the third paragraph here, it
12 starts:  I was on a conference call today, about the
13 option strategy?  Do you know what that means?
14   A.  I do not know.
15   Q.  You do not recall any discussions with
16 Mr. Sala regarding an options strategy?
17   A.  I don't recall what was discussed from the
18 meeting.  I -- and to be fair, it's outside my area
19 of expertise.  So I don't know -- I wouldn't
20 remember.  I mean I wouldn't be able to articulate
21 anything meaningful on that topic.

Page 46

1      Q.   Would it have been within Tracie
2  Henderson's expertise, an option strategy within --
3           (Telephonic interruption.)
4           (Discussion held off the record.)
5           BY MS. MATCHISON:
6      Q.   Would it have been within Tracie
7  Henderson's expertise, an option strategy?
8      A.   Apparently, based on the e-mail; but I
9  don't know for sure what her exact level of
10 expertise on that was or not.  I don't know if
11 that -- I mean she indicates being on a conference
12 call, so I don't know if there were others that were
13 more position, better position to advise on that or
14 not.
15     Q.   Do you have any recollection as to who at
16 this meeting brought up the use of an option
17 strategy?
18     A.   I don't recall.
19     Q.   And, I'm sorry, I think you said that
20 you've -- do you recall ever speaking with Mr. Sala
21 regarding an option strategy at any point, even

1 beyond this meeting?

2    A. As I mentioned before, it's outside my area
3 of expertise. I don't recall.

4    Q. In the same paragraph, there's a reference
5 to investigation regarding the use of a note.

6    Do you have an understanding as to what
7 that means?

8    A. I don't -- I don't have any knowledge of
9 what that would be about.

10    Q. Do you have any recollection at this
11 meeting, foreign currency options were discussed?

12    A. I have no recollection of that.

13    Q. In that same paragraph, there's a reference
14 to knowing something before February.

15    Did you have an understanding as to what
16 that meant?

17    A. I don't know.

18    Q. Do you know of any significance of February
19 in 2000, in regards to Mr. Sala?

20    A. I don't know.

21    Q. That same paragraph also references that

Page 48

1  those -- there are several issues to be worked out
2  before February.
3         Do you have any recollection as to what
4  those issues were?
5     A.  I do not.
6     Q.  In the following paragraph, it starts
7  regarding OPIS.  It says, Were you able to talk to
8  your colleague to gauge his level of interest?
9         Do you have an understanding as to who the
10 colleague refers to?
11    A.  I don't know.  But it could be -- since
12 Tony White was mentioned earlier, it could be Tony.
13 I don't know though.
14    Q.  This reference to OPIS, do you recall
15 discussions about OPIS at this meeting?
16    A.  I don't recall.  But again, it was anything
17 in this area is outside of what my area of expertise
18 is, so I don't recall what that would have been
19 about.
20    Q.  Would OPIS have been a part of Tracie
21 Henderson's expertise?

1  A.  I believe that they -- that that group may
2 have been involved with OPIS or whatever those are.
3 I don't even know what those mean though.  I'm
4 sorry.
5  Q.  Okay.  And when you say that group, you
6 mean the individual --
7  A.  The individual group.
8  Q.  The individual group.
9      Did the individual group, did they market
10 or sell tax shelters?  Do you know?
11     MR. BARLOON:  Objection, vague.  Go ahead.
12   You can answer the question.
13     BY MS. MATCHISON:
14  Q.  I'll narrow it.
15      During this time frame of
16 October/November 1999, do you know if an individual
17 group marketed or sold tax shelters?
18  A.  It's -- I will -- it's pretty widely
19 publicized that OPIS and BLIPS were -- which again,
20 is another acronym.  I couldn't even tell you what
21 it means -- were I guess, quote, marketed by

Page 50

1 professionals. I don't know if those were our names
2 or if they're some other firm's names or something,
3 but that's all I know.
4    Q.  Okay.  So, yes, they did market and sell
5 tax shelters during that time frame?
6         MR. BARLOON:  I'm just going to kind of
7     object to it.  To the extent these are matters
8     that are -- I don't know that it's appropriate
9     for -- if you're asking Mr. Gillis' specific,
10    factual recollection or knowledge, I don't know
11    if he ever came into the DPA or what; but he
12    can only testify as to his knowledge.  So if
13    you're asking his -- if you're asking his
14    understanding as to whether the individual
15    group marketed these tax shelters.
16        MS. MATCHISON:  Exactly.  I'm only --
17    again, I'm only looking for his understanding
18    in all these questions.  I'm not looking for
19    anything bigger, broader than that.  Only just
20    what you know.
21        MR. BARLOON:  His understanding today?