# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CARLOS E. SALA AND            )
TINA ZANOLINI SALA,           )
                              )
          Plaintiffs,         )
                              )
          -vs-                ) CIVIL ACTION NO.:
                              ) 05-CV-00636-LTB-PAC
UNITED STATES OF AMERICA,     )
                              )
          Defendants.         )

DEPOSITION OF

KEVIN BRADY

ATLANTA, GEORGIA

WEDNESDAY, SEPTEMBER 27, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California  91203
(818)551-7300

REPORTED BY:  LINDA K. JACKSON, CCR NO.: B-995

FILE NO.:  A00842C

Page 18

1       MR. FELDMAN:  Unless I give you a different
2  instruction.
3       MS. MATCHISON:  Absolutely.
4       THE WITNESS:  The answer is no.  Not that I
5  know of.
6  BY MS. MATCHISON:
7    Q    What was discussed at that first meeting?
8    A    I can honestly say I do not recall any
9  specifics of it.  But I would assume that we talked
10 about if we just exchanged personal information and he
11 took my phone number so that he could call me when he
12 gets his information together to prepare his tax
13 return.  That would be normal when I met a new client.
14   Q    You mentioned that Tracie Henderson introduced
15 you --
16   A    Uh-huh.
17   Q    -- to Carlos.  Who was Tracie Henderson?
18   A    She was a partner at KPMG in the personal
19 financial planning group.
20   Q    And at that time you were a senior manager or
21 just a manager, do you recall?
22   A    I don't recall.  I would assume I was just a
23 manager as opposed to a senior manager.
24   Q    So in the KPMG hierarchy, Tracie Henderson
25 would have been your superior?

1 timeframe, was it the standard policy or was it your
2 policy, rather, to send -- sign and send a new
3 engagement letter for every different kind of work
4 provided to a client?
5    A    Normally, they were annual.  And again most
6 of our clients in the PFP group were tax return
7 clients, tax compliance clients.  And so it was
8 standard to send out an annual letter for each tax
9 year.  If there was a special project to be done, then
10 there may be a separate engagement letter.
11    Q    And do you recall when Mr. Sala first engaged
12 KPMG?
13    A    The best I could recall would be the end of
14 2000.
15    Q    And what was your understanding of that
16 engagement?
17    A    That I would be assisting Tracie essentially
18 in preparing Carlos's 2000 tax return.
19    Q    After your first meeting, I think you said it
20 was in December of 2000?
21    A    November, December, end of 2000, yes.
22    Q    Did you meet with Carlos again before signing
23 an engagement letter, before he was engaged?
24    A    I don't think, no.  I think that would have
25 been the only meeting.  Carlos lived in Colorado.  I

Page 42

1    A    This, I would call, a standard tax compliance
2 engagement letter you were required to mail out with
3 the tax organizer that apparently went out to each tax
4 client. KPMG, as a company, required that this letter
5 go out with it.
6    Q    Is it a tax organizer?
7    A    A tax organizer is a blank tax input form
8 where you would list your tax items for the year in
9 question like 2000. The client would fill it in and
10 give you the tax information or give you the original
11 documents.
12   Q    And did you sign this letter?
13   A    Yes.
14   Q    Did you perform work for Mr. Sala in
15 connection this tax consultant engagement letter?
16   A    Yes.
17   Q    And what was your role in that regard?
18   A    Preparing his 2000 tax return.
19   Q    You did the actual preparation?
20   A    If I had assistance, I don't recall. I mean,
21 I had staff people working for me but I would have
22 prepared it and/or reviewed it, certainly.
23   Q    Did Tracie Henderson have any involvement in
24 this engagement?
25   A    Yes. She knew the client. And if I had any

Page 43

1 questions about anything, I could ask Tracie so we
2 would work on it together.
3     Q    And were you responsible for the billing for
4 this engagement?
5     A    I wouldn't say I was responsible, no.
6     Q    Who would you say was responsible?
7     A    Either Tracie or I.  But no one was
8 particularly responsible.
9     Q    Do you have a recollection of who prepared the
10 bills for this engagement?
11    A    We probably would have done it together.
12    Q    And by together, you mean you and Tracie?
13    A    Right.
14    Q    And do you have a recollection as to how the
15 services for this engagement were billed?
16    A    No.  But it was standard to have -- to look
17 at whatever time was in the contract and to bill it
18 out.  That was standard but I don't recall this one in
19 particular.
20    Q    When you say time in the contract, does that
21 mean --
22    A    Hours spent working.  The work times our
23 hourly rate.
24    Q    Do you recall delegating any duties in regard
25 to this engagement?

Page 47

1  I suppose, at the end of 2004 is my estimate.

2    Q    And why did he do that, do you know?

3    A    I understood that it was someone local.  And
4  we were not local.

5    Q    Do you know Tony White?

6    A    Yes.

7    Q    How do you know him?

8    A    I prepared his tax returns during the same
9  time period.

10   Q    And who introduced you to Tony White?

11   A    Tracie Henderson.

12   Q    Do you still prepare his tax returns?

13   A    No.  I do not.

14   Q    Why not?

15   A    Again, he lives in New York and I believe he
16 has someone local doing it.

17   Q    When did you last prepare his returns, do you
18 know?

19   A    I believe -- well, at the same time as Carlos
20 would have gotten a new accountant, Mr. White did as
21 well.  So I think 2003 was the last tax return we did
22 for the two of them.

23   Q    Did you ever provide Tony White with any tax
24 consultant services?

25   A    Yes.

Page 103

1    Q    Do you recall if Mr. Sala was billed hourly or
2 if he was billed a flat rate for the preparation of the
3 2000 tax returns?
4    A    I believe it would be hourly and then he
5 would not have been billed a flat rate.  I recall no
6 such flat rate arrangement.
7    Q    And then looking at this detail here on
8 Page 4, other than the three entries for your time at
9 the top there, do you see any other entries that would
10 be reflective of work done for the preparation of the
11 tax returns for 2000?
12    A    There is not enough detail here.  There must
13 be other pages because I could not have spent only six
14 hours working on that 2000 return.
15    Q    Okay.  And then just returning to the front
16 page for one more moment.  The total due there is
17 $25,000.  Is it unusual to have an even amount for an
18 hourly rate like that?  To have it come out so even?
19    A    For it -- to have it come out so even?  No.
20 It is not unusual.
21    Q    No?  Does $25,000 seem reasonable for the
22 services rendered as discussed in this invoice, a
23 reasonable amount to bill?
24    A    For Carlos Sala, yes.  Because he required
25 more work than most all of my clients.  Because he was

1 so hands-on with taking a look at what was going on

2 throughout the year.  So we were able to bill him and

3 he paid it.  And again even the evenness of it, a lot

4 of our bills are a thousand dollars, $1,200.

5    Q    Based on your testimony here today, we can

6 accept this is broken out on an hourly fee, on an hourly

7 basis.  Not on a flat rate fee, this $25,000

8         MR. HALLETT:  Objection.  That's not a proper

9    question, what you can expect.  But that's not a

10   proper question.  There is no foundation.  And it

11   is vague and ambiguous.

12 BY MS. MATCHISON:

13   Q    Go ahead and answer, if you can.

14   A    Certainly as far as I know there was no flat

15 fee arrangement.

16        MS. MATCHISON:  I will go ahead and have you

17   look at another exhibit.  This will be 132.

18                    (WHEREUPON, Exhibit 132 was marked
                      for identification by the court
19                    reporter.)

20 BY MS. MATCHISON:

21   Q    Do you recognize this document?  Take a minute

22 to look at it, of course.

23   A    Yes.

24   Q    What is it?

25   A    It is the aforementioned WIP report, work in