# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

```
------------------------------X
CARLOS E. SALA and            )
TINA ZANOLINI SALA,           )
                              )
            Plaintiffs,       )
                              )
        vs.                   )  Civil Action No.
                              )   05-CV-00636
UNITED STATES OF AMERICA,     )   LTB-PAC
                              )
            Defendant.        )
------------------------------X
```

October 24, 2006

10:30 a.m.

Continued Deposition of CARLOS E.

SALA, held at the offices of Katten, Muchin

& Rosen, LLP, 575 Madison Avenue, New York,

New York, pursuant to Adjournment, before

Elisabeth F. Nason, a Notary Public of the

State of New York.

Atkinson-Baker, Inc.
Court Reporters
www.depo.com
800-288-3376

Reported by:
ELISABETH F. NASON
JOB NO. A00921C

1                    Carlos Sala

2        A.      Roughly, but I can't be specific.

3        Q.      You didn't receive $60 million in your

4  account at any time, did you?

5        A.      No.  My accountant reflected a net

6  balance of 60 million if that's what you mean.

7        Q.      In fact, the cost to you was the net

8  between these two numbers, correct?

9        A.      The net cost, yes.

10        Q.      Approximately 700 and some odd

11  thousand dollars; is that correct?

12        A.      Correct.

13        Q.      You didn't write a check for

14  $60 million that you can recall?

15        A.      No, I would have remembered that one.

16        Q.      You probably would have remembered

17  receiving $60 million in premiums as well?

18        A.      That's a good assumption.  I want you

19  to know that I don't have pink glasses like my

20  colleague did at your deposition.

21        Q.      You are wearing your own and not your

22  wife's I think was the testimony.  Off the record.

23              (Discussion held off the record.)

24        Q.      Was there ever a discussion Mr. Sala,

25  that the tax losses that we are talking about,

1                    Carlos Sala

2 which is approximately $60 million --

3        A.    Yes.

4        Q.    -- that you claimed in 2000, was there

5 a discussion that you had with anyone at Deerhurst

6 or Multinational Strategies that the tax loss

7 would occur in 2000?

8        A.    Certainly no one at Deerhurst.  As we

9 talked about just now with Michael Schwartz, there

10 would have been a discussion with him in terms of

11 the amount of the loss.

12       Q.    And the year?

13       A.    And the year.

14       Q.    Can you tell me what that discussion

15 was?

16       A.    I don't recall specifically.  I'm just

17 going from general concept memory, but I don't

18 recall that there was a phone call or a discussion

19 that I had with Michael Schwartz specifically to

20 that, but because Michael Schwartz -- I think we

21 talked about that, we didn't have a discussion

22 about the tax loss and the amount of the

23 investment.  Then I conclude based on that, that

24 we would have had a discussion like that

25 generally, but I don't remember specific.

1                    Carlos Sala

2        A.     I don't know.

3        Q.     So you acknowledge that there was a

4 $75,000 fee paid to Mr. Ruble in connection with

5 an opinion letter?

6        A.     Yes.

7        Q.     And you paid other attorneys as well?

8        A.     Yes.

9        Q.     Few thousand dollars?

10       A.     Yes.

11       Q.     You paid KPMG for reviewing the

12 transaction?

13       A.     No, I paid KPMG in conjunction to

14 preparing my tax return.

15       Q.     You consulted with KPMG prior to

16 entering into the transaction?

17       A.     Only for the tax return preparation.

18 For instance, had they not prepared the tax

19 return, there would have been no fees for them

20 associated with that Deerhurst.

21       Q.     You can take a look at their bills.

22       A.     Sure.

23       Q.     Part of your profit was interest,

24 correct?

25       A.     Other, I'm certain there was a

1                       Carlos Sala

2 Deerhurst to say redo your nine years' worth of

3 historical results, assuming you had actually

4 charged 1 and 30 instead of 2 and 20.  Only they

5 could have done that.  That would have been

6 actually restated historical results.  I then

7 would have had to put that in my own analysis to

8 have done so, so it would have required a fair

9 amount of work.

10       Q.     You didn't ask them to do that?

11       A.     No.

12       Q.     Prior to entering into the

13 transaction, you reviewed the draft legal

14 opinions?

15       A.     Yes.

16       Q.     The draft opinions were prepared by

17 who?

18       A.     Brown & Wood.

19       Q.     How did you obtain copies of them?

20       A.     I don't recall exactly how I obtained

21 the copies.  They gave them to me.  It would have

22 been one of three sources.  It would have been

23 Brown & Wood would have forwarded it to me.

24 Schwartz would have forwarded it to me or John

25 Raby would have forwarded it to me.

Page 65

1                          Carlos Sala

2 at.

3          A.     I don't know to be perfectly honest.

4 I don't know which version I reviewed page by

5 page.   I don't even know how many versions.   Do

6 you know how many versions there were?

7          Q.     We can get to that.

8          A.     I don't recall how many versions.

9          Q.     You understood this to be representing

10 the transaction or similar to the transaction that

11 you would be entering into?

12          A.     Yes, a draft of it.

13          Q.     This is in October 2000.   Okay.   Do

14 you recall any conversation that you had with

15 Tracie about this?

16          A.     Yes, I asked her if she felt

17 comfortable with signing the return, she said yes.

18 She didn't say yes right away.   At some point she

19 said yes after reviewing it.

20               MR. GEIER:   Just for completeness, I

21          will show you what we will mark as Exhibit

22          160.

23               (Exhibit 160, Brown & Wood draft

24          opinion dated November 13, marked for

25          identification, as of this date.)

1              Carlos Sala

2 prior to entering into it?

3      A.    Yes.

4      Q.    Did Tracie advise you ever that she

5 was familiar with this type of a transaction?

6      A.    I don't recall, but I don't think so.

7      Q.    Were the draft opinions that you

8 reviewed prior to entering into the transaction,

9 consistent with the representation being made by

10 Mr. Schwartz about the transaction?

11     A.    Generally, yes.

12     Q.    Do you know if any of the opinions

13 talked about the buy-in to the transaction being a

14 percentage of the tax losses?

15     A.    I don't recall.

16     Q.    Do you know if the opinions

17 represented that you were told in advance that

18 there would be a tax loss in 2000?

19     A.    Can you repeat that.

20     Q.    Do you know if the opinions discussed

21 the fact that you had been advised prior to

22 entering into the transaction that the tax loss

23 would occur in 2000?

24     A.    I don't recall.

25     Q.    Do you recall any conversations you

1                   Carlos Sala

2 had with Tracie Henderson about any draft Brown &

3 Wood opinions?

4        A.      Just as I stated, in fact she felt

5 comfortable with the form of the opinion, the

6 contents, to be able to send a tax return.  I

7 remember discussing that with her.

8        Q.      Did she talk to you about any risk she

9 perceived you entering into the transaction?

10       A.      There is one additional item that

11 comes into mind; that is that she thought that

12 since the transaction included the use of an

13 S Corp., that she knew of an attorney who had the

14 expertise to review this type of transaction,

15 especially the use of S Corp. and she gave me the

16 name of Bruce Lemons.  That's how I contacted

17 Bruce Lemons to review the transaction, I know

18 that, but that's the extent of what I remember,

19 but she came back after her review and said that

20 she felt comfortable.

21       Q.      Did she explain there was any risk?

22       A.      I don't think I talked to her about

23 risks, but could be, I just don't recall.

24       Q.      Did you talk to anyone about risk?

25       A.      What kind of risk, investment risk?

1                          Carlos Sala

2 return?

3          A.      Yes.

4          Q.      Are you familiar with the term due

5 diligence?

6          A.      Yes.

7          Q.      What does the term due diligence mean

8 to you?

9          A.      It's an examination initially

10 involving extensive financial reviews of records,

11 historical performance.  It is an investigation of

12 managers that are involved in a transaction.  It

13 is an examination of documents to support what is

14 being reported to a potential party.  It's just a

15 very thorough investigation in all aspects of a

16 transaction and very financially oriented.

17         Q.      Do you recall whether or not you did

18 any due diligence before you committed any money

19 to the Deerhurst transaction?

20         A.      Extensive.

21         Q.      First of all, could you tell us what

22 you did in the way of due diligence before you

23 went into the Deerhurst transaction?

24         A.      The first thing I did is, I had many

25 questions and inquiries of John Raby and Michael

1                    Carlos Sala

2 Schwartz.

3              MR. GEIER:   Objection to the

4        narrative.

5        A.     Who presented the transaction to me.

6 Once I had some understanding of the transaction,

7 I met with the Deerhurst principals, primarily

8 Andy Kreiger, had an introductory meeting here in

9 New York.

10       Q.     Do you recall where that meeting took

11 place?

12       A.     It was in a hotel.  I believe it was

13 the Royalton here in New York.

14       Q.     Do you recall who was present?

15       A.     It was Andy Kreiger, Michael Schwartz,

16 John Raby, Tony White and myself.

17       Q.     Do you recall what Mr. Kreiger said,

18 if anything, at that meeting?

19       A.     Yes.  He gave us a good overview of

20 his background where he had actually worked, what

21 his performance had been and gave us a copy of a

22 book he had written on foreign currencies, which I

23 read.  And gave us an overview of what the

24 Deerhurst transaction and its trading would be

25 like.

1                    Carlos Sala

2        Q.     Did you ask any questions at the

3 meeting with Mr. Kreiger?

4        A.     Many questions.

5        Q.     What questions, if any, can you

6 recall?

7        A.     What he did at Bankers Trust.  What he

8 did with George Soros.  How profitable he had been

9 in the past.  How long he had been trading

10 currencies, foreign currencies.  How he got into

11 that business.  What was he doing now in terms of

12 his fund.  What were his results.  Many questions

13 of that sort.

14       Q.     How long was the book that he gave

15 you, how many pages, do you recall?

16       A.     Couple of hundred pages.

17       Q.     You testified you read that?

18       A.     Yes.

19       Q.     When did you read it?

20       A.     At the time that I was considering

21 entering the Deerhurst transaction.

22       Q.     What, if any, further meetings did you

23 have with Mr. Kreiger after that initial meeting?

24       A.     Then I flew back to New York and met

25 with Mr. Kreiger at his offices at least once,

1                    Carlos Sala

2 perhaps twice.

3        Q.     How long did those meetings take

4 place?

5        A.     They took time, certainly well in

6 excess of an hour, probably about two hours of the

7 investigations and questions.

8        Q.     Did you meet any other people?

9        A.     I did.  I met Peter Molyneux, I met

10 some other employees of Mr. Kreiger's.

11        Q.     What, if anything, did you observe

12 other than meeting people?

13        A.     That it was an actual operation,

14 Mr. Kreiger was a very sophisticated trader.  That

15 he seemed to have very strong views to the

16 currency markets.  That he seemed very competent.

17        Q.     Any other meetings with Mr. Kreiger

18 before you went into the transaction?

19        A.     Sure.  I had many telephone calls

20 during the time before the transaction.

21        Q.     I believe you testified that in

22 addition, you called the office manager for the

23 Perot family?

24        A.     I did.

25        Q.     What is the first time that you talked

1                   Carlos Sala

2 with anyone associated with the Perot family?

3      A.    It was prior to entering the

4 transaction, I wanted to get a reference as to

5 someone who had done extensive business with

6 Mr. Kreiger.

7      Q.    What, if anything, do you recall that

8 you were told by that person in that telephone

9 call?

10      A.    He had a very strong recommendation of

11 Mr. Kreiger, they had been doing business for a

12 number of years.  They had a significant

13 investment being managed concurrently with

14 Mr. Kreiger, number comes to mind was about

15 $50 million.  The Perot Family Office manager was

16 a very sophisticated investor, so it gave me a

17 great degree of comfort as to Mr. Kreiger's

18 experience.

19           MR. GEIER:  Objection.  Foundation.

20      Q.    That's a good point, counsel.  Why did

21 the information you obtained from the Perot Family

22 Office manager give you comfort?

23      A.    He was a very sophisticated investor

24 whose office was set up specifically to invest

25 large amounts of money, someone who had worked on

1                    Carlos Sala

2 Wall Street before who had had significant

3 experience with Mr. Kreiger.  Who understood the

4 currency markets.  Who had been very successful in

5 trading with Mr. Kreiger and who had very

6 favorable things to say about Mr. Kreiger.

7             MR. GEIER:  Objection.  Foundation.

8       Q.    Before that phone call, where had you

9 obtained information, if at all, about the Perot

10 family and their investments?

11      A.    Ross Perot is a very well-known

12 individual.  I knew he was worth several billion

13 dollars.  He had obviously run for president.  I

14 knew he had sold his stake in General Motors.

15 Highly accomplished individual.  So before that, I

16 knew of him and then when I was referred to the

17 office family, that was very specific to

18 Mr. Kreiger and Mr. Kreiger's background and

19 trading.

20      Q.    Did you in the year 2000 and prior

21 years, regularly read any financial journals or

22 magazines?

23      A.    Like?

24      Q.    Tell us some.

25      A.    On a daily basis, I read the Wall

1                      Carlos Sala

2 Street Journal, read The New York Times business

3 section, Fortune, Forbes, The Economist.  I get

4 the Kiplinger's letter, which comes out every

5 couple of weeks.  I watch CNBC for several hours

6 every day.  I sometimes watch how the markets

7 close late at night, how they open.  Sometimes I

8 used to watch when I was more interested, how Asia

9 opened.  I was constantly following the financial.

10     Q.    Okay.  Did you engage Mr. Nemirow?

11     A.    When I received a draft copy of the

12 opinion from Brown & Wood, it was clear that it

13 was a very complicated opinion, it was very

14 extensive.  It was clear to me that I needed

15 a -- if I wanted to understand that, I needed an

16 opinion, objective review of the opinion.  I

17 didn't think I was qualified to do that by myself.

18 I needed help to fully understand the opinion.

19           Mr. Nemirow is a tax attorney, very

20 well qualified Harvard trained.  I have been in

21 the tax legal field for many years.  Was working

22 for a major firm in Denver, I think the largest

23 firm in Denver.  Talked to him for a -- felt very

24 comfortable with him and felt like he was

25 essential in my review of the opinion to

1                    Carlos Sala

2 understand that properly.

3         Q.     What, if any, opinion did he express

4 to you as a result of his work that he did for

5 you?

6         A.     He felt that the opinion was well

7 crafted, that conclusions were reasonable and that

8 it could be relied upon.

9         Q.     How was he compensated, if at all?

10        A.     He was compensated on an hourly basis

11 and it was also attractive from a fee perspective,

12 that is that Mr. Nemirow already had some

13 familiarity with the transaction, so I didn't have

14 to pay from the very beginning in terms of getting

15 him up to speed with the transaction.  He also had

16 other clients that were invoked in the transaction

17 and we split those fees I think seven ways.

18        Q.     Did you spend time going through the

19 Brown & Wood draft opinion with him?

20        A.     I think we pretty much went through

21 every page of the opinion.

22        Q.     Did you ask him questions about it?

23            MR. GEIER:  Sorry.  Could you please

24        read back the question.

25            (The record was read.)

1                    Carlos Sala

2              MR. GEIER:  Can we clarify which

3      opinion?

4              MR. HALLETT:   The Brown & Wood draft

5      opinion.

6              MR. GEIER:  There are several.

7              MR. HALLETT:  Whatever Brown & Wood

8      draft opinion you reviewed with him.

9      A.      I reviewed the first --

10             MR. GEIER:  Objection.

11     A.      -- draft with him.  To the extent that

12 there were subsequent drafts, we reviewed changes

13 to the previous draft until it was finalized.

14     Q.      Did you ever put any restrictions on

15 what he could or couldn't see in connection with

16 his engagement with you regarding Deerhurst?

17     A.      No, it was full disclosure.

18     Q.      You testified that you believed one of

19 the reasons you engaged him was to obtain an

20 independent opinion.  Why did you believe he was

21 independent?

22     A.      He had no connection with Michael

23 Schwartz, Andy Kreiger and Brown & Wood, so I felt

24 he was independent of the author of the opinion.

25     Q.      Mr. Lemons, did you engage Mr. Lemons

1                    Carlos Sala

2 to perform any services in connection with

3 Deerhurst?

4       A.    I did.

5       Q.    Can you recall approximately when you

6 engaged him?

7       A.    It was during that time frame of the

8 fall of 2000.

9       Q.    Do you recall what, if anything, you

10 asked him to do in connection with the engagement?

11      A.    I asked him to review the opinion and

12 to tell me if he felt that it was reasonable to

13 rely on that opinion and also to let me know if he

14 had any issues with the S Corp. structure of the

15 opinion.  He was from my references of him, to be

16 particularly knowledgeable with S Corps.

17      Q.    Where did you get that information

18 that he was knowledgeable with S corporations?

19      A.    Tracie Henderson had mentioned that to

20 me.

21      Q.    Did you receive any legal advice or

22 opinion from Mr. Lemons subsequent to the time you

23 engaged him?

24            MR. GEIER:  Objection to the form of

25      the question.

1                    Carlos Sala

2        A.      Yes, he reviewed the opinion and after

3 his review, I had a conference call with him where

4 he expressed his opinion that the legal opinion

5 seemed reasonable, well crafted and could be

6 relied upon.

7        Q.      Did he tell you whether or not he had

8 actually read the opinion?

9        A.      Yes.

10       Q.      Did he tell you where he was when he

11 read the opinion?

12       A.      He said he was mostly on an airplane.

13       Q.      Did you receive a bill from him?

14       A.      I did.

15       Q.      What was the basis for the fee, do you

16 recall?

17       A.      It was an hourly basis and I believe

18 he charged half of his time to me and half of his

19 time to Mr. White.

20       Q.      Do you recall how much approximately

21 was paid to him?

22       A.      About 2,500 to $3,000.

23       Q.      Directing your attention to Exhibit

24 184, which I believe is also 131.  Can you

25 identify that document?

Page 225

1                        Carlos Sala

2        A.      Which exhibit?

3        Q.      Let's look at Exhibit 184.

4        A.      Yes, it's a bill I received from KPMG

5 dated April 17, 2001.

6        Q.      To the best of your recollection, did

7 you actually receive that bill?

8        A.      Yes.

9        Q.      Do you know whether or not you had

10 received any bills from KPMG prior to the receipt

11 of that bill dated April 17, 2001?

12       A.      This was the first bill I received

13 from them.

14       Q.      Do you recall whether or not you paid

15 any fees to KPMG prior to the receipt of that bill

16 dated April 17, 2001?

17       A.      I didn't pay them any fees prior to

18 this.

19       Q.      The amount shown on that bill is

20 $25,000?

21       A.      Yes.

22       Q.      Did you pay that amount?

23       A.      Yes.

24       Q.      Approximately do you recall when you

25 paid it?

1                       Carlos Sala

2       A.      After April 17, 2001, but it would

3 have been sometime I believe in 2001.

4       Q.      During what period were the services

5 rendered for which KPMG was billing you?

6       A.      From December 1st, 2000 through April

7 15, 2001, although the bill has a typo, it says

8 April 15, 2000, but it should read April 15, 2001.

9       Q.      The bill lists some five bullet points

10 of what the bill is for.  Do you see those?

11      A.      Yes.

12      Q.      Did that comport with your

13 understanding of what you had actually engaged

14 KPMG and agreed to pay them to do?

15      A.      Yes.

16      Q.      What was your understanding as to what

17 you had engaged them to do and what you were

18 paying them for what they had done?

19              MR. GEIER:  Objection.

20      A.      You mean --

21      Q.      Yes.

22      A.      The first bullet point says

23 preparation of 2000 federal and income tax

24 projection including discussions with Goldman

25 Sachs and Morgan Stanley.  What that relates to is

1                    Carlos Sala

2 **at the end of the year, I would have collected the**

3 **results of any stocks and bonds that I would have**

4 **sold during the year.**

5          MR. GEIER:  Objection.  Sorry, are you

6     asking him to interpret what each of the

7     provisions on the bill means?

8          MR. HALLETT:  I'm not asking him to

9     interpret it.  I'm asking him to give his

10     understanding of what he was paying for.  Do

11     you have an objection, object.

12          MR. GEIER:  I wanted to understand

13     what the question was, Darrell.  I heard

14     you, you answered me.

15     **Q.     The question was what was his**

16 **understanding of what he was paying for.**

17     **A.     Five items here.  My understanding is**

18 **that the first item relates to quantifying what my**

19 **capital --**

20          MR. GEIER:  Objection.

21     **A.     -- gains or losses --**

22          MR. GEIER:  Foundation.

23     **A.     -- for the year were of stocks and**

24 **bond transactions.  To make sure that my losses**

25 **would offset my gains and to determine whether I**

1                    Carlos Sala

2 needed to sell some stocks to generate losses that

3 would offset any gains from transactions that

4 occurred during the year.  That's the first item.

5 Those transactions occurred through Goldman Sachs

6 and Morgan Stanley.  That's why they are listed.

7              The second bullet point preparation of

8 2001 federal and income tax projections for

9 investment planning purpose and related

10 consultations.  It means making a projection of my

11 2001 federal tax liability to determine whether it

12 made sense to purchase taxable securities or tax

13 exempt securities such as municipal bounds.

14              Third bullet point, preparation of

15 2000 federal and income tax returns, that's pretty

16 much what it says, it's just preparing those

17 returns for the year 2000.

18              The fourth bullet, form W-2 analysis

19 and related discussions regarding stock option

20 income.  That work related to comparing the W-2

21 that was issued and ensuring that the amounts

22 reported by the transfer agent when I sold the

23 stock, a Double Click stock that I held, was

24 reasonable when comparing it to the actual trades

25 that occurred through Goldman Sachs, which sold my

1                   Carlos Sala

2 stock.   That was 600,000 shares being sold at

3 different prices and I wanted to ensure that that

4 was properly recorded.

5               The last bullet point, miscellaneous

6 tax advice would have covered any questions I may

7 have had regarding taxes, but there was nothing of

8 significance in that area.   That's the entire

9 bill.

10               MR. GEIER:   I renew my objection on

11           foundation and move to strike.

12        Q.    Let me refer you to what has been

13 admitted as Exhibit 119, which purports to be

14 addressed to you and states billing for

15 professional services.

16               MR. GEIER:   Do you have a copy?

17               MR. HALLETT:   I don't.

18               MR. GEIER:   Can you show me a copy.

19               MR. HALLETT:   Sure, I assumed you had

20           the exhibits.   You can stand over us if you

21           want.

22               MR. GEIER:   Let me correct, you said

23           it's been admitted.   If anything, it's been

24           identified at this point.

25               MR. HALLETT:   You are right, it's been

1                    Carlos Sala

2      A.    No.

3      Q.    Mr. Ruble, what was the extent, if

4 any, of your dealing with Mr. Ruble?

5      A.    I had a discussion over the telephone

6 with Mr. Ruble prior to hiring him to discuss the

7 details of the Deerhurst transaction to ensure he

8 had a good understanding of the Deerhurst

9 transaction and to ensure that he could issue an

10 opinion associated with the transaction.  He then

11 provided me with an opinion of the Deerhurst

12 transaction.

13      Q.    Directing your attention to what has

14 been marked as Exhibit 161, which is the Brown &

15 Wood opinion dated April 16, 2001.  Directing you

16 to page 4 of that opinion, directing you to the

17 heading representations and the subheading

18 investor representations.  Do you understand that

19 investor here means you, Carlos Sala?

20      A.    Yes.

21      Q.    The opinion states that investor

22 through S Corp., entered into the trial period

23 increased leverage and fund one and fund two for

24 substantial non-tax business reasons including to

25 produce an overall economic profit from the

Page 257

1                    Carlos Sala

2      Q.    That was contained in the October 6,

3 correct, e-mail, the September 15 letter?

4      A.    Yes.

5      Q.    It was also contained in the April 16

6 opinion from Brown & Wood, correct?

7      A.    Yes, yes.

8      Q.    My point here is, you didn't sit down

9 here with Mr. Ruble and make these representations

10 with Mr. Ruble, correct?

11      A.    We negotiated the representations to

12 make sure I was comfortable in making these

13 representations.

14      Q.    You didn't do that with Mr. Ruble?

15      A.    My attorney did.

16      Q.    You weren't part of those

17 conversations with Mr. Ruble and Mr. Nemirow?

18      A.    Indirectly -- with Mr. Nemirow

19 absolutely.  Mr. Nemirow and I discussed them in

20 great detail.

21      Q.    Mr. Ruble and you?

22      A.    No, no.

23      Q.    Many of the representations contained

24 in the September 15 letter in one form or another,

25 wound up in the final opinion letter that you had,

Page 262

1                              Carlos Sala

2        Q.      Mr. Schwartz was the promoter of the

3 transaction in your estimation, correct?

4        A.      He was the tax advisor on the

5 transaction.

6        Q.      You weren't looking for someone who

7 had no connection to the transaction or to

8 Mr. Schwartz, correct?

9        A.      I was.

10       Q.      You were?

11       A.      Yes.

12       Q.      In the past, had you dealt with any

13 attorneys or law firms other than Mr. Nemirow?

14              MR. HALLETT:  You mean in his entire

15       history had he dealt with any other lawyers

16       or law firms?

17       Q.      In Colorado.

18       A.      Mulholland and Bruce Lemons.

19       Q.      What other lawyer did Mr. Schwartz

20 recommend other than Mr. Nemirow?

21       A.      I believe he recommended Becky

22 Cantley.

23       Q.      You understand that Mr. Cantley

24 invested in the transaction, didn't you?

25       A.      Listen to his deposition.  I didn't

1                          Carlos Sala

2 know it at the time.

3         Q.      Looking back now, you realized that

4 Mr. Schwartz wasn't giving you independent advice?

5         A.      I don't believe that's true.

6         Q.      You believed it was independent?

7         A.      I believe that recommending Mr.

8 Nemirow it was a good source.

9         Q.      How many clients did you understand

10 that Mr. Nemirow had that was looking at this

11 transaction in addition to you and Mr. White?

12        A.      And Mr. Dice at the time.  Four I

13 believe.  Larry Nemirow is clearly independent of

14 Schwartz.

15        Q.      Did you ever go to Goldman Sachs and

16 your representatives there and ask them about

17 opportunities to invest in foreign currencies?

18        A.      We talked about opportunities of

19 investing in derivatives and they refused.

20        Q.      Did you ever ask them about

21 investments in foreign currencies, do you mean

22 derivatives, you mean options?

23        A.      Option -- well, options on

24 commodities, which foreign currency would have

25 been one of them.