# EXHIBIT 9

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3                            —  —  —

4

5    CARLOS E. SALA and                )
     TINA ZANOLINI SALA,               )
                                       )        Case No:
6                   Plaintiffs,        )        05-CV-00636-LTB-OES
                                       )
7    vs.                               )
                                       )
8    UNITED STATES OF AMERICA          )
                                       )
9                   Defendant.         )
     ----------------------------------

10

11                                    **CERTIFIED COPY**

12

13

14                      THE DEPOSITION OF

15                      LAURENCE NEMIROW

16                      DENVER, COLORADO

17                    SEPTEMBER 14, 2006

18

19

20

21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY:  MARTHA H. BENNETT
25   FILE NO.:  A007B17

1     recall that he did.

2              Q.     Have you been asked to testify at trial in

3     this matter?

4              A.     No.

5              Q.     If asked to testify, will you do so?

6              A.     Yes.

7              Q.     Do you have any plans during July of 2007 at

8     this point?  Occasions?  Anything scheduled?

9              A.     No.

10             Q.     Any other major matters you've got that would

11    keep you out of the office?

12             A.     I don't think so.

13             Q.     All right.  When did you first meet Carlos

14    Sala?

15             A.     It must have been in October of 2000, right

16    around that time frame.

17             Q.     Why do you say it must have been in October of

18    2000?

19             A.     That's my recollection.  I think that I was

20    able to put that together from my notes.

21             Q.     Tell me about the first meeting with Carlos.

22             A.     Carlos called me -- I think he called me --

23    and asked me whether I would represent him in connection with

24    the Deerhurst transaction.

25             Q.     Did he say why he needed representation?

1            A.     I don't recall.  I mean, people don't usually

2    tell me why they need representation; they just ask for

3    representation.  But, no, I don't recall.

4            Q.     Did you ask him if there was litigation

5    involved with this transaction?

6            A.     No, I did not.

7            Q.     What did he in particular ask you to do?

8            A.     I don't recall what he asked me to do, but I

9    think I recall what I told him I would be willing to do.

10           Q.     All right.  What was that?

11           A.     I would review the tax opinion from Brown &

12   Wood with a view towards trying to ensure that it would

13   provide penalty protection in the event that the IRS asserted

14   civil penalties.

15           I also told him that I would review the underlying

16   transactional documents, and comment on them, and try to make

17   sure that they worked.

18           Q.     What does that mean, "try to make sure that

19   they worked"?

20           A.     That they produced the intended deal; the

21   intended economic arrangement between the parties.

22           Q.     What was that intended economic relation

23   between the parties?

24           A.     Well, Carlos is part of the Deerhurst

25   transaction, invested in a limited liability company.  And

15

1    what I'm talking about are the terms of the investment in

2    that company.  I think "Deerhurst Strategies" is the name of

3    the company.

4              Q.    Could that have been "Deerhurst Trading

5    Strategies"?

6              A.    That could have been, yes.

7              Q.    And your role, then, in that regard, was to

8    ensure that the formation documents were correct to put them

9    in that?

10             A.    No, not the formation documents; it was the

11   terms of the Deerhurst Trading Strategies deal.  It was a

12   complex document.  I read the document and made sure the

13   allocation provisions in the LLC agreement would stand up,

14   and if they were what was intended; and if the termination

15   provisions would work.  All the economic provisions of the

16   document, were what I looked at.

17             Q.    You said "they would work."  Does that mean to

18   you that they would survive legal scrutiny?

19             A.    What I meant to say was that they would

20   capture the intended economic arrangement between Carlos and

21   the company and the rest of the members.

22             Q.    Okay.  Now, we're talking here about Deerhurst

23   Trading Strategies, LLC?

24             A.    Uh-huh.

25             Q.    Were you aware of when that transaction would

16

1    begin?   When Carlos would enter Deerhurst Trading Strategies,

2    LLC?

3              A.     I believe it was at the end of 2000.

4              Q.     Did Carlos ask you to review any transactions

5    he was entering before that time period?

6              A.     Yes.

7              Q.     What was that?

8              A.     He entered into a trading account with

9    Deerhurst, I believe, prior to entering into the Deerhurst

10   Trading Strategies, LLC.

11             Q.     Did you do any review work for that?

12             A.     Less; but, yes.

13             Q.     Were you asked to review that transaction?

14             A.     Yes; yes.

15             Q.     What's your understanding of that transaction?

16             A.     That transaction was an acquisition of short

17   and long options.

18             Q.     What was the goal of that transaction?

19             A.     The goal was to make money.

20             Q.     Was another goal to get a tax loss?

21             A.     There was also a goal to get a tax loss.

22             Q.     Were they equal goals?  Was one more important

23   than the other?

24             A.     That, I don't know.

25             Q.     Did -- we'll come back to that.

1    understood the deal.  I wanted to know what the deal was,

2    because I was helping document the deal.

3              Q.    Was it your worry, then, that if Mr. Sala

4    never actually received any foreign currency that he would be

5    at a greater risk of civil penalty?

6              A.    I don't know what my concern was in writing

7    this down.

8              Q.    Looking at this now, do you have a concern?

9              A.    Looking at it now, I would just want to know

10   what the deal is.

11             Q.    And the note on the bottom of the page?

12             A.    It says "five-year term?"

13             Q.    I'm going to have you look at Page 4.

14             A.    Okay.

15             Q.    Next to "B. Fund Representations," would you

16   read that for us?

17             A.    It says, "Will we get these representations?"

18             Q.    And did you work on the representations for

19   the Brown & Ruble [sic] opinion letter, too?

20             A.    I commented on them.

21             Q.    When you say you "commented," did you add

22   representations?

23             A.    I don't recall adding any representations.

24             Q.    Do you recall eliminating any representations?

25             A.    I don't recall whether I did.

84

1    identify that for me?

2              A.    I'm trying to figure out what it is exactly.

3    I'm not familiar with this form of e-mails.  It looks like an

4    e-mail to me perhaps from R.J. Ruble, I guess.  It's

5    difficult for me to identify exactly what this is, and it's

6    got a redacted portion.

7              Q.    I'm referring you to the language on -- does

8    that appear to be an e-mail that was addressed to you?

9              A.    Yes, it is.

10             Q.    From Mr. Ruble?

11             A.    Yes.

12             Q.    For the record, who is Mr. Ruble?

13             A.    He was the author of the Brown & Wood opinion.

14             Q.    Did you have personal conversations with

15   Mr. Ruble from early October 2000 on or before April 15,

16   2001?

17             MR. JANIK:  Objection; leading.

18             A.    Yes.

19             Q.    (By Mr. Hallett)  Did you have numerous

20   conversations with him?

21             MR. JANIK:  Objection; foundation.

22             A.    I don't know how many I had, but I had

23   several.

24             Q.    (By Mr. Hallett)  All right.

25             A.    Between several and numerous.

1          Q.     That e-mail from Mr. Ruble to you states, "As

2    you see from the attachment, R.J. and I agreed on the final

3    form of the opinion on March 30."

4          MR. JANIK:  Objection; foundation.

5          A.     Yes.

6          Q.     (By Mr. Hallett)  I'm just referring you to

7    that to see if that refreshed your recollection.  Was there a

8    point in time that you recall when you and Mr. Ruble agreed

9    on a final form of the opinion?

10         MR. JANIK:  Objection; foundation.  There's nothing

11   to refresh.

12         Q.     (By Mr. Hallett)  You can answer.

13         A.     Yes.

14         Q.     And when, if ever, did you and Mr. Ruble agree

15   upon a final form of the opinion?

16         MR. JANIK:  Objection; foundation.

17         A.     Based on this, I would say March 30.

18         MR. JANIK:  Are you finished with this exhibit?

19   This is a redacted exhibit.  We have no idea what's included

20   and what's not included to establish any sort of foundational

21   basis.

22         MR. HALLETT:  Well, for the record, the government

23   produced it to us, and it was obtained by the government by

24   (inaudible) Austin.  So if the government can get a better

25   one, have at it.