# EXHIBIT 4

"A settlement is when each side gives a little. A settlement is not where the government wins everything," the practitioner said.

Inquiries into option backdating abuses have exploded recently, and the widespread use of option-based compensation has the potential to create headaches for large numbers of employees well below the executive level.

> 'This shameful practice was widespread,' said Everson. 'We are allowing employers to satisfy the tax obligations of employees who did not knowingly participate in these schemes.'

"This shameful practice was widespread," said IRS Commissioner Mark Everson in a statement. "We are allowing employers to satisfy the tax obligations of employees who did not knowingly participate in these schemes."

Companies will have until February 28, to notify the IRS if they plan to participate. The offer applies only to discounted stock rights exercised in 2006 and is not available to executives or any employees involved in the intentional misdating of options.

"This initiative does not extend to the executives and insiders who were the principal beneficiaries of the backdating schemes," Everson said. "We continue to pursue these cases and work closely with the Securities and Exchange Commission and the Justice Department as appropriate." ■

## NEWS ANALYSIS

## What Does IRS BLIPS Victory Mean?

*By Lee A. Sheppard — lees@tax.org*

We have just returned from Florida, and we never want to see another metallic leather daytime handbag.

Let's talk about status symbols. The east coast of Florida being a resort area and a de facto suburb of New York City, every status symbol imaginable is on display at all times. And for male readers shocked at the prices of fashion items discussed in this column, we would note that men's status symbols are much, much more expensive.

The ultimate male status symbol? A private jet. Little jets are so expensive that it is exceedingly rare that anyone uses his own money to pay for one. It's a business expense deduction — that racing stable is somehow a business — or, more likely, a corporate jet that the CEO just happens to have available for his every golf outing. So the taxpayers are paying for these things, one way or another. (Are you reading this, Senator Grassley?)

To add insult to injury, these little status symbols enjoy equal status at the country's airports with commercial airliners. (Is this a great country, or what?) So regular people flying on regularly scheduled flights on regular airlines have to wait behind lines of these little nuisances waiting to take off. On Super Bowl Sunday, the ultimate status symbol was landing one's little jet in Miami an hour before kickoff. Regular flights were delayed while the airspace over Miami was cluttered with little jets.

Getting back to metallic bags, *The New York Times* reported over the weekend that the status symbol du jour is a mirror-finish metallic gold or silver Vuitton Speedy bag (can't keep 'em down). And the fashion mags are showing not just metallic leather daytime bags for spring, but also big clear plastic bags and big white leather satchels and totes — yes, very similar to the big bag that Bubbe in Boca carries. Don't bite, unless you have a place in Florida where you can dump the bag after a couple of months when you get tired of it. And resort bags look silly at the office.

Of course, the ultimate status symbol for the IRS is winning a tax shelter case. The IRS won the BLIPS case, *Klamath Strategic Investment Fund v. United States*, No. 5:04CV-00278 (E.D. Tex.), Doc 2007-2603, 2007 TNT 22-9. Despite winning the case on the substantive question, the IRS failed to convince the judge to impose any of the numerous penalties for

(C) Tax Analysts 2007. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

taxanalysts
DOCUMENT SERVICE
Doc 2007-3397 (7 pgs)

(C) Tax Analysts 2007. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

NEWS AND ANALYSIS

which a hokey shelter transaction is arguably eligible. (The Justice Department expressed its disappointment. *Doc 2007-2712* or *2007 TNT 23-56*.) So *Klamath* might be a large white leather handbag of a decision, conferring only temporary status.

> Despite winning the case on the substantive question, the IRS failed to convince the judge to impose any of the numerous penalties for which a hokey shelter transaction is arguably eligible.

More has changed in handbag fashion than has changed in the landscape of BLIPS settlements. There are many hundreds of cases. There are a few hundred cases in litigation. The IRS has no current settlement offer for BLIPS, so customers have to come in on their own and be willing to pay more in the way of penalties than they would have had to pay under the midnight settlement offer of a year ago and the previous offer of fall 2005. Under those offers, BLIPS customers would have had to pay penalties ranging from 25 percent to 50 percent of the penalty the IRS thought should apply. (For discussion, see *Tax Notes*, Feb. 20, 2006, p. 812, *Doc 2006-3182*, or *2006 TNT 34-4*.)

Lawyers for the customers say there are many customers who would settle for tax deficiency and interest without penalties. Many cases are in court to contest the penalties. The IRS does not want to back down on penalties in BLIPS cases. IRS Chief Counsel Donald Korb told Tax Analysts that the IRS "will continue to assert penalties when they are appropriate."

## BLIPS

The principal tax shelter at issue in the *Klamath* case is the bond linked issue premium structure (BLIPS), which is a version of son-of-BOSS, a partnership basis abuse transaction. Son-of-BOSS was one of the major retail shelters. The legal issue in the deal is whether an obligation to pay discount interest is a "liability" of a partnership under section 752.

The BLIPS individual customer borrows a large sum of money at a nominal fixed interest rate that is very high. The customer borrows both the principal amount of the loan and an amount equal to the discounted present value of the nominal interest due over the term of the loan — the latter being referred to as a "premium." That premium could be a sizable chunk of the total amount owed to the bank because the nominal interest rate looked like a credit card rate. The premium is determined by the size of the desired tax loss, and the nominal loan principal is derived from that.

The customer then assigns the loan to a partnership in which he holds a 90 percent partnership interest and to which he contributes some cash. The partnership uses only the customer's own small cash contribution in currency trades, although it is authorized to use the total loan proceeds that way. Section 752(b) would treat the assignment as a distribution of money to the partner. Under section 733, a distribution to a partner decreases the partner's basis in his partnership interest.

However, the assumption of the loan by the partnership would proportionally increase the partner's basis in his partnership interest. Section 752(a) treats any increase in a partner's share of partnership's liabilities as a contribution of money to the partnership. Under section 722, this deemed contribution of money to the partnership increases the partner's basis in the partnership.

The partnership law has not adequately addressed the question whether the premium on the loan — which represents the present value of nominal interest that will accrue during the period of the loan — should be treated as a partnership liability. The BLIPS planners aimed to apply sections 733 and 752 only to the nominal principal amount of the loan, ignoring the premium on the ground that it is not part of the principal and is contingent. In reality, however, a purchaser of the partnership interest would take the premium into account.

So the customer seeks to liquidate his partnership interest and take a loss in the amount of the premium. Technically the customer would take a liquidating distribution of cash and property, such as listed shares or foreign currency. The cash would represent return of customer basis. Under section 732(b), the remaining amount of the customer's basis in his partnership interest would be tacked onto the property, which would be sold at its public price, with the customer claiming a huge loss.

These shelters depend on the argument that the customer's obligation to repay the premium should not be considered a liability for purposes of the tax law. The IRS lost a motion for summary judgment in the first *Klamath* decision (*Doc 2006-13753* or *2006 TNT 140-14*). The court also invalidated the government's fighting regulation, reg. section 1.752-6.

Klamath was one of two partnerships that assumed the loans of the shelter customers, who were partners. Each partner borrowed, nonrecourse, $41.7 million in principal amount plus $25 million in "premium" from National Westminster Bank (NatWest). The documented interest rate was just shy of 18 percent, and the loan term was seven years, over which period only interest was payable until a balloon payment at the end. The loan also

taxanalysts®
DOCUMENT SERVICE
Doc 2007-3397 (7 pgs)

featured a gradually decreasing prepayment penalty based on the premium. A week after borrowing, each customer had its loan assumed by one of the partnerships. Each customer contributed $1.5 million in cash to that partnership.

Each partnership entered into a retroactive swap with NatWest that converted the fixed interest rate on the loan it had assumed to a floating rate but also required a $25 million final payment. Thus the floating rate was effectively calculated on the full amount of the funds advanced — here $66.7 million — not the lower stated principal amount.

The customers withdrew from the partnerships after 60 days, receiving liquidating distributions of cash and foreign currency. The total value of each liquidating distribution was the customer's $1.5 million cash contribution less roughly $1 million in promoter fees. The loans were repaid by the partnerships at that time. The customers claimed losses on the sale of the foreign currency, to which their excess basis in their partnership interests had attached. The customers in *Klamath* claimed a basis of $376 in each euro distributed to them.

> **The customers in Klamath claimed a basis of $376 in each euro distributed to them.**

Klamath prevailed on a motion for partial summary judgment on two questions: whether the case law controlled the definition of liability under section 752 and whether reg. section 1.752-6 is invalid. The government argued that the arrangement was the economic equivalent of a loan of the total funds advanced at a market interest rate, making the premium part of the principal amount. The government also argued that inside and outside basis should be equal — a desirable result, but not one called for by the statute at the time. (See section 743(d), enacted in 2004.)

Klamath argued that in no circumstances would the borrower be required to repay the premium itself. Rather, the borrower would pay roughly the same amount either as high fixed quarterly interest or as a prepayment penalty. The prepayment penalty started at roughly $25 million and gradually declined to zero by the end of the loan term. The interest rate used to determine the prepayment penalty was slightly different from the rate charged on the loan, so the penalty and the premium would not exactly match. Hence the amount due to NatWest for the time value of money or prepayment was technically contingent.

The district court held that *Helmer v. Commissioner*, T.C. Memo. 1975-160, and similar decisions controlled whether the premium/prepayment penalty on the loan was a liability. The court noted that the government has "often and consistently relied on the principle that a 'liability' under section 752 does not include an obligation that is contingent." The court rejected the Tax Court's contrary holding in *Salina Partnership et al. v. Commissioner*, T.C. Memo. 2000-352, *Doc 2000-29371, 2000 TNT 221-7*. (Another district court in Texas has agreed with the *Salina* holding. *COLM Producer Inc. v. United States*, No. 3:03-CV-3042 (N.D. Tex. Oct. 16. 2006), *Doc 2006-21372, 2006 TNT 201-9*.)

The larger issue was the validity and retroactive effect of the fighting regulation, reg. section 1.752-6. The government argued that the regulation was a legislative regulation authorized by section 309(d) of the Community Renewal Tax Relief Act of 2000 (enacted by reference in a 2001 appropriations bill), which installed section 358(h). The government lost this argument for deference, and it had no fallback.

Section 7805(b)(3) permits the issuance of retroactive interpretive regulations "to prevent abuse." The court decided that retroactivity was an abuse of discretion given that the customers had justifiably relied on a quarter-century of consistent interpretation and had done their deals before the first indicator of change, Notice 2000-44, was published. The regulation had been issued nearly three years after the notice.

### Economic Substance

District Court Judge T. John Ward's summary judgment for the customers said that the customers were reading section 752 correctly and that the government's fighting regulation was invalid. This holding is not inconsistent with the holding we are looking at here, in which the judge found that the transaction the customers carried out had no economic substance.

The BLIPS transaction failed the economic substance test in the Fifth Circuit. As *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001), *Doc 2002-184, 2002 TNT 1-5*, demonstrated, it is difficult to fail the economic substance test in the Fifth Circuit.

As delineated in *Compaq*, the economic substance test in the Fifth Circuit initially asks whether the transaction "has no economic substance because no reasonable possibility of a profit exists." That is the objective test. The subjective test asks for a tax-independent business purpose. Judge Ward noted that it is not clear whether a transaction that satisfies only one test has economic substance in the Fifth Circuit.

Following *Coltec Industries Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), *Doc 2006-13276, 2006 TNT 134-10*, Judge Ward wanted to draw a fence around the transaction intended to provide tax benefits, for the purpose of economic substance

(C) Tax Analysts 2007. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.


analysis. As the government had argued, he chose the NatWest loan as the transaction intended to provide tax benefits, which makes sense since the loan was intended to boost basis in the customers' partnership interests. But he took the entire record into account when deciding whether the loans had substance.

Presidio, promoter of BLIPS, was the managing member of the partnerships, which were in court under TEFRA partnership procedures. This allowed the judge to keep Presidio's motives separate from the customers' motives. Judge Ward found that Presidio, acting as the agent of the partnerships, entered into side agreements with NatWest to the effect that the loans would not run for the stated term and that the proceeds would not be invested in currencies.

> **The BLIPS transaction failed the economic substance test in the Fifth Circuit. It is difficult to fail the economic substance test in the Fifth Circuit.**

There's nothing quite like the accommodating bank's internal memoranda to put the kibosh on customer assertions that the substance of a transaction matches its form. There were real loan documents the customers signed. But banks write lots of little notes to themselves, especially concerning the exact risk to which the proceeds of any given loan are being put.

NatWest internal memoranda stated that the customers would not stay in the deal for seven years and described ways the bank could apply economic pressure to make the customers exit. A bank memo stated that the customers "will choose to exit . . . at the earliest possible opportunity" and that the loan had a "nominal 7 year life." The memo further stated that the bank was "highly confident" that the loan would be closed out 72 days after being funded.

The funds advanced by NatWest — that would be $66.7 million per customer — were deposited in low-risk synthetic dollar deposits at NatWest, where they earned interest at a lower rate than the customers were required to pay on the loan. The negative carry, in the amount of nearly $200,000 per customer, was taken out of the customers' cash contributions. NatWest exercised full control over all of the partnerships' assets and had the right to limit risk concentration — that is, to prevent the use of funds to make foreign currency bets.

The customers were required to post collateral of more than 101 percent of the $66.7 million loan funding. NatWest could force the customers to repay the loan and withdraw from the partnerships by raising the required collateral. Under the credit agreement, the bank could put the loan in default if any proceeds were used for foreign currency investing.

For the judge, the likelihood of withdrawal offset the possibility that the small foreign currency bets the partnerships did make would produce a profit. The customers' lawyers insisted that there was a possibility of making a profit on the small currency bets the partnerships made, if only they had stayed in the deal for 22 months instead of 2. But those bets were made with the customers' cash contributions, not the loan proceeds.

The customers argued that they wanted leverage and needed the loan proceeds on hand in case they had to settle trades with cash or make spot purchases of foreign currencies. Judge Ward concluded that there was zero credit risk to the bank and that therefore "in truth, NatWest did not make any loans." And if the bank would not allow the partnerships to use the loan proceeds to make foreign currency bets, there was no reasonable possibility of a profit from the deal. That meant that the loans flunked the objective profit potential test in the Fifth Circuit.

The bank's terms were bad enough, but Judge Ward further found that Presidio calculated its fees based on the expected tax loss. For this finding he cited testimony to that effect by a Presidio officer before the Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations in April 2005. (See *Doc 2005-2795* or *2005 TNT 28-28*.) Judge Ward did not mention that the customers had each paid more than $1.3 million in fees to Presidio and their accounting firm.

Judge Ward concluded that Presidio's goal was not to earn a profit but to get tax losses for its customers. He further concluded that Presidio did not "reveal" its side agreements with the bank to the customers, who had "no knowledge" of those agreements at any relevant time. Readers, the customers were plaintiffs' lawyers who had become suddenly rich from tobacco settlements — not financial sophisticates, perhaps, but hardly the babes in the woods that Judge Ward portrayed.

Nonetheless, he gave those customers a "bye" on investment purpose, accepting their assertions that they expected to make money from the BLIPS deals. He found that the customers' primary motive in entering the risky foreign currency investments was to make a profit. Judge Ward found that Presidio did not quantify the expected tax losses to the customers, who apparently found out about their sudden tax losses from their accountants. The judge

taxanalysts
DOCUMENT SERVICE
Doc 2007-3397 (7 pgs)

NEWS AND ANALYSIS

found that the customers did not know the extent of their tax benefits until after they withdrew from the partnerships.

The customers even met with the firm's Harvard-trained economist, who designed the currency bets in the BLIPS deals. Those were basically bets that the Argentine peso and Hong Kong dollar, which were pegged to the U.S. dollar, would depreciate. The peso eventually did, but too late for these customers. The partnership used the customers' cash contributions to enter into short-term forward contracts on Argentine pesos and Hong Kong dollars. A short-term yen bet against the dollar was also thrown into the mix.

Judge Ward later held that there was no subjective business purpose for the deals, despite the customers' profit motive. Presidio, as managing partner, had no business purpose for taking the loans. The significance of these seemingly contrary holdings is evident in Judge Ward's conclusions on penalties.

Judge Ward found that Presidio and NatWest intended for the customers to pull out of the partnerships a mere 60 days after investing in them. But he absolved the customers of their decision to withdraw from the partnerships after 60 days. One customer had a good excuse: He had invested in a local bank and was about to get a capital call. The other customer's excuse was that the first customer pulled out, so he figured he should too. You read that right.

## Penalties

The *Klamath* court's penalty holdings can be summarized as follows: The customers were entitled to rely on template opinions. Those would be opinions that assumed facts and assumed economic substance — what are politely called factual disconnect opinions. (Some tax litigators applauded this holding. See *Tax Notes*, Feb. 5, 2007, p. 505, *Doc 2007-2756*, or *2007 TNT 23-4*.)

> **The customers were entitled to rely on template opinions that assumed facts and assumed economic substance — what are politely called factual disconnect opinions.**

*Klamath* provides an interesting insight into the history of penalties. Penalty rules are enacted. Penalties are not imposed. New penalties are enacted to cure the defects in the old rules. The new penalties are not imposed. And so history repeats. At the moment, Congress is considering tax gap legislation, which will inevitably include more unproductive tinkering with penalties.

Judge Ward looked at three sets of penalties and found that none of them applied. First up were valuation misstatements under section 6662(b)(3), (e), and (h). The Fifth Circuit has a peculiar rule that says there cannot be a valuation misstatement if the transaction giving rise to the overvaluation is being disregarded. Here the loan that would have provided a $376 basis in each euro was ignored. Third up was negligence under section 6662(b)(1). As rewritten a few years back, negligence in tax compliance requires willfulness. No one is ever negligent.

Second up — and the only likely penalty — was for substantial understatement under section 6662(b)(2) and (d). This penalty was originally enacted for the tax shelters of the 1970s and 1980s, because no one was ever found negligent. Readers know where this inquiry ultimately goes: the propriety of customer reliance on advisers' opinions. Judge Ward assumed that the BLIPS were tax shelters for purposes of applying the substantial understatement rules.

The customers had opinions from the accounting firm that got them into the deals and two law firms, Holland & Hart and Olson Lemons, that represented Presidio. The opinions were template opinions that recited the BLIPS deal as documented and assumed a business or investment purpose for the customers.

Real, disinterested, third-party second opinions are rare in BLIPS, which were retail deals. Most customers had only the opinion from the promoters, broadly defined to include accountants who put them in the deal and outside lawyers working for the promoters. The IRS will continue to assert penalties in BLIPS cases when the customer had only a promoter opinion and not a reasonable basis opinion, which, in the IRS view, requires an independent third party.

Why wasn't the court bothered by the apparent conflict of interest of the opinion providers? Judge Ward seemed to be straining to absolve the customers of any bad faith in entering into the BLIPS deals. He recited case law that a taxpayer cannot rely on an adviser who has an inherent conflict of interest. Judge Ward excused the obvious conflict of interest by finding that the customers appropriately concluded that they and Presidio had a shared interest in the tax treatment of the deals.

Judge Ward ruled that the advisers were allowed to rely on the facts as represented by the customers, who didn't know any more than what was on the papers they had signed. The advisers had no duty to look deeper into the situation to see whether the transaction described in the documents would be carried out as written.

(C) Tax Analysts 2007. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

**NEWS AND ANALYSIS**

Case law and reg. section 1.6664-4(c) say that a taxpayer cannot rely on an opinion if he failed to supply the adviser with all of the necessary information. Indeed, reg. section 1.6664-4(c)(1)(ii) states that advice must not be based on unreasonable factual assumptions, including assumptions about future events. But the regulation addresses the taxpayer's knowledge of the facts.

The government argued that the customers did not communicate the facts to the law firm, which got the stated facts from Presidio. Judge Ward accepted the customers' argument that the lawyers' access to the relevant documents was sufficient. He even excused the template opinions' discussion of a grantor trust, which had not been formed in these customers' deals. (Readers, how many times do we have to tell you to get the documents right?)

Sure, there is substantial authority for the reading of section 752 as excluding the premium from the definition of liability for tax purposes in this case. The government had argued at trial that the reading of section 752 lacked a reasonable basis in law. But where is the substantial authority for misrepresenting the customers' relationship with the bank, which was something other than a normal loan?

There is a huge factual disconnect in Judge Ward's penalty opinion. He found a lot of bad facts for the customers, but did not allow those bad facts to seep into his analysis of the legal opinions furnished to those customers. He stated that the opinions were a sound analysis of the law applicable to what he called "the relevant facts."

What does this mean for Circular 230, which places onerous requirements on advisers giving opinions on which clients will rely for penalty protection? Circular 230, as government officials have noted recently, is being rewritten. But the basic idea that the government should prescribe requirements for a penalty protection opinion remains. Moreover, Circular 230 never required due diligence on the part of advisers unless something was obviously wrong.

Circular 230 requires only that the practitioner "must use reasonable efforts to identify and ascertain the facts." Further, the practitioner cannot base an opinion on an unreasonable factual representation — that is, one that the practitioner knows or should know is incorrect or incomplete. Advisers cannot make unreasonable factual assumptions, such as assuming a business purpose. (For discussion, see *Tax Notes*, Jan. 10, 2005, p. 141, Doc 2005-532, or 2005 TNT 7-6.)

What Judge Ward is saying is that the requirements for penalty protection are far less than the drafters of Circular 230 had in mind. It's fine by him that advisers assume a business or investment purpose; no tax shelter opinion was ever drafted any other way. It's fine by him that the actual facts diverge from the stated facts and that the opinion addresses only the law applicable to the stated facts. If the customer had no knowledge of some aspects of the deal he signed onto with the promoter, then his adviser need not know those facts either.

There is also an interesting procedural point. The government argued, as it has in many shelter cases, that because the partnerships were before the court in a TEFRA proceeding, a partner-level reasonable cause defense would not be acceptable. That is, the government wanted to put the partner/customers in the same boat that it was in before TEFRA — individual suits involving individual partners — by virtue of a hyperliteral reading of the TEFRA provisions.

Reg. section 301.6221-1(d) says that a reasonable cause defense is a partner-level defense that cannot be handled in a partnership proceeding unless the managing partner is involved. Judge Ward did not invalidate this regulation, as the customers had argued. He calmly noted that the IRS had delved into partner-level defenses in administrative process and that no administrative benefit would be gained from individual refund suits for recovery of penalties.

### KPMG

*Klamath* was closely watched for its effect on the criminal prosecution of former KPMG officials, *United States v. Jeffrey Stein et al.*, No. S1 05 Crim. 0888 (S.D.N.Y). (For the superseding indictment, see Doc 2005-21082 or 2005 TNT 200-14.) *Klamath* may ultimately have less effect in *Stein* than either side will be arguing it has, because the criminal prosecution is about different questions. (For discussion, see *Tax Notes*, July 31, 2006, p. 405, Doc 2006-14140, or 2006 TNT 147-3.)

The government will want to argue in *Stein* that *Klamath* proves that BLIPS, which is the principal shelter at issue in *Stein*, was never meant to be carried out as written and, incidentally, does not achieve the desired tax result as carried out.

In *Stein* the government argues that the opinion letters do not describe the deals "as designed." By "design," the government meant the deals as intended to be carried out, not as described in the documents. The government argues that KPMG's tax opinions misrepresented not just the facts of the deals but also the legal conclusions of the practitioners that rendered the opinions. The government argues that the promoters did not really believe that their shelter would "more likely than not" survive IRS challenge. (For the government's bill of particulars, see Doc 2006-7762 or 2006 TNT 79-37.)

The government can point to the *Klamath* finding that the BLIPS investments were never meant to last

(C) Tax Analysts 2007. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

seven years and to internal bank memoranda to that effect. In *Stein* the government has argued that the loan proceeds were never intended to be put at risk in currency trades. The government also argued that the level of the promoter fees and the nominal interest rate were unreasonable from a business standpoint.

Why would the *Klamath* bank memos matter in *Stein*? *Klamath* was not a KPMG deal, and different banks were involved. But all banks have internal memos. Only one of the banks involved in the KPMG deals has settled with the government. The government has leverage over banks that accommodate tax shelters because it can threaten to pull their license to do business in the United States (somehow the accommodating banks are all foreign).

So bank memos may yet turn up in *Stein*. In the *Stein* case, one of the accommodating banks, the government argues, did not fund the loans. The government does not, however, allege that the *Stein* defendants knew or had reason to know how the bank was treating the loans on its own books.

Judge Lewis Kaplan, who is presiding over the *Stein* case, has said that he does not want to have a miniature trial of the merits of the tax shelter. He is willing to listen to the government's argument that its false statements charge has nothing to do with whether the transaction as described in the opinions would have achieved the desired tax result. In other words, the *Klamath* decision might not matter.

> 'It's okay for the customer to put his financial adviser together with his tax adviser, and let them figure out the tax consequences. The customer can rely. That's what Klamath stands for,' said Keneally.

Lawyers for the *Stein* defendants will want to argue that Judge Ward's holding that no penalties applied means that no criminal responsibility should attach to the giving of the template, factual disconnect advice. They will argue that the *Klamath* court's penalty holdings could have a profound effect on the former KPMG officers' criminal case, which is scheduled to go to trial September 15, a date that is not expected to stick.

But Judge Ward was protecting the customers, not the providers of the opinions. Section 6662 penalties attach to the customers, and that statute does not address the responsibility of the advisers.

Certainly the visceral response of most observers to *Klamath* is that if participation in the shelter does not draw penalties, how can promoting it or advising on it be criminal?

"It's okay for the customer to put his financial adviser together with his tax adviser, and let them figure out the tax consequences. The customer can rely. That's what *Klamath* stands for," commented Kathryn Keneally of Fulbright & Jaworski.

The position of lawyers for the *Stein* defendants in the wake of the *Klamath* holding on the substance of the BLIPS shelter is that the transaction does not have to achieve the desired result. There need only be a reasonable basis for a professional adviser to have concluded that it could achieve the desired result and that the customer would not be subject to penalties. The lawyers point out that the government conceded that the opinion letters would not be fraudulent if the transaction had been carried out as described. (See bill of particulars, *Doc 2006-7762* or *2006 TNT 79-37*.)

The *Klamath* penalties holding puts the lawyers for the *Stein* defendants in a position similar to that of the *Klamath* customers. To sustain the propriety of the opinions, the *Stein* lawyers will want to show that the agreement not to carry out the transactions as written was strictly between Presidio and the banks and that the accountants were not let in on this deal. That argument may be complicated by Presidio being composed of former KPMG employees, some of whom are on trial in *Stein*. Presidio officials claimed their Fifth Amendment privilege in *Klamath*. Judge Kaplan has thus far refused to sever *Stein* defendants' cases, but reason to do so may emerge later as individual defendants' interests become adverse.

Thus the argument for the *Stein* defendants has to be that the KPMG employees gave their opinions in good faith, without knowledge of any side deals between Presidio and the banks. Judge Ward's holding that advisers do not have to be detectives helps this argument. Judge Ward held that advisers were allowed to accept facts tendered by the promoter/managing partner, Presidio, without having to inquire further about what Presidio was up to with the accommodating bank. Advisers were allowed to take the loan documents at face value. ■

(C) Tax Analysts 2007. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.