# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00636-LTB-PAC

CARLOS E. SALA and
TINA ZANOLINI SALA,

      Plaintiffs,

    v.

UNITED STATES OF AMERICA,

      Defendant.

---

## FINAL PRETRIAL ORDER

---

### 1.   DATE AND APPEARANCES

Darrell Hallett of Chicoine & Hallett, 1011 Western Avenue, Suite 803, Seattle, Washington, 98104 will appear for and on behalf of Plaintiffs. Anton Janik and David Geier, Trial Attorneys, Tax Division, United States Department of Justice, P.O. Box 683, Ben Franklin Station, Washington, D.C. 20044-0683 will appear for and on behalf of the United States.

The Final Pretrial Conference is scheduled to be held on May 3, 2007 at 12:30 p.m. in Courtroom A501 of the Arraj Courthouse in Denver, Colorado before United States Magistrate Judge Schlatter.

### 2.   JURISDICTION

Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331, 1340, and

1346(a)(1) and 26 U.S.C. §§ 6532(a), 7402, and 7422.

### 3.    CLAIMS AND DEFENSES

Plaintiffs:

Pursuant to Section 7491 of the Internal Revenue Code, the burden of proof is shifted from the Plaintiffs to the government provided the Plaintiffs maintained all required records, cooperated with the IRS examination of their 2000 tax return, and introduce credible evidence at trial with respect to the tax loss at issue.

For purposes of the statute, the term "credible evidence" means "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Griffin v. Commissioner*, 315 F.3d 1017, 1021 (8th Cir. 2003)

It should be undisputed that Plaintiffs met the requirements of the statute pertaining to records and cooperation with the IRS in its examination. The testimony and exhibits which will be introduced by Plaintiffs at trial, together with the stipulated facts, will meet the credible evidence requirement. Accordingly, the government will have the burden of proof with respect to the issue of whether the Plaintiffs' claimed loss from the disposition of foreign currencies is an allowable deduction in determining their 2000 Federal income tax liability.

With respect to accuracy penalties imposed by section 6662 of the Code, under sections 7491(a) & (c) of the Code, Defendant has not only the burden of proof but also the burden of production with respect to the accuracy penalty assessed and collected, and that asserted as an affirmative defense and an offset to the interest refund to which Plaintiffs would otherwise be entitled. To satisfy its burden, the Defendant must first prove that, prior to Plaintiffs' filing of

2

their 2000 amended tax return, KPMG was notified of a promoter penalty examination of it with respect to Deerhurst. Plaintiffs claim no such notice was given to KPMG, and therefore no accuracy penalty can be asserted. In the event that it is determined that the required notice was given, then Defendant must meet its burden of proof and production with respect to the elements of section 6662 that give rise to an accuracy penalty. Plaintiffs contend that, in any event, no accuracy penalty should be imposed because Plaintiffs acted with reasonable cause and good faith within the meaning of section 6664(c)(1) of the Code.

Furthermore, with respect to the accuracy penalty assertion by way of affirmative defense and offset, Defendant bears the burden of proof and/or of going forward independent of section 7491 of the Code. *Missouri Pacific Railroad Co. v. United States,* 338 F.2d 668, 671-72 (Ct.Cl. 1964). With respect to Defendant's affirmative defense that Plaintiffs are not entitled to the interest suspension under 6404(g) because this is a case involving fraud, Defendants have the burden of proving this is a case involving fraud by clear and convincing evidence.

Beginning in October 2000, Carlos Sala ("Sala") entered into what he then anticipated would be a five year investment program involving foreign currency contracts. The investments were to be managed by Deerhurst Management Inc. ("Deerhurst Management"). Deerhurst Management was principally owned by Andrew Krieger ("Krieger"). The company had numerous employees responsible for managing the investments in foreign currencies contracts. Krieger oversaw the operations.

Krieger, before 2000 and since the early 1980s, had extensive experience in foreign currency exchange trading. His expertise was widely known and highly regarded in the investment community.

Sala, having sold his interest in a publicly held company in which he was both a shareholder and chief financial officer, had substantial liquid funds in early 2000. He formulated a diversified investment strategy, with the goal of investing the majority of his funds in fixed income non-equity type investments, and a small percentage of his funds in higher risk/reward investments. He specifically wanted to stay out of the stock market, which he accurately foresaw was overvalued.

Having considerable experience in evaluating investments, and after hearing about Deerhurst Sala did extensive due diligence with respect to both the investment and the tax benefits of the proposed program. This included obtaining material sufficient to make his own projections as to profitability, wholly aside from tax benefits, and getting an independent Denver lawyer to review the tax benefits that were represented to be available through investment in the program.

After deciding to invest, Sala invested $8.9 million with Deerhurst. Extensive trading took place with Sala's funds both on behalf of Sala individually and through other entities from October through December 2000. The net result was a significant economic profit to Sala. Included in the contracts acquired and disposed of in 2000 were 24 long and short option foreign currency contracts that were profitable, but produced a tax loss because the tax laws in effect at the time required the long options to be taken into account at their cost in determining gain or loss, but the short options be disregarded entirely. In the seminal case providing this result, a 1975 Tax Court decision (*Helmer v. Commissioner,* T.C. Memo 1975-160), the IRS persuaded the Tax Court, where it was to the taxpayer's detriment, that short positions are to be disregarded for tax purposes because, although there may be a liability associated with a short position, it is

4

too contingent upon future events to be taken into account.

Initially, in what was designated as a "test period," Sala acquired foreign currency contracts in his individual capacity. He then contributed the contracts to a wholly owned S-corporation, Solid Currencies, Inc. ("Solid Currencies"). Solid Currencies was formed and utilized in the remainder of the trading in 2000 to provide Sala with limited liability. Personal liability was a real concern to Sala because the currency contracts often involved options on hundreds of millions of dollars in foreign currencies.

Solid Currencies contributed its holdings to Deerhurst Investors GP ("Deerhurst GP"). The partnership had several other partners in addition to Sala who pooled their funds to participate in the future investment activity. Deerhurst Management preferred, in order to save costs and minimize administrative burdens, that investments take place through the partnership entity on a pooled basis, rather than on an individual basis

Deerhurst Management's primary objectives in offering the program were to obtain substantial funds to manage over a long period, and to make money through commissions and fees. Accordingly, Deerhurst and the investors agreed that if the preliminary investments in 2000 produced a profit, investors were required to keep their funds with Deerhurst Management for five years or incur substantial penalties. From Sala's standpoint, the program provided, initially, a significant tax benefit and, for the long term, the opportunity to make substantial money on his invested capital. Sala's intent with respect to all transactions, including those that produced the tax loss, was to make an economic profit.

The partnership conducted transactions in foreign currency contracts for several weeks in 2000. It then distributed all of its holdings to its partners including Solid Currencies. Solid

5

Currencies converted its holdings to cash, and contributed the cash to Deerhurst Trading

Strategies LLC, where the funds remained invested for several years.

The particular currency contracts that give rise to the tax loss here at issue consist of the

24 contracts involving long and short foreign currency options. The total premium paid for the

long options was $60,987,866.79 and the total premium received on the short options was

$60,259,568.94. When these contracts were transferred to Solid Currencies along with Sala's

other investments, the short options were out-of-the-money i.e they would be worthless if they

expired at that time.

Sala's basis in his interest in Solid Currencies included the premiums paid and costs

incurred in purchasing the long options. Under the Internal Revenue Code and long standing

case law, the short options are not considered liabilities and do not reduce the basis because they

are contingent and not fixed liabilities (there was a significant chance that the short options

would expire worthless).

Similarly, when Solid Currencies contributed its assets to Deerhurst GP, Solid

Currencies' basis in the partnership was equal to the adjusted basis of the property it transferred

to Deerhurst Investors GP.

In December 2000, Solid Currencies liquidated its interest in Deerhurst GP. Upon

liquidation of its interest in the general partnership, Solid Currencies received a distribution of

foreign currency and a foreign currency option in exchange for its partnership interest in

Deerhurst GP. Solid Currencies' basis in the foreign currency and foreign currency option was

determined by its basis in the Deerhurst Investors GP (less any cash received).

Deerhurst Trading Strategies was formed as a limited liability company and there was no

longer a need for the S-corporation to limit Sala's personal liability. Accordingly, Solid Currencies converted the foreign currency into dollars and distributed the proceeds to its shareholder in liquidation.

Section 988(a)(1)(A) of the Code provides that any foreign currency gain or loss is computed separately and treated as ordinary income or loss. When Solid Currencies disposed of the foreign currency, it recognized an ordinary loss measured by the difference between its basis in the foreign currency (which was measured by its adjusted basis in Deerhurst Investors GP), and the sales price of the foreign currency. It is this loss which is passed through to Solid Currencies' shareholder (Sala), and taken into account on the Form 1040X Claim for Refund.

This is a unique case in that both parties' experts agree that the investment had a realistic opportunity to make a profit, and Plaintiffs did in fact make a profit on the specific foreign currency contracts which resulted in the tax loss. Several hundred foreign currency contracts were entered into by a respected and reputable foreign currency trader, Krieger. The Deerhurst program, including the transactions producing the tax benefit was not as the government contends a quick "in and out deal" entered into solely for tax purposes. Sala invested close to $9,000,000 in Deerhurst, and maintained his investment for over four years.


Refund of interest under 6404(g)

Sala is entitled to a refund of interest under section 6404(g) of the Internal Revenue Code. The government is not entitled to an offset in the amount of the accuracy penalty for the following reasons: 1) KPMG was not a promoter of Deerhurst; 2) KPMG was not under 6700 investigation for the promotion of Deerhurst; and 3) Sala is not liable for the accuracy penalty in

any event because he acted with reasonable cause and in good faith.

<u>Defendants</u>:

The plaintiffs have the burden of proof to establish that they are entitled to the losses and deductions claimed in this refund suit. Defendant denies that plaintiffs are entitled to a refund of tax, penalty, and interest for the losses and deductions plaintiffs took stemming from their involvement in this abusive tax shelter.

In addition to their inability to meet their burden by the presentation of relevant and admissible facts, the application of several legal arguments preclude a refund of the tax, penalties, and interest claimed in this case. The claimed tax deductions giving rise to the penalties and interest arose from a set of 23 foreign currency options purchased in late November 2000 and sold days later. The only transactions relevant to plaintiffs' refund suit are these 23 foreign currency option purchases which were necessary for the plaintiffs' noneconomic loss. In brief, plaintiffs' large noneconomic tax loss was generated through a carefully structured plan to (1) buy and sell nearly offsetting options with a face amount of $60 million for a comparatively small net investment of $728,000, (2) contribute the options to an S corporation and partnership to create an artificially inflated basis in those entities, and (3) close the option positions and promptly liquidate the entities prior to year's end in order to create non economic tax losses. The contribution of the offsetting purchased and sold options to a partnership without taking into account the effect of the sold options creating an improperly inflated basis in that partnership, is prohibited.

     (i)     *Whether the transaction lacks economic substance.*

As described in the Government's Opposition to Plaintiffs' Motion for Partial Summary
Judgment, this transaction lacks economic substance. The Supreme Court has held that "a
transaction will be disregarded if it did 'not appreciably affect [the taxpayer's] beneficial interest
except to reduce tax.'" *ASA Investerings v. Comm'r*, 201 F.3d 505, 516 (D.C. Cir. 2000) (*quoting
Knetsch v. United States*, 364 U.S. 361, 366 (1960)). In considering whether a transaction is
legitimate, the Tenth Circuit weighs a number of factors, including the economic substance and
business purpose of the transaction. *James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990).
In general, a transaction has economic substance if an objective economic profit potential exists,
and has a business purpose if it is subjectively compelled by business or regulatory realities
expressing tax-independent considerations, such that it was not shaped solely by tax-avoidance
features having "meaningless labels attached." *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d

89, 91 (4th Cir. 1985).[1] In considering these factors, the Tenth Circuit has rejected attempts by
taxpayers to game the system to achieve favorable tax results. *Keeler v. Comm'r*, 243 F.3d 1212,
1214-15, 1218 (10th Cir. 2001) (noting the "hefty opportunities for tax savings," that the profit

---

[1]      The Tenth Circuit has expressly rejected the Fourth Circuit's formulation in *Rice's
Toyota World* that the Court can only find that a transaction is a sham if it concludes *both* that
the transaction had no economic substance and no business purpose. The Tenth Circuit has
stated that "the consideration of business purpose and economic substance are simply more
precise factors to consider in the [determination of] whether the transaction had any practical
economic effects other than the creation of income tax losses." *James v. Commissioner*, 899 F.2d
905, 908-09 (10th Cir. 1990) (*citing Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988),
*cert. denied*, 488 U.S. 824 (1988)).

potential appeared "anemic beside the[] considerable capacity for tax gaming," and that deduction of several million dollars in losses distorted the taxpayer's economic results and violated the principle that tax advantages must be linked to actual losses); *Bohrer v. Comm'r*, 945 F.2d 344, 348 (10th Cir. 1991) (holding that the existence of some potential for profit does not foreclose a finding of no economic substance).

(ii)      *Whether the general partnership should be disregarded for tax purposes.*

The court may disregard the use of a partnership that does not serve a substantial business purpose. TREAS. REG. 1.701-2(a), (b) and (c); *ASA Investerings Partnership v. Comm'r*, 201 F.3d 505, 512 (D.C. Cir. 2000); *Boca Investerings Partnership v. United States,* 314 F.3d 625 (D.C. Cir. 2003) (a business activity conducted merely for tax purposes may be denied legal effect) *cert. denied* 540 U.S. 826 (Oct 06, 2003). In addition, the step transaction and sham transaction doctrines provide similar legal support for disregarding the partnership. The partnership served no valid business purpose and was not employed for the purposes for which plaintiffs allege it was created.

Given the lack of a valid business purpose, as well as the application of the Treasury Regulations and the judicially-created step transaction and sham transaction doctrines, this Court should disregard the partnership when determining plaintiffs' tax liability. Once the partnership is disregarded, plaintiffs' artificially inflated basis evaporates, and the plaintiffs are left where they properly should be under the applicable tax laws; buying and selling offsetting foreign currency options with a small net outlay and with small profits or losses, but without an artificially inflated tax basis and massive noneconomic losses.

10

    (iii)    *Whether the S corporation was formed with the intent to make a profit, and whether the losses arising from the dissolution of the S corporation should be disallowed under the step transaction doctrine*

Internal Revenue Code ("IRC") § 269(a)(1) (26 U.S.C.) applies to disallow the loss claimed by the taxpayers through their S Corporation because the principal purpose for the formation of their S Corporation was the avoidance of Federal income tax by improperly securing massive artificial tax deductions and/or losses.  Furthermore, the step transaction doctrine applies to collapse the intermediary step of the contribution of the options to the S Corporation, such that the options were contributed directly from the plaintiffs to the partnership.

    (iv)    *Whether the shelter transaction was not motivated by profits.*

Because the plaintiffs cannot establish a profit motive for the transaction that created the noneconomic losses, the deductions and losses they are asserting should be disallowed.  26 U.S.C. §§ 165(a) and 212.   In connection with the entities, the profit determination is made at the entity level.

    (v)    *Whether the purchase of offsetting positions created risk in the amount of losses claimed.*

Because plaintiffs entered into a transaction which limited their economic risk to, at most, the funds actually deposited, plaintiffs cannot claim a loss for amounts in excess of that exposure.  26 U.S.C. § 465.

    (vi)    *Whether plaintiffs can establish their entitlement to a $60 million tax basis in their interests in the S Corporation or partnership used to facilitate this tax shelter transaction.*

No basis was created because the offsetting long and short positions reflect a single economic unit which, for practical economic purposes, could not have been separated into

11

separate components. *See* TREAS. REG. § 1.988-2(f). Further, TREAS. REG. § 1.752-6 requires a reduction in the outside basis in the partnership interest.

Next, to the extent that the corporation assumed a liability of the plaintiffs, then their basis in the stock received is decreased by the amount of such liability assumed. *See* 26 U.S.C. §§ 351, 358(a)(1)(A)(ii) and 358(d)(1). In the alternative, under IRC §§ 357(b) and 358(a), the plaintiffs are required to reduce their basis in the stock of their S corporation by the amount of the liabilities assumed.

Finally, upon liquidation of the partnership, to the extent a loss was created it was a capital not ordinary loss because plaintiffs received U.S. dollars in liquidation, not property whose sale could generate an ordinary loss. *See* 26 U.S.C. § 731; TREAS. REG. 1.731-1(a)(3). The character of that loss remained capital in plaintiffs' hands, even when passed through an S Corporation. *See* 26 U.S.C. § 1366(b). Therefore, plaintiffs were not entitled to the ordinary loss claimed.

     (vii)    *Whether the plaintiffs are entitled to a suspension of interest pursuant to 26 U.S.C.§ 6404(g)(1)(A) .*

To the extent that plaintiffs claim that the running of interest on their tax liability ought to have been suspended for any period of time, this relief is precluded because this is a case involving fraud. 26 U.S.C. § 6404(g)(2)(B). Plaintiffs have filed a motion for partial summary judgment on this issue and the United States has submitted its opposition.

     (viii)    *Whether plaintiffs are liable for an accuracy related penalty under 26 U.S.C § 6662(a).*

The calculation of the accuracy related penalty is set out in the Statutory Notice of Deficiency dated June 18, 2004.

    (ix)    *Whether the United States is entitled to offset any amount due plaintiffs against an accuracy related penalty owed, but not assessed.*

Pursuant to *Lewis v. Reynolds* and other applicable case law, regulations, and statutes, the United States is entitled to offset any amount due plaintiffs against an accuracy related penalty owed by plaintiffs but not assessed by the Internal Revenue Service. *See Lewis v. Reynolds*, 284 U.S. 281 (1932).

## 4.      PROPOSED STIPULATIONS

It is stipulated that, for the purpose of this case, the following statements may be accepted as fact. However, either party has the right to object to the admission of any such facts on the grounds of relevancy and materiality.

1.      PriceWaterhouseCoopers ("PWC") was plaintiffs' accountant and tax return preparer for years 1997, 1998, and 1999.

2.      In late 1999, during the time PWC was serving as plaintiffs' accountants, Sala was introduced to KPMG partner Tracie Henderson through Tim Gillis, an old friend. At the time of the introduction Mr. Gillis was a partner with KPMG .

3.      On November 2, 1999, Tracie Henderson sent Tim Gillis and Sala an email.

4.      During 1999, 2000, 2001, 2002, and 2003 Henderson was a certified public accountant and a partner with KPMG. Henderson was the partner at KPMG responsible for Sala's account. KPMG prepared plaintiffs' federal and state income tax returns for the years 2000, 2001, 2002 and 2003.

5.      On August 13, 2000, IRS Notice 2000-44 was released electronically and on September 18, 2000 it was published.

6.      On August 18, 2000, Tracie Henderson emailed Sala.

7.      On August 31, 2000, Tim Gillis emailed Tracie Henderson.

8.      On September 6, 2000, Tracie Henderson emailed Tim Gillis.

9.      On October 6, 2000, Sala sent Tracie Henderson a September 15th draft Brown & Wood LLP opinion letter titled "Re: Investments in Foreign Currency."

10.     On October 9, 2000, Tracie Henderson emailed Jeffrey Eischeid.

11.     On October 23, 2000 Carlos Sala ("Sala") deposited $500,000 into a personal account at Refco Capital Markets ("Refco"), which was managed by Deerhurst Management Company, Inc. ("Deerhurst Management").

12.     In 2000 Deerhurst Management was principally owned and managed by Andrew Krieger.

13.     On November 8, 2000 Sala formed a Delaware corporation known as Solid Currencies, Inc. ("Solid Currencies"), which he elected to treat as an S Corporation.

14.     On November 21, 2000 Sala deposited an additional $8,425,000 into his personal account at Refco.

15.     On or about December 1, 2000, Deerhurst Investors, GP was formed and was liquidated prior to year's end.

16.     Solid Currencies was one of the general partners of Deerhurst Investors, GP.

17.     On April 9, 2001, Laurence Nemirow forwarded to Tracie Henderson an email he sent to R.J. Ruble.

18.     On April 9, 2001, Laurence Nemirow emailed Tracie Henderson.

19.     On April 12, 2001, Tracie Henderson emailed R.J. Ruble.

20.     On or about April 15, 2001, Sala paid R.J. Ruble $75,000 for the opinion letter.

21.     On August 21, 2003, Tracie Henderson emailed Jeffrey Eischeid.

22.     In September 2004, Sala withdrew from the Lonestar Global LP program ending his relationship with Deerhurst.

23.     On or before April 15, 2001, plaintiffs filed a federal income tax return ("Original Return") for their 2000 tax year.

24.     Plaintiffs' Original Return reported wages of $51,748,681, taxable interest income of $1,837,561, dividend income of $410,300, taxable refunds, credits or offsets of state and local income taxes of $7,846, a capital gain of $6,472,000, and other income of ($23).

25.     Plaintiffs' Original Return reported on line 17 (rental real estate, royalties, partnerships, S corporations, trusts, etc.) a $60,449,984 loss. The loss was identified as a non-passive loss from Solid Currencies, Inc., Sala's wholly owned S corporation.

26.     The Original Return reported adjusted gross income of $26,381. Plaintiffs reported owing no federal income taxes.

27.     On or about April 15, 2001, Sala caused to be filed a corporate income tax return for Solid Currencies, Inc., for its 2000 tax year. David Schwartz, the brother of Michael Schwartz, signed the return for the corporation. The return reported an ordinary loss from a trade or business of ($60,449,984).

28.     On or about December 29, 2003, plaintiffs filed an amended federal income tax return (Amended Return) for their 2000 tax year. The Amended Return reported the same income amounts as the Original Return. The Amended Return did not claim as a deduction the ($60,449,984) loss reflected on the Original Return.

29.     On or about June 18, 2004, the Internal Revenue Service issued a Notice of

15

Deficiency to plaintiffs, asserting that plaintiffs owed additional taxes in the amount of $22,204 due to the disallowance of $56,071 of losses plaintiffs reported as attributable to Solid Currencies, Inc. The Notice of Deficiency also asserted an accuracy-related penalty in the amount of $4,400.80 for tax year 2000.

30.    In September 2004, plaintiffs had prepared and filed a form 1040X for their 2000 tax year claiming a refund due them of $23,727,630.

31.    On October 11, 2006, the Government served a subpoena on Tracie Henderson requiring her to appear for deposition in Atlanta, Georgia. The parties do not dispute that should Henderson be required to testify in this case, she will, upon advice of counsel, invoke her Fifth Amendment privilege against self-incrimination and decline to further respond.

32.    Subject to the following limitations, the trial and deposition testimony of Richard Cassius Lee Starke in *Jade Trading, LLC, et al, v. United States*, No. 03-2164-T ("Jade Trading") (and accompanying exhibits) given in Jade Trading may be offered as evidence in this case as if the testimony and exhibits were provided and offered in the instant case. The parties expressly reserve the right to assert all available evidentiary objections in response thereto, including the relevance of the testimony and exhibits to the issues before this Court.

### 5. COMPUTATION OF DAMAGES

The plaintiffs seek a refund of $27,782,950.15, plus applicable interest, costs, and attorneys' fees. The refund amount is based on the tax, interest and penalties paid by Plaintiffs with respect to their 2000 Federal income tax return.

The United States does not seek damages but pursuant to this Court's ordinary procedures will request its costs should it prevail in this matter.

Based upon the Court's rulings, the parties will endeavor to agree to computations for the entry of judgment.

### 6. PENDING MOTIONS

The plaintiffs filed a motion for partial summary judgment on June 30, 2005 (Docket No. 5) requesting a preliminary determination that, should they not otherwise be entitled to a refund, that they have overpaid the amount of interest because the accrual of interest should have been tolled. The United States' filed its response in opposition to that motion on February 5, 2007 (Docket No. 117). The plaintiffs filed their reply on February 26, 2007 (Docket No. 128). Briefing on this motion is now complete.

On February 5, 2007, plaintiffs filed a motion for partial summary judgment regarding the United States' offset defense (Docket No. 114). On March 12, 2007, the United States' filed a motion to continue its response to this second motion for partial summary judgment pursuant to Rule 56(f), until such time as it can procure the testimony of Tracie Henderson and Raymond J. Ruble (Docket No. 136). Plaintiffs filed their response in opposition to that motion on April 6, 2007 (Docket No. 142). The United States filed its reply on April 16, 2007 (Docket No. 145).

On April 16, 2007, the United States filed a renewed motion to stay this matter pending the trial of the related criminal matter, *United States v. Stein* (Docket No. 147). Plaintiffs' response is due on May 2, 2007 and the United States' reply is due on May 12, 2007.

### 7. WITNESSES

a.      For the Plaintiffs:

<u>Fact Witnesses</u>

Plaintiffs presently intend to call the following witnesses in support of their case-in-chief,

17

if available within this Court's jurisdiction.

(i.)     Carlos Sala will testify about his review and analysis of the investment opportunity offered by Deerhurst, the transactions he entered into upon undertaking the investment and his motivations for entering into the transactions, and documents produced to the IRS during the examination of his 2000 tax return. The witness may also testify about any other matter addressed in his deposition or raised by counsel.

(ii.)     Laurence Nemirow will testify regarding his review and analysis of the tax opinion, and aside from tax issues, his review and advice concerning the legal documents involved the transactions.

(iii.)     Martin (Tony) White will testify about his review and analysis of the investment opportunity offered by Deerhurst, the transactions he entered into upon undertaking the investment and his motivations for entering into the transactions. The witness may also testify about any other matter addressed in his deposition or raised by counsel. If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(iv.)     Andrew Krieger will testify regarding the investment program offered by Deerhurst, including the formation, the nature and structure of the specific foreign currency contracts bought and sold, the history of the investment opportunity and the future profit projects. The witness may also testify about any other matter addressed in his deposition or raised by counsel. If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(v.)     Angie Napier will testify regarding her involvement in the preparation of Plaintiffs' 2000 tax return. The witness may also testify about any other matter addressed in her

deposition or raised by counsel. If the witness declines to voluntarily appear at trial, her deposition testimony will be submitted.

(vi.)   *Kevin Brady* will testify regarding his involvement in the preparation of Plaintiffs' 2000 tax return. The witness may also testify about any other matter addressed in his deposition or raised by counsel. If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(vii.)   *Michael Schwartz* will testify regarding the investment program offered by Deerhurst, including the formation, the nature and structure of the specific foreign currency contracts bought and sold, the history of the investment opportunity, the profit projections, and the Deerhurst financial statements. The witness may also testify about any other matter addressed in his deposition or raised by counsel. If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(viii.)   *Connie Tang* may testify regarding documents produced by the government and documents produced to the IRS during the examination of Plaintiffs' 2000 tax return.

(ix.)   Plaintiffs may also call any witness designated by United States.

b.   For the United States:

Fact Witnesses

The United States presently intends to call the following witnesses in support of its case-in-chief, if available within this Court's jurisdiction.

(i) *Carlos Sala*. Mr. Sala will testify about his financial and investment history, his work experience, the events leading up to his decision to participate in the tax shelter, communications regarding the shelter, and events both during and after the shelter transaction. The witness may

also testify about any other matter addressed in his deposition or raised by counsel.

    *(ii) Martin White.*  Mr. White will testify about his relationship with Carlos Sala, events leading up to his participation in the tax shelter transaction, the tax shelter transaction, and communications with third parties and Carlos Sala regarding these matters.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If Mr. White cannot be found in the jurisdiction, Mr. White's testimony will be presented via his deposition.

    *(iii) Christopher Dice.*  Mr. Dice will testify about his relationship with Carlos Sala, events leading up to his participation in the tax shelter transaction, the tax shelter transaction, and communications with third parties and Carlos Sala regarding these matters.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If Mr. Dice cannot be found in the jurisdiction, Mr. Dice's testimony is expected to be presented via his deposition.

    *(iv) Michael Schwartz.*  Mr. Schwartz will testify about his background, his work on tax shelter matters, his role in the shelter transaction, his compensation and loans regarding this transaction, and his communications with Carlos Sala and others regarding the shelter.  The witness may also testify about any other matter addressed in his deposition.  Mr. Schwartz's testimony is expected to be presented via his deposition.

    *(v) Laurence Nemirow.*  Mr. Nemirow will testify about his research and investigation regarding the shelter transaction and his communications with Carlos Sala and others about the transaction.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.

    *(vi) Andrew Krieger.*  Mr. Krieger will testify about his role in connection with the

shelter, his communications with Carlos Sala and others regarding the shelter transaction and the materials provided to the participants. The witness may also testify about any other matter addressed in his deposition. Mr. Krieger's testimony is expected to be presented via his deposition.


     *(vii) William Natbony.* Mr. Natbony will testify about the legal work he provided in connection with the transaction, the work his law firm performed, and his communications with Carlos Sala and others in connection with transaction. The witness may also testify about any other matter addressed in his deposition. Mr. Natbony's testimony is expected to be presented via his deposition.

     *(viii) John Raby.* Mr. Raby will testify about his work at PricewaterhouseCoopers, his work with Carlos Sala, his communications with Michael Schwartz and others in connection with the shelter transaction, the reasons he left PricewaterhouseCoopers, and his work for Multinational Strategies including his compensation agreement. The witness may also testify about any other matter addressed in his deposition or raised by counsel.

     *(ix) Tim Gillis.* Mr. Gillis will testify about communications with Carlos Sala regarding Tracie Henderson and will authenticate documents. The witness may also testify about any other matter addressed in his deposition. Mr. Gillis's testimony is expected to be presented via his deposition.

     *(x) R.J. Ruble.* Mr. Ruble is an indicted party in the *Stein* criminal case. Pursuant to this Court's Order, Mr. Ruble's deposition has not been taken—although the United States has filed a renewed motion to stay the case until the conclusion of the *Stein* case and until such testimony

may be secured. If available for trial Mr. Ruble will be expected to testify about the legal work he provided in connection with the transaction, the work his law firm performed, and his communications with Carlos Sala and others in connection with the transaction.

(xi) *Tracie Henderson.* Ms. Henderson has asserted her Fifth Amendment rights and pursuant to this Court's Order, has not been deposed. The United States has filed a renewed motion to stay the case until the conclusion of the *Stein* case and until such testimony may be secured. If available for trial, Ms. Henderson will be expected to testify regarding her work at KPMG, communications with Carlos Sala and others, regarding Carlos Sala and/or the shelter transaction, and may authenticate documents.

(xii) *Michael A. Halpert.* Mr. Halpert is a Tax Shelter Promoter Compliance Specialist with the IRS and will be called to authenticate documents the IRS received from KPMG, and to testify to the matters stated in his declaration on file with this Court.

(xiii) *Angie Napier.* Ms. Napier may authenticate documents, testify regarding her work at KPMG, communications with Carlos Sala, Tracie Henderson and others, regarding Carlos Sala and/or the shelter transaction. The witness may also testify about any other matter addressed in her deposition. Ms. Napier's testimony is expected to be presented via her deposition.

The United States may also call the following additional fact witnesses:

(i) *Refco via its corporate designee.* Refco via its corporate designee may authenticate documents, testify about communications regarding this transaction, testify about trading

policies and guidelines in connection with this transaction, including margin requirements and liquidation of offsetting positions.

*(ii) Carl Vertucca.*  Mr. Vertuca may testify about the shelter transaction and his communications with Michael Schwartz, Andrew Krieger, and others regarding the transactions. The witness may also testify about any other matter addressed in his deposition.

*(iii) IRS agent Pamela Ciccotelli.*  Ms. Ciccotelli may discuss the tax examination and assessments made against the plaintiffs.

*(iv) Kevin Brady.*  Mr. Brady may testify regarding his work at KPMG, communications with  Carlos Sala, Tracie Henderson, and others regarding Carlos Sala and/or the shelter transaction.  The witness may also testify about any other matter addressed in his deposition. Mr. Brady's testimony is expected to be presented via his deposition.

*(vi) KPMG via Diane Fuller.*  KPMG via its corporate designee may authenticate documents and testify regarding the facts communicated in its letter of November 17, 2006.

*(vii) Bruce Lemmons.*  Mr. Lemmons may testify regarding his communications with Carlos Sala and his involvement with this and other shelter transactions.  The witness may also testify about any other matter addressed in his deposition.  Mr. Lemmons's testimony is expected to be presented via deposition.

*(viii) Beckett Cantley.*  Mr. Cantley may testify regarding his communications with Carlos Sala, his compensation from this shelter transaction, and his involvement with this and other shelter transactions.  The witness may also testify about any other matter addressed in his deposition. Mr. Cantley's testimony is expected to be presented via his deposition.

*(ix) Bruce Amman.*  Mr. Amman may testify regarding his communications with Carlos

23

Sala and his involvement with Carlos Sala's other investments and financial transactions.

    *(x) The United States may also call any witness designated by plaintiffs.*

Expert Witnesses

Plaintiffs will call:

*(i)*        Dr. Robert W. Kolb who will testify concerning the matters addressed in his expert and rebuttal reports and will testify about matters presented at trial.

*(ii)*       To the extent Andrew Krieger's testimony is considered to be opinion, not factual testimony, Krieger will testify concerning the profitability of the 24 transactions that gave rise to the claimed tax loss, and of any other matter addressed in his expert deposition or matters presented at trial.

    The United States will call Dr. David DeRosa who will testify concerning the matters addressed in his expert and rebuttal reports and will testify about matters presented at trial.

## 8. EXHIBITS

a.      For the Plaintiffs:

The Plaintiffs' Exhibit List is annexed hereto as Exhibit A.

b.      For the United States:

The United States' Exhibit List is annexed hereto as Exhibit B.

c.      The parties agree that additional exhibits may be listed to the extent already exchanged in discovery, provided the additional exhibits are exchanged by May 10, 2007 at 3 p.m. Eastern time. Responsive exhibits may be listed and exchanged by May 11, 2007, at or

by 5 p.m. Eastern time. The parties have agreed in good faith to attempt to stipulate to the exhibits.

## 9. DISCOVERY

Two witnesses identified by plaintiffs in their Rule 26 disclosures, Tracie Henderson and Raymond J. Ruble, have refused to provide testimony in light of the pending *Stein* criminal trial and ongoing criminal investigation. The Court has previously ordered the parties to complete discovery of other witnesses. The testimony of these witnesses is the subject of the United States' renewed motion for stay.

## 10. SPECIAL ISSUES

a.     For the Plaintiffs:

    (i)     *United States undisclosed witnesses.*

The government has indicated it may call as a witness "KPMG via its corporate designee" to testify regarding the facts communicated in a letter dated November 17, 2006 from KPMG's counsel, Joseph Barloon. Plaintiffs sought discovery testimony of individuals associated with KPMG to testify as to specific subject areas in a Rule 30(b)(6) request. Mr. Barloon's letter objected to that request on various grounds and refused to provide the name of individuals who could be deposed. In the letter, Mr. Barloon purported to make statements he asserted were facts relative to the subject matter covered by the Rule 30(b)(6) request. He provided no documents or names of individuals who would support his assertions nor did he provide any sworn declaration on his own behalf. Until April 30, 2007 at approximately 2:30pm Pacific time, the government did not provide the name and contact information of the "corporate

designee" it intends to call at trial. On that date and time the government provided the name Diane Fuller. The initial disclosures and subsequent discovery requested this information, but Ms. Fuller's name, contact information and substance she was going to testify was not provided. Accordingly, the government should not be permitted to call Diane Fuller at trial to testify. Should the Court determine that Ms. Fuller may testify, Plaintiffs should be entitled to depose her in advance of trial and obtain contact information.

     *(ii)*    Michael A. Halpert. The name and expected testimony was not disclosed by Defendant as a person who had information material to this case. The initial disclosures and subsequent discovery requested this information, but Mr. Halpert's name, contact information and expected testimony was not provided. Accordingly, the government should not be permitted to call Mr. Halpert at trial to testify. Should the Court determine that Mr. Halpert may testify, Plaintiffs should be entitled to depose him in advance of trial.

     (iii) The government has indicated that it will call a "corporate designee" from Refco. To date, no name and no contact information have been provided regarding the Refco "corporate designee." Accordingly, Plaintiffs object to the designee testifying at trial unless Plaintiffs receive the name, contact information and opportunity to depose prior to trial.


b.    For the United States:

     *(i)*    *The United States' inability to secure the testimony of Raymond J. Ruble and Tracie Henderson.*

     Mr. Ruble and Ms. Henderson were retained by Plaintiff Carlos Sala to render advice in connection with this transaction. Both Mr. Ruble, who is under criminal indictment in connection with his work on shelter matters, and Ms. Henderson, will not provide testimony

26

about this matter relying instead on their Fifth Amendment right to refuse to testify. Both individuals are likely to have intimate knowledge regarding Mr. Sala's motivations in entering into the shelter. Mr. Sala's intent is relevant to the legal issues before the Court including the application of the economic substance doctrine. The United States has previously requested a stay of this action. The Court denied the request and instructed the parties to take discovery of all witnesses who were not likely to assert their Fifth Amendment rights and refuse to testify. Having completed this discovery, and for the same reasons asserted in connection with its motion for stay (Docket No. 46), the United States requests that the trial be postponed so that it may secure the testimony of these witnesses.

(ii)      *The testimony and notes of Richard Starke are irrelevant and inadmissible.*

The United States anticipates that plaintiffs may attempt to offer the notes and/or prior testimony of Richard Starke, an IRS employee. In order to be relevant, and thus admissible at trial, the Starke notes and testimony would have to tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Relevance depends on the purpose for which the evidence is offered, and the proponent of the evidence is required to articulate that purpose. However, in doing so, plaintiffs confront a powerful generality:

> [T]he cerebrations and mental processes of government officials, leading to admittedly proper exercises of power, *can never be a factor in a judicial proceeding.*

*Rosee v. Bd. of Trade*, 36 F.R.D. 684, 689 (N.D. Ill. 1965) (emphasis added).

Starke's mental musings are irrelevant, incompetent, and inadmissible evidence. Statements made by IRS employees at internal meetings constitute neither the official position of

the IRS nor the law.  Plaintiffs may rely upon official IRS statements, the Internal Revenue Code, pertinent regulations, and case law, among other sources, in support of their argument that they made a reasonable attempt to comply with the provisions of the Code.  However, unofficial, purely internal statements made by IRS employees simply have no bearing on this issue.  *See United States v. American Telephone and Telegraph Co.*, 524 F. Supp. 1381, 1387 (D.D.C. 1981) ("Extrinsic evidence as to how and why the FCC reached its decision and what it intended thereby – either by Commissioners speaking in their individual capacities or by employees of the FCC – are irrelevant to the question whether defendant's compliance was reasonable"); *Siddell v. Commissioner*, 225 F.3d 103, 111 (1st Cir. 2000) (finding internal IRS memoranda discussing the internal construction of a regulation irrelevant because the "memoranda represent the personal views of the authors, not the official position of the agency").

Indeed, there are instances in which a plaintiff/taxpayer may not rely upon *published* IRS statements, even when they are available and may have informed their tax analysis.  *See* 26 U.S.C. § 6110(k)(3) (providing that private letter rulings and technical advice memoranda "may not be used or cited as precedent"); *see also* 26 C.F.R. § 301.6110-7(b) (same); *Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 8-11 (2001) (finding that private letter rulings and technical advice memoranda have precedential value *only* to the specific taxpayers to which they are issued and collecting cases to the same effect).  Accordingly, unpublished, unofficial statements are not properly relied upon here.

Moreover, there is absolutely no evidence that plaintiffs were aware of Starke's notes before this litigation, much less that plaintiffs read and/or relied upon these notes prior to their

entry into this tax shelter. Accordingly, under FED. R. CIV. P. 401, the Starke notes are entirely irrelevant to this case.

Finally, the contents of the notes themselves constitute hearsay. Because the notes contain alleged statements of other IRS employees, plaintiffs must show that each of several levels of hearsay is subject to an exception. *See* FED. R. EVID. 805 (requiring that "hearsay within hearsay" must conform to an exception to be admissible). Thus, even if the Starke notes are somehow admissible in the abstract, the statements by other IRS employees contained within them must be independently admissible.

  (iii) *Plaintiffs have not established that Andrew Krieger is qualified to testify as an expert witness about the subjects listed, or that such testimony will be credible and reliable.*

## 11. SETTLEMENT

  a. Counsel for the parties met by telephone on April 27 and 30, 2007, to discuss in good faith the settlement of the case.

  b. The participants in the settlement conference, included counsel, party representatives, and any *pro se* party.

  c. The parties were promptly informed of all offers of settlement.

  d. Counsel for the parties and any *pro se* party do intend to hold future settlement conferences.

  e. It appears from the discussion by all counsel and any *pro se* party that there is little possibility of settlement.

  f. The date of the next settlement conference before the magistrate judge or other alternative dispute resolution method: none scheduled.

  g. Counsel for the parties and any *pro se* party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 12. OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68

(Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel have discussed it with the clients against whom claims are made in this case.

## 13.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 14.  TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

Trial of this case will be to the Court in Denver, Colorado.  Plaintiffs expect trial to last 5 days.  The United States expects trial to last 10 days.

DATED this 3rd day of May 2007.

BY THE COURT:

_____
United States Magistrate Judge

O. Edward Schlatter
U.S. MAGISTRATE JUDGE

30

2432923.1

APPROVED:


s/                                           s/
DARRELL HALLETT                              DAVID N. GEIER
JOHN COLVIN                                  ANTON L. JANIK, JR. CO#35164
Chicoine & Hallett, P.S.                     AMY MATCHISON
Attorneys for the Plaintiffs                 Trial Attorneys, Tax Division
1011 Western Ave., Suite 803                 U.S. Department of Justice
Seattle, WA 98104 Telephone:                 P.O. Box 683
(206) 223-0800                               Washington, D.C. 20044-0683
Facsimile: (206) 467-8170                    Telephone: (202) 616-3448
Email:                                       Facsimile: (202) 307-0054
dhallett@chicoine-hallett.com                Email:
jcolvin@chicoine-hallett.com                 david.n.geier@usdoj.gov
                                             anton.l.janik@usdoj.gov
                                             amy.t.matchison@usdoj.gov

                                             Judiciary Center Building
                                             555 Fourth Street N.W.
                                             Washington, DC 20001

2432923.1