## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00636-LTB-KLM

CARLOS E. SALA and
TINA ZANOLINI SALA,

      Plaintiffs,

   v.

UNITED STATES OF AMERICA,

      Defendant.

---

## PROPOSED AMENDED PRETRIAL ORDER

### 1. DATE AND APPEARANCES

Darrell Hallett of Chicoine & Hallett, 1011 Western Avenue, Suite 803, Seattle, Washington, 98104 will appear at the pretrial conference for and on behalf of Plaintiffs.  David Geier, Joseph Sergi, and Amy Matchison, Trial Attorneys, Tax Division, United States Department of Justice, P.O. Box 683, Ben Franklin Station, Washington, D.C. 20044-0683 will appear at the pretrial conference for and on behalf of the United States.  Mr. Sergi has filed a motion to appear by telephone.

The Final Pretrial Conference is scheduled to be held on September 7, 2007 at 10:00 a.m. in Courtroom C401 of the Byron G. Rogers United States Courthouse in Denver, Colorado before United States District Judge Babcock.

### 2. JURISDICTION

Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331, 1340, and 1346(a)(1) and 26 U.S.C. §§ 6532(a), 7402, and 7422.

## 3.      CLAIMS AND DEFENSES

<u>Plaintiffs</u>:

Pursuant to section 7491 of the Internal Revenue Code, the burden of proof is shifted from the Plaintiffs to the government provided the Plaintiffs maintained all required records, cooperated with the IRS examination of their 2000 tax return, and introduce credible evidence at trial with respect to the tax loss at issue.

For purposes of the statute, the term "credible evidence" means "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Griffin v. Commissioner*, 315 F.3d 1017, 1021 (8th Cir. 2003)

It should be undisputed that Plaintiffs meet the requirements of the statute pertaining to records and cooperation with the IRS in its examination.  The testimony and exhibits which will be introduced by Plaintiffs at trial, together with the stipulated facts, will meet the credible evidence requirement.   Accordingly, the government will have the burden of proof with respect to the issue of whether the Plaintiffs' claimed loss from the disposition of foreign currencies is an allowable deduction in determining their 2000 Federal income tax liability.

Also at issue are accuracy penalties imposed by section 6662 of the Code.  The IRS erroneously assessed and collected an accuracy penalty of $4,441 with respect to a deficiency asserted against Plaintiffs as a result of disallowance of fees related to Deerhurst. The government has asserted an additional accuracy penalty it contends is due in the event the Court determines Plaintiffs claimed loss from the disposition of foreign currencies is not allowable. This latter penalty is asserted as an affirmative defensive and as an offset to the interest refund to which Plaintiffs would otherwise be entitled.

Plaintiff contends that, under sections 7491(a) and (c) of the Code, Defendant has both

the burden of proof and the burden of production with respect to the accuracy penalties at issue. To satisfy its burden the Defendant must prove that Plaintiffs' amended 2000 return filed in 2003 does not constitute a "qualified amended return" within the meaning of Treasury Regulation section 1.6664-2(c)(3)(B). Plaintiffs' amended return constituted a qualified amended return unless Defendant proves that that 1) prior to Plaintiffs' filing of their 2000 amended tax return, KPMG was notified of a promoter penalty examination of it with respect to Deerhurst and 2) KPMG was "a person described in §6700(a)." Plaintiffs claim the evidence will show that no such notice was given to KPMG. To prove KPMG was a person described in §6700(a), the Defendant bears the burden of showing that KPMG 1) participated in the organization or sale of interests in Deerhurst and 2) made false or fraudulent statements concerning the represented tax benefits of investing in Deerhurst. Plaintiffs contend that neither of the aforementioned requirements are met.

In the event it is determined that Plaintiffs' amended return does not constitute a qualified amended return, then Defendant must meet its burden of proof and its burden of production with respect to the elements of section 6662 that give rise to an accuracy penalty. Plaintiffs contend that, in any event, no accuracy penalty should be imposed because Plaintiffs acted with reasonable cause and good faith within the meaning of section 6664(c)(1) of the Code.

Furthermore, with respect to the accuracy penalty assertion by way of affirmative defense and offset, Defendant bears the burden of proof and/or of going forward independent of section 7491 of the Code. *Missouri Pacific Railroad Co. v. United States,* 338 F.2d 668, 671-72 (Ct.Cl. 1964).

Beginning in October 2000, Carlos Sala ("Sala") entered into what he then anticipated would be a five year investment program involving foreign currency contracts. The investments

were to be managed by Deerhurst Management Inc. ("Deerhurst Management").  Deerhurst

Management was principally owned by Andrew Krieger ("Krieger").  The company had

numerous employees responsible for managing the investments in foreign currencies contracts.

Krieger oversaw the operations.

Krieger, before 2000 and since the early 1980s, had extensive experience in foreign

currency exchange trading.  His expertise was widely known and highly regarded in the

investment community.

Sala, having sold his interest in a publicly held company in which he was both a

shareholder and chief financial officer, had substantial liquid funds in early 2000.  He formulated

a diversified investment strategy, with the goal of investing the majority of his funds in fixed

income non-equity type investments, and a smaller percentage of his funds in higher risk/reward

investments.  He specifically wanted to stay out of the stock market, which he accurately foresaw

was overvalued.

Having considerable experience in evaluating investments, and after hearing about

Deerhurst, Sala did extensive due diligence with respect to both the investment and the tax

benefits of the proposed program.  This included obtaining material sufficient to make his own

projections as to profitability, wholly aside from tax benefits, and getting an independent Denver

lawyer to review the tax benefits that were represented to be available through investment in the

program.

Sala invested $8.9 million with Deerhurst.  Extensive trading took place with Sala's

funds both on behalf of Sala individually and through other entities from October through

December 2000.  The net result was a significant economic profit to Sala.  Included in the

contracts acquired and disposed of in 2000 were 24 long and short option foreign currency

contracts that were profitable, but produced a tax loss because the tax laws in effect at the time required the long options to be taken into account at their cost in determining gain or loss, but the short options be disregarded entirely.  In the seminal case providing this result, a 1975 Tax Court decision (*Helmer v. Commissioner,* T.C. Memo 1975-160), the IRS persuaded the Tax Court, where it was to the taxpayer's detriment, that short positions are to be disregarded for tax purposes because, although there may be a liability associated with a short position, it is too contingent upon future events to be taken into account.

Initially, in what was designated as a "test period," Sala acquired foreign currency contracts in his individual capacity.  He then contributed the contracts to a wholly owned S-corporation, Solid Currencies, Inc. ("Solid Currencies").    Solid Currencies was formed and utilized in the remainder of the trading in 2000 to provide Sala with limited liability.  Personal liability was a real concern to Sala because the currency contracts often involved options on hundreds of millions of dollars in foreign currencies.

Solid Currencies contributed its holdings to Deerhurst Investors GP ("Deerhurst GP"). The partnership had several other partners in addition to Sala who pooled their funds to participate in the future investment activity.  Deerhurst Management preferred, in order to save costs and minimize administrative burdens, that investments take place through the partnership entity on a pooled basis, rather than on an individual basis.

Deerhurst Management's primary objectives in offering the program were to obtain substantial funds to manage over a long period, and to make money through commissions and fees.  Accordingly, Deerhurst and the investors agreed that if the preliminary investments in 2000 produced a profit, investors were required to keep their funds with Deerhurst Management for five years or incur substantial penalties.  From Sala's standpoint, the program provided,

initially, a significant tax benefit and, for the long term, the opportunity to make substantial money on his invested capital.  Sala's intent with respect to all transactions, including those that produced the tax loss, was to make an economic profit.

The partnership conducted numerous transactions in foreign currency.  It then distributed all of its holdings to its partners including Solid Currencies.  Solid Currencies converted its holdings to cash, and contributed the cash to Deerhurst Trading Strategies LLC, where the funds remained invested for several years.

The particular currency contracts that give rise to the tax loss here at issue consist of the 24 contracts involving long and short foreign currency options.  The total premium paid for the long options was $60,987,866.79 and the total premium received on the short options was $60,259,568.94.  When these contracts were transferred to Solid Currencies along with Sala's other investments, the short options were out-of-the-money, i.e., they would be worthless if they expired at that time.

Sala's basis in his interest in Solid Currencies included the premiums paid and costs incurred in purchasing the long options.  Under the Internal Revenue Code and long standing case law, the short options are not considered liabilities and do not reduce the basis because they are contingent and not fixed liabilities (there was a significant chance that the short options would expire worthless).

Similarly, when Solid Currencies contributed its assets to Deerhurst GP, Solid Currencies' basis in the partnership was equal to the adjusted basis of the property it transferred to Deerhurst Investors GP.

In December 2000, Solid Currencies liquidated its interest in Deerhurst GP.  Upon liquidation of its interest in the general partnership, Solid Currencies received a distribution of

foreign currency and a foreign currency option in exchange for its partnership interest in Deerhurst GP.  Solid Currencies' basis in the foreign currency and foreign currency options was determined by its basis in the Deerhurst Investors GP (less any cash received).

Deerhurst Trading Strategies was formed as a limited liability company and there was no longer a need for the S-corporation to limit Sala's personal liability.  Accordingly, Solid Currencies converted the foreign currency into dollars and distributed the proceeds to its shareholder in liquidation.

Section 988(a)(1)(A) of the Code provides that any foreign currency gain or loss is computed separately and treated as ordinary income or loss. When Solid Currencies disposed of the foreign currency, it recognized an ordinary loss measured by the difference between its basis in the foreign currency (which was measured by its adjusted basis in Deerhurst Investors GP), and the sales price of the foreign currency.  It is this loss which is passed through to Solid Currencies' shareholder (Sala), and taken into account on the Form 1040X Claim for Refund.

This is a unique case in that both parties' experts agree that the investment had a realistic opportunity to make a profit, and Plaintiffs did in fact make a profit on the specific foreign currency contracts which resulted in the tax loss.  Several hundred foreign currency contracts were entered into by a respected and reputable foreign currency trader, Krieger.  The Deerhurst program, including the transactions producing the tax benefit was not as the government contends a quick "in and out deal" entered into solely for tax purposes.  Sala invested close to $9,000,000 in Deerhurst, and maintained his investment for over four years.

<u>Defendants</u>:

Sala claims he entered this transaction with a profit motive.  However, the bare existence of some purported business purpose will not validate a transaction whose true purpose was the generation of tax losses.  The relevant legal inquiry is to compare the purported business purpose to the expected, or guaranteed, tax benefit.  *ASA Investerings v. Comm'r*, 201 F.3d 505, 512-13 (D.C.Cir. 2000).  This consideration becomes ever more important where as here, the potential for gain is infinitesimally nominal and vastly insignificant when considered in comparison to the claimed tax deductions.  *See, e.g., Sheldon v. Comm'r*, 94 T.C. 738, 768 (1990); *Cherin v. Comm'r*, 89 T.C. 986, 993 (1987).

The Tenth Circuit recognizes that it is appropriate to focus upon the activity that actually created the tax deduction, and not the window dressing that hid it.  *James v. Comm'r*, 899 F.2d 905, 910 (10th Cir. 1990).  In this transaction, Sala paid $728,000 for long and short options said to generate $60,000,000 in tax losses.  These purported losses nearly offset plaintiffs' entire ordinary income for that tax year.  Sala's potential for economic profit on these offsetting options was within the range of $200,000 to $550,000, or about .03%-.08% when compared to the guaranteed non-economic losses.  Sala's potential for actual economic profit was *de minimis* when compared to the non-economic losses guaranteed by the transaction.  Sala's true purpose for entering this transaction was not profit; it was the creation of massive non-economic tax losses.

Sala took the first predetermined step on or about October 23, 2000, when he deposited $500,000 with Deerhurst, and opened a trading account in his own name.  The transaction's promotional materials stated that the first month was to be a "test period," to allow Sala to determine whether he wished to continue with the transaction and commit the remainder of the

required funds to the transaction.  The transaction's promotional materials demanded that a total of 15% of the desired tax loss be deposited into the Deerhurst partnership in cash.  $500,000 was the minimum required to enter the "test period."  The promotional materials permitted Sala to withdraw at any time within this "test period," but of course, a withdrawal would have left Sala without the $60,000,000 tax deduction.

Despite having only thirty days of performance results—obtaining just one financial report indicating that his account had increased from $500,000 to $502,121, as of October 31, 2000 (*i.e.* a *de minimis* gain of less than one-half percent) and not even having reviewed the progress of his investments at that time— Sala took the second predetermined step of the transaction and placed an additional $8,425,000 into the transaction on November 21, 2000.  The total amount Sala deposited equaled the necessary deposit of 15% of his expected $60,000,000 tax deduction.

Sala's S Corporation, Solid Currencies, was created on November 8, 2000.  However, from November 24th through the 28th, Sala personally entered into certain long positions (with a purchase price of $60,987,866.79) and sold short nearly offsetting positions (with a sale price of $60,259,568.94) at a net cost to him of approximately $728,0000.  Even though his S Corporation was formed by this time, and had the stated purpose of protecting Sala from his "investment" risks, Sala acquired these positions in his own name, not in that of his S Corporation.

Sala explained that he did not utilize the limited liability of the S Corporation in acquiring these options because he knew he was going to transfer the positions just days later.  In reality, Sala had no exposure from these long and short positions beyond the net cost of their premiums. Therefore, Sala's S Corporation could provide absolutely no additional protection

beyond the limited risk already capped as the net capital outlay for the options.  Sala's own tax counsel, in his review of the transaction, questioned whether the S Corporation could even afford personal protection, because it was undercapitalized.  That is, the entirety of the S Corporation's capital was contributed to the General Partnership, with no reserve for contingencies or liabilities.  Certainly, to the extent Sala believed his economic risk was $60,000,000, the money in the account was woefully inadequate to cover such a loss.

On November 28, 2000, Sala completed the third predetermined step of the transaction, transferring the positions from his personal account to the S Corporation and then to the General Partnership in a single move.  According to Sala's view of the tax laws, the contribution of these options to the S Corporation and/or to the partnership (and then the liquidation of these entities as the fourth and final step of this tax shelter) created the tax loss claimed in this case.

The options Sala purchased between November 24th through 28th were liquidated by mid-December.  During December, the partnership contained virtually no foreign currency exposure or risk and trading was static, despite the fact that partnership reported $24 million in open foreign currency trades.  That is, when the trades are compared against each other, they almost completely cancel each other out.  On average each day, well over $20 million of the $24 million in positions the General Partnership held was, in reality, nothing more than U.S. dollars. The reason for this net cash holding was because, according to the promotional materials, if the partners in the General Partnership ended calendar year 2000 with a profit, the participants' funds were automatically contributed to a new transaction scheduled to begin the following year. This new transaction was called Deerhurst Trading LLC.  By December, the General Partnership had made a *de minimis* profit.  In order to ensure the participants would record the profit that would automatically commit them to Deerhurst Trading LLC, once that *de minimis* profit was

made, the General Partnership locked in this gain by essentially moving the account to cash—while still purporting to trade.[1]

According to the General Partnership's records, Sala's year-end account balance increased by approximately $77,435 over his initial deposit of 15% of the desired tax deduction. This "profit" did not take into account over $40,000 in fees and expenses that were charged directly to Solid Currencies but not reflected on the partnerships books, nor does it account for the $75,000 Sala spent on just one of his tax opinions, the R.J. Ruble tax opinion. To put this "profit" into perspective, had Sala's funds been placed in a risk-free interest-bearing account during these same three months, interest alone would have generated $50,000.

The promotional material and the Ruble tax opinion letter state that if the General Partnership posted a profit at year-end, investors would have to commit to entering Deerhurst Trading LLC. Sala, however, exercising his considerable clout as the largest single investor, negotiated an exit strategy from the transaction should Deerhurst be unable to procure an acceptable tax opinion letter by March 8, 2001. This exit strategy was not at all contingent upon Deerhurst's ability to achieve any measure of profits. Furthermore, Sala negotiated the right to exit the transaction at any time should the projected tax benefits be denied. Thus, Sala could get out of the transaction (either while in the General Partnership or Deerhurst Trading Strategies LLC) if he did not get a "protective" tax opinion, or was denied the tax benefits. By negotiating these exit strategies, Sala demonstrated that his primary and true interest was obtaining the tax loss, not making a profit.

---

[1]      Deerhurst stood to gain its tax shelter fee once the participants entered Deerhurst Trading LLC. Deerhurst charged a clearing fee for trades made through the LLC over and above the management and incentive fee they charged participants (which themselves were bloated by being calculated based upon the nominal, not the actual, amount of funds in the account). In 2001, this clearing fee equaled about 25% of the assets in the LLC, or about $5,000,000. These fees were not charged in 2000.

In fact, when one steps back and looks at the entire predetermined transaction, the purpose of this transaction was never profit, unless one considers "profit" to be the generation of tax losses. The Deerhurst Transaction involved a series of carefully constructed and tax motivated steps entered into by approximately 30 individuals who collectively sought $161,345,553.33 in ordinary losses and $102,250,000 in capital losses, each for their 2000 tax year. Each participant's buy-in was calculated as a percentage of their desired tax loss. The participants were promised that these tax losses would be generated in 2000, within 60 days of entering into the transaction. Sala, along with his two colleagues (whom Sala brought into the transaction), accounted for over half of the deposited funds, over $100,000,000 of the claimed ordinary losses, and $27,000,000 of the claimed capital losses. By the end of 2000, everyone in the Deerhurst Transaction, including two of the promoters Andrew Krieger and Michael Schwartz (who each participated in the transaction), came away with two things: (1) a *de minimis* economic gain (before payment of fees and expenses), and (2) a massive non-economic tax loss. In Sala's case, this tax loss approximated $60,000,000.

Although Sala's $60,000,000 deduction was worth $24,000,000 in after tax dollars, and was manufactured in mere days, Sala asserts that obtaining a massive tax deduction was not the reason he entered into the transaction. Sala states that despite his investment acumen, his ability to forecast financial returns for Wall Street, and his personal knowledge of the foreign currency markets, he believed that he would be reaping economic returns in excess of 60% and perhaps even 75% *each year* for five years and therefore, he would achieve earnings in excess of the $24,000,000 tax windfall. In fact, from October 23, 2000 through December 21, 2000 (when the tax losses were purportedly generated), Sala's funds had grown by less than 0.75%, inclusive of interest. At no time was Sala exposed to actual economic loss beyond the amount invested. The

$24,000,000 in tax savings he obtained guaranteed him an enormous windfall even if he lost the comparatively *de minimis* $728,000 he actually placed at risk to purchase these tax losses.

The plaintiffs incorrectly state which party has the burden of proof as to the various issues in this case.  Under Section 7491 of the Internal Revenue Code (26 U.S.C.), the burden of proof as to the amount of tax owed may be shifted from Sala to the United States if Sala meets his burden of production and produces credible evidence as to the amount of tax he owes, because these are factual issues relating to a liability imposed by subtitles A or B of Title 26.  In addition, Sala must show he has complied with the requirements, under Title 26, to substantiate items in dispute, that he has maintained all records required, and cooperated with reasonable requests for witnesses, information, documents, meetings and interviews, in order for the burden of proof to shift under Section 7491.  However, when it comes to penalties, which are imposed under Subtitle F of the Internal Revenue Code, the burden of proof does not shift to the United States for penalties determined in the Statutory Notice of Deficiency.[2]  For those penalties, the United States has the burden of production to make a *prima facie* case that the penalties apply and were properly assessed, but does not have the ultimate burden of proof.  That burden remains on Sala, regardless of Section 7491.  However, the United States does have the burden of production and proof as to penalty assessments not determined in the Statutory Notice of Deficiency.  The United States denies that plaintiffs are entitled to a refund of tax, penalty, and interest for the losses and deductions plaintiffs took stemming from their involvement in this

---

[2]    In this case, the IRS assessed an accuracy-related penalty of $4,441.  The United States avers that pursuant to 26 U.S.C. § 6662(e) this penalty should have been $9,491,132, and is claiming as an offset $9,486,691: the difference between the penalty amount shown on the Statutory Notice of Deficiency and the amount which should have been assessed.  *See infra* subsection (xi) and footnote 4.  The United States has the burden of production and proof as to the difference between the assessment shown on the Statutory Notice of Deficiency and the amount claimed as an offset.

abusive tax shelter.

In addition to their inability to meet their burden by the presentation of relevant and admissible facts, the application of several legal arguments preclude a refund of the tax, penalties, and interest claimed in this case. Those arguments are described in brief below.

(i)     The transaction lacks economic substance.

Plaintiffs' transaction lacks economic substance. The Supreme Court has held that "a transaction will be disregarded if it did 'not appreciably affect [the taxpayer's] beneficial interest except to reduce tax.'" *ASA Investerings v. Comm'r*, 201 F.3d 505, 516 (D.C. Cir. 2000), *quoting Knetsch v. United States*, 364 U.S. 361, 366 (1960). In considering whether a transaction is legitimate, the Tenth Circuit weighs a number of factors, including the economic substance and business purpose of the transaction. *James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990). In general, a transaction has economic substance if an objective economic profit potential exists, and has a business purpose if it is subjectively compelled by business or regulatory realities expressing tax-independent considerations, such that it was not shaped solely by tax-avoidance features having "meaningless labels attached." *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985).[3] In considering these factors, the Tenth Circuit has rejected attempts by taxpayers to game the system to achieve favorable tax results. *Keeler v. Comm'r*, 243 F.3d 1212, 1214-15, 1218 (10th Cir. 2001) (noting that there were "hefty opportunities for tax savings," that

---

[3]     The Tenth Circuit has expressly rejected the Fourth Circuit's formulation in *Rice's Toyota World* that the Court can only find that a transaction is a sham if it concludes *both* that the transaction had no economic substance and no business purpose. The Tenth Circuit has stated that "the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses." *James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990) (*citing Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir. 1988), *cert. denied*, 488 U.S. 824 (1988)).

the profit potential appeared "anemic beside the[] considerable capacity for tax gaming," and that deduction of several million dollars in losses distorted the taxpayer's economic results and violated the principle that tax advantages must be linked to actual losses); *Bohrer v. Comm'r*, 945 F.2d 344, 348 (10th Cir. 1991) (holding that the existence of some potential for profit does not foreclose a finding of no economic substance).

> (ii)     *Whether the general partnership should be disregarded for tax purposes because it does not serve a substantial business purpose, because the transaction was not formed with the intent to make a profit, and because the transaction fails under the step, sham transaction and form over substance doctrines.*

Under the partnership anti-abuse rules, this court may disregard the use of a partnership that does not serve a substantial business purpose. TREAS. REG. 1.701-2(a), (b) and (c); *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512 (D.C. Cir. 2000); *Boca Investerings P'ship v. United States,* 314 F.3d 625 (D.C. Cir. 2003) (a business activity conducted merely for tax purposes may be denied legal effect), *cert. denied* 540 U.S. 826 (Oct 06, 2003).  In addition, the step transaction and sham transaction doctrines provide similar legal support for disregarding the partnership.  The partnership served no valid business purpose and was not employed for the purposes for which plaintiffs allege it was created.  The Tenth Circuit has held that it defeats the purpose of the form over substance principle by permitting a stepped transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps.  *True v. United States*, 190 F.3d 1165, 1177 (10th Cir. 1999).

Given the lack of a valid business purpose, as well as the application of the Treasury Regulation § 1.701 and the judicially-created step transaction, sham transaction, and form over substance doctrines, this Court should disregard the partnership when determining plaintiffs' tax liability.  Once the partnership is disregarded, plaintiffs' artificially-inflated basis evaporates, and

the plaintiffs are left where they properly should be under the applicable tax laws: buying and selling offsetting foreign currency options with a small net outlay and with small economic profits or losses, but without an artificially inflated tax basis and massive noneconomic losses.

> *(iii)    Whether the S Corporation should be disregarded for tax purposes because it was a sham entity (i.e. it was not formed with the purpose of engaging in any business activity and in fact did not perform any business activity); and whether the losses that pass through the S Corporation as a result of the inflated stock basis should be disallowed under the substance over form principles.*

Engaging in business activity whose sole purpose is tax avoidance will not validate the existence of a corporation.  *See Nat'l Investors Corp. v. Hoey*, 144 F.2d 466, 468 (2d Cir. 1944). Here, the S Corporation was newly formed by the plaintiffs and was liquidated shortly thereafter, and its only business activity during that brief period was to engage in this tax shelter.  The S Corporation was not formed for the purpose of, and in fact did not engage in, any substantive business activity.  Thus, the S Corporation should not be respected as a genuine corporate entity, and the plaintiffs' claimed basis in the S Corporation stock should be ignored.  Application of the substance over form principles provides similar support to ignore the intermediary step of the contribution of the options to the S Corporation, thereby eliminating the inflated basis in the S Corporation stock.

> *(iv)    Whether the S Corporation was acquired to evade or avoid income tax and therefore losses arising from the S Corporation should be disallowed.*

Internal Revenue Code Section 269(a)(1) (26 U.S.C.) applies to disallow the loss claimed by the plaintiffs through their S Corporation because the principal purpose for the acquisition of the S Corporation was to avoid Federal income tax by improperly securing massive artificial tax deductions and/or losses.

> (v)     *Whether the shelter transaction was profit motivated, and whether that profit was anything more than* de minimis *in comparison with the noneconomic losses claimed.*

Merely engaging in business activity is not sufficient to validate a partnership. *ASA Investerings*, 201 F.3d at 512.  This is because the pursuit of business activity in furtherance of tax avoidance "is no more a business purpose than actually engaging in tax avoidance."  This principle was recently reaffirmed by the Second Circuit, which stated, "[t]he IRS's challenge to the taxpayer's characterization is not foreclosed merely because the taxpayer can point to the existence of some business purpose or objective in addition to its tax-avoidance objective." *TIFD III-E, Inc. v. United States*, 2006 WL 2171519 at *9 (2d Cir. August 3, 2006) (internal citation omitted).  Thus, the existence of *some* business purpose will not validate a partnership whose true purpose was the generation of tax losses.  Rather, the relevant legal inquiry is to compare the purported business purpose to the expected, or guaranteed, tax benefit.  *ASA Investerings*, 201 F.3d at 513.

This consideration becomes ever more important where as here, the potential for gain is infinitesimally nominal and vastly insignificant when considered in comparison to the claimed deductions.  *See, e.g., Sheldon v. Comm'r*, 94 T.C. 738, 768 (1990); *Cherin v. Comm'r*, 89 T.C. 986, 993 (1987).  As discussed above, in this transaction, plaintiffs paid $728,000 for long and short options which purportedly generated $60,000,000 in tax losses.  These purported losses nearly offset plaintiffs' entire ordinary income for that tax year, and plaintiffs' potential for economic gain on these offsetting options was somewhere in the range of $200,000 to $550,000, or about .03%-.08% when compared to the non-economic losses they or their S Corporation claimed.  Even assuming there was any profit potential in excess of all true fees (see *supra* note 1 and the text referencing it), the profit potential was at best *de minimis*.

The *de minimis* profit potential of this transaction when comparing the amount at risk to the tax benefits claimed, coupled with the fact that the guaranteed non-economic tax loss was generated in within two months by a small handful of trades, clearly indicates that the true nature of this transaction was tax avoidance.  Because there was no valid primary profit purpose, the deductions are barred by 26 U.S.C. § 165(c).

> *(vi)     Whether the purchase of offsetting positions created risk in the amount of losses claimed.*

Because plaintiffs entered into a transaction which limited their economic risk of loss to, at most, the funds actually deposited, plaintiffs cannot claim a loss for amounts in excess of the amount actually at risk.  26 U.S.C. § 465.

> *(vii)    Whether basis in both the S Corporation and the General Partnership should be limited to the $728,298 net premium received for the written and purchased options, which constitutes the actual economic value contributed to these entities.*

The foreign currency options contributed by Sala to his S Corporation and by the S Corporation to the General Partnership are economically offsetting and should therefore be integrated under Treas. Reg. § 1.988-2(f) and treated as a single transaction, thereby limiting Sala's basis in his S Corporation, and his S Corporation's basis in the General Partnership to the net premium amount of $728,298.  This amount reflects the actual amount economically contributed to these entities.  Conversely, the purported basis of over $60 million is non-economic and grossly over-inflated because it only reflects the value in the purchased options, not the offsetting value in the written options, both of which form a single economic unit contributed together.

> (viii)   Whether plaintiffs can establish their entitlement to a $60 million tax basis in their interests in the S Corporation or General Partnership used to facilitate this tax shelter transaction.

Under 26 U.S.C. §§ 722 and 1012, a partner's or shareholder's adjusted basis in a partnership or an S Corporation is determined *inter alia* by a partner's or shareholder's contribution to the partnership or S Corporation.  Substantively, Sala only transferred seven single positions to the S Corporation and from the S Corporation to the General Partnership.  Further, TREAS. REG. § 1.752-6 requires a reduction in the S Corporation's outside basis in the partnership interest.  *See also* 26 U.S.C. §§ 752(b) and 705.

With respect to the plaintiffs' basis in their S Corporation stock, to the extent that the S Corporation assumed a liability of the plaintiffs (i.e., the sold foreign currency options), then the plaintiffs must reduce their basis in the stock of the S Corporation by the amount of the liabilities assumed.  *See* 26 U.S.C. §§ 351(a), 357(b), and 358(a).  Alternatively, if the written foreign currency option positions are not considered liabilities for purposes of 26 U.S.C. §§ 357 and 358, then the S  Corporation's promise to pay the plaintiffs' obligation with respect to such options is considered "other property" (*i.e.* "boot") received by the plaintiffs in the exchange of the options for S Corporation stock, and this consideration may result in gain recognition under 26 U.S.C. §351(b).  The plaintiffs' basis in the S Corporation stock would be reduced by the fair market value of the boot received and increased by the amount of any gain recognized on the exchange. 26 U.S.C. § 358(a)(1).  Additionally, under Section 1366(d), plaintiffs could not deduct on their tax return any amount greater than their $8.9 million adjusted basis in the S Corporation.

Upon liquidation of the partnership, to the extent a loss was created it was a capital loss, not an ordinary loss because, contrary to plaintiffs' contentions, the General Partnership in fact distributed U.S. dollars to the S Corporation in liquidation, not foreign currency whose sale

could generate an ordinary loss.  *See* 26 U.S.C. § 731; TREAS. REG. 1.731-1(a)(3).  The character of that loss was capital to the S Corporation, and remained capital in plaintiffs' hands, when passed through to plaintiffs.  *See* 26 U.S.C. § 1366(b).  Therefore, plaintiffs were not entitled to the ordinary loss claimed.

> (ix)   *Whether the plaintiffs are entitled to a suspension of interest pursuant to 26 U.S.C.§ 6404(g)(1)(A) .*

To the extent that plaintiffs claim that the running of interest on their tax liability ought to have been suspended for any period of time, this relief is precluded because this is a case involving fraud.  26 U.S.C. § 6404(g)(2)(B).  This Court has ordered that the interest suspension statute does apply in plaintiffs' favor.  The Court's decision on this issue is interlocutory and would be incorporated into any final judgment.  Since the Court's decision on this issue is not final, the Court retains jurisdiction to revisit that decision should it so decide.

> (x)   *Whether plaintiffs are liable for an accuracy related penalty under 26 U.S.C § 6662(a).*

The calculation of the accuracy related penalty is set out in the Statutory Notice of Deficiency dated June 18, 2004.

> (xi)   *Whether the United States is entitled to offset any amount due plaintiffs against an accuracy related penalty owed, but not assessed.*

Pursuant to *Lewis v. Reynolds* and other applicable case law, regulations, and statutes, the United States is entitled to offset any amount due plaintiffs against an accuracy related penalty owed by plaintiffs but not assessed by the Internal Revenue Service.  *See Lewis v. Reynolds*, 284 U.S. 281 (1932).  The accuracy related penalty applies to an "underpayment of tax required to be shown on a return."  The penalty is calculated as a percentage of the tax required to be shown on a tax return.  26 U.S.C. § 6662(h).  Section 6662(e) addresses a situation involving a valuation misstatement and provides that if "the value of any property or services (*or the adjusted basis of*

*any property*) claimed on any return … is 200 percent or more of the amount determined to be the correct amount," then the penalty applies.  26 U.S.C. § 6662(e) (emphasis added).  Sala claims a tax basis in the S Corporation and the General Partnership.  Sala contends that he acquired a tax basis in each on account of $60,987,866.79 in long options he personally acquired. However, and concurrently, Sala sold a nearly identical amount of short options thereby creating an offsetting liability in the amount of $60,259,568.94.  Sala takes the position that his contribution of these offsetting positions, first to the S Corporation and then to the General Partnership, allowed him to establish basis in the amount of the in long positions but not reduced by the liability that the short positions established. Because Sala did not take into account the corresponding reduction in basis represented by the sold positions, Sala deducted approximately $60,000,000 in ordinary income for that year and demand a refund in excess of $27,000,000. Because the $60,987,866.79 in claimed basis is more than 200% of the correct amount of basis, an accuracy-related penalty in the amount of $9,491,132 is due and owing and may be applied as a setoff of any return of interest owed pursuant to Section 6404(g) of the Internal Revenue Code.[4]

        The right to assert an accuracy-related penalty is dependent upon the fact that Sala's November 2003 amended return is not considered a "qualified" amended return under Treasury Regulation 1.6664-2T(c)(3)(I).  The 2003 amended return was not a qualified amended return because the Internal Revenue Service's Sections 6700, 6701, 6707, 6708, and 7408 examination of KPMG was initiated before plaintiffs filed their amended return eliminating that

---

[4]     In this case, the penalty should be as follows:

| | |
|---|---|
| Total Tax Liability: | $23,727,830 |
| 40% Accuracy related penalty (26 U.S.C. § 6662(e)) | $9,491,132 |
| Less penalty prev. assessed and paid | -      $4,441 |
| Setoff Amount | $9,486,691 |

underpayment, and the scope of the IRS's KPMG examination included plaintiffs' Deerhurst Transaction.

### 4.      PROPOSED STIPULATIONS

It is stipulated that, for the purpose of this case, the following statements may be accepted as fact.  However, either party has the right to object to the admission of any such facts on the grounds of relevancy and materiality.

1.      PriceWaterhouseCoopers ("PWC") was plaintiffs' accountant and tax return preparer for years 1997, 1998, and 1999.

2.      In late 1999, during the time PWC was serving as plaintiffs' accountants, Sala was introduced to KPMG partner Tracie Henderson through Tim Gillis, an old friend.  At the time of the introduction Mr. Gillis was a partner with KPMG .

3.      On November 2, 1999, Tracie Henderson sent Tim Gillis and Sala an email.

4.      During 1999, 2000, 2001, 2002, and 2003 Henderson was a certified public accountant and a partner with KPMG.  Henderson was the partner at KPMG responsible for Sala's account.  KPMG prepared plaintiffs' federal and state income tax returns for the years 2000, 2001, 2002 and 2003.

5.      On August 13, 2000, IRS Notice 2000-44 was released electronically and on September 18, 2000 it was published.

6.      On August 18, 2000, Tracie Henderson emailed Sala.

7.      On August 31, 2000, Tim Gillis emailed Tracie Henderson.

8.      On September 6, 2000, Tracie Henderson emailed Tim Gillis.

9.      On October 6, 2000, Sala sent Tracie Henderson a September 15th draft Brown & Wood LLP opinion letter titled "Re: Investments in Foreign Currency."

10.      On October 9, 2000, Tracie Henderson emailed Jeffrey Eischeid.

11.     On October 23, 2000 Carlos Sala ("Sala") deposited $500,000 into a personal account at Refco Capital Markets ("Refco"), which was managed by Deerhurst Management Company, Inc. ("Deerhurst Management").

12.     In 2000 Deerhurst Management was principally owned and managed by Andrew Krieger.

13.     On November 8, 2000 Sala formed a Delaware corporation known as Solid Currencies, Inc. ("Solid Currencies"), which he elected to treat as an S Corporation.

14.     On November 21, 2000 Sala deposited an additional $8,425,000 into his personal account at Refco.

15.     On or about December 1, 2000, Deerhurst Investors, GP was formed and was liquidated prior to year's end.

16.     Solid Currencies was one of the general partners of Deerhurst Investors, GP.

17.     On April 9, 2001, Laurence Nemirow forwarded to Tracie Henderson an email he sent to R.J. Ruble.

18.     On April 9, 2001, Laurence Nemirow emailed Tracie Henderson.

19.     On April 12, 2001, Tracie Henderson emailed R.J. Ruble.

20.     On or about April 15, 2001, Sala paid R.J. Ruble $75,000 for the opinion letter.

21.     On August 21, 2003, Tracie Henderson emailed Jeffrey Eischeid.

22.     In September 2004, Sala withdrew from the Lonestar Global LP program ending his relationship with Deerhurst.

23.     On or before April 15, 2001, plaintiffs filed a federal income tax return ("Original Return") for their 2000 tax year.

24.     Plaintiffs' Original Return reported wages of $51,748,681, taxable interest income

of $1,837,561, dividend income of $410,300, taxable refunds, credits or offsets of state and local income taxes of $7,846, a capital gain of $6,472,000, and other income of ($23).

25.     Plaintiffs' Original Return reported on line 17 (rental real estate, royalties, partnerships, S corporations, trusts, etc.) a $60,449,984 loss.  The loss was identified as a non-passive loss from Solid Currencies, Inc., Sala's wholly owned S corporation.

26.     The Original Return reported adjusted gross income of $26,381. Plaintiffs reported owing no federal income taxes.

27.     On or about April 15, 2001, Sala caused to be filed a corporate income tax return for Solid Currencies, Inc., for its 2000 tax year.  David Schwartz, the brother of Michael Schwartz, signed the return for the corporation.  The return reported an ordinary loss from a trade or business of ($60,449,984).

28.     In the Pre Trial Order the parties filed on April 30, 2007, the parties stipulated to the contents of Joint Stipulation Number 28.  In that submission, the parties stipulated as follows:

> 28.     On or about December 29, 2003, plaintiffs filed an amended federal income tax return (Amended Return) for their 2000 tax year. The Amended Return reported the same income amounts as the Original Return. The Amended Return did not claim as a deduction the ($60,449,984) loss reflected on the Original Return.

During the pre-trial conference held on May 3, 2007, Plaintiffs' counsel notified the Court and defendant's counsel of its contention of inaccuracies in paragraph 28.  Plaintiffs contend paragraph 28 is deleted in this Amended Pre Trial Order because the parties are not now in agreement regarding the matters previously stated in paragraph 28.  The United States stands behind the stipulation as previously agreed to and filed.

29.     On or about June 18, 2004, the Internal Revenue Service issued a Notice of Deficiency to plaintiffs, asserting that plaintiffs owed additional taxes in the amount of $22,204

due to the disallowance of $56,071 of losses plaintiffs reported as attributable to Solid Currencies, Inc.  The Notice of Deficiency also asserted an accuracy-related penalty in the amount of $4,400.80 for tax year 2000.

30.     In September 2004, plaintiffs had prepared and filed a form 1040X for their 2000 tax year claiming a refund due them of $23,727,630.

31.     On October 11, 2006, the Government served a subpoena on Tracie Henderson requiring her to appear for deposition in Atlanta, Georgia.  The parties do not dispute that should Henderson be required to testify in this case, she will, upon advice of counsel, invoke her Fifth Amendment privilege against self-incrimination and decline to further respond.

32.     Subject to the following limitations, the trial and deposition testimony of Richard Cassius Lee Starke in *Jade Trading, LLC, et al, v. United States*, No. 03-2164-T ("Jade Trading") (and accompanying exhibits) given in Jade Trading may be offered as evidence in this case as if the testimony and exhibits were provided and offered in the instant case.  The parties expressly reserve the right to assert all available evidentiary objections in response thereto, including the relevance of the testimony and exhibits to the issues before this Court.

## 5.     COMPUTATION OF DAMAGES

The plaintiffs seek a refund of $27,782,950.15, plus applicable interest, costs, and attorneys' fees.  The refund amount is based on the tax, interest and penalties paid by Plaintiffs with respect to their 2000 Federal income tax return.

The United States does not seek damages but pursuant to this Court's ordinary procedures will request its costs should it prevail in this matter.

Based upon the Court's rulings, the parties will endeavor to agree to computations for the entry of judgment.

## 6.   PENDING MOTIONS

On August 10, 2007, plaintiffs filed a motion *in limine* to preclude the United States from offering testimony and evidence as to the United States' offset defense.  The Untied States' response is due September 4, 2007 and plaintiffs' reply is due September 14, 2007.

## 7.   WITNESSES

a.   For the Plaintiffs:

Fact Witnesses

Plaintiffs presently intend to call the following witnesses in support of their case-in-chief, if available within this Court's jurisdiction.

(i.)   *Carlos Sala* will testify about his review and analysis of the investment opportunity offered by Deerhurst, the transactions he entered into upon undertaking the investment and his motivations for entering into the transactions, and documents produced to the IRS during the examination of his 2000 tax return.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.

(ii.)   *Laurence Nemirow* will testify regarding his review and analysis of the tax opinion, and aside from tax issues, his review and advice concerning the legal documents involved the transactions. The witness may also testify about any other matter addressed in his deposition or raised by counsel.

(iii.)   *Martin (Tony) White* will testify about his review and analysis of the investment opportunity offered by Deerhurst, the transactions he entered into upon undertaking the investment and his motivations for entering into the transactions.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(iv.)     *Andrew Krieger* will testify regarding the investment program offered by Deerhurst, including the formation, the nature and structure of the specific foreign currency contracts bought and sold, the history of the investment opportunity and the future profit projects.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(v.)     *Angie Napier* will testify regarding her involvement in the preparation of Plaintiffs' 2000 tax return.  The witness may also testify about any other matter addressed in her deposition or raised by counsel.  If the witness declines to voluntarily appear at trial, her deposition testimony will be submitted.

(vi.)     *Kevin Brady* will testify regarding his involvement in the preparation of Plaintiffs' 2000 tax return.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(vii.)     *Michael Schwartz* will testify regarding the investment program offered by Deerhurst, including the formation, the nature and structure of the specific foreign currency contracts bought and sold, the history of the investment opportunity, the profit projections, and the Deerhurst financial statements.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If the witness declines to voluntarily appear at trial, his deposition testimony will be submitted.

(viii.)     *Connie Tang* may testify regarding documents produced by the government and documents produced to the IRS during the examination of Plaintiffs' 2000 tax return.

(ix.)     Plaintiffs may also call any witness designated by United States.

b.      For the United States:

Fact Witnesses

The United States presently intends to call the following witnesses in support of its case-in-chief, if available within this Court's jurisdiction.

*(i)  Carlos Sala.*  Mr. Sala will testify about his financial and investment history, his work experience, the events leading up to his decision to participate in the tax shelter, communications regarding the shelter, and events both during and after the shelter transaction.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.

*(ii)  Martin White.*  Mr. White will testify about his relationship with Carlos Sala, events leading up to his participation in the tax shelter transaction, the tax shelter transaction, and communications with third parties and Carlos Sala regarding these matters.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If Mr. White cannot be found in the jurisdiction, Mr. White's testimony will be presented via his deposition.

*(iii)  Christopher Dice.*  Mr. Dice will testify about his relationship with Carlos Sala, events leading up to his participation in the tax shelter transaction, the tax shelter transaction, and communications with third parties and Carlos Sala regarding these matters.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.  If Mr. Dice cannot be found in the jurisdiction, Mr. Dice's testimony is expected to be presented via his deposition.

*(iv)  Michael Schwartz.*  Mr. Schwartz will testify about his background, his work on tax shelter matters, his role in the shelter transaction, his compensation and loans regarding this transaction, and his communications with Carlos Sala and others regarding the shelter.  The witness may also testify about any other matter addressed in his deposition.  Mr. Schwartz's

testimony is expected to be presented via his deposition.

(v)  *Laurence Nemirow*.  Mr. Nemirow will testify about his research and investigation regarding the shelter transaction and his communications with Carlos Sala and others about the transaction.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.

(vi)  *Andrew Krieger*.  Mr. Krieger will testify about his role in connection with the shelter, his communications with Carlos Sala and others regarding the shelter transaction and the materials provided to the participants.  The witness may also testify about any other matter addressed in his deposition.  Mr. Krieger's testimony is expected to be presented via his deposition.

(vii)  *William Natbony*.  Mr. Natbony will testify about the legal work he provided in connection with the transaction, the work his law firm performed, and his communications with Carlos Sala and others in connection with transaction.  The witness may also testify about any other matter addressed in his deposition.  Mr. Natbony's testimony is expected to be presented via his deposition.

(viii)  *John Raby*.  Mr. Raby will testify about his work at PricewaterhouseCoopers, his work with Carlos Sala, his communications with Michael Schwartz and others in connection with the shelter transaction, the reasons he left PricewaterhouseCoopers, and his work for Multinational Strategies including his compensation agreement.  The witness may also testify about any other matter addressed in his deposition or raised by counsel.

(ix)  *Tim Gillis*.  Mr. Gillis will testify about communications with Carlos Sala regarding Tracie Henderson and will authenticate documents.  The witness may also testify about any other matter addressed in his deposition.  Mr. Gillis's testimony is expected to be presented via his

deposition.

(x) *R.J. Ruble*.  Mr. Ruble is an indicted party in the *Stein* criminal case.  Pursuant to this Court's Order, Mr. Ruble's deposition has not been taken—although the United States has filed a renewed motion to stay the case until the conclusion of the *Stein* case and until such testimony may be secured.  If available for trial Mr. Ruble will be expected to testify about the legal work he provided in connection with the transaction, the work his law firm performed, and his communications with Carlos Sala and others in connection with the transaction.

(xi) *Tracie Henderson*.  Ms. Henderson has asserted her Fifth Amendment rights and pursuant to this Court's Order, has not been deposed.  The United States has filed a renewed motion to stay the case until the conclusion of the *Stein* case and until such testimony may be secured.  If available for trial, Ms. Henderson will be expected to testify regarding her work at KPMG, communications with Carlos Sala and others, regarding Carlos Sala and/or the shelter transaction, and may authenticate documents.

(xii) *Michael A. Halpert*.  Mr. Halpert is a Tax Shelter Promoter Compliance Specialist with the IRS and will be called to authenticate documents the IRS received from KPMG, and to testify to the matters stated in his declarations on file with this Court.

(xiii) *Angie Napier*.  Ms. Napier may authenticate documents, testify regarding her work at KPMG, communications with Carlos Sala, Tracie Henderson and others, regarding Carlos Sala and/or the shelter transaction.  The witness may also testify about any other matter addressed in her deposition.  Ms. Napier's testimony is expected to be presented via her deposition.

The United States may also call the following additional fact witnesses:

*(i)  Refco via its corporate designee.*  Refco via its corporate designee may authenticate documents, testify about communications regarding this transaction, testify about trading policies and guidelines in connection with this transaction, including margin requirements and liquidation of offsetting positions.

*(ii)  Carl Vertucca.*  Mr. Vertuca may testify about the shelter transaction and his communications with Michael Schwartz, Andrew Krieger, and others regarding the transactions. The witness may also testify about any other matter addressed in his deposition.

*(iii)  IRS agent Pamela Ciccotelli.*  Ms. Ciccotelli may discuss the tax examination and assessments made against the plaintiffs.

*(iv)   Kevin Brady.*  Mr. Brady may testify regarding his work at KPMG, communications with  Carlos Sala, Tracie Henderson, and others regarding Carlos Sala and/or the shelter transaction.  The witness may also testify about any other matter addressed in his deposition. Mr. Brady's testimony is expected to be presented via his deposition.

*(vi)  KPMG via Diane Fuller.*  KPMG via its corporate designee may authenticate documents and testify regarding the facts communicated in its letter of November 17, 2006.

*(vii)  Bruce Lemmons.*  Mr. Lemmons may testify regarding his communications with Carlos Sala and his involvement with this and other shelter transactions.  The witness may also testify about any other matter addressed in his deposition.  Mr. Lemmons's testimony is expected to be presented via deposition.

*(viii)  Beckett Cantley.*  Mr. Cantley may testify regarding his communications with Carlos Sala, his compensation from this shelter transaction, and his involvement with this and other shelter transactions.  The witness may also testify about any other matter addressed in his

deposition.  Mr. Cantley's testimony is expected to be presented via his deposition.

*(ix)  Bruce Amman*.  Mr. Amman may testify regarding his communications with Carlos Sala and his involvement with Carlos Sala's other investments and financial transactions.

*(x)  The United States may also call any witness designated by plaintiffs.*


Expert Witnesses

Plaintiffs will call:

*(i)*        Dr. Robert W. Kolb who will testify concerning the matters addressed in his expert and rebuttal reports and will testify about matters presented at trial.

*(ii)*       To the extent Andrew Krieger's testimony is considered to be opinion, not factual testimony, Krieger will testify concerning the profitability of the 24 transactions that gave rise to the claimed tax loss, and concerning any other matter addressed in his expert depositions or matters presented at trial.


The United States will call Dr. David DeRosa who will testify concerning the matters addressed in his expert and rebuttal reports and will testify about matters presented at trial.

## 8.        EXHIBITS

a.        The parties hereby stipulate and agree that the exhibits listed in Attachment A are authentic business records that are admissible at trial.  The parties reserve the right to object on the basis of relevancy.

b.        The parties hereby stipulate and agree that the remaining exhibits not identified above but included in the parties' filed exhibit lists are authentic documents and are what they purport to be, and that the parties reserve all objections other than authenticity with respect to these remaining exhibits.

## 9.      DISCOVERY

Two witnesses identified by plaintiffs in their Rule 26 disclosures, Tracie Henderson and Raymond J. Ruble, have refused to provide testimony in light of the pending *Stein* criminal trial and ongoing criminal investigation.  The Court has previously ordered the parties to complete discovery of other witnesses.  The testimony of these witnesses was the subject of the United States' renewed motion for stay.

## 10.      SPECIAL ISSUES

a.      For the Plaintiffs:

   (i)      *United States undisclosed witnesses.*

The government has indicated it may call as a witness "KPMG via its corporate designee" to testify regarding the facts communicated in a letter dated November 17, 2006 from KPMG's counsel, Joseph Barloon.  Plaintiffs sought discovery testimony of individuals associated with KPMG to testify as to specific subject areas in a Rule 30(b)(6) request.  Mr. Barloon's letter objected to that request on various grounds and refused to provide the name of individuals who could be deposed.  In the letter, Mr. Barloon purported to make statements he asserted were facts relative to the subject matter covered by the Rule 30(b)(6) request.  He provided no documents or names of individuals who would support his assertions nor did he provide any sworn declaration on his own behalf.  Until April 30, 2007 at approximately 2:30pm Pacific time, the government did not provide the name and contact information of the "corporate designee" it intends to call at trial.  On that date and time the government provided the name Diane Fuller.  The initial disclosures and subsequent discovery requested this information, but Ms. Fuller's name, contact information and substance she was going to testify was not provided.  Accordingly, the government should not be permitted to call Diane Fuller at trial to testify.

Should the Court determine that Ms. Fuller may testify, Plaintiffs should be entitled to depose her in advance of trial and obtain contact information.

     *(ii)*     Michael A. Halpert.  The name and expected testimony was not disclosed by Defendant as a person who had information material to this case.  The initial disclosures and subsequent discovery requested this information, but Mr. Halpert's name, contact information and expected testimony was not provided.  Accordingly, the government should not be permitted to call Mr. Halpert at trial to testify.  Should the Court determine that Mr. Halpert may testify, Plaintiffs should be entitled to depose him in advance of trial.

     *(iii)*     Opinion Testimony from Andrew Krieger.  Krieger's testimony was initially taken at the request of the government and transpired over two days.  During the course of its questioning, the government asked numerous questions that called for opinion testimony from Krieger.  Plaintiffs' counsel, on cross examination of Krieger, asked some questions that called for opinions.  The government objected to some questions that called for opinion testimony.

     Thereafter, Plaintiffs notified the government that, to the extent Krieger's opinion testimony is considered expert opinion, the Plaintiffs intend to offer, as expert testimony, his opinions to which he testified at his deposition.  The government then insisted it had the right to again depose Krieger.  Krieger's deposition was then taken again on April 17, 2007.  Contrary to the government's contention set forth in its claims below, Plaintiffs have not expanded the scope of Krieger's opinion testimony beyond that which has already been disclosed.

b.      For the United States:

(i)      *The United States' inability to secure the testimony of Raymond J. Ruble and Tracie Henderson.*

Mr. Ruble and Ms. Henderson were retained by Plaintiff Carlos Sala to render advice in connection with this transaction. Both Mr. Ruble, who is under criminal indictment in connection with his work on shelter matters, and Ms. Henderson, will not provide testimony about this matter relying instead on their Fifth Amendment right to refuse to testify. Both individuals are likely to have intimate knowledge regarding Mr. Sala's motivations in entering into the shelter. Mr. Sala's intent is relevant to the legal issues before the Court including the application of the economic substance doctrine. The United States has previously requested a stay of this action. The Court denied the request and instructed the parties to take discovery of all witnesses who were not likely to assert their Fifth Amendment rights and refuse to testify. Having completed this discovery, and for the same reasons asserted in connection with its motion for stay (Docket No. 46), the United States requests that the trial be postponed so that it may secure the testimony of these witnesses.

(ii)      *The testimony and notes of Richard Starke are irrelevant and inadmissible.*

The United States anticipates that plaintiffs may attempt to offer the notes and/or prior testimony of Richard Starke, an IRS employee. In order to be relevant, and thus admissible at trial, the Starke notes and testimony would have to tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Relevance depends on the purpose for which the evidence is offered, and the proponent of the evidence is required to articulate that purpose. However, in doing so, plaintiffs confront a powerful generality:

> [T]he cerebrations and mental processes of government officials, leading to admittedly proper exercises of power, *can never be a factor in a judicial proceeding.*

*Rosee v. Bd. of Trade*, 36 F.R.D. 684, 689 (N.D. Ill. 1965) (emphasis added).

Starke's musings are irrelevant, incompetent, and inadmissible evidence. Statements made by IRS employees at internal meetings constitute neither the official position of the IRS nor the law.  Plaintiffs may rely upon official IRS statements, the Internal Revenue Code, pertinent regulations, and case law, among other sources, in support of their argument that they made a reasonable attempt to comply with the provisions of the Code.  However, unofficial, purely internal statements made by IRS employees simply have no bearing on this issue.  *See United States v. American Telephone and Telegraph Co.*, 524 F. Supp. 1381, 1387 (D.D.C. 1981) ("Extrinsic evidence as to how and why the FCC reached its decision and what it intended thereby – either by Commissioners speaking in their individual capacities or by employees of the FCC – are irrelevant to the question whether defendant's compliance was reasonable"); *Siddell v. Commissioner*, 225 F.3d 103, 111 (1st Cir. 2000) (finding internal IRS memoranda discussing the internal construction of a regulation irrelevant because the "memoranda represent the personal views of the authors, not the official position of the agency").

Indeed, there are instances in which a plaintiff/taxpayer may not rely upon *published* IRS statements, even when they are available and may have informed their tax analysis.  *See* 26 U.S.C. § 6110(k)(3) (providing that private letter rulings and technical advice memoranda "may not be used or cited as precedent"); *see also* 26 C.F.R. § 301.6110-7(b) (same); *Vons Cos., Inc. v. United States*, 51 Fed.Cl. 1, 8-11 (2001) (finding that private letter rulings and technical advice memoranda have precedential value *only* to the specific taxpayers to which they are issued and

collecting cases to the same effect). Accordingly, unpublished, unofficial statements are not properly relied upon here.

Moreover, there is absolutely no evidence that plaintiffs were aware of Starke's notes before this litigation, much less that plaintiffs read and/or relied upon these notes prior to their entry into this tax shelter. Accordingly, under FED. R. CIV. P. 401, the Starke notes are entirely irrelevant to this case.

Finally, the contents of the notes themselves constitute hearsay. Because the notes contain alleged statements of other IRS employees, plaintiffs must show that each of several levels of hearsay is subject to an exception. *See* FED. R. EVID. 805 (requiring that "hearsay within hearsay" must conform to an exception to be admissible). Thus, even if the Starke notes are somehow admissible in the abstract, the statements by other IRS employees contained within them must be independently admissible.

> (iii)   *Plaintiffs have not established that Robert W. Kolb is qualified to testify as an expert witness about the subjects listed in his expert designation, his testimony is outside the scope permitted by the Fed. R. Evid. 701 and 702 and Fed. R. Civ. P. 26(a), and plaintiffs have not established that such testimony is credible and reliable pursuant to Fed. R. Evid. 401 through 403.*

> (iv)   *Plaintiffs have not established that Andrew Krieger is qualified to testify as an expert witness about the subjects listed in his expert designation, his testimony is outside the scope permitted by the Fed. R. Evid. 701 and 702 and Fed. R. Civ. P. 26(a), and plaintiffs have not established that such testimony is credible and reliable pursuant to Fed. R. Evid. 401 through 403.*

> (v)   *Plaintiffs have improperly designated non-expert deposition testimony of Andrew Krieger as expert deposition testimony.*

Andrew Krieger was deposed over three days, and pursuant to two separate notices of deposition. His first deposition was taken as a fact witness, so named by plaintiffs in their initial disclosures. Several months after his deposition, plaintiffs suddenly designated Andrew Krieger

as an expert witness, and designated five particular testimonial areas for this expert.  The United

States subsequently took the "expert" deposition of Andrew Krieger upon each of those areas.

In this Amended Pre-Trial Order, plaintiffs have now listed *both* depositions of Andrew

Krieger as "expert depositions."  Such designation violates plaintiffs' expert disclosures in which

they set forth five limited designated areas of Krieger's expert testimony, to now include all

prior-to testified material before he was ever designated an expert, and because they boot-strap

non-expert testimony into that of expert testimony.

Plaintiffs' designation is highly unusual, and is improper.  To the extent that Andrew

Krieger is found to be an expert, any deposition testimony (1) other than that taken at his noticed

expert deposition and (2) outside of the five narrow designated testimonial areas, is improper.

## 11.    SETTLEMENT

a.      Counsel for the parties met by telephone on April 27 and 30, 2007, to discuss in
good faith the settlement of the case.

b.      The participants in the settlement conference, included counsel, party
representatives, and any *pro se* party.

c.      The parties were promptly informed of all offers of settlement.

d.      Counsel for the parties and any *pro se* party do intend to hold future settlement
conferences.

e.      It appears from the discussion by all counsel and any *pro se* party that there is
little possibility of settlement.

f.      The date of the next settlement conference before the magistrate judge or other
alternative dispute resolution method: none scheduled.

g.      Counsel for the parties and any *pro se* party considered ADR in accordance with
D.C.COLO.LCivR.16.6.

## 12.    OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68
(Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel have discussed it with the

clients against whom claims are made in this case.

### 13.      EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 14.   TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

Trial of this case will be to the Court in Denver, Colorado.  Plaintiffs expect trial to last 5 days.  The United States expects trial to last 10 days.

DATED this _____ day of _____ 2007.

BY THE COURT:


_____
United States District Judge


APPROVED:


s/Darrell Hallett _____
DARRELL HALLETT
JOHN COLVIN
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs
1011 Western Ave., Suite 803
Seattle, WA 98104 Telephone:
(206) 223-0800
Facsimile: (206) 467-8170
Email:
dhallett@chicoine-hallett.com
jcolvin@chicoine-hallett.com


s/David N. Geier _____
DAVID N. GEIER
JOSEPH A. SERGI
AMY T. MATCHISON
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044-0683
Telephone: (202) 616-3448
Facsimile: (202) 307-0054
Email:
david.n.geier@usdoj.gov
joseph.a.sergi@usdoj.gov
amy.t.matchison@usdoj.gov

Judiciary Center Building
555 Fourth Street N.W.
Washington, DC 20001