## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00636-LTB-KLM

CARLOS E. SALA and
TINA ZANOLINI SALA,

   Plaintiffs,

 v.

UNITED STATES OF AMERICA,

   Defendant.

---

### PLAINTIFFS' FINDINGS OF FACTS AND CONCLUSIONS OF LAW

---

### FINDINGS OF FACT

**Principal Parties and Events:**

CARLOS SALA ("Sala")

The facts set forth in this section will be proven primarily by Sala's trial testimony, which will be in accordance with his deposition testimony. Joint Exhibit ("Jt. Ex.") 46, Sala's Curriculum Vitae, sets forth Sala's background and experience.

1.  Sala obtained a four year degree from the University of Georgia, majoring in finance and accounting. He then obtained his CPA certificate and worked for Ernst & Young ("E&Y"), a national public accounting firm, for six years. He began in E&Y's Atlanta office working as an auditor, primarily of large companies. His duties focused upon due diligence and accounting work in the context of verifying company financial information in connection with the issuance of E&Y's financial statement opinions.

2.  Sala then transferred to E&Y's New York office. There he performed due diligence on numerous acquisition targets on behalf of financial and strategic buyers. The acquisitions ranged in size from $25 million to $3 billion. Much of his time was spent in the field dealing with top level management. Several employees reported to him.

3.  After leaving E&Y, Sala worked for Dal-Tile International, Inc., ("Dal-Tile"), initially a privately held company which was later listed on the New York Stock Exchange as a result of an Initial Public Offering. Dal-Tile was the world's largest ceramic tile manufacturer and distributor, with sales of over $700 million, and a market capitalization

of $1.5 billion.  Sala was initially Executive Vice President of International Operations, then, at age 30, was made CFO, Executive Vice President and Treasurer.  He was responsible for all of Dal-Tile's financial functions and oversight of approximately 170 employees.  He was personally accountable for communicating financial results to senior management, the Board of Directors, investment analysts, investors, and lenders.

4.     Because of its international operations, Dal-Tile was exposed to foreign currency fluctuations.  Sala's responsibilities included oversight of currency hedging transactions designed to protect the company against value fluctuations in various currencies, including the US Dollar, Mexican Peso, and Italian Lira.

5.     In 1997, Sala left Dal-Tile and became CFO, Secretary and Treasurer of Abacus Direct, Inc., ("Abacus"), a database and marketing firm with one of the largest direct marketing databases in the United States.  Sala was responsible for all financial functions.

6.     At Abacus and Dal-Tile, Sala created, reviewed, and presented many financial projections, forecasting the future based upon past performance and other factors to others.

7.     Abacus was publicly held when Sala joined the firm.  His compensation included cash and stock options.

8.     In June 1999, Abacus' stock was acquired by DoubleClick, Inc. ("DoubleClick"), a publicly held company.  In connection with the acquisition, Sala received DoubleClick stock options.  Sala was precluded under the securities laws from selling DoubleClick stock until February 2000.  He then forecasted (accurately, as it turned out) a substantial decline in the equity markets—particularly technology stocks—and decided to sell his DoubleClick stock as quickly as possible.  He succeeded in doing so before the large market decline began in March 2000.

9.     Sala then oversaw the investment of the proceeds from his DoubleClick stock sales using the investment services of Goldman Sachs & Morgan Stanley ("Goldman Sachs").  He continued his strategy to stay out of the equity markets and placed most of his money in municipal bonds and other fixed income financial products.  His overall investment strategy, however, was to invest approximately 15% of his total portfolio in relatively aggressive, high risk/high reward products.  He did a fair amount of trading in options through Goldman Sachs in 2000.  The trading included taking positions in two or more related options in order to exploit predictions of the price movement in the underlying asset on which the options are written (i.e., 'straddles' and 'strangles').

ANDREW KRIEGER ("Krieger")

10.    Krieger received a Masters degree from the Wharton School of Business in 1984.  He then worked for Salomon Brothers and Bankers Trust.  In 1987, he was responsible for a $228 million dollar foreign exchange trading profit for which Krieger, then 31 years old, received a bonus of $3.25 million.  Krieger then joined Soros Fund Management ("Soros"), whose principal was George Soros, a wealthy investor.  Krieger's foreign

exchange trading on behalf of Soros was successful, and was estimated to have produced $45 million in profits. (Jt. Ex. 9, p. 3; Krieger Deposition ("Krieger Dep.") pp. 8-20, 391-96).

11.   After leaving Soros, Krieger formed his own firm in 1991, which later operated under the name of Deerhurst Management Company and its affiliates ("Deerhurst"). (Jt. Ex. 9, p. 3; Krieger Dep. pp. 395-396).

12.   Krieger was the author of "Money Bazaar" and a columnist for Forbes magazine. (Jt. Ex. 9, p. 3) As acknowledged by David DeRosa ("DeRosa"), the government's expert in this case, Krieger had a reputation as a formidable foreign exchange trader. (David DeRosa Deposition ("DeRosa Dep.") p. 42).

13.   From 1991 through 2004, Krieger and Deerhurst invested money pursuant to a strategy called the "Discretionary Program." This strategy involved investing predominantly in foreign currencies and foreign currency options with a heavy focus upon diversifying exposures across currency pairs (i.e., "long and short options"). (Plaintiff's Exhibit ("Pl. Ex.") 71; Krieger Dep. pp. 400-403).

14.   Krieger's Discretionary Program is illustrated in Attachment 1 hereto (Pl. Ex. 97; Exhibit 1 to Kolb's Report). The Attachment lists the 24 option positions whose acquisition and disposition generated the tax loss at issue. Option A reflects the sale of a Euro call option against the Japanese Yen. In other words, Krieger was betting that the Euro would strengthen against the Japanese Yen. Krieger bought four options (A-D) with the same foreign currency pairs (Euro against the Japanese Yen), but with different strike (exercise) prices. The maximum profit on just these four pairs was over $80,000. Consistent with his program strategy to diversify across foreign currency pairs, Krieger also bought four other foreign currency pairs, i.e., British Pound (GBP) against the Japanese Yen (options G-J), Swiss Franc (CHF) against the US Dollar (options K-N), Euro against the US Dollar (options O-R), and the Japanese Yen against the US Dollar (options S-T).

15.   Although the Discretionary Program made some use of computer models, Krieger and his staff made the ultimate decisions in structuring trades with the objective to make profits with designated levels of risk. (Krieger Dep. pp. 399-400).

16.   Deerhurst's standard fee structure was a 2% management fee based upon the leveraged amount invested, and a 20% incentive fee (profit share). Some investors, however, including Sala, negotiated different fee arrangements. (Jt. Ex. 9, pp. 8-9; Krieger Dep. pp. 120-121, 400-411; Michael Schwartz ("Schwartz") Deposition ("Schwartz Dep.") p. 52); Sala trial testimony).

17.    Deerhurst's annual rates of return from 1991 through 1998 were as follows:

        1991 – 7.30%
        1992 – 18.11%
        1993 – 42.84%
        1994 – 1.22%
        1995 – 23.72%
        1996 – 16.22%
        1997 – 40.52%
        1998 – 13.43%

        (Pl. Ex. 71; Krieger Dep. pp. 129-130, 404-407).

18.    An independent CPA firm, Julias D. Farber and Company, issued a report in September 1999 confirming the trading performance for the periods August 1995 through February 28, 1999 for the portfolio managed by Krieger.  The report showed an average annual return net of fund expenses of 20.70% and a total return for covered period of 96.23%. (Pl. Ex. 68; Schwartz Dep. pp. 15-16; Krieger Dep. pp. 417-418).

19.    By early 1997, Krieger had $75 to $80 million under management in the Discretionary Program.  He then returned these funds to the various investors and then, until February 1999, traded the Discretionary Program exclusively on behalf of one large investor, Ross Capital.  Ross Capital was required to unwind its trading activities in early 1999 because of enormous trading losses unrelated to Krieger's Discretionary Program.  Ross paid Krieger $2 to $3 million in deferred compensation, and encouraged him to begin trading for others.  (Krieger Dep. pp. 96-97, 106-114, 420).

20.    Krieger then decided to market himself and Deerhurst to investors and rebuild a long term, stable capital base with which to conduct trading.  Krieger's preference was to obtain investors who were willing to commit to stay invested with Deerhurst for at least five years so he could focus his energy upon trading rather than marketing.  He also believed, based upon his foreign currency trading experience, that substantial profit opportunities in the foreign currency and option markets occur sporadically over time, such that a period of several years would afford the best opportunity to make large amounts of money.  Also, prior to hiring additional employees and investing in infrastructure, Krieger wanted a long term commitment from his investors.  (Krieger Dep. pp. 420-422)

21.    In late 1999 and early 2000, Krieger had six or fewer clients.  He was still looking to obtain one or more investors who would commit substantial funds to a five year or longer investment program when he met Schwartz.  Schwartz told Krieger that he (Schwartz) dealt with very high net worth clients, some of whom, he thought, would be interested in Krieger's Discretionary Program.  (Krieger Dep. pp. 422-425).

## MICHAEL SCHWARTZ

22.  Schwartz obtained a Bachelors and Masters degree in accounting, then worked as a CPA for Price Waterhouse, KPMG, Coopers & Lybrand, and PriceWaterhouse Coopers ("PwC") from 1979 until April 2000. He then formed his own firm, Multi-National Strategies ("Multi-National"). Multi-National was involved in a number of investment related transactions, and formed a broker-dealer called Multi-National Securities, which was registered with the National Association of Securities Dealers. (Schwartz Dep. p. 8).

23.  Before recommending Krieger to any clients, Schwartz: 1) had numerous detailed discussions with Krieger about his Discretionary Program, his experience, and his performance history; 2) made numerous visits to Deerhurst's offices to observe its trading operations; 3) obtained and analyzed Deerhurst's trading history, particularly of its Discretionary Program, going back to the early 1990s; and 4) made projections of what he thought investors could realistically expect to make over the next five years if their money were placed with Deerhurst's Discretionary Program. (Schwartz Dep. pp. 15-21, 33).

24.  Ultimately, Schwartz concluded that Deerhurst appeared to be a very capable firm specializing in foreign currency and currency option trading. While he recognized the possibility of significant losses if future performance did not match Deerhurst's 10 year history, he believed the Discretionary Program, which at times was highly leveraged, could reasonably be expected to double, and perhaps, triple, investors' capital over a five year period. (Schwartz Dep. pp. 32-33).

25.  Schwartz also consulted with William Natbony ("Natbony"), who had performed legal work for Schwartz in various matters, and had also served as counsel to Krieger and Deerhurst. (Schwartz Dep. p. 13).

26.  From Natbony, Schwartz became familiar with a tax strategy that could be used in conjunction with Deerhurst's trading program. The strategy would provide a significant tax benefit resulting from the acquisition and disposition of long and short option positions on foreign currencies. (Schwartz Dep. p. 158).

## WILLIAM NATBONY ("Natbony")

27.  Natbony has been a partner in the New York office of Katten Muchin Rosenman LLP ("Rosenman"). His clients are primarily private investment advisors, private investment funds, and related entities such as broker dealers. His legal work involves regulatory filings, disclosures, and business structuring. (William Natbony Deposition ("Natbony Dep.") pp. 11-16).

28.  Natbony obtained a law degree and a Masters degree in taxation from New York University ("NYU"). He was a research fellow at Yale Law School for Professor Boris Bittker, one of the premier tax academics in the country. He assisted Professor Bittker in writing Bittker's tax treatise. He taught taxation for 10 years at St. Louis University and

NYU School of Law, and worked at three other law firms before joining Rosenman as a partner. (Natbony Dep. pp. 11-16).

29.    After consulting with Krieger and Schwartz, Natbony prepared various documents to be used in connection with the Deerhurst investment program undertaken in the fall of 2000. He reviewed proposed marketing materials to determine their compliance with securities laws, and prepared a legal memorandum outlining the tax consequences of proposed transactions. Natbony also issued tax opinions to several individuals whose money was placed under the management of Deerhurst, including Martin White ("White"). (Natbony Dep. pp. 32-35).

## MARTIN WHITE

The facts set forth in this section will be proven by White's trial testimony which will be in accordance with his deposition.

30.    White majored in economics and social studies from Trinity College in Dublin, Ireland. He sold advertising space for magazines and worked in sales and marketing for a company in the mailing list business prior to 1982. From 1982 to 1988, he was Vice President and General Manager for a Denver database company. In 1990, he formed Abacus.

31.    In 1996, Abacus went public. White was Chairman of the Board and CEO until the merger with DoubleClick in 1999.

32.    White met Sala in connection with Abacus' search for a CFO in 1997. Since then, White and Sala have been close business associates and friends. White has invested alongside Sala on many occasions, and has frequently sought Sala's advice with respect to a wide range of investments and financial decisions.

33.    White realized a substantial profit on his sale of DoubleClick stock in early 2000. He shared investment advisors with Sala at Goldman Sachs, and used the services of UBS, which had experience in foreign currencies.

34.    White and Sala met with Schwartz and discussed the proposed Deerhurst offering in the fall of 2000. Thereafter, meetings were held with Krieger in Deerhurst's offices. White contacted Goldman Sachs to obtain information on Krieger's reputation. He obtained a copy of a book authored by Krieger, and read it. He reviewed financial projections prepared by Sala of the profitability of investing with Deerhurst Management. He previously reviewed Sala's projections in connection with other business and investment decisions, and he had great confidence in them.

35.    Ultimately, White concluded that investing with Deerhurst provided: 1) the opportunity to make substantial amounts of money over a five year period; 2) diversification of his investment portfolio; and 3) a significant tax benefit. He would not have invested, regardless of the tax benefit, if he had not concluded that there was a good prospect of substantial profit, independent of taxes. He understood that claimed tax savings could be

challenged by the IRS and disallowed. He further understood, based upon legal opinions he received from two law firms, and a review by Lawrence Nemirow ("Nemirow"), a Denver tax and business lawyer, that the claimed tax benefits were supported by the law.

## SALA'S INVOLVEMENT IN DEERHURST

36.     Ultimately, with input from Krieger, Peter Molyneaux (Senior Vice President and Director of Financial Operations of Deerhurst Management), Schwartz, and Natbony, an investment proposal was designed, which will hereinafter be referred to as the "Deerhurst Transaction." The Deerhurst Transaction was offered to numerous potential investors. It involved:

a.      Placement of a minimum amount of funds with Deerhurst for a 30 to 45 day period, during which investors had the opportunity to become familiar with Deerhurst and its trading strategies. Investors were free to withdraw their funds without penalty at any time during this initial test period.

b.      Investors desiring to continue were required to deposit additional funds at least equal to 15% of their expected tax loss which would remain invested under Deerhurst's management during the latter part of 2000.

c.      If investors made some profit during the second phase of the program, they were required to have their funds transferred to a new entity, Deerhurst Trading Strategies, LLC ("Trading Strategies"), and to remain invested with Trading Strategies for a five year period, or incur significant penalties for withdrawal. If investors did not make a profit in 2000, continuation with Trading Strategies was at their discretion.

d.      A significant tax benefit would be available in 2000, primarily through application of a tax strategy based upon then existing law involving the disregard of short option positions as liabilities in determining a taxpayer's basis and gain or loss for tax purposes.

e.      No upfront fee would be charged to investors. Deerhurst's fees were to be based upon a percentage of the investment under management, and a percentage of the profits. These fees were in accordance with industry practice. Schwartz received a portion of Deerhurst's fees in exchange for referring investors and performing management services throughout the investment period.

f.      Trades would be conducted though Refco Capital Markets ("Refco"), a large independent broker, which for years had routinely executed the purchase and sale of foreign currency and foreign currency options in international markets.

        (United States' Exhibit ("US Ex.") 15; Jt. Ex. 9; Schwartz Dep. pp. 40-48; Sala trial testimony).

37.   Schwartz believed that investors should be required to make a cash investment in the
Deerhurst Transaction of at least 15% of their expected ordinary loss. From a tax
standpoint, Schwartz believed that this level of investment would support the economic
substance of the program, since reasonably expected profits over the long term would
significantly exceed the tax benefit. In reaching this conclusion, Schwartz relied, in part,
upon a Treasury proposal (never acted upon by congress) to provide statutory guidelines
to determine whether a tax advantaged investment had sufficient economic substance.
(Schwartz Dep. p. 45).

38.   Sala first heard about Deerhurst from Jonathan Raby who was with PwC's Boulder
office. PwC had been Abacus' CPA firm, and had prepared personal tax returns for Sala.
(Schwartz Dep. p. 12; Sala trial testimony).

39.   In the initial meeting with Schwartz, Sala asked many questions about Deerhurst's
Trading Program, its performance history, Krieger's reputation, and the tax component of
the proposed Deerhurst Transaction. He also asked Schwartz about his own background,
experience and clientele. He was given the name of R.J. Ruble ("Ruble"), an attorney
with Brown & Wood, who Schwartz indicated could provide a tax opinion. At a
subsequent meeting, he talked to Ruble on the telephone. (Schwartz Dep. pp. 47-51; Sala
trial testimony).

40.   Thereafter, Sala did extensive due diligence on both the economics and the tax aspects of
the proposed Deerhurst Transaction. He read the Offering Memorandum and marketing
materials, and reviewed the investment performance of Deerhurst and Krieger. He called
a representative of the Ross Perot Family Fund which, Sala understood, had substantial
funds under Krieger's management. He made multiple trips to Deerhurst's offices and
observed its trading operations. Krieger described Sala's questions about the risk and
performance of Deerhurst as "annoyingly thorough." (Jt. 9, 14; Pl. Ex. 71; Krieger Dep.
pp. 439-441; Sala trial testimony).

41.   Sala obtained and reviewed a draft legal opinion prepared by Brown & Wood. He hired
Nemirow to independently review the draft opinion and provide advice as to whether its
analysis and conclusions were reasonable. Nemirow was paid solely by the hour, and had
no association, financial or otherwise, with Schwartz, Krieger, and/or Brown & Wood.
(Jt. Ex. 43; Nemirow trial testimony; Sala trial testimony).

42.   Based upon all the information he obtained, and his own knowledge and experience, Sala
prepared projections of the profits that could reasonably be anticipated from an
investment in the Deerhurst Transaction over a five year period. He concluded that the
profit potential was substantial, such that the investment made economic sense wholly
aside from the tax benefits. (Pl. Ex. 71; Sala trial testimony).

43.   Sala proposed to Krieger that, because he and White were to be the largest investors in
the Deerhurst Transaction, Deerhurst's standard fee of 2% of the funds under
management and 20% of profits be reduced to a 1% management fee and 20% of profits.
Krieger responded that, if his management fee were to be cut in half, he should receive an
increase in the profit share to 30%. This proposal, Sala concluded, was reasonable,

because he was giving up some of the upside, but was protected from some of the downside risk. (Schwartz Dep. p. 52; Sala trial testimony).

44.   Sala initially invested $500,000 during the test period and made a profit of approximately $9,395 in less than 30 days on trades involving limited leverage. (Jt. Ex. 26; Schwartz Dep. pp. 53-57).

45.   Thereafter, hundreds of trades were undertaken on Sala's behalf and/or on behalf of the Deerhurst Investors GP ("Deerhurst GP"), a general partnership in which he, through Solid Currencies, Inc. ("Solid") (discussed below), was a major partner. The trades included the 24 long and short foreign currency option positions described on Attachment 1. (Jt. Exs. 24, 27, 28-31; Pl. Ex. 42; Pl. Ex. 97, p. 6).

46.   The 24 long and short foreign currency options were acquired as separate instruments and could be assigned or transferred as separate instruments. (Pl. Ex. 97).

47.   The long options shown on Attachment 1 were purchased for an aggregate cost $60,987,866.79. The short options were sold for $60,259,568.94. The cost and the sales price is commonly referred to as the "premium" paid or received in connection with the purchase and sale of currency options. These option positions were acquired between November 20 and November 27, 2000. They involved the Euro, Japanese Yen, Swiss Franc, British Pound and US Dollar. (Jt. Ex. 24).

48.   Krieger directed the investment of the 24 option positions using the same fundamental strategy that he had been using for approximately 10 years in the Discretionary Program. His goal was to make a profit from the investment in these positions. (Krieger Dep. pp. 156, 503-511, 725-730; DeRosa Dep. pp. 41, 132).

49.   The maximum profit potential of the 24 positions was between $545,130 (Robert Kolb ("Kolb"), Plaintiffs' expert) and $553,126 (DeRosa Dep. pp 139-140). (Pl. Ex. 97, pp. 20-21; DeRosa Dep. pp. 139-140). There was a 20-50% chance of achieving the maximum profit, according to DeRosa. (DeRosa Dep. pp. 145-147).

50.   The 24 option positions were liquidated between December 1 and December 14, 2000, by selling the long positions and buying back the short positions at their then current market values. (Attachment 1). The investment in these positions produced an actual profit of between $91,010 (DeRosa) and $111,559 (Kolb). (Pl. Ex. 97, Ex. 1).

51.   On November 28, 2000, the 24 positions and cash were transferred from Sala's individual account to an account owned by Solid, an S corporation, in exchange for all of its stock. The S corporation was used in connection with Sala's participation in the Deerhurst Transaction on the advice of both Rosenman and Nemirow and to limit Sala's liability exposure. (Jt. Exs. 11, 26, 39; Nemirow trial testimony).

52.   On November 28, 2000, Solid transferred the 24 positions and cash to Deerhurst GP in exchange for a partnership interest. Deerhurst GP had 11 partners, including Sala. Its total contributed capital was approximately $24 million. (Jt. Exs. 5, 12).

53.   Some of those investing in the Deerhurst Transaction did not cause their investment to be transferred to Deerhurst GP. However, in order to save costs and minimize administrative burdens, Krieger preferred that investors continuing beyond the initial test period place their funds on a pooled basis with the partnership.

54.   On December 22, 2000, Solid liquidated its interest in Deerhurst GP receiving cash, foreign currency and a foreign currency option in exchange for its interest. Solid then sold the foreign currency and currency option for cash. It transferred the proceeds to Deerhurst Strategies. (Jt. Ex. 31).

55.   Deerhurst Strategies began operations as a new entity as of January 1, 2001. The terms and conditions of the investment in Deerhurst Strategies varied significantly from those of Deerhurst GP. Deerhurst GP was used during 2000 to conduct trades on behalf of investors in an effort to make profits for its partners. If it did make profits, the partners were obligated to invest their capital for the long term with Deerhurst Strategies. However, if the partnership did not make a profit in 2000, the partners were free to withdraw their funds without penalty. Once funds were invested with Deerhurst Strategies, investors were precluded from withdrawing their funds for five years without being assessed a substantial penalty, except for an annual withdrawal of up to 30% of net profits to pay taxes. (Jt. Exs. 9,14; Schwartz Dep. pp. 40-43; Sala trial testimony).

56.   From Krieger's standpoint, it was much simpler and more efficient administratively to liquidate all positions to cash before the end of the year 2000 and then transfer the cash to Deerhurst Strategies, rather than transferring investment positions to Deerhurst Strategies. (Krieger Dep. pp. 516-518).

57.   Sala left his funds invested with Deerhurst Strategies until November 2003. He continued to closely monitor the investment, holding weekly telephone conferences with Krieger and his staff to review trading results, and traveling to New Jersey to visit Deerhurst's offices quarterly for more detailed discussions. (Krieger Dep. p. 287; Sala trial testimony).

58.   Krieger's continuation of the Discretionary Program which had consistently made money in prior years, Deerhurst Strategies incurred net losses in 2001 and 2003, and made a profit in 2002. In November 2003, Sala negotiated an agreement on behalf of himself and others to withdraw their investments in Deerhurst Strategies, without penalty, and place the investments with Lone Star Global Strategy ("Lone Star"), another investment program managed by Krieger. Lone Star was largely a computerized program which had been used to a limited extent in Krieger's Discretionary Program. (Sala trial testimony).

59.   In 2004, primarily because of the continuation of losses with the Loan Star program, Sala terminated his investment. (Sala trial testimony; (Stipulation ("Stip.") ¶ 22).

KPMG INVOLVEMENT

60.  In late November of 1999, Sala was introduced to Tracie Henderson ("Henderson") of KPMG by his friend Tim Gillis ("Gillis"), a partner at KPMG (Amended Pre-trial Order p. 22, ¶ 2).

61.  Henderson was a personal financial planning partner in the Atlanta office of KPMG, who supervised tax return preparation as part of her duties. (Pl. Ex 77, Kevin Brady Deposition ("Brady Dep.") pp.18, 29).  Sala ultimately hired Henderson and KPMG to prepare his federal and state income tax returns for the years 2000 through 2003. (Sala trial testimony).  Sala paid KPMG annually for preparing his returns for several years.

62.  During the year 2000, Henderson attempted to interest Sala in one of the tax strategies marketed by KPMG, the Bond Linked Interest Premium Strategy ("BLIPS"). (Sala trial testimony).  Sala considered the proposed BLIPS investment, but determined not to participate in the BLIPS program, in large part because of the poor economics of the investment as it was presented to him.  Sala did not enter into any binding agreement and paid no fees with respect to BLIPS, or any other tax strategy offered or promoted by KPMG.

63.  During the time Sala was considering participating in the Deerhurst Transaction, he disclosed his consideration of this investment to Henderson.  Because he was employing Henderson and KPMG as his income tax return preparer, Sala believed that Henderson should be apprised of significant tax positions with respect to his tax return. This is consistent with the practice that Sala employed during his tenure as CFO of two publicly traded corporations.

64.  Henderson reviewed a draft legal opinion written by Brown & Wood regarding the Deerhurst Transaction, and referred Sala to attorney Bruce Lemons of the Salt Lake City offices of Holland & Hart, LLP regarding the legal opinion.

65.  Aside from reviewing the opinion and referring Sala to persons with expertise in the area, Henderson took no other material steps with respect to the Deerhurst Transaction. (Sala trial testimony; Schwartz Dep. p. 12-13; Krieger Dep. pp. 389-390).

66.  The only relevant time entries made by Henderson (or any or other KPMG personnel) prior to Sala's entry into the transaction (October 6 through October 13, 2000) are consistent with KPMG functioning as return preparer and recommending Sala employ outside attorneys to review the transaction.  (Jt. Ex. 49).  KPMG was paid $25,000 for five separate professional services from December 1, 2000 through April 15, 2001: (1) preparation of 2000 Federal and Colorado income tax projections, including discussions with Goldman Sachs; (2) preparation of 2001 Federal and income tax projections for investment planning purpose and related consultations; (3) preparation of 2000 Federal and Colorado individual income tax returns; (4) Form W-2 analysis and related discussions regarding stock option income; and (5) miscellaneous tax advice as requested. (Jt. Ex. 49; Sala trial testimony).

67.     KPMG's only involvement with the Deerhurst Transaction was as Sala's return preparer. In that role, it reviewed the Brown & Wood opinion to ensure that the tax treatment was properly reported on Sala's 2000 federal income tax return.  (Sala trial testimony).  No KPMG employee ever attended any meetings or presentations regarding Deerhurst. (Krieger Dep. pp. 389-390).

68.     In his decision to reflect the Deerhurst transaction as a loss on his original income tax return, Sala acted with reasonable cause, and in good faith, in reliance upon the legal advice of Brown & Wood and Nemirow.

69.     KPMG did not organize or assist in the organization of the Deerhurst Transaction.

70.     KPMG did not participate in the sale of any interest in the Deerhurst Transaction to Sala.

71.     KPMG did not make any statement to Sala regarding the tax loss claimed related to the Deerhurst Transaction which KPMG knew or had reason to know was false as to any material matter.

72.     No person who organized or assisted in the organization of the Deerhurst Transaction, or participated in the sale of any interest in the Deerhurst Transaction, was ever contacted by the IRS concerning an examination of the Deerhurst Transaction for purposes of section 6700(a) of the Internal Revenue Code.

73.     Plaintiffs timely filed their 2000 federal income tax return, claiming a loss arising out of the Deerhurst Transaction.  (Jt. Ex. 1; Amended Pre-Trial Order p. 23).

74.     In 2003, Sala filed an amended income tax return for 2000, eliminating the claimed loss, and reflecting the resulting tax due.  Sala paid the tax and interest through the date 18 months after the date that the original return was filed. Subsequently, the IRS Collection Division insisted that additional interest, beyond the 18 month interest suspension period, be paid.  Because Sala contested the assessment of additional interest, the additional interest was paid under protest.  (Jt. Ex. 2,8; Sala trial testimony).

## BURDEN OF PROOF

75.     On February 25, 2004, Plaintiffs received notice that their 2000 Federal income tax return for the calendar year 2000 was selected for examination.  (Sala trial testimony).

76.     On February 25, 2004, Plaintiffs received Information Document Requests ("IDRs") Numbers 1 through 6 from the IRS with approximately 32 requests and over 30 sub-part requests.  (Pl. Ex 90; Sala trial testimony).

77.     On April 22, 2004 the IRS issued IDR Number 7 with three additional requests. (Pl. Ex 90; Sala trial testimony).

78.   In response to the IRS's IDRs, on May 4, 2004 Plaintiffs produced approximately 1,800
      pages of documents, bates numbers 1 through 1783.  In addition, Plaintiffs provided
      written explanations and information.  (Pl. Ex 90; Sala trial testimony).

79.   The documents and information provided in response to the IDRs, and in the claims for
      refund, substantiated the following:

      (a)   Sala invested approximately $8.9 million in a five year program involving
            contracts and options to buy and sell hundreds of millions of dollars worth of
            foreign currencies.  Plaintiffs' investments were pooled in funds which included
            millions of dollars invested by other individuals;

      (b)   Monthly statements and contemporaneous transaction documents confirmed the
            transactions, and confirmed the transactions were conducted through a large
            broker, Refco Capital Markets;

      (c)   The investment manager of the fund was Deerhurst, a currency management firm
            whose principals had a long history of managing foreign currency investments,
            producing substantial profits for clients;

      (d)   Deerhurst had no relationship or dealings with KPMG;

      (e)   Deerhurst was paid a fee by the fund, based upon a percentage of investments
            under management and a percentage of the profits generated;

      (f)   KPMG was the preparer of Plaintiffs 2000 tax return.  No fees were paid to
            KPMG by Plaintiffs for any tax opinion;

      (g)   Plaintiffs paid fees to (a) Deerhurst; (b) Brown & Wood (tax opinion); (c) Davis
            Graham & Stubbs - Denver (review of tax opinion and legal services in
            connection with structure of underlying investments); (d) Rosenman – New York
            (legal opinion on personal liability arising out of the underlying transactions); and
            (e) Holland & Hart – Salt Lake City (incidental legal services); and

      (h)   Plaintiffs purchased long options and sold short options on foreign currencies,
            transferred the options to Solid, which in turn transferred them to a partnership
            formed to pool the foreign currency investment of many individuals.  Prior to
            December 31, 2000, the partnership liquidated, and Solid received US Dollars,
            foreign currency contracts and foreign currency options, which it subsequently
            sold for dollars, which in turn were transferred to a long term pooled investment
            fund, which continued to trade in currency positions on behalf of Plaintiffs and
            others in subsequent years.

            (Pl. Ex 90; Sala trial testimony).

80.   Plaintiffs further supplemented their IDR responses in letters dated March 8, 2004, and
      March 16, 2004. (US Exs. 11, 12).

81.    Plaintiffs cooperated in signing consents to extend the period in which the IRS could assess an additional tax deficiency for the 2000 tax year on March 15, 2004, less than one month after receiving notice of the examination. (Sala trial testimony).

82.    The IRS never had to issue summonses to compel documents or testimony because during the IRS's examination of Plaintiffs' 2000 tax return, Plaintiffs fully cooperated with the IRS's requests and maintained all the documents required to substantiate their claimed loss. (Sala trial testimony).

83.    On June 18, 2004, Plaintiffs received a Notice of Deficiency with an increase of tax in the amount of $22,204 and penalties in the amount of $4,440.80 with respect to their 2000 Federal income tax return. (Jt. Ex. 6; Stip. 29).

84.    At trial, Plaintiffs will introduce credible testimony from Sala, Nemirow, Krieger, Schwartz, White, Natbony, and Kolb. The exhibits introduced at trial together with the stipulated facts meet the credible evidence requirement.

## CONCLUSIONS OF LAW

A.    **The government bears the burden of proof with respect to the merits of this case.**

In 1998, Congress became concerned that individual taxpayers were frequently disadvantaged when forced to litigate with the IRS and believed the existing burden of proof rules contributed to that disadvantage. S. Rep. No. 105-174 (PL 105-206) at 46. Accordingly, in 1998, Congress codified the burden of proof rule in tax cases by enacting 26 U.S.C. § 7491, the Internal Revenue Code of 1986 ("Code").

Section 7491 imposes the burden of proof upon the government when the taxpayer substantiates items in compliance with the Code, maintains records required by the Code, cooperates with reasonable requests by the examiner, and produces credible evidence at trial with respect to any relevant factual matter. For purposes of the statute, the term "credible evidence" means "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Griffin v. Commissioner*, 315 F.3d 1017, 1021 (8th Cir. 2003).

There should be no dispute that Plaintiffs maintained all required records and cooperated with the IRS in its examination of Plaintiffs' 2000 tax return. Further, at trial Plaintiffs will introduce credible evidence through testimony and exhibits with respect to the tax loss at issue. Accordingly, with respect to the allowability of the losses claimed by Plaintiffs, the government shall bear the burden of proof.

Additionally, under § 7491(c) the government has the burden of production in any court proceeding with respect to the liability of any individual for any penalty imposed by the Code. In other words, the government must come forward initially with evidence that it is appropriate to apply a particular penalty to the taxpayer. S. Rep. No. 105-174 (P.L. 105-206) at 46. The government concedes that it bears the burden of proof and production with respect to the

penalties asserted as an offset. Additionally, the government has the burden of production with respect to the $4,400 of accuracy penalties assessed by the IRS.

**B.**   ***Helmer* and its progeny permits the tax loss despite the fact it is not supported by an economic loss.**

The tax loss in this case is based upon a tax rule that the courts have recognized for over 60 years. That is, sold options (short positions) are contingent liabilities that do not have the requisite certainty of exercise to be recognized as liabilities. The IRS's prevailing argument in a 1975 Tax Court case on point, *Helmer v. Commissioner*, T.C. Memo 1975-160, is simply one of a long line of cases which stand for the proposition that sold options are to be disregarded as liabilities for tax purposes.[1] The Brown & Wood opinion (Jt. Ex. 44, pp. 49-50) succinctly summarized the holding in *Helmer* as follows:

> [A] partnership sold an option to purchase land that it owned and distributed the premium to its partners. The taxpayer asserted that the holder's claim against the partnership to perform under the option was a liability for purposes of Code Section 752, and thus increased his basis in his partnership interest. If the option were not considered a liability, then the amount of the premium distributed would exceed the partner's basis in the partnership, and the partner would then recognize gain on the excess under Code Section 731. The court agreed with the IRS that the holder's claim against the partnership to perform under the option did not create a liability to the partnership.

The government in this case argues that application of the rule disregarding sold options results in a tax loss that is not supported by an economic loss, which the government says is not permissible. But the government ignores that, at its own urging in prior cases, the rule was applied to the detriment of taxpayers by creating "artificial gains." That is exactly what happened in *Helmer*, where the taxpayer was forced to pay taxes on a distribution that would have been protected from tax had the taxpayer been allowed to include his share of the contingent liability in his basis.

Similarly, in this case the taxpayer's $60 million basis was created when Sala received premiums of $60 million from the short option sales, and used the proceeds to buy the long options. The basis of the long options was the $60 million paid for them, but the contingent liability in the short options must be disregarded in determining tax basis.

In *Klamath Strategic Fund LLC v. United States*, 440 F. Supp.2d 608, 619 (E.D. Tex.

---

[1] *Helmer* is based upon long standing law that goes back to a 1938 case *Virginia Iron, Coal & Coke Co. v. Commissioner*, 37 B.T.A. 195, *aff'd*, 99 F.2d 919 (4th Cir. 1938) (receipt of premium on short position not recognized because transaction still "open" or contingent). The IRS issued a Ruling in 1958, Rev. Rul. 58-234, 1958-1 C.B. 279, agreeing with the result in *Virginia Iron, Coal & Coke Co.* The Tax Court confirmed that *Helmer* was still good law in 2000 in *Salina Partnership, LLC v. Commissioner*, T.C. Memo 2000-352.

2006), the government made the same argument that it makes here: the taxpayer's position results in "a $25,000,000 windfall in artificial tax basis from loan proceeds that were never taxed as income on their receipt." The *Klamath* Court responded:

> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). *This Court's analysis of 'liability' under section 752 will not vary in meaning simply based on whose ox is being gored.*

*Klamath Strategic Fund LLC*, 440 F. Supp.2d. at 619 (emphasis supplied).

The government's real complaint is not a lack of business purpose or a lack of profit potential. The government is simply frustrated that the economics do not match the tax loss. The government is asking the Court to disregard the rule of law in order to disallow large tax losses that varied from economic losses by operation of law.

The Supreme Court recently squarely rejected the government's argument that a tax loss must be supported by an economic loss to the taxpayer. In *Gitlitz v. Commissioner,* 531 U.S. 206, 207-208 (2001), the taxpayers were solvent shareholders of an insolvent S corporation whose creditors forgave some $2 million of debt. Before the debt relief, the corporation had incurred approximately $2 million in losses, but the shareholders were unable to deduct the losses because the losses exceeded the shareholders' basis in their stock. The taxpayers claimed that, even though the income realized as a result of the debt relief was not taxable to them, it could be added to their stock basis and thereby enable them to claim losses which had not been financed with their money. The government pointed to the fact that the taxpayers made "no economic outlay" in the amount of the debt discharge income, and that the taxpayers sought a "double windfall." That is, the taxpayers sought to both exclude the debt relief income from taxation and use that income to increase their basis and claim the loss.

The Supreme Court rejected the government's argument that these "policy concerns" should control the tax consequences. The Court noted that the claimed tax benefits resulted from unambiguous provisions in the tax law that enabled a solvent shareholder to exclude from his gross income his S corporation's debt relief income. Because these Code provisions permitted the claimed tax benefits, the Court rejected the IRS's result-driven arguments about economics to deny those tax benefits.

The reasons to reject the government's result-driven view as to how the law "should be" based upon the disparity between economic outlay and tax loss are just as compelling in this case as they were in *Gitlitz.* In fact, this case is even more compelling because here, unlike in *Gitlitz,* the Commissioner is taking squarely inconsistent positions with respect to a rule of tax law, depending upon whether the rule results in the taxpayer paying more or less in taxes.

**C.**      **The application of *Helmer* and other applicable legal authorities to the facts of this case results in the tax loss.**

In November 2000, Sala, in his individual name, purchased and sold the 24 foreign currency options shown in Attachment 1. The purchase price of the long options, $60,987,866, became Sala's tax basis (i.e., cost). Rev. Rul. 78-182, 1978-1 C.B. 265 (the tax basis of purchased put or call options is the premium paid plus any fees associated with acquiring the option). Under the analysis set forth above, no liability is recognized with respect to the short options.

On November 28, 2000, Sala transferred the long and short options to his wholly owned S-corporation, Solid. Section 351 of the Code generally provides for nonrecognition of gain or loss on the transfer of property to a controlled corporation. Section 358(a) of the Code provides that the shareholder's basis of stock received in a section 351 exchange equals the shareholder's basis in the property exchanged. In determining the basis of the property transferred, the short options are not taken into consideration based on the long standing law established in *Helmer* and its progeny.

Accordingly, Sala's basis in Solid included the premiums paid and costs incurred in purchasing the long options ($60,987,867).

Solid subsequently transferred the long and short options, along with $8 million in cash, to Deerhurst GP. Under § 721(a) and Treas. Reg. § 1.721-1, generally no gain or loss is recognized by either the partnership or any partner in the case of a contribution of property to the partnership in exchange for a partnership interest. Accordingly, the transfer of the options from Solid to Deerhurst GP in exchange for an interest in Deerhurst GP does not constitute a taxable event to either Deerhurst GP or Solid. Under § 722, a partner's basis in its partnership interest is equal to the amount of money, plus the adjusted basis of the property contributed by the partner to the partnership, increased by the amount of gain, if any, recognized by the partner on the contribution. Again, in determining the adjusted basis of the property contributed, the short options are disregarded pursuant to *Helmer*.

Therefore, Solid's basis in the general partnership interest is equal to Solid's basis in the long and short options contributed ($60,987,867) plus the amount of cash that was contributed, which totals $68,987,867.

Subsequently, Deerhurst GP terminated the 24 positions by selling the long positions and buying back the short options. At that point the partnership realized gain or loss on each position, which resulted in a net gain to the partnership of between $91,010 (DeRosa) and $111,559 (Kolb).

This result is supported by the *Helmer* case, as discussed above, where the Court held that no gain or loss is recognized on the purchase or sale of an option until the transaction has been closed-out. In this case, the closing-out of the transactions resulted in a net gain to the partnership, which increased Solid's basis accordingly under § 705(a)(1).

Upon liquidation, Solid's basis in Deerhurst GP was approximately $69 million. As confirmed by the government's own expert (DeRosa) the following assets were

distributed/transferred to Solid from Deerhurst GP in exchange for Solid's partnership interest: 1) a one-year put option on the euro (call option on the US Dollar) with a face amount of EUR 26,004,030/23,065,575 USD for premium settlement on December 22, 2000 ("euro put option"); 2) a foreign currency spot contract to buy euros, EUR 10,401,612 against the US Dollar, USD 9,423,860 ("euro spot contract"); and 3) $8,084,302.

When a partnership makes a liquidating distribution, the basis of the distributed property in the hands of the partner is the adjusted basis of the partner's interest in the partnership, less any money distributed.  § 732(b).  Under § 731(c)(3), foreign currency is not considered money in the case of a distribution from an "investment partnership."  An "investment partnership" is a partnership whose assets consist substantially of specified marketable securities, including foreign currency and option contracts.  § 731(c)(3)(C)(i).  In this case the assets of Deerhurst GP were composed solely of foreign currencies, foreign currency contracts, and cash.  Accordingly, the euro put option and euro spot contract would be deemed a distribution of property under § 731(c)(3), which would have a basis equal to Solid's adjusted basis in Deerhurst GP less the cash received.

Solid's basis in the partnership was equal (in round dollars) to $69 million.  Hence, Solid's basis in the euro spot contract and the euro put option (distributed property) was $61 million ($69 million less the $8 million cash received).

When Solid sold the euro spot contract and the euro put option, its loss was equal to the sales proceeds received less its basis in the foreign currency positions.  Under § 988(a), the gain or loss from each "§ 988 transaction" is required to be treated as ordinary income or loss.  A § 988 transaction includes entering into or acquiring an option or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency.  In this case, Solid was required to fulfill the euro spot contract and the euro put option in "nonfunctional currency", i.e. anything other that the US Dollar. § 985(b)(1). Accordingly, Solid's loss from the sale of the foreign currency contracts was required to be reported as ordinary.

**D.**     **The government's argument, as set forth in the Amended Pretrial Order pages 14 through 20 that the loss is not allowable are without merit.**

      **1.**     **Whether the Deerhurst Transaction lacks economic substance.**

As the Court has noted, the issues of economic substance and business purpose go to the basic question of whether the transactions executed by Sala should be recognized or disregarded for tax purposes.  These issues are commonly raised by the IRS when it contends that a transaction or series of related transactions fail the "economic substance" or "business purpose" doctrines and are "shams."

Generally, when the IRS argument is accepted, courts recognize two types of "shams": "shams in fact" and "shams in substance."  *James v. Commissioner*, 899 F.2d 905, 908 n. 4 (10th Cir. 1990).  The first involves transactions that, in fact, never occurred.  If contracts are created but the transactions are never actually implemented, the transaction and any intended tax consequence will be disregarded.  *Id.* at n. 4; *see Forseth v. Commissioner*, 85 T.C. 127, 165

(1985) (disputed commodity trades were never executed); *Goodstein v. Commissioner,* 267 F.2d 127, 131 (1st Cir. 1959) (assets were never purchased and a loan never incurred by the taxpayer).

No factual shams exist in this case. Agreements were consummated, and every trade transaction intended to be carried out by Deerhurst did, in fact, occur.

Transactions which may not be "shams in fact" because they actually occurred can still be disregarded for tax purposes. If transactions are structured so that the taxpayer could not earn a profit from them and he had no expectation of making a profit because he had no business purpose, but was motivated solely by tax considerations, the tax consequences will be ignored because they lack any economic substance. *See, e.g. James,* 899 F.2d at 908-09; *Yosha v. Commissioner,* 861 F.2d 494, 498 (7th Cir. 1958).

Courts often employ the concepts of business purpose and economic substance as part of a two-prong test for determining whether a transaction should be disregarded for tax purposes: (1) the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction; and (2) the transaction lacks economic substance. *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91 (4th Cir. 1985).

In the Tenth Circuit, economic substance is determined by both subjective and objective elements. The taxpayer must have been motivated subjectively by business purposes other than receiving tax benefits, and there must have been some reasonable possibility for the taxpayer to make a profit. *James,* 899 F.2d at 908. Sala and the Deerhurst Transaction meet both of the criteria articulated in *James* for having the transaction respected as having economic substance.

"Business purpose" means a business or commercial reason for the taxpayer to engage in the transaction. *Friedman v. Commissioner,* 869 F.2d 785, 792 (4th Cir. 1989); *Rice's Toyota World, Inc.,* 752 F.2d at 92. The existence of a transaction will be respected so long as it serves some useful non-tax business purpose. *Frank Lyon Co. v. United States,* 435 U.S. 561, 584-85 (1978).

A transaction can have an appropriate business purpose even if the transaction does not generate a profit. For example, in *Chisolm v. Commissioner,* 79 F.2d 14 (2d Cir. 1935), *cert. denied* 296 U.S. 641 (1935), the court held that the desire to pool and jointly manage assets was an adequate business purpose to own and manage such assets through a partnership. This is important because Deerhurst Management desired, for economic reasons, to pool and jointly manage Sala's investment with other investors through a partnership. *See I-Torn v. Commissioner,* 968 F.2d 1229 (D.C. Cir. 1992).

The Deerhurst trades each had a business purpose: to make a profit. Sala contributed the options to Solid, and the S corporation contributed the options to Deerhurst GP for substantial non-tax business reasons, including use of leverage with limited liability without the need for additional investment, and the efficiencies involved in pooling the funds in the partnership.

The individuals most involved with execution of the transactions at issue, Krieger and Sala, acted in a way that was consistent with trying to achieve their expressed commercial purposes. Plaintiff will submit credible evidence supporting its contentions at trial, including a showing that the overall Deerhurst Transaction was handled in a business like manner, that Sala

engaged in the transaction with a profit motive, and that the transaction had a reasonable
possibility of making a profit.

The "economic substance" test requires not only the taxpayer's expectation of making a
profit but a reasonable possibility of pre-tax profit. The question is: does the taxpayer have a
reasonable possibility of economically benefiting from the transaction without regard to tax
benefits? *James*, 899 F.2d at 908-909.

Transactions have been upheld for tax purposes where the transactions were designed to
achieve a tax benefit, but also possessed positive pretax economic results. *Northern Indiana
Public Service Company v. Commissioner*, 105 T.C. 341 (1995), *aff'd*, 115 F.3d 506 (7th Cir.
1997).

Sala unquestionably had the desire and expectation to make a profit, as did Krieger. *See*
Proposed Findings of Fact 39-42. Sala did extensive due diligence on both the economics and
the tax aspects of the Deerhurst Transaction.

In addition, the Deerhurst Transaction had a reasonable possibility of making a profit.
The maximum profit potential of the 24 positions in the initial test period was between $545,130
according to Plaintiff's expert and $553,126 in the view of government's expert, DeRosa.
Moreover, there was a 20-50% chance of achieving the maximum profit according to DeRosa.
*See* Proposed Findings of Fact 49.

Unlike situations where large promoter and investment management fees eliminate any
reasonable possibility of making a profit, there is no significant fee barrier in this case. Neither
Deerhurst nor Schwartz charged investors an upfront fee. Fees were based upon a percentage of
the investment under management, and a percentage of the profits. Its fees were in accordance
industry practices. *See* Proposed Findings of Fact 36(e).

Krieger's Discretionary Program had consistently made money in years prior to Sala's
decision to invest in the program for five years beyond the initial test period. *See* Proposed
Findings of Fact 17 & 18. Krieger continued to operate his Discretionary Program in the same
manner, both before and after Sala's investment. *See* Proposed Findings of Fact 48.

In practice, there is often more than one way to consummate a business transaction. Not
surprisingly, taxpayers and their financial advisors attempt to structure their economic affairs in
ways that produce the most favorable tax consequences, which is their right.

Taxpayers may structure their investments to minimize taxes. *United States v. Carlton*,
512 U.S. 26, 35-36 (1994). A taxpayer can arrange his or her affairs so that taxes are as low as
possible and he or she is not bound to choose the approach which favors the Treasury. As often
stated: "there is not even a patriotic duty to increase one's taxes." *Gregory v. Helvering*, 69 F.2d
809, 810 (2d Cir.1934), *aff'd*, 293 U.S. 465 (1935).

To treat a transaction as a sham or without economic substance, the court must find that
the taxpayer was motivated by no business purpose other than obtaining tax benefits when
entering into the transaction and no reasonable possibility of a profit existed. *Drobny v. United
States*, 86 F.3d 1174 (Fed. Cir. 1996) ("To treat a transaction as a sham, the court must find that

the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists."), *cert. denied*, 519 U.S. 1055 (1997).

The IRS ignores virtually all of the business purpose/profit potential evidence when it contends that Sala engaged in the Deerhurst Transaction only to obtain tax benefits. Sala expected to earn a pre-tax profit from the Deerhurst Transaction and his belief was founded upon factual and analytic support. He exercised considerable due diligence before entering into the initial test period and the long term investment. He actually made a profit in the first year, and, over the required five year investment plan, could have reaped a significant return on his several million dollar cash investment. The Defendants own expert recognizes that Sala had a realistic possibility of making a profit through the trading efforts of Krieger and Deerhurst. Sala's involvement in the Deerhurst Transaction was motivated by the prospect of profit as well as tax considerations and should be respected. The existence of transactions will be respected so long as they serve some useful non-tax business purpose. *Frank Lyon Co. v. United States*, 435 U.S. 561, 584-585 (1978).

2.    **Whether Deerhurst GP should be disregarded for tax purposes under the Anti-Abuse Regulations, and because the partnership does not meet the sham transaction and form over substance doctrines.**

A partnership is a distinct entity for some purposes and an amalgamation of its members for other purposes. Under federal tax law a partnership is not subject to federal income tax at the partnership level. § 701. Instead, the income, expenses, and other tax attributes of the partnership are computed at the partnership level, but the partner is required to take into account his or her share of each item of partnership income, gain, loss, expense, deduction, and credit in computing and reporting his or her federal income tax liability. §§ 703 and 702(a).

Section 761(a) defines a "partnership" as an "organization through or by means of which any business, financial operation, or venture is carried on." State law does not define a partnership for federal income tax purposes. *Evans v. Commissioner*, 447 F.2d 547, 550 (7th Cir. 1971) ("For federal income tax purposes, federal tax law is controlling, and the legality, or lack thereof, of a partnership under state law does not determine whether a partnership exists for federal tax purposes.").

A corporation is respected as a separate taxable entity for tax purposes "so long as [its] purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation." *Moline Properties v. Commissioner*, 319 U.S. 436, 439 (1943). Courts have since applied the holding in *Moline Properties* to partnership cases. *See Bertoli v. Commissioner,* 103 T.C. 501, 511-12 (1994); *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000).

The Supreme Court's 64 year-old decision in *Moline Properties* is still the law.[2]

---

[2] *ASA Investerings Partnership* departed slightly from the language of the Supreme Court's decision, holding that both criteria of *Moline* must be met, not just one.

Deerhurst GP clearly carried on a business activity and the purpose of its creation included economic considerations.

Under common law, the courts have held that a partnership is respected for tax purposes if the parties join together to jointly conduct a business and share the profits. The Supreme Court has also stated that whether a partnership existed for tax purposes depends on "whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both." *Commissioner v. Culbertson*, 337 U.S. 733 (1949).

Sala and the other members of Deerhurst GP invested in the general partnership for the purpose of jointly conducting a business activity, i.e. investing in currency options and sharing in the profits, losses and expenses. Sala and the other partners all had the potential for profit or loss in respect to their collective investment. No member was guaranteed a particular minimum profit or payment. Each member of the partnership shared in the income, losses and deductions of Deerhurst GP.

Deerhurst GP was a domestic pooled investment entity which allowed investors to have their money managed by Deerhurst for a relatively short period of time, before they committed to a five year period. The arrangement permitted the investors to withdraw their monies entirely with no penalties if no profit were made by Deerhurst in the initial period. From Deerhurst's perspective it provided the opportunity to show investors profits could be made and obtain long term capital commitments, while minimizing costs and inefficiencies that would be involved in managing each investor's funds separately. Deerhurst GP had 11 partners, including Sala who was a major partner. Its total contributed capital was approximately $24 million. *See* Proposed Finding of Fact 52.

If investors made a profit during 2000, using Deerhurst GP to conduct trades, the partners were obligated to invest their capital for the long term with Deerhurst Strategies. Once funds were invested with Deerhurst Strategies, investors were precluded from withdrawing their funds for five years without being assessed a substantial penalty, except for an annual withdrawal of up to 30% of net profits to pay taxes. *See* Proposed Finding of Fact 55.

In some circumstances courts have upheld the disregard of a partnership for tax purposes. That is the exception, however, not the general rule. The "either or" test of *Moline Properties* does not establish a high threshold of compliance. Recognition of the existence of an entity should occur when any non-tax business purpose exists. *Moline Properties*, 319 U.S. at 438-9. *See also, Peat Oil and Gas Assocs. v. Commissioner*, 100 T.C. 271. 280-83 (1993) and *Culbertson*, 337 U.S. at 742 (confirming that a partnership should be recognized, irrespective of tax motive, if "the parties in good faith and acting with business purpose intended to join together in the present conduct of the enterprise").

The government relies upon *ASA Investerings Partnership*, 201 F.3d 505 when arguing that the existence of Deerhurst GP should be disregarded. The holding in *ASA Investerings Partnership* was based on a finding that the partnership served <u>no</u> non-tax purpose and the ostensible foreign partner was entitled to a preferred payment, rather than sharing in the profits, losses, or expenses of the partnership. The Court found the foreign agents more akin to lenders than partners because they were guaranteed a fixed return or benefit, regardless of how the

partnership performed.  Such was not the case with Deerhurst GP or its partners.

The government indicates that it will to rely upon the partnership anti-abuse regulations (Treas. Reg. § 1.701-2).  However, the tax benefit claim does not result from an "abuse" of the tax rules relating to partnership.  The partnership rules are applied in a straightforward fashion. The tax benefit arises out of the well-settled treatment of option transactions, which apply equally to individuals, corporations and partnerships. In this regard, *Helmer* relies upon *Virginia Iron, Coal & Coke Co. v. Commissioner*, 37 B.T.A. 195, *aff'd*, 99 F.2d 919 and other cases, which did not involve partnerships.  Treating contingent obligations as something other than a "liability" for purposes of § 752 sometimes inures to the benefit of the government (as in *Helmer*), and sometimes to the benefit of taxpayers.  In the words of the *Klamath* court, "it doesn't matter whose ox is being gored." *Klamath Strategic Fund LLC*, 440 F. Supp.2d. at 619.

The government erroneously contends that the court may disregard the use of a partnership "that does not serve a substantial business purposes," citing Treas. Reg. 1.701-2(a), (b) and (c).  These regulations do not define a recognizable partnership as one having a "substantial business purpose."  Such a position is contrary to the overwhelming body of law (cited below) that may require a business purpose, but does not insist upon a "substantiality" requirement in relation to tax benefits.

In December 1994, the IRS issued Treas. Reg. § 1.701-2 (the "Anti-Abuse Regulations"). Under these regulations the IRS purports to grant itself general authority to recharacterize certain partnership transactions that it determines do not comport with what the IRS believes is the intent of the partnership provisions.  The regulations are "interpretive," not statutory, and therefore are not accorded the same weight.  They state that:

> (1)  The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.
>
> (2)  The form of each partnership transaction must be respected under substance over form principles.
>
> (3)  The tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income) . . .

Treas. Reg. § 1.701-2(a).

If valid, the regulations authorize the IRS to: (1) disregard the partnership in whole or in part; (2) treat one or more partners of the partnership as not a partner; (3) adjust the methods of accounting used by the partnership or a partner to clearly reflect the partnership's or the partner's income; (4) reallocate the partnership's items of income; or (5) otherwise adjust or modify the claimed tax treatment. Treas. Reg. § l.701-2(b )(1 )-(5).

These Regulations have been criticized by practitioners and commentators as being

invalid because they are vague, lack clear and workable standards, are exceedingly broad, usurp legislative and judicial powers, were not promulgated in accordance with statutorily required administrative procedures, and grant the IRS the power to disregard the language of the Code when literal compliance with specific provisions is not consistent with the "intent" of Subchapter K, and they allow the IRS to divine that intent without relying on anything of Congressional origin. *See* William S. McKee, *Federal Taxation of Partnerships and Partners,* ¶ 1.05[l][a] (3d ed. 1997) ("Although the abuse-of-Subchapter-K rule is couched in familiar terms, it is in fact a stunning departure from existing law.").

The Supreme Court has ruled that the IRS does not have the authority to disregard statutory provisions merely to reach the result that the IRS desires. *Gitlitz v. Commissioner,* 531 U.S. 206, 207-208 (2001). The Regulations also attempt to supersede the statute, add restrictions not found in Subchapter K and are not based upon any specific grant of authority.

Significantly, the IRS inserted the term "substantial" in the business purpose requirement upon which the Government now attempts to rely upon. This requirement is inconsistent with the definition of a partnership articulated in *Commissioner, v. Culbertson,* 337 U.S. 733 (1949), i.e., where the parties have joined together to jointly conduct a business and share the profits. Furthermore it is contrary to the body of case law discussed in this section of Plaintiffs' Proposed Legal Conclusions addressing the economic substance and business purpose tests. Plaintiffs submit that to the extent the government intends to rely upon the Anti-Abuse Regulations as legal authority, they are invalid.

The government also urges non-recognition of Deerhurst GP urging the application of the "sham" transaction doctrine.

Understandably because of the ambiguities of the economic substance doctrine and the government's frequent reliance upon it in numerous differing circumstances, courts have adopted various formulations of the economic substance doctrine. As recognized by this court, the two criteria most frequently considered by courts are whether: (1) from an objective perspective, the transaction provided the participants with a legitimate prospect of earning a pre-tax profit; and (2) from a subjective perspective, the participants engaged in the transaction for a non-tax business purpose, in addition to tax considerations. Other courts have considered whether, setting aside tax benefits, the transaction had a positive effect upon the economic position of the taxpayer. *See Knetsch v. United States,* 364 U.S. 361, 366 (1960). Other courts have determined economic substance by evaluating whether the disputed transaction, in its execution, "is the kind of transaction that some people enter into without a tax motive." *Yosha v. Commissioner,* 861 F.2d 494, 499 (7th Cir. 1988). Finally, some courts have considered business purpose and economic substance in context of whether the transaction had any practical or economic effects other than the creation of income tax losses. *See James,* 899 F.2d at 908-09.

Regardless of which interpretation or nuance of economic substance doctrine is used, Deerhurst GP meets these tests, both as to the Deerhurst Transaction as a whole and the creation and use of the partnership. The government must not only convince the court that *Moline Properties, Inc.* and numerous subsequent opinions do not apply but, if the focus of the inquiry is placed on the existence of the partnership, Deerhurst GP served no business purpose of any kind. *See United Parcel Serv. of Am. v. Commissioner,* 254 F.3d 1014, 1018 (11th Cir. 2001)

(economic substance doctrine ignores transaction when it has "no economic effects other than the creation of tax benefits"). The facts as set forth above, unquestionably establish, not just one, but several non-tax business purposes for the decision to use Deerhurst GP.

>    **3.     Whether the S corporation should be disregarded for tax purposes and whether the losses that pass through it should be disallowed under the step transaction doctrine.**

The S corporation was used in connection with Sala's participation in the Deerhurst Transaction on the advice of both Rosenman and Nemirow, Sala's lawyers. The principal purpose was to limit Sala's liability exposure on the leveraged option trade transactions. *See* Proposed Finding of Fact 51. The government fails to recognize that Sala could have eliminated the formation of Solid and the transfer of the options to Solid altogether and, instead, transferred the options directly from his personal account to Deerhurst GP. In that situation, the tax consequences to Sala would have been the same. *See* Plaintiff's discussion of authorities at Legal Conclusions, Section D. 4. Thus, the step transaction doctrine should have no application to the existence of Solid.

However, even if the role of Solid is considered a crucial step, that transactional event should not be ignored because the entity did have a business purpose: limiting Sala's personal liability in potentially risky leveraged currency trades. Similarly, the existence and the transactional function of Deerhurst GP should not be disregarded because it served a business purpose with attendant commercial considerations as described in Plaintiffs' Legal Conclusions, Section D. 2.

The "step transaction" doctrine is a particular incarnation of the basic substance over form and economic substance principles discussed in Plaintiffs' Legal Conclusions, Section D. 1 and 2. The step transaction theory allows courts to ignore "meaningless intervening steps" in a transaction. *Grove v. Commissioner,* 490 F.2d 241, 246 (2d Cir. 1973); *Esmark. Inc. v. Commissioner,* 90 T.C. 171, 183 (1988), *aff'd without published opinion,* 886 F.2d 1318 (7th Cir. 1989).

The principle derives from *Gregory,* 293 U.S. 465 where the Court's analysis revealed transactional steps having no business or corporate purpose whatsoever. *Associated Wholesale Grocers, Inc. v. United States,* 927 F.2d 1517, 1522 (10th Cir. 1991). Simply stated, the step transaction doctrine provides that in certain situations, "interrelated, yet formally distinct steps, in an integrated transaction, may not be considered independently of the overall transaction." *True v. United States*, 190 F.3d 1165 (10th Cir. 1999), quoting *Commissioner v. Clark,* 489 U.S. 726, 738 (1989).

As with the economic substance doctrine, the step transaction principle should be applied sparingly. Steps with independent legal or economic significance may not be disregarded solely to increase a taxpayer's liability. *Sheppard v. United States,* 361 F.2d 972, 978 (Ct. Cl. 1966); *Federal Nat'l Mortgage Ass'n v. Commissioner*, 100 T.C. 541, 583 (1993). ("[t]he step-transaction doctrine is inapplicable since the steps comprising each yen borrowing in its entirety were not meaningless - they were genuine and had economic substance.").

The Commissioner may not disregard, reorder, or recast transactions unless the steps are "meaningless" or "fruitless." *Cottage Savings Ass'n v. Commissioner*, 499 U.S. 554 (1991). This limitation applies under all applications of the step transaction theory, *Esmark, Inc. v. Commissioner*, 90 T.C. 171, 183 (1988), and even though the principal reason for structuring a transaction in a particular form was to reduce taxes. *See Tandy Corp. v. Commissioner*, 92 T.C. 1165, 1171-72 (1989); *Grove v. Commissioner*, 490 F.2d 241,246 (2d Cir. 1973) ("We are not so naive as to believe that tax considerations played no role in Grove's planning, but foresight and planning do not transform a non-taxable event into one that is taxable.").

In *Falconwood Corp. v. United States,* 422 F.3d 1339 (Fed. Cir. 2005), the court refused to apply the step transaction doctrine to deny substantial tax benefits to the taxpayer. Because a subsidiary had significant tax losses available, a merger was structured to allow the subsidiary to remain in existence for only a few hours prior to being merged into the parent company. The Court found that the existence of the subsidiary, even if only for a few hours, was sufficient to comply with the law.

Courts have developed three tests for determining when the step transaction doctrine should operate to collapse the individual steps of a complex transaction into a single integrated transaction for tax purposes. These tests are referred to as: (1) binding commitment; (2) interdependence; and (3) end result. *See Associated Wholesale Grocers Inc.,* 927 F.2d at 1522-23. None of these tests apply to the facts.

Under the "binding commitment" test, a series of transactions is integrated only if there is a binding legal commitment to undertake each of the steps. *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968). Sala was not bound in any way to purchase or sell any of the options at issue, to contribute the options to Solid or Deerhurst GP, or to withdraw assets from any entity.

Under the "interdependence" test, a series of transactions is integrated only if the steps are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *Manhattan Building Co. v. Commissioner*, 27 T.C. 1032, 1042 (1957), *acq.*, 1957-2 CB 5. The interdependence test focuses on whether the first step would have occurred without the second. For example, in *Associated Wholesale Grocers Inc.,* 927 F.2d at 1523, the court applied the interdependence test to integrate two purportedly independent transactions and deny the claimed loss because the two agreements were, by their terms, dependent on each other. Unlike the factual situation in *Associated Wholesale Grocers*, each event in the Deerhurst Transaction was independently undertaken by Sala or Deerhurst, each step presented Sala with a potential for economic gain or loss, and each step had independent economic significance, reasons or effects.

The "end result" approach in its broadest application integrates a series of transactions into a single transaction "when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *Associated Wholesale Grocers Inc.,* 927 F.2d at 1523. Courts, however, have limited the expansive scope of the end result test. For example, *Esmark, Inc. v. Commissioner*, 90 T.C. 171 (1988), rejected the IRS's attempt to apply the step transaction doctrine to recast the transactions, although the reduction of taxes was a significant factor in structuring the transaction. The court found that ownership in an entity, no matter how transitory, must be respected because existence

of an overall tax plan does not alone justify application of the step transaction doctrine. The IRS
must establish that the steps are "meaningless" and without economic consequence if they are to
be recharacterized.

The Tenth Circuit has considered these various tests in *True*, 190 F.3d at 1174-75. The
*True* decision indicates that for the "end-result" approach to apply, the record must clearly
demonstrate that at the time of entering into a series of transactions, a taxpayer had in his mind a
sole outcome and no other outcome can be discerned from the evidence, particularly if the
intermediate steps had no or so little economic significance on their own that they fall within the
"mutual interdependence" test.

Each step and event in the Deerhurst Transaction had meaning and economic effects.
The Plaintiffs' Proposed Findings of Fact and the discussion presented in Plaintiffs' Proposed
Legal Conclusions demonstrate that Sala's intent at the time of entering into the series of
transactions was unquestionably to achieve profits as well as reduce taxes. The step transaction
doctrine does not result in the nonrecognition of Solid, nor does it apply as a basis for
disallowing Sala's tax losses.

### 4. Whether the losses resulting from the S corporation should be disallowed under the provisions of section 269.

Section 269 provides that the IRS may disallow a tax loss where the taxpayer acquires
control over a corporation for the principal purpose of evading or avoiding taxes by securing a
tax benefit to which the taxpayer would otherwise have not been entitled.

In this case, Sala formed and was issued all of the stock (i.e. acquired control) of Solid to
serve as a general partner in Deerhurst GP. The government appears to argue that Sala's
principal purpose in forming Solid was to secure tax benefits. However, Sala could have
eliminated the formation of Solid and the transfer of the options to Solid altogether, and instead
transferred the options directly to Deerhurst GP. In that case, the tax consequences would have
been the same.[3] Solid was formed and used in the transactions for liability protection, as has
been proven not only by Sala's testimony, but the testimony of two lawyers who advised him on
the matter, Nemirow and Natbony. In the statute's words, acquisition of Solid does not give rise
to a tax benefit Sala "would not otherwise enjoy." Therefore, § 269 on its face has no
applicability.[4]

---

[3] Sala's basis in his Deerhurst GP partnership interest would have been the same as his
basis in the long option positions, plus cash, instead of his basis in Solid stock. But his basis in
Solid was also equal to his basis in the long option positions, plus cash. Therefore, under either
scenario, the subsequent liquidation of the positions by Deerhurst GP would provide the identical
tax loss to Sala.

[4] This argument is closely related to, though conceptually distinct from, arguing that the
principal purpose for acquiring Solid -- as opposed to the purpose for the Deerhurst Transaction
as a whole -- was not tax avoidance or evasion.

Further, although § 269 grants the IRS some authority to disallow tax losses, the courts have held that its authority to do so has definite bounds. *See Rocco, Inc. v. Commissioner*, 72 T.C. 140 (1979). There, a parent corporation formed two subsidiaries. The subsidiaries subsequently conducted operations and reported losses which offset the parent corporation's significant gains. Because the tax benefits did not result from the acquisition of the subsidiaries, but from their subsequent operations, the court held the Commissioner abused his authority by attempting to disallow the losses under § 269.

Similarly, no tax benefits flowed from Sala's acquisition of Solid. The tax benefits flowed from subsequent transactions, and ultimately flowed from the partnership through the S corporation to Sala individually. The "flow through" of tax benefits provided by Solid is not a benefit that can be denied under § 269:

> The primary benefit is that [S corporations] are not subject to corporate income tax under section 11. This benefit, of course, does not indicate that petitioner was organized for the principal purpose of evasion and avoidance of income tax by securing the benefit of a surtax exemption.

*Modern Home Fire & Casualty Insurance Co. v. Commissioner*, 54 T.C. 839, 852 (1970).

Finally, the statute requires a taxpayer to acquire control over a corporation with the *principal* purpose of evading or avoiding tax. Courts will not find that a tax avoidance purpose was the principal purpose *merely* because the structure of the transaction as carried out allowed for the tax benefit, when another alternative structure would not have provided the same benefits. *See In re: Federated Dept. Stores, Inc.*, 170 B.R. 331 (W.D. Ohio 1992); *see also Gregory*, 69 F.2d at 810 ("[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's own taxes.") As discussed above, however, because Sala could have obtained the same tax benefits from the Deerhurst Transaction without utilizing Solid, the principal purpose for Solid clearly was not tax avoidance or evasion.

**5.     Whether the Deerhurst Transaction was profit motivated and whether the profit was anything but *de minimus* in comparison with the noneconomic losses claimed.**

As discussed above, Sala entered into this transaction with a good faith objective to make a profit, and he did in fact make a profit on the 24 option positions that generated the tax loss at issue. Much of the government's argument to the contrary have been discussed above. However, we will address the government's argument that the profit potential of Sala's Deerhurst Transaction was "de minimus." The government compares the net amount paid ($728,000) for the 24 long and short positions with the $60 million tax loss. That comparison is meaningless, because, as discussed above, the size of the tax loss is the result of applying a rule of law, not economics.

The proper comparison is the $728,000 paid with: 1) the profit potential which, according to both experts, was approximately $550,000; and 2) the actual profit made on the investment in the 24 positions, approximately $90,000 to $110,000. Considering the net investment in the

specific 24 positions was held for a matter of weeks, the potential profit and actual profit represented an enormous rate of return. Moreover, projecting that performance over the expected five year duration of Sala's $9 million investment fully corroborates Sala's projection of profits that warranted his investment in the Deerhurst Transaction regardless of any tax benefits.

>        6.       **Whether the losses are allowable under section 465.**

Section 465 limits a taxpayer's deductions for losses from certain activities to the aggregate amount the taxpayer has "at risk" for such an activity at the close of the taxable year. Section 465 states, in part, that:

> [I]n the case of an individual,... engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year.

Section 465(a)(1).

Under § 465(b)(1), a taxpayer's amount at risk equals, at least, the amount of money and the adjusted basis of property contributed to the activity. Accordingly, Sala's amount at risk was equal to the adjusted basis of the long positions (approximately $60 million) plus cash. That amount remained at risk through the contribution of the positions to Solid, to Deerhurst GP, the liquidation of them by Deerhurst GP, and the subsequent transactions through the sale of the foreign currency and options.

Section 465(b)(4) provides that "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." The IRS might argue that the short options acquired by Sala constitute a "stop loss agreement" or similar arrangement. That argument has been made before, and rejected by the courts.

In *Laureys v. Commissioner*, 92 T.C. 101 (1989), *nonacq.* 1990-1 C.B. 1, the IRS argued that a taxpayer's fully offsetting straddle positions "effectively immunized [taxpayer] from any risk of economic loss in excess of the maximum potential for loss inherent in his option spread positions." 92 T.C. at 130.

Citing *Smith v. Commissioner*, 78 T.C. 350, 385-390 (1982), *Miller v. Commissioner*, 836 F.2d 1274, 1278-1279 (10th Cir. 1988), and *Boswell v. Commissioner*, 91 T.C. 151 (1988), the *Laureys* Court first recognized that courts had expressly rejected the government's attempts to "integrate" the component positions of a straddle transaction in other contexts. 92 T.C. at 130. The Court also noted that it would be "totally impractical" to limit tax losses to the theoretical maximum potential loss inherent in the offsetting positions of a straddle transaction, as such an approach would "presumably have to be calculated for each transaction by an economist prior to filing the taxpayer's return." *Id.* at 130.

Despite the fact that holding partially or wholly offsetting positions contained some

features of downside economic protection, the Tax Court held that the offsetting option positions were not within the Section 465(b)(4) exception as a stop loss agreement or other similar arrangement, stating "[w]e are unpersuaded that Congress intended to deal with the problems of options straddles or spreads by general language in that section." *Laureys*, 92 T.C. at 131; *see also Starr v. Commissioner*, T.C. Memo. 1991-610 (futures straddles not subject to § 465); *Resser v. Commissioner*, T.C. Memo. 1991-423 (stock spread options not subject to § 465); *Thurner v. Commissioner*, T.C. Memo. 1990-529 (commodity futures contracts spreads), where in the Tax Court reached the same conclusion, following the same analysis, on facts similar to those in *Laureys*.

> 7.   **Whether, under section 988 the basis in Solid and Deerhurst GP should be limited to $728,298, the net premium received from and paid for the option positions.**

Congress' purpose for the enactment of § 988 is set forth in the legislative history as: (1) to resolve uncertainty in the prior law regarding the tax treatment for many legitimate tax transactions; and (2) to prevent certain tax motivated transactions. *See* S. Rep. No. 313, 99th Cong., 2d Sess. 450 (1986). To accomplish these purposes, Congress made it a general rule that:

> [T]he amount of exchange gain or loss from a section 988 transaction shall be *separately* computed for each section 988 transaction , and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the section 988 transaction).

Treas. Reg. 1.988-1(e)(emphasis supplied).

A § 988 transaction includes acquiring an option where its termination requires the use on nonfunctional currency, i.e., anything other than US Dollars. §§ 985(b)(1) and 988(c)(1). That of course is what Sala has done in this case, and the general rule requires that his purchased options be considered separate from his sold options- the positions are not to be integrated.

Under Treas. Reg. § 1.988-2(f), the Commissioner has the power to recharacterize the timing, source and character of gains if the substance of the transaction is not in accordance with its form. An example in the Regulation involves a transaction which is designated by the taxpayer as a "currency swap," when in fact it is a forward sales contract. Treas. Reg. § 1.988-2(f)(example ii). The taxpayer there was attempting to take advantage of the rules relating to currency swap contracts, on a transaction that did not really involve currency swaps. In this case the acquisition and disposition of the foreign currency positions are reported consistently with the form of the transactions and consistently with their economic substance.

Our position that the exception to the general rule provided by § 1.988-2(f) of the Treasury Regulations where "the substance of the transaction is not in accordance with its form" has no application to this case is supported by the case law which has consistently held that where a taxpayer holds both long and short positions, each position is a separate property. *Smith v. Commissioner*, 78 T.C. 350 (1982) (court held each leg of a straddle should be treated as separate property even if the legs were acquired at the same time); *Stoller v. Commissioner*, 994

F.2d 855 (D.C. Cir. 1993) *aff'g* in part and *rev'g* in part, 60 TCM (CCH) 1554 (1990) (separate contracts were respected); *Richardson v. Commissioner*, 121 F.2d 1 (2d Cir. 1941) (can hold long and short positions at the same time); Rev. Proc. 65-1965-2 CB 1023; Rev. Rul. 78-182, 1978-1 CB 265.

In this case, each of the 24 option positions was purchased as separate contract and each were independently priced. Additionally, each of the 24 options could have been transferred or assigned independently. As Kolb confirms, Solid could have easily closed out one of the long positions or short positions with his cash invested. The government's expert (DeRosa) also confirms that the options could have been disposed of separately. His attempt to support the government's position that the option positions should be integrated with the argument that because it would have been impractical to sell the entire $60 million portfolio of short or long options separately misses the point. The point is each option can be and was in fact traded separately.

      **8.**      **Whether the contingent liability should be considered in determining Sala's basis in Solid and/or Deerhurst GP under sections 351(c) and 752.**

      **a.**      **Solid's basis in Deerhurst GP**

The government first argues that in determining Sala's basis in Deerhurst GP a reduction must be made for the contingent liability represented by the short option positions and relies upon Treasury Regulations promulgated in 2003.

On June 24, 2003, the Treasury Department adopted regulations regarding the definition of a "liability" for purposes of Section 752. The new regulations under Section 752 expanded the definition of liability to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code." Treas. Reg. § 1.752-1(a)(4)(ii); *see also* Treas. Reg. § 1.752-6(a); Treas. Reg. § 1.752-7(b)(3).

Section § 1.752-6 (the "Regulation") purports to apply to all assumptions of "liabilities" (as newly defined) by partnerships occurring after October 18, 1999, and before June 24, 2003 (i.e., the Regulation applies only to assumptions of "liabilities" by partnerships that took place before the Regulation was promulgated).[5] There are special rules in the Regulation that apply only to transactions which were described in Notice 2000-44, 2002-2 C.B. 255.[6] Treas. Reg. § 1.752-6(b)(2). This new Regulation, aimed solely at transactions described in Notice 2000-44,

---

    [5] The Treasury issued a different regulation for "liabilities" after the effective date of the Regulation. *See* Treas. Reg. § 1.752-7.

    [6] The general rule under § 1.752-6 is that the exceptions set out in § 358(h)(2)(A) and (B) apply. § 1.752-6(b)(1). Section 358(h)(2)(A) and (B) provides that the basis reduction for contingent liabilities set out in § 358(h)(1) does not apply if the trade or business with respect to which the liability is associated, or substantially all of the assets with respect to which the liability is associated, are transferred to the entity receiving the liability. Transactions described in Notice 2000-44 do not get the benefit of the general rule. § 1.752-6(b)(2).

is entirely retroactive in nature.  Treas. Reg. § 1.752-6(d)(1).

As an initial matter, the Regulation applies only to conduct that occurred before June 24, 2003 (the date of issuance), and after October 18, 1999. *See* Treas. Reg. § 1.752-6(d).  A different regulation was issued to govern liabilities for conduct that occurred after June 24, 2003. The government well understood it was changing the law regarding "liabilities" under § 752 with this new regulation.  The Regulation Transmittal indicates that the regulations were intended to reverse settled law regarding "liabilities" for § 752:

> The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner*, TC Memo. 1975-160. (The Tax Court, in *Helmer* held that a partnership's issuance of an option to acquire property did not create a partnership liability for purposes of Section 752.).

*See* Notice of Proposed Rulemaking, 68 Fed. Reg. 37434 (June 24, 2003).

Given the solely retroactive nature of the Regulation, along with the specific focus on Notice 2000-44 transactions, it is beyond peradventure that the sole purpose of the Regulation was to buttress the government's litigation position with respect to so-called "Son of Boss" cases.  Such a procedure is patently improper, and such make-weight regulations are properly disregarded by the Courts. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *see also Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulation.").

The Regulation requires a partner to reduce his basis in his partnership interest by the amount of any contingent obligation assumed by the partnership between October 18, 1999, and June 24, 2003, but would not allow the partner to increase his basis for his share of the new partnership liability, which is the general rule under § 752(a).

Even if the promulgation of the Regulation were not intended solely to buttress the government's litigating position, the Code generally prohibits retroactive regulations.  Section 7805 of the Code only allows the IRS to promulgate retroactive regulations under limited circumstances:

> (b) Retroactivity of regulations. –
>
> (1) In general. – Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:  (A) The date on which such regulations is filed with the Federal Register .
>
> . . .

32

* * *

> (3) Prevention of abuse. – The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse.

* * *

> (6) Congressional Authorization. – The limitation of paragraph (1) may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation.

The standard of review applicable to Treasury Regulations depends on whether the regulation at issue is a "legislative regulation" or an "interpretative regulation."[7]  A legislative regulation is a regulation issued under a specific grant of Congressional authority, and is given much higher deference than regulations issued under the agency's general regulatory authority. *Snape Drape, Inc. v. Commissioner*, 98 F.3d 194, 198 (5th Cir. 1996).

When the Regulation was issued, the government asserted that the Regulation was promulgated pursuant to § 309 of the Community Renewal Tax Relief Act (a 2000 Act, the relevant portions of which had been introduced in October of 1999, providing for certain changes to the treatment of contingent liabilities in certain  corporate transactions). *See* Assumption of Partner Liabilities, T.D. 9207, 70 Fed. Reg. 30334, 30335.  The Community Renewal Tax Relief Act added Section 358(h) to the Code to reverse the results of a corporate transaction described in Notice 2001-17, which involved the acceleration and duplication of a losses obtained by transferring assets and certain liabilities to a corporate subsidiary, and then disposing of that subsidiary.[8]  Section 309(c) directed the Treasury Department to promulgate "comparable rules," combating the same abuses, for partnerships and S corporations:

> (c) Application of Comparable Rules to Partnerships and S Corporations. – The secretary of the Treasury or his delegate –
>
> > (1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer or assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships . . .

---

[7]  A "legislative" regulation would be authorized by Section 7805(b)(6). If the retroactive regulation is interpretive, it must be analyzed under Section 7805(b)(3).

[8]  The statutory basis for the transaction described in Notice 2001-17 (as it existed prior to the addition of § 358(h)) was upheld in *Coltec v. United States*, 62 Fed. Cl. 716 (2004), *rev'd on other grounds*, 454 F.3d 1340 (Fed. Cir. 2006).

In the transmittal accompanying the Regulation, the government contended that this language authorized it to promulgate the Regulation.  An examination of the language of the Community Renewal Tax Relief Act, as well as other steps taken by the Treasury to apply § 309 to partnerships, reveal that the government is incorrect.

As an initial matter, the legislation that became § 309 was proposed on October 19, 1999, long before the IRS issued Notice 2000-44 on August 11, 2000. *See* Joint Committee on Taxation,  Description of Modified Chairman's Mark Relating to Expiring Tax Provisions (JCX-73-99), October 19, 1999 (describing provision to "Prevent Duplication or Acceleration of Loss Through Assumption of Certain Liabilities"). Nothing in the Act or its legislative history suggests that Congress was aware of the transactions described in Notice 2000-44 when the legislation that became Section 309 of the Act was proposed.[9]

The grant of authority by Congress was not to promulgate rules redefining liabilities for purposes of § 752, but rather to make the rules of new § 358(h) applicable to partnerships and S corporations that were shareholders in corporations that engaged in transactions subject to Section 358(h). *Klamath Strategic Fund LLC*, 440 F. Supp. 2d at 622.

Furthermore, the Treasury Department in fact promulgated a rule in accordance with § 309(c) of the Community Renewal Tax Relief Act when it issued Treas. Reg. § 1.358-7.  This regulation, titled "Transfers by partners and partnerships to corporations," addresses contributions of assets and liabilities by partnerships to corporations in which they are shareholders and the implications of such transfers under § 358(h).  This regulation was in fact exactly the type of regulation contemplated by the Community Renewal Tax Relief Act. *Klamath Strategic Fund LLC*, 440 F. Supp. 2d at 621.

Under the circumstances, it is clear that Treasury was not following a specific statutory mandate to create legislative regulations, but rather engaging in its own general interpretative regulatory authority.[10]  *Klamath Strategic Fund LLC*, 440 F. Supp. 2d at 622.

---

[9] The Community Renewal Tax Relief Act and its legislative history do not mention § 752.

[10] When the Regulation was issued, commentators recognized that the Regulation exceeded the scope of Congressional authority. *See, e.g.*, Letter from the American Institute of Certified Public Accountants to Commissioner Mark Everson, *reprinted in AICPA Comments on Proposed and Temporary Regulations on Assumption of Partner Liabilities Under I.R.C. Section 752*, 83 DTR G-7 (April 30, 2004) ("[T]he AICPA is concerned that these regulations appear to exceed the underlying statutory authority."); Letter from the New York State Society of Certified Public Accountants to Mr. Horace Howells at IRS, *reprinted in CPAs Comment on Proposed Definition of Partnership Liabilities*, 2003 Tax Notes Today 195-16 (Sept. 15, 2003) (noting that the Regulation cannot be reconciled with existing precedent and expressing concern about the ability of taxpayers to rely on settled law); Letter from Fred Goldberg, Jr. (former IRS Chief Counsel, Commissioner of IRS and Assistant Secretary of the Treasury for Tax Policy) to IRS, *reprinted in Goldberg Suggests Son of Boss Regs Will Diminish Settlement Prospects*, 2003 Tax Notes Today 219-47 (Nov. 13,  2003) ("[W]e believe that the IRS has significant litigation risks

Because the Regulation exceeds the grant of Congressional authority contained in § 309 of the Community Renewal Tax Relief Act, the regulation cannot be analyzed as a "legislative regulation," but must be viewed as an interpretive regulation. *See Snape Drape, Inc.*, 98 F.3d at 199 ("[A] regulation issued pursuant to a specific directive may nevertheless be interpretive to the extent it exceeds Congress' specific grant of authority.").

The IRS's decision to make a regulation retroactive is reviewed for abuse of discretion. *See Id.* at 202. As the Fifth Circuit noted, "the Internal Revenue Service does not have carte blanche" authority to issue retroactive regulations. *See Id.* The following factors are relevant considerations when reviewing the efficacy of a retroactive regulation:

> (1) whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law;

> (2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative re-enactment of the pertinent Code provisions;

> (3) whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers; and

> (4) whether according retroactive effect would produce an inordinately harsh result.

*Id.* (*citing Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 981 (5th Cir. 1977)). This list of relevant factors is not exhaustive and is to serve as flexible guidance when evaluating a retroactive regulation. *Id.*

> Factor 1: *Whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law.*

In this case, the case law was settled (like in *Snape Drape*) as to the definition of "liability" under § 752. More than twenty-five years of consistent litigating positions, including numerous court victories, by the IRS provided a clear definition of "liability." The Regulation is a clear departure from the accepted definition. Accordingly, this factor weighs heavily in favor of invalidating the retroactive effect of the Regulation.

> Factor 2: *The extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative re-enactment of the pertinent Code provisions.*

Congress never acted to disapprove of *Helmer* and its progeny. After *Helmer*, Congress has amended, or authorized the Treasury Department to promulgate regulations interpreting,

---

respecting the validity of the Temporary Regulation.").

various provisions of Subchapter K of the Code, most notably providing special rules for the application of § 752 in 1984 to reverse the results of a decided court case. Pub.L. 98-369, § 79(a) and (b).[11]   A failure by Congress to amend § 752 constitutes an implicit approval of the definition developed under *Helmer* and the cases which followed it. *Dep't of Hous. and Urban Dev. v. Rucker*, 535 U.S. 125, 133 n.4 (2002). This factor strongly supports a refusal to accord retroactive effect to the Regulation.

> Factor 3: Whether *retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers.*

In this case, most taxpayers purportedly captured by the retroactive regulation had already filed tax returns based on the prior law.  Whether or not the Regulation was applied equally would depend on whether the IRS audited the taxpayer or whether the taxpayer filed amended returns (like Sala).  Because similarly-situated taxpayers would not be treated equally (at least those which had filed tax returns) because their treatment would depend on whether they were audited by the IRS, this factor also supports a refusal to recognize the purported retroactive effect of the Regulation.

> Factor 4: *Whether according retroactive effect would produce an inordinately harsh result.*

In this case, retroactive application will result in the payment of millions of dollars in tax by Sala.  Sala would have been in a position to structure his affairs differently had the IRS amended the regulations three years earlier.

As the government also seeks a penalty offset in this case, granting retroactive effect to the Regulation would also sanction the assertion of a significant penalty for conduct that was, on its face, in accordance with the tax laws. *See, e.g., Compaq Computer Corp. v. United States*, 277 F.3d 776, 786 (7th Cir. 2000); *Carrington*, 476 F.2d at 706; *Rhodes*, 464 F.2d at 1312. This final factor also supports limiting the retroactivity of the Regulation.

While the Fifth Circuit in *Snape Drape* ultimately upheld the retroactivity of the regulation at issue in that case, this case is markedly different.  In the *Snape Drape* case, the retroactivity was limited to the time that the proposed regulation was first published. *See Snape Drape*, 98 F.3d at 202-03. Thus, the regulation was retroactive only to the extent that it was effective back to its originally published date.[12]

In this case, the Regulation was published for the first time in June of 2003. There was no indication that the IRS intended to change the well-settled definition of "liability" for purposes of

---

[11] Section 79(a) of Pub.L. 98-369 provided that § 752 should be applied without regard to the result reached in *Raphan v. United States*, 3 Cl. Ct. 457 (1983).

[12] Were the proposed retroactivity only to the date the Regulation had been first proposed (as in *Snape Drape*), the government would have a much better argument that Sala was on notice of the correct tax treatment. In this case, rules regarding the tax treatment itself were not promulgated until 2003, years after the tax return at issue was filed.

§ 752 prior to that time. Even when Notice 2000-44 was issued in August of 2000, the IRS took the position that the transaction did not achieve the claimed tax benefits, but did not state that the existing law governing liabilities should or would be prospectively altered.

Nearly three years later the Treasury Department promulgated the Regulation. The government admits that the IRS's intent to apply this regulation to liability assumptions occurring as part of Notice 2000-44 transactions is made explicit in the preamble to the published Regulation, which states:

> Prior to the enactment of Code section 358(h) and section 309(c) and (d)(2) of the Act, the lack of specific rules addressing the treatment of liabilities upon the transfer of property to a corporation or a partnership led to interpretations of then existing law that failed to reflect the true economics of certain transactions. In some cases, taxpayers continued to assert these interpretations even after the enactment of these statutory provisions. For example, in a transaction addressed in Notice 2000-44 (2000-C.B. 255), a taxpayer purchases and writes economically offsetting options and then purports to create substantial positive basis by transferring those option positions to a partnership. On the disposition of the partnership interest, the liquidation of the partner's interest in the partnership, or the taxpayer's sale or depreciation of distributed partnership assets, the taxpayer claims a tax loss, even though the taxpayer has incurred no corresponding economic loss.

T.D. 9062 (2003).

While in August of 2000, the government provided notice (Notice 2000-44) that it disagreed with the tax treatment employed by the Plaintiffs in this case, that was simply a litigating position of the government (which did not mention an altered definition of "liability" for purposes of § 752, not a change in the law. Even where the IRS has published a revenue ruling stating its position that a particular tax strategy or reporting position is invalid, the Tax Court views such rulings as the litigating position of a party and accords it no deference. *Electronic Arts, Inc. v. Commissioner*, 118 T.C. 226, 263 n.13 (2002) (collecting cases); *McLaulin v. Commissioner*, 115 T.C. 255, 263 (2000).

Sala's justifiable reliance upon the well-settled law, Congress's acquiescence to the results obtained in the *Helmer* line of cases, the harsh results of retroactivity, the unequal treatment of taxpayers, coupled with a failure to provide notice that the law would be amended until almost three years after Sala entered the transaction, are supportive of Sala's position that the Regulation is owed no deference and should not be afforded retroactive effect.

**b.     Sala's basis in Solid**

On December 15, 2000, Congress passed the Community Renewal Tax Relief Act of 2000 (the Community Renewal Act). As part of the Community Renewal Act, § 358(h) was enacted to address certain loss duplication and acceleration transactions. The principal transaction targeted by section § 358 (and more fully described in Notice 2001-17) involved a

transfer of property to a corporation in exchange for stock in such corporation and the corporation's assumption of contingent liabilities (e.g., medical benefits costs) from the transferor of property. The position taken by the transferor-taxpayer was that the assumption of the contingent liability did not result in a reduction of the transferor's adjusted basis in such stock, thereby creating an artificially high built-in capital loss which could be recognized on the disposition of the corporate stock.

To address this fact pattern, Congress provided new rules for the assumption of liabilities in the context of corporate non-recognition exchanges (e.g., exchanges subject to § 351 or § 368) where, in general, if the basis of stock received in such an exchange exceeds the fair market value of the stock, then the basis of the stock must be reduced (but not below fair market value) by the amount of any liability assumed in exchange for the stock. For these purposes, new § 358(h) defines the term "liability" to include any obligation (whether fixed and determinable or contingent) that requires a payment, thereby requiring taxpayers in the factual scenario described earlier to reduce the tax basis of the stock to fair market value. Section 358(h) applies retroactively to assumptions of liabilities occurring after October 18, 1999 (the time legislation addressing contingent liabilities was first introduced).

In the context of a taxable sale of assets in which the transferee also assumes liabilities of the transferor, it has long been the law that the transferor's "amount realized" on the sale generally includes the amount of the assumed liabilities.[13]

In the early years of the federal income tax system, it was assumed that debt assumption did not require the transferor to recognize gain in a corporate reorganization under the predecessors to §§ 351 and 361. This assumption was proved wrong by the Supreme Court in *United States v. Hendler* 303 U.S. 564, *reh'g denied* 304 U.S. 588 (1938). In *Hendler*, the Court held that the acquired corporation in a corporate reorganization must recognize gain to the extent that liabilities of the acquired corporation were assumed or inherited by the acquiring corporation because relief from debt is, for federal income tax purposes, the equivalent of a receipt of cash equal to the amount of the assumed debt.

Shortly after the IRS prevailed in *Hendler*, Congress responded with the general statutory changes that are now embodied in §§ 357 and 358 (general rule that the assumption of a liability is not treated as money received). This remained the law for decades.

The stimulus of new § 358(h) was a concern for certain corporate transactions that involved the creative use of contingent obligations. One common pattern involved a corporation (the "Transferor") transferred cash or other high basis assets (e.g., securities of an affiliate) to a transferee corporation (the "Transferee") in a transaction qualifying for non-recognition treatment under § 351. In the exchange under consideration, the Transferor received both stock of the Transferee and the Transferee assumed certain contingent obligations of the Transferor (e.g., contingent environmental liabilities, tort liabilities, product liabilities, or other postretirement employee benefit liabilities[14]) that, while reducing the value of the Transferee

---

[13] *See* Treas. Reg. § 1.1001-2(a).

[14] These liabilities cannot be currently deducted, even by accrual basis taxpayers.

stock received, were not taken into account for purposes of determining the Transferor's basis in his stock for purposes of §§ 357 and 358(d)(1). Consequently, the assumption of such contingent obligations did not produce an offsetting reduction in the Transferor's adjusted tax basis in the Transferee stock received in the exchange, thereby presenting the Transferor with the opportunity to sell the stock in its new subsidiary (Transferee) to an unrelated third party and recognize a capital loss. This capital loss accelerated the deductions otherwise allowable with respect to the assumed contingent liability when the satisfaction of the liability was ultimately taken into account for federal income tax purposes.[15] For example, post-retirement benefits that ordinarily would not be deducted until paid, could be accelerated and deducted when the payment of such benefits was funded in a new subsidiary that was then sold.

A potential duplication of the deduction otherwise allowable with respect to the assumed contingent obligation was achieved when the Transferee took the position that it was entitled to deduct the assumed contingent obligation when the liability was later accrued or paid.

In most of these cases, the contingent obligation assumed by the Transferee typically was segregated from the assets and business operations that originated the contingent liability. For example, cash to fund post-retirement benefits and the obligation to provide post-retirement benefits would be transferred, but the business operations where the retired employees worked would be retained. *See Coltec v. United States*, 62 Fed. Cl. 716 (2004), *rev'd in part*, 454 F.3d 1340 (Fed. Cir. 2006).

The general rule of § 358(h) provides a special rule for liabilities which are not otherwise taken into account in determining basis for purposes of §§ 357 and 358(d)(1):

> (1) In general -- If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability -- (A) which is assumed in exchange for such property and (B) with respect to which subsection (d)(1) does not apply to the assumption.

> ...

> (3) Liability -- For purposes of this subsection, the term "liability" shall include any fixed or contingent obligation to make a payment, without regard to whether the obligation is otherwise taken into account for purposes of this title.

Section 358(h)(2) provides that the basis reduction for contingent liability assumed as part of the exchange otherwise required by § 358(h)is not required to be made if either:

---

[15] *See* Staff of Joint Comm. on Taxation, 107th Cong., General Explanation of Tax Legislation Enacted in the 106th Congress pt. 8, tit. III, subtitle A (I) (Comm. Print 2001).

> (A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or
>
> (B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

In this case, Solid assumed the contingent obligations represented by the short positions held in Sala's personal account when Solid was formed. However, at the same time, Sala also transferred all of the long positions to Solid. Thus, *substantially all of the assets* which were associated with the contingent obligations were transferred by Sala to Solid as part of the § 351 incorporation transaction. Pursuant to the exception set out in § 358(h)(2)(B), Sala's basis in his interest in Solid is NOT reduced by the contingent obligations represented by the short options.

The government also makes the argument that, if the contingent obligations are not treated as liabilities reducing Sala's basis, Sala somehow received boot or "other property" when Solid agreed to pay the contingent obligations represented by the short positions. This argument has no merit. The statutory treatment of the assumption of liabilities is comprehensive and set out at §§ 357 and 358. Moreover, any promise to pay by Solid that was not an assumption of liabilities, would not be treated as income to Sala, because Sala is a cash basis taxpayer and (unlike an accrual taxpayer) is not treated as receiving anything merely because he received a promise.

9.      **Whether Plaintiffs are liable for the accuracy penalty assessed and paid under section 6662 and 6664 and whether the government is entitled to offset any amount due Plaintiffs by the amount of the asserted, but unassessed accuracy penalty.**

The Court has already ruled that Plaintiffs are entitled to summary judgment with respect to the suspended interest that they paid. In an effort to deny Plaintiffs this refund, the government seeks to offset the refund with an unasserted accuracy penalty. This is improper for three reasons: (1) no accuracy penalty was due because Sala acted with reasonable cause and good faith, relying upon attorneys to evaluate the tax consequences of the Deerhurst transaction, and his own extensive due diligence evaluating the economics of the transaction; (2) the penalty cannot be asserted because Sala filed a qualified amended return; and (3) the government has failed to offer evidence that the IRS made a determination that a penalty was applicable in this case and should be raised as an offset.

a.      **The Accuracy Penalty Does Not Apply Because Sala Acted With Reasonable Cause And In Good Faith.**

Section 6664(c) provides that the accuracy-related penalty does not apply if the taxpayer acted with reasonable cause and in good faith. Section 1.6664-4 of the Treasury Regulations, discussing what behavior shows reasonable cause and good faith, provides in part that:

> Reliance on an information return, professional advice or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.

Treas. Reg. § 1.6664-4(b)(1).

In *United States v. Boyle*, 469 U.S. 241 (1985), the Supreme Court reasoned that, generally, taxpayers may rely upon the analysis of their tax advisers as a defense to most penalties under the Code:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely upon that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking advice of a presumed expert in the first place.

*Boyle*, 469 U.S. at 250.

With respect to just what circumstances will count in determining if a taxpayer had reasonable cause and good faith in connection with seeking and following tax advice obtained from a professional, the regulations provide the following example:

> A, an individual calendar year taxpayer engages B, a tax professional, to give him advice concerning the deductibility of certain state and local taxes, A provides B with full details concerning the taxes at issue. B advises A that the taxes are fully deductible. A, in preparing his own tax return, claims a deduction for the taxes. Absent other facts, and assuming the facts and circumstances surrounding B's advice and A's reliance satisfy paragraph (c) of this section, A is considered to have demonstrated good faith by seeking the advice of a tax professional, and has shown reasonable cause for any underpayment attributable to the deduction claimed for the taxes.

Treas. Reg. § 1.6664-4(b)(2)(Example 1). *See Houchin v. Commissioner*, T.C. Memo 2006-119 (accrual basis taxpayer relied on accountant in determining that income reportable in year funds received rather than in year settlement agreement executed).

In *Melnik v. Commissioner*, T.C. Memo. 2006-25, knowing that their scrap metal company was going to be acquired by an independent third party, two taxpayer-brothers "sold" their stock to Clend, a BVI holding company organized for this purpose, in exchange for a private annuity. (Clend was owned by two offshore trusts, the trustee of which was a former Israeli army buddy of one of the taxpayers, and the permissible beneficiaries were the taxpayers and their families.) This arrangement, if respected, would have had the effect of deferring income on the sale to the third party until the taxpayers actually received distributions from Clend or the trusts. Subsequent to the sale of the scrap metal company, Clend made available almost the entire $4 million in proceeds received on the sale for use by the taxpayer-brothers, either through loans or through purchasing U.S. real estate selected by the taxpayer-brothers.

The Tax Court found lack of any independent business purpose on the part of Clend and determined that the arrangement was a sham. In reaching this conclusion, it relied substantially

on its findings that certain key documents with respect to the annuity transaction were backdated and that the taxpayer had attempted to manipulate the chronology to make the transaction appear more supportable. Citing *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), the Tax Court found the arrangement merely a conduit for funds from a sale that had already been agreed to by the taxpayer-brothers.

Despite these factual findings, the Tax Court *declined* to impose the accuracy penalty. The Tax Court explained that the accuracy penalty could not be imposed in light of the significant role played by the attorney, Mr. Pennoni, in structuring the transaction:

> The record consisted solely of a substantial number of stipulated exhibits and the testimony of three witnesses called by petitioners. The witnesses testified, among other things, that the private annuity transactions were planned and implemented by Mr. Pennoni, who assured petitioners that the transactions were legitimate and were entitled to respect under Federal income tax law. The exhibits reflect the planning and implementation of the private annuity transactions and, on their faces, do not support a conclusion that petitioners' decision to enter into the transactions was *per se* negligent.

> The uncontroverted record establishes that petitioners relied upon Mr. Pennoni, who was the driving force behind the planning of the annuity transactions and who assured petitioners that there was a reasonable basis for the income tax reporting of the private annuity transactions and the HouTex stock sale.

> We conclude that, under the circumstances, petitioners' reliance upon Mr. Pennoni was reasonable, that petitioners had reasonable cause for the underpayment, and that petitioners acted in good faith with respect to the underpayment within the meaning of section 6664(c)(1).

In *Melnik*, reliance upon an apparently qualified tax professional precluded imposition of the accuracy penalty in a case where: (1) the purpose of the plan was not to govern the prospective relationship between the parties, but to attempt to avoid the consequences of an already agreed sale; (2) there was no independent third party – all parties were under the control of the taxpayer-brothers; (3) virtually all of the funds were made available for the taxpayers' immediate benefit; and (4) documents were backdated. Sala's investment in the Deerhurst Transaction has none of these objectionable features.

In determining to take the Deerhurst loss, Sala relied upon a lengthy tax opinion prepared by Ruble. Sala retained Lemons Holland & Hart and Nemirow of Davis Graham & Stubbs to review the opinion and advise him whether its analysis and conclusions were reasonable. His own analysis and due diligence confirmed to him the economics of the transaction. The objective facts show that he committed almost $10 million to a five year program, which he had reason to believe would yield profits in excess of the tax benefits. A case for reasonable cause and good faith could hardly be more compelling.

**b.    Sala Filed a Qualified Amended Return ("QAR").**

Prior to the initiation of any audit, Plaintiffs filed an amended return in November of 2003, eliminating all of the claimed benefits of the Deerhurst Transaction. Sala paid tax and interest related to the amount shown due on the amended return at that time.[16]  The government, however, seeks to raise as an offset, an accuracy penalty of 40% of the tax it claims should have been paid with the original return, but was not paid because Sala initially claimed the tax benefits associated with the Deerhurst Transaction.

If the November 2003 amended return were a "qualified amended return" for purposes of § 1.6664-2(c)(3)(ii) of the Treasury Regulations, then there would be no "underpayment of tax." Generally, there is no "underpayment" if the correct tax liability is shown due on taxpayer's originally filed return, or on a "qualified amendment return." Treas. Reg. § 1.6664-2(c).  If there were no underpayment of tax, then the government cannot raise an unasserted accuracy penalty under § 6662 as an offset, because the imposition of the accuracy penalty is predicated on the existence of an underpayment.

A "qualified amended return" is an amended return filed before the taxpayer receives a notice of audit, or a third party is contacted regarding a promoter penalty audit.  In short, the accuracy penalty does not apply when the taxpayer self-reports changes to his or her tax return before a disqualifying audit is commenced by the IRS.  This policy underlying this regulation is to encourage taxpayers to file amended returns voluntarily (saving scarce auditing resources) by not subjecting them to penalties when they do so.

Section 1.6664-2(c)(3)(ii) of the Treasury Regulations (as they existed in 2003) provides that an amended return will not be considered a qualified amended return if it is filed after:

> [T]he time "any person described in section 6700(a) (relating to the penalty for promoting abusive tax shelters) is first contacted by the Internal Revenue Service concerning an examination of an activity described in section 6700(a) with respect to which the taxpayer claimed any tax benefit on the return directly or indirectly through the entity, plan or arrangement described in section 6700(a)(1)(A).

Treas. Reg. § 1.6664-2(c)(3)(ii) (prior to amendment by T.D. 9186, 3/01/2005)

Thus, in order to prove that the November 2003 amended return was not a "qualified amended return," the government must demonstrate the following: (1) KPMG was "a person described in § 6700(a)"; and (2) KPMG was contacted by the IRS concerning an examination of the activity that produced Sala's claimed tax loss.  The government cannot establish either

---

[16]  The only Deerhurst-related items on the November 2003 amended return were the contractual investment management fees paid to Deerhurst.  When the IRS examined Sala's return in 2004, it determined that these fees were not deductible, and asserted additional tax and an accuracy penalty.  The additional amounts asserted by the government were paid by Sala and are at issue in this case.

element.

### 1)   KPMG was not a promoter with respect to Deerhurst.

Section 6700(a) describes a person subject to the promoter penalty as follows:

> Any person who-
>
> (1)(A)   organizes (or assists in the organization of)- (i) a partnership or other entity, (ii) any investment plan or arrangement, or (iii) any other plan or arrangement, or
>
> (B)   participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A) **and**
>
> (2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)
>
> (A)   a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter...

26 U.S.C. § 6700(a) (emphasis supplied).

In order for KPMG to be a "person described in section 6700(a)" for purposes of the Treasury Regulation pertaining to qualified amended returns, the government must prove that KPMG participated in the organization or sale of interests in Deerhurst, and made false or fraudulent statements concerning the represented tax benefits of investing in Deerhurst. The evidence in this case falls woefully short of establishing these requirements of Section 6700(a).

Schwartz and Krieger, persons who did participate in the organization of Deerhurst and/or the sale of interests therein, testified unequivocally that KPMG had no role in their activities. Former KPMG employee Kevin Brady who worked extensively on Sala's 2000 tax return testified that he was unaware of any activities of KPMG amounting to the promotion of Deerhurst.

While the government cannot demonstrate that KPMG organized or participated in the sale of interest in Deerhurst, it also cannot show that anyone at KPMG made any statements that they knew or should have known was false or fraudulent with respect to whether the Deerhurst losses were allowable on Sala's 2000 tax return.

Because the government cannot show that KPMG was a promoter (within the meaning of § 6700(a)) and that improper statements about the tax benefits available through Deerhurst were

made by KPMG employees, it cannot establish that a disqualifying promoter penalty examination of KPMG had started prior to the time that Sala filed his November 2003 amended return. Thus, Sala's return is a qualified amended return, and no penalty can be imposed.

### 2) The government cannot establish that KPMG was under promoter penalty audit with respect to Deerhurst.

The regulation disqualifies amended returns from qualified amended return status if they are filed after the time that any person described in section 6700(a) is first contacted,

> [C]oncerning an examination of *an activity* described in section 6700(a) *with respect to which the taxpayer claimed any tax benefit* on the return directly or indirectly *through the entity, plan or arrangement described in section 6700(a)(1)(A)*."

Treas. Reg. § 1.6664-2(c)(3)(ii) (prior to amendment by T.D. 9186, 3/01/2005).[17]

The "investment plan or arrangement" with respect to which Sala claimed tax benefits on his original 2000 tax return was Deerhurst.

The government does not assert that KPMG was contacted concerning an examination of Deerhurst before Sala filed an amended return in November of 2003. Indeed, the government does not argue that KPMG was <u>ever</u> contacted concerning an IRS examination of Deerhurst.[18]

---

[17]   Section 6700(a) defines to an "activity" with respect to which a promoter penalty may apply as a "partnership or other entity, investment plan or arrangement, or any other plan or arrangement."

[18]   Consistent with the language of the regulation, in Request for Admission No. 33, Plaintiffs asked the government to,

> Admit that the IRS did not contact KPMG with respect to an examination of Deerhurst Investor General Partners, prior to the time that Plaintiffs filed an amended return in 2003.

The government replied,

> Subject to and without waiving its general objections, the United States admits that the IRS did not contact KPMG with respect to an examination of Deerhurst Investors General Partners prior to the time that Plaintiffs filed their amended return in 2003. However, the United States avers that it is not required to identify co-promoters in a Section 6700 examination and that the IRS did contact KPMG with respect to transactions substantially similar to the transactions at issue in this case.

(Defendant's Responses to Requests for Admission, at p. 22). The government has thus admitted that it did not contact KPMG with respect to the Deerhurst "activity," apparently believing that it was sufficient to have contacted KPMG with respect to transactions that were

Instead, the government attempts to rely upon summonses that notify KPMG that the promoter penalty examination had been expanded to cover transactions described in Notice 2000-44.

The plain language of the Regulation requires that the contact that would disqualify an amended return from QAR status be specific with respect to the "activity" through which the taxpayer claimed a tax benefit. Neither of the two summonses to KPMG refer at all to Deerhurst. Instead, the "matter" to which the summonses pertain is stated as KPMG's liability for "IRC sections 6700, 6701, 6707, and 6708 penalties." The April 18, 2002 administrative summonses define "transactions" with respect to which documents were requested to include "all transactions, or any part, step or intermediate step or intermediate transaction, that are the same as, or substantially similar to transactions described in Notice 2000-44 ... ."

But the issue here is not whether KPMG was requested, before Sala filed his amended return, to produce documents that might include those relating to Sala and his participation in Deerhurst.   The issue here is whether KPMG was contacted concerning an examination of the specific "activity" that produced Sala's claimed tax benefit within the meaning of Treasury Regulation  § 1.6664-2(c)(3)(ii) and 26 U.S.C. § 6700(a).

Notice 2000-44 describes a situation where "a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring these option positions to a partnership," then disposes of the partnership interest and claims a loss because the cost of the purchased option is included in basis, but the short option is disregarded.  The fact the IRS' summonses sought information from KPMG concerning taxpayers who took the legal position described by the IRS in Notice 2000-44 does not establish that KPMG was contacted regarding an examination of the activity that generated Sala's claimed tax loss. The "activity" that produced Sala's tax loss was far more than a legal theory regarding the treatment of short positions; it was an investment program.  A 'legal theory' standing alone is not an activity that produces a tax loss, which is clear from the relevant language of the Regulation and the provisions of the statute (§6700(a)) to which it refers.

Section 6700(a) refers to an "activity" with respect to which a promoter penalty may apply as a "partnership or other entity, investment plan or arrangement, or any other plan or arrangement." The "investment plan or arrangement" here was Deerhurst, which included the acquisition and disposition of specific foreign currency contracts by specific individuals and entities, not merely the application of the legal theory concerning the treatment of short positions discussed in Notice 2000-44. Thus, the plain language of both the Regulation and § 6700 refute the government's position that a legal theory, standing alone, constitutes an "activity" such that the summonses served upon KPMG meet the Regulation requirements.

The summonses served upon KPMG for information concerning transactions "substantially similar" to those described in Notice 2000-44 were aimed at identifying "activities" that the IRS might want to examine. That is substantially different from a contact with KPMG stating an "activity," e.g. Deerhurst, has been identified and has been placed under examination.

---

"substantially similar" to Deerhurst.

c.    **The government cannot establish that it is entitled to an offset in this case.**

1)    **The government has failed to plead or offer evidence to establish the elements of setoff:**

The Amended Answer does not allege that the IRS had ***determined*** that any penalty in excess of the $4,440 asserted in the Notice of Deficiency was due from Plaintiff, and raised this as a setoff.  The Amended Answer simply alleges that the government is "entitled to setoff any amount due plaintiff against an accuracy related penalty *owed, but not assessed.*"  The Department of Justice apparently purports to have determined that a penalty under the Code is *owed to the IRS* by a taxpayer.  This is improper; it is inconsistent with both the Code and the case law addressing setoff, including *Lewis v. Reynolds*, 284 U.S. 281 (1932), *aff'g* 48 F.2d 515 (10th Cir. 1931).

A valid setoff requires three elements: (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff.  *Citizens Bank v. Strumpf*, 516 U.S. 16, 19 (1995).

The Amended Answer does not allege the existence of any of these three elements.  In response to an Interrogatory requesting all facts and evidence supporting the Government's setoff defense, the Government did not indicate who at the IRS had determined that a setoff was appropriate; that any action was taken by the IRS to accomplish the setoff, or how the setoff was recorded by the IRS.[19]  The pretrial order does not indicate that the Government intends to call any witnesses to establish that the IRS had determined that a setoff was appropriate.

_____

[19] Plaintiffs' Interrogatory No. 15 requested that the Defendant provide the following information:

> Please describe all of the evidence and legal arguments which you believe supports your claim that the United States is entitled to setoff any amount owed Plaintiffs against an accuracy-related penalty owed, but not assessed (Amended Answer, First Defense), including identifying all facts or communications that support your claim, all witnesses who are in possession of information which may support your claim, and identifying all documents that relate to your claim.

The United States responded by stating that it had received the November 17, 2006 letter from KPMG, and had been frustrated in its efforts to learn about KPMG's role by reason of Tracie Henderson's invocation of her Fifth Amendment rights, and concluding,

> On November 17, 2006, the parties each received a statement of facts from counsel for KPMG. This statement was submitted in lieu of deposition testimony. The United States had previously noticed a deposition of former KPMG partner Tracie Henderson. Ms. Henderson's counsel has notified counsel that she will refuse to give testimony in this case relying on her Fifth Amendment privilege. The United States has been frustrated

**(2)     The Department Of Justice is not authorized to determine the applicability of penalties under Title 26.**

Under § 6201(a), the IRS is the agency authorized to make determinations regarding tax matters:

> The Secretary is authorized and required to make the inquiries and *determinations* and *assessments* of all taxes (including interest, additional amounts, additions to tax, and assessable penalties) imposed by this title … .

The Department of Justice's role in tax matters is limited to representing the United States and its agencies in the courts (*See* 28 U.S.C. § 516), and does not encompass independent determinations as to whether a taxpayer is liable for a penalty.

In *Lewis v. Reynolds*, the foundation case which established the setoff defense in tax cases, the taxpayers paid tax and filed a claim for a refund (on the grounds that he was not a non-resident alien) after the statute of limitations for making additional assessments had expired. The IRS reviewed the matter, and, while it conceded that the taxpayers were factually correct in the residency position, it determined that other deductions on the return (attorney's fees) were not allowable. The IRS therefore denied the refund claim. The taxpayers argued that, because the statute of limitations had expired, the IRS was "restricted in [its] consideration of the claim for refund … to a determination of whether the [taxpayers] were entitled to deductions of specific items set up in the claim for refund" (48 F.2d at 516), and could not consider issues outside the claim. On the other hand, the IRS argued that it had "the power, upon consideration of the claim for refund, to reconsider the entire assessment and *determine* whether or not the [taxpayer] had overpaid the tax." 48 F.2d at 516 [Emphasis supplied.].

The Tenth Circuit held that the fundamental question presented in the statutes authorizing the IRS to refund money was whether a taxpayer had overpaid his tax, and that "this involves a redetermination of the entire tax liability." 48 F.2d at 516. The Supreme Court agreed, stating that:

> It follows that the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a *redetermination* of the entire tax liability.

---

> in its effort to learn, from the individual with the most knowledge, the role of KPMG in this case. In light of the statement issued by KPMG on November 17, 2006, the United States is evaluating its claim of setoff and will amend and/or supplement its response to this interrogatory as it is appropriate to do so.

*See* Exhibit 8, United States' Response to Plaintiffs' Interrogatories, p. 21.

The United States never supplemented its answer to Interrogatory No. 15 by providing the identity of any witnesses who would support its claims regarding the Offset Defense.

...

> While the statutes authorizing refunds do not specifically empower the
> Commissioner to *reaudit* a return whenever repayment is claimed,
> authority therefore is necessarily implied.

284 U.S. at 283 (Emphasis supplied).

In *Lewis v Reynolds,* the Supreme Court and Tenth Circuit recognized that the statute authorizing refunds (now codified at § 6404) implicitly authorized the IRS to review the taxpayer's entire tax liability for the year and *determine* if there was any money due, including the determination of whether any refund otherwise due should be offset by other liabilities owing to the IRS, but which had not been assessed.

Similarly, in *Allen v. United States*, 51 F.3d 1012 (11th Cir. 1995), where the IRS was permitted to offset the refund of a fraud penalty with otherwise time-barred delinquency and negligence penalties, it was not the Department of Justice which *determined* the existence of an offset, but rather the IRS:

> While the IRS was attempting to extract the fraud penalties from Allen,
> the Tax Court, in *Kotmair v. Commissioner*, 86 T.C. 1253, 1259-1262,
> 1986 WL 22144 (1986) (*en banc*), held that the assessment of such
> penalties in a tax protestor case like Allen's was improper.  In light of
> *Kotmair*, the IRS decided, in December of 1990, to refund the fraud
> penalty assessment.  *The agency concluded*, however, that it was entitled
> to offset about $1,800 from the $6,600 refund by imposing instead,
> delinquency and negligence penalties for the 1975 and 1976 tax years.

51 F.3d at 1013 (emphasis supplied).

Likewise, in *Dysart v. United States*, 340 F.2d 624, 627 (Ct. Cl. 1965), in light of an unfavorable court decision regarding a penalty imposed on the taxpayers,

> [T]he IRS abandoned its previous grounds for disallowance of the refund
> of the penalty but *asserted* that judgment damages, reported as capital gain
> in the 1954 return, should have been taxed as ordinary income and that,
> although the statute of limitations barred the deficiency, it should be used
> as a setoff against the refund due taxpayers.

*Also see Patterson v Belcher*, 302 F.2d 289, 295 (5th Cir. 1962), *amended on other grounds*, 305 F.2d 557, *cert. denied*, 371 U.S. 921 (1962) ("The *Director is entitled* to set off any monies still owing to the government against the amounts claimed for refund." [Emphasis supplied.]); *Fisher v. United States*, 80 F.3d 1576, 1581 (Fed. Cir. 1996) ("*The IRS's right to assert its setoff* covering interest cannot be defeated by reference to the alleged 'equities' ... ."); *Pacific Gas & Electric Company v. United States*, 417 F.3d 1375, 1377 (Fed. Cir. 2005) ("[T]he IRS discovered the interest computation errors ... and *determined* that it had erroneously overpaid PGE $3,370,535 in statutory interest.  The IRS then used [this] amount ... to offset and reduce the tax

and interest … that it refunded to PGE in 1992."); *Loftin and Woodward, Inc. v. United States*, 577 F.2d 1206, 1245 (5th Cir. 1978) ("*Lewis* permits *the Commissioner* to reopen the prior return *to determine* whether there were any deficiencies in that return which were undetected at the time it was filed.")

While the IRS is the agency with exclusive authority to determine if Plaintiff might have owed any additional penalties, the government has not offered any evidence that the IRS had determined that Sala owed additional penalties and that the government was entitled to a setoff. Namely, the government has not offered any evidence that the IRS (1) *determined* that any additional accuracy penalty was due and owing, (2) took any action to accomplish the setoff, or (3) recorded the setoff.  Indeed, we submit that it cannot because there has been no such determination on the part of the IRS, and the "setoff" defense is solely a litigating position raised by the Department of Justice, inconsistent with the IRS's actual determinations in this case.

Dated this 13th day of December, 2007.

s/

_____

DARRELL D. HALLETT
ROBERT J. CHICOINE
JOHN M. COLVIN
CORI E. FLANDERS-PALMER
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs
1011 Western Ave., Suite 803
Seattle, WA 98104 Telephone:
(206) 223-0800
Facsimile: (206) 467-8170
Email:
dhallett@chicoine-hallett.com
jcolvin@chicoine-hallett.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, I electronically filed PLAINTIFFS' FINDINGS OF FACT AND CONCLUSIONS OF LAW using the CM/ECF system, which will send notification to the following:

| | |
|---|---|
| David N. Geier: | David.N.Geier@usdoj.gov |
| Joseph A. Sergi: | Joseph.A.Sergi@usdoj.gov |
| Amy Matchison: | Amy.Matchison@usdoj.gov |

I declare under the penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 13th day of December, 2007.

CHICOINE & HALLETT, P.S.

s/ John M. Colvin
John M. Colvin
Cori Flanders-Palmer
Darrell D. Hallett
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs Carlos E. Sala
and Tina Zanolini-Sala
1011 Western Ave. Suite 803
Seattle WA, 98104
Telephone: (206) 223-0800
Facsimile: (206) 467-8170
Email: cflanders @chicoine-hallett.com
        dhallett @chicoine-hallett.com
        jcolvin @chicoine-hallett.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, I electronically filed PLAINTIFFS'
FINDINGS OF FACT AND CONCLUSIONS OF LAW using the CM/ECF system,
which will send notification to the following:

| | |
|---|---|
| David N. Geier: | David.N.Geier@usdoj.gov |
| Joseph A. Sergi: | Joseph.A.Sergi@usdoj.gov |
| Amy Matchison: | Amy.Matchison@usdoj.gov |

I declare under the penalty of perjury under the laws of the State of Washington
and the United States that the foregoing is true and correct.

DATED this 13th day of December, 2007.

CHICOINE & HALLETT, P.S.

s/ John M. Colvin
John M. Colvin
Cori Flanders-Palmer
Darrell D. Hallett
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs Carlos E. Sala
and Tina Zanolini-Sala
1011 Western Ave. Suite 803
Seattle WA, 98104
Telephone: (206) 223-0800
Facsimile: (206) 467-8170
Email: cflanders @chicoine-hallett.com
        dhallett @chicoine-hallett.com
        jcolvin @chicoine-hallett.com

# ATTACHMENT 1 TO
# PLAINTIFFS' FINDINGS OF FACT AND
# CONCLUSIONS OF LAW

## Exhibit 1
## Data on 24 Designated Options

| ID | OPTION TYPE | BUY/SELL | TRADE DATE | CURRENCY 1 | CURRENCY 2 | STRIKE PRICE | PREMIUM PER UNIT | TOTAL PREMIUM | EXPIRATION DATE |
|---|---|---|---|---|---|---|---|---|---|
| A | EUR CALL/JPY PUT | SELL | 11/27/00 | EUR 117,935,000.00 | JPY 11,545,836,500.00 | 97.90000 | EUR 0.02370 | EUR 2,795,060 | 11/27/2001 |
| B | EUR CALL/JPY PUT | BUY | 11/27/00 | EUR 117,935,000.00 | JPY 11,522,249,500.00 | 97.70000 | EUR 0.02420 | EUR -2,854,027 | 11/27/2001 |
| C | EUR PUT/JPY CALL | SELL | 11/27/00 | EUR 117,935,000.00 | JPY 10,611,791,300.00 | 89.98000 | EUR 0.05600 | EUR 6,604,360 | 11/27/2001 |
| D | EUR PUT/JPY CALL | BUY | 11/27/00 | EUR 117,935,000.00 | JPY 10,625,943,500.00 | 90.10000 | EUR 0.05670 | EUR -6,686,915 | 11/27/2001 |
| G | GBP CALL/JPY PUT | SELL | 11/28/00 | GBP 200,489,500.00 | JPY 32,739,935,350.00 | 163.30000 | GBP 0.01815 | GBP 3,638,884 | 11/27/2001 |
| H | GBP CALL/JPY PUT | BUY | 11/28/00 | GBP 200,489,500.00 | JPY 32,699,837,450.00 | 163.10000 | GBP 0.01840 | GBP -3,689,007 | 11/27/2001 |
| I | GBP PUT/JPY CALL | SELL | 11/28/00 | GBP 200,489,500.00 | JPY 30,151,615,905.00 | 150.39000 | GBP 0.05555 | GBP 11,137,192 | 11/27/2001 |
| J | GBP PUT/JPY CALL | BUY | 11/28/00 | GBP 200,489,500.00 | JPY 30,173,669,750.00 | 150.50000 | GBP 0.05595 | GBP -11,217,388 | 11/27/2001 |
| K | CHF CALL/USD PUT | SELL | 11/27/00 | CHF 403,266,939.00 | USD 235,870,000.00 | 1.70970 | USD 0.04525 | USD 10,673,118 | 11/27/2001 |
| L | CHF CALL/USD PUT | BUY | 11/27/00 | CHF 403,573,570.00 | USD 235,870,000.00 | 1.71100 | USD 0.04560 | USD -10,755,672 | 11/27/2001 |
| M | CHF PUT/USD CALL | SELL | 11/27/00 | CHF 437,774,720.00 | USD 235,870,000.00 | 1.85600 | USD 0.02580 | USD 6,085,446 | 11/27/2001 |
| N | CHF PUT/USD CALL | BUY | 11/27/00 | CHF 437,302,980.00 | USD 235,870,000.00 | 1.85400 | USD 0.02610 | USD -6,156,207 | 11/27/2001 |
| O | EUR CALL/USD PUT | SELL | 11/27/00 | EUR 117,935,000.00 | USD 104,254,540.00 | 0.88400 | EUR 0.04250 | EUR 5,012,238 | 11/27/2001 |
| P | EUR CALL/USD PUT | BUY | 11/27/00 | EUR 117,935,000.00 | USD 104,018,670.00 | 0.88200 | EUR 0.04340 | EUR -5,118,379 | 11/27/2001 |
| Q | EUR PUT/USD CALL | SELL | 11/27/00 | EUR 117,935,000.00 | USD 95,822,187.50 | 0.81250 | EUR 0.03025 | EUR 3,567,534 | 11/27/2001 |
| R | EUR PUT/USD CALL | BUY | 11/27/00 | EUR 117,935,000.00 | USD 95,999,090.00 | 0.81400 | EUR 0.03090 | EUR -3,644,192 | 11/27/2001 |
| S | JPY CALL/USD PUT | SELL | 11/27/00 | JPY 12,442,142,500.00 | USD 117,935,000.00 | 105.50000 | USD 0.04985 | USD 5,879,060 | 11/27/2001 |
| T | JPY CALL/USD PUT | BUY | 11/27/00 | JPY 12,453,936,000.00 | USD 117,935,000.00 | 105.60000 | USD 0.05035 | USD -5,938,027 | 11/27/2001 |
| W | JPY PUT/USD CALL | SELL | 11/27/00 | JPY 13,609,699,000.00 | USD 117,935,000.00 | 115.40000 | USD 0.01255 | USD 1,480,084 | 11/27/2001 |
| X | JPY PUT/USD CALL | BUY | 11/27/00 | JPY 13,586,112,000.00 | USD 117,935,000.00 | 115.20000 | USD 0.01290 | USD -1,521,362 | 11/27/2001 |
| E | GBP CALL/JPY PUT | BUY | 11/20/00 | GBP 183,600.00 | JPY 29,743,200.00 | 162.00000 | GBP 0.00733 | GBP -1,345 | 2/20/2001 |
| F | GBP CALL/JPY PUT | BUY | 11/20/00 | GBP 1,418,400.00 | JPY 229,780,800.00 | 162.00000 | GBP 0.00510 | GBP -7,234 | 2/20/2001 |
| U | JPY PUT/USD CALL | SELL | 11/24/00 | JPY 241,368,000.00 | USD 2,136,000.00 | 113.00000 | USD 0.00100 | USD 2,136 | 12/1/2000 |
| V | JPY PUT/USD CALL | BUY | 11/24/00 | JPY 239,232,000.00 | USD 2,136,000.00 | 112.00000 | USD 0.00288 | USD -6,141 | 12/1/2000 |

Note: EUR = Euro; JPY = Japanese Yen; GBP = British Pound; CHF = Swiss Franc; USD = U.S. Dollar

Expert Report of Robert W. Kolb    December 12, 2006    Exhibits   1