IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 05-cv-00636-LTB-KLM

CARLOS E. SALA and
TINA ZANOLINI-SALA,

          Plaintiffs,

   v.

UNITED STATES OF AMERICA,

          Defendant.

_____

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
_____

      Defendant, the United States of America ("United States"), submits its Proposed Findings of Fact and Conclusions of Law in the above-captioned case.

**PROPOSED FINDINGS OF FACT**

<u>Overview</u>

    1.    Carlos Sala[1] exercised company stock options in 2000 that, when combined with his other income that year, resulted in taxable income in excess of $60 million.   Mr. Sala spent the later part of 1999 and most of 2000 searching for a way to avoid the payment of approximately $23 million of taxes due.  He settled upon an illegal tax shelter transaction, the Deerhurst Transaction, which purported to generate $60 million of phony losses in a matter of weeks.  As a result of those phony losses, Mr. Sala paid no federal income taxes on his $60 million income.

_____

[1]    Tina Zanolini-Sala is a named plaintiff only because the Salas filed a joint tax return. Hereafter "Plaintiff" will refer to the activities of Carlos Sala.

2.      On October 23, 2000 Mr. Sala entered into the Deerhurst Transaction.  Mr. Sala claims that the Deerhurst Transaction was marketed to him as an opportunity for investment in foreign currency through a program that did not strictly adhere to any particular trading formula or system (the "Diversified Strategy"[2]).  Mr. Sala concedes that he also entered into the transaction to generate predetermined tax losses in amounts selected by him.

3.      Mr. Sala agreed to invest nearly $9 million dollars (the required deposit was 15% of the tax losses he sought in the transaction) and to pay exorbitant expenses and management fees (in 2001 alone, Mr. Sala incurred fees totaling several million dollars), some of them calculated on four times the amounts actually invested, all in exchange for a promised $60 million tax loss.

4.      Mr. Sala concedes that, in the currency trades that resulted in the tax loss (the "Tax Trades"), he had no risk beyond the loss of his initial investment – that initial investment of $728,000 resulted in an immediate tax benefit of over $23 million.

5.      The Deerhurst Transaction involved a series of carefully constructed and tax motivated steps entered into by approximately 30 individuals who collectively sought and obtained $161,345,553.33 in ordinary losses and $102,250,000 in capital losses, each for their 2000 tax year.  Mr. Sala was the largest single participant in the Deerhurst Transaction.

6.      The tax strategy involved the purported creation of phony losses by having participants contribute offsetting long and short foreign currency option positions to a partnership through an S Corporation.  Each S Corporation was created solely for the purpose to artificially inflate each participant's basis[3] by disregarding the obligation for the short positions,

---

[2]      The Diversified Strategy was a discretionary trading program in foreign currency.
[3]      Tax professionals often use the terms "outside basis" and "inside basis" in connection with partnerships (or S Corporations).  "Outside basis" is the partner's basis in his or her own

and then terminating the partnership in such a way as to shift the non-economic loss attributable to the artificially inflated basis to foreign currency.  To create an ordinary loss, which Mr. Sala needed to offset ordinary income from the exercise of his stock-options, Mr. Sala was supposed to receive "property," in this case foreign currency trades, in liquidation of his partnership interest.  This would then allow him to claim an ordinary loss under 26 U.S.C. Section 988, which provides for ordinary rather than capital losses upon the disposition of foreign currency. In fact, Mr. Sala received the full value of his partnership interest in U.S. dollars.

7.      As outlined below, Mr. Sala is not entitled to the phony losses allegedly generated by this transaction based upon the application of the tax statutes and regulations and long-standing doctrines governing tax-motivated transactions.

**Carlos Sala**

8.      By all accounts, including his own, Mr. Sala was an extremely sophisticated investor who paid attention to all the details of financial transactions both in his professional and personal life.   His skills included financial analysis and forecasting.

9.      His resume includes work as a mergers and acquisitions manager for Ernst & Young, a CPA license, and a background in performing financial and legal due diligence for companies that either employed him or retained his services.

10.     Mr. Sala was the Chief Financial Officer of Abacus Direct.  Abacus Direct was a database marketing firm that acquired and sold consumer purchasing data to direct marketers.  In 1999 the company was acquired by Double-Click.  During 1999, and at the time of that sale of Abacus to Double-Click, Mr. Sala knew that his company stock options, a large component of

---

partnership interest, while the partnership's basis in its assets is referred to as "inside basis."  *See Gindes v. United States*, 661 F.2d 194, 197 n.9 (Ct. Cl. 1981).

2904800.10

his salary, would generate substantial income for him when sold.  And in late 1999, Mr. Sala intended to exercise his employee stock options in early 2000, when he was no longer restricted from doing so.

11.     Not only was Mr. Sala aware of the magnitude of the income that the exercise of the options would generate but he also was aware of the resulting tax liability that he would incur for tax year 2000.  These are matters he was able to calculate and in fact discussed with his financial advisors in 1999 and 2000.

12.     At the time he entered into the shelter, Mr. Sala had brokerage accounts and longstanding relationships with major investment advisory firms, including Goldman Sachs and Morgan Stanley.  Up to this time, Sala had made his personal investments through these large financial institutions and had even forced these financial powerhouses to compete for his business, often on a trade-by-trade basis, in order to reduce his transaction costs.  Despite these relationships, he did not consult with these known and trusted advisors about the Deerhurst Transaction or its implication to his other investments.

13.     Before entering into the Deerhurst Transaction, Mr. Sala had undertaken a search for a tax shelter not only on his own behalf but also on behalf of his fellow officers and close friends at Abacus, Martin White (CEO) and Christopher Dice (President) who were also facing enormous tax bills associated with their work at Abacus Direct.  Messrs. White and Dice, at least in part, relied upon Mr. Sala to advise them.

2904800.10

**PriceWaterhouseCoopers and John Raby**

14.     PriceWaterhouseCoopers ("PWC") was Mr. Sala's accountant and tax return preparer for years 1997, 1998, and 1999.  PWC's work on Mr. Sala's 1999 return was performed in 2000.

15.     John Raby was a manager with PWC in 1999 and 2000 but was not involved in the preparation of Mr. Sala's tax returns.  During this period, however, Mr. Raby worked with Mr. Sala to locate a tax shelter.

16.     According to Mr. Raby, by February 2000 PWC refused to place any of its own clients into tax-motivated shelter transactions.  Despite this, and without PWC's knowledge, Mr. Raby, continued to work with Mr. Sala on the side, without charging him an hourly fee, to locate tax shelter opportunities.  Correspondence from Mr. Sala was sent to Mr. Raby's personal residence and not to his PWC office.  Mr. Sala intended that Mr. Raby be compensated if Mr. Raby was able to locate a shelter transaction.

17.     Although Mr. Sala had been happy and satisfied with the tax return preparation work and advice of PWC, due to PWC's decision to refrain from future involvement in highly questionable tax shelter tax transactions, Mr. Sala now felt that PWC was no longer sufficiently qualified to work on his tax returns for future years, including his 2000 tax year.  Mr. Sala severed his relationship with PWC.

18.     After a number of shelter opportunities were reviewed, Mr. Raby eventually helped place Mr. Sala into the Deerhurst Transaction for which Mr. Raby received a substantial commission.  Mr. Raby's commission was paid by the Deerhurst principals and was calculated based upon the amount of tax losses sought by individuals Mr. Raby referred.  Mr. Raby's

referrals included Messrs. Sala, White and Dice and he was paid nearly $1 million from the Deerhurst principals on account of these referrals.

**KPMG and Tracie Henderson**

19.     Mr. Sala first met KPMG partner Tracie Henderson through Tim Gillis, an old friend of his.[4]  Mr. Sala and Ms. Henderson met in Texas on October 28, 1999, at a meeting arranged by Mr. Gillis.

20.     Mr. Gillis was a partner with KPMG and Tracie Henderson was a certified public accountant and a partner with KPMG in Atlanta, Georgia.

21.     Mr. Sala ultimately retained Ms. Henderson and KPMG to prepare his federal and state income tax returns for the years 2000, 2001, 2002, and 2003.  During 1999, 2000, 2001, 2002, and 2003, Ms. Henderson was the partner at KPMG responsible for Mr. Sala's account.

22.     According to Mr. Sala's recollection of events, he claims that although he traveled to Texas to meet Ms. Henderson who had experience marketing tax shelters for KPMG, his desire to keep his financial matters private would have precluded any discussion of his financial situation with Ms. Henderson nor would he have discussed his need to shelter income until after he developed a business relationship with Ms. Henderson.  However, contradicting Mr. Sala's testimony is an email Ms. Henderson sent on November 2, 1999, to Mr. Gillis and Mr. Sala regarding their initial meeting a few days earlier.  According to the email, Ms. Henderson and Mr. Sala spoke about a tax shelter option strategy that KPMG was researching, another tax

---

[4]     Because of an ongoing federal criminal investigation involving tax shelters, Ms. Henderson has asserted her Fifth Amendment Rights and has declined to provide testimony in connection with this lawsuit

2904800.10

shelter strategy called OPIS (offshore portfolio investment strategy[5]) and other matters relating to Mr. Sala's finances.

23.    From the period October 1999 through October 2000, Ms. Henderson presented to Mr. Sala, or spoke with him about, several tax shelter strategies, including, as with the instant case, shelters already identified by the IRS as illegal tax shelters.

24.    One of the transactions that Ms. Henderson presented to Mr. Sala was a tax shelter that involved a taxpayer purportedly borrowing money at a premium, contributing the proceeds of the borrowing and the obligation to repay to a partnership, and the partnership assuming the indebtedness.  KPMG's name for this transaction was BLIPS2000 or a Bond Linked Issue Premium Structure ("BLIPS") shelter transaction.  In connection with the BLIPS2000 transaction, and at Mr. Sala's instruction, Ms. Henderson contacted David Amir Makov to inquire about the economics of the transaction.  An internal KPMG memorandum reported on communications between Mr. Sala's counsel and KPMG about Mr. Sala's request to change the terms of the shelter engagement letter to delete any reference to the IRS challenging "the program."  According to KPMG records, the fee it would charge Mr. Sala for the BLIPS2000 transaction was to be $700,000.  KPMG's records indicate that Mr. Sala agreed to enter into the BLIPS2000 transaction on or about June 6, 2000.  However, Mr. Sala disputes that he ever agreed to enter into this particular transaction.  Among the several reasons given by Mr. Sala for not entering into the BLIPS2000 transaction was his disagreement over the timing of the

---

[5]    OPIS is an abusive tax shelter product designed to create large, seemingly real losses to be used for tax sheltering. This tax shelter involves creating a shell company, which enters into a long chain of sophisticated and complex financial investments. These investments usually create fake accounting losses that are more than 100 times larger than the real financial loss.  Ultimately, these large losses are then used to offset legitimate capital gains, allowing the tax shelter's creators to pay less tax.

2904800.10

expected devaluation of the foreign currency involved in that transaction.  Mr. Sala did not object to the amount of the "fees."

25.      On August 13, 2000, the IRS released Notice 2000-44 (the "Notice") which described abusive tax shelter arrangements designed to give taxpayers artificially high bases, in an entity such as a partnership, through the transfer of long and short options to that partnership and thereby giving rise to deductions for noneconomic losses on disposition of those partnership interests.  This Notice also described a variation on this tax shelter involving a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness in place of the option transactions.  The Notice also required promoters of abusive shelters to report the identity of participants to the IRS.  Mr. Sala concedes the publication of this Notice was a factor in his decision not to enter the BLIPS2000 shelter.

26.      On August 18, 2000, Ms. Henderson emailed Mr. Sala a chronology titled "Timing of the Transaction" which set forth the dates on which each step of the BLIPS2000 transaction would occur.

27.      On August 31, 2000, 18 days after the IRS issued Notice 200-44, Mr. Gillis emailed Ms. Henderson regarding a conversation he had with Mr. Sala stating that "they are rethinking what if anything they should do."  Six days later, Ms. Henderson emailed Mr. Gillis stating that she had just gotten off the telephone with Mr. Sala and that "he said he would do a transaction with [KPMG] if we are able to do one.  Otherwise, he will use us as an advisor on another transaction.  We are hoping to do a Jones Day transaction for Carlos Sala."

28.      On September 6, 2000, Ms. Henderson emailed Mr. Gillis stating that she had just spoken with Mr. Sala and that "we are hoping to do a Jones Day transaction [. . . ] However, it

appears that Jones Day may be getting cold feet; they are having second thoughts about writing the opinion letter."

29.     On September 14, 2000, Ms. Henderson met with Mr. Sala's and Mr. White's investment advisor at Morgan Stanley, Bruce Amman, to "discuss investment."  Mr. Sala was billed for the cost of the meal.

**Carlos Sala's Deerhurst Advisors**

*Michael Schwartz*

30.     The Deerhurst Transaction was the creation of Michael Schwartz, a former KPMG partner and tax specialist.  While Mr. Schwartz has greatly downplayed his role in this shelter, asserting that others came up with the plan, Mr. Schwartz conceived, developed, and marketed the transaction.  Mr. Schwartz who created the marketing materials and sold the transaction to investors or their representatives[6] is the sole connection to all of the necessary resources that brought the shelter transaction together.

31.     Mr. Schwartz's unwillingness to fully acknowledge his role in establishing this transaction is one indication of its lack of true *bona fides*.

32.     Mr. Schwartz, through his business contacts, had access to wealthy clients and their financial advisors.  Mr. Raby was one of these financial advisors.  Mr. Raby, while still working for PWC, agreed to work for Mr. Schwartz and his company, MultiNational Strategies, LLC.

---

[6]     It is interesting to note that counsel retained to develop the transaction's organic documents was surprised to see marketing materials that were shown to investors that he had not seen.

2904800.10

33.     Mr. Schwartz also had contacts with attorney Raymond J. Ruble, a criminal defendant in *U.S. v. Stein*, a criminal tax case pending in the Southern District of New York.[7] Mr. Schwartz enlisted Mr. Ruble to prepare a draft tax opinion that would attest to the legality of the shelter and which could be "sold" to investors for fees ranging up to $100,000 per investor.

34.     In order to enlist Mr. Sala, the largest single investor into the transaction, Mr. Schwartz agreed to pay a portion of Mr. Ruble's fees for Mr. Sala.

35.     Mr. Schwartz advised Mr. Sala, contrary to the advice of Mr. Sala's tax attorney, Laurence Nemirow, that the transaction was not described in IRS Notice 2000-44, the same Notice that covered the BLIPS2000 shelter to which Mr. Sala had committed.

36.     Mr. Schwartz's position on IRS Notice 2000-44 was critical to Mr. Sala because Mr. Sala understood that if Mr. Schwartz took the position that the Notice applied, Mr. Schwartz would be required to report the transaction, including the identity of its participants, to the IRS.

37.     Mr. Schwartz borrowed funds from Andrew Krieger to enter the Deerhurst Transaction.

*Andrew Krieger*

38.     Andrew Krieger had extensive experience as a foreign currency trader at the time of the Deerhurst Transaction.  His work for a large financial institution ended with a dispute over fees.

39.     In the years leading up to the creation of the Deerhurst Transaction, Mr. Krieger was attempting to build his own financial trading program and solicit investors.  Despite past success, he had been trading under an exclusive contractual relationship with a single individual

---

[7]     Not surprisingly, in light of the criminal proceeding, Mr. Ruble has refused to testify about his role in the shelter transaction.

investor.  That relationship ended in 1999 when, according to Mr. Krieger, the investor suffered financial hardships and terminated their relationship.

40.     Although Mr. Krieger had an extensive background in foreign currency trading, his trading results for 1999 and 2000 were lackluster and reflected very little activity and a lack of clients.  For several months in 1999, Mr. Krieger reported no trading activity and his overall trading returns in 2000, prior to the Deerhurst Transaction, were negative.

*Brown & Wood LLP and R.J. Ruble*

41.     On October 6, 2000, Mr. Sala sent Ms. Henderson a September 15th draft opinion letter from Brown & Wood LLP prepared by attorney Ruble.  The draft was titled "Re: Investments in Foreign Currency."  This same day, Ms. Henderson billed Mr. Sala $450 for a one-hour discussion of this "new strategy."

42.     Mr. Ruble worked with Mr. Schwartz to prepare a draft tax opinion letter to help market the Deerhurst Transaction to investors.  At least one other law firm refused to provide a legal opinion to Mr. Schwartz regarding Mr. Sala's Deerhurst Transaction.[8]

43.     The September 15th draft was an earlier iteration of the Ruble opinion that Mr. Sala would rely upon to support the phony tax losses and expenses he claims arising from his participation in the Deerhurst Transaction.

*October 2000*

44.     On October 9, 2000, Ms. Henderson sent an internal email stating as follows: "Sala talked to Beckett Cantley [a tax attorney then practicing with the small Atlanta law firm of Rachelson & White] about Mr. Ruble's option strategy and he likes it.  He has seven clients doing the transaction.  Carlos [Sala] wants me to talk to him tomorrow at 1:00.  Hopefully, I can

---

[8]     Mr. Sala was confronted with the same problem when a law firm he had contacted refused to pass favorably on the proposed tax losses arising from the Deerhurst Transaction.

2904800.10

talk to R.J. Ruble first.  Carlos doesn't seem inclined to [enter into the] CTF [Common Trust Fund Shelter].  He must decide about this other transaction by Friday."

45.     On October 9, 2000, Ms. Henderson's billing records state that she read the Brown & Wood opinion letter for the Deerhurst Transaction; called Ruble, the opinion writer; and discussed the contents of that call with Mr. Sala, billing Mr. Sala $2,500 for those 5 hours of work.

46.     On October 10, 2000, Ms. Henderson made a telephone call to Beckett Cantley, an attorney who later became a Deerhurst Transaction participant, regarding the Deerhurst Transaction, and billed Mr. Sala $900 for the two-hour call.

47.     On October 11, 2000, Ms. Henderson referred Mr. Sala to attorney Bruce N. Lemmons (then practicing with the law firm of Holland & Hart) and sought "investment help" for Sala from David Amir Makov, a criminal defendant in *U.S. v. Stein*.  Mr. Sala was billed $450 for Ms. Henderson's effort.  The next day, Ms. Henderson had a one-hour telephone call with Makov, billing Mr. Sala an additional $450 for that discussion.

48.     On October 13, 2000, Ms. Henderson had a 1.5 hour telephone call with Mr. Lemmons, and billed Mr. Sala $675 for that discussion.  Mr. Sala paid Mr. Lemmons' firm, Holland & Hart, $4,200 in professional fees for its role in the Deerhurst Transaction.

49.     On November 3, 2000, Ms. Henderson presented Mr. Sala with another tax shelter transaction, the POPS transaction.  This transaction is described in IRS Notice 2002-65, 2002-2 C.B. 690, as an abusive tax shelter.  Mr. Sala was billed $450 for this discussion.

**The Deerhurst Transaction**

*The Required Steps*

50.     According to the marketing materials presented to Mr. Sala, the tax losses were to be created by following precise pre-determined steps:

  1)  Mr. Sala and the other participants would each open a foreign currency trading test account in their own names for a one-month test period (Step 1);

  2)  after this test period, Mr. Sala and the other shelter participants purchasing ordinary tax losses were each **required** to deposit a total of 15% of the expected ordinary loss (or, in the case of participants purchasing capital losses, 10% of the expected capital loss) and were advised that due to increased leverage (risk) that the shelter would employ in its trading, should form an S corporation (in Mr. Sala's case, Solid Currencies, Inc.) to shield themselves from any personal liability.  Because Mr. Sala was demanding a tax loss of $60 million to offset a like amount of taxable income, his required deposit was nearly $9 million;

  3)  The participants, including Mr. Sala, were then required to make additional contributions to the test account, which would include certain trades that had been purposefully undertaken in their own names consisting of nearly offsetting long and short options on foreign currency, to their respective S Corporations.  Those contributions would in turn immediately be transferred to the same general partnership (Deerhurst Investors, GP), all for the purpose of creating a tax basis equal to the face amount of the long positions, but not reduced

by the face amount of the nearly offsetting short options.  The participants who

elected capital losses did not transfer their trades into the General Partnership; and

    4)  the shelter would be liquidated "[a]t year end," thereby generating either

"a large capital loss" via the "liquidation of the S Corp." to those participants

seeking capital losses, or, in Mr. Sala's case, a "large ordinary loss" by the

liquidation out of the partnership [Deerhurst Investors, GP] to the Sub S

Corporation [Solid Currencies] prior to roll-up."

51.      Mr. Sala's close friend, Mr. White, who entered the transaction at Mr. Sala's

recommendation, sought both ordinary and capital losses.  Mr. White entered into two duplicate

transactions with two separate "test accounts" that each contributed offsetting positions to two

separate S Corporations formed for the specific purpose of obtaining ordinary and capital losses

respectively.

*Timing of the tax losses*

52.      Each of the Deerhurst participants, including Mr. Sala, was told that the tax losses

would be generated in 2000 to offset their enormous income for that year.  Mr. Krieger, the

trader responsible for the foreign currency option positions that generated the losses, understood

this as well.   Each of the participants, including Mr. Sala, needed the losses to occur in 2000.

The representation as to the timing of the losses was made orally by Mr. Schwartz and in writing

in the marketing material Mr. Schwartz prepared for the transaction and presented to Mr. Sala.

The representations were made to other investors as well.

53.      In order to generate the phony tax losses Mr. Sala was required to transfer the

offsetting option positions to his S Corporation, then to Deerhurst Investors, GP, which was then

to be liquidated and "property" (not U.S. dollars) was to be transferred back to Mr. Sala's S Corporation.

54.     Mr. Schwartz testified that the liquidation of positions occurred to avoid the illiquidity of holding foreign currency positions into the new year.

55.     Mr. Krieger testified that liquidation served to ease the burden of administering the transaction.  According to Mr. Krieger, because the transaction required the formation of a new entity, Deerhurst Trading Company, LLC, to carry out trades *after* the tax losses were generated, it was more efficient if the member's contributions to Deerhurst Trading Company were made in dollars as opposed to varying trading positions.

56.     Mr. Krieger's testimony on this point is not credible.  Approximately one month before year's end, each participant was *required* to contribute trading positions (not U.S. dollars) into Deerhurst Investors, General Partnership to be able to generate basis in both the S Corporations and in Deerhurst Investors, General Partnership.

57.     Mr. Schwartz's explanation of illiquidity, although referenced in the legal opinion letter he helped Mr. Sala obtain from R.J. Ruble, was contradicted by Mr. Krieger.  Mr. Krieger testified that there was no trading reason to "go to cash" at year's end —the currency options were liquid and volatility was not a concern.

58.     Mr. Krieger testified that he was instructed by a non-trader, his office manager Peter Molyneaux, to liquidate the positions held by Deerhurst Investors before year's end.  Mr. Krieger did what he was told.

59.     Although a variety of reasons have been given for the liquidation of the positions, none are or legitimate business reasons.  In fact, the positions were purchased with the predetermined plan to be liquidated, regardless of market conditions, at year's end.

2904800.10

*Actual Events*

60.     Mr. Sala took the first predetermined step of the Deerhurst Transaction on or about October 23, 2000, by making an initial deposit of $500,000 into a personal account at Refco Capital Markets ("Refco").  This account was managed by Mr. Krieger's Deerhurst Management Company, Inc. ("Deerhurst").

61.     Mr. Sala's personal account was labeled by Deerhurst as a test account.  The stated purpose of the test account was to help a participant determine if he or she wished to commit additional funds to the Deerhurst Transaction and commit to a long term trading program.  A $500,000 minimum deposit was required to enter the test period.

62.     The actual purpose of the test account was to fashion a reason for the participants, including Mr. Sala, to acquire positions in their own names, so that the subsequent and required transfers of these positions could establish a tax basis for the phony losses that would be claimed by year's end.

63.     On November 21, 2000, Mr. Sala took the second predetermined step of the transaction and placed an additional $8,425,000 into his personal account at Refco managed by Deerhurst.  Mr. Sala took this step even though there had been only 30 days of  actual trades and he had obtained only one financial report reflecting one week's worth of results (indicating that his account had increased from $500,000 to $502,121, as of October 31, 2000 - *i.e.* a *de minimis* gain of less than one-half percent) and he had not even having reviewed the financial report at the time.

64.     The total amount Mr. Sala deposited now equaled the necessary deposit of 15% of his expected $60,000,000 tax deduction.

65.     From November 24, 2000, through November 28, 2000, and even though Solid Currencies, Inc., an S Corporation, had already been created for the stated purpose of shielding Mr. Sala from personal liability, Mr. Sala, personally entered into a number of pairs of offsetting foreign currency option contracts (collectively, the "Tax Trades") consisting of certain long positions (with a purchase price of $60,987,866.79) and nearly offsetting short positions (with a sale price of $60,259,568.94), at a net cost to him of approximately $728,297.85.  These one-year foreign currency options were all liquidated by mid-December.

66.     The Tax Trades included both call option pairs and put option pairs, as well as one unpaired option.  For each of the option pairs, the option purchased by Mr. Sala would be exercisable if the option sold by the taxpayer would be exercisable.  Thus, in all cases of paired options, if the taxpayer was obligated to make a fixed payment to the option purchaser, the taxpayer would also have a right under the offsetting purchased option to receive a fixed payment.  For each of the pairs the component long and short options are rightfully considered single transactions.  Further, for each of the option pairs, there was, at least in theory, an extremely remote range of currency prices for which the taxpayer would receive a payment but not have to make a payment.  In actuality, given that Mr. Sala's counterparty, who would be making a large payment but not receiving an offsetting payment, was the party who would determine whether the market price on the exercise date fell within that small range, the probability that Mr. Sala would receive a large payment but not make an offsetting payment was essentially zero.  The specifics of the options trading were as follows:

1)     Pair 1 was a pair of options on the currency pair of the U.S. dollar (USD) (call) and the Swiss franc (CHF) (put).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was

less than 1.8540 CHF per USD, the purchased position would lapse unexercised. If the exchange rate on that date was greater than or equal to 1.8540 CHF per USD, the purchased position would be exercisable, and Sala would be entitled to pay 437,302,980 CHF to receive $235,870,000 USD from the counterparty, Refco. Sala claims to have paid $6,156,207 USD for this purchased option. The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was less than 1.8560 CHF per USD, the sold position would lapse unexercised. If the exchange rate on the termination date was greater than or equal to 1.8560 CHF per USD, the sold position would be exercised and Sala would be required to pay $235,870,000 USD to Refco in exchange for 437,774,720 CHF. Sala claims to have received $6,085,446 USD for this sold option. If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 471,470 CHF. The actual cost to Mr. Sala for Pair 1 was $70,761 USD. This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

2)      Pair 2 was a pair of options on the currency pair of the USD (put) and the CHF (call). The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was greater than 1.7110 CHF per USD, the purchased position would lapse unexercised. If the exchange rate on that date was less than or equal to 1.7110 CHF per USD, the purchased position would be exercisable, and Sala would be entitled to pay $235,870,000 USD to receive 403,573,570 CHF from Refco. Sala claims to have paid $10,755,672 USD for this purchased option. The terms relating to the sold option

2904800.10

were that if the exchange rate on November 27, 2001, the termination date, was greater than 1.7097 CHF per USD, the sold position would lapse unexercised.  If the exchange rate on the termination date was less than or equal to 1.7097 CHF per USD, the sold position would be exercised and Sala would be required to pay 403,266,939  CHF to Refco in exchange for $235,870,000 USD.  Sala claims to have received $10,673,118 USD for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 306,631 CHF.  The net premium paid by Sala for Pair 2 was $82,554 USD.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

Because Pair 1 and Pair 2 involve the same currency pairs, expire on the same date, and have exchange strike rates as described above, if either option (or both options) in Pair 1 is exercisable, neither option in Pair 2 will be exercisable, and vice versa.

3)     Pair 3 was a pair of options on the currency pair of the USD (call) and the Japanese yen (JPY) (put).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was less than 115.20 JPY per USD, the purchased position would lapse unexercised.  If the exchange rate on that date was greater than or equal to 115.20 JPY per USD, the purchased position would be exercisable, and Sala would be entitled to pay 13,586,112,000 JPY to receive $117,935,000 USD from Refco.  Sala claims to have paid $1,521,362 USD for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination

date, was less than 115.40 JPY per USD, the sold position would lapse unexercised.  If the exchange rate on the termination date was greater than or equal to 115.40 JPY per USD, the sold position would be exercised and Sala would be required to pay $117,935,000 USD to Refco in exchange for 13,609,699,000 JPY.  Sala claims to have received $1,480,084 USD for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 23,587,000 JPY.  The net premium paid by Sala for Pair 3 was $41,278 USD.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

4)      Pair 4 was a pair of options on the currency pair of the USD (put) and the JPY (call).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was greater than 105.60 JPY per USD, the purchased position would lapse unexercised.  If the exchange rate on that date was less than or equal to 105.60 JPY per USD, the purchased position would be exercisable, and Sala would be entitled to pay $117,935,000 USD to receive 12,453,936,000 JPY from Refco.  Sala claims to have paid $5,938,027 USD for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was greater than 105.50 JPY per USD, the sold position would lapse unexercised.  If the exchange rate on the termination date was less than or equal to 105.50 JPY per USD, the sold position would be exercised and Sala would be required to pay 12,442,142,500 JPY to Refco in exchange for $117,935,000 USD.  Sala claims to have received $5,879,060 USD for this sold option.  If the sold position was

exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 11,793,500 JPY.  The net premium paid by Sala for Pair 4 was $58,967 USD.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

Because Pair 3 and Pair 4 involve the same currency pairs, expire on the same date, and have exchange strike rates as described above, if either option (or both options) in Pair 3 is exercisable, neither option in Pair 4 will be exercisable, and vice versa.

5)      Pair 5 was a pair of options on the currency pair of the Euro (EUR) (put) and the JPY (call).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was greater than 90.1000 JPY per EUR, the purchased position would lapse unexercised.  If the exchange rate on that date was less than or equal to 90.1000 JPY per EUR, the purchased position would be exercisable, and Sala would be entitled to pay 117,935,000 EUR to receive 10,625,943,500 JPY from Refco.  Sala claims to have paid 6,686,915 EUR for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was greater than 89.9800 JPY per EUR, the sold position would lapse unexercised.  If the exchange rate on the termination date was less than or equal to 89.9800 JPY per EUR, the sold position would be exercised and Sala would be required to pay 10,611,791,300 JPY to Refco in exchange for 117,935,000 EUR. Sala claims to have received 6,604,360 EUR for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be

exercisable, and Sala would receive a net 14,152,200 JPY.  The net premium paid by Sala for Pair 5 was 82,555 EUR.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

6)      Pair 6 was a pair of options on the currency pair of the EUR (call) and the JPY (put).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was less than 97.7000 JPY per EUR, the purchased position would lapse unexercised.  If the exchange rate on that date was greater than or equal to 97.7000 JPY per EUR, the purchased position would be exercisable, and Sala would be entitled to pay 11,522,249,500 JPY to receive 117,935,000 EUR from Refco.  Sala claims to have paid 2,854,027 EUR for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was less than 97.9000 JPY per EUR, the sold position would lapse unexercised.  If the exchange rate on the termination date was greater than or equal to 97.9000 JPY per EUR, the sold position would be exercised and Sala would be required to pay 117,935,000 EUR to Refco in exchange for 11,545,836,500 JPY.  Sala claims to have received 2,795,060 EUR for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 23,587,000 JPY.  The net premium paid by Sala for Pair 6 was 58,967 EUR.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

Because Pair 5 and Pair 6 involve the same currency pairs, expire on the same date, and have exchange strike rates as described above, if either option (or

both options) in Pair 5 is exercisable, neither option in Pair 6 will be exercisable, and vice versa.

7)      Pair 7 was a pair of options on the currency pair of the EUR (put) and the USD (call).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was greater than $0.8140 USD per EUR, the purchased position would lapse unexercised.  If the exchange rate on that date was less than or equal to 0.8140 USD per EUR, the purchased position would be exercisable, and Sala would be entitled to pay 117,935,000 EUR to receive $95,999,090.00 USD from Refco.  Sala claims to have paid 3,644,192 EUR for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was greater than $0.8125 USD per EUR, the sold position would lapse unexercised.  If the exchange rate on the termination date was less than or equal to $0.8125 USD per EUR, the sold position would be exercised and Sala would be required to pay $95,822,187.50 USD to Refco in exchange for 117,935,000 EUR.  Sala claims to have received 3,567,534 EUR for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net $176,902.50 USD.  The net premium paid by Sala for Pair 7 was 76,658 EUR.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

8)      Pair 8 was a pair of options on the currency pair of the EUR (call) and the USD (put).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was less than $0.8820 USD per

2904800.10

EUR, the purchased position would lapse unexercised.  If the exchange rate on that date was greater than or equal to $0.8820 USD per EUR, the purchased position would be exercisable, and Sala would be entitled to pay $104,018,670 USD to receive 117,935,000 EUR from Refco.  Sala claims to have paid 5,118,379 EUR for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was less than $0.8840 USD per EUR, the sold position would lapse unexercised.  If the exchange rate on the termination date was greater than or equal to $0.8840 USD per EUR, the sold position would be exercised and Sala would be required to pay 117,935,000 EUR to Refco in exchange for $104,254,540  USD.  Sala claims to have received 5,012,238 EUR for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net $235,870 USD.  The net premium paid by Sala for Pair 8 was 106,141 EUR.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

Because Pair 7 and Pair 8 involve the same currency pairs, expire on the same date, and have exchange strike rates as described above,  if either option (or both options) in Pair 7 is exercisable, neither option in Pair 8 will be exercisable, and vice versa.

9)      Pair 9 was a pair of options on the currency pair of the JPY (call) and the British pound (GBP) (put).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was greater than 150.50 JPY per GBP, the purchased position would lapse unexercised.  If the

2904800.10

exchange rate on that date was less than or equal to 150.50 JPY per GBP, the purchased position would be exercisable, and Sala would be entitled to pay 200,489,500 GBP to receive 30,173,669,750 JPY from Refco.  Sala claims to have paid 11,217,388 GBP for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was greater than 150.39 JPY per GBP, the sold position would lapse unexercised.  If the exchange rate on the termination date was less than or equal to 150.39 JPY per GBP, the sold position would be exercised and Sala would be required to pay 30,151,615,905 JPY to Refco in exchange for 200,489,500 GBP. Sala claims to have received 11,137,192 GBP for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 22,053,845 JPY.  The net premium paid by Sala for Pair 9 was 80,196 GBP.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

10)      Pair 10 was a pair of options on the currency pair of the JPY (put) and the GBP (call).  The terms relating to the purchased option were that if the exchange rate on November 27, 2001, the termination date, was less than 163.10 JPY per GBP, the purchased position would lapse unexercised.  If the exchange rate on that date was greater than or equal to 163.10 JPY per GBP, the purchased position would be exercisable, and Sala would be entitled to pay 32,699,837,450 JPY to receive 200,489,500 GBP from Refco.  Sala claims to have paid 3,689,007 GBP for this purchased option.  The terms relating to the sold option were that if the exchange rate on November 27, 2001, the termination date, was less than 163.30

JPY per GBP, the sold position would lapse unexercised.  If the exchange rate on the termination date was greater than or equal to 163.30 JPY per GBP, the sold position would be exercised and Sala would be required to pay 200,489,500 GBP to Refco in exchange for 32,739,935,350 JPY.  Sala claims to have received 3,638,884 GBP for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 40,097,900 JPY.  The net premium paid by Sala for Pair 10 was 50,123 GBP.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

Because Pair 9 and Pair 10 involve the same currency pairs, expire on the same date, and have exchange strike rates as described above, if either option (or both options) in Pair 9 is exercisable, neither option in Pair 10 will be exercisable, and vice versa.

11)     Pair 11 was a pair of options on the currency pair of the USD (call) and the JPY (put).  The terms relating to the purchased option were that if the exchange rate on December 1, 2000, the termination date, was less than 112.00 JPY per USD, the purchased position would lapse unexercised.  If the exchange rate on that date was greater than or equal to 112.00 JPY per USD, the purchased position would be exercisable, and Sala would be entitled to pay 239,232,000 JPY to receive $2,136,000 USD from Refco.  Sala claims to have paid $6,141 USD for this purchased option.  The terms relating to the sold option were that if the exchange rate on December 1, 2000, the termination date, was less than 113.00 JPY per USD, the sold position would lapse unexercised.  If the exchange rate on

2904800.10

the termination date was greater than or equal to 113.00 JPY per USD, the sold position would be exercised and Sala would be required to pay $2,136,000 USD to Refco in exchange for 241,368,000 JPY.  Sala claims to have received $2,136 USD for this sold option.  If the sold position was exercisable at expiration, the purchased option would also be exercisable, and Sala would receive a net 2,136,000 JPY.  The net premium paid by Sala for Pair 11 was $4,005 USD.  This net amount is the only amount Mr. Sala actually paid and is the only money that Mr. Sala had at risk.

12)     Option 12 was not paired with an offsetting option.  This purchased option involved the currency pair of the JPY (put) and GBP (call).  The terms relating to the purchased option were that if the exchange rate on February 1, 2001,  the termination date, was less than 162.00 JPY per GBP, the purchased position would lapse unexercised.  If the exchange rate on that date was greater than or equal to 162.00 JPY per GBP, the purchased position would be exercisable, and Sala would be entitled to pay 259,524,000 JPY to receive 1,602,000 GBP from Refco.  Sala claims to have paid 8,170 GBP for this purchased option.

67.     Because the long options were offset with short options, Mr. Sala's potential for actual economic loss was locked in at the net cost of the long and short options: $728,000.

68.     Mr. Sala's potential for economic gain on these offsetting options (before consideration of fees and expenses related to the entire transaction) was somewhere in the range of $200,000 to $500,000, or about .03%-.08% when compared to the noneconomic losses he claimed.

69.     The chances of actually hitting the high-end of this profit potential were virtually non-existent and required that currency values which historically traveled together in the same direction would have to travel in opposite directions, including a total crash of the Japanese Yen.

70.     Even though Mr. Sala had formed the S Corporation by the time of the Tax Trades, and had claimed that the purpose for the S Corporation was to protect him from his "investment" risks that had been presented in the marketing materials, Mr. Sala  acquired these long and short positions in his own name, not in the name of his S Corporation.  Mr. Sala testified that he was not worried about any exposure.

71.     Mr. Sala's tax counsel, Mr. Nemirow, made it clear to Mr. Sala that his role as a legal advisor would be very limited.  Mr. Nemirow did not provide Mr. Sala with a recommendation on the merits of the tax losses.  Instead, he agreed to review the Ruble Opinion and advise Mr. Sala whether the opinion could protect Mr. Sala from penalties should the transaction be challenged by the IRS.   In his review of the transaction, Mr. Nemirow, doubted the validity of any protections potentially afforded by the S Corporation, noting that the S Corporation was undercapitalized and therefore might not protect against liability.  The S Corporation's capitalization consisted of assets worth $9 million.  Mr. Nemirow also expressed his concern that the fees being charged were too high.

72.     On or about November 28, 2000, Mr. Sala completed the third predetermined step of the transaction, executing two assignments of the Tax Trades (and other assets in his account), first to his S Corporation (Solid Currencies), and then immediately to Deerhurst Investors General Partnership ("the General Partnership").

73.     The S Corporation and General Partnership were liquidated prior to year's end.

74.     Mr. Schwartz acknowledged that the General Partnership was used for the generation of the ordinary tax losses, and that everyone who wanted an ordinary tax loss went into the General Partnership.

**Financial Results**

75.     At the planned liquidation, Solid Currencies received the full value of its partnership interest ($9,021,108) in cash.

76.     During December of 2000, the partnership contained virtually no foreign currency exposure or risk and trading was static, despite the fact that partnership reported $24 million in open foreign currency trades.  That is, when the trades are compared against each other, they almost completely cancel each other out.  On average each day, well over $20 million of the $24 million in positions the General Partnership held was, in reality, nothing more than U.S. dollars.

77.     The reason for this net cash holding was because, according to the promotional materials, if the partners in the General Partnership ended calendar year 2000 with a "profit," the participants' funds were automatically contributed to a new transaction scheduled to begin the following year.  This new transaction was Deerhurst Trading LLC.

78.     By December, the General Partnership had made a *de minimis* profit:

1)   From October 23, 2000, through December 21, 2000, Mr. Sala's funds had grown by less than 0.75%, inclusive of interest.

2)   According to the General Partnership's records, Mr. Sala's year-end account balance increased by approximately $77,435 over his initial deposit of 15% of the desired tax deduction.

3)   This "profit" did not take into account over $40,000 in fees and expenses that were charged directly to Solid Currencies but not reflected on the partnerships

2904800.10

books and records, nor does it account for the $75,000 Mr. Sala spent on just one of his tax opinions, the Ruble tax opinion.

79.      In order to ensure the participants would record the profit that would automatically commit them to Deerhurst Trading LLC, once that *de minimis* profit was made, the General Partnership locked in this gain by essentially moving the account to cash—while still purporting to trade.

80.      To put this "profit" into perspective, had Mr. Sala's funds been placed in a risk-free interest-bearing account during these same three months, interest alone would have generated $50,000 of "profits."

81.      Mr. Sala claimed to believe that, based on his investment acumen, his ability to forecast financial returns for Wall Street, and his personal knowledge of the foreign currency markets, he would be reaping economic returns in excess of 60% and perhaps even 75% *each year* for five years and therefore, he would achieve earnings in excess of the $24,000,000 tax windfall.

**Liquidation of Carlos Sala's Interest**

82.      Mr. Sala's S Corporation received the full value of its Deerhurst Investors' partnership interest in U.S. dollars at year's end.  The amount due the S Corporation is reflected on a final partnership statement for December 2000.  The U.S. dollars transferred in liquidation is shown on the account statements for the S Corporation.

83.      To make it make it appear that Mr. Sala also received "property" to which his inflated tax basis could attach, the shelter principals engaged in a series of highly questionable and inconsistent transactions described in detail below.  Some of these events occurred after December 21, the date that the partnership had liquidated.

2904800.10

84.     Based on the Refco daily trade reports for the General Partnership, the S Corporation's monthly statement for December 2000, and the Deerhurst production reports, the following occurred in liquidation of Mr. Sala's S Corporation's partnership interest:

1)      On December 20, 2000, Deerhurst Investors GP purchased a one-year put option on the euro (call option on the dollar) with face amount of EUR 26,004,030 (alternatively USD 23,065,574.61) for premium settlement on December 22.  The option expiration date was December 20, 2001. Deerhurst Investors GP did not pay the option premium to Refco.  Deerhurst Investors GP sold euros spot, EUR 10,401,612 against USD 9,423,860.47, for value December 27, 2000.

2)      On December 22, 2000, Deerhurst Investors GP transferred $8,084,301.65 to Solid Currencies.  The transfer represented the entirety of Solid Currencies' account balance at this time.

3)      On December 22, 2000, Deerhurst Investors GP transferred the put option on the euro (EUR 26,004,030), described in paragraph 1 above, to Solid Currencies. According to the account statements the option's premium settlement date was revised to December 26.  Solid Currencies paid the premium amount of $915,342 to Refco.  After paying the option premium, the running balance in the Solid Currencies account was $7,168,959.65.

4)      On December 22, 2000, Deerhurst Investors GP transferred the spot trade, described in paragraph 1 above, to buy euros against dollars (EUR 10,401,612 against USD 9,423,860.47) to Solid Currencies. This trade came to value on December 27, 2000. This spot transaction effectively hedged the put option on the euro that was received in

paragraph 3 above.  To settle the spot trade Solid Currencies needed to have $9,423,860.47 in its account on December 27.

5)      On December 26, 2000, Solid Currencies closed out the option transferred to it, in paragraph 3 above, by selling a put option on the euro (EUR 26,004,030) with premium settlement on December 27.  The option expiration date was December 20, 2001.  Solid Currencies received a premium of $725,512 for the option.  The difference in the buying and selling prices for the options caused Solid Currencies to take a loss of $189,830.   After the sale of the option Solid Currencies' running account balance was USD 7,894,471.65.

6)      On December 26, 2000, Solid Currencies sold the euro against the dollar (EUR 10,401,612 against USD 9,613,169.81 for value December 27, 2000.  Solid Currencies made a profit of $189,309.34 on the euro trade.  However, when netted with the option trade that began as described in paragraph 1 above, the net loss was only $520 – this attests to the efficiency of hedging the option with the spot transaction.  Euro spot trades settle in two bank business days after trade date, which would have been December 28.  At this point the running account balance was $8,083,780.90.  The Solid Currencies account records a transaction labeled "rollover" on December 26, 2000, that was reversed (cancelled) in a bookkeeping entry on December 27, the next day.

7)      On December 27, 2000, Deerhurst Investors GP transferred $945,268 to Solid Currencies.  After this transaction the Solid Currencies account showed a running account balance of $18,642,218.80. This balance was struck before the reversal of the rollover.

8)    On December 27, 2000, the euro spot trade transferred to Solid Currencies required a dollar payment of $9,423,860.47 on December 27, 2000.  The funding for the payment was accomplished with a reverse rollover transaction done on December 27, 2000 which effectively brought forward the proceeds of the euro sale done as described in paragraph 6 above.  The reverse rollover is reflected by Solid Currencies' overnight borrowing of EUR 10,402,612 from Refco on December 27, 2000.  Solid Currencies was charged EUR 1,979.20 in interest for this borrowing (it is customary in the industry that interest is charged in the currency borrowed).  The EUR 10,402,612 was repaid to Refco the following day.  The running balance was $9,029,048.99 at the end of the day on December 27, 2000.

9)    On December 26, 2000, Solid Currencies entered a spot trade in dollar/yen for settlement December 28, 2000.  This position was entered into and closed out the same day for a $52.90 loss.  The running balance of the Solid Currencies account was $9,028,996.09.

10)   On December 29, 2000, the Solid Currencies account was closed.

85.    The trades described above reflected activity undertaken by Deerhurst Investors acting as an order taker or agent for Mr. Sala and did not constitute property of the partnership transferred by it to Mr. Sala.

**Carlos Sala's Right to Exit the Transaction**

86.    Mr. Sala, unlike other participants, negotiated an exit strategy from the transaction should Deerhurst be unable to procure an acceptable tax opinion letter for Mr. Sala by March 8, 2001.  This exit strategy was not contingent upon Deerhurst's ability to achieve any measure of profits.

2904800.10

87.     Mr. Sala negotiated the right to exit the transaction at any time should the projected tax benefits be denied by the IRS.

*Tax Benefits*

88.     The phony tax benefits Mr. Sala obtained in the Deerhurst Transaction far outweigh any potential for economic profit.  Mr. Sala's $60,000,000 tax deduction was worth in excess of $23,000,000 in federal tax savings alone.  This tax savings guaranteed Mr. Sala an enormous windfall even if he lost the comparatively *de minimis* $728,000 he actually placed at risk to purchase those losses.  These purported losses (the noneconomic tax benefits) nearly offset Mr. Sala's entire ordinary income for that tax year.

89.      Mr. Sala, and the legal opinion prepared for him by Mr. Ruble, which Mr. Sala reviewed, assert that Mr. Sala's contributions of 23 Tax Trades to the S Corporation were "for substantial non-tax business reasons, including the use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst."

90.     No leverage was employed and at no time would Mr. Sala have been exposed to the risk of any loss other than the net cost ($728,000) of the tax trades. The General Partnership account was never actually traded with leverage during the tax year at issue.  After the tax losses were generated in 2000, trading was not conducted at the risk levels reflected in the marketing material.

*Fees*

91.     Messrs. Krieger and Schwartz together established a fee structure by which excessive fees were to be charged to the investors by way of quarterly management fees (based upon four times the level of funds actually invested) and by charging excessive administrative

2904800.10

fees.  Just in 2001, the administrative fees (including "mark-ups" charged by Mr. Krieger's company on the trades) alone exceeded 25% of the total funds actually deposited.

92.     For trading year 2001, in addition to a 4% management fee (computed based on a notional trading value of four times the funds deposited) and a 30% share of profits, Deerhurst Management charged the participants in Deerhurst Trading Strategies, LLC a total of $8,527,204 in foreign exchange mark-up fees and $2,307.630 in clearing fees charged against the $34 million invested.  The $8,527,204 in mark-up fees were paid directly to Beckenham Trading Company, a company wholly owned by Deerhurst principal, Mr. Krieger.  The expense ratio for the diversified strategy was 50.87% for 2001.

93.     Deerhurst did not charge the participants any mark-ups in 2000.

94.     The amount of the fees defeats any argument by Mr. Sala of a reasonable expectation of profit from the transaction.

*The Purpose of the S Corporation*

95.     On November 8, 2000, Mr. Schwartz, for the investors, caused to be incorporated individual S Corporations.  In Mr. Sala's case, it was Solid Currencies, Inc.

96.     Mr. Sala transferred assets to Solid Currencies on November 28, 2000, and the S Corporation was liquidated by year's end.  Its stated purpose was to shield Mr. Sala from personal liability for the month that it was actually utilized.

97.     The Tax Trades were made beginning on November 24, 2000, but were made in the name of Mr. Sala individually.  Mr. Sala's testimony that he was not concerned about personal liability at the time of the Tax Trades also calls into question the purpose of the corporation.

98.     The S Corporation had no other assets other than what Mr. Sala placed into the Deerhurst Transaction.  To the extent that the S Corporation was intended to protect Mr. Sala from personal liability, it was grossly undercapitalized.  Mr. Nemirow, recognized this.

99.     The S Corporation did not serve the stated reasons for its formation.

100.    The value of Mr. Sala's interest in Solid Currencies, Inc. did not exceed $8,943,673 at the time of his initial contribution.  Similarly, the value did not exceed $9,021,108 at the time of its liquidation.

*The Purpose of Deerhurst Investors, G.P.*

101.    The partnership was in business from December 1 to December 21, 2000.

102.    The general partnership did not provide any further profit potential to Mr. Sala on the contributed trades—the profit potential on the offsetting options was no greater inside the partnership than it was outside.  Fully realizing that the putative partnership would also appear highly suspect, the promoters, as early as the design stage, manufactured a list of alleged business purposes for the general partnership.  Each is totally contrived and utterly meritless.

103.    For example, although the promotional materials represent that value was created from centralizing the trading to create economies of scale, Mr. Krieger testified that it did not matter to him, or to his trading style, whether the accounts were held individually, in an S Corporation, or in a general partnership.  He traded the body of funds as one economic unit without distinction, and simply allocated trades to each partner's account based upon partnership percentage.   Moreover, the Tax Trades were entered into while the accounts were held in the individual investor's hands and simply transferred to the General Partnership—those trades were not entered into by the general partnership.

104.     By way of additional example, a stated purpose of the partnership was to gain efficiencies by the pooling of investor funds.  In exchange for this, and according to the promotional materials provided to Mr. Sala, this would allow Mr. Sala to trade at a lower level of risk (3 to 1) for a short period (less than 30 days) before entering into a more risky (4 to 1) trading program.

105.     The trades in the partnership posed no risk to Mr. Sala and utilized almost no leverage, and certainly far less than the 3 to 1 advertised.

106.     The true purpose of the partnership was for the generation of ordinary tax losses. According to Mr. Schwartz, the only individuals who entered the partnership were those participants seeking ordinary tax losses.  The remainder of the participants, that is those seeking capital losses, did not enter the partnership.  Participants like Mr. Sala's friend, Mr. White, who sought both ordinary and capital losses, formed two S Corporations, only one of which became a member of the partnership.

107.     The existence of the General Partnership was inconsequential for purposes of the Tax Trades; instead it was useful solely for the tax benefits the general partnership is alleged to have created through application of the tax basis rules.

**Carlos Sala's Withdrawal from Deerhurst**

108.     Although Mr. Sala states he committed to a five-year trading program, commencing *after* the tax loss was generated, on October 31, 2001, he withdrew 10% of his then existing capital from the Diversified Strategy and transferred it to a computerized or systematic trading program named Lonestar Global LP, operated by Mr. Krieger.

109.     On November 30, 2001, Mr. Sala withdrew an additional 10% of his investment (totaling 20% to date) in the Diversified Strategy and transferred it to Lonestar Global LP.

2904800.10

110.     On December 31, 2001, Mr. Sala withdrew an additional 15% (totaling 35% to date) of his investment in the Diversified Strategy and transferred it to Lonestar Global LP.

111.     On January 31, 2002, Mr. Sala withdrew an additional 15% of his investment (totaling 50% to date) in the Diversified Strategy and transferred it to Lonestar Global LP.

112.     On November 28, 2003, Mr. Sala released Deerhurst Trading Strategies LLC, and its "managing member, and its or their agents, servants, employees, representatives, officers, directors, parents, subsidiaries, affiliated corporations and other entities, sureties, predecessors, successors and assigns ("Releasee") from any and every claim of whatsoever kind or nature, known or unknown, that [Mr. Sala] had, have, or may hereafter have against Releasee arising from or in any way relating to the purchase or sale of limited liability company interests relating to" the Deerhurst Transaction.

113.     As of November 28, 2003, Mr. Sala had agreed to withdraw all of his remaining 50% interest in the Diversified Strategy and to transfer it to Lonestar Global LP.

114.     As of December 31, 2003, Mr. Sala had withdrawn his remaining participation in the Diversified Strategy and transferred it to Lonestar Global LP.

115.     In September 2004, Mr. Sala withdrew from the Lonestar Global LP program, ending his relationship with Mr. Krieger.

**Carlos Sala's Reporting of the Deerhurst Shelter Transaction**

116.     According to KPMG billing records, on March 20, 2001, Ms. Henderson spent two hours discussing "strategy issues" with Mr. Nemirow, billing Mr. Sala $900.

117.     On April 9, 2001, Mr. Nemirow forwarded to Ms. Henderson an email he sent to Mr.  Ruble with changes he wanted to make to the Brown & Wood representation letters.  Mr.

2904800.10

Nemirow requested that Mr. Ruble change the language of one paragraph from "Investor actively participates in management" to read "Investor invests directly in marketable securities."

118.     On April 9, 2001, Mr. Nemirow emailed Ms. Henderson, stating that he had received a final opinion letter from Mr. Ruble, but was waiting for Mr. Sala to execute his representation letter before he would release the opinion letter.

119.     On April 12, 2001, Ms. Henderson emailed Mr. Ruble asking him to resend the Sala opinion letter to her, as she had not received it.  She also stated that Mr. Nemirow "would like an email from you [Mr. Ruble] stating that you considered any developments from December 31 (the date of the Opinion Letter) through the issue date."

120.     On or about April 15, 2001, Mr. Sala  paid Mr. Ruble $75,000 for the opinion letter.  The remainder of Mr. Ruble's fees of $25,000 were paid by Mr. Schwartz.

121.     On or before April 15, 2001, Mr. Sala caused to be filed a corporate income tax return for the S Corporation for its 2000 tax year.  David Schwartz, the brother of Michael Schwartz, signed the return for the S corporation.  The return reported an ordinary loss from a trade or business of $60,449,984, expenses (*i.e.,* management fees) of $27,950, and incentive fees (also an expense) of $28,071.

122.     The Salas' original Form 1040, U.S. Individual Income Tax Return (Original Return) reported wages of $51,748,681, taxable interest income of $1,837,561, dividend income of $410,300, taxable refunds, credits or offsets of state and local income taxes of $7,846, a capital gain of $6,472,000, and other income of ($23).  These income amounts total $60,476,365 and stemmed from Mr. Sala's sale of his stock options.

123.     The Salas' Original Return reported a $60,449,984 loss on line 17 (rental real estate, royalties, partnerships, S corporations, trusts, etc.).  The loss was identified as a non-

passive loss from the S Corporation, and it consisted of the noneconomic losses generated from Mr. Sala's participation in this tax avoidance transaction.

124.   The Original Return reported adjusted gross income of $26,381. the Salas reported owing no federal income taxes.

125.   On or about December 29, 2003, the Salas filed a Form 1040-X, Amended U.S. Individual Income Tax Return (Amended Return) for their 2000 tax year.  The Amended Return reported the same income amounts as the Original Return.  The Amended Return did not report the $60,449,984 loss reflected on the Original Return, but did include expenses of $56,071 attributable to Solid Currencies, Inc.'s participation in the Deerhurst Transaction.  The Salas paid the additional tax owed as shown on the Amended Return.

126.   An amended federal income tax return ("Amended Return") for the Salas' 2000 tax year was mailed to the Internal Revenue Service's St. Louis, Missouri Service Center on or about November 18, 2003.  A check for the amount of tax shown due on the return, $26,179,875.00, was forwarded with that Amended Return.  On or about December 1, 2003, the Salas mailed a second copy of their Amended Return for the 2000 tax year to the Internal Revenue Service's Austin, Texas Service Center.  The Salas stopped payment on the check mailed on or about November 18, 2003 and forwarded a new check in the amount of the tax shown due with the Amended Return mailed on or about December 1, 2003.  The IRS had already posted the check sent with the Amended Return mailed on or about November 18, 2003, and because that check had been cancelled, it was returned to the IRS dishonored on or about December 5, 2003.  Both Amended Returns were received by the IRS, which indicated in the official Form 4340 Certificate of Assessments, Payments, and Other Specified Matters that an "amended return [was] filed" on December 5, 2003, and again on December 29, 2003.  The IRS

adjusted the Salas' tax account based upon information presented in the Amended Return filed December 29, 2003.

127.    On or about June 18, 2004, the Internal Revenue Service issued a Notice of Deficiency to the Salas, asserting that the Salas owed additional taxes in the amount of $22,204 due to the disallowance of $56,071 of losses the Salas reported as attributable to the S Corporation, Inc.  The Notice of Deficiency also asserted an accuracy-related penalty in the amount of $4,400.80 for tax year 2000.

128.    In September and October 2004, the Salas prepared and filed forms 1040X for their 2000 tax year claiming a refund due them of $23,727,630 and $23,705,626, respectively.

2904800.10

## PROPOSED CONCLUSIONS OF LAW

**<u>Burden of Proof</u>**

1.         This is a *de novo* proceeding.  The Salas are not entitled to prevail merely by showing that the Service made an error of law or applied the law improperly in their case. *Helvering v. Gowran*, 302 U.S. 238, 245-46 (1937) ("If the Commissioner was right in his determination, the [trial court] properly affirmed it, even if the reasons which he had assigned were wrong"). Thus, the Court may sustain the Service's determinations based upon any applicable legal theory or authority, regardless of whether that authority or theory was enunciated in the disallowance notice.

2.         The burden of proving entitlement to the claimed deductions rests squarely with the Salas.  *See Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 170-71 (D. Conn. 2004), aff'd, 2005 WL 2365336 (2d Cir. 2005).  Deductions are a matter of legislative grace, and a taxpayer seeking them must point to a statute and show that it comes within its terms. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).  In addition, the Salas bear the burden of proving that the form of their transactions matches their substance. *National Starch and Chem. Corp. v. Comm'r*, 918 F.2d 426, 429 (3d Cir. 1990),  *aff'd. sub nom, Indopco v. Comm'r*, 503 U.S. 79 (1992).

3.         Under Section 7491 of the Internal Revenue Code (26 U.S.C.), the burden of proof as to the amount of tax owed may be shifted from the Salas to the United States if the Salas meet their burden of production and produce credible evidence as to the amount of tax they owe, because these are factual issues relating to a liability imposed by subtitles A or B of Title 26.  In addition, the Salas must show they have complied with the requirements, under Title 26, to substantiate items in dispute, that they have maintained all records required, and cooperated with

reasonable requests for witnesses, information, documents, meetings and interviews, in order for the burden of proof to shift under Section 7491.

4.    However, when it comes to penalties, which are imposed under Subtitle F of the Internal Revenue Code, the burden of proof does not shift to the United States for penalties determined in the Statutory Notice of Deficiency.[1]  For those penalties, the United States has the burden of production to make a *prima facie* case that the penalties apply and were properly assessed, but does not have the ultimate burden of proof.  *See generally Pahl v. Comm'r*, 150 F.3d 1124, 1131 (9th Cir. 1998); *Long-Term Capital Holdings, LP v. United States,* 330 F.Supp.2d 122, 196-99 (D. Conn. 2004).  That burden remains on Plaintiff, regardless of Section 7491.  The United States does have the burden of production and proof as to penalty assessments not determined in the Statutory Notice of Deficiency.  *Id.*  The United States denies that the Salas are entitled to a refund of tax, penalty, and interest for the losses and deductions the Salas took stemming from their involvement in this abusive tax shelter.

**Statutory Background**

*Tax on Sales of Property*

5.    The Code imposes federal income tax on the "taxable income" of every person. Section 1. "Taxable income" is defined as "gross income" minus "deductions." Section 63(a). "Gross income" includes "gains derived  from dealings in property," Section 61(a)(3), and

---

[1]    In this case, the IRS assessed an accuracy-related penalty of $4,441.  The United States avers that pursuant to 26 U.S.C. § 6662(e) this penalty should have been $9,491,132, and is claiming as an offset $9,486,691: the difference between the penalty amount shown on the Statutory Notice of Deficiency and the amount which should have been assessed.  *See infra* subsection (xi) and footnote 4.  The United States has the burden of production and proof as to the difference between the assessment shown on the Statutory Notice of Deficiency and the amount claimed as an offset.

2904800.10

deductions include "loss" from "the sale or other disposition of property." Sections 161 and 165(b).

6.      In general, the amount of gain or loss recognized upon the sale or other disposition of property is the difference between the adjusted basis of the property transferred and the amount realized from the sale. Section 1001(a) and (c).  The basis of property, at its simplest, is its cost. Section 1012.

*Partnerships*

7.      American law treats a partnership as a distinct entity for some purposes and as an amalgamation of its members for other purposes. Similarly, federal tax law reflects a special statutory regime, codified in Sections 701-761, under which a partnership is not subject to federal income tax at the partnership level. Section 701. Instead, the income, expenses, and other tax attributes of the partnership are computed at the partnership level (Section 703), but the partner is required to take into account (and pay tax upon) his or her share of each item of partnership income, gain, loss, expense, deduction, and credit in computing and reporting his or her federal income tax liability. Section 702(a).

8.      State law does not define a partnership for federal income tax purposes. *Evans v. Comm'r*, 447 F.2d 547, 550 (7th Cir. 1971) ("For federal income tax purposes, Federal Tax law is controlling, and the legality, or lack thereof, of a partnership under State law does not determine whether a partnership exists for federal tax purposes.") (internal citations omitted). Rather, the Code contains its own definitions of "partnership" and "partner."

9.      Section 761(a) defines a "partnership" as an "organization through or by means of which any business, financial operation, or venture is carried on." To be recognized as a

2904800.10

partnership for federal income tax purposes, an entity must be created for a "legitimate, non-tax business purpose." *Andantech L.L.C. v. Comm'r*, 331 F.3d 972, 980 (D.C. Cir. 2003).

10.     Under Section 761 a partnership includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate.  *See also* Section 7701(a)(2).  The Supreme Court in *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949), stated that a partnership is created for federal income tax purposes if:

> [C]onsidering all the facts -- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent – the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*See also*, *TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d. Cir. 2006) (hereafter Castle Harbour).

11.     The Tax Court in *Luna v. Commissioner*, 42 T.C. 1067, 1077-78 (1964), set forth the following nonexclusive list of factors relevant to the consideration of whether a partnership is created:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party had made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and co-proprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate  books of account were maintained for the venture; and whether the parties exercised mutual control over the assumed mutual responsibilities for the enterprise.

*Id.*

2904800.10

12.     A "partner" is defined as a "member of a partnership." Section 761(b). A partnership is terminated (and a new partnership created) when, within a twelve-month period, more than 50% of the interests in the partnership are sold or exchanged. Section 708. Thus, where an investor acquires a majority interest of an existing partnership and, some time later, sells that majority interest, the tax law recognizes three different partnerships (i.e., the partnership constituted before the investor's purchase, the partnership constituted during the investor's period of ownership, and the partnership constituted after the investor's departure)– even if state law recognizes only one continuing partnership.

13.     Where a partnership acquires property, it has a basis in that property. A partner also has basis in his or her own interest in the partnership. Tax professionals often use the terms "outside basis" and "inside basis" in connection with partnerships. "Outside basis" is the partner's basis in his or her own partnership interest, while the partnership's basis in its assets is referred to as "inside basis." *See Gindes v. United States*, 661 F.2d 194, 197 n.9 (Ct. Cl. 1981).

14.     Section 721(a) establishes that no gain or loss is recognized when a partner contributes property to a partnership in exchange for a partnership interest:

> No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.

15.     Section 722 governs the partner's basis in the partnership interests acquired:

> The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution . . .

16.     Where a partner contributes property, such as the spread options, to a partnership, his basis in the partnership interest that he acquires is equal to the partner's former adjusted basis in the property he contributes to the partnership.

2904800.10

17.     Under Section 731, partners generally do not recognize gain or loss upon a liquidating distribution of property only.

**The Sham Transaction Doctrine**

18.     The sham transaction doctrine requires courts to look beyond the form of a transaction and to determine whether its substance, in fact, mirrors its form.  If a transaction's form complies with the Code's requirements for deductibility, but the transaction lacks the factual or economic substance that the form represents, then expenses or losses incurred in connection with the transaction are not deductible.  *Knetsch v. United States,* 364 U.S. 361, 365-66 (1960); *United States v. Wexler*, 31 F.3d 117, 122 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995); *Lerman v. Commissioner*, 939 F.2d 44, 45 (3rd Cir. 1991), *cert. denied*, 502 U.S. 984 (1991); *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989).

19.     The origin of the sham transaction doctrine lies in the seminal Supreme Court decision of Gregory *v. Helvering*, 293 U.S. 465 (1935).  In *Gregory*, the Court affirmed the Commissioner in denying deductions claimed by taxpayers for losses and expenses incurred in a corporate reorganization.  The taxpayers had followed each step required by the Code for the reorganization.  Nevertheless, the Court held these losses nondeductible, reasoning that the transaction was a "mere device" for the "consummation of a preconceived plan" and not a reorganization within the intent of the Code as it then existed.  *Id.* at 469.  Because the transaction lacked economic substance, as opposed to formal reality, it was not "the thing which the statute intended."  *Id.*

20.     The sham transaction doctrine is now a fundamental axiom of the federal tax law, *see generally* B. Bittker, *Federal Taxation of Income, Estates and Gifts*, § 4.3.3 (1981 and Supp.1988), and requires a rigorous examination by courts of the challenged transaction as a

whole, as well as each step thereof, to determine if the substance of the transaction is consistent with its form.  *ACM Partnership v. Commissioner*, 157 F.3d 231, 246 (3rd Cir. 1998); *Weller v. Comm'r*, 270 F.2d 294 (3d Cir. 1959).  As the Supreme Court declared in *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, (1945):  "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."  The burden, of course, is on the taxpayer to show that the form of the transaction reflects its substance. *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986); *accord National Starch and Chem. Corp. v. Commissioner*, 918 F.2d 426, 429 (3rd Cir. 1990), *aff'd*, *INDOPCO v. Commissioner*, 503 U.S. 79 (1992).

21.     While a taxpayer can legitimately structure a transaction to minimize tax liability under the Code, the transaction must nevertheless have factual and economic substance in order to be "the thing which the statute intended." *Gregory*, 293 U.S. at 469.  As the Seventh Circuit observed in *Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985):

> The freedom to arrange one's financial affairs does not include the right to engage in financial fantasies with the expectation that the IRS and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly.

22.     Courts have recognized two basic types of sham transactions. Shams in fact are transactions that never occurred in reality.  In such shams, taxpayers claim deductions for transactions that have been created on paper but which never took place.  Shams in substance are transactions that actually occurred but are devoid of economic substance. *ACM Partnership*, 157 F.3d at 247 n.30 (citing *Kirchman*, 862 F.2d at 1492); *accord Lerman*, 939 F.2d at 49 n.6.  Given the common lineage of these principles, they are often applied alternatively and sometimes are

described in slightly different terms.  Collectively, these well-established doctrines establish that taxpayers are not free from challenge merely because they have papered their transaction in purported mechanical compliance with the language of the Code. Such a notion has been repeatedly rejected by many different courts. *See, e.g., In re CM Holdings*, 301 F.3d 96, 102 (3d Cir. 2002) ("[E]ven if a transaction complies precisely with all requirements for obtaining a deduction, if it lacks economic substance it 'simply is not recognized for federal taxation purposes, for better or for worse.'"  (*quoting ACM Partnership*, 157 F.3d at 261)); *Kirchman*, 862 F.2d at 1490; *Long Term Capital*, 330 F. Supp 2d at 171; *TIFD III-E*, 342 F.Supp.2d at 108 ("Castle Harbour"); *See also James v. Commissioner*, 899 F.2d 905, 908 (10th Cir. 1990).  On the contrary, these doctrines and rules, many of which are reflected in the language of regulations, are an integral part of the tax law which must be applied in this and every case.

**Sham in Fact**

23.    Shams in fact are transactions that have been created on paper but which never took place in reality.  *Kirchman*, 862 F.2d at 1492 (cited with approval in *ACM Partnership*, 157 F. 3d at 247, n.30); *accord Lerman*, 939 F.2d at 49 n.6.

24.    The Tenth Circuit has described factual shams as "transactions which did not occur, did not occur as reported, or were performed in violation of some of the background assumptions of commercial dealing, for example, arms-length dealing at fair market values." *Horn v. Commissioner*, 968 F. 2d 1229, 1236, n. 8 (10th Cir. 1992).  *See also James v. Commissioner*, 899 F.2d 905, 908 n. 4 (10th Cir.1990). This "factual sham" rule is the "sham transaction doctrine" in the literal sense of the term.

## Sham in Substance and the Economic Substance Doctrine

*Background*

25.     Where there is nothing of substance to be realized from a transaction apart from income tax savings, the transaction will be disregarded for federal tax purposes, for the law does not recognize a transaction that does not appreciably affect a taxpayer's beneficial interest except to reduce his tax.  *Knetsch*, 364 U.S. at 366.

26.     In evaluating the economic substance of a challenged transaction, a court must look beyond its mere form to determine whether it possesses the economic substance its form represents, *id*. at 365, and thoroughly examine the transaction as a whole, as well as each step thereof, to determine if its substance is consistent with its form.  *ACM*, 157 F.3d at 247.

27.     If a transaction's form complies with the Code's requirements for deductibility but the transaction lacks the factual or economic substance that the form represents, then expenses or losses incurred in connection with the transaction are not deductible.  *Knetsch*, 364 U.S. at 365-66.

28.     There are two predominant prongs to test whether a transaction will be disregarded as a sham in substance and not respected for tax purposes.  This test is considered to have an "objective" prong, and a "subjective" prong; the objective prong looking to whether the transaction had a real, pre-tax economic benefit (not necessarily requiring a pre-tax profit potential), and the subjective prong looking to whether that transaction was compelled by an actual business purpose.  Both prongs of this test, objective and subjective, require a determination of whether the transaction possesses non-tax economic substance.  see, e.g., *James v. Commissioner*, 899 F.2d 905, 908-09 (10th Cir. 1990); *ACM Partnership v. Commissioner*,

157 F.3d 231, 247 (3d Cir. 1998); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91-95 (4th Cir. 1985); *Black & Decker Corp. v. United States*, 436 F.3d 431, 440-41 (4th Cir. 2006).

29.     While the Fourth Circuit has adopted a strict standard for disregarding a transaction that requires both prongs be met, *Rice's Toyota,* 752 F.2d at 91; *see also Black & Decker,* 436 F.3d at 441,  "[a] better approach to the description of this sham analysis, which is more flexible and enjoys the support of a majority of the circuits, holds that 'the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses.'" *Keener*, 2007 U.S. Claims LEXIS 113, 2007 WL 1180476, at *10 (quoting *Sochin v. Comm'r,* 843 F.2d 351, 354 (9th Cir 1988), cert. denied, 488 U.S. 824, 109 S. Ct. 72, 102 L. Ed. 2d 49 (1988));  *James*, 899 F.2d at 908-09 (10th Cir. 1990) (referring to this as the "better approach"). *See also Winn-Dixie Stores, Inc. v. Comm'r,* 254 F.3d 1313, 1316 (11th Cir. 2001), *cert. denied*, 535 U.S. 986, 122 S. Ct. 1537, 152 L. Ed. 2d 464 (2002) (noting that the doctrine has "few bright lines," but clearly applies to "'transactions whose sole function is to produce tax deductions'" (*quoting Kirchman*, 862 F.2d at 1492; *UPS v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001); *ACM*, 157 F.3d at 247 (1999) ("these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a rigid two-step analysis, but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes"); *Rose v. Comm'r*, 868 F.2d 851, 854 (6th Cir. 1989) ("the essential inquiry is whether the transaction had any practicable economic effect other than the creation of economic tax losses"). In one case the D.C. Circuit followed the Fourth Circuit's approach, see *Horn*, 968 F.2d at 1237, while in a later case, that court followed the prevailing rule, see *ASA Investerings P'ship v. Comm'r,* 340 U.S.

2904800.10

App. D.C. 55, 201 F.3d 505, 511-12 (D.C. Cir.), *cert. denied*, 531 U.S. 871, 121 S. Ct. 171, 148 L. Ed. 2d 117 (2000) ("the absence of a nontax business purpose is fatal").

30.     The Tenth Circuit does not follow a strict, formulaic approach to the economic substance test, and has expressly rejected the Fourth Circuit's formulation in *Rice's Toyota*, 752 F.2d 89 (4th Cir. 1985), that the Court can only find that a transaction is a sham if it concludes both that the transaction had no economic substance and no business purpose.  *James,* 899 F.2d at 908-09.

31.     The Tenth Circuit considers that the best approach to analyzing transactions under the economic substance doctrine is that the consideration of business purpose and objective economic potential are simply factors to be considered in determining whether the transaction had any practical economic effects other than the creation of income tax losses.  *James*, 899 F.2d at 908-09 (*citing Sochin,* 843 F.2d at 354).

32.     In examining the economic substance of a transaction, the Tenth Circuit recognizes the importance of focusing upon the activity that actually created the tax deduction, and not the window dressing that hid it.  *See also James,* 899 F.2d at 910 ("The only transactions at issue in this case are the purported sales by the Communications Group to the joint ventures. These sales cannot be legitimized because they are on the periphery of some legitimate transactions"); *Klamath Strategic Investment Fund v. United States*, 472 F.Supp.2d 885, 895 (E.D.Tex. 2007) ("When applying the economic substance doctrine, courts emphasize that the transaction to be analyzed is the particular transaction that gives rise to the tax benefit, and not collateral transactions which do not produce [the] tax benefits"); *Coltec Indus., Inc.* 454 F.3d at 1356-57 ("the transaction to be analyzed is the one that gave rise to the alleged tax benefit");

*Black & Decker Corp.*, 436 F.3d at 441; *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 283-84 (2d Cir. 2002); *ASA Investerings*, 201 F.3d at 514 n.6; *ACM*, 157 F.3d at 260.

33.     In order to be deductible, a loss must reflect actual economic consequences sustained in an economically substantive transaction.  *ACM*, 157 F.3d at 252.  It cannot result solely from bifurcating the loss component of a transaction from its offsetting gain component, to generate an artificial loss which is not economically inherent to the transaction.  *Id.*

**The Transaction Should be Disregarded**

34.     In this transaction, Mr. Sala paid $728,000 for long and short options he then claimed generated $60,000,000 in tax losses.  These purported losses nearly offset Mr. Sala's entire ordinary income for 2000.  Mr. Sala's potential for economic gain on these offsetting options was somewhere in the range of $200,000 to $550,000, or about .03%-.08%, when compared to the noneconomic losses he claimed.

35.     The purported $60 million deduction generated a guaranteed but phony loss, leading to a tax savings of $24 million.  Thus, even if Mr. Sala lost all of the money he put into this transaction ($8.9 million), he would still have walked away with at least $15 million, with a tax deduction exceeding 80 times his actual economic capacity for loss, and would have gained what every investor dreams of-complete insurance against any possible actual economic loss on the trades themselves.

36.     The recent decision in *Coltec Indus., Inc. v. United States*, 454 F. 3d 1340 (Fed. Cir. 2006), affirmed the validity of the economic substance doctrine, emphasizing that it "prevent[s] taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." The court identified five specific principles for application of the doctrine. First, transactions which do not

"vary control or change the flow of economic benefits" must be disregarded. Second, the taxpayer bears the burden of proving that a transaction has economic substance. Third, economic substance must be evaluated objectively, not subjectively. Fourth, a court must clearly define, and focus solely on, the specific transaction that produces the tax benefits at issue, not collateral transactions which do not produce tax benefits. Finally, "arrangements with subsidiaries that do not affect the economic interest of independent third parties" require close scrutiny. These principles compel the conclusion that the Mr. Sala's transaction lacks economic substance.

37.     As the court made clear in *Coltec*, the economic substance doctrine requires an objective analysis of the transaction, i.e., that the transaction must be evaluated "from the standpoint of a prudent investor." *Id.* at 26-27. The transaction will be recognized for tax purposes only if, from the perspective of rational economic investor, the "transaction offers a reasonable opportunity for profit, that is, exclusive of tax benefits." Critically, in determining profit, all expenses and costs associated with the transaction that produces the tax benefits must be taken into account.

38.     For purposes of this analysis here, the relevant transaction is the Deerhurst Transaction, which involved a series of carefully constructed and tax motivated steps entered into by approximately 30 individuals who collectively sought $161,345,553.33 in ordinary losses and $102,250,000 in capital losses, each for their 2000 tax year, and not the subsequent trades, which occurred in 2001 and 2002. This is because "the transaction to be analyzed is the one that gave rise to alleged tax benefit."  Here, the initial investment transferred to the partnerships, which was used to purchase the currency trades gave rise to the tax benefits—by creating an inflated basis in Deerhurst. Therefore, the economic substance analysis must focus exclusively

on whether the approximately 12 tax motivated trades provided Mr. Sala with a reasonable possibility of economic profit.

39.     The transaction did not provide the Mr. Sala with a reasonable possibility of economic profit. The economic profit that could have been generated on the transaction was not reasonable. Because the long options were offset with short options, Mr. Sala's potential for actual economic loss was locked in at the net cost of the long and short options: $728,000. Similarly, Mr. Sala's potential for economic gain on these offsetting options (before consideration of fees and expenses related to the entire transaction) was somewhere in the range of $200,000 to $500,000, or about .03%-.08%, when compared to the noneconomic losses he claimed.  Moreover, the chances of actually hitting the high-end of this profit potential were virtually non-existent and required that currency values which historically traveled together in the same direction would have to travel in opposite directions, including a total crash of the Japanese Yen.  Accordingly, these transactions lacked objective economic substance.

40.     In addition, in 2001 Mr. Sala was required to a pay management fees and a mark-up fee at commercially unreasonable above-market rates.  Because a portion of these fees were paid to the promoters and material advisors for their work on the  tax shelter during the initial testing period, it would be reasonable to consider these in the analysis of economic profit.  When considering those fees, the economic profit that could have been generated on the transaction was starkly negative. The costs that Mr. Sala paid on these transactions exceeded the amounts that were credited to him on their alleged investments.  Put another way, the investments cost more than they earned.  Moreover, the supposed plan to earn a profit by investing in foreign currencies in the second half of the transaction bore no relationship whatsoever to the transactions in the testing period.  Consequently, any potential profit from these peripheral

investments are totally irrelevant to whether or not the purported testing period transactions themselves – which gave rise to the tax benefits at issue – had economic substance.

41.     The Deerhurst transactions also lacked economic substance because potential tax benefits would dwarf any potential profits.

42.     Even if the focus of the economic substance analysis was on the potential for— and not the reasonable possibility of—profit, the profit potential of the transactions was infinitesimal in relation to their associated potential tax benefits. Indeed, courts have disregarded transactions that resulted in simply nominal profit.  *ASA Investerings*, 201 F.3d at 513, 515-16 (agreeing with Tax Court that the taxpayer's "interest in any potential for gain from the partnership's investments was . . . dwarfed by its interest in the tax benefit"); accord *Sheldon v. Comm'r*, 94 T.C. 738, 768 (1990) (denying tax benefits when the real economic impact of the transactions at issue was "infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions"). This case law is consistent with the teachings of the Supreme Court that to have economic substance, the transaction must "appreciably affect" the taxpayer's beneficial interest. *Knetsch*, 364 U.S. at 366.

43.     Applying economic substance principles, courts have also refused to recognize a sham entity for tax purposes "if it is fictitious or if it has no business purpose . . . other than the creation of tax deductions." *Ferguson v. Comm'r*, 29 F.3d 98, 101 (2d Cir. 1994) (citations omitted); *accord Merryman v. Comm'r,* 873 F.2d 879, 881 (5th Cir. 1989). In such cases, the "basic inquiry . . . [is] . . . whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance," and "the absence of a nontax business purpose is fatal." *ASA Investerings*, 201 F.3d at 512-13.

44.     Courts also make clear that merely engaging in business activity is not sufficient to validate a partnership. Id. at 512. This is because the pursuit of business activity in furtherance of tax avoidance "is no more a business purpose than actually engaging in tax avoidance." This principle was recently reaffirmed by the Second Circuit, which stated, "The IRS's challenge to the taxpayer's characterization is not foreclosed merely because the taxpayer can point to the existence of some business purpose or objective in addition to its tax-avoidance objective." *TIFD III-E, Inc.* 459 F.3d at 220 ("Castle Harbour").

45.     In conducting its sham entity analysis, the Court's inquiry is fundamentally objective, focusing on whether the partnership actually served any business needs or whether it was "essentially wasteful activity," the only purpose of which was tax savings. *ASA Investerings*, 201 F.3d at 512-517. As the D.C. Circuit wrote, "In order to satisfy the legal test for this kind of partnership, [there must be] a non-tax business purpose need for the partnership in order to accomplish the goals of the partners." *Boca Investerings P'ship v. United States*, 314 F.3d 625, 632 (D.C. Cir. 2003), cert. denied 540 U.S. 826 (2003). This analysis looks to whether the stated non-tax business purposes could have been achieved more cheaply outside the partnership. *See, e.g., ASA Investerings*, 201 F.3d at 517; Boca, 314 F.3d at 632; *accord Andantech, L.L.C. v. Comm'r*, 331 F.3d 972, 980 (D.C. Cir. 2003) ("Although it is possible that the computer leasing business could have been profitable and beneficial to any of the parties involved, there was no evidence of a non-tax need to form the partnership in order to take advantage of the potential profits of the business"); *Saba P'ship v. Comm'r*, T.C. Memo 2003-31.

46.     There were no non-tax reasons for Deerhurst. The sole reason for forming this entity was to obtain tax benefits by inflating basis.

47.     Deerhurst obviously did not provide anything other than a de minimis profit potential to Mr. Sala—the profit potential was no greater inside the partnership than it was outside.

48.     The parties do not dispute that the option trades of long and short options, which were used to create the artificially inflated basis that generated the non-economic tax losses, were shrouded among other trades. However, the Tenth Circuit recognizes that it is appropriate to focus upon the activity that actually created the tax deduction, and not the window dressing that hid it. *James,* 899 F.2d at 910. The window dressing trades were all part of the promoters' tax shelter conceived of and engaged in solely to mask their real objective and thereby fool the tax authorities. The window dressing trades must be disregarded by this Court. Instead, the Court must focus its review upon the 23 trades that generated the massive non-economic tax losses claimed by Mr. Sala as the grounds for his tax deduction. *Klamath Strategic Investment Fund v. United States*, 472 F.Supp.2d at 895; *Coltec Indus., Inc.* 454 F.3d at 1356-57; *Black & Decker Corp.*, 436 F.3d at 441; *Nicole Rose Corp.*, 320 F.3d at 283-84; *ASA Investerings*, 201 F.3d at 514 n.6; *ACM*, 157 F.3d at 260.

49.     The trading pattern alone, including the deliberate incurrence of losses at the end of the year, may be indicative of tax avoidance-the primary purpose of this transaction. *See Miller v. Comm'r,* 836 F.2d 1274, 1277 (10th Cir. 1988); *Keeler*, 243 F.3d at 1220. The *de minimis* profit potential of this transaction when comparing the amount at risk to the tax benefits claimed, coupled with the fact that the guaranteed noneconomic tax loss was generated in the first year by a small handful of trades, clearly indicates that the true nature of this transaction was tax avoidance.

50.     Here, none of the claimed losses were economically inherent in the transaction. Indeed, Mr. Sala's capacity for economic loss was capped at the net premiums of the long and short options, which totaled $728,000-yet Mr. Sala claimed a tax loss of $60,000,000.  Because the long options were offset with short options, Mr. Sala's potential for actual economic loss was locked in at the net cost of the long and short options: $728,000.  Mr. Sala got quite a deal in this tax shelter, as this significant noneconomic loss required a total economic outlay of just over 1% of the total deduction he claimed.

51.     Before ever entering the transaction, Mr. Sala, his two colleagues who also entered this transaction, his personal tax lawyer, the trader conducting the trades, and the promoters KPMG, Michael Schwartz, and Andrew Krieger were all aware that the tax losses would be created in 2000.

52.     The deliberate incurrence of first year tax losses further supports a lack of business purpose and the transactions will not be accorded tax recognition.  *Keeler,* 243 F.3d at 1218.

**The Partnership Should be Disregarded**

53.     In *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000), *cert. denied*, 531 U.S. 871 (2000), the Court of Appeals for the D.C. Circuit found that a partnership formed for a tax purpose and which engages in de minimis business activity in furtherance of that tax purpose is not a valid partnership.  *ASA*, 201 F.3d at 512.  As explained by the Second Circuit in the recently decided Castle Harbour case, a partnership is not considered to be bona fide "merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to its tax-avoidance objective."  *TIFD III-E, Inc.*, 459 F.3d at 232 ("Castle Harbour"); *see also Boca Investerings*, 314 F.3d at 625.  Moreover, the *ASA* court stated

that whether "the 'sham' be in the entity or the transaction . . . the absence of a non-tax business purpose is fatal." *ASA*, 201 F.3d at 512.  Applying this analysis to the facts before it, the court of appeals in *ASA* found that even though the "investment in LIBOR Notes might have had a business purpose, the prior three-week investment in and subsequent sale of the private placement Notes (PPNs) was . . . a business activity merely conducted for tax purposes." *Id*. at 513.  The Court of Appeals realized that the taxpayer may have had an interest in potential gain from its investments, but those interests were "dwarfed by its interest in the tax benefit." *Id*. at 513.  In concluding that ASA Investerings was not a legitimate partnership, the court further clarified that "[a]lthough a taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." *Id.* (quoting *Zmuda v. Commissioner*, 731 F.2d 1417, 1421 (9th Cir. 1984)).  Hence, the rule in the D.C. Circuit is that a de minimis business purpose will not validate a partnership whose true purpose is the pursuit of tax benefits. Rather, the relevant legal inquiry, is a comparison of the purported business purpose to the expected tax benefit. *Id*. at 513.  The weight placed upon this legal factor led the D.C. Circuit to disregard the partnership entity. *Id*. at 516.

54.     On the issue of risk, the *ASA* Court allowed for the existence of de minimis risk in the transaction noting that "no investment is entirely without risk." *Id*. at 514.  The court further concluded that a carve out of de minimis risk is consistent with the Supreme Court's view that "a transaction will be disregarded if it did 'not appreciably affect [taxpayer's] beneficial interest except to reduce his tax.'" *Id*. (quoting *Knetsch*, 364 U.S. at 366).  As with the transactions in *ASA* and *Boca* , it is possible that de minimis risk existed in the Deerhurst Transaction. However, even if it exists, this de minimis risk does not give substance to the General

Partnership.  The Deerhurst Transaction was structured specifically to generate a tax benefit while limiting each purported partner's risk of loss.  The minor investment activities engaged in by the General Partnership are de minimis compared to the amount of the claimed tax savings and the fees incurred.  Further, the modicum of business purpose asserted by the promoters for the formation of the General Partnership does not alter the fact that the true purpose for the partnership is the reduction of tax liability.  Thus, the General Partnership should be disregarded.

55.     A partnership may not be respected for tax purposes if its partners lacked a good faith business purpose when they joined together to conduct the enterprise.  *Commissioner v. Culbertson*, 337 U.S. 733, 741-743 (1940). Whether a partnership will be recognized for tax purposes is a matter of federal, not local, law.  *Commissioner of Internal Revenue v. Tower*, 327 U.S. 280, 287-288 (1946).  As recently explained in *TIFD III-E*, 459 F.3d at 225 ("Castle Harbour"), this Culbertson test for a valid partnership is in addition to the broad definition of a partnership found in Section 761 of the Internal Revenue Code, *Id*. at 231, n. 12.

56.     Where the partnership is formed, in part, for a tax avoidance purpose, the *Culbertson* test is different than the test for economic substance or sham. Under the *Culbertson* analysis, the denial of partnership status for federal tax purposes is not precluded by the existence of some business purpose or objective reality in addition to its tax-avoidance objective. Id. at 231, n. 13.  In other words, "[w]hile a classification that fails the sham test may be certain to also fail the Culbertson analysis, a classification that passes the sham test would not necessarily survive the Culbertson analysis." *Id.* at 231, n. 13.  In Culbertson, the Supreme Court ruled that a partnership exists when:

> [C]onsidering all the facts-the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true

intent-the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.
*Culbertson*, 337 U.S. at 742.

57.     Thus, partnerships like Deerhurst should be disregarded for federal tax purposes if they were formed with a tax avoidance purpose despite also having some business purpose or objective reality. *Id.*  The *Culbertson* test examines all circumstances including partner's motives and purposes as evidenced by their testimony and their conduct.  *Culberston*, at 741-742; *TIFD III*, 459 F.3d at 220 ("Castle Harbour").  In this case, because Sala's primary purpose was to avoid the payment of taxes when he joined Deerhurst, the partnership fails to meet the *Culbertson* test and should be disregarded for federal tax purposes

58.     The General Partnership was a sham in substance created for tax purposes. Indeed, Michael Schwartz, the promoter of the transaction, admitted in his deposition that the General Partnership was used for the generation of the ordinary tax losses, and that everyone who wanted an ordinary tax loss went into the General Partnership.  The marketing materials also made this clear.[2]

    a.     The marketing materials clearly state that the buy in to the tax shelter is 15% of the expected tax loss if ordinary income is desired, and 10% of the expected tax loss if a capital loss is desired.  These facts clearly evidence the true nature of the transaction, and the reason for the partnership.

    b.     Furthermore, the General Partnership did not itself provide any further profit potential to Mr. Sala on the contributed trades– the profit potential on the offsetting options was no greater inside the partnership than it was outside.

    c.     Fully realizing that the putative partnership would also appear highly suspect, the promoters, as early as the design stage, manufactured a list of alleged business purposes for the General Partnership.  Each is wholly

---

[2]     The marketing materials also purport to show how to create capital losses through the Foreign Exchange Trading Program.

2904800.10

contrived and utterly meritless.  The General Partnership was used solely for its ability to generate significant noneconomic tax losses.

d.  Economies of scale.  Mr. Sala implausibly claims that value was created from centralizing the various partners' offsetting options.  Andrew Krieger, the trader who directed and oversaw all the trading, testified that he never looked at any of these accounts in their individual nature.  It didn't matter to him, or to his trading style, whether the accounts were held individually, in an S Corporation, or in a General Partnership.  Rather, he traded the body of funds as one economic unit without distinction, and simply assigned down to each partner's account based upon their partnership percentage.  However, the option trades used for the creation of basis were entered into while the accounts were held in the individual investor's hands and simply transferred to the General Partnership—those trades were not entered into by the General Partnership.  Thus, the existence of the General Partnership was inconsequential for purposes of the option trades, and was used solely for the creation of artificially high basis to generate noneconomic losses.  Accordingly, the economies of scale argument fails to explain a business purpose for the creation of the artificially high basis by moving the trades into a General Partnership.

e.  Leverage.  The promoters also developed a contrived reason for the liquidation at the transaction's end- the liquidation needed to pass the noneconomic tax losses back to the taxpayer.  Salas' litigating position, and the position set forth in their tax opinion letter, is that it was necessary to liquidate and hold foreign currencies at the end of the year due to illiquidity and volatility in the markets.  However, the trader in charge of all the trading activity, was entirely unaware that this was the purported reason for the liquidation, and testified instead that in actuality there was absolutely no reason to go to cash at the end of the year—the currencies were liquid and volatility was simply not a concern.  On cross-examination, the trader attempted to rehabilitate that testimony and stated that it was too cumbersome to transfer actual positions from the S Corporations into Deerhurst Trading LLC (the entity that was to begin operation the year following the relevant tax year), and thus zeroed out the accounts to cash.  However, Mr. Sala's argument is belied by the fact that both the S Corporation and General Partnership were set up with the partners transferring in actual trades—the long and short options in addition to cash.  In fact, each of the roughly 30 participants in the tax shelter purchased and contributed their basis trades to the partnership in the form of options, not cash.  The trader's attempt at rehabilitation is belied by the practice already expressed twice over.

f.  Fees.  The General Partnership imposed costs on the Salas that they would otherwise not have had, *e.g.* expenses for management of the funds as well

as performance incentives to the fund managers.  In contravention to industry standard, these fees were calculated as a multiple of the leveraged trading size of the account,[3] and were not based upon the actual dollars present in the account.  Mr. Sala could have traded outside the General Partnership, and avoided these high management fees, or traded with a different firm and avoided the highly unusual method of calculating the fee.  *See ASA Investerings*, 201 F.3d at 512-517 ("There is no reason to believe that Allied Signal could not have realized Matthew's interest play without the partnership at far, far, lower transaction costs").

**The S Corporation Should be Disregarded**

59.     A separate corporate entity in a transaction will be respected and, so long as that purpose of the separate entity is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.  *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438-39 (1943).  However, engaging in business activity whose sole purpose is tax avoidance will not validate the existence of a corporation.  *See ASA Investerings*, 201 F.3d at 512; *Nat'l Investors Corp. v. Hoey*, 144 F.2d 466, 468 (2d Cir. 1944).  Thus, in order for a corporation to be recognized as a separate entity for tax purposes, the corporation must engage in some industrial, commercial or other activity besides avoiding taxation.  *Nat'l Investors Corp.*, 144 F.2d at 468; *see ASA Investerings*, 201 F.3d at 513.  Here, the S Corporation was newly formed by Mr. Sala and was liquidated shortly thereafter, and its only business activity during that brief period was to engage in this tax avoidance transaction.  The S Corporation was not formed for the purpose of, and in fact did not engage in, any substantive business activity.  Mr. Sala's S Corporation must be disregarded because it had no economic purpose other than the creation of tax losses.  Thus, the S Corporation should not be

---

[3]     While the accounts were never actually leveraged, Mr. Sala agreed to fees as if the accounts were leveraged at 3 times nominal and 4 times nominal, such that he was incurring management fees of 3% to 4%, and incentive fees of 30%—giving away much of any possible profit.  As the United States' expert witness testified, such fees are highly irregular for the industry.

respected as a genuine corporate entity, and the Mr. Sala's claimed basis in the S Corporation stock should be ignored.

60.     Mr. Sala, and his counsel who provided a written tax opinion, claim that Mr. Sala contributed the 23 option trades to the S Corporation for substantial non-tax business reasons, including the use of leverage with limited liability without the need for additional investment, and the professional management provided by Deerhurst.

61.     The Ruble opinion letter states that the S Corporation was to be used for purposes of protecting Mr. Sala from liability stemming from his account being traded at three times leverage.  This purported reason is not supported by the record.  In fact, the S Corporation afforded Mr. Sala no protection from those 23 option trades at all.  It was used for the sole (if ineffective) purpose of distinguishing the transaction from the plain language of IRS Notice 2000-44 which described abusive tax shelter transactions.

62.     To begin with, the 23 option trades underlying the noneconomic tax losses in question were not entered into by the S Corporation.  It is undisputed that Mr. Sala purchased the option trades in his own name, and on his personal account.  Because Mr. Sala entered into those trades in his own name, and not that of his S Corporation, it was Mr. Sala, not his S Corporation, that was liable upon those trades.  The fact that Mr. Sala transferred the trades to the S Corporation after they were executed and paid for does not attenuate his liability.  As discussed below, because of the offsetting nature of the options used to generate the significant amount of noneconomic tax loss, Mr. Sala's liability—and capacity for any economic loss—was capped at the $728,000 net premium of the long and short options, and not at the $60 million amount claimed by Mr. Sala.

63. Finally, the General Partnership account was never actually traded with leverage In fact, Mr. Sala's expert conceded that he analyzed whether leverage was employed, and found that the only time leverage was used was for trades conducted by the General Partnership involving a meager multiple never approaching the purported 4:1 leverage, and only for trades occurring in the year *following* the shelter transaction—a year not at issue in this case.

64. Moreover, the S Corporation had no business purpose other than to shelter the purported economic effect of the transaction: the only assets it held were the 23 trades, although only for a fleeting moment, and the General Partnership interest.  It conducted no other activity other than generating the noneconomic tax losses.[4]  Because the S Corporation engaged in no other business activity, it should be disregarded as a sham entity.  *See ASA Investerings*, 201 F.3d at 512 (finding a partnership a sham where it lacked any business activity other than the generation of tax losses).

**Section 165(c) provides that losses incurred cannot be deducted when a transaction is not entered into primarily for profit**

65. The lack of a significant non-tax profit motive also supports an independent statutory basis for disallowing the loss claimed by Mr. Sala's S Corporation and passed through to him.  Section 165(c) of the Internal Revenue Code allows individuals to deduct losses from dispositions of property only to the extent that the losses are "incurred in a trade or business" or "incurred in any transaction entered into for profit."  Under this statute, individuals may deduct losses for an investment only if they can establish that they entered into the transaction *primarily* for profit.  Section 165(c)(2) has been characterized as codification of the economic substance doctrine with respect to losses.  *Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir. 1988).

---

[4]   Mr. Sala's argument is that to protect himself from liability he needed to hold his partnership interest through his S Corporation.

However, under Section 165(c)(2) the taxpayer must establish that the transaction was undertaken *primarily* for profit.  *See Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Dewees*, 870 F.2d at 33.  The Tenth Circuit has recognized this requirement.  *See Cannon v. Commissioner*, 949 F.2d 345 (10th Cir. 1991) (profit motive must be "dominant," "primary," "overriding").  This requirement is more stringent than the general economic substance test, and thus, Section 165(c)(2) may apply to limit the deductions even without a finding that the transaction lacked substance.  *Fox v. Comm'r*, 82 T.C. 1001, 1019-21 (1984).

66.     In *Ewing v. Commissioner*, 91 TC 396, 418 (1988), *aff'd without published opinion*, 940 F.2d 1534 (9th Cir. 1991), the Tax Court derived the following guidelines from *Fox*:  (1) The ultimate issue is profit motive and not profit potential.  However, profit potential is a relevant factor to be considered in determining profit motive; (2) profit motive refers to economic profit independent of tax savings; (3) it is the overall scheme which determines the deductibility or nondeductibility of the loss; (4) if there are two or more motives, it must be determined which is primary, or of first importance.  The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent; and (5) because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated.  However, all circumstances surrounding the transactions are material to the question of intent.

67.     When the loss deduction is taken by a pass-through entity, and flows through to a partner, the determination of profit motive is made at the entity level, based on the motives of the general partner, sole shareholder, or other individuals who control the entity.  For example, when partners invest through a partnership, and the Section 165 deduction is taken by the partnership, not the partners, the determination of primary motive, for purposes of Section 165(c)(2) and

2904800.10

other provisions requiring a business or profit motive, is made at the partnership level.  See

Section 703(a) (partnership's taxable income computed in the same manner as an individual's);

*Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), *aff'd*, 722 F.2d 695 (11th Cir. 1984) ("In

order for a partnership to be entitled to a deduction for expenses attributable to a trade or

business in computing its taxable income (or loss) under Section 703(a), it must be established

that the partnership engaged in the activity with the primary purpose and intent of making a

profit").  In determining whether the partnership engaged in the activity for profit, all of the

relevant facts and circumstances are taken into account, and the burden is on the taxpayer.  See

*Brannen*, 78 T.C. at 506.  The intent of the partnership for purposes of applying Section

165(c)(2) is determined by reference to the intent of the general partners, managers, and other

controlling individuals, including owners.  *See Ewing*, 91 TC at 416-17; *Rosenfeld v.*

*Commissioner*, 82 TC 105, 112 (1984); *Seigel v. Commissioner*, 78 T.C. 659, 698 (1982);

*Resnick v. Commissioner*, 66 T.C. 74 (1976), *aff'd per curiam*, 555 F.2d 634 (7th Cir. 1977).

68.     The *Brannen* entity-level analysis also applies to an S Corporation, whose taxable

income, like that of a partnership, is computed in the same manner as that of an individual under

Section 1363(b).  *See Packard v. Commissioner*, 85 T.C. 397 (1985) (material distortion test of

Section 446(b) applied to S Corporation at entity level, citing *Brannen*); *see also* Rev. Rul. 93-

36, 1993 C.B. 187; Rev. Rul. 2000-43, 2000 2 C.B. 333.  Accordingly, Mr. Sala's lack of any

significant non-tax profit motive is imputed to his controlled S Corporation, the entity that

actually claimed the noneconomic loss deduction and only existed to implement the transaction.

69.     The requisite primary profit motive that is a prerequisite for a loss deduction

under Section 165(c)(2) is lacking in this case.  Neither Mr. Sala, nor the S Corporation, which

was 100% owned by him, nor the General Partnership, of which Mr. Sala's S Corporation was a

general partner, nor the promoters, who set up the shelter, had a primary non-tax motive in engaging in these transactions.  As discussed, the evidence shows that these transactions were utterly devoid of economic substance.  Specifically, the evidence shows that the focus was upon the pursuit of multi-million dollar noneconomic tax losses.  The promoters designed this shelter to give the appearance of partners' engaging in legitimate investment activity for the purpose of making money.  In reality, however, this was a clever cover for the partnership's actual objective—creating significant noneconomic tax losses for partners in the General Partnership.  Similarly, the S Corporation had no business motive apart from using its inflated basis to generate the noneconomic tax loss.  The statutory requirements were simply not met.

**Substance Over Form and The Step Transaction Doctrine**

70.    Even if Deerhurst and Mr. Sala's transactions has sufficient business purpose or objective economic substance to be respected for federal tax purposes under the economic substance doctrine, the transactions he entered into can be collapsed or disregarded under substance over form and step transaction doctrines.  *Kuper v. Commissioner*, 533 F. 2d 152 158-159 (5th Cir. 1976). The existence of business purpose for the group of transactions or even the structure of the transactions does not preclude application of step transaction doctrine where a larger tax objective controls the form of the transactions. *Kuper*, 533 F. 2d at 158-159.  *See also, Areoquip-Vickers, Inc., v. Commissioner*, 347 F. 3d 173, 182-183 (6th Cir. 2003); *Associated Wholesale Grocers, Inc. v. United States*, 927 F. 2d 1517, 1526-1527 (10th Cir. 1991) (valid business purpose does not bar step transaction doctrine).

**Substance over Form Doctrine**

71.    The substance-over-form doctrine is applicable to instances where the "substance" of a particular transaction produces tax results inconsistent with the "form"

embodied in the underlying documentation, permitting a court to recharacterize the transaction in accordance with its substance. The economic substance doctrine, in contrast, applies where the economic or business purpose of a transaction is relatively insignificant in relation to the comparatively large tax benefits that accrue (that is, a transaction "which actually occurred but which exploits a feature of the tax code without any attendant economic risk. *Neonatology Associates v. Commissioner*, 299 F.3d 221, 231, n. 12 (3rd Cir. 2002).

72.     The "incidence of taxation depends upon the substance of a transaction" rather than its form.  *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945).  In applying this doctrine of substance over form, the courts look to the objective economic realities of a transaction rather than to the particular form the parties employed. *Frank Lyon Company v. United States*, 435 U.S. 561 573 (1978).  Although Mr. Sala had a right to arrange their business affairs as his judgment deemed best, the courts do not permit taxpayers to randomly piece together the various provisions of the Internal Revenue Code unhampered by any limits on the artificiality of their constructions.  To do so would leave the Congressional taxing schemes in shambles. *Kuper,* 533 F. 2d at 159.

73.     A transaction's substance, not its form, determines its treatment for federal income tax purposes.  *Gregory v. Helvering,* 293 U.S. 465 (1935).

74.     For this reason, courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes where, as here, a transaction's objective economic realities do not comport with the form in which the deal has been cast.  *Commissioner v. Tower*, 327 U.S. 280, 291 (1946); *Commissioner v. Duberstein*, 363 U.S. 278 (1960); *Frank Lyon Co.*, 435 U.S. at 573.

75.     Thus, when the substance of a transaction differs from its form, substance controls.  *See Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994) (recharacterizing a "sale" and "repurchase" of municipal bonds as a secured lending transaction).

76.     In form, it appeared that Mr. Sala entered into five transactions, each consisting of four separate offsetting options, as well as two transactions, each consisting of two offsetting options.  Relying on the form, Mr. Sala claimed an aggregate basis of $60,987,867 for the long options and ignored the $60,259,569 aggregate obligation for the short options when the contracts were deemed contributed to the S Corporation.  For all other purposes, each set of offsetting options were entered into and existed as one arrangement between the parties.  Under the substance-over-form doctrine, each set of offsetting options should be integrated and treated as a single transaction as reflected by its substance.

77.     There are numerous factors that support this conclusion, including: (1) the contracts are nearly identical mirror images; (2) numerous terms are identical; (3) the purportedly separate options are linked contractually; (4) for business reasons, one option would not have been entered into without the other; (5) separation of the contracts by transfer or assignment was never intended by the parties; and (6) the treatment of the options as pairs controlled the economics of the outcomes.

78.     The substance-over-form principle is also reflected in Section 988 which grants the Commissioner the authority to integrate separate foreign currency transactions, such as foreign currency options, when in substance they function as one transaction.  Section 988(d)(1) specifically provides:

> To the extent provided in regulations, if any section 988 transaction is part of a section 988 hedging transaction, all transactions which are part of such 988 hedging transaction shall

be integrated and treated as a single transaction or otherwise
treated consistently for purposes of this subtitle.

79.     Section 988(d)(2) provides, in part, that a Section 988 hedging transaction is any

transaction entered into by the taxpayer primarily "to manage risk of currency fluctuations with

respect to property which is held or to be held by the taxpayer."[5]  Since the purchased long

options in this case are considered property and the sold short options manage the risk of

currency fluctuations with respect to the purchased options (*i.e.*, the hedge protects against loss

of the premium on the purchased options), Section 988 allows the united States to integrate those

options as provided in the regulations.

80.     Moreover, Section 989(c) provides the Secretary with authority to prescribe

regulations "necessary or appropriate" to carry out the purposes of section 988.[6]  Before

discussing the regulations issued under this broad grant of authority, it is important to note that

Congress intended that the Service recharacterize foreign currency transactions that were not

consistent with the policies of Section 988.  The legislative history to the Technical and

---

[5]      Foreign currency constitutes "property" for federal income tax purposes.  *National Standard Co. v. Commissioner*, 749 F.2d 369, 371 n.3, (6th Cir. 1984); *Norwest Corp. v. Commissioner*, 108 T.C. 265, 301 (1997).  Generally, gain or loss on the sale or exchange of an option to buy or sell property (option property) by a purchaser is considered as gain or loss from the sale or exchange of property having the same character as the option property.  I.R.C. §1234(a).  Moreover, a cash-settled option is treated as an option to buy or sell property.  I.R.C. §1234(c)(2)(A).

[6]      It has long been a bedrock legal principle that courts are to accord deference to the formal interpretations of a statute adopted by the agency that has been "charged with responsibility for administering the provision" by Congress, provided that the agency's interpretation is reasonable.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 865 (1984).  With respect to tax cases, the Supreme Court has adopted a reasonableness standard under which deference is given to Treasury Regulations if they implement a congressional mandate in a reasonable manner.  *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169 (1981) ("Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes'", quoting *Commissioner v. South Texas Lumber Co*, 333 U.S. 496 (1948); *United States v. Correll*, 389 U.S. 299, 307 (1967) ("The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner).

Miscellaneous Revenue Act of 1988 ("TAMRA"), in discussing the law prior to the enactment of

TAMRA, states that "[t]he Secretary has general authority to provide the regulations necessary

or appropriate to carry out the purposes of new subpart J [sections 985-989].  For example, the

Secretary may prescribe regulations appropriately recharacterizing transactions to harmonize the

general realization and recognition provisions of the Code with the policies of section 988."

H.R. Rep. No. 795, 100th Cong., 2d Sess. 296 (1988); S. Rep. No. 445, 100th Cong., 2d Sess. 311

(1988) (containing identical language).  One of the principal reasons Section 988 was

promulgated was a concern about tax-motivated transactions relating to foreign currency."[7]

81.     Consistent with Sections 988(d) and 989(c) and the legislative history set forth

above, the Service issued Treas. Reg. §1.988-2(f) providing that—

> If the substance of a transaction described in §1.988-1(a)(1) [i.e., a transaction subject to section 988, which the options in this case clearly are] differs from its form, the timing, source, and character of gains or losses with respect to such transaction may be recharacterized by the Commissioner in accordance with their substance. . . .  ***In applying the substance over form principle, separate transactions may be integrated where appropriate***.  (Emphasis added.)

82.     Thus, independent of the common law substance-over-form rule, the Code and the

regulations authorize the Service to integrate separate financial instruments, such as the

offsetting options sold and purchased in this case.  This anti-abuse provision under section 988 of

the Code applies regardless of whether the transferor of the offsetting options is a partnership or

an S Corporation.

83.     In sum, Mr. Sala purchased and sold offsetting options, which functioned

economically as single, small, and integrated financial positions.  In particular, Mr. Sala never

would have been able to participate in one of the option positions standing alone without also

---

[7]     The Senate report on the enactment of Subpart J (sections 985-989) states under the heading "Reasons for Change": "The result of the state of present law is uncertainty of tax treatment for many legitimate business transactions, as well as opportunities for tax-motivated transactions." S.Rep. No. 313, 99th Cong., 2nd Sess. 450 (1986).

participating in the other, substantially offsetting position. The impracticality of separating the economic benefits and burdens of the two options into their component parts requires that they be treated as a single transaction for tax purposes.

84.     By exalting form over substance, Mr. Sala seeks to produce a tax loss nearly 85 times greater than the actual $728,000 net premium paid for the positions.  Moreover, this noneconomic loss does not reflect any real decline in value due to currency fluctuations. Thus, this case involves exactly the type of tax-motivated foreign currency transaction that concerned Congress when it enacted Section 988, and that concerned the Service when it promulgated Treas. Reg. § 1.988-2(f).  Congress intended to prohibit such an absurd result.

**Step Transaction Doctrine**

85.     Another application of the substance over form principle is the step transaction doctrine. The step transaction doctrine treats the steps in a series of formally separate but related transactions as a single transaction, if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan." *Long Term Capital Holdings*, 330 F. Supp. 2d at 191 (*citing Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994)).

86.     Thus, where a taxpayer has embarked on a series of transactions that are in substance a single, unitary, or indivisible transaction, the courts have disregarded the intermediary steps and have given credence only to the completed transaction. *Redwing Carriers, Inc., v. Tomilson*, 399 F. 2d 652, 654 (5th Cir. 1968).

87.     Over time, the courts have applied three different tests before imposing the step transaction doctrine and collapsing one or more of the transactions in these cases. They are the binding commitment test, the interdependence test, and the end result test.  *See Falconwood*

*Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005).  These three expressions of the step transaction doctrine have different meanings in different contexts, and may not result in one rule for all situations. Courts choose between them depending on the substantive provision of the Code to which they are being applied. *Id*. at 1350.

88.     The "binding commitment test" collapses a series of steps into a single transaction where there was a binding commitment at the time the first transaction was entered into to also undertake a later transaction or series of transactions.  If however, there is a moment in the series of transactions during which the parties were not under a binding obligation, the steps cannot be integrated, regardless of the parties' intent. *See Commissioner v. Gordon*, 391 U.S. 83 (1968); *Penrod v. Commissioner*, 88 T.C. 1415 (1987). *But see, Security Industrial Insurance v. United States,* 702 F. 2d 1234, 1245 (5th Cir. 1983) (rejecting the binding commitment test and stated that it would apply either the end result or interdependence test.)

89.     The "interdependence test" requires an inquiry as to whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. *Associated Wholesale Grocers, Inc. v. United States*, 927 F. 2d 1517, 1523 (10th Cir. 1991). The "interdependence test" focuses on the relationship between the steps, rather than on the "end result." Disregarding the tax effects of individual steps under this test is, therefore, especially proper where it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts. *Id*.

90.     Under the "end result test" courts hold that if a series of formally separate steps are prearranged parts of a singe transaction intended from the outset to achieve the final result, one or more of the steps along the way to that preplanned goal can be collapsed.  This test relies

on the parties' intent at the time of the transactions, which can be derived from the actions

surrounding the transactions.  *See Penrod v. Commissioner,* 88 T.C. 1415 at 1429 (1987).

91.     The end result test applies when separate transactions were "really component

parts of a single transaction intended from the outset to be taken for the purpose of reaching the

ultimate result."  *Falconwood*, 422 F.3d at 1349; *Associated Wholesale Grocers*, 927 F.2d at

1523; *True*, 190 F.3d at 1175.  Under the end result test, "purportedly separate transactions will

be amalgamated into a single transaction[.]"  *King Enterprises*, 418 F.2d at 516; *Associated*

*Wholesale Grocers*, 927 F.2d at 1523; *True*, 190 F.3d at 1175.  The test focuses on whether the

taxpayer intended to reach a particular result by structuring a series of transactions in a certain

way.  *True*, 190 F.3d at 1175.  Subjective intent "is especially relevant … because it allows [a

court] to determine whether the taxpayer directed a series of transactions to an intended

purpose." *True*, 190 F.3d at 1175-78 (citations omitted); *see also Andantech*, T.C. Memo 2002-

97 ("[E]very step taken by the parties … were but transitory steps.").  However, the analysis does

not examine whether the taxpayer had the subjective intent of following these steps for purposes

of making a profit.  Rather, the analysis focuses only on whether the taxpayer intended to

undertake the series of steps.  True, 190 F.3d at 1175.

92.     The Tenth Circuit Court of Appeals emphasizes that:

> [the] focus is not on the legitimacy of the intended result, but instead on whether the
> taxpayer undertook multiple steps to achieve a particular result.  Thus, if a taxpayer
> engages in a series of steps that achieve a particular result, he cannot request independent
> tax recognition of the individual steps unless he shows that at the time he engaged in the
> individual step, its result was the intended end result in and of itself.  If this is not what
> the taxpayer intended, then we collapse the series of steps and only give tax consideration
> to the intended end result.
> *Id.*

93.     Recently, the Sixth Circuit confirmed that where there is a tax motive, the end

result test can be applied irrespective of the transaction or the structure's business purpose.

Here, although the individual steps of the transaction had a legitimate business reason, the transaction must be treated as a single unit and judged by its end result. "To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps, would frequently defeat the purpose of the substance over form principle." *True v. United States*, 190 F.3d 1165, 1177 (10th Cir.1999). Aeroquip-Vickers has shown only the existence of a non-tax business purpose for engaging in a series of transactional steps "to accomplish a result [it] could have achieved by more direct means." *Id.* (quoting *Associated Wholesale Grocers*, 927 F.2d at 1527). Notwithstanding this business purpose, [the IRS] correctly concluded that the intended end result of the transaction was to ... avoid [tax] liability....

*Areoquip-Vickers, Inc., v. Commissioner*, 347 F. 3d 173, 183 (6th Cir. 2003).

94.     Each of the three basic steps of the offsetting options transaction were meticulously scripted in advance and were integral components of a carefully-devised overall plan.  In evaluating whether steps should be combined, particular scrutiny is given to steps taken between related parties.  *United States v. General Geophysical Co.*, 296 F.2d 86, 89 (5th Cir. 1961), cert. denied 369 U.S. 849 (1962).  The application of the step transaction doctrine will require that Mr. Sala's step transferring of the offsetting options to his S Corporation, the step transferring the options from the S Corporation to the General Partnership, and the final step liquidating the General Partnership and passing back assets to Mr. Sala be collapsed and the intervening steps disregarded.  Stated differently, the step transaction doctrine requires that Mr. Sala be treated as having both acquired and closed the offsetting options themselves.  And for the very same reasons, the step transaction doctrine also mandates that the S Corporation and the General Partnership be disregarded.  Either conclusion will have the effect of eliminating any claim to an outside basis in the S Corporation or General Partnership derived from the offsetting options and will thereby eliminate the inflated basis that Mr. Sala claims, and bar a refund of the assessed taxes.

95.     There is no question that Mr. Sala intended to and did undertake a series of steps, passing the long and short options which composed the tax basis trades at issue in this tax shelter transaction, to his S Corporation and then to the General Partnership, which was followed by the General Partnership's liquidation and ultimate return of assets to him, in a step-by-step process, with the intent of attaining the end result: the tax benefits derived from his alleged basis in the contributed options.  These steps were set forth in the marketing materials, and show that the steps of transferring offsetting options to, and then redeeming assets with inflated bases from, the partnership were key, preordained steps of this tax shelter.  These same steps were also laid out in the tax opinion letter issued by Brown & Wood.  Mr. Sala concedes that he entered into this series of steps with the intention to use these trades for the creation of tax basis resulting in massive non-economic tax losses.

96.     As discussed above, the purported reasons for why each individual entity was created are not supported by the facts or by reasonable inference.  The creation of the entities, and the successive steps of the transaction, were laid out in the marketing materials and the tax opinion letter.  Mr. Sala intended to undertake this series of steps.  Accordingly, this series of steps should be collapsed, and only the intended end result given consideration.  Upon collapsing the transaction, Mr. Sala must be treated as acquiring and closing out the offsetting options directly and purchasing the assets transferred to him in liquidation of the General Partnership, directly.  The tax effect of this collapse means that Mr. Sala cannot claim the artificially inflated basis allegedly created by use of the intermediary entities.

97.     The interdependence test focuses on the relationship between the steps that a taxpayer has taken, rather than the end result.  *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1523 (10th Cir. 1991).  Under this test, the Tenth Circuit will disregard

2904800.10

the tax effects of individual transaction steps if "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts." *True,* 190 F.3d at 1175. Courts applying this test have examined whether each of the steps under scrutiny had a "reasoned economic justification standing alone." *Security Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1247 (5th Cir. 1983).  Any step which lacks such a justification is a candidate for elimination under the step transaction doctrine.  *True*, 190 F.3d at 1168-69.

98.     If the steps have "reasoned economic justification standing alone," then judgment under the interdependence test is inappropriate.  *True*, 190 F.3d at 1178; *Security Indus. Ins. Co.*, 702 F.2d at 1247.  However, if the only reasonable conclusion from the evidence is that the steps have "meaning only as part of the larger transaction," then the step transaction doctrine applies as a matter of law. *Security Indus. Ins. Co.*, 702 F.2d at 1246.  Here, the sole purpose of each of these steps was to use the S Corporation and General Partnership strictly as conduits for generation of tax losses: first, to pass the massively inflated basis of the long options onto the Mr. Sala's S Corporation and General Partnership interests, and then to pass the inflated basis of his General Partnership interest onto assets later distributed to Mr. Sala on his prearranged withdrawal from the partnership.  Mr. Sala admits that he entered this transaction with several reasons, including the tax losses.  As explained above, because the entities afforded no other benefit, the contribution of the offsetting options to the S Corporation and to the General Partnership would have been fruitless without Mr. Sala's receipt of assets from the General Partnership having a inflated basis, upon whose sale Mr. Sala could recognize the tax loss.  Each step was absolutely critical to Mr. Sala's claim for non-economic tax losses, and none of the steps would have been undertaken without the others.

99.     As discussed above, the transaction's steps only have meaning as part of the larger tax shelter, because, for example, the act of contributing the offsetting options to the S Corporation and to the General Partnership did not provide a meaningful economic benefit to Mr. Sala.  The only benefit they offered was the ability to generate non-economic tax losses. The transfers offered no liability protection for the basis trades, no economies of scale, no lower fees, nor any economic benefit other than the sham tax deduction itself.  Each of the steps of this tax shelter transaction was inextricably interrelated and served no purpose other than to generate non-economic losses.  Thus, under the interdependence test, the interconnected steps of the transfer of the offsetting options to the S Corporation and to the General Partnership, and the distribution of assets to Mr. Sala upon liquidation must be disregarded.  With these steps disregarded, there is no purpose for the existence of the S Corporation and General Partnership, and they too must be disregarded.

100.     In sum, the S Corporation and the General Partnership played transitory roles in a preordained plan to pass offsetting options through the purported partnership, with the end result that Mr. Sala would receive assets with an artificially inflated basis.   These well-choreographed steps should be disregarded.  Under the interdependence and end result tests, Mr. Sala  must be treated as acquiring and closing out the offsetting options directly and purchasing the assets distributed to him upon liquidation of the General Partnership, directly.  Moreover, given that these transitory steps must be disregarded, the S Corporation and the General Partnership must likewise be disregarded for tax purposes.

**The Partnership Should be Disregarded Under the Anti-Abuse Regulations**

101.     Like the economic substance doctrine, the partnership anti-abuse regulations provide that this Court may disregard the use of a partnership that does not serve a substantial

business purpose. *ASA Investerings*, 201 F.3d at 512; *Boca Investerings,* 314 F.3d at 625 (a business activity conducted merely for tax purposes may be denied legal effect); TREAS. REG. 1.701-2(a), (b) and (c).

*Treasury Regulation § 1.701-2*

102.    Treasury Regulation § 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that Internal Revenue Code subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax.  Implicit in the intent of subchapter K are the following requirements:

> The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose;

103.    The form of each partnership transaction must be respected under substance over form principles; and

> Except as otherwise provided, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income).

104.    Treasury Regulation § 1.701-2(b) provides that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in Treasury Regulation § 1.701-2(a).  Accordingly, if a partnership is formed or availed of in connection with a transaction, a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of

2904800.10

subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts

and circumstances.  Thus, even though the transaction may fall within the literal words of a

particular statutory or regulatory provision, the Commissioner can determine, based on the

particular facts and circumstances, that to achieve tax results that are consistent with the intent of

subchapter K: (1) the purported partnership should be disregarded in whole or in part, and the

partnership's assets and activities should be considered, in whole or in part, to be owned and

conducted, respectively, by one or more of its purported partners; (2) one or more of the

purported partners of the partnership should not be treated as a partner; (3) the methods of

accounting used by the partnership or a partner should be adjusted to reflect clearly the

partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction

or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or

modified.

105.    Treasury Regulation § 1.701-2(c) provides that whether a partnership was formed

or availed of with a principal purpose to reduce substantially the present value of the partners'

aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is

determined based on all of the facts and circumstances, including a comparison of the purported

business purpose for a transaction and the claimed tax benefits resulting from the transaction.

106.    In this case, the tax consequences resulting from the operation of the General

Partnership and from transactions between the partners and the General Partnership do not

accurately reflect the partners' economic agreement and do not clearly reflect Mr. Sala's income.

The tax loss generated by the transaction does not reflect accurately an underlying economic loss

experienced by either the S Corporation or the General Partnership.  Further, no provision in

2904800.10

subchapter K contemplates the creation of the significant noneconomic losses generated by the Deerhurst Transaction engaged in by Mr. Sala and his S Corporation.

107.     Pursuant to the Regulation, the transfer of each of the 23 option trades to the General Partnership should be recast to reflect a contribution of twelve single offsetting option transactions not only to reflect their practical economic reality but also to ensure that the tax benefits arising from this transaction are likewise consistent with economic reality.

108.     Congress did not intend the subchapter K partnership provisions to facilitate transactions, like that at issue here, which give a partner a tax basis grossly out of proportion to his actual economic investment.  Application of the Anti-Abuse Regulation therefore mandates disallowing the noneconomic tax losses generated through artificially inflated bases of the assets distributed to Mr. Sala in redemption of his interest in the General Partnership.  Accordingly, the Court should uphold the Commissioner's recast of this transaction either to disregard the contribution of the offsetting option pairs by Mr. Sala's S Corporation to the partnership or to reduce the amount for the contribution of the option pairs to the General Partnership to $728,000, the net amount that Mr. Sala paid for acquiring them, to account for the offsetting nature of the option pairs.  This approach will eliminate the artificially inflated basis and the noneconomic tax loss and will result in a proper reflection of income.

109.     Treasury Regulation § 1.701-2(c) lists factors that may be considered in determining if a partnership was formed or availed of in a manner inconsistent with subchapter K, but those factors do not create a presumption that a partnership was or was not used in a manner inconsistent with subchapter K.

110.     Two specific factors provided in TREAS. REG. § 1.701-2(c) to be considered in the facts and circumstances analysis in this area are:

2904800.10

The present value of the partners' aggregate federal tax liability is substantially less than it would be had the partners owned the partnership's assets and conducted the partnership's activities directly;

The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction ….

111.    Considering the facts and circumstances, it is clear that the General Partnership was formed or availed of for the principal purpose of substantially lowering Mr. Sala's income tax liability in a manner inconsistent with subchapter K of the Internal Revenue Code. The General Partnership was in existence for barely one month at the end of tax year 2000.  In that short period the General Partnership was formed, the offsetting options and cash were contributed to it by Mr. Sala's S Corporation and Mr. Sala terminated the S Corporation's interest in the General Partnership.  All of these transactions were intended by Mr. Sala and the promoters of the Deerhurst Transaction to create and justify a significant tax loss for Mr. Sala without a corresponding economic outlay by him.

112.    The loss generated in this tax shelter was achieved by generating an artificially inflated outside basis in the partnership.  This inflated basis is not supported by the underlying economics of the transaction.  That is, if Mr. Sala, outside the partnership, had held the economically offsetting option positions, liquidated them and then purchased other assets, the noneconomic tax loss would not have been generated.

113.    Another factor specifically listed for consideration in § 1.701-2(c) is that the present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions designed to achieve a particular end result are integrated and treated as a single transaction.  For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose

2904800.10

interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners.  Section 1.701-2(c)(2).

114.    As described more fully above, this case involves the use of purportedly separate transactions to achieve a substantially smaller aggregate federal tax liability than if the transactions were integrated.  Mr. Sala embarked on a planned series of separate steps that were in substance part of a single transaction designed to reduce his tax liability.  Each of these steps was contemplated from the beginning of Mr. Sala's involvement with promoters as reflected by the promotional materials provided for the Deerhurst Transaction.  Entering into offsetting option pairs, contributing those option trades, through the S Corporation, to the General Partnership, the temporary nature of the S Corporation as a purported partner in the General Partnership, and the liquidation of the partner's interest in the General Partnership were all key steps designed to achieve a far different tax result than had there been one integrated transaction engaged in by Mr. Sala.  The example in Section 1.701-2(c)(2) is telling in that it mirrors the facts of this case.  The S Corporation does not appear to have had any business motive for purportedly becoming a partner in the General Partnership.  Therefore, the S Corporation's sole role in the Deerhurst tax shelter transaction was as a temporary partner to allow Mr. Sala to claim a large noneconomic loss from his S Corporation's interest in the General Partnership.

**The S Corporation Should be Disregarded Under the Anti-Abuse Regulations**

115.    Pursuant to the Regulation, the S Corporation should also be disregarded.  The S Corporation's transitory membership in the General Partnership should be recast to disregard the S Corporation as a partner in order to ensure that the tax benefits arising from this transaction are likewise consistent with economic reality for Mr. Sala and his S Corporation. The tax loss

generated by the transaction does not accurately reflect an underlying economic loss experienced by either the S Corporation or the General Partnership.  Further, no provision in subchapter K contemplates the creation of the large noneconomic losses generated by the Deerhurst transaction engaged in by Mr. Sala and his S Corporation.  TREAS. REG. § 1.701-2 clearly supports recasting the transaction to disregard the S Corporation as a partner in the General Partnership.

**The S Corporation Basis Must be Reduced Under 26 U.S.C. § 752**

116.    Mr. Sala's S Corporation was a partner in the General Partnership.  Under Section 752, a partner's adjusted basis in a partnership is determined *inter alia* by a partner's contribution to the partnership.  Substantively, Mr. Sala only transferred twelve[8] offsetting option pairs to the S Corporation and from the S Corporation to the General Partnership.

117.    For tax shelter transactions involving the contribution of offsetting option pairs after October 18, 1999, but before June 24, 2003, Treasury Regulation § 1.752-6 requires a reduction in the outside basis in the partnership of the taxpayer/partner who contributed the offsetting option pairs.

118.    Under Treasury Regulation § 1.752-6(a), if, in a transaction described in Section 721(a), a partnership assumes a liability of a partner as defined in Section 358(h)(3) of the Internal Revenue Code other than a liability to which Section 752(a) and (b) apply, then, after application of Section 752(a) and (b), the partner's basis in the partnership is reduced by the amount of the liability determined as of the date of the exchange, but not below the adjusted value of such interest.  For purposes of this Regulation, the adjusted value of a partner's interest in a partnership is the fair market value of that interest, increased by the partner's share of

---

[8]    Because the parties count the options differently (Mr. Sala counts 24, the United States counts 23), there are either eleven offsetting option pairs plus a single option or twelve offsetting option pairs.  We will refer to these option trades as the twelve offsetting option pairs for sake of simplicity.

partnership liabilities.  Section 358(h)(3) defines liability to include any fixed or contingent obligation to make a payment, without regard to whether the obligation is otherwise taken into account for federal tax purposes.

119.     Treasury Regulation § 1.752-6(b) provides an exception through which the § 1.752-6(a) reduction in a partner's basis is not required where a partnership assumes a liability to which Section § 752(a) and (b) do not apply if substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange. TREAS. REG. § 1.752-6(b)(1).  However, in the case of Notice 2000-44 transactions, which includes this tax shelter, the regulation specifically states that this exception does not apply.[9]  *See* TREAS. REG. § 1.752-6 (b)(2).  Accordingly, the S Corporation's basis in the General Partnership must be reduced by the General Partnership's assumption of the liabilities represented by the short options.

120.     Pursuant to Treasury Regulation § 1.752-6, the General Partnership's assumption of the short options is an assumption of liability that reduces Mr. Sala's basis in the General Partnership, to the extent of the amount of the liability but not below the adjusted value of the partner's interest.  TREAS. REG. § 1.752-6 (a).  This Regulation sets forth a certain time window within which such options must have been contributed to the General Partnership in order for

---

[9]        TREAS. REG. § 1.752-6 (b)(1) includes another exception which provides that the reduction in basis is not required after an assumption of a liability described in Section 358(h)(3) if the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange.  This Deerhurst Transaction does not involve the transfer of a trade or business and therefore, this exception does not apply to the transaction.

this Regulation to apply.[10]  The parties do not dispute that the options were contributed to the General Partnership within that time period.

121.    In short, this Regulation states that, subject to the restrictions stated above, where a partnership assumes a partner's liability, the partner's basis in the partnership will be reduced by the amount of that liability.  In the context of this case, the Regulation provides that upon the S Corporation's contributions of the long and short options to the General Partnership, the S Corporation's basis in its partnership interest is increased by the premiums for the long options and decreased by the fair market value of the short option, thus taking into account the General Partnership's assumption of the liabilities represented by the short options.  The fair market value of Solid Currencies' partnership interest in Deerhurst Investors, GP did not exceed $8,943,673 at the time of contribution.  Similarly, the value did not exceed $9,021,108 at the time of liquidation Accordingly, the S Corporation's basis in the General Partnership is equal to its cash contributions plus the net value of any transferred offsetting option pairs, plus his share of any partnership liabilities, and is not equal to the roughly $60 million value of the long options on their own.  The S Corporation's basis in the partnership, after application of Regulation § 1.752-6, amounts to roughly $9 million dollars.

**Mr. Sala's Basis in the S Corporation Cannot Exceed His Economic Investment**

122.    Mr. Sala was the 100% shareholder of his S Corporation.  Section 1371(a) provides that, except as otherwise provided, and except to the extent inconsistent with subchapter S, subchapter C shall apply to an S Corporation and its shareholders.  Under Section 358(a), the transferor's basis in the stock received in a Section 351 exchange is equal to its basis in the

---

[10]     Pursuant to TREAS. REG. § 1.752-6, the options must have been contributed to the partnership between October 18, 1999, and June 24, 2003.  It is undisputed that these options were contributed to the General Partnership in November 2000.

property transferred, reduced by any money received and by the fair market value of any non-stock consideration ("other property," or boot) received.  An S Corporation shareholder's deduction for the shareholder's allocable share of S Corporation losses is limited to the sum of that shareholder's adjusted basis in stock and debt on the last day of the taxable year.  26 U.S.C. § 1366(d)(1)(A).  Similarly, for an S Corporation without earnings and profits, a distribution from an S Corporation is excluded from the shareholder's income only to the extent the distribution does not exceed the adjusted basis of the stock.  26 U.S.C. § 1368(b)(1).  For this purpose, a shareholder's basis in an S Corporation is meant to represent the shareholder's economic investment in the S Corporation.

123.    The legislative history of Section 1374(c)(2), the predecessor to Section 1366(d), states that the purpose of this section is as follows:

> The amount of the net operating loss apportioned to any shareholder pursuant to the above rule is limited under section 1374(c)(2) to the adjusted basis of the shareholder's *investment* in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder.

* * *

Report of Committee on Finance, 1958-3 C.B. 1141; emphasis added.

124.    In *Pike v. Comm'r*, the Tax Court applied this statute to deny losses claimed by an S Corporation, finding that the taxpayers' basis in the S Corporation was zero based on the lack of an economic investment.  In *Pike,* two taxpayers entered into an auto leasing tax shelter.  Two S Corporations ("Cerritos" and "Delta") established by the shelter promoter purchased vehicles selected by the respective taxpayers.  *Pike v. Comm'r*, 78 T.C. 822 (1982), *aff'd without opinion*, 732 F.2d 164 (9th Cir. 1984).  The vehicles were leased to the taxpayers for their personal use, at a minimal rate.  Each taxpayer took out two loans from a finance company ("Confidential") also

established by the shelter promoter.  The first loan was used to purchase stock in the S

Corporations, with a face value greater than the cost of the car.  The second loan was used to

prepay the car rental payments and the interest on the stock purchase loan.  It was understood by

all parties that this stock purchase loan would not have to be repaid, as long as the taxpayer

remained in the program; and if the taxpayer withdrew from the program, the loan would be

cancelled upon cancellation of the stock.  Thus, the investor had no out-of-pocket cost for

acquiring the S Corporation stock.  In holding that the taxpayers did not have basis in their S

Corporation stock, the Tax Court reasoned,

> "[w]hile at first glance it appears that petitioners purchased their stock in Cerritos
> and Delta and thus made an investment in the corporations, upon closer
> examination it is clear this was not the case.  Petitioners obtained the funds
> necessary to purchase their stock from Confidential.  As discussed, *supra*,
> petitioners at all times understood that they would not have to pay this money
> back.  Accordingly, petitioners never made an actual economic outlay, nor will
> they ever have to do so.  Furthermore, we note that Cerritos and Delta never
> really had the use of the funds."

*Pike*, 78 T.C. at 840.  *See also, Estate of Leavitt v. Comm'r*, 875 F.2d 420, 422 (4th Cir.
1989), *affg*. 90 T.C. 206 (1988); *Perry v. Comm'r*, 54 T.C. 1293, 1296 (1970).

125.    As the *Pike* court stated, Congress' use of "[t]he word 'investment' reveals an

intent, on the part of the committee, to limit the applicability of Section 1374(c) to the actual

economic outlay of the shareholder in question. *Perry v. Comm'r*, 54 T.C. 1293, 1296 (1970)."

The Tax Court in *Pike* concluded that because "no investment was ever made by petitioners",

their basis in the S Corporation stock was zero, and therefore they were not entitled to deduct the

S Corporations' net operating losses.

126.    The Tax Court reached a similar result in *Chamberlain v. Comm'r*, T.C. Memo.

1987-20.  In *Chamberlain*, the taxpayer acquired shares in an S Corporation for $60,000.  Forty-

five thousand dollars of the purchase price was paid with a nonrecourse promissory note issued

by a third party bank.  The loan was to be repaid from Chamberlain's share of the S

Corporation's receipts.  The tax court found the loan represented by the $45,000 nonrecourse

note was too contingent to be included in Chamberlain's cost basis for tax purposes.  The court

reasoned, "no actual obligation was intended or created and no economic detriment suffered for

which petitioner would be entitled to include the nonrecourse note in his cost basis."

Furthermore, the court found nothing in the "record as a whole, to show that petitioner will ever

be 'irretrievably out of pocket' for the $45,000."  The taxpayer further argued that although the

stock purchase was financed by the bank, he had sufficient resources that he could have paid the

$45,000 from his own assets.  The court was unconvinced, stating,

> What was actual [*sic*] done is determinative of tax treatment, not what might have
> been done.  Moreover, it is clear from this record that petitioner, as an investor in
> [the S Corporation], had no intention of financing the transaction other than by
> executing a $45,000 nonrecourse note.

*Chamberlain*, T.C. Memo. 1987-20 (citation omitted).

127.     The instant case bears comparison to *Pike* and *Chamberlain* in several important

respects.  The value of Mr. Sala's interest in Solid Currencies, Inc. did not exceed $8,943, 673 at

the time of his initial contribution.  Similarly, the value did not exceed $9,021,108 at the time of

its liquidation.  Mr. Sala purchased these offsetting options in his own name, then transferred

them to the S Corporation, and then into the General Partnership.  When purchasing the

offsetting trades, Mr. Sala never made an actual economic outlay of $60 million.  Mr. Sala was

only required to pay the net premium resulting from the various offsetting positions, and such net

premium would cap his potential economic loss.  Mr. Sala was not made poorer by $60 million,

and the S Corporation was not enriched by $60 million.  The S Corporation never received or

had use of $60 million.  Taxpayer's $60,987,866.79 "outlay" for the contributed long options

was funded, to the extent of $60,259,568.94, by the proceeds of short options, therefore equaling

a net required out-of-pocket payment of only $728,297.85.   No further premium payment would ever be required, as Mr. Sala's, and the S Corporation's, risk of loss was capped at the net premium of $728,000.  Mr. Sala's investment in the S Corporation was increased by only $728,000 as a result of the option contribution.  As a result, any increase in Mr. Sala's adjusted basis in the S Corporation related to the options should be limited to $728,000, the amount of his economic outlay.[11]

128.    Mr. Sala could similarly only deduct the aggregate amount of losses that did not exceed his adjusted basis in the S Corporation at the end of 2000.  Here, his basis in the S Corporation was his contribution of $8.9 million, a part of which was used to pay for the contributed options having the net economic outlay of $728,000.  Because his adjusted basis in the S Corporation was only $8.9 million, Mr. Sala could not deduct any amount greater than that on his income tax return.  *See* 26 U.S.C. § 1366(d).

**Reduction of S Corporation Basis under Section 358**

*Basis under §§ 357 and 358*

129.    The general rule of Section 1001(a) of the Internal Revenue Code is that the transfer of property to a corporation in exchange for stock of the transferee corporation generally is a "sale or disposition" of property that results in the realization of gain or loss equal to the difference between the adjusted basis of the property and the value of the stock received.  The entire amount of the realized gain or loss on the property is recognized by the transferor except as otherwise provided.  Section 1001(c).

---

[11]    *See also* 26 U.S.C. § 358(d)(1), which provides that the S Corporation's assumption of Mr. Sala's short option liabilities reduces his basis in S Corporation stock by the value of the liabilities assumed.

2904800.10

130.     One exception to the general recognition rule of § 1001(c) can be found in § 351. Under § 351(a), no gain or loss is recognized if property is transferred to a corporation (*i.e.*, in this case the S Corporation or "the transferee") by one or more persons (*i.e.*, Mr. Sala or "the transferor") solely in exchange for stock in such corporation and immediately after the exchange, such person or persons are in control of the corporation.  The basic purpose of section 351 is to permit deferment of gains or losses where there has been a mere readjustment of the form of ownership rather than a termination of the taxpayer's interest in the transferred property.  *See Helvering v. Cement Investors, Inc.*, 316 U.S. 527, 533-34 (1942) (discussing the purpose of section 112(b), the predecessor to section 351).

131.     As stated by the court in *Portland Oil Co. v. Commissioner*, 109 F.2d 479, 488 (1st. Cir. 1940):  It was the purpose of section 112(b)(5) (the predecessor to § 351) to save the taxpayer from an immediate recognition of a gain or the claim of a loss, in certain transactions where gain or loss may have accrued in a constitutional sense, but where in a popular and economic sense there had been a mere change in the form of ownership and the taxpayer had not really "cashed in" on the theoretical gain, or closed out a losing venture.

132.     The Code achieves this deferment while preserving the taxpayer's inherent gain or loss, by generally treating the taxpayer's basis in the stock received as equal to his basis in property that was transferred to the corporation.  *See* § 358.  Thus, the taxpayer is placed in the same position, no better and no worse, with respect to his stock as he was with respect to the property transferred.

133.     If an exchange would otherwise qualify for § 351(a) treatment but for the fact that the transferor receives money or other non-property (commonly referred to as "boot") in addition to the transferee's stock, then gain (if any) to such recipient shall be recognized, but not in excess

of the amount of money plus the fair market value of such other property received.  I.R.C. § 351(b)(1).  If the transfer would result in a loss, no loss may be recognized by the taxpayer. I.R.C. § 351(b)(2).

134.     Under § 358(a), a transferor's basis in the transferee corporation's stock received in the § 351 exchange is equal to the transferor's basis in the contributed assets, decreased by the amount of any "other property" received (*i.e.,* "boot"), and increased by any gain recognized by the transferor on the exchange.   Section 358(a) provides:

In the case of an exchange to which section 351 . . . applies -

(1) Nonrecognition Property – The basis of the property permitted to be received under such section without the recognition of gain or loss shall be the same as that of the property exchanged –

(A) decreased by –

(i) the fair market value of any other property (except money) received by the taxpayer,

(ii) the amount of any money received by the taxpayer, and

(iii) the amount of loss to the taxpayer which was recognized on such exchange, and

(B) increased by –

(i) the amount which was treated as a dividend, and

(ii) the amount of gain to such taxpayer which was recognized on such exchange (not including any portion of such gain which was treated as a dividend).

(2)  Other Property – The basis of any other property (except money) received by the taxpayer shall be its fair market value.

135.     In circumstances where a corporation has assumed a liability, § 358(d)(1) treats it as other property, or "boot."  Section 357(a) provides that, in a § 351 exchange, if as part of the consideration, "another party to the exchange assumed a liability of the taxpayer, such

assumption shall, for purposes of this section, be treated as money received by the taxpayer on the exchange."  Accordingly, the taxpayer's basis would be decreased by the amount of the assumed liability.  Sections 358(a)(1)(A)(ii) and 358(d)(1).

136.   Congress did not define the term "liability" in sections 357 or 358, but the Tax Court, in general, had given the term an expansive reading.  *See Bongiovanni v. Commissioner*, T.C. Memo. 1971-262, *rev'd*, 470 F.2d 921 (2d Cir. 1972); *Thatcher v. Commissioner*, 61 T.C.28, 36 (1973), *rev'd in part and aff'd in part*, 533 F.2d 114 (9th Cir. 1976); *Rosen v. Commissioner*, 62 T.C. 11, 19 (1974) (holding that accounts payable were "liabilities" for purposes of § 357(c)(1)).[12]

---

[12]      On review of the Tax Court's decision in these cases, the Second Circuit and Ninth Circuit reached different results.  The Second Circuit restricted § 357 "liabilities" to "tax liabilities" (generally secured liabilities in excess of a property's basis).  *Bongiovanni v. Commissioner*, 470 F.2d 921 (2nd Cir. 1972).  But the Ninth Circuit gave "liabilities" an all-inclusive definition and solved the perceived cash basis transferor hardship by other means.  *Thatcher v. Commissioner*, 533 F.2d 114 (9th Cir. 1976) (the transferee's payment of the accounts payable is treated as consideration for the transferor's sale of its accounts receivable, which essentially provides a setoff of deductible trade accounts payable against trade accounts receivable, up to the lesser of the trade accounts payable or the gain recognized under § 357(c)(1)).  In response to these Appellate decisions, the Tax Court revisited its earlier position and concluded that § 357 "liabilities" excluded any obligation that is deductible by the transferor.  *Focht v. Commissioner*, 68 T.C. 223 (1977).   In 1978 Congress added §§ 357(c)(3) and 358(d)(2) to the Code.  Revenue Act of 1978, P.L. 95-600, sec. 365(a), (c), 92 Stat. 2763, 2854 (November 6, 1978).  These sections were designed to: 1) codify the approach taken by the Focht court; 2) clear up any questions regarding whether deductible accounts payable should be treated as liabilities for purposes of section 357(c)(1), and 3) correct "... unforeseen and unintended tax difficulties [experienced by] ... certain cash basis taxpayers who incorporate a going business." S. Rep. No. 95-1263, 95th Cong., 2d Sess. 183 -185 (1978).  But Congress did not narrowly define (or redefine) the term "liabilities" for purposes of section 357(c) or section 357 in general. The Senate Finance Committee Report accompanying the Revenue Act of 1978, noted that the provision was "not intended to affect the definition of the term liabilities for any other provision of the Code, including sections 357(a) and 357(b)."  S. Rep. No. 1263, 95th Cong., 2d Sess. 185 (1978), 1978-3, Vol 1 C.B. 481, 483.  Accordingly, Congress did not comment upon or change the all-inclusive meaning of the term "liabilities" by its enactment of the 1978 Act.

2904800.10

137.    Mr. Sala takes the position that the liabilities associated with the short option positions are too contingent to be taken into account under § 357 and § 358, for purposes of calculating his basis in the S Corporation's stock.  As a result, Mr. Sala claims an artificially high basis in the S Corporation stock (a basis that includes its purported basis in the long option positions ($60,987,866.79) with no reduction for the liabilities associated with the short option positions even though the total value of his contribution is somewhat less than $750,000) which he utilized approximately 6 weeks later to claim more than $60 million of noneconomic loss.  But nothing in the statute, legislative history, or case law suggests that the term "liabilities," as used in these sections, is limited to noncontingent obligations.  Rather, Congress and the courts have accorded the term an expansive meaning, and limited it only in specific and narrowly prescribed circumstances.

138.    The liabilities at issue in this case fall well within the group of liabilities that are traditionally taken into account when assumed by a transferee in a § 351 exchange.  As previously discussed, Mr. Sala's liabilities arose in a transaction in which he received tax-free more than a $60 million premium from the sale of certain short option positions.  The tax treatment regarding the receipt of option premiums recognizes Mr. Sala's real and continuing obligation (which might ultimately prove to be burdensome) to perform in accordance with the terms of the written option.  However, the option premium can be used (as it was in the current case) to purchase an asset with a basis and value equal to the amount of the premium.

139.    One consistent theme running throughout the tax law is that if a taxpayer has been enriched or received a tax benefit (*e.g.*, an increase in the basis of its assets, including cash) from its incurrence of a liability with no current imposition of tax, then that liability is to be taken into account (*i.e.*, included in the seller's amount realized in a § 1001 transfer, or as an adjustment to

a transferor's basis in a § 351 transaction) when transferred or assumed in a later transaction. This result reflects a fundamental principle underlying our tax laws: a tax is imposed on an accession to wealth unless Congress specifically provides otherwise.  That an assumption of a solvent taxpayer's liability enriches the taxpayer is beyond question.

140.    The Government's pronouncements regarding liability assumptions in tax-free exchanges are consistent with this tax result.  For example, Rev. Rul. 95-45 provides that the transferee's assumption of a transferor's obligation to deliver replacement securities to close out a short sale constitutes the assumption of a liability for purposes of §§ 357 and 358.   Short sale proceeds, like option premiums, are not included in the short seller's income until the short sale closes.  But the proceeds "are an asset of the short seller [that increase] the aggregate adjusted basis of its total assets by the amount of the proceeds.  Because the incurrence of the obligation on the part of the seller to return the borrowed securities resulted in an increase in the adjusted basis of its assets, the obligation is treated as a liability" for purposes of § 357 and § 358.  Rev. Rul. 95-45, 1995-1 C.B. 53.

141.    In summary, Mr. Sala's obligations with respect to the short options positions constitute "liabilities" under §§ 357 and 358.  Accordingly, Mr. Sala was required to reduce his basis in the S Corporation stock by the amount of the untaxed option premium he received upon writing the short option positions.

**Reduction of Basis under 358(a)(1)(A)(i)**

142.    Even if the obligations associated with short options were not liabilities for purposes of §§ 351, 357 and 358, Mr. Sala was required to reduce his basis in the S Corporation stock by the amount of the premium he received tax free at the time he wrote the options.

143.     As noted above, the only tax free non-stock consideration (other property, or "boot") a transferor may receive in an otherwise qualifying § 351 exchange is consideration in the form of a transferee's assumption of a transferor's liability (subject to the limitations discussed above set forth in Section 357(b) and (c)).

144.     As part of the exchange between Mr. Sala and the S Corporation, the S Corporation transferred consideration in the form of (i) its stock and (ii) its assumption of Mr. Sala's obligations associated with the short option positions.

145.     If we are to assume (as Mr. Sala maintains), that the S Corporation's assumption of the obligation associated with the short options was something other than an assumption of a "liability" within the meaning of § 357 and § 358, then such consideration must be a form of "other property" (or boot).  Under § 358(a)(1)(A)(i), Mr. Sala is required to reduce his basis in the stock of the S Corporation by the fair market value of the liability.

146.     The value of that assumption is the amount Mr. Sala received on his sale of the short option positions.  This is objectively evidenced by the fact that Mr. Sala only paid the net difference between the purchase price and the sales price of the various long and short option positions (i.e., Mr. Sala offset the price to be paid for the long options by the amount of the obligations of the short options).

147.     Accordingly, under the controlling statutes—Sections 351, 357 and 358—Mr. Sala was required to reduce the basis in the stock of the S Corporation received in the exchange by the value of the short option premiums.

*Basis in the S Corporation*

148.     Whether the short options were or were not "liabilities" under the controlling statutes is irrelevant for purposes of determining Mr. Sala's basis in his S Corporation stock.

149.    Short option obligations are liabilities for purposes of the controlling statutes, as a result, pursuant to § 358(a)(1)(A)(ii) and (d), Mr. Sala was required to reduce the basis in the stock by the amount of the short option premiums.

150.    Alternatively, if the short obligations were not liabilities for purposes of the controlling statutes, then Mr. Sala received taxable non-stock consideration in the form of other property or "boot," and the basis of his stock must be reduced by the value of the short option premiums under § 358(a)(1)(A)(i).

151.    Mr. Sala can only deduct the aggregate amount of losses that do not exceed his adjusted basis in the S Corporation at the end of 2000.  *See* 26 U.S.C. § 1366(d).  Here, his basis in the S Corporation was his contribution of $8.9 million, a part of which was used to pay for the contributed options having the net economic outlay of $728,000.  Because his basis in the S Corporation was only $8.9 million, Mr. Sala can not deduct any amount greater than that on his income tax return.

**Section 465(a) At Risk Rules**

152.    Section 465 limits the amount of allowable deductions to the amount for which the taxpayer is actually "at risk," and precludes taxpayers from premising deductions upon "paper" debts.  Specifically, Section 465(a)(1) provides that, in the case of an individual engaged in an activity identified in Section 465(c), any loss from the activity for the taxable year is allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk for such activity at the close of the taxable year.[13]  Section 465(c)(3) provides that Section 465

---

[13]    While the United States contends that the taxpayer had no true business purpose in entering the Deerhurst Transaction, in the event the Court should find otherwise then the "at risk" rules apply to any activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.  26 U.S.C. § 465(c)(3).

applies to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.

153.     Section 465(b)(1) provides that a taxpayer is considered at-risk for an activity with respect to amounts including the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and amounts borrowed with respect to such activity. Under Section 465(b)(2), a taxpayer is considered at risk for an activity with respect to amounts including amounts borrowed for use in an activity to the extent that the taxpayer either is personally liable for the repayment of such amounts, or has pledged property, other than property used in such activity, as security for such borrowed amount.

154.     Section 465(b)(4) provides that notwithstanding the other provisions of Section 465, a taxpayer is not considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.  Under Section 465(b)(4), the legislative history provides that in evaluating the amount at risk, it should be assumed that a loss-protection guarantee, repurchase agreement or other loss-limiting mechanism will be fully paid to the taxpayer. *Id*. (citing S. Rep. No. 938, 94th Cong., 2d Sess. 50 n.6 (1976)); *see also Moser v. Commissioner*, 914 F.2d 1040 (8th Cir. 1990) (A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of [Section 465(b)(4)]); *Levien v.Commissioner*, 103 T.C. 120 (1994).

155.     The decision in *Laureys v. Commissioner*, 92 T.C. 101 (1989), should not be followed in this case.  The *Laureys* court limited the application of § 465(b)(4) in cases involving straddles on the basis that a separate regime exists for the regulation of straddle transactions and that it is unlikely that Congress intended to include straddles in the term "similar arrangement" given the other provisions of the Code regulating straddles.

156.     As the Ninth Circuit has ruled in concluding that Section 465 applies to an expansive range of risk-reducing arrangements, the purpose of the statute is to—

> suspend at risk treatment where a transaction is structured—*by whatever method*—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable.  A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection.  We must be guided by economic reality.

*American Principals Leasing Corp. v. United States*, 904 F.2d 477, 483 (9th Cir. 1989) (emphasis added); *Waters v. Comm'r*, 978 F.2d 1310, 1316 (2d Cir. 1992).

157.     The evidence shows that, as a matter of economic reality, the offsetting nature of the options transaction limited the Mr. Sala's risk generated by the options to the net premium he committed to the transaction.  The offsetting nature of the options eliminated any other risk, because the values of the options moved in opposite directions in economically offsetting amounts, and the long option eliminated any theoretical risk presented by the short option.  As a result, the amount that the Mr. Sala put at risk was fixed at the time the options were written and purchased.  Therefore, for purposes of Section 465, when the Mr. Sala contributed cash and the options were transferred to the S Corporation and then to the General Partnership, the amount by which Mr. Sala was "at risk" in the S Corporation and in the General Partnership was limited to the amount of the cash plus the net premium paid for the options.

**No Ordinary Loss Was Created**

158.     According to the Ruble opinion letter, upon liquidation of the General Partnership, only foreign currency was to be distributed to the S Corporation.  Under his view of the tax laws, this would give Mr. Sala an ordinary loss, and if his basis calculations were true, i.e. the liabilities imposed by the short options were ignored, the noneconomic ordinary loss would be massive.  However, the exit from the tax shelter was not executed in accordance with the

Ruble opinion letter.  According to the official Refco account records for the S Corporation, the General Partnership transferred U.S. dollars, not foreign currency, to Mr. Sala.  A transfer of U.S. dollars means that even if their basis calculations were correct, the loss would be a capital loss.  Mr. Sala erred in his exit from the transaction. This argument presents alternative grounds for invalidating the entire transaction based upon this failed exit strategy, as the exit strategy could not have created the ordinary loss of $60 million claimed on the Salas' return.

159.    The official Refco account records for the S Corporation show that the General Partnership transferred U.S. dollars to the S Corporation in full liquidation of the S Corporation's partnership interest.  Those official records indicate that after the partnership liquidated, the S Corporation used these U.S. dollars to purchase options and engage in a handful of foreign exchange trades.  At the deposition of the currency trader who executed or oversaw all of the trading for this tax shelter, Mr. Sala's counsel introduced a prior-undisclosed self-serving memorandum, which was purported to show that the General Partnership transferred to the S Corporation both currency (in the full amount of the partnership interest) plus two open and unpaid for trades, upon the liquidation of the General Partnership.  Those two open and unpaid for trades do appear on the official Refco account records; however, according to those records those trades were actually entered into by the S Corporation and paid for by the S Corporation *after* the General Partnership had already liquidated.  In fact, the official Refco account records for the S Corporation show that the S Corporation had to borrow money to pay for one of these trades.

*Mr. Sala's S Corporation was transferred U.S. dollars in full liquidation of its partnership interest.  Accordingly, there was no loss, ordinary or otherwise.*

160.    Just before liquidation of the General Partnership, Mr. Sala's partnership interest (via the S Corporation) was worth $9 million.  For purposes of this and the following arguments,

2904800.10

reference to the S Corporation's interest in the General Partnership is as Mr. Sala's interest.[14]

The $9 million is also equal to the S Corporation's basis in the General Partnership, and was

calculated as the amount of money plus the net premium of the options contributed to the

General Partnership.  Upon liquidation, the S Corporation was entitled to nothing less than its

full interest in the partnership.  Upon liquidation of the partnership interest, Mr. Sala (via the S

Corporation) received $9 million in U.S. dollars.  Accordingly, upon the liquidation of the

General Partnership, Mr. Sala received the entire value of his partnership interest in U.S. dollars.

161.    Both partnerships and S Corporations are pass-thru entities, such that items of

income or loss are passed through to the individual partner or shareholder.  26 U.S.C. §§ 701 and

1366(a).  When only money is distributed to a partner in complete liquidation of his partnership

interest, the amount of gain or loss recognized is equal to the difference between the partner's

adjusted basis in the partnership and the amount of money received in liquidation.[15]  26 U.S.C. §

731(a).  As discussed above, the S Corporation did not have any basis in the General Partnership

(or Mr. Sala in the S Corporation, for that matter) in excess of his $9 million contribution.

Accordingly, Mr. Sala could not claim any loss on his tax return, ordinary or otherwise, because

the value of the partnership interest received in liquidation exceeded his basis in the General

Partnership.

162.    For purposes of resolving whether Mr. Sala was permitted to take an ordinary

income tax deduction of $60 million in tax year 2000, it makes no difference whether Mr. Sala

was transferred only U.S. dollars, or U.S. dollars plus two open, unpaid for trades.  The tax effect

---

[14]      As noted earlier, Mr. Sala was the 100% shareholder of the S Corporation.

[15]      It should be obvious that had plaintiffs (via the S Corporation) received any money or "paid-for" property in excess of his basis in the partnership, such money or property would be a gain, not a loss, to him.  26 U.S.C. § 731(a)(1).  If Mr. Sala received unpaid-for property, the gain or loss would be equal to the difference between the sale price and the purchase price.

is the same: (1) because Mr. Sala's full partnership interest was worth $9 million; and because (2) Mr. Sala's basis in that partnership interest was $9 million; and (3) Mr. Sala was repaid the $9 million upon the General Partnership's liquidation in U.S. dollars; therefore (4) any additional property transferred to Mr. Sala would have been distributed in excess of basis, such that (5) Mr. Sala would have incurred a gain, not a loss upon that distributed property's final sale or disposition.[16]

*Assuming, arguendo, that Mr. Sala had a basis in the S Corporation of $69 million and the S Corporation had a basis in the General Partnership of $69 million, because Mr. Sala received U.S. dollars in full liquidation of his partnership interest, Mr. Sala had a capital, not ordinary, loss of $60 million.*

163.    It is clear that no loss whatsoever was actually sustained or is deductible in this case.  However, even assuming that a deduction was allowable, the failure to execute the exit strategy results in a capital, not an ordinary loss.  Assume, *arguendo*, that the S Corporation's basis in the General Partnership was not $9 million, but was instead $69 million, calculated as the value of Mr. Sala's cash investment of roughly $9 million plus the amount of the long option premiums.[17]  Upon liquidation of its partnership interest, the S Corporation received $9 million in U.S. dollars – *not foreign currency as intended*.  This $9 million reduced its basis in the General Partnership to $60 million.  Because no property was distributed, pursuant to Section 741, the excess basis the S Corporation had in the partnership became a capital loss upon the liquidation of the partnership interest, which would be passed through to Mr. Sala as a capital loss.  Had Mr. Sala received a capital loss in excess of basis, he could have used a portion, albeit a very small portion, to offset his ordinary income for tax year 2000.  Pursuant to Section

---

[16]    This assumes, *arguendo*, that unpaid for trades constitute property for purposes of this calculation.

[17]    For purposes of this analysis, the Court ignores the $728,000 cost of the options as well as the incidental profits and interest accruing in the account.

2904800.10

1211(b), an individual may use a capital loss to offset up to $3,000 in ordinary income per year. Accordingly, Mr. Sala could have used this capital loss to shelter no more than the value of his capital gains in tax year 2000, plus up to $3,000 in ordinary income.  In short, had Mr. Sala received a loss in excess of his basis in the General Partnership, it would have been a capital loss which could not have been used to shelter the $60,000,000 in ordinary income he claimed was sheltered from tax on his 2000 tax return.

*Assuming, arguendo, that Mr. Sala had a basis in the General Partnership of $9 million, and received $9 million U.S. dollars plus additional property in full liquidation of his partnership interest, he had no basis in the property received and could only have realized gain the on disposition of that property, at any price.*

164.     As discussed, Mr. Sala's interest and basis in the General Partnership was $9 million.  Assume upon liquidation of the General Partnership, Mr. Sala received his $9 million in cash, plus the two open but unpaid for trades: an option and a spot.  This position of course makes no sense, because the Refco account statements clearly show that the two trades were purchased by the S Corporation, with the S Corporation's money, and done so after the General Partnership had liquidated.

165.     Regardless, as set forth in subsection A, the $9 million would have fully reduced the S Corporation's basis in the partnership interest, generating no loss, and fully cashing the S Corporation out of the General Partnership.  If the two additional trades transferred to the S Corporation were fully paid for at the partnership level, the S Corporation would have had a zero basis in that property and thus upon their eventual sale or disposition could only have gain. Assuming further, that these two trades were subject to Section 988(a)(1)(A), this gain would be ordinary.

166.     If one instead recognizes that these two trades were open and unpaid for at the General Partnership level, and were paid for only at the S Corporation level, but were

2904800.10

nonetheless transferred, from the General Partnership to the S Corporation, at most, Mr. Sala would have a gain or loss the value of which would be the difference between the price paid for it by the S Corporation, and the value received at the trades' sale or disposition.  In either case, Mr. Sala could never have taken a $60 million ordinary loss on these trades, as he either had at best a negligible basis in the trades, as their costs were only $728,000.  Therefore, even if Mr. Sala took a complete loss on the disposition of the two trades, he could never have taken a loss greater than $728,000.

**Out-of-Pocket Expenses**

167.    The deduction for expenses of $56,071 attributable to the S Corporation's participation in the Deerhurst Transaction at issue in this case was properly disallowed.  Fees paid to generate artificial tax losses in connection with a sham transaction are not deductible under Section 212 or any other provision of the Internal Revenue Code.  *Enrici v. Commissioner,* 813 F.2d 293, 296 (9th Cir. 1987), *aff'g Forseth v. Commissioner, 85 T.C. 127, 165-66 (1985); Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. 254, 279 (1999), *aff'd,* 254 F.3d 1313 (11th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002); *United States v. Wexler*, 31 F.3d 117, 122 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995); *Brown v. Commissioner*, 85 T.C. 968, 1000 (1985), *aff'd sub nom. Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988), *cert. denied*, 488 U.S. 824 (1988).  Similarly, an expense is deductible under Section 212, as under Sections 162 and 165(c)(2), only if it is incurred in the pursuit of an activity engaged in with an actual and honest non-tax profit objective that is the taxpayer's primary or dominant motive.  *Agro Science Co. v. Commissioner*, 934 F.2d 573, 576 (5th Cir. 1991), *cert. denied*, 502 U.S. 907 (1991); *Simon v. Commissioner,* 830 F.2d 499, 500-01 (3d Cir. 1987); *Brown v. United States*, 396 F.2d 459 (Ct. Cl. 1968).  Section 183 of the Code confirms and buttresses the principle that expenses incurred

in an activity, including a shelter activity, that is not conducted with a primary non-tax profit motive are not available to shelter other income.  *See Antonides v. Commissioner,* 893 F.2d 656 (4th Cir. 1990) (profit-motive standard the same for Sections 162, 183, and 212).  These requirements apply to partnerships and S corporations at the entity level, determining the entity's motives by looking to those of its controlling individuals.  *See Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), *aff'd*, 722 F.2d 695 (11th Cir. 1984); *Cannon v. Commissioner*, 949 F.2d 345 (10th Cir. 1991).[18]

168.    In certain cases courts have allowed expenses that were unrelated to the shelter transaction or allowable without regard to profit motive.  *See, e.g.*, *ACM*, 157 F.3d at 260-63; *Rice's Toyota*, 752 F.2d at 95-96.  In an opinion of the Tenth Circuit, *James*, 899 F.2d at 910, the court acknowledged this precedent, but noted that the Service had probably been inconsistent and overly generous in allowing amortization of fees related to the sham transaction at issue in that case.

169.    The fees paid for the Deerhurst Transaction were not incidental costs unrelated to the shelter transaction; they were integral and vital to a transaction lacking economic substance and entered into with the primary motive of obtaining inappropriate tax benefits.  Accordingly, the S Corporation is not entitled to deduct and pass through to Mr. Sala any of the fees expense.

**Section 6662 Accuracy-Related Penalty Offset**

170.    The Section 6662 accuracy-related penalty applies to this transaction.  The Section 6662 accuracy-related penalty applies only to underpayments of tax.

---

[18]     Similarly, courts have repeatedly denied a deduction for a "theft loss" for out-of-pocket expenses paid to invest in shelter transactions. *See Viehweg v. Commissioner*, 90 T.C. 1248 (1988), *cert. denied*, 502 U.S. 819 (1991); *Marine v. Commissioner*, 92 T.C. 958 (1989), *aff'd* 921 F.2d 280 (9th Cir. 1991).

171.     There are four ways in which the accuracy-related penalty under Section 6662 could apply to this noneconomic transaction:

(1)     a 40% penalty for a gross valuation misstatement (§ 6662(b)(3) and (h));

(2)     a 20% penalty for substantial valuation misstatement (§ 6662(b)(3));

(3)     a 20% penalty for substantial understatement of income tax (§ 6662(b)(2)); or

(4)     a 20% penalty for negligence or disregard of rules and regulations (§  6662(b)(1)).[19]

172.     The first three penalties are essentially arithmetic and apply if the Court rules for the government on the merits.  Specifically, if the S Corporation and the General Partnership are disregarded as shams, Mr. Sala will have no outside basis to carry over to his distributed property.  Similarly, disregarding the offsetting options under the economic substance doctrine or eliminating the contribution of those options to the S Corporation and to the General Partnership under the step transaction doctrine would also eliminate any outside basis attributable to the offsetting options.  Finally, integrating the offsetting options would limit Mr. Sala's outside bases in the S Corporation and the General Partnership to the net premiums of the offsetting options.  Under any of these holdings, should Mr. Sala claim any future noneconomic tax losses on the disposition of his distributed stock or foreign currency, he would misstate the adjusted basis of that property, resulting in a gross or substantial valuation misstatement and also a substantial understatement of income tax.

173.     For example, a gross valuation misstatement exists if the value or *adjusted basis* of property claimed on the return is 400% more than the amount determined to be the correct amount of such value or *adjusted basis*.  *See* Section 6662(a), (b)(3), (e)(1), (h)(1).  Since the

---

[19]     There is no stacking of penalties, so the maximum penalty is either 20% or 40% of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct.  *See* TREAS. REG. § 1.6662-2(c).

actual basis of the property distributed to the taxpayers would be zero (where the offsetting options transactions are disregarded under the economic substance doctrine), this 400% threshold would be easily exceeded.  *See Gilman v. Commissioner*, 933 F.2d 143, 150-51 (2d Cir. 1991). The result would be the same if the S Corporation and the General Partnership are disregarded. If the offsetting option pairs are determined to be a single economic transaction, the actual adjusted basis of the distributed stock or foreign currency would be the net premiums paid for the offsetting options, and the 400% threshold would also be far exceeded.  Thus, should the taxpayers report tax losses on future returns on the sale of their stock or foreign currency based on the highly-inflated bases derived from this tax shelter, the 40% gross valuation penalty would automatically apply.  *Long Term Capital*, 330 F. Supp. 2d at 199-200.

174.    For purposes of the fourth penalty, negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code.  Any claims of losses from the offsetting options transaction by these taxpayers are negligent, because the taxpayers did not take care to comply with the provisions of the Code—to the contrary, they set out, with the help of Deerhurst and Multinational Strategies and others, to subvert the Code with a tax shelter that generated paper losses.  The sole reason to undertake the offsetting options transaction, and form the S Corporation and the General Partnership, was to create these paper losses.  Therefore, should Mr. Sala claim any noneconomic tax losses from his offsetting options transactions, this would constitute not just ordinary negligence but gross negligence, and this penalty should most definitely apply.

175.    The only available defense to penalties is the "reasonable cause" exception of Section 6664(c), which allows a taxpayer to avoid penalties for any portion of an understatement if he shows that "there was a reasonable cause for such portion and that the taxpayer acted in

good faith[.]"  Here, Mr. Sala clearly knew the offsetting options transaction was intended to create paper losses, and he can have no "reasonable cause" to believe these losses could be claimed legally.  In fact, Mr. Sala's own tax counsel Mr. Nemirow testified that Mr. Sala was aware of Notice 2000-44 before the transaction was entered into, and believed the transaction was covered by Notice 2000-44.  Therefore, Mr. Sala is liable for the accuracy-related penalty under Section 6662.

**Interest Suspension**

176.    To the extent that plaintiffs claim that the running of interest on their tax liability ought to have been suspended for any period of time, this relief is precluded because this is a case involving fraud.  26 U.S.C. § 6404(g)(2)(B).  This Court has ordered that the interest suspension statute does apply in plaintiffs' favor.  The Court's decision on this issue is interlocutory and would be incorporated into any final judgment.  Since the Court's decision on this issue is not final, the Court retains jurisdiction to revisit that decision should it so decide.

177.    Pursuant to *Lewis v. Reynolds* and other applicable case law, regulations, and statutes, the United States is entitled to offset any amount due plaintiffs against an accuracy related penalty owed by plaintiffs but not assessed by the Internal Revenue Service.  *See Lewis v. Reynolds*, 284 U.S. 281 (1932).  The accuracy related penalty applies to an "underpayment of tax required to be shown on a return."  The penalty is calculated as a percentage of the tax required to be shown on a tax return.  26 U.S.C. § 6662(h).  Section 6662(e) addresses a situation involving a valuation misstatement and provides that if "the value of any property or services (*or the adjusted basis of any property*) claimed on any return … is 200 percent or more of the amount determined to be the correct amount," then the penalty applies.  26 U.S.C. § 6662(e) (emphasis added).  Sala claims a tax basis in the S Corporation and the General Partnership.

2904800.10

Sala contends that he acquired a tax basis in each on account of $60,987,866.79 in long options he personally acquired.  However, and concurrently, Sala sold a nearly identical amount of short options thereby creating an offsetting liability in the amount of $60,259,568.94.  Sala takes the position that his contribution of these offsetting positions, first to the S Corporation and then to the General Partnership, allowed him to establish basis in the amount of the in long positions but not reduced by the liability that the short positions established. Because Sala did not take into account the corresponding reduction in basis represented by the sold positions, Sala deducted approximately $60,000,000 in ordinary income for that year and demand a refund in excess of $27,000,000.  Because the $60,987,866.79 in claimed basis is more than 200% of the correct amount of basis, an accuracy-related penalty in the amount of $9,491,132 is due and owing and may be applied as a setoff of any return of interest owed pursuant to Section 6404(g) of the Internal Revenue Code.[20]

**The Right to Offset**

178.    The right to assert an accuracy-related penalty is dependent upon the fact that Sala's November 2003 amended return is not considered a "qualified" amended return under Treasury Regulation 1.6664-2T(c)(3)(I).  The 2003 amended return was not a qualified amended return because the Internal Revenue Service's Sections 6700, 6701, 6707, 6708, and 7408 examination of KPMG was initiated before plaintiffs filed their amended return eliminating that underpayment, and the scope of the IRS's KPMG examination included plaintiffs' Deerhurst Transaction.

---

[20]    In this case, the penalty should be as follows:

| | |
|---|---|
| Total Tax Liability: | $23,727,830 |
| 40% Accuracy related penalty (26 U.S.C. § 6662(e)) | $9,491,132 |
| Less penalty prev. assessed and paid | -      $4,441 |
| Setoff Amount | $9,486,691 |

2904800.10

179.     This issue is more fully discussed in the Proposed Amended Pretrial Order filed on September 4, 2007.  In support of the right of offset the United States intended to rely on the trial testimony of IRS Tax Shelter Promoter Compliance Specialist Michael Halpert and KPMG, via its corporate designee, Diane Fuller as well as two witnesses (R.J. Ruble and Tracie Henderson) who will not testify in light of an ongoing criminal investigation.  The Court recently entered an Order in limine precluding the testimony of these two witnesses.  The United States reserves this argument.

Dated this 14th day of December, 2007.

TROY A. EID
United States Attorney
MARK S. PESTAL
Assistant U.S. Attorney

s/ Amy Matchison
DAVID N. GEIER
JOSEPH A. SERGI
AMY MATCHISON
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone:  (202) 616-3448
Facsimile:   (202) 307-0054
Email: David.N.Geier@usdoj.gov

Street Address:          Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20001

2904800.10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

    I hereby certify that on December 14, 2007, I electronically filed the foregoing United States' Proposed Findings of Fact and Conclusions of Law with the Clerk of Court using the EFC system which will send notification of such filing to the following e-mail addresses:

dhallett@chicoine-hallett.com
jcolvin@chicoine-hallett.com
david.n.geier@usdoj.gov
joseph.a.sergi@usdoj.gov
amy.t.matchison@usdoj.gov

        s/ Amy Matchison
        AMY MATCHISON
        U.S. Department of Justice
        Tax Division

2904800.10