# EXHIBIT   A

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

**REGULATIONS UNIT
CC:PA:RU**

**Traynor Guy R**

**Subject:**        FW: Comment from Web Site        SEP 2 3 2003

*Howells*

-----Original Message-----
From: postoffice@a321.g.akamai.net [mailto:postoffice@a321.g.akamai.net]
Sent: Monday, September 22, 2003 9:18 PM
From: p-postlewaite@law.northwestern.edu
reg=Assumption of Partner Liabilities
category=taxregs
email=p-postlewaite@law.northwestern.edu

Begin Comment Text --------------------

RE: Temporary and Proposed Regulations (REG-106736-00)

Dear Internal Revenue Service:

    This letter and the attached document serves as my formal submission of Comments to the Internal Revenue Service for consideration regarding Temporary and Proposed Regulation 1.752-6T (REG-106736-00).  I also request an opportunity to make a presentation at the hearing for the
Temporary and Proposed regulation, set for October 14, 2003 in Washington, DC.  To ensure that the entire set of Comments are received, please note that my Comments (print version) are 26 pages in length.  Because the IRS web site does not allow filing the Comments as one complete document, I will break up the document into multiple segments.  I will also Federal Express a print version of the Comments to you tomorrow.

Written Comments on Temporary Regulation 1.752-6T

By Philip F. Postlewaite

Professor of Law and Director of the Graduate Tax Program Northwestern University School of Law

Purpose of Analysis

Temporary Regulation 1.752-6T, issued on June 23, 2003, specifically references Notice 2000-44 in its Preamble as well as its text and calls for its application to the transactions described therein.  Tax practitioners who are interested in the outcome of Notice 2000-44 cases
have formed a coalition (Coalition Against Regulatory Excesses (CARE)).

CARE has requested an analysis from this commentator of (1) whether the legislative history of   358(h) authorizes the issuance of the Temporary Regulation for pure partnership transactions, i.e., those involving only partners and partnerships, as opposed to those transactions involving corporations and partnerships (as shareholders), and (2) if the Temporary Regulation has Congressional authorization, whether its impact is proper in light of the rationale for, and the tax policy behind, its promulgation.

The following commentary does not assert that the transactions described in Notice 2000-44 generate the tax consequences advocated by the taxpayers and their advisers who made such investments.  In fact, this commentator in his treatise has regularly greeted such efforts with skepticism (Willis, Pennell, and Postlewaite, Partnership Taxation (WG&L 6th ed. 1997) at 1 n.229; S1 n.236; S4 ns. 83, 245, 254; S6 ns. 10, 262; S9 n.21; 13 n.124. Instead, the sole and exclusive focus of this commentary is the legislative authorization for, and the tax policy operation of, Temporary Regulation  1.752-6T.

Background The Facts of Notice 2000-44

In Notice 2000-44, 2000-2 C.B. 255, the Internal Revenue Service addressed transactions utilizing the partnership vehicle and concluded that the tax consequences were "abusive" because they produced artificially high basis. Therein, two transactions were confronted.

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pages)

In the first (Situation 1) transaction, the taxpayer borrowed an amount at an inflated rate of interest combined with a reduced stated principal amount. The borrowed amount was contributed to a partnership, subject to the indebtedness, in return for an interest in the partnership.

The Service alleged that the transactions promoters, without reference to the authority upon which they relied, had concluded that the amount of the assumed indebtedness for purposes of 752 was only the principal amount thereof. As a consequence, the distribution arising from
the liability relief under 752(b) was capped and gain recognition on the transfer was avoided. Furthermore, the parties asserted that the basis for the partnership interest equaled the excess of the cash contributed over the principal amount of the debt.

In the second (Situation 2) transaction, the taxpayer purchase[d] and wr[ote] options which were transferred to the partnership. Again, an artificially high basis arose. The taxpayer claimed a basis increase in the partnership equal to the cost of the call options but did
not reduce the basis under 752(b) for the relief by the partnership from the obligation to provide for the written call options.

The taxpayers in both settings asserted that a basis greater than the value of the partnership interest arose for the transactions as structured. The subsequent disposition of their partnership interests thereby generated a loss.

Notice 2000-44 The Service's Position

In Notice 2000-44, the Service did not single out the raison d'etre for why the transactions would not succeed. Rather, the Service referenced no less than five separate reasons as to why the transactions would not generate the tax results sought by their advocates and participants.

One proffered defense was that such losses did not represent "bona fide losses reflecting actual economic consequences" as mandated by 165, a position bolstered by recent judicial decisions involving similar efforts in the partnership area. See ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), and its progeny. The Service proceeded with its
second argument to invoke the partnership anti-abuse Regulation as a ground for rejecting the sought-after favorable tax results. See Regulation 1.701-2. Third, the Service invoked other general judicial safeguard doctrines. The fourth attack, aimed at individuals only,
suggested a challenge under 165(c)(2), referencing the holding of Fox v. Commissioner, 82 T.C. 1001 (1984). Importantly, the final argument was the Service's assertion that 752 itself and its controlling principles were a solid ground upon which to challenge the transaction.

There is no indication in the text of Notice 2000-44 that the issues confronted therein were either of such a weighty nature or so complex and monumental that safeguard legislation would be required to protect the interests of the Service and the Treasury. In fact, the Service asserted that the appropriate and necessary defenses to the transactions occurring in Notice 2000-44 were already present under established law. Particularly given the Service's assertion that 752 was sufficient in its own right to thwart such tax-saving efforts, it is questionable that the Service concluded that remedial legislation was needed under 752 to combat the transactions described in Notice 2000-44.

Notice 99-59

In Notice 99-59, 1999-2 C.B. 761, a partnership contributed cash to a foreign corporation in return for common stock. Another party, possibly accommodating, contributed capital in return for preferred stock. The corporation thereafter approached a bank, borrowed cash with which it
purchased securities, granted a security interest in the securities to the bank, and thereafter distributed the encumbered securities to its shareholder (the partnership).

Because the distribution was not a liquidating distribution, it was tested for tax purposes under 301. The Service stated that the distribution of the encumbered securities might make the partnership and its partners secondarily liable thereon as guarantors.

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

This characterization apparently stemmed from the stipulation that the parties to the transaction intended that the corporation would repay the debt.

The shareholder partnership took the position that the amount of the distribution for tax purposes was zero under 301(b)(2). That subsection reduces the amount of a corporate distribution by "the amount of any liability . . . assumed by the shareholder." Thus, the distributee partnership asserted that the distributed amount was zero and that no tax consequences ensued.

Subsequently, at a time when the common stock of the partnership (with a basis equal to its original contribution) had a de minimis value, the foreign corporation converted to partnership status under the check-the-box regulations. In doing so, it precipitated a deemed liquidation, which generated a recognized loss equal to the basis of the common stock. Upon the retirement of the debt by the foreign enterprise, the parties asserted that no tax consequences arose for the shareholder from its satisfaction.

The Service concluded that the loss was not bona fide, citing ACM Partnership and other judicial authority. It then, without elaboration, added that the tax benefits arising under the transaction may also be subject to challenge under other provisions of the Code and the regulations, including but not limited to 269, 301, 331, 446, 475, 482, 752, and 1001 of the Code.

The reference to 752 is noteworthy. Although the application of 752 to a corporate transaction is not instantly apparent, it would appear to be a necessary consideration in arriving at the final overall tax consequences of the transaction because the shareholder in Notice 99-59 was a partnership. Any liability shifted to a shareholder, if a partnership, in a distribution of property would require a set of adjustments to the bases and the like of its partners.

Distinction Between Notice 2000-44 and Notice 99-59

The Service in Notice 2000-44 asserted that the transactions thereunder were similar transactions [to those in Notice 99-59] that purport to generate tax losses for taxpayers. However, the facts of Notice 99-59 when compared to those of Notice 2000-44 call into question the Service's conclusion that the transactions were similar.

Most importantly, Notice 99-59 involved a corporate, rather than a partnership, setting and thus the controlling statutory provisions under scrutiny were radically different than those at play in Notice 2000-44. Although the investors in Notice 99-59 formed a partnership through which to contribute property to a foreign corporation, the issue under consideration was the Subchapter C tax consequences of a distribution of encumbered property. The separate existence for tax purposes of shareholders from their corporation and the imposition of a double tax regime does not compare with the single tax regime for partnerships and their members and the interrelationship between partnership liabilities (including transferred liabilities) and the partners bases for their partnership interests. Thus, the Service at an early juncture in its efforts to combat "suspect" transactions inappropriately and inaccurately concluded that remedial safeguards for a corporate structure are interchangeable with those for a partnership structure.

Safeguard Legislation Efforts and the Enactment of 358(h)

At the same time, taxpayers were employing popular tax-motivated structures involving transactions through which they transferred contingent liabilities to a corporation along with other assets and took the position that the transferred liabilities did not constitute such for purposes of 358. See Rev. Rul. 95-74, 1995-2 C.B. 36, involving the transfer of contingent environmental liabilities. Similarly, taxpayers transferred to corporations obligations to pay (e.g., accounts payable of a cash method taxpayer) which were statutorily excluded from the definition of liabilities. See 357(c)(3). These transfers provided the contributors with a basis in their corporate stock which was unreduced by the amount of the transferred

3

taxanalysts™
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

obligation to pay.  Thereafter, they sold their stock (which by definition had a lesser value due to the amount of the transferred obligation to pay) and recognized a loss for tax purposes.

Deductions for the obligation arose subsequently upon payment by the transferee corporation and reduced the corporation's, not the shareholder's, taxable income.

Momentum began to crystallize for legislative safeguards against these transactions. Efforts were begun to amend 357 in the Taxpayer Refund and Relief Act of 1999, but stalled. Thereafter, the Tax Relief Extension Act of 1999 shifted the focal point of safeguard legislation from an

amendment of 357 to an amendment of 358. These efforts did not result in legislation in 1999. However, the legislative efforts to curb such transactions continued into the next year. Congress revisited the issue in the Community Renewal Tax Relief Act of 2000 and, in December of that year, enacted   358(h).  That subsection provides for a reduction in the basis of the corporate stock by the amount of certain obligations to pay, i.e., those not described in 358(d), assumed by the corporation.

Against this historical backdrop, it is unlikely that the transactions described in Notice 2000-44 and the purported tax consequences thereof played a role in the enactment of 358 (h), a Subchapter C provision.  Notice 2000-44 involved a pure partnership setting under Subchapter K, no aspect of which impacted Subchapter C.  Furthermore, the legislation which ultimately led to the enactment of 358(h) was introduced prior to the issuance of the Notice. Notice 2000-44 was not released until August 11, 2000.  The legislation was introduced almost ten months earlier on October 26, 1999.

It is a more logical conclusion that the impetus for the safeguard legislation of 358(h) was a concern with a transfer to a corporation of obligations to pay which did not reduce the basis of the transferor's corporate stock.  This result occurred because either existing Code

provisions, e.g., 357(c), specifically excluded certain obligations from liability status or existing authority, e.g., Rev. Rul. 95-74, 1995-2 C.B. 36, excluded certain obligations such as contingent obligations from the definition of liability. Accordingly, the basis for the corporate stock did not reflect the decline in fair market value attributable to the transferred obligations to pay. This conclusion is reinforced by the fact that such concerns, as described below, were specifically referenced by Congress in the legislative history behind the enactment of 358(h).  H.R. Rep. No. 106-1033, at 1017 (2000).  Nowhere therein was any reference made to either a pure partnership setting or Notice 2000-44.

The legislative history behind the enactment of 358(h) fails to reveal the precise parameters and boundaries of its intended application.  Clearly, it was enacted in response to the use of tax planning techniques that accelerated and duplicated losses through basis manipulation.

However, the interpretative issue is whether the legislation was directed toward only basis manipulating transactions originating in a Subchapter C context and involving a contributor partnership or toward any basis manipulating transaction under Subchapter K.

On October 26, 1999, what appears to be the earliest forerunner of the current version of 358(h) was introduced in the Senate.  Interestingly, Senate Report 106-201 called for the drafting of rules by the Treasury to provide appropriate adjustments in order to prevent loss

acceleration or duplication through the assumption of liabilities where partnerships were involv[ed]. S. Rep. No. 106-201, at 48 (1999). It expressly stated: The Secretary of the Treasury is directed to prescribe rules providing appropriate adjustments to prevent the acceleration or duplication of losses through the assumption of liabilities (as defined in the provision) in transactions involving partnerships.

The efforts to enact these provisions were postponed and continued in other bills, including H.R. 5542 and S. 2354.  On April 4, 2000, in S. 2354, the Senate Finance Committee proposed the addition of 358(h).  The House on October 25, 2000 did similarly in H.R. 5542.  Notwithstanding

this new legislative push, apparently neither the House nor the Senate in their initial consideration of the Community Renewal Tax Relief Bill of 2000 proposed the enactment of 358(h). Similarly, hearings on 358(h) did not occur in either house while the bill was under consideration.  Not until conference was 358(h) even proposed in section 309 of the Act. The Conference Committee Report was issued on December 15, 2000 and indicates an absence of consideration by either house.

tax**analysts**
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

The Example Provided in the Legislative History of 358(h)

The example in the legislative history appearing in the Conference Committee Report involves a rather innocuous transaction. H.R. Rep. No. 106-1033, at 1017 (2000). It fails to address any of the more exotic and imaginative transfers of obligations to pay. Instead, the example considers a transfer of obligations to pay which are statutorily excluded from the definition of a liability in the corporate context. This selection by the Conference Committee of such a straight forward transaction itself suggests a rather conventional application for, and narrow interpretation of, the settings to which the legislation was intended to apply.

In the example provided in the legislative history, the transferor shareholder contributes property with a basis and value of $100 to its wholly-owned corporation and $40 of liabilities, the payment of which would give rise to a deduction. The value of the stock is $60 and the basis for the transferor's stock is reduced under 358(h) to $60. Without the legislative change, the basis would have been $100 because the $40 obligation to pay was not a liability for purposes of 358(d). The apparent legislative concern was that in the absence of legislation, the transferor could sell his stock immediately after the transfer and recognize a $40 loss even though the corporation itself would subsequently deduct $40 when the liability was paid.

In the view of Congress, without safeguard legislation, this type of structuring resulted in the acceleration and duplication of losses. Congress wished to preclude the derivation of tax benefits through such efforts. The acceleration occurred because the shareholder who made a net contribution of $60 was entitled to a basis of $100 under the law. Thus, the $40 of deductions which would arise subsequently upon the payment of the obligations by the corporation were accelerated through the recognition by the transferor of an equivalent amount of loss on the sale of the corporate stock. The duplication of loss arose because the corporation upon payment of the transferred obligation enjoyed a deduction of $40, which the shareholder had also effectively taken into account through the previously recognized loss of $40. Had the transfer to the corporation not been made or, if made, the stock had not been sold, only $40 of deductions would have been taken into account for tax purposes and only upon the actual payment of the obligations by the contributor or the corporation.

In the context of the example provided in the legislative history, the application of 358 (h) prevents acceleration and duplication of loss. However, as discussed below, it is questionable whether the improper acceleration or duplication of losses can arise in a pure partnership setting in the context of Subchapter K.

Authorization of Regulations for Applying 358(h) to Partnerships

The text of section 309 of that Act authorizes the promulgation of Regulations through which to apply the principles of 358(h) to partnerships. In relevant part, it provided:

(c) Application of Comparable Rules to Partnerships and S Corporations. The Secretary of the Treasury or his delegate  (1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and (2) may prescribe rules which provide appropriate adjustments under subchapter S of chapter 1 of such Code in transactions described in paragraph (1) involving S corporations rather than partnerships.

The legislative history provided similarly in the Conference Committee Report. Therein, it stated: The Secretary of the Treasury is directed to prescribe rules providing appropriate adjustments to prevent the acceleration or duplication of losses through the assumption of liabilities (as defined in the provision) in transactions involving partnerships. H.R. Rep. No. 106-1033, at 1019 (2000). However, in the case of S corporations, the Conference Report stated that "appropriate adjustments" may be provided and that they may be applied instead of "the otherwise applicable basis reduction rules." Id.

TaXanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

Given the textual language of section 309(c) of the Act and the charge in the Conference Committee Report, it is clear that some setting involving partnerships was considered in need of appropriate adjustments in order to prevent certain acceleration or duplication of losses    in the partnership context.   The question is which transactions were intended for coverage.   At its broadest, Congress intended to extend the provisions of 358(h) to the entirety of Subchapter K.   At its narrowest, the intent was limited to settings where the shareholder in the 358(h) transfer was a partnership.

The difficulty is determining the intent of Congress from the scanty legislative history. The authorizing language of the Act is non-specific as to the transactions to which it is to apply.   Under these circumstances, the best method through which to attempt to make such a
determination is to focus upon some of the key components of the statutory language of section 309(c) of the Act and to ascertain whether those ingredients auger for a broad or a narrow interpretation of the legislative charge.   Section 309(c) of the Act authorizes regulations
providing for (1) appropriate adjustments (2) in transactions involving partnerships (3) in order to prevent acceleration or duplication of losses through the transfer of liabilities.

The reach of the term appropriate adjustments is uncertain.   In the corporate context, the adjustment under 358(h) is an immediate reduction in the basis for the stock of the contributor.   The language of the legislative history suggests that, only in the case of S corporations, may the adjustment be something other than an immediate basis reduction.   This
language by implication suggests that the only adjustment applicable to partnerships is an immediate basis adjustment.   However, Temporary Regulation 1.752-6T and Proposed Regulation   1.752-7 adopt different standards as to when, and if, the adjustment is made even though both
address partnerships.   The Temporary Regulation insists upon an immediate reduction, while the Proposed Regulation ties the reduction in basis to specified subsequent events.

As illustrated below in the tax policy section of these comments, an immediate basis reduction as required by the Temporary Regulation is flawed in the pure partnership setting.   Even the Treasury and the Service have recognized that an immediate basis reduction is not appropriate in the pure partnership context.   The Preamble to Proposed Regulation 1.752-7 explicitly provides:  In the corporate context, section 358(h) prevents the duplication and acceleration of loss with respect to obligations not encompassed by section 358(d) by reducing the transferor shareholder's basis in corporate stock received in the exchange. Treasury and the IRS do not believe that this is the best approach for partnerships given their passthrough nature. Ultimately, the partners' shares of a partnership's deductions are limited by the partners' bases in their partnership interests (their outside bases). If, at the time of an assumption of a 1.752-7 liability by a partnership from a partner (the 1.752-7 liability partner), the partner's outside basis were reduced by the amount of the 1.752- 7 liability, then the partner would not have sufficient outside basis to absorb any deduction with respect to the 1.752-7 liability that passed through the partnership.   For this reason, these proposed regulations do not reduce the outside basis of the 1.752-7 liability partner upon the partnership's assumption of the 1.752-7 liability. (Emphasis added.)

However, an immediate basis reduction functions properly in the partnership as shareholder context, thereby supporting the more narrow interpretation of the legislative history.

While the Act's authorization of regulations references transactions involving partnerships,    its scope is unclear.   The phrase need not be read as one which sanctions provisions applicable to a pure partnership setting. This awkward phraseology, particularly when read with the need
for "appropriate adjustments," suggests a more limited concern focused on the impact of 358(h) on its shareholder.   Thus, the Temporary Regulation may have been intended to apply to corporate transactions arising under 358(h) that involved partnerships as shareholders, e.g., the transferor partnership was a shareholder of the corporation.

End Comment Text  --------------------------------

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

**Traynor Guy R**

Subject:                      FW: Comment from Web Site

-----Original Message-----
From: postoffice@a321.g.akamai.net [mailto:postoffice@a321.g.akamai.net]
Sent: Monday, September 22, 2003 9:21 PM
From: p-postlewaite@law.northwestern.edu
reg=Assumption of Partner Liabilities
category=taxregs
email=p-postlewaite@law.northwestern.edu

Begin Comment Text --------------------

INSTALLMENT 2 (PAGES 11-20)

RE: Temporary and Proposed Regulations (REG-106736-00)

Dear Internal Revenue Service:

        This letter and the attached document serves as my formal submission of Comments to
the Internal Revenue Service for consideration regarding Temporary and Proposed Regulation
1.752-6T (REG-106736-00).  I also request an opportunity to make a presentation at the
hearing for the
Temporary and Proposed regulation, set for October 14, 2003 in Washington, DC.  To ensure
that the entire set of Comments are received, please note that my Comments (print version)
are 26 pages in length.  Because the IRS web site does not allow filing the Comments as
one complete document, I will break up the document into multiple segments.  I will also
Federal Express a print version of the Comments to you tomorrow.

Nothing in the legislative history describes or suggests that the referenced acceleration
or duplication of losses can arise in a pure partnership transaction.  As evidenced by
Proposed Regulation 1.358-7, it can arise in transactions where a partnership is the
transferor
shareholder under 358(h).  As described below in the tax policy discussion, the
fundamental differences in the tax regimes of Subchapter K (aggregate) and Subchapter C
(entity) suggest that it is a rare setting in which legislation arising under one
subchapter is similarly applicable to the other.

Finally, if Congress had been similarly concerned about the use of such transactions in
the pure partnership context, arguably it would have legislated such a solution in the
same way that it did in the corporate context.  Regarding Subchapter C, Congress amended
358 by adding a new subsection, i.e., (h).  Had Congress intended a significant substantive
change in Subchapter K, it is more plausible that it would have acted similarly and
directly amended 722 or 752.

Although Congress did not amend 752, the Temporary Regulation effectively amends 752(b) by
providing for deemed distribution treatment not only in the case of partnership
assumptions of    liabilities (within the meaning of 752) but also for assumptions of any
fixed or contingent obligation to make payment that is not otherwise a 752 liability,
incorporating the definition of 358(h)(3).  Congress intent that Treasury amend Subchapter
K via regulations seems far from
clear, particularly when such an amendment does not have a nexus to a corporate
transaction covered by 358(h).

All of these concerns raise serious questions as to whether Congress intended a blanket
extension of these concepts into a pure partnership setting and as to whether the
Temporary Regulation conflicts with the legislative intent.  However, there can be no
doubt that Congress intended some regulatory promulgation involving partnerships.  Thus,
consideration must be given to whether a partnership and its partners could be impacted by
the application of 358(h) in a non-pure partnership setting.  If such a setting can be
identified, then a compelling argument exists for reading the Congressional authorization
narrowly.

**tax** **analysis**
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

Congressional Purpose In Authorizing Regulations

As described above, it is uncertain whether Congress intended to authorize the promulgation of Regulations to apply to pure partnership transactions. Notwithstanding this less than certain legislative charge, Temporary Regulation 1.752-6T and Proposed Regulation 1.752-7 confirm that the Service and the Treasury have concluded that such an extension is not only authorized, but warranted.

However, it is arguable that the adjustments contemplated by section 309(c) of the Act and the legislative history of 358(h) were only intended to ensure harmonizing adjustments to all of the parties that would be impacted by the basis reduction for the transferred obligation
under 358(h) where a partnership was the contributing shareholder. Congress may have intended that the regulations only address the issue of how such a basis reduction for an obligation transferred by a shareholder, which was a partnership, would be integrated into the assessment of the tax consequences to the partners and the determination, including a possible similar adjustment, of the basis for their partnership interests. Employing a narrow interpretation, many of the ambiguities and uncertainties discussed above regarding the scope of the legislative charge are more easily reconciled or eliminated.

The Service and Treasury recently (June 23, 2003) issued Proposed Regulation 1.358-7, entitled    Transfers by partners and partnerships to corporations. This action itself serves as additional support for a more narrow interpretation of the settings for which Congress intended the
authorization of regulations for transactions involving partnerships. Regulation 1.358-7 was issued in order to address specifically the types of adjustments which are required of a partnership and its partners if 358(h) applies to its contribution to a corporation as a shareholder of assets and transfer of obligations to pay. These adjustments are similar to those which would have been required if the contributing shareholder in the example in the legislative history to 358(h) had been a partnership. This limited concern may well constitute the sole reason for the regulatory extension of 358(h) to transactions "involving" partnerships.

A discussion of the example in Proposed Regulation 1.358-7 illustrates the issue and the reason why adjustments are required when 358(h) applies to a contributing shareholder that is a partnership. In the Treasury's example, a cash method partnership in a qualifying 351
transfer contributes $2,000,000 cash to a corporation and $1,000,000 of accounts payable in exchange for corporate stock with a value of $1,000,000.

It is stipulated that 358(h) reduces the shareholder's (the partnership's) basis in the corporation by $1,000,000, i.e., the amount of the non-358(d) liability but not below fair market value. The partnership thus takes a basis in its corporate stock of $1,000,000 ($2,000,000-$1,000,000).

Without more, while the 358(h) reduction precludes the shareholder (the partnership) from accelerating the loss through its sale of the corporate stock at fair market value, it does not prevent a similar bailout or acceleration through the sale by a partner of his or her partnership interest. Thus, the Proposed Regulation at 1.358-7(b) provides that the amount of the 358(h) reduction in basis is treated as a 705(a)(2)(B) expenditure for the determination of the partners bases in the partnership, thereby reducing the basis of their interests. In the
example, a reduction in A's and B's bases in their partnership interests by $1,000,000 would be required.

Importantly, the example may evidence the extent to which appropriate adjustments are required in the partnership context in order to prevent the acceleration or duplication of losses through the assumption of . . . liabilities described in section 358(h)(3). Thus, the
legislative history of 358(h) and the text of section 309(c) of the Act permit a more narrow interpretation of the legislative charge than that adopted by the Service and the Treasury in extending the Temporary Regulation to transactions arising in pure partnership settings. At a
minimum, it appears that Treasury and the Service should not extend the reach of the safeguard legislation where there is no certainty that such was the intended legislative charge.

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

The Tax Policy Operation of Temporary Regulation 1.752-6T

In essence, the Temporary Regulation calls for a reduction in the contributing taxpayer's basis of his partnership interest, at the time of the transfer, by the amount of certain obligations to pay transferred to the partnership. Taxpayers can avoid the application of the Temporary Regulation if they elect otherwise, i.e., they elect to be governed by Proposed Regulation 1.752-7 which dictates adjustments that are less immediate (but by no means beyond criticism from a tax policy standpoint) than those mandated by Temporary Regulation 1.752-6T. Under Proposed Regulation 1.752-7, a transferred obligation does not impact the partner's basis for his partnership interest until it is satisfied. Should the partner cease to be a member of the partnership prior to the satisfaction of the obligation, basis adjustments ensure that these consequences coincide with the partner's departure date from the partnership.

Regardless of whether the legislative history of 358(h) and section 309(c) of the Act sanction the promulgation of regulations to apply in the pure partnership setting, there is an additional concern for consideration in assessing the soundness of Temporary Regulation 1.752-6T. Critical to the legitimacy of any regulatory promulgation is its operation in conformity with sound tax policy. If sound tax policy is not present, then the regulation should be withdrawn.

Of particular significance, even the Treasury and the Service have recognized that an immediate basis reduction is not appropriate in the pure partnership context. The Preamble to Proposed Regulation 1.752-7 explicitly provides:
In the corporate context, section 358(h) prevents the duplication and acceleration of loss with respect to obligations not encompassed by section 358(d) by reducing the transferor shareholder's basis in corporate stock received in the exchange. Treasury and the IRS do not believe that this is the best approach for partnerships given their passthrough nature.
Ultimately, the partners' shares of a partnership's deductions are limited by the partners' bases in their partnership interests (their outside bases). If, at the time of an assumption of a 1.752-7 liability by a partnership from a partner (the 1.752-7 liability partner), the partner's outside basis were reduced by the amount of the 1.752-7 liability, then the partner would not have sufficient outside basis to absorb any deduction with respect to the 1.752-7 liability that passed through the partnership. For this reason, these proposed regulations do not reduce the outside basis of the 1.752-7 liability partner upon the partnership's assumption of the 1.752-7 liability. (Emphasis added).

As is discussed and illustrated below, the abuse against which the 358(h) legislation safeguards in the corporate context does not arise in the case of pure partnerships. If the proscribed improper acceleration or duplication of losses cannot arise in the partnership context, Temporary Regulation 1.752-6T would be improperly grounded and, thus, should be withdrawn.

Acceleration or Duplication of Losses in the Partnership Context

In the text of the Temporary Regulation, the Treasury attempts to integrate the general effect of 358(h) by requiring an immediate reduction in basis for the taxpayer's partnership interest where an obligation to pay (other than a liability to which 752(a) or 752(b) would apply) of the contributor is assumed by the partnership. In assessing the soundness from a tax policy standpoint of the Temporary Regulation and its impact on transactions involving pure partnerships, the example appearing in Temporary Regulation 1.752-6T is discussed and evaluated below. An assessment of whether the example produces the right result is made. These results are compared with those which would have arisen if the Temporary Regulation had not been promulgated. Finally, both variations are tested in order to determine if an improper acceleration or duplication of losses arises upon the sale of the partnership interest.

The Example Presented by the Temporary Regulation

Only a single example is provided of a setting involving partnerships which requires the

**tax**analysts™
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

application of Temporary Regulation 1.752-6T.  In Regulation 1.752-6T(c) example, a partnership is formed by two parties.  One (hereafter X) contributes property with a value and a basis of $200, subject to a 752 nonrecourse liability of $50 and a fixed or contingent non-752 obligation of $100 for a 50 percent interest in the partnership.  There is no discussion of why the obligation fails to constitute a liability for purposes of 752 or whether its payment would generate a deduction for tax purposes.

However, for purposes of meaningful discussion and analysis, it is assumed that the transferred obligation in the example of Temporary Regulation 1.752-6T is the same type of obligation to pay utilized in the Conference Committee Report accompanying the enactment of 358(h). In the Conference Report, the obligation to pay (most likely accounts payable of a cash method taxpayer) gave rise to a deduction upon payment which under 357(c)(3) did not constitute a liability. Thus, a similar assumption is made in evaluating the example of Temporary Regulation 1.752-6T.  Accounts payable of a cash method taxpayer do not constitute a liability for purposes of 752.  See Rev. Rul. 88-77, 1988-2 C.B. 128.

The example asserts that a 722/752 initial basis calculation for X produces an amount of $175 ($200 basis of property contributed minus 752(b) net liability relief of $25 from the nonrecourse liability (50% of $50)).  Under Regulation 1.752-6T, that basis is further reduced by the assumed non-752 liability of $100, leaving a basis for the contributor's (X's) partnership interest of $75.  The example is silent as to the particulars of the other partner  s (hereafter Y) contribution.  Presumably, Y contributed $50 for the interest and would have a basis of $75 ($50 cash plus 752(a) share ($25) of the nonrecourse liability).

The treatment mandated by the Temporary Regulation results in a disparity between the inside basis for the partnership assets (basis of contributed property $200 and $50 cash contributed by other contributor, total $250) and the $150 of outside basis for the interests in the partnership (X--$75 as determined by the Temporary Regulation, and Y--$75 determined under the traditional rules of 722 and 752).  This disparity exists even though the assets possess a value of $250 and are subject to two obligations (one under 752 and the other not under 752) totaling $150.

Consequences from the Application of the Temporary Regulation and Comparison With Results If It Were Not Applicable

In order to illustrate the tax consequences of the transaction as restructured by the Temporary Regulation, it is assumed that the partnership and its partners run their course. In so doing, not dissimilar from some of the Subchapter K approaches to the allocation of recourse liabilities and the 704(b) allocation of partnership operations among the partners, it is assumed that the partnership sells its assets, pays its liabilities (752 first and non-752 last), and ultimately liquidates.  Taking each step separately, one can ascertain the overall impact of the approach dictated by the Treasury and the Service and can assess its soundness from a tax policy standpoint.

Temporary Regulation Applies

As a first step, it is assumed that the partnership sells the property (basis $200, value $200, subject to 752 liability of $50) for $150 of cash and the assumption of the liability by the purchaser.  Since the amount realized would be $200 ($150 cash plus liability relief of $50) and the basis was $200, no gain or loss would arise to the partnership.  Additionally, under  752(b), a constructive cash distribution would occur for each partner (X and Y) and the bases for their partnership interests would decrease to $50 each.  Thus, even after the sale of the asset and transfer of the 752 liability, the partnership would have $200 cash and a non-752 liability of $100.  Again, inside and outside basis would differ ($200 versus $100).

A deduction of $100 arises upon the payment of the non-752 liability. The issue in Subchapter K is to which partner(s) is the deduction allocable.  The structure of Subchapter K under 752 affords an adjustment to the partners for their share of liabilities assumed by their

4

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

partnership.  To avoid a possible recognition of gain on the transfer of accounts payable to a partnership by a cash method contributing partner, such obligations do not constitute a liability for purposes of 752.

However, Congress specified in the legislative history of 704(c) that deductions arising to the partnership on its payment of the transferred obligations would be allocable to the contributor.  Accord Reg. 1.704-3(a)(4).  Thus, under the established law of Subchapter K, the deductions arising upon payment of the obligations are allocable only to the contributor or his or her transferee.  See Reg. 1.704-3(a)(7).

Consistent with this treatment, there would be no impact on the basis of the partners partnership interests upon the satisfaction of the obligation, because the obligation was not a   liability for purposes of 752.  Upon payment, X would be entitled to the $100 deduction.  This would typically result in a deduction on his personal return and would reduce the basis of his partnership interest similarly.

However, under 704(d), deductions are limited to the partner's basis for his partnership interest.  As X's basis is $50, only $50 of the $100 deduction would flow through and his basis would be reduced to $0.  On the equal distribution of the final $100, X would recognize gain under 731 of $50.  Y would not recognize gain as the basis for his partnership interest ($50) is sufficient to absorb the cash distributed ($50).

Significantly, as illustrated above, Temporary Regulation 1.752-6T goes further than its corporate counterpart in 358(h).  In the corporate context, a full deduction upon the payment of the obligation is available to the corporation.  In the partnership context, the $100 basis adjustment mandated by the Temporary Regulation has the unexpected consequence of permanently suspending one-half of the available deduction ($50) and generating gain to the contributor ($50).  These draconian consequences by themselves call into question the legitimacy of the Temporary Regulation and its soundness from a tax policy standpoint.

Results if the Temporary Regulation Had Not Been Promulgated

If the Temporary Regulation had not been promulgated, a similar analysis would apply except that the contributor's (X's) basis for his partnership interest would have been $175 rather than $75.  Thus, the remainder of the transaction would be similar to that discussed above, except that the $100 deduction allocable to X would not be subject to the impediment of 704(d).  Basis at that time would be $150, not $50.  The entire deduction would flow through, basis would be reduced to $50, and the final cash distribution of $50, not exceeding the basis for X's partnership interest, would not generate additional tax consequences.

Thus, the effect of the Temporary Regulation is overbroad and improper since the basis reduction precludes the full utilization of the available deduction.  Some of the transactions involving basis manipulation efforts have involved foreign parties who are typically unconcerned about the attendant tax consequences as they are typically immune from taxation by the United States.   Nevertheless, from the standpoint of sound tax policy, the deduction should be available regardless of whether it is utilized.

Thus, the tax consequences which ensued prior to the promulgation and application of the Temporary Regulation appear to have been correct.  Even if the Treasury and the Service were authorized by Congress to promulgate regulations for the pure partnership setting, the Temporary Regulation as drafted functions improperly and should be withdrawn.

Possibility of Acceleration or Duplication of Loss On Sale of Partnership Interest

Given the focus of 358(h) on the acceleration or duplication of losses and the fact that these consequences arose in the example appearing in the legislative history in the corporate context, a question arises as to whether such effects could occur in a pure partnership setting.  In making this assessment, the example of the Temporary Regulation must again be evaluated for these effects, both with and without the application of the Temporary Regulation.  A determination of the overall tax consequences if the contributor sold his partnership interest shortly after his transfer of assets and obligations to the

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

partnership may illustrate
whether the type of abuse against which 358(h) was intended to safeguard could arise in
the partnership context.

Under the example, the application of the Temporary Regulation results in a reduced basis
for X s partnership interest of $75. The purchaser (hereafter Z) would pay cash
consideration of $50 for X's 50% interest in the partnership. Thus, X would have no gain
or loss as the amount realized upon the sale of the interest is $75 ($50 cash and $25
relief from X's one-half share of the 752 liabilities (50% of $50)) and his basis is $75.
The Temporary Regulation ensures that an acceleration of loss does not occur.

Z would take a basis of $75 for the partnership interest.  If the partnership sold the
property for $150 and the purchaser's assumption of the nonrecourse liability, there would
be no gain or loss.  Both partners (Y's and Z's) bases for their partnership interests
would be reduced
to $50.  The effects of 704(c) would continue to apply to the transferee of a partnership
interest.  Thus, the payment of the obligation by the partnership would give rise to a
deduction which would be allocable to Z.  However, Z would encounter negative tax
consequences through gain recognition and a suspension of losses. An imperfection in the
Temporary
Regulation, similar to that described above, arises in the context of the sale of the
partnership interest.  The only difference between the two settings is that it impacts the
transferee (Z) rather than the transferor (X).

In the example of the Temporary Regulation, without the mandatory basis reduction, X would
recognize a loss upon the sale of the partnership interest, an event which could be
characterized as an acceleration of loss, because the transferred obligation upon payment
would give rise to a deductible expense or loss.  As described above, X's basis was $175.
On the sale of his interest for $75 ($50 cash and $25 liability relief), X would recognize
a capital loss of $100.

However, in Subchapter K, the most innocent of transactions involving the contribution of
appreciated or depreciated assets to a partnership invariably afford the contributor an
opportunity to accelerate tax consequences by the sale of his or her partnership interest
prior to the sale of the assets by the partnership.  Any time a taxpayer contributes net
depreciated assets, i.e., basis greater than value, to a partnership, an acceleration of
loss occurs if he sells his partnership interest prior to the partnership's sale of the
contributed assets.  Such
is clearly permissible under Subchapter K and the nonrecognition provisions of   721.

Z would take a basis of $75 for his partnership interest.  However, as discussed above,
the impediment of 704(d) would preclude the full benefit of the deduction to Z upon the
payment of the obligation.  Thus, the duplication component of the basis manipulating
transaction
against which Congress wished to safeguard would not be present in the pure partnership
setting.

While the legislation of section 309 of the Act authorized appropriate adjustments where
acceleration or duplication would arise, it is unclear whether both consequences must
arise as a prerequisite to the safeguard legislation's or regulation's application.
Notwithstanding
the use by Congress of the disjunctive, the example employed by Congress involved both
consequences acceleration and duplication.

Furthermore, except when quoting section 309(c) of the Act, even the Preamble to Temporary
Regulation 1.752-6T in at least four places uses the conjunctive, rather than the
disjunctive, phrase in referencing the abuse about which Congress was concerned.
Similarly, the Preamble to
Proposed Regulation 1.752-7 in at least four places also takes the conjunctive approach.
The actual text of Proposed Regulation 1.752-7(a)(1) begins its discussion of the purpose
and structure of the provision with the disjunctive, "acceleration or duplication."
However,
later in that paragraph, it returns to the conjunctive by asserting that the rules
"prevent the duplication of loss" and "also prevent the acceleration of loss."

End Comment Text

6

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

**Traynor Guy R**

To:
Subject:

            Howells Horace W; Miosi Dianna K
            FW: Comment from Web Site

```
-----Original Message-----
From: postoffice@a321.g.akamai.net [mailto:postoffice@a321.g.akamai.net]
Sent: Monday, September 22, 2003 9:28 PM
From: p-postlewaite@law.northwestern.edu
reg=Assumption of Partner Liabilities
category=taxregs
email=p-postlewaite@law.northwestern.edu

Begin Comment Text --------------------

INSTALLMENT 3 (PAGES 21-26)

RE: Temporary and Proposed Regulations (REG-106736-00)

Dear Internal Revenue Service:

     This letter and the attached document serves as my formal submission of Comments to
the Internal Revenue Service for consideration regarding Temporary and Proposed Regulation
1.752-6T (REG-106736-00).  I also request an opportunity to make a presentation at the
hearing for the
Temporary and Proposed regulation, set for October 14, 2003 in Washington, DC.  To ensure
that the entire set of Comments are received, please note that my Comments (print version)
are 26 pages in length.  Because the IRS web site does not allow filing the Comments as
one complete document, I will break up the document into multiple segments.  I will also
Federal Express a print version of the Comments to you tomorrow.
```

This phraseology suggests that the Treasury and the Service have concluded that the
prohibited abuse about which Congress was concerned can only arise if a transaction
produces both an acceleration and a duplication of loss.  In fact, the text of the
Preamble to Proposed Regulation 1.752-7 explicitly concludes that an immediate reduction
in basis is not
appropriate for passthrough entities.  The Temporary Regulation is fatally flawed.  The
dual concerns expressed in the Conference Committee Report cannot occur in a pure
partnership setting under Temporary Regulation 1.752-6T.  For further illustration of this
point, see the discussion in the Appendix.  Thus, the Temporary Regulation produces an
unsound tax policy result and should be withdrawn.

Conclusion

The discussion in the legislative history of 358(h) reveals that Congress was concerned
about transactions arising under Subchapter C.  Partnership transactions under Subchapter
K were not needy candidates for safeguard legislation.

Instead, the legislation appears intended to apply to economic transactions in the
corporate arena with compelling arguments, i.e., statutory, judicial, or administrative
exclusion from   liability status, as to why the basis for the corporate stock received
should not be reduced by the amount of the transferred obligation to pay.  Given the
legitimacy of these arguments, Congress needed to act, and did act, to prevent the
acceleration and duplication of losses through the enactment of 358(h).

The legislative history of 358(h) also authorized the promulgation of regulations to
provide for appropriate adjustments to prevent acceleration or duplication of loss for
transactions involving partnerships. While the intent behind this extension is far from
certain, it is arguable that it was only intended to apply to corporate transactions
involving a shareholder that was itself a partnership.  Proposed Regulation 1.358-7(b)
appears to bolster this focused
interpretation of the mandate of Congress and fits neatly within the language of section
309(c) of the Act.  Consequently, the extension of the legislation by regulation to

tax analysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

transactions involving pure partnerships, without a clear and convincing articulation by Congress of such an intention, is at the least questionable. Without the requisite certainty of the breadth of the legislative intent behind section 309(c) of the Act, the Treasury and the Service should be hesitant to expand an uncertain legislative charge beyond the most certain of its boundaries.

The operation of Temporary Regulation 1.752-6T itself is unsound from a tax policy standpoint as it mandates a basis reduction in a pure partnership context. Such an adjustment functions improperly. Either the contributor or the purchaser of his or her partnership interest will not be able to deduct the payment of the transferred obligation because the basis for the partnership interest will be insufficient to absorb the loss under 704(d).

The Temporary Regulation fails to recognize that duplication of loss would not occur in a pure partnership setting. In fact, the treatment mandated by Temporary Regulation 1.752-6T conflicts with that provided in Proposed Regulation 1.752-7. Instead of avoiding "duplication" of a loss, Temporary Regulation 1.752-6T in many circumstances will prohibit any deduction for the loss in the first instance. If acceleration occurs, such an effect is inherent in the structure of Subchapter K. Finally, in spite of the use of the disjunctive in the enabling legislation, the offending example in the legislative history possesses both components of acceleration and duplication. Similarly, the Preambles of Temporary Regulation 1.752-6T and Proposed Regulation 1.752-7 use the conjunctive in describing the abuse upon which Congress was focused in enacting 358(h). Only in transactions where acceleration and duplication occur should the legislative safeguard apply.

Possibly the most compelling reason for withdrawing Temporary Regulation 1.752-6T is the public acknowledgement by the Treasury and Service that an immediate basis reduction is inappropriate for passthrough entities. Given this concession, it is difficult to understand why the Treasury and Service would advocate the application of any regulatory regime that was other "than the best for partnerships given their passthrough nature." The best approach with regard to Temporary Regulation 1.752-6T is to withdraw it and to spend additional time and effort focusing upon the shortcomings of, and solutions to, the problems discussed above that may also arise under the current version of Proposed Regulation 1.752-7.

APPENDIX

Corporate Transaction 358(h)

The following discussion adopts the same technique for assessing the impact of the 358(h) legislation, Temporary Regulation 1.752-6T, and Proposed Regulation 1.752-7 as that employed in the written commentary. The goal is to evaluate the transaction described in the legislative history of 358(h), i.e., property with a basis and value of $100 and a non-357 liability (accounts payable of a cash method taxpayer) of $40 contributed for a 49% interest in the enterprise in each of these settings both under the old law and the new law. In each, a comparison will be made of the acceleration and duplication effects of the transaction under old and new law. Thereafter, the partnership transfers will be compared with the corporate transfers to determine whether taxpayers can, in the words of the Preambles of the Temporary Regulation and the Proposed Regulation, use partnerships "to carry out the same type of abuses that section 358(h) was designed to deter." Thus, the base for comparison is a corporate transaction with the factual particulars described in the legislative history of 358(h). An analysis of that transaction highlights the acceleration and duplication of loss about which Congress was concerned.

Old law

A, a cash method taxpayer, transfers in year 1 property with a basis of $100, fair market value $100, and accounts payable of $40 in return for a 49% interest in the corporation. While not referenced in the legislative history, we assume that B transfers $62 cash for the remaining 51% interest in the corporation. We assume that the corporation pays the accounts payable in year 3, and A sells his stock to C in year 2 for $60. We further assume breakeven operations, a sale of the property for no gain or loss, and a liquidation

2

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

of the corporation in year 4.

Under old law, A would have a basis of $100 in year 1, and in year 2, he would have a $40 capital loss. C has a basis of $60 for the stock. Upon payment of the accounts payable in year 3, the corporation would have a $40 deduction. Upon liquidation, C and B would have neither gain nor loss.

Thus, the transaction allowed A to take a loss in year 2, albeit possibly capital, and the corporation to take a similar deduction in amount in year 3. Consequently, Congress viewed A as accelerating his loss by the sale of his corporate stock and the subsequent deduction to the corporation upon the payment of the obligation as creating a duplication of the loss.

New law--358(h)

Under the new law, using identical facts, the contributor takes a basis of $60 for the corporate stock and has no gain or loss on the sale of the stock. The corporation is entitled to the $40 deduction upon payment in year 3. Accordingly, there is no acceleration of the loss and there is no duplication of the loss.

Partnership Transaction Temporary Regulation 1.752-6T

Partnership taxation does not utilize a separate entity regime. Thus, differences between the double tax regime for corporations and the single tax regime for partnerships can arise regarding the tax consequences of an identical transaction. The discussion which follows makes a similar comparison between old law and new law in a transaction identical to that described above except that it involves a partnership and the application of Temporary Regulation 1.752-6T and Proposed Regulation 1.752-7.

Old law

A would have a basis for his partnership interest of $100. Upon his sale of the interest in year 2, he would have a $40 loss. C would take a basis for his partnership interest of ·$60. In year 3, a deduction would arise to the partnership of $40, which under 704(c) would be allocated to the contributor A or his successor in interest. Thus, C would receive a $40 deduction and his basis would be reduced to $20. In year 4, upon liquidation of his interest, C would recognize income of $40, because the cash distributed ($60) would exceed his basis ($20). Thus, under the old law, only a single net loss of $40 arose in year 2 for A. C's loss of $40 in year 3 is offset by a gain of $40 in year 4.

New law--Temporary Regulation 1.752-6T

Applying the Temporary Regulation, A takes a basis of $60 for his partnership interest. Upon the sale of the interest in year 2, he has no gain or loss. C takes the deduction in year 3 of $40 accompanied by an equal basis reduction. In year 4, upon the liquidation of his interest, he has gain of $40. Under this treatment, the deduction/loss is not allowed to either A or C.

New law Proposed Regulation 1.752-7

Under the Proposed Regulation, A takes a basis of $100 in year 1. Upon his sale in year 2, his basis is reduced to $60 and he recognizes neither gain nor loss. In year 3, upon the partnership's payment of the obligation, the $40 deduction arising to the partnership is allocated to A, at that time a non-partner, provided the partnership notifies him of its payment. The net result of this treatment is that, at best, a single deduction of $40 to A arises in year 3. If A is not notified, in theory, no one would be entitled to the deduction.

Conclusion

An overall comparison reveals the following results by 358(h), Temporary Regulation 1.752-6T, and Proposed Regulation 1.752-7.

| "Acceleration" | "Duplication"<br>(Loss to Enterprise |
|---|---|

3

taxanalysts
DOCUMENT SERVICE
Doc 2003-21409 (16 pgs)

Both "Acceleration"
     (Loss to Contributor)    or Other Partner)
and "Duplication"
Corporate

| | | | |
|---|---|---|---|
| Old law | Year 1 | Year 3 | Yes |
| New law | None | Year 3 | No |

Partnership

| | | | |
|---|---|---|---|
| Old law | Year 1 | None | No |
| Temp. Reg. | None | None | |
|     No | | | |
| Prop. Reg. | Year 3 or None | None | |
|     No | | | |

Accordingly, it is questionable whether any partnership transaction can produce the acceleration and duplication effect that arose in the corporate context prior to the enactment of 358(h). Partnership transactions do not produce a similar duplication of loss. Proposed Regulation 1.752-7, which is not the focal point of this commentary, suggests to the contrary in its text. However, it fails to carry the transaction to its logical conclusion. A loss of the transferor is not duplicated if the loss to the transferee is subsequently offset by an equal amount of gain. Without the duplication of loss, the need for the regulation is questionable.

The acceleration concern is nonexistent under Temporary Regulation 1.752-6T as it totally eliminates the loss. Proposed Regulation 1.752-7 effectively delays the deduction, but the Treasury and the Service have yet to harmonize that treatment with the treatment dictated by 704(c), its legislative history, and Regulation 1.704-3(a)(4). Thereunder, the deduction arising from the payment of accounts payable is allocated to the contributor. Importantly, Regulation 1.704-3(a)(7) provides that such items and their "built in gain or loss must be allocated to the transferee partner as it would have been allocated to the transferor partner." Little attention appears to have been given to this conflict between Regulation 1.704-3(a) and the Temporary Regulation and Proposed Regulation and their integration into the concept of acceleration.

End Comment Text -----------------------