1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00636-LTB-KLM

3

4

CARLOS E. SALA and
TINA ZANOLINI SALA,

5

    Plaintiffs,

6

vs.

7

UNITED STATES OF AMERICA,

8

    Defendant.

9

_____

10

11

REPORTER'S TRANSCRIPT
TRIAL TO COURT
CLOSING ARGUMENTS

12

_____

13

14

15

        Proceedings before the HONORABLE LEWIS T. BABCOCK,
Judge, United States District Court for the District of
Colorado, commencing at 9:34 a.m., on the 19th day of March,
2008, in Courtroom C-401, United States Courthouse, Denver,
Colorado.

16

APPEARANCES

17

18

19

20

For the Plaintiffs          ROBERT J. CHICOINE, ESQ.
                            DARRELL DELMAR HALLETT, ESQ.
                            CORI E. FLANDERS-PALMER, ESQ.
                            Chicoine & Hallett
                            719 Second Avenue, Suite 425
                            Seattle, Washington

21

22

23

For the Defendant           DAVID NEIL GEIER, ESQ.
                            JOSEPH ANDREW SERGI, ESQ.
                            AMY T. MATCHISON, ESQ.
                            U.S. Department of Justice-DC
                            Tax Division
                            Washington, D.C.

24

25

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

2

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Good morning.

 3          Mr. Hallett.

 4                        CLOSING ARGUMENT

 5          MR. HALLETT:  Thank you, Your Honor.  May it please,

 6   the Court.

 7          Your Honor, I'm motivated to be brief this morning,

 8   and I'll make every effort to do that.

 9          I'm not motivated by any of the three things Your

10   Honor mentioned yesterday.  I'm motivated by a more maybe

11   equally fundamental thing.  With all due respect to your Mile

12   High city, I'm motivated to get back to sea level and run with

13   my golden retriever, my wimpy runs again.

14          Going back to the opening statement.  Sometimes I

15   think opening statements are like campaign promises.  Although

16   we didn't make promises in the opening statement, we laid out

17   what we thought the plaintiff's case would prove.  Oftentimes

18   opening statements are like campaign promises:  They're easy to

19   make standing up here.  They're something else to deliver on

20   and prove.

21          I submit this -- Your Honor, that this was an easy

22   case.  You deal with the facts you're dealt.  We have an

23   extremely strong set of facts.  And I submit that every

24   material fact regarding Mr. Sala's profit motive, regarding the

25   economic substance and the reality of these transactions, every
```

1   material fact that we laid out we thought would be proven, has

2   been proven.

3           And this is the case despite, Your Honor -- and with

4   all respect to the Government -- you can see enormous efforts

5   were put into this case to go through thousands and thousands

6   of pages of documents and depose for many hours many witnesses.

7   But you can't change the facts.  Sometimes I stand up here, and

8   I wish I could.  But in this case, I don't wish I could,

9   because --

10          THE COURT:  Well, you know, one of the promises you

11  made to me I think was that even the Government's expert,

12  Mr. DeRosa, would say that property went from a partnership to

13  the Sub S corporation.

14          MR. HALLETT:  That was, indeed, one of the promises,

15  Your Honor.

16          THE COURT:  I didn't hear him say that.

17          MR. HALLETT:  I want to get to that.

18          But on page 41 -- 47 of his report -- and I'll get

19  that into detail -- he said -- there was outlining transactions

20  between December 20 and December 31, 2000.  He said, beginning

21  on December 20, there were foreign currency and foreign

22  currency option trades initiated in Deerhurst Investors GP and

23  then transferred to Solid Currencies, where the trades were

24  paid for and settled.

25          Thank you, Mr. DeRosa.  After studying those

1   documents, he stated exactly what has been our position.  And I

2   heard him say it on the stand, Your Honor.  Maybe you can look

3   at the realtime.  I haven't.  I heard him say it on the stand,

4   that they were purchased by the general partnership, but he

5   said they weren't paid for by the general partnership.  So his

6   position was that because they weren't paid for by the general

7   partnership, the general partnership didn't buy them and own

8   them.  And I submit, Your Honor, that's nonsense.

9          That's like, if I bought my daughter a house, and I

10  had an obligation to make a down payment when I bought the

11  house and a mortgage obligation, and then I decided I'd be

12  generous and transfer it to her, but not too generous, and she

13  ought to pay for it.  And I transfer it to her, and she takes

14  the obligation to pay for it, it's like me saying I never owned

15  the house.

16         And if you go on, Your Honor, in that same

17  testimony -- I'm sorry, the same provision in the report, the

18  key transactions, page 47, December 20, Deerhurst Investors GP

19  purchased a one-year put option on the euro.  Going on down,

20  Deerhurst Investors GP sold euro spot.  That's our spot

21  transaction.

22         Page 48, Deerhurst Investors GP transferred the step

23  one put option on the euro to Solid.  Exactly what we say

24  happens.

25         And then on page 48, Deerhurst Investors GP

1    transferred the step one spot trade to buy euro against the

2    dollars to Solid.  Exactly what we say happened.

3         And, Your Honor, I felt confident in the opening

4    statement saying that this would be a fact, not only because

5    Mr. DeRosa, who wanted to carefully lay out the sequence of the

6    transactions, had stated it, but because after hours of

7    Mr. Krieger being examined concerning this matter, Mr. Krieger

8    said, now, look, there is some confusion in the documents here.

9    But it appears to me, based upon all the information from these

10   statements, that what happened is that GP bought the positions,

11   transferred them to Solid, along with the cash, and Solid paid

12   for them.

13        Part of the confusion -- Your Honor, asked me in

14   opening statement.  And part of the confusion in the

15   documents -- you know, lawyers oftentimes, they don't like to

16   own up to some of the facts.  And on some of the facts, there

17   is confusion.  And one of them is this Joint 31, which is the

18   Deerhurst/Solid statement.  And it's got our two friends on

19   here, these two positions, saying on 12/22 there was a buy of

20   the put option and on -- and on 12/22 there was a buy of the

21   European spot.

22        I think it's clear from all of the evidence that their

23   computer didn't apparently have anything for "transfer," and

24   they stuck in there "buy."  I think it's as simple as that.

25        And the final document, Your Honor, that will bear

1    this out -- two final documents -- is Joint Exhibit 29.  And I

2    didn't -- the Government blows a lot of smoke on this issue.  I

3    didn't hear them refer to it.  And that is a Refco statement in

4    the name of Deerhurst Investors General Partnership.  And it

5    shows the status of the open positions as of the 21st and the

6    22nd.

7            And it's got there very clearly the put option, and

8    it's got very clearly the European spot.

9            So I submit, Your Honor, I delivered -- we delivered

10   on the campaign promise.  And we did not because we're great

11   lawyers, but because we have the facts.  And Mr. DeRosa, I

12   submit, would not give us a millimeter if he didn't have to

13   give us a millimeter.

14           And I think what happened, Your Honor, when he wrote

15   that report, he didn't know the significance of all of this.

16   He was going to lay out in detail all of these transactions.

17   And he couldn't have said it clearer, that the GP bought them,

18   the GP transferred them, and then Solid settled up on them.

19           And then when he apparently learned that it was an

20   issue, he gets up there and makes this, I submit, ridiculous

21   argument that because they were purchased but settled up in

22   Solid, they weren't owned.

23           All right, Your Honor.  Thank you, that eliminated one

24   issue that I have to talk about here.

25           Let me just summarize briefly what I think again --

1    and maybe Your Honor has more -- are the key issues here in

2    this case.  And I think, again, it boils down to some very

3    fundamental issues, not necessarily simple.

4          But, one, is there economic substance to the relative

5    transactions under the test set forth in *James*?

6          Second, did Sala did have the requisite profit motive

7    in entering into the Deerhurst investment?

8          A couple of subissues that I see there, one is a legal

9    issue.  This notion of primary motive that you see out there in

10   the cases.  What does it take to satisfy the primary motive

11   test?  What is a primary motive?  What do the courts mean by

12   that?  So I'm going to discuss that a little bit.

13         And the second subissue on profit objective is, do we

14   test the profit objective against what the Government likes to

15   call a basis generating trade of the 24, or do we test

16   Mr. Sala's profit motivation, to use Mr. DeRosa's words,

17   against the whole investment?  And the whole investment is the

18   $9 million invested over an expected five-year period.

19         The profit issue and that distribution -- I'll call it

20   the distribution issue, the one I talked about, as to whether

21   positions as well as cash came out from the partnership --

22   those are purely factual issues.  So that brings into play the

23   burden of proof.  And I'll talk about that first up here.

24         And the final issue, I think here, which is a very

25   significant issue, is, does this *Helmer* case and its progeny

1  that says that when a partnership sells options, that those

2  options are not to be taken into account in determining basis,

3  applies not only to partnerships, applies to corporations.

4  There is lots and lots of law on it.  The basic question is, is

5  that law changed by these 2003 Treasury regulations under

6  1.752?

7        So that's the last issue that -- I'm sorry, Your

8  Honor, there is one last issue.  And I'm most hopeful that

9  there is no need to ever get to it.  And that is, is plaintiff

10  entitled to the suspended interest?

11       We only are not if the penalties come into play.  The

12  penalties don't come into play if Your Honor rules in favor of

13  the plaintiff on the merits.  But if they do come into play --

14       THE COURT:  What if I rule in favor of the plaintiff

15  on the merits, the economic substance merits, what does the

16  regulation, 1.752-6, have to do with penalties and interest?

17       MR. HALLETT:  I don't think directly it has anything

18  to do with the -- with -- well, it would in this respect:  If,

19  let's say, you ruled against the plaintiff on the 752, you said

20  that the plaintiff doesn't get the deduction, sorry, because

21  the 2000 regulation knocks him out, then I would say, it would

22  come into play if Your Honor found that this didn't -- it

23  wasn't a qualified amended return.  If it was a qualified

24  amended return, you don't have to get to reasonable cause and

25  good faith.  But if it's not a qualified amended return, the

1   Code says in 6664(c), none of the penalties apply if the

2   plaintiff acted with reasonable cause and good faith.

3        Certainly at the time the defendant went into the

4   transaction there wasn't a 1.752.  It came in in 2003.  So I

5   guess -- and it's a highly complex matter.  I don't think it's

6   all that complicated.  I think it clearly went beyond the

7   authority that Congress granted it.  But it's certainly a

8   debatable legal proposition.  So I would say he certainly

9   shouldn't get hit with a penalty because three years later

10  Treasury tried to change the law retroactively.

11       All right.  Your Honor, if I can just go to the burden

12  of proof.  A couple of conditions that I don't think the

13  Government even disputes are clearly met here.

14       That is that the plaintiff's cooperated in the

15  examination.  No question about that.  All the questions were

16  answered, and many hundreds of pages of documents were provided

17  to the agents.  Kept adequate records.  No question about that.

18  Everything could be figured out from the records that Mr. Sala

19  provided here.

20       And then the question -- and then the taxpayer has to

21  introduce credible evidence.  And the question is, what's

22  credible evidence?  And the case law indicates, and the

23  legislative history, it is a fairly low threshold.  It's

24  evidence based upon which the Court could rule in favor of the

25  plaintiff, or it could rule the other way.  Congress clearly --

1    they did this in '98.  And there was an effort to make it a

2    fairer playing field for taxpayers at that point in time.  But

3    they were cognizant about all of these tax protestors and so

4    forth.  And they didn't want tax protestors to be coming in and

5    making frivolous positions and shifting the burden to the

6    Government.

7           Absent that, it's a fairly easy standard.  And the

8    significance of it is set forth in the legislative history,

9    House Report No. 105-599.  And the report says -- and the case

10   law is consistent.  One is the *Thompson* case cited in the

11   brief -- if after evidence from both sides the Court believes

12   that the evidence is equally balanced, the Court shall find

13   that the secretary has not sustained his burden of proof.

14          In other words, the Government has the burden of

15   proving by a preponderance of the evidence.  As I said, there

16   is a couple of issues here that that could come into play with

17   respect to profit motive versus tax motive.  If Your Honor is

18   struggling back and forth, well, you know, it could be this and

19   it could be that, is it profits, is it taxes, where is it, and

20   you could go either way, again, I submit under the appropriate

21   test, it doesn't.  The Government has the burden of proof.  And

22   if they didn't carry it, then they lose.

23          The same thing on this distribution issue, as I say.

24   That's a pure fact issue.  What was distributed?  And if --

25   well, that could go either way, then the government's got to

1   show by a preponderance of the evidence that there wasn't

2   positions as well as currency that was transferred.

3         Your Honor, let me go to the legal issue first, plod

4   through this a little bit.  But I think it's worth plodding

5   through the statutes and this regulation, because I think it's

6   enlightening as to the validity of the plaintiff's position.

7         The starting point here is *Helmer*.  And I won't bore

8   the Government with a discussion of *Helmer*.  I'm sure you're

9   well familiar with it.  It's been around since 1975.  It says,

10  when a partnership sells options, that obligation to perform on

11  the option is contingent.  It's not to be taken into account in

12  determining basis.  That rule has been applied many times, not

13  only in the partnership context, but in the corporate basis

14  context.

15        It probably hurts taxpayers far more often than it

16  helps taxpayers.  Mr. Helmer had to pay tax on artificial gain.

17  The way I look at it, he probably had to pay tax twice, once

18  when he got the option proceeds distributed to him, and his

19  basis was tiny, because he couldn't add the obligation on the

20  option to it.  And then again if the option was exercised, he

21  would have gain from the sale of the property, including the

22  option.  And if it wasn't exercised, there would be income from

23  the option money.  So it's been around there a long time.

24        There is a doctrine in the law, Your Honor, a doctrine

25  in the law, I'm sure Your Honor is very familiar with, that

1   when there is a court interpretation -- many court

2   interpretations out there for many years, of the Internal

3   Revenue Code, and the Internal Revenue Code is reenacted many

4   times.  And with reenactments, the Treasury is directed to

5   promulgate regulations that Congress implicitly approved, that

6   that is the law.

7        And I think that might have been what Treasury had in

8   mind in 2003 when they tried to change the law by these 752

9   regulations.  And they said in a preamble, this doesn't follow

10  the law as applied in *Helmer*.  So that was the law.

11       And it's very interesting here, Your Honor, that the

12  dust hadn't cleared on the Deerhurst transactions when Congress

13  amended in December of 2000, Section 358 of the Code.  Now,

14  that has to do with determining basis in a corporation, the

15  shareholders' basis in the corporation.

16       It was --

17       *THE COURT:*  Can Congress grant authority to the IRS to

18  amend the law *Helmer* dealt with, tax code, not a constitutional

19  provision?  Could Congress give the IRS authority to amend the

20  law and do it retroactively?

21       And then the following question, of course, is, did

22  Congress do that when they amended Section 309(c) of the

23  Community Renewal Tax Relief Act of 2000?

24       *MR. HALLETT:*  No and no.

25       One of the most fundamental legal propositions in the

1      law, if anything is certain, Congress makes the law.  Treasury

2      interprets the law, and they can be authorized to promulgate

3      regulations to carry out the law, but Treasury does not make

4      the law.

5              THE COURT:  Does that bring into play a *Chevron*

6      analysis?

7              MR. HALLETT:  I think it does.  But -- well, I think

8      even a *Chevron* analysis, if I recall, that gets to legislative

9      regulations.  And even there, there is two types of

10     regulations, the interpretive and the legislative.

11             Even the legislative regulations, which have the

12     higher weight, even those have to be within the statute.

13     Treasury can't go out and make the law.

14             Now, let's take a look, Your Honor, at what -- and

15     this is -- comes right into play here.  Because with the first

16     step here, we have the Solid, the S corporation.  And Sala

17     transfers his account, including the 24, to Solid.  In

18     exchange, he gets stock in Solid.  So what's his basis in

19     Solid's stock?

20             And we go over to 358 of the Code.  I love this

21     language in the Internal Revenue Code.  I've been dealing with

22     it for 40 years.  It's still basis to distributees.  I can

23     hardly say it, the distributee is Solid.  And basically, 358(a)

24     is -- what it is saying is that the basis is the property

25     transferred decreased by the amount of any money received by

1    that in connection with the exchange.

2          So then the question comes, well, what's a liability?

3    And the provision goes on to say that over in (d), 358(d), that

4    where as part of the consideration the taxpayer and another

5    party to the exchange assumes a liability, the liability shall

6    be treated as a distribution of money.

7          Now, before these cases, it said that a contingent

8    liability, such as an option, is not a liability for purposes

9    of 358.  But Congress did change the law with this Community

10   Relief Act.  And it brings into play 358(h), special rules for

11   assumption of liabilities to which subsection (d) does not

12   apply.

13         (h)(1) says, and I'll paraphrase it, the basis shall

14   be reduced by any liability which is assumed.  Well, what's any

15   liability?  And then it goes down and says in (3), for purposes

16   of this subsection, the term "liability" shall include any

17   fixed or contingent obligation to make payment without regard

18   to whether the obligation is otherwise taken into account for

19   purposes of this title.

20         So there we are.  If you stop there, we're knocked out

21   of the saddle.  They blast us out of the saddle.  But they

22   didn't stop there.  They said, there is an exception here that

23   contingent liabilities are treated as money and reduced.  And

24   the exception is in (h)(2).  It says that paragraph 1 shall not

25   apply if substantially all of the assets with respect to which

 1     the liability is associated is transferred to the person

 2     assuming the liability as part of the exchange.

 3            So they basically approve *Helmer*, provided the shorts

 4     go in with the longs.

 5            Now, what that tells us is that Sala's basis in Solid

 6     is the $60 million basis, because the shorts went in with the

 7     longs.  And so you get the big $60 million basis.  So his basis

 8     in Solid is 60 million.  And if this thing played out and we

 9     didn't get the partnership basis -- assume we didn't -- he'd

10     get a loss.  It would be with what the government doesn't like,

11     a noneconomic loss of 60 million.  It would be a capital loss

12     and not an ordinary loss.

13            And we acknowledge, Your Honor, critical to the

14     ordinary loss is the partnership.  No question about it.

15     Because the partnership has special rules for distributions.

16     Special rules that we'll get to here.

17            But, basically, what Congress did then in the

18     Community Relief Act -- I don't know what all of this has to do

19     with community renewal relief, but there you are -- it says

20     that Treasury shall promulgate comparable rules for

21     partnerships.  Comparable rules.

22            And what is comparable?

23            Well, *Klamath*, which I submit, Your Honor, not just

24     because it came out the way we like, the *Klamath* decision on

25     752 is a very, very well-reasoned opinion.  And they said

1   Treasury did enact comparable rules for partnerships.  And it's

2   Treasury regulation 1.758-7.  And that dealt with transfers by

3   partners and partnerships to corporations.

4        Now, that's what -- Congress gave them the authority

5   to do that.  And they have rules there with partners and

6   partnerships when they put property into a corporation.  That

7   regulation doesn't say anything about what -- nobody argues

8   that it has any implication to what we're talking about here.

9        But what Treasury did, then, fired up, apparently, by

10  their passion, as they can get fired up by what they call tax

11  shelters -- and it's always interesting, Your Honor.  Some

12  counsel and tax practitioners, they don't like to use the word

13  "tax shelter."  And I always say, show me in the Internal

14  Revenue Code where it says, the taxpayer cannot claim tax

15  benefits with respect to a tax shelter.  It doesn't say that.

16  It has special reporting rules.  It allows deductions and

17  losses for tax shelters.

18       But Treasury gets fired up.  And they come along, and

19  they enact, finally in 2003 and try to make it retroactive,

20  this 1.752-6.

21       And it -- in subsection (a) says, if a partnership

22  assumes a liability as defined in Section 358(h)(3) -- so it

23  brings us 358(h)(3) into play, which would include contingent

24  obligations.  And then it has exceptions.  And the exceptions

25  it says is, except as provided in (d)(2), the exceptions

1    provided in (h)(2)(A) and (B) apply.  So those are the

2    exceptions where there is a contingent liability, the longs are

3    put in with the shorts.  No problem with that.  You're just

4    going right in accordance with comparable rules.

5          But then they come out, transactions described in

6    Notice 2000-44.  The -- and they made an exception to the

7    exception.  And says, if the exception doesn't apply to

8    transactions described in Notice 2000-44.

9          That was clearly beyond the grant of the authority.

10   Congress said, make rules consistent and comparable.  And it is

11   squarely contrary.

12         There is absolutely nothing -- and we're not the only

13   one.  Practitioners, the government, everybody has combed the

14   legislative history to see, was there any intent by Congress to

15   change the rule with respect to a Son of Boss transaction or

16   have a special rule for that.  And there isn't.

17         And look at the anomaly you come out with here.  Here

18   is the anomaly:  If that comes into play, as they want it to

19   come into play, in the case of a corporation and a taxpayer's

20   basis in a corporation, you get to boost the basis as long as

21   you put all of the shorts in with the longs.  Yet in the case

22   of a partnership, you don't.

23         Now, especially given the fact that that's been over

24   30 years the rule in the case of partnerships, with no

25   indication -- no indication that Congress intended to change

1    that, my position -- our position is, Your Honor, that that is

2    clearly contrary to the authority that was provided by

3    Congress.  And that's exactly what the *Klamath* case found.

4         And on the other side of the coin, we have the *Cemco*

5    case.  And with all due respect to the Seventh Circuit, that

6    was a terribly reasoned opinion.  They didn't go through the

7    analysis that I just stated and *Klamath* did, what's the extent

8    of the authority?  What is the exception?  Was there an intent

9    to change the rules and so forth?

10        They said, first of all, they weren't even considering

11   *Helmer*.  They don't even have to get to *Helmer*, because the IRS

12   has the authority to disallow transactions that have economic

13   substance.

14        *THE COURT:*  Is *Klamath* on appeal?

15        *MR. HALLETT:*  It is on appeal to the Fifth Circuit.

16        And if that's the basis of *Cemco*, I don't quarrel with

17   it.  If they're just saying, okay, if the transactions don't

18   have economic substance, then we're going to -- we're going to

19   apply these regulations, I don't quarrel with it.  But I sure

20   quarrel with it where we have transactions such as involved in

21   this case that do have economic substance.

22        It is a very poorly reasoned opinion.  As Your Honor

23   is fully aware, the Tenth down here is binding on Your Honor,

24   but the Seventh down there isn't binding on Your Honor.  And I

25   think if you look at the two and you look at the quality of the

1    reasoning and the analysis, I would submit Your Honor will be

2    persuaded that *Klamath* reads the right result.

3         THE COURT:  I think I hear you correctly -- and you'll

4    correct me if I'm wrong -- that the economic substance analysis

5    must be on the $9 million investment on a five-year investment

6    program.

7         MR. HALLETT:  Yes, although --

8         THE COURT:  And not simply 2000.

9         MR. HALLETT:  No, no, I wouldn't say that with respect

10   to economic substance.  With respect to profit objective, I say

11   that's the case.

12        With respect to economic substance, I acknowledge that

13   the 24 positions that generated the tax loss, they have to have

14   economic substance.  The whole program has to have economic

15   substance.  But I acknowledge that those 24 have to have

16   economic substance.  And I submit that it's overwhelming in

17   this record that they do have.

18        THE COURT:  Your position, then, is that the -- you

19   take a macro view of the program, including, of course, the 23

20   positions in 2000.

21        MR. HALLETT:  Absolutely.  Absolutely.

22        I'll have a few comments about that in the beginning.

23        Let me get, first of all, to the question here of the

24   standard for determining the profit motive -- the statute --

25   again, I was taught 40 years ago by my boss at the Justice

1    Department, young man, read the statute first before you think

2    great thoughts.

3           So you go to the statute that's involved here.  And

4    that's 165(c)(2), that allows losses in transactions entered

5    into for profit.  It simply says, it is hereby allowed losses

6    in connection with transactions entered into for profit.  It

7    doesn't say anything about profit motive or primary motive or

8    anything else, and neither do the regulations.

9           So it gets the case law.  And it gets a little

10   confusing, because you find this profit objective requirement

11   coming up in this 165.  You see it in 162, which allows

12   ordinary and necessary business expenses incurred in a trade or

13   business.  You see it in a Section 183, that says that there

14   are no deductions allowed under any of those provisions if

15   there is not an objective to make a profit.

16          But I don't think it makes any difference, because the

17   case law I think is pretty consistent.  And you'll see popping

18   up in the case law, you'll see this notion of profit objective

19   as a primary motive.

20          And counsel cited in the opening statement a case I

21   don't think was cited in the brief, but we read the case and

22   looked at this.  It was *Keeler v. Commissioner*.  And I thought

23   that was very interested or enlightening, or maybe not

24   enlightening, on the issue here as to what this primary motive

25   meant.  And that was the straddle case.

1          The Court did say, just in general, just came out with

2     a general statement, that the transactions -- the loss must

3     result from an activity engaged in primarily for profit.

4          But then they found ultimately that straddles and

5     combination spreads charging large transaction fees reducing to

6     almost nil any realistic expectation of any economic gain, said

7     that was the situation, said it didn't have any practical

8     economic effects, other than the creation of losses.  And it

9     said that trading -- normal trading by the taxpayer was outside

10    the purview.

11         So it distinguished, interestingly, a case by the name

12    of *Laureys*, which is cited in the brief, L-A-U-R-E-Y-S.  And

13    there the taxpayer had large losses and straddle transactions.

14    But the Court found there was a motive to make a profit.

15         So, really doesn't tell us, well, how much of a

16    motive?  And what is this primary mean?

17         The Government cites in their brief this *Cannon* case,

18    1991 Tenth Circuit case.  Again says primary and overriding and

19    so forth.  But then it goes on to look at the regulations under

20    183, and it says -- it says, ultimately, the question is

21    whether the taxpayer's activities are engaged in with the

22    objective of realizing profit.  And they look at how much

23    effort and time he put into the transaction and so forth.  And

24    said ultimately that there wasn't an expectation of a profit.

25         Significantly, Your Honor, one year -- one year after

1    *Cannon*, it's the only other case I could find that really bears

2    on this, the recent case, is a Tenth Circuit case in Nickeson,

3    N-I-C-K-E-S-O-N, v. Commissioner, at 962 F.2d 973.

4           And the Court referred there to the test being whether

5    an activity was entered into with good faith with the dominant

6    hope and interest in making a profit.  And then it said, the

7    ultimate determination critical to the case is whether the

8    taxpayer had an actual and honest profit motive.

9           And that was the same that the Court came out with,

10   Tenth Circuit, an old case, *King v. Commissioner*, 545 F.2d 700.

11   Same thing.  They said the question is whether when it all

12   boils down, the transactions were entered into in good faith by

13   the taxpayer for the purpose of making a profit.

14          And so I submit, Your Honor, when all of this dust

15   clears, the question is, did Mr. Sala -- and it's Mr. Sala, not

16   Mr. Dice or not Mr. White or not Mr. Schwartz.  It's Mr. Sala

17   whose interest is important here -- did he enter into this with

18   a good faith expectation making of making a profit, taking into

19   account the fact that he hoped to achieve a significant tax

20   benefit?

21          Now, Your Honor asked about whether -- on the profit,

22   we just look at the 24, or would you look at the overall

23   program?  And I think it's clear that we look at the overall

24   program here.

25          Here we have a unitary deal.  We have a unitary deal.

1   The first thing I always point to, Mr. Sala could not invest

2   $728,000 in Deerhurst, just enough to get a $60 million loss,

3   walk away, say thank you very much, I'm out of here, like most

4   of these taxpayers that I've seen in these cases.  He couldn't

5   do it.  He had to invest 8.9.  They put flesh on the bones.

6   This thing has to have economic substance.  You have to have

7   enough money in there to realistically have an opportunity.  He

8   had to do that.  And he had to be prepared to put it in for the

9   long-term.

10        Interestingly, I -- the way I put it, is, sure, there

11  was a tax component here in the initial phases of the program.

12  It was an incentive.  There is no question about it.  There is

13  nothing wrong with that.  This recent stimulus act to try to

14  get taxpayers and businesses to go out and buy equipment, they

15  say, hey, we'll give you extra tax benefits that otherwise you

16  might not go buy the equipment.  Does that mean it's a tax scam

17  when they go into it and buy the equipment because they're

18  motivated by the tax benefits?  It obviously doesn't.

19        This case, *Ewing v. Commissioner*, that the Government

20  cites.  Again, that's a straddle transaction.  And it says, the

21  determination of profit motive must be met with respect to the

22  spread transactions of the straddle and not merely the losing

23  legs.  It is the overall scheme that determines the

24  non-deductibility or deductibility of a loss.

25        Mr. DeRosa.  Thank you, Mr. DeRosa.  Another thing

1    that I heard him keep saying, hey, you can't just look at the

2    728.  You've got to look at the 9.  You've got to look at the

3    overall deal.  I could not agree with you more, Mr. DeRosa.

4           *James v. United States*, which the Government cites, is

5    saying, hey, that shows that you've got to look at the really

6    narrow piece of this.  And that wasn't the case in *James*.  In

7    *James*, you had a situation where you had one entity that bought

8    equipment, leased equipment, owned the equipment, and another

9    entity that the Government argued was just buying tax shelters

10   and trying to make it look like it owned and leased the

11   equipment.

12          And the taxpayer made I don't think a very ingenious

13   argument, hey, this is a unitary deal.  If the first entity

14   really owned equipment and leased equipment, then the whole

15   thing has to prevail.  And the Court said, no.  Said, you're

16   the one over here that is trying to make it look like they own

17   equipment.  That's on the periphery.

18          Well, the $8.9 million invested over a five-year

19   period is not on the periphery.  The tax component is a part of

20   that.  And it clearly is a unitary deal.

21          What about the evidence, Your Honor, on the profit

22   motive?  I submit it's absolutely overwhelming.  Your Honor is

23   very familiar with it, extensive due diligence that was done by

24   Mr. Sala.  It's corroborated by Mr. Krieger, by Mr. Nemirow, by

25   Mr. Schwartz.

1    And his projections -- and you can quibble with them,

2    of course you can say, saying 40 to $60 million, oh, that's

3    outlandishly optimistic and so forth.  And mr. DeRosa could

4    say, well, I wouldn't do that, and I could say, well, I

5    wouldn't do that.  But the question is, did he in good faith

6    have those expectations?

7    And they weren't just something he threw out there.

8    He gets the 10-year history, he gets the audited statement of

9    the history.  He calls the office manager and says, what about

10   this guy?  Is this guy for real?  Does he produce on those

11   kinds of returns?  And it said that he does.

12   So -- as Mr. Sala said, as kind of an example, when

13   Your Honor's trying to probe here, and he's testifying about

14   the profit objective and the taxes -- and, of course, the taxes

15   were a significant part of it.  He says, you know, you can

16   discount my profit projections by 50 percent, so I'm at 20 to

17   $30 million.  And I certainly knew the tax benefits weren't

18   guaranteed.  They say it's at least 51 percent, but discount

19   that by 50 percent, and you're at 11 to $12 million.

20   Your Honor, I submit that the facts are just

21   overwhelming the time he put into it before he went into the

22   transaction, the time he put into it after he went into the

23   transaction, the time and effort he put into it right up to the

24   bitter end four years later.

25   *THE COURT:*  It seemed to me that Dr. Kolb, in looking

```
 1    at this component, opined as to an objective analysis, that it

 2    would be one who with Mr. Sala's experience, expertise, due

 3    diligence that would define the objective investment --

 4    investor.

 5            MR. HALLETT:  I think that's correct, Your Honor.  And

 6    I think -- and he did that because we instructed him to do it.

 7    And the reason was to say --

 8            THE COURT:  Is that a true objective analysis?

 9            MR. HALLETT:  I think his was objective, to see --

10            THE COURT:  I'm focused on the taxpayer.

11            MR. HALLETT:  No, no, but -- well, the test is clearly

12    a subjective test.  But we asked Dr. --

13            THE COURT:  Well, in the Tenth Circuit, as I

14    understand it, it's both subjective and objective.

15            MR. HALLETT:  And I think what it is, that the

16    objective aspect of it is looked at to say, hey, is this really

17    realistic?  Is this just some fanciful thing that is thrown up

18    there?  But it's a test.  I think it's a test.  And it can be a

19    very significant test.  I think that's what it comes down to,

20    and I think that's -- I know why we asked Dr. Kolb to say,

21    okay, look at it, based on the information that was available,

22    would a hypothetical person with that kind of information come

23    out with that kind of a result?

24            And, of course, you have Mr. Sala, who is a highly

25    sophisticated, very knowledgeable, very experienced individual.
```

1    And I submit that there wasn't a crack in the dike here.  You

2    can talk about the expenses.  You know, they were more, and --

3    and he actually lost a lot of money.  And it's clear --

4    fortunately, hindsight doesn't control -- he did lose a lot of

5    money.  That's not the test here.

6         Let me go briefly to economic substance, Your Honor.

7    And I know you've read the *James* case.  And I think there is

8    some very telling language in there about economic substances,

9    if transactions have any appreciable economic consequences.

10   Are they encouraged by business or economic realities, or are

11   they solely by tax avoidance?  Whether the transactions had any

12   practical economic effects other than the creation of income

13   tax losses.

14        So I submit, you know, they -- *James* tolerates a

15   pretty heavy level of tax consequences and tax motivation and

16   tax intuit, because that's the way it is.  That's the way it

17   is, out of the tax shelter arena.  People go into transactions

18   all the time because of the number one consideration of the tax

19   consequences.  And the Tenth Circuit says, that's okay as long

20   as you've got some economic consequence of the thing.

21        And I always go there, the starting point, look at

22   Krieger.  You can hammer Krieger.  They tried to.  Oh, you

23   know, he's making too much out of Beckenham, and maybe DeRosa

24   thinks he just had a hot hand with Banker's Trust.  But he had

25   a hot hand for a lot of years.  But the one thing is clear,

1    Krieger didn't make money out of this deal unless this was a

2    long-term deal, unless actually capital were raised and

3    actually capital was invested.  And he made a lot more money if

4    the capital made money.

5           This is not that typical fee case where the investment

6    advisor and the promoters, they get all their money up front,

7    great big fees, and they walk away from the deal.  That's not

8    the way it was structured.

9           Same thing with Mr. Schwartz.  He gets a piece of

10   Mr. Krieger's action.  He doesn't get a nickel unless this

11   thing gets real capital and enters into real transactions and

12   hopefully makes money.

13          THE COURT:  Well, he got some money for bringing the

14   investors in.

15          MR. HALLETT:  But he got it out of Krieger's.  He got

16   it, as Krieger got it, out of the management fees.  That's

17   where he got it.  Mr. Sala didn't write him out a check and

18   say, thank you very much, here it is.  He got it out of

19   Krieger.  And Krieger got it out of the long-term investment

20   program.  That's what it came down to.

21          Sala was obviously focused on the long-term.

22   Obviously focused on the long-term.  He was fine with the

23   15 percent, because that met with roughly 15 percent of his

24   portfolio he wanted to aggressively investigate.  But he didn't

25   want to go into an in-and-out deal.  If there is any doubt

1    about that, look what he went through for three to four years,

2    there, on the phone weekly, quarterly, going back to what he

3    did.  It's obvious he was into it for the long run.

4         The money was at risk.  DeRosa says, well, you know,

5    the transactions were structured so there really was no risk.

6    There was a hedge here and there.  Well, you know, things

7    happen.  When Sala put his 9 million bucks in there -- when the

8    9 million bucks went over to the partnership, you know,

9    there -- there is a figure volume of trading.  People can make

10   mistakes.  People can make mistakes and bad judgments.  His

11   $9 million was at risk.

12        Your Honor, the Government says that the --

13        THE COURT:  Well, the Government will say that

14   $728,000 was at risk.

15        MR. HALLETT:  Well, I would say the full $9 million

16   was at risk.  The full 9 million.  It was invested in there.

17   There was no restrictions put by Mr. Sala upon the manner of

18   investing.  No restrictions whatsoever.  He understood it to be

19   invested in accordance with his discretionary program, that

20   there would be significant periods of relatively light trading,

21   and then they would go for it.  But there were no restrictions

22   put.  And there was a risk, and that's why he had that S

23   corporation formed, to try to help insulate himself from the

24   liability.

25        Just one real quickly, Your Honor.  The Government

1    argues these losses are not bona fide within the meaning of the

2    regulation.  My short answer to that would be, a taxpayer

3    invests in a residential property, rents it out.  And before

4    recent times, it's appreciating all the time.  And the taxpayer

5    is taking depreciation and taking losses.  Well, that's -- you

6    could say that's non-economic, because it's actually going up

7    as you're getting losses.  But the transactions that gave rise

8    to it were real transactions, and the law doesn't allow that --

9    and the law does allow that if they're real transactions.  It's

10   the same thing here.

11        Any question about this economic outlay is answered by

12   this *Gitlitz* case, Your Honor.  And I happen to be familiar

13   with it because I had the pleasure of representing Mr. Gitlitz

14   and Mr. Winn.  And they were two gentlemen involved in

15   commercial real estate ventures in the Denver area in the late

16   '80s.  They did it through an S corporation.  And in the late

17   '80s, things went in the tank.  And the S corporation ended up

18   with a bunch of debt that it couldn't satisfy.

19        The S corporation was insolvent.  Fortunately, my

20   clients were solvent.  But the S corporation was insolvent.

21   And the law said at the time that they worked out a relief of

22   that debt, that insolvent -- that it was insolvent, that amount

23   of debt relief is not income.  Yet, we argued that the -- even

24   though it's non-taxable income, it flows down to the taxpayers,

25   bumps up their basis.  Even though all of their economic

1    investment had been eaten up, it bumped up their basis, and

2    they could take the losses.  And the government said, hey, you

3    can't do that.  You're getting deductions here for non-economic

4    losses.  You weren't out a penny for those.

5        They argued that to the tax court, and unfortunately

6    they won.  I argued it to the Tenth Circuit down here, and

7    unfortunately, the Tenth Circuit, unfortunately said, no, you

8    can't do that.  No, you can't do that.  Fortunately just by

9    happenstance, we happened to be the first one out of the box,

10   and there was a conflict in Circuit, got to the Supreme Court

11   of the United States.  And the Supreme Court of the United

12   States came down in an eight to one opinion.  And it said,

13   look, if that's what the law allows, that's what the law

14   allows.  If it's bad policy, if it's bad economics, let

15   Congress go change the law, but it's not to be changed by

16   courts.

17       So, Your Honor -- could I ask where I am in time?

18   I've got about 15 minutes, I think.

19       *THE COURT:*  Well, yeah, just about.

20       *MR. HALLETT:*  Okay.  I'm going to try to be brief

21   here.

22       Just a couple of things.  There is a lot of -- as

23   usual, you get into sub-battles in here that really aren't

24   going to move you towards Berlin very much, and you get

25   scattered out here, and they're not that crucial.

32

1        Some of that, well, did they make money in 2000?  And

2   do you take these expenses and apply them here and all of that

3   sort of thing?  And I think when the dust all clears, he made

4   about 60 grand -- 60, 65 grand in 2000.  Which is okay.  It's

5   not a bad deal.  It's not huge, but given the program there has

6   very modest returns, you can see it on the exhibit, despite

7   what DeRosa says.  He'll have months in there where plus or

8   minus .01 percent, years, three or four years where it's less

9   than 7.

10        But that being the case, this doesn't come down to

11   whether money was made or lost in 2000.  Transactions had

12   economic substance.  The 24 transactions had a real -- a profit

13   potential of a half a million dollars, 550.  They actually made

14   100 grand.  So whether you do this or that or argue about this

15   or that, I submit it doesn't make any difference.  It's not

16   something you need a finding on as to whether they made or lost

17   money.  The question is, did they have a real expectation of

18   making money?  And, second, did the transactions have economic

19   substance?

20        And I noticed Mr. DeRosa -- Dr. DeRosa, he -- first of

21   all, I heard him say the word "fake."  And then I heard him say

22   these transactions were real.  And these transactions were

23   real.  And Mr. Krieger testified, in the third day, and he was

24   grilled extensively.  He traded this thing just like he'd

25   always traded it, maybe not with as high a leverage.

1        And Your Honor I will readily admit, Mr. Krieger, I

2   still don't understand this concept of leverage.  It's a

3   concept that I think only he really understands.  And it's a

4   complicated concept.

5        And the last thing I'll talk about, Your Honor, is the

6   issue about the partnership here.  The question is whether that

7   has economic substance, whether that is to be recognized.

8        Now, if Your Honor held that it wasn't, we'd still get

9   a loss.  It would just be a capital loss over there in Solid.

10  But, Your Honor, the evidence shows that under this *Moline*

11  *Properties*, an old Supreme Court case, that the entity is

12  recognized that there was a purpose for forming it or it

13  actually conducted business.

14       And the evidence shows, it's overwhelming, it actually

15  conducted business.  It wasn't around for a long period of

16  time, 20 days or so, but it had $23 million of capital.  It had

17  that -- tax return shows some $205,000 of trading profits after

18  the expenses, 150 of net profits.  It was managed by

19  Mr. Krieger and his people.  It was run.  It wasn't just some

20  telephone in the Cayman Islands.  It was a going deal.  And for

21  the period of time it had substantial activity, hundreds of

22  trades.  That is some practical economic effect and economic

23  consequences --

24            *THE COURT:*  If it's a capital loss, how much?

25            *MR. HALLETT:*  60.  But unfortunately, it -- capital

1    losses, you can only carry forward, and they don't offset

2    ordinary income.  So Mr. Sala will be 104 years old, using the

3    capital losses out of the deal.

4           So let me just close, Your Honor, with the penalties,

5    because that's an easy one.  Hopefully it's an easy one for

6    Your Honor, because you'll never have to get to it.

7           The question is, is this a qualified amended return?

8    The only promoter they allege is Deerhurst.  Did they get

9    notice of an examination before Sala filed his return?  And

10   they got a general generic notice.  It says, you're under

11   examination for all transactions described in 2000-44.  They

12   didn't even know Deerhurst existed at the time.

13          But the way the regulation reads is, they have to have

14   notice to promoter regarding the activity that gave rise to the

15   benefit claim.

16          Well, it was Deerhurst, the activity that gave rise,

17   not some other Son of Boss type of transaction.  But even if

18   you get over that, it has to be notice to a person described in

19   6700.  6700 says it's a person that participates in the

20   organization and sale of an arrangement that has a material tax

21   benefit and made or furnished material false statements as to

22   the tax benefits.

23          There is not a whit of evidence in this record that

24   shows that KPMG participated in the organization and sale.

25   Mr. Krieger verified he never talked to them.  Mr. Schwartz

 1   verified that was the case.  You don't see one iota of that.

 2   And these people out there that try to get stays on Tracy

 3   Henderson or anybody else -- Mr. Brady testified.  And you

 4   don't see any evidence, no evidence whatsoever.

 5          And if we got by that, Your Honor, and we got down to

 6   whether there was reasonable cause and good faith, I submit

 7   it's overwhelming.

 8          It kind of bears on the profit objective as well, as

 9   to the thoroughness of this man.  You know, he didn't just

10   take, like most of them do, Mr. Ruble's opinion -- you know, I

11   think it's an irony.  That is a very well written opinion.  It

12   covers the issues.  It's a good discussion, every time I look

13   at it.

14          But he didn't just take that, and he brought it down

15   to Larry Nemirow.  And he didn't put any restrictions on Larry

16   Nemirow.  And he said, look at that thing and that see if the

17   reasoning is -- if it it's reasonable.  He concluded that he

18   did.  And then he had a third lawyer, Bruce Lemons, look at it

19   on an airline flight.  And that's reasonable cause and good

20   faith.

21          And I submit, Your Honor, it's clear no penalty

22   applies.  But we should never get to that, because I submit,

23   Your Honor, it's clear that the law allowed this.  The

24   government brought this law on, this disregard of contingent

25   liabilities.  And what's good for the goose is good for the

1    gander.  And the government could have changed the law in 2000.

2    If they didn't like it, they could have changed it.

3         This Notice 2000-44, Your Honor, notices -- there is

4    only one case out on notices.  The cases say rulings, revenue

5    rulings, which are a step up the chain, they say, those -- a

6    lot of cases say, those have no more weight than the contingent

7    of one of the parties.  Tax court gives them no more weight

8    than the taxpayer's argument is.  That's what the IRS's

9    position is.

10        They're obviously bootstrapping.  You know, they're

11   saying, we don't like this, we're going to litigate this.

12   Well, even a ruling or even a regulation that is adopted

13   primarily to bootstrap and strengthen the position, the Court

14   says have no weight.

15        That 2000-44, it didn't discuss *Helmer*, it didn't

16   discuss 752.  It talks about a couple of court cases and

17   economic substance.  It's poorly reasoned.  Knew it was out

18   there.  Mr. Nemirow looked at it, ruled, he said, that's the

19   Government's position.  We think it's wrong.  So that 2000-44

20   doesn't come into play here at all.  It means nothing.

21        Thank you, Your Honor.

22        *THE COURT:*  Mr. Geiger.

23        Mr. Sergi.

24                      **CLOSING ARGUMENT**

25        *MR. SERGI:*  Yes, Your Honor.

1          Your Honor, we made of our slides, binders.  And I

2  didn't know if the Court wanted them, instead of looking just

3  at the screen.  We have a copy for opposing counsel, you and

4  your law clerk, if you would like them.

5          THE COURT:  As I said before, I can decide the case.

6  I can't decide simple questions.

7          MR. SERGI:  I apologize, Your Honor.  We made them

8  anyway.  Would you like one?

9          THE COURT:  Go ahead.  Pass them out.

10        MR. SERGI:  I will attempt to be brief, Your Honor,

11  but I know that that's not entirely up to me.

12         May it please the Court.  May I proceed?

13        THE COURT:  Yes.

14        MR. SERGI:  Last Monday we delivered our opening and

15  asked the Court to deny Mr. Sala's refund claim.  In the

16  intervening nine days we've heard from five fact witnesses in

17  court, two experts, and submitted the depositions of several

18  additional witnesses.  After all of this evidence, the

19  unescapable fact remains.  Mr. Sala entered into an abusive

20  transaction known as a Son of Boss tax shelter identified in

21  Notice 2000-44.

22         As we described in our opening, not only something the

23  shelter lack economic substance, but there are several

24  statutory arguments that would disallow Mr. Sala's claims that

25  do not even require the Court to consider whether this

1    transaction has economic substance.

2         They are the application of the Treasury regulation,

3    1.752-6, the application of 165, because we -- it is our

4    argument that Mr. Sala was not primarily motivated by economic

5    profit.  And, finally, there is even a question as to whether

6    Mr. Sala complied with the statute at issue in the form of the

7    transaction, because even though the shelter required the

8    transfer of property at liquidation, only cash was transferred.

9         I'm going to address each one in part, starting with

10   Treasury regulation 1.752-6.

11        This regulation was promulgated in 2003.  It was made

12   retroactive to October 18, 1999.  And applies to transactions

13   like the one at issue that are covered by or substantially

14   similar to those described in the notice.

15        The regulation defeats the scheme at issue by

16   providing that the liabilities assumed by the partnership when

17   it receives the offsetting options reduced the taxpayer's

18   basis.

19        I had a simple example in my opening.

20        *THE COURT:*  Let me just interject.

21        *MR. SERGI:*  Yes, Your Honor.

22        *THE COURT:*  The opinion that I will be writing will

23   necessarily touch on all questions.

24        *MR. SERGI:*  Yes, Your Honor.

25        *THE COURT:*  Because it will be appealed regardless of

39

 1    which way I go, to the Tenth Circuit Court of Appeals.

 2            MR. SERGI:  Yes, Your Honor.

 3            THE COURT:  If there happened to be a circuit split

 4    between the Tenth Circuit and the Fifth Circuit -- and that is

 5    a projection that is fraught with peril -- then it may

 6    ultimately go to the United States Supreme Court.

 7            MR. SERGI:  That is correct, Your Honor.

 8            THE COURT:  My analysis in the opinion, therefore,

 9    will have to -- you know, counsel on two sides of the case, it

10    is, I suppose, prudent for the plaintiff's counsel to begin

11    with the economic substance analysis and then wind up, or at

12    least wind through it, 1.752-6.  So it is not surprising that

13    you start with 1.752-6.  That involves a question of law.

14            MR. SERGI:  Yes, Your Honor.

15            THE COURT:  My analysis is going to have to go,

16    though, through determinations of fact relative to the economic

17    substance question, profit motive, the factual question of

18    transfer of property, conclusions with regard to that question,

19    which will yield, in turn, conclusions regarding qualified

20    amended return, interest suspension and penalties.  And then

21    ultimately the question is going to then turn on a question of

22    law which I'll have to answer in any event concerning 1.752-6.

23            That question, where you start, is one which I find

24    perhaps inadequately addressed in the proposed conclusions.

25            MR. SERGI:  I'm sorry, Your Honor, the 1.752-6?

1              THE COURT:  Right.  And its retroactivity.

2              MR. SERGI:  Yes.

3              THE COURT:  So I will be entering an order inviting

4    additional briefing on that question, just so you know.

5              MR. SERGI:  Thank you, Your Honor.  May I explain why

6    I started with the regulation?

7              THE COURT:  I understand why you did.  Because if it

8    applies retroactively, you win.

9              MR. SERGI:  Well, not only that, Your Honor.  But the

10   economic substance test exists because it -- when taxpayers

11   comply with the Code and the regulations, yet nonetheless lack

12   substance, then the Court can still -- it's a judicial doctrine

13   which strikes down the tax deductions.

14             THE COURT:  Why don't we start with economic

15   substance?

16             MR. SERGI:  Because, Your Honor, if the transaction

17   doesn't comply with the law, then you don't necessarily need to

18   get to economic substance.  Of course, it is our position that

19   this transaction lacks economic substance.

20             THE COURT:  Go ahead.

21             MR. SERGI:  If you'd like, I can skip to that first.

22             THE COURT:  Yeah, let's do.  That's part -- pardon me,

23   but that's my analytical progression.

24             MR. SERGI:  We'll get there, Your Honor.

25             Here I am.  You learn to be flexible.

1          Your Honor, it is our position that this transaction

2     lacks economic substance.

3          THE COURT:  So define "transaction."  Is it 2000, or

4     is it the entire five-year program?

5          MR. SERGI:  Your Honor, in accordance -- I'll explain

6     more fully with the slides.  But in accordance with the Tenth

7     Circuit's view, we view that the transaction is the basis

8     trades.  However, I do think that you can't ignore that

9     Mr. Sala was required to put $9 million into the transaction to

10    get his basis trades.  And that that money is not doing

11    anything, but it's still a necessary outlay as part of the

12    transaction.

13         THE COURT:  If he had made 1300 percent on his

14    investment, would we be here?

15         MR. SERGI:  You mean on the basis trades, Your Honor?

16         THE COURT:  No, on the entire program.

17         MR. SERGI:  Well, it would depend on how it was

18    segregated, Your Honor.  If he had bought the basis trades

19    themselves and then had a separate investment that was

20    completely different than the basis trades, then it would be a

21    completely different issue, because that would be -- that would

22    be a completely different transaction.  It would be, I believe

23    Dr. DeRosa referred to, un-Krieger-like.

24         If he invested in an investment program that had these

25    investments, but they also designated these basis trades that

 1    have virtually no effect, the condors, then I think we would be

 2    in the same situation, Your Honor.

 3              May I proceed?

 4              The test from the Supreme Court is -- the Supreme

 5    Court concludes where there is nothing of substance to be

 6    realized from a transaction apart from income tax savings, the

 7    transaction will be disregarded for federal tax purposes.

 8              There are two predominant prongs -- there are two

 9    prongs to this test --

10         THE COURT:  You mentioned United States Supreme Court.

11    I assume you read *Boulware v. United States*.

12         MR. SERGI:  Yes, Your Honor.

13         THE COURT:  Decided March 3 of this year.  It was a

14    criminal prosecution.

15         MR. SERGI:  Oh, yes, Your Honor.  That's -- and they

16    commented on economic substance in that case.

17         THE COURT:  Yes.  They -- and there was colorful

18    behavior involved in the transactions there.  But the Supreme

19    Court said, the colorful behavior described in the allegations

20    requires a reminder that tax qualifications like "dividend" and

21    "return of capital" turn on the objective economic realities of

22    the transaction rather than a particular form the parties

23    employ.

24              And that a given result at the end of a straight path

25    is not made a different result by following a devious path,

1    citing *Minnesota Tea v. Helvering*.  And in footnote 7, Justice

2    Souter writes, we have also recognized that the legal right of

3    a taxpayer to decrease the amount of what otherwise would be

4    his taxes or altogether avoid them by means which the law

5    permits cannot be doubted.  *Gregory v. Helvering*.

6              MR. SERGI:  That is correct, Your Honor.

7              THE COURT:  So that sort of sets a benchmark, doesn't

8    it?

9              MR. SERGI:  It does, Your Honor.  But, however, what

10   also I believe the Court is saying is that you can't rob a bank

11   and give it to the poor.  Even the best intentions can't make a

12   bad transaction good, Your Honor.

13             THE COURT:  That's fair.

14             MR. SERGI:  So that is why -- I mean, I believe in

15   *Knetsch* -- I was frankly surprised -- I did read that criminal

16   case.  I was frankly surprised because the Supreme Court seems

17   to want to stay away from the economic substance doctrine.  I

18   think they're waiting for it to be codified.

19             THE COURT:  Even if codified, they're going to wind up

20   having to address it.

21             MR. SERGI:  That is true, Your Honor.

22             But in the history of the economic substance doctrine,

23   there are two basic prongs, an objective prong and a subjective

24   prongs.  And the way that it varies among circuits is how much

25   weight each circuit gives to each prong.  And in the Tenth

 1    Circuit it's a combined test of all factors to see practical

 2    economic effect.

 3          The objective prong is whether the transaction has a

 4    real economic benefit.  And the subjective prong is whether the

 5    transaction is compelled by an actual business purpose.

 6          The Tenth Circuit held that the best approach in

 7    analyzing this transaction is the consideration of both, a

 8    business purpose and the objective economic potential.  And

 9    that they are simply factors to be considered.  And that at the

10    end of the day, what they look at is whether the transaction

11    had any practical economic effects other than the creation of

12    taxes.

13          THE COURT:  Therefore, don't we have to look at the

14    five-year program rather than simply the trades?

15          MR. SERGI:  Well, Your Honor, this is the slide,

16    DeRosa 22, on the screen that we used in Dr. DeRosa's

17    testimony.

18          The plaintiff is arguing that for some purposes, we

19    should view this entire transaction.  I don't think that's the

20    case.  And that's based on the James case.

21          In the James case, the Court said, the only

22    transactions at issue in this case are the purported sales by

23    the communications group to the joint ventures.  These sales

24    cannot be legitimized because they are on the periphery of some

25    legitimate transactions.

1          Your Honor, what the Tenth Circuit is recognizing here

2   is the importance in focusing only upon the activity that

3   created the tax loss in this case.

4          So if we were to look at the DeRosa slide again, it's

5   where the circle is, the Table 1 trades, the trades in

6   Mr. Sala's name, also referred to as basis trades and tax

7   trades, and I think even condors in this case.

8          And they're in Exhibit J24.  These are the trades that

9   Mr. Sala used to purportedly create his astronomically inflated

10   basis, and as a result, his fictitious losses.  The rest of the

11   money were these no or low impact trades that had virtually no

12   risk, as Dr. DeRosa testified.

13          So if we look at these through the guise of the

14   objective prong, we have to look at what drives the

15   transaction.

16          First, let's look at the profit potential.  We're in a

17   rare situation here, Your Honor, because apparently our experts

18   actually don't really disagree.  They're both right around

19   550,000.  Dr. Kolb at 545, and Dr. DeRosa at 553.

20          But we also heard testimony in this case that there

21   are additional fees.  There was a legal opinion, a letter from

22   Brown & Wood, advice given to Mr. Sala by Mr. Nemirow, there

23   were some startup costs, and finally there was a cost of

24   putting this on the tax return, which was so complicated he had

25   to go to a different firm, and a firm he had met with on other

1    transactions.

2         In fact, I'll actually get back to this slide.  But

3    Exhibit B20 lists some of these fees out with Ms. Napier's

4    handwriting.  She referred to that in her deposition.  And what

5    it says is, he doesn't want to lose, but not worth the risk of

6    linking it to last year.

7         So what we attempted to do is link it to last year to

8    see what would happen.  And what it does is it reduces the

9    profit, 439 under Dr. Kolb's number, and 547 under Dr. DeRosa's

10   number and I believe the Court would recall, I think that's not

11   much of a difference.

12        However, we must remember that this is the maximum

13   profit.  So that means we have to look at the maximum expenses.

14        And if we turn to Exhibit P30, Mr. Sala agreed to an

15   incentive fee of 30 percent of the profits, which you also

16   heard testimony about that from Mr. Sala.  This amount was not

17   taken into account in any of the expert's numbers.

18        Moreover, on page 11 of Exhibit J14, this section

19   says, BTC will receive markups with respect to all transactions

20   executed through BTC equal to one and a half -- and one-half

21   PIPs, that is, at exchange rates current at the date of this

22   memorandum, approximately 17 to $325 per 1 million on a

23   round-turn basis -- transaction basis, an average of

24   approximately 150 per 1 million per round-turn.

25        Now, Mr. Krieger --

1        THE COURT:  Well, both of those points on those

2    expenses pertain to the entire five-year program.

3        MR. SERGI:  But, Your Honor, they also pertain to the

4    basis trades.  And in fact, they were charged later on when the

5    transaction was used.  But they weren't charged early on,

6    and -- and part of the Government's feeling is, that's to show

7    that it had a pretax profit in the first year, because it was

8    using the economic substance test of pretax profit, post-tax

9    loss.

10        Mr. Krieger testified about these fees.  And, Your

11   Honor, I believe our position is abundantly clear that we are

12   not relying on, nor did we present any testimony of Krieger.

13   However, I just wanted to show how inconsistent he is on these

14   fees.

15        And what we did was, if we could play the clip.

16        (Video clip played as follows:)

17   "Q. Let's look over at page 1798, page 9 of the document.  And

18      I'm directing your attention to the last paragraph midway

19      down, the sentence that says 'BTC' -- which I take it is

20      Beckenham -- will receive markups with respect to all

21      transactions executed through BTC equal to one and one half

22      percent, paren, 1 1/2, in paren, quotes, end of quotes,

23      paren, that is at exchange rates current at the date of

24      this disclosure statement, approximately 17-$325 per

25      $1 million on a round-turn transaction basis, paren, an

1     average of approximately 150 per one million per

2     round-turn.  And I'll leave out the rest of the sentence.

3          "Is that a correct statement in relation to how, if at

4     all, Beckenham received any markups?

5  "A. No, it's not.

6  "Q. And why not?

7  "A. Because, as I've stated before, it was anticipated that

8     Refco was going to have multiple dealing relationships set

9     up with multiple banks so Beckenham could prove its value

10    added and improve the overall performance of the execution,

11    which didn't happen.

12        "In addition, the proposed charge was, I think,

13    frankly, in error, in terms of the decimal place.

14  "Q. Where do you think it should be?

15  "A. I think he was off by a decimal of 10.

16  "Q. Why do you say that?

17  "A. Because we never charged a PIP and a half for trades at any

18    point in time.  It was way too much.

19  "Q. And do you know what the markup or commission was for

20    Beckenham trading?

21  "A. I don't know.  It was a few dollars per million.  I don't

22    remember exactly.

23  "Q. Okay.  Was it calculated in terms of PIPs?

24  "A. It was calculated in terms of the certain dollar charge for

25    every million dollars traded.

1    "Q. All right.  And was --

2    "A. So a fraction of PIPS.

3    "Q. Okay.  To the extent it's not an even million, right?

4    "A. I mean, it's a fraction of a PIP.  A PIP is -- actually,

5        that would be a very big charge.

6            "It was much cheaper than if we traded through Refco.

7        The Refco -- the Refco cost, in terms of the liquidity,

8        could have been as much as two or three PIPs per trade.  So

9        to charge .2 PIPs per trade is, you know, it's a fraction.

10   "Q. Okay.  And for spots, is it -- was one and a half PIPs

11       unreasonable for any element of Mr. Sala's transaction?

12   "A. Was it what?

13   "Q. Unreasonable for any element of Mr. Sala's transaction?

14   "A. I think it depends on the currency pairs.

15   "Q. So it could be unreasonable, depending upon the currency --

16   "A. It could be -- it could be too low for certain currency

17       pairs.

18   "Q. Could it be too high?

19   "A. I think -- I think the market -- are you talking today or

20       then?

21   "Q. Then.

22   "A. I think -- I think it was probably a touch high, but

23       less -- less important than the options, which is the bulk

24       of the volume.

25   "Q. Okay.  So when he was in Deerhurst, was one and a half PIPs

1      a reasonable fee in your estimation?

2   "A. I think for options, I think it was extremely inexpensive.

3   "Q. Well, in this transaction, is it your testimony that one

4      and a half PIPs was a reasonable fee?  Is that what you're

5      telling me?

6   "A. I think I just said that."

7           MR. SERGI:  So, Your Honor, Mr. Krieger was very

8   consistent on this PIP.

9           Dr. DeRosa stated that this PIP could have been

10  charged, that this fee could have been charged.  He also said

11  it was very easy to calculate, and that it approximately would

12  have been about $500,000.

13          So if we take the numbers we had, and now we include

14  both the incentive fee, as well as the execution fee, the

15  potential profits goes down and becomes negative, Your Honor,

16  minus 224,000 for Mr. Kolb, and minus 218,000 for Dr. DeRosa.

17          But we also, Your Honor, in addition to this, we have

18  actual profit numbers, because this transaction occurred.

19          And in this Dr. Kolb comes in at about 111, Dr. DeRosa

20  comes in at about 91,000.  So if we go through the same

21  exercise, again, this actually reduces the pretax profit after

22  actual to Dr. Kolb slightly on the positive side of 5,000,

23  almost $6,000.  And Dr. DeRosa's already in negative territory

24  with 15,000.  But then if we include the markups, it becomes

25  remarkably and substantially negative, minus 527 for Dr. Kolb,

 1    but minus 542,000 for Dr. DeRosa.

 2         And what we've attempted to do in the next slide is

 3    show it graphically.  And this is the results of the basis

 4    trades, Your Honor, based on all the various scenarios.

 5         So basically, if we take the highest of all of these,

 6    and that's what will work, because we think it's even de

 7    minimis at highest end, that would be Dr. DeRosa's number.

 8    But, Your Honor, other activity occurred in these basis trades.

 9    Mr. Sala created a $60 million tax loss that resulted in a

10    $24 million tax savings.  And we also have -- by the way, I

11    missed a slide.  We have the actual profit as well, which shows

12    a slightly dire position, with Dr. Kolb coming in with a higher

13    number.

14         But as I was saying, if we include the taxes, the

15    $24 million, and we include it onto the chart of all the

16    potential profits, the landscape drastically changes, Your

17    Honor.

18         The tax savings from these transactions, $24 million,

19    are approximately 45 times the economic profit -- the highest

20    economic profit that Mr. Sala could have made from the

21    transaction.

22         But we can look at in another way.  If we use the best

23    possible scenario, Dr. DeRosa's maximum profit potential

24    without any expenses, and we add to that the savings, that

25    means at best, Mr. Sala made approximately $24.5 million in

1    both tax and investment income.

2           So what we did is we put it in a pie chart.  And you

3    can see that the income from the investments is a relatively

4    small percentage.  It's only 2 percent.  This percent would go

5    down further if we used Dr. Kolb's number, and even further

6    when we include both expenses of actual and possible.  And when

7    the possible expenses are included, then 100 percent is the

8    tax, because the economic profit becomes negative.

9           So, Your Honor, our position is that Mr. Sala was able

10   to generate an ordinary loss of 60 million, which resulted in

11   tax savings of over 24 million.

12          Dr. DeRosa compared the price of the long option,

13   which was also the basis for the deduction -- for the loss, to

14   both profit and cost, in DeRosa 31, which we have on the

15   screen.  But more telling is if we look at the actual profit

16   numbers.  Because here, the tax loss created was 548 times the

17   so-called economic profit derived by the experts.  And the

18   savings are approximately 218 times the sum he made on the

19   options transactions.

20          This is not the type of practical economic effect that

21   the Tenth Circuit would look to to validate transactions.

22   Doing so would render the doctrine worthless.

23          I believe Mr. Sala testified, if it was a penny of

24   profit, he would go forward.  This isn't much different, when

25   you compare it to the tax savings.

1          This was acknowledged by the Tenth Circuit in *Keeler*,

2     which I discussed in detail in my opening.  And I have some of

3     the quotes from *Keeler*, along with the corresponding slides

4     underneath.  And that is, the Court said, the existence of some

5     profit does not foreclose a finding of no economic substance.

6     *Keeler* also determined that under scrutiny, what profit

7     potential the transactions offered appeared anemic beside their

8     considerable capacity for tax gaining.

9          The Court also said, in the aggregate, any actual

10    economic gains from changes in the transaction were

11    overshadowed by the tax losses generated in year-end trading.

12         Then finally the Court said, the principal attraction

13    of this transaction was plainly the ability to generate tax

14    deductions far in excess of the amounts invested.  That ability

15    is the hallmark of tax avoidance schemes, and if present

16    supports the Commissioner's disallowance of the taxpayer's

17    claimed losses.

18         Your Honor, they could pick how big their deduction

19    was and the character of it.  Mr. Krieger, a trader who wasn't

20    generally told what to do, bought premiums in the amount of

21    exactly the losses they needed.  Dr. DeRosa said that was also

22    very un-Krieger-like.

23         Your Honor, objectively, we believe this transaction,

24    just based on the numbers, lacks economic substance --

25    objective economic substance.

54

1            But the test is practical economic effect.  So even on

2      the objective prong, we're not limited to a simple

3      pretax/post-tax analysis.  Instead, we should look at the

4      transaction as a whole, from an objective point of view.

5            First -- and, Your Honor, we have a slide here where

6      we've cited to our findings of facts, the exhibits that support

7      the proposition, as well as the testimony that we relied upon.

8      We did not point to pages in the transcript because it's

9      realtime, and we didn't want to fall afoul of the realtime

10     rules.

11           First, the evidence has shown that Mr. Sala's tax loss

12     equated his gain.  Second, the transaction was designed to

13     allow taxpayers to choose the amount and character of their

14     loss.  The third, the fee and contribution amounts that were

15     required before participants could enter this transaction were

16     based on the desired tax loss.  Fourth, there is not a logical

17     explanation for the use of the partnership other than to change

18     the character of the debt.

19           And, Your Honor, other cases have looked to the

20     intention of the designers to determine the practical economic

21     effect -- or in the Sixth Circuit, the practicable economic

22     effect in *American Electrical Power*.  We tried to do that, and

23     we have a short, very short clip that shows what happened when

24     we tried to do that, when we talked to the various witnesses.

25           (Video clip played as follows:)

1    "A. Sure.

2    "Q. Have you ever approached a client, as opposed to a client

3        approaching you, with the idea for a tax shelter?

4    "A. Not to the best of my recollection.

5    "Q. You came up with the tax idea?

6    "A. No.

7    "Q. They came up with the tax loss; that was their idea?

8    "A. Yes.

9    "Q. That wasn't your idea?

10   "A. No.

11   "Q. So the idea of this transaction to generate a tax loss

12       wasn't you?

13   "A. No.

14   "Q. Okay.  And they came up with it on their own, and they

15       talked to you; is that how it worked?

16   "A. No.  They came up with it, and they talked to Andy, and

17       then Andy talked to me.

18   "Q. Do you know who came up with the idea that the transaction

19       could create tax losses?

20   "A. I presume it was some tax people who sat around and looked

21       for some quirks in the Code.

22   "Q. Okay.  Do you know whether Mr. Schwartz came up with that

23       idea?

24   "A. I don't know if Mr. Schwartz or one of his advisers or

25       friends, or I don't know."

1              MR. SERGI:  So, Your Honor, no one is taking credit

2       for designing this tax shelter that created all of these

3       losses.

4              But we do have the marketing materials.  And what

5       these marketing materials say is, at year end, there would be a

6       large capital loss created upon the liquidation of the S corp

7       or a large ordinary loss via a liquidation of the option spread

8       out of a lower tier LLC to the Sub S corporation prior to the

9       roll-up.

10             So, Your Honor, in the marketing materials, it's

11      saying, you can choose what type of deduction that you would

12      like.

13             We also have the view of other participants of this

14      transaction who, despite the fact that the economic transaction

15      was losing money, decided that they could do nothing because

16      the litigation would likely expose why the investors were in

17      the deal, including the tax benefits that arose in 2000.  And

18      that they should wait until the tax statute had expired before

19      doing it.

20             Like Mr. Sala, these other investors also stayed into

21      the transaction and lost money.  Mr. Sala lost half of his

22      investment before he finally got out of Deerhurst.  But don't

23      worry, Your Honor, because despite the fact that he lost that

24      money, it was more than made up by the tax savings.  In

25      essence, the government subsidized his investment in Deerhurst.

1            THE COURT:  Are you looking at this in hindsight?

2            MR. SERGI:  No, Your Honor.  What we're doing is we're

3    looking at it as two separate transactions.  But we're looking

4    at the motivation of why people would objectively stay in a

5    transaction if nothing but to create a smoke screen.

6            Our view is that these other profits or profits along

7    the entire term of the transaction are merely window dressing,

8    and when you look at this transaction it actually lacks

9    economic substance, both objectively --

10           THE COURT:  You say "this transaction," that's the

11   five-year transaction?

12           MR. SERGI:  No, Your Honor, the basis trades.  That's

13   what we referred to as the transaction.  If it would be

14   clearer, I could say "the basis trades."

15           So that is the objective prong.  We think all of the

16   objective evidence demonstrates that this is a transaction

17   without objective economic substance.

18           Let's look at the second prong, which is the

19   subjective test.  And to do that, we need to go no further than

20   Mr. Sala.

21           The Court pointed out, I think it was during

22   Mr. Kolb's cross, that there is no dispute that Mr. Sala

23   entered into this transaction seeking to generate a large loss.

24   Mr. Sala doesn't run from that.  I don't think I'm even putting

25   words in his mouth.  However, his argument is that his primary

1    motivating factor was that he engaged in an investment program

2    to make economic profits and tax profits.

3         And while Mr. Sala entered into this transaction in

4    October 23, 2000, we believe it is more important to go a

5    little bit further back to see what his motivation was.  And,

6    once again, we have a slide that lists finding of facts, the

7    testimony and the exhibits that support each conclusion.

8         We realize that we should go back to 1999, because

9    that's when Mr. Sala realized that he would have a gain on the

10   sale of his DoubleClick options.  That is when Mr. Sala

11   eventually recognized he had to recognize $60 million in

12   income.

13        Now, here is where the interpretation changes a little

14   bit among the parties.  I think the facts aren't in dispute,

15   rather, the motivation behind the facts.

16        We know Mr. Sala met with Tracie Henderson.  We know

17   he spoke with R.J. Ruble.  We see that there were discussions

18   of BLIPS and references to OPIS, two other abusive tax

19   shelters.

20        The Government views this, as we said in our slide, as

21   a quest for a tax shelter.  Plaintiff claims that these tax

22   advantage transactions were not sought out by Mr. Sala, but

23   were simply brought to him.  In fact, I believe Dr. Kolb even

24   said that Deerhurst was not sought out by Sala; rather,

25   Deerhurst sought out Sala.

1          This is a distinction without a difference, Your

2     Honor.  How Mr. Sala became aware of the Deerhurst transaction

3     is not relevant.  What is relevant to this court is Mr. Sala's

4     motivation for entering into this transaction.  And we've heard

5     Mr. Sala testify to this.  He did it for the taxes.  He did it

6     for the investment.  So the question is, what is the primary

7     motivating factor behind these transactions?  Is it the taxes?

8     Is it the investment?

9          First, let's look at Mr. Sala's investment without

10    regard to the taxes.  Mr. Sala invested into the Deerhurst

11    transaction.  He put in $9 million.  At the end of the year he

12    made 77,000, a return of less than 1 percent.  Even if we limit

13    it solely to the basis trades, he put in the 9 million and

14    received from Dr. Kolb 110, and even the maximum amount of 550.

15    That's a very small profit.  In fact, Mr. Sala could have

16    received the same amount as Dr. DeRosa said and not incurred

17    any of those potential or actual fees.

18          Now, let's look at the tax side.  Mr. Sala invested

19    $9 million and was guaranteed a deduction of 24.  He nearly

20    tripled his money in less than, I guess, a month and a half.

21    That's a very good investment.

22          So when we take these numbers and we examine it with

23    the other evidence, including the fact that Mr. Sala paid

24    15 percent of his desired loss to enter the transaction, the

25    fact that his gains equaled his losses, the fact that there was

1    no non-tax business for liquidation of the partnership or the S

2    corp, or even the existence of the S corp, we believe that the

3    evidence shows that Mr. Sala is primarily motivated by tax

4    avoidance in entering this transaction.

5         Moreover, we heard Mr. Nemirow testify that

6    Mr. Nemirow on his behalf negotiated two exit strategies based

7    on tax events.  There was no similar negotiation based on a

8    desire for any economic profits.  In fact, Mr. Sala said that

9    all he needed was a penny in profit to continue in the

10   investment, an aspect I believe he said he had never seen in

11   another investment before.

12        In addition, we would like to address several points

13   that relate to business purpose.  And that's on this slide,

14   once again we list the testimony that supports it, the

15   exhibits, and I actually -- these are legal arguments, so we

16   didn't cite any findings of facts.

17        First, the trading positions had to be liquidated to

18   avoid illiquidity and volatility.  What we heard from

19   Dr. DeRosa and Dr. Kolb, that the currency market is highly

20   liquid, in fact the most liquid in the world.  And that

21   Krieger's style in this was to seek volatility.  So it doesn't

22   make sense as to why they would want to do that.

23        Second, liquidating the partnership gave a fresh start

24   for trading.  Well, Your Honor, if that was a very valid

25   strategy, then it should have been done the first time, rather

1    than transferring the trades from Sala's personal account into

2    the S corp then into the partnership.

3           Next, the partnership existed solely for economies of

4    sale and leverage.  Your Honor, we've heard testimony that the

5    partnership existed for one reason only, people that wanted

6    ordinary losses regardless of their risk appetite.

7           Finally, the basis trades were part of the evaluation

8    period.  Well, Your Honor, we heard Dr. Kolb and Dr. DeRosa say

9    that they had not seen condors anywhere else in the portfolio

10   in any of the rest of the years.  And Dr. DeRosa, once again to

11   use his word, referred to this as un-Krieger-like trading

12   because of the small margins.

13          THE COURT:  Well, this all begs a question raised in

14   *Gregory v. Helvering*, and that is whether this taxpayer had the

15   legal right to decrease the amount of what otherwise would be

16   his taxes or avoid them altogether by means which the law

17   allows.

18          MR. SERGI:  Well, Your Honor, first of all, we would

19   dispute that the law allows it.

20          THE COURT:  And that segues over into the regulation.

21          MR. SERGI:  But assuming that the Treasury regulation

22   didn't apply.

23          THE COURT:  Right.

24          MR. SERGI:  That is not what is happening here, Your

25   Honor.  What happens is, Mr. Sala wanted two things:  He wanted

1    to invest his money, and he wanted a tax deduction.  The second

2    half of the Deerhurst transaction that began in 2001, with a

3    completely different entity, with a completely different

4    trading style, with completely different -- I did say "style."

5    I was going to say "style" again -- with a completely different

6    motivation is very different than the basis trades, which is

7    the end of 2000, because he knew he needed the exact amount of

8    the loss.

9           So I do think he had two motivations.  And I think

10   those motivations took place in two different time periods.  I

11   think the tax motivation was in the latter part of December

12   2000, and I think the economic motivation was in 2001.

13          So under *Gregory v. Helvering* -- I think *Gregory v.*

14   *Helvering* would say, well, what do we have to look at?  Well,

15   you can seek to avoid your taxes, but you can't behave

16   irrationally to do it, which is what happened during November

17   and December.

18          We've -- I guess we'll get back to Treasury reg

19   1.752-6, Your Honor.  But I did want to address, because it

20   closely relates to the economic substance doctrine, especially

21   the subjective prong, 165(c)(2).  And what 165(c)(2) does,

22   Mr. Hallett mentioned it, is that section of the Code limits

23   the loss deduction claimed by an individual taxpayer to losses

24   incurred in any transaction entered into for profit.

25          165(c)(2) sets forth a subjective standard under which

1    Mr. Sala must show that his primary motive for entering into

2    the Deerhurst transaction was to make a profit.

3          Now, I know it sounds exactly like the subjective

4    prong.  And in some courts, it is the subjective prong.  But

5    the Tenth Circuit in the *Keeler* case, the most recent case on

6    the issue -- I believe Mr. Hallett cited some older cases.  He

7    cited *Kim* and *Nickeson*.  But *Keeler* is much after that, and we

8    believe that that represents the current state of the law.

9    Says that this is a completely independent issue for the Court

10   outside of economic substance.

11         That being said, in *Keeler*, *King*, all the cases that

12   address it, they tend to rely on the same factors, Your Honor.

13   And they tend to come down the same way, they lack economic

14   circumstances, and it fails 165(c)(2).  I'm unaware of a case

15   that goes the opposite way.

16         In ruling for the Government in *Keeler*, the Court of

17   Appeals pointed to a number of factors that evidence the lack

18   of primary profit motive, including the fact that the claimed

19   loss is actually offset nearly 100 percent the income for the

20   relevant year, as well as what they referred to as suspect

21   trading patterns.

22         I won't waste the Court's time and go through, but we

23   believe those same factors are in this case.  And I also would

24   like to point out the Tenth Circuit in *Miller*, which was after

25   *King*, cited by Mr. Hallett, stated that under 165(c)(2), the

1    tax tail cannot wag the business judgment dog.

2          Now, we submit, Your Honor, that this is precisely

3    what occurred here, given Mr. Sala's net cash outlay of

4    approximately 728,000, which generated over 60 million in tax

5    losses, which resulted in tax savings of $24 million, and

6    completely offset any taxes he owed from the sale of his

7    DoubleClick.

8          Mr. Sala entered this transaction, created an ordinary

9    loss of 85 times his net cash outlay.  And by looking -- and

10   I'm referring back to the same slide as before -- I think we

11   can see from this pie chart what is the tail and what is the

12   dog.  So it is our argument that 165(c)(2) would prevent this

13   loss.

14         Your Honor, if I may go back to the Treasury

15   regulation again.

16         THE COURT:  Sure.

17         MR. SERGI:  Here I am.  The Treasury regulation, I

18   believe I summarized it, was promulgated in 2003, retroactive

19   to October 18, 1999, applicable to substantially similar

20   transactions and transactions governed by Notice 2000-44.  And

21   the way that it basically works is to reduce economic -- reduce

22   tax loss to economic loss.

23         And in my opening I had an example.  And it's

24   Mr. Sala's example that shows that he bought 60 million of

25   long, 60 million of short at a cost of 728,000, which created a

1    tax basis of 60 million and a corresponding tax loss of

2    60 million.  What the regulation would come in and do is it

3    would change that 60 million and make it $728,000.  And it

4    would. therefore, reduce the tax loss so that tax outlay and

5    the economic outlay would be equal.

6           There is -- I don't think there is a dispute that if

7    this were to apply to this case, it would decrease the

8    partnership's basis and the contributed property as well as

9    each partner's basis in the partnership.  So consequently, when

10   Mr. Sala's Subchapter S withdraws from the partnership, the S

11   corporation's basis is not 60 million, but, really, the

12   difference between the two options, $728,000.

13          As described in our opening, and as mentioned by

14   Mr. Hallett, the Seventh Circuit upheld the regulation in

15   *Cemco*.  And this is what the Court said -- it says, *Cemco* says

16   that in treating 50,000 of euros as having a 3.6 million basis,

17   which turned into a loss when the euros were sold for exactly

18   what they had been worth all along, it was just relying on

19   *Helmer v. Commissioner* and a few similar decisions.  That may

20   or may not be the right way to understand *Helmer*.  We need not

21   decide, for it is not controlling in this court or anywhere

22   else.

23          We heard Mr. Hallett walk through *Helmer* and walk

24   through the Code and walk through the regs in order to set the

25   basis of Mr. Sala's transaction.  We believe that is simply

1    incorrect and that the Treasury regulation is the appropriate

2    mechanism in which to apply the Code and not *Helmer*.

3    Therefore, that's how we should decide Mr. Sala's basis.

4              THE COURT:  This is, with maybe a little additional

5    language in *Cemco*, the extent of the analysis.

6              MR. SERGI:  Are you saying because he's -- well, first

7    of all, Your Honor, I think it is stark at how close the

8    analysis between *Cemco* and this case is, the facts.

9              But I understand your position.  You're saying --

10             THE COURT:  I mean, I'm talking about --

11             MR. SERGI:  If the Court comments on economic

12   substance of the transaction, Your Honor?

13             THE COURT:  Sure.  Yeah.

14             MR. SERGI:  They do that.  And Judge Easterbrook

15   mentioned clearly that the transaction lacked economic

16   substance in his mind.  But what the Court also says is, the

17   IRS has considerable latitude in issuing regulations that

18   specify sorts of transactions that may be looked through.

19   These regulations avoid the need to litigate one tax shelter at

20   a time whether any real economic transaction is inside the box.

21             THE COURT:  There is not much analysis behind that.

22             MR. SERGI:  Well, yes, Your Honor.  But we believe

23   it's a sound principle, because why else have a regulation if

24   you had to litigate everything to see if it fell under the

25   initial term of the regulation?  It would defeat the purpose.

1          Every taxpayer would come forward and say, this

2     regulation doesn't apply because I have economic substance.

3     And their logic would be, well I'm going to argue economic

4     substance anyway, therefore, I should -- so if it really

5     wouldn't serve to stop -- the reason that the Treasury issued

6     this regulation and the reason that the Congress gave them the

7     ability to issue this regulation is to stop these kinds of

8     transactions.

9          THE COURT:  And that's a key question of law in this

10    case, regarding whether Congress gave them the authority to

11    issue that regulation in the way it was issued.

12         MR. SERGI:  Well, Your Honor, that's a very valid

13    point.  And Mr. Hallett cited *Cemco* for that -- not *Cemco*,

14    *Klamath* for that.

15         THE COURT:  Right.

16         THE WITNESS:  He said, *Klamath* is right, *Klamath* is

17    this, *Cemco* is completely wrong, and *Klamath* is the one to look

18    at.

19         Well, let's look at what *Klamath* said.  It said --

20    this is -- I'm reading, Your Honor, from page 44 of the

21    decision, actually -- I'm sorry, I'm giving you the wrong

22    reporter.  I'm reading from page 625 of the decision.

23         It says, thus it could not be clearer that the

24    government provided notice as early as August of 2000 that it

25    disagreed with the method of tax treatment used by the

1    plaintiffs in this case.  Thus, plaintiffs -- thus taxpayers

2    who engaged in conduct similar to the plaintiffs after August

3    of 2000 were on notice of the Service's issue with regard to

4    these transactions.  See Notice 2000-44.

5         The question of whether those taxpayers could have

6    justifiably relied on the definition of liability in the 752

7    cases in the context of these transactions is not before the

8    Court.

9         Your Honor, they didn't look at that.  The facts are

10   different in our case.  In the *Klamath* case, they -- the notice

11   wasn't out yet.  They didn't know it existed.  Mr. Sala did

12   know the notice existed.  And we have a slide here that showed

13   that not only did he know about it, but he analyzed it.

14        First, Notice 2000-44 was a factor in his decision not

15   to enter the BLIPS transaction.  Second, Willkie Farr

16   rejected -- we heard Mr. Nemirow say Willkie Farr rejected

17   representation of Mr. Sala because Notice 2000-44 applied to

18   the Deerhurst transaction.  Third, Mr. Nemirow, himself

19   despite -- I think Mr. Hallett might have misstated when he

20   said he thought Notice 2000-44 was worthless.  In fact, Mr.

21   Nemirow stated that he thought Notice 2000-44 applied to the

22   Deerhurst transaction.  The only person who thought it didn't

23   apply was the guy who was promoting this tax shelter,

24   Mr. Schwartz.  And he advised it didn't apply.

25        So, Your Honor, this is very different, drastically

1    different than the facts the Court was given in *Cemco* -- I

2    mean, in *Klamath*.

3              *THE COURT:*  About 15 minutes left.

4              *MR. SERGI:*  I do?  Okay.

5              *Cemco* addresses this.  You say there is not a lot of

6    analysis.  They say, the -- and I won't even find the page,

7    because I might run out of time.  The District Court in *Klamath*

8    did not doubt that retroactivity could rest on the 2000 act.

9    Treasury reg 1.752-6 applies to partnerships and LLCs treated

10   as partnerships, a rule similar to the approach that Congress

11   adopted for other business entities.  *Klamath* held, however,

12   that when promulgating Treasury reg 1.75-6, the IRS had not

13   availed itself of that power.

14             But if the IRS was not using that authority, why in

15   the world does the regulation reach back to October 18, 1999?

16   Retroactivity requires justification to make a rule --

17   retroactivity requires justification.  To make a rule

18   retroactive is to invoke one of the available jurisdictions.

19   And the choice of the date tells us that the jurisdiction is

20   the one supplied by the 2000 act.  A regulation's legal effect

21   is not dependent upon reiterating the obvious.

22             So, Your Honor, that's *Cemco*'s view.  And I will tell

23   you, and I'm not sure I did, the Government is appealing

24   *Klamath*.  There is another case that is out there, Kormen [ph],

25   in the same circuit, where the Court actually asked them to go

1    back and brief the *Cemco* issue.  And our position, the

2    Government's position, is that *Cemco* is correct, not because

3    it's favorable -- because I've had my share of reversals by

4    appellate where they won't take appeals -- but because it's the

5    right answer.

6         Your Honor, maybe what I should do to summarize the

7    Treasury regulation is just to say what the Court said.  And it

8    says, although regulations do not apply to transactions that

9    occur before the initial publication of a draft regulation, the

10   norm of prospective application may be superseded by a

11   legislative grant from Congress authorizing the Secretary to

12   prescribe the effective date with regard to any regulation.

13        Section 309 of the Community Tax Relief Act of 2000,

14   enacts basis reduction rules for many transactions and

15   authorizes the IRS to adopt regulations prescribing similar

16   rules for partnerships and S corp's.  Section 309(d)(4) of the

17   2000 act adds that those regulations may be retroactive to

18   October 18, 1999.  That's the power the Commissioner used when

19   promulgating this regulation.

20        Now, Your Honor, Judge Easterbrook speaks much better

21   than I can, and I think he's correct.  And so therefore, we

22   believe that regulation would apply, and it would -- and it

23   would seek to strike down this transaction, and Mr. Sala would

24   be limited to his economic outlay.

25        I just have one more issue to quickly address, Your

1    Honor.  And that is the currency property issue.  And I will do

2    that quick.

3            Our final argument is based upon the fact that

4    Mr. Sala did not transfer property when he liquidated the

5    partnership.  According to the Ruble opinion letter -- which is

6    Exhibit J44, which I will get on the screen -- he basically

7    said that, initially, the individual trades were distributed

8    from the fund -- from Fund 1 back to the S corp in the original

9    foreign currency.

10           And that's important for two reasons, Your Honor.

11   First, under the view of the loss, this would give Mr. Sala an

12   ordinary loss versus a capital loss.  It's also important to

13   touch very quickly upon the penalty issue, because if they're

14   relying on this to give them penalty relief, first we've seen

15   that there are some omissions.  Next we've seen that there is

16   some question as to whether the representations by Mr. Krieger

17   are accurate.  And, third, we see now that they might not have

18   even followed this opinion.

19           But for purposes of the currency argument, what is

20   more important is that this was required to give Mr. Sala the

21   ordinary loss.  However, when Mr. Sala exited from the tax

22   shelter, when he did his step-up, it was not executed in

23   accordance with the Ruble opinion.  We base that on the

24   official Refco account records for the S corporation.

25           Mr. Hallett pointed to Dr. DeRosa's report.  And

1   Dr. DeRosa was answering the Court's question on the issue of

2   whether property was transferred.  What that was meant to do in

3   his report is give a general overview based on Deerhurst

4   statements and Refco statements.  The Deerhurst statements

5   are -- were written after the fact.  And I believe, actually,

6   J29, which was an exhibit that Mr. Hallett put up, and he

7   represented was a Refco statement, was actually a Deerhurst

8   statement.

9           Mr. Hallett said in his opening, you can't change the

10  facts.  Well, I think that's what Deerhurst tried to do by

11  Mr. Molyneaux writing that self-serving memo that said that

12  property and trades were transferred.

13          If you look at the Refco statements, they equal

14  exactly what Mr. Sala was intended to get, the two cash

15  disbursements.  If you look at the trade confirmations, it

16  shows that the trade was made in the name of Solid Currencies.

17  We didn't see any other trade confirmations with the name of

18  Deerhurst.

19          Finally, when you asked Dr. DeRosa, he made an analogy

20  that if someone calls for dinner to make a reservation, and you

21  show up and eat the dinner, is it the person who made the

22  reservation's dinner?

23          So for those general reasons, Your Honor, we believe

24  that Mr. Sala erred in his exit from the transaction.  And that

25  could not have created the ordinary loss of 60 million, and

1    instead, it's a capital loss.  However, Your Honor, that's a

2    very far away position because we don't think it's 60 million

3    at all.  We think it's -- nothing first -- well, 758,000 under

4    the statute.  But if the statute -- the Treasury regulation.

5    But if the Treasury regulation doesn't apply, we hope it has no

6    substance.  It violates 165(c), so it would be absolutely

7    nothing.

8          Our fallback is clearly that the character is

9    different because he didn't comply with the transaction.

10          So in conclusion, Your Honor, for the reasons

11    discussed here, as well as those in our findings of facts and

12    conclusions of law, especially on the penalty, which I barely

13    addressed here, we request the Court deny Mr. Sala's refund

14    claim and find for the Government on both the tax and penalty

15    issues in this case.

16          THE COURT:  Mr. Hallett.

17                      **REBUTTAL ARGUMENT**

18          *MR. HALLETT:*  The evidence regarding Mr. DeRosa that I

19    relied upon -- Dr. DeRosa, the currency -- the distribution

20    issue, that didn't come from his testimony in this court.  That

21    came from the report that he wrote well before he got to this

22    courtroom.  And he wrote that report based upon these

23    statements and transaction documents.  And he couldn't have

24    been more explicit.

25          The Ruble opinions refers, one way to do this would

1    have been to have the partnership distribute the 24 positions.

2    They didn't have to do that to get to do the job.  If the

3    partnership distributed any foreign currency contract or

4    option, that does the job.  That's what they did.  The

5    partnership -- and this helps us, Your Honor -- they actually

6    traded in those 24 positions, and it actually made money on

7    that.

8           That whole issue is a red herring, and I submit the

9    Government continues to stir dust on that.  And the proof is

10   overwhelming that what -- that those two contractor positions

11   were distributed.

12          Next, Your Honor, counsel completely -- they go both

13   ways.  They want to focus on the 24, and then they want to

14   expand it out a little bit.  You can't have it both ways.  And

15   this was -- Dr. DeRosa, he says, you know, you could have done

16   this a different way, rather than the condors.  You could have

17   had 36 digital options.

18          Well, it's not what you might have done or could have

19   done or different ways.  It's the way that this deal was

20   structured and the way this deal was implemented.  And this

21   deal was structured and implemented as an overal deal,

22   requiring a $9 million investment, a commitment for 5 years,

23   and that's the way deal came down.  The $9 million, 5-year

24   program is not on the periphery.  It's the heart of the

25   program.

1          With respect to -- here again, notice how the

2     Government -- there is an old saying about figures here.   And

3     they want to try to -- they don't like DeRosa saying that the

4     profit potential of these 24, the profit potential was

5     $553,000, because that shows they certainly had economic

6     substance.   So trying to play with the figures and look at

7     numbers and see if you can't whittle that down.

8          The $75,000 cost and other costs of the tax opinion

9     and the tax return, that has -- is not an economic cost.

10    That's not a fee or an expense of doing the deal.   That's

11    deductible under Section 212 of the Code.   It allows deductions

12    for expenses of determining your cost -- determining your tax

13    liability, whether it has to do with your personal house or

14    investment or anything.   So that doesn't come into play.

15         *THE COURT:*   Mr. Sergi also says, if there had been the

16    PIPs charged in 2000, you would have a net loss.

17         *MR. HALLETT:*   If --

18         *THE COURT:*   Even against maximum potential profit.

19    Doesn't that give rise to an inference that the accounts were

20    traded in 2000 in a way to simply create -- contrary to the

21    forward going documents, create a mythical profit?

22         *MR. HALLETT:*   I don't believe it does, because it's

23    not the ifs.   And the testimony was undisputed.   Frankly, what

24    he played there of Mr. Krieger makes the case.   Mr. Krieger

25    said, look, I had this Beckenham, and I was going to use

76

 1   Beckenham when it was up and going, which it wasn't in 2000,

 2   but when it is up and going and it's doing what it is intended

 3   to do, it's going to get a better deal on the trades.  It's

 4   going to lower the cost of the trades as compared to what we've

 5   been doing through Refco, and that's going to increase the

 6   profitability way over and above the amount of the fees.

 7   That's the testimony.

 8          The fact is -- the fact is that the Beckenham fees

 9   were not charged.  And they were not charged, not to make this

10   look like something it wasn't; they were not charged because

11   Beckenham, it was not in a position to deliver in getting lower

12   costs in those years.  That's the fact.

13          And to speculate that somebody craftily sat back and

14   said, how -- can we take this away?  Can we take $75,000 away?

15   Could we do this?  Could we do that?  There is just no evidence

16   that that's the case.

17          The organization costs they want to throw in there.

18   Organization costs, the costs of organizing, are not deductible

19   under the Internal Revenue Code.  They're not deductible under

20   GAAP.  They're long-term costs.  They're capitalized.  You

21   don't write those off.

22          And to take these kinds of expenses -- one, the

23   Beckenham fees that were not charged and were not intended to

24   be charged -- and there is not one whit of evidence that they

25   were -- and then throw them down here against the 24, it's a

1    desperate attempt to try to show that transactions that had

2    real economic substance didn't have economic substance.

3          Your Honor, this business about the -- comparing the

4    24 -- the 5 -- if they grudgingly look at the 553 profit and

5    the 100,000 it made and comparing that to the $24 million loss,

6    the loss -- I'm sorry, the $60 million loss.  That's not a

7    result of economics.  That has no reflection on the economics.

8    It's the result of a rule of law.  Just like in the *Gitlitz*

9    case.  It had nothing to do with economics.  That was a rule of

10   law that caused that loss.

11         And to say, well, Mr. Sala, what a great deal.  He

12   invested 9 mill and got 23, $24 million in tax savings.  Well,

13   he's a sophisticated man.  He knows he can't go spend it on a

14   corporate jet, because he knew and he was advised and said,

15   look, while we think it's a winner, we think it's a 51 percent

16   chance of success, the IRS could and likely will challenge

17   that.  And he's going to be right here in this courtroom, where

18   he is, and the investment is going to have to stand or fall on

19   its own.  You can't put that money and go spend it and say,

20   that's the savings.  And he didn't.  And that's why he was

21   looking for profits.

22         Regarding this quest for a tax shelter.  I am amazed

23   they bring that one up again, this quest for tax shelter.

24   Sure, KPMG, sure, they read the papers.  They know who is

25   making these sales.  And they go hustle them and they say, how

1    about this deal, how about that deal, how about this?  Does

2    Mr. Sala, like a lot of these people -- none of my clients --

3    just say, oh, great, I'll take it.  No.  The one he looks at is

4    BLIPS.  And he says, that's a rotten investment.  I can't make

5    money on the Argentine peso in 15 days.  I don't want it.  It's

6    a stinker.  It shows you that he was looking to make money.

7         No logical explanation for the partnership here.

8    Well, Your Honor, one of the questions, did the partnership

9    actually conduct business?  Was there any economic consequence

10   of the partnership?  And it actually conducted business.  There

11   is no dispute about it that.  It made those trades.  It made

12   hundreds of other trades.  No question about that.  No question

13   whatsoever.

14        Krieger testified -- they tried to pooh-pooh this --

15   that as far as his firm was concerned, it eased administrative

16   burdens.  You don't have to have multiple bank accounts.  Was

17   it done for that reason?  No, we don't say it was done for that

18   reason.  We don't -- obviously, that -- it was done because it

19   did provide the tax benefit.  But there was an economic

20   consequence of that, and there was an economic reason for that.

21        Finally, Your Honor, with respect to *Cemco*.  This case

22   is not *Cemco*.  *Cemco*, one long, one short, $36,000 invested,

23   $30,000 came right back.  I mean, no wonder Judge Easterbrook

24   was offended.  How can you say that's got any economic

25   substance?  I don't blame him.  But that's not the case here.

1        2000-44, the Court in *Klamath*, I submit, it was a

2   careful court, and it said -- made it's analysis.  The

3   authority of the statute, all things talked about, it says now

4   the Government argues it's 2000-44, but we don't have it to

5   consider that here, because these transactions were undertaken

6   before 2000-44 came in.  2000-44 doesn't affect this at all.  I

7   submit -- I'm delighted, Your Honor, and grateful, as you have

8   throughout the case, gave the parties every opportunity to

9   present their position.  And I'm delighted that we can submit a

10  brief on that.

11       But as we'll say in the brief, if Ms. Flanders will

12  let me do it, because she writes them -- as we'll say, you

13  don't have to get to retroactivity and notice.  The plain fact

14  is that when that Treasury regulation started -- tried to reach

15  out and say, the exception doesn't apply to 2000-44

16  transactions, it was simply beyond the authority of Congress?

17  And putting 2000-44 out there in 2000, August of 2000, didn't

18  give Treasury the authority to enact the law and change the law

19  beyond the authority that Congress gave it.

20       Thank you very much, Your Honor.

21       *THE COURT:*  Thank you, counsel.

22       I will take the case under advisement, and we'll get

23  some additional briefing.  I'll be entering an order today

24  specifying what I would like to receive from you.  And once we

25  have a chance to put it together, we will issue findings and

 1  conclusions and an order one way or the other.

 2          I appreciate the way your case has been presented.

 3  Thank you very much.

 4          We'll be in recess.

 5          (Hearing concluded at 11:33 a.m.)

 6                              **INDEX**

 7  **Item**                                                      **Page**

 8  CLOSING ARGUMENTS

 9      By Mr. Hallett                                               3
        By Mr. Sergi                                                37
10      Rebuttal Argument By Mr. Hallett                            74

11                      REPORTER'S CERTIFICATE

12

13      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

14

15      Dated at Denver, Colorado, this 26th day of March, 2008.

16                      s/Therese Lindblom

17                      _____

18                      Therese Lindblom,CSR,RMR,CRR

19

20

21

22

23

24

25