# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00636-LTB-KLM

CARLOS E. SALA and
TINA ZANOLINI-SALA,

      Plaintiffs,

  v.

UNITED STATES OF AMERICA,

      Defendant.

---

## PLAINTIFF'S RESPONSE TO THE UNITED STATES' MOTION FOR A NEW TRIAL

---

### I.      Issues

The government has submitted a post-trial declaration signed by Andrew Krieger ("Krieger") after granting him immunity from prosecution and executing a non-prosecution cooperation agreement in connection with a criminal investigation entirely unrelated to this case as its basis for a new trial. Should the Court retry this case when the specifics of Krieger's post-trial statements: 1) were known to Department of Justice lawyers who chose not to use them before or during trial; 2) are cumulative; 3) are submitted in an effort to impeach Krieger's trial testimony; and 4) do not materially contradict credible evidence relied upon by the Court in its findings of fact?

### II.      Relief Requested

Plaintiff [1] requests that this Court deny the government's motion for a new trial in its

---

[1] Plaintiffs Carlos E. Sala and Tina Zanolini-Sala are husband and wife. Plaintiff wife is a party to this suit solely

entirety and without further proceedings.  Plaintiff further asks this Court to include in its order a ruling that the government has acted in bad faith by unnecessarily prolonging this proceeding, and wrongfully attempting to undermine the findings and conclusions of this Court.

### III.   Introduction

On March 11, 2008, this Court characterized the government's "repeated efforts to delay, postpone, stay, and otherwise put off the trial of this case" as "troubling."  Those efforts involved the government's contentions that alleged fraud committed by KPMG-related defendants in the *Stein* prosecution (S.D.N.Y. No. 05-888) was somehow connected to the *Sala* case.  An Assistant U.S. Attorney with the Southern District of New York even filed a declaration in support of one of the several motions to stay this case, claiming that the *Sala* case was "encompassed within the *Stein* indictment."  This Court has found the government's assertions regarding KPMG's involvement in Sala's case to be a "red herring." Slip Op., at 56.

Now, the government seeks to continue its never-ending quest to delay and postpone, and, at the same time, attempts to taint the merits of the *Sala* case with statements obviously written by the government and signed by Krieger as *quid pro quo* for immunity in another entirely unrelated criminal case (*United States v. Coplan*, S.D.N.Y. No. 07-453).  Plaintiff respectfully requests that the Court find the government's belated attempt to revise Krieger's trial testimony and to reverse the outcome of this civil litigation constitutes bad faith.  Enough is enough.

On the face of the materials submitted, the government cannot show that it is entitled to a new trial applying the Tenth Circuit's five-part test.  The so-called "newly discovered evidence" was available to the government well before trial.  Some of it is in the trial record, and was not

---

by reason of having filed a joint federal income tax return.  Plaintiff husband will hereinafter be referred to as "Plaintiff."

disputed by the Plaintiff.  Some was simply not offered.

The government could have granted Krieger immunity prior to trial, and obtained his availability to further testify on deposition or at trial.  Instead, the government withheld the grant of immunity, ultimately doing so at the eleventh hour, following this Court's decision against it, in order that a declaration signed by Krieger could be obtained in support of its motion.[2]  In the meantime, at least since September 2007, Krieger made himself unavailable to Plaintiff's counsel and to the Court at trial, by hiding out in Dubai. (Krieger Decl. ¶ 9).  However, he was willing to make himself available to the U.S. Attorney's Office.

Furthermore, even if the statements in Krieger's post-trial declaration are accepted as true, they do not come close to the required showing that they are not cumulative or impeaching, are material, and would likely change the Court's findings.  The Krieger trial testimony that the government now says is false and misleading consists of a few lines from 5 to 10 pages out of a total of over 800 pages of Krieger's transcribed testimony.  More significant than what Krieger now says, is what he does *not* say: that over 99% of his testimony is not in any way false or misleading.

And, there is no assurance that even if this case were retried, Krieger would not again claim the Fifth Amendment and refuse to testify on the grounds that the Southern District of New York's U.S. Attorney's immunity promise does not protect against perjury prosecution by federal or state authorities in New Jersey or Colorado.

In an apparent attempt to influence the outcome of this case on appeal, the government undoubtedly believes that it achieves an important goal, even if the motion is lost, because Krieger's post-trial declaration—with its bogus allegations of fraudulent testimony—is now on

---

[2] Krieger's May 22, 2008 post-trial declaration is hereinafter referred to as "Krieger's post-trial declaration" or "Krieger Decl."

record.  The government's bad faith conduct should not be condoned.

## IV.    Background

The facts relevant to this motion are discussed in the body of our Argument, and won't be repeated in detail here.  Plaintiff doesn't dispute the procedural chronology recited by the government in the background section of its Memorandum in Support of the United States' Motion for a New Trial.[3]  The basic factual flaws in the government's memorandum relate to: 1) its characterization of Krieger's trial testimony in relation to his post-trial declaration; and 2) its assertions that, if Krieger testified at a retrial consistent with his post-trial declaration, his additional testimony would change the outcome of this case.  In essence, the government seeks to infuse into Krieger's testimony its spin on the significance of tax benefits to the Deerhurst Program.  That spin did not convince this Court at trial when asserted by the government and its expert, and would not change the outcome in a retrial if it were mouthed by Krieger.

## V.    Argument

### A.    The Government Has Not Met The Test For A New Trial.

The Tenth Circuit requires the government to make the following showing, if a new trial is to be granted:

> (1) the evidence was newly discovered since the trial; (2) the moving party was diligent in discovering the new evidence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the newly discovered evidence was material; and (5) that a new trial, with the newly discovered evidence, will probably produce a different result.

*Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1285 (10th Cir. 1994).  A new trial is to be granted only if the moving party can carry its substantial burden of convincing the Court that every

---

[3] Hereinafter referred to as the "government's memorandum" or "Mem. in Supp. of Mot. for New Trial."

element of a five-part test has been met. Showing that evidence was newly discovered is essential, before proceeding to the other four requirements.

Citing *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716 (10th Cir. 1993), the government agrees this test controls its right to a new trial. (Mem. in Supp. of Mot. for New Trial, p. 7). *Jefferson Bank & Trust* is particularly important authority because it also holds that, if a party, through negligence or a tactical decision, fails to present evidence that was available, it may not seek a retrial using evidence from a claimed newly discovered source. 994 F.2d at 728. Even assuming the Krieger post-trial declaration would otherwise be considered "newly discovered," it was plainly not used before or at trial because of the government's own tactical decision. Having put the Plaintiff and the Court through the time and expense of a lengthy trial, the government should not be permitted to now further delay and greatly increase the cost of obtaining finality to this case.

Motions for a new trial based on newly discovered evidence are disfavored, *Waul v. Coughlin*, 177 F.R.D. 173, 176 (S.D.N.Y. 1997), and the moving party has the burden to demonstrate that the new evidence clearly weighs in favor of a new trial. *Diaz v. Methodist Hospital*, 46 F.3d 492, 495 (5th Cir. 1995); *Dunn v. Consolidated Rail Group*, 890 F. Supp. 1262, 1269 (M.D. La. 1995). Granting a motion for a new trial is "within the discretion of the trial court and will not be disturbed on appeal in the absence of a manifest abuse of discretion." *Terminix*, 17 F.3d at 1285.

The detail of Krieger's post-trial declaration in its entirety *was* available to the government by at least the third day of trial, as evidenced by the March 12, 2008 letter from Jay Fischer ("Fischer"), Krieger's lawyer. It was not disclosed to the Court and, therefore, is not newly discovered. Krieger was available to testify, had the government chosen to timely grant

him immunity before trial. His lawyer or government representatives were available to testify to the matters set forth in his letter had the government not chosen to withhold disclosure until after trial. The government totally fails to meet any of the five criteria set out in *Terminix* and *Jefferson Bank & Trust.* Under the circumstances, Plaintiff respectfully suggests that it would be a manifest abuse of discretion for the Court to grant the government's motion, and the Court has good reason to deny its motion.

    **1.    The Information In Krieger's Post-Trial Declaration Is Not Newly Discovered.**

        **a)    The government possessed the details of Krieger's post-trial declaration at least in the early stages of trial. The government has the burden to show that it didn't have this information before the trial and it has failed to do so.**

The important initial inquiry is whether the Krieger post-trial declaration qualifies as "newly discovered" evidence. The government possessed the substance of Krieger's post-trial statements during the early stages of the trial, if not before. The March 12, 2008 letter from Fischer proves this.

Krieger's post-trial declaration mirrors statements made in Fischer's March 12 letter. The March 12, 2008 letter also shows that the U.S. Attorney's Office, which was investigating a case in New York involving accountants of Ernst & Young, encouraged Krieger to adopt statements that the prosecutors believed were inconsistent with his trial testimony. The obvious purpose for the U.S. Attorney's Office pressure was to bolster the government's case, should it lose based upon the trial record. The government chose not to disclose this letter to the Court or to Plaintiff's counsel during the trial, offer it as evidence, or attempt to submit evidence of Krieger's statements through Krieger, Krieger's lawyers, or government representatives who were present at Krieger's interrogations by the U.S. Attorney's Office.

Plaintiff's counsel was unaware of Fischer's March 12 letter or the post-trial declaration of Krieger until the government filed its Motion for a New Trial. (Tang Decl. ¶ 6, 8). The government "has no explanation" as to why Plaintiff's counsel did not receive the March 12, 2008 letter, although the government received the letter on or about March 12, 2008. (Tang Decl. ¶ 6, 8). It likewise presents no explanation as to why it did not disclose to the Court the March 12, 2008 letter until well after the trial and the Court's entry of its findings and conclusions. (Tang Decl. ¶ 6).

Even if the government was unable to timely obtain Krieger's testimony at trial, which we dispute, because its lawyers were in possession of the information prior to or during trial, the evidence is not "newly discovered." The circumstances of the government now bringing the post-trial declaration to the Court's attention, in the context of a motion for a new trial, are more than "troubling"; they exhibit bad faith.

> **b)**  **Testimony that is known, but not presented at trial because of a witness's lack of cooperation, is not "newly discovered" for purposes of Fed. R. Civ. P. 59.**

In *FMT Corporation, Inc. v. Nissei ASB Co.*, 1995 WL 478853 (N.D. Ga. 1995), one of the litigants (Nissei) was unable to compel a Japanese national to appear at the trial. Later, after judgment had been entered against it, Nissei moved for a new trial claiming newly discovered evidence, i.e., deposition testimony given by a witness (Takeuchi) in a related case. The court rejected Nissei's motion for a new trial, reasoning that evidence, known to a party at the time of trial, but which could not be procured or presented, did not qualify as "newly discovered":

> [T]he evidence upon which defendant relies as the basis of its motion was not newly discovered. The defendant clearly was aware of Mr. Takeuchi, and the substance of his knowledge regarding the Chicago trade shows, during its trial of the case. The fact that defendant was unable to procure Takeuchi's cooperation and testimony in the trial of its case does not make his subsequent

testimony in a related case "newly discovered" evidence under
Rule 60(b)(2).

*Id.* at *1.

The government was aware of Krieger's statements at the time of trial. Its present

allegation that it was unable to procure Krieger's testimony because it had not yet chosen to

grant him immunity fails under *Nissei*. The government asks this Court to adopt a rule, contrary

to *Nissei*, that any time a litigant alleges he was unable to procure the attendance of a witness at

trial, but asserts after the trial that the witness is willing to testify, a retrial should be granted.

Such a rule is totally contrary to the principles of judicial efficiency and finality of decisions.

      c)      **The statements in Krieger's post-trial declaration are not "newly discovered evidence" because the government could have presented the statements at trial by means other than Krieger's testimony.**

The government characterizes Krieger's post-trial declaration as newly discovered

because he refused to testify until he and the government had finalized a non-prosecution

agreement. This contention ignores the government's control over the timing of the immunity

grant to Krieger, which was executed shortly before the motion for a new trial was due, although

Krieger states he was contacted by the U.S. Attorney's Office in 2007. (Krieger Decl. ¶ 4).[4]

Wholly aside from Krieger's alleged unavailability before and during trial, there were

ways the government could have sought to submit the information in the post-trial declaration as

evidence during the trial. The government could have called Fischer, who was cooperating with

the U.S. Attorney's Office on Krieger's behalf during the proffer and interview process and,

through Fischer's testimony, offered evidence of Krieger's statements as against Krieger's penal

interest. The statements would not have been privileged because they were made in the presence

---

[4] According to Krieger's post-trial declaration, he spoke to the U.S Attorney's Office no later than August, 2007, when he stated that he left for Dubai, which is well before the trial began on March 10, 2008. (Krieger Decl. ¶ 9; *see also* Tang Decl. ¶ 6).

of representatives of the U.S. Attorney's Office. The statements were not client secrets because Fischer had already disclosed the subject matter of the statements in his February 27, 2008 and March 12, 2008 correspondence.

The government could have also called representatives of the U.S. Attorney's Office to testify about information they received during the numerous Krieger interviews which the government now contends is inconsistent with Krieger's deposition testimony.[5] The availability of these witnesses and production of their memoranda of interview were within the government's control.

### d) The Government glosses over the newly discovered requirement in its brief.

Although the government has the burden of showing all of the details necessary to entitle it to a new trial, its only discussion of whether or not Krieger's post-trial declaration was "newly discovered" after the trial is presented in one small paragraph without any cited supporting authority. (Mem. in Supp. of Mot. for New Trial, p. 9). The government contends that, after receipt of information from Krieger's counsel regarding the "material misstatements," it "promptly informed the court," but this assertion is blatantly inaccurate. *Id.* at 9-10.

The government's assertion that Krieger refused to sign a sworn statement until the non-prosecution and cooperation agreement was executed is not supported by affidavit explaining why the immunity agreement could not have been obtained earlier. Even if true, the willingness

---

[5]   The government may contend that it could not offer evidence from these interviews because they were "matters occurring before the grand jury" for purposes of Fed.R.Crim.P. 6(e). However, if this were the case, the government could have obtained an order under Fed.R.Crim.P. 6(e)(C)(i), authorizing disclosure of the statements for use in the *Sala* trial. When disclosure of matters occurring before the grand jury is sought for purposes of a federal civil case, a court will authorize disclosure if the government meets the requirements set forth in Fed.R.Crim.P. 6(e)(3)(C)(i)(I): that the disclosure is "preliminarily to or in connection with a judicial proceeding...." and a showing of "particularized need" for the requested material has been made. *See United States v. Sells Engineering, Inc.*, 463 U.S. 418, 427 (1983); *See United States v. John Doe, Inc. I*, 481 U.S. 102, 108 (1987). The Department of Justice is well aware of the existence of such procedures and they are routinely used in tax cases. See U.S. Attorneys Manual, §§ 6-4.126 and 9-11.254; DOJ Criminal Reference Manual, § 156; DOJ Tax Resource Manual, § 22.

of a witness to sign a sworn declaration is not determinative of whether or not the information described in the declaration is "newly discovered." The critical question is whether or not the government had the information subsequently included in the sworn declaration, which it did.

> ### 2.   The Government Was Not Diligent In Its Discovery Or Submission Of The Declaration It Contends Is Newly Discovered And Material To The Court's Opinion And Judgment.

The government had access to Krieger for years before the trial. Krieger gave deposition testimony for three full days; two in October, 2006, and one again in April, 2007. The government knew that Krieger's deposition testimony would likely be used at trial, which is why the depositions were videotaped. Thousands of pages of Krieger's companies' documents were produced. The government had adequate time to assimilate this information. Its experts poured over the documents and attended Krieger's depositions. During the many hours of deposition testimony in 2006 and 2007, the government had every opportunity to cross-exam Krieger about all aspects of the program it believed were "tax driven," and it did so. For example, with respect to the 24 option positions that produced the loss claimed by Sala in 2000, Krieger acknowledged he was operating under parameters provided to him by Michael Schwartz as to the amount of "option premium" that was used to generate the tax loss. (Krieger Dep. 165-167, attached as Exhibit 1).[6] Thus, his statement in his post-trial declaration that he was "required to purchase roughly equal amounts of long and short options to generate tax losses for the transactions" is nothing new. (*Compare* Krieger Decl. ¶ 12(a) and ¶ 12(b) *with* Krieger Dep., 165-167; 503-510). The government simply incorporates its spin as to the significance of the tax loss into Krieger's post immunity statements, i.e., ignoring the fact the tax loss is a product of a rule of law and does not negate the economics of the transaction. The government argues that it meets

---

[6] The option premium received on the short positions was used to purchase the long positions, whose purchase price was ultimately reflected in the Deerhurst investor's basis, including Sala's.

the diligence test because the "only evidence available to the government at the time" (when it filed its motion to vacate trial) was Fischer's February 27th letter, which it offered as evidence and "was presented promptly to this Court upon its availability" but "it was unable to secure a sworn statement until after trial." (Mem. in Supp. of Mot. for New Trial, p. 10). None of these assertions ring true.

As disclosed by Fischer's February 27, 2008 letter, Krieger was questioned extensively by the U. S. Attorney's Office. Obviously, the government agents took notes, prepared memoranda of the interviews and possessed information that went beyond the ambiguous comments made in Fisher's February 27, 2008 letter. Any government attempt to separate its civil tax division lawyers from the U.S Attorney's Office, by arguing the latter had no knowledge of the activities of the former, is without merit. All of the government lawyers work for the Department of Justice. Sala's opponent in this case is the United States, not the Tax Division. Significant coordination occurred between the trial lawyers in this case and the U.S. Attorney's Office. The Department of Justice used its powers of investigation and prosecution to coerce evidence from Krieger for the purpose of assisting its defense in the *Sala* case. The U.S. Attorney's Office even encouraged Krieger to acknowledge alleged inconsistencies between his deposition testimony in *Sala* and the information obtained by the government in its interviews. The U.S. Attorney's Office and the Tax Division closely coordinated their efforts in connection with this case, at least from the time that the first motion to stay was filed in late 2005.

> **3.   The Post Trial Declaration Relates To The Weight And Credibility Of A Small Portion Of Krieger's Testimony. Thus, It Is Cumulative Or Impeaching And Insufficient As Grounds For a Motion for a New Trial.**

Evidence which is not new, but merely affects the weight and credibility of testimony, does not justify a new trial.

a)   **The post-trial declaration is merely cumulative of evidence that was presented, or could have been presented at trial.**

Citing testimony by Sala, White, Schwartz, Krieger and the experts, the government consistently argued at trial that tax considerations played a significant role in how the Deerhurst investment was structured. Krieger's post-trial declaration concerning the role of tax benefits is nothing new to this case. The Plaintiff never disputed that a tax law rule permitted a tax loss unrelated to the economics of this transaction and he did not downplay the significance of tax benefits in relation to the role they actually played. None of the other witnesses – Schwartz, White and other investors – denied the significance of tax benefits. Even if Krieger's post-trial declaration were considered to constitute newly discovered evidence, it is cumulative of the other evidence that the government presented or could have presented at trial and is not justification for a new trial:

> The requirements of Rule 60(b)(2) that the moving party be diligent and that the newly discovered evidence not be merely cumulative, *Graham v. Wyeth Lab.*, 906 F.2d 1399 (10th Cir.), *cert. denied*, 498 U.S. 981, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990), must be read together. *The newly discovered evidence must not be cumulative not only with evidence that the moving party actually presented at trial, but also with the evidence that the moving party could have, had it exercised due diligence, presented at trial.* If a party, through negligence or a tactical decision, fails to present evidence that was available, it may not find refuge under Rule 60(b)(2) by finding similar evidence from a newly discovered source.

*Jefferson Bank & Trust*, 994 F.2d at 728 (emphasis supplied).

In *Terminix Int'l Co.*, 17 F.3d 1282, the court addressed the issue of whether evidence of prior misrepresentations was "cumulative." Because Joseph had already raised other facts suggesting misrepresentations by Terminix, the court ruled that the new information was only cumulative:

> [T]he Josephs had already argued alleged misrepresentations by Terminix and the history of alleged disrepair. Hence, the excluded evidence, though probative of intent, would be cumulative.
>
> ...
>
> [E]ven if the Josephs acted diligently in discovering the proffered evidence, it would still be cumulative or offered as rebuttal. Therefore, we find no abuse of discretion for denying a new trial based on newly discovered evidence.

*Id.* at 1285.

The government asserts, without specification, that Krieger's post-trial declaration "is inconsistent with the entirety of Sala's presentation of the evidence." (Mem. in Supp. of Mot. for New Trial, p. 10). This assertion is simply not so.

Krieger's post-trial declaration alleges that the "tax trades" were "primarily tax motivated." It says nothing about Sala's testimony as to his due diligence, his subjective intent to make a profit, his commitment to a long term investment, the reasonableness of his conclusions as to profit potential, or his efforts to make a profit from the inception of his investment. These are the facts that were critical to the Court's findings and conclusions.

Fischer's February 27, 2008 letter confirms this fact when it states: "This, of course, does not change any of Mr. Krieger's testimony as to what Mr. Sala told Mr. Krieger regarding his (Sala's) motivation, nor does it affect any testimony provided in the deposition as to the lack of knowledge on Mr. Krieger's part as to the ultimate utilization by Sala of any gains and/or losses in the preparation of any returns."

**b)      At most, Krieger's post-trial declaration only impeaches an insignificant part of his testimony.  Impeachment evidence is not grounds for a new trial.**

Krieger is now willing to say what the U.S. Attorney's Office wanted him to say: that he understood that the Deerhurst investment was "tax driven," rather than "profit driven." Indeed,

Fischer's February 27, 2008 makes it clear that, after "reevaluating the circumstances," Krieger

had come around to the view that:

> [I]t is now Mr. Krieger's view, based upon his review and reevaluation of the circumstances, that the programs in which Mr. Sala was involved were essentially tax driven as opposed to profit driven.

In essence, all Fischer's March 12, 2008 letter and Krieger's May 22, 2008 post-trial

declaration do is expand on this point. However, even if his post-immunity statements were

considered inconsistent with his trial testimony, this type of evidence, which only serves to

impeach a witness's trial testimony, is not a sufficient grounds for a motion for a new trial. *In re*

*Wyatt, Inc.*, 168 B.R. 520, 525 (Bankr. D. Conn. 1994); *Terminix Int'l Co.*, 17 F.3d at 1285.

### 4.      Krieger's Post Immunity Statements Are Not Material To The Court's Findings And Do Not Alter its Conclusions.

The reliability of Krieger's post-trial declaration is highly suspect given its timing and the

circumstance of its procurement. However, even if accepted as credible, the post-trial

declaration says nothing that materially contradicts the Court's findings as to the economic

substance of the overall Deerhurst Program, Sala's subjective profit motive, or the profit

potential of Sala's investment in the Deerhurst Program over the long term: (1) Krieger does not

state that the Refco trades were shams; (2) he does not deny that the 24 trades, which produced

the tax loss, had a significant profit potential, or that Sala actually made money on the 24 trades,

as both experts concluded at trial; (3) he does not deny that his goal was attracting long-term

investors, such as Sala, with a large capital base, so that he could make money over the long term

from managing investor accounts; (4) he does not deny that his compensation was derived from

Sala's commitment to trade over a five-year term; and (5) he does not deny that a significant

profit potential existed, both with respect to the 24 "tax trades" and over the five year term of

Sala's investment.

14

A new trial on the grounds of newly discovered evidence is aimed at correcting erroneous judgments based on evidence that could not have been obtained at trial. The burden is on the moving party to demonstrate that, if all of the other elements of the test are met, the missing evidence is of such a material and controlling nature that it would probably have changed the outcome of the trial. *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995).

In *Malandris v. Merrill Lynch*, 703 F.2d 1152 (10th Cir. 1981) (*en banc*), the decision at trial depended almost entirely on the credibility of two opposing witnesses, Barron and Malandris. After judgment was entered, the losing litigant obtained materials from government investigators[7] suggesting that Malandris "repeatedly and systematically perjured himself at trial." *Id.* at 1180. However, after a careful review, the trial judge determined that this additional material would not have changed his opinion regarding the issues decided in the case, and refused to order a new trial. *Id.* at 1181.

The examples provided in Krieger's post-trial declaration purporting to show inconsistencies are not, on close examination, and placed in context, materially inconsistent with his trial testimony or the findings of the Court. For example:

(1) In Krieger's post-trial declaration, he states "[t]he primary purpose of the tax trades was to generate tax losses for the participants and not to generate positive economic returns." Krieger Decl. ¶ 12 (a). Krieger's testimony, cited as "contrary," was actually that *his* purpose was to earn profits on the transactions he now calls "tax trades." (Krieger Dep. 505: 6-15). The carefully worded government drafted declaration doesn't disclose whose purpose Krieger is now referring to, and leaves the impression that neither Krieger nor Sala had a profit motive, which is

---

[7] According to the movant, the FBI, the SEC, and the Denver DAs office had refused to produce evidence until a large verdict, which included punitive damages, was entered in favor of Mr. Malandris. Apparently, after the large verdict was entered, the government agencies had a change of heart and decided "in the interests of justice," to release additional information. 703 F.2d at 1180.

not so, as demonstrated by other portions of the record. The term "primary purpose" is a legal standard argued by the government. The use of the term in Krieger's post-trial declaration illustrates who really is doing the talking and the spinning in that declaration: the government. Krieger does not dispute in his trial testimony that there were tax benefits associated with the transaction, but what is most significant is that the presence or absence of tax benefits did not affect his goal to "generate positive economic returns." The declaration also fails to disclose that the supposed false deposition testimony was clarified when he stated, "I know *part of* the significance is that they were intended to make profits." (Dep. Krieger 503: 15-17) (emphasis supplied). Or that he admitted in his deposition that, "Yeah; I understand that there was some relationship between premiums and the anticipated tax benefit," (Dep. Krieger 504: 3-6) and when he acknowledged that the transactions "bare some relationship to the tax consequences." (Dep. Krieger 504: 15-17).

(2) Krieger's post-trial declaration goes on to describe that the tax benefits were not "incidental" to how the "tax trades," the "test period," the remaining trades in 2000, or the "investment program" were structured. Krieger Decl. ¶ 12(a). However, that description is not inconsistent with the testimony the government contends is false; nor is it inconsistent with the evidence recognized by the Court in its opinion. The following testimony is cited as contrary to Krieger's statements in Paragraph 12(a):

> Q.    In your mind, at the time the program was implemented, to what extent, if any, was achieving a tax loss, a goal that you had with respect to the operation of the program?
>
> A.    It wasn't.
>
> Q.    What was the goal?
>
> A.    The goal was to simply generate good returns because we wanted to manage money.

(Dep. Krieger 429: 3-21)

The above trial testimony about Krieger's "goal" in operating the program says nothing about the whether the tax benefits were "incidental" to 1) the tax trades; 2) the initial test period; 3) the remaining trades in 2000; or 4) the remainder of the investment program.  In short, there is no inconsistency on the face of the testimony with the present post-trial declaration.

Krieger's personal goal of managing money and making a profit for himself and his clients over a five-year program is not inconsistent with the anticipated tax benefits which may have been derived from a portion of the trades in 2000.  When he was requested by Schwartz to enter into long and short options involving approximately $60 million dollars in premiums, as part of the 2000 trading, his "goal" was still, according to his undisputed testimony, to make money on the trades undertaken within those parameters.  The resulting tax loss had nothing to do with Krieger's "goal."  It was the result of the tax law's disregard of short options as liabilities.

(3)  Krieger's post-trial declaration also states that in his deposition, he purposefully avoided acknowledging the motivation for the 24 trades related to Sala's 2000 tax loss and that he would not have entered into those particular trades absent the requirements of the tax structure.  Krieger Decl. ¶ 11.  However, as noted previously, Krieger *did* acknowledge on deposition that he was required to spend a certain amount of premium, which related to the tax benefits.  Notably, the government-prepared declaration chooses to ignore Krieger's testimony that, operating within those parameters, he structured trades that were designed to make money and that he anticipated that he would make "$15 to $30,000 on the low side, up to about $80 to $100,000 on the high side for each of those five pairs."  (Krieger Dep. at 509)  He further testified that these trades, which are now labeled in his post-trial declaration as "tax trades"

"...were all part of the basic strategy, which was to, as much as possible, create a basket of diversified ideas, differing time horizons, different strategies to generate profits." (Krieger Dep. 503-510).  *None* of that testimony is disputed in his post-trial declaration.  In light of this testimony and based upon the testimony of both the Plaintiff's and government's experts, the Court found as a fact that these trades had significant profit potential, and thus possessed economic substance and had a legitimate business purpose.  Slip Op. at 21-22, 29.  The fact that tax benefits were sought (and whether Krieger believed those benefits were "incidental" or not) is irrelevant.

(4)  Although Krieger states that he was required to liquidate the 24 trades related to the tax loss, that market conditions did not play a factor, and that there was no sound business reason to liquidate the positions (Krieger Decl. ¶ 12(g)), the positions *did* in fact *yield a profit* when they were sold.[8]  The fact that tax considerations with respect to timing led one to make a profit on an investment does not mean that the transactions should be disregarded.  Moreover, the liquidation of the positions was consistent with the evidence that a business purpose was to determine which investors were "in" or "out" for the long term; and, for those who were "in," the liquidation of option positions avoided the complications of transferring option positions to a new entity as of January of 2001.  Krieger does not dispute any of this evidence in his post-trial declaration.

(5)  Krieger's post-trial declaration also states that absent the intervention of Beckenham Trading Company ("BTC") (and its alleged assumption of risks on the 24 trades), the trades

---

[8]  Curiously, the government-drafted declaration has Krieger saying – absent tax considerations - both: (1) I wouldn't have bought the 24 positions, and (2) I wouldn't have sold the 24 positions. (Krieger Decl. ¶12(b) and ¶ 12(g)).  Certainly, one is allowed to sell an asset prior to the end of the year in order to recognize a tax loss.  Any contrary rule cannot be reconciled with the clear permissible, bread and butter tax planning engaged in by millions of Americans: sell investments with built-in losses before year end in order to recognize the losses against gains.

would not have been economically feasible and would have made achieving profitability at the end of 2000 more difficult.[9]  Krieger Decl. ¶ 12(c).  Three responses are appropriate.  First, the statement is conclusory and without analysis.  It does not dispute or even attempt to explain the trial evidence that trades were actually conducted through Refco on arms-length terms.  Refco made its money on the pricing of the transactions, which the Court has recognized.  All transactions had real counterparties who assumed the risk of the market.  The Court made specific findings about the likely size of the mark-up fee ($9,000), and that the mark-up fee would not have adversely affected the profit potential of the trades. Slip. Op., at 21.  Second, if BTC did assume some portion of the risk, this assumption should have *increased* Sala's opportunity to make a profit on his investment with Deerhurst.  Third, achieving a profit was in Krieger's self-interest because the investors would then be bound to continue their investment for five years.

(6)  As to Krieger's statement that a ninety-day "test period" was not a realistic test of his trading program, but was instead a means used by Mr. Schwartz to disguise the purpose of the 24 trades from the Internal Revenue Service (Krieger Decl. ¶ 12(e)), the Court considered the testimony of Sala, White, and Schwartz to be reliable and found that the test period did serve an important non-tax purpose for Sala.  The Court found that it gave him familiarity with Krieger and currency option trading—a new and untried form of investment:

> The evidence presented at trial overwhelmingly shows that Sala was an extremely cautious investor who invested a great deal of time and energy carefully researching and choosing his investment. Sala's participation in the Deerhurst GP test period falls well within the realm of behavior one would expect from such an investor.  Had the Deerhurst Program lost money during the

---

[9]  Again, the government-drafted Krieger declaration is internally inconsistent.  Either the trades would not have been economically feasible (in which case they would not have happened), *or* it would have been harder for Deerhurst to achieve profitability in 2000; not both.  The post-trial declaration ignores entirely the indisputable finding of fact by this Court that the trades were *actually* profitable.

Deerhurst GP test period comparable to the money lost in the Deerhurst LLC period – a phenomenon not uncommon among hedge funds according to Sala's credible testimony – Sala would have invested the money elsewhere.   Accordingly, Sala's investment in Deerhurst GP was not a circuitous sojourn on the path to his investment in Deerhurst LLC, but was instead a checkpoint that protected him – albeit only to a small degree – from plunging headfirst into an uncertain five-year strategy.

Slip Op., at 16.

Krieger's willingness to sign a declaration stating that he now believes the test period was not long enough is irrelevant.   Krieger does not (and cannot) deny that he obtained a significant upside benefit if the test period proved profitable.   The government made similar arguments about the length and appropriateness of the test period at trial through its expert, Dr. DeRosa. The Court found that the test period served Krieger's purposes (committing the pool of investors for five years) as well as serving an important investment protection goal for Sala and other investors such as Martin White. Slip. Op., at 27-28.

(7)  Krieger's post-trial declaration claims that all aspects of the transaction (including the use of an S corporation and a general partnership) were designed by Schwartz in order to achieve tax losses.   Krieger Decl. ¶ 12(f).   The short answer to this is, so what?   Krieger did not testify at trial that he (Krieger) was responsible for those matters.   He did testify that there were business benefits to pooling trades in the partnership, and he does not dispute that testimony in his post-trial declaration.   The Court looked closely at the business purpose of each entity and the actual conduct of business by those entities and concluded that the entities should be recognized for tax purposes. Slip Op., at 20-30.   Krieger does not provide any reason to revise that conclusion.

Krieger does not change any of his testimony regarding: (1) his desire to rebuild an investment fund; (2)  his investment track record; (3) his efforts to profit on all of his trading

activity; and (4) Sala's motives to make a profit.  The Court's opinion does not cite nor does it rely upon Krieger's speculation as to whether tax motives or profit motives were more significant.

Krieger's post-trial declaration does not impact any of the following key findings of the Court:  (1) Sala subjectively viewed his participation in the Deerhurst Program to be a single transaction. Slip. Op. at 9; (2) for purposes of determining whether the loss-generating portion of Sala's participation in Deerhurst was part of a bona fide transaction—the Deerhurst Program must be viewed in its entirety. Slip. Op. at 9; (3) Sala had a good faith and reasonable belief in and expectation of the Deerhurst Program's profitability above and beyond the tax benefits.  Slip. Op. at 9; (4) the Deerhurst Program offered a reasonable opportunity for profits exclusive of the tax benefits and therefore possessed economic substance. Slip. Op. at 22; (5) the burden is on the government to show by a preponderance of the evidence that there was no business purpose to Sala's actions other than tax avoidance, and it failed to do so.  Slip. Op. at 23; (6) Krieger's trading style consisted mostly of lower risk, lower return investments coupled with occasional core positions betting in the direction of a particular currency's valuation. Slip. Op. at 28; and (7) the government failed to meet its burden to show that Sala did not enter into the Deerhurst Program with a primary profit objective. Slip. Op. at 23.

Essentially, the government requests a new trial based on nothing more than the fact that, having obtained immunity, Krieger is now willing to parrot aspects of the government's argument regarding the tax motivation for the transaction.  Having failed to persuade the Court at trial, the government endeavors to have a witness now within its control, repeat the self-same arguments that the Court properly rejected in its opinion.

### 5.   Krieger's Post-Trial Declaration is Not Reliable.

The Government argues that Krieger's trial testimony is false and he now recants that

testimony in his post-trial declaration.  Krieger's statements are offered to impeach his trial testimony.  However, as discussed in Section V.3.b of this memorandum, impeachment is an insufficient basis for granting a new trial.

Further, Courts are particularly reluctant to grant motions for a new trial when the "newly discovered evidence" consists of witness recantations because they are "looked upon with the utmost suspicion." *Ortiz v. New York City Housing Authority*, 22 F. Supp.2d 15, 37 (E.D. N.Y. 1998), *quoting United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987).  "Even where newly discovered evidence indicates perjury, motions for a new trial should be granted only with great caution and in the most extraordinary circumstances." *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006).

Krieger's material trial testimony isn't false.  The overwhelming bulk of his deposition testimony—particularly those portions on which the Court places reliance—remains unchallenged.  In this regard, Krieger's alleged recantation resembles the recantation in *United States v. Schlesinger*, 438 F. Supp.2d 76 (E.D. N.Y. 2006), where the moving party argued in broad and sweeping language that a witness lied to the grand jury and at trial.  However, a closer examination of a two-hour taped interview revealed that the witness only recanted two specific items of trial testimony.  *Id.* at 101-02.  The more important aspects of his testimony were not addressed in the newly discovered recantation.  *Id.*  The court, therefore, denied the motion.

**B.    The Government Has Acted In Bad Faith.**

The U.S. Attorney's Office has long had an interest in the *Sala* trial.  In late 2005, an Assistant U.S. Attorney from New York associated with the *Stein* prosecution filed a declaration in support of the first of the several government motions to stay this case, claiming that the *Sala* case was "encompassed within the *Stein* indictment."  Following the government's depositions of many witnesses around the country, production of thousands of pages of documents, and an

eight day trial, those allegations proved to be totally unfounded.  Indeed, the Court found the

government's allegations regarding KPMG to be a "red herring."

Krieger's post-trial declaration indicates that he was contacted by the U.S. Attorney's

Office some time in 2007 in connection with a Justice Department criminal investigation of Ernst

& Young.  The Ernst & Young tax shelter prosecution is not new: four members of the

accounting firm were indicted in May of 2007 in *United States v. Coplan et al*, S.D.N.Y. Case

No. 07-CR-453, and additional charges were brought against two outside promoters in a

superseding indictment filed in February of 2008.  Nothing in the record indicates Sala has any

connection to *Stein* or *Coplan*.

As the documentation filed in support of the government's motion indicates, starting

sometime in 2007, federal prosecutors "contacted" Krieger who then "learned" that the "USAO"

was "conducting an investigation" relating to a "pending criminal case."  He then met with the

USAO and "provided certain information under a proffer agreement" and then negotiated for

immunity which was ultimately granted by the government shortly before the motion for retrial

was filed.

In September, 2007, Krieger's lawyer informed Plaintiff's counsel, in response to a

request for Krieger's attendance at the January, 2008 trial date that Krieger had moved to Dubai

and would not testify for the Plaintiff at the trial.  (Tang Decl. ¶ 7).

By letter dated February 27, 2008, just a few days before trial, Krieger's attorney,

Fischer, stated that Krieger was questioned "extensively" and informed the parties that

statements Krieger had given to the U.S. Attorney's Office may be inconsistent with unspecified

portions of Krieger's deposition testimony in this case.

The government initiated a conference call with the Court on February 28, 2008.  The

Court informed the parties that it would address any issues arising out of Fischer's February 27, 2008 letter at the pretrial conference on March 5, 2008.

On March 5, 2008, at the pretrial conference, the government moved to vacate the trial date on the grounds that the United States would be prejudiced if it could not obtain new testimony from Krieger prior to trial, in light of the representations contained in Fischer's February 27, 2008 letter.  After oral argument, the Court denied the government's motion.

On March 11, 2008, prior to the Court receiving Krieger's video testimony, the government then moved to admit Fischer's February 27, 2008 letter as evidence.  After receiving oral argument and reviewing the Fischer letter and additional correspondence from Fischer to the Court, it denied admission of the Fischer letter into evidence for various reasons, noting the lack of specificity as to what the "inconsistencies" were between Krieger's deposition testimony and his subsequent statements to the U.S. Attorney's Office:

> THE COURT: Well, there's no reference in any of this communication to any specific answer given in a deposition.
>
> MR. SERGI: But, your Honor, we hold that it is relevant that Mr. Krieger feels that today and --
>
> THE COURT: How do I know that? I don't know that from any of this communication. If Mr. Fischer had said -- or if Mr. Krieger was here to say, I recant answer so-and-so in response to question so-and-so, lines such and such through such and such, page, X, Y and Z, that might be one thing, but he's not here to do that. And to inject something outside of this case to that effect would be wholly improper under the federal rules of evidence.

(Trial Tr., 354:16-355:2, March 11, 2008).

It appears that the substance of this colloquy was communicated immediately to the lawyers at the U.S. Attorney's Office in New York, and Krieger's attorney Fischer.  One day later, on March 12, 2008, Fischer prepared a new letter, identifying a total of five pages from Krieger's three day deposition transcript, containing a few lines each, which he stated were

24

inconsistent with statements Krieger previously made to federal prosecutors. Significantly, Fischer stated that the U.S. Attorney's Office "has reviewed this list and agree that the statements in this list are inconsistent but have their own additions which are highlighted below." He goes on to state: "In addition to the foregoing, members of the United States Attorney's Office want us to include the below listing. When they reviewed the transcript, they reviewed it to determine whether Andrew Krieger's testimony today would be different from how he testified in the Sala deposition." The specific portions of Krieger's deposition testimony identified as "inconsistent" in Fischer's March 12, 2008 letter and the portions of the deposition which "members of the United States Attorney's Office" wanted him to state are inconsistent are virtually identical with the portions identified as inconsistent in Krieger's post-trial declaration, which forms the basis for the government's motion for a new trial. *Compare* Fischer's March 12, 2008 letter *with* Krieger Decl. ¶ 12(a)-(h).

This letter was received by the government on or about March 12, 2008, with copies going to David Geier and Deborah Landis at the Department of Justice. However, for some reason it was never received by counsel for Sala, despite the fact that Sala attorney Darrell Hallett was listed as an addressee on the letter. (Tang Decl. ¶ 6,8). The Court concluded its viewing of Krieger's deposition testimony on March 13, 2008.

While Fischer's March 12, 2008 letter was apparently prepared for possible submission to the Court (as it addressed the Court's concerns regarding which specific lines of deposition testimony were inconsistent with his statements to the U.S. Attorney's Office), as discussed previously, the government never disclosed the existence of the letter to the Court, never offered it as evidence at the conclusion of Krieger's video testimony, and never attempted to call rebuttal witnesses. Instead, the government decided to wait, hoping to prevail on the legal and factual

issues of its case. After all, the government had not lost a similar case before. But if it lost, the government could always agree to immunity, obtain a cooperation agreement from Krieger, and attempt to sabotage the Court's findings by submitting the post-trial declaration requesting a new trial.

After the trial concluded, with no further mention of Krieger's purportedly inconsistent testimony, the Court undertook the daunting task of rendering findings of fact and conclusions of law on several complex legal issues. The Court's analytical and comprehensive fifty-eight page opinion was issued on April 22, 2008, along with an accompanying order that the parties were to submit a joint stipulation regarding the amounts in controversy by May 22, 2008.

On May 21, 2008, shortly before the judgment was to become final, the government entered into a non-prosecution agreement with Krieger. In what can only be a *quid pro quo*, on the next day, Krieger signed the post-trial declaration. [10] Obviously, someone at the Department of Justice carefully drafted the post-trial declaration which emphasizes the government's arguments at the *Sala* trial and uses descriptive "un-Krieger like" terminology such as "USAO," (as a defined term for the U.S. Attorney's Office in Manhattan) "false, misleading and incomplete," "predetermined steps," "tax shelter transaction" and "tax trades." This Court had ample opportunity to observe Krieger's manner of speaking. The verbiage is certainly not his.

The government has thus used its criminal investigatory power and processes in order to change a witness's testimony in a civil case. It contacted Krieger in connection with a grand jury investigation, implicitly or explicitly threatened criminal prosecution, interviewed him

---

[10] The Krieger declaration indicates that the non-prosecution agreement extends to both the E&Y matter and false testimony given in the *Sala* case. (Krieger Decl. ¶ 8). We note that Krieger could potentially be prosecuted for perjury in the Sala case in either New Jersey (where the deposition was conducted) or Colorado (where the deposition was entered at trial). *United States v. Reed*, 773 F.2d 477, 482-83 (2d Cir. 1985); US DOJ Criminal Reference Manual, § 1754. The agreement of the U.S. Attorneys Office in New York not to prosecute such crimes is an empty promise, as such office would have no prosecutorial authority in the only districts where venue lay.

extensively under a proffer agreement, and ultimately granted immunity by entering into a non-prosecution agreement with the apparent condition that he agree to change his testimony, and assist in the government's *Sala* defense. The government purposefully withheld from the Court the information it elicited from Krieger until after the trial, in a last-ditch effort to derail the Court's expeditious resolution of this case. The government has continually attempted to delay the outcome of this case and Sala's day in court by repeated costly, unnecessary and time consuming motions. This abuse of process and prosecutorial power is patently improper, violates public policy and should be rejected. *United States v. Stein*, 435 F. Supp.2d 330 (S.D. N.Y. 2006); *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983 (1958); *In re Grand Jury Investigations*, 414 F. Supp. 74, 76 (S.D. N.Y. 1976). For example, courts have the power to impose sanctions under 28 U.S.C. 1927 against counsel who "unreasonably and vexatiously" multiply proceedings.

In this case, the government's potent criminal powers and the process by which it investigates and prosecutes crimes were used as a subterfuge to obtain testimony for use in a civil case. In *Stein*, the Court found that KPMG's decision to decline to pay attorneys fees for employees under investigation was a result of improper pressure from the U.S. Attorney's Office—the government "held the proverbial gun to [KPMG's] head." *Stein*, 435 F. Supp.2d at 336. Similarly, Krieger signed a declaration when confronted with the same "proverbial gun." This improper conduct by the government taints the perception of this Court's final judgment in the eyes of the public and the future appellate court, and unnecessarily prolongs and adds significant costs to these proceedings. This conduct should not be condoned.

## VI.    Conclusion

Based on the foregoing, the relief requested by the Plaintiff in response to the government's motion for a new trial should be granted.

DATED this 1st day of July, 2008.

CHICOINE & HALLETT, P.S.

s/Robert J. Chicoine_____
Robert J. Chicoine
Darrell D. Hallett
John M. Colvin
Cori Flanders-Palmer
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs Carlos E. Sala
          and Tina Zanolini-Sala
719 Second Ave. Suite 425
Seattle WA, 98104
Telephone: (206) 223-0800
Facsimile: (206) 467-8170

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2008, I electronically filed PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION FOR A NEW TRIAL and DECLARATION OF CONNIE TANG IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION FOR A NEW TRIAL using the CM/ECF system, which will send notification to the following:

> David N. Geier
>
> Joseph A. Sergi
>
> Amy Matchison

I declare under the penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 1st day of July, 2008.

CHICOINE & HALLETT, P.S.

s/ Robert J. Chicoine
Robert J. Chicoine
Darrell D. Hallett
John M. Colvin
Cori Flanders-Palmer
Chicoine & Hallett, P.S.
Attorneys for the Plaintiffs Carlos E. Sala
and Tina Zanolini-Sala
719 Second Avenue, Suite 425
Seattle WA, 98104
Telephone: (206) 223-0800
Facsimile: (206) 467-8170