FILED
United States Court of Appeals
Tenth Circuit

November 19, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

CARLOS E. SALA; TINA ZANOLINI-SALA,

    Plaintiffs - Appellees,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellant.

No. 08-1333
(D.C. No. 1:05-CV-00636-LTB-KLM)

---

**ORDER**

---

Before **MURPHY** and **HOLMES**, Circuit Judges, and **ARMIJO**,[*] District Judge.

---

    This matter is before the court on the appellees' *Petition For Rehearing and Suggestion For Rehearing En Banc*. We also have a response from the government. The implicit request for panel rehearing is granted in part. The court's opinion is amended to add footnote 5 at page 13. That amended opinion shall issue nunc pro tunc to the original filing date of July 23, 2010. A copy of the amended decision is attached to this order. The request for panel rehearing is otherwise denied.

---

[*] Honorable M. Christina Armijo, U.S. District Judge, District of New Mexico, sitting by designation.

The petition with en banc suggestion was also transmitted to all of the judges of the court who are in regular active service.  As no member of the panel and no judge in regular active service on the court requested that the court be polled, the en banc suggestion is denied.

      Entered for the Court,

      ELISABETH A. SHUMAKER
      Clerk of Court

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

CARLOS E. SALA; TINA
ZANOLINI-SALA,

      Plaintiffs - Appellees,

v.

UNITED STATES OF AMERICA,

      Defendant - Appellant.

No. 08-1333

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### (D.C. NO. 1:05-cv-00636-LTB-KLM)

---

Richard Farber, Attorney, Tax Division, Department of Justice, Washington, D.C. (Brett L. Tolman, former United States Attorney, Salt Lake City, Utah, of counsel; John A. DiCicco, Acting Assistant Attorney General, Washington, D.C.; Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, Washington D.C., and Arthur T. Catterall, Attorney, Tax Division, Department of Justice, Washington, D.C., with him on the briefs), for Appellant.

Darrell D. Hallett (John M. Colvin, Robert J. Chicoine, Cori E. Flanders-Palmer, and Cory L. Johnson, with him on the brief), Chicoine & Hallett, P.S., Seattle, Washington, for Appellees.

---

Before **MURPHY**, **HOLMES**, Circuit Judges, and **ARMIJO**,[*] District Judge.

---

[*]Honorable M. Christina Armijo, U.S. District Judge, District of New Mexico, sitting by designation.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Appellee, Carlos Sala, participated in an investment program that included an initial phase designed primarily to generate a tax loss so as to offset over $60 million in income he earned during the 2000 tax year. Sala's wholly owned S Corporation, Solid Currencies, Inc. ("Solid"), acquired a combination of long and short foreign currency options and contributed them to a partnership. Under a pre-determined plan, the partnership existed for only a few weeks and was liquidated before year's end. Relying on the rule from *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975), Sala calculated Solid's basis in its partnership interest to be $69 million by disregarding the short options and considering only the value of the long options plus Solid's $8 million cash contribution. Using these figures, Solid's basis in the property it received from the partnership upon liquidation was calculated as approximately $61 million. Solid sold this property for less than $1 million and Sala claimed a tax loss of over $60 million for the 2000 tax year. As a result, Sala initially reported owing no federal income taxes.[1] In reality, however, Sala's participation in the investment program did not result in an economic loss, but rather entitled him to a share in the partnership's profits.

---

[1] Because Carlos Sala and his wife, Tina Zanolini-Sala, jointly filed their tax return and refund claims, Zanolini-Sala is also a party to this lawsuit. For ease of reference, this opinion refers only to Carlos Sala.

Sala later amended his 2000 tax return and did not include the loss. Instead, he paid approximately $26 million in taxes, interest, and penalties. In September 2004, Sala filed a form 1040X reclaiming the loss for the 2000 tax year and seeking a refund of nearly $24 million. The Internal Revenue Service disallowed the refund, and Sala filed the instant action. After an eight-day trial, the district court ruled in favor of Sala on all issues and entered judgment. The Government now appeals.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **REVERSE** the district court's decision.

## II.  BACKGROUND

In 2000, Sala realized over $60 million of income primarily from the exercise of stock options. Before year's end, Sala invested approximately $9 million in a foreign currency investment program known as the "Deerhurst Program." The Deerhurst Program was managed by Deerhurst Management Company, Inc. ("Deerhurst Management"), which was principally owned and managed by Andrew Krieger, a foreign currency trader. Sala admits he participated in the Deerhurst Program, in part, to generate a tax loss he believed would result in approximately $24 million in tax savings.

The Deerhurst Program required investors to deposit $500,000 in separate accounts as part of a brief "test period" during which investors could withdraw their funds at any time without incurring a penalty. Once the test period ended,

-3-

investors wishing to continue participating had to deposit additional funds totaling at least fifteen percent of the tax loss they expected to achieve through their participation in the Deerhurst Program.  Krieger would use these funds to acquire a combination of long and short foreign currency options for each investor.  Investors were to contribute these options to a partnership known as Deerhurst Investors, GP ("Deerhurst GP").  This transfer was necessary to obtain the desired tax benefits because, assuming the *Helmer* rule controlled, only the value of long options would be used to calculate a partner's basis in his partnership interest.[2]  As a result, a partner could inflate the basis of his partnership interest such that, upon liquidation of the partnership, a tax loss could be generated while minimizing the potential for any actual economic loss to the

---

[2]In *Helmer v. Comm'r*, the Tax Court ruled that a contingent obligation should not be treated as a liability when calculating a partner's basis in his partnership interest.  34 T.C.M. (CCH) 727 (1975).  This is because no liability arises until the obligation becomes fixed, which might never occur.  *Id.*  The short options purchased by Sala and contributed to Deerhurst GP are contingent obligations.

Though Sala argues the *Helmer* rule should control the tax treatment of the Deerhurst GP transaction, it should be noted that prior to Sala's participation in the Deerhurst Program, the IRS challenged the sort of offsetting-options structure employed by Deerhurst GP.  On August 13, 2000, the IRS released Notice 2000-44 explaining its position that transactions involving the transfer of property and offsetting contingent liabilities to a partnership, followed by the taxpayer's exit from the partnership to achieve a non-economic loss, do not give rise to an allowable tax deduction.  I.R.S. Notice 2000-44, 2000-2 C.B. 255.  The Notice states that "purported losses resulting from . . . [such] transactions . . . do not represent bona fide losses reflecting actual economic consequences as required for purposes of [26 U.S.C. § 165]."  *Id.*  It also informed taxpayers that the IRS would challenge such transactions and seek penalties.  *Id.*

-4-

partner. Indeed, as part of a series of pre-determined steps in the investment plan, Deerhurst GP would be liquidated prior to year's end so any tax loss could be claimed in the 2000 tax year. If Deerhurst GP was profitable in 2000, participants were required to reinvest all proceeds with Deerhurst Trading, LLC ("Deerhurst LLC") for a minimum of five years, or face a significant penalty.

On October 23, 2000, Sala deposited an initial sum of $500,000 into a personal account with Refco Capital Markets, which was managed by Krieger through Deerhurst Management. Opting to participate beyond the "test period," Sala contributed another $8,425,000 to his Refco account on November 21, 2000. Krieger used the funds in this account to acquire a combination of twenty-four long and short foreign currency options on Sala's behalf, resulting in a net cost to Sala of $728,297.85. The options had a total sales price of $60,259,568.94 for the short options, if exercised, and a total purchase price of $60,987,866.79 for the long options, if exercised. In other words, the long and short options essentially offset one another.

On November 28, 2000, Sala transferred all of these options to Solid along with approximately $8 million in cash. In turn, Solid transferred the options and cash to Deerhurst GP in exchange for a partnership interest. Applying the rule in *Helmer*, Solid calculated its adjusted basis in Deerhurst GP by disregarding the short options. Thus, only the value of the long options, approximately $61

million, plus $8 million in cash Solid contributed to the partnership were used to calculate Solid's basis in its partnership interest. *See* 26 U.S.C. §§ 705, 722.

During the one-month existence of Deerhurst GP, the long and short options were sold, resulting in a profit of between $90,000 and $110,000. Deerhurst GP was liquidated prior to December 31, 2000. Solid's share of the partnership assets upon liquidation consisted of $8 million in cash and two foreign currency contracts. Solid's basis in these foreign currency contracts upon distribution was "equal to the adjusted basis of [Solid's] interest in the partnership reduced by any money distributed in the same transaction." 26 U.S.C. § 732(b). Because Solid calculated its adjusted basis in its partnership interest as approximately $69 million and received $8 million in cash upon liquidation, Solid's basis in the foreign currency contracts was calculated as approximately $61 million. Solid then sold the foreign currency contracts for less than $1 million, resulting in a total calculated tax loss of $60,250,065.94. In reality, however, this loss was wholly artificial as Solid suffered no actual economic harm but instead profited from participating in Deerhurst GP. Because Deerhurst GP was profitable during its short existence, Sala complied with the terms of the agreement and transferred his Deerhurst GP proceeds to Deerhurst LLC. Krieger managed these funds until 2004.

When Sala filed his personal federal income tax return for the 2000 tax year, he reported total losses of $60,449,984 attributed to a non-passive loss from

Solid. This loss nearly offset Sala's entire income for 2000; he reported his adjusted gross income as $26,381. Consequently, Sala reported owing no federal income taxes.

In November 2003, Sala amended his 2000 return by filing a form 1040X in which he did not include the $60,449,984 loss. He then paid approximately $26 million in taxes, interest, and penalties. In September 2004, however, Sala filed a second form 1040X reclaiming the loss for the 2000 tax year and asserting his right to a refund of $23,727,630. When the Internal Revenue Service disallowed the refund, Sala filed the instant action. After an eight-day trial, the district court ruled in favor of Sala. The Government now appeals.

## III.   DISCUSSION

The Government's primary argument is that the transaction giving rise to Sala's claimed tax loss had no economic substance. When considering a district court's economic substance determination, this court reviews findings of fact for clear error and any legal determinations de novo. *See Keeler v. Comm'r*, 243 F.3d 1212, 1217 (10th Cir. 2001). The ultimate determination of whether a transaction lacks economic substance is a question of law. *James v. Comm'r*, 899 F.2d 905, 909 (10th Cir. 1990) ("[W]e review de novo the ultimate characterization of the transactions as shams."); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) ("The general characterization of a transaction for tax purposes is a question of law . . . ."). *But see Nicole Rose*

-7-

*Corp. v. Comm'r*, 320 F.3d 282, 284 (2d Cir. 2003) (treating the ultimate determination of whether a transaction lacks economic substance as a question of fact).

Before analyzing the question of economic substance, however, this court must first determine which transactions control the inquiry. The district court concluded the entire Deerhurst Program, from 2000 onward, should be reviewed as a single transaction. The Deerhurst GP phase, however, "cannot be legitimized merely because [it was] on the periphery of some legitimate transactions." *James*, 899 F.2d at 910. Rather, a loss-generating transaction must stand or fall on its own merit. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356 (Fed. Cir. 2006) ("[T]he transaction to be analyzed is the one that gave rise to the alleged tax benefit."); *see also Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006) (indicating courts must focus "on the specific transaction whose tax consequences are in dispute").

Those portions of the Deerhurst Program occurring in 2001 and beyond have no connection whatsoever to Sala's year-2000 tax loss. The tax loss stems entirely from Sala's participation in Deerhurst GP which, coupled with his brief investment during the "test period," constituted his only involvement with the Deerhurst Program before 2001. Sala's participation in the program during 2000 culminated with the pre-determined liquidation of Deerhurst GP prior to December 31, 2000. Thereafter, Sala continued investing in the Deerhurst LLC

-8-

stage of the program, but the Deerhurst GP portion had completely ended, signifying a clear break between each phase. As the district court found, the Deerhurst LLC portion of the program had no tax benefits. Because the only transaction that relates to the $60 million tax loss Sala seeks to claim is his participation in Deerhurst GP, our circuit precedent dictates that we not consider any of the post-2000 Deerhurst transactions.

Though the district court erred in broadening its focus beyond Sala's participation in Deerhurst GP, it also concluded that each phase of the investment strategy had economic substance. Accordingly, this court will review the district court's decision to the extent the court concluded the Deerhurst GP phase itself had economic substance. In doing so, "we consider both the taxpayers' subjective business motivation and the objective economic substance of the transactions." *Jackson v. Comm'r*, 966 F.2d 598, 601 (10th Cir. 1992) (quotation and alteration omitted).

A taxpayer is not permitted to deduct losses resulting from a transaction that lacks economic substance. *Keeler*, 243 F.3d at 1217. "[T]ransactions lacking an appreciable effect, other than tax reduction, on a taxpayer's beneficial interest will not be recognized for tax purposes." *James*, 899 F.2d at 908. That a transaction has some profit potential does not necessarily compel the conclusion the transaction has economic substance. *Keeler*, 243 F.3d at 1219. Rather, "tax advantages must be linked to actual losses." *Id.* at 1218; *Coltec Indus., Inc.*, 454

F.3d at 1352 (explaining the economic substance doctrine requires "disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality"); *Rogers v. United States*, 281 F.3d 1108, 1116 (10th Cir. 2002) (explaining the economic substance doctrine applies where "the transaction lacks economic reality"). We have also recognized "correlation of losses to tax needs coupled with a general indifference to, or absence of, economic profits may reflect a lack of economic substance." *Keeler*, 243 F.3d at 1218.

In light of these well-established standards, this court concludes Sala's participation in Deerhurst GP lacked economic substance. Most compelling is that the claimed loss generated by the program was structured from the outset to be a complete fiction. It is clear the transaction was designed primarily to create a reportable tax loss that would almost entirely offset Sala's 2000 income with little actual economic risk. By acquiring a series of long and short options that largely offset one another, contributing them to Deerhurst GP in exchange for a partnership interest, and then almost immediately liquidating the partnership, Krieger was able to ensure that a tax loss nearly equivalent to Sala's income would be achieved in just a few weeks. This is because, if the rule in *Helmer* controlled, the short options would not be treated as liabilities when calculating Solid's partnership basis. 34 T.C.M. (CCH) 727 (1975). Through this mechanism, the generated loss was designed to be entirely artificial. Indeed,

-10-

rather than suffering any actual financial loss through Deerhurst GP, Sala actually profited from the transaction. Sala does not contest that the loss is fictional, but rather protests that the rule from *Helmer* should control. This argument does not, however, address the claimed loss's absence of economic reality. The absence of economic reality is the hallmark of a transaction lacking economic substance. *See Keeler*, 243 F.3d at 1218-19; *Coltec Indus., Inc.*, 454 F.3d at 1352; *Rogers*, 281 F.3d at 1116.

The pre-determined nature of the Deerhurst GP stage further highlights the transaction was structured mainly to create a tax loss. The district court noted Sala's participation in Deerhurst GP involved a $728,000 investment, which it found had the potential to produce a 45% profit, net of fees, over the course of the year. Before Sala invested, however, he was aware Deerhurst GP would exist for only a short time and would have to be liquidated before the end of the 2000 tax year in order to generate a tax loss large enough to offset his income. Consequently, liquidation was set to occur irrespective of any profits or losses, and would have happened even if market conditions indicated it would be more profitable not to dispose of the long and short options at that point. Though a taxpayer is permitted to structure a transaction in a way that minimizes his tax liability, the transaction must nevertheless have economic substance. *Keeler*, 243 F.3d at 1218. The pre-determined nature of the liquidation indicates a lack of economic substance.

Additionally, while the district court found the long and short options had a potential to earn profits of $550,000 over the course of one year,[3] the expected tax benefit was nearly $24 million. That expected tax benefit dwarfs any potential gain from his participation in Deerhurst GP such that "the economic realties of [the] transaction are insignificant in relation to the tax benefits of the transaction." *Rogers*, 281 F.3d at 1116. The existence of some potential profit is "insufficient to impute substance into an otherwise sham transaction" where a "common-sense examination of the evidence as a whole" indicates the transaction lacked economic substance. *Keeler*, 243 F.3d at 1219 (quotation omitted).

The district court also found Sala provided plausible business explanations for various components of the Deerhurst GP stage, including his use of an S Corporation, the creation and almost immediate liquidation of the Deerhurst GP partnership, and the selection of the particular foreign currency options he acquired. Any anticipated economic benefit from participating in Deerhurst GP for a few weeks, and then quickly liquidating the partnership before year's end, however, is negligible in comparison to the $24 million tax benefit which would not have been achieved but for this pre-determined course of action. Likewise, the district court's finding that Sala entered into the Deerhurst Program primarily for profit does not alter our conclusion. "[W]e have never held that the mere

---

[3]The district court found the transaction had a $550,000 profit potential over one year. As noted, however, it was pre-determined that Deerhurst GP would only exist for approximately one month.

-12-

presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance." *Jackson*, 966 F.2d at 601 (quotation omitted). More importantly, the district court's findings on this issue were based on its consideration of the five-year Deerhurst Program as a whole. As noted above, only the Deerhurst GP phase is relevant to the economic substance analysis.[4]

Presented with a transaction specifically designed to produce a massive tax loss devoid of economic reality, we hold Sala's participation in Deerhurst GP lacks objective economic substance. As a result, the district court's decision must be reversed. As this conclusion resolves the Government's appeal, we need not reach any of the other issues it presented.[5]

---

[4]It should also be noted the district court's finding that Sala entered into the Deerhurst Program primarily for profit was not part of its economic substance analysis. Rather, this finding was made in the district court's analysis of whether the claimed tax loss was deductible under 26 U.S.C. § 165(c)(2), which limits deductibility of an individual's losses to those "incurred in any transaction entered into for profit."

[5]On May 1, 2007, the district court ruled Sala was entitled to a refund of more than $1.5 million in interest payments he made relating to his 2000 taxes and the Government represents to this court that it does not appeal this ruling. Neither does the Government seek to overturn the district court's ruling that it may not offset this refund with an accuracy related penalty. Accordingly, our decision has no affect on either of these aspects of the district court's judgment.

## IV.  CONCLUSION

For the foregoing reasons, this court **REVERSES** and **REMANDS** to the district court with instructions to vacate its judgment and enter judgment in favor of the United States.

-14-